**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

UNITED STATES OF AMERICA,

    *Plaintiff*,

  v.

GREG ABBOTT, in his capacity as
GOVERNOR OF THE STATE OF TEXAS,
and THE STATE OF TEXAS,

    *Defendants*.

Case No. 1:23-cv-00853-DII

**PLAINTIFF UNITED STATES'
OPPOSED MOTION FOR PRELIMINARY INJUNCTION**

JAIME ESPARZA
UNITED STATES ATTORNEY

JAMES E. DINGIVAN
 Assistant United States Attorney
 Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
 Senior Trial Counsel
 DC Bar No. 459525
ANDREW D. KNUDSEN
 Trial Attorney
 DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 353-7466 (Knudsen)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov

Dated:  July 26, 2023

*Counsel for the United States of America*

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ...................................................................................................... iii

Introduction ..................................................................................................................... 1

Background ....................................................................................................................... 2

   I.  The Rivers and Harbors Act of 1899 ................................................................... 2

   II.  Texas's Floating Barrier in the Rio Grande ....................................................... 3

Standard for Decision ..................................................................................................... 7

Argument ........................................................................................................................... 8

   I.  The United States Will Likely Succeed on the Merits of Its Claim That Texas Has Violated Section 10 of the Rivers and Harbors Act ...................................................... 8

      A.  Texas Built an Unpermitted Structure in Navigable Waters of the United States ........ 9

      B.  Texas Created an Unauthorized Obstruction to the River's Navigable Capacity ....... 10

   II.  The United States' Likelihood of Success on the Merits Alone Warrants Preliminary Injunctive Relief ........................................................................ 12

   III.  To the Extent Relevant, the Traditional Equitable Considerations Supporting Preliminary Injunctive Relief Are Satisfied ................................................... 13

      A.  A Preliminary Injunction Is Necessary to Prevent Irreparable Harm to Foreign Relations, Public Safety, and Navigation. ................................................. 14

      B.  The Equities and Public Interest Strongly Favor Preliminary Injunctive Relief. ....... 16

Conclusion ...................................................................................................................... 19

Appendix:

Attachment 1:  Declaration of Abraham Garcia
Attachment 2:  Declaration of Mario Gomez
Attachment 3:  Declaration of Jason D. Owens
Attachment 4:  Declaration of Captain Brandy Parker
Attachment 5:  Declaration of Jennifer T. Pena
Attachment 6:  Declaration of Captain Justin Peters
Attachment 7:  Declaration of Hillary Quam
Attachment 8:  Declaration of Joseph L. Shelnutt
Attachment 9:  Letter from Assistant Attorney General Todd Kim and U.S. Attorney Jaime Esparza to Governor Greg Abbott (July 20, 2023)
Attachment 10:  Letter from Governor Greg Abbott to President Joseph R. Biden, Jr. (July 24, 2023)

# TABLE OF AUTHORITIES

**UNITED STATES CONSTITUTION**

Art. I, § 8 cl. 4 ............................................................................................................18

**CASES**

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ...............................................................................................18

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................................1, 18

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    597 F.3d 115 (2d Cir. 2010) ..................................................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009) ...............................................................................................16

*Sanitary Dist. of Chicago v. United States*,
    266 U.S. 405 (1924) ............................................................................................1, 13

*TVA v. Hill*,
    437 U.S. 153 (1978) ...............................................................................................13

*United States v. Angell*,
    292 F.3d 333 (2d Cir. 2002) ..................................................................................10

*United States v. Boyden*,
    696 F.2d 685 (9th Cir. 1983) .................................................................................11

*United States v. FDIC*,
    881 F.2d 207 (5th Cir. 1989) ..............................................................................7, 12

*United States v. Hayes Int'l Corp.*,
    415 F.2d 1038 (5th Cir. 1969) .................................................................................7

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) .........................................................................7, 12, 16

*United States v. Milner*,
    583 F.3d 1174 (9th Cir. 2009) ...............................................................................12

*United States v. Oak Beach Inn*,
    744 F. Supp. 439 (S.D.N.Y. 1990)...................................................................11, 13

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001)................................................................................13, 18

*United States v. Raven*,
  500 F.2d 728 (5th Cir. 1974) ...............................................................12

*United States v. Republic Steel Corp.*,
  362 U.S. 482 (1960)..............................................................................11

*United States v. Rio Grande Dam & Irrigation Co.*,
  174 U.S. 690 (1899)..............................................................................11

*United States v. Stoeco Homes, Inc.*,
  498 F.2d 597 (3d Cir. 1974)..................................................................13

*United States v. W. Indies Transp., Inc.*,
  127 F.3d 299 (3d Cir. 1997)..................................................................10

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)..............................................................................13

*Winter v. NRDC*,
  555 U.S. 7 (2008)....................................................................................7

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191, 201 (1967)....................................................................2, 19

## STATUTES

33 U.S.C. § 403........................................................................2, 9, 10, 11

33 U.S.C. § 406.................................................................................2, 3

33 U.S.C. § 413....................................................................................2

## CODE OF FEDERAL REGULATIONS

33 C.F.R. § 322.3(a)..............................................................................2

33 C.F.R. § 322.4..................................................................................2

## DICTIONARY

William Dwight et al., eds., *Century Dictionary and Cyclopedia: A Work of Universal Reference
in All Departments of Knowledge with a New Atlas of the World* (1899) ................................9, 10

**INTRODUCTION**

This case involves a straightforward violation of the Rivers and Harbors Act ("RHA"). Defendants, Governor Greg Abbott and the State of Texas (collectively, "Texas"), have built a large floating barrier in the middle of an international boundary river, the Rio Grande, without federal authorization.  The basic facts are clear, and no further inquiry is needed for this Court to grant the United States immediate injunctive relief in this enforcement action.  But even if the United States had to show some irreparable injury beyond an RHA violation, the evidence submitted with this motion carries that burden.  Irreparable harm to the United States—including to its critically important relations with Mexico—has already occurred and will only heighten if Texas builds more floating barriers in the Rio Grande (as Governor Abbott has suggested Texas may do) or if the current one is allowed to stand for any substantial period of time.

The Court need not inquire into the balance of the equities or the public interest, but those factors also favor an injunction.  "This is not a controversy between equals.  The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction." *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1924) (Holmes, J.). In an RHA enforcement action, "[t]here is no question" that "the authority of the United States to remove obstructions to interstate and foreign commerce … is superior to that of the States" to implement policies they allege will "provide for the welfare or necessities of their inhabitants." *Id.*  Governor Abbott's suggestion (Att. 10) that Texas can violate the RHA in service of its own policy priorities inverts the Supremacy Clause and controverts Supreme Court precedent recognizing the federal government's plenary power over immigration and foreign affairs.  *See Arizona v. United States*, 567 U.S. 387 (2012).

The United States therefore moves the Court to enter a prohibitory injunction against construction of new floating barriers (or additions to the current one), as well as an affirmative injunction compelling Texas to remove the existing barrier within 10 days of the Court's order. *See* Proposed Order.

## BACKGROUND

### I.    The Rivers and Harbors Act of 1899

The RHA was enacted "to prevent obstructions in the Nation's waterways," and the Supreme Court has "consistently found its coverage to be broad." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967).  Section 10 of the RHA prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403.  Section 10 independently prohibits "build[ing] or commenc[ing] the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States … except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." *Id.*  A Section 10 permit issued by the United States Army Corps of Engineers ("Corps") is required to build structures or perform work in or affecting such waters. 33 C.F.R. § 322.3(a); *see also id.* § 322.4 (listing narrow exceptions not relevant here).

Section 12 of the RHA provides that "the removal of any structures or parts of structures erected in violation of [Section 10, and other enumerated RHA provisions] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States."  33 U.S.C. § 406; *see also id.* § 413.

## II.     Texas's Floating Barrier in the Rio Grande

The Rio Grande in the vicinity of Eagle Pass, Texas, is a navigable water of the United States within the meaning of RHA Section 10.  *See* Parker Decl. ¶ 6 & Ex. A.  Numerous federal agencies operate on the river and rely on the ability to freely navigate it.[1]  Border Patrol agents at times use small watercraft and shoreline-based devices or tactics, including specialized swift water techniques, to rescue individuals in distress from the Rio Grande.  Owens Decl. ¶ 4.  The Coast Guard may also be called upon to carry out search and rescue, marine environmental response, and law enforcement operations on the Rio Grande.  Peters Decl. ¶ 3.  And the United States Section of the International Boundary and Water Commission ("IBWC") conducts surveying and engineering work in the river, such as taking cross-sections of the riverbed and banks.  Gomez Decl. ¶ 15.

In early June, Governor Abbott announced Texas's intent, as part of a broader initiative called Operation Lone Star, to deploy "marine floating barriers" in the Rio Grande intended to "mak[e] it more difficult to cross the Rio Grande and reach the Texas side of the southern border."  Press Release, "Governor Abbott Signs Sweeping Package Of Border Security Legislation" (June 8, 2023), https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.  The announcement indicated that the "first 1,000 feet" of floating barrier would be deployed near Eagle Pass, Texas.[2]  *Id.*

---

[1] Related litigation in this Court indicates that private parties also use this stretch of the Rio Grande for recreational boating.  *See* Notice of Removal, Ex. A ¶¶ 47-52, Ex. B ¶¶ 69-74, *Epi's Canoe & Kayak Team, LLC v. State of Texas*, No. 1:23-cv-00836 (W.D. Tex. July 21, 2023).

[2] Texas provided a high-level description of its planned buoy barrier system to the United States Section of the IBWC on June 12, 2023, including Texas's plan to deploy such barriers at three different locations.  Gomez Decl. ¶ 3.  Texas did not provide detailed project plans at this meeting, Gomez Decl. ¶ 8, and in any event did not share this information with the Corps.

On or before July 10, Texas began building a floating barrier system in the Rio Grande roughly two miles downstream of the International Bridge II in Eagle Pass (the "Floating Barrier").  *See* Garcia Decl. Ex. 1; Shelnutt Decl. ¶ 5; Gomez Decl. ¶ 4.  Texas never sought authorization from the Corps or any federal agency to erect the Floating Barrier, and the Corps has not issued a Section 10 permit for it.  Shelnutt Decl. ¶ 14.  Photos of Texas's building activities from July 10 show excavators lifting buoy segments and placing them in the river.  Garcia Decl. Ex. 1.  The buoy segments appear to be anchored in the Rio Grande by large concrete blocks, with additional concrete blocks staged along the bank.  *Id.*



*Fig. 1 – Garcia Decl. Ex. 1, full view and closeup of Floating Barrier components on July 10*

On July 13, representatives of the Corps and the IBWC visited the installation site and directly observed Texas building the Floating Barrier.  Shelnutt Decl. ¶¶ 8, 10; Gomez Decl. ¶ 11.  They observed personnel using boats and an excavator to place portions of the Floating Barrier system in the middle of the river.  Gomez Decl. ¶ 11.  The installed buoys appeared to be anchored in place in the river.  Shelnutt Decl. ¶ 10.  At the time of this visit, the Floating Barrier was estimated to be approximately 450 feet long.  *Id.*

Photographic evidence depicts Texas's work on the Floating Barrier continuing through at least July 17, 2023.  Garcia Decl. Ex. 2.  On that date, boats and two excavators continued to

work on the Floating Barrier, with one excavator carrying what appears to be a large concrete

block in the Rio Grande.  These photographs show that the Floating Barrier is an uninterrupted

chain of large, tightly spaced buoys running longitudinally down the Rio Grande.  They also

show large concrete anchoring structures at intervals along both sides of the Floating Barrier.



*Fig. 2 – Garcia Decl. Ex. 2, full view and closeup of July 17 construction activities*



*Fig. 3 – Garcia Decl. Ex. 2, full view and closeup of Floating Barrier on July 17*

Texas's construction of the Floating Barrier has already substantially harmed the United

States' foreign relations with Mexico.  Quam Decl. ¶¶ 3, 13.  On numerous occasions since late

June, the Government of Mexico has lodged protests with the United States, including at the

highest diplomatic levels, regarding Texas's deployment of the Floating Barrier.  *Id.* ¶¶ 8, 11.

Mexico has asserted that the Floating Barrier violates various international treaties.  *Id.* ¶ 9.

Mexico has raised humanitarian concerns regarding the prospect that the Floating Barrier could cause injury or death to persons swimming in the Rio Grande, which (in addition to loss of life) could prompt a significant international incident. *Id.* ¶ 10.  Deployment of the Floating Barrier is a source of diplomatic concern, and its continued presence is adversely affecting foreign policy. *Id.* ¶¶ 3, 11.  In addition to these impacts on U.S. foreign relations, Texas's actions also have disrupted the day-to-day bilateral efforts between the United States and Mexican Sections of the IBWC.  For example, in 2020, the United States and Mexico committed to seek agreement by December 2023 on a new mechanism to improve the predictability and reliability of Rio Grande water delivery from Mexico to the United States.  Pena Decl. ¶ 25.  Citing Texas's actions, however, Mexico recently cancelled a meeting related to this topic and stated that it may need to rethink and limit its cooperation with the United States going forward. *Id.* ¶ 17.

The Floating Barrier also poses threats to navigability and public safety on the river.  As Texas intended, the placement and configuration of the structure impedes cross-river navigation. Shelnutt Decl. ¶ 15.  Because Texas failed to submit project plans or specifications to the Corps, the Corps has been unable to conduct a complete evaluation of the Floating Barrier's impacts on safety and navigability. *Id.* ¶ 14.  But it is clear that any vessel at this location would be forced to maneuver around the Floating Barrier to avoid collision or entanglement. *Id.* ¶ 15.  Further, the Corps has been unable to determine whether the Floating Barrier will remain secured during predicted high river flows. *Id.* ¶ 16.  If all or part of the Floating Barrier were to be unmoored, it would present additional safety and navigation risks. *Id.*

Further, the Floating Barrier interferes with the federal government's ability to carry out its operations on the Rio Grande.  For example, obstructions in the water impair the freedom of movement of Border Patrol personnel conducting rescue operations and potentially delay their

response times.  Owens Decl. ¶ 4.  These rescue situations can be very hazardous for Border

Patrol personnel, as well as for the individuals in distress.  *Id.* ¶ 5; *see also id.* ¶ 6 (discussing

water-related rescues and deaths in Eagle Pass Station area of responsibility).  The Floating

Barrier also impedes the IBWC's ability to independently cross the Rio Grande when carrying

out its surveys and other engineering work.  Gomez Decl. ¶¶ 15-16.

        The United States alerted Texas on July 20 that the Floating Barrier violates Section 10

of the RHA and invited the State to avoid litigation by committing to expeditiously remove it.

*See* Att. 9.  On July 24, Governor Abbott responded with an open letter to President Biden that

acknowledges "the floating marine barriers we have deployed in the Rio Grande River in Eagle

Pass."  *See* Att. 10.  But the Governor summarily denied that Texas had violated Section 10 and

alluded to possible constitutional defenses.  *Id.* at 1.  The United States filed suit later that day.

## STANDARD FOR DECISION

        Ordinarily, a plaintiff seeking a preliminary injunction must establish that: (1) it is likely

to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  But in this RHA enforcement suit,

the United States, "to whom the enforcement of the [public] right has been entrusted," *United*

*States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969), need not establish irreparable

injury beyond a likely violation of Section 10.  As discussed below in Argument II, the Court

may issue a preliminary injunction "without making findings of irreparable harm, inadequacy of

legal remedy, or the balance of convenience."  *United States v. Marine Shale Processors*, 81

F.3d 1329, 1359 (5th Cir. 1996); *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir.

1989) (where statute "by necessary and inescapable inference requires injunctive relief," the United States "is not required to prove the injury and public interest factors").

## ARGUMENT

The United States is entitled to a preliminary injunction that directs Texas to remove the Floating Barrier and related structures from the Rio Grande and prohibits Texas from building additional structures or obstructions in the river without federal authorization.  The United States is likely to succeed on the merits of its RHA claim because Texas built an unauthorized structure in a navigable water of the United States that is obstructing the Rio Grande's navigable capacity in violation of Section 10.  Preliminary relief should be awarded on that basis alone.  But, to the extent this Court considers irreparable injury, the balance of equities, and public interest, each of those factors favors the United States.  The Floating Barrier is already causing substantial and ongoing harm to the United States' conduct of foreign relations, poses an imminent risk to public safety and navigation, and interferes with the operations of federal agency officials in the river.  Those harms outweigh any harm a preliminary injunction might cause Texas.[3]

I.   **The United States Will Likely Succeed on the Merits of Its Claim That Texas Has Violated Section 10 of the Rivers and Harbors Act.**

The RHA bars building structures in, and obstructing the navigable capacity of, navigable waters of the United States.  Commission of *either* of these acts gives rise to liability under RHA Section 10.  Texas's own admissions, coupled with other easily demonstrable facts, establish that *both* grounds exist for finding Texas in violation of the Act.

---

[3] The United States reserves the right to seek a more expedited disposition of this motion, and/or a temporary restraining order, if and when the facts may so warrant.

**A.  Texas Built an Unpermitted Structure in Navigable Waters of the United States.**

To establish a violation of Section 10's second clause, the United States must show that Texas (1) built or commenced the building (2) "of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure[]" (3) in navigable waters (4) outside established harbor lines or where no harbor lines have been established (5) without the Corps' permission. 33 U.S.C. § 403 (quoted in full, *supra* at 2).  The first, third, fourth, and fifth liability elements are beyond dispute.  In his July 24 letter, Governor Abbott openly admitted that Texas built the Floating Barrier.  Att. 10 (acknowledging "the floating marine barriers we have deployed in the Rio Grande River in Eagle Pass").  This stretch of the Rio Grande is a navigable water of the United States.  Parker Decl. ¶ 6 & Ex. A.  No harbor lines have been established.  Shelnutt Decl. ¶ 4.  And Texas built the Floating Barrier without the Corps' permission.  *See id.* ¶¶ 5-6, 13-14.

The remaining liability element also is met.  The Floating Barrier is either a "boom" or an "other structure" within the meaning of Section 10.  A "boom" is any floating barrier that arrests movement across a waterway.  At the time of enactment (and today), the term included, for example, "[a] strong barrier, as of beams, or an iron chain or cable fastened to spars, extended across a river or the mouth of a harbor, to prevent an enemy's ships from passing," as well as "[a] chain of floating logs fastened together at the ends and stretched across a river, etc., to stop floating timber."  William Dwight et al., eds., *Century Dictionary and Cyclopedia: A Work of Universal Reference in All Departments of Knowledge with a New Atlas of the World*, at 626 (1899).  As observed by a Corps representative before the completion of installation, and reflected by photographic evidence, the Floating Barrier is a string of connected buoys that runs hundreds of feet down the river.  Shelnutt Decl. ¶ 10.  Subsequent photos indicate that the Floating Barrier likely has reached the 1,000-foot length Texas anticipated prior to construction. *See* Garcia Decl. Ex. 2; *compare with* Compl. ¶ 19 (Governor Abbott's announcement of the

project) *and* Gomez Decl. ¶¶ 3-6 (statements of Texas Department of Public Safety at a June 2023 meeting).  Texas principally intended the Floating Barrier to arrest the movement of persons crossing the river, as opposed to movement of ships or timber.  But the barrier is nonetheless a "boom."

Even if the Floating Barrier were not a "boom," it undoubtedly fits within Section 10's catchall term, "other structures."  A "structure" is a "an edifice or a building of any kind; in the widest sense, any production or piece of work artificially built up, or composed of parts joined together in some definite manner."  Dwight, at 6001, *supra*.  The Floating Barrier, constructed over a period of days using heavy construction equipment, and consisting of hundreds of yards of connected buoys anchored in place by large concrete blocks on the riverbed, readily meets even the narrowest conception of a "structure."  Courts consistently find comparable installations to be "other structures" within the meaning of Section 10.  *See, e.g.*, *United States v. Angell*, 292 F.3d 333, 337 (2d Cir. 2002) (floating docks); *United States v. W. Indies Transp., Inc*., 127 F.3d 299, 310 (3d Cir. 1997) (barges strung together and attached to land with rope and wire cable to form a permanent dock).

The United States is thus likely to succeed in showing that Texas violated, and remains in violation of, the second clause of Section 10.

**B.  Texas Created an Unauthorized Obstruction to the River's Navigable Capacity.**

Section 10's first clause bars the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  As with the elements of Texas's liability under Section 10's second clause, most elements of Texas's liability under Section 10's first clause are incontestable.  Texas admits deploying the Floating Barrier; it had no federal authorization; and this portion of the Rio Grande is a navigable water of the United States.  *See supra* at 9.

The only remaining liability question is whether the Floating Barrier "obstruct[s] … the navigable capacity" of the Rio Grande.  33 U.S.C. § 403.  Because Section 10's first clause does not prohibit "any obstruction *to the navigation*, but any obstruction to the *navigable capacity*," *United States v. Rio Grande Dam & Irrigation Co*., 174 U.S. 690, 708 (1899) (emphasis added), the United States need not prove that the Floating Barrier wholly impedes navigation, but merely that it "interfere[s] with or diminish[es]" the Rio Grande's *capacity* to be navigated.  *Id.* at 709. "'[O]bstruction' as used in § 10 is broad enough to include diminution of the navigable capacity of a waterway by means not included in the second or third clauses [of that section]"—e.g., by clogging a channel with deposits of inorganic solids.  *United States v. Republic Steel Corp.*, 362 U.S. 482, 489 (1960).[4]

The Floating Barrier manifestly interferes with or diminishes the Rio Grande's navigable capacity, owing to its sheer dimensions—approximately 1,000 feet of linked buoys that each are at least four feet in diameter, *see* Gomez Decl. ¶ 6; Shelnutt Decl. ¶ 10—and its placement in the middle of the river.  *See* Pena Decl. ¶ 16 (Texas's construction crew used heavy equipment "to assemble, drag and anchor the buoys within the Rio Grande channel").  "The placement and tandem configuration of the buoys present a structural barrier to cross-river navigation and would force a vessel to maneuver around the structure to avoid collision or entanglement at this location."  Shelnutt Decl. ¶ 15.  Additionally, "because no information was submitted for project evaluation and potential permitting, it is unknown if the structure meets engineering standards to withstand predicted high flows," which makes its stability uncertain, further lessening the river's

---

[4] Notably, several courts have held that a qualifying "structure" under Section 10's second clause presumptively also constitutes an "obstruction" under Section 10's first clause.  *See, e.g.*, *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983); *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 443 (S.D.N.Y. 1990).

navigable capacity.  *Id.* ¶ 16.  It is inconceivable that the Floating Barrier does *not* create an obstacle for anyone seeking to navigate across this part of the river—that is, after all, precisely what Texas intended.[5]  Indeed, the Fifth Circuit has affirmed not merely civil, but *criminal*, RHA liability for construction of far lesser obstacles to a water's navigable capacity.  *United States v. Raven*, 500 F.2d 728, 731 (5th Cir. 1974) (affirming conviction for obstructing a waterway with an 83-foot sunken schooner).

For all the above reasons, the United States will likely succeed on the merits in showing that Texas violated, and continues to violate, Section 10 of the RHA.

## II.   The United States' Likelihood of Success on the Merits Alone Warrants Preliminary Injunctive Relief.

Where, as here, the United States seeks an injunction enforcing a public-interest statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute," *Marine Shale Processors*, 81 F.3d at 1359, justifies a court in granting a preliminary injunction based solely on the United States' likelihood of success on the merits, *see id.* at 1358.  *See also FDIC*, 881 F.2d at 210; *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010).  Numerous courts have concluded this rule applies to RHA Section 10 in particular.[6]  *See United States v. Milner*, 583 F.3d 1174, 1193-94 (9th Cir. 2009) (explaining that "[n]o balancing of interest or need to show irreparable injury

---

[5] *See* Press Release, "Operation Lone Star Boosts Border Response With New Marine Barriers" (July 14, 2023) (the Floating Barrier will "prevent people from even crossing the middle part of the Rio Grande River and coming into the State of Texas"), https://gov.texas.gov/news/post/operation-lone-star-boosts-border-response-with-new-marine-barriers.

[6] The Fifth Circuit has not squarely addressed the question whether the United States must meet traditional equitable criteria to obtain a preliminary injunction to restrain a Section 10 violation. But the Fifth Circuit has not insisted that the United States meet those criteria in other contexts where the defendant's violation of law imposed "a risk of danger to the public."  *Marine Shale Processors*, 81 F.3d at 1359.

is required when an injunction is sought under [RHA] § 12 to prevent erection or seek removal of an unlawful structure") (cleaned up); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 611 (3d Cir. 1974) (same); *Oak Beach Inn Corp.*, 744 F. Supp. at 446-47 (holding that because plaintiff had demonstrated a likelihood of success on the merits of RHA Section 10 claim, "no further showing is required for a grant of preliminary relief"); *cf. Sanitary Dist.*, 266 U.S. at 432 ("[W]e are not at liberty to consider [alleged harms to a defendant liable under RHA Section 10] as against the edict of a paramount power.").

Once a plaintiff satisfies the criteria for injunctive relief, where a public-interest statute is at issue the ordered relief must enforce the statute that Congress enacted, and the Court's traditional equitable discretion is narrowed to evaluating how equitable considerations "are affected by the selection of an injunction over other enforcement mechanisms" authorized by statute. *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 498 (2001); *see id.* at 497 (holding courts' equitable discretion cannot "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited"). The Court's choice "is simply whether a particular means of enforcing the statute should be chosen over another permissible means," and "not whether enforcement is preferable to no enforcement at all." *Id.* at 497-98; *cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982) (explaining that district court in *TVA v. Hill*, 437 U.S. 153 (1978), lacked discretion to withhold injunction where "only an injunction could vindicate the objectives of the Act"). Here, because preliminary injunctive relief is the only viable mechanism for remedying Texas's statutory violation, such relief should be awarded.

## III. To the Extent Relevant, the Traditional Equitable Considerations Supporting Preliminary Injunctive Relief Are Satisfied.

Even if the Court weighs the traditional equitable factors in considering whether to issue a preliminary injunction, the United States is entitled to that relief.

### A. A Preliminary Injunction Is Necessary to Prevent Irreparable Harm to Foreign Relations, Public Safety, and Navigation.

Irreparable harm to the United States is presumed based on a violation of Section 10 of the RHA. *See supra* at 7.  In any event, the evidence establishes that a preliminary injunction is needed to prevent immediate harm to the United States that cannot be remedied by a permanent injunction entered after disposition on the merits.

Texas's deployment of the Floating Barrier has caused significant and ongoing harm to the United States' foreign relations with Mexico.  Quam Decl. ¶ 13.  Mexico has "raised its concerns at the highest diplomatic levels" regarding Texas's deployment of the Floating Barrier. *Id.* ¶¶ 8, 11.  Mexico has specifically asserted that Texas's actions contravene various treaty obligations and has raised humanitarian concerns regarding possible loss of life to persons swimming in the Rio Grande.  *Id.* ¶¶ 9-10.  Any such loss of life could "quickly give rise to a significant international incident."  *Id.* ¶ 10.  The United States' ability to successfully pursue its foreign policy goals with Mexico "depends largely on maintenance of a cooperative bilateral relationship based on mutual respect for each other's sovereignty."  *Id.* ¶ 12.  The continued presence of the Floating Barrier is harming that relationship at a time when the United States and Mexico are engaged in "ongoing dialogues at senior political levels" to address important issues such as: strengthening supply chains; promoting sustainable economic and social development; countering the trafficking of fentanyl, other synthetic drugs, and firearms; and implementing humane migration management and border infrastructure.  *Id.* ¶¶ 5-6.  Allowing the Floating Barrier to remain in place while the parties litigate this case would further compound this harm. *Id.* ¶ 13.

In addition to these high-level foreign policy concerns, Texas's actions have disrupted the day-to-day cooperative efforts of the IBWC's United States and Mexico Sections on issues of

vital importance, such as management of water deliveries on the Rio Grande.  Pena Decl. ¶ 25.

Texas's actions have spurred the Mexican Section of the IBWC to cancel a meeting and to

reconsider its cooperation with the United States at a sensitive stage in discussions on a new

agreement governing water delivery from Mexico to the United States.  *Id.* ¶¶ 17, 18, 25.

  The Floating Barrier also causes imminent irreparable harm because it obstructs lateral

navigation across the Rio Grande for hundreds of yards along the river's length.  Shelnutt Decl.

¶ 15; Gomez Decl. ¶ 6.  This obstruction poses risks to health and public safety.  By design and

by Texas's own admission, *supra* at 12 n.5, the Floating Barrier impedes passage from one side

of the river to the other, forcing vessels to maneuver around it to avoid collision or entanglement.

Shelnutt Decl. ¶ 15.  The Floating Barrier appears to be anchored by a series of large concrete

blocks extending laterally to either side of the buoys, which could also present risks to navigation

and public safety.  *See id.* ¶ 10; Garcia Decl. Exs. 1, 2.  Further, if the Floating Barrier is unable

to withstand predicted high flows and becomes unmoored, it would present additional safety and

navigation risks.  Shelnutt Decl. ¶ 16.  Notably, these impacts to safety and navigability threaten

the missions of several federal agencies that conduct operations in and around the Rio Grande.

*Supra* at 2-3, 6-7.  No relief granted at the end of this case would make up for the continuing

threat to navigation and public safety that the Floating Barrier will impose while the parties

litigate the merits.

  There is also a reasonable likelihood that Texas will inflict additional irreparable harms

on the United States absent a preliminary injunction.  With respect to the Floating Barrier that

has already been installed, Texas has informed the IBWC that it may also install netting below

the existing barrier system, which could impose environmental impacts as well as increasing the

risks to public safety and navigability.  Gomez Decl. ¶ 7 & Ex. A.

More broadly, in its June 8 press conference, Texas stated its intent to deploy floating barriers in *multiple* portions of the Rio Grande.  *Supra* at 3.  Texas representatives also told the United States Section of the IBWC on June 12 that Texas intends to install floating barriers in "3 different locations," of which the location of the Floating Barrier is only one.  Gomez Decl. ¶¶ 3-4.  Texas already has funding and a designated contractor for these projects.  *Id.* ¶ 6 & Ex. A.  Moreover, it is reasonably likely that Texas will not seek federal authorization for these projects under RHA Section 10.  Indeed, in discussing the overall initiative known as "Operation Lone Star" that the Floating Barrier is a part of, Governor Abbott avowed that "[w]e aren't asking for permission."[7]  A preliminary injunction is necessary to prevent Texas from inflicting further irreparable harm by again circumventing the RHA, especially since "a court need not balance the hardship when a defendant's conduct has been willful."  *Marine Shale Processors*, 81 F.3d at 1358.

### B.  The Equities and Public Interest Strongly Favor Preliminary Injunctive Relief.

Where the United States is a party, the third and fourth elements of the traditional preliminary injunction analysis—harm to the opposing party and the public interest—merge and essentially require the Court to balance the equities of the case.  *Cf. Nken v. Holder*, 556 U.S. 418 (2009); *but see supra* Part II (explaining why such a balancing is not required here).  The equities in these circumstances strongly favor an injunction.

The significant risk of further irreparable injury posed by Texas's actions outweighs any harm a preliminary injunction might cause Texas.  The United States seeks two forms of relief in this motion.  First, the United States seeks a prohibitory injunction that would prevent Texas from building or installing additional structures or obstructions in the Rio Grande (or adding to

---

[7] *See* https://twitter.com/GregAbbott_TX/status/1638306917939380224?t=BB0rNKcTgwy Dn0j8qRiQKQ&s=19.

the Floating Barrier itself) without obtaining any authorization required under the RHA while this case proceeds.  This limited relief would merely preserve the status quo by preventing further violations of the law and, notably, would not prevent Texas from applying for any authorizations required for such floating barriers under the RHA and other applicable law.[8]

Second, the United States seeks a mandatory injunction requiring Texas to remove the currently installed Floating Barrier, including any supporting infrastructure used to anchor the Floating Barrier, from the Rio Grande.  The only harm to Texas from this requested relief would be the cost of personnel and equipment necessary to remove and transport the Floating Barrier and associated infrastructure.

The cost to Texas of removing its unauthorized barrier pales in comparison to the harms that the United States is suffering and will continue to suffer if the Court does not issue the requested preliminary injunction.  So long as the Floating Barrier remains in the Rio Grande, it will continue to disrupt the United States' conduct of foreign relations with Mexico, obstruct navigation on the river, present health and public safety risks, and interfere with federal agencies' ability to execute their missions on the river.  *Supra* at 14-15.  The harm to the United States' foreign relations, in particular, will increase the longer the Floating Barrier remains in place on the Rio Grande.  Quam Decl. ¶ 13.  Texas's expansion of the Floating Barrier, or installation of additional floating barriers, would only compound these harms.

Texas may argue that an injunction requiring it to remove the Floating Barrier would harm what it describes as the State's "sovereign interest in protecting [its] borders."  *See* Att. 10 at 1 (quoting *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part)).  But

---

[8] The United States makes no representation here regarding what action the Corps or any other federal agency would ultimately take on a hypothetical permit application from Texas.

Texas's desire to pursue its own preferred strategy for deterring migration is insufficient to outweigh the United States' harms here—let alone to override the balance of priorities that Congress struck in Section 10 of the RHA.  Texas has no authority to pursue policies regulating immigration or the international border that are preempted by federal law.  The power to conduct foreign relations, including on the subject of immigration, lies solely with the federal government.  *See* Art. I, § 8 cl. 4 (authorizing federal government to "establish an uniform Rule of Naturalization"); *Arizona*, 567 U.S. at 394 (recognizing federal government's "broad, undoubted power over the subject of immigration" preempts state law on same subject); *Am. Ins. Ass'n*, 539 U.S. at 413 ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government in the first place.") (cleaned up).  States "may have understandable frustrations with the problems caused by illegal immigration," but they "may not pursue policies that undermine federal law."  *Arizona*, 567 U.S. at 416; *see also id.* at 422 (Scalia, J., concurring in part and dissenting in part) ("I accept as a given that state regulation [of immigration] is excluded by the Constitution when … it has been prohibited by a valid federal law.").  Texas may not rely on an interest in implementing its own border control policies to "undermine federal law" by thwarting enforcement of the RHA.

Finally, issuing the requested preliminary injunction would serve the public interest.  The public has a compelling interest in the enforcement of federal law, which Texas has violated.  In enacting Section 10, Congress has already "decided the order of priorities" between the United States' interests and those of Texas.  *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497.  The

harms that Texas's Floating Barrier causes to the United States and the public underscore why Congress struck this balance.  The public has a strong interest in waterways that are clear of potentially life-threatening hazards, both for its own use and for use by government agencies that must navigate those waterways to carry out their official duties.  And as to the Floating Barrier's impacts on foreign relations, the public certainly has an interest in maintaining "one of the most important, dynamic, and economically impactful partnerships in the world," which is vital to pursuit of the United States' "extensive, multi-faceted agenda to address with Mexico."  Quam Decl. ¶¶ 4, 12.

The United States has demonstrated a substantial likelihood of prevailing on the merits— that is, that Texas violated and continues to violate RHA Section 10, which Congress enacted to protect both navigation and safety in waters of the United States.  *See Wyandotte Transp. Co.*, 389 U.S. at 201.  Restraining Texas from compounding the threat of irreparable harm, and requiring it to abate the existing irreparable harm, is in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a preliminary injunction and enter the attached proposed order.

19

Respectfully submitted,

Dated:  July 26, 2023

JAIME ESPARZA
UNITED STATES ATTORNEY

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division


 /s/ James E. Dingivan
JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel.)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

 /s/ Brian H. Lynk
BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 353-7466 (Knudsen)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov

*Counsel for the United States of America*

## CERTIFICATE OF CONFERENCE

I certify that I conferred via email with counsel for Defendants regarding the relief requested in this motion.  Counsel for Defendants stated that they oppose the motion for a preliminary injunction and the requested relief.

/s/  Brian Lynk
Brian Lynk

## CERTIFICATE OF SERVICE

I certify that on July 26, 2023, a copy of this filing was emailed to counsel for Defendants: Leif Olson, Benjamin Wilson, David Bryan, Munera Al-Fuhaid, and Ryan Walters.

/s/  Brian Lynk
Brian Lynk