IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   *Plaintiff,*<br><br>v.<br><br>GREG ABBOTT, in his capacity as GOVERNOR OF THE STATE OF TEXAS, and THE STATE OF TEXAS,<br>   *Defendants*. | Case No. 1:23-CV-00853-DII |

**BRIEF OF UNITED STATES REPRESENTATIVES JODEY C. ARRINGTON, ET AL AS AMICI CURIAE IN OPPOSITION TO PLAINTIFF UNITED STATES' OPPOSED MOTION FOR PRELIMINARY INJUNCTION**

ROBERT HENNEKE
rhenneke@texaspolicy.com
CHANCE WELDON
cweldon@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTEREST OF AMICUS CURIAE ....................................................................................... v

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

I. TO ESTABLISH JURISDICTION UNDER THE RIVERS AND HARBORS ACT, THE GOVERNMENT MUST SHOW THAT THE WATERS IT SEEKS TO REGULATE ARE NAVIGABLE ...................... 3

II. THE FEDERAL GOVERNMENT'S POSITION THAT A RIVER REMAINS NAVIGABLE FOR JURISDICTIONAL PURPOSES IF IT HAS EVER BEEN NAVIGABLE IN THE PAST, IGNORES THE TEXT OF THE STATUTE AND WOULD LEAD TO ABSURD RESULTS ................................................................................. 6

CONCLUSION .................................................................................................................... 10

CERTIFICATE OF SERVICE ............................................................................................. 11

# TABLE OF AUTHORITIES

*Cases:*

*Alabama v. North Carolina,*
    560 U.S. 330 (2010) ................................................................................................ 9

*Bond v. United States,*
    572 U.S. 844 (2014) ................................................................................................ 3

*Daniel Ball,*
    77 U.S. (10 Wall.) 557 (1870) ................................................................................ 4

*Econ. Light & Power Co. v. United States,*
    256 U.S. 113 (1921) ........................................................................................ 5, 8, 9

*Leovy v. United States,*
    177 U.S. 621 (1900) ......................................................................................... 3, 4 5

*Sackett v. EPA,*
    143 S. Ct. 1322 (2023) ............................................................................................ 5

*Solid Waste Agency v. United States Army Corps of Eng'rs,*
    531 U.S. 159 (2001) .............................................................................................. 10

*Terkel v. CDC,*
    521 F. Supp. 3d 662 (E.D. Tex. 2021) ................................................................... 3

*United States v. Appalachian Elec. Power Co.,*
    311 U.S. 377 (1940) ............................................................................................ 5, 6

*United States v. Bass,*
    404 U.S. 336 (1971) ................................................................................................ 3

*United States v. Lopez,*
    514 U.S. 549 (1995) ................................................................................................ 3

*United States v. Morrison,*
    529 U.S. 598 (2000) ................................................................................................ 6

*United States v. Rio Grande Dam & Irrigation Co.,*
    174 U.S. 690 (1899) ............................................................................................ 2, 6

*United States v. Rio Grande Dam & Irrigation Co.*,
    10 N.M. 617 (1900) ................................................................................................ 6

*United States v. Rio Grande Dam & Irrigation Co.*,
    184 U.S. 416 (1902) ................................................................................................ 6

*Statutes:*

33 U.S.C.S § 403 ............................................................................................................. 4

*Other Authorities:*

C. Reid Ferring, The Geology of Texas 4 (2007) (available at:
    https://custom.cengage.com/regional_geology.bak/data/Texas.pdf) ................... 9

Dylan Baddour, *Big Shock in Big Bed,* Texas Observer, (June 29, 2022),
    https://www.texasobserver.org/big-bend-rio-grande-dry-water/ .................. 2, 8

Leon C. Metz, Rio Grande, Handbook of Texas Online, (1952)
    https://www.tshaonline.org/handbook/entries/rio-grande ............................ 2, 7

## INTEREST OF AMICUS CURIAE

This case turns on the proper interpretation and application of the Rivers and Harbors Act. Amici are members of the United States Congress, represented by the Texas Public Policy Foundation.

- Representative Jodey C. Arrington represents the 19th Congressional District of Texas.
- Representative Brian Babin, D.D.S. represents the 36th Congressional District of Texas.
- Representative Andy Biggs represents the 5th Congressional District of Arizona.
- Representative Vern Buchanan represents the 16th Congressional District of Florida.
- Representative Michael C. Burgess, M.D. represents the 26th Congressional District of Texas.
- Representative Kat Cammack represents the 3rd Congressional District of Florida.
- Representative John Carter represents the 31st Congressional District of Texas.
- Representative Michael Cloud represents the 27th Congressional District of Texas.
- Representative Jeff Duncan represents the 3rd Congressional District of South Carolina.
- Representative Jake Ellzey represents the 6th Congressional District of Texas.
- Representative Lance Gooden represents the 5th Congressional District of Texas.
- Representative Sam Graves represents the 6th Congressional District of Missouri.

- Representative Clay Higgins represents the 3rd Congressional District of Louisiana.
- Representative Ronny L. Jackson represents the 13th Congressional District of Texas.
- Representative Nathaniel Moran represents the 1st Congressional District of Texas.
- Representative August Pfluger represents the 11th Congressional District of Texas.
- Representative David Rouzer represents the 7th Congressional District of North Carolina.
- Representative Chip Roy represents the 21st Congressional District of Texas.
- Representative Keith Self represents the 3rd Congressional District of Texas.
- Representative Pete Sessions represents the 17th Congressional District of Texas.
- Representative Beth Van Duyne represents the 24th Congressional District of Texas.
- Representative Roger Williams represents the 25th Congressional District of Texas.

As members of Congress, Amici have a strong interest in ensuring that federal administrative agencies are bound by the text of Congressional statutes. This is particularly important when, as here, the statute at issue contains a jurisdictional element tying federal authority to Congressional power under the Commerce Clause.

Moreover, Amici represent constituents who live and work adjacent to rivers and streams. These ordinary Americans are also subject to Rivers and Harbors Act—a statute with both civil and criminal penalties. Amici therefore have a strong interest in ensuring that federal agencies do not adopt an over-broad reading of the statute.

**INTRODUCTION**

In July of 2023, Texas placed a series of buoys in the Rio Grande River to encourage migrants to cross the border at points of entry rather than crossing the river illegally. The United States Department of Justice responded with this lawsuit, alleging that those buoys were un-permitted obstructions to navigable waters in violation of the Rivers and Harbors Act ("the Act") and must be removed. Given the political importance of issues along the border, both the buoys and the federal lawsuit set off a political firestorm, with both sides making policy arguments about the appropriate response.

Amici do not engage in that policy debate here. Nor do Amici take a position on whether, in fact, the placement of buoys in this particular location violates the Act. Rather, Amici write separately to address important questions about the test that courts should apply when establishing federal jurisdiction under the Act—a statute which can be applied against ordinary Americans in less politically charged contexts.

The Act grants federal agencies authority to police obstructions to the navigability of the "waters of the United States." The term "waters of the United States" was not chosen by accident. At the time the Act was adopted, that legal term of art was understood to limit federal authority to only those navigable waters it would have authority to regulate under the Commerce Clause.

When a statute contains this kind of "jurisdictional element," the burden falls to the federal agency asserting jurisdiction to establish that element has been satisfied. In the present case, that means the agency asserting jurisdiction must provide evidence that the waters it seeks to regulate are "navigable."

Unfortunately, at this early stage of litigation, the federal government has made no serious attempt to do so. Instead, the government points to a 1984 letter (which itself seems to rely on 1947 Coast Guard finding) holding the entirety of the Rio Grande River in Texas is navigable. ECF No. 5, p 13 (citing ECF No. 5-4.) The

1

government claims that this decades-old information is sufficient, because once a river is deemed navigable, it is allegedly always navigable as a matter of law. ECF 5-4, p. 6.

But it is not clear that the 1947 Coast Guard finding was accurate when it was written. See *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699 (1899) (finding that stretches of the Rio Grande in New Mexico are not navigable waters.); see also Leon C. Metz, Rio Grande, Handbook of Texas Online, (1952) https://www.tshaonline.org/handbook/entries/rio-grande (last updated June 13, 2020) (noting that "The Rio Grande has never been navigable except near its mouth and, on rare occasions, to Laredo."). More importantly, a 1947 observation cannot be the perpetual metric for federal jurisdiction over rivers in Texas. As any Texan knows, rivers change. Indeed, hundreds of miles of the Rio Grande that were deemed navigable in the 1947 Coast Guard finding relied on by the government are now dry. Dylan Baddour, *Big Shock in Big Bend*, Texas Observer, (June 29, 2022), https://www.texasobserver.org/big-bend-rio-grande-dry-water/. The government's "once navigable, always navigable" approach would therefore allow federal agencies to assert perpetual jurisdiction over dry ditches and trickling streams that are well-removed from any actually navigable waters. Such an approach cannot be justified under a statute that limits agency authority to regulating navigability.

To be clear, amici take no position on whether the stretch of river at issue in this case is currently navigable. But the test this Court puts forward for establishing federal authority under the Act will apply outside of the narrow confines of this case. Given this broad scope, it is not too much to ask that a federal agency asserting jurisdiction show its work by providing *some* current evidence as to navigability. To hold otherwise, would allow the agency to rewrite the statute and potentially violate the Constitution.

## ARGUMENT

I. **TO ESTABLISH JURISDICTION UNDER THE RIVERS AND HARBORS ACT, THE GOVERNMENT MUST SHOW THAT THE WATERS IT SEEKS TO REGULATE ARE NAVIGABLE**

At bottom, this case is about federal authority under the Commerce Clause. When discussing the commerce power, "[w]e start with first principles." *United States v. Lopez*, 514 U.S. 549, 552 (1995). The federal government is one of limited and enumerated powers. *Id.* Unlike the states, which have general police powers, the federal government must point to an explicit grant of authority from the Constitution when it chooses to regulate. *Bond v. United States*, 572 U.S. 844, 854 (2014). The Ratifiers of the Constitution believed this limitation on federal power was necessary to "ensure protection of our fundamental liberties." *Lopez*, 514 U.S. at 552.

To meet this burden, Congress often places so-called "jurisdictional elements" in statutes. *Terkel v. CDC*, 521 F. Supp. 3d 662, 673 (E.D. Tex. 2021). For example, a federal statute regulating firearms may limit its scope to those firearms "transported in interstate commerce." See *id*. This approach is designed to ensure "'through case-by-case inquiry,' that all applications of a regulation 'have an explicit connection with or effect on interstate commerce'" and therefore pass constitutional muster. *Id.* (quoting *Lopez*, 514 U.S. at 561-62). In such circumstances, "the Government must prove [the jurisdictional element] as an essential element of the offense…". *United States v. Bass*, 404 U.S. 336, 339 (1971).

The Rivers and Harbors Act contains exactly this sort of jurisdictional element. Congress's authority to regulate rivers and streams is not "expressly granted in the Constitution, but is a power incidental to the express 'power to regulate commerce with foreign nations, and among the several States and with the Indian tribes'" *Leovy v. United States*, 177 U.S. 621, 632 (1900). The Act therefore does not grant authority

3

to police obstruction to every ditch or creek in the country, but expressly limits its scope to the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the *waters of the United States*..." 33 U.S.C.S. § 403 (emphasis added). At the time the Act was passed "waters of the United States" was a recognized legal term with inherent ties to the Commerce Clause. Two decades earlier, the Supreme Court held that rivers constitute *"waters of the United States* within the meaning of the acts of Congress" only when they are "navigable in fact." *Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1870) (emphasis added). A river is "navigable in fact," the Court explained, only when it is a "contained highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Id*. This narrow definition was likely necessary, the Court suggested, because Congress's authority in this area "is limited to commerce 'among the several States,' with foreign nations, and with the Indian tribes." *Id*. at 564-65; see also

In 1900—just a year after the Rivers and Harbors Act was passed—the Court applied this test in *Leovy*, 177 U.S. at 625. In that case, the federal government sued local officials under the Act for building a dam across Red Pass—a tributary of the Mississippi River—without federal permission. The local officials countered that the Act did not apply because Red Pass was not navigable.

The district court held an evidentiary hearing. The sole evidence presented by the federal government as to navigability was the testimony of a few fishermen "that they occasionally went through this pass with small vessels, carrying oysters for planting, and one or two cargoes of willows and timber..." *Id*. at 634. The district court held this evidence to be sufficient, because, in its view, the passage of any boat or raft was sufficient to establish navigability. *Id*.

On appeal, the Supreme Court rejected this approach. Once again, the Court's reading of the statute was anchored in concerns about the Commerce Clause.

4

Rejecting the government's broad reading, the Court explained that if "the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another…is sufficient to constitute a navigable water of the United States…[it] would extend the paramount jurisdiction of the United States over all the flowing waters in the States." *Id.* at 633.  Instead, the Act must be read with the scope of the commerce power in mind and should only apply when there is evidence showing that the waters can be navigated to such an extent to be "generally and commonly useful to some purpose of trade or agriculture." *Id.* at 634.

In subsequent years, the Court expanded the scope of the Act.  In *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 118 (1921), for example, the Court held that the Act reaches rivers that are navigable in their "natural state," even if a man-made obstruction has rendered them currently non-navigable.  And in *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 409 (1940), the Court expanded the Act further to include rivers that have the capacity for navigation with "reasonable improvements."  But even these cases made it clear that *Daniel Ball* remains the test for navigability, and that test must be satisfied with evidence.  *Sackett v. EPA*, 143 S. Ct. 1322, 1351 (2023) (Thomas, J., concurring); see also *Appalachian Elec. Power Co.*, 311 U.S. at 410 ("With these legal tests in mind we proceed to examine the facts to see whether the 111-mile reach of this river from Allisonia to Hinton, across the Virginia-West Virginia state line, has 'capability of use by the public for the purposes of transportation and commerce.'").

Therefore, the question before this Court is whether the federal government has produced sufficient evidence at this early stage of litigation to show that the waters at issue in this case are navigable in fact.

## II. THE FEDERAL GOVERNMENT'S POSITION THAT A RIVER REMAINS NAVIGABLE FOR JURISDICTIONAL PURPOSES IF IT HAS EVER BEEN NAVIGABLE IN THE PAST, IGNORES THE TEXT OF THE STATUTE AND WOULD LEAD TO ABSURD RESULTS

Historically when the government has wanted to establish jurisdiction under its authority to regulate navigable waters, it has provided substantial evidence as to navigability. See, e.g., *Appalachian Elec. Power*, 311 U.S. at 410-419 (discussing evidence of navigability). In *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699 (1899), for example, the Court considered substantial evidence from both sides before concluding that portions of the Rio Grande in New Mexico were not navigable in fact. The federal government returned to the lower court claiming that even if those portions of the river were not navigable, obstructions there could affect the navigable capacity of the river downstream, and therefore fall under the scope of the Act. See *United States v. Rio Grande Dam & Irrigation Co.*, 10 N.M. 617 (1900). Once again substantial amounts of evidence were produced by both sides and the federal government lost. See, *id.* On appeal, the Supreme Court remanded the case for the production of *even more* evidence. *United States v. Rio Grande Dam & Irrigation Co.*, 184 U.S. 416, 424 (1902).

In the present case, by contrast, the federal government does not meaningfully attempt to show that the relevant portions of the Rio Grande are currently, or even historically, navigable. Instead, the government points to a single conclusory 1984 letter (which itself seems to rely on 1947 Coast Guard finding) holding, without explanation, that the entirety of the Rio Grande River in Texas is navigable. ECF No. 5, p 13 (citing ECF no. 5-4.)

But *ipse dixit* from a single agency claiming that something falls within the commerce power is generally not binding on this Court. *United States v. Morrison*, 529 U.S. 598, 614 (2000) ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.").

Moreover, there is reason to doubt the Coast Guard's decades-old finding. The Texas State Historical Association, which has been assessing the Rio Grande since at least 1952, notes that the "Rio Grande has *never* been navigable except near its mouth and, on rare occasions, to Laredo." Leon C. Metz, Rio Grande, Handbook of Texas Online, (1952) https://www.tshaonline.org/handbook/entries/rio-grande (last updated June 13, 2020) (emphasis added).

But even if the Coast Guard's original assessment of navigability was accurate, the river has changed substantially in the last seventy-six years. For example, each of the pictures below show the recent state of the river in places that, according to the letter relied on by government, were navigable in 1947.





Dylan Baddour, *Big Shock in Big Bend*, Texas Observer, (June 29, 2022), https://www.texasobserver.org/big-bend-rio-grande-dry-water/.

The government claims these changes to the river's actual navigability do not matter because it claims that under *Econ. Light & Power*, "once a stream has been found to be of navigable use it remains so." ECF No. 5-4, p. 6. But the government misreads that case. *Econ. Light & Power*, involved the application of the Act to a historically navigable river that had arguably lost navigability due to, among other things, unlawful man-made obstructions. As the Court put it:

8

> Since about the year 1835 a number of dams have been built in the Desplaines, without authority from the United States, and one or more of them still remain; besides, a considerable number of bridges of various kinds span the river. *The fact, however, that artificial obstructions exist capable of being abated by due exercise of the public authority, does not prevent the stream from being regarded as navigable in law, if, supposing them to be abated, it be navigable in fact in its natural state.* The authority of Congress to prohibit added obstructions is not taken away by the fact that it has omitted to take action in previous cases.

*Econ. Light & Power*, 256 U.S. at 118 (emphasis added). That case cannot be read so broadly as to relieve the federal government of its duty to *ever* prove navigability through evidence if it can provide a single government report of navigability at any time history.

First, such a broad reading of *Econ. Light & Power* ignores the text of the statute. The Rivers and Harbors Act does not allow for the regulation of *formerly* navigable waters of the United States, it regulates navigable waters of the United States. Neither courts nor agencies may add words to the text. *Alabama v. North Carolina*, 560 U.S. 330, 351–52 (2010) ("We do not—we cannot—add provisions to a federal statute.")

Second, the government's theory that navigability is established if navigation was *ever* possible at *any* time in history, would lead to absurd (and likely unconstitutional) results. The geologic record shows that most of Texas was once covered by seas. C. Reid Ferring, The Geology of Texas 4 (2007) (available at: https://custom.cengage.com/regional_geology.bak/data/Texas.pdf). Indeed, if one takes the Book of Genesis literally, then the entire world was once navigable by boats large enough to carry significant amounts of livestock. *Genesis* 7:17-20 (ESV). Under the federal government's theory, these anecdotes would render any structure built anywhere in Texas an obstruction to navigation subject to federal regulation. That certainly was not the intent of Congress in 1899. As the Supreme Court has made clear, "Congress does not casually authorize administrative agencies to interpret a

9

statute to push the limit of congressional authority." *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001).

## CONCLUSION

The path of a river may often change, but unless Congress acts, the text of a federal statute does not. When Congress passed the Rivers and Harbors Act it carefully chose language designed to balance its desire to protect our rivers and harbors for commercial navigation with the limitations placed on its authority under the Commerce Clause. It did not intend to grant federal agencies unchecked power to regulate every ditch and stream that once upon a time could have carried a boat.

The federal government's view in this case would turn the Act into a one-way ratchet, where federal jurisdiction may always expand, but never contract with changes to the river. This approach misreads the statute and, if taken seriously, likely exceeds Congress's authority under the Commerce Clause. See *Solid Waste Agency*, 531 U.S. at 174. (Reading similar language in the Clean Water Act to apply to abandoned gravel pits, isolated ponds, or mudflats, would raise "significant constitutional questions.") This Court should not adopt that approach.

Rather, this Court should do the same thing the Supreme Court did more than a century ago—make the government produce evidence that the waters it seeks to regulate are navigable. While that evidentiary burden may be meager in this case, we cannot know until and unless the evidence is produced. We do know; however, this is an evidentiary burden mandated by the Constitution that the federal government must carry.

Respectfully submitted,

*/s/ Chance Weldon*
ROBERT HENNEKE
TX Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
TX Bar No. 24076767

10

cweldon@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:  (512) 472-2700
Facsimile:  (512) 472-2728

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the Western District of Texas by using the CM/ECF system, which will serve a copy of same on all counsel of record.

*/s/ Chance Weldon*
CHANCE WELDON