**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Background and Facts ................................................................................................ 2

    I.      The Crisis At The Southern Border And Texas's Response. ................................ 2

    II.     The Rio Grande in Maverick County. ...................................................... 5

    III.    The Buoy System. ................................................................................ 6

    IV.   Deployment Of The Buoy System. ......................................................... 7

Argument ................................................................................................................ 8

    I.      The United States Is Not Entitled To A Preliminary Injunction Because It
         Is Unlikely To Succeed On The Merits. ................................................... 8

         A.    The United States has failed to show that this segment of the Rio
               Grande is navigable or that the buoy system obstructs navigable
               capacity. ................................................................................... 9

         B.    The buoy system does not fall within the Rivers and Harbors Act
               because it is neither a boom nor any other prohibited structure. ............... 14

         C.    Texas retains sovereign authority to defend itself in the event of
               invasion, and this Court should construe the Rivers and Harbors
               Act narrowly in view of the constitutional questions that right
               poses. ..................................................................................... 18

    II.     The Remaining Factors Do Not Favor a Preliminary Injunction. ......................... 21

Conclusion ........................................................................................................... 23

Certificate of Service............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
567 U.S. 387 (2012) (Scalia, J., concurring in part and dissenting in part) ................. 18, 20, 21

*Econ. Light & Power Co.*,
256 U.S. 113 (1921) ...................................................................................................9

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir. 2023) (en banc) .....................................................................8

*Hersh v. U.S. ex rel. Mukasey*,
553 F.3d 743 (5th Cir. 2008) ...................................................................................20

*House v. Mayes*,
219 U.S. 270 (1911) ..................................................................................................20

*Inn of Daphne v. United States*,
No. CIV.A. 97-0796-BH-S, 1998 WL 34024732 (S.D. Ala. Aug. 26, 1998) ............................9

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ...................................................................................21

*Justin Indus., Inc. v. Choctaw Secs., L.P.*,
920 F.2d 262 (5th Cir. 1990) (per curiam) ..............................................................8

*Leovy v. United States*,
177 U.S. 621 (1900) ..................................................................................................13

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976) ..................................................................................8

*Miami Valley Conservancy Dist. v. Alexander*,
692 F.2d 447 (6th Cir. 1982) ...............................................................................9, 13

*New York v. New Jersey*,
143 S. Ct. 918 (2023) ................................................................................................22

*Newbold v. Kinder Morgan SNG Operator, L.L.C.*,
65 F.4th 175 (5th Cir. 2023) ...............................................................................10, 11

*Norfolk & W. Co. v. United States*,
641 F.2d 1201 (6th Cir. 1980) ..................................................................................13

*Phenix Const. Co. v. Cornell Steamboat Co.*,
    103 N.E. 891 (N.Y. 1913) ..................................................................................17

*Pillsbury Co. v. Midland Enterprises, Inc.*,
    715 F. Supp. 738 (E.D. La. 1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990) ....................12

*PPL Montana, LLC v. Montana*,
    565 U.S. 576 (2012) .........................................................................................9

*Puente de Reynosa, S. A. v. City of McAllen*,
    357 F.2d 43 (5th Cir. 1966) ..............................................................................11

*Rowe v. Granite Bridge Corp.*,
    38 Mass. 344 (1839) .........................................................................................10

*Sackett v. EPA*,
    143 S. Ct. 1322 (2023) (Thomas, J. concurring) ....................................................9

*Shively v. Bowlby*,
    152 U.S. 1 (1894) ............................................................................................22

*Tate v. Am. Tugs, Inc.*,
    634 F.2d 869 (5th Cir. Unit A Jan. 1981) ..............................................................8

*United States v. Angell*,
    292 F.3d 333 (2d Cir. 2002) ..............................................................................13

*United States v. Appalachian Elec. Power Co.*,
    311 U.S. 377 (1940) .........................................................................................13

*United States v. Bellingham Bay Boom Co.*,
    176 U.S. 211 (1900) .........................................................................................14

*United States v. Bridgeport Towing Line*,
    15 F.2d 240 (D. Conn. 1926) .............................................................................17

*United States v. Burns*,
    54 F. 351 (C.C.D.W. Va. 1893) .........................................................................17

*United States v. Estate of Boothby*,
    16 F.3d 19 (1st Cir. 1994) .................................................................................17

*United States v. Hall*,
    63 F. 472 (1st Cir. 1894) ...................................................................................17

*United States v. Hansen*,
    143 S. Ct. 1932 (2023) ......................................................................................20

iv

*United States v. Oak Beach Inn Corp.*,
    744 F. Supp. 439 (S.D.N.Y. 1990) ..............................................12

*United States v. Oregon*,
    295 U.S. 1 (1935) ...............................................................9

*United States v. Republic Steel Corp.*,
    362 U.S. 482 (1960) ..................................................10, 11, 12

*United States v. Rio Grande Dam & Irrigation Co.*,
    174 U.S. 690 (1899) .......................................................12, 13

*United States v. Utah*,
    283 U.S. 64 (1931) ...............................................................9

*United States v. W. Indies Transp., Inc.*,
    127 F.3d 299 (3d Cir. 1997) ...............................................13

*Yates v. United States*,
    574 U.S. 528 (2015) ............................................................16

## Statutes

33 U.S.C. § 409 ....................................................................15, 16, 17

Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001) ........................20

33 U.S.C. § 403 ..........................................................................*passim*

1 Stat. 264 ..................................................................................19

1 Stat. 424 ..................................................................................19

Tex. Gov't Code §§ 418.001 *et seq.*...............................................4

Tex. Gov't Code § 418.018(c) .........................................................4

## Other Authorities

33 C.F.R. § 2.1..........................................................................11

33 C.F.R. § 322.2(b) ..................................................................17

33 C.F.R. §§ 329.1, 329.14 ........................................................10

33 C.F.R. § 329.4.........................................................................9

33 C.F.R. § 329.11 .......................................................................9

33 C.F.R. § 329.14 ..................................................................................................... 11

1 Noah Webster, American Dictionary of the English Language 113 (1828) ................. 19

ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: The Interpretation of Legal
    Texts* (2012) .......................................................................................................... 16

1 Noah Webster, American Dictionary of the English Language 25 (1828) ................. 15

*Boom*, Webster's International Dictionary of the English Language (1890) ................... 15

*Boom*, Webster's Revised Unabridged Dictionary (1913) ............................................. 15

2d Cong., Sess. I, Ch. 28 (1792) .................................................................................. 19

3d Cong., Sess. II, Ch. 36 (1795) ................................................................................ 19

Dictionary of the English Language 164 (1806) .......................................................... 19

Tex. Const. art. IV, § 7 ................................................................................................. 18

U.S. Const. art. I, § 8 ................................................................................................... 19

U.S. Const. art. I, § 8, cl. 11 ........................................................................................ 19

U.S. Const. art. I, § 10, cl. 3 ................................................................................... 18, 20

U.S. Const. art. IV, § 4 ................................................................................................. 18

## Introduction

The United States has failed to defend Texas's southern border, leading to millions of individuals and hundreds of millions of fatal doses of drugs like fentanyl illegally entering the State and the United States—often trafficked by cartels that function as transnational criminal organizations. To defend its own borders, since the United States has lawlessly refused to do so, the State has, among other actions, declared a border security disaster and placed an approximately 1,000-foot-long floating buoy system in the Rio Grande to prevent people and drugs from being trafficked into the State in violation of both federal and Texas law. That buoy system is effective; it has nearly eliminated illegal crossings of people and drugs where it has been placed and will ultimately save lives.

The United States' contention that it is entitled to a mandatory preliminary injunction requiring the State to remove the buoys based on the Rivers and Harbors Appropriation Act of 1899 is without merit—as is the United States' request that the State and the Governor be enjoined from deploying additional buoy systems. The segment of the river where the buoy system has been deployed is not navigable; even if it were, the buoy system does not decrease the navigable capacity of the river; and the buoy system is not a boom or other structure prohibited under the Act. Perhaps in some recognition of the severe problems posed by illegal immigration in Texas, the United States has waived the Rivers and Harbors Act as to construction of border barriers where the buoy system has been placed, even while seeking to hold Texas to account for allegedly violating it.

Even if those problems were surmountable for the United States, others are not. Because Texas has a federal constitutional right to defend itself against invasion from even non-state actors, the Court should construe the Rivers and Harbors Act narrowly to avoid a collision between that constitutional right and the federal statute. And the United States has failed to show that the remaining preliminary-injunction factors have been met. The motion for a preliminary injunction should be denied.

## BACKGROUND AND FACTS

### I.   The Crisis At The Southern Border And Texas's Response.

**A.** The crisis at the southern border is well known. While U.S. Customs and Border Protection encountered about 458,000 aliens at the border in FY2020, that number skyrocketed to over 1.7 million in FY2021 and nearly 2.4 million in FY2022.[1] In part because of this surge of aliens crossing the border, the number of "gotaways"—aliens who are detected as making an illegal entry but neither found nor apprehended—increased by 303 percent between FY2019 and FY2022, reaching more than 600,000 known gotaways in FY2022.[2] And because "an unknown number of migrants evade detection," the actual number entering the United States illegally is "unknown."[3] In FY2023 alone, which will not end until October, CBP has already encountered nearly 1.8 million aliens—a population greater than the City of Philadelphia—crossing the border.[4] Because Texas shares a land border with Mexico of over 1,200 miles, many of these aliens enter the United States in Texas.

The border crisis is hardly limited to massive unlawful immigration. It also includes deadly drug smuggling, human trafficking, terrorist infiltration, and other criminal drug cartel activities. To date in FY2023, CBP has seized over 22,000 pounds of fentanyl—compared with 8,300 pounds over the same period in FY2022.[5] Fentanyl is potentially lethal at a two-milligram dose and is

---

[1]   *See* Ex. G, Department of Homeland Security Office of the Inspector General, OIG-23-24, *Intensifying Conditions at the Southwest Border are Negatively Impacting CBP and ICE Employees Health and Morale*, at p.6 (May 3, 2023), https://tinyurl.com/yckad9sx.

[2]   *See id.* at 10.

[3]   *Id.*

[4]   *See* Ex. H, *Southwest Land Border Encounters*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters  (last visited Aug. 8, 2023).

[5]   *CBP Releases June 2023 Monthly Update*, U.S. Customs and Border Protection ( July 18, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-june-2023-monthly-update; *see also* Ex. I, *Drug Seizure Statistics FY2023*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/drug-seizure-statistics  (last visited Aug. 9, 2023).

involved in more deaths of Americans under 50 than any cause of death, including heart disease, cancer, homicide, or suicide. Ex. J. Over 107,000 people in the U.S. died of drug overdoses and drug poisonings in the 12-month period ending in January 2022, of which a staggering 67 percent involved synthetic opioids like fentanyl. *Id.* Fentanyl and other drugs are often illegally smuggled into the United States by cartels that operate as transnational criminal organizations—and that have been designated by the Governor as foreign terrorist organizations.[6]

The dangers of illegal immigration are not confined to those living in the United States. Perilous conditions exist for individuals attempting to illegally cross the U.S.-Mexico border. At least 853 individuals died crossing the U.S.-Mexico border in the past 12 months—a record high.[7] Deaths and disappearances along the U.S.-Mexico border have become commonplace in recent years, and such tragedies are increasing.[8] Indeed, in 2021 there were 78 water-related deaths along the Southwest Border, up from 41 in 2020.[9] Since President Biden took office, a United Nations agency has declared that the U.S.-Mexico border is now the deadliest land crossing in the world.[10]

---

[6]  Press Release, *Governor Abbott Designates Mexican Cartels as Terrorist Organizations*, Office of the Texas Governor (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations.

[7]  Camilo Montoya-Galvez, *At least 853 migrants died crossing the U.S.-Mexico border in past 12 months—a record high*, CBS News (Oct. 28, 2022, 10:37 AM), https://www.cbsnews.com/news/migrant-deaths-crossing-us-mexico-border-2022-record-high/; Priscilla Alvarez, *A record number of migrants have died crossing the US-Mexico border*, CNN (Sept. 7, 2022, 3:53 PM EDT), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[8]  *See* Ex. K, *Annual Regional Overview—Executive Summary*, International Organization for Migration's ("IOM") Missing Migrants Project ("MMP") (2021), available at https://missingmigrants.iom.int/sites/g/files/tmzbdl601/files/publication/file/MMP%20ann ual%20regional%20overview%202021%20LAC_Executive%20Summary-ENG_0.pdf; *see also* Ex. L, *Border Rescues and Mortality Data*, U.S. Customs and Border Protection, available at cbp.gov/newsroom/stats/border-rescues-and-mortality-data (last visited Aug. 9, 2023).

[9]  *See* Ex. L.

[10]  *UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers*, (July 4, 2022), https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

The U.S. Border Patrol's Del Rio Sector, which includes Maverick County, is particularly affected by the crisis. *See* Ex. M, Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,953, 14,954 (Mar. 16, 2020). In just June 2023, CBP recorded nearly 25,000 encounters in the Del Rio Sector, nearly one quarter of encounters along the entire border.[11] Seizures of cocaine, methamphetamine, heroin, fentanyl, and marijuana (combined, by weight) increased 7% from May to June 2023.[12]

**B.** In response to the crisis at the Southwest Border, Governor Abbott declared a border security disaster in 2021 and launched Operation Lone Star.[13] Operation Lone Star fills dangerous gaps left by the Biden Administration's failure to secure the U.S.-Mexico border. And Operation Lone Star has been a success. "Since the launch of Operation Lone Star, the multi-agency effort has led to over 401,900 illegal immigrant apprehensions and more than 32,400 criminal arrests, with more than 29,600 felony charges reported. In the fight against fentanyl, Texas law enforcement has seized over 422 million lethal doses of fentanyl during this border mission."[14] "Every individual who is apprehended or arrested and every ounce of drugs seized would have otherwise made their way into communities across Texas and the nation due to President Joe Biden's open border policies."[15]

---

[11] Ex. N, *Southwest Land Border Encounters (By Component)*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component (last visited Aug. 9, 2023); *see also* Ex. O.

[12] *CBP Releases June 2023 Monthly Update*, U.S. Customs and Border Protection ( July 18, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-june-2023-monthly-update.

[13] Governor Abbott declared a border security disaster under the Texas Disaster Act of 1975. *See* Tex. Gov't Code §§ 418.001 *et seq.* The disaster area specifically includes Maverick County, Texas. The buoys control ingress to a portion of the disaster area, as specifically authorized by Tex. Gov't Code § 418.018(c).

[14] Press Release, *Operation Lone Star Deploys New Border Security Deterrence Strategies*, Office of the Texas Governor (August 4, 2023), https://gov.texas.gov/news/post/operation-lone-star-stops-criminals-at-president-bidens-open-border.

[15] *Id.*

4

## II.    The Rio Grande in Maverick County.

The buoys at issue here have been deployed in a segment of the Rio Grande comprised of sand bars, shallow water, water with inconsistent depths, small islands, large rocks, man-made debris, natural debris such as logs and stumps, and sandy shoals; it can be very shallow or even dry. Ex. A, Nordloh Decl. ¶ 5; Ex. D, Gomez Dep. at 10:7–17, 51:7–19. The river is about 200 feet wide where the buoy system is placed. Ex. B, Escalon Decl. ¶ 9; Ex. A, Nordloh Decl. ¶ 9. Although the river's depth in this segment depends on releases from the Lake Amistad Dam and varies slightly day-to-day, Ex. A, Nordloh Decl. ¶ 54, the river is no more than ankle-to-knee deep in many places and is no greater than four feet deep near the site of the floating buoys, Ex. B, Escalon Decl. ¶ 10.

No lawful commercial transportation exists in the Maverick County segment of the Rio Grande. Ex. B, Escalon Decl. ¶ 3. No commercial boats, barges, fishing boats, cargo ships or carriers, tankers, or other commercial vessels operate on this segment. Ex. A, Nordloh Decl. ¶ 7. Law enforcement agencies, including the Tactical Marine Unit of the Texas Highway Patrol, use shallow-draft airboats in this segment of the river. Ex. A, Nordloh Decl. ¶ 6. These law enforcement boats are incapable of bearing the weight of commercial goods. Ex. B, Escalon Decl. ¶ 10; Ex. A, Nordloh Decl. ¶ 6. Larger vessels cannot operate in this segment due to the shallow conditions of the stream and frequent presence of sand bars and islands. Ex. B, Escalon Decl. ¶ 10. While smaller vessels may operate in this segment, the shallow depth, sandbars, and other features of the river described above nonetheless poses dangers to such vessels. Ex. A, Nordloh Decl. ¶ 4, 5. The U.S. Coast Guard has no watercraft in this segment of the Rio Grande and has not deployed watercraft there. *See* Ex. A, Nordloh Decl. ¶ 8; Ex. E, Peters Dep. at 28:14–18, 29:12–30:7; Ex. D, Gomez Dep. at 51:3–6

Instead, this segment of the river sees mostly illegal activities. Ex. B, Escalon Decl. ¶ 4. Indeed, drug and weapons smuggling, human trafficking, and illegal immigration make up the majority of activity around this segment of the river. Ex. B, Escalon Decl. ¶ 4. Mexican cartels are also active in this area. Ex. B, Escalon Decl. ¶ 4. This area is one of the most active hotspots for criminal activities such as drug and weapons smuggling and human trafficking along the length of

the river. Ex. B, Escalon Decl. ¶ 13. No lawful traffic should move from bank to bank across the river at this point, and there is no legitimate reason for lateral traffic. Ex. B, Escalon Decl. ¶ 8.

### III.  The Buoy System.

To advance the objectives of Operation Lone Star, Governor Abbott "announced the deployment of new marine floating barriers to deter illegal crossings in hotspots along the Rio Grande River."[16] The floating buoys deployed via Operation Lone Star were originally developed for CBP. Ex. C, Flossman Decl. ¶ 3. This solution is part of a broader strategy to resolve the acute and immediate need to construct physical barriers in the vicinity of the U.S.-Mexico border in the Del Rio Sector. *See* Ex. M, 85 Fed. Reg. 14,953, 14,954 (March 16, 2020). Transnational criminal organizations frequently circumvent, defeat, and exploit the existing obstacles. *Id.*

The floating buoys were placed in the river in mid-July 2023. Ex. B, Escalon Decl. ¶ 5.[17] The system is approximately 1,000 feet long and is comprised of multiple interconnected buoys tethered via chains to concrete blocks placed on the bed of the river, entirely within Maverick County, Texas. Ex. C, Flossman Decl. ¶¶ 5, 6; Ex. B, Escalon Decl. ¶ 6. A two-foot-deep anti-dive net made of stainless steel with a gauge of +/- 3mm also runs the entire length under the buoys. Ex. C, Flossman Decl. ¶ 8. The floating buoys do not run across the river. Ex. D, Gomez Dep. at 43:13–15. The buoys have never been referred to or marketed as a boom and are not considered a boom. Ex. C, Flossman Decl. ¶ 5; Ex. F, Shelnutt Dep. At 61:22–23.

The floating buoy system is designed to save lives by directing aliens to appropriate ports of entry while deterring unlawful, dangerous crossings through the water. Ex. C, Flossman Decl. ¶ 4. The system is designed to withstand at least a 100-year flood. Ex. C, Flossman Decl. ¶ 10. The buoys are well-marked, colorful, and under continuous and uninterrupted surveillance by

---

[16]  Press Release, *Governor Abbott Signs Sweeping Package of Border Security Legislation*, Office of the Texas Governor (June 8, 2023), https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.

[17]  CBP contracted for, and even tested, the buoy system before it was deployed by Texas but cancelled the contract after the change in administration in 2021. Flossman Decl. ¶ 3. At that time, no permit from the U.S. Army Corps of Engineers was considered necessary. *Id*.

Operation Lone Star personnel. Ex. B, Escalon Decl. ¶ 12; Ex. A, Nordloh Decl. ¶ 10. No one has attempted to climb over the buoys, and not a single injury or death due to the floating buoys has been reported. *See* Ex. B, Escalon Decl. ¶ 12.

## IV. Deployment Of The Buoy System.

The floating buoy system as designed and deployed impedes no lawful use of the Rio Grande and has no impact on the ability to navigate those waters. Ex. C, Flossman Decl. ¶ 11; Ex. A, Nordloh Decl. ¶ 10. The buoys occupy approximately three percent of the stream's width and were placed on the shallower, U.S. side of the stream. Ex. A, Nordloh Decl. ¶ 9; Ex. C, Flossman Decl. ¶ 6; Ex. B, Escalon Decl. ¶ 9.

Use of this segment of river is rare in any event; there is no commercial navigation of the Rio Grande in Maverick County. Ex. B, Escalon Decl. ¶ 8. Any vessel capable of going up or down the river at the current site of the floating buoys can easily navigate past the floating buoys. Ex. B, Escalon Decl. ¶ 9. Law enforcement watercraft using this segment of the Rio Grande—the only type of motorized watercraft regularly operating in this segment—readily maneuver around the floating buoys. Ex. A, Nordloh Decl. ¶ 10.

The buoys, by design, are temporarily located. Neither the buoys nor concrete blocks are attached or affixed in any way to the riverbed; no excavation or building occurred in the river. Ex. C, Flossman Decl. ¶ 6; Ex. B, Escalon Decl. ¶ 7. The design and placement of the floating buoys is temporary; they may be dismantled and redeployed using machinery to lift and move the concrete blocks. Ex. C, Flossman Decl. ¶ 5–7.

The buoy system as deployed allows for the free flow of water through this segment and does not interfere with the travel of watercraft up and down the river or the river's navigable capacity. Ex. C, Flossman Decl. ¶ 8, 11; Ex. B, Escalon Decl. ¶ 8. And the floating buoys are being monitored in the event debris must be cleaned off them. Ex. C, Flossman Decl. ¶ 8. No vacuum is created by the system. Ex. C, Flossman Decl. ¶ 8. The only effect this buoy system has on regular activities on this segment of the Rio Grande is to redirect individuals who perilously attempt to cross the river at this location towards lawful ports of entry in a safe manner. Ex. B, Escalon Decl. ¶ 6, 12. It

is safer for aliens to cross at a port of entry instead of through the water—nobody drowns on a bridge.

ARGUMENT

The United States is not entitled to a mandatory preliminary injunction. "'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id.* (quoting *Winter*, 555 U.S. at 20). Because the United States seeks "a mandatory injunction, it bears the burden of showing a clear entitlement to the relief [it seeks] under the facts and the law." *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (per curiam). Such relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). A mandatory preliminary injunction alters, rather than preserves, the status quo, and in this instance would provide the primary relief the plaintiff seeks on the merits without even affording the defendants a trial. "Only in rare instances is the issuance of a mandatory preliminary injunction proper." *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. Unit A Jan. 1981) (internal quotation marks omitted).

**I.    The United States Is Not Entitled To A Preliminary Injunction Because It Is Unlikely To Succeed On The Merits.**

The United States is unlikely to succeed on the merits for at least three reasons. *First*, the United States has failed to show that the applicable section of the Rio Grande is navigable or that the buoy system obstructs navigable capacity. *Second*, because the buoys are neither a "boom" nor "other structure," the Rivers and Harbors Act did not require Texas to seek permission to place them. *Third*, Texas has a sovereign right to defend itself against invasion by transnational cartels like the one occurring here, and this Court should construe the Rivers and Harbors Act narrowly in light of that sovereign right.

8

**A.   The United States has failed to show that this segment of the Rio Grande is navigable or that the buoy system obstructs navigable capacity.**

**1.** "The history of federal regulation of navigable waters demonstrates that Congress' authority over navigation, as traditionally understood, was narrow but deep. It only applied to a discrete set of navigable waters and could only be used to keep those waters open for interstate commerce." *Sackett v. EPA*, 143 S. Ct. 1322, 1348 (2023) (Thomas, J. concurring). The question of navigability is fact-specific and made on a segment-by-segment basis. *See PPL Montana, LLC v. Montana*, 565 U.S. 576, 594 (2012); *see also United States v. Utah*, 283 U.S. 64, 77 (1931) ("Even where the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken, it may yet be a question, to be determined upon evidence, how far navigability extends.") (citing *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899))). In many instances, "the character of a river will, at some point along its length, change from navigable to non-navigable." 33 C.F.R. § 329.11.

To be considered navigable under the Rivers and Harbors Act, a waterway "must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce." *Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 449-450 (6th Cir. 1982); *see also* 33 C.F.R. § 329.4.[18] A waterway with only sporadic commercial use is not navigable—rather a navigable waterway must be of practical service as a highway of commerce. *United States v. Oregon*, 295 U.S. 1, 23 (1935); *Econ. Light & Power Co.*, 256 U.S. 113, 124 (1921). This fact-based, judicially-applied test for navigability has been a feature of American jurisprudence since well before the passage of the Rivers and Harbors Act, and it remains good law to this day. *See e.g., Rowe v. Granite Bridge Corp.*, 38 Mass. 344, 344 (1839) ("A creek in a salt marsh, in order to be deemed *navigable*, must not merely be sufficient to float a small boat at high water, but must be navigable generally and commonly, and not at extraordinary high tides

---

[18]   Navigability for the Rivers and Harbors Act is not the same as navigability for purposes of, for example, the Clean Water Act or various state regulations. "In accordance with its more sweeping purpose, the Clean Water Act defines 'navigable waters' more broadly than the understanding of the term in the Rivers and Harbors Act of 1899." *Inn of Daphne v. United States*, No. CIV.A. 97-0796-BH-S, 1998 WL 34024732, at *3 (S.D. Ala. Aug. 26, 1998).

only, to some purpose useful to trade or agriculture."); *The Montello*, 87 U.S. 430, 442 (1874) ("[I]n order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture."); *Newbold v. Kinder Morgan SNG Operator, L.L.C.*, 65 F.4th 175, 182 (5th Cir. 2023) ("If the channel in question, in its ordinary condition, has potential commercial value such that it may be called 'navigable,' Plaintiffs have not carried their burden to 'satisfactorily prove[ ]' as much." (quoting *Utah*, 283 U.S. at 82)).

Even if a waterway is theoretically navigable in *some* respects, whether any such navigability would be impaired must be judged against existing uses of the waterway. So, for example, in *United States v. Republic Steel Corp.*, 362 U.S. 482 (1960), the Supreme Court pointed to a district court's factual findings that "the Calumet [River] was used by vessels requiring a 21-foot draft, and that that depth has been maintained by the Corps of Engineers." *Id.* at 483. Because the defendants' milling operations in that case created solid waste deposits that caused "a progressive decrease in the depth of the river in the vicinity of [their] mills," the milling operations could implicate existing navigability. *Id.* at 485.

The United States, however, relies almost entirely (at 3, 9) on a 39-year-old navigability determination made by the Coast Guard that concludes the Rio Grande is navigable "for the entire distance where it forms the international boundary." ECF No. 5-4 at 5. But this determination is no evidence at all. That document acknowledges that it "represents the opinion of the Coast Guard only as to the extent of its own jurisdiction," and expressly disclaims that it establishes the jurisdiction of other agencies, such as the U.S. Army Corps of Engineers. *Id.* [19] And even the Corps recognizes such agency determinations are not dispositive because "conclusive determinations of navigability can be made only by federal Courts." 33 C.F.R. § 329.14.

---

[19]   The Corps division engineers must make a report of factual findings passed on specific criteria as to navigability for purposes of the Rivers and Harbors Act, 33 C.F.R. §§ 329.1, 329.14, an entirely different process and standard than used by the Coast Guard to determine its jurisdiction, 33 C.F.R. § 2.1.

Similarly, the declaration by a regulatory project manager with the Corps provides no evidence for concluding this segment of the Rio Grande has been held navigable, or is currently in fact navigable.[20] Indeed, the United States is entirely silent on whether the waters of this segment of the Rio Grande (within Maverick County, Texas) are of practical service as a highway of commerce. *Cf. Puente de Reynosa, S. A. v. City of McAllen*, 357 F.2d 43, 50–51 (5th Cir. 1966) (looking to affidavits and historical references of current and historic use in determining that the Hidalgo segment of the Rio Grande is navigable under the Rivers and Harbors Act). Furthermore, the United States' witnesses admitted that segments of the Rio Grande, including this segment, can be dry. Ex. D, Gomez Dep. at 51:14–19; Ex. E, Peters Dep. at 27:4–8. When it comes to assessing the navigability in this stretch of the Rio Grande, the United States ignores the need to focus on how this waterway is ordinarily "used by vessels." *Republic Steel*, 362 U.S. at 483. And, as already explained above, that waterway is used by vessels mostly not at all. *Supra* at 4-5, 7.

Texas has shown that this segment of the Rio Grande is not used for interstate or foreign commerce. This segment is shallow and plagued by sandbars and portages and cannot support the customary modes of trade or travel on water. *See* Ex. B, Escalon Decl. ¶ 10; Ex. A, Nordloh Decl. ¶ 5. Individuals with day-to-day exposure to this segment observe no commercial trade. Ex. B, Escalon Decl. ¶ 3; Ex. A, Nordloh Decl. ¶ 7; *see Newbold*, 65 F.4th at 181 (affirming a lack of navigability when "there is no allegation that the channel *is* currently being used for commercial purposes; the nearest evidence of that is that the boat in which [plaintiff] was a passenger was able to traverse the channel," and noting that "neither navigation nor commerce encompass recreational fishing" (internal quotation marks and alterations omitted)). And the United States' own witness, who is familiar with this segment of the Rio Grande, admitted that no other vessels other than law enforcement operating airboats have been seen there. Ex. D, Gomez Dep. at 11:1–12:8. Another United States witness who has been to the Rio Grande stated he is unaware of any

---

[20]   The Corps manager even admitted that he has no knowledge about current, past, or potential future navigation at the portion of the river where the buoys are located. Shelnutt Dep. (unsigned) at 15:5–7, 32:3–18, 46:24–47:20.

commercial navigation on the river in Texas or on the segment at issue. Ex. F, Shelnutt Dep. at 15:5–7, 32:3–18, 46:24–47:20. The United States has not presented any evidence that this segment of the Rio Grande is navigable, and its motion for a preliminary injunction can be denied on this basis alone.

**2.** Even if that were not right, the United States has not shown that the buoy system obstructs navigation. It bears the burden of proving that the buoy system presents an "obstruction . . . to the navigable capacity" of the Rio Grande within the meaning of Section 10 of the Rivers and Harbors Act. 33 U.S.C. § 403. Thus far, all the United States has succeeded in doing is show that the buoys deter illicit passage across the United States border in between established ports of entry. But preventing illegal border crossings is not the same as obstructing the navigable capacity of the Rio Grande. And even if the Rio Grande were navigable in this segment (it is not), the buoys would not obstruct that navigation.

"[T]he mere presence of an object in a navigable river does not necessarily require a finding that the object is in violation of § 403." *Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F. Supp. 738, 761 (E.D. La. 1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990). As the Supreme Court made clear more than 60 years ago, it is not sufficient that an object "may only deter movements in commerce"; it must actually "adversely affect[] navigational capacity." *Republic Steel*, 362 U.S. at 487. Whether Texas's buoys obstruct the navigable capacity of the Rio Grande or, instead, merely deter or divert movements within an otherwise navigable waterway, is a question of fact. *See Rio Grande Dam & Irrigation Co.*, 174 U.S. at 709; *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 444 (S.D.N.Y. 1990).

In determining the answer to that factual question, the Court should focus on the source of authority for, and the purpose of, the Rivers and Harbors Act. Congress' authority over rivers, harbors, and other waters of the United States "is not expressly granted in the Constitution, but is a power incidental to the express power to regulate commerce." *Leovy v. United States*, 177 U.S. 621, 632 (1900). The purpose of the Rivers and Harbors Act, therefore, is to protect "the Nation's right that its waterways be utilized for the interests of the commerce of the whole country." *United*

*States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 405 (1940); *Miami Valley Conservancy Dist.*, 692 F.2d at 449. In accordance with this source of authority and purpose, "a practical construction must be put on these enactments as intended for such large and important purposes." *Leovy*, 177 U.S. at 633.

A practical consideration of the impact of Texas's buoys reveals that they do not obstruct navigable capacity in the sense established in the case law. The requisite obstruction cannot be just a minor or technical one; the plaintiff must show that it "substantially diminishes the navigability of that stream within the limits of present navigability." *Rio Grande Dam & Irrigation Co.,* 174 U.S. at 710. It is no wonder, then, that every riparian case the State has identified finding an obstruction under the Act—including those cited by the United States—involved obstructions extending out into rivers and set perpendicular to the current (so as to obstruct vessels navigating up and down the rivers). *See United States v. Angell*, 292 F.3d 333, 335 (2d Cir. 2002) (the "dock structure" at issue "span[ned] most of the width of the Canal"); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 310 (3d Cir. 1997) (defendants created "a large dock" from barges connected to the shore via "walkways . . . constructed out of metal and wood"); *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1211 (6th Cir. 1980) (the structure at issue was "a collapsed dock, extending 35 feet into the river").

Texas's buoys are set parallel to the current to prevent cross-border fording of the river—not perpendicular to the current in a manner that would obstruct navigation up and down the river in violation of the Act. Because the buoy system occupies just 4 feet out of 200 feet of breadth, any navigation along the river is entirely unimpeded. Indeed, United States' witness admitted that up-and-down river traffic is not blocked by the presence of the buoys. Ex. D, Gomez Dep. at 43:16–22. The shallowness of the Rio Grande at the point of the buoy system allows only extremely shallow-draft boats to navigate this portion of the river, and any boat that could navigate at all "at the current site of the floating buoys can easily navigate past them on either the United States or Mexico side of the River." Ex. B, Escalon Decl. ¶ 9. Under the Rivers and Harbors Act, this segment of the Rio Grande is not navigable, and even if it were, the buoy system would do nothing

to detract from its navigable capacity. If anything detracts from that capacity, it is that the river is regularly filled with thousands of individuals illegally fording it to cross from Mexico into the United States.

**B.   The buoy system does not fall within the Rivers and Harbors Act because it is neither a boom nor any other prohibited structure.**

The United States asserts that Texas, in its deployment of the buoys, engaged in the "building" of certain "structures" that were impermissible under Section 10 of the Rivers and Harbors Act. This erroneous assertion, in turn, rests upon deeply flawed interpretations of the relevant statutory text and supporting case law.

**1.   Buoys are not booms.**

Section 10 of the Rivers and Harbors Act bars "the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in a navigable river of the United States, absent the express permission of the Corps. 33 U.S.C. § 403. The word *buoy* is notably absent from the list of structures for which a permit is required. Nevertheless, the United States attempts to shoehorn that word into the statute by claiming that the buoys at issue here qualify as a "boom" within the meaning of Section 10. That attempt to rewrite the statute fails for at least three reasons.

*First*, the United States' own definitions belie its assertion that Texas's buoy system is a boom. The United States mischaracterizes (at 9) a boom as "any floating barrier that arrests movement across a waterway." But immediately following this mischaracterization, the United States cites two definitions that correctly identify a boom as a barrier "extended across a river or mouth of a harbor" or "stretched across a river." While this mischaracterization presents a subtle difference, it is one with a massive directional distinction: a boom is stretched across a river, perpendicular to the flow of the current, to impede traffic moving up and down the river, parallel to the flow of the current. *See United States v. Bellingham Bay Boom Co.*, 176 U.S. 211, 213 (1900) ("[T]he boom crosses the channel of the river and entirely fills it[.]"). A boom is not, as the United States asserts in direct contradiction of its own definitions, designed to prevent movement *across* a river. Rather, a boom is stretched across a river with the intent or effect of preventing movement

14

*up and down* the course of that river. By contrast, Texas's buoy system is designed to prevent unauthorized movement *across* the Rio Grande from one bank to another and is accordingly situated parallel to the river's current. Ex. B, Escalon Decl. ¶ 6, 8. The buoy system is therefore not a boom within the meaning of the Rivers and Harbors Act.

*Second*, this understanding is confirmed by dictionaries close in time to passage of the Rivers and Harbors Act. Webster's 1828 Dictionary defines a boom as "[a] strong iron chain, fastened to spars, and extended across a river, or the mouth of a harbor, to prevent an enemy's ships from passing." *Boom*, 1 Noah Webster, American Dictionary of the English Language 25 (1828). Webster's 1890 Dictionary defines a boom as "[a] chain cable, or line of spars bound together, extended across a body of water to obstruct passage." *Boom*, Webster's International Dictionary of the English Language (1890). And Webster's 1913 Dictionary describes a boom alternately as "[a] strong chain cable, or line of spars bound together, extended across a river or the mouth of a harbor, to obstruct navigation or passage" or "[a] line of connected floating timbers stretched across a river, or enclosing an area of water, to keep saw logs, etc., from floating away." *Boom*, Webster's Revised Unabridged Dictionary (1913). None of these definitions contemplate the buoys at issue here, which discourage illicit and dangerous passage from the Mexico side of the Rio Grande to the Texas side.

*Third*, the Corps manager on whose declaration the United States relies admitted at his deposition that Texas's floating buoys are not a boom. Shelnutt Dep. (unsigned) at 61:22–23.

Moreover, the statutory context surrounding Section 10 of the Rivers and Harbors Act evidences the clear distinction between buoys and booms. While Section 10 of the Act lists booms among the structures that require advance approval from the Corps, Section 15 of the Act mandates the placement and maintenance of "a buoy or beacon" to mark sunken vessels that could pose a hazard to navigation. 33 U.S.C. § 409. In other words, the Act not only permits buoys—it sometimes *requires* them, and without first obtaining approval of the Corps. *Id.* (operator of sunken craft "shall . . . immediately mark it with a buoy" and "failure . . . to do so shall be unlawful"). And it does so because, far from obstructing navigation, buoys *assist* navigation in a waterway. At the

very least, this explicit requirement to place buoys in navigable waters under certain circumstances contrasts with Section 10's prohibition on placing obstructive booms, and contradicts the United States' assertion that buoys and booms are one and the same. Buoys and booms were different to the authors of the Rivers and Harbors Act, are different under a straightforward reading of the statutory text, and should not, as a matter of statutory construction, have their differences erased.

> **2. The buoys are not "other structures" within the meaning of the Rivers and Harbors Act.**

Perhaps anticipating that its attempt to elide the statutory and definitional separation of the terms "buoy" and "boom" would prove unsuccessful, the United States seeks to stash buoys within Section 10's catchall term "other structures." But reliance on this catchall ignores the *ejusdem generis* (or "of like kind") canon of statutory construction. This canon applies where general words follow specific words within a statute, such as in Section 10 where Congress "has tacked on a catchall phrase at the end of an enumeration of specifics." ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: The Interpretation of Legal Texts*, 199 (2012). It directs that such general terms be construed to encompass only what is similar in nature to the preceding specific terms, ensuring that those generalities "will not render specific words meaningless." *Yates v. United States*, 574 U.S. 528, 545-46 (2015).

Applied in the context of Section 10, the *ejusdem generis* canon bars the overbroad interpretation of "other structures" promulgated by the United States. If "other structure[]" meant any structure whatsoever, there would be no purpose in Congress's specific mention of the structures listed in Section 10, making it "hard to see why it would have needed to include the examples at all." *Yates*, 574 U.S. at 545–46.

Moreover, as discussed above, the Rivers and Harbors Act affirmatively distinguishes buoys from the sort of obstructions listed in Section 10. Section 15 of the Act mandates the placement of buoys under certain circumstances, 33 U.S.C. § 409, and it does so precisely because buoys aid navigation, including around other objects that might obstruct navigation. This positively indicates that a buoy is different in kind from a "wharf, pier, dolphin, boom, weir, breakwater, bulkhead, [or]

16

jetty." 33 U.S.C. § 403; *see also id.* § 408(a) (distinguishing "buoys" from various "work[s] built by the United States"); *id.* § 403b (implying in a 1986 amendment that the "other structures" catchall would include permanent things like "a dock or a boat launching facility"). Buoys, therefore, are not among the "other structures" contemplated by Section 10, and the United States' assertion to that effect is erroneous.

This conclusion is buttressed by both Corps regulations and precedent, both of which confirm that the word *structure* entails permanence. According to the Corps, "structure" includes "permanent mooring structure[s]" and "permanently moored floating vessel[s]." *See* 33 C.F.R. § 322.2(b). Numerous cases reach the same conclusion. *See, e.g.*, *United States v. Estate of Boothby*, 16 F.3d 19, 21 (1st Cir. 1994) ("We believe that this regulation lawfully can be applied to houseboats that are found to constitute *permanently moored* vessels." (emphasis added) (citing *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983); *United States v. Oak Beach Inn Corp.*, 744 F. Supp. 439, 444 (S.D.N.Y. 1990))); *United States v. Burns*, 54 F. 351, 363 (C.C.D.W. Va. 1893) ("I think that the obstructions contemplated by [Section 10] are such obstructions as are *permanent in their nature*[, not] the floating of rafts, logs, timber, boats, and vessels." (emphasis added)); *United States v. Bridgeport Towing Line*, 15 F.2d 240, 240 (D. Conn. 1926) (holding that a sunken vessel "constitutes a *permanent* obstruction" (emphasis added)); *Phenix Const. Co. v. Cornell Steamboat Co.*, 103 N.E. 891 (N.Y. 1913) ("The intent of [Section 10] was against the construction of structures of a more, or less, *permanent nature* . . . ." (emphasis added)); *cf. United States v. Hall*, 63 F. 472, 474 (1st Cir. 1894) ("[S]ection 10 of the act of September 19, 1890, was intended to apply to all obstructions of a *permanent character* . . . ." (emphasis added)).

But the buoys at issue here are not permanent. Neither the buoys nor the concrete blocks attached to them are affixed in any way to the riverbed; no excavation or building occurred in the river. Ex. C, Flossman Decl. ¶ 6; Ex. B, Escalon Decl. ¶ 7. And the buoys may be dismantled and redeployed using machinery to lift and move the concrete blocks. Ex. C, Flossman Decl. ¶ 5–7. Regulations and caselaw therefore confirm that the buoy system is not an "other structure" under the Rivers and Harbors Act.

17

**C. Texas retains sovereign authority to defend itself in the event of invasion, and this Court should construe the Rivers and Harbors Act narrowly in view of the constitutional questions that right poses.**

The Constitution provides that "[n]o state shall, without the Consent of Congress, . . . engage in war, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. This provision represents "an acknowledgement of the States' sovereign interest in protecting their borders." *Arizona v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., concurring in part and dissenting in part). The Constitution thus "leaves intact [States'] inherent power to protect their territory." *Id*. The power to determine whether Texas has been "actually invaded," U.S. Const. art. I, § 10, cl. 3, is vested in the Governor of Texas as the commander-in-chief of the State's militia, *see* Tex. Const. art. IV, § 7. Governor Abbott has asserted this power because, due to President Biden's open-border refusal to faithfully execute federal immigration laws, the United States has unconstitutionally refused to "protect [the State of Texas] against Invasion" by transnational cartels. U.S. Const. art. IV, § 4.

Texas's sovereign power is not limited to repelling invasions by state actors. By its terms, Article I, § 10, Clause 3 applies to all types of invasions, including invasions from non-state or quasi-state actors, like the cartels. Indeed, throughout American history, States have had to use military force to respond to hostile non-state actors. For example, James Madison explained at the Virginia Ratifying Convention how state militia were customarily utilized: "There were a number of smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions." 11 James Madison, Debate From Virginia Ratifying Convention (June 16, 1788). And in 1792, Congress exercised its power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. I, § 8, by authorizing the President to call forth the militia "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or *Indian tribe*." An Act to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792) (emphasis added). Congress reenacted the same provision in 1795. *See* An Act to provide for calling

18

forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions; and to repeal the Act now in force for those purposes, 1 Stat. 424, 3d Cong., Sess. II, Ch. 36 (1795) ("imminent danger of invasion from any foreign nation or Indian tribe"). Any notion that "invasion" somehow hinges on the difference between state actors and non-state actors would seem wholly artificial to the Framers: After all, the Constitution gives Congress power to "grant Letters of Marque and Reprisal" authorizing *private actors* to cross international borders to commit hostile acts. U.S. Const. art. I, § 8, cl. 11.

This lack of a limitation to state actors comports with the use of the word invasion near the founding. Webster's 1806 dictionary—the first American English dictionary—defines "invade" broadly, as meaning "to enter or seize in hostile manner." Noah Webster, A compendious Dictionary of the English Language 164 (1806). Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "1. . . to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate." 1 Noah Webster, American Dictionary of the English Language 113 (1828). Dictionary definitions at the time defined "invade" as simply "to enter in a hostile manner." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828). An "invasion" was a "hostile entrance" or "an attack." *Id.* Further, "hostile" is not defined to include only state actors. *Id.* ("HO'STILE. adj. [hostilis, Latin.] Adverse; opposite; suitable to an enemy."),  (E'nemy. n.s. [ennemi, French; inimicus, Latin.]  1. A publick foe. . .  2. A private opponent; an antagonist. . . 3. Any one who regards another with malevolence; not a friend. . . ."). Indeed, modern American law also recognizes this sense of the term. After the attacks of September 11, 2001, Congress authorized the use of military force against not only responsible "nations" but also "organizations" and "persons." Authorization for the Use of Military Force, Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001).

Thousands of aliens have entered the State illegally, including members of cartels that traffic in people, weapons, and vast quantities of drugs like fentanyl.[21] By any account, this amounts to "ent[ry] in a hostile manner." And the State has the constitutional power to repel that invasion. U.S. Const. art. I, § 10, cl. 3. The State may do so to, for example, protect the health, safety, morals, and general welfare of its citizens. *House v. Mayes*, 219 U.S. 270, 282 (1911).

In view of this constitutional authority, this Court should construe the Rivers and Harbors Act narrowly to avoid the constitutional questions presented by the interaction between the State's constitutional authority to repel invasions and the Rivers and Harbors Act. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023) (applying constitutional avoidance in immigration context). "Under the doctrine of constitutional avoidance, '[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753–54 (5th Cir. 2008) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)). Here, the State has deployed the buoy system to prevent cartels from trafficking an unprecedented number of aliens, an unknown number of terrorists, and illegal drugs such as fentanyl across the Rio Grande. To prevent a collision between the Rivers and Harbors Act and the State's constitutionally guaranteed right to protect itself, the Court should hold that the terms of the Rivers and Harbors Act do not apply here.

As the Supreme Court has recognized, border States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. And those consequences are severe, as detailed above. At a minimum, this Court should not enter a mandatory preliminary injunction that will all

---

[21] Press Release, *Governor Abbott Designates Mexican Cartels As Terrorist Organizations*, Office of the Texas Governor (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations; Victor Nava, *Armed Men Believed to be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, New York Post (August 8, 2023), https://nypost.com/2023/08/08/armed-men-in-body-armor-spotted-crossing-southern-border/.

but dispose of this case on expedited briefing and without trial, in view of these significant concerns related to federalism and a State's constitutional right to defend itself in case of invasion.

## II.   The Remaining Factors Do Not Favor a Preliminary Injunction.

The United States has failed to show either that irreparable harm will occur prior to the trial on the merits of this case in the absence of a preliminary injunction, or that the equities and public interest favor an extraordinary mandatory preliminary injunction.

**A.** The United States first asserts (at 14–16) that the presence of the buoy system harms its relationship with the government of Mexico. But the evidence that the United States uses to support that proposition is insufficient. Even fully credited, that evidence shows at most that the buoy system "has become the subject of diplomatic concern between Mexico and the United States" and "the presence of the floating barrier in the Rio Grande for any extended period of time . . . would become a major irritant in U.S.-Mexico relations and damage U.S. foreign policy." ECF No. 5-7 at ¶¶ 3, 13. Far from showing that irreparable harm has occurred or even will occur, this is merely speculation that, should this case take months or year to resolve, some harm that might or might not be irreparable would occur in the relationship between the United States and Mexico. But "a showing of '[s]peculative injury is not sufficient'" to support a showing of irreparable harm. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (quoting *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980)). This is particularly true where, as here, the United States seeks preliminary relief in the form of a disfavored mandatory injunction. In any event, the federal government has no freewheeling power to prevent States from doing anything that "may upset foreign powers." *Arizona*, 567 U.S. at 423–24 (Scalia, J., concurring in part and dissenting in part) (citing *Medellin v. Texas*, 552 U.S. 491 (2008)).

The United States also asserts (at 15) that it will be irreparably harmed because the buoy system interferes with lateral navigation across the Rio Grande and "could present risks to navigation and public safety." But lawful commerce, as opposed to drug or human smuggling, is nonexistent in this segment of the river. Ex. B, Escalon Decl. ¶ 3. Ex. A, Nordloh Decl. ¶ 7. And because there is no port of entry at the site of the buoy system, navigation across the river from

Mexico into the United States is unlawful in any event. Moreover, the mere possibility that either navigation or some risk to navigation could materialize is both contested and speculative—and Texas Department of Public Safety officials monitor the buoy system continuously to minimize such risks in any event. The United States offered no evidence that the buoys are a threat to public safety; the evidence shows the contrary.

**B.** The public interest and the balance of the equities likewise do not support relief, particularly not mandatory injunctive relief. As discussed above, millions of individuals and hundreds of millions of fatal doses of illegal drugs have crossed the State's border with Mexico because of the federal government's refusal to secure it.[22] Five Texans died per day in 2022 from fentanyl poisoning. And the State has a strong interest in preventing the harms from such criminality and illegal immigration from being visited on its citizens. Indeed, the harms that the United States purports to identify—potential future harms to the United States' relationship with Mexico and minor impairments to navigation on a nonnavigable segment of the Rio Grande—are incommensurate with that interest. *See Shively v. Bowlby*, 152 U.S. 1, 24 (1894) (State's "right to prohibit persons not citizens of the state" from "tide waters within the state" was subject only to federal government's right of navigation). Considerations of federalism as well strongly counsel against any federal court injunction that would thwart a State and its commander-in-chief in their efforts to respond to a deadly crisis for less than the most urgent and compelling command of the Constitution or federal law. *See New York v. New Jersey*, 143 S. Ct. 918, 925 (2023) (refusing to interpret compact to "delegat[e] a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders").

---

[22] On December 15, 2021, President Biden found that "the trafficking into the United States of illicit drugs, including fentanyl and other synthetic opioids, is causing the deaths of tens of thousands of Americans annually" and declared "a national emergency to deal with the threat." Exec. Order 14059, 86 Fed. Reg. 71549. President Biden continued that national emergency in effect on December 12, 2022. On April 21, 2022, President Biden sent to Congress a National Drug Control Strategy, noting that drug overdoses "have taken a heartbreaking toll claiming 106,854 lives in the most recent 12-month period." A key part of the Strategy was "specific border strategies" to "strengthen interdiction and law enforcement capabilities on our Nation's borders."

What's more, the buoy system protects not only the safety of the State and its citizens, but also aliens attempting to enter Texas. The floating buoy system is designed to save lives and direct aliens to appropriate ports of entry while deterring unlawful, dangerous crossings through the Rio Grande. Ex. C, Flossman Decl. ¶ 4. Aliens who enter the United States and Texas at ports of entry—rather than attempting an illegal and dangerous water crossing on what is reported to be the world's deadliest land border—may enter lawfully if allowed to do so and in any event do not risk death or drowning while illegally crossing the Rio Grande. *Supra*, 3-4. This independently shows that the equities and the public interest do not favor a preliminary injunction.

## Conclusion

The Court should deny the request for a preliminary injunction.

Date: August 9, 2023

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Respectfully submitted,

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Special Counsel
Tex. State Bar No. 00798537
patrick.sweeten@oag.texas.gov

RYAN D. WALTERS
Deputy Chief
Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**Counsel for Defendants**

## CERTIFICATE OF SERVICE

On August 9, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN