**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.,* | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA,      *
                               *
    Plaintiff                  *
                               *
v.                             *   CIVIL ACTION
                               *       NO. 1:23-00853-DAE
GREG ABBOTT, in His            *
Official Capacity as           *
Governor of the State of       *
Texas, and the State of        *
Texas,                         *
                               *
    Defendants.                *

VIDEOCONFERENCED ORAL DEPOSITION

OF

CAPTAIN JUSTIN PETERS

Monday, August 7, 2023

(REMOTELY REPORTED)

VIDEOCONFERENCED ORAL DEPOSITION OF CAPTAIN

JUSTIN PETERS, produced as a witness at the instance of

the Defendants, and duly sworn, was taken in the above-

styled and numbered cause on Monday, August 7, 2023,

from 11:17 a.m. to 12:44 p.m., before Debbie D.

Cunningham, CSR in and for the State of Texas, remotely

reported via Machine Shorthand, pursuant to the Federal

Rules of Civil Procedure.

--ooOoo--

1                        APPEARANCES

2

3    FOR PLAINTIFF:

4        U.S. ATTORNEY'S OFFICE - DEPARTMENT OF JUSTICE
         Environment & Natural Resources Division
5        150 M. Street N.E.
         Washington, DC 20002
6        (T) 202.514.2275

7             By:  Kimere Kimball, Esq.
                   kimere.kimball@usdoj.gov
8                      AND
         U.S. ATTORNEY'S OFFICE - DEPARTMENT OF JUSTICE
9        601 N.W. Loop 410, Suite 600
         San Antonio, Texas  78216
10       (T) 210.384.7100

11            By:  Mary Kruger, Esq.
                   mary.kruger@usdoj.gov
12


13   FOR DEFENDANTS:

14       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15       Special Counsel for Civil Litigation
         300 W. 15th Street
16       Austin, Texas  78701
         (T) 512.475.4133

17            By:  Patrick Sweeten, Esq.
18                 Patrick.Sweeten@oag.texas.gov
                             AND
19                 Jake Marx, Esq.
                   Jake.Marx@oag.texas.gov

20

21                     --ooOoo--

22

23

24

25

1                           INDEX

2    APPEARANCES                              2

3

4   EXAMINATION OF CAPTAIN JUSTIN PETERS:

5    BY MR. SWEETEN                           6

6    BY MS. KIMBALL                          58

7

8

9    CHANGES AND SIGNATURE                   60

10   REPORTER'S CERTIFICATION                62

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Justin Peters - 8/7/2023

4

1                          EXHIBIT INDEX

2   Exhibit Number       Description                    Page

3    Exhibit 1     1984 Coast Guard Determination      11

4    Exhibit 2     Image of Rio Grande River           11

5    Exhibit 3     Declaration of Captain Justin        11
                   Peters

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Monday, August 7, 2023, 11:17 a.m.)

 2                    P R O C E E D I N G S

 3          THE REPORTER:  This is the

 4   Deposition of Captain Justin Peters, in the

 5   matter of the United States of America versus

 6   Greg Abbott, et al.  We are conducting this

 7   deposition remotely, and we are located in our

 8   preferred respective locations.  We are on the

 9   record at 11:17 a.m. Central Standard Time.

10          My name is Debbie Cunningham,

11   and my business address is 9901 Brodie Lane,

12   Austin, Texas 78748.

13          Would all parties present please

14   introduce themselves for the record?

15          MR. SWEETEN:  This is Patrick

16   Sweeten on behalf of Governor Greg Abbott and

17   the State of Texas.

18          MS. KIMBALL:  This is Kimere

19   Kimball U.S. Department of Justice, Environment

20   & Natural Resources Division, on behalf of the

21   United States; and with me today in San Antonio

22   is Mary Kruger at the U.S. Attorney's Office of

23   the Western District of Texas.

24          MR. SWEETEN:  And let me add

25   that Jake Marx is with me as well.  I forgot to

1  introduce him.

2          THE WITNESS:  My name is

3  Captain Justin Peters, U.S. Coast Guard.

4          (Witness sworn by the reporter.)

5          MR. SWEETEN:  Let me just show

6  that this deposition is being taken pursuant to

7  the Federal Rules of Civil Procedure.

8          Also, through negotiations on

9  Friday, Counsel for the State of Texas and

10  Governor Abbott and Counsel for the DOJ agreed

11  to take this deposition by Zoom, rather than

12  require Mr. Peters -- or Captain Peters to

13  appear in Texas or have this in person.

14          CAPTAIN JUSTIN PETERS,

15    having been duly sworn, testified as follows:

16          EXAMINATION

17  BY MR. SWEETEN:

18      Q.   Captain Peters, will you state your

19  full name, please?

20      A.   Justin David Peters.

21      Q.   And Justin -- I mean, Captain, how

22  old are you?

23      A.   50.

24  ██   ███   ███████████████

25  ██   ████████████

1       Q.   All right.  And how long have you

2  worked at the Coast Guard, sir?

3       A.   Over 31 years.

4       Q.   Okay.  All right.  As you know, I'm

5  the attorney representing the State of Texas

6  and Governor Abbott.  I'm going to be taking

7  your deposition today.  Have you ever had your

8  deposition taken before today?

9       A.   No.

10      Q.   Okay.  You understand today that you

11  are under oath here in this proceeding?

12      A.   Yes.

13      Q.   You've had the opportunity to speak

14  with your lawyer about a deposition and what it

15  is, correct?

16      A.   That is correct.

17      Q.   You understand that you'll be

18  providing testimony to the Court in this case

19  in the matter of The United States of America

20  versus Gregg Abbott, et al., correct?

21      A.   Yes.

22      Q.   You understand that the testimony

23  today that you will provide might be used in a

24  court proceeding?

25      A.   Yes.

8

```
 1        Q.   And that you're under oath today just
 2   as you would be if you were in court, correct?
 3        A.   Yes.
 4        Q.   All right.  So I'm just going to go
 5   through a couple of ground rules since this is
 6   your first deposition.  I'm not going to
 7   belabor these since I assume you've had the
 8   opportunity to talk to your attorney about
 9   this, but I'm going to be asking you a series
10   of questions today.  If at any time you do not
11   understand a question that I'm asking you,
12   please ask me to rephrase it; and I'll be more
13   than happy to do that.  Okay?  Is that fair?
14        A.   Yes.
15        Q.   If you do answer the question, then
16   I'll assume you understood what the question
17   was asking.  Is that fair?
18        A.   Yes.
19        Q.   Okay.  A couple of things:  The court
20   reporter can't get down if we're both talking
21   at the same time.  So I'm going to try today to
22   endeavor to let you finish your answer; and if
23   you would please let me finish my question,
24   that way we'll make sure we have a cleaner
25   record here.  Okay?
```

```
 1        A.   Yes.

 2        Q.   One other rule is the court reporter

 3   can't take down in the transcription that she's

 4   typing out today shakes of the head, nods,

 5   "uh-huhs" or "huh-uhs."  So there may be times

 6   today -- it's normal in conversation for us to

 7   do those types of things and I typically would

 8   understand it; but because we're trying to make

 9   sure there's a clear record, there may be a

10   time or two today that I say, "Does that mean

11   'yes'?"  Or I'll follow up on a nonverbal

12   gesture; but at all times, if you would,

13   provide a verbal answer.  That way we'll make

14   sure the transcription is clear.  Okay?

15        A.   Yes, I understand.

16        Q.   Okay.  Thank you.

17             Captain Peters, where do you

18   live, sir?

19        A.   I live in Annandale, Virginia.

20        Q.   All right.  And are you at the --

21   tell me where your main office is.  Where do

22   you go to work?

23        A.   Coast Guard Headquarters.

24        Q.   Okay.  And where is that?

25        A.   Washington, D.C.
```

Justin Peters - 8/7/2023

10

```
1        Q.   Okay.  Now, you've had the
2   opportunity to speak with your attorney today
3   in advance of this deposition; is that correct?
4        A.   Yes.
5        Q.   Okay.  And your attorney is Kimere
6   Kimball?
7             MR. SWEETEN:  I hope I got that
8   right, Kimere.
9        A.   Yes, that's correct.
10       Q.   (BY MR. SWEETEN)  Okay.  And have you
11  spoken, outside of your attorneys -- because
12  I'm not going to ask you about conversations
13  you had with her -- outside of her, have you
14  had conversations about this deposition that
15  you're providing today?
16       A.   Can you clarify if you're asking
17  about scheduling the deposition or the
18  deposition itself?
19       Q.   I'm not as interested in scheduling.
20  Like, for example, if you've talked about times
21  you'd be available or wouldn't be, things
22  you're doing other than this, that's not what
23  I'm asking.
24             I'm asking more along the lines
25  of you knew you had a deposition today.  Did
```

Justin Peters - 8/7/2023

1   **you talk to anyone other than your attorneys in**

2   **advance of this deposition to prepare you for**

3   **the deposition?**

4         A.   I spoke to Department of Justice

5   attorneys and Coast Guard attorneys together.

6         **Q.   Did you speak to anybody outside of**

7   **that group?**

8         A.   No.

9         **Q.   Were you shown any documents in those**

10  **meetings?**

11        A.   I was shown my declaration.

12        **Q.   Okay.   Were you shown any other**

13  **documents?**

14        A.   No.

15        **Q.   Okay.**

16              (Exhibit 1 marked.)

17              (Exhibit 2 marked.)

18              (Exhibit 3 marked.)

19              MR. SWEETEN:   All right.   Jake,

20  I need you to e-mail Kimere Kimball the

21  exhibits, please.

22              MS. KIMBALL:   Sorry.   Hold on

23  just a second.   I don't have my e-mail open.

24              THE REPORTER:   I assume this is

25  off the record?

1          MR. SWEETEN:  Yes, we can go off

2   the record.  Thank you.

3               (Off the record from 11:28

4          to 11:31 a.m.)

5      Q.   (BY MR. SWEETEN)  Captain Peters, I'm

6   going to show you what's been marked as

7   Exhibit Number 1 to this deposition; and it is

8   a document that at the very top has U.S.

9   Department of Transportation, United States

10  Coast Guard letterhead.  It's a letter dated

11  October 19th, 1984.

12               Do you have that in front of

13  you, sir?

14      A.   Yes, I do.

15      Q.   Okay.  And you're familiar with this

16  document, correct?

17      A.   I have seen this document before,

18  yes.

19      Q.   Okay.  Because this document was

20  actually attached to the preliminary injunction

21  that was filed by the Department of Justice.

22  Are you aware of that, sir?

23      A.   I'm aware that this was a

24  declaration, yes.

25      Q.   Okay.  So let's talk about what this

Justin Peters - 8/7/2023

13

1    document is.  First of all, it is a document

2    written by T. W. Snook of the United States

3    Coast Guard; is that correct?

4                 MS. KIMBALL:  I can scroll over

5    here.

6          A.   Yes.

7          Q.   (BY MR. SWEETEN)  And it is from --

8    it says, "From:  Commander, Eighth Coast Guard

9    District, To:  Commanding Officer, Marine

10   Safety Office Corpus Christi, Texas."  Did I

11   describe that correctly?

12         A.   Yes.

13         Q.   All right.  Now, the date -- this

14   letter is 40 years old almost, correct?

15         A.   1984, yes.

16         Q.   It's 39 years old.  Is my math wrong?

17         A.   Um, I mean, I don't want to get my

18   math wrong (laughing.)

19         Q.   All right.  Very good.

20                So let's look at the document

21   that's been attached to an affidavit in this

22   case and attached to the Preliminary Injunction

23   Motion filed by the Department of Justice.  In

24   Number 1 it says, "From 1947 to 1975 the Rio

25   Grande River was listed among the navigable

Justin Peters - 8/7/2023

14

1  waters of the United States pursuant to

2  treaties with Mexico and for Coast Guard

3  regulatory purposes."  Did I read that first

4  sentence correctly?

5      A.   Yes.

6      Q.   Okay.  And the purpose of -- what is

7  the purpose of the navigability determination

8  that's here on this page?

9      A.   I'm not in a position to answer that.

10     Q.   Okay.  Have you reviewed this

11 document before today?

12     A.   I have seen the document, yes.

13     Q.   Okay.  And you understand that it

14 states that, "The Rio Grande River was listed

15 among the navigable waters of the U.S. pursuant

16 to treaties with Mexico and for Coast Guard

17 regulatory purposes."  Do you see that?

18     A.   Yes, I do.

19     Q.   Now, it's also the case that if we go

20 to Number 3, that that letter says, "This

21 represents the opinion of the Coast Guard only

22 as to the extent of its own jurisdiction, and

23 does not address the jurisdiction of other

24 agencies."  Did I read that last sentence

25 correctly?

Justin Peters - 8/7/2023

15

```
 1        A.    Yes.
 2        Q.    And that sentence is part of this
 3   navigability determination that has been
 4   provided in this lawsuit, correct?
 5        A.    That is my understanding.
 6        Q.    Okay.  Are you aware of
 7   Captain Brandy Parker's review -- she is, as I
 8   understand it, with the Judge Advocate
 9   General's Office of the Coast Guard -- her
10   review of the Coast Guard's navigability
11   determination?
12        A.    I am familiar that she provided this
13   document to the Department of Justice.
14        Q.    Okay.  And this is not a document
15   that you provided.  This is something that
16   Captain Brandy Parker provided, correct?
17        A.    That is my understanding.
18        Q.    Okay.  So is it the case that -- when
19   I asked you what it was earlier, it sounded
20   like you didn't have great familiarity with
21   this document and what its import is.  Is that
22   fair to say, Captain Peters?
23        A.    Yes.
24        Q.    Okay.  And so if I were to ask you if
25   you agreed with her determinations, her
```

1    findings about the '84 navigability

2    determination and whether or not it's still in

3    effect, that's not something you would know

4    sitting here today, correct?

5         A.   That is not under -- that information

6    is not under my purview.

7         Q.   Okay.  And so you don't know that as

8    you're sitting here today, correct?

9         A.   That is correct.

10        Q.   All right.  And you're not testifying

11   one way or the other as to whether or not this

12   is a navigability determination that is still

13   in effect, correct?

14        A.   I'm not in a position to answer that.

15        Q.   Okay.  And so the answer is "no,"

16   you're not testifying one way or the other,

17   correct, about this navigability determination?

18   I just want to make sure we're clear, close

19   that out.

20        A.   I am not testifying to the contents

21   of this document.

22        Q.   All right.  I understand.  Thank you:

23             "The Rio Grande River remains

24   navigable waters of the United States."  That's

25   something that Captain Brandy Parker said.

1   That's not something you're here to testify

2   about or know about, correct?

3        A.   That is correct.

4        Q.   Okay.  That the navigability

5   determination makes no qualification, that's

6   not something you're here to talk about.

7   That's something that we would have to talk

8   with Captain Parker about; is that correct?

9        A.   I am not able to answer that.

10       Q.   Okay.  If I were to ask you what is

11  the definition of "navigable waters" that was

12  used by T. W. Snook in providing this

13  determination, you wouldn't know that, correct?

14       A.   That's correct.

15       Q.   Okay.  The same with what

16  Captain Parker's opinion is in what she

17  reviewed.  You wouldn't know what she was

18  utilizing as the definition of "navigable

19  waters" used for this determination in this

20  letter, correct?

21       A.   That is correct.

22       Q.   Okay.  Thank you for your testimony.

23            All right.  Now, as you're

24  sitting here today, are you aware there are

25  1247 river miles between Texas and -- on the

```
 1  southern border of Texas, sir?

 2      A.   No, I am not.

 3      Q.   Okay.  Then let me ask it more

 4  generally.  With respect to the -- hold on a

 5  second.

 6            In the letter it talks about

 7  mile 0 to mile 1247, correct?

 8            MS. KIMBALL:  Are we talking

 9  about Exhibit 1?

10            MR. SWEETEN:  Yes, ma'am.  Yes,

11  Kimere.

12            MS. KIMBALL:  Can you just tell

13  me where that is so I can get the document --

14            MR. SWEETEN:  Oh, sure.

15  Paragraph 1.  And it is, I think, Line 2.

16      A.   Can you restate the question?

17      Q.   (BY MR. SWEETEN)  Yeah, yeah, no

18  problem.

19            It says, "This determination

20  covers the river for the entire distance..."

21  And if you skip down, it says mile 0 to mile

22  1247.  You are not here to testify whether or

23  not -- what of those miles of river you believe

24  to be navigable today, correct?

25      A.   I am not able to testify to that.
```

1      **Q.   Okay.  And you're not offering an**

2 **opinion on that, correct?**

3      A.   No, I am not.

4      **Q.   Okay.  Thank you.**

5          **Oh, I forgot to ask you a couple**

6 **of questions about the Coast Guard.  The Coast**

7 **Guard, tell me generally:  What is their job?**

8      A.   The Coast Guard has multiple

9 statutory missions that are assigned to us via

10 law.  The Coast Guard conducts a variety of

11 missions, to include search and rescue, law

12 enforcement, marine environmental protection,

13 waterway management, and a variety of other

14 missions.

15      **Q.   Thank you, sir.**

16          **Now, the Coast Guard is a public**

17 **entity, correct?  It is not a private entity**

18 **engaged in commerce; is that accurate?**

19      A.   That is correct.

20      **Q.   And the Coast Guard is not a**

21 **commercial operation in any way, correct?**

22      A.   That is correct, to the best of my

23 knowledge.

24      **Q.   Okay.  Now, we talked a little bit**

25 **about this on Exhibit 1, which was the Coast**

1  Guard's determination.  Are you aware of any

2  other federal agency, other than the Coast

3  Guard, that has determined that the segments

4  within Maverick County of the Rio Grande River

5  are, indeed, navigable?

6       A.   I do not know.

7       Q.   Okay.  Are you aware as you're

8  sitting here of a single federal court decision

9  that has determined that the segments of the

10 river in Maverick County are in any way

11 navigable?

12      A.   I am not aware of that information.

13      Q.   Thank you.

14           Are you aware of a single state

15 court determination that has held that the

16 river areas within Maverick County are

17 navigable?

18      A.   I do not have that information.

19      Q.   Okay.  Let me ask you another

20 question.  It's the case, isn't it, that the

21 Coast Guard does not make navigability

22 determinations under the Rivers and Harbors

23 Act?  Is that accurate?

24           MS. KIMBALL:  Objection, calls

25 for a legal conclusion and also is outside the

```
1   scope of discovery authorized by the Court,

2   which is limited to just the question of

3   obstructions.

4               The witness is instructed not to

5   answer.

6               MR. SWEETEN:  Okay.  So the

7   instruction is you're telling him not to answer

8   the question that I asked; is that right?

9               MS. KIMBALL:  That's correct.

10              MR. SWEETEN:  Okay.

11      Q.   (BY MR. SWEETEN)  Now, have you been

12  to -- you understand that at issue in this

13  litigation are a series of buoys that are in

14  the -- currently in the Rio Grande River in

15  Maverick County, right?

16              MS. KIMBALL:  Could you clarify

17  if Maverick County is the county where Eagle

18  Pass is?

19              MR. SWEETEN:  Maverick County is

20  where Eagle Pass is, yes, Kimere.

21      A.   Yes, I am aware.

22      Q.   (BY MR. SWEETEN)  Okay.  Now, have

23  you, yourself, personally been to the site

24  where the buoys are?

25      A.   No.
```

1    Q.   Okay.  And I'm asking:  Ever in your

2  life?

3    A.   That is correct.

4    Q.   Okay.

5    A.   I have not been there.

6    Q.   Thank you.

7            So if I were to ask you

8  personally as you're sitting here whether or

9  not that stretch of river where the buoys

10  are -- and I think the Department of Justice

11  has alleged it's a thousand feet -- if I were

12  to ask you what commercial traffic looks like

13  in that area, if there is any, would you be

14  able to answer that?

15    A.   I do not know that information.

16    Q.   Okay.  Thank you.

17            I want to circle back to the

18  letter as far as -- and I think I asked this

19  already, but I just want to be clear; and then

20  we'll leave that whole area, Captain Peters.

21  As far as what the basis of the Coast Guard's

22  navigability determination contained in this

23  letter is, that's not something you know one

24  way or the other; is that accurate?

25    A.   That information is not in my

1  purview.

2      Q.   Okay.  Thank you, sir.

3           MR. SWEETEN:  One second.  Okay?

4           (Off the record from 11:44

5           to 11:45 a.m.)

6      Q.   (BY MR. SWEETEN)  Okay.  I told you

7  we'd leave navigability.  I want to go on to

8  another subject.  It's related, though.

9           Are you aware of what U.S. Coast

10 Guard operations are on the Rio Grande?

11     A.   I am aware of some Coast Guard

12 operations on the Rio Grande, but not in their

13 totality.

14     Q.   Okay.  Now, it's my understanding --

15          MS. KIMBALL:  Sorry.  We were

16 disconnected for a second.  I don't know if you

17 asked a question or...

18          MR. SWEETEN:  Okay.  No worries.

19 I'll start the question over.

20     Q.   (BY MR. SWEETEN)  It's the case,

21 isn't it, that the closest Coast Guard base to

22 the Rio Grande River would be found at

23 South Padre Island; is that correct?

24     A.   I do not know that for a fact.

25     Q.   Okay.  It's the case, isn't it, that

Justin Peters - 8/7/2023

24

1  there is no Coast Guard base on the Rio Grande,

2  correct?

3       A.   To the best of my knowledge, that is

4  correct.

5       Q.   All right.  And, Captain Peters, let

6  me ask you:  Have you ever been on the Rio

7  Grande River?

8       A.   No.

9       Q.   Okay.  Have you ever served while in

10  the Coast Guard on the Rio Grande River?

11       A.   Not on the Rio Grande River.

12       Q.   Okay.  You said earlier that you were

13  able to describe some operations on the Rio

14  Grande.  Let me ask you this:  You understand

15  that the Rio Grande, it goes from Brownsville

16  to McAllen; and then it goes up to Eagle Pass

17  and to Del Rio.  Have you ever at any time been

18  aware of a Coast Guard operation that occurred

19  north of McAllen, upriver from McAllen?

20       A.   I am not familiar with the geography

21  of the border.

22            MS. KIMBALL:  Do you have a map

23  that you can show?

24            MR. SWEETEN:  I think we do, but

25  let me ask it a different way.

```
 1        Q.   (BY MR. SWEETEN)   What operations are

 2   you familiar with that the Coast Guard performs

 3   on the Rio Grande River, if any?

 4        A.   The Coast Guard currently has

 5   deployable specialized forces, which include

 6   boats, in the Rio Grande Valley that are

 7   currently deployed; and there was a team that

 8   was also operating on Falcon Lake that is no

 9   longer there.

10        Q.   Okay.  Now, where is Falcon Lake in

11   relation to where these contested buoys are?

12        A.   I do not -- I cannot testify to that.

13        Q.   Okay.  Do you know if Falcon Lake is

14   accessible to the river at the point where the

15   buoys are?

16        A.   I do not have that information.

17        Q.   Okay.  Are you familiar -- now, you

18   had talked about the Rio Grande Valley,

19   correct?  You described an operation that

20   occurred there, correct?

21        A.   I understand that there are boats

22   operating in the Rio Grande Valley, but I do

23   not know the exact location.

24        Q.   Do you know how far north Eagle Pass

25   is from the Rio Grande Valley?
```

Justin Peters - 8/7/2023

26

```
1        A.    No.
2        Q.    Okay.  At what point were the
3   operations occurring in the Rio Grande Valley,
4   where geographically?
5        A.    I do not have that information.
6        Q.    Okay.  If testimony were to indicate
7   that the Coast Guard -- that individuals have
8   never seen a Coast Guard vessel north of
9   McAllen, would you have any -- upriver from
10  McAllen, would you have any reason to dispute
11  that as you're sitting here?
12       A.    I do not know that information.
13       Q.    Okay.  Prior to making the
14  declaration in this case, Captain Peters, were
15  you aware of those Coast Guard operations,
16  those two that you just described?
17       A.    Yes.
18       Q.    Okay.  Were you aware prior to
19  providing the declaration in this case that
20  segments of the Rio Grande River can be -- are
21  completely dry?
22       A.    No.
23       Q.    Okay.  Do you know that one way or
24  the other?
25       A.    I do not know that information.
```

1    Q.   And I should say "can be dry."  Will

2 you answer the question just with -- let me ask

3 it again.

4            Were you previously aware prior

5 to providing the declaration in this matter

6 that some segments of the Rio Grande River can

7 be dry?

8    A.   I have seen that on the news.

9    Q.   Okay.

10           MS. KIMBALL:  Sorry.  We just

11 disconnected and reconnected again.  Did you

12 ask a question?

13           MR. SWEETEN:  No, I did not ask

14 a question during that time, Kimere.

15    Q.   (BY MR. SWEETEN)  What Coast Guard

16 operations exist near Eagle Pass other than

17 you've described something at Falcon Lake and

18 you described something in the Rio Grande

19 Valley?  Can you describe any other operations

20 that occur at or near Eagle Pass, Texas?

21    A.   The Coast Guard has members deployed

22 to Eagle Pass now that are assisting Customs

23 with information technology support.

24    Q.   Okay.  When were those assets

25 deployed in Eagle Pass?

Justin Peters - 8/7/2023

28

1          A.   Approximately 60 days ago, and they

2     are still there now.

3          **Q.   All right.  And they were -- and can**

4     **you tell me -- you say those assets are there.**

5     **Are those assets in the water, or are those**

6     **assets on the surface?**

7          A.   It is personnel only.

8          **Q.   Okay.  So there's no -- the Coast**

9     **Guard has deployed no watercraft in Maverick**

10    **County or Eagle Pass; is that correct?**

11         A.   I can only testify to where they have

12    been in recent memory, but I cannot say that

13    definitively over a long period of time.

14         **Q.   Okay.  Well, what about in the last**

15    **60 days?  Has the Coast Guard deployed a single**

16    **watercraft in Maverick County or Eagle Pass in**

17    **the last 60 days?**

18         A.   No, not to the best of my knowledge.

19         **Q.   Okay.  Now, the individual from the**

20    **Coast Guard that was sent to assist Customs and**

21    **Border who was not tasked with having a**

22    **watercraft, what is that individual's job title**

23    **or duties -- job duties is a better question?**

24              MS. KIMBALL:  Objection,

25    misstates testimony.

1       But you can answer.

2       A.   Those members that are there are

3   performing information technology assistance.

4       Q.   (BY MR. SWEETEN)  Okay.  So you've

5   got some Coast Guard IT personnel working with

6   Customs and Borders.  And that's the only

7   presence that you're able to testify about in

8   Maverick County; is that accurate?

9       A.   That is the only presence that I am

10  able to testify to.

11      Q.   Okay.  Thank you.

12           Has the Coast Guard conducted

13  water rescues on the stretch of river located

14  within Maverick County?

15      A.   I'm not aware of that.

16      Q.   And that's at any point, correct?

17      A.   That is correct.  I do not have that

18  information.

19      Q.   Okay.  Has the Coast Guard performed

20  search and rescue in Maverick County at any

21  time?

22      A.   I do not know.

23      Q.   Has the Coast Guard provided marine

24  environmental responses or law enforcement

25  responses in Maverick County at any time?

30

1     A.   I do not know.

2     Q.   Does the Coast Guard assist either

3  the federal government or the Texas state

4  officials with stopping drug trafficking,

5  trafficking of Fentanyl, or human trafficking

6  in Maverick County?

7     A.   I do not know.

8     Q.   Okay.  Are you familiar -- I know

9  that you said that -- let me just make sure

10 it's clear.  You have not been to this stretch

11 of river where the contested buoys are before

12 today, correct?

13    A.   That is correct.

14    Q.   Are you familiar with what types of

15 watercraft are typically used in the river

16 segment at issue near Eagle Pass?

17    A.   No, I am not.

18    Q.   Have you ever seen any vehicles on

19 the Rio Grande River in Maverick County

20 transporting goods or logs?

21    A.   No, I have not.

22    Q.   Okay.  Have you ever seen any non-law

23 enforcement watercraft in the area of the buoys

24 in Maverick County that were recreational

25 craft?

```
 1              MS. KIMBALL:  Objection, lacks
 2  foundation.
 3              But you can answer.
 4      A.   I do not know that information.
 5      Q.   (BY MR. SWEETEN)  Okay.  Have you
 6  ever seen watercraft in any other segment of
 7  the Rio Grande River?
 8              MS. KIMBALL:  Objection, lacks
 9  foundation.
10              But you can answer.
11      A.   No.
12      Q.   (BY MR. SWEETEN)  Have you researched
13  the historical watercraft used in the
14  Rio Grande area in Maverick County?
15      A.   No.
16      Q.   Do you know if the Rio Grande River
17  in Maverick County is subject to the ebb and
18  flow of tides?
19      A.   No, I do not know.
20      Q.   Are you aware of whether or not the
21  segment of river where the buoys are is
22  especially treacherous to persons who are
23  crossing in the water?
24      A.   I do not know.
25      Q.   Would it in any way surprise you to
```

1  know that this segment of river where the buoys

2  are is comprised of sandbars; water; shallow

3  water; water with inconsistent depths; small

4  islands; rocks; manmade debris; natural debris,

5  such as logs and stumps; and sandy shoals?

6      A.   I do not have that information.

7      Q.   Okay.  I would assume, based on your

8  prior testimony, that you are not here to opine

9  on whether the Rio Grande River near Eagle Pass

10 is a highway of commerce, correct?

11     A.   I do not have that information.

12     Q.   Okay.  As far as whether or not

13 interstate commerce is transported at this

14 segment of the river in Maverick County, you

15 don't have an opinion one way or the other as

16 you're sitting here, correct?

17     A.   I do not have that information.

18     Q.   Okay.  All right.  You stated in your

19 affidavit -- do you have your affidavit in

20 front of you, Captain Peters?

21     A.   Yes.

22     Q.   You stated in your affidavit that you

23 were informed that the State of Texas is

24 constructing a floating barrier within the

25 boundaries of the Rio Grande River, correct?

Justin Peters - 8/7/2023

33

1      A.   That is correct.

2      Q.   Who informed you of this, sir?

3      A.   Coast Guard attorneys.

4      Q.   Okay.  Was that at or near the

5  time that your declaration was signed,

6  Captain Peters?

7      A.   It was prior to the declaration.

8      Q.   Okay.  How much before?

9      A.   Approximately one week.

10     Q.   Okay.  So a week before the date of

11 your declaration, which I think here is the

12 25th day of July, so on July 18th, you were

13 first -- approximately --

14          MS. KIMBALL:  Sorry.

15     Q.   (BY MR. SWEETEN)  I'll start over.  I

16 apologize.

17     A.   Thank you.

18     Q.   So you indicated that you first

19 learned of the construction of the buoys some

20 seven days before the execution of your

21 declaration, which is dated July 25th, 2023; is

22 that correct?

23     A.   That is the date of the declaration.

24 I had personal knowledge that the buoys were

25 being placed from watching the news.  That was

Justin Peters - 8/7/2023

34

1  prior to being informed by Coast Guard

2  attorneys.

3      Q.   Okay.  I think I understand.  So do

4  you know approximately when the buoy

5  construction began?

6      A.   I do not.

7      Q.   Okay.  And there's some other

8  declarants that have talked about there was a

9  meeting between DPS and some members of the

10  federal government.  Were you ever involved in

11  any meetings to discuss the buoys prior to you

12  first learning about them on the news?

13      A.   No.

14      Q.   Okay.  So you first learned about it

15  on the news.  Do you think that would have been

16  sometime in July?

17      A.   It may have been in July, or it could

18  have been prior to.  I don't recall.

19      Q.   Okay.  But then the first official

20  contact you had -- so you had seen it on the

21  news; and then you said a week before the

22  declaration was signed, you were approached to

23  discuss the buoys, correct?

24      A.   Yes.

25      Q.   And who approached you?

Justin Peters - 8/7/2023

35

```
 1        A.   Coast Guard attorneys.

 2        Q.   Okay.  So from an operational

 3   standpoint, the only time that you were ever

 4   contacted or that you've discussed the buoys in

 5   any part of your job at the Coast Guard was

 6   when you were first contacted by Coast Guard

 7   attorneys about the buoys, right?

 8        A.   Yes.

 9        Q.   Have you seen pictures of the

10   floating buoys?

11        A.   Yes.

12        Q.   And you have described the string of

13   buoys that exist near the Camino Real

14   International Bridge in your affidavit,

15   correct?

16        A.   Yes, it is located in my affidavit.

17        Q.   Okay.  And do you know where exactly

18   the Camino Real International Bridge is in

19   relation to Eagle Pass?

20        A.   No.

21        Q.   I think we've established from your

22   testimony that you would not have seen those in

23   person.  What were you relying upon to say that

24   you have seen those floating buoys?

25                  MS. KIMBALL:  Objection,
```

1  misstates the document.

2      Q.   (BY MR. SWEETEN)  Okay.  Well, let me

3  find in the document specifically where that

4  is; and then we can talk about it.

5              All right.  So I've got

6  Paragraph 4.  It says, "I have been informed

7  that the State of Texas is constructing a

8  floating barrier within the boundaries of the

9  Rio Grande River."  Let's stop there.

10             You were informed by Coast Guard

11  attorneys; is that correct?

12     A.   That is correct.

13     Q.   And that was at or near the time you

14  were asked to sign a declaration in this case,

15  correct?

16     A.   That was prior to me signing the

17  declaration.

18     Q.   It was a week before, right?

19     A.   Yes.

20     Q.   Okay.  Then it says, "The floating

21  barrier reportedly consists of a string of

22  buoys between 4 to 6 feet in diameter."  Who

23  provided you that information?

24     A.   Coast Guard attorneys.

25     Q.   Okay.  A week before you signed your

1  declaration, correct?

2      A.   Yes.

3      Q.   Okay.   Then you say, "...which is

4  anchored to the bed of river near the Camino

5  Real International Bridge, Eagle Pass, Texas."

6  Did I read that right?

7      A.   Yes.

8      Q.   Okay.   And who told you that it was

9  anchored to the bed of the river near the

10  Camino Real International Bridge?

11      A.   Coast Guard attorneys.

12      Q.   A week before the declaration,

13  correct?

14      A.   Yes.

15      Q.   And just to be clear, you've never

16  seen these buoys before with your own eyes?

17      A.   That is correct.

18      Q.   Now, when you were told these things,

19  that they are 4 to 6 feet in diameter, that

20  they are anchored to the bed of the river, this

21  was told to you by the lawyers in the case?

22              (Connection with the witness

23  lost.)

24              THE REPORTER:  Do you want me to

25  go off the record?

Justin Peters - 8/7/2023

38

```
 1              MR. SWEETEN:  Yeah, that's fine.
 2   Thank you.
 3              (Off the record from 12:03
 4        to 12:14 p.m.)
 5        Q.  (BY MR. SWEETEN)  Before we left,
 6   there was a question that I had asked.  Then
 7   you got cut off, and we didn't hear your
 8   answer.  So I'm going to have Debbie read the
 9   question, please.
10              (The requested material was read
11   by the reporter as follows:
12              "QUESTION:  Now, when you were
13   told these things, that they are 4 to 6 feet in
14   diameter, that they are anchored to the bed of
15   the river, this was told to you by the lawyers
16   in the case?")
17        A.  By Coast Guard attorneys, yes.
18        Q.  (BY MR. SWEETEN)  And no one else?
19        A.  No.
20        Q.  All right.  You described the string
21   of buoys as being anchored to the bed of the
22   river; is that correct?
23        A.  Yes.
24        Q.  Do you have any personal knowledge as
25   to how those were anchored to the bed?
```

1    A.   The only personal knowledge I have is

2  what I saw in the news.

3    **Q.   Okay.  And as far as whether they are**

4  **or whether they aren't anchored to the bed,**

5  **that's not something that you have personal**

6  **knowledge of, right?**

7    A.   I do not have that knowledge.

8    **Q.   Okay.  And, similarly, if I were to**

9  **ask you how the buoys are affixed, you don't**

10  **know the answer to that, correct?**

11    A.   No, I do not.

12    **Q.   Okay.  Now, you indicated that the**

13  **State of Texas did not contact the Coast Guard**

14  **prior to the installation and construction of**

15  **the floating barriers.  That's what you said,**

16  **isn't it?**

17    A.   I said the Coast Guard was not

18  contacted by the State of Texas.  That is

19  correct to the best of my knowledge.

20    **Q.   Okay.  Is it your testimony that the**

21  **State of Texas had some statutory duty to**

22  **contact the Coast Guard prior to setting up**

23  **buoys in the portion of the Rio Grande River in**

24  **Maverick County?**

25            MS. KIMBALL:  Objection, calls

Justin Peters - 8/7/2023

40

1  for a legal conclusion.

2              You can answer.

3      A.   Can you restate the question, please?

4      Q.   **(BY MR. SWEETEN)  Yes.  Why are you**

5  **saying that the U.S. Coast Guard was not**

6  **contacted by the State of Texas prior to the**

7  **installation and construction of the floating**

8  **barrier?  That's what Paragraph 5 says, right?**

9      A.   Paragraph 5 says, "The U.S. Coast

10 Guard was not contacted by the State of Texas

11 prior to the installation and construction of

12 this floating barrier."

13     Q.   **Okay.  And you're not suggesting in**

14 **any way that the State of Texas had some duty**

15 **to contact the Coast Guard about that**

16 **installation, are you?**

17     A.   That information would not be under

18 my purview.

19     Q.   **Okay.  Now, when you use the word**

20 **"construction" as you had -- as you've done in**

21 **Paragraph 4 -- it says, "I have been informed**

22 **the State of Texas is constructing a floating**

23 **barrier," what do you mean by "constructing a**

24 **floating barrier"?**

25     A.   I would -- I would use that term

Justin Peters - 8/7/2023

41

1  to -- installing, erecting, or constructing, my

2  personal view of the -- from the news was --

3  showed excavators putting and moving the

4  barriers in the river.

5      **Q.   Okay.  But "construction" is the term**

6  **you used, not "installing" or "erecting."  You**

7  **said, "construction."  Is there a reason you**

8  **chose that over "placing," for example?**

9      A.   No.

10      **Q.   Okay.  Now, you don't have any**

11  **personal knowledge as to whether any, quote,**

12  **"excavation" occurred at the site, do you?**

13      A.   No, I do not.

14      **Q.   Okay.  And you didn't personally**

15  **observe construction, correct?**

16      A.   Only what I saw in the news.

17      **Q.   Okay.  And you didn't personally**

18  **observe the installation that you talk about,**

19  **correct?**

20      A.   Only what I've seen in the news and

21  what I was informed by Coast Guard attorneys.

22      **Q.   Other than what you saw in the**

23  **news -- and, by the way, are we talking about**

24  **print media or broadcast media or both?**

25      A.   Broadcast media.

Justin Peters - 8/7/2023

```
 1        Q.   Okay.  And so you saw some video film
 2  on -- like, are we talking about on ABC news,
 3  on a news source like that?
 4        A.   I generally watch Fox News and CNN.
 5        Q.   Okay.  And so you would have seen
 6  the -- whatever was going on with the buoys
 7  that you saw, you saw it on TV on Fox or CNN?
 8        A.   Yes.
 9        Q.   Now, you describe these buoys as a
10  floating barrier, don't you?
11        A.   Yes.
12        Q.   Now, it's the case, isn't it, that
13  the buoys that are present that you've seen on
14  TV do not stretch across the river laterally to
15  block upward and downstream traffic, if it even
16  exists there, correct?
17        A.   I only know what I saw on the news --
18        Q.   Okay.  And so what you --
19        A.   -- and what I was told by Coast Guard
20  attorneys.
21        Q.   Okay.  So what you saw on the news
22  was, you would agree with me, not a buoy that
23  blocked upstream or downstream traffic,
24  correct?
25        A.   I cannot attest to that.
```

Justin Peters - 8/7/2023

43

1      Q.   You don't know one way or the other?

2      A.   No.

3      Q.   You're not affirmatively telling this

4  Court that in any way, shape, or form, that the

5  string of buoys is impeding upstream or

6  downstream traffic at the location of the

7  buoys, correct?

8      A.   I do not have that information.

9      Q.   Okay.  And if I were to ask you:  Can

10 watercraft, to the extent any even exist at

11 this location, go upstream or downstream,

12 that's not an answer that you have for the

13 Court today, correct?

14     A.   I am not in a position to answer

15 that.

16     Q.   Okay.  Now, when you used the term

17 "floating barrier" in Paragraph 4 and in

18 Paragraph 6, who coined that term for you?

19     A.   The draft language was provided by

20 Coast Guard attorneys.

21     Q.   Okay.  That's not your language; that

22 was provided to you, correct?

23     A.   That is correct.

24     Q.   Okay.  And as far as -- I've already

25 sort of asked you this -- a barrier to what, do

1  you have any information on that?

2      A.   Only what I saw in the news.

3      Q.   Okay.  Now, the buoys were completed.

4  Have you seen them since they were completed,

5  Captain Peters?

6      A.   I do not know when they were

7  completed.  I can't answer that.

8      Q.   Okay.  And have you seen them since

9  they were totally completed?

10     A.   I do not know when they were

11  completed.

12     Q.   Do you have any information to

13  indicate that the State of Texas has tried to

14  go string another string of floating buoys

15  somewhere else in the river?

16     A.   I do not have that information.

17     Q.   Now, you've been in the Coast Guard

18  31 years, correct?

19     A.   Yes.

20     Q.   And you have been on -- have you

21  spent time on watercraft?

22     A.   Yes.

23     Q.   And can you give us some idea of your

24  tours of duty in the Coast Guard, like, where

25  you've served on watercraft, particularly?

Justin Peters - 8/7/2023

45

```
 1        A.   I have served on large ships, down

 2   to small, 25-foot boats from Cape Cod,

 3   Massachusetts to Florida.

 4        Q.   Okay.  I bet I almost don't even have

 5   to ask this:  A log boom, do you know what that

 6   is?

 7        A.   No.

 8        Q.   Okay.  Do you know what a boom is,

 9   generally?

10        A.   Can you define it for me?

11        Q.   Well, I was going to ask if you knew

12   what a boom was generally in nautical terms.

13        A.   A boom from -- there are multiple

14   uses of the term.

15        Q.   So I've already asked you about the

16   log boom.  That's not something you've got

17   familiarity with?

18        A.   No.

19        Q.   What about an oil boom?

20        A.   Yes.

21        Q.   Okay.  Now, tell me:  What is the

22   function of an oil boom?

23        A.   It is to -- in the Coast Guard, it is

24   used to encircle an environmental spill to

25   assist in preventing it from spreading.
```

1     Q.   So the oil boom is designed to

2 contain a spill, correct?

3     A.   That is the use of it, yes.

4     Q.   Okay.  And booms can be used to

5 contain anything, like, logs or floating

6 debris, correct?

7     A.   I can only attest to what we use them

8 for in the Coast Guard, which is to contain a

9 substance that may have been released into the

10 water.

11     Q.   Okay.  And you would agree that booms

12 can also be something -- could be defined as a

13 long beam projecting from the mast of a derrick

14 to support or guide cargo; is that right?

15     A.   That's not information that I can

16 answer and attest to.

17     Q.   Okay.  Now, you would agree that the

18 floating buoys are not a wharf, correct?

19     A.   I cannot attest to that.

20     Q.   Okay.  Do you know if -- so you're

21 not attesting to whether or not they're

22 dolphins or piers or breakwaters or bulkheads,

23 jetties or booms?  That's not your testimony,

24 right?

25     A.   I cannot attest to what the buoys

1  are.

2      Q.   Okay.

3           MR. SWEETEN:  All right.  Give

4  me one second.  I'm still trying to -- I'm

5  going to go off the record for 3 minutes and be

6  right back on.  We're getting near the end,

7  Captain Peters.  Okay?

8           THE WITNESS:  Yes.

9           MR. SWEETEN:  Thank you, sir.

10          (Off the record from 12:26

11      to 12:27 p.m.)

12      Q.   (BY MR. SWEETEN)  All right.  Captain

13  Peters, we're getting near the end; but I do

14  have more questions for you, sir.  Okay?

15      A.   Yes, sir.

16      Q.   Now, in your affidavit -- and I'm

17  looking at Paragraph 7 in particular -- you

18  used the term, quote, "navigable waterway,"

19  "navigable channel," "navigational traffic

20  patterns."  Would you agree with me that those

21  words were given to you by the Coast Guard

22  attorneys in your first meeting prior to

23  providing the declaration in this case?

24      A.   They were given to me in the draft

25  declaration.

1        Q.   Okay.  So those are not your words.

2   Those are the words of the attorneys for the

3   Coast Guard?

4        A.   They are my words in there, in my

5   declaration; but the language specifically was

6   provided by Coast Guard attorneys.

7        Q.   Okay.  So the first people to call it

8   "navigable waterway," "navigable channel,"

9   "navigational traffic patterns," the people

10  that coined those terms for you gave this to

11  you in a draft already written, correct?

12       A.   It was a collaborative process.  They

13  submitted the first draft.

14       Q.   Okay.  But those terms were first

15  given to you by the Coast Guard; and then you

16  signed the declaration, right?

17       A.   Yes.

18       Q.   All right.  So let's go to

19  Paragraph 7 where you use it.  You say, "If

20  consulted, the Coast Guard will require further

21  study of the barrier to appropriately assess

22  the impacts of the barrier to the navigable

23  waterway to ensure that placement of this

24  structure within a navigable waterway of the

25  United States complies with all applicable laws

1  and regulations."  Did I read that correctly?

2  It's the second sentence of the paragraph.

3       A.   Yes, you did.

4       Q.   All right.  Now, what are you saying

5  with respect to navigable waterway?  What does

6  that mean here?

7       A.   A federal navigable waterway would

8  have -- if the Coast Guard is consulted, would

9  conduct study of that waterway for any -- if a

10  barrier was placed and the Coast Guard was

11  consulted, the Coast Guard would conduct

12  studies to appropriately assess whether it was

13  in compliance with any federal laws and

14  regulations.

15       Q.   Okay.  So you were describing an

16  instance where if the State of Texas were to

17  seek a permit to construct a floating barrier

18  through the Army Corps of Engineers, right?

19       A.   That is my understanding, but

20  waterway management is not within my purview.

21       Q.   Okay.  And that's kind of what I'm

22  getting at.  When you're calling it a navigable

23  waterway, you're talking about the general

24  process of a navigable waterway.  It is not

25  your opinion and you're not trying to tell this

1  Court that, "I know this is a navigable

2  waterway," right?

3      A.   I have seen the declaration from

4  Coast Guard District 8 that defines it as a

5  navigable waterway.  That's the only way I can

6  define that.

7      Q.   Okay.  So the only basis for you --

8  if you were even saying this is a navigable

9  waterway, the only basis for that would be

10 looking at the affidavit of another witness in

11 this case, correct?

12     A.   Determining navigable waterways is

13 not within my purview.

14     Q.   Okay.  And it's not something that

15 you're providing this Court testimony about.

16 You're not saying, "This is a navigable

17 waterway where these buoys were built," are

18 you?

19     A.   I am saying that if it is a navigable

20 waterway, the Coast Guard could be called upon

21 to conduct Coast Guard missions.

22     Q.   Got it.  And I think I understand,

23 through your clarification, that what that

24 means is if it were -- you're saying -- by

25 saying that, you're not telling this Court

Justin Peters - 8/7/2023

51

1    affirmatively this is or is not a navigable

2    waterway.  That is not in your purview, right?

3        A.   I do not determine, personally,

4    navigable waterways, that is correct.

5        Q.   And it is not your testimony here

6    today that it is, is it?

7        A.   My testimony is that I've seen the

8    Coast Guard declaration that defines this as a

9    navigable waterway.

10       Q.   And other than that, you have no

11   personal knowledge as to whether this is a

12   navigable waterway, correct?

13       A.   I do not have any personal knowledge.

14       Q.   You've never been there --

15       A.   That is correct.

16       Q.   -- right?

17            You've never studied it, right?

18       A.   That is correct.

19       Q.   You've seen only pictures on Fox and

20   CNN?

21       A.   And in the DOJ motion.

22       Q.   Okay.  You don't know what kind of

23   traffic goes up and down the river at that

24   section?

25       A.   I do not.

Justin Peters - 8/7/2023

52

1       Q.   And you are not opining that it is a

2  navigable waterway here today to this Court?

3       A.   I have said that I've seen the Coast

4  Guard declaration that it's a navigable

5  waterway provided by Coast Guard District 8.

6       Q.   I understand that you've seen the

7  affidavit, but this is an important question.

8  Other than seeing the affidavit, you have no

9  other information -- and, by the way, the

10 affidavit you're talking about -- let's be

11 clear -- is from a lawyer for the Coast Guard,

12 right?

13      A.   I'd have to refer to the document on

14 who signed it.

15      Q.   Well, isn't it Brandy Parker of the

16 Judge Advocate General?

17      A.   I don't believe she signed the

18 document.

19      Q.   Can you tell me what document you're

20 referring to?

21      A.   The exhibit that you provided to us.

22      Q.   Oh, Exhibit 1?

23      A.   Yes.

24      Q.   Oh, okay.  I think I understand.  So

25 you're saying the only basis on which you know

Justin Peters - 8/7/2023

53

1  whether or not this is a navigable waterway is

2  this 39-year-old letter from T. W. Snook, which

3  is Exhibit Number 1 that we went over, correct?

4      A.   That is the only reference that I

5  have.

6      Q.   Okay.  And let's be very clear.  If

7  we read Paragraph Number 3 of that singular

8  reference that you have, it says, quote, "This

9  represents" --

10            MS. KIMBALL:  Hold up.  Let me

11  get it up so he can see it.

12            Okay.  Go ahead.

13      Q.   (BY MR. SWEETEN)  "This represents

14  the opinion of the Coast Guard only as to the

15  extent of its own jurisdiction and does not

16  address the jurisdiction of other agencies,"

17  correct?  That's what that says?

18      A.   That is what the document says.

19      Q.   All right.  And that's the only basis

20  upon which you are saying that you -- that

21  you're even remotely discussing the idea of

22  navigable waters, correct?

23            MS. KIMBALL:  Objection --

24            MR. SWEETEN:  Bad question.  Let

25  me ask it again.

Justin Peters - 8/7/2023

54

1   Q.   (BY MR. SWEETEN)  The only thing that
2   you've looked at that would lead you to believe
3   this is a navigable water is this sheet that I
4   just read Paragraph 3 from, correct?

5   A.   That is the only reference that I've
6   seen.

7   Q.   You have no other personal knowledge
8   to lead you to that conclusion or for that
9   testimony, correct?

10   A.   Determining navigable waterways is
11   not within my purview.

12   Q.   Okay.  Thank you.

13       Captain Peters, in Paragraph 7
14   of your affidavit, you say, "If the State of
15   Texas seeks a permit to construct the floating
16   barrier through the Army Corps of Engineers,
17   the Army Corps of Engineers may consult the
18   Coast Guard as a supporting agency."  Did I
19   read that first sentence correctly?

20   A.   That is correct.

21   Q.   And that means the Army Corps of
22   Engineers does not always consult the Coast
23   Guard on permits related to the Rivers and
24   Harbors Act, correct?

25   A.   I do not have that information.

Justin Peters - 8/7/2023

1    Q.   Well, I mean, you say here "may

2  consult the Coast Guard."  I would think that

3  also means they may not consult the Coast

4  Guard?

5    A.   Permitting is not within my purview.

6    Q.   Well, here, you're talking about

7  seeking a permit; and you say the Corps of

8  Engineers may consult the Coast Guard as a

9  supporting agency.  If that's outside of your

10  purview, do you have an explanation for why

11  that is contained in your sworn declaration?

12    A.   In my personal experience, I have

13  been contacted in previous tours by the Army

14  Corps of Engineers.

15    Q.   Okay.  So there have been times that

16  you were contacted.  Do you recall what those

17  projects were?

18    A.   No.

19    Q.   Were any of those projects on the

20  Rio Grande River?

21    A.   No.

22    Q.   Were any of those projects in

23  Maverick County, Texas?

24    A.   No.

25    Q.   Were any of those projects in

1   Eagle Pass, Texas?

2        A.   No.

3        Q.   Okay.  And you would agree with me

4   that there's likely to be a whole class of

5   permits that the Corps of Engineers does not

6   contact the Coast Guard about, correct?

7        A.   I do not have that information.

8        Q.   Okay.  Do you know what the term

9   "navigable capacity" means, Captain Peters?

10       A.   No, I do not.

11       Q.   Okay.  Do you have an opinion one way

12   or the other as to whether -- let me back up

13   and ask it a different way.

14            Since you've never been to the

15   river, since you've not studied the river,

16   since navigable capacity is not within your

17   purview, would you agree with me that you have

18   no opinion on whether or not the buoys, the

19   string of buoys, interfere in any way with the

20   traffic on the river?

21       A.   I'm not in a position to answer that.

22       Q.   And you're not suggesting they impact

23   the navigable capacity, as you're sitting here

24   today, are you?

25       A.   I'm not in a position to answer that.

Justin Peters - 8/7/2023

57

1    Q.   Okay.  All right.  Captain Peters, I

2   don't have any -- well, let's take a 5-minute

3   break just to make sure.  I was about to end

4   this, but give me just a few minutes to talk to

5   my cocounsel here.  Okay?

6            MS. KIMBALL:  Before we go --

7   well, we can off the record.

8            (Off the record from 12:39

9            to 12:42 p.m.)

10    Q.   (BY MR. SWEETEN)  I just have, I

11   think, one more question; and that is:  The

12   navigability determination, this one that we

13   talked about --

14    A.   Yes.

15    Q.   -- are you aware of any more recent

16   navigability determinations than this letter?

17    A.   I am not aware of any other than that

18   letter; and to the best of my knowledge, my

19   personal knowledge, the Coast Guard has not

20   been asked to provide any additional analysis.

21    Q.   Okay.  At this time point, have you

22   understood the questions that I've asked you

23   today, Captain Peters?

24    A.   Yes.

25    Q.   Okay.  Are there any answers that you

1   want to change that we discussed today?

2       A.   No.

3       Q.   Have I been courteous to you today,

4   Captain Peters?

5       A.   Yes, you have.

6       Q.   Okay.  I wish you a great vacation

7   from here forward.  We appreciate your time

8   today.  I hope I've been efficient in trying to

9   conduct the examination.  We wish you the very

10  best.

11              MS. KIMBALL:  I have one

12  question I want to clarify before we go off the

13  record.

14              MR. SWEETEN:  Sure.  Of course.

15                  EXAMINATION

16  BY MS. KIMBALL:

17      Q.   Captain Peters, you testified earlier

18  about the documents that you saw in preparation

19  for your deposition.  Do you recall that

20  testimony?

21      A.   Yes.

22      Q.   Do you recall if I showed you a

23  photograph during prep?

24      A.   I do not recall.  The only

25  photographs that I had seen were from the DOJ

1  motion, but I don't recall if we did that

2  during the prep.

3      **Q.   Okay.**

4              MS. KIMBALL:  No further

5  questions.

6              MR. SWEETEN:  None from me.

7  Once again, we appreciate it.

8              MS. KIMBALL:  Oh, and he will

9  read and sign.

10             MR. SWEETEN:  Debbie, we're

11  going to need -- we're off the record, right?

12             THE REPORTER:  This concludes

13  the deposition at 12:44 p.m.)

14        (Deposition concluded at 12:44 p.m.)

15                  --ooOoo--

16

17

18

19

20

21

22

23

24

25

60

```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:                DATE OF DEPOSITION:

 3   CAPTAIN JUSTIN PETERS          August 7, 2023

 4   PAGE/LINE    CHANGE               REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1     I, CAPTAIN JUSTIN PETERS, have read the

2 foregoing deposition and hereby affix my signature that

3 same is true and correct, except as noted herein.

4

5     _____

6     CAPTAIN JUSTIN PETERS

7

8 THE STATE OF _____   )

9     Before me, _____, on

10 this day personally appeared CAPTAIN JUSTIN PETERS,

11 known to me (or proved to me under oath or through

12 _____) (description of identity card or other

13 document) to be the person whose name is subscribed to

14 the foregoing instrument and acknowledged to me that

15 they executed same for the purposes and consideration

16 therein expressed.

17     Given under my hand and seal of office on

18 this _____ day of _____, _____.

19

20

21     _____

22     NOTARY PUBLIC IN AND FOR

23     THE STATE OF _____

24     My Commission Expires:_____

25

62

```
 1  STATE OF TEXAS      )

 2              REPORTER'S CERTIFICATION

 3      I, DEBBIE D. CUNNINGHAM, CSR, hereby certify that

 4  the witness was duly sworn and that this transcript is a

 5  true record of the testimony given by the witness.

 6      I further certify that I am neither counsel for,

 7  related to, nor employed by any of the parties or

 8  attorneys in the action in which this proceeding was

 9  taken.  Further, I am not a relative or employee of any

10  attorney of record in this cause, nor am I financially

11  or otherwise interested in the outcome of the action.

12      I further certify that pursuant to FRCP

13  Rule 30(f)(1) that the signature of the deponent was

14  requested by the deponent or a party before the

15  completion of the deposition and that the signature is

16  to be before any notary public and returned within 30

17  days from date receipt of the transcript.  If returned,

18  the attached Changes and Signature Page contains any

19  changes and the reasons therefore.

20      Subscribed and sworn to by me this day, August 7,

21  2023.

22                  Debbie D. Cunningham, CSR
                    Expiration:  6/30/25
23                  INTEGRITY LEGAL SUPPORT SOLUTIONS
                    9901 Brodie Ln, Ste. 160-400
24                  Austin, Texas 78748
                    www.integritylegal.support
25                  512-320-8690; FIRM # 528
```