**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

---

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.,* | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

```
UNITED STATES OF AMERICA,      )
                               )
                               )
              Plaintiff,       )
                               )
VS.                            )  CIVIL ACTION
                               )  NO.1:23-00853-DAE
                               )
                               )
GREG ABBOTT, in his official   )
capacity as Governor of the    )
State of Texas, and the State  _
of Texas,                      )
                               )
                               )
              Defendants.      )
```

-----------------------------------

ORAL DEPOSITION OF

MARIO GOMEZ

AUGUST 7, 2023

VOLUME 1

-----------------------------------

        ORAL DEPOSITION OF MARIO GOMEZ, produced as a witness at

the instance of the DEFENDANT, and duly sworn, was taken in the

above-styled and numbered cause on August 7, 2023, from 2:07

p.m. to 3:21 p.m., before Ariana McCoy, CSR in and for the

State of Texas, reported by stenographic means, at the office

of USAO San Antonio Office, 601 Northwest Loop 410, Suite 600,

San Antonio, Texas 78216, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record or

attached hereto.

2

1                   A P P E A R A N C E S

2

3    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

4

5          Ms. Krystal-Rose Perez
           United States Department of Justice
           Boards and Divisions Agency
6          825 North Capitol Street, Northeast 2224
           Washington, DC 20002
7          202-727-5365- phone
           krystal-rose.perez@usdoj.gov

8

9    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

10         Ms. Mary Kruger
           United States Attorney's Office
11         Western District of Texas
           601 Northwest Loop 410
12         Suite 600
           San Antonio, Texas 78216
13         210-384-7100- phone

14

15   FOR THE DEFENDANTS, GREG ABBOTT AND THE STATE OF TEXAS:

16         Mr. Patrick Sweeten
           Office of the Attorney General of Texas
17         Special Counsel
           P.O. Box 12428
18         Austin, Texas 78711
           512-936-7236- phone
19         patrick.sweeten@oag.texas.gov

20

21   FOR THE DEFENDANTS, GREG ABBOTT AND THE STATE OF TEXAS:

22         Mr. Jake Marx
           Office of the Attorney General of Texas
23         Assistant Attorney General
           P.O. Box 12428
24         Austin, Texas 78711
           512-936-7236- phone
25         jake.marx@oag.texas.gov

Mario Gomez - 8/7/2023

3

1  FOR THE INTERNATION BOUNDARY AND WATER COMMISSION:

2        Ms. Rebecca Rizzuti (via Phone)
         International Boundary and Water Commission
3        General Attorney
         4191 North Mesa Street
4        El Paso, Texas 79902
         800-262-8857- phone

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mario Gomez - 8/7/2023

4

INDEX

                                                  PAGE

Appearances.......................................   02

Stipulations......................................   05

MARIO GOMEZ
     Examination by Mr. Sweeten.....................   05

Signature and Changes.............................   53

Reporter's Certificate............................   55


                      EXHIBITS

    DESCRIPTION                              PAGE

    Exhibit 1.............................   12
         Declaration of Mario Gomez
    Exhibit 2.............................   16
         CBP Releases June 2023

5

P R O C E E D I N G S

1                    THE REPORTER:  Today is August 7th, 2023.  The

2   time is 2:07 p.m.  We're on the record.  Mr. Gomez, would you

3   please raise your right hand?

4                         MARIO GOMEZ,

5   having been first duly sworn, testified as follows:

6                         EXAMINATION

7   BY MR. SWEETEN:

8       **Q.   Good afternoon.  Will you please state your full name**

9   **for the record, sir?**

10      A.   Mario Gomez.

11      **Q.   Mr. Gomez, what is your business address?**

12      A.   My business address, 1 Reservoir Road, Falcon

13  Heights, Texas 780- -- 78545.

14      **Q.   All right.  And you live in -- live in what city?**

15      A.   Laredo, Texas.

16      **Q.   Laredo.  Okay.  All right.  And -- and you work -- do**

17  **you commute to work at the Falcon Dam address you just gave us?**

18      A.   Yes.

19      **Q.   Okay.  And -- and how long have you held that?  By --**

20  **by the way, what's the -- what is your position there?**

21      A.   Area Operations Manager.

22      **Q.   Okay.  And you work at the Amistad Dam Field Office**

23  **of the United States, Section of the IBWC; is that right?**

24      A.   At the moment.

1    Q.   Okay.  Why do you say at the moment?  Are you

2 leaving?

3    A.   No.  Normally my position is at Falcon Dam Field

4 office, right now I'm a TDY, so 120 days detailed to Amistad.

5    Q.   Okay.  So you're working at Amistad for 120 days.  Is

6 that like an MOU or a Memorandum of Understanding or something?

7    A.   It's -- yeah, like a temporary thing that -- your new

8 duty station.

9    Q.   Okay.  So you've worked at Falcon Head before this?

10    A.   Yes.

11    Q.   And now you work at Amistad for the 120-day period?

12    A.   Yes.

13    Q.   All right.  How long have you worked at Falcon Head?

14    A.   I started with the agency as area manager was --

15 since about 2013 or '14.

16    Q.   Okay.  And -- and what do you do as the area manager

17 of Falcon Head?  Let's start there.

18    A.   Okay.  So it's mainly operations and maintenance of

19 the dam and hydroelectric power plant, which is maintaining the

20 dam, telemetry equipment.  Same with the power plant, keeping

21 the units operational.

22    Q.   Okay.  And what do you do for Amistad, is it the same

23 type of job?

24    A.   Yes.

25    Q.   Okay.  So basically your -- your specialty is dams,

1  correct?

2      A.   Yes.

3      Q.   All right.  And let -- let me just ask you a few

4  things.  You work for the IBWC, which is, as I understand it,

5  is sort of a -- a joint -- well, explain to me what it is.

6      A.   International Bond and Water Commission, I guess it's

7  a -- an international agency.  The U.S. section and the Mexican

8  section.  And our mission mainly relates to boundary

9  demarcation, flood control, water -- allocation of water

10  resources.  Some other, like, sanitation and water quality.

11      Q.   Okay.  And -- and I'm going to stop here.  And I've

12  forgotten to kind of ask you, have you had your deposition

13  taken before today?  Before today, any depositions?

14      A.   No.

15      Q.   Okay.  Has your lawyer had the opportunity to explain

16  what a deposition is and sort of the deposition process?

17      A.   Yes.

18      Q.   Okay.  A few things, few rules of the road, I'll just

19  run by you.  First of all, you understand you're under oath at

20  all times today?

21      A.   Yes.

22      Q.   You understand you're testifying as if you were --

23  were in court and that portions of your testimony could be

24  pertinent to the Court sitting in on this matter?

25      A.   Yes.

Marlo Gomez - 8/7/2023

8

1    Q.   Okay.  We've got here today, a court reporter, that's

2  going to be taken down the words that you and I say to each

3  other.  I'm going to try my very best to not step on your

4  answer when you're giving an answer.  I'm going to try to let

5  you complete the answer, and if you would, in turn, try to let

6  me complete my question.  And that way we can make sure that we

7  have a clear record of what you and I talked about today.

8  Okay?

9    A.   Yes.

10    Q.   You can do that for me.  The second thing is, often

11  in conversation we use gestures and head nods and uh-huh and

12  uh-uh.  And so she can't take those down or if we -- if we do

13  read them later, we won't know what they were.  So there may be

14  times today where I ask you to -- to give a verbal answer.

15  If -- if you and I -- if -- if they're -- if -- if we are

16  giving gestures or uh-huhs or uh-uh or shakes of the head, I

17  may just ask you, "Is that yes or no?"

18            And so I'm doing that to make sure I've got a

19  clear record and that's the reason.  Okay?

20    A.   Okay.

21    Q.   All right.  Also, I'm -- when I ask a question, if

22  you don't understand what I'm asking you, feel free to just ask

23  me to rephrase it.  I'll try to -- my very best to do that.  If

24  you answer the question though, I'll -- I'll assume that you

25  understood what the question asked; is that fair?

Mario Gomez - 8/7/2023

9

```
 1        A.    Okay.

 2        Q.    All right.  And we were talking about your work on

 3   the dams.  You don't work -- or -- or do you work for Customs

 4   and Border Patrol or have any role with Customs and Border

 5   Patrol?

 6        A.    No.

 7        Q.    Okay.  Do you have any role with -- with the Coast

 8   Guard of any kind?

 9        A.    No.

10        Q.    Okay.  Do you have any functional role working on the

11   actual Rio Grande River itself, other than the dam release,

12   obviously into the Rio Grande?  Do you work on the river?

13        A.    Yes.

14        Q.    You do work on the river.  What do you do?  What are

15   your function -- what are your jobs on that -- that interact

16   with working on the river?

17        A.    My personal?

18        Q.    Say it again.

19        A.    My personal role?

20        Q.    Yeah.

21        A.    Site inspections.

22        Q.    Okay.  And what types of site inspections do you do

23   on the river?

24        A.    Since part of our mission is flood control, so -- so

25   we look out for any developments, any activities are going on
```

1   in the river, any new construction sort of.  And that's sort of

2   my duties, just to report on any new developments.  There are

3   some activities that go through it for agency review.  We

4   review them and my role is to sometimes visit those sites just

5   to make sure that the work is carried out to the specs that

6   they -- that the proponent proposed.

7        **Q.   Okay.  Are you familiar with the section of the river**

8   **where the buoys that are the subject of this lawsuit are**

9   **positioned right now?**

10       A.   Yes.

11       **Q.   Okay.  And let me just ask you, if you could give us**

12  **a de- -- a description of that part of the river in your own**

13  **words.**

14       A.   Well, I don't know.  It's kind of shallow area,

15  there's green vegetation on the Mexican embankment.  The U.S.

16  side, it's a little bit silty, I guess, sandy.  I don't know

17  what else.

18       **Q.   Are there -- are there rocks located in the river?**

19  **Shallow parts, too?**

20       A.   I cannot say.  I can't remember.

21       **Q.   Can you tell us, are there barriers on the -- on**

22  **the -- the river islands -- barrier islands there?**

23       A.   There at that particular site?

24       **Q.   Yes, at that particular site?**

25       A.   Not that I can recall.

Mario Gomez - 8/7/2023

11

1       Q.   Okay.  As I understand it, the majority of watercraft

2  on that portion of the river is law enforcement right now and

3  their -- and their airboats.  Would you agree with that

4  statement?

5       A.   Yes.

6       Q.   Are there any other watercraft that you could single

7  out right now in that section of the river?  The area of the

8  buoys.

9       A.   Can't say that.

10      Q.   Okay.  There's not any that you could think of other

11 than law enforcement presence in that general section, correct?

12      A.   That's correct.

13      Q.   Okay.  And -- and law enforcement is not -- the --

14 the boats that are able to operate in and around that section

15 of the river are -- are -- are these airboats, right, that

16 don't require a lot of depth to navigate, correct?

17      A.   Yes.

18      Q.   Because if you required a lot of depth to navigate,

19 you wouldn't be able to -- to negotiate large portions of that

20 river, correct?

21      A.   Yes.

22      Q.   Okay.  Any other watercraft you can think of other

23 than the airboats that you see from time to time from law

24 enforcement?

25      A.   No.

Mario Gomez - 8/7/2023

12

1      Q.   Okay.  So the types of boats that would be in that

2  section of the buoys are law enforcement airboats you've --

3  you've said.  Have you ever seen any non-law enforcement

4  watercraft in that area?

5      A.   I cannot say I have.

6      Q.   Okay.  What about any kind of recreational craft of

7  any kind in that area?

8      A.   While I visited, I did not see any of that.

9      Q.   Okay.  All right.  I'm going to ask you just as a

10 general question, have you ever sat down and researched the

11 historical watercraft uses of the Rio Grande that are in the

12 Maverick County portion specifically?

13     A.   I cannot say that.

14     Q.   Okay.  Are you aware of any federal or state court

15 decisions that have determined the -- whether or not that area

16 is navigable waters?

17     A.   I cannot say that.

18     Q.   Okay.  All right.  When were you first approached to

19 provide an affidavit or a declaration in this case, Mr. Gomez?

20     A.   Probably last week.

21     Q.   Okay.  Let me show you a copy of it.  I'll go ahead

22 and mark it as Exhibit 1 for purposes of this deposition.

23           (Exhibit 1 marked.)

24           MR. SWEETEN:  Clean copy for Mr. Gomez here.

25 Can you help me out with that?

Mario Gomez -  8/7/2023

13

```
 1                 MR. MARX:  Yes.

 2                 MR. SWEETEN:  There's about 10 of them in there.

 3                 MR. MARX:  All right.  Here we go.

 4                 MR. SWEETEN:  That's the color, I should mark

 5     that as 1.

 6                 MS. KRUGER:  Yeah, this is the one.

 7                 MS. PEREZ:  Oh.

 8                 MS. KRUGER:  This is -- yeah.  Yeah.  Yeah.

 9                 MR. SWEETEN:  Just put a 1 right there.  There

10     you.  Okay.

11          Q.   (BY MR. SWEETEN)  All right.  So very quickly just

12     want to ask you, is this -- this -- I know this is called --

13     this is Exhibit 1, but it's called Detachment 2 on the front

14     page.  Is this the declaration that you were asked to provide

15     in this case, Mr. Gomez?

16          A.   Yes.

17          Q.   And who asked you to provide this, sir?

18          A.   My lawyers.

19          Q.   Okay.  Can you tell me who specifically you've had

20     interactions with?

21          A.   IBWC lawyers.

22          Q.   Okay.  Is that -- I don't remember her name on the

23     phone.

24          A.   Ms. -- Ms. Rebecca Rizzuti and Ms. Jennifer Pena.

25          Q.   Okay.  So -- so those two individuals are the people
```

Mario Gomez - 8/7/2023

14

1  that you've talked to about this -- this issue, correct?

2       A.   Yes.

3       Q.   When did you first learn about this lawsuit filed by

4  DOJ?  I guess, let me ask it a different way because you knew

5  it was coming, right, because you signed an affidavit in

6  advance of the lawsuit, executed on July 25th, 2023; is that

7  right?

8       A.   I cannot speak.

9            MS. PEREZ:   Objection, form.

10      Q.   (BY MR. SWEETEN)  Well, let me ask it another way.

11           When did you first learn about the lawsuit?

12  Because it appears you executed the affidavit the day after the

13  lawsuit, which is then part of the preliminary injunction

14  motion that was filed the next day.  So when did you first hear

15  about the lawsuit?

16      A.   Yeah, I cannot say when exactly.

17      Q.   Okay.  And then you were obviously contacted either

18  on the 25th or before that time about providing a declaration,

19  correct?

20      A.   I know it was last week.  I can't say specific date.

21      Q.   Okay.  So it was like either it would've been Monday

22  or Tuesday of last week, would you think?

23      A.   I guess I signed it on -- signed it on the 25th.

24      Q.   I don't have my calendar, so...

25      A.   Yeah.

Mario Gomez -  8/7/2023

15

1    Q.   I have -- here -- let's -- let's figure it out

2    together.

3                All right.  Okay.  So it was signed the -- it --

4    it says it signed the 25th, so that would've been Tuesday of

5    not last week, but the week before.

6    A.   Okay.

7    Q.   So two weeks ago is when you first signed this

8    declaration?

9    A.   Right.

10   Q.   Okay.  Is that on the day you signed the declaration?

11   Was that the day that you met with the attorneys in the case?

12   A.   I met with the attorneys for this?

13   Q.   For the IBWC.

14   A.   Yes.

15   Q.   You met with the two attorneys from the IBWC, was it

16   the same day that you executed this?

17   A.   To review my statement.

18   Q.   Okay.  So you had had a previous meeting with those

19   attorneys.  Do you know when that was?

20   A.   Happened so fast.

21   Q.   Okay.

22   A.   Maybe.

23   Q.   So you have probably seen quite a bit being in both

24   of the Falcon at -- at the Falcon Lake Dam -- Falcon Lake --

25   A.   Falcon Dam.

1    Q.    Falcon Dam and the Amistad Dam, you've seen a lot

2  with respect to the border crisis, correct?

3              MS. PEREZ:  Objection, form.

4    Q.  (BY MR. SWEETEN)  Have you seen -- I mean, you're

5  familiar with the current border crisis, aren't you?

6    A.    I don't keep up with the information.

7              MS. PEREZ:  Objection, form.

8    Q.  (BY MR. SWEETEN)  Okay.

9              MS. PEREZ:  You can answer if you can.

10    Q.  (BY MR. SWEETEN)  You -- you would agree with me

11  that -- that at this -- that over the last two years that --

12  that millions of migrants have gone over, have crossed the Rio

13  Grande to migrate into the United States, correct?

14    A.    I cannot say.

15    Q.    Okay.  Well, let -- let me just ask you.  I'll just

16  show you a document.  I'll mark it as Exhibit Number 2.  Take a

17  look at that.

18              (Exhibit 2 marked.)

19              MR. SWEETEN:  If you could add that to them.

20              MS. PEREZ:  Thanks.

21    Q.  (BY MR. SWEETEN)  And I'm show you there's official

22  government.

23              MR. SWEETEN:  Yeah, we've got you.

24    Q.  (BY MR. SWEETEN)  There's official government

25  document of from the U.S. Customs and Border Patrol.  Do you

1   see that?  And -- and do you see what it's entitled?  The CBPs,

2   Customs of Border Patrol releases June 2023 monthly update,

3   right?

4       A.   Yes.

5       Q.   In it they're talking -- one thing they're talking

6   about, if we can go to page 2 together, an Operation Artemis.

7   Do you see that?  It's in the middle of the page with those

8   bullet points.  Do you see it, sir?

9       A.   Yes, sir.

10      Q.   See you where it says -- by the way, did you have

11  any -- any part or were you aware of Operation Artemis that

12  began on June 5th, according to this document "And had made

13  over 130 seizures, including 21 pill presses, more than 5,000

14  pounds of precursor chemicals, more than 300 pounds of

15  methamphetamine and over 5,000 pounds of other drugs."  Were

16  you familiar with that -- that operation?

17      A.   I cannot say.

18      Q.   Okay.  Okay.  So if we can go, ensuring border

19  security and effectively managing migration from the CPB

20  document, if you look at the top of the second page of Exhibit

21  Number 2, it says "In June, the first full month since the

22  lifting of the Title 42 Public Health Order, U.S. Border Patrol

23  recorded 99,545 encounters between ports of entry along the

24  southwest border."  Do you see that, where it says that?

25      A.   Okay.

1    **Q.   Okay.  Do you have any estimate -- I mean, do you --**

2    **living where you do, which is along the -- working where you do**

3    **along the border, do you have any estimate as to how many**

4    **migrants have illegally entered the United States over the last**

5    **two years, say?**

6                    MS. PEREZ:  Objection, scope.  I'm going to

7    direct the witness not to answer because this obviously goes

8    outside the scope of what the Court ordered.

9                    MR. SWEETEN:  What did the Court order?  What

10   did -- let's -- let's --

11                   MS. PEREZ:  The topic is just going to be about

12   the obstruction under the Court order --

13                   MR. SWEETEN:  Well, no, let's just -- read it to

14   me what you're saying prohibits this question.

15                   MS. PEREZ:  Yeah.  Page 6 of the Court's

16   August 3rd order states that "The Court finds it proper to

17   allow expedited discovery for the limited purpose of

18   investigating the factual assertions made by the declarance on

19   obstruction."

20                   MR. SWEETEN:  Okay.  Well, I mean, I -- my

21   argument would be that -- that, you know, this goes to the

22   certainly to the balancing of interests portion.  This goes to

23   the -- the -- the purpose of -- of putting the buoys out.  I'm

24   not going to belabor this though, but I'll just -- I'll ask the

25   last question and then if you're going to instruct him not to

Mario Gomez - 8/7/2023

19

1  answer then -- then that's -- we'll go forth on other things.

2      Q.   (BY MR. SWEETEN)  I was going to ask you if you had

3  any estimate as to how many illegal migrants came into the --

4  into the U.S. over the last two year period, if you know about

5  it?

6           MS. PEREZ:  Same objection.  And I'll go ahead

7  and -- you can go ahead and answer, if you know, Mr. Gomez.

8      A.   No, I don't know.

9      Q.   (BY MR. SWEETEN)  Okay.  Let's move on.  I do really

10 want to engage with the things that you've -- you've indicated

11 in your affidavit in particular.  Do you have any understanding

12 as to -- and one of the things that you discussed in your

13 affidavit is the DPS operations of -- of placing some buoys in

14 the river, correct?

15     A.   Correct.

16     Q.   And you understand that the purpose of placing those

17 buoys was because it is a -- a section of the river where

18 the -- the Operation Lone Star is trying to prohibit migrants

19 from crossing from what -- the Mexican side to the Texas side;

20 is that your understanding of the buoys?

21           MS. PEREZ:  Objection, form.

22     A.   Correct.

23     Q.   (BY MR. SWEETEN)  Okay.  Now, you've -- in your

24 affidavit you provided pictures and so if we can have that.

25 Thank you.  I've lost my copy apparently.  Is it under here?

Mario Gomez - 8/7/2023

20

1   There we go.  That's better.

2                   Okay.  So let's turn to the affidavit itself,

3   and the first paragraph you talk about what it is you do.  You

4   currently work in Maverick County, Texas, correct?

5       A.   Correct.  Right.

6       Q.   And you're familiar with the -- your familiarity with

7   the Rio Grande, would you agree, that not all of the Rio Grande

8   is the same as far as water levels, flow, terrain, et cetera?

9   That some -- that -- that it differs along the 1200 mile

10  stretch of the Rio Grande River based on your experience?

11      A.   I would agree.

12      Q.   Okay.  And in your affidavit on paragraph 3, you talk

13  about a meeting that you attended in El Paso with DPS.  Do you

14  recall that meeting?

15                  MS. PEREZ:  Objection, form.

16      A.   Meeting?

17      Q.   (BY MR. SWEETEN)  So in paragraph 3 it says, "On

18  June 12th, 2023, I attended a meeting in Eagle Pass, Texas,

19  with the Texas Department of Public Safety."

20      A.   Yes.

21      Q.   Did I read that correctly?

22      A.   (Nods head.)

23      Q.   Okay.  Can you tell me who was in attendance at that

24  meeting?

25      A.   They're in Exhibit A.

1      Q.   Okay.  Let's go to Exhibit A.  And -- and Exhibit A,

2  as I understand it, is a one page document that is dated

3  June 12th, 2023 that you indicate sort of summarizes your

4  meeting with DPS; is that right?

5      A.   I would agree.

6      Q.   Okay.  And did you -- were you asked to write this,

7  or did you write this as a matter of course?

8      A.   This was prepared by our safety advanced engineer,

9  his name is listed there, Evelio Siller.

10     Q.   Okay.  All right.  You say, "The buoy project is part

11  of Governor Greg Abbott's loans Operation Lone Star Initiative.

12  The City of Eagle Pass are 100 percent on board with the

13  DPS/Texas National Guard operations for border security."  Did

14  I read that correctly?

15     A.   Yes.

16     Q.   Okay.  Do you know who's -- it -- it says that's a --

17  one of the Meeting Notes and Highlights.  Is that -- do you

18  recall who said these things, or would you say that's just a

19  summary of the things that were discussed?

20     A.   I believe maybe Mr. Isaac Gonzalez.

21     Q.   Okay.

22     A.   Lieutenant.

23     Q.   And let's go over who was at the meeting.  There was

24  an individual named Mario Gomez, who -- he is with the IBWC; is

25  that correct?

Mario Gomez - 8/7/2023

22

1      A.   Yes.

2      **Q.   That's you?**

3      A.   Yes.

4      **Q.   Demetrius Gaines, IBWC?**

5      A.   Assistant area manager.

6      **Q.   Okay.  Evelio Siller is your assistant?**

7      A.   He's safety advanced engineer.

8      **Q.   Okay.  Luise Martinez?**

9      A.   He's in charge of our security.

10     **Q.   Okay.  Isaac Gonzalez?**

11     A.   DPS, Lieutenant.

12     **Q.   All right.  Mr. Cordova?**

13     A.   Can't recall who.

14     **Q.   And then you said Laredo section lead.  Do you know**

15   **who that was?**

16     A.   No, I can't remember.  I just remember that he was

17   from the Laredo area.

18     **Q.   Okay.  And those were all the IBWC attendees and all**

19   **the DPS attendees that you recall being at the meeting,**

20   **correct?**

21     A.   Correct.

22     **Q.   Was it a cordial meeting?**

23     A.   Yes.

24     **Q.   It says that the issue of Operation Lone Star and**

25   **operations for border security were discussed at the meeting?**

Mario Gomez -  8/7/2023

23

```
 1        A.    Yes.

 2        Q.    Okay.  And -- and have you had prior meetings with

 3   DPS on the issue of border security?

 4        A.    No.

 5        Q.    Okay.  Is this the first one you attended with DPS?

 6        A.    Yes.

 7        Q.    Okay.  Or was it a -- what -- what was it a helpful

 8   meeting or -- and -- and a positive meeting generally?

 9        A.    Yes, I would say so.

10        Q.    Okay.  All right.  And at the meeting it was

11   discussed that Maverick County would be an initial test site

12   for the buoy system, correct?

13        A.    Yes.

14        Q.    That the "Buoy system project had been an ongoing

15   7-month design project with coordination between DPS,

16   Department of Homeland Security, Texas National Guard, Texas

17   Parks and Wildlife."  And that it had been approved and funded

18   by the state of Texas.  That's what this says about the

19   meeting, correct?

20        A.    Yes.

21        Q.    And is that what was discussed in the meeting, that

22   it had been that sort of joint project between DHS and DPS and

23   the other agencies listed?

24              MS. PEREZ:  Objection, form.

25        A.    DHS, it was more of a heads up.
```

Mario Gomez - 8/7/2023

24

1      Q.   (BY MR. SWEETEN)  Okay.

2      A.   Yeah, that was it.

3      Q.   So this says though that, the buoy system project had

4  been an ongoing 7-month design project with coordination with

5  DHS.  Was DHS coordinated with on the buoy design as this says?

6      A.   I can't say.

7      Q.   Okay.  You weren't involved in that in -- in the

8  development of the project prior to this meeting on June 12th;

9  is that what I'm understanding?

10     A.   Right.  I can't...

11     Q.   Okay.  All right.  Is this the first time that you

12  had heard of the buoy system?

13     A.   I can say yes.

14     Q.   Okay.  So the June 12th meeting was the first time

15  you ever heard buoys discussed, correct?

16          That's, yes?  Gotcha.

17     A.   Yes.

18     Q.   All right.  And -- and so it's the case then that --

19  that they may have had multiple discussions before, but this

20  was your first time to discuss buoys with them, correct?

21     A.   Correct.

22     Q.   Okay.  It says that the buoy system will be installed

23  in three strategic locations to prevent that drownings.  That

24  is what was discussed at the meeting, correct?

25     A.   Correct.

Mario Gomez -   8/7/2023

25

1    Q.    Okay.  That, in other words -- and are you aware that

2    last year some 1,238 migrants drowned?  No.  "1,238 migrant

3    deaths and disappearances were recorded in 2021."  Did you --

4    were you aware that that figure was that high?

5           MS. PEREZ:  Objection, scope, but you can

6    answer, if you know, Mr. Gomez.

7    A.    No, I don't.

8    Q.    (BY MR. SWEETEN)  Okay.  I mean, you -- you knew it

9    was high though?  I mean, you knew it's dangerous for migrants

10   to cross rivers and migrate in non ports of entry, correct?

11          MS. PEREZ:  Same objection, and you can answer,

12   if you know, Mr. Gomez?

13   A.    Crossing the river, yeah, it's dangerous.

14   Q.    (BY MR. SWEETEN)  Okay.  This says from the meeting

15   notes, it says, "Installation of the first (1,000 ft) of buoy

16   system will start approximately July 7th-10th of 2023 with an

17   estimated completion of 2-3 weeks."  Did I read that correctly?

18   A.    Yes.

19   Q.    Were you appreciative of the fact that -- that this

20   was being openly discussed by these multiple agencies, both

21   state and federal, the issue of -- of the buoy system, and that

22   you were included and given a heads up?

23   A.    Yes.

24   Q.    Okay.  Are those folks that you generally have had

25   good relationships with and coordination with in the past?

Mario Gomez -   8/7/2023

26

1    A.   This was my first meeting with DPS --

2    **Q.   Okay.**

3    A.   -- from that area.

4    **Q.   Did you walk away with a good impression of that**

5    **meeting?**

6    A.   Yes.

7    **Q.   Okay.  It says that there was there -- what was --**

8    **I -- I think this says what was discussed is that there would**

9    **be a "Buoy System-interconnecting linkable 4 foot diameter**

10   **floating barriers."  Did I read that right?**

11   A.   Yes.

12   **Q.   Okay.  That the manufacturer of the buoys was**

13   **Cochrane, USA.  The contractor was Spencer Construction, and**

14   **then that DP -- that, I'm sorry.  "Texas Parks and Wildlife had**

15   **brought up concerns about utilizing netting.  Project plans**

16   **were not shared at the meeting."  But the "Local operation has**

17   **been instructed to point IBWC to the State of Texas Land office**

18   **for further project details."  Did I read that correctly?**

19   A.   Yes.

20   **Q.   Is there anything outside of what's been reported**

21   **on -- in these notes that you're saying that you recall about**

22   **the meeting?  Or does this accurately capture what happened at**

23   **the meeting in your opinion?**

24   A.   I think it's captured here.

25   **Q.   Okay.  Now, DPS in -- in paragraph 4, I'm -- I'm kind**

1    of going back to page 3 of your affidavit, Mr. Gomez.  It says

2    that you were told, in the meeting, that DPS said this was a

3    test for these buoy barriers, correct?

4         A.   Yes.

5         Q.   Okay.  Were you aware, either from the meeting or

6    sometime after that, that the buoy system had actually been

7    developed for the federal government to employ at some point?

8         A.   Can't say that I remember right now.

9         Q.   Okay.  And it looks like I -- I think from your

10   affidavit, it appears that though there was some discussion of

11   putting it at the International Railroad Bridge near Eagle

12   Pass, that it ended up being placed in another location; is

13   that right?

14        A.   That is correct.

15        Q.   Okay.  And how far from the -- how far from the

16   International Bridge was -- were the buoys placed

17   approximately?

18        A.   Two, three miles.

19        Q.   Okay.  And do you know why they chose that test site

20   for the buoys rather than the International Bridge?

21        A.   No.

22        Q.   Okay.  Did you have any problem with that?  Like, did

23   that change anything for you?

24        A.   No.

25        Q.   Okay.  Now, I want to be clear there have, to your

Mario Gomez - 8/7/2023

1  knowledge, there's not been construct -- there's not been the

2  placement of buoys in any other portion of the river other than

3  that one stretch that I think is captured in your affidavit; is

4  that correct?

5      A.   Yes.

6      Q.   And no con- -- no -- no efforts have been taken to

7  place buoys in any other place that you are aware of, correct?

8      A.   Correct.

9      Q.   Okay.  With -- to the buoys that are placed that

10 are -- that are there presently, I -- I think you've described

11 they've been described as being about 1,000 feet long, correct?

12     A.   Correct.

13     Q.   And is that about right?

14     A.   I would say, yes.

15     Q.   Okay.  Now, you would agree with me that there --

16 there have not been any reported injuries or deaths as a result

17 of the placement of those buoys, correct?

18     A.   I cannot say.

19     Q.   Okay.  You don't know one way or the other?

20     A.   Correct.

21     Q.   Okay.  Do you know if the area is monitored by Texas

22 DPS's or -- or the Texas Military Department, the buoy area?

23     A.   I cannot say.  I saw them there during my site, but I

24 cannot say --

25     Q.   Okay.

1    A.    -- it's monitored.

2    **Q.    How many times have you been to the -- the buoy site**

3  **since the buoys have been either construct -- been**

4  **constructed -- in the process of being constructed or finished?**

5    A.    Weekly basis.

6    **Q.    About every other week -- every week; is that right?**

7    A.    Since my first site --

8    **Q.    Okay.**

9    A.    -- when I first visited a -- or once while they were

10  identified there on that site, I would say every week maybe.

11   **Q.    Okay.**

12   A.    Once a week.

13   **Q.    Okay.  And when you're there, what -- what is it that**

14  **you're there to do to observe or something else?**

15   A.    Again, report site conditions.

16   **Q.    Okay.  And who do you report those site conditions**

17  **to?**

18   A.    It would be my chain of command.

19   **Q.    Okay.  And other than the fact that the buoys are**

20  **there, have there been any -- have you -- have you shared any**

21  **concerns as to human safety about the -- the buoys being there?**

22   A.    No.

23   **Q.    Okay.  You took some photographs of the of the buoys;**

24  **is that correct?**

25   A.    Yes.

Mario Gomez - 8/7/2023

30

```
 1        Q.    And did you do that through dr- -- drone?  Did you
 2   fly a drone?
 3        A.    No.
 4        Q.    Okay.  All right.  You -- you were on-site then when
 5   you took them?
 6        A.    Yes.
 7        Q.    Okay.  And you -- were you in any way prevented from
 8   taking those pictures at all?
 9        A.    No.
10        Q.    Okay.  So let's look -- let's kind of go through your
11   pictures if we can.  Can you tell me what this document, which
12   is at page 8 of 21, what this is a picture of?
13        A.    This was part of the Evelio Siller report.
14        Q.    Can you say what report that was?
15        A.    The -- the Exhibit A.
16        Q.    Okay.  So you're talking about the June 12th meeting?
17        A.    Correct.
18        Q.    This -- this was given to you -- was this given to
19   you during the meeting?
20        A.    No.
21        Q.    Okay.  How was this created, this page 8 of the
22   affidavit?
23        A.    I can't say.
24        Q.    Okay.  Do you think it was created by DPS or one of
25   the Texas agencies?  Do you think IBWC created it?  Do you
```

1   think the DHS folks?

2       A.   No, our -- -our staff did this.

3       Q.   Oh, your staff at IBWC did this?

4       A.   Yes.

5       Q.   Okay.  And -- and what was the purpose of creating

6   this?  Just to show where you thought DPS had indicated in the

7   June 12th meeting they would be putting the buoys?

8       A.   That is correct.

9       Q.   Okay.  And it turned out to be that -- that those

10  buoys were actually their -- their test run of the buoys was --

11  actually occurred two miles, approximately two miles south --

12      A.   That is correct.

13      Q.   -- on the river?

14           Okay.  So they were not put at this location at

15  the International Bridge, but instead downriver about two

16  miles?

17      A.   That's correct.

18      Q.   All right.  Is there -- and -- let's see.

19           All right.  Let's go to page 10, which is your

20  next picture.  That was part of your affidavit.  Now, it

21  appears that this picture must have been taken before those

22  buoys were placed into the water; is that correct?

23      A.   It would appear so.

24      Q.   Okay.  And do you have an idea of approx- -- you took

25  this picture, correct?

32

1    A.   No.

2    Q.   Okay.  Do you know who took this picture?

3    A.   I believe that's Mr. Demetrius Gaines, our assistant

4  area man.

5    Q.   Okay.  And was -- what -- was he asked by you to take

6  the picture?

7    A.   No.

8    Q.   Do you know why he took the picture?

9    A.   I cannot say that I do.

10    Q.   Okay.  And this -- this simply shows what the orange

11  buoys look like before they're deployed, correct?

12    A.   That is correct.

13    Q.   Okay.  And then there's another picture, it's a

14  little hard to see, but there's another picture it looks like

15  of the buoys there on page 11 of 21.

16    A.   Yes.

17    Q.   And once again, this is before they were deployed,

18  correct?

19    A.   Correct.

20    Q.   And -- and this -- what -- what location -- where

21  were they?  Where are they here?

22    A.   They appear to be at the Shelby Park.

23    Q.   Shelby Park in Eagle Pass, Texas, correct?

24    A.   Correct.

25    Q.   Okay.  The next picture on page 12 of 21 also -- is

Mario Gomez -  8/7/2023

33

```
 1   that also taken in Shelby Park?

 2        A.   Yes.

 3        Q.   Okay.  And this is just another -- the buoys from

 4   another angle, correct?

 5        A.   Yes.

 6        Q.   Okay.  Prior to deployment.  And then we have other

 7   pictures.  If we look on page 14 of 21, is this still -- still

 8   at Shelby Park before the buoys have been deployed in the

 9   river?

10        A.   Yes.

11        Q.   Okay.

12        A.   This is -- yes.

13        Q.   By the way, at the meeting on -- on the 12th, was

14   anybody from Cochrane there --

15        A.   No.

16        Q.   -- at the meeting?

17        A.   No.

18        Q.   Representative of the corporation that made them was

19   there?

20        A.   No.

21        Q.   Okay.  Is it the case that these buoys are made, do

22   you know of -- of foam and -- and plastic; is that correct?

23        A.   I cannot say.

24        Q.   Okay.  All right.  I'll show you the next picture.

25   Is this another picture of Shelby Park, and I'm talking about
```

Mario Gomez - 8/7/2023

34

1   picture 15 of 21?

2       A.   Yes.

3       Q.   All right.  And -- and what is that showing us?

4       A.   Guess you can't see, but there's Conex boxes far away

5   down there.

6       Q.   Okay.  And those are Conex boxes that have been up

7   for how long?

8            MS. PEREZ:  Objection, form.

9       Q.   (BY MR. SWEETEN)  Do you know how long those Conex

10  boxes have been there?

11      A.   I cannot say.

12      Q.   Okay.  And what was the purpose of taking the picture

13  of the Conex boxes?

14      A.   Site conditions.

15      Q.   Okay.  And are -- are those deployed at the border or

16  are they just resting in Shelby County [sic] -- Shelby Park?

17      A.   I cannot say --

18      Q.   Okay.

19      A.   -- where property line is.

20      Q.   Okay.  But are those deployed -- is the river back

21  over the --

22      A.   Yes.

23      Q.   I think you're showing me here, right?

24      A.   Yes.

25      Q.   Okay.  And the river is back there?

Mario Gomez - 8/7/2023

35

1      A.   Yes.

2      Q.   Okay.  So are the Conex boxes in place in order to

3  stop immigration or somebody crossing there; is that right?

4           MS. PEREZ:  Objection, form.

5      A.   Conex boxes are in Shelby Park.

6      Q.   (BY MR. SWEETEN)  Okay.  But I -- I'm trying to

7  figure out, are they deployed at the river or they just parked

8  there for -- for temporary use, if you know?

9      A.   No.

10     Q.   You don't know?

11     A.   I mean, they're not inside the river.

12     Q.   Okay.

13     A.   They're outside the river.

14     Q.   They're outside the river.  Okay.  And do you know

15  where those -- were those Conex boxes ever deployed or are they

16  still in Shelby Park?

17     A.   Last time I -- I was there, yes.

18     Q.   They were still in Shelby Park when you were last in

19  Shelby Park?

20     A.   Yes.

21     Q.   And when was that approximately?

22     A.   Maybe two weeks.  I can't recall.

23     Q.   Okay.  So I -- I guess I'm trying to figure out what

24  are we -- what -- why is this picture part of your affidavit?

25     A.   It's describes site conditions.

1      Q.   Okay.  All right.  Let's go to the next page, page 16

2  of 21.  Where is this location where these buoy -- this shows

3  some buoys, looks like some fasteners.  Where was this taken,

4  Shelby Park?

5      A.   Yes.

6      Q.   Okay.  Does this reflect anything other than that

7  these are the buoys pred- -- pre-deployment in the river?

8      A.   No.

9      Q.   Okay.  And same -- looks like it's the same with

10  page 17 of 21.  These are the -- these are the buoys before

11  they were deployed in the river, correct?

12      A.   Yes.

13      Q.   Okay.  Okay.  If we can turn now to the next picture,

14  which is page 19 of 21.  What -- so we -- we can see that there

15  is fence and there is concertina wire at the -- at the area of

16  the of the river.  Do you see that?

17      A.   Yes.

18      Q.   And do you know when those, let's -- let's talk about

19  the wire that was deployed outside of the fence.  Do you see

20  those there, the wire?

21      A.   Yes.

22      Q.   Okay.  Do you know when that was put there?

23      A.   No.

24      Q.   Okay.  It could have been months ago?  Could have

25  been recently?

Mario Gomez - 8/7/2023

37

1      A.    Yes.

2      Q.    Okay.  And then I think you can see in the right most

3   portion of the picture, you can see the buoys in the river; is

4   that correct?

5      A.    Yes.

6      Q.    Okay.  Would you agree with me that there's no wire

7   that's reflected in any of the pictures of the buoys that we've

8   seen?  There's no wire on the buoys, correct?

9      A.    I cannot say that.

10     Q.    Okay.  I mean, we can go back and look at all these,

11  but you -- you would agree that on any of the pictures that

12  we've gone through, and we've gone through about six or seven I

13  would guess, there's not any concertina wire on those buoys,

14  correct?

15     A.    Yeah, I cannot say that.  I cannot say that there was

16  wire on the --

17     Q.    You did not say that there was?

18     A.    No.

19     Q.    No.  No.  No, I'm not saying that you said that.  I'm

20  just asking that there's not, is that?

21     A.    No, there's not.

22     Q.    All right.  Very good.  I wasn't accusing you of

23  saying that to --

24     A.    No, I mean, I cannot say that there is not.

25     Q.    Okay.  All right.

Mario Gomez -   8/7/2023

38

1      A.   I mean...

2      Q.   Well let -- let's look at the next picture because

3   it's a clearer picture, I think of the buoys.

4      A.   Okay.

5      Q.   Now, on this picture of the buoys, there's no

6   concertina wire on those buoys, correct?

7      A.   Correct.

8      Q.   Okay.  And with respect to -- to the -- it looks like

9   there's a piece of equipment out there.  Was this -- would this

10  have been about the time that the buoys were placed out into

11  the river?

12     A.   That is correct.

13     Q.   Okay.

14          MS. KRUGER:  Counsel, was this page 20 here?

15          MR. SWEETEN:  Yeah.  So we are on page 20 of 21

16  in case -- yeah.  He's on it.  I'm on it.

17          MS. KRUGER:  Okay.  Twenty or 21?  I just got

18  lost.

19          MR. SWEETEN:  Page 20 of 21.

20          MS. KRUGER:  Okay.  Got it.  Sorry.  Thanks.

21     Q.   (BY MR. SWEETEN)  All right.  So it looks like

22  there's a piece of equipment.  Do you know what it was doing

23  out there?

24     A.   Based off picture 20 and 21, it was transporting

25  buoys.

1    Q.   It was transporting buoys out there.  Okay.  Now,

2  there was no excavation that was occurring where those buoys

3  are?

4    A.   I cannot say.

5    Q.   Okay.  Did you take this picture, this picture number

6  20 of 21?

7    A.   Yes.

8    Q.   Okay.  When you were there, did you see any

9  excavation activities occurring under -- at the -- at the bed

10  of the river?

11    A.   No.

12    Q.   Okay.  There was no ex- -- there was no digging up of

13  soil, no dis- -- no -- no construction other than placing buoys

14  out in the river, correct?

15    A.   While I was there --

16    Q.   Okay.

17    A.   -- I did not see any of that.

18    Q.   Okay.  Thank you.  Now, we, as I said, we can see

19  these buoys better.  There's no concertina wire on those buoys,

20  right?

21    A.   Yeah.  Yes.  There's no concertina wire on there.

22    Q.   Okay.  Do you know approximately how many days -- how

23  long it took them to install this section of buoys?

24    A.   No.

25    Q.   Okay.  It is not your contention, is it, that the

Mario Gomez - 8/7/2023

40

1  buoys are on the -- the Mexican side of the river; is it?

2       A.   I cannot say.

3       Q.   Okay.  You're not claiming that though here, right?

4       A.   No. No.

5       Q.   Okay.  Okay.  Do you know how the buoys are kept in

6  place?

7       A.   No.

8       Q.   Okay.  It is not your testimony, is it, that these

9  buoys are moored to the -- to the floor of the river; is it?

10      A.   No.

11      Q.   Okay.  Was it told to you in the June 12th meeting

12 that the buoys were temporary?

13      A.   No.

14      Q.   Was it told to you that they could be moved to other

15 locations?

16      A.   Okay.

17      Q.   Is that a yes?

18      A.   Okay.  Can you repeat the question?

19      Q.   Yes.  Was it told to you that those were temporary

20 structures, the buoys?  Not structures.  That they were

21 temporarily going to be placed in the river?

22      A.   I can't say that temporary was specifically

23 described.

24      Q.   Okay.  Was it told to you that those could be placed

25 in different -- could be moved to different parts of the river?

1        A.    Yes.

2        Q.    **Okay.**

3        A.    That's fair.

4        Q.    **All right.  And was it told to you that that was a**

5  **possibility that they would move to different areas of the**

6  **river with these buoys?**

7        A.    I was told that these buoys could go up on other

8  sites, but not necessarily that these buoys could be

9  transported.

10       Q.    **Okay.  But that was your assumption, correct?  If**

11 **they could be moved that they -- these -- these very buoys**

12 **could be moved also, correct?**

13       A.    I guess you could say.

14       Q.    **Okay.  So I asked you if you knew whether the buoys**

15 **were moored to the floor of the ocean -- the river, and you**

16 **said you didn't know one way or the other; is that correct?**

17       A.    Correct.

18       Q.    **All right.  I want to ask a few questions along those**

19 **lines and the answer may be the very same.  Do you know if --**

20 **if the buoys in any way were affixed to the bottom of the**

21 **river?**

22       A.    No.

23       Q.    **Do you know if they were attached in any way to the**

24 **bottom of the river?**

25       A.    No.

Mario Gomez - 8/7/2023

42

1    Q.   Okay.  Do you know if they were bolted in any way to

2  the bottom of the river?

3    A.   No.

4    Q.   Okay.  Now, are you aware of letters exchanged

5  between the IBWC and different departments of -- of Texas state

6  government regarding issues on the border?

7    A.   Can't say that I have.

8    Q.   Okay.  So if -- if there had been letters, like, say,

9  earlier in the year about water from Mexico or other issues,

10  that's not something that you were a part of or know about,

11  correct?

12    A.   I would say --

13    Q.   Okay.

14    A.   -- correct.

15    Q.   When is the last time you saw the buoys?

16    A.   Sometime last week of July.

17    Q.   And had the -- does do the pictures that are here on

18  page 20 of 21 and 21 of 21, you see these?  Does it still look

19  like that approximately?

20    A.   No, I think it's longer now.

21    Q.   Okay.  Do you know how much longer it is then?

22    A.   No.

23    Q.   Okay.  Because it looks like they were still

24  constructing it in these pictures; is that right?

25    A.   Correct.

Mario Gomez - 8/7/2023

43

1      Q.   All right.  Thank you, Mr. Gomez.  Now, you have not

2  seen -- when you saw it -- the last time you saw it, you did

3  note there had not been concertina wire, any kind of wire or

4  any structure -- okay.  Let me ask the question again.

5           You had not concertina wire nor any sort of

6  spike, structures or anything like that have been placed on

7  those buoys, correct?

8      A.   Correct.

9      Q.   Okay.  All right.  When we look at the pictures on

10  page 20 and 21, it appears that the buoys are, they're running

11  parallel to the banks of both sides of the river, correct?

12     A.   Somewhat apparently.

13     Q.   Somewhat.  They -- they do not go across the river,

14  correct?

15     A.   Correct.  Yeah.

16     Q.   And -- and they, in other words, traffic that wanted

17  to go upriver or downriver is not blocked by those buoys,

18  correct?

19           MS. PEREZ:  Objection, form.  You can answer,

20  Mr. Gomez.

21     A.   I guess they could travel up -- up the river and down

22  the river.

23     Q.   Okay.  Because as you say in your affidavit, you --

24  you explained that -- that the buoys are four-foot-diameter

25  floating barriers manufactured by Cochrane, USA, correct?

Mario Gomez - 8/7/2023

44

1          A.    Correct.

2          Q.    All right.  As far as the -- as to the installation

3    and the -- and characteristics of the buoys, you would agree

4    with me that the expert here would likely be Cochrane, USA, the

5    manufacturer of those buoys, correct?

6          A.    Correct.

7          Q.    Okay.  In paragraph 11, you talk about -- you say,

8    and that's on page 4 if you want to read it with me.  All

9    right.  So this first sentence says that "On July 13th, 2023, I

10   drove personnel from the Mexican Section of the Commission and

11   the U.S. Army Corps of Engineers to the installation site

12   approximately 2 miles downstream of International Bridge."  Did

13   I read that correctly?

14         A.    Yes.

15         Q.    How often do you work with the U.S. Army Corps of

16   Engineers?

17         A.    Not very much.

18         Q.    Okay.  Did the Army Corps of Engineers tell you why

19   they were interested in the buoys that were being built?

20   being -- being placed in the river?

21         A.    Again?

22         Q.    Yeah.  Did the U.S. Army Corps of Engineers tell you

23   why they were there and -- and wanted to see the buoys that had

24   been placed in the river?

25         A.    Clean Water Act.

Mario Gomez -   8/7/2023

45

1      Q.   Okay.  Anything else other than Clean Water Act, did

2   they say?

3      A.   Not that I recall.

4      Q.   Did they tell you whether or not they -- they had a

5   problem with the -- in the -- the placement of the buoys in the

6   river?

7      A.   Not that I can recall.

8      Q.   They didn't complain about the buoys in the river?

9      A.   Not that I can recall.

10      Q.   Okay.  Did anybody from the Corps of Engineers

11   indicate that they thought it was blocking travel in the river?

12      A.   Not that I can recall.

13      Q.   Okay.  In paragraph 14, you say "Texas has not

14   provided USIBWC with any design drawings, construction plans,

15   or other technical information on the installation or design of

16   the buoy system."  Do you see that?

17      A.   Yes.

18      Q.   Did I read that provision correctly?

19      A.   Yes.

20      Q.   Okay.  And -- and is -- are -- are -- you didn't say

21   it here, you're -- are -- you're not suggesting that -- that

22   DPS or the state officials had to provide that under -- had to

23   provide that to the USIBWC, are you?

24      A.   Normally -- if I can answer.  Normally, any

25   floodplain -- I mean, any activities within the floodplain,

1    they would go for USIBWC review.  Any activities or any

2    construction that happens on the River Grande Floodplain so...

3        Q.   Well, let's go through it again though.  You --

4    you've indicated that -- that you -- you're not familiar with

5    how you -- you said the word construction.  Okay?

6        A.   Any type of development.

7        Q.   Well, I mean, I think that's what the lawsuit fight

8    is about.

9        A.   Okay.

10       Q.   But -- but -- but with respect to buoys placed in the

11   river, what authority would you be relying upon to suggest that

12   you -- that the State of Texas has to provide notice to the

13   IBWC that a buoys been put in the river?

14       A.   I would just base off experience that activities I

15   report, and I would say they would go for agency review or not.

16   The agency would notify me.

17       Q.   Okay.  Are you claiming right now that there is some

18   law that requires the State of Texas if they're going to put a

19   buoy out that, they have to tell the IBWC, and if so, I want to

20   know what that law is.

21       A.   Okay.

22       Q.   What?

23       A.   No, I'm saying that normally when there's any

24   activities or development that happens within the floodplain, I

25   normally report up --

1     Q.    Okay.

2     A.    -- to -- that's all I mean.

3     Q.    Did -- did you report the June 12th meeting that the

4  state officials had had with you and -- and multiple other

5  agencies about the buoys?

6     A.    Yes.

7     Q.    Okay.

8     A.    That was in the Exhibit A.

9     Q.    In the middle?

10    A.    Yeah.

11    Q.    Yeah.  Okay.  Here you say -- first of all, the term

12  floating barriers.  How did you come up -- did the -- did the

13  attorneys come up with the word floating barriers or did you?

14          MS. PEREZ:  Counsel, could you...

15          MR. SWEETEN:  On -- on paragraph 16.

16    A.    That's probably me.

17    Q.    (BY MR. SWEETEN)  Okay.  You -- here you say that

18  they "are an impediment to the sections crossing independently

19  in this part of the river."  Did I read that correctly?

20    A.    Yes.

21    Q.    Now, can you tell me a single time when the IBWC over

22  this 1,000 foot stretch has tried to cross that portion of the

23  river?

24    A.    Not since July 20th.

25    Q.    Okay.

Mario Gomez - 8/7/2023

48

1    A.   July 25th.

2    Q.   **Okay.**

3    A.   I would say no.

4    Q.   **What about before July 20th?  When is this -- when --**

5    A.   I mean, since before July 20th.

6    Q.   **Got it.**

7    A.   Up to July 25th.

8    Q.   **All right.  There's -- let me rephrase the question,**

9    **make sure it's clear what you just said.  You've said that**

10   **there's not a single time prior to July 25th, 2023 that you can**

11   **recall the IBWC attempting -- the section attempting to cross**

12   **in this area of the river.  That's what you just said, correct?**

13   A.   Yeah, the U.S. --

14            MS. PEREZ:  Objection, form.

15   A.   -- I --

16            MR. SWEETEN:  He -- he's answering.

17   Q.   **(BY MR. SWEETEN)  Go -- go ahead.**

18   A.   Yeah, I'm trying to remember.  I can't recall.

19   Q.   **Okay.  You can't recall a time?**

20   A.   Yeah.

21   Q.   **Okay.  And then what -- were there any plans that the**

22   **IBWC had in the over 70 miles of river that exists in Maverick**

23   **County to cross that specific section of the river?  The 1,000**

24   **foot area of the river there?**

25   A.   Yeah.  Without agency review, I cannot say.

Mario Gomez - 8/7/2023

49

1    Q.   Okay.  Now, you say in the next paragraph "On July

2  20th, 2023, the Mexican Section of the Commission planned to

3  survey the riverbed just upstream of the buoy system."  Did I

4  read that correctly?

5    A.   Yes.

6    Q.   Okay.  And with respect to that, you're saying

7  upstream, approximately how far upstream would you say they

8  were going to -- to do this, go survey the riverbed?

9    A.   Right at the buoy site.

10    Q.   Okay.  You're saying -- now, here it's -- it doesn't

11  say right at the buoy site, it says just upstream of the buoy

12  system.  So which one of those two is correct?

13    A.   Right at the buoy site.  Just upstream of the buoy,

14  right there.

15    Q.   Okay.  So is there any reason that that riverbed

16  survey could not be conducted in as much as it's north -- it --

17  it'd be north of the of -- of the buoy site?

18    A.   No, north of the buoy, you could carry it out.

19    Q.   Okay.  So it could still, this riverbed survey can

20  still be carried out?

21    A.   Upstream of the buoy, yes.

22    Q.   Okay.  And -- and the DPS officers on duty have not

23  tried to stop you-all from doing IBWC work actively, correct?

24    A.   Correct.

25    Q.   There's not been any time when you've had DPS say

1   you're not going where -- where you were going, correct?

2        A.   Correct.

3        Q.   All right.  Because you have your job to do, and they

4   have their job to do, right?

5        A.   Correct.

6        Q.   Okay.  And their job is to try to stop the flow of

7   migrants and the dangerous crossings in the Rio Grande; isn't

8   it?

9             MS. PEREZ:  Objection, form.  Mr. Gomez, you can

10  answer, if you know.

11       A.   I'm not fully aware of all the DPS duties.

12       Q.   (BY MR. SWEETEN)  Isn't that your understanding of

13  just what Operation Lone Star is trying to do?

14       A.   Correct.

15       Q.   Okay.

16            MR. SWEETEN:  All right.  I'm going to take a --

17  a break.  I've got to talk my co-counsel.  I've got to see what

18  other questions I've got to ask.  So we're going to take a

19  break real fast, if that's okay?  Maybe take five?

20            MS. KRUGER:  Yeah, that's great.

21            THE REPORTER:  3:07 p.m., off the record.

22            (Break taken from 3:07 p.m. to 3:18 p.m.)

23            THE REPORTER:  Okay.  3:18 p.m., back on the

24  record.

25       Q.   (BY MR. SWEETEN)  Thank you, Mr. Gomez.  We're back

51

1    on the record after the break.  Just have a few more questions

2    for you, sir.

3                    First, have you ever seen a U.S. Coast Guard

4    vessel in the -- in the entire 70-some-odd mile stretch of

5    re- -- of the Rio Grande in Maverick County?

6        A.    No.

7        Q.    Okay.  Second, with respect to the segments of the

8    river that are in Maverick County, would you agree that some of

9    those, there's sand bars in a lot of areas in the river in that

10   70 mile stretch?

11       A.    I really cannot say --

12       Q.    Okay.

13       A.    -- certainty.

14       Q.    Would you agree that some of those areas show shallow

15   water -- have shallow?

16       A.    Yes.

17       Q.    Okay.  And when we're talking shallow, it can get

18   very shallow, like sometimes even dry, correct?

19       A.    Yes.

20       Q.    Okay.  So there's -- there's not consistent depths

21   along the -- along the river section of this in Maverick

22   County, correct?  There's -- there's a lot of inconsistency in

23   depth, correct?

24       A.    There's inconsistencies of depth, you know, lots of

25   the river, so I would imagine Maverick County's probably

1  similar.

2      Q.   Okay.  Like a lot of other sections of the Rio

3  Grande, inconsistent depths.  Okay.  Are there small islands in

4  sections of -- in -- in segments of the Rio Grande in Maverick

5  County?

6      A.   Can't say, but there are islands on the river.

7      Q.   Okay.  Are there at times large rocks in the river

8  along that 70 mile stretch?

9      A.   I cannot say.

10     Q.   Okay.  Sometimes manmade debris is in that river?

11     A.   Manmade debris?  Are you talk of plastics?

12     Q.   Yeah.

13     A.   Yes.

14     Q.   Okay.  Sometimes there's natural debris like log

15  stumps in the river?

16     A.   Yes.

17     Q.   Sandy shoals along that 70 mile segment of the river?

18     A.   I would say, yes.

19          MR. SWEETEN:  I have no further questions.

20  Mr. Gomez, thank you for your time.

21          THE WITNESS:  Thank you.

22          MS. PEREZ:  And we don't have any questions.

23          THE REPORTER:  Okay.  3:21 p.m., off the record.

24          (End of proceedings.)

25

<pre>
1                           CHANGES AND SIGNATURE

2    WITNESS NAME: MARIO GOMEZ          DATE: AUGUST 7, 2023

3    PAGE LINE        CHANGE                REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
</pre>

1          I, MARIO GOMEZ, have read the foregoing deposition
and hereby affix my signature that same is true and correct,
2   except as noted above.

3

4

                         _____
5                        MARIO GOMEZ

6

7

8

9   THE STATE OF _____)

10  COUNTY OF _____)

11

12          Before me, _____, on this day

13  personally appeared MARIO GOMEZ, known to me (or proved to me

14  under oath or through _____) (description

15  of identity card or other document) to be the person whose name

16  is subscribed to the foregoing instrument and acknowledged to

17  me that they executed the same for the purposes and

18  consideration therein expressed.

19          Given under my hand and seal of office this

20  _____ day of _____, _____.

21

22

23                       _____
                         NOTARY PUBLIC IN AND FOR
24                       THE STATE OF _____
                         COMMISSION EXPIRES: _____
25

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2

 3   UNITED STATES OF AMERICA,        )
                                      )
 4                  Plaintiff,        )
     VS.                              )
 5                                    )  CIVIL ACTION
                                      )  NO.1:23-00853-DAE
 6   GREG ABBOTT, in his official     )
     capacity as Governor of the      )
 7   State of Texas, and the State    )
     of Texas,                        )
 8                                    )
                    Defendants.       )
 9                                    )

10                   REPORTER'S CERTIFICATION
                   DEPOSITION OF MARIO GOMEZ
11                      AUGUST 7, 2023

12

13       I, Ariana McCoy, Certified Shorthand Reporter in and for

14   the State of Texas, hereby certify to the following:

15       That the witness, MARIO GOMEZ, was duly sworn by the

16   officer and that the transcript of the oral deposition is a

17   true record of the testimony given by the witness;

18       That the deposition transcript was submitted on

19   August 9, 2023 to the witness or to the attorney for the

20   witness for examination, signature and return to me by

21   September 8, 2023;

22       That the amount of time used by each party at the

23   deposition is as follows:

24   Ms. Krystal-Rose Perez   .....00 HOUR(S):00 MINUTE(S)

25   Mr. Patrick Sweeten       .....01 HOUR(S):04 MINUTE(S)
```

1       That pursuant to information given to the deposition

2  officer at the time said testimony was taken, the following

3  includes counsel for all parties of record:

4  Ms. Krystal-Rose Perez.

5

6       That $_____ is the deposition officer's charges to

7  the Plaintiff for preparing the original deposition transcript

8  and any copies of exhibits;

9       I further certify that I am neither counsel for, related

10  to, nor employed by any of the parties or attorneys in the

11  action in which this proceeding was taken, and further that I

12  am not financially or otherwise interested in the outcome of

13  the action.

14       Certified to by me this 8th day of August, 2023.

15

16

17  _____
    Ariana McCoy, Texas CSR 9145
18  Expiration Date: 08/31/2023
    Integrity Legal Support Solutions
19  9901 Brodie Lane
    Suite 160-400
20  Austin, Texas
    210-277-6200- phone

21

22

23

24

25