**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.,* | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT F

```
                  UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,        )
                                 )
               Plaintiff,         )
                                 )
v.                               )   Civil Action
                                 )
GREG ABBOTT, IN HIS OFFICIAL     )   No.: 1:23-00853-DAE
CAPACITY AS GOVERNOR OF THE      )
STATE OF TEXAS, AND THE STATE    )
OF TEXAS,                        )
                                 )
               Defendant.         )
```

---------------------------------

ORAL DEPOSITION OF

JOSEPH SHELNUTT

AUGUST 7, 2023

VOLUME 1

---------------------------------

    ORAL DEPOSITION OF JOSEPH SHELNUTT, produced as a witness

at the instance of the DEFENDANT, and duly sworn, was taken in

the above-styled and numbered cause on August 7, 2023, from

10:00 a.m. to 1:06 p.m., before Amber Garcia, Notary Public in

and for the State of Texas, reported by machine shorthand, at

the United States Attorney's Office, 801 Cherry Street,

Fort Worth, Texas 75201, pursuant to the Federal Rules of Civil

Procedure.

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3         MR. BRIAN LYNK
           United States Attorney's Office - Department of Justice
 4         601 N.W. Loop 410
           Suite 600
 5         San Antonio, Texas 78216
           Phone: (202) 532-3131
 6         Brian.lynk@usdoj.gov

 7

 8         MR. LANDON A. WADE
           United States Attorney's Office - West District
 9         903 San Jacinto Boulevard
           Suite 334
10         Austin, Texas 78701
           Phone: (512) 916-5858
11         landon.wade@usdoj.gov

12         MS. KATHERINE T. ROONEY
           U.S. Army Corps of Engineers - Assistant District
13         Counsel
           Phone: (817) 886-1149
14         katherine.t.rooney@usace.army.mil

15

16    FOR THE DEFENDANT:

17         MR. DAVID BRYANT
           Office of the Attorney General of Texas
18         300 W. 15th Street
           Austin, Texas 78701
19         Phone: (512) 936-2275
           david.bryant@oag.texas.gov

20

21

22

23

24

25
```

3

1                            INDEX

2                                                        PAGE

3     Appearances........................................   2

4     JOSEPH SHELNUTT
           Examination by Mr. Bryant.....................   5
5

6     Signature and Changes..............................  94

7     Reporter's Certificate.............................  96

8

9                           EXHIBITS

10    NO.            DESCRIPTION                          PAGE

11    Exhibit 1      Subpoena to Testify                  9

12    Exhibit 2      Mr. Shelnutt's Declaration           10

13    Exhibit 3      Map of U.S. Army Corps of Engineers  75
                     Districts
14
      Exhibit 4      List of Navigable Waters             77
15
      Exhibit 5      Portion of Coast Guard Regulation    87
16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1                                    THE REPORTER:  We are on the record.  This is

2    the deposition of Joseph Shelnutt in the matter of United

3    States of America versus Greg Abbott, et al.  Our location is

4    801 Cherry Street in Forth Worth, Texas, and we are on the

5    record at 10:00 a.m.  My name is Amber Garcia and my business

6    address is 9901 Brodie Lane, Austin, Texas 78748.

7                        Would all Counsel present please state their

8    appearances for the record.

9                                    MR. LYNK:  This is Brian Lynk from the

10   Department of Justice Environmental Defense Section on behalf

11   of Plaintiff, The United States.  I'm lead counsel for the

12   United States in this matter.

13                                    MR. WADE:  This is Landon Wade for the U.S.

14   Attorney's Office for the Western District of Texas, also

15   Counsel for Plaintiff in this matter.

16                                    MS. ROONEY:  Katherine Rooney, Counsel for the

17   U.S. Army Corps of Engineers, also for the plaintiff.

18                                    MR. BRYANT:  My name is David Bryant.  I'm

19   special counsel in the office of the Attorney General of Texas,

20   representing the defendants in this case.

21                                    THE REPORTER:  Do y'all have any further

22   stipulations y'all would like to put on the record?

23                                    MR. BRYANT:  None as far as I'm concerned.

24                                    MR. LYNK:  None that we have as well.

```
 1                    MR. BRYANT:  Okay.  Mr. Shelnutt, we're here in
 2   a case in which you --
 3                    THE REPORTER:  I need to swear in the witness.
 4                    MR. BRYANT:  I'm sorry?
 5                    THE REPORTER:  I need to swear him in.  Sorry.
 6                    MR. BRYANT:  Okay.  Please do.
 7                          JOSEPH SHELNUTT,
 8   having been first duly sworn, testified as follows:
 9                          EXAMINATION
10   BY MR. BRYANT:
11       Q.   Mr. Shelnutt, we're here in a -- a case in which
12   you've given a declaration in support of a motion for
13   preliminary injunction by the United States of America.  By
14   agreement, we're taking this deposition and it is limited for
15   purposes of today to a maximum of three hours, and I'll ask the
16   court reporter to keep track of the time that we're on the
17   record.  Could you state your office address, please?
18       A.   It's the federal building here in Fort Worth.  I'm
19   not sure the exact street address.
20       Q.   But you know how to get there?
21       A.   I do know how to get there, yes.
22       Q.   Okay.  How long have you worked for the Army Corps of
23   Engineers?
24       A.   Approximately eight years.
25       Q.   And what did you do immediately prior to becoming
```

Joseph Shefnutt - 8/7/2023

6

1  employed by the Army Corps of Engineers?

2      A.   I was a freelance consultant.

3      Q.   What type of consulting did you do during that

4  period?

5      A.   Various kinds of biological consulting.

6      Q.   Okay.  And during that period, where were you

7  located?

8      A.   Which period?

9      Q.   The period when you were a freelance consultant.

10     A.   In Hood County, Texas.  And prior to that, in Central

11  Alabama.

12     Q.   When did you begin that period of freelance

13  consulting?

14     A.   Approximately, 2004 to 2000- -- no.  No.

15  Approximately, 2008.

16     Q.   Okay.  And typically, who were your clients during

17  your freelance consulting work?

18     A.   Various.  They might be nonprofits that might have

19  some interest in various biological work or conservation work.

20  Some might have an interest in running their -- advice on

21  running their boards, which has overlap into the actual work

22  that they do.

23     Q.   Have you ever done any freelance consulting or other

24  work for the State of Texas or any agency or -- or subdivision

25  of the State of Texas?

Joseph Shefnutt - 8/7/2023

1      A.   I had some overlap into consulting with the Texas A&M

2  University system.

3      **Q.   Anything else?**

4      A.   With the State of Texas?

5      **Q.   Yes, sir.**

6      A.   Not that I can recall.

7      **Q.   Okay.  When did you graduate from college with a**

8  **bachelor's degree?**

9      A.   1996.

10      **Q.   And what was your first employment after you**

11  **completed your degree?**

12      A.   I was the director of the Raptor Center at Auburn

13  University.

14      **Q.   How long did you have that job?**

15      A.   Well, that's quite a while ago, so approximately

16  seven years.

17      **Q.   And what was your next job after your work with the**

18  **Raptor Center?**

19      A.   I worked for Bartlett Ranches, and they also had a --

20  a linked conservancy linked with their ranches, so...

21      **Q.   And what did you do for the Bartlett Ranches while**

22  **you were employed by them?**

23      A.   I did various educational outreach concerning

24  wildlife conservation, birds of prey.  Also implemented

25  wildlife management scenarios on their three properties.

Joseph Shefnutt - 8/7/2023

8

1    Q.    Where are their three properties located, in general?

2    A.    At the time?

3    Q.    Yes.

4    A.    Central Alabama; Brock, Texas and Chugwater, Wyoming.

5    Q.    All right.  Once you became employed by the Army

6  Corps of Engineers, what was your first position there?

7    A.    I was a regulatory specialist in the evaluations

8  branch of the Regulatory Division here in Forth Worth, Texas.

9    Q.    When did you begin your employment with the Army

10  Corps of Engineers?  It was about eight years ago, but --

11    A.    Approximately mid November of 2015.

12    Q.    And what, if any, specialized training did you

13  receive in connection with your work in the Regulatory Division

14  of the Army Corps of Engineers?

15    A.    Since I've been employed with the Corps of Engineers?

16    Q.    Yes.

17    A.    Various -- what's known as "regulatory prospect

18  courses" that deal with the execution of duties in the

19  regulatory role.  Some are more specialized, have to do with

20  jurisdiction, compliance enforcement, various repair and

21  wetland training.

22    Q.    After your initial position with the Army Corps of

23  Engineers, what was your next position?

24    A.    Regulatory project manager.

25    Q.    And is that your current position?

1    A.    It is.

2    Q.    **When did you first become a regulatory project**

3  **manager for the Army Corps of Engineers?**

4    A.    I'm going to say, approximately, 2017, maybe early

5  2018, somewhere in that time frame.  I'm not sure of the exact

6  date.

7    Q.    **Okay.  You have the title of Regulatory Project**

8  **Manager.  What types of projects does that refer to?**

9    A.    Projects that would come to the Regulatory Division

10  concerning Section 4 for the Clean Water Act and Section 10 of

11  the Rivers and Harbors Act of 1899.

12    Q.    **Okay.  And what does such a project typically consist**

13  **of?**

14    A.    Well, it could be a broad range.  Typically,

15  applicants that come to us are seeking to impact waters in one

16  of those two statutes that may require a permit, or they may

17  seek advice on how to proceed preapplication.

18    Q.    **To whom do you report in your current position?**

19    A.    I report to Mr. Neil Lebsock.

20    Q.    **What's his title?**

21    A.    He is the chief of the Compliance Enforcement Branch

22  within the Fort Worth Regulatory Division.

23    Q.    **All right.  Let me hand you what's been marked as**

24  **Exhibit 1 to your deposition.**

25              (Exhibit No. 1 was marked.)

1          MR. BRYANT:  Excuse my reach.

2          MR. LYNK:  Thank you.

3      Q.  (BY MR. BRYANT)  Have you seen this document before,

4  Mr. Shelnutt?

5      A.  I have not.

6      Q.  Okay.  This is a -- a subpoena pursuant to which the

7  defendants requested that you testify today, and you are here,

8  so I guess you didn't need to know that you had a subpoena.

9  Appreciate your presence.  Let me hand you what's been marked

10  as Exhibit 2 to your deposition.

11              (Exhibit No. 2 was marked.)

12          MR. LYNK:  Thank you.

13          MR. BRYANT:  Sure.

14      Q.  (BY MR. BRYANT)  Can you identify Exhibit 2,

15  Mr. Shelnutt?

16      A.  Sorry.  What was the question again?

17      Q.  Could you identify or tell us what that document is?

18      A.  It's my declaration.

19      Q.  Okay.  And is that a declaration that you,

20  personally, signed?

21      A.  It is.

22      Q.  And did you, personally, prepare all of that

23  declaration?

24      A.  I -- this declaration was -- parts of this was

25  drafted.  I took the declaration, I edited it, and I reviewed

Joseph Shelnutt - 8/7/2023

11

1    it, and then I signed it.

2        Q.   Okay.  Did you, personally, draft any of the

3    declaration that's Exhibit 2?

4        A.   Did I personally -- what was the question again?

5        Q.   Did you, personally, draft it as opposed to review

6    and edit it?

7        A.   I did not draft all of it, but I reviewed all of it,

8    and I edited portions of it.

9        Q.   Okay.  And my question is whether you drafted any of

10   it?

11       A.   Yes.

12       Q.   What portions?

13       A.   Oh, I edited portions on Item 1, Item 2, portions of

14   Item 5.

15       Q.   Are these -- these -- when you say "Item 5," are you

16   referring to the numbered Paragraph 5?

17       A.   I am.

18       Q.   Okay.  And are you saying that you originally drafted

19   portions of that or just that you edited portions of that?

20       A.   I edited.

21       Q.   Okay.

22       A.   And which means that I changed things and I

23   inserted -- I added to it.

24       Q.   Very good.  Okay.  Can --

25       A.   Would you like me to continue?

Joseph Shelnutt -   8/7/2023

1    Q.   Are there any -- are there any paragraphs that you

2    originally drafted?

3    A.   Complete paragraphs, is that what you're asking?

4    Q.   No.  Just paragraphs that you took the first draft

5    of, as opposed to got them from someone else and -- and edited

6    or added to.

7    A.   No.

8    Q.   Mr. Shelnutt, I believe that Exhibit 2 indicates that

9    you have a master's degree.  When did you receive that master's

10   degree?

11   A.   2015.

12   Q.   Okay.  And was that an online degree or did you go

13   somewhere to get that?

14   A.   It was an online degree.

15   Q.   And what was the specific topic or topics that were

16   the subject of your master's degree?

17   A.   Environmental Policy with a concentration in Fish and

18   Wildlife Management.

19   Q.   Okay.  And was that a -- done at the request or at

20   the expense of the Army Corps of Engineers?

21   A.   It was not.

22   Q.   Mr. Shelnutt, my understanding is that the Fort Worth

23   District of the Army Corps of Engineers includes some counties

24   that are along the Rio Grande River.  Do you know how many?

25   A.   I do not know a total number of counties.

1      Q.   Do you know the approximate length of the river over

2   which the Fort Worth District of the Army Corps of Engineers

3   has jurisdiction?

4      A.   I do not know the approximate length.

5      Q.   Okay.  Do you know how many permits have been issued

6   by the Army Corps of Engineers with respect to projects on the

7   Rio Grande section of the Fort Worth District?

8      A.   I do not.

9      Q.   Do you know if there are any?

10     A.   I'm aware that there are project numbers that appear

11  along the Rio Grande.

12     Q.   Does that mean that there are permits issued or could

13  it be simply that those are applications or expressions of

14  interest in -- in getting a permit?

15     A.   Both.

16     Q.   Okay.  So is it fair to say that you don't know

17  whether the Fort Worth District has actually issued any permits

18  for projects on the portion of the Rio Grande River that is

19  within its jurisdiction?

20     A.   Are you speaking of the entire portion of the

21  Rio Grande?

22     Q.   That is within the Fort Worth Division's

23  jurisdiction.

24     A.   The Fort Worth District has completed permits on the

25  Rio Grande River.

Joseph Shelnutt - 8/7/2023

1   Q.   Okay.  Could you further identify any of them?

2   A.   Not personally.

3   Q.   Is it correct that you have not personally worked on

4   a permit application with respect to the -- any project on the

5   Rio Grande River within the Fort Worth Division?

6   A.   I recall working in -- on projects in proximity --

7   close proximity to the Rio Grande River, but I do not remember

8   working on projects that were in waters of the Rio Grande

9   River.

10   Q.   Okay.

11   A.   That I was assigned.

12   Q.   Have you ever worked on applications for permits or

13   related projects within Maverick County, Texas?

14   A.   No.

15   Q.   Prior to July 2023, did you ever travel to Maverick

16   County, Texas in connection with your work with the Army Corps

17   of Engineers?

18   A.   No.

19   Q.   Prior to July 2023, had you ever been to Maverick

20   County, Texas in any -- in your life?

21   A.   No.

22   Q.   Is it correct that one of the things that you do in

23   your job is to do investigations of reports of situations that

24   might require a permit from the Army Corps of Engineers?

25   A.   Yes.

Joseph Shelnutt -  8/7/2023

15

1    Q.   Have you ever done an investigation for that purpose

2  with respect to any activities on the Rio Grande River within

3  the Fort Worth Division prior to July 2023?

4    A.   No.

5    Q.   Have you ever observed any commercial navigation on

6  the Rio Grande River in Texas?

7    A.   Not that I'm aware of.

8    Q.   Had you ever seen the Rio Grande River prior to July

9  2023?

10    A.   Yes.

11    Q.   Where -- what portions of the Rio Grande River had

12  you seen prior to July 2023?

13    A.   Approximate vicinity of Laredo, Texas.

14    Q.   And on how many occasions had you been there?

15    A.   I believe three times.

16    Q.   Were those all in connection with your work for the

17  Army Corps of Engineers?

18    A.   In Laredo?

19    Q.   Yes.

20    A.   Correct.

21    Q.   Excuse me.  Have you ever seen the Rio Grande River

22  in the area generally referred to the "Rio Grande Valley,"

23  which is closer to the Gulf of Mexico than Laredo or Maverick

24  County?

25    A.   No.

16

1      Q.   Okay.  I understand that you do, as part of your job,

2   investigations of reports of activity that might require

3   permits from the Army Corps of Engineers; is that right?

4      A.   That's correct.

5      Q.   And what's your methodology for doing such

6   investigations when you're asked to do so?

7      A.   Well, it depends on what the -- what the assignment

8   is.  So typically, we refer to -- I'm going to call it

9   "complaints," that may come to us from various sources as

10   unauthorized activity or potential or alleged unauthorized

11   activity.  In that case, we may have a lot of information or we

12   may have very little to -- to no information, and you could

13   take various tracks there.

14            We -- I could be forced to find various contacts

15   to make our initial contact with.  We may already have that

16   information or we can go ahead and make that contact.  First,

17   we need to determine, is it a water under our jurisdiction, and

18   then has a impact to that water occurred, and if so, did it

19   require a permit?

20      Q.   Now, you referred to a "contact."  What -- who would

21   that be?

22      A.   Potential violator.

23      Q.   Okay.

24      A.   Or witnesses.

25      Q.   Do you typically -- or is it part of your methodology

1  to get in touch with what I would refer to as the

2  "complainant," any -- the person or persons who may have made

3  the Corps of Engineers aware of some situation that might need

4  investigation?

5      A.   So you mean the person reporting?

6      Q.   That would be the person or persons reporting a

7  situation that brings it to your attention.

8      A.   Usually, we have that person's information.  They --

9  they bring the complaint to us or the information to us.  I

10  don't know if it's a complaint at that point.  And they can

11  elect to remain anonymous or they can elect not to.  But we

12  typically have some -- some level of information about them and

13  how to get in touch with them, yes.

14      Q.   And so is it typical that you would get in touch with

15  them?

16      A.   With the person alleging a violation?

17      Q.   Yes.

18      A.   It depends.

19      Q.   Okay.  Is there any place that either your personal

20  methodology or the divisions methodology or the Corps's

21  methodology for investigating a report or complaint of that

22  kind is written down?

23           MR. LYNK:  Object to form.

24      A.   Yes.

25      Q.   (BY MR. BRYANT)  Where is that?

Joseph Shelnutt - 8/7/2023

```
 1        A.   It would be in the project file.

 2        Q.   And is that a -- a different document for each

 3   different project?

 4        A.   It would be.

 5        Q.   Okay.  Is there any more general statement of the

 6   methodology that the Army Corps of Engineers or your division

 7   uses in investigating reports or complaints about activities

 8   that might require permits?

 9        A.   There are.  There's a -- there's a course, it's

10   called a "prospect course" for compliance and enforcement

11   personnel.  These personnel -- various districts around the

12   country attend these courses regularly, and that's where they

13   get their initial training on how to conduct business under the

14   compliance and enforcement branch.

15        Q.   Okay.  Is there anything else that describes the

16   required or expected methodology for investigating such a

17   report or complaint?

18        A.   There is a -- yes.  There -- in the regs, there's the

19   regulations for compliance enforcement.  And I believe it's

20   33 CFR 326.

21        Q.   Okay.  In connection with the -- what I'll refer to

22   as "floating buoys" in the Rio Grande River that are the

23   subject of this action, when did you first become aware of

24   them?

25        A.   Approximately around July 10th.
```

Joseph Shelnutt -   8/7/2023

1    Q.   And how did you become aware of them at that time?

2    A.   Public media.

3    Q.   Do you recall any particular public media that you

4  accessed at that time?

5    A.   I don't recall.  There was numerous public media

6  reports.  I don't recall a specific one --

7    Q.   Okay.

8    A.   -- a specific outlet.

9    Q.   Did you or the Army Corps of Engineers receive any

10 complaints or reports other than what they may have seen in the

11 public media?

12   A.   In the Fort Worth office?

13   Q.   Yes, let's start with that.

14   A.   At -- so I'm going to ask, at what time did you ask?

15 What time frame -- would you repeat the question, sir?

16   Q.   Yeah.  I'm -- what -- say, anytime after June 1st,

17 2023, did the Fort Worth office of the Army Corps of Engineers

18 or anybody within it, to your knowledge, receive a complaint or

19 a report regarding floating buoys in the Rio Grande River that

20 are the subject of this case?

21   A.   Yes.

22   Q.   Who did you receive such a report or complaint from?

23   A.   It came down from our headquarters in Washington,

24 D.C.

25   Q.   Okay.  Do you know of any person or persons who sent

1   that report or complaint to the Fort Worth Division of the Army

2   Corps of Engineers in June or July of 2023?

3       A.   My understanding is that -- I'm aware that the

4   International Border [sic] and Water Commission, IBWC.

5       Q.   And what information did the Fort Worth Division

6   receive fr- -- either from Army Corps of Engineers headquarters

7   in Washington or from the International Border [sic] Waters

8   Commission regarding the floating buoys in June or July of

9   2023?

10      A.   It was a -- a document that contained text describing

11  what they had seen, photographs, and at least one map.

12      Q.   When you say "they," who are you referring to?

13      A.   IBWC.

14      Q.   Okay.  Did that information express concern about the

15  location of the floating buoys, and whether they were on the

16  Texas side or the Mexican side of the International Boundary

17  Line?

18      A.   So -- so my recollection is that document contained

19  information that related to potential impacts in the Shelby

20  Park area.  And I believe that original document referred to

21  buoys so- -- downstream of Shelby Park.

22      Q.   Okay.  Did that document express any concern about

23  whether the -- the buoys that were in the river were on the

24  Texas or Mexican side of the international boundary?

25      A.   I don't recall language in that document that

Joseph Shelnutt - 8/7/2023

1    addressed that particular aspect.

2        Q.   Okay.  Did you later receive an expression of concern

3    on that subject from anyone?

4        A.   I don't recall concern about that particular aspect.

5        Q.   Okay.  When you -- when you went to Maverick County

6    or at any other time, did you verify that the floating buoys at

7    their then current location were on the Texas side of the

8    international boundary?

9        A.   I'm unaware exactly where the international boundary

10   is within the Rio Grande.

11       Q.   Okay.  Did you verify that the buoys at their current

12   location are closer to the Texas shore than to the Mexican

13   shore at that location?

14              MR. LYNK:  Object to form.

15       A.   What I observed at -- at the time of the site visit

16   on the 13th of July while this structure was under

17   construction, it was closer to the United States side of the

18   river.

19       Q.   (BY MR. BRYANT)  Okay.  And have you ever received

20   any information to the contrary?

21       A.   I have not.

22       Q.   Once the Fort Worth Division received the media

23   reports regarding the floating buoys that you described and the

24   communication from the International Border Waters Commission,

25   was the -- this project assigned to you, personally?

1    A.   Yes.

2    Q.   Who else, if anyone, was also assigned responsibility

3  for this project relating to the floating buoys?

4    A.   So my chief has worked in tandem with me on this.

5    Q.   And when you refer to your chief, are you -- "chief,"

6  are you referring to Mr. -- is it Lebstock?

7    A.   Mr. Neil Lebsock.

8    Q.   Lebsock.  Thank you.  In the course of -- strike

9  that.

10            What's the first thing you did with respect to

11  your investigation related to the floating buoys, aside from

12  read the news -- the public media reports you described, and

13  the communication or document from the International Border

14  Waters Commission?

15    A.   So -- and this is typical, is to check and see if

16  there are any permits that may -- or active projects that may

17  be in the -- at that location or in the vicinity of that

18  location.

19    Q.   And did you do that in early July 2023?

20    A.   I did that after July 10th, 2023.

21    Q.   Okay.  And I think your determination is described in

22  your declaration that you did not locate any permits or active

23  projects relating to the floating buoys; is that correct?

24    A.   That is correct.

25    Q.   And what's the next thing that you did with respect

1  to your investigation of the reports with respect to the

2  floating buoys in the Rio Grande River?

3      A.   So I employed various remote sensing tools to

4  understand the conditions at the sites.

5      Q.   Could you describe what you -- what remote sensing

6  tools you're referring to?

7      A.   That would be the available LIDAR data.  Also,

8  topographic maps.  I would say in -- in some cases, verify if

9  there is a Section 10 water under the Rivers and Harbors Act of

10  1899, but, well, that's already known.  Various oth- -- you

11  know, make sure that the -- are we still -- sorry.  Are we

12  still on the remote sensing?

13      Q.   Yes.

14      A.   Okay.  So there's various layers and tools that we

15  have that include the LIDAR data, and it would be various

16  aspects of LIDAR data.  Some of it doesn't all display the same

17  thing, but various other layers may give us better granularity.

18  So it's typical to review all that, and I did that in this --

19  in this case as well.

20      Q.   Approximate --

21      A.   Also --

22      Q.   Sorry.  Go ahead and finish your answer.

23      A.   Also checked on -- I did a cross river profile at

24  Shelby Park, and I believe I did one where the buoys are as

25  well.  And so that cross river profile from, you know,

Joseph Shelnutt - 8/7/2023

24

1  somewhere upland on the east side of the riverbank typically --

2  typically gives us the relief at the riverbank, and the relief

3  at the riverbed all the way across.  So it's just a better way

4  of having a picture of what conditions are on the site.

5       Q.   And what tools are used to do such a cross river

6  profile?

7       A.   In this case, a publicly available tool, such as

8  Google Earth can be employed to do that.

9       Q.   Okay.  And what, if anything, relevant to your

10  investigation did you learn from doing the cross river profile

11  with respect to the Shelby Park area?

12       A.   There was -- there was a disturbance there -- well, I

13  should say there was an impact to the Rio Grande in that

14  location where a portion of the channel had been filled between

15  an island in the Rio Grande, and the bank on the United States

16  side of the Rio Grande River.  And so I verified that the

17  bottom elevation of the river was the same in the main river

18  channel as was previously present in the channel that's been

19  filled now.

20       Q.   Okay.  And how did you determine that in the Shelby

21  Park area there had been some filling of a portion of the

22  river?

23       A.   Initially, that was in the IBWC's document to us.

24       Q.   Okay.  Was there anything else that you did that

25  verified that?

1      A.   We conducted a site visit on the 13th of July where I

2   could confirm firsthand the fill had taken place in that

3   location.

4      **Q.   Anything else?**

5      A.   Could you be more specific?

6      **Q.   Was there anything else that -- that caused you to**

7   **conclude that -- that there had been some filling of an area**

8   **near Shelby Park?**

9      A.   So to clarify, we're talking about just at Shelby

10   Park?

11      **Q.   Yes.  Right now.  I'll ask you about the actual buoy**

12   **side in a minute.**

13      A.   So I believe the document that was supplied to us

14   with IB- -- from IBWC and our site visit was, you know, the

15   confirmation of that through the site visit was the only thing.

16      **Q.   Okay.  Now, if I understood you correctly, you think**

17   **you also did a cross river profile or may have done one with**

18   **respect to the actual location where the -- the buoys were**

19   **located in the river that you actually saw on July 13th, 2023;**

20   **is that correct?**

21      A.   Correct.

22      **Q.   Did you -- were any documents created as a result of**

23   **these profiles that you did either at the Shelby Park area or**

24   **at the site of the floating buoys?**

25      A.   Yes.

Joseph Shelnutt - 8/7/2023

1    Q.   **What are those documents?**

2    A.   They are KMZ files.

3    Q.   **Okay.  Could you explain what that means?**

4    A.   Well, using the -- the Google Earth -- the publicly

5    available Google Earth app, you can save and -- the profile and

6    various other data to a single file called a KMZ file, and so

7    that packaged file was saved to the project file.

8    Q.   **Okay.  And so that's within your project file here at**

9    **the Fort Worth Division now?**

10   A.   Yes.

11   Q.   **Okay.  As a result of any cross river profile that**

12   **you did at the location where the floating buoys are currently**

13   **located, what, if any, information did you get?**

14   A.   So doing these -- these elevation profiles like that

15   is routine for me.  It just confirmed where the riverbanks are

16   in relation to the other aerial data and remote sensing data

17   that we have.

18   Q.   **Okay.  And do you recall anything in particular that**

19   **you learned about the site where the floating buoys are**

20   **currently located?**

21   A.   So do you mean in the context of the elevation

22   profile?

23   Q.   **It would include that, yes.**

24   A.   So you've got to be more specific than that, so I

25   mean...

1      Q.    I'll do my best.

2      A.    Okay.

3      Q.    So as I understand it, you used LIDAR topographic

4  maps and may have used Google Earth to get information about

5  the Rio Grande River at the area where the floating buoys are

6  located; is that correct?

7      A.    That's correct.

8      Q.    And what did you learn from the -- from your work

9  with respect to those tools before you went to the actual site?

10     A.    So much like the -- much like previously, it confirms

11 the -- where the approximate riverbanks are, and they match up

12 with the aerials, the actual aerials that we're able to -- to

13 see, satellite imagery we're able to see.  And it shows us the

14 elevation of the riverbed as you travel across the width of the

15 river, take a cross section through the river.

16     Q.    Okay.  And do you recall any- -- anything,

17 specifically, that you learned about that site through using

18 those tools?

19     A.    Nothing that we didn't already know.  That there's

20 water present, there's a, you know, riverbed elevation present,

21 you know, that changes somewhat acro- -- as you travel across

22 the river, as you would expect.

23     Q.    Okay.  Anything else?

24     A.    No.

25     Q.    All right.  Your declaration indicates that you went

1   to the -- to sites in Maverick County, Texas on July 13th,

2   2023; is that correct?

3       A.   Correct.

4       Q.   How long were you there?

5       A.   Approximately three to three and a half hours.

6       Q.   And was all of that time at or near the -- the bank

7   of the Rio Grande River or was some time either in Eagle Pass

8   or elsewhere?

9       A.   There was a -- a certain amount of time spent

10  traveling.

11      Q.   Approximately how much?

12      A.   30 minutes.

13      Q.   Okay.  And did you spend a portion of that period at

14  or near Shelby Park?

15      A.   Yes.

16      Q.   Approximately how much time did you spend at or near

17  Shelby Park?

18      A.   45 minutes to an hour and 15 minutes.

19      Q.   And when you went on that site visit, who did you

20  meet with aside from Mr. Lebsock, who I understand accompanied

21  you?

22      A.   We met with Mario Gomez from the IBWC.  Later,

23  Mr. Gomez's counterpart, Mexican counterpart, crossed into the

24  United States, and he met up with us.

25      Q.   And what was his name?

 1      A.    His first name is Enrique.  I don't know his last

 2 name.

 3      Q.    **Was he introduced to you?**

 4      A.    He was.

 5      Q.    **Did you meet with anybody else besides the persons**

 6 **you've already named?**

 7      A.    No.

 8      Q.    **Did you meet with anybody from the State of Texas,**

 9 **Texas Department of Public Safety or any other agency of the**

10 **State of Texas?**

11      A.    No.

12      Q.    **Did you make any effort to meet with anybody from the**

13 **State of Texas in connection with that site visit?**

14      A.    No.

15      Q.    **Why not?**

16      A.    At the time, it was a preliminary investigation and

17 we were still gathering information, and that wasn't a part of

18 our agenda for the day.

19      Q.    **Prior to that site visit, did you or anybody else**

20 **from the Fort Worth Division, to your knowledge, get in touch**

21 **with the State of Texas or any agencies or representatives of**

22 **the State of Texas in connection with the matter of the**

23 **floating buoys in the Rio Grande River?**

24      A.    So I did not.  I can't speak for others.

25      Q.    **Well, have you been told about anybody else doing**

Joseph Shelnutt - 8/7/2023

30

1   that?

2       A.   I have not.

3       Q.   Okay.  Have you received any reports, by any means,

4   that someone from the Fort Worth Division did get in touch with

5   the State of Texas prior to the site visit?

6               MR. LYNK:  Object to form.

7               You can answer.

8       A.   No.

9       Q.   (BY MR. BRYANT)  So there's a portion of the visit

10  that related to Shelby Park, and a portion that related to the

11  portion of the river where the floating buoys were located.

12  Did you view or inspect any other portions of the Rio Grande

13  River in that site visit?

14      A.   No.

15      Q.   About what is the distance between the Shelby Park

16  area that you visited on July 13th, 2023 and the site of the

17  floating buoys in the Rio Grande that you also visited on that

18  date?

19      A.   Approximately two to two-and-a-half miles.

20      Q.   Do you know where the U.S. Customs Border Patrol

21  ports of entry are in or near Eagle Pass, Texas?

22      A.   You're referring to the controlled points of entry

23  between --

24      Q.   Yes, sir.

25      A.   -- the United States and Mexico?

1      Q.   Yes, sir.

2      A.   Approximately, I'm aware.

3      Q.   Okay.  Approximately, what is the distance between

4  the port of entry nearest the site of the floating buoys, and

5  the site of the floating buoys?

6           MR. LYNK:  I'll object as beyond the scope of

7  the limited subject matter the court authorized today, but I'm

8  not giving you instruction, so you can answer.

9      A.   Well, I have not measured that distance, so it would

10  be total speculation.

11      Q.   (BY MR. BRYANT)  Okay.  When you were at the Shelby

12  Park area on July 13th, 2023, did you observe any commercial

13  navigation in the Rio Grande River at that site?

14      A.   I'm not aware of any.

15      Q.   Okay.  When you were at the site of the floating

16  buoys, two to two-and-a-half miles downstream from the Shelby

17  Park site, did you observe any evidence of commercial

18  navigation at the floating buoy site?

19      A.   I'm not aware of that.

20      Q.   Have you ever received any information or reports of

21  any commercial navigation at or near the current site of the

22  floating buoys in the Rio Grande River that are subject of this

23  case?

24           MR. LYNK:  Object to form.

25           You can answer.

1    A.   Could you answer -- could you repeat that -- the

2    first part of that, at least, so...

3         Q.   (BY MR. BRYANT)  Okay.  And I'm happy anytime when

4    I -- if I don't make myself clear to repeat and/or try to

5    clarify my question.  I understand that you did not observe any

6    commercial navigation or evidence of commercial navigation at

7    the floating buoy site that day.  I'm now asking whether or

8    not, through other means, you have received any information

9    regarding any present, past or future commercial navigation at

10   that floating buoy site?

11        A.   So I -- I'm not aware of that personally in my role

12   in the Regulatory Division.

13        Q.   Okay.

14        A.   So...

15        Q.   And so I'm -- so we're clear, when I -- when you say

16   "personally," are you including any reports you may have

17   received from other people, either written or in other forms?

18        A.   Correct.

19        Q.   Okay.  Now, when you met with Mr. Mario Gomez on

20   July 13th, 2023, what discussion did you have?

21        A.   We discussed his -- obviously, his document that he

22   supplied to the Corps and where he took the photographs, and

23   his -- his regurgitation of what he observed at the time.  We

24   also discussed, obviously, some logistics about where we were

25   going to go or the plan of where we -- where we might go during

1  the site visit, and what we might see at various points on the

2  site visit.

3      Q.  Have you read Mr. Gomez's declaration in this matter?

4      A.  I have not.

5      Q.  Okay.  Do you recall anything else of your

6  conversation with Mr. Gomez on that occasion beyond what you've

7  already told me?  And let me clarify.  When I say "your

8  conversation," that would include Mr. Lebsock's conversation

9  with Mr. Gomez or anyone else who was present at the time and

10 you witnessed.

11     A.  So I -- I do recall some conversation between his

12 counterpart, Mr. Gomez's counterpart from Mexico.  I wasn't

13 really a party to this -- I didn't participate in this

14 conversation.  I don't believe Mr. Lebsock participated in the

15 conversation either, but I do remember Mr. Gomez translating,

16 you know, his -- Enrique's Spanish, saying -- you know, giving

17 his observations about what he observed from the Mexican side

18 of the river, and photographs that he had taken.  Other than

19 that, I don't remember specifics.

20     Q.  Okay.

21     A.  Yeah.

22     Q.  If I understand correctly, there was a first part of

23 the conversation that did not include the gentleman you refer

24 to as Enrique; is that correct?  A part of the conversation

25 before he arrived in Texas?

Joseph Shelnutt - 8/7/2023

34

1    A.   Oh, yes.

2    Q.   Okay.  And who was present for that conversation?

3    A.   Myself, Mario Gomez and Mr. Lebsock.

4    Q.   Okay.  No one else was present for any part of that

5 conversation?

6    A.   Are you referring to a specific conversation or

7 just...

8    Q.   No.  Just the --

9    A.   No, I don't --

10    Q.   -- any conversations that you had with Mr. Gomez and

11 Mr. Lebsock on that occasion.

12    A.   That's -- that's correct.

13    Q.   Okay.  And about how much later was the conversation

14 that included the gentleman referred to as Enrique?

15    A.   I don't know for sure, but I'm going to say about an

16 hour.

17    Q.   Okay.  Was that also at the Shelby Park site?

18    A.   It was outside the Shelby Park site.

19    Q.   Okay.

20    A.   Yeah.

21    Q.   What's your best description of where it occurred?

22    A.   On the -- on the street outside the Shelby Park site.

23    Q.   Okay.  And who was present for that conversation, if

24 anyone, besides Mr. Gomez, Mr. Lebsock, Enrique and yourself?

25    A.   No one.

1    Q.   Okay.  And what was conveyed to you by Mr. Gomez that

2    had been said by the gentleman referred to as Enrique?

3    A.   So you have to understand when he's translating from

4    Spanish, my Spanish is rudimentary, so I'm getting bits and

5    pieces, and Mr. Gomez is giving truncated, you know, account of

6    what Enrique is telling us.  Basically, he's just getting --

7    giving some information about Enrique's observation from the

8    other side about how he saw and heard construction activity

9    and -- but I don't remember over what time frame Enrique was

10   referring to.

11              And also, he said something about that there may

12   be some -- he couldn't identify a noise some piece of equipment

13   was making, and I remember some conversation going back and

14   forth about -- that didn't involve me, about what piece of

15   equipment or multiple pieces of equipment that might be

16   involved in that.

17              There was also some conversation about the

18   Mexican side of the IBWC using -- or potentially use a drone,

19   but I have no idea if that was previous use or planned use,

20   so...

21   Q.   I think you mentioned earl- -- strike that.

22              Is there anything else that you can recall of

23   that conversation?

24   A.   I don't recall anything -- yeah.

25   Q.   I think you mentioned that some information that

1  Enrique or others on the Mexican side of the commission had

2  taken some photographs.  Were any photographs provided to --

3  either to Mr. Gomez or to the Army Corps of Engineers from the

4  Mexican side?

5      A.   I'm not aware of any.

6      Q.   Okay.  Is that true today?

7      A.   I'm not aware of any, that's correct.

8              MR. BRYANT:  Why don't we take a short break --

9              MR. LYNK:  Sure.

10             MR. BRYANT:  -- if that's okay with you?

11             MR. LYNK:  Yeah.  That's great.

12             THE REPORTER:  We're going off the record at

13  10:55 a.m.

14             (Break taken from 10:55 a.m. to 11:05 a.m.)

15             THE REPORTER:  We are back on the record.  The

16  time is 11:05 a.m.

17     Q.   (BY MR. BRYANT)  Mr. Shelnutt, I'm looking at

18  Exhibit 2, which is your declaration, and at Paragraph 8, it

19  says, quote, I made a site visit to Eagle Pass to investigate

20  the placement of the floating barrier on July 13th, 2023.  Is

21  it correct that that was not the only reason for your visit on

22  that occasion?

23     A.   That's correct.

24     Q.   And one additional reason was to -- to review the

25  area near Shelby Park?

1      A.    That's correct.

2      Q.    **Were there any other reasons?**

3      A.    Other than to -- excuse me.   Other than to view the

4  location where the floating buoys are, those are the two

5  objectives.

6      Q.    **Okay.  And Paragraph 8 states, in part, quote, We met**

7  **with a U.S. representative and a Mexican representative from**

8  **the International Boundary and Water Commission, and they**

9  **accompanied us on the site visit.  Did the Mexican**

10 **representative from the International Boundary and Water**

11 **Commission accompany you and Mr. Lebsock on the site visit to**

12 **the site of the floating buoys?**

13     A.    Yes.

14     Q.    **And did Mr. Gomez also do so?**

15     A.    Yes.

16     Q.    **About how long were the group of you at the site of**

17 **the floating buoys on that day?**

18     A.    So we were there twice.  Okay?  Initially, it was

19 just Mr. Lebsock, Mr. Gomez and myself, and then we left to

20 meet Enrique from Mexico, had the conversation we discussed

21 earlier, and then we went back to the site where the floating

22 buoys were.  So your question is how long with those two

23 combined?

24     Q.    **That was my question, but I'll also ask you, how long**

25 **was each one?**

1    A.    Sure.  They were approximately the same length,

2  approximately 30 minutes each.  I didn't time it, so that's --

3  good.

4    **Q.    When I first read your declaration, Mr. Shelnutt,**

5  **when you said, quote, We met with a U.S. representative, I**

6  **thought that might refer to a member of Congress.  But am I**

7  **correct that you didn't meet with any members of Congress when**

8  **you had your site visit on July 13th, 2023?**

9    A.    We met with no members of Congress on that date.

10    **Q.    Okay.  Did you meet with any government officials**

11  **aside from the ones that you've already named?**

12    A.    No.

13    **Q.    Have you met with any Congress people or government**

14  **officials relating to the floating buoy sites at any other**

15  **time?**

16    A.    No.

17    **Q.    Have you communicated with any government officials**

18  **or elected officials regarding the floating buoy sites at any**

19  **other time?**

20    A.    No.

21    **Q.    To your knowledge, has anybody in the Corps of**

22  **Engineers met with elected officials or other government**

23  **officials regarding the floating buoy sites at any point today?**

24            MR. LYNK:  Object to form.

25    A.    I'm not aware of that.

Joseph Shelnutt - 8/7/2023

39

Q.   (BY MR. BRYANT)  Do you recall any conversation that
was had with the Mexican representative referred to as Enrique
when he was present at the site of the floating buoys on
July 13th, 2023?

A.   The only -- the only communication I can remember
that happened between myself and Enrique had to do with his
operation of some range-finding equipment and measurement of,
you know, the buoys.

Q.   Tell me what you recall in that regard.

A.   It was simply a -- a struggled, broken Spanish,
broken English conversation where he was trying to operate
and -- and figure out how to operate and tell me -- ask me how
to operate his range-finding equipment.

Q.   He had range-finding equipment with him at the time?

A.   He had a small range-finding device.

Q.   Okay.  Did -- did Enrique or you succeed in getting
any data from the range-finding equipment on July 13th, 2023?

A.   Yes.

Q.   What data did you get?

A.   We calculated the length of the buoy structure at the
time at approximately -- and this is very approximately, 450
feet.

Q.   Anything else that you learned from the range-finding
equipment?

A.   I know that Enrique was trying to ascertain the

1  channel width at that location.

2      Q.   What, if any, information did -- did you understand

3  he obtained in that regard?

4      A.   I understood that he was successful in gaining some

5  channel width information at that location, but we didn't

6  gather that information.

7      Q.   Okay.

8      A.   And by "we," I mean myself, and the Regulatory

9  Division here.

10     Q.   And you don't recall anything he said as to the width

11  of the channel at that point?

12     A.   I don't recall.

13     Q.   Did you or anybody else from the Army Corps of

14  Engineers do anything to either measure or estimate the width

15  of the channel of the Rio Grande River at the point where

16  there -- the floating buoys are located?

17     A.   There were some mixed conversation about that between

18  Mr. Gomez, Enrique and Mr. Lebsock as well, along the same

19  general lines as I've just described.

20     Q.   Well, as you sit here today, do you have access to

21  either a measurement or an estimate of the width of the channel

22  of the Rio Grande River at the point of the floating buoys

23  current site?

24     A.   Yes, through our remote sensing tools that we

25  mentioned earlier.

Joseph Shelnutt -  8/7/2023

41

```
 1        Q.    And what is that?

 2        A.    I don't recall the exact width of the channel there.

 3        Q.    Do you recall the approximate width?

 4        A.    It would be speculation without looking at my notes.

 5        Q.    Do you know the current length of the floating buoys,

 6   either precise or -- either measured or estimated?

 7        A.    I do not.

 8        Q.    In Paragraph 10 of your declaration, which is

 9   Exhibit 2, it states that, quote, From the bank, we observed

10   orange spheres with a 4 to 6-foot diameter being installed in

11   shallow water of the Rio Grande with the use of an excavator

12   supported by individuals standing on the riverbed, two

13   airboats, and large type watercraft.  Did you do any measuring

14   or estimation of the depth of the water of the Rio Grande where

15   the floating buoys were located on July 13th, 2023?

16        A.    The only estimation we did of the water depth at that

17   approximate location was a scale of an individual standing or

18   individual standing in the water against the height of the

19   water on their body.

20        Q.    And approximately was -- what was the height of the

21   water based on that estimation?

22        A.    Very -- very approximately, knee height to waist

23   height at that time.

24        Q.    Okay.  So is it correct that what you observed was

25   the -- that the -- the depth of the water at the point where
```

1    the floating buoys were installed was approximately knee to

2    waist high for an adult person?

3         A.   Yes.

4         Q.   Would it be fair to say that's, roughly, a foot and a

5    half to three feet?

6                   MR. LYNK:   Object to form.

7         A.   Where the individuals were standing, I could agree

8    with that.

9         Q.   (BY MR. BRYANT)   Okay.   And you didn't make any

10   measurements as to other locations where the floating buoys

11   were?

12        A.   No --

13        Q.   You had no -- no basis to estimate that?

14        A.   No.   That's correct.

15        Q.   Have you or anybody at the Corps of Engineers made

16   any other measurements or estimates of the depth of the water

17   at the site of the floating buoys currently at any other time?

18        A.   I have not.   I'm not aware of others.

19        Q.   Okay.   In Paragraph 10 of your declaration, you

20   mention the presence of an excavator.   Is that the machine that

21   is depicted in the photograph on Page 3 of Exhibit 2?

22        A.   Yes.   It's the piece of equipment with the bucket

23   attached to it.

24        Q.   Okay.   And did you see any actual excavation or

25   evidence of excavation at or near the site of the floating

Joseph Shelnutt - 8/7/2023

43

1   buoys on July 13th, 2023?

2       A.   At the time I was present at the site, I did not see

3   that.

4       Q.   Okay.  Have you ever seen any evidence of excavation

5   in connection with the current site of the floating buoys in

6   the Rio Grande River?

7       A.   With regard to the site of the floating buoys, no.

8       Q.   Okay.  Did you see any evidence of any fill in the

9   Rio Grande River at the site of the floating buoys in Maverick

10  County, Texas on July 13th, 2023?

11      A.   From my vantage point, I could not identify a fill in

12  the Rio Grande River.

13      Q.   Have you ever received information or seen any

14  evidence of any fill in the Rio Grande River at or near the

15  site of the floating buoys in the Rio Grande River as they're

16  currently located?

17      A.   I do not have any information to that effect at this

18  time.

19      Q.   Okay.  Did you see what you referred to as an

20  "excavator" doing any work at the site of the floating buoys on

21  July 13th, 2023, that did not involve actual excavation?

22      A.   So could you repeat that one more time?

23      Q.   I'll try.

24      A.   Okay.

25      Q.   When you were there on July 13th, 2023, did you see

Joseph Shelnutt - 8/7/2023

44

1  the excavator or the machine you just -- you identified as an

2  excavator doing some other work that did not involve actual

3  excavation?

4      A.   Yes.

5      Q.   And what work did you see that -- that machine or

6  equipment do?

7      A.   Transporting buoys from an upstream location, I

8  assume that was on the upland site to the work site in the

9  river to install, you know, another chain of -- of buoys to the

10 existing floating buoys.

11     Q.   Okay.  So as I -- as I look at the photograph on

12 Page 3, I see a machine that appears to have -- to have what I

13 would call a "bucket" that is of the kind that I've seen used

14 for excavation.  If I understand you correctly, you did not see

15 that used for excavation that day, but did you see that bucket

16 used just to transport and place buoys in the river?

17     A.   Correct.

18     Q.   Did you see it do anything else?

19     A.   Not while I was present, no.

20     Q.   Okay.  Have you ever received any information that

21 any excavator or other equipment was used to do anything at the

22 floating buoy site other than carry and place floating buoys?

23     A.   I'm not aware of anything else.

24     Q.   Okay.  In Paragraph 10 of your declaration, you also

25 mention airboats.  Are airboats -- are those the airboats that

1   are depicted in the photograph on Page 3 of Exhibit 2?

2       A.   That's correct.

3       Q.   And when you refer to an airboat, how -- what would

4   you -- how would you describe that or define it?

5       A.   It'd be a vessel with a fan mounted in the rear of

6   the vessel that propels the vessel forward.

7       Q.   Okay.  And as you understand it, are airboats

8   watercraft that are used where the depth of the water may be

9   shallow or nonexistent, so that you have to have a propeller up

10  out of the water to -- to propel them?

11      A.   I'm aware, in my experience with airboats, is they

12  can be used in shallow water.

13      Q.   Okay.  And did that appear to be the kind of water

14  that the two airboats were operating in on July 13th, 2023, at

15  the site of the floating buoys?

16      A.   Well, the airboats were in various positions while I

17  was there.  Some of it may be characterized as shallow.  Other

18  depths, I'm not aware of according to where they were

19  positioned at the time.  Yeah.

20      Q.   Okay.  You also referred to in Paragraph 10 of your

21  declaration that's Exhibit 2, quote, barge-type watercraft,

22  unquote.  Is that -- is the boat that you refer to as a

23  "barge-type watercraft" also depicted in the photograph on

24  Page 3?

25      A.   It is.

1    Q.   Is it -- strike that.

2              What, if anything, did you observe that

3    watercraft doing on July 13th, 2023?

4    A.   The barge-type watercraft was, I believe, stationary

5    the entire time I was there.  So I didn't -- I assumed it was

6    stabilizing the buoy system at that point in the structure, but

7    I don't know what it was doing, so...

8    Q.   Okay.  On July 13th, 2023, did you see any other

9    watercraft or types of watercraft than those depicted in the

10   photograph on Page 3 of Exhibit 2?

11   A.   I don't recall.

12   Q.   Could you describe what you observed of the use of

13   the land on the Texas side at the site of the floating buoys on

14   July 13th, 2023?

15   A.   From -- from my vantage point during the site visit

16   on that date, I could see that there was concertina wire along

17   the riverbank.  There was a portion immediately land side of

18   the river, and land side of that concertina wire that appeared

19   to be used as a -- as a road, but I don't know how -- I don't

20   know if that road connected anywhere.  More concertina wire, I

21   could see upstream and downstream in various positions.

22   Q.   Okay.

23   A.   Yeah.

24   Q.   Did you see any evidence at all of any commercial

25   activities on the Texas side of the river at the floating buoy

1  site on July 13th, 2023?

2      A.    I'm not aware of any.

3      Q.    And you stood over there, right?

4      A.    I stood?

5      Q.    On the Texas side of the river as you made your

6  observations?

7      A.    That's correct.

8      Q.    And looking up and down the river, did you see any

9  docks or piers or any other evidence of -- of commercial

10 navigation at that floating buoy site?

11     A.    I don't recall seeing anything of that nature.

12     Q.    As you looked over to the Mexican side of the

13 Rio Grande at the floating buoy site, if you did, did you see

14 any evidence of commercial activity?

15     A.    I don't recall seeing anything of that nature there

16 either.

17     Q.    Have you ever, at any other time, seen or received

18 any evidence of any commercial activities at or near the

19 floating buoy site on the Texas side of the Rio Grande River?

20     A.    No.

21     Q.    And you mentioned that there's concertina wire on

22 that side of the Rio Grande River.  How did you avoid or get

23 past that, or did you?

24     A.    We did not.

25     Q.    Okay.  So about how far away from the bank of the

Joseph Shelnutt -  8/7/2023

1  river were you and Mr. Gomez and Mr. Lebsock and the gentleman

2  we refer to as Enrique when you made your observations on

3  July 13th, 2023?

4      A.   My estimate is 50 to 75 feet.

5      Q.   Is it correct that you did not make any effort to get

6  closer access to the work on that date?

7      A.   That's --

8      Q.   "You," meaning all four of you?

9      A.   That's correct.

10      Q.   Now, had -- prior to your site visit on July 13th,

11  had you concluded that the portion of the river where the

12  floating buoys were located was subject to the jurisdiction of

13  the Army Corps of Engineers?

14      A.   Yes.

15      Q.   How did you do that, how did you arrive at that

16  conclusion?

17      A.   The Rio Grande at that location is a Section 10 water

18  under the Rivers and Harbors Act of 1899, and is within our

19  jurisdiction under that act.

20      Q.   And my question --

21      A.   Additionally, it is a perennial water of the United

22  States under Section 404, The Clean Water Act.

23      Q.   How did you conclude, prior to the site visit, that

24  the location where the floating buoys are located was subject

25  to the jurisdiction of the Corps of Engineers under Section 10

1   of the Rivers and Harbors Act of 1899?

2                   MR. LYNK:  I'll object that this is beyond the

3   scope of what the Court authorized limited discovery for today,

4   but you can answer the question.

5       A.   So the Rio Grande River is on an established list of

6   navigable waters within Texas -- within our area of

7   responsibility at the Fort Worth District.

8       Q.   (BY MR. BRYANT)  Okay.  Anything else?

9       A.   That list is derived from studies that indicate

10  whether a water body is a Section 10 navigable water.

11      Q.   Okay.  Anything else?

12      A.   No.

13      Q.   Have you ever seen or read a -- any study related to

14  the portion of the Rio Grande River where the floating buoys

15  are located?

16      A.   We -- have I ever seen or read?

17      Q.   Yes.

18      A.   That's the question?

19      Q.   Yes.

20      A.   Yes.

21      Q.   Okay.  What -- could you describe that?

22      A.   Yes.  It would be the study that was performed, and I

23  don't remember the date, that codifies the Rio Grande River as

24  a Section 10 traditional navigable water under the Rivers and

25  Harbors Act of 1899.

Joseph Shelnutt -   8/7/2023

1      Q.   Okay.  Have you read that study?

2      A.   I have not read that study in its entirety.

3      Q.   When did you partially read it, if at all?

4      A.   So sometime, and this is very approximate, after -- I

5  believe, after July 13th.

6      Q.   And what, specifically, do you recall from your

7  partial reading of the study after July 13th, 2023?

8      A.   Confirming the title and the date, and, generally,

9  the contents.

10     Q.   Could you explain what you mean by "the title"?

11     A.   Verifying that that was a document -- correct

12  document.

13     Q.   Okay.  And what title did it have that confirmed to

14  you it was the correct document?

15     A.   I don't remember the specific title of the document.

16     Q.   Okay.  And you also said you read the dates.  What

17  dates do you refer to?

18     A.   The date the document would have been generated.

19     Q.   Okay.  And what was that?

20     A.   I don't recall the exact date.

21     Q.   What do you recall as the date, approximately, if

22  anything?

23     A.   That'd be total speculation now.

24     Q.   Okay.

25     A.   Yeah.

Joseph Shelnutt - 8/7/2023

51

1      Q.   And what do you recall of the portion of the study
2  that you read?
3      A.   I didn't read specific technical data in the report.
4      Q.   What do you recall of what you did read?
5      A.   There were maps presence -- present.  It was signed
6  and dated.
7      Q.   When you say the -- "it was signed and dated," are
8  you referring to the maps or the study?
9      A.   The study.
10     Q.   Okay.  But you don't recall the approximate date?
11     A.   I do not.
12     Q.   Okay.  Did you determine that the study that you
13  looked at after July 13th, 2023, was a study that specifically
14  related to the portion or segment of the Rio Grande River where
15  the floating site -- buoys are sited at currently?
16     A.   Yes.
17     Q.   What did it say that caused you to come to that
18  conclusion?
19     A.   It gave a -- the map portion of it that identified
20  the Rio Grande in its location and its length.
21     Q.   Okay.  So was this a study that concluded that the
22  entire length of the Rio Grande was covered?
23     A.   Not the entire length.
24     Q.   Okay.  What part was not covered, according to the
25  study?

Joseph Shelnutt - 8/7/2023

1    A.   I'm not entirely sure.

2    Q.   **Aside from looking at a map that showed it as**

3    **covered, do you recall any text that you read that stated that**

4    **any portion of Maverick County was covered by the study's**

5    **conclusions?**

6              MR. LYNK:  Object to form.

7              You can answer.

8    A.   So -- so as -- as previously discussed, you know, my

9    objective for encountering this document was to confirm that

10   we -- we actually possessed the document locally.  And so I did

11   not read any technical aspects of the document.

12   Q.   **(BY MR. BRYANT)  Did you obtain any information as to**

13   **who were the authors of the document?  And the document I'm**

14   **referring to is the study that you looked at.**

15   A.   No.

16   Q.   **Do you know if that document or study was prepared in**

17   **the 21st century?**

18   A.   Meaning after?

19   Q.   **After the ball dropped on New Year's 2000?**

20   A.   Of -- my under- -- that'd be speculation too.  I'm

21   not --

22   Q.   **Okay.  Do you know if that study was prepared in**

23   **the -- in the 20th century?**

24             MR. LYNK:  Object to form.

25   A.   I'm not entirely sure, but I believe so.

Joseph Shelnutt - 8/7/2023

53

1     Q.   (BY MR. BRYANT)  Okay.

2     A.   Yeah.

3     Q.   Is it fair to say that in concluding that the area

4  where the floating sites -- the floating buoys are currently

5  sited, you're relying on the list that the Army Corps of

6  Engineers compiled, and the existence of studies by unknown

7  persons that the Corps keeps as backup for that list?

8     A.   That's correct.

9     Q.   And you don't have any personal knowledge of that

10  otherwise?

11     A.   So could you clarify, any personal knowledge of?

12     Q.   Of whether that body of water is -- where the -- the

13  buoys are located is subject to Section 10 of the Rivers and

14  Harbors Act of 1899?

15     A.   So the knowledge I do have is the long established

16  list that we use on a daily basis to -- to refer to traditional

17  navigable waters under Section 10 of the Rivers and Harbors Act

18  of 1899.  So I trust and affirm that that list is accurate.

19     Q.   Okay.  And you didn't do anything else other than

20  what you've described to arrive at the conclusion of coverage?

21     A.   That's correct.

22     Q.   Okay.  Based on what you observed on July 13th, 2023,

23  and any other information that you have, do you know if the

24  floating buoys that are the subject of this action are in any

25  way structurally built into the bed of the Rio Grande River?

1    A.   I don't have any firsthand knowledge of how -- no.

2    **Q.   Okay.  Do you have any secondhand knowledge?**

3    A.   No.

4    **Q.   Okay.  So you don't know whether the floating buoys**

5    **are part of some structure in the bed of the river there?**

6    A.   We don't have information to make those

7    determinations, no.

8    **Q.   Okay.  Do you have any knowledge either first- or**

9    **secondhand as to whether or not the floating buoys at that site**

10   **are temporary or permanent?**

11   A.   So again, we don't have any -- any information that

12   makes us -- so we can make a determination to that effect.

13   **Q.   And is it correct that as of this date, to your**

14   **knowledge, the Army Corps of Engineers has not contact- --**

15   **contacted the State of Texas or any representative thereof to**

16   **get any information about whether the site of the floating**

17   **buoys is one in which there's been any kind of structural**

18   **attachment to the riverbed or any kind of building?**

19             MR. LYNK:  Object to form.

20             You can answer.

21   A.   So I don't have any knowledge outside of our

22   Regulatory Division here in the Fort Worth District.  I have

23   not had any contact to that effect, so...

24   **Q.   (BY MR. BRYANT)  Okay.  And I just want to be sure I**

25   **understand your answer.  You said that there's no knowledge**

1  outside of the Regulatory Division.  Is there knowledge on that

2  subject within the Regulatory Division by people other than

3  yourself personally, to your knowledge?

4      A.   I'm not aware of it.

5      Q.   Okay.  And is it also true that to the best of your

6  knowledge, there's nobody in the Fort Worth Division of the

7  Army Corps of Engineers who has sought any information from the

8  State of Texas about whether the floating buoys are temporary

9  or permanent?

10              MR. LYNK:  Object to form.

11              You can answer.

12      A.   I don't have that information.

13              MR. BRYANT:  Let's go off the record for a

14  second.

15              THE REPORTER:  Going off the record at

16  11:41 a.m.

17              (Break taken from 11:41 a.m. to 11:42 a.m.)

18              THE REPORTER:  We are going back on the record

19  at 11:42 a.m.

20      Q.   (BY MR. BRYANT)  Mr. Shelnutt, based on what you saw

21  on July 13th, 2023, or any other information you have, do you

22  have any reason to believe that the floating buoys at their

23  current site have altered or modified the course of the Rio

24  Grande River?

25      A.   So I don't have any information to understand that

Joseph Shelnutt - 8/7/2023

1  the course of the river or mod- -- modification of the course

2  of the river has occurred.

3      **Q.   Based on what you observed on July 13th, 2023, or**

4  **from any other sources, do you have any reason to believe that**

5  **the floating buoys, as they're currently located, interfere**

6  **with any navigation up and down the Rio Grande River?**

7      A.   Yes.

8      **Q.   What is that reason?**

9      A.   So if you refer to 33 CFR 322.3, I believe,

10  Activities Requiring Permits.  So -- and I'm paraphrasing here.

11      **Q.   Okay.**

12      A.   So the navigable capac- -- navigable capacity of the

13  river, if it's affected by work or structures in the river,

14  requires a permit.  So that being said, for example, if a -- an

15  applicant were to come to us, and they have, for work in, over

16  or under a Section 10 water, under the Rivers and Harbors Act

17  of 1899, that requires a permit, because even a structure under

18  the river, that was tunneled under the river that didn't impact

19  the water course at all, but it was under the river, that

20  requires a permit too, because that's considered to affect the

21  navigable capacity of the river.

22          So in this case we have a -- a structure of

23  floating buoys that's actually in the water, and could present

24  a -- a -- an effect to navigation or the navigable capacity of

25  the water body.

Joseph Shelnutt - 8/7/2023

57

1      Q.   I understand that you -- you have been trained and --
2  and no doubt spent a lot of time being aware of and applying
3  the Corps of Engineers regulations.  My question was more of
4  a -- just a common sense question that does not apply to those
5  or to the technical term "navigable capacity."  And it is
6  whether the buoys, as they're currently located in the Rio
7  Grande River, do you have any reason to believe they actually
8  interfere with any navigation up and down the river?
9      A.   So -- so I have to -- I have to rely on, in my
10 capacity in the -- in the Regulatory Division here in Fort
11 Worth, I have to rely on my capacity as a regulator and refer
12 to the regulations.  Also, I -- I know very little, and
13 certainly not an expert about navigation or -- or all the
14 various expertise that may go into determining if something is
15 or is not, on a layman's basis, an obstacle.  So I don't think
16 I can speak to that, so...
17     Q.   Okay.  Now, you used the term "navigle-" --
18 "navigable capacity."  What do you understand that to mean?
19     A.   Effects to navigation.  So in this case, I cannot say
20 that there's no effect to the navigable capacity of the river
21 due to the structure that we're discussing in the river at that
22 location.
23     Q.   Based on what you have observed and otherwise
24 learned, do you have a reason to believe that the floating
25 buoys, as they are currently sited, actually and substantially

Joseph Shelnutt - 8/7/2023

58

1  interfere with any navigation up and down the Rio Grande River?

2                    MR. LYNK:  I'm going to object to form.

3                    You can answer.

4       A.    So I'll state again, in my capacity as a regulator, I

5  have to refer to and follow the regulation in our normal

6  capacity as regulators.  And, you know, requiring -- or

7  authorizations for such structures, this is a -- the typical --

8  this may not be a typical one in its -- in its current form

9  we're discussing today, but typically, when people come to us

10 or we -- we determine that there's a structure in a navigable

11 water, you know, we evaluate the capacity of it to obstruct or

12 potential to obstruct navigation in that area, so I would see

13 as no different here.

14                   MR. BRYANT:  Objection, nonresponsive.

15      Q.    (BY MR. BRYANT)  Have you or anybody else at the

16 Corps of Engineers, to your knowledge, ever received any report

17 or complaint that the floating buoys have caused a problem of

18 any kind for any watercraft going up and down the Rio Grande

19 River?

20      A.    I'm not aware of that.

21      Q.    Okay.  If somebody places a single buoy in the Rio

22 Grande River, is it your understanding that that requires a

23 permit from the Corps of Engineers?

24      A.    That's not enough information for me to make a

25 determination on it.

Joseph Shelnutt - 8/7/2023

59

1      Q.    What additional information would you need?

2      A.    Method of placement, purpose of the placement, how

3   it's anchored, the location, various other aspects of it.

4   Is -- is it permanent or temporary, for example, so...

5      Q.    In your conversation with Mario Gomez or the

6   gentleman we've referred to as Enrique, did they express any

7   concern to you or Mr. Lebsock, to your knowledge, about the

8   floating buoys actually interfering with any navigation in the

9   Rio Grande River?

10     A.    I know that there was concern, but I don't know the

11  nature of the concern.

12     Q.    Have you or anybody else at the Army Corps of

13  Engineers, to your knowledge, received any complaints about the

14  floating buoys of a political nature related to Mexico's

15  reaction to them?

16     A.    So could you -- could you state that again?

17     Q.    Okay.  Have you or anybody else at the Corps of

18  Engineers, to your knowledge, received any communications of a

19  political nature from any representatives of Mexico,

20  representatives in the U.S. or the government of Mexico about

21  political problems caused by the existence of the floating

22  buoys in the Rio Grande River?

23             MR. LYNK:  I'm going to object that that

24  question is beyond the scope of the authorized discovery topic,

25  as well as very compound.

1           You can answer, if you know the answer.

2      A.    I'm not aware of that.

3      Q.    (BY MR. BRYANT)  Have you ever seen any evidence

4  of -- or heard any reports of any kind of lawful cross-river

5  traffic at the site of the floating buoys in Maverick County on

6  the Rio Grande River?

7      A.    I'm not aware of that.

8      Q.    Are you aware of unlawful traffic across the Rio

9  Grande River at the site of the floating buoys before the buoys

10 were there?

11     A.    No.

12     Q.    Are you aware that the floating buoys in Maverick

13 County are within a disaster area declared by the governor of

14 Texas related to illegal drug smuggling, human trafficking,

15 terrorist infiltration and illegal immigration?

16           MR. LYNK:  Object as beyond scope.

17           You can answer.

18     A.    I'm not aware of that.

19     Q.    (BY MR. BRYANT)  Are you aware that the Department of

20 Homeland Security has determined that the area where the

21 floating buoys were located is a area of intensity for drug

22 smuggling?

23           MR. LYNK:  Same objection.  You can answer.

24     A.    I'm not aware of that.

25     Q.    (BY MR. BRYANT)  If you were aware of it, would it

Joseph Shelnutt -   8/7/2023

61

1    make any difference to you in your -- in your assessment of

2    whether or not the floating buoys require a permit under the

3    Section 10 of the Rivers and Harbors Act?

4         A.    I'm not aware that it would at all.

5         Q.    Yeah.  Based on what you observed and otherwise know

6    about the floating buoys in the river at -- that are the

7    subject of this lawsuit, based on the current location, would

8    you refer to them as a "pier"?

9         A.    No.

10        Q.    Would you refer to them as a "wharf"?

11        A.    No.

12        Q.    Would you consider them a "breakwater"?

13        A.    No.

14        Q.    Would you consider them a "bulkhead"?

15        A.    No.

16        Q.    Would you consider them a "weir"?

17        A.    No.

18        Q.    Would you consider them a "dolphin"?

19        A.    No.

20        Q.    Would you consider them a "jetty"?

21        A.    No.

22        Q.    Would you consider them a "boom"?

23        A.    No.

24        Q.    Have you ever either done any work yourself or

25    received any information regarding the historical uses of the

1   Rio Grande River for commercial navigation anywhere in the

2   vicinity of the current location of the floating buoys?

3       A.   No.

4       Q.   If somebody applies for a permit from the Corps of

5   Engineers for a project, generally, of -- of the nature of the

6   floating buoys, as you understand them, approximately what time

7   range would you think would be necessary for the Corps to act

8   on such permit?

9       A.   Well, first, I'd have to understand what the

10  applicant was seeking to do within the water body, and we

11  simply don't have enough information to really respond to

12  that -- that question accurately for time frames, because it --

13  it could go, depending if it -- if it fit under a certain

14  regulatory or permitting pathway, it could take less time.  Or

15  if it had to -- had to have more review, it could take a little

16  longer time frame.  But at this point, since we don't have an

17  application with information about the project, various aspects

18  of the project, we simply don't have a -- I don't see how we

19  can answer that question right now.  I'm sorry.

20      Q.   Okay.

21      A.   Yeah.

22      Q.   And I certainly understand you can't answer that

23  question with precision.  I don't even want you to -- I'm not

24  even asking you about that specific project.  But typically,

25  when you say "less time" or "more time," what kind of range is

Joseph Shelnutt - 8/7/2023

63

1  that for processing and issuing a permit by the Corps of

2  Engineers for a project very generally similar to the floating

3  buoys?

4      A.   Well, I can give you -- maybe the best way to answer

5  this is two possible scenarios, and I'm not indicating that

6  it's one of the two at all --

7      Q.   Fair enough.

8      A.   -- or something else.  If someone approached us for a

9  project -- proposed a project in waters such as the Rio Grande,

10 if the impact was of such a nature, it might fit under a -- one

11 of the nationwide permits, which we're required to give a

12 response within 45 to 60 days of the -- of when we consider the

13 application federally complete.  If it won't fit under -- in

14 one of the existing nationwides, then it would go to what's

15 called a standard individual permit.  There is a 120-day goal

16 of rendering a decision once it's considered federally

17 complete.

18     Q.   Thank you.  And I -- I know that that term "federally

19 complete" is, kind of, a term of art.  Could you explain for

20 somebody like me who's not really familiar with it all that is

21 involved in going from an initial expression of interest and

22 getting a permit, to getting a permit that is, quote, federably

23 [sic] -- federally complete, unquote?

24     A.   Sure.  Well, we would need all the required, you

25 know, information about the project, dimensions, cubit yards of

1  fill, acres of fill, linear feet of fill, if it's fill, all the

2  maps and figures that go with that, plus, you know, the text

3  description that would go with that.  We'd also need an

4  understanding of, you know, is there compensatory mitigation

5  involved or is there none, state that.  You know, if it -- if

6  it rose to a limit requiring that.

7           Understand, I'm simply describing it in general

8  here.  I'm not speaking to what's -- what may be required for

9  the floating buoys at this location at this time.  Our review

10  would also include things like, you know, the Endangered

11  Species Act, would there be an impact to federally listed

12  species at this location.  That could entail coordination with

13  the U.S. Fish and Wildlife Service.

14           Also the historic -- I'm sorry -- the -- yes,

15  the Historic Preservation Act.  There needs to be a review

16  there.  That's routine for that to happen.  That'd be

17  Section 106 of the Historic Preservation Act.  And that's

18  typical for all -- those sorts of reviews are typical for both

19  general permits or nationwide permits, and standard individual

20  permits too.

21           So in general, that's what is required.  There's

22  more detail, depending on the nature of the project.  I mean,

23  you could imagine some of these projects are simple in nature,

24  and they don't require a lot of elaboration if they're simple

25  in nature.  Some are more complex and require a lot of

1   elaboration or clarification and coordination with other

2   federal -- could entail coordination with other federal and

3   state agencies.

4        **Q.   So all that you just described to me are things that**

5   **happen prior to the time that an application is deemed**

6   **federally complete?**

7        A.   Not all of that, but it does affect our ability to

8   render a decision.  So you can still -- there can still be --

9   determined to be federally complete, which is a lower bar than

10  being able to make a decision.  So for example, if -- if we had

11  everything that we needed in this theoretical project, but

12  there still needed to be coordination with, say, the Fish and

13  Wildlife Service for a potential impacted list of species,

14  Fish and Wildlife Service would be coordinating with us, we

15  would be coordinating with them.  Whoever the lead federal

16  agency is would be coordinating with them.  And then they would

17  have to go through their process.

18             So we could be federally complete, but we still

19  have to wait on their process till they're -- till they're done

20  with that, and that usually entails a biological assessment

21  about the project and they would -- it may entail them

22  producing a biological opinion, but not always necessary.  But

23  whatever decision of coordination, we have to wait for the end

24  of that to play out.

25             And if that's all we're waiting on, then we can

Joseph Shelnutt - 8/7/2023

66

```
1   go ahead and render our federal decision in writing right
2   immediately after that.  And that would be the same for
3   coordination, say, under the Historic Preservation Act --
4   National Historic Preservation Act, too, if we required that
5   kind of coordination.
6        Q.   Okay.  If I understand you correctly, and please
7   correct me if I'm wrong, first, the applicant has to go through
8   the steps of providing all of the information that is required
9   to fully and accurately describe the proposed project, and also
10  has to get a -- some type of study or information relating to
11  the biological or fish and wildlife impacts of the proposed
12  project, and the potential Historic Preservation Act
13  implications of the proposed project before it can reach the
14  stage of being, quote, federally complete?
15               MR. LYNK:  Object to form.
16               Go ahead.
17       Q.   (BY MR. BRYANT)  Is that correct?
18       A.   Not entirely.
19       Q.   Okay.  Could you correct me, please.
20       A.   I'll attempt to.  So yes, you were correct in that
21  the applicant's responsibility is, is give us a certain amount
22  of information, you know, describe -- generally describing the
23  project.  Yes.  And in that, some of the things are the
24  required figures for the project, description of the project,
25  we may even need some engineering specs for the project too, so
```

Joseph Shelnutt - 8/7/2023

1   we can either review that or have someone else in the Corps

2   locally here review the engineering specs if we're not capable

3   of doing that.

4          Also, the statement about the mitigation, you

5   know, if that's required or not, if it rises to the level of

6   needing some sort of -- of mitigation.  And again, I'm not

7   speaking to this specific project in the Rio Grande that we're

8   here today discussing.  I'm talking about a typical project.

9          If you meet all those criteria there, then it

10  can be federally complete.  If you have sufficient information

11  to make a decision on all those criteria, it can be federally

12  complete.  In some cases, and not every case, it could require

13  a coordination with, say, the Fish and Wildlife Service,

14  because it could -- if there's a listed species in that

15  location, it may be affected by the project.  That has nothing

16  to do with federally complete.  But it delays our ability to

17  render a decision until that process is complete.

18         So I'm not saying that's necessary, and I'm not

19  saying it is or isn't for this floating buoy project.  I'm just

20  trying to give you an example of -- of what, typically, might

21  occur, you know?  So I could -- in this case, though, I could

22  see us coordinating with the IBWC in this case.  But I don't

23  know in what form, because it's -- again, we don't have any

24  information for the project, so...

25     Q.   **Have you ever personally been involved in a project**

Joseph Shelnutt - 8/7/2023

68

1   or learned of a project that did require coordination with the

2   IBWC?

3       A.   I have not been.

4       Q.   Okay.  Are you aware of any such projects that had

5   been handled by the Fort Worth Division of the Army Corps of

6   Engineers?

7       A.   So I'm not personally aware of that.

8       Q.   Okay.  So if I understand, there's Level 1, which is

9   getting to a federally complete application, then there is a

10  Level 2, which is where you have a federally complete

11  application, but you don't have all the steps completed that

12  would allow the Army Corps of Engineers to actually make a

13  decision on the application for a permit.  And then there's

14  whatever period is required for the Corps of Engineers to

15  decide whether to issue the permit after it completes Level 2,

16  and reaches the point at which the -- the Corps of Engineers

17  could act on the permit?

18      A.   Well, I wouldn't describe those as levels.  But the

19  vast majority of applicants that come to us, we can simply make

20  a determination when they've supplied us with enough

21  information it is federally complete, and we can render a

22  decision.  But in the case that they maybe have to -- we may

23  have to involve or coordinate with another federal or state

24  agency, that can entail a diff- -- you know, more time.

25      Q.   And sometimes does it require coordination with

Joseph Shelnutt - 8/7/2023

69

1    multiple federal or state agencies?

2         A.    From -- for complex projects, that's typical.

3         Q.    Okay.  Have you or anybody at the Army Corps of

4    Engineers, to your knowledge, done any research regarding

5    potential commercial uses of the Rio Grande River in the

6    segment where the floating buoys are located?

7         A.    I'm not aware of that.

8         Q.    Okay.  Is it fair to say that the -- the Rio Grande

9    River in Maverick County is not subject to the ebb and flow of

10   the tides?

11        A.    That's correct.

12        Q.    Is it fair to say that, to the best of your

13   knowledge, the Rio Grande in -- River in Maverick County is not

14   presently used to transport interstate or foreign commerce?

15        A.    I don't know the answer to that question.

16        Q.    Do you -- do you have any knowledge that it is used

17   to --

18              MR. LYNK:  Object --

19        Q.    (BY MR. BRYANT)  -- presently to inter- -- to

20   transport interstate or foreign commerce?

21              MR. LYNK:  Object to form.

22        A.    I'm not aware of actual use in that capacity.

23        Q.    (BY MR. BRYANT)  Okay.  Has the Rio Grande in

24   Maverick County, to your knowledge, been used in the past to

25   transport interstate or foreign commerce?

```
 1      A.   So I'm not personally aware of that.

 2      Q.   Are you aware by even second- or thirdhand means?

 3      A.   No.

 4               MR. LYNK:  Object to form.

 5               Sorry.

 6      Q.   (BY MR. BRYANT)  Okay.  Do you have any information

 7 or knowledge, either personal or secondhand, that the Rio

 8 Grande in Maverick County is or may be susceptible for use to

 9 transport interstate or foreign commerce?

10      A.   Well, it's designated as a Section 10 water, so I

11 would -- I would -- I would rely on that designation.

12      Q.   Okay.  Do you have any information other than that?

13      A.   No.

14      Q.   Do you have any knowledge regarding any historical

15 use of canoes or other frontier craft on the Rio Grande River

16 in Maverick County, Texas?

17               MR. LYNK:  I'm going to object that this line of

18 questioning is going beyond the scope of -- that was authorized

19 for expedited discovery today.

20               You can answer, if you know the answer.

21      A.   I don't know.

22      Q.   (BY MR. BRYANT)  Do you have any knowledge of any

23 transportation of grains, furs or other agricultural products

24 up and down the Rio Grande River in Maverick County?

25      A.   I don't have that information.
```

Joseph Shelnutt - 8/7/2023

71

1    Q.   Okay.  Do you have any information regarding any

2  transportation of logs or any other commercial product up and

3  down the Rio Grande River in Maverick County?

4    A.   I don't have that information.

5    Q.   Have you ever seen in the Rio Grande River in

6  Maverick County any watercraft or vessels other than law

7  enforcement or government vessels?

8    A.   Well, I've noticed watercraft in the river, but I --

9  I could not identify definitively what they are in -- in every

10 case.

11   Q.   Okay.  Were there any watercraft in the river that

12 you've seen that you could definitely identify as not being

13 part of law enforcement or government?

14            MR. LYNK:  Object to form.

15   A.   Not that I'm aware.

16   Q.   (BY MR. BRYANT)  Okay.  Have you ever seen any

17 vessels in the Rio Grande River in Maverick County that were

18 transporting any kind of goods other than the buoys?

19   A.   Not that I'm aware.

20   Q.   Have you ever seen any recreational watercraft on the

21 Rio Grande River in Maverick County?

22            MR. LYNK:  Object to form.

23   A.   Not that I'm aware.

24   Q.   (BY MR. BRYANT)  Have you ever received any

25 information about any such recreational watercraft in use in

Joseph Shelnutt - 8/7/2023

72

1  the Rio Grande River in Maverick County, Texas?

2      A.   I don't have any information to that effect.

3      **Q.   Okay.  We talked earlier about a -- a bunch of**

4  **different terms that I asked, and I asked you whether or not**

5  **you regarded the floating buoys as a jetty.  What do you**

6  **understand a jetty to be?**

7      A.   A structure in a river that directs or deflects

8  float --

9      **Q.   Okay.**

10      A.   -- for a particular reason.

11      **Q.   And what do you understand a -- a boom to be?**

12      A.   A similar -- similar situation.

13      **Q.   Okay.  Do you recall -- I'm sorry.  Strike that.**

14          **Do you regard the buoys as either an aid or an**

15  **obstacle to navigation of the Rio Grande River?**

16          MR. LYNK:  Object to form.

17          You can answer.

18      A.   Excuse me.  With the information I have, I don't

19  believe it's an aid to navigation.

20      **Q.   (BY MR. BRYANT)  Okay.**

21      A.   So the second part of that is -- refers to being an

22  obstacle --

23      **Q.   An obstacle, yes.**

24      A.   It appears to affect the navigable capacity of the

25  river under the regulations.

Joseph Shelnutt - 8/7/2023

73

1      Q.   Okay.  And since I'm not 100 percent sure about what

2  the regulations mean by "navigable capacity," I need to ask you

3  to answer my question, which is, do you regard it as an -- as

4  an obstacle to navigation of the river?

5           MR. LYNK:  Object to form.

6           You can answer.

7      A.   Okay.  Well, certainly, the -- you know, with the

8  configuration of the -- the line of buoys in the river, it's

9  a -- it's -- it's a barrier to cross river navigation.  So --

10 so a vessel can't navigate from one side of the river to the

11 other without encountering that obstacle there.  So does that

12 answer your question?

13     Q.   (BY MR. BRYANT)  Well, if -- if that means -- if

14 that's what you mean by it being an obstacle to navigation,

15 then it does.  Do you regard it as an obstacle to navigation in

16 any other sense?

17     A.   Well, as I stated in my declaration, I -- you know,

18 the -- a vessel traveling from one side of the river to the

19 other in that location would have to either maneuver around it

20 or it would in- -- you know, impact it or come into contact

21 with it -- with the barrier, the floating buoys in this case.

22     Q.   Okay.

23     A.   It's -- it is also, I think, blatantly obvious that,

24 you know, if a vessel's navigating the river, you know, up or

25 downstream, it's an -- it's a object that the -- whoever's

Joseph Shelnutt - 8/7/2023

74

```
 1  driving or steering the vessel would have to take note of and
 2  make sure they avoid it.
 3       Q.   They'd have to avoid it by going 6 or 10 feet to one
 4  side of it?
 5       A.   Avoid it at whatever distance they deem necessary.
 6       Q.   Yeah.  But the -- the buoys are only, what, at
 7  maximum, six feet in diameter, up and down --
 8                 MR. LYNK:  Object to form.
 9                 Sorry.
10       Q.   (BY MR. BRYANT)  -- you know, as -- as you approach
11  them from up river?
12                 MR. LYNK:  Object to form.
13       A.   So when I was on-site on the 13th of July as they
14  were being constructed, that's -- that's what I observed,
15  correct.
16       Q.   (BY MR. BRYANT)  Okay.  To your knowledge, is the
17  U.S. Coast Guard at all active in the portion of the Rio Grande
18  River that is within the jurisdiction of the Fort Worth
19  Division of the Army Corps of Engineers?
20       A.   I don't have information to answer that.
21       Q.   Okay.
22                 MR. LYNK:  Counsel --
23                 MR. BRYANT:  Let's take a break.
24                 MR. LYNK:  Yeah.  That's what I was about to
25  ask.
```

75

1          THE REPORTER:  We are going off the record at

2   12:17 p.m.

3          (Break taken from 12:17 p.m. to 12:31 p.m.)

4          THE REPORTER:  We are going back on the record

5   at 12:31 p.m.

6      Q.   (BY MR. BRYANT)  Mr. Shelnutt, I have marked a few

7   more exhibits.  Could you take a look at what I've marked as

8   Exhibit 3 to your deposition?

9          (Exhibit No. 3 was marked.)

10     A.   Okay.

11     Q.   (BY MR. BRYANT)  Exhibit 3 is a map that I copied

12  from the -- from an Army Corps of Engineers website, but aside

13  from that, can you identify that map?

14     A.   This is a map of Texas and surrounding states that

15  shows various U.S. Army Corps of Engineers districts.

16     Q.   Have you seen that map or a map like that before?

17     A.   I have.

18     Q.   Okay.  And do you ever consult that in your work for

19  the Army Corps of Engineers?

20     A.   Yes.

21     Q.   Okay.  And I wish the -- it were more distinct,

22  because I think the original is in color.  But as you look at

23  the portion of Exhibit 3 that depicts the Rio Grande River and

24  its course in Texas, is that divided up within several

25  different Army Corps of Engineers districts?

1      A.   Yes.

2      Q.   And it's pretty easy, I think, to see on Exhibit 3

3 where the jurisdiction of the Galveston District of the Army

4 Corps -- Corps of Engineers ends on the Rio Grande River.  And

5 then what division has the jurisdiction over the area of the

6 Rio Grande River just west of where the Galveston District's

7 jurisdiction stops?

8      A.   So just upstream of the Rio Grande River from the

9 Galveston District is the Fort Worth District's.

10      Q.   Okay.  And what counties along the Rio Grande River

11 does the Fort Worth District have jurisdiction over?

12      A.   Webb, Maverick, Kinney, Val Verde.

13      Q.   Okay.  And at the Val Verde county line on the west,

14 what Army Corps of Engineer district takes over jurisdiction?

15      A.   Well, that would be the Albuquerque District.

16      Q.   So the Albuquerque District has jurisdiction over

17 quite a number of counties in Texas along the Rio Grande River?

18      A.   Correct.

19      Q.   Do you have any knowledge or information as to why

20 that division of responsibility among three different Army

21 Corps of Engineers districts along the Rio Grande River was

22 done?

23      A.   Those -- those district boundary lines were done

24 before my -- before I came along as a Corps employee, so I'm

25 sure -- I'm not aware of the data they made this decision upon.

Joseph Shelnutt - 8/7/2023

1    Q.   Do you have any information as to why it was made by

2    whoever made it?

3    A.   Any -- anything -- any response I would have would be

4    speculative, so...

5    Q.   Okay.  I think in your declaration, it says that your

6    office is located some seven hours from Eagle Pass, Texas; is

7    that right?

8    A.   That's correct.

9    Q.   Is there any part of your -- of the Fort Worth

10   District that is farther from your office than Maverick County,

11   Texas?

12   A.   Well, I can't be sure, but that's one of the furthest

13   reaches away from the office that we have jurisdiction over.

14   Q.   Okay.  Could you take a look at --

15   A.   Or responsibility.

16   Q.   I'm sorry.  I didn't mean to cut you off.

17   A.   That's okay.

18   Q.   Could you take a look at Exhibit 4.

19            (Exhibit No. 4 was marked.)

20   Q.   (BY MR. BRYANT)  Can you identify Exhibit 4, and

21   please take whatever time you need to review it before you

22   answer the question.

23   A.   Yeah.  It's a -- it's a list of navigable waters in

24   the United States in the Fort Worth District.

25   Q.   Is this a -- a list or document that you use in your

Joseph Shelnutt - 8/7/2023

78

1  work for the Corps of Engineers?

2      A.   This is a document that we refer to on a regular

3  basis.

4      Q.   And is -- this document bears the date,

5  December 20th, 2011.  Is this the same 2011 document that you

6  refer to in your declaration?  I believe it's referred to in

7  Paragraph 3.  Or a document is.  I wanted to see if this

8  Exhibit 4 is that document.

9      A.   That is correct.

10      Q.   Okay.  So is it fair to say that, fundamentally,

11  Exhibit 4 is the basis on which you concluded that the current

12  location of the floating buoys in the Rio Grande River in

13  Maverick County, Texas is part of the navigable waters of the

14  United States?

15      A.   That's correct.

16      Q.   Now, earlier, I asked you -- earlier, I asked you

17  about the involvement of the Coast Guard in the area of the

18  Rio Grande River that is within the jurisdiction of the

19  Fort Worth Division.  Do you know whether or not the Coast

20  Guard has a different definition of navigable waters of the

21  United States than the Army Corps of Engineers does?

22      A.   If they follow a different definition, then I'm

23  unaware of it.

24      Q.   Okay.  Do you ever have occasion to deal with U.S.

25  Coast Guard in your work?

Joseph Shelnutt - 8/7/2023

1        A.    So in -- in my work, our district has, but I
2   personally have not.

3        **Q.    Okay.   What is your understanding of the situations**
4   **in which the Fort Worth District of the Army Corps of Engineers**
5   **has dealings with the U.S. Coast Guard?**

6        A.    I -- I'm not cognizant of the entire situation where
7   we might have cause to coordinate with or communicate with the
8   Coast Guard, but I do know Section 9 of The Rivers and Harbors
9   Act is one of those -- one of those instances.

10       **Q.    Okay.   Are you aware of any involvement of the U.S.**
11  **Coast Guard in making any determinations pursuant to Section 10**
12  **of the Rivers and Harbors Act of 1899?**

13       A.    So when you say "making a determination," are you
14  referring to our determination?

15       **Q.    Either our -- either the Army Corps of Engineers**
16  **determinations or any other agencies' determinations.**

17       A.    So could you repeat the entire question again?

18       **Q.    I'll do my best.**

19       A.    Thank you.

20       **Q.    Are you aware of any involvement of the United States**
21  **Coast Guard in the making of determinations under Section 10 of**
22  **The Rivers and Harbors Act of 1899 by the Army Corps of**
23  **Engineers or any other federal agency?**

24       A.    No.

25       **Q.    Has anybody ever suggested that it would be advisable**

Joseph Shelnutt - 8/7/2023

80

1   or even relevant to -- to consult the U.S. Coast Guard in any

2   way in making a determination under Section 10 of The Rivers

3   and Harbors Act of 1899?

4                    MR. LYNK:  Object to form.

5                    You can answer.

6        A.   No.

7        Q.   (BY MR. BRYANT)  We talked a little bit today about

8   whether or not the floating buoys in the Rio Grande River that

9   are the subject of this lawsuit are structurally connected to

10  the bed of the Rio Grande River.  Do you have any understanding

11  as to what the term "structure" means under the -- Section 10

12  of The Rivers and Harbors Act of 1899?

13       A.   My understanding is just, patently obvious,

14  structure, you know, as commonly referred to as, you know, any

15  structure in layman's terms.

16       Q.   Well, what does -- what does that mean to you?

17  Because it's -- you know, it's not a -- something I think

18  everybody would automatically agree with.

19       A.   An object or -- or other equipment present in the

20  waterway.

21       Q.   Okay.  Well, a fish is an object.  There are lot of

22  things that are objects.  Would you call all of them

23  structures?

24       A.   I wouldn't call something that's biological an

25  object.

Joseph Shelnutt - 8/7/2023

1      Q.    Okay.

2      A.    No.

3      Q.    Would you call a rock a structure?

4      A.    If it's naturally occurring, no.  If it's placed

5   there by, you know, a human -- deliberate human interaction,

6   then it could be considered, you know, an object, either

7   singularly or in aggregate with other such, you know, objects.

8      Q.    Okay.  And you know, I'm not -- I'm not just trying

9   to argue with you.

10     A.    I understand.

11     Q.    I'm really trying to understand what -- how you would

12  define that term, because if I throw a rock in the water, then

13  I placed it in there, but to me that's not a structure.  And

14  that's probably true even if I threw 10 or 100 of them in the

15  water.  So what is your def- -- what is your best definition of

16  a structure?

17              MR. LYNK:  Object to form.

18     Q.    (BY MR. BRYANT)  For purposes of this Section 10 of

19  the har- -- Rivers and Harbors Act of 1899.

20     A.    Well, if you're asking would I consider the floating

21  buoys or, you know, the system that -- not the bu- -- not only

22  the buoys themselves, but any other apparent structures or

23  devices that might be employed to hold it in place or otherwise

24  make it function as -- make it a viable -- viably function as

25  it's intended, then I consider that a structure.

1        So to get back to your rock, I mean, if

2    someone's skipping rocks across the river, it may end up in the

3    river, obviously, that's not a structure.  But placement of

4    material in such a way, in singularly or in aggregate --

5    aggregate, whether it's a natural material, it could be

6    constructed or -- or aligned in a way that might be considered

7    a structure is a possibility, but also manufactured material or

8    the movement of other material that might be aggregated or

9    assembled in a way could also be considered a structure.

10       **Q.   Well, would you consider it a structure in all**

11   **instances?**

12       A.   Would I consider what a structure?

13       **Q.   What you just described.**

14            MR. LYNK:  Object to form.

15       A.   As I describe and understand it, I just described

16   what I would consider a structure.  But, you know, I would --

17   we don't make decisions on theoretical, you know, definitions.

18   We make decisions on the information that's in front of us to

19   define what a structure might be.

20       **Q.   (BY MR. BRYANT)  Okay.**

21       A.   Okay?

22       **Q.   If I were to string a lot of the kind of rafts that**

23   **you and I might float in a swimming pool on together in a**

24   **river, would you consider that a structure?**

25            MR. LYNK:  Object to form.

Joseph Shelnutt -   8/7/2023

83

1      A.   Well, I don't have a lot of information to base that

2  on.  You know -- you know, it's -- it's possible.

3      **Q.   (BY MR. BRYANT)  Okay.  You testified, if I**

4  **understood you correctly earlier, that the Army Corps of**

5  **Engineers would consider a tunnel that goes under a river as**

6  **affecting its navigable capacity; is that correct?**

7      A.   That's what the regulations indicate.

8      **Q.   Okay.  Could you explain to me as best you understand**

9  **it why tunneling under a river affects the navigable capacity**

10 **of that river?**

11     A.   So I don't know all the -- the reasons behind that,

12 but some of it points to, you know, if you have a tunnel under

13 the river, you know, or a structure under the river that has a,

14 say, a pipe with -- with material in the pipe, there is

15 potential for that structure to become -- or tunnel, if it's

16 just a tunnel, to actually become, through flows and energy

17 movement across the riverbed or -- or maybe material in the --

18 in the tunnel or pipe might be -- might encounter pressures

19 that either make it exposed to the riverbed or could actually,

20 you know, erupt material out of the pipe into the riverbed, and

21 therefore, cause a navigation or affect navigable capacity.

22 Now, I don't know that that's the entire reason for that, but

23 that's my understanding.

24     **Q.   Are you aware of instances in which the Courts have**

25 **found that the Army Corps of Engineers interpreted terms in the**

1  law too broadly?

2      A.    I'm not aware of specific instances or specific

3  cases.

4      Q.    Okay.  Have you ever heard of a case called Sackett

5  versus the Environmental Protection Agency that was decided

6  May 25th, 2023?

7      A.    I've heard of that.

8      Q.    Yeah.  And is that one in which the Supreme Court of

9  the United States found that a definition that the EPA and the

10  Army Corps of Engineers had been using was too broad, and --

11  and they made a different decision?

12              MR. LYNK:  I'll object that questions about the

13  Sackett Case are going beyond the scope of the authorized

14  expedited discovery topic.

15              You can answer, if you know the answer.

16      A.    I'm -- I'm aware of the Sackett case.  There's been a

17  lot of publicity, obviously.  I haven't read the information

18  around it.  All that I've read or heard of excerpts, I don't

19  know, so I don't know if it's -- your characterization of "too

20  broadly" applies or not.

21      Q.    (BY MR. BRYANT)  Okay.  Would you agree that,

22  ultimately, it's the Courts and the judges who have to decide

23  what laws like The Rivers and Harbors Act of 1899 mean rather

24  than the Army Corps of Engineers?

25      A.    So the Army Corps of Engineers in its regulatory

Joseph Shelnutt - 8/7/2023

85

 1  capacity often interprets the -- the laws that's given to us

 2  and the regulations that's given to us.  I also understand

 3  regularly that things change in the legal environment where

 4  that affects our understanding and interpretation of laws and

 5  regulations and things shift, and we shift with them as

 6  required.

 7       **Q.   And do you understand that it's the -- it's the**

 8  **Courts, the judges, who make the definitive interpretation of**

 9  **what the law means, that you -- that you at the Army Corps of**

10  **Engineers have to do your best to enforce?**

11       A.   Yes.

12       **Q.   Okay.  The Rio Grande River's a long river, even just**

13  **in Texas.  Have you seen it referred to as different segments**

14  **in your work at the Army Corps of Engineers?**

15       A.   I have not.

16       **Q.   Okay.  Have you seen enough of the Rio Grande River**

17  **to know that it really is quite different at different points**

18  **in the river?**

19            MR. LYNK:  Object to form.

20            You can answer.

21       A.   Well, like any -- any, you know, perennial

22  waterbody -- flowing waterbody that courses along a distance,

23  it's -- it's natural to encounter, you know, different

24  ecological and biological and geomorphological, you know,

25  changes across its continual.

Joseph Shelnutt - 8/7/2023

1    Q.   (BY MR. BRYANT)  And is that true of the Rio Grande

2   River in Texas?

3    A.   The Rio Grande River changes in function and form

4   along its course.

5    Q.   Okay.  Based on what you've seen of the floating

6   buoys in the Rio Grande River in Maverick County, Texas, do you

7   see any harm that they're actually doing at this point?

8    A.   Well, I don't -- harm to -- harm in what way?

9    Q.   Well, that -- I would include any way.

10            MR. LYNK:  I'm going to object that this is

11   beyond the scope of the authorized expedited discovery.  I'm

12   actually going to instruct the witness not to answer on this

13   one.  The -- the Court did not authorize testimony about -- or

14   discovery into the issue of harm.

15    Q.   (BY MR. BRYANT)  Could you take a look at exhibit --

16   let's see.

17            MR. BRYANT:  Do we have a five?  Okay.  This one

18   is marked 6.

19            THE REPORTER:  Oh, it says -- sorry.

20            MR. BRYANT:  Should we mark it 5?

21            THE REPORTER:  No, it's 5.  I just have bad

22   handwriting.

23            MR. BRYANT:  Oh, okay.  I'm sorry.  I misread

24   it.

25            THE REPORTER:  I could put a new sticker.

1        (Exhibit No. 5 was marked.)

2        **Q.   (BY MR. BRYANT)  Okay.  Let me show you,**

3   **Mr. Shelnutt, what's been marked as Exhibit 5.  This is a**

4   **portion of a regulation of the Coast Guard.  Have you ever seen**

5   **or consulted that regulation in connection with your work for**

6   **the Army Corps of Engineers?**

7        A.   So not the Coast Guard regulation, so...

8        **Q.   Okay.  And I assume you have -- have consulted the**

9   **Army Corps of Engineers regulation on a similar subject?**

10       A.   Correct.

11       **Q.   Okay.  Is it fair to say, then, that -- that the**

12  **Coast Guard regulation that is in Exhibit 5 is not something**

13  **that you have considered relevant at all to your work at the**

14  **Army Corps of Engineers to date?**

15       A.   Well, let me take a minute to read over this, because

16  I don't know --

17       **Q.   Please do.**

18       A.   I don't know if there's overlap or how much overlap

19  there is between Coast Guard regulations and regulations that

20  might be relevant to -- to us in the Corps.

21       **Q.   Okay.  And please take as much time as you --**

22       A.   Okay.

23       **Q.   -- as you want to review Exhibit 5.**

24       A.   (Reviewing document.)  Okay.

25       **Q.   So my question is, have you ever considered or do you**

1  **consider now the Coast Guard's definition that's set forth in**

2  **Exhibit 5 as relevant to determinations of -- under Section 10**

3  **of The Rivers and Harbors Act of 1999 [sic] as far as you and**

4  **the Army Corps of Engineers are concerned?**

5      A.   So there are portions of this document, Exhibit 5,

6  that seem familiar to me.  But since this is, you know, some of

7  this refers to U.S.C. 1321 and 1322, and you know, what -- what

8  various aspects of this, you know, language means here and

9  others.  So I can understand that there's significant overlap

10 between, you know, our regulations under 18 -- Rivers and

11 Harbors Act under 18- -- Rivers and Harbors Act of 1899 and

12 this.

13          But I'm not sure the -- I'm not sure of the

14 exact wording here, so I want to say that we rely on,

15 traditionally, you know, our regulations, and we don't go to

16 another agency's interpretation of regulations to -- typically,

17 to make those decisions.

18     Q.   Okay.

19     A.   That is not to say that we don't coordinate, if

20 necessary, with other -- other agencies --

21     Q.   Okay.

22     A.   -- you know, and their requirements, so...

23     Q.   **Is it fair to say that you did not in any way consult**

24 **the regulation that's Exhibit 5 or anything else from the Coast**

25 **Guard --**

Joseph Shelnutt -   8/7/2023

89

```
 1        A.    I didn't -- I didn't look --
 2        Q.    -- in making your determination with respect to the
 3   floating buoys that are in the Rio Grande River?
 4        A.    I didn't look at this -- these regulations that you
 5   have marked at Exhibit 5 to make a determination.
 6        Q.    Okay.  And you didn't get any -- have any other
 7   interaction with the Coast Guard?
 8        A.    No.
 9        Q.    Okay.  Let me just try to sum up a few things, and
10   then I think we're done.  Strike that.
11              Let me ask another question or two.  Did
12   Mr. Lebsock have any role in determining for the Corps of
13   Engineers whether or not the floating buoys constitute a
14   violation of Section 10 of The Rivers and Harbors Act of 1899?
15        A.    So since -- since he's my chief and this is, you
16   know, a visible project on the Rio Grande, naturally, we
17   discussed it.  And so we both agree that -- that yes.
18        Q.    Okay.  Would you say that he -- he made the decision
19   more than you or that you made the decision more than him or --
20        A.    I think it --
21        Q.    -- were they both equal?
22        A.    I think it's equal.
23        Q.    Okay.  Did anybody else at the Army Corps of
24   Engineers, besides the two of you, have a role in that
25   decision?
```

Joseph Shelnutt - 8/7/2023

90

```
1        A.    At the district level here in Fort Worth, no.

2        Q.    At any other level?

3        A.    Decisions outside of the Fort Worth District, I'm not

4   privy to.

5        Q.    Well, my question is, did anyone outside the

6   Fort Worth District in the Corps of Engineers have any role in

7   making this particular decision with respect to the floating

8   buoys, to your knowledge?

9        A.    Well, to my knowledge -- to my knowledge, no.

10       Q.    Okay.  And in making the conclusion that -- that the

11  floating buoys violate Section 10 of The Rivers and Harbors Act

12  of 1899, as I understand it, no one did any kind of study or

13  observation of any present navigation of that section of the

14  Rio Grande River; is that right?

15             MR. LYNK:  Object to form.

16       A.    I'm not aware of any recent study.

17       Q.    (BY MR. BRYANT)  Okay.  And is it also true that in

18  making that determination, the Army Corps of Engineers did not

19  make any consideration of possible future commercial uses or

20  navigation of that section of the Rio Grande River?

21             MR. LYNK:  Object to form.

22       A.    Could you restate that again?

23       Q.    (BY MR. BRYANT)  I'll try.  Is it correct that in

24  making the determination that the floating buoys violate

25  Section 10 of The Rivers and Harbors Act of 1899, the Army
```

1  Corps of Engineers did not include any consideration of

2  possible future commercial navigation in that area of the Rio

3  Grande River where the floating buoys are currently located?

4      A.   So at the Fort Worth District, no.

5      Q.   Do you know of any other part of the Corps of

6  Engineers that did consider that?

7      A.   I'm not aware.

8      Q.   Okay.  And is it correct that the Army Corps of

9  Engineers did not make any study or consideration of any past

10  commercial navigation in the section of the Rio Grande River

11  where the floating buoys are located in making its

12  determination that the floating buoys violate Section 10 of the

13  Rivers and Harbors Act of 1899?

14              MR. LYNK:  Object to form.

15              You can answer.

16      A.   So I'm not aware of any recent studies, and I'm

17  not -- and we did not refer to or research any other studies --

18      Q.   (BY MR. BRYANT)  Okay.  And --

19      A.   -- at the Fort Worth District level.

20      Q.   Okay.  Are you aware of any such consideration at any

21  other level?

22      A.   I'm not aware.

23      Q.   And in making that determination with respect to the

24  current site of the floating buoys, is it also correct that the

25  Army Corps of Engineers did not consider and has not determined

92

1  whether the floating buoys substantially interfere with any

2  commercial navigation on the Rio Grande River?

3       A.   Specifically commercial navigation, you're asking?

4       Q.   That's my -- that was my question, yes.

5       A.   We didn't -- we didn't do a study to make a

6  determination, specifically, about commercial navigation.

7       Q.   Did you do anything else other than look at -- at the

8  list?

9       A.    No.  Referring to the list is common for us to do in

10  this state -- in this district.

11            MR. BRYANT:  Mr. Shelnutt, thank you very much,

12  and I pass the witness.

13            MR. LYNK:  Just go off the record, and I'll take

14  a quick -- quick break.

15            THE REPORTER:  We are going off the record at

16  1:03 p.m.

17            (Break taken from 1:03 p.m. to 1:06 p.m.)

18            THE REPORTER:  We are going back on the record

19  at 1:06 p.m.

20            MR. LYNK:  I have no questions for the witness.

21            MR. BRYANT:  Mr. Shelnutt, thank you very much.

22  Appreciate your time and your thoughtfulness.

23            THE WITNESS:  Thank you.

24            THE REPORTER:  Okay.  And Mr. Lynk, just for the

25  record, do you want a copy of the transcript?

```
1                    MR. LYNK:  I do.

2                    THE REPORTER:  Okay.  We are going off the

3  record at 1:06 p.m.

4                    (End of proceedings at 1:06 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

94

CHANGES AND SIGNATURE

WITNESS NAME: JOSEPH SHELNUTT        DATE: AUGUST 7, 2023

PAGE LINE        CHANGE              REASON

1 _____

2 _____

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1    I, JOSEPH SHELNUTT, have read the foregoing
deposition and hereby affix my signature that same is true and
2    correct, except as noted above.

3

4

                         _____
5                         JOSEPH SHELNUTT

6

7

8

9    THE STATE OF _____)

10   COUNTY OF _____)

11

12       Before me, _____, on this day

13   personally appeared JOSEPH SHELNUTT, known to me (or proved to

14   me under oath or through _____) (description of

15   identity card or other document) to be the person whose name is

16   subscribed to the foregoing instrument and acknowledged to me

17   that they executed the same for the purposes and consideration

18   therein expressed.

19       Given under my hand and seal of office this

20   _____ day of _____, _____.

21

22                         _____
                           NOTARY PUBLIC IN AND FOR
23                         THE STATE OF _____
                           COMMISSION EXPIRES: _____

24

25

96

1                    UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
2
UNITED STATES OF AMERICA,        )
3                                )
                    Plaintiff,   )
4                                )
v.                               )  Civil Action
5                                )
                                 )  No.: 1:23-00853-DAE
6  GREG ABBOTT, IN HIS OFFICIAL  )
CAPACITY AS GOVERNOR OF THE      )
7  STATE OF TEXAS, AND THE STATE )
OF TEXAS,                        )
8                                )
                    Defendant.   )
9                                )

10

11                    REPORTER'S CERTIFICATION

12                 DEPOSITION OF JOSEPH SHELNUTT

13                      AUGUST 7, 2023

14

15       I, Amber Garcia, Notary Public in and for the State of

16  Texas, hereby certify to the following:

17       That the witness, JOSEPH SHELNUTT, was duly sworn by the

18  officer and that the transcript of the oral deposition is a

19  true record of the testimony given by the witness;

20       That the deposition transcript was submitted on

21  August 8, 2023 to the witness or to the attorney for the

22  witness for examination, signature and return to me by

23  September 7, 2023;

24       That the amount of time used by each party at the

25  deposition is as follows:

Joseph Shelnutt - 8/7/2023

97

```
 1   MR. BRIAN LYNK.....00 HOUR(S):00 MINUTE(S)
     MR. DAVID BRYANT.....02 HOUR(S):38 MINUTE(S)
 2

 3        That pursuant to information given to the deposition

 4   officer at the time said testimony was taken, the following

 5   includes counsel for all parties of record:

 6   MR. BRIAN LYNK, Attorney for Plaintiff

 7   MR. LANDON A. WADE, Attorney for Plaintiff

 8   MS. KATHERINE T. ROONEY, Attorney for Plaintiff

 9   MR. DAVID BRYANT, Attorney for Defendant

10        That $_____ is the deposition officer's charges

11   to the Defendant for preparing the original deposition

12   transcript and any copies of exhibits;

13        I further certify that I am neither counsel for, related

14   to, nor employed by any of the parties or attorneys in the

15   action in which this proceeding was taken, and further that I

16   am not financially or otherwise interested in the outcome of

17   the action.

18        Certified to by me this 8th day of August, 2023

19

20

21   _____
     Amber Garcia, Notary ID No. 13426953-9
22   Expiration Date:  3/24/2027
     Integrity Legal Support Solutions
23   Firm Registration No. #528
     9901 Brodie Ln, Ste. 160-400
24   Austin, Texas 78748
     (512) 320-8690
25
```