**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | No. 1:23-cv-00853-DII |
| GREG ABBOTT, in his capacity as Governor of the State of Texas, and THE STATE OF TEXAS, | |
| *Defendants*. | |

---

| | |
|---|---|
| EPI'S CANOE & KAYAK TEAM, LLC AND JESSIE FUENTES, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00836-DII |
| STATE OF TEXAS, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

# EXHIBIT G

**OFFICE OF INSPECTOR GENERAL**

# Intensifying Conditions at the Southwest Border Are Negatively Impacting CBP and ICE Employees' Health and Morale

Homeland Security

**May 3, 2023**

**OIG-23-24**



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

May 3, 2023

| | |
|---|---|
| **MEMORANDUM FOR:** | Troy A. Miller<br>Acting Commissioner<br>U.S. Customs and Border Protection |
| | Tae D. Johnson<br>Acting Director<br>U.S. Immigration and Customs Enforcement |
| **FROM:** | Joseph V. Cuffari, Ph.D.<br>Inspector General |
| **SUBJECT:** | *Intensifying Conditions at the Southwest Border Are Negatively Impacting CBP and ICE Employees' Health and Morale* |

JOSEPH V CUFFARI
Digitally signed by JOSEPH V CUFFARI
Date: 2023.05.02 14:06:30 -07'00'

Attached for your action is our final report, *Intensifying Conditions at the Southwest Border Are Negatively Impacting CBP and ICE Employees' Health and Morale.* We incorporated the formal comments provided by your office.

The report contains three recommendations aimed at improving resource management along the Southwest border. Your office concurred with two recommendations and did not concur with one. Based on information provided in your response to the draft report, we consider recommendation 1 open and unresolved. As prescribed by the Department of Homeland Security Directive 077-01, *Follow-Up and Resolutions for the Office of Inspector General Report Recommendations*, within 90 days of the date of this memorandum, please provide our office with a written response that includes your (1) agreement or disagreement, (2) corrective action plan, and (3) target completion date for each recommendation. Also, please include responsible parties and any other supporting documentation necessary to inform us about the current status of the recommendation. Until your response is received and evaluated, recommendation 1 will be considered open and unresolved.

We consider recommendations 2 and 3 open and resolved. Once your office has fully implemented the recommendations, please submit a formal closeout letter to us within 30 days so that we may close the recommendations. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions and of the disposition of any monetary amounts.

Please send your response or closure request to OIGAuditsFollowup@oig.dhs.gov.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Consistent with our responsibility under the *Inspector General Act of 1978, as amended*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over DHS. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Bruce Miller, Deputy Inspector General for Audits, at (202) 981-6000.



# DHS OIG HIGHLIGHTS

## *Intensifying Conditions at the Southwest Border Are Negatively Impacting CBP and ICE Employees' Health and Morale*

**May 3, 2023**

## Why We Did This Audit

The dramatic increases in migrant encounters and traffic at the Southwest border have magnified existing staffing challenges at CBP and ICE. In light of these intensifying issues, we conducted this audit to determine whether CBP and ICE are effectively managing law enforcement staffing resources to accomplish their mission at the Southwest border.

## What We Recommend

We made three recommendations to help CBP and ICE better manage resources along the Southwest border.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at
DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) support complex and intersecting missions related to immigration, trade, and travel. Since 2019, shifts in U.S. immigration and border security policies, migrant surges, COVID-19, and the overall rising number of migrant encounters along the Southwest border have exacerbated staffing challenges.

CBP's and ICE's current method of managing law enforcement staffing is unsustainable. CBP and ICE workloads have grown significantly due to factors beyond the Department of Homeland Security's control, namely increasing migrant encounters and travel volume. Despite greater workloads, staffing levels have remained the same, with CBP and ICE using details and overtime to temporarily address the rising number of encounters along the Southwest border.

Based on interviews and survey responses from 9,311 law enforcement personnel, the details and overtime have negatively impacted the health and morale of law enforcement personnel, who feel overworked and unable to perform their primary law enforcement duties. Although CBP and ICE annually assess their staffing needs, neither has assessed how using details and overtime has affected the workforce and operations. Unless CBP and ICE assess and strategically change their current staffing management at the border, heavier workloads and low morale may lead to higher turnover and earlier retirements. This could worsen staffing challenges and degrade CBP and ICE's capacity to perform their mission.

# DHS Response

The Department did not concur with recommendation 1 and concurred with recommendations 2 and 3.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Table of Contents

Background ................................................................................. 1

Results of Audit .......................................................................... 4

    Current Factors Beyond DHS' Control Are Affecting CBP and ICE
    Workloads and Exacerbating Staffing Challenges.......................... 4

    CBP and ICE Need to Assess Their Current Methods of Managing Staff..... 11

    CBP's and ICE's Resource Allocation Practices Are Detrimental to Staff
    Health, Safety, and Morale ...................................................... 20

    The Department Is Using a New Approach to Manage the Higher Volume
    of Migrants, but More Action Is Needed .................................... 23

Conclusion.................................................................................. 24

Recommendations......................................................................... 25

### Appendixes

    Appendix A: Objective, Scope, and Methodology  ................................. 28
    Appendix B: DHS Comments on the Draft Report ............................... 33
    Appendix C: Immigration Processing Pathways .................................... 48
    Appendix D: Prior DHS OIG and GAO Reports .................................. 49
    Appendix E: Workforce Challenge Survey Results ............................... 53
    Appendix F: CBP and ICE Staffing and Attrition ................................ 57
    Appendix G: Timeline of Shifting Policies ........................................ 58
    Appendix H: Report Distribution...................................................... 59

### Abbreviations

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| CPC | Centralized Processing Center |
| ERO | Enforcement and Removal Operations |
| GAO | U.S. Government Accountability Office |
| HSI | Homeland Security Investigations |
| ICE | U.S. Immigration and Customs Enforcement |
| MPP | Migrant Protection Protocols |
| NTA | Notice to Appear |
| OFO | Office of Field Operations |
| Parole + ATD | Parole Plus Alternative to Detention |
| SBCC | Southwest Border Coordination Center |
| TEDS | National Standards on Transport, Escort, Detention, and Search |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Background

The Department of Homeland Security is responsible for securing U.S. borders from illegal activity while facilitating travel and trade. Within DHS, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) enforce immigration laws and safeguard approximately 6,000 miles of U.S. border, with the Southwest border comprising about 2,000 miles.

Security and immigration enforcement at the Southwest border require extensive coordination between CBP and ICE. Table 1 details the responsibilities of the CBP and ICE subcomponents that are primarily involved in border operations.

**Table 1. CBP and ICE Subcomponents' Roles and Responsibilities at the Southwest Border[1]**

| Component | Subcomponent | Responsibilities at the Border |
|---|---|---|
| **U.S. Customs and Border Protection** | Border Patrol | Agents apprehend individuals illegally crossing the border between the ports of entry. |
| | Office of Field Operations | Officers manage people and goods entering and leaving the country at ports of entry. |
| **U.S. Immigration and Customs Enforcement** | Enforcement and Removal Operations | Deportation officers manage long-term custody of noncitizens in detention facilities nationwide and deport individuals in the country illegally. |
| | Homeland Security Investigations | Agents are deployed to the border to assist CBP and Enforcement and Removal Operations due to the rising influx of migrants. |

*Source:* DHS Office of Inspector General analysis of CBP and ICE roles and responsibilities

---

[1] Table 1 does not include all CBP and ICE subcomponents' roles and responsibilities.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

CBP's Border Patrol and Office of Field Operations (OFO) are responsible for short-term detention[2] and processing of migrants at stations, checkpoints, and ports of entry along the border.  Processing an individual involves collecting biographical and biometric information, checking immigration and criminal histories, verifying identity, and screening for medical issues to determine admissibility into the United States.  Based on this information, a processing pathway for immigration is identified for the individual.  (Appendix C details several immigration processing pathways.)  When immigration proceedings are not resolved quickly, ICE's Enforcement and Removal Operations (ERO) is responsible for the longer-term detention of inadmissible migrants.

Since 2016, DHS OIG and the U.S. Government Accountability Office (GAO) have issued 25 reports on challenges CBP and ICE face along the Southwest border (see Appendix D).  As of January 2023, 80 percent (41 of 51) of DHS OIG's and GAO's recommendations from these reports are closed.  These reports describe struggles with employee morale, proper management of resources and planning during migrant surges, and difficulties recruiting and hiring.  For example, in 2017, DHS OIG reported[3] that after a presidential Executive Order directed DHS to hire an additional 15,000 law enforcement officers, CBP and ICE experienced difficulties recruiting and hiring that number of officers.

In recent years, migrant encounters[4] at the Southwest border have risen from approximately 978,000 in fiscal year 2019 to 2.4 million in FY 2022. The FY 2022 total includes migrants apprehended more than once and exceeds FY 2021's 20-year record high of more than 1.7 million encounters.

According to outside reports, multiple "push" and "pull" factors have contributed to this dramatic rise in migration at the Southwest border. Examples of "push factors" include gang violence and stagnant economic growth in migrants' countries, along with political instability and recent shifts in U.S. immigration policy[5] and border enforcement.  Common "pull" factors include more economic and work opportunities and a better quality of life in the United States.  In addition, DHS has seen a pronounced shift in the demographics and nationalities of migrants encountered.  This has included more single adults claiming fear and a steady flow of unaccompanied children, who have unique vulnerabilities and needs.  The number of migrants from

---

[2] CBP's *National Standards on Transport, Escort, Detention, and Search* (TEDS) generally limits detention in CBP facilities to 72 hours.

[3] *Challenges Facing DHS in Its Attempt to Hire 15,000 Border Patrol Agents and Immigration Officers*, OIG-17-98-SR, July 2017.

[4] The term "encounter" can refer either to apprehension, removal, or expulsion of a person from the United States under immigration or public health authorities; the person may be removed or expelled to the last country they crossed before entering or to their home country.

[5] Claire Klobucista, Amelia Cheatham, and Diana Roy, *The U.S. Immigration Debate*, Council on Foreign Relations (Aug. 3, 2022), https://www.cfr.org/backgrounder/us-immigration-debate-0.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Cuba, Venezuela, and Nicaragua also steadily increased in FY 2022, bringing additional challenges, as it is difficult for the United States to return these migrants to their home countries. Finally, FY 2022 set the record for migrant deaths with more than 800 migrants dying while attempting to cross the Southwest border.[6]

These dramatic increases have magnified existing staffing challenges at CBP and ICE. In light of these intensifying issues, we conducted this audit to determine:

1. whether CBP and ICE are properly managing law enforcement staffing resources to accomplish their mission at the Southwest border; and
2. CBP's and ICE's turnover rates, and whether they have effective succession planning for departing officers.

For this audit, we sent a survey focused on the current work environment to all CBP and ICE law enforcement personnel nationwide (approximately 57,000 employees). We sent the survey to all law enforcement personnel because many are, or have been, detailed (that is, temporarily assigned to a different position for a specified period) to the Southwest border to assist with migrant surges. (See Appendix E for our workforce challenge survey questions and results.)

We received responses from 9,311 law enforcement personnel, approximately 16 percent of the total population surveyed. To highlight their unique perspectives and firsthand experiences, we summarized the survey results and incorporated respondents' comments throughout this report. The comments in our report reflect the views and experiences of individual employees' who responded to our survey and may not represent the views and experiences of all CBP and ICE staff.

> **We conducted a non-statistical survey. The survey results presented throughout this report cannot be projected to the entire population of CBP and ICE law enforcement officers and agents. Our survey results are only representative of the views of the law enforcement officers who responded to our survey.**
>
> *Source:* DHS OIG

---

[6] Griff Jenkins, Bill Melugin, Timothy H.J. Nerozzi, *Record 856 migrants die at southern border in fiscal year 2022: CBP,* Fox News (Oct. 22, 2022), https://www.foxnews.com/politics/record-856-migrants-die-southern-border-fiscal-year-2022-cbp and Juliana Kim, *The U.S. set a new record for apprehensions at the southern border,* NPR (Oct. 24, 2022), https://www.npr.org/2022/10/24/1130841306/new-record-in-border-patrol-apprehensions.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Results of Audit

CBP and ICE serve on the frontlines to support complex and intersecting missions related to immigration, trade, and travel. Since 2019, migrant surges, COVID-19, and the overall rising number of migrant encounters along the Southwest border have exacerbated staffing challenges.

We determined that CBP's and ICE's current management of law enforcement staffing resources is unsustainable. CBP and ICE workloads have grown significantly due to factors beyond DHS' control, such as increasing border encounters and travel volume. Despite greater workloads, staffing levels have remained the same, with CBP and ICE using details and overtime to temporarily fill staffing gaps along the Southwest border.

The consistent use of details and overtime in the current environment has proved burdensome for the workforce. Our interviews and survey responses showed that the details and overtime have had negative impacts on the health and morale of law enforcement personnel, who already feel overworked and unable to perform their primary law enforcement duties. Although CBP and ICE annually assess their staffing needs, neither has assessed how using details and overtime has affected the workforce and operations.

Unless CBP and ICE assess and make strategic changes to their current staffing management at the border, heavier workloads and low morale may lead to higher turnover rates and earlier retirements among these employees. This could further worsen staffing challenges along the border, which could in turn degrade CBP's and ICE's capacity to carry out their mission.

## Current Factors Beyond DHS' Control Are Affecting CBP and ICE Workloads and Exacerbating Staffing Challenges

Enforcing immigration laws and safeguarding U.S. borders are vital elements of our overall economic and physical security. However, the last 4 years have brought unprecedented challenges for CBP and ICE that are beyond their control. In October 2020, during the COVID-19 pandemic, the United States began experiencing a surge of migrants at the Southwest border, adding additional risks to an unprecedented public health emergency. Also, in FY 2022, CBP encountered more than 2 million migrants along the Southwest border - the first time annual enforcement statistics have reached this level. Although these factors are beyond DHS' control, they are affecting CBP and ICE workloads and exacerbating their staffing challenges.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Since FY 2019, Migrant Encounters at the Southwest Border Have Increased by 143 Percent**

In 2019, DHS faced one of the largest migrant surges crossing the Southwest border in a decade (see Figure 1). This has caused a corresponding growth in workload for CBP employees, as the component with the primary responsibility for managing migration and travel into the United States.



**Figure 1. FY 2019 Migrant Surge at McAllen Border Patrol Station**
*Source:* CBP

Migrant encounters at the border temporarily declined in FY 2020 during the COVID-19 outbreak, but the next year the number reached a new high of 1,734,686 encounters.[7] By the end of FY 2022, CBP had surpassed that number by more than 600,000 encounters (see Figure 2).

---

[7] Nationwide Southwest border encounter data for Border Patrol and OFO. See CBP's public website https://www.cbp.gov/newsroom/stats/nationwide-encounters.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Figure 2. CBP Southwest Border Encounters FYs 2019–2022



*Source*: CBP Southwest land border encounters as of October 14, 2022, published on cbp.gov

In FY 2019, Border Patrol and OFO encountered approximately 81,000 migrants per month on average. In FYs 2021 and 2022, encounters rose to approximately 145,000 and 198,000 per month, respectively. As with migrant encounter trends, travel volume along the Southwest border continues to outpace the prior year. In FY 2021, OFO processed about 183 million vehicles and travelers entering the United States through the 30 ports of entry along the border. By the end of FY 2022, OFO processed nearly 249 million vehicles and travelers entering the United States.

OFO is also processing an increasing number of vehicles and travelers per month at ports of entry on the Southwest border. In FY 2022, OFO processed an average of 20.7 million vehicles and travelers per month, an increase of 36 percent over FY 2021.

### In the Current Environment, CBP's and ICE's Workloads Have Outpaced Authorized Staffing

Sufficient law enforcement staffing is key to sustaining and improving operations and accomplishing the Department's critical missions. Although CBP and ICE have received the law enforcement staffing appropriation they requested from Congress and have been staffed close to these authorized staffing levels, CBP's and ICE's workloads have outpaced their current staffing. During our discussion with CBP officials in January 2023, they indicated that authorized staffing levels and funding for staff are complex issues, requiring coordination with external entities such as the Office of Management and Budget and Congress.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Since FY 2019, Congress has authorized most of the law enforcement personnel that CBP and ICE requested.  Additionally, in FYs 2019 through 2021, CBP and ICE filled 89 percent or more[8] of their congressionally authorized law enforcement positions assigned to the Southwest border. (Appendix F provides CBP's and ICE's staffing and attrition data at the Southwest border.)

Although CBP and ICE were consistently staffed close to their authorized hiring levels, staffing at the border has not grown at the same pace as the flow of migrants and traffic into the country.  In FYs 2021 and 2022, for example, OFO had approximately 7,800 officers assigned to the Southwest border.  This means that roughly the same number of officers who processed about 6,300 migrant encounters per month in FY 2021 processed nearly 14,400 encounters per month in FY 2022 (see Table 2).

**Table 2.  CBP Officer Staffing Compared to Migrant Encounters along the Southwest Border in FYs 2019–2022**

| Fiscal Year | OFO Officers | Average Monthly Encounters |
|---|---|---|
| FY 2019 | 7,248 | 10,500 |
| FY 2020 | 7,751 | 4,786 |
| FY 2021 | 7,824 | 6,290 |
| FY 2022* | 7,816 | 14,376 |

*Source:* OFO provided staffing data and DHS OIG analysis of OFO Southwest Land Border Encounters as of October 14, 2022, published on cbp.gov
* Officer data is as of May 7, 2022.  Encounters are through FY 2022.

In FY 2022, 5 million more vehicles and travelers used the Southwest border's ports of entry than in FY 2021.  On average, OFO processed 15.3 million vehicles and travelers per month in FY 2021 and 20.7 million vehicles and travelers per month in FY 2022.

---

[8] These proportions represent authorized law enforcement personnel onboard as of the last day of each fiscal year, so the rates may have fluctuated during the fiscal year.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Similarly, Border Patrol migrant encounters surged without corresponding growth in staffing (see Table 3).

**Table 3.  Border Patrol Agent Staffing Compared to Migrant Encounters Along the Southwest Border in FYs 2019–2022**

| Fiscal Year | Border Patrol Agents | Average Monthly Encounters |
|---|---|---|
| FY 2019 | 16,731 | 70,959 |
| FY 2020 | 16,878 | 33,388 |
| FY 2021 | 16,726 | 138,267 |
| FY 2022* | 16,654 | 183,870 |

*Source:* Border Patrol provided staffing data and DHS OIG analysis of Border Patrol Southwest Land Border Encounters as of October 14, 2022, published on cbp.gov
* Agent data is as of May 7, 2022.  Encounters are through FY 2022.

As discussed in the background, immigration processing requires extensive coordination between CBP and ICE, and the rising number of encounters along the Southwest border have also had an impact on ICE's Notice to Appear (NTA)[9] caseloads.  From October 2020 through April 2022, 18 of ERO's 25 regions across the United States saw more than 100 percent growth in NTAs. Moreover, ERO offices along the Southwest border saw much greater NTA caseloads in FY 2022 than in previous years, but the numbers of deportation officers stayed approximately the same (see Table 4).  For example, in FY 2022, the San Antonio ERO office's average NTA caseload per officer was nearly twice what it was in FY 2021.

**Table 4.  ICE ERO Staffing Compared to NTA Caseloads Along the Southwest Border in FYs 2019–2022**

| Fiscal Year | Deportation Officers | Average NTAs per Officer |
|---|---|---|
| FY 2019 | 1,437 | 7 |
| FY 2020 | 1,491 | 4 |
| FY 2021 | 1,444 | 7 |
| FY 2022* | 1,414 | 18 |

*Source:* ICE provided Staffing Data and DHS OIG Review of NTA Caseloads
* FY 2022 data is as of April 2022.

As NTAs have risen, ERO has seen a significant decrease in removals and administrative arrests.  In FY 2019, ERO had 92,108 administrative arrests with criminal conviction compared to 18,173 in the first 7 months of FY 2022.

---

[9] An NTA is a document that instructs an individual to appear before an immigration judge. This is the first step in starting removal proceedings against them.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ERO had removed 35,260 migrants as of April 2022, compared to 267,258 in FY 2019.

In our survey, we asked CBP and ICE law enforcement personnel for their perspective on whether their current work location is adequately prepared and staffed during normal operations. Seventy-one percent (4,303 of 6,093) of CBP respondents and 61 percent (1,936 of 3,198) of ICE respondents said no. Even more respondents, 88 percent (5,362) of CBP respondents and 88 percent (2,810) of ICE respondents, indicated that in their opinion, their current duty locations are not adequately staffed during migrant surges. According to CBP personnel, Border Patrol stations and ports of entry are severely understaffed and running with a "skeleton crew" to ensure migrants are processed and port lanes remain open.

One reason we heard in the field for why staffing has not increased is that the authorized staffing levels appear, in theory, to be sufficient. However, authorized levels do not represent the actual number of staff available to work. Staff assigned to a station or port may, for example, be detailed to other stations, off duty, or assigned other duties such as processing migrants at Centralized Processing Centers (CPCs). With the consistently high volume of migrant encounters, these challenges are reducing the number of available staff to work along the Southwest border.

Additionally, in our survey and during discussions with law enforcement personnel, multiple staff explained that when there are visitors to Southwest border stations or ports, local management will require more staff to work, creating the impression that they are sufficiently staffed. CBP law enforcement personnel indicated that in these instances visitors "are not shown how conditions are in reality."

For example, some Border Patrol agents said that local management would transport migrants out of the facility before a visit and return them after the visit ended. One Border Patrol agent wrote that every time a visit took place, they would transport migrants away "and make this place look fit and proper to code." Once the visit was over, the agent wrote, "[W]e go right back to over filled pods and lack of staff and equipment to handle the situation."

**Greater Numbers of Encounters Have Shifted CBP's and ICE's Priorities**

During OIG site visits at six ports of entry, many CBP officers and supervisors expressed the opinion that maintaining the flow of traffic and minimizing wait times at ports of entry were prioritized by CBP leadership over security.

CBP personnel at two different Border Patrol Stations shared with us that they felt pressured to process and release migrants as quickly as possible to move



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

them out of their facilities. A recent DHS OIG report[10] determined that when Border Patrol began using informal, expedited processing to manage the migrant volume, agents did not consistently assign identification numbers to migrants as required.  The report explains that these identification numbers enable immigration and law enforcement officials to track a migrant's immigration file, so not issuing them could jeopardize ICE's ability to track migrants released into the United States and ensure they appear for immigration proceedings.

According to the Immigration and Nationality Act, as amended, when CBP encounters migrants it must determine their admissibility to the U.S.  During our site visits to the Southwest border, Border Patrol agents shared how managing the increasing encounters can result in less enforcement.  This is reflected in Border Patrol's number of "gotaways" — a person who is not turned back or apprehended after making an illegal entry — observed

# 303%

Increase in gotaways, FYs 2019–2022

along the border.  Gotaways occur when cameras or sensors detect migrants crossing the border, but no one is found, or no agents are available to respond. Gotaways are observational estimates and rely on agents identifying migrants as crossing illegally and tracking them to the point where they cannot be apprehended; however, an unknown number of migrants evade detection. Therefore, the actual number of "gotaway" migrants is unknown.  In FY 2019, 150,090 gotaways were recorded along the Southwest border.  In FY 2021, this number rose by 159 percent, to 389,155.  In FY 2022, CBP recorded more than 600,000 gotaways.  In one Southwest border station, 15 percent (24 of 156) of the gotaways in a 5-day period occurred because no agents were available to respond.

Border Patrol has developed an alternative processing pathway known as parole plus alternative to detention (Parole + ATD) for times when CBP does not have the capacity to detain migrants.  Under Parole + ATD, noncitizens are enrolled in ICE's ATD program and then released from Border Patrol facilities. Once released, they must report to an ICE office for an NTA to continue through the removal process.  From October 1, 2021, through June 22, 2022, Border Patrol released 70,273 noncitizens under Parole + ATD.

---

[10] *U.S. Border Patrol Screened Migrants at the Southwest Border but Could Strengthen Processes,* OIG-22-71, September 2022.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Nearly half of the CBP personnel who completed our survey (3,007 of 6,093)[11] indicated that from their perspective they were required to take on responsibilities outside their normal duties at their work location.  Twenty percent (843 respondents) said they felt unable to perform their primary law enforcement duties of securing the border.  "One of our duties is the detention and processing of non-citizen migrants, which is what almost all of our manpower is being delegated to do," one Border Patrol agent states.  "This does prevent us from doing the other part of the duties/responsibilities we were hired for, which is deterring or apprehending individuals that have made an illegal entry into the United States."

In addition, more than half of ICE survey respondents (1,901 of 3,198)[11] indicated that they had been required to take on responsibilities outside of their normal or traditional duties.  One deportation officer explained how ICE went from tracking down and arresting criminals to handing out paperwork.  Similarly, a Homeland Security Investigations (HSI) special agent said that HSI has gone from investigating to providing security at processing facilities.

## CBP and ICE Need to Assess Their Current Methods of Managing Staff

The sustained surge in migrant encounters at the Southwest border makes ensuring appropriate levels of law enforcement personnel vital.  Although CBP's and ICE's staffing models provide useful information for planning, they do not consider unplanned staffing needs.  Also, although CBP's and ICE's attrition (employee departure for any reason, such as resignation or retirement) has not risen in recent years, according to a CBP union representative and leadership we spoke to, a large number of officers will reach their law enforcement retirement in 2028.  At that time, and in subsequent years, retirements could rise yet neither component has a succession plan addressing possible rapid personnel changes.  CBP relies on overtime and details from its own agency and ICE to temporarily fill staffing gaps along the Southwest border.  Although CBP and ICE annually assess their staffing needs, neither has assessed how the impact of using details and overtime is affecting their operations and morale.

### Staffing Models Do Not Account for Sudden or Unplanned Needs

CBP and ICE do not have proactive staffing models capable of adapting to the everchanging environment on the Southwest border.  As an example, OFO's workforce staffing model is designed to project staffing requirements at the ports of entry, using workload data and average processing times to identify the

---

[11] There were 9,311 survey respondents, however, 20 did not indicate which component they were in.  Therefore, we did not include those 20 in the total number of CBP and ICE respondents cited here.  See Appendix E for a breakdown of respondents.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

recommended staffing levels to complete that workload. However, according to an OFO official, the model is a "snapshot," using the work completed the previous year to determine each port's optimal staffing levels in the future.

Similarly, ICE's staffing model does not consider the effects of future conditions on staffing needs. The model is designed to inform ICE's planning, programming, and budgeting processes based on operational data from offices including ERO and HSI. Although that data is updated quarterly, one ERO official explained that ERO does not create multiple models based on different scenarios and cannot anticipate changes in policy or migrant patterns and how those could affect staffing.

In 2011, Congress required Border Patrol to submit a workforce staffing model, which would help Border Patrol assess whether it is allocating its workforce efficiently. Eight years later, in 2019,[12] DHS OIG reported that Border Patrol had not completed or submitted the staffing model. DHS OIG recommended that DHS ensure that Border Patrol expedited its development and implementation of a workforce staffing model. [13] CBP drafted a staffing model, which was approved by Border Patrol leadership in July 2022 and submitted to multiple entities, including DHS and the Office of Management and Budget, for review and approval. As of August 2022, it was still awaiting approval before it could be completed and implemented.

**CBP and ICE Attrition Rates Could Rise as a Result of Staffing Issues**

Although attrition rates were not elevated during the period of our audit, the current changes in workload and staffing challenges along the Southwest border could contribute to a rise in these rates. Approximately one in four CBP and ICE survey respondents indicated they plan to leave within the next year. With the rising number of migrant encounters along the border, CBP and ICE could see higher turnover rates and earlier retirements among law enforcement officers, which could in turn worsen the staffing challenges at the Southwest border.

Among the CBP and ICE subcomponents we reviewed, attrition rates along the Southwest border have either decreased or remained consistent. CBP's and ICE's overall attrition rates have also been generally consistent with the overall Government rate (see Table 5).

---

[12] *Border Patrol Needs a Staffing Model to Better Plan for Hiring More Agents*, OIG-19-23, February 2019.
[13] This recommendation is still open and pending final approval and implementation of the workforce staffing model. DHS estimates a completion is June 30, 2023.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Table 5.  CBP and ICE Attrition Rates along the Southwest Border Compared to Government-wide Attrition Trends in FYs 2019–2021**

| Fiscal Year | Border Patrol | OFO | ERO | HSI | Gov-Wide |
|---|---|---|---|---|---|
| FY 2019 | 6.1% | 4.8% | 5.2% | 4.9% | 6.1% |
| FY 2020 | 5.6% | 4.3% | 4.2% | 5.0% | 5.5% |
| FY 2021 | 5.7% | 4.9% | 5.6% | 6.1% | 6.1% |

*Source:* DHS OIG review of CBP and ICE provided law enforcement officer attrition and https://ourpublicservice.org/fed-figures/attrition/

In FY 2021, CBP's and ICE's average retirement rates were consistent with the overall Government rate of 3.2 percent.  According to CBP's Consolidated Personnel Reporting Online System, 505 CBP and 118 ICE agents and officers retired in FY 2021.  These retirements accounted for approximately 2.1 percent of CBP's 24,550 employees at the Southwest border, and 4.1 percent of ICE's Southwest border workforce of 2,874.

Twenty-four percent (2,275 of 9,311) of CBP and ICE personnel who responded to our survey indicated that they plan to separate (leave their component) within the next year.  In reviewing the survey comments for those who indicated that they plan to separate, respondents shared their struggles with carrying out their law enforcement duties as well as morale as issues influencing their decision to either leave or retire.

According to GAO's *Standards for Internal Control in the Federal Government,* known as the "Green Book,"[14] effective management of an agency's workforce, its human capital, is essential.  As part of human capital planning, management must consider how best to retain valuable employees and plan for their eventual departure.

According to CBP and ICE data, the number of personnel eligible to retire will spike in FY 2027.  Although we cannot predict whether these employees will actually retire, a spike in retirements could exacerbate the difficulty in recruiting and hiring law enforcement officers.

**Succession Plans Do Not Address Attrition**

According to GAO's Green Book, management must define succession plans for key roles to help the agency continue achieving its mission.  Succession plans address the need to replace competent personnel over the long term.  Although CBP has succession plans, they are focused on key roles in the component and not on immediate staffing needs based on significant attrition rates.

---

[14] GAO-14-704G, September 2014.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Border Patrol's and OFO's succession management plans provide information about knowledge, skills, and abilities for agents and officers to advance through their career progression.  In short, they help ensure law enforcement personnel are prepared for long-term career growth but are not focused on the need to address sudden personnel changes.

ICE does not have succession plans that address attrition.  HSI does not maintain a formal succession plan, nor does it plan for special agent retirements and departures.  Similarly, ERO does not have a current succession plan.  One ERO official told us ERO had a succession planning guide in 2012, but it was not actively used.

### Details and Overtime Temporarily Fill CBP's Staffing Gaps at the Border but Are Unsustainable and Contribute to Low Morale

CBP addresses staffing needs with details and overtime to manage operations at Border Patrol stations, ports of entry, and CPCs, which were established in 2014 to facilitate the processing of migrants along the Southwest border. However, these solutions respond only to the immediate need and are not sustainable long term.

During our audit scope period, October 2018 through April 2022, Border Patrol detailed 10,432 agents, sometimes multiple times, to the Southwest border. These details included agents from the northern and coastal borders of the United States, as well as Southwest border agents detailed to other sectors. Border Patrol data shows a total of 24,751 details from October 2018 through April 2022 (see Figure 3).

**Figure 3. Total Border Patrol Details, FY 2019–April 2022**



*Source:* DHS OIG review of Border Patrol provided data on Southwest border details



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE has helped CBP with the increased migrant encounters by detailing its own personnel along the Southwest border. Despite having fewer officers than CBP, the number of ERO details dramatically increased, from 10 in June 2021 to 212 in July 2021 (see Figure 4). Since then, the number of ERO details has remained relatively high, with 55 percent of all ERO details (1,067 of 1,939), each detail lasting 44 days on average, occurring in FY 2022.

**Figure 4. ERO Details by Month, October 2020–March 2022**



*Source:* DHS OIG review of ICE ERO provided data on Southwest border details

HSI special agents have also been detailed to the Southwest border. From FY 2019 through April 2022, HSI agents were sent on 465 details to support Southwest border efforts, often from other parts of the Southwest border or other nearby offices. An HSI supervisor based at the Southwest border told us that their agents' caseloads were greater than those of offices in other regions of the country.[15]

According to Border Patrol data, 2,063 northern border agents completed 7,469 details during the period of our audit. On average, northern border stations had approximately 20 percent of their workforce detailed to the Southwest border in FY 2021, affecting Border Patrol's ability to safeguard the approximately 5,525 miles of the northern border. In our survey, northern border agents noted, from their experience, operational concerns about their own permanent duty stations during their details including shifting manpower to the Southern border.

We determined that on average, the 7,469 Border Patrol details from the northern border to the Southwest border cost approximately $5,100 for each

---

[15] Despite the details and increasing migrant encounters along the Southwest border, HSI's human trafficking case numbers remained relatively stable from FY 2019 through FY 2022.



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

detailee's travel and per diem.  This means that for the period we audited, the approximate total cost of Border Patrol's northern border details was $37.9 million.[16]

CBP personnel whose regular duty stations are at the Southwest border may also be detailed.  They may go to other stations, to a CPC in their sector, or to another Southwest border sector to provide aid.  During the period of our audit, 8,011 agents already at the Southwest border completed 16,002 details.

Border Patrol agents and CBP officers can also be detailed from their duty locations to serve at CPCs.  During these details, the employees process migrants and provide essential care, which may include:

- providing security;
- overseeing meal delivery;
- restocking snacks and hygiene products;
- helping stations transport migrants to the CPCs; and
- helping watch migrants who were taken or admitted to hospitals.



**Figure 5.  OFO Officers Making Bologna Sandwiches**
*Source:* National Treasury Employees Union representative

Although the CPCs provide immediate, safe, and secure processing spaces for migrants, they have had the unintended consequence of diverting CBP staff away from CBP's border security mission to provide humanitarian care (see Figure 5).  One Border Patrol agent said agents were providing clothing, diapers, formula, and other domestic services, noting that the job "feels more like social worker duties rather than law enforcement."

According to CBP and ICE personnel, details negatively affect operations at their stations and ports of entry.  From October 2018 through April 2022, OFO detailed 2,505 CBP officers to the Southwest border for various operations.  One officer commented that details hurt the mission of the port and that the

---

[16] This amount may be an underestimate of actual costs incurred.  It is an approximation based on U.S. General Services Administration's lodging, meal, and incidental per diem rates, and the average, deeply discounted contracted airfare.  It does not include additional travel costs, such as hotel taxes or rental cars.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

border situation has taxed officers dramatically. Another said that "staffing is an issue at all Ports of Entry, yet we leave them shorthanded to force employees to another location for long periods of time."

Border Patrol agents and CBP officers described similar effects from these details on their duty stations. One agent explained that one location "very seldom" has agents patrolling the border. "Most of our staff is detailed to the [CPC] or other details," the agent said. "Groups of people are detected [crossing the border], and we have no units to respond. Sometimes we pull people from other duties to respond to traffic but that leaves areas open and vulnerable also. This also creates a very busy and stressed-out workforce."

According to CBP's publicly available data on drug seizures, from fiscal year 2019 until fiscal year 2022, the average number of drug seizures per month on the northern border has decreased. In FY 2019, Border Patrol conducted an average of 40 drug seizures per month along the northern border. In FY 2021, these seizures decreased by 34 percent, to 26 per month. In FY 2022, Border Patrol was conducting an average of 20 drug seizures per month.

ICE details to the Southwest border have also affected enforcement and investigative operations. As with the CBP workforce, the overwhelming number of migrants along the Southwest border has forced ICE agents and deportation officers to take on responsibilities outside their typical roles, which has affected their own operations. Deportation officers we spoke to on the Southwest border and those detailed from other ICE offices told us that morale is affected because deportation officers are spending more time processing paperwork that could have been done remotely and releasing migrants instead of enforcing immigration law.



**Figure 6.  Check-in Line at ERO's
Baltimore Field Office
September 22, 2020**
*Source:* ICE

Migrants who are released into the United States must report to an ERO office where NTAs will be issued to them. However, deportation officers said these offices are not built or staffed for the numbers of migrants reporting in (see Figure 6). One deportation officer stationed in the Northeast explained that details tend to leave permanent locations short staffed, so offices do not have nearly enough employees to manage migrants checking in.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Deportation officers also said details have affected their arrest rates. One said that his rate had dropped from seven or eight arrests a day to one or two "on a good week."

"[D]ue to the amount [of] personnel 'detailed' out, there are not enough officers … to sufficiently handle the completion of the case processing. This can be summed up in the old adage **'robbing Peter to pay Paul.'**"

—ICE survey respondent

In addition, of the 6,564 survey respondents who provided comments on our survey, 242 ICE and 133 CBP agents and officers commented that they either did not know why they were detailed or believed the detail was a waste of resources. For example, during an OIG site visit, law enforcement personnel told us that for one operation they had less than 24 hours' notice to volunteer or be forced to go on a detail. Those who volunteered said they were not told where they would be deployed, what they would be doing, or how long they would be away from their homes. Survey respondents also indicated that they had little work to do while on detail or that mandatory overtime was assigned to the detailed staff but not to permanently assigned staff. One Border Patrol agent commented that detailed agents sometimes had no work because "everything is being sent to be virtually processed."

Details have also affected employees' personal lives. Agents and officers described missing holidays and vacations with their families or having to plan care for children or elderly family members while they were detailed. One commented, "Parents are missing 30% of the year, and [are] unable to participate in many family functions. This causes much stress on the parents and children."

"Most mandated details that I have been [on] have had an **excess number of agents** assigned for the level of work. Many agents doing very little…"

—CBP survey respondent

Despite these impacts, some employees described details as vital to the stations and ports that are encountering high numbers of migrants. One officer explained that before the detail assignments to a port, officers were forced to work two to three double shifts every 2 weeks due to lack of staff. An HSI supervisor shared that, when deployed to a Southwest border office, the amount of work far surpassed anything that the supervisor had imagined. The



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

supervisor described a "staggering" volume of calls for assistance and an "insurmountable workload faced daily."

In addition to details, CBP used overtime to fill staffing gaps at ports of entry. CBP officers we spoke with explained that OFO is severely understaffed. Ports of entry rely on overtime to compensate for the understaffing to maintain operations. From October 1, 2018, through April 30, 2022, CBP officers stationed at the Southwest border worked roughly 5.1 million hours of overtime, resulting in $403 million in gross overtime pay.[17] In the first 7 months of FY 2022, CBP officers worked approximately 881,000 overtime hours, an average per officer of 114 hours — or 14 additional workdays a year.

According to officers we spoke with, overtime is also used to reduce wait times at ports of entry. From FY 2019 through FY 2021, 13 of the 34 Southwest border ports were consistently below recommended staffing levels. One, the San Ysidro port of entry in California, which according to CBP is the world's busiest land border crossing, was below its recommended staffing levels by an average of 217 officers each year. This port also had the most overtime use compared to other ports along the Southwest border, with 811,057 overtime hours worked from October 1, 2018, through April 30, 2022.

In our survey, CBP officers shared their experiences of reaching their statutory limits on overtime, most of it forced, early in the fiscal year. One officer wrote that at the Ysleta port of entry in Texas, "[O]vertime waivers are being prepared to hand out to officers as we speak. Meaning more ordering to work overtime and double shifts." Another respondent wrote that more officers are leaving due to the expansion in overtime, noting that this perpetuates the overtime cycle: "There has been 'drafting' [mandatory overtime] on every shift for more than a year now. There are a lot of officers leaving the agency or transferring to other work locations ... This is causing more drafting ... in order to meet ... minimum staffing numbers."

### CBP and ICE Have Not Assessed How Their Use of Details and Overtime Has Impacted the Workforce

CBP and ICE have not completed a comprehensive assessment to evaluate how details and overtime have impacted the workforce. According to GAO's Green Book, changing conditions often prompt new risks to an agency's internal control system because existing controls may not be effective. These changes may include governmental, legal, or physical conditions. Management is responsible for identifying, analyzing, and responding to any new risks prompted by these changes as well as evaluating and adjusting excessive

---

[17] The data we received did not differentiate between mandatory and voluntary overtime. Therefore, the total overtime worked at the Southwest border includes both mandatory and voluntary overtime.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

personnel pressures such as rebalancing workloads or increasing resource levels.

We asked CBP and ICE officials if they had completed any internal assessments or contracted for assessments related to managing law enforcement staffing, including hiring or recruitment, personnel allocation, or the impacts of policy on workforce. HSI did not do any assessments or studies during the period we audited, but OFO, Border Patrol, and ERO took the following steps:

- OFO piloted a staffing program to prioritize positions for funding.
- Border Patrol developed the workforce staffing model that is currently awaiting approval.
- In FY 2021, ERO published an analysis of workload data as part of an assessment for field office realignment and proposed a new structure to reduce inefficiency and rebalance uneven workloads.

Despite these assessments, the current immigration environment along the Southwest border has significantly changed within the last 2 years. Neither CBP nor ICE has assessed how details and overtime have affected workforce and operations. Without assessing those specific practices and identifying strategic changes, CBP and ICE could face increases in employee attrition in coming years.

## CBP's and ICE's Resource Allocation Practices Are Detrimental to Staff Health, Safety, and Morale

Studies of law enforcement personnel have shown that they experience high levels of work-related stressors, such as understaffing, overtime, shiftwork, poor public image, and violence or threats of violence.[18] The COVID-19 pandemic brought additional stressors to members of this community, including fear for their safety and that of their loved ones and coworkers, exposure to COVID-19, isolation, prolonged periods of exhaustion and vigilance, and demoralization.

These are the very stressors CBP and ICE law enforcement personnel face. A common theme of our interviews and survey responses was frustration over lack of work-life balance as well as fatigue caused by the pressure of managing overtime, details, and frequent changes in immigration policies. As a result of

---

[18] Jim Dawson, *Fighting Stress in the Law Enforcement Community*, NIJ Journal 281, November 2019; John M. Violanti, *Shifts, Extended Work Hours, and Fatigue: An Assessment of Health and Personal Risks for Police Officers*, Final Report to the National Institute of Justice, grant number 2005-FS-BX-0004, March 2012, NCJ 237964; Riedy, S.M., Fekedulegn, D., Vila B., Andrew, M. and Violanti, J.M. (2021), *Shift work and overtime across a career in law enforcement: a 15-year study,* Policing: An International Journal, Vol. 44 No. 2, pp. 200-212.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the staffing challenges and the use of details and overtime as short-term solutions, survey feedback suggests morale among law enforcement personnel at the border is declining.  CBP and ICE survey comments indicated low morale in 3,037 (or 46 percent) of respondents.  With the possibility of attrition increasing during the next 5 years, addressing poor morale is crucial to retaining law enforcement personnel.

**Too Much Overtime and Too Many Details Affect Health and Morale**

"The mental and physical fatigue I experienced **will stay with me for my entire life.**"

—ICE survey respondent

Work-related stressors can lead to significant physical and mental health issues.  These issues include sleep problems, obesity, heart problems, fatigue, performance impairments, accidents, and mental health concerns such as post-traumatic stress disorder, depression, and suicidal thoughts.

According to May 11, 2022, testimony by the National Treasury Employees Union president[19], CBP's and ICE's use of details and overtime to address staffing challenges is having a severe effect on employee mental health.  "According to the agency [CBP]," the president said, "134 employees died by suicide between 2007 and 2020.  In 2021, there were 11 suicide deaths, and 8 suicide deaths since the start of 2022 at CBP."

In reviewing survey comments, we found that 24 percent (1,017 of 4,222) of CBP's survey respondents shared their experience of a lack of work-life balance, and 13 percent (560 of 4,222) indicated concerns about mental health.  "Officers are getting burned out," one respondent commented.  "We need more staff and better shifts that allow for more time off with families.  Divorce rates and suicides are rampant in the agency.  We want to feel like we are respected and not a cog in the machine that can be easily replaced."

According to the Occupational Safety and Health Administration, long work hours, such as extended shifts (more than 8 hours long) or consecutive shifts resulting in more than the typical 40-hour work week, may increase the risk of injuries and accidents and can contribute to poor health and worker fatigue.  Of the 3,176 OFO personnel who completed our survey, 72 percent (2,292) shared that they have been required to work extra or double shifts within the last year.  Officers described working 16-hour shifts, sometimes multiple days in a row.  A survey respondent shared, "Long days and hours make officers more prone and vulnerable to make mistakes in our daily duties and off duty." Many officers shared how the overtime has negatively affected their mental and

---

[19] Testimony on FY 2023 Budget request for CBP before the Subcommittee on Homeland Security House Appropriations Committee



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

physical health, their ability to respond on the job, and their ability to spend time with their families.

In addition, we reviewed the 1,502 ERO and 835 HSI survey comments and found that 37 percent (555) of ERO respondents and 33 percent (274) of HSI respondents shared the experience of details that, from their perspective, affected their operations at their duty location, their personal lives, or both. Among the comments:

- "No consideration was provided to officers' personal situation when determining detail selection."
- "[The agency forces] a ridiculous 'anti-suicide' app onto our phones which cannot be deleted yet make us leave our homes and live in a hotel where we can't even eat healthily.  This nightmare is forced upon us without a care of our mental or physical health."
- "We are being detailed to the southwest border to perform functions that essentially run counter to our job description.  It is truly demoralizing to work here.  It is no wonder that our agency ranks so low on morale surveys.  Please let us do our job and enforce our nation's immigration laws."

**Unpredictable Immigration Policies Have Impacted Morale**

Unpredictability surrounding major immigration policies has caused uncertainty and additional anxiety among law enforcement personnel.  Since FY 2019, immigration policies have shifted significantly as the United States experienced the COVID-19 pandemic and transitioned from one administration to another.  (See Appendix G for a timeline of immigration policy changes since 2017).  Our interviews and survey comments showed staff frustration and lower morale related to changing policies, especially when the respondents felt the changes were inconsistent with their law enforcement duties.  In the view of some law enforcement personnel these policies have made it difficult for them to enforce the laws and carry out their mission; one said they felt as if they were doing their job "with one hand tied behind [their] back."

For example, under the *Public Health Service Act* (42 U.S.C. § 265), the Surgeon General can prohibit the entry of people from other countries to avert the spread of diseases.  On March 20, 2020, the Centers for Disease Control and Prevention issued an order under Title 42 in response to COVID-19; this allowed Border Patrol to expel individuals at or near the U.S. borders who potentially posed a health risk or who had unlawfully entered the country to bypass health screening measures.

The use of Title 42 has resulted in people repeatedly trying to reenter the United States because Border Patrol agents could not deliver consequences at



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

---

the first interdiction.  Despite this challenge, CBP personnel said Title 42 has helped them manage the volume of migrants crossing the border.

When we visited the Rio Grande Valley sector in March 2022, there was a possibility that Title 42 could have been lifted in early April.  Law enforcement personnel expressed frustration over this, explaining that when Title 42 is lifted, the border would be "flooded."  As of October 2022, however, Title 42 was still in place, and CBP's use of it is under legal review.[20]

DHS has also indicated it will end the Migrant Protection Protocols (MPP),[21] in which individuals wait in Mexico during their immigration proceedings.  DHS announced the use of MPP in December 2018; in June 2021, the DHS Secretary issued a memo terminating its use.  Since then, the enforcement or termination of MPP has changed frequently due to litigation.  As with Title 42, CBP personnel explained that ending MPP would further overwhelm their resources.  From the frontline perspective, MPP has helped agents regain operational control of the border and stop migration north.

## The Department Is Using a New Approach to Manage the Higher Volume of Migrants, but More Action Is Needed

During our audit, we learned that DHS has begun to take a more unified approach to prepare and respond to migrant surges.  In February 2022, the DHS Secretary established the Southwest Border Coordination Center (SBCC), stating that its purpose was "to support DHS-wide coordination and unity of effort" along the border consistent with DHS' *Southwest Border Mass Irregular Mitigation Contingency Plan.*

The contingency plan takes a proactive approach, focusing on "current and anticipated irregular migration surges" at the Southwest border and providing "a flexible and scalable framework to address significant variances in migration over time."  The contingency plan also instructs the head of the SBCC to:

- develop a plan to meet the SBCC's objectives and priorities;
- identify and resolve gaps in operation and coordination;
- coordinate with interagency partners; and

---

[20] On November 15, 2022, a federal judge issued a decision that vacated the Title 42 policy. See *Huisha-Huisha v. Mayorkas*, --- F. Supp. 3d. ---, 2022 WL 16948610 (D.D.C. Nov. 15, 2022).  On December 27, 2022, the U.S. Supreme Court granted a stay of the District Court's decision to vacate the Title 42 policy.  See *Arizona v. Mayorkas*, 143 S. Ct. 478 (2022).
[21] In 2022, MPP was under litigation, with the Supreme Court ruling in June 2022 that DHS could rescind it.  In August 2022, a permanent injunction requiring DHS to continue MPP was lifted, and DHS indicated it would terminate MPP.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- coordinate with other stakeholders — Federal, state, local, tribal, and territorial governments; the private sector; and nongovernmental entities — to achieve the SBCC's objectives and priorities.

The SBCC focuses on the interdependencies among DHS components, nongovernmental organizations, and localities. SBCC officials explained to us that by understanding these interdependencies, they could identify the best way to move resources into Southwest border sectors to make migrant surges more manageable by:

- evaluating immigration processes to find greater efficiencies, such as processing migrants on buses while enroute to a processing facility and establishing enhanced CPCs; and
- using contracts to help with certain tasks, such as moving migrants and taking on administrative duties for law enforcement officers, which would allow the officers to do more enforcement.

Although the SBCC is promising, it faces hurdles of its own. SBCC officials told us the SBCC is carrying out its efforts without any additional appropriated funds. One compared the situation to a disaster, noting that FEMA receives funding for disasters like hurricanes, but the SBCC receives no funding for the issues involved with mass migration at the border. Additionally, the SBCC only coordinates CBP and ICE staff to help alleviate pressures with processing and detention when surges occur. Finally, the SBCC can only manage the capacity issues DHS faces with the growing number of migrant encounters. The SBCC is not responsible for, and has no authority over, direct hiring and staffing issues. CBP and ICE are ultimately responsible and accountable for future workforce planning.

## Conclusion

Multiple factors such as political instability, gang violence, and stagnant economic growth in migrants' countries, coupled with recent shifts in U.S. immigration policy and border enforcement, have contributed to a dramatic rise in migration at the Southwest border. DHS has acknowledged the outdated immigration system was not built to manage the current levels of migrant encounters and a significant increase will substantially strain the system even further. As stated in the *DHS Plan for Southwest Border Security and Preparedness*, "[…] we need the partnership of Congress, state and local officials, [nongovernmental organizations], and communities […]."

CBP and ICE staff and resources are at the forefront of the increased flow of migrants, affecting workloads and exacerbating staffing challenges. The components have addressed this by detailing staff and using overtime to fill staffing gaps. However, their use in the current environment is now affecting



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

law enforcement staff's health and morale. Over time, this could lead to increased attrition and even affect CBP's and ICE's border security and immigration law enforcement missions.

CBP and ICE cannot continue to treat details and overtime as viable long-term solutions to staffing issues at the border. Both components need to understand the current immigration environment and make strategic changes to their planning and operations so they can better address the issues affecting their law enforcement personnel. As factors outside of DHS' control can affect the work environment, different approaches towards managing resources should be considered. In one SBCC official's opinion, "We will not process or detain ourselves out of this surge. Policy is the only thing that will be able to correct and address the surge we are facing now."

## Recommendations

**Recommendation 1:** We recommend that the CBP Commissioner and the ICE Director coordinate with the DHS Secretary to contract with an independent, federally funded research and development center to complete a full assessment of the staffing needs at the Southwest border and strategically implement recommendations based on the assessment. The assessment should:

- review existing staffing models and methodology for deploying personnel at the Southwest border and across the country and the impact of continuously relying on details and overtime to temporarily fill staffing gaps; and
- include factors within and outside of DHS' control that are affecting workloads and exacerbating staffing challenges to identify solutions the components can accomplish as well as those that require congressional action.

**Recommendation 2:** We recommend that the CBP Commissioner and the ICE Director complete after-action reviews of the SBCC's completed priorities to determine whether its efforts are working as intended.

**Recommendation 3:** We recommend that the CBP Commissioner and the ICE Director communicate the duties and responsibilities of the SBCC more effectively to frontline staff.

### DHS Comments and OIG Analysis

DHS' Director, Departmental Audit Liaison provided written comments in response to our draft of this report. Appendix B contains a copy of DHS' management comments in its entirety. DHS also provided technical comments



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

to our draft report.  We discussed these technical comments at our exit
conference and made changes to incorporate these comments as appropriate.
A summary of DHS' responses and our analysis follows.

In its management response, DHS concurred with two of the three report
recommendations.  Although DHS concurred with two of our
recommendations, its management response highlighted several concerns
regarding the underlying audit work.

First, DHS asserted that the report does not recognize all the DHS initiatives to
support its personnel.  We recognize DHS' efforts in implementing many
initiatives to address employee well-being.  However, the number of initiatives
also demonstrates the extent of the underlying workforce issues and challenges
we identified in our audit.

Second, DHS called into question the survey methodology, results, and
presentation in the report.  We disagree with DHS' assertions.  Our survey was
not a statistical survey intended to project our results and generalize across
the population.  The purpose of our survey was to provide frontline law
enforcement personnel the opportunity to confidentially share their
perspectives on the challenges they are facing.  DHS' choice to call into
question the validity and reliability of the survey results does not invalidate the
individual perspectives and experiences shared by those who responded.  To
develop our survey, we followed GAO guidance on surveys and performed
procedures necessary to enhance survey development.  Additionally, the survey
results supplement our work reviewing documentation, analyzing data, and
conducting interviews during site visits.  Throughout the report we are clear
that the survey results reflect the individuals' opinions and do not represent
the views or experiences of all law enforcement personnel at CBP and ICE.

Finally, according to DHS, the list of prior reports in Appendix D is misleading.
As discussed, the list of prior reports shows challenges related to our audit
objective that DHS OIG and GAO have identified.  Our report clearly states how
many of the recommendations are closed.

**DHS Response to Recommendation 1:** Non-concur.  According to DHS, CBP
and ICE have internal models for staffing requests.  Additionally, DHS
indicated there is no funding available for contracting an assessment of the
staffing needs and that it would be a duplicative effort to Border Patrol's
staffing model and CBP's Office of Field Operations workload staffing model.
DHS requested the OIG consider this recommendation resolved and closed.

**OIG Analysis of DHS' comments:** We do not consider DHS' actions responsive
to the recommendation, which is unresolved and open.  The recommendation
does not require developing another staffing model.  As discussed in our report,



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

CBP and ICE have not assessed how their use of details and overtime has impacted the workforce.  The intent of the recommendation is to identify solutions by reviewing existing staffing models as part of an overall assessment reviewing the factors within and outside DHS' control that are affecting workloads and exacerbating staffing challenges.

**DHS Response to Recommendation 2:** Concur.  The Southwest Border Coordination Center's Senior Coordination Official meets regularly with senior officials pertaining to ongoing efforts and efficiencies at the Southwest border. DHS indicated that these actions are tracked, evaluated, and logged in a report.  DHS requested that the OIG consider this recommendation resolved and closed.

**OIG Analysis of DHS' comments:** We consider these actions responsive to the recommendation, which we consider open and resolved.  We will close this recommendation when DHS submits meeting minutes, reports, or other documentation showing completed after-action reviews of the Southwest Border Coordination Center's efforts.

**DHS Response to Recommendation 3:** Concur.  DHS acknowledges the importance and impact of effective communication to a program and its workforce.  CBP and ICE will develop a messaging campaign to help the workforce understand the role of the Southwest Border Coordination Center, the duties, and leadership expectations.  This messaging campaign will include videos and frequently asked questions for the workforce.  Estimated Completion Date: April 28, 2023.

**OIG Analysis of DHS' comments:** We consider these actions responsive to the recommendation, which we consider open and resolved.  We will close this recommendation when DHS submits documentation showing full implementation of the messaging campaign.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107–296) by amendment to the *Inspector General Act of 1978*.

We conducted this audit to determine whether CBP and ICE are properly managing law enforcement staffing resources to accomplish their mission at the Southwest border, and to determine CBP's and ICE's turnover rates and whether the components have effective succession planning for departing officers.  Our audit scope included CBP's and ICE's law enforcement program offices, including Border Patrol, OFO, ERO, and HSI, from FY 2019 through FY 2022.  After reviewing the mission of CBP's Air and Marine Operations along the Southwest border, we excluded that component from our review because most agents have minimal direct interactions with migrants.

To answer our audit objective, we reviewed legislation and court cases, workforce staffing models, succession plans, and policies and procedures.  We also reviewed previous OIG and GAO reports, media articles, research, studies on the effect of prolonged stress, and congressional testimony.  In addition, we developed, deployed, and analyzed a workforce challenge survey, which we sent to all CBP and ICE law enforcement personnel across the United States.  We analyzed and reviewed multiple data sets, including hiring, staffing, attrition, enforcement statistics, and the use of details and overtime.

In planning and performing our audit, we identified the internal control components and underlying internal control principles that were significant to the audit objective.  Specifically, we reviewed CBP's and ICE's staffing models, succession plans, policies and procedures, and controls over its management of law enforcement staffing resources, as well as current workforce practices.  We identified internal control deficiencies that could adversely affect CBP's and ICE's law enforcement personnel and staffing.  However, because we limited our review to these internal control components and underlying principles, it may not have disclosed all control deficiencies that may have existed at the time of our audit.

We interviewed CBP personnel from the Office of Human Resource Management and OFO's Strategic Transformation Office.  We also interviewed ICE personnel from ERO's Human Resources Unit, Field Operations, and Law Enforcement Systems Analysis Strategic and Operations Analysis Unit as well as personnel from HSI's Workforce Management and Policy, Planning, and Records Management.  Additionally, we met with personnel from the SBCC and officials from CBP and ICE labor unions including the National Border Patrol Council, the National Treasury Employees Union, and the National ICE



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Council.  Further, with the assistance of our Office of Innovation, we met with
subject matter experts for CBP's Consolidated Personnel Reporting On-Line
system.

To understand what CBP and ICE law enforcement personnel are experiencing
along the Southwest border, we visited Border Patrol stations and CPCs, ports
of entry, and ERO and HSI field offices in the Rio Grande Valley, Laredo, and El
Paso sectors.  During these site visits, we interviewed leadership and available
Border Patrol agents, CBP officers, deportation officers, and HSI special agents
to gain a better understanding of staffing and challenges they face.

In addition, we developed a voluntary, anonymous paper survey to identify
workforce issues that frontline law enforcement personnel are experiencing.  To
develop our survey, we reviewed OIG hotline complaints, results from CBP's
and ICE's Federal Employee Viewpoint Surveys in FY 2019 and FY 2020, ICE
and CBP exit surveys for departing employees, and our interview with the labor
union representatives.  We followed GAO's guidance and consulted with subject
matter experts and questionnaire experts and pretested the survey with
individuals from the targeted population.  We piloted the survey with
approximately 500 Border Patrol, OFO, ERO, and HSI agents and officers
during our site visits to the Rio Grande Valley.  We discussed the survey with
agents and officers and made minor adjustments to the survey based on their
feedback.  A copy of this survey is in Appendix E.  To identify the prevalence of
issues such as accountability, management, staffing, and overtime, we
administered the survey during our discussions with law enforcement
personnel.

After our site visits, the team converted this survey to an electronic format
using DHS OIG's secure web-based survey software, Qualtrics.  The only
substantive change from the paper survey was the inclusion of a question
asking whether the respondent completed our paper survey; this was to help
prevent people from taking the survey twice.

We sent the survey to approximately 57,000 CBP and ICE law enforcement
personnel across the United States to provide personnel who had been detailed
to work along the Southwest border with the opportunity to respond.  To
maintain the integrity of the survey and to protect all personally identifiable
information received, we ensured that all responses remained anonymous and
reported aggregated survey results.

We received survey responses from May 23 through June 13, 2022.  We
included in our analysis electronic survey results that were at least 98 percent
complete and excluded respondents who indicated they had taken our paper
survey.  We combined these results with our paper survey results for a total of
9,311 results, approximately 16 percent of the total population surveyed.  See



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Appendix E for a breakdown survey participation by program office and our overall survey results.

We conducted a non-statistical survey and acknowledge that the survey results cannot be projected to the total population of CBP and ICE law enforcement personnel. Rather, the purpose was to provide a high-level understanding of challenges facing CBP and ICE law enforcement personnel and capture their individual experiences and perspectives. CBP and ICE, and their subcomponents Border Patrol, OFO, ERO, and HSI, have different missions, different operating environments, and different workforce concerns. Therefore, after each survey question, we included an optional free-text field to allow respondents to provide additional information. We reviewed each comment to identify themes such as the impacts that details, overtime, and lack of staff have on the workforce and how these practices are affecting staff health, safety, and morale. To further protect the anonymity of respondents, we removed any identifiable information in direct quotes we used throughout the report. The comments and viewpoints throughout our report reflect the individuals' opinions and are not projected to represent the opinions of the entire population of CBP and ICE law enforcement personnel.

To describe CBP's and ICE's staffing and workloads at the Southwest border, we requested and reviewed multiple data sources, to include CBP's and ICE's:

- staffing, attrition, and retirement data;
- enforcement statistics; and
- details and overtime at the Southwest border.

As discussed in the following paragraphs, we analyzed this information to provide a snapshot describing the situation at the Southwest border from CBP's and ICE's perspectives. This data was used to provide background information and was not used to support our recommendations. Additionally, for each data set CBP and ICE provided, we conducted assessments to either ensure we received data from the best available source, or ensure the data was appropriate for our use and tested for completeness.

To identify trends and provide background information for the number of agents and officers stationed at the Southwest border, we analyzed CBP and ICE staffing data. For each fiscal year of our scope, we requested the total number of law enforcement personnel onboarded and the turnover in each Southwest border sector or field office. To identify retirement trends, we requested personnel data from CBP's and ICE's Consolidated Personnel Reporting On-Line system. With the assistance of OIG's Office of Innovation, we analyzed this data to identify the total number of law enforcement personnel who retired during our audit period and the number eligible to retire in the future. We reported this data as provided by OIG's Office of Innovation.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

We did not validate this data and, therefore, did not use it as the sole basis of support for our findings or recommendations.

We also reviewed enforcement statistics, either publicly available or provided by the component, to determine the total number of enforcement actions along the Southwest border and to identify the impact migrant surges and resource allocation can have on these actions. Specifically, we downloaded publicly available encounter and travel statistics from CBP's public website[22] for FYs 2019 through 2022 and asked CBP for the total number of gotaways within the same timeframe. We also requested the total number of ERO arrests of convicted criminals and removals, the total number of NTAs by field office, and the total number of HSI human trafficking cases in FY 2019 through April of FY 2022. Because this information was used to identify trends and provide background information, we did not test the reliability of the data.

To describe the total number of CBP and ICE details across the Southwest border, we requested a list of all Border Patrol agents, CBP officers, ERO deportation officers, and HSI special agents who completed details along the Southwest border from October 2018 through April 2022. OFO's and HSI's data was limited and did not include consistent data points, such as where the individual was detailed to and from or the length of the detail. Therefore, we focused our review on Border Patrol's and ERO's details to identify the total number of details. For Border Patrol, we also analyzed this data to identify the total number of agents detailed from the Southwest border and from the northern border.

For the northern border details, we determined approximate costs for each detail. These costs were based on U.S. General Services Administration lodging, meal, and incidentals per diem rates, and the average, deeply discounted contracted airfare. This analysis is only an approximation. CBP could have approved a higher airfare or lodging cost if the Government rate was unavailable. This approximate cost also does not include travel costs such as hotel taxes or rental cars. Because of these limitations, we used this information to provide context for estimated costs associated with northern border details and did not use it to support our audit findings or recommendations.

Finally, to validate statements we heard in the field and our survey regarding the reliance of overtime at OFO ports, we requested overtime data from CBP's payroll branch. This data identified the total overtime and gross overtime pay for each port of entry along the Southwest border during the period we audited.

---

[22] According to GAO's *Assessing Data Reliability* (GAO-20-283G, December 2019), if an audit relies on information that is used for widely accepted purposes and is obtained from sources generally recognized as appropriate, it may not be practical or necessary to conduct a data reliability assessment.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The information we were provided did not differentiate between mandatory and voluntary overtime. We analyzed this information to identify the total overtime at each port and provide additional context describing the situation at the Southwest border from CBP's perspective. We did not validate this data. Therefore, we did not use it as the sole basis of support for our findings.

We conducted this performance audit from November 2021 through November 2022 pursuant to the *Inspector General Act of 1978, as amended*, and according to generally accepted government auditing standards, with the exception of data reliability. Specifically, we did not test the accuracy of data associated with the current operating environment at the Southwest border because we did not have access to various systems used by CBP and ICE. We identified the most appropriate source to obtain the data and reviewed it for completeness. We deemed the reliability of the data as a low risk of leading to incorrect conclusions by determining if the data was (1) what we requested; (2) from valid sources; and (3) the best available information at the time of our request. In addition, this data was not used as the sole source for our findings and conclusions based on our audit objectives; rather, this information was used as context for the current operating environment at the Southwest border. We believe the steps taken to mitigate risks with the reliability of the data meets the modified standards which require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

The Office of Audits' major contributors to this report are Shelley Howes, Director; David Lu, Audit Manager; Amber Carlson-Jones, Auditor-In-Charge; Susan Parrott, Communications Analyst; Kelly Herberger, Supervisory Communications Analyst; and Kenneth Schoonover, Independent Referencer.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## DHS Comments to the Draft Report

U.S. Department of Homeland Security
Washington, DC 20528



February 10, 2023

| | |
|---|---|
| MEMORANDUM FOR: | Joseph V. Cuffari, Ph.D.<br>Inspector General |
| FROM: | Jim H. Crumpacker, CIA, CFE<br>Director<br>Departmental GAO-OIG Liaison Office |
| SUBJECT: | Management Response to Draft Report: "Intensifying<br>Conditions at the Southwest Border Are Negatively<br>Impacting CBP and ICE Employees' Health and Morale"<br>(Project No. 22-011-AUD-CBP, ICE) |

JIM H CRUMPACKER Digitally signed by JIM H CRUMPACKER Date: 2023.02.10 17:06:22 -05'00'

Thank you for the opportunity to comment on this draft report. The U.S. Department of Homeland Security (DHS or the Department) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

DHS leadership is pleased with OIG's recognition of the Department's strides in developing a more unified approach to respond to migrant surges, starting with the establishment of the Southwest Border Coordination Center (SBCC) in February 2022, which is staffed and managed by several DHS components, including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) personnel. The SBCC acts as a centralized group to coordinate DHS resources along the Southwest Border (SWB) to create more efficient processes, particularly looking at where resources are versus where they are needed and moving those resources to address gaps and reduce pressure on local staffing, as appropriate. DHS remains committed to maintaining employee morale and resiliency, as well as the safety and well-being of our workforce and those individuals in our custody.

DHS leadership is also pleased to note, subsequent to OIG's fieldwork for this report, that recent policy initiatives such as the parole processes for Cubans, Nicaraguans, Haitians, and Venezuelans have resulted in a sharp decline in encounters of migrants of these nationalities.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

DHS leadership is concerned, however, that the OIG's draft report does not fulsomely recognize the extent of initiatives DHS has implemented to support its personnel. These initiatives include, but are not limited to:

- In March of 2021, DHS activated a Volunteer Force to augment staffing along the SWB and provide support for frontline law enforcement personnel. Through the Volunteer Force, employees from across the DHS and the interagency can volunteer to support SWB efforts by going on temporary duty to the SWB, or by working remotely to help perform initial processing of individuals. This added support for processing allows law enforcement personnel to continue performing their primary frontline law enforcement duties. Since the 2021 activation, the DHS Volunteer Force has facilitated more than 2,500 deployments providing direct support.

- In 2020, CBP established the Border Patrol Processing Coordinator position in 2020, which supports U.S. Border Patrol (USBP) agents in performing administrative tasks and allows agents to return to the frontline and focus on their border security mission and safeguarding the American public. In Fiscal Year (FY) 2022, CBP hired 582 processing coordinators, and as of January 14, 2023, successfully onboarded more than 1,000 processing coordinators across the SWB to assume noncitizen processing duties as their core function.

- CBP issued contracts to support the health and morale of its employees, while also improving conditions within the facilities along the SWB in which they are working. CBP expanded the use of contract support personnel at SWB facilities, to include 249 security personnel for the Centralized Processing Centers and 535 processors to handle data entry and management tasks (and has another 285 processors pending deployment). CBP also contracted caregiver, unarmed guard, and porter services to supplement CBP staff support. Porter services relieve the need for Volunteer Force personnel and allow law enforcement personnel to continue performing their frontline law enforcement duties. Additionally, CBP contracted to mobilize temporary soft-sided facilities (SSF) along the SWB to address overcrowding at permanent CBP facilities and provide additional capacity and processing space for safer and more efficient operations. As of February 2023, there are SSFs in seven (7) SWB locations, including recently deployed structures in El Paso, TX and San Diego, CA, with total capacity for up to ~6,468.

- The CBP Procurement team issued a medical services contract in FY 2020 to provide medical screening services and treatment to individuals crossing into the U.S. seeking asylum at ports of entry (POE) and Border Patrol stations as a flexible and timely solution to help ensure sufficient medical support at the various locations to support migrant flow patterns. Additionally, since FY 2019, multiple construction and renovation contracts were completed for processing facilities to

2



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

support "wrap-around" services, which include services such as showers, bathrooms, food, laundry, clothing, and caregiving.

- DHS has made significant progress in digitizing stages of noncitizen processing across CBP, ICE, and U.S. Citizenship and Immigration Services to reduce the amount of time our agents and officers spend doing paperwork so that they can get back to the field. These efforts include electronic review and signature of paperwork towards a fully electronic A-File, digital file transfer through the ICE Case Acceptance System, and Mobile Intake to complete the first steps of processing while still in the field. These systems and technologies allow agents and officers to seamlessly process migrants, work and share information with government agency partners, and deploy technology when and where it is needed, regardless of location and terrain. These innovations have already saved over 70,000 hours of agent time.

- DHS has also initiated a Department-wide effort to improve employee morale and engagement. In late 2021, the Office of the Chief Human Capital Officer began a nationwide series of focus groups with frontline employees and supervisors at CBP, ICE, and the Transportation Security Administration to understand the ground truth of the employee experience. As a result of these focus groups, DHS instituted a comprehensive employee experience framework and began multiple activities to better address employee basic needs. This has included deploying jump teams of headquarters mission support personnel to high-need field locations to understand and directly address issues ranging from technology to fleet and facilities. DHS will continue to build on these efforts to better meet employee needs and well-being.

- CBP established programs to support employees in specific geographical areas, as well as within specific populations. In 2019, CBP piloted a program with three part-time clinicians in the Rio Grande Valley, Del Rio, and El Paso sectors, to provide direct in-person and telehealth services, including various presentations, critical incident responses, and outreach activities. Following this pilot, CBP expanded these efforts, and currently has 27 clinicians in 18 CBP locations. The program recently received additional funding to expand to new locations based on the needs of CBP operators, with a goal of staffing 50 or more clinicians by the end of FY 2023.

- CBP Chaplaincy and Peer Support Teams assisted in the promotion and maintenance of the physical and mental well-being of employees and their families. Specifically, through more than 66,000 interactions in FY 2022, the Chaplaincy Program provided a confidential resource for guidance, counseling and assistance to employees and their immediate families in both crisis and non-crisis situations. Further, CBP's Survivor Advocacy Programs, like the Traumatic

3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Incidents and Events Response Team, which is comprised of personnel from across CBP program offices who are specially trained to provide support to employees experiencing psychological trauma following critical incidents or traumatic events, completed critical and high-profile deployments to places such as Uvalde, Texas and Miami, Florida.

- CBP hired a mental health specialist, who is an expert in suicide prevention, and will further develop and evaluate CBP's programs, decrease stigma, and reduce barriers to help-seeking, and address the individual and system risk factors for suicide. Additionally, 12,278 supervisors were trained on Suicide Prevention and Awareness in FY 2022 to strengthen the agency's focus on employee wellness. During FY 2023, CBP plans to conduct in-person suicide prevention training for more than 200 peer support personnel and chaplains, and then for all CBP employees. CBP will also revise all leadership courses with new suicide prevention and awareness training materials.

- Starting in FY 2021, ICE launched its first ever suicide awareness and prevention campaign. The campaign released a series of short videos that included members of the ICE workforce, front-line employees, subject matter experts, and leaders, that shared personal experiences and provided important information and resources to the ICE workforce. The campaign also includes recurring broadcast messages from executive leadership, stories that are posted to internal site, large and printable posters, brochures for employees and supervisors, and wallet cards. ICE employees are encouraged to visit the internal site and form a community to work together in preventing suicide.

- ICE ERO, in collaboration with DHS subject matter experts, also created and disseminated information to the entire workforce of multiple informational materials on critical topics, including a "Know the Facts" series of resources to discuss sensitive issues such as Post-Traumatic Stress Disorder and mental health care, and created a Veterans Resources flyer for all ERO employees containing critical information for veterans, such as buying back military time and the Veterans Affairs (VA) On-the-Job Training Program.

- ICE ERO is in the process of deploying a science-based mindfulness program, Mindful Performance Enhancement Awareness & Knowledge (mPEAK), to provide training to help employees increase and improve their overall mental health. mPEAK is an intensive course in mindfulness training to help participants achieve their goals, both personal and professional, as well as attain new levels of performance and success. This cutting-edge three-day intensive training program was designed around the latest brain research related to peak performance, resilience, focus, and "flow." The mPEAK program enhances the human capacity of mindfulness through established and empirically supported practices and

4



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

exercises which tailored to fit the unique needs of ERO and the stressors particular to the demands of the work. To date, approximately 250 employees have completed the training, and ERO is on target to complete an additional 25 trainings with an average class size of 15 this FY.

- CBP's and ICE Employee Assistance Program (EAP) delivers to its employees and eligible family members a comprehensive suite of services, available "24/7," designed to assist with balancing work obligations and personal responsibilities that help employees to be more focused and effective on the job. EAP Services include confidential counseling for personal and work problems (in-person, telephone, video) and online information and resources.

- Since 2019, veteran employees have had access to the Veteran Support Program (VSP), which delivers support and resources specific to the welfare and resilience of the veteran workforce. The CBP veteran workforce encounters unique challenges specific to geographic dislocation from U.S. Department of VA resources, including obstacles to accessing care as a direct result of CBP's duty locations. In response, the CBP VSP established multiple regionally-based initiatives to bridge the gap to care, including: (1) developing a network of duty-location based field coordinators, (2) partnering with non-profits to provide veteran-based peer support, and (3) establishing a collaborative inter-agency partnership with VA to deliver needs-based support via deployment of clinicians to emergent events impacting veterans, streamlining enrollment processes, and sequestering designated appointment times at VA regional medical centers to overcome scheduling conflicts and delayed treatment. These initiatives have had a direct, positive impact by ensuring the CBP veteran workforce has immediate access to medical and mental health services.

- ICE ERO also developed a portfolio focused on ERO's military veterans which make up one-third of the workforce, as well as their families and colleagues, with the goal to create a community of veterans and provide immediate support to help address the various aspects of military service-related benefits, issues, concerns, and recommendations. In the last year, ERO facilitated a series of focus groups consisting of ERO's veterans at all levels with the goal of identifying and mitigating veterans' challenges with their transition from military to civilian service. Numerous informational materials were developed to ensure understanding of veteran rights and resources. Furthermore, a series of lunch and learn events were organized and hosted by some of the most knowledgeable experts on veteran topics, within and outside of ICE, including the VA.

- In 2020-2021, ICE Enforcement and Removal Operations (ERO) assessed and realigned its 25 areas of responsibility (AORs) to create a more efficient and effective operational structure by making geographically more compact AORs

5



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

with a more balanced workload distribution. The new alignment included establishing four new AORs, dissolving one AOR, shifting boundaries of 11 AORs, and retaining the same area and boundaries of 12 AORs. Shifting AOR boundaries removed counties or entire states from AORs with higher workloads and added them to AORs comprised of smaller workloads to more equitably dispersed and balanced workloads. The disparate workload distribution placed an undue burden and strain on agency staff.

- ICE also worked to advance or implement multiple technical solutions and alleviate the strain on frontline personnel. These initiatives included, but are not limited to:
    - ○ Deployment of the ICE Air Operations Charter Application to streamline flight scheduling;
    - ○ Update to the Field Office Appointment Scheduler, to include mobile access and walk-in appointment features;
    - ○ Deployment of several dashboards to enhance data accessibility and analysis capabilities; and
    - ○ Release of the Executive Office for Immigration review Court Date Scheduler to reduce time spent scheduling hearings.

    This was accomplished while also: (1) continuing to make improvements to existing systems such as the Enforce Alien Removal Module, Electronic Post Order Custody Review to meet changing operational demands, and (2) sustained work to ensure user understanding of system capabilities, through the creation of comprehensive training materials.

- In August 2021, ICE ERO partnered with the U.S. Marshals Service (USMS) to conduct a workforce survey to assess the overall state of employee wellness and help to identify potential resources for its employees. ERO has utilized the results of the USMS National Survey for Public Safety Personnel survey to address significant and pressing mental health challenges within the workforce, through a time-sensitive and multi-pronged approach, including the acquisition of the Headspace App, the nationwide rollout of a mindfulness training course, the facilitation of a "Mindful Mondays" weekly mindfulness session, and a concentrated focus on supporting ERO's military veterans and their families.

- In June 2022, ICE ERO deployed free Headspace App subscriptions to its entire workforce. Headspace is a mindfulness and meditation app that was identified to help employees as they face extraordinary challenges in the face of an ongoing global pandemic, an increase nationally in officer deaths, and the historic border challenge. It offers a range of resources to help manage stress, ease depression, reduce anxiety, and cultivate peace of mind on and off the job to positively impacts mental, physical, and emotional health.

6



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- ICE ERO developed a comprehensive, modern, and intuitive intranet library of information, tools, and other resources to support the wellbeing and morale of employees. This initiative included webpages dedicated to Wellness and Resilience, Awards and Employee Recognition, and Communication and Engagement Resources that is part of a broader campaign to strengthen workforce communication.

In addition, DHS leadership is concerned about the OIG's use of its "workforce challenge survey" results to support conclusions that CBP's and ICE's current method of managing staffing is unsustainable and negatively impacting the health and morale of law enforcement personnel. Leadership recognizes that the OIG stated its survey was broad and that it did not use the survey as the sole basis of support for its findings; however, the Department remains concerned about repeated references to the survey results throughout the report, especially given the low response rate to the survey. DHS believes these results are generally misleading and not necessarily representative of the workforce issues that frontline law enforcement personnel may be experiencing along the SWB. Also, DHS does not believe the survey results are reliable and valid because:

- Contrary to OIG's representation in Appendix A, "Objective, Scope, and Methodology" of the draft report, OIG's audit does not appear to fully comport with certain relevant U.S. Government Accountability Office (GAO) auditing standards,[1] because of apparent deficiencies in OIG survey planning, design and administration, and

- Nowhere in Appendix A—nor elsewhere in the draft report—does DHS find any discussion about consideration of best practices and guidelines for survey design and administration, such as those highlighted in (1) Office of Management and Budget (OMB) standards and guidelines for statistical surveys, which document the professional principles and practices that Federal agencies are required to adhere to and the level of quality and effort expected in all statistical activities,[2] and (2) OMB's information quality guidelines' requirements for ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by the Federal Government.[3]

---

[1] GAO, "Government Auditing Standards," (also known as "Generally Accepted Government Auditing Standards" (GAGAS) or colloquially as the "Yellow Book") GAO-18-568G, dated July 2018 (with Limited Technical Updates made in April 2021) (https://www.gao.gov/yellowbook).
[2] OMB, Office of Information and Regulatory Affairs (OIRA), "Standards and Guidelines for Statistical Surveys," dated September 2006 (https://www.whitehouse.gov/wp-content/uploads/2021/04/standards_stat_surveys.pdf).
[3] OMB, "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility and Integrity of Information Disseminated by Federal Agencies," dated February 22, 2022 (67 FR 8452-8460).
https://www.gpo.gov/fdsys/pkg/FR-2002-02-22/pdf/R2-59.pdf.

7



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

For example, Generally Accepted Government Auditing Standards (GAGAS) require audit organizations to assign personnel—including any specialists—to engagements who before beginning work on the engagements, collectively possess the competence (including being knowledgeable about the specific GAGAS requirements and having the skills and abilities to proficiently apply that knowledge).[4]  GAGAS also states that the use of specialized audit methodologies or analytical techniques, such as the use of complex survey instruments, may necessitate the use of a specialist.[5]  Further, GAGAS cites the importance of evaluating survey design and administration, to assist auditors in determining the objectivity, credibility, and reliability of self-reported information about existing conditions or programs.[6]  In addition, OMB standards and guidelines for statistical surveys state:

> When undertaking a survey, an agency should engage knowledgeable and experienced survey practitioners to effectively achieve the goals of the standards.  Persons involved should have knowledge and experience in survey sampling theory, survey design and methodology, field operations, data analysis, and dissemination as well as technological aspects of surveys.[7]

Appendix A of OIG's draft report, however, does not describe the use of any specialist or other knowledgeable and experienced survey practitioner in the design and administration of OIG's survey.  DHS believes that the use of such a person was warranted given the aforementioned criteria cited and, for example, the complexities involved with surveying all CBP and ICE law enforcement personnel across the United States (approximately 53,000 individuals) and interpreting the responses received from only 9,311 individuals (a very low 18 percent).  OIG has not identified any steps it took to mitigate the potential for nonresponse bias since opinions of those individuals who chose to respond may be different—in meaningful ways—than those who did not respond.  We understand that OIG sent the survey to all CBP and ICE law enforcement officers across the country to provide an equal opportunity to respond.  To account for nonresponse bias, however, OMB says that agencies should:  (1) design surveys to ensure that results are representative of the target population so that they can be used with confidence to inform decisions, and (2) conduct nonresponse bias analyses when response rates or other factors introduce the potential for bias.[8]

Also, we understand that the OIG primarily developed the survey based on benchmarking the types of questions asked during different CBP and ICE surveys, Federal Employee Viewpoint Surveys, and a review of OIG hotline complaints.  Additionally, the OIG

---

[4] GAO GAGAS "Yellow Book" Sections 4.01, 4.02, 4.03, 4.04, and 4.12
[5] GAO GAGAS "Yellow Book" Sections 4.13 and 4.23p.
[6] GAO GAGAS "Yellow Book" Section 8.106
[7] OMB OIRA Standards Page 2
[8] OMB OIRA Standards Sections 1.3, and 3.2.

8



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

indicated that its survey was administered at various points in time by different individuals using two different instruments. It is unclear, however, whether the OIG ensured the survey functioned as intended by conducting a pretest or using a version of the survey that was previously successfully implemented, an important step as highlighted by OMB.[9]

In addition, while OIG's draft report acknowledges that CBP and ICE, and their program offices (i.e., USBP, Office of Field Operations (OFO), ERO, and Homeland Security Investigations) have different missions, operating environments, and workforce concerns, the audit team apparently only relied on a simple judgmental review of an "optional free-text field" to identify themes related to the workforce and their effect on staff health, safety, and morale.[10] It is unclear what, if any, additional steps OIG used for designing and evaluating the results of the survey to account for these different groups. OMB standards and guidelines note best practices for survey design which include identifying the sampling frame, sampling unit used, sampling strata, and criteria for stratifying or clustering the target population, among other things.[11]

It is important to note that GAGAS also requires auditors to perform additional procedures when limitations or uncertainties in evidence exist that are significant to the audit findings and conclusions and to describe the scope of the work performed and any limitations so that report users can reasonably interpret the findings, conclusions, and recommendations in the report without being misled.[12] Further, OMB standards states agencies should "evaluate the quality of the data and make the evaluation public to allow users to interpret the results of analyses.[13] Overall, DHS believes the validity and reliability of the survey results used in this draft report are at best questionable given apparent deficiencies with OIG's survey planning, design, and administration.

DHS leadership is also concerned that Appendix D, "Prior DHS OIG and GAO Reports," of OIG's draft report is misleading as presented. Specifically, DHS believes OIG's simple listing of 25 previously published reports dating back nearly seven years without providing any additional substantive context or analysis logically tying this past work to OIG's current work creates the impression that all of the Department's past challenges along the SWB continue to plague the Department today, which is not true.

---

[9] OMB OIRA Standards Section 1.4

[10] The survey also did not differentiate between voluntary and forced overtime, and CBP believes it important to clarify that many officers request overtime. There are specific rules in place as determined by the local collective bargaining agreements regarding the order in which overtime is to be offered, and a specific hierarchy of which officers have the right of first refusal. Any decrease or elimination of overtime would seriously and significantly impact every aspect of CBP OFO's operation, from facilitation of legitimate travel, and travel to safeguarding the nation. It would also impact the morale of many officers who desire overtime.

[11] Stratification involves dividing or arranging the target population into homogeneous units. See OMB Standards Section 1.22.2

[12] GAO Yellow Book Sections 8.110 and 9.12

[13] OMB Standards Section 3.5

9



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

For example, 80 percent (41 of 51) of the recommendations made in the reports listed
have already been closed with OIG or GAO agreement. As you know, DHS strictly
adheres to a self-imposed practice of not closing any OIG or GAO recommendations
without first reaching agreement with the respective audit organization to do so. This
provides Congress and the public added confidence that appropriate actions were taken to
implement these recommendations or otherwise resolve any disagreements.

In addition, the OIG and GAO agree that the Department's completed, on-going, and/or
planned actions will address 9 of the remaining 10 recommendations, which are
considered "open and resolved." In November and December 2022, CBP requested that
five (5) of these recommendations be closed and is awaiting OIG responses, and ICE
plans to request OIG closure of two (2) more recommendations by March 31, 2023.
GAO is keeping two (2) recommendations open to monitor how the Department's actions
impact employee engagement over time. The one remaining OIG recommendation is
"open and unresolved" (i.e., in disagreement), although it had previously been considered
"open and resolved," because of OIG dissatisfaction with CBP taking longer than
originally planned to complete certain verification, validation, and accreditation; and
other activities needed to fully address the recommendation. CBP's current estimated
completion date (ECD) is June 30, 2023.

The draft report contains three (3) recommendations, two (2) with which DHS concurs
(Recommendations 2 and 3) and one with which the Department non concurs
(Recommendation 1). Enclosed find our detailed response to each recommendation.
DHS previously submitted technical comments addressing several accuracy, contextual,
and other issues under a separate cover for OIG's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please
feel free to contact me if you have any questions.

Enclosure

10



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Enclosure:  Management Response to Recommendations
Contained in Project No. 22-011-AUD-CBP, ICE**

OIG recommended that the CBP Commissioner and the ICE Director coordinate with the
Secretary of Homeland Security to:

**Recommendation 1:**  Contract with an independent, federally funded research and
development center to complete a full assessment of the staffing needs at the Southwest
border and strategically implement recommendations based on the assessment.  The
assessment should:

- review existing staffing models and methodology for deploying personnel at the
  Southwest border and across the country and the impact of continuously relying on
  details and overtime to temporarily fill staffing gaps; and
- include factors within and outside of DHS' control that are affecting workloads
  and exacerbating staffing challenges to identify solutions the components can
  accomplish as well as those that require congressional action.

**Response:**  Non-concur.  CBP and ICE currently use internal models on which it bases
staffing levels requests.  Specifically, USBP's staffing model is comprised of four
separate sub-models which are subject to independent verification, and CBP OFO
currently uses a model as a first step in determining workload level at each of its POE, to
include sudden or unplanned needs, as appropriate.  Like all government agencies, CBP
and ICE can request additional staffing through the federal budget process, and staffing
levels are based on funding for positions through both appropriations and user fees.  For
example, as part of the recently enacted FY 2023 budget,[14] DHS requested funding to
hire 300 new USBP agents and 300 new USBP Processing Coordinators to improve
border processing.

As noted above, USBP's staffing model is comprised of four defensible workforce sub-
models that delineate personnel requirements for USBP.  In developing the four sub-
models, USBP incorporated statistically sound methodologies to ensure that the results
were demonstrable and repeatable.  USBP regions can vary greatly due to the operational
environment, different types of threats, and different levels of available resources.
Considerations were made to ensure that the model accounted for the operational realities
and uniqueness of the different USBP regions.  USBP continuously reviews the model to
ensure that all significant variables that affect staffing requirements are considered, to
include ever-changing threat levels and investments in other mission capabilities that

---

[14] https://www.dhs.gov/sites/default/files/2022-03/22-%201835%20-
%20FY%202023%20Budget%20in%20Brief%20FINAL%20with%20Cover_Remediated.pdf

11



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

augment personnel requirements. Currently, the USBP's staffing model takes into account 37 key essential mission functions that are performed by USBP personnel.

CBP OFO's workload staffing model (WSM) is a decision support tool and is the initial, data-driven, step in the process of quantifying workload at the POEs. This model is completely reviewed and updated each year with data from the previous fiscal year. The activities covered in the model (currently numbering approximately 100) are reviewed and evaluated each year to remove any activities that are no longer performed, update processes to reflect current operating conditions, and add new activities in response to changing conditions and emerging threats. Further, the WSM is independently assessed, and the model routinely audited and reviewed by outside stakeholders such as DHS and OMB. Accordingly, it is updated each year to reflect the changing activities and emerging threats in all environments, to include air, sea, and land. Throughout the year, CBP OFO uses the WSM to inform other modeling efforts that estimate the impact to throughput and enforcement of various scenarios to determine the best way to respond to sudden and unplanned needs.

Currently, there is no funding available for the issuance of a contract for the completion of an assessment of the staffing needs on the SWB. Developing an additional staffing model would be a duplicative effort given the activities described above and, if implemented, would require the use of resources from other mission critical operations. Currently, the WSM models approximately 100 activities that cover the entirety of a CBP OFO Officer's duties from pre-primary, primary, secondary, and seizure processing.

DHS requests that the OIG consider this recommendation resolved and closed.

OIG recommended that the CBP Commissioner and the ICE Director:

**Recommendation 2:** Complete after-action reviews of the SBCC's completed priorities to determine whether its efforts are working as intended.

**Response:** Concur. In February 2022, the Secretary of Homeland Security established the SBCC to coordinate planning, operations, engagement, and interagency support to address increased migration. Accordingly, the priority mission of the SBCC is to coordinate DHS resources (i.e., officers, agents, and DHS Volunteer Force personnel) to help decompress points along the border; more efficiently process migrants; and avoid breakdowns in the immigration system. The SBCC takes a "whole-of-government" approach to this mission, as it includes participation of personnel from DHS, Department of Defense, and the U.S. Department of Health and Human Services, who meet on a regular basis to discuss policies, challenges, and potential solutions affecting the southwest border.

12



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The SBCC operates under the Incident Command System (ICS).  Under this system, the Senior Coordination Official (SCO) who oversees the SBCC is responsible for coordinating the needs of the Lead Field Coordinators (LFCs), such as personnel and resources to address the situation on the ground along the SWB.  LFCs are CBP Senior Executive Service level managers with a vast operational background and extensive CBP experience who have operational oversight of the SWB.  There are currently three LFCs in place, and they oversee the following areas of responsibility:

- Region 9:  California and Arizona;
- Region 6:  New Mexico and Texas; and
- Region 4:  Florida.

The SCO is also responsible for coordination efforts between all U.S. Government entities to focus on a "whole of government" approach to address the SWB events. Currently, the SCO meets with the CBP Commissioner and staff at least three times per week, as appropriate, and works in close coordination with the Commissioner's staff daily.  As a part of these meetings, the SBCC looks at all ongoing efforts to see where efficiencies can be gained, measures ongoing efforts in place, and provides situational updates.  Additionally, the SCO meets with the Secretary of Homeland Security and staff weekly, or more as needed, to provide status updates on the six pillars of the DHS Border Security Plan,[15] and other SBCC focus areas.

These pillars include the following key areas:

- Pillar 1:  Surging resources, including personnel, transportation, medical support, and facilities to support border operations.

- Pillar 2:  Increasing processing efficiency and moving with deliberate speed to mitigate potential overcrowding at USBP stations and to alleviate the burden on the surrounding border communities.

- Pillar 3:  Administering consequences for unlawful entry, including removal, detention, and prosecution.

- Pillar 4:  Bolstering the capacity of non-governmental organizations (NGOs) to receive noncitizens after they have been processed by CBP and are awaiting the results of their immigration removal proceedings.

---

[15] https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf

13



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- Pillar 5: Targeting and disrupting the transnational criminal organizations and smugglers who take advantage of and profit from vulnerable migrants and who seek to traffic drugs into our country.

- Pillar 6: Deterring irregular migration south of our border, in partnership with the U.S. Department of State, other federal agencies, and nations throughout the Western Hemisphere, to ensure that we are sharing the responsibility throughout the region.

The SBCC has several sections that are directly responsible for work related to the above-mentioned priorities: (1) Operations, (2) Planning, (3) Logistics, (4) Finance, (5) Medical, (6) Movement Coordination Cell, (7) Intelligence, and (8) External Affairs.

To further track and evaluate its actions, SBCC produces various reports that articulate its work, which are disseminated to all U.S. Government members working on SWB operations. Some examples of these reports are the Federal Coordination Plan (FCP) and the Senior Leadership Brief (SLB).

The FCP is updated weekly and includes SBCC objectives, roles and responsibilities, and priorities tracking. The priorities tracker is divided into several areas that cover both international and domestic policy, processing efficiencies, resourcing, non-governmental organization capacity building, engagement, and messaging. In these action areas, the SBCC lists items that need to be addressed, the responsible party, and the ongoing status of each action. Completed actions are logged in the report to provide a historical comprehensive list of actions taken that directly influenced the activities along the SWB. Each day, the SBCC sends the SLB to senior leadership across the Department. This report is focused on the operational picture of each day and the support efforts the SBCC is coordinating across the SWB.

DHS requests that the OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 3:** Communicate the duties and responsibilities of the SBCC more effectively to frontline staff.

**Response:** Concur. Effective communication is the bedrock of any program and is vital to workforce morale. CBP and ICE believe that it is important for personnel to understand their roles and leadership's expectations. The SBCC operates under the ICS structure and communicates daily with the entire chain of command, as appropriate, to ensure all stakeholders have the most up-to-date information. Although the SBCC does not communicate directly with frontline staff, it communicates with the LFCs to streamline and manage the flow of information across the SWB. The LFCs have Emergency Operations Centers (EOC) that are comprised of staff from OFO and USBP

14



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

who come from the frontline areas they support. In addition, the LFC, generally a USBP Sector Chief or OFO Director of Field Operations, works with the EOC to communicate their needs, which are then sent to the SBCC for further coordination and action; and information that is received by the SBCC is sent to the LFC EOCs, who further communicate with the field on a regular basis. CBP and ICE will develop a messaging campaign to help the workforce understand the role of the SBCC, the specifics of their duties, and leadership's expectations. This messaging campaign will include such items as a video posted to the CBP and ICE websites, frequently asked questions posted for the workforce to use, and potentially other materials, as appropriate. ECD: April 28, 2023.

15



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix C
## Immigration Processing Pathways (with Title 42)



*Source:* DHS OIG review of DHS SBCC strategic planning (2022)



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix D
## Prior DHS OIG and GAO Reports

Since 2016, DHS OIG and GAO have issued 25 reports on challenges CBP and ICE face along the Southwest border.  As of January 2023, 80 percent (41 of 51) of DHS OIG's and GAO's recommendations from these reports are closed. These reports described struggles with recruiting and hiring, proper management of resources and planning during migrant surges, and poor employee morale.

## DHS OIG

- *CBP Needs Better Data to Justify Its Criminal Investigator Staffing* – (OIG-16-75; April 2016) https://www.oversight.gov/sites/default/files/oig-reports/OIG-16-75-Apr16.pdf

- *DHS Is Slow to Hire Law Enforcement Personnel* – (OIG-17-05; October 2016) https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-05-Oct16.pdf

- *Major Management and Performance Challenges Facing the Department of Homeland Security* – (OIG-17-08; November 2016) https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-08-Nov16.pdf

- *CBP's Border Security Efforts – An Analysis of Southwest Border Security Between the Ports of Entry* - (OIG-17-39; February 2017) https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-39-Feb17.pdf

- *ICE Deportation Operations* - (OIG-17-51; April 2017) https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-51-Apr17.pdf

- *Challenges Facing DHS in Its Attempt to Hire 15,000 Border Patrol Agents and Immigration Officers* – (OIG-17-98-SR; July 2017) https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-98-SR-Jul17.pdf

- *Management Alert – CBP Spends Millions Conducting Polygraph Examinations on Unsuitable Applicants* – (OIG-17-99-MA; August 2017)



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-17-99-ma-080417.pdf

- *Major Management and Performance Challenges Facing the Department of Homeland Security* – (OIG-18-11; November 2017) https://www.oig.dhs.gov/sites/default/files/assets/2017-11/OIG-18-11-Nov17.pdf

- *Most Complaints About CBP's Polygraph Program Are Ambiguous or Unfounded* – (OIG-18-68; July 2018) https://www.oig.dhs.gov/sites/default/files/assets/2018-07/OIG-18-68-Jul18.pdf

- *DHS Training Needs for Hiring 15,000 Border Patrol Agents and Immigration Officers* – (OIG-19-07; November 2018) https://www.oig.dhs.gov/sites/default/files/assets/2018-11/OIG-19-07-Nov18.pdf

- *Management Alert – CBP Needs to Address Serious Performance Issues on the Accenture Hiring Contract* – (OIG-19-13; December 2018) https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-19-13-nov18.pdf

- *Border Patrol Needs a Staffing Model to Better Plan for Hiring More Agents* – (OIG-19-23; February 2019) https://www.oig.dhs.gov/sites/default/files/assets/2019-03/OIG-19-23-Feb19.pdf

- *Capping Report: CBP Struggled to Provide Adequate Detention Conditions During 2019 Migrant Surge* – (OIG-20-38; June 2020) https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-38-Jun20.pdf

- *DHS' Fragmented Approach to Immigration Enforcement and Poor Planning Resulted in Extended Migrant Detention during the 2019 Surge* – (OIG-21-29; March 2021) https://www.oig.dhs.gov/sites/default/files/assets/2021-03/OIG-21-29-Mar21.pdf

- *DHS Needs to Enhance Its COVID-19 Response at the Southwest Border* – (OIG-21-60; September 2021) https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-60-Sep21.pdf



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- *Rio Grande Valley Area Border Patrol Struggles with High Volumes of Detainees and Cases of Prolonged Detention but Has Taken Consistent Measures to Improve Conditions in Facilities* – (OIG-22-22; January 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-02/OIG-22-22-Feb22.pdf

- *CBP Border Patrol Stations and Ports of Entry in Southern California Generally Met TEDS Standards* – (OIG-22-26; February 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-02/OIG-22-26-Feb22.pdf

- *Yuma Sector Border Patrol Struggled to Meet TEDS Standards for Single Adult Men but Generally Met TEDS Standards for Other Populations* – (OIG-22-38; April 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-04/OIG-22-38-Apr22.pdf

- *El Paso Sector Border Patrol Struggled with Prolonged Detention and Consistent Compliance with TEDS Standards* – (OIG-22-57; August 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-57-Aug22.pdf

- *U.S. Border Patrol Faces Challenges Administering Post-Apprehension Outcomes Consistently Across Sectors* – (OIG-22-68; September 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-09/OIG-22-68-Sep22.pdf

- *U.S. Border Patrol Screened Migrants at the Southwest Border but Could Strengthen Processes* – (OIG-22-71; September 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-09/OIG-22-71-Sep22.pdf

## GAO Reports

- *Border Patrol: Issues Related to Agent Deployment Strategy and Immigration Checkpoints* – (GAO-18-50; November 2017) https://www.gao.gov/assets/gao-18-50.pdf

- *U.S. Customs and Border Protection: Progress and Challenges in Recruiting, Hiring, and Retaining Law Enforcement Personnel* – (GAO-18-487; June 2018) https://www.gao.gov/assets/gao-18-487.pdf



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- *DHS Employee Morale: Some Improvements Made, but Additional Actions Needed to Strengthen Employee Engagement* – (GAO-21-204; January 2021) https://www.gao.gov/assets/gao-21-204.pdf

- *Border Security: CBP's Response to COVID-19* – (GAO-21-431; June 2021) https://www.gao.gov/assets/gao-21-431.pdf



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix E
## Workforce Challenge Survey Results



CBP and ICE Resource Allocations Audit
OIG Project No. 22-011-AUD-CBP, ICE

**Are you:**   USBP / OFO / ERO / HSI        **Duty Location:** _____

**Job Title/Grade:** _____        **Length of Time at Location:** _____

**Length of Time in Component:** _____        **Are you a supervisor?** Yes / No

*Please Circle
Your Response*

1) Were you detailed/TDY to the Southwest border within the last 5 years?  (if **No**, skip to
   Question 2)   ........................................................................................................... Yes / No
   a.  Original Duty Location: _____
   b.  How many details have you had at the Southwest border in the last 5 years?....... _____
   c.  Did you volunteer for your most recent detail?.................................................... Yes / No
   d.  Were your duties during the detail the same as your regular duties?.................... Yes / No
   e.  Were you adequately trained for any new duties while on detail?......................... Yes / No

2) Have you been required to work extra or double shifts within the last year?.................. Yes / No
   a.  within the last 30 days?.................................................................................... Yes / No

3) Is your current work location adequately prepared and staffed during 'normal'
   operations?............................................................................................................. Yes / No
   a.  during migrant surges? ..................................................................................... Yes / No

4) Have you been required to take on responsibilities outside of your normal/traditional
   duties in your current work location?  (for example, during migrant surges)................. Yes / No
   a.  If yes, what kind of responsibilities _____

5) Have your duties increased so much in your current work location that you cannot
   utilize your physical fitness opportunities?................................................................ Yes / No

6) Does your current work location foster a culture of accountability (holding staff and
   supervisors responsible for their duties and actions)?................................................. Yes / No

7) Are promotions in your current work location based on merit?....................................... Yes / No

8) Are employees' opportunities for relocation or reassignment fair and reasonable? ......... Yes / No

9) Are employees in your current work location adequately protected from health and
   safety hazards on the job?........................................................................................ Yes / No

10) In your current location are you supported to carry out the duties and responsibilities
    you were hired for?.................................................................................................. Yes / No

11) Do you plan on separating from your current agency within the next year?.................... Yes / No

***Survey responses will only be reported in aggregate and will not be attributable to any single person.***

Note: "TDY" in question 1 means *temporary duty assignment,* another term for detail.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Workforce Challenge Survey Participation Breakdown by Subcomponent

| Subcomponent | Number of Respondents |
|---|---:|
| Office of Field Operations | 3,176 |
| U.S. Border Patrol | 2,917 |
| Enforcement and Removal Operations | 1,873 |
| Homeland Security Investigations | 1,325 |
| Respondent did not report subcomponent | 20 |
| **Total** | **9,311** |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## CBP Survey Results

| Survey Question | Yes | No | No Selection |
|---|---|---|---|
| Have you been required to work extra or double shifts within the last year? | 61% | 39% | – |
| ... within the last 30 days? | 39% | 58% | 3% |
| Is your current work location adequately prepared and staffed during 'normal' operations? | 29% | 71% | – |
| ... during migrant surges? | 10% | 88% | 2% |
| Have you been required to take on additional responsibilities outside of your normal/traditional duties in your current work location? (for example, during migrant surges) | 49% | 50% | 1% |
| Have your duties increased so much in your current work location that you cannot utilize your physical fitness opportunities? | 55% | 44% | 1% |
| Does your current work location foster a culture of accountability (holding staff and supervisors responsible for their duties and actions)? | 54% | 45% | 2% |
| Are promotions in your current work location based on merit? | 37% | 60% | 3% |
| Are employees' opportunities for relocation or reassignment fair and reasonable? | 47% | 50% | 3% |
| Are employees in your current work location adequately protected from health and safety hazards on the job? | 55% | 44% | 1% |
| In your current location are you supported to carry out the duties and responsibilities you were hired for? | 61% | 38% | 1% |
| Do you plan on separating from your current agency within the next year? | 25% | 74% | 1% |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## ICE Survey Results

| Survey Question | Yes | No | No Selection |
|---|---|---|---|
| Have you been required to work extra or double shifts within the last year? | 56% | 43% | 1% |
| ... within the last 30 days? | 32% | 66% | 1% |
| Is your current work location adequately prepared and staffed during 'normal' operations? | 39% | 61% | 1% |
| ... during migrant surges? | 11% | 88% | 1% |
| Have you been required to take on additional responsibilities outside of your normal/traditional duties in your current work location? (for example, during migrant surges) | 59% | 40% | 1% |
| Have your duties increased so much in your current work location that you cannot utilize your physical fitness opportunities? | 52% | 47% | 1% |
| Does your current work location foster a culture of accountability (holding staff and supervisors responsible for their duties and actions)? | 57% | 41% | 2% |
| Are promotions in your current work location based on merit? | 41% | 55% | 4% |
| Are employees' opportunities for relocation or reassignment fair and reasonable? | 54% | 43% | 3% |
| Are employees in your current work location adequately protected from health and safety hazards on the job? | 65% | 34% | 1% |
| In your current location are you supported to carry out the duties and responsibilities you were hired for? | 59% | 40% | 1% |
| Do you plan on separating from your current agency within the next year? | 22% | 76% | 1% |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix F
## CBP and ICE Southwest Border Staffing and Attrition in FYs 2019-2022

| Fiscal Year | Authorized Staffing | On Board | Turnover | Attrition Rate |
|---|---|---|---|---|
| **CBP Border Patrol** | | | | |
| FY 2019 | 18,116 | 16,731 | 1,016 | 6.1% |
| FY 2020 | 18,132 | 16,878 | 945 | 5.6% |
| FY 2021 | 16,415 | 16,726 | 961 | 5.7% |
| FY 2022* | 16,414 | 16,654 | 758 | 7.4% |
| **CBP OFO ** ** | | | | |
| FY 2019 | 7,302 | 7,248 | 330 | 4.8% |
| FY 2020 | 7,600 | 7,751 | 334 | 4.3% |
| FY 2021 | 7,600 | 7,824 | 361 | 4.9% |
| FY 2022* | 7,601 | 7,816 | - | - |
| **ICE ERO*** ** | | | | |
| FY 2019 | 1,620 | 1,437 | 74 | 5.2% |
| FY 2020 | 1,629 | 1,491 | 62 | 4.2% |
| FY 2021 | 1,617 | 1,444 | 82 | 5.6% |
| FY 2022 | 1,616 | 1,414 | 53 | - |
| **ICE HSI*** ** | | | | |
| FY 2019 | 1,587 | 1,511 | 74 | 4.9% |
| FY 2020 | 1,574 | 1,477 | 74 | 5.0% |
| FY 2021 | 1,556 | 1,430 | 88 | 6.1% |
| FY 2022 | 1,588 | 1,387 | 55 | - |

*Source*: CBP and ICE staffing and attrition data
* CBP Staffing data for FY 2022 is as of the last pay period in April 2022 (May 7, 2022).
** Attrition rate for OFO is the average rate for Southwest border offices.
*** No complete FY 2022 attrition rate exists for ERO and HSI because the data is through the end of April 2022 and the fiscal year had not ended when we requested the information.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix G
## Timeline of Shifting Policies

**January 25, 2017**

**Executive Order No. 13767**
**Executive Order No. 13768**
Deploy all lawful means to secure the
Southwest border and enforce the
immigration laws.

**June 20, 2018**

**Executive Order No. 13841**
Policy of the Administration to rigorously
enforce immigration laws.

**December 20, 2018**

**Migrant Protection Protocols**
DHS announces the use of Section 235(b)
(2)(C) of the Immigration and Nationality
Act (INA).

**March 20, 2020**

**Title 42**
CDC issued an order under Title 42 to
combat the spread of COVID-19.

**January 20, 2021**

**Executive Order No. 13768 Revoked**

**February 2, 2021**

**Executive Order No. 13767 Revoked**
**Executive Order No. 13841 Revoked**

**June 1, 2021**

DHS Secretary issued a memo terminating
MPP

**August 13, 2021**

U.S. District Court of the Northern District
of Texas ordered the Department to
"enforce and implement MPP in good faith."

**October 29, 2021**

DHS Secretary issued a second memo
terminating MPP

**December 6, 2021**

MPP is expanded and DHS begins enrolling
undocumented migrants and asylum
seekers

**May 20, 2022**

Federal judge blocks the administration
from lifting Title 42

**June 30, 2022**

Supreme Court ruled that the Secretary has
the discretion to terminate MPP

**August 8, 2022**

DHS commits to ending the
implementation of MPP

*Source*: DHS OIG analysis of immigration policies



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix H
## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary, Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" box. If you cannot access our website, call our hotline at
(800) 323-8603, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305