IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA,

       *Plaintiff*,

    v.

GREG ABBOTT, in his capacity as
GOVERNOR OF THE STATE OF TEXAS,
and THE STATE OF TEXAS,

       *Defendants*.

Case No. 1:23-cv-00853-DAE

**PLAINTIFF UNITED STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

JAIME ESPARZA
UNITED STATES ATTORNEY

JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Kimere.kimball@usdoj.gov
Andrew.knudsen@usdoj.gov

Dated:  August 16, 2023

*Counsel for the United States of America*

# TABLE OF CONTENTS

Table of Contents .................................................................................................................... ii
Table of Authorities ............................................................................................................... iii
    I.  The United States Will Likely Succeed on the Merits. ........................................................ 2
        A.  The RHA Bars Unauthorized Structures and Obstructions in These Waters. .............. 2
        B.  Texas Violated Clause 2 of RHA Section 10 by Building a "Structure." ..................... 6
        C.  Texas Violated Clause 1 of Section 10 by "Obstruct[ing] … Navigable Capacity." ... 8
        D.  The Self-Defense Clause Does Not Excuse Texas's Section 10 Violations. ................ 9
    II.  Preliminary Injunctive Relief Is Warranted to Address Texas's RHA Violations. ........... 11
    III. The United States Requests Only a Return to the Status Quo. ......................................... 12
Conclusion ............................................................................................................................. 13

## TABLE OF AUTHORITIES

**UNITED STATES CONSTITUTION**

U.S. Const. art. I., § 8, cl. 15..................................................................................................10

U.S. Const. art. I., § 9, cl. 2......................................................................................................9

U.S. Const. art. I, § 10, cl. 3................................................................................................9, 10

U.S. Const. art. IV, § 4............................................................................................................10

**CASES**

*Atlee v. Union Packet Co.*,
   88 U.S. 389 (1874)................................................................................................................7

*Arizona v. United States*,
   567 U.S. 387 (2012)....................................................................................................... 10, 12

*Byrum v. Landreth*,
   566 F.3d 442 (5th Cir. 2009) ................................................................................................3

*California v. United States*,
   104 F.3d 1086 (9th Cir. 1997) ........................................................................................9, 10

*Chiles v. United States*,
   69 F.3d 1094 (11th Cir. 1995) ..............................................................................................9

*Clark v. Martinez*,
   543 U.S. 371 (2005)..............................................................................................................9

*Economy Power & Light v. United States*,
   256 U.S. 113 (1921)..............................................................................................................5

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ............................................................................................12

*New Jersey v. United States*,
   91 F.3d 463 (3d Cir. 1996)..............................................................................................9, 10

*Newbold v. Kinder Morgan SNG Operator, L.L.C.*,
   65 F.4th 175 (5th Cir. 2023)..................................................................................................6

*Nova Health Sys. v. Edmondson*,
  460 F.3d 1295 (10th Cir. 2006) ............................................................................................. 12

*Padavan v. United States*,
  82 F.3d 23 (2d Cir. 1996) .................................................................................................. 9, 10

*Sanitary Dist. of Chicago v. United States*,
  266 U.S. 405 (1924) (Holmes, J.) ............................................................................................ 12

*Texas v. United States*,
  106 F.3d 661 (5th Cir. 1997) ................................................................................................... 10

*Tugwell v. Eagle Pass Ferry Co.*,
  9 S.W. 120 (Tex. S. Ct. 1888) .................................................................................................. 4

*United States v. Appalachian Elec. Power Co.*,
  311 U.S. 377 (1940) ............................................................................................... 2, 4, 5, 6

*United States v. Raven*,
  500 F.2d 728 (5th Cir. 1974) .................................................................................................... 8

*United States v. Republic Steel Corp.*,
  362 U.S. 482 (1960) ................................................................................................................. 8

*United States v. Rio Grande Dam & Irrigation Co.*,
  174 U.S. 690 (1899) ................................................................................................................. 5

*Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*,
  875 F.2d 453 (5th Cir. 1989) .................................................................................................... 8

*Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) ................................................................................................. 12

**STATUTES**

33 U.S.C. § 401 ............................................................................................................................ 3

33 U.S.C. § 403 ......................................................................................................................... 1, 2

**CODE OF FEDERAL REGULATIONS**

33 C.F.R. § 329.4 ......................................................................................................................... 6

**DICTIONARY**

*Boom*, Webster's International Dictionary of the English Language (1890) ............................. 7

*Boom*, Webster's Revised Unabridged Dictionary (1913) ............................................................7

*Dolphin*, Webster's Academic Dictionary 178 (1895) ....................................................................7

Texas admits that, without federal authorization, it deployed a roughly 1,000-foot barrier consisting of "multiple interconnected buoys tethered via chains to concrete blocks placed on the bed of [a] river," the Rio Grande, that traces the United States' border with Mexico and is "about 200 feet wide where the buoy system is placed." Defs' Mem. in Opp. to Mot. for Prelim. Injunction ("Opp.") 5-6 (ECF 26). Texas asserts that it did this "to repel [an] invasion" of persons and goods, *id.* at 20, by "discourag[ing] passage" across the Rio Grande, *id.* at 15. Yet, in Texas's view, the United States is unlikely to succeed on the merits of its Rivers and Harbors Act ("RHA") Section 10 claim because Texas's Floating Barrier is somehow neither a "structure" nor an "obstruction," and because this particular stretch of the river is not a "navigable river, or other water of the United States." 33 U.S.C. § 403. Texas's contradictory position is without merit, and this Court should reject it.

That is reason enough to award preliminary relief. Texas offers no rebuttal to Point II of our motion, namely, that this Court should award a preliminary injunction to halt a Section 10 violation irrespective of whether the United States establishes irreparable injury beyond that bare violation. Regardless, the United States has shown such injury, chiefly to its relations with Mexico—and that was *before* it was determined that the bulk of Texas's Floating Barrier intrudes into the sovereign territory of Mexico. This intrusion would have been avoided had Texas simply done as Congress instructed: seek and obtain federal authorization before placing any structures or obstructions in the Rio Grande.

Because the Floating Barrier is a single, integrated structure traversing an international boundary, the safest and soundest means for its prompt removal is for a single actor to remove the barrier. The Government of Mexico has requested the United States to effectuate removal of the entire Floating Barrier and associated materials, including the portion of the barrier located in

1

Mexico's territory, in coordination with the IBWC.  An order of this Court requiring removal of the entire Floating Barrier by Defendants, in coordination with the IBWC and the U.S. Army Corps of Engineers, will enable the United States to fulfill that request.  Thus, the Court should order Defendants to remove the entirety of their Floating Barrier in coordination with the IBWC and the Corps, and to refrain from building any such barrier elsewhere in the Rio Grande while litigation proceeds.

**I.      The United States Will Likely Succeed on the Merits.**

The United States is likely to succeed in showing two violations of RHA Section 10: Texas built a "structure" in a "navigable river, or other water of the United States," and additionally "obstruct[ed]" the "navigable capacity" of that water.  33 U.S.C. § 403.  Texas claims first that the United States has not carried its evidentiary burden to show that the Rio Grande, at this specific location, is a water to which Section 10 applies.  Texas alternatively argues that its 1,000-foot anchored barrier is neither a structure nor an obstruction.  Lastly, Texas suggests there may be an implied exemption to the RHA's prohibition for actions the State takes in furtherance of its own position on immigration.  All of Texas's arguments are wrong.

**A.      The RHA Bars Unauthorized Structures and Obstructions in These Waters.**

Section 10 prohibits all unauthorized structures and obstructions in "any of the waters of the United States," including but not limited to "navigable river[s]."  33 U.S.C. § 403.  It is well established in Supreme Court caselaw that whether a water is "navigable" under Section 10 is not determined *solely* by considering any *current* use in interstate or foreign commerce.  Rather, navigability may be established based on evidence of a water's historic use or its susceptibility to future use if reasonable improvements were made to the river to facilitate such commerce.  *See, e.g., United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407-09 (1940).  Contrary to Texas's assertion, the United States has carried its burden at this stage to show that the Rio

2

Grande in the vicinity of Eagle Pass, Texas, is a water subject to Section 10. *See Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ("A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes."). The Rio Grande forms a nearly 1,250-mile border between the United States and Mexico (our largest foreign-trade partner), is the central subject of numerous treaties and federal statutes, is a vital water source for the populace and the commerce of several States, and is historically important to commerce and travel in the Southwest. Texas's position that it is not a "water of the United States" is untenable.

*First*, the Court cannot ignore clear evidence that Congress itself, contemporaneous with the RHA's enactment, acknowledged the navigability of this specific portion of the Rio Grande. Congress had only recently enacted "[a]n act to authorize the construction of a bridge over the Rio Grande River between the cities of Eagle Pass, Texas, and Piedras Negras, Mexico," 23 Stat. 29 (1884), that required "free navigation of said river" to be maintained, and gave federal courts jurisdiction over cases "arising from an obstruction or an alleged obstruction to the free navigation thereof," *id.* § 3, 23 Stat. 30 (Reply Att. 11, numbering consecutively from the Motion's attachments). This statute—a precursor to Section 9 of the RHA, 33 U.S.C. § 401— created a regime closely resembling RHA Section 10, with the specific aim of protecting the Rio Grande's navigability near Eagle Pass. *See also* 42 Stat. 1482 (1923) (Reply Att. 12) (authorizing bridge at Eagle Pass only "at a point suitable to the interest of navigation").[1] Congress used comparable language regarding navigability in a pair of 1890 statutes authorizing other commercial projects—electric wires and water pipes—in the same vicinity. 26 Stat. 495

---

[1] Any contrary views of current members of Congress (*e.g.*, as expressed by Congressional amici, ECF 24) do not countermand the legal effect of prior Congresses' duly enacted statutes.

(1890); 26 Stat. 502 (1890) (Reply Atts. 13, 14). Congress's sensitivity to navigation within this portion of the Rio Grande reflected the actual navigation and commercial activity there in that era.[2]  "When once found to be navigable, a waterway remains so." *Appalachian Elec. Power Co.*, 311 U.S. at 408.

*Second*, the Fort Worth District of the U.S. Army Corps of Engineers, the agency that Congress charged with administering and enforcing Section 10, has determined that the entirety of the Rio Grande in its jurisdiction (which includes Eagle Pass) is "navigable," within the meaning of the RHA.  Mot. for PI Att. 8 (Shelnutt Decl. ¶ 3).  Joseph Shelnutt, the Corps' witness whom Texas deposed, cited the agency's 1975 navigability study as the basis for the Corps' designation of this sweep of the river as navigable. Opp. Ex. F, Shelnutt Dep. at 48:23-49:25, 50:6-23.  That 1975 study notes intervening economic and policy developments have prioritized other river uses and purposes over commercial navigation, including construction of the Amistad Dam to divert significant quantities of water for irrigation.  Reply Att. 15, Shelnutt Decl. ¶ 5 & Ex. B at 15-16.  The study nonetheless finds that the Rio Grande could be navigated by some vessels in its then-current "natural condition," *i.e.*, with its flows reduced by dams as noted. *Id.* ¶ 5 & Ex. B at 19.  It also finds that "[i]mprovement of the Rio Grande [beyond its natural condition] for navigation is physically possible"—in the *entire* river within the District's

---

[2] *See, e.g.*, Decl. of Joseph L. Shelnutt (Aug. 15, 2023), attaching Navigability Study, Rio Grande, Tributaries, and Lakes, Rio Grande Basin, River Mile 275.5-610.0 (March 31, 1975) ("1975 study") at 26 (pdf page number) (Reply Att. 15, Ex. B at 26) (noting "a great deal of interest … pertaining to transportation of goods along the Rio Grande" in the nineteenth century and citing sources reflecting that steam navigation was then possible well upstream of Eagle Pass, including one expedition that navigated "up to Babbitt's Falls (probably RM 750)," more than 100 miles upstream of Eagle Pass, and another account that the river was considered navigable for "500 miles above Laredo," again well above Eagle Pass); *see also Tugwell v. Eagle Pass Ferry Co.*, 9 S.W. 120 (Tex. S. Ct. 1888) (resolving dispute between ferry companies operating between Eagle Pass and Piedras Negras).

4

jurisdiction, not just the reach near Eagle Pass—but would require the "judicious[] use[]" of the Amistad and other dams.  *Id.* ¶ 6 & Ex. B. at 19; *see also Appalachian Elec. Power*, 311 U.S. at 407 ("A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken.").  Though Congress's policy choices have rendered some portion of an otherwise navigable river "incapable of [commercial use] according to present methods, either by reason of changed conditions or because of artificial obstructions," the river remains "navigable" if riparian commerce is susceptible to restoration if the policy choices change—even after "a hundred years."  *Economy Power & Light v. United States*, 256 U.S. 113, 123-24 (1921).

The Corps' 1975 navigability study also noted long-standing legal precedent regarding the navigability of the Texas stretch of the Rio Grande, including the United States' treaties with Mexico governing the use of the river,[3] as well as the Supreme Court's decision in *United States v. Rio Grande Dam & Irrigation Co*., 174 U.S. 690 (1899).[4]  *See* Reply Att. 15, Ex. B at 23-25.

---

[3] *See, e.g.,* 9 Stat. 928 (Reply Att. 16) (the 1848 Treaty of Guadalupe Hidalgo, declaring that, at all points below New Mexico, "the navigation of" the Rio Grande "shall be free and common to the vessels and citizens of both countries; and neither shall, without the consent of the other, construct any work that may impede or interrupt, in whole or in part, the exercise of this right; not even for the purpose of favoring new methods of navigation."); 10 Stat. 1034 (Reply Att. 17) (the 1853 Gadsden Treaty, identifying the upstream limit of applicability of the 1848 Treaty at a longitudinal and latitudinal point that is near El Paso and well upstream from Eagle Pass, Texas).

[4] In *Rio Grande Dam*, the Supreme Court found it unnecessary to determine if a company's proposal to dam the river upstream, in New Mexico, violated the 1848 and 1853 treaty provisions, as the United States had an independent duty "to preserve, for [its] own citizens, the navigability of its navigable waters."  *Id.* at 700-01.  The amicus brief of members of Congress cites the Supreme Court's remand in *Rio Grande Dam* for further factual development as a reason not to award a preliminary injunction here. ECF 24 at 6.  But the Court did not remand for a determination of navigability of the *Texas* stretch of the Rio Grande; indeed, the Court appears to have *assumed* navigability there.  *See* 174 U.S. at 708.

Regarding susceptibility for future commercial use, the Corps found that while there were no plans in 1975 to improve the Rio Grande for navigation throughout the jurisdiction of the Fort Worth District, the river's "natural and ordinary condition …, its volume of water, gradient and regularity of flow do not preclude future improvement for smaller commercial craft."  Reply Att. 15, Ex. B at 27.  That finding suffices to establish navigability.  *See Appalachian Elec. Power*, 311 U.S. at 409 ("Small traffic compared to the available commerce of the region is sufficient.").

Texas cites (Opp. 9) the Corps' regulations implementing the RHA's navigability standard but wrongly argues (Opp. 10) that a finding of navigability must rest on "existing uses of the waterway."  Navigable waters include those that "are presently used, *or have been used in the past, or may be susceptible for use* to transport interstate or foreign commerce."  33 C.F.R. § 329.4 (emphasis added).  That regulatory text is consistent not only with the Supreme Court cases cited above, but also Fifth Circuit precedent, *see Newbold v. Kinder Morgan SNG Operator, L.L.C.*, 65 F.4th 175, 181 (5th Cir. 2023) ("'[T]he extent of existing commerce is not the test' for navigability."), and the Sixth Circuit standard that Texas ostensibly adopts (Opp. 9).[5]

Therefore, the portion of the Rio Grande in the vicinity of Eagle Pass, Texas, is a navigable water to which the prohibitions of RHA Section 10's first and second clauses apply.

**B.    Texas Violated Clause 2 of RHA Section 10 by Building a "Structure."**

Texas's claim that its 1,000-foot floating barrier is not a "structure" is implausible.  Even Texas concedes that the catchall phrase "other structure" includes any structure that is "similar in nature to the preceding specific terms" (Opp. 16), including the term "boom."  Texas attempts to

---

[5] The Congressional amici concede that a "historically navigable river" that undergoes changed conditions due to man-made obstructions is still, under Supreme Court precedent, a "navigable river," and they fail to explain why changed conditions from the man-made dam diversions on the Rio Grande should be treated differently.  *See* ECF 24 at 8-9.

draw a "subtle," "directional distinction" (Opp. 14) between its Floating Barrier and a boom, based on Texas's (erroneous) assertion that a boom is always positioned perpendicular to the current, whereas the majority of Texas's Floating Barrier is positioned roughly parallel to the current. But even if a 90° rotation could suffice to render the Floating Barrier not a "boom," a mere difference in spatial orientation does not make it sufficiently *dissimilar* to a "boom" to remove the otherwise-covered structure from the scope of the RHA's prohibitions.

In any event, Texas's directional distinction is without merit. The essence of a "boom" is that it "obstruct[s] passage," *Boom*, Webster's International Dictionary of the English Language (1890), whether of vessels, logs, or—in the case of Texas's Floating Barrier—persons and goods. Obstruction of passage may occur laterally as well as longitudinally. For example, as Texas observes, a boom may "enclos[e] an area of water" without crossing a river. Opp. 15 (quoting *Boom*, Webster's Revised Unabridged Dictionary (1913)). Moreover, it is not hard to find descriptions and drawings of booms, contemporaneous with the RHA's enactment, that run longitudinally with the river. *E.g.*, *Atlee v. Union Packet Co.*, 88 U.S. 389, 392 (1874) (describing boom running parallel to shore between two piers); Frank Leslie, *The Great Log Jam*, Popular Monthly (July 1901), http://www.catskillarchive.com/rrextra/lgjam.Html (depicting boom running length of river, parallel to shore).

That the specific word "buoy" does not appear in Section 10 is irrelevant. The Floating Barrier is not an isolated "buoy" used to "*assist* navigation," Opp. 15, but a "buoy system" that, by virtue of its sheer size and composition, functions as a "physical barrier[]," *id.* at 6. And even if the floating barrier were merely a buoy, a "dolphin"—one of the structures explicitly barred by the Act—is defined to include "a buoy." *Dolphin*, Webster's Academic Dictionary 178 (1895).

7

Texas asserts (Opp. 17) that the Floating Barrier is too impermanent to comprise an RHA "structure." But its own declarants attest that moving the barrier would require "several weeks," heavy machinery, and $300,000. Opp. Ex. C, Flossman Decl. ¶¶ 6-7; Opp. Ex. B, Escalon Decl. ¶ 14. If that were enough to exempt a structure from RHA coverage, it would render the statute a nullity. To take one example, Texas's archetype of a "boom"—a "strong chain cable," Opp. 15—would be far too easily moved to be a structure covered by the Act.

In sum, Texas is in violation of Clause 2 of Section 10.

### C. Texas Violated Clause 1 of RHA Section 10 by "Obstruct[ing] … Navigable Capacity."

Texas argues (Opp. 12-13) that navigable capacity can only be considered in relation to present-day commerce. But "[t]he Supreme Court has encouraged a broad interpretation of a section 10 'obstruction,'" and the Fifth Circuit has approved the Corps' consideration of "possible future effects in navigable waters." *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 462-63 (5th Cir. 1989). The Floating Barrier is a threat to navigation, not just across the river but also up and down the river, as "whoever's steering [a] vessel would have to take note of and make sure they avoid it." Opp. Ex. F, Shelnutt Dep. 72:14-74:5.

Texas asserts without foundation (Opp. 13-14) that Section 10 prohibits only obstructions "extending out into rivers and set perpendicular to the current." That limitation does not appear in the text, and Texas cites no authority finding that an object did not obstruct a river because it was not so positioned. On the contrary, courts routinely find "obstruction" by objects that do not extend perpendicularly from the shore. The Supreme Court held industrial solids deposited into a river were an obstruction. *United States v. Republic Steel Corp.*, 362 U.S. 482, 485 (1960). The Fifth Circuit held that a sunken schooner was an obstruction. *United States v. Raven*, 500

F.2d 728, 731 (5th Cir. 1974).  If both "floating particles" and "an 83 ft. schooner" create obstructions, there is no doubt that the 1000-foot Floating Barrier does.

        **D.**       **The Self-Defense Clause Does Not Excuse Texas's Section 10 Violations.**

Texas argues (Opp. 18-21) that it constructed the Floating Barrier pursuant to the Self-Defense Clause, U.S. Const. art. I, § 10, cl. 3, because Texas purportedly is being "invaded," and that the Court accordingly must interpret the RHA to exempt Texas's facially unlawful conduct. This is not a "constitutional avoidance" defense, but a sweeping claim that States may ignore the will of Congress whenever their Governors unilaterally declare an "invasion."  Texas asks the Court not to "choos[e] between competing plausible interpretations of a statutory text"—its argument is divorced from and makes no reference to the RHA's words—but rather to "render [the] statute a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case."  *Clark v. Martinez*, 543 U.S. 371, 382 (2005). The RHA's text is not fairly amenable to Texas' construction, under which it could create *any* structure or obstruction in *any* water of the United States to fend off a self-declared invasion.

In any event, there are no constitutional concerns that bear on the interpretive question here because the political-question doctrine bars consideration of Texas's "invasion" allegation. Courts of appeals have uniformly held that what constitutes an "invasion" triggering the Self-Defense Clause is a nonjusticiable political question.  *See California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995).  Whether and when an "invasion" occurs is a matter of foreign policy and national defense, which the Constitution specifically commits to the federal government.  *See Padavan*, 82 F.3d at 28; *California*, 104 F.3d at 1091; *New Jersey*, 91 F.3d at 470.  That commitment is especially strong when the purported invasion also involves "the subject of

9

immigration and the status of aliens," which the Constitution assigns exclusively to Congress.[6] *Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *New Jersey*, 91 F.3d at 469.

In particular, "there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *California*, 104 F.3d at 1091; *accord New Jersey*, 91 F.3d at 470. For much the same reason, the Fifth Circuit has dismissed as nonjusticiable a claim that the United States' purported "fail[ure] to control illegal immigration" violated the Naturalization Clause, finding that there are no "judicially discoverable standards for determining whether immigration control efforts by Congress are constitutionally adequate." *Texas v. United States*, 106 F.3d 661, 664-65 (5th Cir. 1997).

Even if Texas's Self-Defense Clause argument were justiciable, it would fail. Immigration is not the kind of "invasion" contemplated by the Self-Defense Clause. An invasion is "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government."[7] *Padavan*, 82 F.3d at 28; *California*, 104 F.3d at 1091; *see Debates and Other Proceedings of the Convention of Virginia*, 302 (2d ed., 1805) (Reply Att. 18) (reflecting James Madison's understanding that "invasion" means "invasion from other states, as well as from foreign powers"). The Self-Defense Clause's narrow applicability is

---

[6] Amicus the Immigration Reform Law Institute ("IRLI") agrees that identifying an "invasion" is a political question, but wrongly asserts that as a result the Court *must accept* Texas's claim of invasion as valid. ECF 33 at 5-7. The Constitution does not commit this issue to Texas's sole discretion. Several constitutional provisions assign the *federal* government—not states—the authority to recognize and respond to invasions. *See* U.S. Const. art. I., § 8, cl. 15 (power to call forth militia), art. I, § 9, cl. 2 (power to suspend habeas corpus). Indeed, numerous courts have found (and IRLI concedes) that the Self-Defense Clause's corresponding provision at U.S. Const. art. IV, § 4 commits the question whether an invasion has occurred to the federal government. ECF 33 at 4, 5; *California*, 104 F.3d at 1091; *New Jersey*, 91 F.3d at 469.

[7] Texas tries to find support (Opp. 18) in Justice Scalia's partial dissent in *Arizona*. But even that opinion acknowledged the irrelevance of the Self-Defense Clause to Arizona's power to respond to unlawful immigration. 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part).

evident from the extraordinary powers it unlocks when triggered: A state that has been "actually invaded" may "engage in War," even without Congress's consent. U.S. Const. art. I, § 10, cl. 3; *cf.* ECF 33 at 7-8 (brief of amicus IRLI arguing that once Texas decides, in its sole discretion, that it has been "actually invaded," it is subject to no federal oversight of its "chosen means of waging war"). It is implausible that the Constitution would so substantially undermine its vesting of the war powers in the federal government by permitting states to unilaterally take these actions in response to immigration by individuals.

For all these reasons, the Court should reject Texas's invitation to write an "unlawful immigration" exception into the RHA, as it should reject the rest of Texas's merits arguments. The United States is likely to succeed on the merits.

## II.   Preliminary Injunctive Relief Is Warranted to Address Texas's RHA Violations.

Because this suit seeks to enforce a violation of a public-interest statute, the Court may grant a preliminary injunction based solely on the United States' likelihood of success on the merits. Mot. 12-13. Texas does not contest this principle in its Opposition and has therefore forfeited any arguments against it.

But to the extent this Court considers all the traditional equitable factors, each favors a preliminary injunction. Mot. 13-19. The irreparable harm to the United States if the Floating Barrier remains in place, or if Texas builds additional barriers, is far from "speculative." Opp. 21. The harm to the United States' conduct of foreign relations is *immediate* and *ongoing*, as the evidence shows.[8] Texas's conduct is already "the subject of diplomatic concern between Mexico and the United States," and has concretely disrupted the countries' cooperative efforts to manage the delivery of water to the United States. Quam Decl. ¶ 3; Pena Decl. ¶¶ 16-18, 25. Since the

---

[8] Texas also fails to dispute any harm to federal agency operations on the Rio Grande that the U.S. established in its opening motion. Opp. 21-22; *see* Mot. 3, 6-7, 15

11

United States filed its motion, removal of the Floating Barrier has remained a top-priority issue in foreign relations between the two nations, *see* Quam Decl. (August 15, 2023) ¶¶ 3, 4 (Reply Att. 19), and that concern has only been exacerbated by the knowledge that the bulk of this unlawful structure is actually located in Mexican territory, ECF 32.  That the harm might become *worse* without injunctive relief does not mean no harm is occurring now.  Only the prompt removal of the entire Floating Barrier will remedy this harm.

Finally, the public interest and balance of equities favor preliminary relief.  Mot. 16-19.  The United States is merely seeking to enforce Congress's clear command in Section 10 of the RHA.  Texas's invocation of "[c]onsiderations of federalism," Opp. 22, rings hollow in light of *Arizona*'s holding that states may not "undermine federal law" in pursuit of their own preferred immigration policies.  *See* 567 U.S. at 416.  "There is no question" that the United States' authority under the RHA "is superior to that of the States" to implement policies they allege will "provide for the welfare or necessities of their inhabitants." *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1924) (Holmes, J.).

**III.     The United States Requests Only a Return to the Status Quo.**

Texas contends (Opp. 8) that the United States carries a heavier burden because it seeks a "mandatory injunction" that "goes well beyond simply maintaining the status quo pendente lite." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).  On the contrary, the United States' motion seeks to restore the "last peaceable uncontested status existing between the parties before the dispute developed," which is the generally accepted meaning of status quo.  *See Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006); *cf. Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1144 (5th Cir. 2021).  The relevant status quo is the state of affairs *before* Texas deployed its unlawful barrier in the Rio Grande.

Developments since the United States' motion was filed do not alter the appropriateness of the relief requested in the Motion. While it is now clear that the Floating Barrier straddles an international border, it remains a single, integrated structure whose prompt and safe removal can best be effected in a single operation. The Government of Mexico has requested that the United States effectuate removal of the entire Floating Barrier and associated materials, including the portion of the barrier located in Mexico's territory, in coordination with the IBWC. An order requiring removal of the entire Floating Barrier by Defendants in coordination with the IBWC, as well as the Corps, will enable the United States to fulfill that request. This Court should so order. Further, as our Motion requests, the Court should enter prohibitory injunctive relief that prevents Texas from building additional structures in the Rio Grande (for which it has publicly announced plans) without authorization from the Corps.

## CONCLUSION

The Court should grant the United States' motion for a preliminary injunction.

Respectfully submitted,

Dated: August 16, 2023

JAIME ESPARZA
UNITED STATES ATTORNEY

 /s/ James E. Dingivan
JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel.)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

 /s/ Brian H. Lynk
BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section

P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov
Kimere.kimball@usdoj.gov

*Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I certify that on August 16, 2023, a copy of this filing was served on all counsel of record using this Court's electronic filing system.

/s/  *Brian H. Lynk*
Brian H. Lynk