**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| United States of America, *Plaintiff*, v. Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas, *Defendants*. | No. 1:23-cv-00853-DAE |

### DEFENDANTS' SURREPLY TO THE UNITED STATES' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Perhaps recognizing that its Rivers and Harbors Act theory is doomed, the United States remakes it on the fly. After filing a preliminary-injunction motion supported by eight declarations, ECF 5, the United States filed a "Notice" claiming the buoys cross the U.S.–Mexico boundary in violation of international treaties, ECF 30. The United States filed this after Texas responded, ECF 26, even though the IBWC conducted its survey almost *two weeks* prior. When it replied, the United States attached two new declarations, contending irreparable harm now flows from diplomatic disruption from the IBWC's "discovery." ECF 32. A new merits theory, fresh factual allegations, a novel foreign-relations harm—the United States seems never at a loss for new ideas.

**I.   The United States cannot increase its likelihood of success on the merits by cooking up new legal theories or new facts.**

In its motion, the United States pressed two theories under Section 10: that Texas's buoys (1) obstruct a navigable waterway and (2) are a covered "structure." It newly argues that the buoys violate treaty obligations. ECF 32; *see also* ECF 37 at 1, 10–11. It claims a waterway need not be "navigable" for the Act to apply. ECF 37 at 7–8. It agrees that buoys do not violate the Act if they do not become a buoy *system*. *Id.* at 12. And while conceding the existence of an "invasion" is a

1

nonjusticiable question, the United States insists Texas lacks authority to defend itself. *Id.* at 9–11.

**A.** The United States disclaims any need to conduct a navigability analysis based on the notion that "waters of the United States" need not be navigable. ECF 37 at 7. That is dubious after *Sackett v. EPA*, 143 S. Ct. 1322 (2023), and out of step with Section 10's repeated references to navigation, 33 U.S.C. § 403 ("navigable capacity," "navigable river," "navigable water"). Perhaps that is why the United States never develops this argument, leaning instead on a new, old study contending this stretch of the Rio Grande has potential to *become* navigable. Supreme Court precedent rejects that analytical framework. *See United States v. Republic Steel Corp.*, 362 U.S. 482, 483, 485 (1960) (assessing navigable use against present state of waterway). So, the United States ignores *Republic Steel* in its navigability discussion. And it refuses to face its own witnesses' concessions that this part of the river is *not* commercially navigable. ECF 26-5 at 12, 52–53; ECF 37-5 at 3.

The United States fails to bolster its case with the 1975 navigability study it located for its reply. First, the study found no verifiable past commercial navigation of the Rio Grande around Eagle Pass; no present commercial navigation there; and no plans for future commercial navigation—the study even references statements that there "has never been any 'practical navigation' between Roma . . . and El Paso," a 1000-mile distance that includes the Eagle Pass area. ECF 37-5 at 26–27; *see also id.* at 19 (noting "little likel[i]hood of change" and that any possible improvements' "economic justification appear[s] doubtful"). Second, despite the insistence that the Supreme Court "*assumed* navigability" in *United States v. Rio Grande Dam & Irrigation Co.*, ECF 37 at 10, the study recognized the opposite: The Court remanded—even though the Rio Grande may have been navigable in *some* portions—because navigability was a matter "requiring evidence, and to be determined by proof." ECF 37-5 at 24–25 (quoting *Rio Grande Dam*, 174 U.S. 690, 698 (1899)).

The argument that navigability is purely an exercise of the imagination proves too much. With enough time and effort, even Interstate 35 could be made into a navigable waterway. This is not what the countries envisioned when guaranteeing a mutual right to navigate the Rio Grande.

**B.** The United States also reinvents its legal theory with respect to Section 10's ban on "obstruction" and enumerated "structures." Finding the Act wanting, it urges this Court to review bilateral agreements between the United States and Mexico. ECF 37 at 10–11. The two countries have long allowed navigation along the Rio Grande. *See* 1848 Treaty, art. VII; 1853 Treaty, art. IV; 1884 Convention, art. V; 1944 Treaty, art. 3. But the United States never mentions how those agreements describe the navigability guarantee or when it is infringed.

For one thing, the United States and Mexico agreed that "[n]o artificial change in the navigable course of the river, by building jetties, piers, or obstructions which may tend to deflect the current or produce deposits of alluvium, or by dredging to deepen another than the original channel . . . or by cutting waterways to shorten the navigable distance, shall be permitted." 1884 Convention, art. III. These impediments hinder navigation up and down the river—not across it. That is why the countries agreed that "such common right [to navigation] shall continue without prejudice throughout the actually navigable main channels of the said rivers, from the mouth of the Rio Grande to the point where the Rio Colorado ceases to be the international boundary." 1884 Convention, art. V. It is also why the 19th- and 20th-century statutes the United States added in its reply concern obstructions "across" the Rio Grande. ECF 37-1, 37-2, 37-3, 37-4.

Next, the United States gives ground. "[A]n isolated 'buoy' " might be okay, "but a 'buoy system' " is not. ECF 37 at 12. But the bilateral agreements with Mexico foreclose this contention. For more than 150 years the countries have guaranteed: (1) a general right to navigate (2) up and

down the Rio Grande (3) where it is actually navigable. Simultaneously, those agreements bless buoy systems. Where dams form lakes, federal law directs IBWC to "establish in the artificial lakes, *by buoys or by other suitable markers, a practicable and convenient line* to provide for the exercise of jurisdiction." 1944 Treaty, art. 21 (emphasis added). This buoy system, moreover, serves not only to "assist navigation," but also to "*mark the boundary* for the application of the customs and police regulations of each country." *Id.* (emphasis added). This is consistent with the treaty's navigability guarantee, 1944 Treaty, art. 3, because buoys (including buoy systems) are not "obstructions." It is no surprise that they are missing from Section 10's detailed list of "structures."

**C.** On the treatment of foreign invasions, the parties agree that determining an "invasion" is a nonjusticiable political question. *Cf. Texas v. United States*, 106 F.3d 661, 666–67 (5th Cir. 1997). The United States cannot argue otherwise, having conceded that "there are no manageable standards" to apply. ECF 37 at 14–15. But the United States is wrong on States' authority to repel invasions. *Id.* at 14 (citing only Second, Third, Ninth, and Eleventh Circuit decisions).

The federal government must protect each State "against Invasion and . . . domestic Violence." U.S. Const. art. IV, § 4. On its face, this provision establishes two different rules for dealing with two different scenarios. For a "domestic" attack, States may seek help from the federal government ("on Application of the Legislature, or of the Executive"). For an "Invasion," however, States need not apply to the federal government. That comports with what the Constitution says elsewhere—a State may take certain measures "without the consent of Congress" if "actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3; *see Sveen v. Melin*, 138 S. Ct. 1815, 1826–27 (2018) (Gorsuch, J., dissenting).

Founding-era sources support this conclusion—including the United States' source. In the Virginia ratifying convention, James Madison "perceive[d] no competition in these clauses [art. I, § 10, cl. 3 and art. IV, § 4]." ECF 37-8 at 3. Instead, they attest "to a concurrence of the power" between federal and state governments. *Id.* As he put it: "Does this bar the States from calling forth their own militia? No—but it gives them a supplemental security to suppress insurrections and domestic violence." *Id.* Alexander Hamilton also took for granted that States had independent authority to suppress or repel invasions: "If the interposition of the general government should not be needed"—because a State could handle the matter itself—the provision for federal intervention "will be a harmless superfluity." The Federalist No. 43. The framers thus understood that the Constitution permitted a State to work alone or with the federal government to repel an invasion.

Just as the President has exclusive "authority to decide whether the exigency has arisen" for purposes of Article I, Section 8, Clause 15, *Martin v. Mott*, 25 U.S. 19, 29–30 (1827), so too the Texas Governor has exclusive authority to decide whether the exigency has arisen under Article I, Section 10, Clause 3, *Moyer v. Peabody*, 212 U.S. 78, 83–85 (1909). Because this authority "results from the nature of the power itself," and federal and state governments have the same or (as Madison put it) "concurren[t]" power to repel invasions, it makes no sense to treat good faith exercises of federal or state authority differently. *Sterling v. Constantin*, 287 U.S. 378, 399 (1932).

Texas has not argued that every illegal entry into Texas is an "invasion" or that States may invoke that authority via differing "position on immigration." ECF 37 at 7, 10. Texas acts to protect migrants from harm, as even the United States' witnesses recognize. *Cf.* ECF 26-5 at 25. But hostile non-state actors moving in open defiance of lawful state authority (mass entry of armed cartels trafficking human beings, illegal drugs, and guns) is an invasion the federal government refuses to

acknowledge. Justice Story himself understood that "[t]he southern states, being more peculiarly open to danger from this quarter, ought" to "be more particularly tenacious of a constitution" guarding against invasion—and "accession of alien residents" may create the threat Article IV, Section 4 guards against. 3 Story, Commentaries on the Constitution §§ 1815, 1819 (1833).

## II. The United States cannot claim irreparable diplomatic harm under treaty obligations with which it has not even bothered to comply.

All that leaves is the United States' new theory of irreparable harm—namely, that foreign and diplomatic relations with Mexico will be irreparably damaged and that compliance with the border boundary established by the IBWC is "a top-priority issue" that cannot wait. ECF 37 at 16–17.

Despite this show of concern for treaty obligations, the United States has not maintained compliance with them. Per bilateral treaty, IBWC "shall with appropriate precision delineate the international boundary on maps or aerial photographic mosaics." 1970 Treaty, art. II.C. IBWC must do so periodically and "in any event at intervals not greater than ten years." *Id*. The United States' declarants admit that "the current IBL delineation was recorded in 2009 as Minute 315." ECF 32-1 at 2; *see also id*. at 14 (indicating Exhibit B figure was mapped against a 2008 map). IBWC's "current" map thus expired under the treaty's terms in 2019.

After failing in its treaty obligations for *four years*, the United States cannot complain that the buoys present an emergency justifying an injunction today. Nor should courts rely on stale maps when the United States and Mexico agreed to "promptly" update those maps in recognition of the inevitable and natural "changes in the channels of th[e] rivers." 1970 Treaty, Preamble. Accordingly, even assuming IBWC applied a sound methodology in determining whether the buoy barrier crosses the international boundary as of 2009, neither government thought it was "a top-priority issue" to comply with its obligation to delineate the international boundary.

6

<div style="display: flex;">

<div>

Date: August 19, 2023

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

</div>

<div>

Respectfully submitted,

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Special Counsel
Tex. State Bar No. 00798537
patrick.sweeten@oag.texas.gov

RYAN D. WALTERS
Deputy Chief
Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**Counsel for Defendants**

</div>

</div>

### Certificate of Service

On August 19, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN