IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>GREG ABBOTT, in his capacity as GOVERNOR OF THE STATE OF TEXAS, and THE STATE OF TEXAS,<br><br>*Defendants*. | Case No. 1:23-cv-00853-DAE |

**PLAINTIFF UNITED STATES' POST-HEARING CLOSING ARGUMENT IN SUPPORT OF PRELIMINARY INJUNCTION**

JAIME ESPARZA
UNITED STATES ATTORNEY

JAMES E. DINGIVAN
  Assistant United States Attorney
  Texas Bar No. 24094139
United States Attorney's Office
Western District of Texas
601 N.W. Loop 410, Ste 600
San Antonio, TX 78216
(210) 384-7372 (tel)
(210) 384-7312 (fax)
James.dingivan@usdoj.gov

Dated: August 25, 2023

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Andrew.knudsen@usdoj.gov
Kimere.kimball@usdoj.gov

*Counsel for the United States of America*

The evidence presented in connection with the United States' Motion for Preliminary Injunction (ECF 5) establishes that the United States is likely to succeed on the merits of its claim that Texas violated Section 10 of the Rivers and Harbors Act (RHA), 33 U.S.C. § 403. Further consideration of the traditional equitable factors is unnecessary (Mot. 12-13), but if the Court considers them, the evidence establishes irreparable harm to the United States and that the balance of equities and the public interest favor a preliminary injunction. Finally, the evidence supports the United States' requested scope and timing of the injunction.

## I.     The United States is likely to succeed on the merits.

Based on all the evidence, the United States is likely to establish that Texas is violating Section 10—both its first clause ("obstruction . . . to the navigable capacity") and, independently, its second clause ("building of . . . structures"). 33 U.S.C. § 403. Conversely, Texas' unprecedented, far-reaching "invasion" defense is decidedly unlikely to succeed.

### A.     The relevant segment of the Rio Grande is a Section 10 "navigable river."

The United States is likely to succeed in establishing that the Rio Grande in the vicinity of Eagle Pass, Texas is a "navigable river" under Section 10.[1] Four Acts of Congress (*see* Exhibits G-45 to G-48) recognized, and enacted provisions to protect, the "navigability" of the Rio Grande in connection with authorizing bridges and other projects involving foreign commerce (electric wiring and water connections) between Eagle Pass and Piedras Negras, Mexico. *See* Reply 3-4 (ECF 37); Surreply 3 (ECF 41) (Texas conceding that these statutes "concern obstructions 'across' the Rio Grande" at Eagle Pass). This alone establishes the government's likelihood of success. *See Economy Power & Light v. United States*, 256 U.S.

---

[1] It is unnecessary for present purposes to decide whether the Rio Grande is a "water of the United States," 33 U.S.C. § 403, for reasons other than its navigability, such as its status as an international boundary river.

1

113, 124 (1921) (if historically navigable waters "are to be abandoned" due to changes in use or economic need, "it is for Congress, not the courts, so to declare"); *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 408 (1940) ("When once found to be navigable, a water remains so." (citing *Economy Power & Light*)).  Congress indeed has enacted "non-navigability" declarations for a number of waters, but not the Rio Grande.  33 U.S.C. §§ 21-59mm.

With respect to the larger segment of the Rio Grande over which the Corps' Fort Worth District exercises RHA regulatory jurisdiction, the Court heard Mr. Shelnutt's testimony about the District Engineer's March 31, 1975 navigability determination and the study underlying that determination.  G-34, G-35; Tr. 14-15.  These documents establish that the District Engineer properly determined the Rio Grande is an RHA navigable water from river mile 275.5—the boundary between the Fort Worth and Galveston Districts—to river mile 610.0, which is the boundary between the Fort Worth and Albuquerque Districts, about 135 miles upstream of Eagle Pass.  G-34 at 1, 2; G-35 at 14-15, 18.  Mr. Shelnutt testified that this 1975 determination is the Corps' basis for including the Rio Grande on its 2011 list of Fort Worth District RHA navigable waters.  Tr. 12-15; *see also* Compl. Att. 1.  He testified that the 1975 determination remains in effect and that he relies on it in his day-to-day work as a regulatory project manager for the District.  Tr. 50-51.  His testimony is consistent with a Corps regulation stating that "[a] determination of navigability, once made, applies … and is not extinguished by later actions or events." 33 C.F.R. § 329.4.  Mr. Shelnutt also confirmed that the Barrier is within the stretch of the Rio Grande subject to this determination.  Tr. 15.

The Corps' 1975 study provides evidence of the historic navigability of this segment of the Rio Grande, and its susceptibility of use in commercial navigation with reasonable improvements, where either suffices as a matter of law (Reply 2, 6).  The study found that "a

great deal of interest prevailed during the period between 1829-1882 pertaining to transportation of goods along the Rio Grande." G-35 at 18.  Although navigation "above Laredo up to Eagle Pass" was "impeded by rocks and ledges at low water stages," accounts from the era nonetheless "reveal sufficient interest and available commerce to accommodate river travel above Laredo." *Id.*  Historical accounts also indicate that the river was considered navigable by steam to points above river mile 610.0 and well upstream of Eagle Pass, if improvements were made to the river channel. *Id.* at 10, 18.  Keelboat navigation was successfully completed to about 1300 miles upstream from the mouth of the river—more than *800 miles* above Eagle Pass. *Id.* at 10. Ultimately, railroads supplanted commercial navigation in the study area. *Id.* at 18.

      With respect to the Rio Grande's "natural conditions" in 1975, the study observed that the river's natural flows were then (as they are now) reduced by diversion at multiple dams, including (since 1968) the Amistad Dam near the Fort Worth District's upper boundary.  G-35 at 7, 8; *see* G-33 ¶ 5 (Mr. Shelnutt's declaration of Aug. 16, 2023, explaining "natural condition" means "natural condition with flows altered by the Amistad Dam").  Even with these diversions, the study found that shallow draft boats can navigate the river during periods of sufficient flow (G-35 at 11); this remains true today, as several boats were in the vicinity during the Barrier's construction.  Tr. 17; G-26, G-27.  The study also found that "[i]mprovement of the Rio Grande for navigation is physically possible.  Storage in the Falcon and Amistad Reservoirs would have to be judicially used to provide sufficient flow for continuous navigation." G-35 at 11.

      This evidence demonstrates the United States is likely to prove that the full stretch of the Rio Grande within the Fort Worth District is navigable.  In *Economy Power & Light*, the Court affirmed decisions holding that the Desplaines River in Illinois was navigable for purposes of section 9 of the RHA.  256 U.S. at 115-17.  That river had not actually been used in commercial

navigation for a century at the time of the Court's review. *Id.* at 117-18. The Court emphasized that it could not, "without doing violence to [the] manifest purpose" of the RHA, "limit [the statute's] prohibition to such navigable waters as were, at the time of its passage, or now are, actually open for use." *Id.* at 124. Rather, navigable water status also applies to long unused rivers and streams that remain susceptible to use in commercial navigation if "improvements … [to] restore the usefulness of th[e] stream" are undertaken. *Id.*

In *Appalachian Electric Power*, the Court reversed decisions that erroneously denied the navigability of the New River in Virginia and West Virginia without considering evidence that improvements could make that river available for commercial navigation. 311 U.S. at 406-07. The Court's analysis of the river's Radford-Wiley's Falls segment is particularly instructive. Similar to the Rio Grande's upper reaches (*see* G-35 at 10, 18), in the 19th century the Radford-Wiley's Falls segment was navigable by shallow-draft keelboats ("eight feet wide, drawing two feet") and there was interest in making river channel improvements to facilitate such navigation. 311 U.S. at 417-18. These plans were abandoned due to changing economic conditions, with the Corps opining that improvements for navigation would be "cost prohibitive." *Id.* at 418; *compare* G-35 at 11 (acknowledging that the economic justification for re-purposing the Rio Grande's flows to support navigation "appear[ed] doubtful"). Nonetheless, the Court held that the Radford-Wiley's Falls segment was a navigable water based on its historic use and its improvability for easier keelboat navigation. 311 U.S. at 418. The Court emphasized that such a river does not lose its status as a navigable water merely because alternative uses in commerce for its flows—*e.g.*, for hydropower development—become economically favored over commercial navigation. *See id.* at 426. Such uses are "from the public's standpoint a by-product of the general use of the rivers for commerce." *Id.* Here, too, the current prioritization of Rio

Grande flows for other uses like power generation and irrigation (G-35 at 8, 28) over commercial navigation does not change that river's *legal* status as a navigable water subject to Section 10.

In sum, the evidence shows the United States is likely to succeed on this issue. To the extent Texas relies on the alleged absence of *current* commercial navigation, its argument is contrary to Supreme Court precedent. In any event, such an argument contradicts Texas's claim that its Barrier will prevent millions of dollars in illicit commerce from crossing the Rio Grande.

### B. Texas built a "structure" in violation of Section 10's second clause.

Section 10's second clause makes it unlawful to "build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in an RHA navigable water without a Corps permit. 33 U.S.C. § 403. The United States likely will succeed in showing that Texas built an unauthorized "structure" in the Rio Grande.

The evidence indicates that the Barrier is a qualifying "structure."[2] Texas's witness Mr. Flossman, who is familiar with the Barrier's design and construction, testified that it consists of a series of units of 3 attached buoys, which are linked together in the river to extend approximately 1,000 feet. Tr. 97-98. Each buoy unit includes a steel piece attached by metal chain to a concrete positioning anchor that weighs about 1,000 pounds, with a total of 75 such anchors attached to the Barrier. Tr. 97-98, 104, 107. The Barrier is also attached to 68 concrete block

---

[2] It is immaterial whether the Barrier would also constitute a "boom" (Opp. 14-16), although it likely would (Reply 6-7). The statutory clause plainly encompasses "structures" *other* than the listed types of marine construction. 33 U.S.C. § 403. Texas asserts (Opp. 16) that the *ejusdem generis* canon somehow constrains the Court from a straightforward application of the term "other structure." The Fifth Circuit has cautioned that this canon "is not a cast-iron rule" and is "*never* applied to defeat the real purpose of the statute." *United States v. Mackay*, 757 F.3d 195, 197-98 (5th Cir. 2014) (emphasis added). The Barrier need not precisely match any listed maritime item and is at least sufficiently similar to one or more listed items to satisfy this canon.

5

anchors weighing 3,000 pounds each.  Tr. 107; G-52 (photo in which Mr. Flossman identified both anchor types).  Mr. Flossman agreed that the Barrier is an "integrated system."  Tr. 104.  The Barrier is thus a "structure" within the meaning of the second clause.  Mot. 9-10; Reply 6-8.

Finally, Texas's argument that the Barrier is not "permanent" enough to be a structure lacks merit.  Reply 8.  The cases Texas cited for this proposition (Opp. 17) are inapposite.  Most concerned vessels, but no vessel is at issue here.  One case held that "rafts, logs, timber, boats and vessels" floating "loose and adrift" were not an "obstruction."  *United States v. Burns*, 54 F. 351, 363 (C.D.D.W. Va. 1893).  The Barrier is not "loose and adrift"; to the contrary, it is so heavily anchored to the riverbed that Mr. Flossman testified it is physically *incapable* of drifting.  Tr. 103-04.  Texas's construction of a single, "integrated system" linked by metal and chain and anchored by nearly 140 tons of concrete[3] satisfies any plausible "permanence" criterion.

### C.    The Barrier "obstruct[s] … the navigable capacity" of the Rio Grande.

Section 10's first clause prohibits "[t]he creation of any obstruction" to the "navigable capacity" of the river that is "not affirmatively authorized by Congress."  33 U.S.C. § 403.  The United States likely will succeed in establishing that Texas violated this clause as well.

Mr. Shelnutt testified that the Corps' regulations apply to "any other obstacle or obstruction."  Tr. 21 (citing 33 C.F.R. § 322.2).  He concluded after his site visit that the Barrier would constitute an "obstacle or obstruction" under the regulations because "it would [] impede the movement of a vessel [a]cross [the] river."  Tr. 21.  Texas's witness Mr. Flossman agreed that the Barrier would stop boats from crossing the river at the Barrier's location.  Tr. 106.  Mr. Flossman also acknowledged that while he refers to it as a "buoy system," his employer's website markets it as a "marine floating barrier."  Tr. 110; *see* G-57.  The evidence indicates that

---

[3] Sixty-eight 3,000-lb anchors + seventy-five 1,000-lb anchors = 279,000 pounds.  *See* Tr. 107.

6

the Barrier "interfere[s] with or diminish[es]" the river's capacity to be navigated. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 709 (1899); *see* Mot. 10-12, Reply 8-9.

      **D.**    **The United States is likely to succeed on the merits notwithstanding Texas's "invasion" defense.**

Texas is unlikely to succeed on its novel theory that Texas is exempt from RHA Section 10 because it is "engag[ing] in War" in response to an "actual inva[sion]." U.S. Const. art. I, § 10, cl. 3; *see* Opp. 18-21 (ECF 26); Surreply 4-6 (ECF 41). The doctrine of constitutional avoidance cannot apply to narrow the RHA's scope, as there is no plausible alternative interpretation of the statutory text that would permit Texas's conduct. Reply 9; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018). Instead, Texas claims that—based on its self-declared "invasion"—the Constitution empowers it to *ignore* the RHA (and, apparently, any other statute standing in its way). The Court should reject this assertion for at least three reasons.

First, appellate courts have uniformly held that whether a given set of facts amounts to an "invasion" is committed to the political branches of the *federal* government. Reply 9-10. Texas argues that *it* views the same facts differently than the political branches of the federal government, and that Governor Abbott's view that there is an "invasion" allows Texas to ignore Congress and its commands. To avoid "inappropriate interference in the business of the other branches" of the federal government, the Court should decline to consider Texas' unprecedented defense. *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990).

Second, as a matter of textual interpretation, neither immigration nor criminal activity is the kind of "invasion" the Constitution contemplates. Reply 10-11; *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996). Texas's contrary position relies on sources addressing states' power to address domestic *insurrection*, not *invasions*. Surreply 4-5.

7

Third, even if Texas *has* been "actually invaded," U.S. Const. art. I, § 10, cl. 3, the Constitution does not give Texas *carte blanche* to "take certain measures" that it unilaterally chooses, Surreply 4, in disregard of any inconsistent federal statute.  The constitutional provision on which Texas relies speaks only of "engag[ing] in War," and "war" has always meant "[a] contest between nations or states, carried on by force."  *War*, Noah Webster, American Dictionary of the English Language (1828); *see also* 3 J. Story, Commentaries on the Constitution §§ 1172, 1398 (1833).  Texas does not claim to be engaged in war with another political entity.  Nor does Texas attempt to show any actual conflict between its exercise of asserted self-defense power and the RHA.  Moreover, this clause prohibits states from engaging in war unless there is such exigency "as will not admit of delay."  U.S. Const. art. I, § 10, cl. 3.  That language is properly read as a whole, and in context, to apply only when a state lacks time to coordinate with the federal government, but here Texas *did* have time to seek federal authorization for its response to irregular migration and the asserted harms caused by cartels.  Texas has not claimed otherwise.

Given the novelty of Texas's argument—and the extraordinary implications of its claim of sole discretion to declare an actual invasion and unilaterally, and indefinitely, engage in conduct unbound by federal statutes—Texas is decidedly unlikely to succeed in its defense.

## II.     The traditional equitable factors all favor the United States.

The United States' likelihood of success is reason alone to grant a preliminary injunction.  Mot. 12-13.  But if resort to the usual equitable factors is necessary, those factors support relief.

The evidence shows that the Barrier is causing significant and ongoing harm to the United States' relations with Mexico. Mot. 14-15; Reply 11-12; G-22, G-24, G-36, G-37.  Hillary Quam, the State Department's "primary adviser and expert on all issues, initiatives,

8

negotiations and programs related to the U.S./Mexico border region," testified that the Barrier is a "major concern" for Mexico and "will have an adverse impact on U.S. foreign policy" if not removed expeditiously. Tr. 57, 67; G-24 ¶ 3. Specifically, Mexico remains concerned that the Barrier potentially obstructs and deflects the water of the Rio Grande in violation of the two governments' treaty, and this kind of issue can have implications for Mexico's sovereignty and its status as an equal partner to the United States. Tr. 67. Mexico has sent multiple diplomatic notes to the United States regarding its concerns about Texas's conduct and has directly raised its objections at the highest diplomatic levels. Tr. 61-65.

As long as the Barrier remains in place, it threatens Mexico's participation as a "willing partner" in aspects of the United States' agenda that require binational cooperation, including improving water deliveries from Mexico to Texas, improving border infrastructure, managing migration, countering drug and firearms trafficking, promoting sustainable economic and social development, and strengthening supply chains. Tr. 65, 68-71; G-24 ¶¶ 5-6. Those harms are not mere "speculation," Opp. 21, but are being felt now. The two nations are negotiating an emergency agreement to "provide more predictability to Texas farmers regarding their water deliveries from Mexico," Tr. 70, with a goal of concluding the agreement this year, G-22 ¶ 25. In light of Texas's conduct, Mexican officials cancelled a July meeting of these negotiations and "indicated that they are less inclined to conclude an Emergency Minute by the end of the year while the buoy barrier remains in place." Tr. 70; G-22 ¶¶ 17-18.[4]

---

[4] The Barrier also poses potential harm to federal agency operations on the Rio Grande. Both the U.S. Border Patrol and the International Boundary and Water Commission ("IBWC") carry out activities requiring the ability to freely navigate the river in boats. Mot. 6-7; Exs. G-8, G-21, G-22; *supra* at 6-7 (boats cannot pass through the Barrier). Texas has not disputed these harms.

The balance of equities likewise favors the United States. Congress has already struck the balance between the two parties' interests in the RHA, and the United States merely seeks to enforce Congress's command. Mot. 16-19; *cf. United States v. Locke*, 529 U.S. 89, 120 (2000) ("The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution." (citing *e.g.*, The Federalist Nos. 44, 12, 64.)). Moreover, without a preliminary injunction, Texas is likely to *continue* violating the RHA. Texas has announced plans to build additional barriers in the Rio Grande. Mot. 16. And Texas's unannounced decision to reposition the Barrier while this Motion was pending strongly indicates that, absent a court order, Texas will continue to ignore the RHA.

**III.     The Court should grant the United States' requested preliminary injunction.**

The Court should enjoin Texas from building new structures or creating new obstructions in any portion of the Rio Grande subject to the RHA without federal authorization and should also order Texas to remove the Barrier from the river within ten days of the Court's order. That is more than enough time for Texas to comply. Texas's recent efforts to move the Barrier in response to the IBWC's joint survey results demonstrate that it has the personnel and equipment standing ready to begin work in a few days. ECF 32 (notice of survey results filed Aug. 15, 2023); Tr. 102 (stating Texas began moving the Barrier on August 18th). And while Texas's witness Mr. Flossman claimed removing the Barrier would take "[a]pproximately three weeks," actions speak louder than words: even absent a court order, he testified that Texas repositioned the entire Barrier in "approximately three days." Tr. 108-09. Texas has not argued that ten days is too short a time to remove the Barrier, and the evidence does not support such an argument.

Respectfully submitted,

Dated:  August 25, 2023

| | |
|---|---|
| JAIME ESPARZA<br>UNITED STATES ATTORNEY | TODD KIM<br>ASSISTANT ATTORNEY GENERAL<br>Environment & Natural Resources Division |
| /s/ James E. Dingivan<br>JAMES E. DINGIVAN<br>  Assistant United States Attorney<br>  Texas Bar No. 24094139<br>United States Attorney's Office<br>Western District of Texas<br>601 N.W. Loop 410, Ste 600<br>San Antonio, TX 78216<br>(210) 384-7372 (tel.)<br>(210) 384-7312 (fax)<br>James.dingivan@usdoj.gov | /s/ Brian H. Lynk<br>BRIAN H. LYNK<br>  Senior Trial Counsel<br>  DC Bar No. 459525<br>ANDREW D. KNUDSEN<br>  Trial Attorney<br>  DC Bar No. 1019697<br>KIMERE J. KIMBALL<br>  Trial Attorney<br>  CA Bar No. 260660<br>U.S. Department of Justice<br>Environmental Defense Section<br>P.O. Box 7611<br>Washington, DC 20044<br>(202) 514-6187 (Lynk)<br>(202) 514-8865 (fax)<br>Brian.lynk@usdoj.gov<br>Andrew.knudsen@usdoj.gov<br>Kimere.kimball@usdoj.gov<br><br>*Counsel for the United States of America* |

11

## CERTIFICATE OF SERVICE

I certify that on August 25, 2023, a copy of this filing was served on all counsel of record using this Court's electronic filing system.

<i>/s/ Brian H. Lynk</i><br>
Brian H. Lynk