**United States District Court**
**Western District of Texas**
**Austin Division**

United States of America,

*Plaintiff*,

v.

Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas,

*Defendants*.

No. 1:23-cv-00853-DAE

**DEFENDANTS' CLOSING ARGUMENT**
**SUBMITTED IN OPPOSITION TO**
**MOTION FOR PRELIMINARY INJUNCTION**

The United States seeks a preliminary injunction forcing the State to allow untold numbers of cartel members to ford the Rio Grande onto Texas soil. That would be "an extraordinary remedy" indeed. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Even more so since "[t]he time pressures involved in a request for a preliminary injunction require courts to make determinations without the aid of full briefing or factual development." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 603 n.7 (1984) (Blackmun, J., dissenting). This is why a plaintiff *must* establish each and every element to win a preliminary injunction: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

The US falls far short of this high bar. Its own witnesses show it is unlikely to succeed on the merits—no evidence shows this stretch of the Rio Grande is navigable; no evidence shows the buoys "obstruct" any navigable capacity of the river; and no evidence shows the buoys are "booms" or "other structures" covered by Section 10 of the Rivers and Harbors Act. And even if there were such evidence, Texas has clear constitutional authority to defend its territory against the invasion that Governor Abbott has declared. As this Court acknowledged, such "political questions" are "not a purview of this Court." Tr. 90:10–11. This Court is therefore duty-bound to apply constitutional avoidance to reject the US's reading of the Rivers and Harbors Act.

What's more, although the Court refused to let Texas develop the record on the equities and public interest at the hearing on the US's motion, those factors overwhelmingly favor the State. No court has discretion to overlook such evidence. *See Winter*, 555 U.S. at 24 (courts "must pay *particular* regard for the public consequences in employing the extraordinary remedy of injunction" (emphasis added)). Texas was not permitted to ask the US's witness about "the 2.3

1

million . . . border encounters," the "600,000 . . . got-aways" at the border, "the importation of lethal fentanyl," "unlawful migration," or "cartel activity." Tr. 73–77. Failure to weigh such evidence would be reversible error. The Court should thus deny the preliminary injunction sought by the US. At most, only a more limited, prohibitory injunction would be proper—forbidding Texas from deploying additional buoys but allowing the buoys already deployed to remain in the river.

## I. The Rivers and Harbors Act Does Not Ban Buoys in the Rio Grande in Maverick County.

### a. The Corps lacks jurisdiction over this non-navigable stretch of the Rio Grande.

Navigability is a prerequisite to the Corps' jurisdiction under the Act and is determined segment by segment. *PPL Mont., LLC v. Montana*, 565 U.S. 576, 594 (2012); *cf. Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 451 (6th Cir. 1982) (rejecting jurisdiction over 36.5-mile river stretch). Corps regulations sensibly acknowledge that, at some point along its length, a river may change from navigable to non-navigable. 33 C.F.R. § 329.11(b). The Supreme Court already said as much about the Rio Grande. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899) (stating this river "is not navigable within the limits of the territory of New Mexico"). Binding precedent likewise repudiates the idea that the Rio Grande is navigable for the entire 1,200-mile stretch on the Texas-Mexico border. *See Puente de Reynosa v. City of McAllen*, 357 F.2d 43, 50–51 (5th Cir. 1966). Here, the relevant waterway is a 1,000-foot stretch near Eagle Pass.

To exercise jurisdiction over that segment, the US cannot rely solely on the Corps' self-serving assertion of jurisdiction over *300 miles* of the river in a 1975 Corps of Engineers navigability determination. G-34. The US cannot demand that the Court merely defer to that determination. Navigability is a fact question that "should be determined by evidence" in open court, not simply claimed by agency officials behind closed doors. *Rio Grande*, 174 U.S. at 698 (remanding for trial

2

court factfinding). Because "[j]urisdiction over . . . portions of" a river "is in controversy," the US must "prove" the disputed stretches are navigable. *Miami*, 692 F.2d at 451. Here, the Corps' 48-year-old navigability determination is allegedly based on a 1975 Corps of Engineers study that Corps employee Joseph Shelnutt found in the Corps' Ft. Worth office. Tr. 12:10–15:2. But Shelnutt—the US's only witness on this point—had "not read any technical aspects" of the study. D-6 at 50–52. The US will have its chance to defend its assertion of jurisdiction at trial. But the present record does not prove that the disputed segment is navigable.

Rather, the law and the facts show that the disputed segment is *non*-navigable. Congress's authority to pass the Act rests on the Commerce Clause, so covered waters must be "of practical service as a highway of commerce." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 124 (1921). They "must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce." *Miami*, 692 F.2d at 449–50. If commercial use is only "sporadic and ineffective," or "exceptional, and only in times of temporary high water," then the waters are non-navigable. *Id*. at 449. Commercial use is judged by the "customary mode of travel," *id*. at 451, for commercial shipping in the area, *United States v. Republic Steel Corp.*, 362 U.S. 482, 483–85 (1960). Evidence that people "waded or walked" through water hardly suggests commercial navigability. *United States v. Oregon*, 295 U.S. 1, 20–21 (1935). And just because small craft can cross bank-to-bank does not make it "a highway of commerce." *United States v. Crow, Pope & Land Enters.*, 340 F. Supp. 25, 34–35 (N.D. Ga. 1972).

Refusing to analyze navigability would contravene not only *Sackett v. EPA*, 143 S. Ct. 1322 (2023), and Section 10's repeated references to "navigable" waters, 33 U.S.C. § 403, but also the Act's genesis as an exercise of Congress's *Commerce* Clause power, U.S. CONST. art. I, § 8, cl. 3. If

3

the Act really did not require showing commercial navigability, then its constitutional "validity might well be questioned." *Leovy v. United States*, 177 U.S. 621, 633 (1900). The US's interpretation would also conflict with Texas's constitutional right to defend its territory against *invasion*, *see* U.S. CONST. art. I, § 10, cl. 3; *id.* art. IV, § 4; TEX. CONST. art. IV, § 7, which the US concedes is a nonjusticiable issue, *see* ECF 41 at 4–6. This Court must construe the Act to avoid such constitutional problems. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023).

At the hearing, the US called only one navigability witness, who repeatedly testified he had *never* seen commercial navigation in this stretch of river. Tr. 26:10–12; Tr. 31:20–23; Tr. 34:14–18. Joseph Shelnutt nevertheless deemed the waterway navigable—sight unseen—"just" because "a list" said it was. Tr. 34:19–25; Tr. 35:4–25. But even that list, Mr. Shelnutt agreed, relied on a study "more than four decades old" that admitted this stretch of the river had no commercial navigation. Tr. 44:17–21; Tr. 45:11–20; Tr. 46:1–6. That study notes that there "has never been any 'practical navigation' between Roma . . . and El Paso," a 1000-mile stretch that includes Eagle Pass; that only one "extraordinary" military expedition passed Roma but no "substantial items of commerce were shipped from this point"; that "actual accounts of commercial travel [were] lacking" because "[a]bove Laredo up to Eagle Pass . . . navigation was impeded by rocks and ledges"; and that the "present use test" couldn't justify navigability as there was "no commercial activity within the study area" in 1975. G-35 at 10, 18–19. Neither a one-off "exceptional" use, *Rio Grande*, 174 U.S. at 699, nor "military expeditions," *Miami*, 692 F.2d at 451, will suffice.

Nor does it matter that the US thinks—contrary to the 1975 study and Supreme Court precedent—that the river could someday *become* navigable. ECF 41 at 2 (citing *Republic Steel*, 362 U.S. at 483–85). Even assuming the possibility of improvement for *future* use may be considered,

the US entirely failed to prove that "the costs of improvement would be justified by the benefits to commercial transit in this area." *Lykes Bros. Inc. v. U.S. Army Corps of Eng'rs*, 821 F. Supp. 1457, 1464 (M.D. Fla. 1993), *aff'd*, 64 F.3d 630 (11th Cir. 1995); *Crow*, 340 F. Supp. at 35–36 (absent "these two crucial factors, the court cannot balance the opposing interests").

The 1975 study's legal analysis is equally unhelpful to the US. It relies on "treaties between the United States and Mexico together with the *Rio Grande River* case." G-35 at 17. But *Rio Grande* (and *Puente de Reynosa*, 357 F.2d at 50–51) rejected the idea that the entire river was navigable under treaties, which merely preserve free navigation where the Rio Grande is "actually navigable." ECF 41 at 3. The study's exhibits recognize the same. *See* G-35 at 76 ("treaties provide that the navigation of the *actually navigable* main channels of the river is made free and common"); *see also* ECF 41 at 2 (addressing US's statutes). Far from assuming navigability in *Rio Grande*, the Court remanded because navigability was a matter "requiring evidence, and to be determined by proof." *Id.* at 16–17 (quoting 174 U.S. at 698).

Other evidence tells the same story. Conditions are shallow, rocky, or even dry; full of sandbars and debris; and can be dangerous for watercraft. D-2 ¶¶ 4–5; D-4 at 10:7–17, 51:7–19. No commerce or trade activities exist in this segment. D-1 ¶¶ 3, 10; D-2 ¶ 7; D-6 at 15:5–7, 32:3–18, 46:24–47:20; D-4 at 11:1–12:8. Lawful activity is limited to shallow-water vessels like law-enforcement airboats. D-4 at 11:1–12:8; D-2 ¶ 6. Larger vessels cannot operate due to shallow conditions, sand bars, and islands. D-1 ¶ 10. "Hidden dangers" can "punch holes in the hull of a boat." D-2 ¶ 4. And crossing the river is illegal: it's lawful to cross the border *only* at a port of entry. *See* 8 U.S.C. § 1325; 19 U.S.C. § 1459.

    **b. The buoy system does not "obstruct" any (hypothetical) navigable capacity and is not a "boom" or "other structure."**

5

**1.** Even if this waterway were navigable, the US bears the burden of proving the buoy system presents an "*obstruction . . . to the navigable capacity*" of the Rio Grande. 33 U.S.C. § 403 (emphasis added); *see, e.g.*, *Miami*, 692 F.2d at 451. The issue is whether an activity "substantially diminishes the navigability of that stream within the limits of present navigability." *Rio Grande*, 174 U.S. at 710. "The question always is one of fact whether such appropriation substantially interferes with the navigable capacity within the limits where navigation is a recognized fact." *Id.* The "mere presence of an object in a navigable river does not necessarily" violate the Act. *Pillsbury Co. v. Midland Enters., Inc.*, 715 F. Supp. 738, 761 (E.D. La. 1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990). An object that "may only deter movements in commerce" will not do—it must "adversely affect[]" navigation such that it "tends to *destroy* the navigable capacity of one of the navigable rivers of the United States." *Republic Steel*, 362 U.S. at 487–88 (emphasis added). In short, it is insufficient to point to an object that a boater must simply note and navigate around.

The US failed to show the buoy system substantially diminishes the navigability of this waterway. Evidence shows the buoys do not obstruct travel up and down the river at the site. D-5 at 43:16–22; D-1 ¶ 9. Because its width "from bank to bank" is about 200 feet (maybe more according to a US witness, Tr. 32:15–17), any vessel "going up or down the River at the site of the floating buoys can easily navigate past them." D-1 ¶ 9; *see also* Tr. 106:3–13 (people can simply "go around [the buoys] if they choose"). Insofar as there is any navigation, it is available "up and down the river by all." D-1 ¶ 9. The US's own witness, Mario Gomez, testified the traffic he saw was limited to law-enforcement airboats, which could travel "up the river and down the river" since the buoys were merely "four-foot-diameter floating barriers." D-5 at 43:09–44:01. He noted the buoys do not run side-to-side to block traffic up- or down-river. *Id.* at 43:13–15. Instead, they run *parallel*

to the current to prevent illicit cross-border fording of the river. D-1 ¶¶ 6, 8.

**2.** Nor did Texas build "booms" or "other structures." 33 U.S.C. § 403. There was no action to "build or commence the building" of anything covered by the Act. The buoys were deployed in mid-July 2023. D-1 ¶¶ 5–17. Their design and placement are temporary; they may be dismantled and redeployed with machinery to lift and move the concrete anchoring blocks. D-3 ¶¶ 5–7. No construction or excavation—and no affixing, bolting, or attachment to the riverbed or shore—occurred during or after placement. Tr. 95–96; D-3 ¶ 6; D-1 ¶ 7. And testimony of Cochrane USA project manager Loren Flossman shows that, although the buoys will not drift on their own, they can be (and have been) repositioned intentionally in a matter of days. Tr. 102–03.

Section 10 of the Act bars "the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in navigable waters without a Corps permit. 33 U.S.C. § 403. Mr. Shelnutt's testimony forecloses any claim that the buoys qualify under the listed terms. Tr. 48:5–23 (agreeing that the buoys are not a "boom," a "pier," a "wharf," a "breakwater," a "weir," a "bulkhead," a "jetty," or a "dolphin"); D-6 at 61:22–23. Having conceded that the buoys do not fit within any of the eight items Congress enumerated, the US nevertheless insists the buoys fall within the catchall for "other structures." But the *ejusdem generis* canon bars overbroad readings of general words where Congress "has tacked on a catchall phrase at the end of an enumeration of specifics." Scalia & Garner, Reading Law 199 (2012). Such general terms encompass only what is similar in nature to the specific terms. *Yates v. United States*, 574 U.S. 528, 545–46 (2015). And what the enumerated terms here have in common—whether projecting from one shore to another (like a boom or weir), or jutting out from one shore into the water (like a pier, wharf, breakwater, bulkhead, or jetty), or spanning offshore waters (like a dolphin)—is that all of them are permanent

7

structures that may *stretch across* a waterway. *Cf. United States v. Burns*, 54 F. 351, 363 (C.C.D.W. Va. 1893). By design, Texas's buoys are impermanent and parallel to the water. ECF 41 at 3.

More importantly, this statutory text, like all statutory text, must be considered in context. *See Dubin v. United States*, 143 S. Ct. 1557, 1566 (2023). And context here sinks the US. For one thing, the Act prohibits obstructions across the board. But it elsewhere *mandates* placing buoys in navigable waters—without obtaining approval from federal authorities. *See* ECF 26 at 16–17 (citing 33 U.S.C. § 409). Clearly, no one thought buoys were impermissible structures.

That result makes sense, too, in light of bilateral treaties. The 1944 treaty with Mexico requires IBWC to place "buoys [in] a practicable and convenient line" to "mark the boundary" between the two countries in certain places along the Rio Grande. ECF 41 at 3–4 (citing 1944 Treaty, art. 21). It cannot be that whether an item qualifies as an impermissible structure turns on whether US or state officials placed it there. Given that treaty provisions mandate a buoy barrier while *also* guaranteeing a mutual right to navigation, buoys cannot be classed as structures barred by the Act. But even if buoys could fall within "other structures," such that Section 10's circa-1899 prohibition conflicts with the 1944 treaty, the latter provision would control. *See Cook v. United States*, 288 U.S. 102, 118–19 (1933) (enforcing later-enacted treaty over earlier-enacted statute).

## II. Balancing the Equities Requires Weighing a Litany of Harms to Texas and All Americans Against a Contrived Injury to US-Mexico relations.

Courts are not "mechanically obligated to grant an injunction for every violation of law when the United States is the plaintiff." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1360 (5th Cir. 1996) (cleaned up). Mandatory injunctions ordering a party to take certain actions rather than merely refrain from acting—like the one the US requests here—are "particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v.*

*Mathews*, 522 F.2d 1233, 1243 (5th Cir. 1976). The US has failed to meet its burden to show that the alleged irreparable harm, equitable balance, and public interest support an injunction. ECF 26 at 8. Injunctive relief should be denied, or at least stayed pending appeal.

**A.** The US proved no irreparable harm. The buoys occupy a "de minimis" space in one 70-mile stretch of a 1,200-mile river. *See* D-1 ¶ 9; D-5 at 51:3–6. They were placed over two weeks before the US sued. *See* D-3 ¶ 7. And there is no alleged interference with commercial shipping. After all, commerce is nonexistent on this part of the river. D-1 ¶ 3; D-2 ¶ 7; *accord* D-16; D-17. The US relies instead on vague diplomatic tensions with Mexico. During the PI hearing, the US presented testimony from a low-level federal employee, Hillary Quam, who claimed Mexico has expressed "concerns" that Texas is preventing the US from complying with treaty obligations. Tr. 63–67. And border-boundary compliance, the US says, is "a top-priority issue." ECF 37 at 11–12. Any claimed urgency is, however, impossible to square with the US and Mexico's *four-year* delay in meeting their border-mapping obligations under the 1970 Treaty. ECF 41 at 6. But even assuming the two countries have suddenly decided to take treaties seriously, the federal government cannot stop States from doing everything that "may upset foreign powers." *Arizona v. United States*, 567 U.S. 387, 423–24 (2012) (Scalia, J., concurring in part and dissenting in part).

In any event, this Court rightly noted that all "international partners . . . have some disagreements." Tr. 77:6–15. And when it comes to the relationship between the US and Mexico, cabinet-level officials tasked with overseeing federal diplomatic relations with Mexico tell a different story than Ms. Quam. National Security Advisor Sullivan called U.S.-Mexico relations a "strong and enduring bond[ ] of friendship and partnership." D-35. And Secretary of State Blinken said he couldn't recall a time of "stronger partnership and collaboration" between the countries,

9

even though "the multiplicity of issues and their complexity is also greater than ever" and *even though the buoys had already been in place for weeks*. D-36. According to the Biden Administration, relations have never been better. This Court should take the US at its word. In balancing the equities, the only thing on the US's side of the scale is alleged friction in U.S.-Mexico relations— something entirely at odds with the federal government's own dereliction in its treaty obligations and its principal officers' assertions that the U.S.-Mexico relationship has never been stronger. This sort of "[s]peculative injury" is "not sufficient" for irreparable harm. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The requested preliminary injunction, which is all the more extraordinary for its mandatory nature, cannot issue. *See Martinez*, 544 F.2d at 1243.

**B.** The other side of the scale overwhelmingly favors Texas. In balancing equities and considering the public interest, courts must consider how an injunction hurts the public: It is in the public interest to reduce the flow of fentanyl, to combat human trafficking, and to protect Texans from unlawful trespass and violent attacks on their property by drug cartels; it is also in the public interest to minimize the risks to migrants of drowning while making a perilous journey to and through illegal points of entry. *Cf.* D-1 ¶¶ 4, 12–13. And it surely remains in the public interest to treat laws as worthy of respect, not easily flouted. Texas tried to expound on this evidence at the PI hearing. But the Court rejected Texas's repeated efforts to raise such issues, which were said to be "of [no] concern to the Court." *See, e.g.*, Tr. 73, 76, 86, 90. The Court should obviate any chance of error by denying a preliminary injunction or, at least, staying any order enjoining Texas pending an appeal to the Fifth Circuit. *See* Fed. R. App. P. 8(a)(1)(A). The public interest clearly favors keeping the buoys in the water, which save lives by deterring unlawful, dangerous crossings in one of the most active hotspots for drug- and human-trafficking on the river. D-1 ¶¶ 4, 8, 13; D-3 ¶ 4.

| | |
|---|---|
| Date: August 25, 2023 | Respectfully submitted, |
| Angela Colmenero<br>Provisional Attorney General | /s/ Patrick K. Sweeten<br>PATRICK K. SWEETEN<br>Special Counsel<br>Tex. State Bar No. 00798537<br>patrick.sweeten@oag.texas.gov |
| Brent Webster<br>First Assistant Attorney General | |
| Grant Dorfman<br>Deputy First Assistant Attorney General | RYAN D. WALTERS<br>Deputy Chief<br>Special Litigation Division<br>Tex. State Bar No. 24105085<br>ryan.walters@oag.texas.gov |
| Ralph Molina<br>Deputy Attorney General for Legal Strategy | |
| Office of the Attorney General<br>P. O. Box 12548, MC-009<br>Austin, TX 78711-2548<br>(512) 936-2172 | DAVID BRYANT<br>Special Counsel<br>Tex. State Bar No. 03281500<br>david.bryant@oag.texas.gov |
| | MUNERA AL-FUHAID<br>Special Counsel<br>Tex. State Bar No. 24094501<br>munera.al-fuhaid@oag.texas.gov |
| | **Counsel for Defendants** |

### Certificate of Service

On August 25, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN

11