```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UNITED STATES OF AMERICA,      )
     Plaintiff,                     )
 4   vs.                            ) Case No. AU:23-CV-00853
                                    )
 5   GREG ABBOTT, in his capacity as ) Austin, Texas
     Governor of the State of Texas, )
 6   and THE STATE OF TEXAS,        ) August 22, 2023
     Defendants.                    )
 7   ********************************************************

 8           TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                BEFORE THE HONORABLE DAVID A. EZRA
 9              SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE UNITED STATES OF AMERICA:
11     Brian H. Lynk
       Landon Allen Wade
12     James Edward Dingivan
       Kimere J. Kimball
13     Andrew D. Knudsen

14

15   FOR THE DEFENDANTS:
       Patrick K. Sweeten
16     Monroe David Bryant
       Ari Cuenin
17     Munera Al-Fuhaid
       Ethan Szumanski
18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

# I N D E X

**WITNESSES**                                    **PAGE**

**JOSEPH SHELNUTT**

By Mr. Wade                              7,49

By Mr. Sweeten                          21,51


**HILLARY QUAM**

By Mr. Dingivan                           56

By Mr. Sweeten                            71


**LOREN FLOSSMAN**

By Mr. Bryant                          93,111

By Ms. Kimball                           105

1   *(Tuesday, August 22, 2023, 9:02 a.m., in open court.)*

2                                   *   *   *

3          COURT SECURITY OFFICER:  All rise.

4          COURTROOM DEPUTY CLERK:  Austin 23-CV-00853, United

5   States of America versus Greg Abbott, et al.

6          THE COURT:  Good morning, counsel.  Can we please have

7   appearances?

8          MR. LYNK:  Good morning, Your Honor, Brian Lynk,

9   senior trial counsel at the Department of Justice,

10  Environmental Defense Section.  I'll introduce the other

11  attorneys at the table who have all made appearances, we have

12  Mary Kruger, the civil chief of the U.S. Attorney's Office

13  here, James Dingivan, as well as Landon Wade, assistant U.S.

14  attorneys.  And from my office, Environmental Defense Section,

15  we have Andrew Knudsen and we have Kimere Kimball.

16         THE COURT:  Thank you very much, counsel.

17         MR. SWEETEN:  Good morning, Your Honor, Patrick

18  Sweeten on behalf of the State of Texas and Governor Greg

19  Abbott.  With me today is Ari Cuenin, David Bryant, Munera

20  Al-Fuhaid, and Ethan Szumanski.

21         THE COURT:  All right.  Thank you very much.  We are

22  here this morning for a hearing on the United States motion for

23  preliminary injunction against the defendants seeking to remove

24  or order to have removed the so called floating barrier which

25  Texas has installed in the Rio Grande River near the city of

1    Eagle Pass.

2              Before we get started, I do need to clear a couple of

3    things up.  I did read or had called to my attention some

4    erroneous information that may be out there.  One was that I

5    had denied Texas ability to take depositions of relevant

6    government witnesses.  It is true Texas filed a request to take

7    a number of depositions, the United States opposed that

8    request.  I did, in fact, grant Texas the right to take a

9    number of relevant depositions and they did do that.  So these

10   were not interviews, these were actual depositions that were

11   taken.  We don't do interviews.  So that's number one.

12             Number two, you see me up here with something and

13   normally I've been sitting here as a federal judge by

14   designation of the Chief Justice of the United States for over

15   ten years, so lawyers who appear before me know what this is.

16   I had a procedure done on my vocal cords many, many years ago.

17   If I don't keep my vocal cords somewhat moist during the

18   proceeding, I run the risk of losing my voice.  There may be

19   some who think that is a good thing, but in order for me to do

20   my job I do need to be able to talk, so that's what we've got

21   going on here.  We are in the ceremonial courtroom, I notice

22   we've got a lot of people here.  This is the largest courtroom

23   we have here in the Austin courthouse, and my courtroom is

24   actually upstairs.  It is not that much smaller, but this does

25   hold more people, so we'll try to accommodate as many people as

1    we can.

2         In a preliminary injunction hearing such as this, it

3    is normal for us to have just argument and matters submitted by

4    way of declarations and other materials.  Now, we do have

5    declarations from both sides in the record and those have been

6    received and have and will be considered by the Court.  So

7    that's number one.  Occasionally counsel will request the

8    opportunity to present live witness testimony in particularly

9    cases like this.  It has generally been my policy over the 36

10   years or so I've been a federal judge to allow that kind of

11   presentation.  Now, my understanding is the government U.S. has

12   one witness, is that right?

13        MR. LYNK:  Your Honor, we do expect to call actually

14   two witnesses today, and whether we would call a third remains

15   to be seen.

16        THE COURT:  All right.  And does Texas -- you didn't

17   list that you wanted to call any witnesses, I don't know

18   whether you intend to.

19        MR. SWEETEN:  Your Honor, I think we sent the Court

20   our witness list and designated two potential witnesses as may

21   call.

22        THE COURT:  May call.

23        MR. SWEETEN:  May call witnesses, yes, sir.

24        THE COURT:  All right.  Of course, you're going to be

25   cross-examining their witnesses.

 1          MR. SWEETEN:  We will be cross-examining Mr. Shelnutt

 2    and Ms. Quam and I think, Your Honor, we've got two that are

 3    going to be here and we'll make those determinations as to

 4    whether or not we'll call them as the injunction proceedings

 5    transpire.

 6          THE COURT:  Okay.

 7          MR. LYNK:  Your Honor, my apologies, I just wanted to

 8    add, because there will be at least two people testifying and

 9    then, as counsel noted, there could be others, we have agreed

10    on invoking the Rule on excluding the witness.

11          THE COURT:  The Rule, by the way, is shorthand for the

12    attorney's right to request the Court to exclude anyone from

13    the courtroom who might be testifying, might be testifying,

14    even though they're not for sure testifying, they need to wait

15    outside.  Unfortunately, if they don't get called, they just

16    don't get called, but that's not my decision.  So if you are a

17    potential witness here, you must wait outside.

18          Okay, I do not need opening statements by counsel.  I

19    have carefully reviewed the submissions by counsel.  I have

20    carefully reviewed the declarations and other material that

21    both sides have presented to the Court.  So I do not need

22    opening statements.  I should make it clear that all the

23    materials that I have reviewed have been filed, I ordered them

24    to be filed, and they are available to the public on the public

25    docket of this court in this matter.

1          So, counsel, would you like to call your first witness

2    please.

3          MR. WADE:  Yes, Your Honor, we will call to the stand

4    Mr. Joseph Shelnutt from Army Corps of Engineers.

5          COURTROOM DEPUTY CLERK:  Please raise your right hand.

6                              *  *  *

7          *(Oath administered and JOSEPH SHELNUTT, Plaintiff*

8    *Witness, sworn.)*

9                              *  *  *

10         THE WITNESS:  I do.

11         COURTROOM DEPUTY CLERK:  You can have a seat.

12         THE COURT:  Before we proceed, can you please spell

13   your name for the court reporter?

14         THE WITNESS:  My first name is Joseph, my last name is

15   Shelnutt, S-H-E-L-N-U-T-T.

16         THE COURT:  Thank you.  All right, counsel, you can

17   proceed.

18          *(9:11 a.m.)*

19                      DIRECT EXAMINATION

20   BY MR. WADE:

21   Q.  Mr. Shelnutt, can you please just introduce yourself to the

22   judge?

23   A.  My name is Joe Shelnutt, I work for the U.S. Army Corps of

24   Engineers Regulatory Division, in the Fort Worth District.

25   Q.  How long have you worked with the Corps of Engineers?

1   A.   Approximately eight years.

2   Q.   How long have you been doing the work you currently do as a

3   regulatory project manager?

4   A.   Approximately six years.

5   Q.   So what does your job entail, what are your normal duties?

6   A.   Currently my normal duties are to review potential

7   unauthorized activities in waters of the United States,

8   navigable waters of the United States.

9   Q.   Okay.  So do you in your position with Corps of Engineers

10   help enforce sections of the Rivers and Harbors Act?

11   A.   That is correct.

12   Q.   So what does enforcement of the Rivers and Harbors Act

13   entail?

14   A.   So I'll refer to the regulations, 33 CFR 322.3, Activities

15   Requiring Permits.  So this would be -- we would normally

16   review cases that would come to us or potential cases that

17   would come to us for unauthorized activity or rule compliance

18   verification on authorized activities.

19   Q.   So you mentioned that you investigate potential violations

20   of the Rivers and Harbors Act.  How does one of those

21   investigations typically begin?

22   A.   Typically a report comes to us from various sources, it

23   could be normal citizens, other federal agencies or state

24   agencies or someone within the Corps itself.

25   Q.   So after you receive a complaint, what are some of the next

1  preliminary steps you take in your investigation?

2  A.  We would verify a location, contact information, the

3  extent, potential extent of the potential violation, whether it

4  is in a location that will be under our authority to regulate,

5  and if so, is there an impact or violation at that site.

6  Q.  So what geographic area is under your jurisdiction to

7  regulate?

8  A.  In the Fort Worth District, we cover I believe it's 183

9  counties, which is a lot of Texas, portions of three parishes

10  in Louisiana, and we're bordered on the south by the Galveston

11  District and the west by the Albuquerque District.

12  Q.  You mentioned that you are concerned with navigable waters.

13  Can you tell the Court how you determine what's a navigable

14  water within your jurisdiction?

15  A.  Well, fortunately, I don't have to determine that myself,

16  it's on a list of navigable waters that's available to the

17  public, or the Rio Grande in this case.

18  Q.  And to be clear, you do not make navigability

19  determinations yourself, you rely on those determinations made

20  by others in the Corps?

21  A.  That is correct.

22  Q.  Would that be by one of the District's engineers?

23  A.  I assume it would be by one or several engineers in the

24  District.

25  Q.  Okay.  So after you've done your sort of preliminary

1   investigation, after you received a complaint, do you ever do a

2   site visit to go take a look at what you're looking at?

3   A.  A site visit would be a common practice.

4   Q.  When you go to a site visit, what are you assessing, what

5   are you looking for?

6   A.  We're verifying in many cases what we already know, in some

7   cases we're gathering additional information such as the

8   location of the potential violation, the extent of the

9   potential violation.  We may actually talk to people on site if

10  it warrants it at the time or if we have the opportunity.

11  Q.  Now, if you're investigating a potential violation and

12  there hasn't been a permit that's been submitted, are you

13  working with less information than you would have if you would

14  have gotten the permit application?

15  A.  Usually that's the case.

16  Q.  So I want to talk about now the case we're all here for

17  today involving the floating barrier in the Rio Grande.  When

18  did you become aware that Texas had placed a floating barrier

19  in the Rio Grande River?

20  A.  It would be approximately July 10th.

21  Q.  And how did that come to your attention at first?

22  A.  The first that I was aware was through various media

23  reporting.

24  Q.  Okay.  And so did the Corps of Engineers ever receive a

25  complaint that that was a potential Rivers and Harbors Act

Joseph Shelnutt - Examination                    11

1    violation?

2    A.  Yes.

3    Q.  Approximately when did the Corps receive that complaint, do

4    you remember?

5         MR. SWEETEN:  Sorry, objection to the question.  When

6    did the Corps receive--  I didn't hear the question and I think

7    he's asking what the Corps, beyond this witness's personal

8    knowledge.

9         THE COURT:  I'm going to sustain the objection to the

10   extent that you need to lay a foundation as to how he would

11   know.  Corps of Engineers is a big organization.

12        MR. WADE:  Yes, Your Honor.

13   BY MR. WADE:

14   Q.  Well, did it ever come to your attention that the Corps had

15   received a complaint about this activity on the Rio Grande?

16   A.  Yes.

17   Q.  And when approximately was that?

18   A.  Approximately on the 12th.

19   Q.  July 12th?

20   A.  Yes.

21   Q.  Okay.  And do you know who that complaint came from?

22   A.  It came down from our headquarters in Washington, D.C.

23   Q.  And do you know what entity made the complaint?

24   A.  I do, it was the International Border and Water Commission.

25   Q.  Okay.  And so after that complaint was received, were you

1    assigned to investigate this potential violation?

2    A.  I was.

3    Q.  So I want to walk through the steps you took in your

4    investigation.  So first did you check to see if there was a

5    permit for this work?

6    A.  Yes.

7    Q.  And what did you learn?

8    A.  I reviewed our database and we could find no valid permit

9    for that location.

10   Q.  And did you then verify that the site where this floating

11   barrier was placed was in navigable water within your

12   jurisdiction?

13   A.  Ultimately, yes.

14   Q.  And how did you determine that?

15   A.  Could you repeat the question again?

16   Q.  Sure.  How did you know that you were looking at a

17   navigable water within your jurisdiction to regulate and

18   enforce?

19   A.  Well, I'll refer back, it's on a list, a publicly available

20   list of navigable waters within the Fort Worth District.

21   Q.  And that particular stretch of Rio Grande we're talking

22   about in Maverick County, is that included in the stretch of

23   the Rio Grande that's on that list?

24   A.  It is.

25   Q.  And do you know how that area came to be on that list that

1  you referenced?

2  A.  Yes.

3  Q.  And how so?

4  A.  It was the result of a study that was done a little over

5  four decades ago.

6          MR. SWEETEN:  Your Honor, I'm going to object to this

7  testimony.  In his own declaration, this witness says that the

8  list was compiled in December of 2011.  Mr. Shelnutt was not

9  even employed by the Corps of Engineers in 2011.  He's being

10  asked how it came to be that this is on the list that is kept

11  and maintained by this Fort Worth office.

12          THE COURT:  Without any further foundation, I'm going

13  to have to sustain the objection.

14          MR. WADE:  Okay.

15  BY MR. WADE:

16  Q.  With respect to the list that you had mentioned, do you

17  know how those determinations of navigability ended up on the

18  list, generally speaking?

19          MR. SWEETEN:  Your Honor, I assume this is limited to

20  his personal knowledge?

21          THE COURT:  I think that's true for every question.

22          MR. SWEETEN:  Otherwise, objection, foundation.

23          THE COURT:  The objection is overruled.

24  A.  My understanding is to be on the list that is publicly

25  available that I mentioned earlier is the result of a study

Joseph Shelnutt – Examination                    14

1    that was done on navigability.

2    Q.  Okay.  I want to show you what's been marked as Exhibit 34.

3    Can you turn to that?  And let me know when you pull it up.

4    A.  Okay, I'm there.

5    Q.  Do you recognize this document?

6    A.  I do.

7    Q.  And have you reviewed this document?

8    A.  I have.

9    Q.  Do you understand this to be a navigability determination

10   that the portion of the Rio Grande we're talking about is a

11   navigable water of the United States?

12        MR. SWEETEN:  Objection, Your Honor, he's leading the

13   witness.

14        THE COURT:  He's just asking him about a document in

15   front of his face.  The objection is overruled.  We don't have

16   a jury here.

17   A.  Yes.

18   Q.  So this document at the top references a navigability

19   study.  Is that what you referred to earlier in your testimony?

20   A.  That is correct.

21   Q.  And so can you turn to Exhibit 35 now please?

22   A.  Okay.

23   Q.  And you understand this to be the navigability study that's

24   referenced in Exhibit 34, The Navigability Determination?

25   A.  I do.

1   Q.  Have you reviewed that navigability study?

2   A.  I have reviewed it.

3   Q.  So at this point, let's go back to the steps in your

4   investigation.  You have determined there's not a permit, you

5   know that you're looking at a navigable water that's within

6   your jurisdiction.  After that, what did you do?  What were

7   your next steps?

8           THE COURT:  Listen, we've got a map here.  Where is on

9   this -- are you going to ask him or do we guess where the buoys

10  are on this map, if at all.

11          MR. WADE:  We can do that, Your Honor, yes.

12  BY MR. WADE:

13  Q.  So on this map up here, what area was this violation or

14  this -- what area were the buoys placed in, do you know?

15  A.  I do, it was just downstream of Eagle Pass.

16  Q.  So right where the map shows Eagle Pass, that's about where

17  it was?

18  A.  That's correct.

19          THE COURT:  That red arrow area, is that it right

20  there?

21          THE WITNESS:  That would be approximate, sir, Your

22  Honor.

23          THE COURT:  All right.  And that is within the so

24  called navigable waters, as determined by the document.

25          THE WITNESS:  That would be correct, Your Honor.

 1   BY MR. WADE:

 2   Q.  Mr. Shelnutt, while that is still up there, can you explain

 3   the area that's on the 2011 list, this area of the Rio Grande

 4   that's navigable, where does that navigability -- where does

 5   that area start and end on that map that's within your

 6   jurisdiction?

 7   A.  So on the southern portion of the river which is the

 8   border, close to Falcon Reservoir in the south, you can see

 9   there on the map, within our district all the way up to where

10   we meet the Albuquerque District above Amistad, north of

11   Amistad Reservoir.

12   Q.  Okay.  So after you've seen where this violation or you've

13   assessed where this alleged violation has occurred, you know

14   it's within your jurisdiction, what do you do after that?

15   A.  Once we know it's within our jurisdiction, then we do some

16   remote sensing, just base information about existing condition

17   at the site, is there satellite imagery available at the site

18   that also gives us the baseline conditions or that might record

19   that actual activity, we'll review for that.

20   Q.  So what's the purpose of the remote sensing that you do?

21   A.  So we can have a good sense of what the baseline conditions

22   are at the site or what the impacts might be or in this case

23   what the structures might be if that's available to us.

24   Q.  Okay.  And you're doing this from -- are you doing this

25   from your office or are you doing it at the site or where do

Joseph Shelnutt - Examination                    17

1  you do the remote sensing?

2  A.  It would be desktop from the office.

3  Q.  So did you do that in this case?

4  A.  I did.

5  Q.  After you did sort of your preliminary investigation, did

6  you eventually conduct a site visit?

7  A.  Yes.

8  Q.  And what did you observe during your sight visit?  Did you

9  go to where the actual buoys were placed in the river?

10  A.  We did actually visit the site where the buoys were in the

11  river.

12  Q.  Okay.  Can you just generally recall what you observed when

13  you were down there?

14  A.  Yes, we observed spheres, orange and red spheres

15  approximately four to 6 feet in diameter actually in the water

16  with more actually being taken from some upstream location to

17  be installed in segments along the south end of the segment

18  that was already constructed.  There was heavy equipment in the

19  river, there were workers in the river.  There were airboats

20  and other water craft in the river as well, and as well as

21  people standing in the river too.

22  Q.  And I think I got ahead of myself a little bit.  When did

23  you take this site visit?

24  A.  That would be July 13th of this year.

25  Q.  Okay.  So I want to show you what's been marked as

1  Government's Exhibit 26.  Do you recognize this photo?

2  A.  I do.

3  Q.  And did you take this photo?

4  A.  I took this photo.

5  Q.  Did you take this photo when you were conducting your site

6  visit on July 13th?

7  A.  Yes.

8  Q.  And so I also want to show you Government's Exhibit 27.

9  Now, are you familiar with this photo?

10  A.  I am.

11  Q.  Did you take this photo?

12  A.  I did not.

13  Q.  Who took this photo?

14  A.  Mr. Neil Lebsock took this photo.

15  Q.  Who is Neil Lebsock?

16  A.  Mr. Lebsock is the Chief of Compliance and Enforcement in

17  the Fort Worth District.

18  Q.  So you report to Mr. Lebsock?

19  A.  I do.

20  Q.  Did he accompany you on this trip?

21  A.  He did.

22  Q.  And was this taken at the time you conducted your site

23  visit?

24  A.  Yes.

25  Q.  Can you explain what you understand to be going on, what

1  you saw happening in the river as depicted in this photograph?

2  A.  Yes, there's an excavator actually in the river itself,

3  it's transporting a series of three buoys toward the downstream

4  end of the segment of buoys that appear to already be attached

5  to each other.  There's also some support craft in the form of

6  airboats, and there's also at the time or in this photograph

7  another barge-type craft parked adjacent to or abutting the

8  buoys as well.

9  Q.  So how close were you able to actually get to this site?

10 A.  Approximately a hundred yards or 150 yards, something like

11 that.

12 Q.  Okay.  So you weren't -- were you able to determine the

13 full extent of the construction of the floating barrier or

14 would you like to have had more information about how it was

15 built?

16       MR. SWEETEN:  Objection to the question, form, vague.

17       THE COURT:  Well, I think it's a compound question.

18 You asked him two questions, actually.  Ask him one at a time.

19 BY MR. WADE:

20 Q.  Based on what you observed, were you confident you had

21 sufficient information to know what you were looking at?

22 A.  Not full information to understand what we -- the extent of

23 what was being constructed.

24 Q.  Would you have expected to see those details in a permit

25 application?

Joseph Shelnutt - Examination                    20

1    A.  Yes.

2    Q.  But based on what you saw, did this floating barrier appear

3    to you to be a structure that would require a permit to be

4    lawfully placed in the Rio Grande?

5    A.  Yes.

6    Q.  And how did you come to that conclusion?  What are the

7    features of the floating barrier that led you to that

8    conclusion?

9    A.  Well, I'll refer to the regulations, 33 CFR 322.3,

10   Activities Requiring Regulations, so any work or structure

11   under Section 10, navigable water requires a Department of Army

12   permit.

13   Q.  So based on your training, your experience, what you

14   observed at the site, again did you conclude this was a

15   structure affecting navigable waters?

16   A.  I did.

17   Q.  And did the floating barrier appear to you to be an

18   obstruction to the navigable capacity of the Rio Grande?

19          MR. SWEETEN:  Objection, calls for a legal conclusion.

20          THE COURT:  No, I can give it the weight that I

21   believe it deserves.  It's just his observation.  You can

22   answer the question.

23   A.  Yes.

24   Q.  And how did you come to that conclusion?  Can you explain

25   why did this appear to be an obstruction to navigation?

1   A.  Well, I'll refer back to the regs again at 33 CFR 322.2,

2   Structures.  In that particular part of the regulations, it

3   begins by saying, *A structure is without limitation,* and it

4   gives several examples, but concludes with *or any other*

5   *structure that obstructs or -- any other structure that*

6   *obstructs, that is an obstruction or obstacle.*

7   Q.  So why did you consider this to be an obstruction or

8   obstacle?

9   A.  Well, I guess two reasons.  I think it's obvious that the

10  purpose of this structure is to impede human movement cross

11  river, therefore, it would also impede the movement of a vessel

12  cross river as well.

13  Q.  Thank you, Mr. Shelnutt.

14          MR. WADE:  I'll pass the witness.

15          *(9:32 a.m.)*

16          THE COURT:  Okay.  Cross.

17          MR. SWEETEN:  Yes, Your Honor.

18                      CROSS-EXAMINATION

19  BY MR. SWEETEN:

20  Q.  Good morning, Mr. Shelnutt.

21  A.  Good morning.

22  Q.  You came down from Fort Worth last night or yesterday?

23  A.  Last night.

24  Q.  Met with the lawyers with the Department of Justice

25  yesterday?

Joseph Shelnutt - Examination                    22

1    A.  Maybe a couple of them.

2    Q.  And you've had several occasions now over these last few

3    weeks to meet with the Department of Justice lawyers, correct?

4    A.  I've had occasion to do that.

5    Q.  Now, let's talk about your training and experience.  You're

6    a graduate of Auburn University, 1996, correct?

7    A.  That's correct.

8    Q.  What is your year of birth, Mr. Shelnutt?

9    A.  1963.

10   Q.  And you have now worked for the Corps for approximately

11   eight years; is that right?

12   A.  That's correct.

13   Q.  Before that you worked at something called The Raptor

14   Center in Alabama, correct?

15   A.  Much before that, yes.

16   Q.  You worked at Bartlett Ranches then immediately before you

17   were working at the Corps, is that correct?

18   A.  Not immediately, but after the other place of employment

19   you had mentioned.

20   Q.  So what did you do for between Bartlett Ranches and the

21   Corps of Engineers?

22   A.  I was a freelance consultant.

23   Q.  Now, in the seven years you worked at the Raptor Center in

24   Alabama, and as I understand it that's where you studied

25   eagles, hawks and other birds of prey; is that correct?

1   A.  That's correct.

2   Q.  And what was the time period when you worked there, sir?

3   A.  Approximately 1996 to 2003 or '04.

4   Q.  Okay.  Thank you, sir.  Now, couple things just to get out

5   of the way, you're not a lawyer, correct?

6   A.  That's correct.

7   Q.  And you don't give legal opinions for a living, correct?

8   A.  I do not.

9   Q.  You're not an engineer?

10  A.  I am not.

11  Q.  You have not been involved in the construction industry,

12  correct?

13  A.  That's correct.

14  Q.  And you have not had nautical training on a boat or ship,

15  correct?

16  A.  That's correct.

17  Q.  Now, you provided a deposition in this case, the Court

18  allowed us to take a limited three-hour deposition of you some

19  time back in late July, or early August I think it is, correct?

20  A.  That's correct.

21  Q.  And at that time, you met my colleague, David Bryant,

22  correct?

23  A.  That's correct.

24  Q.  And he asked you questions under oath and you understood at

25  that time that you were under oath just like you are today,

1   correct?

2   A.   That's correct.

3   Q.   Now, you are a regulator project manager in the Fort Worth

4   office, correct?

5   A.   That's correct.

6   Q.   And your two main job duties that you describe in your

7   declaration are that your responsibilities include evaluating

8   permit applications under Section 10 of the RHA and

9   investigating possible unauthorized activities that don't

10   comply with issued permits; is that correct?

11   A.   That is correct.

12   Q.   So the first part is investigating --  evaluating permit

13   applications, that part of your job presupposes that the river

14   in question where permit work is going to be done is a

15   navigable river, correct?

16   A.   So we're talking about in this specific case?

17   Q.   No, sir.  Just as a general matter, I'm just talking about

18   your general in permit application process?

19   A.   So would you state that question again for me.

20   Q.   Yeah.  Typically when you're looking at permits and

21   evaluating them, you're evaluating them for can this project go

22   on in the spot where they want to build the project, correct?

23   A.   That's correct.

24   Q.   That presupposes that that river is a navigable river that

25   is subject to the jurisdiction of the Corps of Engineers,

1  correct?

2          MR. WADE:  Objection, speculation.

3          THE COURT:  I'll overrule that objection.  He can

4  answer that question.

5  A.  In the case of Section 10, that would be correct.

6  Q.  Okay.  And then you also investigate possible unauthorized

7  activities that don't comply with previously issued permits,

8  right?

9  A.  Correct.

10  Q.  Now, prior to July 2023, you had never been to Maverick

11  County, Texas, correct?

12  A.  That's correct.

13  Q.  And Maverick County, Texas is where Eagle Pass is, correct?

14  A.  Yes.

15  Q.  And Eagle Pass is where these buoys that are the subject of

16  this dispute have been placed, correct?

17  A.  Yes.

18  Q.  Prior to July 2023, when you first went to El Paso- sorry,

19  Eagle Pass, you had never been there before, correct?

20  A.  That's correct.

21  Q.  And you had never done an investigation for the purpose of

22  evaluating activities on the Rio Grande for the Fort Worth

23  office prior to this occasion when you were given the buoy

24  issue, correct?

25  A.  So could you state that again please?  I'm being very

1   particular about this.

2   Q.  Prior to July 2023, you had never done an investigation for

3   the purpose or regarding any activities on the Rio Grande River

4   within the Fort Worth Division, correct?

5   A.  That's correct.

6   Q.  And you've never during your time, and you've been once or

7   twice, as I understood it, to the Rio Grande River in Laredo,

8   correct?

9   A.  I have been to Laredo on the river, yes.

10  Q.  And you've never observed any commercial navigation on the

11  Rio Grande River, correct?

12  A.  Not that I was aware of.

13  Q.  Now, we talked about this, but you indicated the date that

14  you first learned of the buoys was in July, and I think you

15  said the 12th of 2023, correct?

16  A.  That's correct.

17  Q.  You said that you first learned about the buoys on the

18  news, right?

19  A.  That's correct.

20  Q.  And you took a site visit then, it sounds like it would

21  have been the next day on July 13th, 2023?

22  A.  That's correct.

23  Q.  Now, when you went to the site at Eagle Pass, there were

24  law enforcement officers from the Operation Lone Star, DPS

25  officers, correct?

1    A.   There were DPS officers in the area.

2    Q.   And you did not make an effort while you were there to

3    speak with anybody from the State of Texas about the buoys as

4    part of your investigation; is that correct?

5    A.   That's correct.

6    Q.   Didn't talk to any state official while you were there?

7    A.   That's correct.

8    Q.   And in fact, to your knowledge, Mr. Shelnutt, no one in the

9    Fort Worth office has made contact with anyone from the State

10   of Texas or agencies or representatives of the state; is that

11   right?

12   A.   I don't have that information.

13         THE COURT:   You don't know one way or the other.

14         THE WITNESS:   I do not.

15   BY MR. SWEETEN:

16   Q.   But certainly you did not, sir?

17   A.   That is correct.

18   Q.   Now, you mentioned earlier that the first report that the

19   Army Corps of Engineers received about the buoys, quote, came

20   down from Washington, D.C.; you recall that?

21   A.   I do.

22   Q.   And in fact, it is true that the actual entity that sent

23   the original report or complaint to the Army Corps of

24   Engineers, you said here today was the IBWC, correct?

25   A.   That's correct.

Joseph Shelnutt - Examination                    28

 1   Q.  And the information that the Corps of Engineers received
 2   was from the IBWC was a document that included photographs, a
 3   map, and a description of what IBWC had seen on the river,
 4   correct?
 5   A.  That's correct.
 6   Q.  When IBWC sent the complaint, did IBWC disclose to you that
 7   they had already met with the State of Texas an entire month
 8   before on June 12th, 2023?
 9   A.  Not to my knowledge.
10   Q.  You were not told, as the declarations show in this case,
11   that IBWC was -- four members of IBWC were fully briefed on the
12   DPS's plan to put the buoys in the river some over a month
13   before you were first contacted in this case, correct?
14          MR. WADE:  I'm going to object to counsel testifying,
15   Your Honor.
16          THE COURT:  Sustained.  It will be stricken.
17   BY MR. SWEETEN:
18   Q.  So you were not told of a meeting that occurred between DPS
19   and the IBWC, correct?
20   A.  I don't have that information.
21   Q.  Well, that's different.  My question is were you told by
22   IBWC who complained to you that they had spoken with DPS
23   officials back in June?
24   A.  No.
25   Q.  Thank you.  You spoke with Mr. Gomez of the IBWC, correct?

1    A.   That is correct.

2    Q.   When you spoke with Mr. Gomez at the scene, and that would

3    have been July 13, did Mr. Gomez tell you he was involved in a

4    meeting with DPS over a month before to discuss the placement

5    of the buoys in the Rio Grande River?

6          MR. WADE:   Objection, Your Honor.

7          THE COURT:   Again, sustained.   You can ask him whether

8    he ever talked to him about it, but you can't inject your own

9    testimony into the question.

10         MR. SWEETEN:   Thank you, Your Honor, yes.

11   BY MR. SWEETEN:

12   Q.   Did you talk with Mr. Gomez about any prior meetings he had

13   had with DPS?

14   A.   No.

15   Q.   And it sounds like you have not been shown declarations

16   from other declarants in this case; is that right?

17   A.   That's correct.

18   Q.   So you mentioned International Boundaries and Waters

19   Commission, that's what IBWC stands for, correct?

20   A.   That's correct.

21   Q.   And it's not strictly a U.S. federal agency, it's an

22   international body, correct?

23   A.   That's my understanding.

24   Q.   And it's composed of two sections, there's the Mexican

25   section and the United States section that make up the IBWC,

 1  correct?

 2          MR. WADE:  Object to counsel testifying.

 3          THE COURT:  Well, he can lead the witness.  It's

 4  cross-examination.  I'm going to overrule that.

 5  A.  Yes.

 6  Q.  Okay.  And you understand that each section of the IBWC is

 7  administered separately from the others; is that your

 8  understanding?

 9  A.  I don't have -- I don't know the structure of IBWC.

10  Q.  Okay.  No worries.  Do you know as you're sitting here

11  which section from IBWC sent the complaint in question to the

12  Corps of Engineers that then came down from Washington?

13  A.  I do not.

14  Q.  Now, we've already talked about the fact that this was your

15  first trip to this segment of the river there in Maverick

16  County, correct?

17  A.  Correct.

18  Q.  And would you agree with me that the segment of the river

19  in Maverick County it covers about 70 river miles?

20  A.  I don't have anything to base that estimate upon.

21  Q.  And to be clear, you yourself have never had occasion to

22  study that segment of the Rio Grande River, correct?

23  A.  That's correct.

24  Q.  But the floating buoy project when it was assigned, it was

25  assigned to you and I think you said to your chief, what was

1  his name again, Mr. Lebsock?

2  A.  Mr. Lebsock.

3  Q.  And the purpose of your visit, you wanted to look at the

4  buoys for yourself, right?

5  A.  That's correct.

6  Q.  And when you first laid eyes on the buoys, I think you

7  described them as large orange buoys, but you observed that

8  they were closer to the U.S. side than the Mexican side, that's

9  what you said, correct?

10  A.  At the time of the site visit, that's correct.

11  Q.  Now, Mr. Lebsock, your chief has not provided a declaration

12  in this case, correct, to your knowledge?

13  A.  Correct.

14  Q.  Has not testified -- is not on the witness list, correct?

15  A.  Correct.

16  Q.  Now, would you estimate that the amount of time you spent

17  at the buoy site was about three and a half hours; isn't that

18  correct?

19  A.  That would be correct.

20  Q.  And when you went to the site of the buoys, during your

21  site visit, you were not aware of seeing any evidence of

22  commercial navigation at the floating buoy site, correct?

23  A.  I was not aware of any of that.

24  Q.  So on your July 13th visit, you met with the -- with

25  American representative from the IBWC, but you also met with a

Joseph Shelnutt - Examination                    32

1    representative from the Mexican side, correct?

2    A.   Correct.

3    Q.   Prior to your visit, did you investigate who manufactured

4    the buoys?

5    A.   No.

6    Q.   Were you aware, did you talk to Customs and Border Patrol

7    about whether they had discussed utilizing similar buoys?

8    A.   I had not.

9    Q.   Did you talk with anybody at Customs and Border Patrol?

10   A.   I did not.

11   Q.   You described the buoys we've already talked about the fact

12   they're orange spheres, 4-foot by six-foot in diameter I think

13   you said, right, sir?

14   A.   Approximately, yes.

15   Q.   And that's in an otherwise, what, 150, 200-foot wide river?

16   A.   I think it would be slightly more than that, but I'm not

17   sure the total width.

18   Q.   Now, you estimated the depth of the river where you saw the

19   buoys as being between knee high and waist high, correct?

20   A.   The depth of the water at the time of the site visit,

21   that's correct.

22   Q.   And that would be about I think you said about one and a

23   half to 3 feet, correct?

24   A.   Correct.

25   Q.   Now, did you view the buoys from the Mexican side of the

1   border?

2   A.   No.

3   Q.   Now, we talked a little bit and you showed a picture

4   earlier, or your counsel did, of what you called I think an

5   excavator out there, correct?

6   A.   Yes.

7   Q.   And when he observed the excavator at the site, it was

8   transporting buoys from an upstream location to place them,

9   correct?

10  A.   That's what I observed.

11  Q.   You did not see those excavators doing actual excavation

12  work, correct?

13  A.   Correct.

14  Q.   And you've never received any information that excavation

15  or other equipment for that matter was used to do anything at

16  the floating buoy site other than to carry and place floating

17  buoys to put them in place, correct?

18  A.   At this time, that's correct.

19  Q.   When you were at the site of the buoys, you saw airboats

20  used by law enforcement, correct?

21  A.   I'm not sure who they were used by.  Yes, correct.

22  Q.   So the water craft that you would have seen in that section

23  of the river was only airboats, correct?

24  A.   There were at least two airboats that I can recall at the

25  time.  There was another barge-type craft there.

1  Q.  Okay.  Well, we'll talk about that, but the airboats, they

2  have a fan on them, right, that allows them to operate in very,

3  very shallow water, correct?

4  A.  That's correct.

5  Q.  And you mentioned a barge and you said that that was being

6  used to stabilize the placement of the buoy system, that's what

7  you saw, right?

8  A.  It was stationary, so I assume that's what it was doing

9  there.

10  Q.  Okay.  It wasn't transporting buoys, it was stabilizing, in

11  your opinion, the placement of the buoys in the river by boats

12  that were placing them there, right?

13  A.  That's what I observed.

14  Q.  When you were at the Rio Grande River that day, you did not

15  see -- you were not aware of seeing any commercial activities

16  either on the Texas side or the Mexican side of the river,

17  correct?

18  A.  Correct.

19  Q.  Now, prior to your first visit to Eagle Pass, you had

20  already concluded that in your opinion the segment of the Rio

21  Grande was subject to the jurisdiction of the Corps of

22  Engineers, correct?

23  A.  That's correct.

24  Q.  And I want to talk a little bit about that conclusion.

25  First, you concluded that the Rio Grande River is on a list

Joseph Shelnutt - Examination                35

1   maintained within the Fort Worth District of navigable water,
2   correct?
3   A.   Correct.
4   Q.   And so there is -- the list was created I think you said in
5   2011, correct?
6   A.   That list, yes.
7   Q.   And I think it was December 2011?
8   A.   I believe that's correct.
9   Q.   Okay.  And that's prior to you joining the Corps, correct?
10  A.   Yes.
11  Q.   And you told my colleague -- well, let me just ask you.
12  That list is derived from studies that indicate whether a body
13  of water is a, quote, Section 10 navigable water, correct?
14  A.   Yes.
15  Q.   You would agree with me that in the first affidavit that
16  you filed with this court, which would have been in July of
17  2023, late July, that you filed -- that you indicated you had
18  gone to the list to make this determination as to navigability,
19  correct?
20  A.   Yes.
21  Q.   It was not your opinion based on study, based on recent
22  analysis, independently of that list, it just was on the list
23  and therefore it is in, in your view, the Fort Worth District's
24  jurisdiction, correct?
25  A.   That's correct.

1   Q.  And I would assume -- I think you may have covered this,

2   but I just want to make sure it's clear.  You had no part in

3   conducting any sort of study that would have been utilized for

4   purposes of creating that December 2011 list, right?

5   A.  That's correct.

6   Q.  And that list is important because if a water is not

7   navigable, if it's not on that list, it's not in your

8   jurisdiction, correct?

9   A.  It's not in the Section 10 of the Rivers and Harbors Act

10  jurisdiction.

11  Q.  Now, the Corps of Engineers does not rely on Coast Guard

12  determinations of navigability, they rely on creating their own

13  list for their own jurisdictional purposes, correct?

14  A.  That's correct.

15  Q.  But ultimately it's the case, is it, that it is -- one

16  second, let me find my spot, that there is a Corps of Engineers

17  regulation, 329.14 of 33 CFR that says that a conclusive

18  determination of navigability is made only by a federal court.

19  Correct?

20  A.  Correct.

21  Q.  Now, in your second affidavit, you provided then -- so

22  let's give the Court the chronology.  You provided an affidavit

23  that is utilized in the filing by the Department of Justice in

24  late July, your deposition is taken on August 7th by

25  Mr. Bryant, correct?

Joseph Shelnutt – Examination                    37

1    A.  Correct.

2    Q.  And then you provide last week in a reply brief that

3    provided a second declaration from you, correct?

4    A.  Correct.

5    Q.  And it was at this point that the State of Texas and the

6    Court was made aware of what was called the 1975 determination

7    by the Fort Worth engineer, as you say in your declaration,

8    correct?

9    A.  I believe I referred to that in my first declaration, but

10   maybe not as to the title and the purpose of it, but I think I

11   referred to it as a study in the first one.

12   Q.  Now, are you saying you think you mentioned it in the

13   deposition?

14        THE COURT:  No, he didn't say that.  I think he said

15   the declaration; is that right?

16        THE WITNESS:  In the deposition.

17        THE COURT:  Oh, was it in the deposition you used the

18   word "study"?

19        THE WITNESS:  I'm not entirely sure, but I think so.

20   It was the document I was referring to.

21        THE COURT:  Okay.

22   BY MR. SWEETEN:

23   Q.  As of the date of the deposition, when you were being asked

24   questions by Mr. Bryant, you indicated you had not read any

25   study related to the portion of the Rio Grande where the

1   floating buoys were located, correct?

2   A.  That's correct.

3   Q.  You only partially read a study, you said, and were not

4   able to recall the date of the study?

5   A.  That's correct.

6   Q.  So when as far as -- so when you were asked these questions

7   under oath between the first declaration and the second

8   declaration and you were asked what study are you talking

9   about, you indicated you didn't know?

10  A.  I don't think I indicated I didn't know, just that there's

11  this study that's more than four decades old of navigability

12  that we don't refer to on a daily basis to determine if a river

13  or water body is a Section 10 navigable water.

14  Q.  When you provided the first affidavit in this case

15  indicating that this segment of the river was navigable, you

16  had not read any technical aspects of the 1975 study, correct?

17  A.  That's correct.

18  Q.  So just to summarize, when you provided your declaration to

19  the Court, you had gone to the list, had not read technical

20  aspects of the study, and just determined it was in the Fort

21  Worth District office's jurisdiction?

22  A.  Referring to the first declaration.

23  Q.  That's correct, the first declaration.

24  A.  Yes.

25  Q.  And you've said that and you've talked about in your

1    deposition that when you first went to the study, your purpose

2    was not to read its technical portions, but just to confirm

3    that the Fort Worth office possessed the study, correct?

4    A.  That's correct.

5    Q.  So to be clear, you have not done any work yourself

6    regarding the historical uses of the Rio Grande River?

7    A.  Correct.

8    Q.  And the backup study that you weren't able to particularly

9    identify in the deposition was from 1975, correct?

10   A.  That's correct.

11   Q.  And I think that would have made it 48 years old, right?

12   A.  Correct.

13   Q.  There were no updated studies by the Corps of Engineers in

14   the Fort Worth file when you looked that evaluated any aspect

15   of the Maverick County segment of the Rio Grande River,

16   correct?

17   A.  That's correct.

18   Q.  Now, I want to take a look at some portions of that study,

19   so if we could put up G35 please.

20        This is the 1975 study, correct?

21   A.  That's correct.

22   Q.  Let's look down.  So to be clear, Mr. Shelnutt, where you

23   were and where these buoys are is Eagle Pass, Texas, correct?

24   A.  Correct.

25   Q.  That's substantially north of Laredo.  Do you have an

Joseph Shelnutt - Examination                    40

1   estimate for how far north of Laredo that is?

2   A.  It would just be speculation, but quite a ways north of

3   Laredo.

4   Q.  Do you know where Roma, Texas is, sir?

5   A.  I do not.

6   Q.  Now, I'm going to jump around a little bit on this

7   document, so forgive me, but I want to look at some aspects of

8   it, okay?  First, this document discusses historical background

9   in the river and the park, right?

10  A.  I believe there's historical data in there, yes.

11  Q.  If we can go to page four of the 1975 study please, at the

12  end of the second paragraph.  And I'm going to read a portion

13  to you and I'm going to ask you if I've read it correctly,

14  okay?  *In the letter written by Mr. Elliott to Lord Aberdeen,*

15  *Exhibit 13, "In December of 1843, it is noted that in the*

16  *winter and spring months the river would be navigable for great*

17  *distances and general commercial use in the dry season due to*

18  *rapids, navigation in steamboats to the vicinity of Roma,*

19  *Carmago, Mier, and Rio Grande City is cited in several books."*

20      Now, would you have any reason to dispute that Roma,

21  Carmago, Mier and Rio Grande City, we don't have the map

22  anymore, but are substantially down river from Eagle Pass?

23  A.  Again I'm not sure where these locations are in relation to

24  Eagle Pass.

25  Q.  Okay, that's fair.  Let's look down to page five.

1      And by the way, Mr. Shelnutt, just to make it clear, you

2   have a copy of this so you can easily read it up there; is that

3   right?

4   A.   I do, if you give me time to.

5   Q.   Of course, yes, sir.  So if we can look at the first

6   paragraph is what I'm looking at, the first sentence starts off

7   with, *"In October 1846, a successful attempt was made to ascend*

8   *the Rio Grande in the United States steamer Major Brown."*  Do

9   you see that?

10  A.   I do.

11  Q.   And then if we go down, it says, *"She experienced few*

12  *obstacles in reaching the River Salado nearly a hundred miles*

13  *by water above Mier.  Above this there was a series of*

14  *continued shoals, rocks and rapids, among which the boat*

15  *repeatedly grounded.  She at length reached Laredo, a town*

16  *about 600 miles by water above the mouth of the river."*

17  Correct?

18  A.   That's what it says.

19  Q.   So this historical conclusion in this document indicates

20  that a steamer observed shoals, rocks and rapids and then

21  reached only as far as Laredo, correct?

22  A.   That appears to be the condition in 1846.

23  Q.   Now, if we go to page three now of the document, if you

24  look under four where it says, *"Nature and location of*

25  *significant obstructions to navigation,"* that second paragraph,

1   first sentence, are you there?

2   A.   I am.

3   Q.   That says, *"The river is blocked by the major Falcon Dam*

4   *just downstream of the Fort Worth District boundary and by the*

5   *major Amistad Dam near Del Rio."*  That's what that says,

6   correct?

7   A.   It does.

8   Q.   And the Amistad Dam, you know from your visit, is located

9   up river from Eagle Pass, and the Falcon Dam is down river from

10  Eagle Pass, correct?

11  A.   Correct.

12  Q.   If we can go to page six now.  *"In addition to these*

13  *blockages, the 1975 study determined that the Rio Grande can be*

14  *navigated during periods of sufficient float only by fishing*

15  *boats and other shallow draft craft."*  Do you see that on page

16  six, section 7A?

17  A.   I do.

18  Q.   Did I read that correctly?

19  A.   Yes.

20  Q.   But the '75 study also determined that records were

21  inadequate to develop actual or hypothetical high and ordinary

22  low flows, correct?

23  A.   I don't remember that.

24  Q.   Okay.  Let's turn to page three, subsection G please.  And

25  it says, *"Improvements to navigation.  There are not any*

1    *improvements to navigation within the study reached."*

2         Did I read that correctly?

3    A.   You did.

4    Q.   Now, the study acknowledges on page 13, so let me give you

5    time to get there.  We're looking at the last paragraph on page

6    13.  Do you see where it says, the first sentence, *"The*

7    *difficulty in pinpointing the precise head of navigation from a*

8    *historical standpoint stems from the sketchy accounts on use."*

9    Did I read that correctly?

10   A.   Yes.

11   Q.   The 1975 study determined that the physical characteristics

12   in obstruction to flow under natural conditions would have to

13   be overcome for navigation in the Rio Grande, correct?

14   A.   I believe that's correct.

15   Q.   If we go to page six, Section 7B now.  There it says --

16   there's a section called *"If improved,"* are you there with me?

17   A.   I am.

18   Q.   It says, *"Improvement of the Rio Grande for navigation is*

19   *physically possible.  Storage in the Falcon and Amistad*

20   *Reservoirs would have to be judiciously used to provide*

21   *sufficient flow for continuous navigation.  Since navigation*

22   *has fifth priority under existing treaties, there is little*

23   *likelihood of change."*

24        Did I read that correctly?

25   A.   You did.

Joseph Shelnutt - Examination                    44

1   Q.  And then I'll read the last part which says, *"There would*
2   *be serious ecological objections to any channelization."*
3   Right?
4   A.  That's what it states.
5   Q.  Now, you stated in your declaration that there were no
6   plans to improve the Rio Grande for navigation when the Corps
7   conducted this study, right?
8   A.  Yes.
9   Q.  You stated in your declaration that *"In addition to*
10  *possible improvements for navigation, storage in the Falcon Dam*
11  *and Amistad also have to provide sufficient flow for the*
12  *purpose of navigation."*  That's from your declaration, right?
13  A.  Yes.
14  Q.  You also stated that you have no knowledge of federal or
15  federal plans to improve navigation since 1975, correct?
16  A.  That's correct.
17  Q.  Couple more provisions from the study.  *"The 1975 study*
18  *opined ultimately that above Laredo, up to Eagle Pass,*
19  *navigation is impeded by rocks and ledges at lower stages."*
20  Correct?
21  A.  Correct.
22  Q.  The study even says there has never been any practical
23  navigation above Roma, Texas, between there and El Paso, the
24  distance of about a thousand miles, right?
25  A.  I don't remember that exact passage.

1    Q.  Okay, I'll direct you to it.  There's a lot in here.  So if
2    we can go to page 13.  And it's subsection A, third paragraph
3    in the middle.  And it starts with the sentence *"Further,"* are
4    you with me?
5    A.  Not yet.
6    Q.  Okay.
7    A.  Where in that paragraph is that?
8    Q.  Yes, sir, there's a sentence that starts with *"Further"* in
9    the second to the last paragraph on page 13?
10   A.  Okay.
11   Q.  *"Further,"* and I'm reading from the study, right, *"Further,*
12   *there apparently has never been any practical navigation*
13   *between Roma and El Paso, a distance of about a thousand*
14   *miles."*  And it sites to Exhibit 23 for that proposition,
15   correct?
16   A.  Yes.
17   Q.  And you understand that Eagle Pass is located, and you may
18   not know this, but do you know if Eagle Pass is located between
19   Roma, Texas and South Texas and El Paso out in West Texas?
20   A.  Yes.
21   Q.  On page 13, the study goes further to say, *"The normal*
22   *stages of the river apparently was not navigable above Rio*
23   *Grande City."*  Correct?
24   A.  Yes.
25   Q.  On page 14, the study says, *"At present,"* and this is the

1  top of page 14, Mr. Shelnutt, *"At present, there is no*
2  *commercial activity occurring within the study area that would*
3  *qualify as substantial items of commerce.  However, there is*
4  *frequent use of pleasure and fishing boats on Falcon and*
5  *Amistad Reservoirs."*  Did I read that correctly?
6  A.  You did.
7  Q.  And lastly, if we could look down the page at future use.
8  Do you see that?
9  A.  I do.
10  Q.  In the 1975, it here says, *"In terms of future use, there*
11  *are no authorized plans to improve the Rio Grande River for*
12  *navigation in the area of the study.  The natural and ordinary*
13  *condition of the Rio Grande River, its volume of water,*
14  *gradient and regularity of flow do not preclude future*
15  *improvement for smaller commercial craft."*  Did I read that
16  correctly?
17  A.  Yes.
18  Q.  Now, I want to turn away from the study and from your
19  second affidavit and I want to ask you a few additional
20  questions.  You would agree with me that based on your
21  conclusion -- actually, I'm going to withdraw that question, I
22  think I've asked it.
23      I'll ask you a few more questions about your site visit.
24  You do not have any first or secondhand knowledge whether the
25  buoys at issue are structurally built into the Rio Grande

1   River, correct?

2   A.  That's correct.

3   Q.  You don't have any knowledge as to whether or not the buoys

4   at the site location are temporary or permanent, correct?

5   A.  I don't have that knowledge.

6   Q.  And when you were there, you did not ask state employees

7   that question?

8   A.  That's correct.

9   Q.  And when you gave your -- let me just ask it.  Based on

10   what you saw on July 13, 2023, you don't have any reason to

11   believe that the floating buoys at the current site have

12   altered or modified the course of the Rio Grande River, right?

13   A.  That's correct.

14   Q.  The buoys float on top of the river, correct?

15   A.  Correct.

16   Q.  And that's what you observed when you were there?

17   A.  That's correct.

18   Q.  Final questions.  With respect to your expertise, you have

19   not held yourself out as an expert on rivers or navigability,

20   correct?

21   A.  That's correct.

22   Q.  And you're not aware of anyone filing a complaint with the

23   Corps of Engineers that the floating buoys have caused a

24   problem of any kind for any water craft going up or down the

25   Rio Grande River, correct?

1    A.   I'm not aware of that.

2    Q.   Now, you're familiar with the Rivers and Harbors Act,

3    correct?

4    A.   Correct.

5    Q.   You would agree that the floating buoys in this river are

6    not a boom, correct?

7    A.   Correct.

8    Q.   These floating buoys are not a pier?

9    A.   That's correct.

10   Q.   They are not a wharf?

11   A.   Correct.

12   Q.   They are not a breakwater?

13   A.   Correct.

14   Q.   They are not a bulkhead?

15   A.   Correct.

16   Q.   They are not a weir?

17   A.   Correct.

18   Q.   They're not a jetty?

19   A.   Correct.

20   Q.   And they're not a dolphin?

21   A.   Correct.

22        MR. SWEETEN:  I have no further questions.  Thank you,

23   Mr. Shelnutt.

24        (10:16 a.m.)

25        MR. WADE:  Brief redirect, Your Honor?

Joseph Shelnutt - Examination                    49

```
 1            THE COURT:  Yes.
 2                      REDIRECT EXAMINATION
 3  BY MR. WADE:
 4  Q.  Mr. Shelnutt, you were just asked if you had talked to
 5  anybody who was with DPS or Texas on your site visit, right?
 6  A.  That's correct.
 7  Q.  Do you feel like you would have needed to talk to them to
 8  come to your conclusion that what you observed was a structure?
 9            MR. SWEETEN:  Objection.  Leading, Your Honor.
10            THE COURT:  Well, why don't you rephrase your
11  question.
12            MR. WADE:  Okay.
13  BY MR. WADE:
14  Q.  I'll back up a little bit.  You testified earlier that the
15  floating barrier that you observed you considered that to be a
16  structure within the meaning of the Section 10 of the Rivers
17  and Harbors Act, correct?
18  A.  That's correct.
19  Q.  Do you feel like you would have needed to talk to anyone
20  from Texas to come to that conclusion?
21  A.  Not to make that determination.
22  Q.  And we just went through the navigability study in detail.
23  And again, I want to confirm, you were not the person who
24  conducts these navigability studies, right?
25  A.  That's correct.
```

1   Q.  Is it your job to second guess the navigability

2   determinations made by the District engineers?

3   A.  It is not.

4   Q.  As a practical matter, do you have to rely on those

5   determinations to do your job as a regulatory project manager?

6   A.  Yes.

7          MR. WADE:  Can we put up Exhibit 34 please, the

8   Government's Exhibit 34.

9          *(Pause.)*

10         THE COURT:  Is there a problem?

11         COURTROOM DEPUTY CLERK:  The HDMI is not switching

12  over.

13         MR. WADE:  Your Honor, would you like a physical copy?

14         THE COURT:  I've got it.

15  BY MR. WADE:

16  Q.  Turn to Exhibit 34, Mr. Shelnutt.

17  A.  I have.

18  Q.  I want you to go to that second page, paragraph three.  Do

19  you see that?

20  A.  I do.

21  Q.  And this is the navigability determination that you

22  testified about earlier, correct?

23  A.  That's correct.

24  Q.  Paragraph three, this navigability determination states,

25  *"We anticipate no controversy in connection with the above*

1   *declaration."*  Did I read that correctly?

2   A.  You did.

3   Q.  And to your knowledge, is this 1975 navigability

4   determination still good, is it still in effect?

5   A.  Yes.

6           MR. WADE:  Pass the witness.

7           *(10:20 a.m.)*

8           THE COURT:  Very briefly, counsel, and no further than

9   where he went.  We're not going to reopen cross-examination.

10          MR. SWEETEN:  Yes, Your Honor, understood.

11                          RECROSS-EXAMINATION

12  BY MR. SWEETEN:

13  Q.  So you said that you didn't feel the need to talk to

14  anybody from the State of Texas, correct, because it wouldn't

15  have impacted your structure, your determination about

16  structure.  That's roughly what you said, right?

17  A.  That's correct.

18          THE COURT:  Okay, it finally showed up.

19  BY MR. SWEETEN:

20  Q.  While we've got it up, so again what he showed you today,

21  and I am old enough to recognize that little symbol in the

22  bottom right corner, that's the bicentennial symbol, that's the

23  1975 conclusion, correct?

24  A.  That's correct.

25  Q.  So back to my question about structure.  Part of

Joseph Shelnutt - Examination                    52

1   determination as to structure under -- well, let me ask it a

2   different way.  You would agree with me that had you spoken

3   with members of Texas DPS, that you could have asked about

4   whether or not the intention was to use these buoys as a

5   temporary tactical measure to stop immigration, but you didn't

6   do that, correct?

7   A.  We didn't speak with anybody from DPS.

8   Q.  And you didn't think it was important to your determination

9   about structure, correct?

10  A.  That's correct.

11          MR. SWEETEN:  Thank you.

12          THE COURT:  Nobody asked you this question, but what

13  was the final conclusion of the study?

14          THE WITNESS:  It determined a segment of the Rio

15  Grande was navigable between certain points, and I don't

16  remember the exact river miles there, Your Honor.

17          THE COURT:  Do those between those two points cover

18  the area we're concerned about?

19          THE WITNESS:  It does.

20          THE COURT:  Okay.  You can step down.

21          THE WITNESS:  Thank you, Your Honor.

22          (10:22 a.m.)

23          THE COURT:  All of the exhibits which have been

24  referred to will be received for purpose of preliminary

25  injunction hearing in the record as well as the other documents

 1  that have been offered by counsel in their papers, the
 2  declarations.
 3       MR. SWEETEN:  Sorry, Your Honor.  I didn't hear, was
 4  that a question?
 5       THE COURT:  This is not a trial, obviously, this is a
 6  preliminary injunction hearing.  What I said was that all --
 7  I'm trying to alleviate the need for you to be jumping up every
 8  moment and offering things into evidence.  I said all of the
 9  documents which have been referred to by counsel and the
10  declarations and so forth that have been referred to, that have
11  been filed are being received into evidence.
12       MR. SWEETEN:  Okay.
13       THE COURT:  That's what I'm saying.
14       MR. SWEETEN:  And that includes the evidence on the
15  defendant's and plaintiff's exhibits that were offered -- that
16  were sent to the Court yesterday.
17       THE COURT:  Of course, not just one side.  Next
18  witness.
19       MR. DINGIVAN:  Your Honor, United States is going to
20  call Hillary Quam, but she's upstairs -- oh, she's here, Your
21  Honor.  We can proceed unless the Court would like to --
22       THE COURT:  We've got to make sure we have a clear
23  record, so I'm going to give my reporter -- she says she needs
24  a little break, we're going to take a ten-minute recess.
25       COURT SECURITY OFFICER:  All rise.

1          *(10:24 a.m.)*

2                              *   *   *

3          *(10:43 a.m.)*

4          COURT SECURITY OFFICER:  All rise.

5          THE COURT:  Please be seated.  The Court would note

6    the presence of all counsel as well as the representatives and

7    parties.  Before we get started, I should have really addressed

8    this with you at the very beginning because I don't believe any

9    of you have ever either tried a case in front of me or been in

10   any major hearings in front of me.  So all of the State of

11   Texas has many times as has the United States, not these

12   particular lawyers.

13         In a situation like this where we are dealing with

14   numerous documents, studies, rulings, precedential opinions, it

15   is really, in my view, much less informative for the Court to

16   hear oral closing argument because what happens is the lawyers

17   simply get up and off the top of their head make a closing

18   argument to the Court.  The jury is a whole other story.

19   Obviously, we have to have closing argument in front of a jury,

20   but what I require instead of oral closing argument is a

21   written closing argument.  That gives you time to go back and

22   assess the evidence, to site to the Court the relevant evidence

23   that you are relying upon, gives us a much cleaner and better

24   record, not only for my purposes, but for purposes of any

25   appeal, and it is just so much more beneficial for the parties

1  as well as the Court.  Now, it will be no more than ten pages

2  and will be submitted to the Court by Friday.  That gives you

3  plenty of time.  Today is Tuesday, so by close of business on

4  Friday.

5       MR. SWEETEN:  Your Honor, just to clarify, so at the

6  close of the presentation of the witnesses, then we would then

7  recess and provide the Court the briefing.

8       THE COURT:  That is correct.  Look, I was a trial

9  lawyer and I know everybody likes to get up and make a big

10  flowing closing argument, I enjoyed it myself, and I know that

11  there are members of the press here who really want you to make

12  a closing argument, but they'll have access to your written

13  closing argument which is actually far more beneficial, believe

14  me, than somebody just getting up and going right off the top

15  of their head.  And then they're going to sit down, as I did

16  many times in my legal career and say, geez, I forgot to

17  mention this, that or the other thing.  And this will give you

18  an opportunity to do all of that.  It's just a much better way

19  to go, in my view.  So let's then proceed with your next

20  witness please.

21       MR. DINGIVAN:  Thank you, Your Honor.  United States

22  calls Hillary Quam.

23       THE COURT:  Swear her in please.

24       COURTROOM DEPUTY CLERK:  Please stand and raise your

25  right hand.

```
 1                          *   *   *
 2          (Oath administered and HILLARY QUAM, Plaintiff
 3   Witness, sworn.)
 4                          *   *   *
 5          THE WITNESS:  I do.
 6          COURTROOM DEPUTY CLERK:  Have a seat.
 7          (10:48 a.m.)
 8                     DIRECT EXAMINATION
 9   BY MR. DINGIVAN:
10   Q.  Ms. Quam, please introduce yourself to the Court.
11   A.  My name is Hillary Quam, I am the U.S./Mexico border
12   affairs coordinator at the Department of State.
13   Q.  Ms. Quam, where are you joining us from today?
14   A.  I now live on Oahu, in Hawaii.
15   Q.  How does the U.S --
16          THE COURT:  My old home.
17   BY MR. DINGIVAN:
18   Q.  What is the U.S. --
19          THE COURT:  Just a minute.  Ms. Quam, would you please
20   spell your last name for the Court?
21          THE WITNESS:  It is Q-U-A-M.
22          THE COURT:  Thank you.
23          MR. DINGIVAN:  Your Honor, she has two declarations.
24          THE COURT:  I remember her declarations, it's for the
25   court reporter's benefit, she doesn't look at the declarations.
```

1   BY MR. DINGIVAN:

2   Q.  Ms. Quam, why are you living out on Oahu at the moment?

3   A.  My husband was transferred to a position at U.S.

4   Indo-Pacific command on Oahu in February of last year, and our

5   family moved at that time.  And at the time the Department of

6   State agreed to allow me to work remotely from there.

7   Q.  Did that impact your ability to perform your position at

8   all?

9   A.  No.

10  Q.  Can you explain what your position as border coordinator

11  is, what do you do?

12  A.  Sure.  I work within the Bureau of Western Hemisphere

13  Affairs, at the Department of State, and my role is to be the

14  primary adviser and expert on all issues, initiatives,

15  negotiations and programs related to the U.S./Mexico border

16  region.

17  Q.  How long have you had that position?

18  A.  Most recently I've been in the position since March of last

19  year.  I previously held the position from August of 2016 until

20  December of 2018.

21  Q.  What did you do between December 2018 and March 2022?

22  A.  In January 2019, I was detailed to a different position

23  within the Bureau of Western Hemisphere Affairs to stand up the

24  what was at the time the WHA Migration Working Group.  I was in

25  that position until March of 2021 when I was detailed to the

 1   Office of the Vice President to serve as the Western Hemisphere
 2   adviser for the Vice President.
 3   Q.  And you did that until you returned to your current
 4   position, correct?
 5   A.  Yes.
 6   Q.  Now, you've been with the State Department for how long?
 7   A.  I have been with the State Department since 2006 and worked
 8   for the Department of Homeland Security for two years before
 9   that, so I've been with the federal government since 2004.
10   Q.  Are you a civil service officer or a foreign service
11   officer?
12   A.  I'm a civil service officer.
13   Q.  Can you explain to the Court what the difference is?
14   A.  Civil servants, we generally stay in Washington and are
15   supposed to be subject matter experts and provide the
16   institutional knowledge for the Department as the foreign
17   service officers rotate between Washington and embassies
18   abroad.
19   Q.  Now, you wrote in your declaration, the first one, that you
20   were acting director of the Office of Mexican Affairs.  Can you
21   explain a little bit what that means?
22   A.  Sure.  For a period of time this summer, during which time
23   the declaration, my declaration was signed, I also served as
24   the office director for the Office of Mexican Affairs to cover
25   a gap in our leadership team during the summer transition

1    season, so I was in Washington for that period of time to lead

2    the office.

3    Q.  Can you describe a little bit about the structure within

4    that office and how you fit into it?

5    A.   Sure.  At the Office of Mexican Affairs at the Department

6    of State, we have about 16 people in the office.  We are led by

7    an office director and have three deputy director equivalence.

8    One is the person who has the title of the deputy of the

9    office.  We also have myself as the border coordinator and we

10   have a security coordinator.

11   Q.  Do you have a specific focus within that office?

12   A.  So my team's focus in particular is overseeing all of our

13   engagement on the U.S./Mexico border region.

14   Q.  Now, you were -- I guess if you started in this position in

15   August 2016, that was under the Obama administration, correct?

16   A.  Yes, it was.

17   Q.  And then you were in your current position through the

18   Trump administration as well?

19   A.  Yes.

20   Q.  And that's actually when you were selected for the detail

21   position to address to the Western Hemisphere Affairs Migration

22   Working Group, correct?

23   A.  Correct.

24   Q.  That was also under the Trump administration?

25   A.  Yes.

1  Q.  Then you've also continued to work for the State Department

2  even after the transition to the Biden administration?

3  A.  Yes, I was a detailee to the Office of the Vice President,

4  but continued my position with the State Department.

5  Q.  So you've worked under every administration since the Bush

6  administration, correct?

7  A.  That's right.

8  Q.  Before you got to the current position, what other roles

9  have you served in at the Department of State?

10 A.  At the Department of State, I worked in the Office of

11 Central American Affairs for a number of years, it was security

12 focused, looking at anti-gang issues.  I've served as the El

13 Salvador desk officer and the Panama desk officer from 2010

14 to -- no, I'm sorry, from 2012 to 2014, I oversaw a program to

15 encourage more educational exchange between the United States

16 and Western Hemisphere countries, the 100,000 Strong program.

17 And then from 2014 through 2016, I served as the Bureau's

18 executive assistant, which is essentially a chief of staff

19 position for the Bureau of Western Hemisphere Affairs.

20 Q.  Now, in your current position besides being the State

21 Department's primary expert on U.S./Mexican border, do you have

22 other job responsibilities?

23 A.  I directly engage on negotiations with the government of

24 Mexico on issues related to Borden infrastructure and water

25 agreements, health agreements, basically anything that impacts

1    the border itself.

2    Q.   Okay.   Thank you.   I want to now talk more to the buoy

3    issue because we're here today.   When did you first become

4    aware of Texas's intent to place the buoy barrier in the Rio

5    Grande?

6    A.   I became aware of the issue in late June of this year.

7    Q.   Through what source?

8    A.   Primarily through media reports.

9    Q.   When or if were you first contacted about this issue by the

10   government of Mexico?

11   A.   We received a diplomatic note from the government of Mexico

12   in -- it was June 26th of this year.

13   Q.   What is a diplomatic note?

14   A.   A diplomatic note is official correspondence between two

15   governments.   It is a formal diplomatic communication.

16   Q.   How can those be exchanged between two governments?

17   A.   There are two ways that we receive diplomatic notes.

18   Either from the foreign ministry in a country to our embassy

19   there or from the foreign country's embassy in the United

20   States directly to the State Department.

21   Q.   And this June diplomatic note, how was that one delivered?

22   A.   This one was transmitted from the Mexican embassy in

23   Washington to our office at the State Department.

24   Q.   And who received that note?

25   A.   I did.

1   Q.  So what did that note say?

2   A.  That note called attention to Mexico's concerns about the

3   plans to install buoy barriers in the Rio Grande River.  Mexico

4   specifically pointed to concerns about potential obstruction

5   and deflection of water from the barriers and reminded the

6   United States of our treaty obligations to seek concurrence

7   from the International Boundary and Water Commission before

8   anything was built in the channel.

9   Q.  And after you received that diplomatic note, the United

10  States and Mexico engaged in some prescheduled meetings in

11  Washington, D.C., correct?

12  A.  We did.

13  Q.  Can you describe those meetings for the Court?

14  A.  We had two meetings prescheduled in July, July 20th and

15  21st.  Those were our mid-year technical meetings for the 21st

16  Century Border Management initiative as well as the plenary

17  session of the Binational Bridges and Border Crossings Group

18  meeting.

19  Q.  Did Mexico raise any concerns about the buoy barrier at

20  those meetings?

21  A.  Mexico raised the issue of the buoy barriers on the margins

22  at both meetings.

23  Q.  What do you mean by that?

24  A.  That in side conversations.  They did not raise them during

25  the formal discussion itself at the table, but did pull us

Hillary Quam - Examination                    63

1    aside for discussions to raise their concerns.

2    Q.  After those meetings in Washington, D.C., when was the next

3    time that you became aware of a formal correspondence from

4    Mexico on this topic?

5    A.  We received a second diplomatic note from the government of

6    Mexico, it was actually the same day of the Binational Bridges

7    and Border Crossings Group meeting on July 21st, so that was

8    the second diplomatic note from the government of Mexico.

9    Q.  Have you seen that diplomatic note as well?

10   A.  Yes.

11   Q.  What does that one say?

12   A.  So that one reiterated Mexico's concerns about the buoy

13   barriers again and thanked the U.S. government for its actions,

14   specifically for DOJ's engagement to have the buoy barriers

15   removed.

16   Q.  Is that the last receipt of formal correspondence from the

17   government of Mexico in this case?

18   A.  No.  We received a third diplomatic note last week from the

19   government of Mexico.

20   Q.  And what did that one say?

21   A.  The note again acknowledged and thanked the United States

22   for DOJ's engagement on the issue, and communicated formally to

23   the United States Mexico's preference that the International

24   Boundary and Water Commission oversee any removal efforts of

25   the buoy barrier.

Hillary Quam - Examination                    64

1    Q.  Now, in addition to these formal diplomatic correspondence

2    notes that you reviewed, have there been other formal

3    complaints from the government of Mexico about the buoy

4    barrier?

5    A.  Yes, the government of Mexico has raised their concerns at

6    the highest diplomatic levels on two specific occasions.  There

7    was the first phone call that took place between Mexican

8    Foreign Secretary, Barcena, and Secretary of State, Blinken, on

9    July 21st in which the Mexican Foreign Secretary flagged

10   concerns for Secretary Blinken about the buoy barriers.  Again

11   in their first meeting on August 10th, it was also a topic of

12   discussion.

13   Q.  So when the Mexican Foreign Secretary and Secretary of

14   State Blinken met for the first time, this was the first topic

15   that was brought up?

16   A.  Yes.  Well, they discussed the issue during the course of

17   the meeting and then immediately after in the press conference,

18   the joint press conference that the two gave, this was the

19   first topic raised by Foreign Secretary Barcena.

20   Q.  And that's attached to your declaration as well?

21   A.  Yes.

22   Q.  In addition to statements by the government of Mexico

23   diplomatic notes and the statements by the Mexican Foreign

24   Secretary, had the President of Mexico commented on this at

25   all?

1    A.   Yes.   Mexican President Lopez Obrador gives a daily press
2    conference and he has raised the topic or discussed the topic
3    of the buoy barriers six times in his daily press conference
4    since June 25th.
5    Q.   Now, I'm going to switch gears a little bit.   I want to
6    talk to you about a statement you wrote in your first
7    declaration.   You wrote, quote, *If the barrier is not removed*
8    *expeditiously, this presence will have adverse impact on U.S.*
9    *foreign policy.*
10       Can you explain or expound what you mean by "adverse
11   impact"?
12   A.   Absolutely.   So the U.S./Mexico relationship is extensive,
13   very broad.   We work on a number of issues that are of interest
14   to both countries in the bilateral relationship, including
15   economic competitiveness, security issues, cultural, labor,
16   educational issues, the gamut is -- we run the gamut on the
17   issues that we discuss.   So an issue like this distracts from
18   the binational agenda and essentially our concern is that
19   Mexico will not be a willing partner on other issues that we
20   need them while this remains an issue in the relationship.
21   Q.   And those include commercial issues and infrastructure
22   issues as well?
23   A.   Absolutely, yes.
24   Q.   And going a little bit further, what sort of -- based on
25   your experience, what sort of length would you anticipate this

 1   adverse impact could have, how long could this impact last?

 2           MR. SWEETEN:  Objection, Your Honor, calls for

 3   speculation.

 4           THE COURT:  I'm going to sustain that objection.  I

 5   think she can testify about what has occurred, but I don't

 6   think she can speculate as to what may occur.

 7           MR. DINGIVAN:  May I be heard on that topic?

 8           THE COURT:  Yes.

 9           MR. DINGIVAN:  I believe that Ms. Quam has established

10   sufficient foundation based on 19 years of working in the State

11   Department and long time in this current office to have a

12   reasonable expectation as to what Mexico-- how long this might

13   be an issue for the country of Mexico.

14           THE COURT:  Well, she has already testified that it's

15   a significant issue for Mexico.  She's testified to that.  I

16   think the Court can draw its own conclusions as to whether this

17   will continue for some period of time, but I don't think that

18   she's in the position to speak for the government of Mexico as

19   to how long this is going to create an issue for them.  She can

20   certainly testify about -- I believe that her declaration

21   includes some actions that Mexico has already taken or refused

22   to take, she can testify about that.

23           MR. DINGIVAN:  Okay.  I'll move on, Your Honor.

24   BY MR. DINGIVAN:

25   Q.  Let's talk about we're dealing with adverse impacts to a

1  huge multi bilateral relationship between United States and

2  Mexico.  How can a 1,000-foot buoy barrier along a

3  multi-thousand mile border have this type of impact?

4  A.  So essentially this is a major concern for Mexico both as

5  they've noted the potential obstruction and deflection of water

6  which is a concern, but they believe that this is a treaty

7  violation, and that that raises real concerns for them and for

8  us in the international arena.  That Mexico has sensitivities

9  about sovereignty issues and doesn't want to be seen as a

10  lesser partner to the United States.  So an issue like this

11  that impacts the U.S./Mexico border in which there are, you

12  know, potential incursions into Mexico, that this raises major

13  concerns for the government of Mexico.

14  Q.  Have they raised concerns about activities in the past on

15  the part of the United States government in terms of walls and

16  things like that?

17  A.  Yes.

18  Q.  Why is this different or how is this different?

19  A.  For two reasons in particular.  This is different because

20  it is not a U.S. federal government action.  It is different

21  because it's in the river and specifically on the international

22  boundary.  Generally when the U.S. has constructed walls in the

23  past, they are some distance inland into the United States and

24  are very much, while Mexico has raised concerns and generally

25  does not like walls between our two countries, they understand

1   when they are domestically within the United States.

2   Q.  Do you believe, based on your experience, that Mexico

3   believes that this action is provocative intentionally?

4          MR. SWEETEN:  Your Honor, objection, speculation, "do

5   you believe --"

6          THE COURT:  Sustained, sustained.

7   BY MR. DINGIVAN:

8   Q.  You mentioned in your first declaration that one of the

9   most important and sensitive bilateral issues are human

10  migration management and border infrastructures.  Can you

11  explain to the Court why that's so important to Mexican/U.S.

12  relations?

13  A.  Sure.  For border infrastructure in particular, we have 47

14  active border crossings between the United States and Mexico

15  and there is significant trade and travel across the border

16  through those border crossings daily.  It's in both countries'

17  interest to keep the border crossings moving and functional and

18  for the efficient and secure trade that impacts not just the

19  border region, but people throughout both countries.  And then

20  migration management is a major topic in the relationship that

21  Mexico has historically been a transit country for migrants to

22  arrive in the United States, and it's an issue that we've

23  worked on closely together for years.

24  Q.  Now, generally speaking, is the issue of illegal

25  immigration in the United States something the State Department

1  deals with?

2  A.   Immigration within the U.S. and our agency structure is

3  inherently a domestic issue, and the Department of Homeland

4  Security is the primary point of contact for that.  We at the

5  State Department do work on international migration issues

6  which is generally negotiating agreements with foreign

7  countries related to migration, but we do not work directly on

8  immigration to the United States.

9  Q.   Now, I want to talk to you -- you mentioned earlier a

10  little bit about water delivery negotiations.  Can you explain

11  to the Court what you meant by that?

12  A.   Sure.  The United States and Mexico have a number of

13  treaties that essentially govern how we share water between the

14  U.S. and Mexico based on the flows in that portion of the

15  country.  So in the western region of the United States, most

16  of the rivers flow south and we owe certain quantities of water

17  to Mexico on specific cycles.  In Texas, water generally flows

18  north and Mexico owes certain quantities of water to us on

19  cycles.

20  Q.   What's the status of the current water negotiations?

21  A.   So we are about four years in to the current five-year

22  cycle of deliveries here in this portion of the border.  So

23  we -- there is concern that Mexico is not going to meet its

24  water delivery obligations by next year's deadline, and the

25  U.S. government has been working closely with the government of

1    Mexico to negotiate an emergency -- it's called a Minute, but

2    an emergency agreement that would provide, try to attempt to

3    provide more predictability to Texas farmers regarding their

4    water deliveries from Mexico.

5    Q.  How has this buoy barrier impacted those water

6    negotiations?

7    A.  It has essentially slowed those negotiations, and Mexico

8    has indicated that they are less inclined to conclude an

9    Emergency Minute by the end of the year while the buoy barrier

10   remains in place.

11   Q.  Has the State Department received any complaints regarding

12   this issue from Texas citizens?

13   A.  Yes, we have been hearing both from stakeholders here in

14   Texas and there are significant congressional interest in the

15   issue as well.

16   Q.  I just have a few more questions for you.  I want to

17   talk -- one of the things you wrote in one of your declarations

18   was the importance of, quote, *mutual respect for each other's*

19   *sovereignty.*  What do you mean by that?

20   A.  So it's essentially this concept underpins the U.S./Mexico

21   relationship, that the United States and Mexico are equal

22   partners with mutual respect for each other's sovereignty.

23   Q.  In addition to the water negotiations, are there other

24   infrastructure projects that are being made more difficult to

25   negotiate due to this buoy barrier?

1    A.  We do have concerns that Mexico could not be as willing to

2    work with us on major infrastructure projects along the border,

3    that through the President's bipartisan infrastructure law,

4    about $2.6 million was allocated for border infrastructure

5    modernization and upgrades with two of those specific projects

6    being in the Texas region, and there are concerns that Mexico

7    might not be as willing to meet our schedules for those

8    projects as they could be otherwise.

9    Q.  And do we need Mexico's cooperation to complete this

10   infrastructure project?

11   A.  Yes.  Close binational coordination is essential for all of

12   our border infrastructure, that we have to ensure that both

13   sides essentially build what they say they're going to build

14   and the roads meet up in the middle.

15           MR. DINGIVAN:  Thank you, Your Honor.  I'll pass the

16   witness.

17           THE COURT:  Okay.  Cross.

18           MR. SWEETEN:  Thank you, Your Honor.

19           *(11:12 a.m.)*

20                    CROSS-EXAMINATION

21   BY MR. SWEETEN:

22   Q.  Good morning, Ms. Quam.  Thank you for coming.  You work

23   for the Biden administration, correct, the Department of State?

24   A.  Yes.

25   Q.  It's the case, isn't it, that you have testified that the

1   thousand feet of an orange buoy in the Rio Grande River is a

2   source of significant diplomatic concern for Mexico, that's

3   your testimony, isn't it?

4   A.   Yes.

5   Q.   It's certainly not the only issue of great diplomatic

6   concern between the United States and Mexico, is it?

7   A.   No.

8   Q.   For example, you surely are aware that there were

9   2.3 million border encounters in FY 2021, correct?

10  A.   I'm generally aware of the statistics, yes.

11  Q.   In fact, let's take a look at it, if we could pull up D7.

12  First let's look at page one and then page 12.

13      Okay.  So are you familiar with this report which is from

14  the Inspector General and it's entitled *"Intensifying*

15  *Conditions at the Southwest Border are Negatively Impacting CBP*

16  *and ICE Employees Health and Morale."*  Have you read this?

17  A.   I don't know that I have read this report, no.

18  Q.   This appears to be a government report, correct?

19  A.   It looks like it.

20  Q.   Okay.  Seal of the United States on it?

21          MR. SWEETEN:  Let's go to page 12, if we could.  Let's

22  stop there.

23          MR. DINGIVAN:  Your Honor, I'm going to object to this

24  entire questioning out of a report that she has not read and

25  she's said that she's not familiar with specifically.

1          THE COURT:  The objection is sustained.

2    BY MR. SWEETEN:

3    Q.  May I ask you, are you familiar with the fact that in

4    addition to the 2.3 million people border encounters that we've

5    had, that it's been reported that 600,000 of those are

6    got-aways, are folks that are not processed through any sort

7    of --

8          MR. DINGIVAN:  Same objection, Your Honor.

9          THE COURT:  The objection is sustained.

10   BY MR. SWEETEN:

11   Q.  Are you familiar with how many got-aways there are?  You've

12   talked about the 2.3 million.  How many got-aways of the

13   2.3 million are there?

14         MR. DINGIVAN:  Same objection, Your Honor.

15         MR. SWEETEN:  It's a question as to--

16         THE COURT:  No.  Look, the issue in this case is

17   whether the -- sorry, there appears to be some sort of the --

18         One of the problems we have in the federal court

19   system is we are not first in line for money for equipment.

20         The issue is that we are here for purpose of

21   determining whether this is a barrier to navigation, whether

22   this is a navigable waterway, that's why we're here.  Now, I

23   don't think anybody would reasonably suggest that the United

24   States does not have a serious problem with what has been

25   termed "illegal immigration."  She isn't in a position to give

1    us any insight that has anything to do with this case on that

2    issue except for the argument that Texas has made that this is

3    somehow within the Governor of Texas prerogative to act

4    unilaterally to stop what has been determined by Texas to be an

5    invasion.  Correct?

6                MR. SWEETEN:  Well, I mean --

7                THE COURT:  Isn't that what your argument is?  That

8    Governor Abbott has the unilateral authority to act to stop an

9    invasion of the United States?

10               MR. SWEETEN:  Your Honor, that is part of our argument

11   is yes, that the Governor possesses authority under the

12   invasion clause to stop -- to act to stop unlawful migration

13   and cartel activity.  What I was getting at with my questioning

14   of the witness is she has talked about -- she has focused on

15   this 1,000-foot buoy system.  There are a plethora of other

16   issues.  Now, I could move --

17               THE COURT:  She's already testified in response to

18   your question that she is aware that there are a multitude of

19   issues between the United States and Mexico.  We're not going

20   to delve deeply into areas where she has no expertise

21   whatsoever.

22               MR. SWEETEN:  Okay.  Thank you, Your Honor.  I

23   understand.

24   BY MR. SWEETEN:

25   Q.  Let's move from unlawful migration to other issues.  First

1  of all, you would agree with me that it is a source of concern

2  between the bilateral relationship between the parties that

3  cartel activity is occurring in Mexico that involves drugs and

4  human smuggling, that's a source of friction and discussion

5  certainly in those circles, isn't it?

6  A.  The United States and Mexico do have regular discussions

7  about security issues including cartels.

8  Q.  You touched on water routes, you understand that there

9  are -- and then you talked a little bit about constituent

10  communications to you about the issues.  It's the case, isn't

11  it, that the State of Texas has expressed concern and

12  landowners on the Rio Grande have expressed concern about the

13  lack of water deliveries that are being provided by Mexico.

14  That's also an issue between the two countries, correct?

15          MR. DINGIVAN:  Objection, Your Honor, this is

16  testimony in the question tacked on the very end.

17          THE COURT:  Sustained.

18  BY MR. SWEETEN:

19  Q.  You would agree with me that water issues are a subject of

20  contention between the parties, correct?

21  A.  Water issues, we have water negotiations between the two

22  countries.  They have not raised to the same level of

23  diplomatic concern at this point.

24  Q.  You understand that the federal government has, through

25  IBWC, has received communiques from the State of Texas

1   complaining about the lack of water deliveries that were bound

2   by the treaty, correct?

3   A.   I'm sorry.  Can you repeat that?

4   Q.   Yes.  Are you familiar with letters directed to the IBWC

5   related to lack of water deliveries that are required by treaty

6   obligations?

7   A.   I have not seen specific communications to IBWC.

8   Q.   Okay.  Are you familiar with complaints by Texas landowners

9   about the lack of fulfillment of treaty obligations by Mexico

10  in the Rio Grande River?

11  A.   Yes.

12  Q.   Are you familiar with the fact that the importation of

13  lethal fentanyl, that is an issue, isn't it, that impacts

14  bilateral relationships between Mexico and Texas, right?

15          PLF. COUNSEL:  Objection, Your Honor.  This is again

16  outside the bounds of what you've previously ruled.

17          THE COURT:  The objection is sustained.  Counsel,

18  look, I said it before and I'll say it again, we're going to

19  stay with the issues here.  Now, she has already testified to

20  and the Court will take judicial notice of the fact that

21  illegal drugs do come across the border from Mexico to the

22  United States, the vast majority which come through legal

23  border points, by the way, through subterfuge, and that is an

24  issue that exists between the United States and Mexico and has

25  for decades.  I don't think we need her to testify to that.

1          MR. SWEETEN:  Okay.  And Your Honor, I will just say

2     in response, and I understand the Court's ruling and will

3     adhere to it on the issue of drugs and the illegal migration,

4     but I will say that the DOJ explored and certainly highlighted

5     this issue.  And I'm pointing out --

6          THE COURT:  They certainly highlighted the issue as it

7     relates to the buoys, okay.  The fact that there are other

8     issues between the United States and Mexico is relevant to a

9     degree, but not to a great degree because there are issues

10    between the United States and even its most important partners,

11    Canada and the United States have issues, Mexico and the United

12    States have issues.  The United Kingdom and the United States

13    have issues.  There's no question about that.  There is no two

14    international partners that don't have some disagreements, and

15    that's a fact of life.

16         The question is whether the positioning by the

17    Governor of Texas unilaterally in the Rio Grande River of these

18    buoys constitutes a substantial issue between the United States

19    and Mexico.  That's the issue.  The fact that something else

20    might be a substantial issue is there also, but we know what

21    those issues are.

22         MR. SWEETEN:  I will keep it high level then on that

23    question.

24         THE COURT:  All right.

25         MR. SWEETEN:  In adherence to the Court's order.

1   BY MR. SWEETEN:

2   Q.  So it's the case, isn't it, that the issue of human

3   smuggling is an issue that impacts bilateral relations between

4   Mexico and the United States?

5         MR. DINGIVAN:  Objection, Your Honor.  The Court just

6   ruled that this has to do with the buoy barriers and we're

7   talking about everything but buoy barriers.

8         THE COURT:  She can answer that question, then we're

9   going to move on.

10  A.  The United States and Mexico do cooperate and talk about

11  human smuggling, yes.

12  Q.  Okay.  Now, your testimony was that you first learned of

13  the buoy issue, that there were a thousand feet of buoys put in

14  Eagle Pass, in one place in Eagle Pass, in late June of 2023,

15  isn't that right?

16  A.  That's correct, we received the media reports of the plans

17  to install the barrier.

18  Q.  Are you familiar with the fact that Governor Abbott already

19  had announced the buoys were going to be deployed on June 8th

20  of 2023?

21  A.  We saw the press reports, yes.

22  Q.  And are you aware that state officials briefed officials

23  from the International Borders and Water Commission regarding

24  their plans to put this buoy system out in the river?

25  A.  I am not personally aware of those briefings, no.

1   Q.  In your discussions or work regarding the bilateral

2   negotiations and relationship between Mexico and the U.S., has

3   the issue of migrant safety come up?

4   A.  Generally, yes.

5   Q.  And that's because the U.S. called the border the most

6   dangerous crossing in the world, correct?

7   A.  I couldn't say if that's -- I wouldn't say that's why we

8   discussed that issue with the government of Mexico.

9   Q.  Has Mexico expressed safety for the migrants that are

10  crossing into the United States?

11  A.  Mexico generally supports humane migration practices, yes.

12  Q.  And are you aware that part of the reason for the

13  deployment of the buoys is to prevent drownings of migrants

14  that might try to ford the Rio Grande?

15          MR. DINGIVAN:  Objection, Your Honor.  This is

16  speculation as to what other people are thinking.

17          THE COURT:  Yes, you're asking her to put herself in

18  Governor Abbott's mind.  I don't think she's --

19          MR. SWEETEN:  I'm not trying to do that, Your Honor.

20  BY MR. SWEETEN:

21  Q.  I'm addressing now the orange buoys in the one segment of

22  the river in Maverick County, Texas.  Have you explained that

23  the Governor or that expressions have been made that it might

24  save migrant lives to the government of Mexico.

25  A.  No, I have not.

1  Q.  Have you discussed the fact that not a single person has

2  been injured or killed as a result of the buoys?

3  A.  No, we have not.

4  Q.  So when they've raised the issue, you haven't discussed the

5  fact that, well, it's being monitored and no one has been

6  injured or killed as a result of these buoys?

7            MR. DINGIVAN:  Objection, Your Honor.

8  BY MR. SWEETEN:

9  Q.  You haven't said that in response --

10           THE COURT:  Just a minute.  Yes.

11           MR. DINGIVAN:  I apologize, Your Honor.  Objection to

12  counsel is testifying and asking the witness.

13           THE COURT:  Yes.  Look, I understand your zeal in

14  attempting to get her to testify about these things that are

15  beyond her capacity to testify to.  You've already asked her

16  whether she had discussions, you can ask her about that.  But

17  then you interpose your own view of how this should or should

18  not impact her own interpretation of her discussions, and I

19  don't think she's in the position to tell you that.

20           MR. SWEETEN:  Okay.

21  BY MR. SWEETEN:

22  Q.  Let me ask you this, go back to the timeline.  June 8th

23  Governor Abbott announced it, you said that.  You weren't aware

24  of a discussion on June 12th between state officials and the

25  IBWC, correct?

1   A.  I was not, no.

2   Q.  Then you find out in late June that the buoys have been

3   built, that's when you first learned of it, correct, is that

4   right?

5   A.  Yes, around that timeframe.

6   Q.  And we get a filing from the Department of Justice back in

7   July, July 24th of 2023.  Do you have any reason to dispute

8   that?

9   A.  I would have no reason to dispute that, no.

10  Q.  And in that time, there have been statements that have been

11  made by State Department officials about the relationship with

12  the government of Mexico, correct?

13  A.  Yes.

14  Q.  If we could pull up D35 please.  Okay.  Do you see that

15  document, *Statement from National Security Adviser Jake*

16  *Sullivan on Legal Pathways Initiative with Mexico*"?

17  A.  I do.

18  Q.  Have you seen that before today?

19  A.  Yes.

20  Q.  Okay.  And it is dated July 28th, 2023, correct?

21  A.  Correct.

22  Q.  So this would have been after the Department of Justice

23  filed a motion with this Court seeking to enjoin the placement

24  of the buoys, right?

25  A.  Yes.

1    Q.   *"Following the very productive meetings that took place*

2    *earlier this week in Mexico between President Andres Manuel*

3    *Lopez Obrador and U.S. delegation led by White House Homeland*

4    *Security Adviser Elizabeth Sherwood-Randall, the United States*

5    *is taking additional steps to expand --"*

6              THE COURT:  Counsel, why are you reading that?

7              MR. SWEETEN:  Well, I want to make sure it's in the

8    record.

9              THE COURT:  Well, do you want to put it in the record?

10   Has it been submitted previously?

11             MR. SWEETEN:  It has been.

12             THE COURT:  All right, then it's in the record.  All

13   right.  You want to ask her a specific question, you don't need

14   to read the whole document.

15             MR. SWEETEN:  Okay.

16   BY MR. SWEETEN:

17   Q.   Let's go to the second paragraph.  *"This builds on a series*

18   *of successful legal pathway initiatives that President Biden*

19   *and President Lopez Obrador have agreed to launch during the*

20   *last year."*  Did I read that sentence correctly.

21   A.   It looks like it.

22   Q.   *"The expanded cooperation between the United States and*

23   *Mexico to manage our shared border in a humane and orderly way*

24   *is a testament to, quote, strong and enduring bonds of*

25   *friendship and partnership between our two countries."*

Hillary Quam - Examination                    83

1   Correct.  Did I read that correctly?

2   A.  Yes.

3   Q.  There's also an attachment 19 that you provided to this

4   Court.  You added an exhibit that has a picture of Antony

5   Blinken.  Do you have this in front of you.  Let's put it up,

6   G24, and we're on the attachment at page five.

7         MR. DINGIVAN:  Your Honor, just for clarity for the

8   purposes of my witness, they've switched now to defendant's

9   exhibit, that's why it's the plaintiff's exhibit so that we're

10  just clear what we're looking at.  I don't think those are in

11  front of her.

12        THE COURT:  No, those aren't in front of her, but

13  she's got a monitor that's got it right in front of her.

14  BY MR. SWEETEN:

15  Q.  So it's your sworn declaration this was attached to it,

16  right, do you recall that?

17  A.  Yes, the transcript of the press conference.

18  Q.  So if we can go very quickly to the next page, first text

19  page please.  And I just want to read one sentence for you.  It

20  starts in the middle of the second paragraph, it says -- and

21  this is Secretary of State, Antony Blinken, your high boss

22  talking, right?  Is that correct?  Yes?

23  A.  Yes, I assume that's what you're going to read, yes.

24  Q.  And it says, *"I don't think there's been a time when we've*

25  *had stronger partnership and collaboration between Mexico and*

1    *the United States, and that's a time when the multiplicity of*

2    *issues and their complexity is also greater than ever before."*

3        Did I read that correctly?

4    A.  Yes.

5    Q.  Can you tell us the date of that statement, do you know?

6    A.  Yes, that was from the August 10th meeting that I mentioned

7    previously.

8    Q.  So 12 days ago Secretary of State Blinken said this, right?

9    A.  Yes.

10   Q.  When you spoke with Mexican officials about this concern

11   that you've said that they expressed, did you cite U.S. law and

12   discuss the Rivers and Harbors Act with them?

13   A.  We discussed the various treaty commitments, yes.

14   Q.  Did you cite U.S. law and the Rivers and Harbors Act

15   specifically?

16   A.  Personally I did not, no.

17   Q.  Did they express -- did the Mexican government express

18   gratitude that you were pursuing an action against the State of

19   Texas for placing these barriers in the Rio Grande?

20   A.  Yes.

21   Q.  You would agree with me that IBWC also expressed

22   gratitude -- has IBWC expressed gratitude for pursuing this

23   action?

24   A.  Not to me, no.

25   Q.  Do you know if they are the ones that initiated this with

1    the Corps of Engineers, do you know?

2    A.  So IBWC is a binational body and there are two sections,

3    there's the U.S. section of the International Boundary

4    Commission and there's CILA, or the Mexican section of the

5    International Boundary and Water Commission.  And then both

6    sections operate independently and then come together as the

7    binational body.  So when we say IBWC, we're generally talking

8    about the joint section and then we have the U.S. section and

9    the Mexican section.

10   Q.  Okay.  So you have -- and in fact, it's an international

11   body, correct?  It's those two -- it's one reports up to the

12   foreign affairs, I guess the foreign affairs minister of Mexico

13   and one reports up to the United States, correct?

14   A.  That's correct and then they come together in the

15   binational commission, but they do not have the status of an

16   international organization.

17   Q.  Do you know if it was the IBWC that initiated the complaint

18   in this case to the Corps of Engineers?

19   A.  I do not know.

20   Q.  Did you at any time encourage the IBWC, you or anyone that

21   you work with, encourage the IBWC to pursue this claim with the

22   Corps of Engineers?

23   A.  No.

24   Q.  On the complaint filed by the Department of Justice is

25   attached a letter from Governor Greg Abbott.  You were talking

1  earlier about constituent communications, correct?

2  A.  Yes.

3  Q.  And have you seen this document which is docket 3-1 filed

4  by the United States, letter from Governor Greg Abbott?

5  A.  No.

6  Q.  This was written July 24, 2023, and you have not had the

7  opportunity to see it?

8  A.  No.

9  Q.  We can go to the next page.  Read the bullets.  Can you see

10  that okay?

11  A.  Yes.

12  Q.  Just read the bullets to yourself.

13      (Pause.)

14          MR. DINGIVAN:  Your Honor, I'm going to lodge the same

15  objection I lodged --

16          THE COURT:  The objection is sustained.  What you're

17  asking her to do is just repeat something she hasn't ever seen

18  before.  I don't know what she could possibly testify to.

19          MR. SWEETEN:  Okay.

20  BY MR. SWEETEN:

21  Q.  The constituent communications that you testified about

22  earlier, you've received competing constituent communications,

23  haven't you, on issues involving the buoys, correct?

24  A.  I'm not sure what you mean.

25  Q.  Well, you were talking earlier, you said that you had had,

 1   and I forgot who it was, reach out to you to express concern
 2   about the buoys, correct?
 3   A.   No.   I said that we have had stakeholder engagement
 4   regarding the water negotiations.
 5   Q.   Okay.   And you've also heard concerns from constituents
 6   about the fact that Mexico is not delivering sufficient water
 7   to the United States, correct?
 8   A.   Yes.
 9            MR. SWEETEN:   No further questions.   Thank you.
10            MR. DINGIVAN:   No redirect, Your Honor.
11            THE COURT:   All right.   Ma'am, you may step down.
12   Thank you very much.   Does the United States have any further
13   witnesses?
14            MR. LYNK:   We do not, Your Honor.
15            THE COURT:   Okay.   Does Texas have any witnesses?
16            MR. SWEETEN:   Your Honor, may we have a minute to
17   briefly conference?
18            THE COURT:   Absolutely.
19            MR. SWEETEN:   Thank you, sir.
20            (11:37 a.m.)
21            Your Honor, I think we are going to -- first of all,
22   we've admitted, the Court has admitted a video taken from the
23   drone of the Rio Grande.
24            THE COURT:   Yes, that's correct, we have that.
25            MR. SWEETEN:   We can show that, it's three minutes and

1    it's a silent clip picture of the Rio Grande.

2            THE COURT:  I'll allow you to do that.

3            MR. SWEETEN:  We'd like to show that, and then

4    secondly we intend to call Loren Flossman of the Cochrane

5    Company who put the buoys in the river.

6            THE COURT:  Okay.  How long do you anticipate her

7    testimony will take because we're getting close to the lunch

8    hour here.

9            MR. SWEETEN:  I think it will be short, 15 minutes or

10   less.

11           THE COURT:  We'll watch the video, then we're going to

12   break for lunch, 12 to 1:00 and come back 1:00 to finish.

13           MR. SWEETEN:  Okay.

14           THE COURT:  The record should reflect that we're

15   seeing a video apparently from August 17th of 2023.  Is that

16   correct, counsel?

17           MR. SWEETEN:  That's correct, Your Honor.  It's a

18   video of approximately several-mile stretch of the Rio Grande

19   from above.

20           THE COURT:  Okay.  The video is in the record.

21           *(11:41 a.m., video playing.)*

22                              *   *   *

23           *(11:45 a.m.)*

24           MR. SWEETEN:  Your Honor, I have one motion to address

25   to the Court that may impact the witnesses that we may need to

1  call.

2         THE COURT:  Sure.

3         MR. SWEETEN:  Your Honor, on Tuesday of last week, the

4  State received a filing I must say that I've never seen before

5  called Plaintiff United States's Notice of New Facts.  In that

6  notice of new facts filed with the Court, there was an

7  allegation that some of the buoys may be on the Mexican side.

8  We dispute that.  Our own contractor has his own view on how

9  that was done, but nevertheless --

10         THE COURT:  I've received by the United States or

11  somehow information reached the Court that Texas had

12  repositioned the buoys.  Is that true?

13         MR. SWEETEN:  There was a follow-up from the DOJ that

14  said, well, now Texas is moving the buoys--

15         THE COURT:  I'm asking you did Texas --

16         MR. SWEETEN:  They have been repositioned back to

17  avoid controversy --

18         THE COURT:  All right.

19         MR. SWEETEN:  -- with our federal partners.  So here

20  is where we are, I don't know what the import of the Court's

21  ruling to have admitted all the exhibits that both parties have

22  provided.  I don't know if I need to address this notice of new

23  facts which seemingly is no longer a matter in dispute.  We had

24  agreed with counsel that they had a witness named Peña that

25  they would agree to bring Peña to testify if they were going to

1    rely on her late filed declaration which was accompanied with

2    this notice of new filing.  And so where I am, Your Honor, is

3    we are prepared to put on Mr. Flossman to talk about the

4    positioning of those buoys, but if the Court is not going to

5    receive this filing --

6              THE COURT:  No, you should bring Mr. Flossman because

7    one of the issues here, obviously, and you spent a lot of time

8    cross-examining on it was the relationship between Mexico and

9    the United States.  Now, let me make it very clear, this Court

10   is not going to delve into political questions.  That is not a

11   purview of this Court.  And the Fifth Circuit has made it very

12   clear in rulings that they have made that it is not the purview

13   of their court either, and so has the Supreme Court, by the

14   way.  So I am not going to get into political question issues

15   in my ruling.  Suffice it to say that what is of concern to the

16   Court is the fact that this buoy, buoys or whatever it is, this

17   long chain of buoys that are apparently, as the record

18   reflects, are cabled together with steel and then have wire

19   underneath to keep people from diving underneath it, I guess,

20   and then are anchored somehow by concrete blocks --

21             MR. SWEETEN:  Uh-huh.

22             THE COURT:  -- is moving with the tide of the river.

23   Because either Texas intentionally placed it out in the middle,

24   which would be a very interesting thing, or if they didn't

25   intentionally put it there so close to the Mexican border, it

1   floated there or was dragged there by the current sufficiently

2   so that Texas saw the need to bring it back.

3           MR. SWEETEN:  Well, Your Honor --

4           THE COURT:  One of these things happened.

5           MR. SWEETEN:  Right, and so that's what my query is

6   about.  If this Court is going to receive this motion for new

7   facts and then the subsequent --

8           THE COURT:  It isn't a motion, it was a notice.

9           MR. SWEETEN:  Notice.  If the Court is going to

10  receive that evidence and if the Court wants to hear from

11  Flossman --

12          THE COURT:  I think you should because I'm concerned

13  if something is moving around in the river.

14          MR. SWEETEN:  And those are tethered to blocks,

15  moveable cement blocks that are on the bottom of the river,

16  they're not moored in any way, they're placed there, so he can

17  testify about those issues.

18          THE COURT:  The question is does this thing with the

19  current, is it capable of being moved?  And I don't know, but

20  the record would indicate that at least the way that it's

21  constructed at the moment, it is, because Texas found the need

22  to bring it back.  And if it wasn't in a position that Texas

23  was comfortable with, they wouldn't have done that.  And the

24  suggestion that they were trying to avoid controversy is

25  probably a good one.

```
 1              MR. SWEETEN:  Well, Your Honor --
 2              THE COURT:  That was your statement.
 3              MR. SWEETEN:  I think we in the exercise of caution
 4   moved it back, we had done readings of --
 5              THE COURT:  Well, they say that it was in Mexico,
 6   80 percent of it had drifted over to Mexico.  Now, I assume
 7   Texas didn't intentionally put it in Mexico.
 8              MR. SWEETEN:  We don't agree it was in Mexico.
 9              THE COURT:  Okay.
10              MR. SWEETEN:  At any rate, I understand the Court's
11   direction, we'll call Mr. Flossman.
12              THE COURT:  So we will see Mr.Flossman or Ms.
13   Flossman?  Loren could be a man's name or a woman's name?
14              MR. SWEETEN:  It's Mr. Flossman.
15              THE COURT:  I don't know which one it is, I've never
16   met Mr. Flossman.  So we will resume at roughly 1:00.  Court
17   stands in brief recess.
18              COURT SECURITY OFFICER:  All rise.
19              (11:52 a.m.)
20                              *   *   *
21              (1:06 p.m.)
22              COURT SECURITY OFFICER:  All rise.
23              THE COURT:  Please be seated.  All right, the court
24   notes the presence of all counsel as well as the parties.
25   Counsel, your witness.
```

```
 1          MR. SWEETEN:  Your Honor, we do.  Mr. Bryant is going
 2   to call Mr. Flossman.
 3          THE COURT:  All right.
 4          COURTROOM DEPUTY CLERK:  Please raise your right hand.
 5                          *   *   *
 6          (Oath administered and LOREN FLOSSMAN, Defense
 7   Witness, sworn.)
 8                          *   *   *
 9          THE WITNESS:  I do.
10          COURTROOM DEPUTY CLERK:  You can have a seat.
11          (1:07 p.m.)
12                      DIRECT EXAMINATION
13   BY MR. BRYANT:
14   Q.  Mr. Flossman, how are you currently employed?
15   A.  I'm employed with Cochrane USA.
16   Q.  And could you generally describe your current role with
17   Cochrane as it pertains to the floating buoy system that is the
18   subject of this case?
19   A.  I represent that system to their client base, which is
20   international.
21   Q.  Okay.  And prior to your employment with Cochrane, was
22   there a time when you worked for a portion of the federal
23   government?
24   A.  Yes.
25   Q.  What part of the federal government did you work for?
```

1    A.  I was employed by CBP, Customs and Border Protection and

2    specifically U.S. Border Patrol.

3    Q.  And how long were you with the U.S. Border Patrol and CBP?

4    A.  Since 2007.  Don't ask me to do the math please.

5    Q.  During the period you were with the Border Patrol, did you

6    have any responsibilities related to the Rio Grande River?

7    A.  Yes, I was responsible for the tactical infrastructure

8    program which included the fence barrier wall as it changed

9    from administration, the roads, lights, and Border Patrol

10   facilities along the southwest border, both for 2007 Secure

11   Fence Act and then President Obama's fence bill, and then

12   subsequently Trump, President Trump.

13           MR. BRYANT:  Your Honor, are you hearing the witness

14   okay?

15           THE COURT:  Yes, I can hear him.  The more important

16   question is can the reporter hear.

17   BY MR. BRYANT:

18   Q.  When you were with the U.S. Border Patrol, did you have an

19   overall role with them relating to infrastructure?

20   A.  Yes, I was appointed acquisition manager for the whole

21   program.

22   Q.  In that role, did you have occasion to conduct or supervise

23   testing of the floating barrier system that ultimately later

24   was put into the Rio Grande?

25   A.  Yes, deputy chief of Border Patrol got together with me, I

1  provided their requirements -- or they identified requirements,

2  I provided solutions and wanted to develop a solution that

3  would --

4          MS. KIMBALL:  Objection, Your Honor.  Mr. Flossman

5  appears to be testifying about information that would be

6  covered by deliberative process privilege, discussing Border

7  Patrol's privilege.

8          THE COURT:  Yes.  Unfortunately, I think that's right.

9          MR. BRYANT:  That's fine.  We'll work around that,

10 Your Honor.

11 BY MR. BRYANT:

12 Q.  Did Customs and Border Patrol ultimately decide to consider

13 contracting to deploy the floating barrier system in the Rio

14 Grande?

15         MS. KIMBALL:  Objection, Your Honor.  Same objection

16 regarding deliberative process privilege.

17         MR. BRYANT:  Your Honor, I just asked about the

18 decision, not about the process.

19         THE COURT:  The objection is overruled.

20 A.  Yes, they did.

21 Q.  And did there come a time when that process was canceled

22 after the change of administration at the beginning of 2021?

23 A.  Yes, on the 22nd of January when the proclamation that

24 President Biden put out.

25 Q.  Now, I'd like to ask you some questions about the floating

1   buoy system that is deployed in the Rio Grande now.  Are any

2   parts of that system structurally attached to the riverbed or

3   the shore of the river?

4   A.  No, no parts are attached to the river or to the shore.

5   Q.  Does that floating buoy system include some concrete blocks

6   resting on the riverbed?

7   A.  Yes, it does.

8   Q.  With respect to the system, it's actually placed in

9   Maverick County downstream from Eagle Pass now.  What are the

10  weight of each of the blocks that are deployed?

11  A.  Approximately 3,000 pounds each of the 68 anchors, and then

12  there's some positioning anchors that are about half that

13  weight, 75.

14  Q.  So if I understand you correctly, there are 68 anchors plus

15  of about 3,000 pounds each on the bed of the river?

16  A.  Correct.

17  Q.  Are those concrete blocks capable of drifting or moving

18  within the riverbed in the Rio Grande where they're deployed?

19  A.  No, they were designed specifically based on the flow of --

20  high level flow from the river.

21  Q.  Now, have you been to that location on the Rio Grande in

22  the past few days or weeks?

23  A.  I was there when we installed them was the last time.

24  Q.  And is the general level of the Rio Grande River now in

25  that area low?

1   A.  Yes.

2   Q.  If there comes a day when the river is much higher, even up

3   to flood stage, would those concrete blocks move?

4   A.  No, they're designed -- the weight and the way they're

5   integrated will not allow them to move, but allows the buoys to

6   rise with the water level.

7   Q.  And what's the maximum distance that the river -- that the

8   floating buoy system could expand if there comes a day when

9   there's a huge amount of water going down the Rio Grande River

10  at that point?

11  A.  Chains 12 meters long which allow the buoys to rise

12  12 meters which is about 39, 40 feet I believe.

13  Q.  In your observation --

14       THE COURT:  Just a minute.  So there's 40 feet of

15  chain attached to each buoy?

16       THE WITNESS:  Yes, there's 12 meters, yes.

17       THE COURT:  Okay.

18       THE WITNESS:  Not to each buoy, but there's three

19  buoys that have attached to those anchors.

20       THE COURT:  There's only three of the buoys are

21  attached to the anchors?  Little confusing.

22       THE WITNESS:  So the anchors aren't attached to every

23  buoy.  There's a system of three buoys that repeat itself.

24       THE COURT:  So the anchors are not attached to every

25  buoy, they're only attached to three of the buoys?

1          THE WITNESS:  They're attached to a piece of steel

2    that's got a hook on it and three buoys are attached to that

3    and that repeats itself for the thousand feet, so every three

4    buoys the chains are attached to that segment.

5          THE COURT:  And there is a chain on that that would

6    allow them to rise.

7          THE WITNESS:  12 meters.

8          THE COURT:  Up to 40 feet.

9          THE WITNESS:  Yes, sir.

10         THE COURT:  So what keeps them from moving side to

11   side.

12         THE WITNESS:  In addition to those, the positioning

13   anchors that keep them from moving side to side.  Additionally,

14   when the river flows, it's going to keep the buoys pretty much

15   center, the water doesn't go side to side.

16         THE COURT:  So you're relying on the flow of the

17   river.

18         THE WITNESS:  No, that's why we have the positioning

19   anchors in addition, I'm talking --

20         THE COURT:  I understand that that is north to south.

21   I'm talking east to west.

22         THE WITNESS:  There's north to south with 68 anchors

23   and there's 75 anchors put along the buoy line attached to the

24   system of three buoys to keep it going from east to west

25   limitations.

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  When it's shallower.

 3              THE COURT:  Okay.

 4   BY MR. BRYANT:

 5   Q.  Mr. Flossman, when Texas made the decision to put the

 6   floating buoy system in the Rio Grande in Maverick County, did

 7   it retain some suppliers and contractors to accomplish that?

 8   A.  Yes, sir.

 9   Q.  And who did Texas retain for that purpose?

10   A.  The company I work for, Cochrane USA.

11   Q.  And did Texas direct Cochrane to place the floating buoy

12   system on the U.S. or Texas side of the Rio Grande?

13   A.  Yes.

14   Q.  What did Cochrane do to carry out Texas direction that the

15   buoy system would be on the Texas and U.S. side of the Rio

16   Grande?

17   A.  The contractor we used, subcontractor, we had them use a

18   mapping system to do a GPS mark at the beginning and at the end

19   based on what we had historically of the border with Mexico,

20   put on the U.S. side of that border.

21   Q.  And as a result of what was done, did you personally

22   conclude when the floating buoy system was placed that it was

23   on the Texas and U.S. side of the international boundaries?

24   A.  Yes, it was my belief that we had, in fact, placed the buoy

25   system within the U.S. side.
```

1   Q.  And did Cochrane advise Texas that the floating buoy system

2   in Maverick County was on the Texas side of the international

3   boundary?

4   A.  We did.

5   Q.  Did there come a time when you became aware of an

6   allegation that that was not correct and that a portion of the

7   buoy system was on the Mexican side of the international

8   boundary?

9   A.  Yes.

10  Q.  When did you become aware of that?

11  A.  I believe it was last Wednesday, Tuesday or Wednesday last

12  week.

13  Q.  And what came to your attention at that time that caused

14  you to become aware of that allegation?  How did you become

15  aware of that allegation?

16  A.  I was sent a copy from DPS of the filings that IBWC had

17  made.

18  Q.  And did you review the filing?

19  A.  Yes, I did.

20  Q.  And did you see what survey or the date of the survey that

21  IBWC had used to come to the conclusion that a portion of the

22  buoy system was on the Mexican side of the international

23  border?

24  A.  I was surprised to see that it was 2009, as the river moves

25  constantly, and had not been updated.

1  Q.  Why were you surprised to see that it was a 2009 survey

2  that was used by IBWC?

3  A.  I believe the policy is that they did one every ten years

4  because of the movement of the river and the boundaries of that

5  river.

6  Q.  As a result of your knowledge of that policy, did you

7  conclude that the survey that was used was not the most current

8  one, at least according to their policy?

9  A.  The one that was in their filings was not -- was 2009, so

10  that I wouldn't classify as current.

11  Q.  When that filing was made alleging that a portion of the

12  floating buoy system in Maverick County is across the

13  international line into Mexico, what did Texas direct you and

14  your company to do?

15  A.  They directed us to move the system, which includes the

16  anchors, 4 feet to the U.S. side of the boundary line that IBWC

17  identified.

18  Q.  If I understand you correctly, you're saying that Texas

19  directed you to move the system 4 feet to the Texas side of

20  even the boundary as marked in the survey that was submitted to

21  the Court?

22  A.  That is correct.

23  Q.  And did Cochrane take action to fulfill that directive from

24  the State of Texas?

25  A.  Yes, we believe we had.  In fact, we're doing a final

1  survey this afternoon, this evening to, in fact, verify.  And

2  if there's adjustments that need to be made, we'll make them.

3  Q.  When did Cochrane start moving the concrete blocks to

4  accomplish that goal?

5  A.  Friday.

6  Q.  And were you aware that the United States filed a paper

7  with the Court Friday, advising the Court that people were out

8  in the river working?

9  A.  No, I was not aware.

10  Q.  Okay.  Were your people out in the river working to move

11  the concrete blocks on Friday to make absolutely sure that the

12  system is on the Texas side?

13  A.  That's correct, we were.

14  Q.  And did they work all weekend --

15  A.  Yes.

16  Q.  -- to accomplish that?

17  A.  Yes.

18  Q.  When your people went into the river to accomplish that

19  work Friday and over the weekend, did you verify that the

20  concrete blocks had been moved from when they were originally

21  placed?

22  A.  That's correct.

23  Q.  How is it possible to move those 68, 3,000-pound blocks in

24  just a matter of four or five days?

25  A.  We used two track hoes to pick up the blocks and move them.

```
 1    It's designed to be -- to accommodate the move.
 2    Q.  In your judgment, is there any way that that river could
 3    have moved those blocks?
 4    A.  No.
 5    Q.  Now, as we sit here today, can you tell the Court under
 6    oath that the floating buoys are within the Texas and U.S. side
 7    of the river?
 8    A.  Currently the buoys are in the U.S. side of the river and I
 9    believe the anchor system is inside the Texas, until we do the
10    actual survey this afternoon that verifies it.
11    Q.  If there were any question after the survey, would you move
12    it further?
13    A.  Yes.
14    Q.  And would you encourage IBWC to verify that the current
15    location of the floating buoy system in Maverick County is
16    within the United States and on the Texas side of the
17    international boundary?
18    A.  Definitely.  I think that would put to rest where the buoys
19    would be.
20              MR. BRYANT:  Pass the witness.
21              THE COURT:  All right.  Cross.
22              MR. SWEETEN:  One second, Your Honor.  Mr. Sweet.
23              (Pause.)
24    BY MR. BRYANT:
25    Q.  I just want to clarify something you touched on in your
```

1    testimony I want to make sure is clear.  Why can't the buoys

2    themselves go, say, 40 or 50 feet to the side if the concrete

3    blocks are not moved?

4    A.  Because there's additional anchors, 75 of them, in addition

5    to the 68 positioning anchors that hang down so to keep the

6    buoy from drifting.  That was part of the design is to be able

7    to let the buoys rise with the river and to keep it from

8    drifting over the boundary line.

9              THE COURT:  So this is a fairly solid arrangement here

10   attached by, what, metal, so that it can't move side to side?

11             THE WITNESS:  No, it's attached by chains.

12             THE COURT:  Metal chains.

13             THE WITNESS:  Yes.

14             THE COURT:  So they can't move side to side.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  And it's fairly solid all the way down.

17             THE WITNESS:  They repeat, so when you say solid --

18             THE COURT:  It's not a solid concrete block, but it's

19   all anchored together so that it is one unified arrangement.

20             THE WITNESS:  Correct, an integrated system.

21             THE COURT:  It's an integrated system and it is

22   attached by metal chain.

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Must be fairly heavy gauge.

25             THE WITNESS:  Yes, sir.

1          THE COURT:  All right.

2    BY MR. BRYANT:

3    Q.  And I think you touched on this briefly, but I ask for you

4    to clarify, if you can.  What is the effect of the flow of the

5    river up and down -- the direction of the river, what is the

6    effect of that stabilizing the floating buoy system?

7    A.  In fact, it keeps the buoys in a specific track with the

8    flow of the river.  We didn't have to compensate for east and

9    west flow or north and south, depending how you look at it,

10   across way like you would in an ocean.  So between the anchors

11   and the flow, they're staying pretty much.

12          MR. BRYANT:  Pass the witness.  Thank you.

13          THE COURT:  Okay.  Cross.

14          MS. KIMBALL:  Thank you, Your Honor.

15          (1:26 p.m.)

16                  CROSS-EXAMINATION

17   BY MS. KIMBALL:

18   Q.  Good afternoon, Mr. Flossman.  Mr. Flossman, the floating

19   barrier is designed to stop people and goods moving across the

20   river, right?

21   A.  Designed to stop people, I don't know about goods.

22   Q.  That's the entire purpose, right, to stop people from

23   moving across the river?

24   A.  Correct.

25   Q.  It's not placed in the Rio Grande to identify any sunken

1   danger, right?

2   A.   I don't understand the question.

3   Q.   The purpose of it is just to stop movement of people

4   across, right?

5   A.   Correct.

6   Q.   It's not --

7            THE COURT:  Just a minute.  When you say "people",

8   that would also mean people in boats or people in anything, it

9   would stop.

10           THE WITNESS:  Where the buoys are.

11           THE COURT:  Where the buoys are.

12           THE WITNESS:  Yes.  So they can go around it if they

13  choose.

14           MS. KIMBALL:  Mr. Woolner, could you pull up Exhibit

15  G39.

16  BY MS. KIMBALL:

17  Q.   Mr. Flossman, the buoys come together to form a single

18  barrier, correct?

19  A.   Correct.

20  Q.   It forms a single wall in the water, right?

21  A.   It's a buoy, it's not a wall.

22  Q.   They're tethered together, right?

23  A.   Yes.

24  Q.   They're tightly interconnected such that a person can't

25  pass through them, right?  Between them?

1   A.  Yeah, they can attempt to climb over them.
2          MS. KIMBALL:  Mr. Woolner, could you pull up G26.
3   BY MS. KIMBALL:
4   Q.  Boats like these can't pass through the barrier either,
5   right?
6   A.  Correct.
7   Q.  And you mentioned that the barrier is anchored in multiple
8   places along the thousand-foot length, correct?
9   A.  Correct.
10  Q.  And that's with 3,000-pound concrete blocks, correct?
11  A.  Correct.
12         MS. KIMBALL:  Mr. Woolner, could you pull up G52.
13  BY MS. KIMBALL:
14  Q.  So are these the concrete blocks that you're referring to?
15  A.  They are.
16  Q.  And are these the -- are these the positioning blocks?
17  A.  If you look at this square rectangle anchor, there's a
18  little round one after that.  That's the positioning.
19  Q.  So the square one are the anchoring ones, and the round
20  ones between are the positioning ones?
21  A.  Correct.
22  Q.  And you said there were 70-some of these of the anchoring
23  ones and 60-some of the positioning ones?
24  A.  Sixty-eight of the anchors with 3,000-pound, and then of
25  the thousand-pound ones, there's about 75, I believe, of those.

 1          THE COURT:  Let me ask you a question before I lose

 2   this train of thought.  Now, as I'm looking at these, these are

 3   sitting next to -- well, they're several feet away from the

 4   actual buoy system.  Is that where they remain or do they go

 5   underneath?  Is that where they--

 6          THE WITNESS:  That's where they remain.

 7          THE COURT:  So they are on either side.  And how many

 8   feet away are they from the buoy itself?  Looks like on the

 9   left side, it could be an optical illusion, but it looks like

10   it's further away than it is on the right side.

11          THE WITNESS:  That's correct.  So there is some

12   movement with that.

13          THE COURT:  There is some movement.  So the buoys can

14   move back and forth within those concrete blocks.

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.

17   BY MS. KIMBALL:

18   Q.  Moving the barrier even just a little bit requires heavy

19   machinery, right?

20   A.  Correct.

21   Q.  Requires a track hoe.  So a barrier couldn't just be moved

22   out of the way any time somebody needed to pass across the

23   river at that location, right?

24   A.  Correct.

25   Q.  Approximately how long would it take to remove the barrier

1   from the river?

2   A.  Approximately three weeks.

3   Q.  But isn't it true that you testified that the barriers --

4   the entire barrier has been moved over the course of just three

5   days?

6   A.  Are you asking removed or moved?

7   Q.  Well, you were able to remove the entire barrier, correct?

8   A.  I moved it, yes, we moved it within approximately three

9   days.  Removing it, we would have to disassemble it.  I would

10  have to disconnect the chains that anchor to the buoys and

11  disassemble the buoy connection.

12  Q.  And you keep referring to them as buoys and as a buoy

13  system, but your company markets this as a full length barrier,

14  correct?

15  A.  I can't tell you how the company markets all of its

16  systems.  This is a buoy system, it's a floating buoy system.

17  And in dealing with other clients like the Home Office of the

18  UK, it's a floating buoy system that we're dealing with.

19  Q.  So your company does not market this system as a marine

20  floating barrier?

21  A.  They have two different kind of barriers, one of them is

22  for -- to protect ships from small craft, which is different,

23  has spikes on it versus this one which does not have the

24  spikes, they're smooth buoys.

25          MS. KIMBALL:  Your Honor, I'd like to mark as an

 1   exhibit the Cochrane website as a new exhibit, G57.

 2          THE COURT:  Okay.  Do we have that on the computer?

 3          MS. KIMBALL:  We don't.  We can put it on the screen,

 4   but it's not on the JERS system.

 5   BY MS. KIMBALL:

 6   Q.  Mr. Flossman, do you recognize this as your company's

 7   website?

 8   A.  Yeah, I recognize the pictures.

 9   Q.  And looking at the pictures on this website, these pictures

10   represent the same pictures that are the buoy system here,

11   correct?

12   A.  Correct.

13   Q.  And turning to page two --

14          MS. KIMBALL:  First, I would like to enter this into

15   evidence, Your Honor.

16          THE COURT:  It will be received.

17   BY MS. KIMBALL:

18   Q.  Looking at page two, this system is marketed by your

19   company as a marine floating barrier, correct?

20   A.  Yes.

21   Q.  And your company markets it as a high security perimeter,

22   correct?

23   A.  I don't believe they market this as a high security

24   perimeter.  The initial buoys, talking about high security

25   perimeters, have devices on them to stop boats from crossing.

1   Q.  But you would agree that this is a barrier system that is

2   designed to stop the passage across the river, correct?

3   A.  Of people.

4   Q.  And it's a system that is firmly in place, it's a sturdy

5   system?

6   A.  Firmly in place, it's put in place with anchors and the

7   system can be moved and removed.

8   Q.  But you testified that it's very secure in its current

9   location, correct?

10  A.  Yes.

11  Q.  And it's very difficult to move, correct?

12  A.  With the proper equipment, you can move it.

13          MS. KIMBALL:  No further questions, Your Honor.

14          THE COURT:  Any redirect?

15          MR. BRYANT:  Just a couple questions.

16          *(1:35 p.m.)*

17                    REDIRECT EXAMINATION

18  BY MR. BRYANT:

19  Q.  Mr. Flossman, looking at that Government Exhibit 32, there

20  was a reference to the possibility of the buoys moving to some

21  extent, do you recall that, between the concrete blocks?

22  A.  Yes.

23  Q.  About how far is the maximum amount that the buoys could

24  move?

25  A.  The concrete blocks, the outside ones are pretty much the

1   limits.  That's why that outside buoy, the one I'm calling to

2   the south, I'm not sure to the Mexican side, that DPS has to

3   make sure that that anchor is 4 feet within the boundary,

4   inside the boundary.

5   Q.  In the placement of those buoys and the entire flowing buoy

6   system in Maverick County, was there any excavation done of any

7   kind?

8   A.  No.

9   Q.  And in that process, was there any fill or addition to the

10  riverbed?

11  A.  No.

12  Q.  Have you ever seen any commercial navigation --

13          MS. KIMBALL:  Objection, Your Honor, outside the scope

14  of cross.

15          THE COURT:  Sustained.

16          MR. BRYANT:  No further questions.  Thank you,

17  Mr. Flossman.

18          THE COURT:  Anything else?

19          MS. KIMBALL:  No, Your Honor.  Thank you.

20          THE COURT:  Thank you, sir, you can step down.  Be

21  careful there, those steps.

22          Do you have any other witnesses, sir?

23          MR. SWEETEN:  Your Honor, no other witnesses at this

24  time.

25          THE COURT:  Do you have any rebuttal?

1          MR. LYNK:  No rebuttal witnesses?

2          THE COURT:  All right, very good.  So I won't be, as

3     I've already discussed, hearing any closing argument today.

4     I've set the deadline for the submission of closing argument

5     and the maximum number of pages, doesn't mean you need to use

6     all ten pages.  For 38 years I've told my law students you

7     don't have to use all three hours that you have for your final

8     exam.  They do anyway, and I can understand that.

9          The Court is going to very carefully cabin itself to

10    the issues which are relevant to this motion.  I am quite

11    cognizant of the fact that this is a United States District

12    Court, it is not Congress, it is not the President.  I have

13    strictures that I must and should live within to make sure that

14    my decision is within that bound and not commenting upon

15    politics.  That is not my role.  I'm not here to engage in any

16    type of nor do I have any inclination to engage in any type of

17    political comment in this decision.  That is not why I am here.

18    I have never done so in my entire judicial career and I have no

19    intentions of doing so today.

20          I've noted, as unfortunately is often the case that

21    there's been some mention of the fact that I was appointed to

22    the bench by President Reagan.  I indeed was, but I was

23    appointed by President Reagan with the full support of Senators

24    Daniel Inouye and Spark Matsunaga, so I had both Republican and

25    Democratic support for my nomination and approval.  So I have

1    throughout my career endeavored to ensure that I have a level

2    playing field for both sides and that my decisions are based

3    solely on the facts and the law.  There will be no leaning one

4    way or the other here from this Court.  Obviously, in any type

5    of situation such as this, particularly one of such interest to

6    members of the public, somebody is going to be happy and

7    somebody is going to be unhappy with the decision I make.  That

8    is a fact of life that I've lived with my entire career as a

9    judge.  It is not in any way going to impair my ability to make

10   the right decision in my view, and that's all I can do.

11            I am going to try very hard to get a decision out as

12   quickly as I can, consistent with making sure that I have

13   carefully reviewed all of the materials and taken into

14   consideration the closing arguments of counsel.  I don't send

15   counsel off to prepare a closing argument in writing simply to

16   ignore it.  I do it because I think it will be helpful to me

17   and assist me in making sure that I fully understand their

18   arguments.  I do thank counsel very much, both sides, for your

19   courtesies, for your hard work.  Obviously, we have very

20   capable lawyers in this matter.  I've had a lot of materials

21   presented to me and we've already -- this Court has already

22   began working on this for at least a couple of weeks now, week

23   and a half, however long it's been since it's been filed.  The

24   Court hasn't waited to get the materials, we've already started

25   legal research and reviewing the law and the materials as they

 1   came in were reviewed by the Court, so I'm not starting at

 2   square zero here.

 3          Is there anything else I can address for counsel

 4   before we recess for the afternoon?

 5          MR. SWEETEN:  No, Your Honor, nothing from the State.

 6          MR. LYNK:  Only just to clarify close of business

 7   Friday, I assume that's going to be 5:00 p.m. Central time,

 8   just want to be clear.

 9          THE COURT:  Not around here.  To make sure that you

10   get it in to the clerk in time, I would say 4:00 p.m., to be

11   sure.

12          MR. LYNK:  Thank you, Your Honor.

13          THE COURT:  We work quite a bit later than that, but I

14   don't work in the Clerk's Office, so it would be 4:00 p.m. on

15   Friday would be the latest and you should simultaneously as you

16   file it provide e-copies to opposing counsel and to

17   Ms. Springs, my courtroom deputy, so she can disseminate it to

18   the Court.

19          I would let members of the media know, and I know we

20   have quite a few here today, that these filings are

21   unfortunately -- I think you should have CM/ECF, for us it's

22   CM/ECF, for you it's PACER, you should have PACER access to be

23   able to get these materials after they are filed.  In the old

24   days, you couldn't.  If somebody filed something on Friday, you

25   had to wait until Monday and run to the Clerk's Office to get

1  it, but fortunately now you can get it online.  So you should

2  be able to have it by, if you're interested, by Friday

3  afternoon.  I think they scan it right in, don't they?

4            COURTROOM DEPUTY CLERK:  Yes, Judge.

5            THE COURT:  It will go right in.  Anything else?

6  Nothing?  Well, thank you very much.  I look forward to your

7  filing.  I've taken pretty copious notes here, went through two

8  legal pads, blew out my fountain pen.  So I thank you so much

9  and I will get a decision out as quickly as I can, consistent

10  with getting it out the way I want to get it out.  Thank you so

11  much.

12            COURT SECURITY OFFICER:  All rise.

13         *(1:45 p.m.)*

14                          *   *   *

15

16

17

18

19

20

21

22

23

24

25

1                    *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  August 23, 2023

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25