## United States District Court
## Western District of Texas
## Austin Division

United States of America,

   *Plaintiff*,

      v.

Greg Abbott, in his capacity as
Governor of the State of Texas, and the
State of Texas,

   *Defendants*.

No. 1:23-cv-00853-DAE

**Defendants' Motion to Dismiss the First Amended Complaint**

## TABLE OF CONTENTS

Table of Contents ................................................................................................... ii

Table of Authorities .............................................................................................. iii

Standard of Review ...............................................................................................1

I.    Plaintiff's claim under the Rivers and Harbors Act fails to state a cause of action upon which relief may be granted. ................................................................ 2

A.    Defendants are not "Persons" or "Corporations" covered by the Rivers and Harbors Act. .................................................................................................. 2

B.    Plaintiff fails to adequately plead that the buoy system is a prohibited "obstruction" or "structure[]"in a "navigable" segment of the Rio Grande. ....................7

II.    Plaintiff fails to state a "preemption" claim upon which relief may be granted under the Treaty of Guadalupe Hidalgo of 1848. ................................................... 8

A.    The Treaty of Guadalupe Hidalgo of 1848 is not self-executing and cannot supply a rule of decision as domestic law.............................................................. 9

B.    The United States has no cause of action to enforce Article VII's navigability guarantee in federal court. ......................................................................15

C.    Plaintiff's claim is groundless because Article VII does not "preempt" the exercise of territorial rights, like Texas's deployment of the buoy system............................18

Conclusion ........................................................................................................ 20

Certificate of Service............................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ...................................................................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 1, 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 1, 19

*Bond v. United States*,
    572 U.S. 644 (2014) ...................................................................................................... 9

*Bond v. United States*,
    572 U.S. 844 (2014) .................................................................................................... 19

*Chicken Kitchen USA, LLC v. McDonnough Investment Grp., Inc.*,
    No. 07-20315, 2007 WL 9709735 (S.D. Fla. Aug. 17, 2007) ...................................... 7

*Continental Oil Co. v. Bonanza Corp.*,
    706 F.2d 1365 (5th Cir. 1983) ...................................................................................... 2

*Econ. Light & Power Co. v. United States*,
    256 U.S. 113 (1921) ...................................................................................................... 7

*El Al Israel Airlines v. Tsui Yuan Tseng*,
    525 U.S. 155 (1999) .................................................................................................... 14

*Elizondo v. Univ. of Texas at San Antonio*,
    No. ASA-04-CA-1025-XR, 2005 WL 823353 (W.D. Tex. Apr. 7, 2005) .................... 5

*Freimanis v. Sea-Land Serv., Inc.*,
    654 F.2d 1155 (5th Cir. Unit A Sept. 1981) ................................................................ 6

*Garcia v. Purdy*,
    No. 13-cv-0234, 2014 WL 12796880 (D.N.M. March 11, 2014) .............................. 18

*Haule v. Univ. of Texas Health Sci. Ctr.-Houston*,
    No. A-19-CV-033-LY, 2019 WL 13194148 (W.D. Tex. Mar. 25, 2019) .................... 5

*United States ex rel. King v. Univ. of Texas Health Sci. Ctr.*,
    544 F. App'x 490 (5th Cir. 2013) ................................................................................ 5

*United States ex rel. Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) ..................................................................................... 19

*In re Life Partners Holdings, Inc.,*
  926 F.3d 103 (5th Cir. 2019) ......................................................................... 8

*Loeffler v. Frank,*
  486 U.S. 549 (1988) ..................................................................................... 17

*Lone Star Fund V (US), LP v. Barclays Bank PLC,*
  594 F.3d 383 (5th Cir. 2010) ......................................................................... 1

*Louis v. Nelson,*
  544 F. Supp. 973 (S.D. Fla. 1982) ............................................................... 20

*Mayor of New York v. Miln,*
  36 U.S. 102 (1836) ....................................................................................... 19

*MB Fin. Grp. v. USPS,*
  545 F.3d 814 (9th Cir. 2008) ....................................................................... 16

*McCulloch v. Maryland,*
  17 U.S. 316 (1819) ......................................................................................... 3

*McKesson Corp. v. Islamic Republic of Iran,*
  539 F.3d 485 (D.C. Cir. 2008) ..................................................................... 17

*Medellin v. Texas,*
  552 U.S. 491 (2008) ............................................................................. *passim*

*Newhall v. Sanger,*
  92 U.S. 761 (1875) ....................................................................................... 12

*Nino v. United States,*
  No. 13-cv-0469, 2014 WL 1028575 (S.D. Cal. March 13, 2014) ................. 18

*Oklahoma v. Texas,*
  258 U.S. 574 (1922) ..................................................................................... 18

*Premiere Network Servs. v. SBC Comm's, Inc.,*
  440 F.3d 683 (5th Cir. 2006) ......................................................................... 5

*R.F.C. v. MacArthur Min. Co.,*
  184 F.2d 913 (8th Cir. 1950) ....................................................................... 16

*Return Mail, Inc. v. U.S. Postal Service,*
  139 S. Ct. 1853 (2019) ................................................................................... 5

*Ridgely v. FEMA*,
  No. 07-2146, 2007 WL 1728724 (E.D. La. June 13, 2007) ...................................... 7

*Summa Corp. v. California*,
  466 U.S. 198 (1984) ................................................................................................ 13

*United States v. Bollinger Shipyards, Inc.*,
  775 F.3d 255 (5th Cir. 2014) ..................................................................................... 1

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ................................................................................................ 20

*United States v. Republic Steel Corp.*,
  362 U.S. 482 (1960) .................................................................................................. 6

*United States v. Rio Grande Dam & Irrigation Co.*,
  184 U.S. 690 (1899) .................................................................................................. 7

*United States v. United Mine Workers*,
  330 U.S. 258 (1947) .................................................................................................. 3

*Vieux Carre Property Owners Residents & Ass'ns v. Brown*,
  40 F.3d 112 (5th Cir. 1994) ....................................................................................... 2

*Willson v. Black-Bird Creek Marsh Co.*,
  27 U.S. 245 (1829) .................................................................................................... 7

*Yancoskie v. Del. River Port Auth.*,
  528 F.2d 722 (3d Cir. 1975) .................................................................................... 17

*Ysleta Del Sur Pueblo v. City of El Paso*,
  433 F. Supp. 3d 1020 (W.D. Tex. 2020), *aff'd*, No. 20-50313, 2021 WL
  5504744 (5th Cir. Nov. 23, 2021) ........................................................................... 18

*Yturbides Executors v. United States*,
  63 U.S. 290 (1859) .................................................................................................. 12

## Statutes

33 U.S.C. § 403 ...................................................................................................... 2, 3

33 U.S.C. § 406 ...................................................................................................... 2, 3

33 U.S.C. §§ 408(a), 409 ........................................................................................... 8

33 U.S.C. § 413 .......................................................................................................... 3

42 U.S.C. § 1983 ................................................................................................ 4, 17

Act of March 3, 1891, 26 Stat. 854 .................................................................... 13

Act of Feb. 24, 1863, 12 Stat. 664 ...................................................................... 13

Act of Mar. 3, 1851, ch. 41, 9 Stat. 632 (1851) ................................................. 11

Act of Feb. 28, 1861, 12 Stat. 172 ...................................................................... 13

Act of July 22, 1854, ch. 103, § 8, 10 Stat. 309 ................................................. 13

9 Stat. 922, 1848 .............................................................................................. 8, 9

12 Stat. 71 .......................................................................................................... 13

26 Stat. 1512, 1890 ............................................................................................ 16

59 Stat. 1219 ...................................................................................................... 16

**Other Authorities**

32 Cong. Rec. 2297 ............................................................................................. 6

32 Cong. Rec. 2923 (1899) .................................................................................. 6

Fed. R. Civ. P. 12(b)(6) ...................................................................... 1, 2, 10, 20

Rest. of Foreign Relations Law 4th, § 310, Cmt. 7 ........................................... 10

U.S. Const. art. VI, cl. 2 ..................................................................................... 17

Pursuant to Federal Rule of Civil Procedure 12, Defendants Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas move to dismiss Plaintiff's First Amended Complaint, ECF 60, in its entirety.

*First*, Plaintiff's claim under the Rivers and Harbors Appropriation Act of 1899 fails for two reasons: (1) Section 12 of the Act authorizes actions only against "persons" and "corporations," not against sovereign States or their officials; and (2) Plaintiff fails to adequately plead that the at-issue segment of the Rio Grande is "navigable" or that the buoy system is a prohibited "obstruction" or "structure[]," and therefore covered by Section 10 of the Act.

*Second*, Plaintiff's claim under Article VII of the 1848 Treaty of Guadalupe Hidalgo similarly fails because: (1) text, caselaw, and history demonstrate that the Treaty, including Article VII, is not self-executing and thus cannot be enforced as domestic law; (2) the United States has identified no cause of action to enforce the Treaty; and (3) Article VII does not "preempt" Texas's deployment of the buoy system.

## Standard of Review

A count should be dismissed when it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). When reviewing the sufficiency of a complaint, the main objective is "to determine whether the plaintiff has stated a legally cognizable claim that is plausible." *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). For a claim to be plausible on its face, the plaintiff must sufficiently plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While the Court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff, a plaintiff's legal conclusions need not be accepted as true. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. *Id.*

1

I. **Plaintiff's claim under the Rivers and Harbors Act fails to state a cause of action upon which relief may be granted.**

Plaintiff has asserted a claim in Count I against both Defendants under the Rivers and Harbors Act, 33 U.S.C. §§ 403, 406, 413. However, the Rivers and Harbors Act authorizes actions only against "persons" and "corporations," not against sovereign States like the Defendant State of Texas or its officials. Because the First Amended Complaint states no valid claim against either Defendant under the Rivers and Harbors Act, Plaintiff's Count I must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

A. **Defendants are not "Persons" or "Corporations" covered by the Rivers and Harbors Act.**

**1.** The Rivers and Harbors Act proscribes conduct and provides for enforcement of those proscriptions in separate sections. Section 10 of the Act, 33 U.S.C. § 403, generally makes it "unlawful" to obstruct navigable capacity or to construct certain structures in navigable rivers of the United States without obtaining a permit to do so from the United States Army Corps of Engineers. However, it is Section 12 that defines the parties to whom Section 10 applies and that authorizes legal action and legal remedies against them:

> *Every person and every corporation* that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

33 U.S.C. § 406 (emphasis added). On its face, this provision establishes a *federal crime*—namely, a "misdemeanor" "punish[able]" by "fine" or "imprisonment." *See Vieux Carre Property Owners Residents & Ass'ns v. Brown*, 40 F.3d 112, 117 n.9 (5th Cir. 1994) (describing § 406 as a "criminal statute[]"); *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1370 n.6 (5th Cir. 1983) (similar). Ancillary to those criminal penalties—as seen in Congress's use of

2

the phrase "And further," 33 U.S.C. § 406—a federal district court having jurisdiction may also issue an injunction.

Another section of the Act states that "[t]he Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of sections 401, 403, 404, 406, 407, 408, 409, 422, and 423 of this title," and adds that officials shall have the power and authority to "arrest and take into custody, with or without process, any person or persons who may commit any of the acts or offenses prohibited by the said sections." 33 U.S.C. § 413. When these sections are read together, the Act allows the Department of Justice to seek criminal sanctions or injunctive relief against "persons" or "corporations" who commit acts proscribed by § 403. The Act does not apply to a sovereign State like Texas or its officers in their official capacities.

The issue of whether a sovereign can be considered a "person" to which federal statutes apply is not a new one.[1] The Supreme Court has spoken to this issue on many occasions. In *United States v. Cooper Corp.*, the Court held that the United States was not a "person" that can assert a treble damages antitrust claim under the Sherman Act. 312 U.S. 600, 604 (1941) ("Since, in common usage, the term "person" does not include the sovereign, statutes employing the phrase are ordinarily construed to exclude it.").[2] The Court rejected a claim that including the United States as a "person" would "tend to effectuate the public policy evidenced by the statute," because "it is not our function to engraft on a statute additions that we think the legislature logically might or should have made." *Id.* at 605; *see also United States v. United Mine Workers*, 330 U.S. 258, 275 (1947) (noting that in common usage the term "persons" "does not include the sovereign and

_____

[1] There is no plausible argument that a sovereign State is a "corporation." To the contrary, corporations are legal entities *created by sovereigns* and dependent for their existence on the sovereign's laws. *See McCulloch v. Maryland*, 17 U.S. 316, 409–11 (1819).

[2] The Sherman Act was enacted in 1890, within months of the original passage of what became Section 10, and in the same decade as Congress revised that law in the Rivers and Harbors Act. Since the *Cooper* case establishes that "person" was not intended to include sovereign States in the Sherman Act, it makes sense that "person" also was not intended to include them in the Rivers and Harbors Act.

statutes employing it will ordinarily not be construed to do so," and finding that the absence of provisions "extending the term to sovereign governments implies that Congress did not desire the term to extend to them").

In *Wilson v. Omaha Indian Tribe*, the Supreme Court applied this principle to sovereign States like Texas. 442 U.S. 653 (1979). The Court emphasized that it is particularly true that statutes using the word "person" ordinarily will be construed to exclude the sovereign "where the statute imposes a burden or limitation, as distinguished from conferring a benefit or advantage." *Id.* at 667.

In *Will v. Michigan Department of State Police,* the plaintiff sued a State and one of its officials under 42 U.S.C. § 1983, which provides that a "person" acting under color of state law in violating constitutional rights is liable to the injured party. 491 U.S. 58 (1989). Relying on cases like *Wilson*, the Court held that the term "person" in the statute did not include a sovereign State or an officer acting in his official capacity and therefore § 1983 was inapplicable. The Court reasoned that the "common usage of the term 'person' provides a strong indication that 'person' as used in § 1983 likewise does not include a State." *Id.* at 64. The Court noted that "[t]he language of § 1983 also falls far short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 65 (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)). The petitioner in *Will* also argued that, even if States were not "persons," state officials surely were. *Id.* at 70. The Court rejected this argument, holding that "neither a State nor its officials acting in their official capacities are 'persons,'" and noting that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Id.* at 71.

In yet another application of this principle, in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, an individual sued on behalf of the United States against a state agency pursuant to the False Claims Act, which imposes civil liability on "persons" who present fraudulent claims to the United States. 529 U.S. 765 (2000). The Court determined that the state

4

agency was not a "person" who could be held liable under the statute, finding no basis to conclude that the statute was intended to include States as "persons," and added that its conclusion was buttressed by "the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Id.* at 787.

The Supreme Court in 2019 relied upon the *Vermont Agency* case in concluding that the Federal Government was not a "person" entitled to seek review of a patent after its issuance. *Return Mail, Inc. v. U.S. Postal Service*, 139 S. Ct. 1853, 1861–62 (2019). Justice Sotomayor's opinion for the Court applied the presumption that use of the term "person" in a statute does not include the sovereign. Because that presumption applied, it was the proponent's burden to "point to some indication in the text or context of the statute that affirmatively shows Congress intended to include the Government." *Id.* at 1863. The Court rejected three arguments by the Postal Service that the context of the relevant statute, which Congress enacted in 2011, overcame that presumption. 139 S. Ct. at 1863–67.[3]

**2.** In the Rivers and Harbors Act, too, the presumption that the terms "persons" and "corporations" do not include sovereign governments like Texas applies. As in *Wilson*, that presumption is strengthened as to the Rivers and Harbors Act, "where the statute imposes a burden or limitation, as distinguished from conferring a benefit or advantage." 442 U.S. at 667. Here, just as in *Vermont Agency*, the presumption is especially applicable where Plaintiff claims that the Act subjected Texas to liability to which it had not been subject before. On top of that, the law imposes criminal penalties, which makes it an especially odd fit when applied against States and state government offices.

---

[3] The Fifth Circuit and courts throughout this District have applied these legal principles. *E.g.*, *United States ex rel. King v. Univ. of Texas Health Sci. Ctr.*, 544 F. App'x 490, 499 (5th Cir. 2013); *Premiere Network Servs. v. SBC Comm's, Inc.*, 440 F.3d 683, 690 & n.8 (5th Cir. 2006); *Haule v. Univ. of Texas Health Sci. Ctr.-Houston*, No. A-19-CV-033-LY, 2019 WL 13194148, at *2 (W.D. Tex. Mar. 25, 2019); *Elizondo v. Univ. of Texas at San Antonio*, No. ASA-04-CA-1025-XR, 2005 WL 823353, at *4 (W.D. Tex. Apr. 7, 2005).

Because the presumption is that "persons" in a statute like the Rivers and Harbors Act excludes a State or its officials, this is a case in which the United States would have to show that Congress in the Act made it "unmistakably clear in the language of the statute" that, in using the terms "person" and "corporation," it intended to include the sovereign States and state officials. *Vermont Agency*, 529 U.S. at 787. No such showing can be made here. Indeed, the Fifth Circuit has stated that "[t]he Rivers and Harbors Appropriation Act of 1899 does not evince an intent to visit liability on states." *Freimanis v. Sea-Land Serv., Inc.*, 654 F.2d 1155, 1160 (5th Cir. Unit A Sept. 1981).[4]

Because of the presumption that "persons" excludes a State or its officials, it is not surprising that neither the legislative history of the Rivers and Harbors Act nor that of its 1890 predecessor contains any suggestion that they can be "persons or "corporations" subject to liability.[5] The legislative history instead indicates that railroads and other private corporations were the principal targets of these statutes.[6]

Accordingly, the Court should dismiss Plaintiff's claim in the First Amended Complaint under the Rivers and Harbors Act, 33 U.S.C. §§ 403, 406, 413, against both Defendants State of Texas and Greg Abbott in his official capacity as Governor of the State of Texas.

---

[4] *Freimanis* dealt with whether a private right of action existed under the Rivers and Harbors Act by a private plaintiff against a state highway department. *See* 654 F.2d at 1157, 1160.

[5] The Conference Report on the Rivers and Harbors Act stated: "The Bill now agreed upon and presented also includes a codification of existing laws pertaining to rivers and harbors, though containing no essential changes to the existing law." *See* 32 Cong. Rec. 2923 (1899). The Senate sponsor went so far as to declare that the new bill added "not ten words changed in [its] entire thirteen sections." 32 Cong. Rec. 2297 (statement of Mr. Frye); s*ee also United States v. Republic Steel Corp.*, 362 U.S. 482, 504 (1960) (the 1899 law had "no new substantive effect").

[6] *See, e.g.,* 21 Cong. Rec. at 8607 (Statement of Mr. Edmunds) (explaining one purpose of § 406's predecessor language as giving the government recourse against railway companies that spill freight into rivers). A statement by the Senate sponsor connected the need for the criminal penalties for maintaining obstructive structures, which appear both in the 1890 and 1899 statute, to the tendency of railroad bridges to obstruct river navigation. *See id.* at 8602 (Statement of Mr. Frye).

**B.    Plaintiff fails to adequately plead that the buoy system is a prohibited "obstruction" or "structure[]"in a "navigable" segment of the Rio Grande.**

Even if Plaintiff has sued proper actors under Section 12, its complaint does not identify covered misconduct under Section 10. The portion of the Rio Grande where the floating buoys are currently located is not "navigable" and the floating buoys are not "obstructions" or "structures" to which Section 10 applies. In ruling on this motion to dismiss, the Court is not bound by its contrary reading of Section 10 at the preliminary-injunction stage. *See, e.g.*, *Chicken Kitchen USA, LLC v. McDonnough Investment Grp., Inc.*, No. 07-20315, 2007 WL 9709735, at *3 n.3 (S.D. Fla. Aug. 17, 2007) (prior ruling on preliminary injunction did not bind district court on motion to dismiss, "especially … as the Court is restricted to the face of the [pleadings] in considering any motion to dismiss"); *Ridgely v. FEMA*, No. 07-2146, 2007 WL 1728724, at *8 (E.D. La. June 13, 2007) (issues "can be revisited [in] pending motion to dismiss" even after finding likelihood of success on preliminary-injunction motion).

**1.** The Rivers and Harbors Act applies only to "navigable" waters "in the nature of a highway" permitting "the free passage of vessels up and down the" river. *Willson v. Black-Bird Creek Marsh Co.*, 27 U.S. 245, 251–52 n.1 (1829). Whether a watercourse is navigable at any "particular place between its mouth and its source" must ultimately be "determined by evidence." *United States v. Rio Grande Dam & Irrigation Co.*, 184 U.S. 690, 698 (1899). Accordingly, Plaintiff needed to allege that the specific stretch of river at issue had "actual navigable capacity in [its] natural state and [was] capable of carrying commerce among the States." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 124 (1921). Plaintiff made no effort to meet this standard. Its Amended Complaint does not even identify the "particular place" at issue. It simply declares that "[t]he Rio Grande *in the vicinity of Eagle Pass, Texas*, is a navigable water of the United States." ECF 60 ¶ 22. Why is this unknown stretch of river navigable? The complaint does not say. Plaintiff simply declares that conclusion before citing agency documents, perhaps expecting this Court to defer to them. *Id.*; *cf. id.* ¶ 14. Such a "formulaic recitation" of the navigability requirement is a picture-perfect example of the kind of conclusory allegation that

cannot suffice on a motion to dismiss. *See, e.g.*, *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 122–23 (5th Cir. 2019). That threshold defect dooms *both* of its claims under the Act.

**2.** Plaintiff's allegations about whether the buoy system is a prohibited "obstruction" or "structure[]" are no more detailed. Its sole allegation providing any specific detail about the buoy system consists of the following: "The Floating Barrier consists of a string of buoys each of which is between 4 and 6 feet in diameter. According to a June 8, 2023, press statement by Governor Abbott, this string of buoys may stretch for at least 1,000 feet." ECF 60 ¶ 25. Plaintiff makes no attempt to link that barebones description of the buoys to the conduct the Act proscribes, for example, by alleging that the buoys actually interfere with river traffic. Instead, it resorts once again to conclusory statements that merely recite the elements under Section 10: The buoy system "constitutes a 'structure'" and it "is an obstruction." *Id.* ¶¶ 34–36. Then it immediately moves on to declare that the buoy system therefore required the Corps' preapproval, *id.* ¶¶ 37–38, and that it violates Section 10, *id.* ¶¶ 39–40. Plaintiff offers no specific allegation about why any of that is so, which one would fairly expect given that the Act treats some objects in a watercourse—including buoys—differently than prohibited structures and obstructions. *See* 33 U.S.C. §§ 408(a), 409.

## II. Plaintiff fails to state a "preemption" claim upon which relief may be granted under the Treaty of Guadalupe Hidalgo of 1848.

Plaintiff in Count II of its First Amended Complaint asserts a new (and entirely novel) claim it labels as "Preemption by the 1848 Treaty." ECF 60 at 9. The Treaty of Guadalupe Hidalgo of 1848, also known as the *Treaty of Peace, Friendship, Limits, & Settlement with the Republic of Mexico.*, 9 Stat. 922, 1848 WL 6374, at *1 (July 4, 1848), is the treaty between the United States and Mexico that ended the Mexican War and ceded to the United States substantial parts of what are now the States of California, Arizona, New Mexico, and Texas. This 175-year-old treaty also set the southern boundary of Texas and the United States as the middle of the Rio Grande River (referred to by Mexico as "Rio Bravo del Norte"). In addition, the Treaty provided for recognition of the

titles of landowners of land formerly in Mexico as well as citizenship rights of residents of the land

ceded to the United States. Article VII of the Treaty, on which Plaintiff solely relies, provides:

> The River Gila and the part of the Rio Bravo del Norte lying below the southern
> boundary of New Mexico, being, agreeably to the fifth article, divided in the middle
> between the two republics, *the navigation of the Gila and the Bravo below said boundary
> shall be free and common to the vessels and citizens of both countries; and neither shall,
> without the consent of the other, construct any work that may impede or interrupt, in whole
> or in part, the exercise of this right; not even for the purpose of favoring new methods of
> navigation.* Nor shall any tax or contribution, under any denomination or title, be levied
> upon vessels or persons navigating the same or upon merchandise or effects
> transported thereon, except in the case of landing upon one of their shores. If for the
> purpose of making the said rivers navigable, or for maintaining in such state, it should
> be necessary or advantageous to establish any tax or contribution, this shall not be done
> without the consent of both governments.
>
> The stipulations contained in the present article shall not impair the territorial rights
> of either republic within its established limits.

*Id.* (emphasis added). Article XXI of the Treaty provides for a non-judicial dispute resolution

procedure using diplomatic means in the event of any disputes that might arise under the Treaty.

*Id.* at 9. Despite this non-judicial dispute resolution procedure, Plaintiff now seeks to assert Treaty

claims against Defendants in federal court.

### A. The Treaty of Guadalupe Hidalgo of 1848 is not self-executing and cannot supply a rule of decision as domestic law.

The Supreme Court has long recognized the critical distinction between treaties that are

self-executing and those that are not. *See, e.g., Bond v. United States*, 572 U.S. 644 (2014); *Medellin

v. Texas*, 552 U.S. 491 (2008); *Head Money Cases*, 112 U.S. 580 (1884). Although treaties always

constitute international commitments of the U.S. Government, treaties that are not self-executing

are not binding domestic law within the United States and are not enforceable in U.S courts unless

implemented by congressional legislation. In contrast, self-executing treaties do bind domestic

persons and entities even absent implementing legislation.

Thus, when "[treaty] stipulations are not self-executing they can only be enforced pursuant

to legislation to carry them into effect." *Medellin*, 552 U.S. at 504–05 (quoting *Whitney v. Robertson*,

124 U.S. 190, 194 (1888)). Here, there is no legislation that purports to implement Article VII of the Treaty or make it enforceable in or by the federal courts. Accordingly, because the Treaty as a whole (and Article VII in particular) is not self-executing, no relief may be granted on such claims under federal law. Thus, Count II of Plaintiff's First Amended Complaint must be dismissed under Fed. R. Civ. P. 12(b)(6).

A treaty is primarily a "compact between independent nations" that "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Medellin*, 552 U.S. at 505 (quoting *Head Money Cases,* 112 U.S. at 598). The Executive Branch "has an array of political and diplomatic means available to enforce international obligations." *Id.* at 525. However, if the treaty is not self-executing, it is *not* domestic law which may be enforced in federal courts as part of the "Supreme Law of the Land," absent implementation by congressional legislation. *Id.*

**1.** How should a court determine whether a treaty is self-executing? Chief Justice Roberts, in *Medellin*, explained that "the interpretation of a treaty, like the interpretation of a statute, begins with its text." 552 U.S. at 506. Here, the text of the Treaty of Guadalupe Hidalgo strongly indicates that it is *not* self-executing. The Treaty, and Article VII in particular, is utterly devoid of any directives to United States or Mexican courts. Indeed, there is no reference whatsoever in Article VII, or in the Treaty as a whole, to any judicial role in enforcing the Treaty or to any judicial remedies for alleged violations of the Treaty. The *Medellin* Court partly reached its conclusion that the treaty at issue there was not self-executing on the basis that the key Article of the treaty "is not a directive to domestic courts." *Id.* at 508.

Conversely, a treaty's inclusion of non-judicial, diplomatic remedies to resolve treaty disputes is strong evidence that it is not self-executing. *Id.* at 509 ("provision of an express diplomatic—that is, non-judicial—remedy is itself evidence that ICJ judgments were not meant to be enforceable in domestic courts"). Diplomatic remedies are especially probative of non-self-execution when they are the only remedy the treaty provides. *See* Rest. of Foreign Relations Law 4th, § 310, Cmt. 7.

Judicial redress for violations or disputes is nowhere mentioned in any provision of the Treaty of Guadalupe Hidalgo. Most tellingly, Article XXI of the Treaty expressly provides for diplomatic and other nonjudicial means to resolve disputes arising from it. In what is essentially a "best efforts" provision, "the said Governments … do promise to each other that they will endeavor, in the most sincere and earnest manner, to settle [any] differences." Meanwhile, Article VII is in no way excepted from Article XXI, which says that its best-efforts dispute-resolution process applies to "*any* stipulation in this treaty." *Treaty*, 1848 WL 6374, at *9 (emphasis added). Consistent with that reading, Article VII places no obligations on anyone other than the nations of Mexico and the United States, which it refers to as "the two republics" and "the said Governments." It does not name, and certainly places no obligations on, the State of Texas or any other. It includes no references to courts or judicial remedies for possible violations. And it expresses no intention that its enforcement is to be different in any way than any other provision of the Treaty. "[W]here a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one on the States through lawmaking of their own." *Medellin*, 552 U.S. at 513–14 (quoting *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006)). This is indeed robust evidence that the Treaty is *not* self-executing.

**2.** Here, the conclusion that the Treaty of Guadalupe Hidalgo is not self-executing is confirmed by the many statutes the President and Congress enacted following ratification of the Treaty to implement its provisions. Most of Congress's post-ratification statutes addressed Article VIII's guarantee of pre-existing title to land in the conquered territories. *See Treaty,* 1848 WL 6374, at *5. After the Treaty was ratified in 1848, there were many questions and disputes as to land titles in the former Mexican territories ceded to the United States. These were especially numerous in California,[7] which was flooded with American settlers during the California Gold Rush.

Congress in 1851 enacted, and the President signed into law, a statute to implement the Treaty. *See generally* Act of Mar. 3, 1851, ch. 41, 9 Stat. 632 (1851). In the 1851 Act, sometimes

---

[7] California was admitted as a State of the United States in September 1850.

referred to as the "Mexican Claims Act," Congress created a Commission to verify California land titles derived from the Spanish or Mexican Government. The purpose of this statute was to carry out Article VIII's provision protecting pre-Treaty land titles in California.

The 1851 Act is powerful evidence that neither the President nor Congress ever regarded the Treaty of Guadalupe Hidalgo of 1848 as self-executing. Had either done so, there would have been no need for any such legislation; the land titles of Mexicans in territories ceded to the United States, like California, simply would have been entitled to "be inviolably respected" in territorial, state, and federal courts as part of the "Supreme Law of the Land." But Congress and the President instead believed legislation was needed to "execute" the Treaty—and enacted a law to do so.

Moreover, the Supreme Court expressly stated that in the 1851 Act "Congress had passed laws to carry into effect the treaty stipulations." *Yturbides Executors v. United States*, 63 U.S. 290, 292 (1859); *see also Newhall v. Sanger*, 92 U.S. 761, 764–65 (1875) (describing the Treaty as creating a duty to respect "rights of private property" but awaiting legislation to create processes for "judicial hearing and determination" of title). In *Botillier v. Dominguez*, the Court rejected an argument that the 1851 Act was invalid because it failed to fulfill the Treaty's provision that Mexican land titles in the ceded territories would be "inviolably respected," citing the Treaty's guarantee of existing title. 130 U.S. 238, 244 (1889). The Court reasoned that "[i]f the treaty was violated by this general statute enacted for the purpose of ascertaining the validity of claims derived from the Mexican government, it was a matter of international concern, which the two States must determine by treaty." *Id*. at 247. The Court ruled, however, that it could not enforce the Treaty's provisions itself. *Id*. ("This court, in a class of cases like the present, has no power to set itself up as the instrumentality for enforcing the provisions of a treaty with a foreign nation which the government of the United States, as a sovereign power, chooses to disregard.").

The Supreme Court reiterated this reasoning in *Baker v. Harvey*, rejecting another claim that the 1851 Act failed to properly respect land claims based on pre-Treaty rights. 181 U.S. 481, 486 (1901) (noting that the United States' obligation to respect land titles is "entirely consistent

with the right of this Government to provide reasonable means for determining the validity of titles" within the ceded territory). More recently, the Supreme Court reaffirmed that the 1851 Act was valid legislation enacted by Congress "[t]o fulfill its obligations under the Treaty of Guadalupe Hidalgo and to provide for an orderly settlement of Mexican land claims." *Summa Corp. v. California,* 466 U.S. 198, 203, 06 (1984). The 1851 Act thus was necessary to and did "execute" the Treaty, which was itself *not* self-executing.

The conclusion that the Treaty of Guadalupe Hidalgo was not self-executing and had to be implemented by Congress is evidenced by a series of statutes implementing the Treaty's land title provisions. On July 22, 1854, Congress enacted, and the President signed into law, the New Mexico Surveyor General Legislation. Act of July 22, 1854, ch. 103, § 8, 10 Stat. 309. Among other provisions, Congress directed the Surveyor General to investigate Spanish and Mexican land grant claims in the territory and to recommend—through the Secretary of the Interior—congressional approval or rejection of the claims. Thus, the 1854 Act was another statute that implemented or "executed" the provisions of the non-self-executing Treaty of Guadalupe Hidalgo.

In *Tameling v. U.S. Freehold & Emigration Co.*, the Supreme Court was faced with a challenge to a land title that had been recommended to Congress by the Surveyor General of New Mexico, and later approved by Congress in an Act dated June 12, 1861. 93 U.S. 644 (1878); 12 Stat. 71. The claimant argued that the Treaty of Guadalupe Hidalgo had to govern land titles in the ceded territory of New Mexico and that the claimant was entitled under Mexican law to land even though it was not within the grants approved by Congress in 1861. The Supreme Court rejected the claim, holding that congressional action upon the claim as recommended by the Surveyor General was operative for the entire tract of land. *Tameling*, 93 U.S. at 663.

Congress established similar Surveyors General by statute for Colorado and Arizona. Act of Feb. 28, 1861, 12 Stat. 172; Act of Feb. 24, 1863, 12 Stat. 664. These statutes, too, implemented or "executed" the provisions of the Treaty of Guadalupe Hidalgo in their respective territories to recognize the titles to land in ceded territories. Congress also enacted and the President signed into law yet another piece of legislation in 1891. Act of March 3, 1891, 26 Stat. 854. The Act established

a Court of Private Land Claims to address land grant claims in New Mexico, Arizona, Utah, Nevada, Colorado, and Wyoming. Superseding previous legislation, the Act was another congressional implementation of the Treaty of Guadalupe Hidalgo of 1848. This long history of effectuating legislation makes it incontestable that Congress and the President never interpreted the Treaty as self-executing.

**3.** There is even more direct and recent evidence that the Treaty claim is entirely untenable: Plaintiff United States, through its General Accounting Office ("GAO"), previously stated that the Treaty is not self-executing. That previous interpretation of the Treaty is not only directly inconsistent with Plaintiff's claims here; it is also "entitled to great weight" as evidence that the Treaty is not self-executing. *Medellin*, 552 U.S. at 513 (citing *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85 (1982)); *see also El Al Israel Airlines v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999). That interpretation can be gleaned from declarations by the Senate and the President accompanying ratification as well as from post-ratification behavior. *Medellin*, 552 U.S. at 507 (post-ratification practice of parties is an "aid to interpretation" of treaties).

In response to a request from Senator Domenici and Congressman Udall of New Mexico, GAO in 2002 undertook a massive review of the implementation of the Treaty of Guadalupe Hidalgo with respect to community land grants in New Mexico, and community concerns about that implementation. On June 4, 2004, the United States published Doc. No. GAO-0459, "Treaty of Guadalupe Hidalgo: Findings and Possible Options Regarding Longstanding Community Land Grant Claims in New Mexico," available at https://www.gao.gov/products/gao-04-59 (accessed December 4, 2023).

The United States responded to assertions that the statutes implementing the provisions of the Treaty of Guadalupe Hidalgo did not satisfy the United States' obligations under the Treaty by emphasizing that "[u]nder established U.S. law … courts are required to comply with the terms of federal statutes that *implement a treaty such as the Treaty of Guadalupe Hidalgo that is not self-executing*." *Id*. at 10 (emphasis added). Later in the same publication, the United States reiterated that "the Treaty of Guadalupe Hidalgo was not a self-executing treaty, and thus it required

implementing congressional action in order to take effect in the United States." *Id.* at 141. It also noted that Supreme Court precedent has long established that "where a treaty is not self-executing, "the treaty addresses itself to the political, not the judicial department, and the legislature must execute the contract [treaty] before it can become a rule for the Court." *Id.* at 142 n.133 (citing *Foster v. Neilson*, 27 U.S. 283, 314–15 (1829)). And the only such legislative action the Report detailed was Congress's implementation efforts in 1851, 1854, and 1891 with respect to the Treaty's land-grant in guarantee in Article VIII. *Id.* at 5–7, 33–44. In other words, the Treaty was not self-executing but required legislation to be implemented, and Congress had acted only to implement Article VIII.

Because the Treaty of Guadalupe Hidalgo—including Article VII—is not self-executing, Plaintiff's preemption claim against Defendants under that Treaty must be dismissed. *See Medellin*, 552 U.S. at 504–06.

### B.   The United States has no cause of action to enforce Article VII's navigability guarantee in federal court.

Even assuming Plaintiff's reliance on Article VII of the 1848 Treaty of Guadalupe Hidalgo could be read as invoking some abstract navigability guarantee more broadly, *but see infra* Part II.C.1, it has not identified any cause of action to press a claim under any such guarantee. In subsequent treaties and conventions between the United States and Mexico, the two countries have never provided for judicial enforcement of a navigability guarantee by either country, whether as initially stated in 1848 or as modified thereafter. Nor have they ever purported to impose any judicially enforceable navigability obligations on their own citizens, much less on the States. To the contrary, the two countries agreed to assign exclusive jurisdiction over navigability disputes about "works" in the Rio Grande to a non-judicial commission. The Convention between the two nations in 1889, ratified by the Senate in 1890, granted to the newly formed International Boundary and

Water Commission ("IBWC")[8] "exclusive jurisdiction" over issues relating to "works that may be constructed in said [Rio Grande or Colorado] rivers." 26 Stat. 1512, 1890 WL 10691, at *1. The Convention required the United States (in Article I) to submit "*[a]ll* differences or questions" arising over that issue not to a federal court, but to a newly created non-judicial commission. *Id.* (emphasis added).

Moreover, the United States and Mexico agreed (in Article VIII) that if the IBWC could not unanimously resolve any such question or difference, "both Governments … shall decide it amicably." *Id.* at *3. Even in such a case, there was no provision whatsoever for the United States to resort to judicial remedies. Instead, the two countries mutually urged to "bear[] constantly in mind the stipulation of Article XXI of the treaty of Guadalupe Hidalgo" providing for diplomatic and non-judicial remedies. *Id.* These provisions of the 1889 Convention were reiterated by the Water Treaty of 1944[9] and are still in force today. *See* 1944 Treaty, art. 2, 59 Stat. 1219, at *2 ("the term of the Convention of March 1, 1889 shall be considered to be indefinitely extended"). To be sure, the 1944 Treaty says that IBWC Commissioners may "invoke when necessary the jurisdiction of the courts or other appropriate agencies of his country to aid in the execution and enforcement of these powers and duties." 1944 Treaty, art. 24(c), 59 Stat. 1219, at *17. But this functional equivalent of a "'sue and be sued' provision … does not create a cause of action against" Texas or anyone else. *MB Fin. Grp. v. USPS*, 545 F.3d 814, 819 (9th Cir. 2008). It just gives IBWC authority to go to court when it otherwise has a lawful basis to do so. *See, e.g., R.F.C. v. MacArthur*

---

[8] This body was originally called the International Boundary Commission, or IBC. The IBC had two members, one appointed by the President of the United States and one appointed by the President of the Republic of Mexico. *See* 26 Stat. 1512, 1890 WL 10691, at *1.

[9] The 1889 Convention was directly referenced in the 1944 Treaty between the United States and Mexico, which was ratified by the Senate in 1945. 59 Stat. 1219. The 1944 Treaty renamed the IBC as the "International Boundary and Water Commission." In Article I, the 1944 Treaty also "indefinitely extended the term" of the 1889 Convention. Although the great majority of the 1944 Treaty concerned allocation of the waters of the Rio Grande between the two countries and the agreed building of certain dams in the Rio Grande, the 1944 Treaty also confirmed that, except as otherwise specifically provided, the IBWC was to operate as provided in the 1889 Convention.

*Min. Co.*, 184 F.2d 913, 917 (8th Cir. 1950) (sue-and-be-sued provision did not furnish cause of action); *Yancoskie v. Del. River Port Auth.*, 528 F.2d 722, 725-26 (3d Cir. 1975) (same); *cf. Loeffler v. Frank*, 486 U.S. 549, 562 (1988) (differentiating Title VII's sue-and-be-sued provision from plaintiff's cause of action under Federal Tort Claims Act).

And Plaintiff has no independent cause of action to enforce a treaty provision against the State of Texas. The Supreme Court has recognized that international agreements do not by themselves create causes of action. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989). Tellingly, even that famed civil-rights provision codified at 42 U.S.C. § 1983 provides a private cause of action against States for "the deprivation of any rights, privileges, or immunities secured by *the Constitution or laws*"—conspicuously omitting *treaties*. *Cf.* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States …; and all Treaties made … under the Authority of the United States…").

That makes good sense considering the nature of treaties, as described by the Supreme Court almost 150 years ago:

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. *It is obvious that with all this the judicial courts have nothing to do and can give no redress.*

*Head Money Cases*, 112 U.S. 580, 598 (1884) (emphasis added). Because treaties countenance political (not judicial) enforcement, between contracting (not absent) parties, it is unsurprising that Plaintiff has identified no case where a contracting party (the United States) sued a non-contracting party (a State) to enforce a treaty obligation. *See generally McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488–91 (D.C. Cir. 2008).

In fact, district courts in each of the three circuits that could conceivably be called upon to address navigability between the United States and Mexico—the Fifth Circuit, Ninth Circuit, and Tenth Circuit—have affirmatively concluded the Treaty of Guadalupe Hidalgo does *not* furnish a

17

cause of action. *See Ysleta Del Sur Pueblo v. City of El Paso*, 433 F. Supp. 3d 1020, 1027 (W.D. Tex. 2020), *aff'd*, No. 20-50313, 2021 WL 5504744 (5th Cir. Nov. 23, 2021); *Nino v. United States*, No. 13-cv-0469, 2014 WL 1028575, at *6–7 (S.D. Cal. March 13, 2014); *Garcia v. Purdy*, No. 13-cv-0234, 2014 WL 12796880, at *12–13 (D.N.M. March 11, 2014).

None of this should come as a surprise to the United States. After all, it previously argued, in one of the cases just cited, that the 1848 Treaty does not create a cause of action: "With respect to the Treaty of Guadalupe Hidalgo, Defendants"—*i.e.*, the United States, Department of Homeland Security, Customs and Border Protection, and Border Patrol—"contend that they cannot be sued under the 'Treaty of Guadalupe Hidalgo'" because it does not "'create a private right of action against the United States'"—and, indeed, "as a general rule, international treaties do not create" a cause of action at all. *Nino*, 2014 WL 1028575, at *6.

### C.   Plaintiff's claim is groundless because Article VII does not "preempt" the exercise of territorial rights, like Texas's deployment of the buoy system.

Even if the Treaty of Guadalupe Hidalgo were somehow self-executing, and even if this Court could imply a cause of action of action to enforce it, Plaintiff's claim would *still* fail. That is because Texas's conduct here does not run afoul of Article VII, which cannot limit a State's constitutional prerogative in any event.

**1.** In Clause 1 of Article VII, the 1848 Treaty provides that "the navigation … of the Rio Bravo … shall be free and common to the vessels and citizens of both counties." In Clause 2, it provides that neither contracting party shall "without the consent of the other, construct any work that may impede or interrupt … the exercise of this right." These references to navigability—just like similar language Congress has included in federal statutes—are merely precatory. *See Oklahoma v. Texas*, 258 U.S. 574, 586 (1922). Clause 4 of the very same Article VII provides proof. It recognizes that the river is not entirely navigable *and* that the contracting parties have no obligation to make it so. 1848 Treaty art. VII, cl. 4 ("If, for the purpose of *making the said rivers navigable* …); *cf.* 1884 Convention art. V (navigability right attaches "throughout the *actually navigable* main channels"). In the end, then, Plaintiff's claim based on the Treaty adds nothing to

its claim under the Rivers and Harbors Act. The Treaty claim just raises the same questions: Is this stretch of river actually "navigable" such that "exercise of this [navigability] right" even attaches? If so, does Texas's buoy system "impede or interrupt" it? *Compare* ECF 60 at ¶¶ 11–12, *with id.* at ¶¶ 19–20. This claim fails for the same reasons, because Plaintiff's conclusory allegations do not satisfy *Twombly* and *Iqbal*. *Supra* Part I.B.

    **2.** Clause 5 of Article VII expressly states that its other provisions—including the navigability guarantee—"shall not impair the territorial rights of either republic within its established limits." The long-recognized "territorial rights" of all sovereigns include "the rights to control borders and regulate the flow of people and goods across them and rights to defend the territory against outside aggression." Stanford Encyclopedia of Philosophy (Mar. 24, 2020) (citing A. J. Simmons, *On the Territorial Rights of States,* Philosophical Issues, 11:300–26 (2001)); D. Miller, Territorial Rights: Concept and Justification, Political Studies 60(2): 252–68 (2012). That power "undeniably existed at the formation of the constitution" for the States; and "it yet remains with them." *Mayor of New York v. Miln*, 36 U.S. 102, 132 (1836). That is why President Polk, when first transmitting the Treaty to the Senate for ratification, noted that "[t]he public lands within the limits of Texas *belong to that State*, and this Government has no power to dispose of them or to change the conditions of grants already made." 7 Journal of the Executive Proceedings of the Senate 302. Thus, actions to exercise territorial rights cannot constitute violations of Article VII.

    **3.** To the extent Plaintiff's claim requires reading Article VII as somehow stripping away that preexisting prerogative, it runs into a different problem. "[N]o agreement with a foreign nation can confer power … which is free from the restraints of the Constitution." *Bond v. United States*, 572 U.S. 844, 880 (2014) (Scalia, J., concurring in judgment) (quoting *Reid v. Covert*, 354 U.S. 1, 16 (1957)). In other words, treaties—just like federal statutes—cannot transgress the Constitution. And Texas, like every other sovereign State, has an inherent constitutional prerogative to protect its territorial sovereignty—quite apart from any provision in the 1848 Treaty—by excluding aliens. *See, e.g., United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542

(1950); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936); *Louis v. Nelson*, 544 F. Supp. 973, 976 (S.D. Fla. 1982) (absolute right to control borders).

There is no dispute that it is just this territorial right to control and defend its borders that Texas and its Governor are exercising through the buoy system that is the subject of this action. Governor Abbott declared a border disaster in 2021 pursuant to Texas Disaster Act of 1975. Among the Governor's powers under the Act is to control ingress and egress to the disaster area, which is precisely what the buoys do. That border disaster continues today. There is also no dispute that the southern border of Texas today is beset by innumerable unlawful crossings by international criminal cartels, drug smugglers, human traffickers, weapons smugglers, and illegal aliens.

Texas has an inherent territorial right to defend its borders against this encroachment and control ingress through its borders. These are precisely the territorial rights that the United States and Mexico expressly agreed are *not* impacted by Article VII of the Treaty of Guadalupe Hidalgo as a matter of law. For this additional reason, the United States fails to state a claim against Texas under Article VII upon which relief may be granted. Count II therefore must be dismissed under Rule 12(b)(6) as to both Defendants.

## Conclusion

The Court should dismiss Plaintiff's First Amended Complaint and this action in its entirety.

Date: December 6, 2023

Respectfully submitted,

KEN PAXTON
Attorney General of the State of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Tex. State Bar No. 24125371
jacob.przada@oag.texas.gov

**Counsel for Defendants**

**Certificate of Service**

On December 6, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS