**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

UNITED STATES OF AMERICA,

        *Plaintiff*,

    v.

GREG ABBOTT, in his capacity as
GOVERNOR OF THE STATE OF TEXAS,
and THE STATE OF TEXAS,

        *Defendants*.

Case No. 1:23-cv-00853-DAE

**PLAINTIFF UNITED STATES' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

JAIME ESPARZA
UNITED STATES ATTORNEY

LANDON A. WADE
  Assistant United States Attorney
  Texas Bar No. 24098560
United States Attorney's Office
Western District of Texas
903 San Jacinto Blvd., Suite 334
Austin, TX 78701
(512) 370-1255 (tel)
(512) 916-5854 (fax)
Landon.wade@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov
Kimere.kimball@usdoj.gov
Andrew.knudsen@usdoj.gov

Dated:  December 20, 2023

*Counsel for the United States of America*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

STANDARD OF REVIEW ...................................................................................................3

ARGUMENT ......................................................................................................................3

I.      The United States Sufficiently Pleads That Texas Violated the RHA................................3

        A.      The RHA Authorizes the United States to Seek Injunctive Relief
                Against States and State Officials for Violations of Section 10 .............................4

        B.      The United States Sufficiently Pleads that the Floating Barrier Is a
                Structure and Obstruction in a Navigable River ......................................................8

II.     The United States Has Stated A Preemption Claim Based on the 1848
      Treaty ..................................................................................................................10

        A.      Article VII of the Treaty Is Self-Executing and Enforceable as
                Federal Law ..........................................................................................................11

        B.      The United States May Sue to Enforce Article VII ...............................................15

        C.      The Installation of the Floating Barrier by Texas Is Preempted..........................16

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

## UNITED STATES CONSTITUTION

U.S. Const. art. II, § 2 ..................................................................................................17

U.S. Const. art. VI, cl. 3 .........................................................................................15, 17

## CASES

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008).............................................................................................5

*Arizona v. United States,*
   567 U.S. 387 (2012)...........................................................................................15

*Asakura v. Seattle,*
   265 U.S. 332 (1924)...........................................................................................11

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)........................................................................................1, 3

*Babb v. Wilkie,*
   140 S. Ct. 1168 (2020)........................................................................................5

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).............................................................................................3

*CLMS Mgmt. Servs., L.P. v. Amwins Brokerage of Ga.,*
   8 F.4th 1007 (9th Cir. 2021) .............................................................................15

*Doe v. Holder,*
   763 F.3d 251 (2d Cir. 2014).........................................................................12, 15

*ESAB Grp. v. Zurich Ins. PLC,*
   685 F.3d 376 (4th Cir. 2012) ............................................................................14

*Freimanis v. Sea-Land Serv., Inc.,*
   654 F.2d 1155 (5th Cir. Unit A Sept. 1981) ......................................................6

*Funk v. Stryker Corp.,*
   631 F.3d 777 (5th Cir. 2011) ..............................................................................7

*Garcia v. Purdy,*
   No. 13-cv-0234, 2014 WL 12796880 (D.N.M. Mar. 11, 2014) ......................16

*Geo Grp., Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) ............................................................................15

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) .........................................................................................16

*In re Debs*,
   158 U.S. 564 (1895) .......................................................................................15

*Leal v. McHugh*,
   731 F.3d 405, 410 (5th Cir. 2013) .................................................................1, 8

*Louis v. Nelson*,
   544 F. Supp. 973 (S.D. Fla. 1982) ................................................................19

*McKesson Corp. v. Islamic Republic of Iran*,
   539 F.3d 485 (D.C. Cir. 2008) ......................................................................16

*Medellin v. Texas*,
   552 U.S. 491 (2008).................................................................... 11, 12, 13, 14

*Missouri v. Illinois*,
   180 U.S. 208 (1901).........................................................................................6

*Nino v. United States*,
   No. 13-cv-0469, 2014 WL 1028575 (S.D. Cal. Mar. 13, 2014) ...................16

*PennEast Pipeline Co., LLC v. New Jersey*,
   141 S. Ct. 2244 (2021).....................................................................................7

*Piazza's Seafood World, LLC v. Odom*,
   448 F.3d 744 (5th Cir. 2006) .........................................................................17

*Potomac River Ass'n, Inc. v. Lundeberg Maryland Seamanship Sch., Inc.*,
   402 F. Supp. 344 (D. Md. 1975) .....................................................................8

*Republic of the Marshall Islands v. United States*,
   865 F.3d 1187 (9th Cir. 2017) ............................................................10, 11, 15

*Rodriguez v. Pan Am. Health Org.*,
   502 F. Supp. 3d 200 (D.D.C. 2020),
   *aff'd*, 29 F.4th 706 (D.C. Cir. 2022) ........................................................14, 15

*Sanchez-Llamas v. Oregon*,
   548 U.S. 331 (2006).......................................................................................15

*Sanitary District of Chicago v. United States*,
  266 U.S. 405 (1924) ................................................................................6

*Turner v. Pleasant*,
  663 F.3d 770 (5th Cir. 2011) ...............................................................3, 8

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ..............................................................................19

*United States v. Abbott*,
  No. 23-50632, 2023 WL 8291577 (5th Cir. Dec. 1, 2023) .................2, 4, 8

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ............................................................15

*United States v. Appalachian Elec. Power Co.*,
  311 U.S. 377 (1940) ..............................................................................17

*United States v. Arizona*,
  295 U.S. 174 (1935) .............................................................................5, 6

*United States v. Bd. of Trustees of Florida Keys Cmty. College*,
  531 F. Supp. 267 (S.D. Fla. 1981) ..........................................................8

*United States v. Bd. of Cnty. Commr's*,
  843 F.3d 1208 (10th Cir. 2016) ............................................................15

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ..............................................................................19

*United States v. Kane*,
  461 F. Supp. 554 (E.D.N.Y. 1978) ..........................................................8

*United States v. LeMay*,
  322 F.2d 100 (5th Cir. 1963) ................................................................16

*United States v. Pink*,
  315 U.S. 203 (1942) ..............................................................................16

*United States v. Postal*,
  589 F.2d 862 (5th Cir. 1979) ...........................................................11, 14

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ................................................................15

*United States v. Texas,*
   143 U.S. 621 (1892)................................................................................................15

*United States v. Texas,*
   557 F. Supp. 3d 810 (W.D. Tex. 2021)..............................................................15, 16

*United States v. Washington,*
   596 U.S. 832 (2022)...............................................................................................15

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765 (2000).................................................................................................7

*Wolcott v. Sebelius,*
   635 F.3d 757 (5th Cir. 2011) ................................................................................3, 9

*Wyandotte Transp. Co. v. United States,*
   389 U.S. 191 (1967)..................................................................................................2

*Ysleta Del Sur Pueblo v. City of El Paso,*
   433 F. Supp. 3d 1020 (W.D. Tex. 2020)................................................................16

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(6)........................................................................................1, 3, 8

**STATUTES**

33 U.S.C. § 401........................................................................................................4, 7

33 U.S.C. § 403..................................................................................1, 2, 4, 5, 9, 10

33 U.S.C. § 406...............................................................................................1, 4, 5, 6

33 U.S.C. § 413..........................................................................................................7

**TREATISES**

Restatement (4th) of the Foreign Relations Law of the U.S., § 310.............................13

**TREATIES**

Treaty of Guadalupe Hidalgo, 1848 WL 6374 ......2, 3, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20

1853 Treaty, art. IV, 10 Stat. 1034 (Dec. 30, 1853) ....................................................13

Convention of 1884, 24 Stat. 1013, art. V, 1886 WL 15138 (Nov. 12, 1884) .............................13

1944 Treaty Between the United States and Mexico, 59 Stat 1219, 1945 WL 26968
   (Feb. 3, 1944)........................................................................................................................13

1970 Treaty, art. VIII, T.I.A.S. No. 7313, 23 U.S.T. 371, 1972 WL 122557 (Nov. 23, 1972).....13

## INTRODUCTION

The amended complaint alleges Texas committed two independent and ongoing violations of Section 10 of the Rivers and Harbors Act ("RHA"), 33 U.S.C. § 403, by installing a floating barrier in the Rio Grande:  (1) building a structure in a navigable water of the United States without the U.S. Army Corps of Engineers' permission; and (2) obstructing that water's navigable capacity without Congressional authorization.  ECF 60 ¶¶ 22-41.  It further alleges that Texas's action is inconsistent with a free-navigation requirement established by a treaty between the United States and Mexico, and therefore is preempted.  *Id.* ¶¶ 17-21, 42-45.  These allegations establish claims to relief that are "plausible on [their] face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Texas moves to dismiss for failure to state a claim under Rule 12(b)(6).  ECF 62 ("Mot.").  Such a motion "is viewed with disfavor and is rarely granted" particularly when predicated on challenges to the amount of detail in the allegations.  *Leal v. McHugh*, 731 F.3d 405, 410, 413 (5th Cir. 2013).  Texas presents no valid ground for dismissal.

First, the RHA does not limit the availability of injunctive relief (as opposed to criminal sanctions) to violations committed by "persons" and "corporations."  *Contra* Mot. at 1, 2-6.  Rather, Section 12 authorizes "injunction[s]" directing "removal of *any* structures … erected in violation of" Section 10 without regard to their origin, 33 U.S.C. § 406 (emphasis added), and Section 10 bars unauthorized obstructions and structures created by *any* actor, *see id.* § 403.  Additionally, the complaint sufficiently alleges that Texas violated the RHA by constructing the floating barrier in the Rio Grande because the Rio Grande is a "navigable river" or "other water of the United States," and the barrier both is a "structure" and "obstruct[s] [the river's] navigable capacity." *Id.*

Second, the amended complaint states a claim under the Supremacy Clause that Article VII of the 1848 Treaty of Guadalupe Hidalgo preempts Texas's construction of the floating barrier. The treaty text and the parties' post-ratification understanding unambiguously reflect that Article VII's guarantee of free navigation on the Rio Grande is self-executing. That *other* provisions of the 1848 Treaty may not be self-executing is irrelevant, and the treaty's dispute resolution provision is not a domestic enforcement mechanism. Finally, the United States alleges sufficient facts to support its claim, and Texas's defenses based on amorphous "territorial rights" lack merit.

## BACKGROUND

The United States sued Texas and its governor on July 24, 2023, claiming violations of RHA Section 10. ECF 1. The RHA prohibits "obstructions in the Nation's waterways," and the Supreme Court has "consistently found its coverage to be broad." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967); *see United States v. Abbott*, No. 23-50632, 2023 WL 8291577, at *9 (5th Cir. Dec. 1, 2023). Section 10 independently prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States," and "build[ing] … any … boom … or other structures in any … navigable river, or other water of the United States" without the Corps' permission. 33 U.S.C. § 403.

This Court issued a preliminary injunction on September 6th upon finding, *inter alia*, that the United States had established a likelihood of success on the merits of its RHA claim. ECF 50. A Fifth Circuit panel affirmed that injunction, denied Texas's motion for a stay pending appeal, and dissolved a motions panel's administrative stay of the injunction. *Abbott*, 2023 WL 8291577. Thus, the injunction is now in effect. Texas's petition for rehearing *en banc* is briefed and ripe for disposition by the court of appeals.

Meanwhile, on October 23rd, the United States filed an amended complaint that restates the RHA claim and adds a second claim, alleging preemption of Defendants' actions by Article VII of the 1848 Treaty of Guadalupe Hidalgo ("Treaty").  That treaty ended the Mexican-American War, with Mexico ceding certain of its territory to the United States in exchange for money.  Article V establishes the middle of the Rio Grande as "[t]he Boundary line between the two republics" from the Gulf of Mexico to the southern border of New Mexico.  1848 WL 6374, at *4.  And Article VII provides that navigation on the Rio Grande:

> shall be free and common to the vessels and citizens of both countries; and neither shall, without the consent of the other, construct any work that may impede or interrupt, in whole or in part, the exercise of this right; not even for the purpose of favoring new methods of navigation.

*Id*.  Texas now moves to dismiss both claims in the amended complaint under Rule 12(b)(6).

## STANDARD OF REVIEW

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (quotation omitted).  "To satisfy this standard, the complaint must provide more than conclusions, but it need not contain detailed factual allegations."  *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (reversing 12(b)(6) dismissal; quotations omitted).  "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters on which the court may take judicial notice."  *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations omitted).

## ARGUMENT

**I.    The United States Sufficiently Pleads That Texas Violated the RHA.**

The pleading standard *only* "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the alleged illegal activity]."  *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 545 (2007).  The Court has already had the benefit of limited discovery and held that the United States is likely to establish RHA violations.  ECF 50 at 7-29.  That holding has been affirmed.  *Abbott*, 2023 WL 8291577, at \*2-\*10.  The RHA claim should not be dismissed.

### A.    The RHA Authorizes the United States to Seek Injunctive Relief Against States and State Officials for Violations of Section 10.

The RHA proscribes a multitude of projects in waters of the United States absent federal authorization, including "bridge[s], causeway[s], dam[s] or dike[s]" (Section 9), as well as "structures" and "obstructions" (Section 10).  33 U.S.C. §§ 401, 403.  Section 12 authorizes two types of relief in response to violations of these provisions.  *Id.* § 406.  Section 12's first sentence authorizes criminal penalties against "persons" and "corporations":

> [E]very person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title … shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine …, or by imprisonment (in the case of a natural person) …, or by both such punishments, in the discretion of the court.

*Id.*  Section 12's second sentence, which is not limited by the first sentence and not limited to "person[s]" and "corporation[s]," authorizes injunctive relief—the "removal" of "any structures or parts of structures erected in violation" of the substantive provisions:

> And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

*Id.*

Texas's principal argument is one that it did not make in opposing a preliminary injunction, namely, that Defendants cannot be enjoined to remove offending structures because neither a state nor its governor is a "person" or "corporation."  33 U.S.C. § 406.  Texas contends that the words "And further" demonstrate that the injunctive relief authorized by the second sentence of Section

12 is merely "[a]ncillary to [the] criminal penalties" authorized in the first sentence.  Mot. at 2. According to Texas, every action the United States brings to enforce the RHA is necessarily a criminal proceeding, and only in such a proceeding can the district court "*also* issue an injunction." *Id.* at 3 (emphasis added).  Texas thus maintains that the United States can seek injunctive relief only against the persons and corporations the RHA subjects to criminal penalties.  Texas then cites a line of precedent holding that Congress must speak clearly to waive state sovereign immunity against suits by private parties.  Texas's arguments are misplaced.

Contrary to Texas's view, RHA injunctive relief is not merely "ancillary" to criminal penalties.  A careful reading of *all* the pertinent statutory text—including Section 10, which Texas is alleged to have violated, and the second sentence of Section 12, authorizing injunctive relief for such violations—undercuts Texas's interpretation.  Section 10 categorically prohibits non-federally-authorized "structures" and "obstructions"; nothing in its text purports to narrow that prohibition to violations by "persons" or "corporations."  33 U.S.C. § 403.  Likewise, the second sentence of Section 12 authorizes a court to order "the removal of *any* structures or parts of structures erected in violation" of the RHA.  *Id.* § 406 (emphasis added).  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008); *Babb v. Wilkie*, 140 S. Ct. 1168, 1173 n.2 (2020).  This sentence, like Section 10, does not refer to "persons" or corporations" or use any other term that plausibly alters the natural meaning of "any."

In *United States v. Arizona*, the Supreme Court interpreted the RHA in precisely this manner.  295 U.S. 174, 183-84 (1935).  The Court considered whether the same portions of Section 12 relied on by Texas limit the availability of injunctive relief for RHA Section 9 violations to actions against private persons and corporations.  *Id.*  As the Court explained, the RHA's

provisions "unmistakably disclose definite intention on the part of Congress effectively to safeguard rivers and other navigable waters against the unauthorized erection therein of dams or other structures for any purpose whatsoever." *Id.* at 184.  The Court rejected the argument (asserted in that case by the United States, which sought to avoid liability for its own activities) that "the restrictions so imposed apply only to work undertaken by private parties." *Id.*  The Court reasoned that "no such intention is expressed, and we are of opinion that none is implied." *Id.*  The Court concluded: "The measures adopted … for the enforcement of the prescribed rule are in general terms and purport to be applicable to all.  No valid reason has been or can be suggested why they should apply to private persons and not to federal *and state* officers." *Id.* (emphasis added).  Likewise, in *Sanitary District of Chicago v. United States*, the Supreme Court affirmed an injunction against a state agency in a civil action filed by the United States under Section 12's second sentence.  266 U.S. 405 (1924) (Holmes, J.); *see also Missouri v. Illinois*, 180 U.S. 208, 242 (1901) (noting that "[t]he Sanitary District of Chicago is not a private corporation formed for purposes of private gain, but a public corporation whose existence and operations are wholly within the control of the state").

Nor do the "clear statement" cases cited by Texas support its position that states and their officers are immune from RHA injunction suits.  The plaintiffs in those cases were private parties that had to identify waivers of state sovereign immunity.  Here, by contrast, the United States is the *only* entity eligible to seek an injunction for a Section 10 violation.  *Compare, e.g., Freimanis v. Sea-Land Serv., Inc.,* 654 F.2d 1155, 1160 (5th Cir. Unit A Sept. 1981) (cited in Mot. at 6),[1] *with* 33 U.S.C. §§ 406 ("[P]roper proceedings to th[e] end [of injunctive relief] may be instituted

---

[1] As Texas acknowledges, *Freimanis* "dealt with whether a *private* right of action existed under the [RHA] by a private plaintiff against a state highway department."  Mot. at 6 n.4 (emphasis added).  Thus, it has no application to this RHA action brought by the United States.

under the direction of the Attorney General of the United States."), *and* 413 ("The Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of," *inter alia*, Section 10.).  Allowing the United States to enforce the RHA against states and their officers does not "alter the usual constitutional balance between States and the Federal Government," *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000), because "States implicitly consented at the founding" to "suits by the Federal Government," *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021).  No clear statement is needed to authorize this suit—though, as already discussed, Section 12 clearly authorizes injunctions to effect removal of "any" unlawful structure.

Texas's position would significantly transform Section 10's blanket prohibition by making it unenforceable against a set of actors—states and their officers—that are among the most likely to construct the sorts of structures (*e.g.*, bridges, dams, and dikes) for which the RHA requires federal authorization.[2]  *Cf.* 33 U.S.C. § 401 (exempting from Section 9's congressional-approval requirement certain structures "built under the authority of the legislature of a State" with approval of the Corps or the Coast Guard).  The most natural reading of "persons" and "corporations" in the first sentence of Section 12 is that those terms define the extent of Congress' authorization of

---

[2] Texas's newfound statutory interpretation would make its own actions difficult to understand. For example, Texas's Department of Transportation has applied to the Corps recently for multiple RHA Section 10 permits for projects in waters of the United States.  *See, e.g.,* https://www.swg.usace.army.mil/Portals/26/docs/regulatory/PN%20Dec/PN_2023-00667.pdf?ver=a9rrysVr8Q5RB7OEWKeqfQ%3d%3dhttps://www.swg.usace.army.mil/Portals/26/docs/regulatory/PN%20Dec/PN_2023-00667.pdf?ver=a9rrysVr8Q5RB7OEWKeqfQ%3d%3d (Application No. SWG-2023-00667, issued for public comment Dec. 12, 2023); https://www.swg.usace.army.mil/Portals/26/docs/regulatory/PN%20Nov/PN_2023-00744.pdf?ver=tfOo4lTUkpD8VIf__W26CA%3d%3d (Application No. SWG-2023-00744, issued for public comment Nov. 30, 2023).  The Court may take judicial notice of these applications for Rule 12(b)(6) purposes.  *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

*criminal* penalties but do not limit the availability of injunctive relief for RHA violations.  Such injunctive relief is not "ancillary" to criminal proceedings and may be ordered in a civil enforcement action.  *See Potomac River Ass'n, Inc. v. Lundeberg Maryland Seamanship Sch., Inc.*, 402 F. Supp. 344, 357 (D. Md. 1975) (noting the U.S. "has the authority to initiate criminal proceedings resulting in fines or imprisonment and may sue civilly for removal of structures"); *see also, e.g., United States v. Kane*, 461 F. Supp. 554, 555 (E.D.N.Y. 1978) (granting injunctive relief under Section 12 in a civil action alleging violation of Section 10); *United States v. Bd. of Trustees of Florida Keys Cmty. College*, 531 F. Supp. 267, 269 (S.D. Fla. 1981) (same).

B.   **The United States Sufficiently Pleads that the Floating Barrier Is a Structure and Obstruction in a Navigable River.**

A plaintiff's complaint merely must "raise the right to relief above a speculative level"; but it "need not contain detailed factual allegations."  *Turner*, 663 F.3d at 775 (quotations omitted).  "Determining whether the plausibility standard has been met is a context-specific task that requires the reviewing court to draw on its own judicial experience and common sense."  *Leal*, 731 F.3d at 410, 413 (reversing Rule 12(b)(6) dismissal even though amended complaint "contain[ed] few facts" and "admittedly bare allegations"; internal quotations omitted)).  The United States's RHA allegations easily meet this standard; indeed, both this Court and the Fifth Circuit already have held that the United States is likely to be able to *prove* that Texas's floating barrier is a "structure" and "obstruction" in a "navigable" river.  ECF 50 at 7-29; *Abbott*, 2023 WL 8291577, at \*2-\*10.

First, the United States sufficiently alleges the Rio Grande is a "navigable river . . . or other water of the United States" in the specific stretch of the river in which Texas deployed the

floating barrier.[3]  33 U.S.C. § 403.  As Texas itself notes, the United States alleges that the "Rio Grande in the vicinity of Eagle Pass, Texas, is a navigable water of the United States."  ECF 60 ¶ 22; Mot. at 7.  Texas's assertion that the complaint "does not even identify the 'particular place' at issue" is false.  Mot. at 7.  "[T]he vicinity of Eagle Pass, Texas," is sufficiently descriptive to identify the relevant navigable portion of the Rio Grande when seeking an injunction to remove the floating barrier that Texas itself deployed there.  ECF 60 ¶ 22.[4]

Texas argues that the United States insufficiently alleges facts demonstrating the navigability of the river, Mot. at 7, but the United States alleges that two separate federal agencies have administratively determined that stretch of the river to be navigable.  The Corps determined that it is navigable "[f]rom Zapata-Webb county line upstream to the point of intersection of the Texas-New Mexico state line and Mexico," and the Coast Guard determined that the river is a "navigable water[] of the United States pursuant to treaties with Mexico."  ECF 60 ¶ 22 & Att. 1-2.  The complaint also quotes the 1848 treaty specifically addressing the continued free navigation of the river by citizens of both the United States and Mexico.  *Id*. ¶¶ 19-20.  The complaint even attaches a photograph demonstrating a boat navigating the river.  *Id*. Att. 4, Ex. 1 at 3.  At this juncture, the United States has more than met its burden.

---

[3] Notably, Texas does not claim that the United States's allegations are insufficiently descriptive to seek a permanent injunction prohibiting Texas from placing *additional* barriers in the Rio Grande.  *See generally* Mot.  Texas has threatened that the currently deployed floating barrier constitutes only "the *first* 1,000 feet" with no specificity as to where in the Rio Grande it may extend the existing barrier or build a new one.  https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation (emphasis added; incorporated by reference at ECF 60 ¶ 25 n.2).

[4] The attachments to the complaint specifically identify the location of the barrier that Texas itself built as "at or near the Heavenly Farms in the vicinity of Texas Loop 480 in Eagle Pass."  ECF 60, Att. 4 ¶¶ 2-3; *Wolcott*, 635 F.3d at 762-63 (court may rely on attachments to the complaint in ruling on a motion to dismiss).

Second, the United States sufficiently alleges the floating barrier (a) is a structure and (b) obstructs the navigable capacity of the river.  As to the former, the United States alleges the floating barrier "consists of a string of buoys each of which is between 4 and 6 feet in diameter" and "may stretch for at least 1,000 feet."  Mot. at 8 (quoting ECF 60 ¶ 25).  The amended complaint also alleges that the barrier "appears to include associated infrastructure designed to anchor or fix it in place in the Rio Grande" and attached six photographs demonstrating the enormity of the barrier and its anchoring system; the heavy machinery required to it in the water; and the size of the barrier and anchoring system in relation to watercraft.  ECF 60, Att. 4, Exs. 1-2.

Similarly, the amended complaint plausibly alleges the floating barrier is an "obstruction to . . . navigable capacity."  33 U.S.C. § 403.  Texas itself asserted that the floating barrier's purpose is to "mak[e] it more difficult to cross the Rio Grande."  https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation (incorporated by reference at ECF 60 ¶ 25).  The photographs attached to the amended complaint make clear that vessels cannot traverse the barrier and would have to navigate around it, potentially maneuvering hundreds of feet out of their way, and into shallower and less easily navigated water.  ECF 60, Att. 4, Exs. 1-2.  As this Court explained, "obstruction" to "navigable capacity" is construed "flexibly, without a size or positional limit."  ECF 50 at 20.  The United States has plausibly alleged that the floating barrier is an "obstruction … to the navigable capacity" of the Rio Grande.  33 U.S.C. § 403.

## II.    The United States Has Stated A Preemption Claim Based on the 1848 Treaty.

The amended complaint states a claim that Texas's installation of the floating barrier in the Rio Grande is preempted by Article VII of the 1848 Treaty.  That article prohibits either country from constructing without the other's consent any work in the Rio Grande that "may impede or interrupt" the "free and common" navigation of the river.  1848 WL 6374, at *4.  This prohibition

is self-executing and judicially enforceable against Texas, and the United States may sue to enforce it. Moreover, Article VII's prohibition is not limited to commercial navigation, nor is it constrained by Texas's "territorial rights" defenses.

### A. Article VII of the Treaty Is Self-Executing and Enforceable as Federal Law.

"[A] treaty is equivalent to an act of the legislature, and hence self-executing, when it operates of itself without the aid of any legislative provision." *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (citation omitted). Some provisions of a treaty may be self-executing even if others are not. *United States v. Postal*, 589 F.2d 862, 884 n.35 (5th Cir. 1979). "[L]ike the interpretation of a statute," the court considers the text, background, "negotiation and drafting history of the treaty as well as the postratification understanding of signatory nations" to determine whether a treaty provision is self-executing. *Medellin*, 552 U.S. at 507 (cleaned up); *see id.* at 523. Specifically, courts assess whether the treaty provision anticipates "future action through [signatory parties'] political branches," *id.* at 508, and "whether the treaty provision is sufficiently precise or obligatory to be suitable for direct application by the judiciary," *Republic of the Marshall Islands v. United States*, 865 F.3d 1187, 1194 n.3 (9th Cir. 2017).

The text of Article VII unambiguously "conveys an intention that it be self-executing." *Medellin*, 552 U.S. at 505 (cleaned up). It uses imperative language—"shall"—and creates a prohibition, with immediate effect, on any work that "may impede or interrupt, in whole or in part," free navigation on the Rio Grande. 1848 WL 6374, at *4; *see, e.g.*, *Asakura v. Seattle*, 265 U.S. 332, 339, 341 (1924) (treaty provision providing that citizens of U.S. and Japan "shall have liberty to … carry on trade," and "to own or lease and occupy houses … and shops" in the other country directly preempted local law limiting pawnbroking licenses to U.S. citizens). Article VII contrasts with other provisions of the 1848 Treaty that use precatory language signifying a

"commitment" by the treaty parties "to take future action through their political branches." *Medellin*, 552 U.S. at 508.  For example, Article VI provides that "the governments of both republics will form an agreement regarding [the] construction" of a "road, canal, or railway" in a certain location, if it is "practicable and advantageous" to do so.  1848 WL 6374 at *4.  By contrast, Article VII does not require any future action by the two countries: The prohibition against any work that would impede free navigation on the Rio Grande was effective upon ratification of the treaty.

Nor does Article VII use "indeterminate, vague, or aspirational language" that fails to provide a rule of decision for a domestic court.  *Marshall Islands*, 865 F.3d at 1194; *see id.* at 1196 (treaty's call for negotiations on "effective measures" to cease nuclear arms race and achieve disarmament did not provide specific standards for courts); *Doe v. Holder*, 763 F.3d 251, 256 (2d Cir. 2014) (treaty provision was not self-executing because it "left to the signatory's discretion to determine what measures are 'appropriate' and 'within its means,' and what protection is sufficiently 'effective'").  Rather, Article VII concretely prohibits any construction that may impede or interrupt navigation, and federal courts can fashion appropriate remedies to redress violations.  Its text thus "indicate[s] that the President and Senate intended" Article VII "to have domestic effect."  *Medellin*, 552 U.S. at 519.

Moreover, "the postratification understanding of [the two] signatory nations," as reflected in subsequent treaties, confirms the two countries' intent that the free-navigation guarantee was immediately binding upon ratification of the treaty, with no further action needed to effectuate that provision.  *Id.* at 507.  In the Treaty of 1853, whereby the United States purchased more territory from Mexico, the two countries reaffirmed that "[t]he several provisions, stipulations, and restrictions contained in the 7th article of the [1848 Treaty] shall remain in force" as to the portion

of the Rio Grande that constituted the international boundary.  1853 Treaty, art. IV, 10 Stat. 1034 (Dec. 30, 1853) (Ex. 1).  A Convention of 1884 also recognized the mandatory and binding nature of Article VII, as it provided that certain lands that had "become separated" from their original side of the boundary by natural movement of the river "shall continue to be under the jurisdiction of the country to which they previously belonged."  24 Stat. 1013, art. V, 1886 WL 15138, at *2 (Nov. 12, 1884).  And the Convention emphasized that "[i]n no case … shall this retained jurisdictional right affect or control the right of navigation common to the two countries under the stipulations of Article VII" of the 1848 Treaty.  *Id*.  Both treaties recognized the obligatory, and already binding, nature of Article VII's free-navigation requirement.[5]

A treaty need not explicitly refer to judicial enforcement or provide judicial remedies in "talismanic words" to be self-executing.  *Medellin*, 552 U.S. at 521; *see also* Restatement (4th) of the Foreign Relations Law of the U.S., § 310, n.7 ("Only rarely will a treaty be regarded as addressing the methods of domestic implementation for the United States").  Instead, the Supreme Court's "cases simply require courts to decide whether a treaty's terms" reflect "that the treaty has domestic effect."  *Id.* at 521.  If it does, courts may enforce it like any other domestic law.

Texas argues that the 1848 Treaty's "non-judicial dispute resolution procedure" in Article XXI precludes enforcement in domestic courts.  Mot. at 9, 10-11.  But the treaty's mechanism for resolving disputes *between the parties* has no bearing on how one of the parties may enforce compliance with the treaty *domestically*.  1848 WL 6374 at *9; *see* Restatement (4th) § 310 n.7

---

[5] Although the 1884 Convention was later terminated by the 1970 Treaty, the 1970 Treaty left in place the free-navigation requirement in Article VII of the 1848 Treaty.  *See* 1970 Treaty, art. VIII, T.I.A.S. No. 7313, 23 U.S.T. 371, 1972 WL 122557 (Nov. 23, 1972); *see also* 1944 Treaty Between the United States and Mexico, 59 Stat 1219, 1945 WL 26968, *1 (Feb. 3, 1944) (recognizing that Article VII of the 1848 Treaty regulates the use of the waters of the Rio Grande (Rio Bravo) and the Colorado River "for purposes of navigation").

("[A] treaty's provision for international enforcement mechanisms does not necessarily preclude its domestic enforcement through direct judicial application."). *Medellin* is not to the contrary. There, the Court concluded that the UN Charter's explicit provision for enforcing decisions by the International Court of Justice ("ICJ") provided "the sole remedy for noncompliance" with those decisions because the treaty's "remedial scheme" was fundamentally incompatible with simultaneously treating ICJ decisions as "automatically enforceable domestic law." 552 U.S. at 509-10. Because the UN Charter's remedial scheme afforded the United States an "unqualified right" to opt for "[n]oncompliance with an ICJ judgment," it would be "particularly anomalous" for such decisions nonetheless to be deemed self-executing and thus "immediately and directly binding on state and federal courts." *Id.* at 510-11. Construing Article VII of the 1848 Treaty as self-executing produces no comparable "anomal[y]." Regardless of how a court applies Article VII in any particular case, the United States and Mexico may still "endeavor … to settle" any "differences [ ] arising" from it through diplomatic negotiations. 1848 WL 6374 at *9.

Finally, Texas argues that a *different* provision of the 1848 Treaty, regarding protection of property rights in territories ceded to the United States, is not self-executing. *See* Mot. at 11-15 (discussing Article VIII). Even if true, that argument is irrelevant, as "[i]t is well-established that a treaty may contain both self-executing and non-self-executing provisions."[6] *ESAB Grp. v. Zurich Ins. PLC*, 685 F.3d 376, 387 (4th Cir. 2012) (cleaned up); *accord Postal*, 589 F.2d at 884 n.35. The inquiry "proceeds on a provision-by-provision basis," *Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200, 224 (D.D.C. 2020), *aff'd*, 29 F.4th 706 (D.C. Cir. 2022), and caselaw is replete

---

[6] Thus, the 2004 report Texas cites cannot possibly establish that the entire 1848 Treaty is not self-executing, Mot. at 14-15, as that report plainly deals with the matters covered by Article VIII and does not address Article VII. *See* "Treaty of Guadalupe Hidalgo: Findings and Possible Options Regarding Longstanding Community Land Grant Claims in New Mexico" at 2 (June 2004) https://www.gao.gov/products/gao-04-59 (describing report's purpose).

with examples of courts examining whether a provision is self-executing without regard to other provisions of the treaty.[7]

Accordingly, Article VII is self-executing and is enforceable against Texas.

### B.    The United States May Sue to Enforce Article VII.

Texas observes that the 1848 Treaty does not provide a cause of action to enforce its provisions.  Mot. at 15.  But the United States' cause of action derives from the Supremacy Clause itself.  Under that clause, "all Treaties made, or which shall be made, under the Authority of the United States," are "the supreme Law of the Land."  U.S. Const. art. VI, cl. 3.  And "it is well established that a self-executing treaty binds the States pursuant to the Supremacy Clause." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006).

"[E]very government, [e]ntrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other."  *In re Debs*, 158 U.S. 564, 584 (1895).  A contrary conclusion—that the United States cannot sue in federal court to enforce federal law—"has no place in our constitutional system."  *United States v. Texas*, 143 U.S. 621, 641 (1892).  "Thus, the United States has brought many lawsuits under the Supremacy Clause … without any questioning [it] as the basis for a federal cause of action."  *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021).[8]

---

[7] *See, e.g., Rodriguez*, 29 F.4th at 718; *CLMS Mgmt. Servs.*, 8 F.4th at 1012; *Marshall Islands*, 865 F.3d at 1190; *Doe*, 763 F.3d at 256.

[8] *See, e.g.*, *United States v. Washington*, 596 U.S. 832 (2022); *Arizona v. United States*, 567 U.S. 387 (2012); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc); *United States v. Bd. of Cnty. Commr's*, 843 F.3d 1208 (10th Cir. 2016)*; United States v. South Carolina*, 720 F.3d 518, 523 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1279 (11th Cir. 2012).

The Supremacy Clause thus entitles the United States to sue in its own courts to enforce Article VII. *See United States v. LeMay*, 322 F.2d 100, 103 (5th Cir. 1963); *United States v. Texas*, 557 F. Supp. at 820. Texas's cited cases are not to the contrary. Mot. at 17-18. For example, in *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485 (D.C. Cir. 2008), the D.C. Circuit simply held that "the Treaty of Amity" does not "provide[] a *private* cause of action." *Id.* at 488 (emphasis added). It said nothing about whether the United States could enforce a self-executing treaty in its own courts under the Supremacy Clause. *See id.* at 488–91. The same is true for other cases cited by Texas—all involved *non-federal* actors attempting to enforce unrelated aspects of the 1848 Treaty.[9] Texas cites nothing for the novel idea that the United States cannot sue in its own courts to enforce a self-executing treaty provision. Accordingly, the United States may enforce the free-navigation guarantee in federal court.

### C.   The Installation of the Floating Barrier by Texas Is Preempted.

Texas's placement of the floating barrier in the Rio Grande is preempted by Article VII of the 1848 Treaty. State law "must yield when it is inconsistent with or impairs the policy or provisions of a treaty." *United States v. Pink*, 315 U.S. 203, 230–31 (1942); *see Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government … requires that federal power in the field affecting foreign relations be left entirely free from local interference."). Texas constructed the barrier under state law, *see* Mot. at 20, and because the barrier "may impede or interrupt" navigation of the Rio Grande, Texas's actions are unlawful.

---

[9] *See Ysleta Del Sur Pueblo v. City of El Paso*, 433 F. Supp. 3d 1020, 1026 (W.D. Tex. 2020) (Tribe attempting to enforce Article VIII); *Nino v. United States*, No. 13-cv-0469, 2014 WL 1028575, at *6 (S.D. Cal. Mar. 13, 2014) (private actor attempting to assert cause of action *against* United States under 1848 Treaty); *Garcia v. Purdy*, No. 13-cv-0234, 2014 WL 12796880, at *13 (D.N.M. Mar. 11, 2014) (private actor attempting to enforce Article IX).

This claim is not duplicative of the United States' RHA claim.  *See* Mot. at 18-19.  Article VII's free-navigation guarantee protects *all* navigation, whether it has a commercial purpose or not.  The RHA was enacted under the Commerce Clause, and its focus on commercial navigability arises from the limits of Congress's authority under that clause.  *See United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 404 (1940).  But the 1848 Treaty was ratified to end a war and became law under the Constitution's treaty power, which contains no such limitation.[10]  *See* U.S. Const. art. II, § 2; art. VI, cl. 3.

The text of Article VII confirms that its guarantee extends to *all* navigation on the Rio Grande.  First, the treaty text refers simply to "navigation," without limiting the type or purpose of navigation.  1848 WL 6374, at *4.  At the time of ratification, "navigation" commonly meant broadly "[t]he act of navigating; the act of passing on water in ships or other vessels." *Navigation*, Webster's Dictionary (1828).  Second, Article VII's prohibition on taxation explicitly protects all "vessels" or "persons" navigating the river, not just those transporting "merchandise or effects." *See* 1848 WL 6374, at *4.  Third, Article VII recognizes that navigation includes vessels passing *across* the river as well as *along* it.  *Id.* (addressing taxation "in the case of landing upon one of their shores").

The United States sufficiently alleges that Texas's construction of the barrier is preempted by Article VII.  *Contra* Mot. at 19.  That provision prohibits (1) constructing any work that (2) may impede or interrupt, in whole or in part, the free navigation of (3) the part of the Rio Grande River lying below the southern boundary of New Mexico (4) without Mexico's consent.  *See* 1848

---

[10] To the extent the Commerce Clause is relevant to interpreting the meaning of "navigation" under Article VII, the 1848 Treaty deals with *foreign* commerce, where the federal government's Commerce Clause authority is broadest.  *See Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006).

WL 6374, at *4.  Texas nowhere disputes that the United States sufficiently alleges the first, third, or fourth elements above.  *See* ECF 60 ¶¶ 7, 23, 24, 45; *supra* pp. XX (discussing allegations showing barrier is a "structure" under RHA).

Texas contends the United States does not sufficiently allege the second element, insofar as the relevant stretch of river must be "actually 'navigable,'" Mot. at 19.  To the contrary, the amended complaint and attachments, along with other materials of which the Court may take notice, offer ample evidence of navigation within the meaning of Article VII to satisfy the United States' pleading burden.  The United States does not rely on Article VII itself to show that the relevant portion of the river is navigable.  The amended complaint includes photos showing at least one boat navigating the river during the barrier's construction.  ECF 60 Att. 4, Ex. 1 at 3; *see also* Pls.' First Am. Original Pet. ¶ 70, *Epi's Canoe & Kayak Team, LLC v. Texas*, 1:23-cv-00836-DII, (W.D. Tex. July 21, 2023) (case remanded) (alleging that plaintiff company "conducts its canoeing and kayaking sessions on the Rio Grande River" in Eagle Pass); *supra* at 9.  Texas cannot seriously dispute that this portion of the river is navigable by small craft, as it has represented to the Fifth Circuit that "motorized [law enforcement] watercraft regularly operat[e] in this segment."  Stay Motion at 7 (Doc. 11), *United States v. Abbott*, No. 23-50632 (5th Cir. Sept. 7, 2023).

The United States also sufficiently alleges the barrier may impede or interrupt navigation. *See supra* at 10 (discussing allegations showing barrier "obstructs" the river's navigable capacity). Even if vessels may maneuver past the barrier, Article VII prohibits any works that "*may* impede or interrupt, in whole *or in part*," navigation.  1848 WL 6374, at *4 (emphases added).  Thus, the United States has sufficiently pleaded its claim that Texas's construction of the barrier violates Article VII's free-navigation guarantee.

Texas also argues that its construction of the barrier is an exercise of the "territorial rights" reserved in Article VII.  Mot. at 19.  Even if Texas's actions furthered a valid "territorial right" held by the state, this argument would be unavailing, as the reservation is cabined to "the territorial rights of *either republic* within its established limits."  1848 WL 6374, at *4 (emphasis added). Texas is not one of the two "republic[s]" that are party to the 1848 Treaty.

Texas's invocation of "an inherent constitutional prerogative to protect its territorial sovereignty" fares no better.  Mot. at 19-20.  No provision of the Constitution supports Texas's purported authority.  To the extent Texas is reasserting its prior argument that it may unilaterally violate federal law in response to a self-declared "invasion," that argument fails for the reasons previously explained by the United States and stated by this Court.  *See* ECF 37 at 9-11; ECF 45 at 7-8; ECF 50 at 29–35.  To the extent Texas is attempting to conjure some other free-floating power "to protect its territorial sovereignty … by excluding aliens," Mot. at 19, there is no basis for such power.  Indeed, Texas's cited cases prove the exact opposite: admission or exclusion of noncitizens is a matter for the federal government alone.  States may not intrude upon the federal government's decisions regarding the "exclusion of [noncitizens]," which "is a fundamental act of" *federal* "sovereignty," stemming "not alone from [Congress's] legislative power" but "inherent in the [President's] executive power to control the foreign affairs of the nation."  *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936) (explaining that only the *federal* government is invested "with the powers of external sovereignty"); *Louis v. Nelson*, 544 F. Supp. 973, 976 (S.D. Fla. 1982) ("The sovereign United States government has an absolute right to control its borders.").  Texas has no viable argument to the contrary.

The amended complaint states a claim that Texas's installation of the floating barrier in the Rio Grande is preempted by Article VII of the 1848 Treaty.  That article prohibits either country, without the other's consent, from constructing any work in the Rio Grande that "may impede or interrupt" the "free and common" navigation of the river.  1848 WL 6374, at *4.[11]  This prohibition is not limited to commercial navigation, is self-executing and judicially enforceable against Texas, and the United States may sue to enforce it.

## CONCLUSION

For the foregoing reasons, the Court should deny Texas's motion to dismiss.

Respectfully submitted,

Dated:  December 20, 2023

JAIME ESPARZA
UNITED STATES ATTORNEY

 /s/ Landon A. Wade
LANDON A. WADE
  Assistant United States Attorney
  Texas Bar No. 24098560
United States Attorney's Office
Western District of Texas
903 San Jacinto Blvd., Suite 334
Austin, TX 78701
(512) 370-1255 (tel)
(512) 916-5854 (fax)
Landon.wade@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

 /s/ Brian H. Lynk
BRIAN H. LYNK
  Senior Trial Counsel
  DC Bar No. 459525
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov

---

[11] Under international law, the United States would be deemed responsible for the actions of Texas's National Guard and/or Department of Public Safety in installing the floating barrier.  *See* United Nations, 2001 Articles on Responsibility of States for Internationally Wrongful Acts, Art. 4, https://legal.un.org/ilc/texts/instruments/english/draft_articles/9_6_2001.pdf.

Kimere.kimball@usdoj.gov
Andrew.knudsen@usdoj.gov

*Counsel for the United States of America*


## CERTIFICATE OF SERVICE

I certify that on December 20, 2023, a copy of this filing was served on counsel of record through the Court's electronic filing system.

/s/  Brian Lynk
Brian Lynk