**United States District Court**
**Western District of Texas**
**Austin Division**

United States of America,

*Plaintiff*,

v.

Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas,

*Defendants*.

No. 1:23-cv-00853-DAE

# Defendants' Reply in Support of their Motion to Dismiss the First Amended Complaint

## TABLE OF CONTENTS

Table of Contents ........ ii
Table of Authorities ........ iii
Argument ........ 1
I. The United States fails to state a claim for violation of a treaty. ........ 1
  A. Article VII of the Treaty is not self-executing. ........ 1
  B. The United States has no cause of action to enforce the Treaty domestically. ........ 5
II. The Rivers and Harbors Act does not create a cause of action against Texas. ........ 7
III. The United States has insufficiently pleaded a Rivers and Harbors Act claim. ........ 9
Conclusion ........ 10
Certificate of Service ........ 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ....................5

*Asakura v. Seattle*,
265 U.S. 332 (1924) ....................2, 3

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ....................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................9

*Bertrand v. Sava*,
684 F.2d 204 (2d Cir. 1982) ....................3

*Denver & R.G.R. Co. v. United States*,
241 F. 614 (8th Cir. 1917) ....................5

*Econ. Light & Power Co. v. United States*,
256 U.S. 113 (1921) ....................10

*Gann v. United States*,
142 S. Ct. 1 (2021) ....................6

*Medellin v. Texas*,
552 U.S. 491 (2008) ....................1, 2, 3

*Miami Valley Conservancy Dist. v. Alexander*,
692 F.2d 447 (6th Cir. 1982) ....................10

*Newbold v. Kinder Morgan SNG Operator, L.L.C.*,
65 F.4th 175 (5th Cir. 2023) ....................10

*Nino v. United States*,
No. 13-cv-0469, 2014 WL 1028575 (S.D. Cal. Mar. 13, 2014) ....................6

*Papasan v. Allain*,
478 U.S. 265 (1986) ....................9

*PPL Montana, LLC v. Montana*,
565 U.S. 576 (2012) ....................10

*Raygor v. Regents of Univ. of Minn.*,
534 U.S. 533 (2002) ....................8

*Republic of Marshall Islands v. United States*,
865 F.3d 1187 (9th Cir. 2017) ....................2

*Sanitary Dist. of Chicago v. United States*,
266 U.S. 405 (1924) ....................9

*Texas v. Florida*,
306 U.S. 398 (1939) ....................5

*Tonkawa Tribe of Oklahoma v. Richards*,
75 F.3d 1039 (5th Cir. 1996) ....................2

*United States v. Arizona*,
295 U.S. 174 (1935) ....................9

*United States v. California*,
655 F.2d 914 (9th Cir. 1980) ....................5

*United States. v. Oregon*,
295 U.S. 1 (1935) ....................10

*United States v. State of Utah*,
283 U.S. 64 (1931) ....................10

*United States v. Texas*,
557 F. Supp. 3d 810 (W.D. Tex. 2021) ....................6

*Webster v. Fall*,
266 U.S. 507 (1925) ....................6

*Will v. Michigan Dep't of State Police*,
491 U.S. 58 (1989) ....................8

*Wilson v. Omaha Indian Tribe*,
442 U.S. 653 (1979) ....................8

**Statutes**

29 U.S.C. § 794a(a)(2) ....................8

42 U.S.C. § 1983 ....................8

33 U.S.C. § 406 ....................7, 8, 9

26 Stat. 1512, 1890 ....... 6

**Other Authorities**

John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 (1905) ....... 5

*Restatement of Foreign Relations Law* 4th, § 310, Cmt.7 ....... 6

Defendants Greg Abbott, in his official capacity as Governor of Texas, and the State of Texas file this reply in support of their motion to dismiss Plaintiff's First Amended Complaint.[1]

## ARGUMENT

### I. The United States fails to state a claim for violation of a treaty.

Halfway through this case—and more than 175 years after the 1848 Treaty was ratified—the United States asks this Court to fundamentally alter the bilateral relationship between the United States and Mexico by finding that Article VII of the Treaty is self-executing. No federal court has ever made that unprecedented foray into such "sensitive foreign policy decisions." *Medellin v. Texas*, 552 U.S. 491, 511 (2008). This Court should not become the first. *See* ECF 50 at 31–35 (Ezra, J.) (stressing importance of federal courts refraining from wading into sensitive political questions). The United States' claim pursuant to the Treaty of Guadalupe Hidalgo fails for three key reasons: (1) the United States has failed to cite to any relevant authority indicating how Article VII is self-executing in light of legislative and textual background indicating otherwise, (2) the treaty's plain language assigns "exclusive jurisdiction" to another forum, and (3) the United States does not have a cause of action to enforce the Treaty against Texas.

#### A. Article VII of the Treaty is not self-executing.

Because a treaty is "primarily a compact between independent nations," it usually "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Head Money Cases*, 112 U.S. 580, 598 (1884). The default rule, then, is that signatories police treaty compliance through political means like "international negotiations" and that "the judicial courts have nothing to do and can give no redress." *Id.* A self-executing treaty is the extraordinary exception. To qualify, the treaty language itself must with "clarity" provide "explicit textual expression" not only of a substantive obligation but also of an "enforcement

---

[1] Plaintiff claims this Court's "injunction is now in effect" because a panel of the Fifth Circuit affirmed this Court's decision. ECF No. 63 at 9. That is wrong. Before the panel's mandate issued, Texas petitioned the full Fifth Circuit for en banc review. That petition remains pending.

mechanism" that speaks as "a directive to domestic courts." *Medellin*, 552 U.S. at 508, 514.

**1.** The text of the Treaty is dispositive here. Article XXI provides that "[i]f unhappily any disagreement should hereafter arise between the two republics" over "any stipulation in this treaty," the two governments "do promise to each other that they will endeavor, in the most sincere manner, to settle the differences" by using "mutual representations and pacific negotiations." And "*any* stipulation" unquestionably includes the stipulation contained in Article VII. "The [Treaty's] provision of an express diplomatic—that is, nonjudicial—remedy is itself evidence" that any navigability guarantee was "not meant to be enforceable in domestic courts." *Medellin*, 552 U.S. at 509–10. If parties could instead sue directly in federal court, Mexico and the United States "would have no need to proceed to" negotiations under Article XXI. *Id.* at 510–11. This political remedy, moreover, "fatally undermine[s]" Plaintiff's argument when we consider how it focuses on the *signatories*—*i.e.*, "the two republics" themselves—not on third parties like individuals or political subcomponents. *Id.* at 511–12. Finally, the Treaty states plainly an aspiration that those two signatories will "endeavor" to reach a negotiated agreement. "Aspirational language is the hallmark of a non-self-executing treaty." *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1196 (9th Cir. 2017).

Plaintiff ignores all the above evidence and points only to Article VII's use of the word "shall." However, the use of the language "shall" or "must" does not decisively indicate that a treaty would be self-executing. *See, e.g., Tonkawa Tribe of Oklahoma v. Richards*, 75 F.3d 1039, 1046 (5th Cir. 1996). Plaintiff cites *Asakura v. Seattle*, 265 U.S. 332, 339, 341 (1924), for the proposition that "shall" means a treaty is self-executing. ECF No. 63 at 18. However, the *Asakura* Court said no such thing; rather, it evaluated the meaning of "shall" for the purposes of determining whether "Pawnbrokers" are engaged in "trade" under the meaning of the treaty, not whether the treaty was self-executing. *Id.* at 342. The *Asakura* Court's interpretation of the definition of "shall" in the context of whether "Pawnbrokers" are engaged in "trade" under the meaning of the treaty has no bearing on whether the use of the term "shall" necessitates a finding that Article VII is self-executing.

In any event, *Asakura* was not the last word from the Supreme Court, which has recognized that treaties may require implementing legislation "even when the operative treaty provisions use far more mandatory language." *Medellin*, 552 U.S. at 533–34. Plaintiff's argument here that mandatory language nevertheless suffices comes straight from the *dissenting* opinion in *Medellin*. *See id.* at 551 (Breyer, J., dissenting). Moreover, the United States has itself successfully argued that treaties using mandatory language are *not* self-executing. *See, e.g.*, *Bertrand v. Sava*, 684 F.2d 204, 218–19 (2d Cir. 1982) (INS successfully argued the United States Convention and Protocol Relating to the Status of Refugees was not self-executing). Unless the United States is prepared to say now that it was wrong with respect to countless other treaties, it must treat Article VII of the 1848 Treaty the same way.

**2.** Plaintiff stresses that post-ratification history is also relevant. But that subsequent history confirms what the plain text suggests. The 1848 Treaty specifically contemplated "future action" to implement its guarantees. *Medellin*, 552 U.S. at 508. Article VII referenced the boundary described in "the fifth article." And Article V tasked both countries with appointing "a commissioner and a surveyor" to delineate the international boundary with that later, agreed-upon "result" to "be deemed a part of this treaty." Over the ensuing decades, agreeing on where the international boundary even was proved difficult. In 1853, the signatories signed a new treaty considering ongoing questions about the "true limits" and "opposite interpretations" of the 1848 Treaty. *See* Gadsden Purchase Treaty, Preamble. In 1884, the signatories executed a convention to "lay down rules for the determination" of questions "which may arise through the changes of the channel." Convention of 1884, Preamble. And at various points in between, they established numerous temporary commissions to mark the dividing line. In 1889, they formally created the International Boundary Commission—forerunner to the present-day IBWC—to help. (To date, Plaintiff has never once acknowledged that IBWC's own maps are not compliant with the currently governing Treaty.) Thus, the 1848 Treaty not only envisioned future action—the parties, in fact, took future action to implement the treaty's guarantees. *Medellin*, 552 U.S. at 508.

That comports with the study that Congress later commissioned that concluded the Treaty

*as a whole* was not self-executing. The Government Accountability Office's 2004 review of the Treaty of Guadalupe Hidalgo found that the "[u]nder established U.S. law … courts are required to comply with the terms of federal statutes that implement a treaty *such as the Treaty of Guadalupe Hidalgo that is not self-executing*."[2] This review, which was commissioned in response to a congressional request, reiterated its findings when it subsequently noted: "the Treaty of Guadalupe Hidalgo was not a self-executing treaty, and thus it required implementing congressional action in order to take effect in the United States." *Id*. at 141. To be sure, other portions of the 2004 report went on to discuss other provisions of the treaty at greater length. And cases finding the 1848 Treaty involved Article VIII's land grant guarantee. But Plaintiff has identified no government report, no binding precedent—*no* source whatsoever indicating that Article VII was somehow singled out for different treatment than the rest of the Treaty, which contemplated negotiated enforcement between the signatory parties for all of its provisions.

**3.** Plaintiff accidentally concedes the Treaty is not self-executing. First, it claims that "federal courts can fashion appropriate remedies" to redress violations of the Treaty and this Court should do so here. ECF No. 63 at 19. But asking this Court to imply a remedy is proof the Treaty does not supply a self-executing remedy of its own. Second, in suggesting that Texas cannot exercise territorial rights under Article VII, it dooms its case once more. If the rights in Article VII attach only to "either republic," then the obligations, too, attach only to "the two republics" who signed the Treaty. ECF No. 63 at 26. Plaintiff cannot have it both ways. Finally, the last paragraph of Plaintiff's argument gives the game away entirely: Article VII "prohibits *either country*"—*i.e.*, the United States and Mexico—from doing certain things. Assuming the idea that the acts of subcomponents (like states or cities) might be deemed the acts of the nation for international law purposes is even relevant, even though international law is *not* domestic law, that spells disaster for

[2] Treaty of Guadalupe Hidalgo: Findings and Possible Options Regarding Longstanding Community Land Grant Claims in New Mexico, at 10 (emphasis added), available at https://www.gao.gov/products/gao-04-59.

the Plaintiff. If international law would move responsibility up one level from the State to the Nation, that only points us back to Article XXI's dispute resolution procedures for a dispute between *Mexico and the United States*. ECF No. 63 at 27 n.11.

**B. The United States has no cause of action to enforce the Treaty domestically.**

"The federal government, of course may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). The federal government's sovereign status does not alter this. "When the state as plaintiff invokes the aid of a court of equity, it is not exempt from the rules applicable to ordinary suitors." John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 (1905). "[I]t must establish a case of equitable cognizance, and a right to the particular relief demanded." Id. Thus, a court cannot award relief unless it is convinced "that a cause of action cognizable in equity is alleged and proved," even when one sovereign sues another. *Texas v. Florida*, 306 U.S. 398, 411 (1939). For this reason, Plaintiff must establish "a right of action given by some statute" or "a common-law right of action." *Denver & R.G.R. Co. v. United States*, 241 F. 614, 616 (8th Cir. 1917) (rejecting a claim by the federal government).

Plaintiff briefly argues that it has a cause of action based on the Supremacy Clause itself. *See* ECF No. 63 at 22–23. Remarkably, it claims the idea that the Supremacy Clause furnishes no cause of action is a "novel idea." That would come as a surprise to the Supreme Court: "It is … apparent that the Supremacy Clause is not the source of any federal rights, and *certainly does not create a cause of action*." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (quotations omitted). Rather, it "creates a rule of decision" and "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 324. The Supreme Court further noted that when it has allowed suits "to enjoin unconstitutional actions by state and federal officers," those cases have not been brought under the Supremacy Clause. *Id.* at 327. The United States is not singularly exempt from this rule. Its claim would be especially perverse given the United States' argument that the 1848 Treaty does not confer a private cause of action against

itself. *See Nino v. United States*, No. 13-cv-0469, 2014 WL 1028575, at *6 (S.D. Cal. Mar. 13, 2014). It cannot be the case that the 1848 Treaty furnishes *no* cause of action against an actual signatory (*i.e.*, the United States), but that it *does* furnish a cause of action against non-signatory (*i.e.*, Texas).

Plaintiff argues that because it "has brought many lawsuits under the Supremacy Clause … without any questioning [it] as the basis for a federal cause of action," this Court should not question it, either. ECF No. 63 at 22 (quoting *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021)). In support, Plaintiff cites a string of cases, ECF No. 63 at 22 n.8—none of which addressed the issue of whether there was a cause of action, and therefore are not precedent on this. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Gann v. United States*, 142 S. Ct. 1, 2 (2021) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

The Treaty itself does not provide a cause of action, as the United States and Mexico agreed to assign exclusive jurisdiction over navigability disputes to the International Boundary and Water Commission ("IBWC"). 26 Stat. 1512, 1890 WL 10691, at *1. Plaintiff recognizes that the Treaty has a "non-judicial dispute resolution procedure"; it fails to cite to any authority demonstrating why this Court should now interpret the clause assigning the IBWC "exclusive jurisdiction," to mean that federal district courts now have jurisdiction over Treaty disputes.

In response to Defendants' argument that the IBWC's exclusive jurisdiction precludes any cause of action in domestic courts, Plaintiff responds that "a treaty's provision for international enforcement mechanisms does not necessarily preclude its domestic enforcement through direct judicial application." ECF No. 63 at 20–21 (quoting *Restatement of Foreign Relations Law* 4th, § 310, Cmt.7). But that footnote cannot overcome the language used by the United States Senate: "The International Boundary and Water Commission retains 'exclusive jurisdiction' over issues relating to 'works that may be constructed in said [Rio Grande or Colorado] rivers.'" 26 Stat. 1512, 1890 WL 10691, at *1. It requires the United States to submit "*[a]ll* differences or questions" arising over that issue to the IBWC. *Id.* (emphasis added). Neither the Treaty nor the Supremacy Clause provide a cause of action and Plaintiff's treaty claim must be dismissed.

## II. The Rivers and Harbors Act does not create a cause of action against Texas.

Section 12 of the Rivers and Harbors Act, 33 U.S.C. § 406, provides for remedies against "[e]very person and every corporation" that builds any of the structures prohibited by §§ 401, 403, and 404 of the Act. This phrase is the subject of the entire section, including the second sentence that permits injunctive relief. Plaintiff maintains that the second sentence authorizes injunctive relief beyond those categories. *See* ECF No. 63 at 11–15. But federal courts have developed a presumption against liability for States when Congress has not made a clear statement.

"As in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Section 406 comprises two sentences. Plaintiff agrees that the first applies only to persons and corporations. The second sentence reads:

> And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

33 U.S.C. § 406. Confined to the immediate text, the second sentence does not name the target of the remedy it provides; it does not say against whom injunction may be sought. Read in context, the injunction referenced in the second sentence runs against the same targets as the criminal penalties in the first sentence. Sentence two also begins "[a]nd further," signaling that its contents are in addition to the substance of the first sentence and apply on the same basis. Therefore, the scope of § 406's relief is limited to "persons" and "corporations."

Plaintiff argues that the modifier "any" appearing in "any structures or parts of structures" means that an injunction is available whenever any structure is erected by any entity. ECF No. 63 at 12. But "any" could just as easily mean that any prohibited structure can be enjoined when built by an offending person or corporation. Grammatically, "any" modifies "structures" and "parts of structures," so the more natural reading is the more limited one where only the types of prohibited structures are indefinite, not the targets of injunctive relief.

But when determining whether a statute applies to States, court must look "for a clear

statement of what the [statute] *includes*, not a clear statement of what it *excludes*." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 546 (2002) (emphases in original). In *Atascadero State Hosp. v. Scanlon*, a statute providing civil remedies for violations committed by "'*any* recipient of Federal assistance'" was "not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment" when a State was such a recipient. 473 U.S. 234, 245–246 (1985) (quoting 29 U.S.C. § 794a(a)(2) (emphasis in original)). Because "[w]hen Congress chooses to subject the States to federal jurisdiction, it must do so specifically." *Id.* at 246. The language of the Act as applying to "*any* structures" thus cannot serve to bring the States within the ambit of the statute.

State governments are excluded from the meaning of "person." When "the statute imposes a burden or limitation, as distinguished from conferring a benefit or advantage," the Court is particularly cautious about extending statutory provisions to the states. *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979). A statute that creates legal burdens or affects the powers of States relative to the federal government should only be interpreted to encompass States and their officials when Congress has made its "intention to do so unmistakably clear *in the language of the statute*." *Id.* (emphasis added); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989); *Atascadero State Hosp.*, 473 U.S. at 242. Thus, there is a presumption against construing "persons" to include States, and this presumption can only be rebutted by a clear text.

Plaintiff dismisses this caselaw as limited to creating a presumption against waiving sovereign immunity for statutory private causes of action. ECF No. 63 at 13–14. While some of these cases addressed questions of sovereign immunity, not all did. *See, e.g.*, *Wilson*, 442 U.S. at 653. Among those that did, the Court often made a standalone case for construing "person" to exclude States. *See Will*, 491 U.S. at 64–65 (applying principles of statutory construction to 42 U.S.C. § 1983 separately from its treatment of sovereign immunity). Thus, the presumption against including a sovereign is applicable to the Act.

Section 406 creates legal "burdens" or "limitations" as it creates penalties for building obstructions. Were these to run against the States, the Act would affect federal-State relations by granting the federal government new powers to restrain the States. Thus, § 406 should not be

construed to apply to States absent a clear statement of Congress's intent.

Plaintiff points to one case in which the Court comments that § 406's injunctive relief could be brought against States.[3] ECF No. 63 at 12 (citing *United States v. Arizona*, 295 U.S. 174 (1935)). *Arizona* noted that the penalties in § 406 could be brought against "federal and state officers" for violations of § 401, which requires "the consent of Congress" to authorize damming a navigable river. *Arizona*, 295 U.S. at 184. The Court had no opportunity to order relief under § 406, so its statement regarding its applicability of § 406 was dicta. Further, *Arizona* was decided before the Court had developed its clear statement rule and is contradicted by the more recent caselaw. *Compare Arizona*, 295 U.S. at 669 (rejecting argument that Act does not apply to state officers on basis that "[t]he measures adopted for the enforcement of the prescribed rule are in general terms and purport to be applicable to all" and "[t]here is no presumption that regulatory and disciplinary measures do not extend to such officers."), *with Will*, 491 U.S. at 64–65 (relying on clear statement rule to find the term "person" did not include a State or its officials).

**III. The United States has insufficiently pleaded a Rivers and Harbors Act claim.**

The amended complaint does not contain factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff is obligated to set forth the "grounds of [its'] entitlement to relief." *Id.* The "formulaic recitation of the elements of a cause of action [under Section 10 of the Rivers and Harbors Act] will not do." *Id.* This Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Plaintiff's Rivers and Harbors Act claim fails because the allegations do not contain enough facts to "nudge[] the[] claim[] across the line from conceivable to plausible." *Bell Atl. Corp.*, 550 U.S. at 570.

The determination of a river's navigability is a fact-specific inquiry that is determined on a

[3] Plaintiff also relies on *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405 (1924), as upholding an injunction under the Act against a State, ECF No. 63 at 13, but that involved "a corporation of Illinois,"—a special-purpose district akin to a mere municipality—not a State. *Id.* at 423.

segment-by-segment basis, *PPL Montana, LLC v. Montana*, 565 U.S. 576, 594 (2012), by reference to the specific facts. *United States v. State of Utah*, 283 U.S. 64, 77 (1931). Plaintiff simply alleges in a conclusory fashion that the Rio Grande in the vicinity of Eagle Pass, Texas is a navigable water.

There are no facts alleged that the segment of the Rio Grande in which the buoy system is located frequently serves as a highway of interstate or foreign commerce. *See United States. v. Oregon*, 295 U.S. 1, 23 (1935). Attaching a photograph of a boat in the water near the buoys is insufficient to allege that the segment of the river (1) is presently or has been historically, (2) used or is susceptible of use, (3) in the customary modes of trade and travel on water, (4) as a highway for interstate commerce. *Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 449–50 (6th Cir. 1982). Instead, Plaintiff points to administrative determinations from the Coast Guard and the U.S. Army Corps of Engineers. But the Coast Guard navigability determination admits that it simply "represents [its] opinion … only as to the extent of its own jurisdiction," ECF No. 60 at 16, while neither show that the relevant segment of the river is presently or historically navigable.

Plaintiff also contends that because law-enforcement boats use the segment, the river is navigable. ECF No. 63 at 25. But the question is whether there is *commercial navigation*, whether a waterway is "of practical service as *a highway* of commerce." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 124 (1921) (emphasis added); *Newbold v. Kinder Morgan SNG Operator, L.L.C.*, 65 F.4th 175, 182 (5th Cir. 2023).

Similarly, the amended complaint insufficiently alleges that the buoy system is a structure prohibited by Section 10 of the Act or that it obstructs the navigable capacity of the Rio Grande. While Plaintiff points to its description of the buoy system, it provides no facts connecting the buoys to the list of prohibited structures, *see* 33 U.S. § 403, or alleging they interfere with commercial navigation along the length of the relevant segment of the Rio Grande. Instead, the amended complaint contains conclusions on these elements.

## CONCLUSION

This Court should dismiss Plaintiff's amended complaint in its entirety.

Date: January 10, 2024

Respectfully submitted,

KEN PAXTON
Attorney General of the State of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Tex. State Bar No. 24125371
jacob.przada@oag.texas.gov

**Counsel for Defendants**

**Certificate of Service**

On January 10, 2024, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS