# United States Court of Appeals for the Fifth Circuit

**FILED**
February 09, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ klw

DEPUTY

---

No. 23-50632

---

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

GREG ABBOTT, *in his capacity as Governor of the State of Texas*; STATE OF TEXAS,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-853  DAE

---

Before RICHMAN, *Chief Judge*, and KING, JONES, SMITH, STEWART, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

PER CURIAM:[1]

IT IS ORDERED that "Appellants' Emergency Motion to Stay Trial Proceedings Pending En Banc Review" is DENIED.

---

[1] JUDGE HAYNES concurs in the judgment without a written opinion.

No. 23-50632

EDITH H. JONES, *Circuit Judge*, joined by WILSON, *Circuit Judge*, concurring:

Reading the approximately 20 page transcript of the district court's pretrial conference persuades me that the court determined to rush to trial and, for whatever reason, to parallel this court's en banc review. If the court's goal was to flesh out the record from the preliminary injunction hearing, pushing its draconian discovery and trial timetable defeats that purpose. And if the court thought this court had little to do on en banc review that might change the legal analysis it had previously used, then the district court was uninformed. Finally, if the district court thought that going to trial during en banc briefing by the parties and preparation by this court's judges somehow expedites ultimate resolution of this case, it makes no sense. I do not speculate on the court's possible motives, only the litigation posture that he created.

But because the plausible goals are erroneous, I would hold that the district court abused its discretion in its trial setting and pretrial deadlines. Judge Willett's order for a further scheduling conference is the least that should be accomplished. *See In re JPMorgan Chase & Co.*, 916 F.3d 494, 504 and n. 24 (5th Cir. 2019)(denying mandamus, but holding that "[w]e issue this published opinion as a holding …under our supervisory authority to correct errant caselaw from the district courts under our jurisdiction.") I reluctantly agree to deny mandamus.

Dᴏɴ R. Wɪʟʟᴇᴛᴛ, *Circuit Judge*, joined by Rɪᴄʜᴍᴀɴ, *Chief Judge*, and Eʟʀᴏᴅ, Sᴏᴜᴛʜᴡɪᴄᴋ, and Wɪʟsᴏɴ, *Circuit Judges*, concurring:

The State of Texas has moved to stay trial proceedings pending *en banc* rehearing in this case. We would treat Texas's motion as a petition for mandamus, as Texas requests in the alternative. In our view, the district court's rushed schedule, while questionable, is not mandamus-able.

I

In July 2023, the State of Texas installed a floating barrier in the Rio Grande near Eagle Pass, one of the busiest corridors in the nation for illegal crossings by undocumented immigrants. The United States brought a civil enforcement action under Sections 12 and 17 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 406, 413, seeking removal of the floating barrier, which it alleged was an "obstruction" to a "navigable" waterway, *see* 33 U.S.C. § 403. The district court granted a preliminary injunction in favor of the United States, ordering Texas to cease any work on the floating barrier and to reposition it on the Texas side of the riverbank. Over a dissent, a panel of this court affirmed the district court's preliminary injunction. *United States v. Abbott*, 87 F.4th 616 (5th Cir. 2023). The full court then ordered rehearing *en banc* and vacated the panel opinion. *United States v. Abbott*, No. 23-50632, 2024 WL 174374 (5th Cir. Jan. 17, 2024). We subsequently granted Texas's motion to stay the preliminary injunction pending appeal.

Two days after we ordered rehearing *en banc*, the district court held a status conference with trial counsel. The district court stated that it would try the case "soon, very soon, because there is no need for this to linger on." It accordingly set a trial date of March 19, two months away. It also set several pretrial deadlines, requiring, for example, disclosure of expert witnesses by January 26, completion of general discovery by February 16, completion of

No. 23-50632

expert discovery by February 29, and filing of proposed findings of fact and conclusions of law by March 5.

Texas then submitted this mandamus petition, arguing that the district court's decision to expedite the case to trial is unreasonable in light of our impending *en banc* review. We entered a temporary administrative stay of the pretrial proceedings while we considered Texas's petition.

## II

A writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary cases." *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 350 (5th Cir. 2017) (citation omitted). We may issue the writ only if three conditions are met. First, Texas must have "no other adequate means to attain the relief [it] desires." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (citation omitted). Second, Texas must demonstrate that its "right to issuance of the writ is clear and indisputable." *Id.* at 381 (citation and internal quotation marks omitted). Third, we "must be satisfied that the writ is appropriate under the circumstances." *Id.*

We are particularly concerned by the district court's sudden decision to expedite trial, its seeming indifference to the parties' arguments, and its inconsistent comments about the need for extensive pretrial discovery.

Although the district court said that it "had made the decision to do this, to move it forward before they [i.e., the Fifth Circuit] went *en banc*," it had been relatively inactive for the five months following its preliminary injunction hearing and did not set a trial date until just two days after this court decided to rehear the case *en banc*. And despite the district court's promise in September "to expedite this matter *in consultation with counsel*," the transcript of the conference shows that even before the court heard from the parties, it had decided on a trial date "as early in March as we can." When the court set trial to begin on March 19, it rebuffed any attempt to extend the

date, saying, "Somebody looks like he's trying to jump up and say something. It isn't going to change my mind on the trial."

We agree with the district court that this litigation, involving unprecedented action regarding the Texas border, deserves expeditious resolution—but more, it deserves *meticulous* resolution. While the United States agreed with the district court's breakneck schedule, Texas attempted to voice concerns during the status conference—and was repeatedly interrupted by the district court before it could finish its comments or requests.

The district court also vacillated about the scope of evidence to be presented at trial, sometimes undercutting its own justification for a hurried pretrial schedule. On one hand, the court opined that "[t]here's no need for any extensive discovery here." But it then emphasized the critical difference between the evidentiary standards for a preliminary injunction versus a subsequent trial on the merits. Shortly after those comments, the court stated, "And of course, there are many other issues that need to be addressed in this trial that were not fully explored in the preliminary injunction hearing."

After these divergent remarks about the need for evidence to fully explore the issues, the court gave the parties only five days (subsequently extended to seven days) to designate expert witnesses;[1] allowed less than a month for general discovery; and required expert reports to be filed and expert discovery to be completed by February 22 and February 29, respectively. As a result, multiple expert depositions must be undertaken in

---

[1] During the January 19 status conference, the court overlooked that Texas presented no experts, only fact witnesses, in the preliminary injunction hearing. The court later "extended the State's deadline to disclose experts [from January 24] to January 26, 2024, specifically to give the State the opportunity to develop a response of its own."

No. 23-50632

one week, and experts' rebuttal reports are required almost instantaneously. Finally, working backward from the March 19 trial date, the district court required the parties to file proposed findings of fact and conclusions of law by March 5, less than a week after the close of expert discovery. At the time it set these deadlines, the court was unaware of how significantly its schedule overlaps with the parties' briefing deadlines for our *en banc* rehearing in May. Texas's principal brief is due February 16, and the United States' reply brief is due March 18.

Despite our misgivings about the district court's decisions, we cannot say that the rigorous criteria for mandamus are fulfilled. The district court's scheduling orders, although questionable, fall shy of showing a "persistent disregard of the Rules of Civil Procedure" or a pattern of noncompliance that could justify mandamus relief. *See Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 31 (1943); *Will v. United States*, 389 U.S. 90, 104–05 (1967) (discussing *La Buy v. Howes Leather Co.*, 352 U.S. 249 (1957), where the court "specifically relied upon evidence in the record which showed a pattern of improper references of cases to special masters by the District Judge"); *see also Donnelly v. Parker*, 486 F.2d 402, 409 n.29 (D.C. Cir. 1973) ("While a pattern of noncompliance with the federal rules may warrant an invocation of mandamus, the [Supreme] Court has made it clear [in *Will*] that *La Buy* 'is simply inapposite where there is no showing of a persistent disregard of the federal rules.'" (citing *Will*, 389 U.S. at 105)); *Parr v. United States*, 351 U.S. 513, 520 (1956) ("Here the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction. The extraordinary writs do not reach to such cases . . . .").

And, critically, the district court has jurisdiction to proceed to trial while we review *en banc* the factual, historical, and legal issues on appeal from

No. 23-50632

the preliminary injunction.[2] *See Satanic Temple Inc. v. Tex. Health & Human Servs. Comm'n*, 79 F.4th 512, 514 (5th Cir. 2023); *United States v. Lynd*, 321 F.2d 26, 28 (5th Cir. 1963) (per curiam). Although these issues are undeniably significant to both sovereigns, their importance is not of the type that could imbue us with authority to override the district court's jurisdiction. Each of the cases cited by JUDGE HO, for example, features some *plus* factor that is not present here, such as the need to maintain proper deference to the legislature or executive or the risk that, without mandamus relief, the district court's actions will cause irremediable harm. *See, e.g.*, *Ex parte Republic of Peru*, 318 U.S. 578, 587 (1943) (issuing the writ of mandamus where the claims "which are normally presented and settled in the course of the conduct of foreign affairs by the President and by the Department of State," not by courts); *In re Landry*, 83 F.4th 300, 306–07 (5th Cir. 2023) (issuing the writ in part because "a court must afford the legislative body that becomes liable for a Section 2 violation the first opportunity to accomplish the difficult and politically fraught task of redistricting"); *see also id.* at 308 (Ho., J., concurring) (describing *In re Trinity Indus., Inc.*, No. 14-41067 (5th Cir. Oct. 10, 2014), where "the district court had no legal basis to hold a particular proceeding"); *In re Justs. of Supreme Ct. of Puerto Rico*, 695 F.2d 17, 25 (1st Cir. 1982) (issuing the writ to prevent them from taking part in litigation that "risks harm to the court's stance of institutional neutrality—a

---

[2] JUDGE DOUGLAS says that "any conclusions we might reach in rehearing this case *en banc* would have no bearing on the merits." True, findings of fact and conclusions of law by the *district court* when granting a preliminary injunction do not bind the *district court* in a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Likewise, our factual determinations on an interlocutory appeal are often nonbinding. *Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 881 (5th Cir. 1993). But "[a]s to *decisions of law* [made by this court], the interlocutory appeal will establish law of the case." *See, e.g.*, *id.* (emphasis added); *see also Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 702 (5th Cir. 2010). Just to be clear, any conclusions of law made by an *en banc* court on appeal from a preliminary injunction are binding on the district court in a subsequent trial on the merits.

No. 23-50632

harm that appeal would come too late to repair"). By contrast, the district court's decision to expedite trial, despite our impending *en banc* rehearing, is within its jurisdiction, does not tread on the dominion of other branches of government, and will not permanently close our courthouse doors to the parties. The district court's *preliminary* injunction remains stayed by order of this court. And we fully expect the district court's *permanent* injunction decision (whichever way it goes) to be swiftly appealed following trial on the merits. *See La. World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1038 (5th Cir. 1984) ("The Defendants will be able to obtain as broad a review on the merits of the order granting the permanent injunction as they could have obtained on appeal from the order granting the preliminary injunction.").

Nonetheless, because we administratively stayed the pretrial proceedings while we reviewed Texas's petition, the district court will need to adjust its recently passed January 26 deadline for expert designations and, accordingly, its upcoming February 16 deadline for general discovery. We recognize that, to some extent, trial preparation in the district court will overlap with preparation for our *en banc* rehearing in May. But we exhort the district court to consider, at long last, both parties' explanations as to what they regard as reasonable dates for these and other pretrial deadlines and to further modify the schedule to set a reasonable trial date that does not sacrifice rigor for rapidity. Prompt resolution, while important, cannot come at the expense of *painstaking* resolution. This is an historic case that deserves a record assembled with utmost thoroughness and evenhandedness for the interests of both sovereigns.

Accordingly, we concur in DENYING Texas's motion to stay trial proceedings or, in the alternative, for a writ of mandamus.

DANA M. DOUGLAS, *Circuit Judge*, joined by KING, STEWART, HAYNES, GRAVES, HIGGINSON, and RAMIREZ, *Circuit Judges*, concurring:

I concur in the denial of mandamus. I write separately regarding the district court's decision to expedite this trial.

The record indicates that the district court simply complied with our precedent in suggesting that cases such as this should be tried expeditiously on the merits. *See Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 815 (5th Cir. 1989) (holding that where a district court enters a preliminary injunction in the face of significant defenses, "it is frequently desirable in such cases to expedite the trial on the merits"). Here, the district court sought to expedite trial on the merits to "provide a complete and full factual as well as legal record" for both our court and the Supreme Court to review, if necessary.

Texas's insistence that trial be delayed appropriately gave the district court pause, as preliminary issues—such as our decision to grant rehearing en banc on a preliminary injunction—only serve to prolong a final determination on the matter as they weave their way through the courts of appeal. Crucially, any conclusions we might reach in rehearing this case en banc would have no bearing on the merits because "findings of fact and conclusions of law made by a court granting a preliminary injunction *are not binding at trial on the merits*." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added). Further, our en banc review is curbed by the standard of review, which only permits review of whether the district court abused its discretion in granting the preliminary injunction. *See Janvey v. Alguire*, 647 F.3d 585, 591-92 (5th Cir. 2011).

Finally, I wish to emphasize that the parties were not blindsided by the district court's decision to quickly move this case to trial on the merits. In its September 2023 order granting a preliminary injunction, the district court

No. 23-50632

indicated that it "intend[ed] to expedite this matter" to resolve the full merits in "the shortest time possible." Preceding that order, the district court permitted extensive discovery.  Texas itself, in opposing the preliminary injunction, stressed the urgency with which it seeks to remedy the "invasion" at the border.  Yet now, Texas seeks to prolong the termination of these proceedings by seeking intervention from this court at the eleventh hour without so much as awaiting the district court's own order on the motion to stay.[1]

Thus, I concur in the judgment only and find nothing in the record to support the misgivings surrounding the district court's decisions concerning its own docket.

---

[1] Texas sought a stay of proceedings from the district court at 11:56 p.m. on January 22, 2024.  The district court only received the United States' opposition at 2:00 p.m. on January 23.  It then filed its decision at 6:00 p.m. on January 24.  But despite both the United States and the district court expeditiously responding to Texas's motion, Texas did not await the district court decision. Instead, it misleadingly suggested to this court that the district court had failed to rule on its motion.

No. 23-50632

James C. Ho, *Circuit Judge*, joined by Smith, Duncan, Engelhardt, and Oldham, *Circuit Judges*, dissenting:

This case is about the fundamental right of self-defense—and in more ways than one.

At the heart of this en banc appeal is a State's sovereign authority to defend itself and its citizens. But before we can even get to that appeal, we must first decide an emergency motion that calls on us to defend our *own* authority as an en banc appellate court.

Our Nation is presently faced with a historic national security crisis at the border. The State of Texas has determined that the United States is failing to protect Texans from this danger, and has thus taken its own measures to combat the uncontrolled outbreak of illegal border crossings.

The district court entered a preliminary injunction that prevents the State of Texas from taking some of those measures. But our court recently granted rehearing en banc to review that order. *See United States v. Abbott*, 90 F.4th 870 (5th Cir. 2024). We also stayed the preliminary injunction.

In response, the district court immediately announced that it would hold expedited trial proceedings, in an obvious and transparent attempt to thwart our en banc proceedings.

I would grant mandamus relief, out of respect for the sovereign interests asserted by the State of Texas, and out of respect for our own authority as an en banc appellate court. The court today declines to do so. Accordingly, I respectfully dissent.

## I.

The All Writs Act authorizes courts of appeals to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "It was early

No. 23-50632

recognized that the power to issue a mandamus extended to cases where its issuance was either an exercise of appellate jurisdiction or in aid of appellate jurisdiction." *United States v. U.S. Dist. Court for S. Dist. of N.Y.*, 334 U.S. 258, 263 (1948).  "It is, indeed, a high function of mandamus to keep a lower tribunal from interposing unauthorized obstructions to enforcement of a judgment of a higher court." *Id.* at 264.  "[A] judicial usurpation of power[] will justify the invocation of this extraordinary remedy." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980) (per curiam).

So mandamus "plainly extends to invalidating district court orders that threaten to undermine the very system of review that the All Writs Act protects." *In re Murphy-Brown, LLC*, 907 F.3d 788, 794 (4th Cir. 2018).  *See also id.* (invalidating district court order that "so plainly undercut the court of appeals in the orderly exercise of its own jurisdiction").

The emergency motion we address today calls upon us to exercise this important authority.  Just two days after we announced that we would rehear this appeal en banc, the district court suddenly and abruptly announced an expedited trial schedule.  Under this new schedule, the district court would presumably enter final judgment while our en banc review is pending.

This is a transparent effort to moot our en banc proceedings.  *See*, *e.g.*, *Koppula v. Jaddou*, 72 F.4th 83, 84 (5th Cir. 2023) ("[W]e must dismiss this appeal as moot.  After all, there is no need for a preliminary injunction to preserve the status quo during the pendency of trial court proceedings that are now over.") (collecting cases).

To allow this stratagem to succeed is to "replace judicial hierarchy with judicial anarchy." *M.D. v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020). *See also Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018).  No precedent or other authority has been cited that justifies a district court interfering with our court's en banc authority.

No. 23-50632

It's no answer that the district court had jurisdiction to issue this expedited trial schedule. We routinely reverse orders that a district court had jurisdiction to enter, but were erroneous for other reasons—indeed, that is the very essence of appellate review. Similarly, courts of appeals are well within our authority to grant mandamus relief on matters that remain in the jurisdiction of a district court. To take just one example, courts of appeals may grant mandamus relief due to "unwarranted district court delay." *Murphy-Brown*, 907 F.3d at 794. "None of this . . . forecloses our review of the district court's actions and its reassertion of jurisdiction in the circumstances of this case." *Id.*

Mandamus relief is accordingly warranted here, to defend our exercise of appellate jurisdiction as an en banc court.

## II.

Moreover, mandamus relief is especially warranted in cases of significant public consequence. It's hard to imagine a dispute of greater public importance than this one.

### A.

The Supreme Court has recognized that mandamus is appropriate in a number of extraordinary circumstances—for example, "to restrain a lower court when its actions would . . . result in the 'intrusion by the federal judiciary on a delicate area of federal-state relations.'" *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 381 (2004) (quoting *Will v. United States*, 389 U.S. 90, 95 (1967), and citing *Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926)).

The Court has also granted mandamus relief to protect "the dignity and rights of a friendly sovereign state." *Ex parte Peru*, 318 U.S. 578, 586–87 (1943).

No. 23-50632

Cases of "such public importance and exceptional character . . . call for the exercise of our discretion to issue the writ." *Id.* at 586. Mandamus relief is appropriate under such circumstances to effect "prompt termination of the proceedings in the district court" and thereby avoid "prolonged litigation" "where a question of public importance is involved." *Id.* at 585, 587.

For example, the United States is currently seeking mandamus relief to stop the district court from proceeding in *Juliana v. United States*, No. 6:15-cv-01517-AA (D. Or.). Just last week, the United States asked the Ninth Circuit to force the district court to dismiss a climate change lawsuit against the Government. *See* Petition for a Writ of Mandamus and Opposed Motion for a Stay of Proceedings, *In re United States*, No. 24-684 (9th Cir. Feb. 2, 2024).

Notably, the Government's mandamus petition in *Juliana* emphasizes the same themes presented by the State of Texas here—the profound importance of the case, as well as the insubordination of the district judge. *See id.* at 49 (noting that the district court "plans to hold a multi-week trial on issues of significant public import that will require enormous expenditures of government time and resources"); *id.* at 50 (explaining that the district court's "decision to proceed with trial was inconsistent with [the Ninth Circuit's] decision"); *id.* ("The district court's actions and words suggest that it is set on advancing its expansive view of the judiciary's role regardless of this Court's mandate."); *id.* at 51 ("[C]limate change is unquestionably an 'important issue.'").

The Government's efforts to seek mandamus relief in *Juliana* received encouragement from the Supreme Court just a few years ago. *See In re United States*, 139 S. Ct. 452, 453 (2018) ("[A]dequate relief may be available in the United States Court of Appeals for the Ninth Circuit. . . .

Although the Ninth Circuit has twice denied the Government's request for mandamus relief, it did so without prejudice.").

It's also supported by mandamus decisions from courts of appeals nationwide in a diverse range of cases. *See, e.g.*, *Abelesz v. OTP Bank*, 692 F.3d 638, 651 (7th Cir. 2012) (granting mandamus relief to compel dismissal of case involving "appreciable foreign policy consequences" and "astronomical" "financial stakes"); *In re Justices of Supreme Court of Puerto Rico*, 695 F.2d 17, 25 (1st Cir. 1982) (granting mandamus relief to Puerto Rico Supreme Court Justices to avoid "harm to the court's stance of institutional neutrality—a harm that appeal would come too late to repair"); *In re Landry*, 83 F.4th 300, 309 (5th Cir. 2023) (Ho, J., concurring) (granting mandamus relief because Congressional redistricting affects not only the right to vote but also "the course of national policy decisions made by Congress"). *See also id.* at 308 (mandamus to stop False Claims Act trial may be appropriate where "the litigation stakes are unusually high—namely, the risk of a $1 billion adverse judgment") (cleaned up) (quoting *In re Trinity Indus., Inc.*, No. 14-41067 (5th Cir. Oct. 10, 2014)).

These and other mandamus decisions confirm that, in cases of significant public consequence, a court of appeals may relieve the parties from the obligations of the "ordinary litigant who is forced to wait until the conclusion of a lawsuit to cure legal errors on appeal." *In re Justices*, 695 F.2d at 25. Courts of appeals may use the mandamus writ to exempt important disputes from "the ordinary appellate process." *Id.*

## B.

It's hard to imagine how anyone could dispute the importance of the issues presented in this appeal.

1.  The Governor of Texas has "declared an invasion under Article I, § 10, Clause 3 to invoke Texas's constitutional authority to defend

No. 23-50632

and protect itself."[1]  That clause provides that "[n]o State shall, without the Consent of Congress, . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. CONST. art. I, § 10, cl. 3.  *See also Mayor of New York v. Miln*, 36 U.S. 102, 132–33 (1837) (examining State authority to exclude persons from its territory); *Arizona v. United States*, 567 U.S. 387, 417–21 (2012) (Scalia, J., concurring in part and dissenting in part) (same).

This invocation of Article I, section 10 is supported by a majority of the Nation's governors, who agree that the States have the authority to "protect American citizens from historic levels of illegal immigrants, deadly drugs like fentanyl, and terrorists entering our country."[2]

Similarly, the U.S. House of Representatives recently passed a resolution attesting to the fact that "the United States is in the midst of the worst border security crisis in the Nation's history," calling it a "historic border crisis" and "national security and public safety crisis."  H.R. Res. 957, 118th Cong. (2024).  A similar resolution is currently pending before the U.S. Senate.  *See* S. Res. 543, 118th Cong. (2024).

These concerns are further amplified in a recent letter to Congress by a group of former senior FBI officials, who state that "an invasion of the homeland . . . is unfolding now," and that "[i]t would be difficult to overstate

---

[1] Statement of Governor Greg Abbott, Jan. 24, 2024, *available at* https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf.

[2] *Republican Governors Band Together, Issue Joint Statement Supporting Texas' Constitutional Right to Self-Defense*, REPUBLICAN GOVERNORS ASS'N, Jan. 25, 2024, *available at* https://www.rga.org/republican-governors-ban-together-issue-joint-statement-supporting-texas-constitutional-right-self-defense/.

the danger represented" by this "unprecedented penetration by uninvited foreign actors," resulting in "dramatically diminished national security."[3]

2.    These emphatic statements of concern by leading public officials nationwide about the serious dangers presented by the current border crisis deserve our recognition and our respect. And they certainly confirm the profound importance of this case, justifying mandamus relief.

Our panel colleagues have already acknowledged that the State's invocation of Article I, section 10 is a "plausible defense" in this matter, while noting that it would prefer to address that defense "on a fully developed record." *United States v. Abbott*, 87 F.4th 616, 631 (5th Cir. 2023) (quotation omitted), *vacated on reh'g en banc*, 90 F.4th 870 (5th Cir. 2024).

The panel's respectful treatment of the State's defense is understandable considering the broadly held concern that migration can be weaponized by one sovereign to inflict damage on another. *See, e.g.*, Kelly M. Greenhill, *When Migrants Become Weapons: The Long History and Worrying Future of a Coercive Tactic*, Foreign Affairs, March/April 2022 ("In the fall of 2021, the leaders of several European countries announced that they were being confronted by an entirely new security threat: weaponized migration."). *See also* Tomasz Grzywaczewski, *Russia and Belarus Are Using Migrants as a Weapon Against the EU*, Foreign Policy, Sept. 18, 2021 ("Authoritarian regimes in Moscow and Minsk are aiding Iraqis and Afghans in order to sow chaos and domestic discord in Eastern European countries."); Andreas Kluth, *How Russia and Belarus Are Weaponizing Migration*, Bloomberg, Oct. 27, 2021 ("A new type of hybrid warfare is

---

[3] A copy of the letter is located at Adam Shaw, *Ex-FBI officials warn Congress of 'new and imminent' border danger: 'The country has been invaded,'* Fox News, Jan. 27, 2024, *available at* https://www.foxnews.com/politics/ex-fbi-officials-warn-congress-new-imminent-border-threat-the-country-invaded.

No. 23-50632

developing as Minsk and Moscow traffic refugees between the Middle East and the European Union."); Mark Galeotti, *How Migrants Got Weaponized*, Foreign Affairs, Dec. 2, 2021; Elisabeth Braw, *Russia Is Taking Advantage of the Invasion-Stirred Migration Crisis*, Foreign Policy, July 18, 2022 ("Russian President Vladimir Putin has created a new weapon against the West."); Megan Janetsky, *Nicaragua is 'weaponizing' US-bound migrants as Haitians pour in on charter flights, observers say*, AP, Oct. 24, 2023; Gus Contreras, Justine Kenin & Mary Louise Kelly, *How Nicaragua is weaponizing immigration to the U.S.*, NPR, Jan. 4, 2024.

3.      In its panel briefing filed months ago, the United States took issue with the State's invocation of Article I, section 10, contending that a State's authority to defend itself against invasion is "a non-justiciable political question committed to the political branches of the *federal* government." Appellee's Answering Brief at 36.

But think about that for a moment. If only "the political branches of the *federal* government" can determine that a State has been invaded, that effectively means that a State is constitutionally prohibited from exercising its sovereign right of self-defense without federal permission.

That's hard to reconcile with the text of Article I, section 10, which makes clear that a State does *not* need "the Consent of Congress" to act if it is "actually invaded." U.S. Const. art. I, § 10, cl. 3. Article I, section 10 establishes, first, a general rule that States ordinarily need Congressional consent to act—and second, an express exception for when States don't. So it defies the plain meaning of Article I, section 10 to say that, as a general matter, a State must have "the Consent of Congress" to act—but if it's "actually invaded," the State *still* must have "the Consent of Congress." *Id.*

It also defies our Nation's history—not to mention common sense. To begin with, there's no guarantee that Congress will even be in session at

No. 23-50632

the time of an invasion. *Cf. Virginia v. Tennessee*, 148 U.S. 503, 518 (1893) ("[I]t would be the height of absurdity to hold that the threatened states could not . . . repel the invasion of [a] pestilence without obtaining the consent of congress, which might not be at the time in session.").

Moreover, it's unfathomable that any State would have ratified a Constitution that conditioned its right to self-defense on the consent of rival States and their representatives in Congress—as the ratification debates confirm.

James Madison repeatedly recognized that States feared attack from other States, as well as from foreign sovereigns. He sought to assure fellow citizens that, under the Constitution, the States would reserve the right to defend themselves against either threat.

In Federalist 43, he noted that every State was constitutionally entitled to "protection against invasion" to "secure each State not only against foreign hostility, but against ambitious or vindictive enterprises of its more powerful neighbors." THE FEDERALIST No. 43, at 272 (Clinton Rossiter ed., 1961).[4]

Madison repeated these same themes at the Virginia ratifying convention. He reiterated that the States must be "protected from invasion from other states, as well as from foreign powers." 3 DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 425 (Jonathan Elliot ed., 1836). And he reaffirmed that, under the Constitution, each State would retain the right to defend itself. *See id.* ("Does [the Constitution] bar the states from calling

---

[4] Madison also acknowledged the concern that a "minority of *citizens* may become a majority of *persons*, by the accession of alien residents." *Id.* at 273.

No. 23-50632

forth their own militia?  No . . . it gives them a supplementary security to suppress insurrections and domestic violence.").

John Marshall agreed that the States would retain the power to defend themselves "when they find it necessary." *Id.* at 420.  As Marshall explained, "[t]he state legislatures had power to command and govern their militia before [the Constitution], and have it still, undeniably." *Id.* at 419. "To me it appears . . . unquestionable that the state governments can call forth the militia, in case the Constitution should be adopted, in the same manner as they could have done before its adoption." *Id.*  Citing "the 10th section of the 1st article," Marshall concluded:  "[W]hat excludes every possibility of doubt, is the last part of it—that 'no state shall engage in war, unless actually invaded, or in such imminent danger as will not admit of delay.'  When invaded, they can engage in war, as also when in imminent danger.  *This clearly proves that the states can use the militia when they find it necessary.*" *Id.* at 420 (emphasis added).

4.      The position of the United States as described above was set forth several months ago in the Government's panel briefing.  The situation at the border, and the threat to our Nation's security, have only worsened since then.

The President has now acknowledged that the Nation is facing a "border crisis," and called for robust government action to "shut down the border."[5] So it should be beyond dispute that this case presents precisely the kind of extraordinary circumstances that warrant mandamus relief.

---

[5] *Statement from President Joe Biden On the Bipartisan Senate Border Security Negotiations*, THE WHITE HOUSE, Jan. 26, 2024, *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2024/01/26/statement-from-president-joe-biden-on-the-bipartisan-senate-border-security-negotiations/.

No. 23-50632

* * *

I would grant mandamus relief.  The en banc court declines to do so.
Accordingly, I respectfully dissent.

No. 23-50632

Andrew S. Oldham, *Circuit Judge*, joined by Smith, Ho, Duncan, and Engelhardt, *Circuit Judges*, dissenting:

In response to our decision to rehear this case en banc, the district court suspended the federal rules, directed the parties to try a monumental federalism dispute in mere weeks, and rejected objections before the defendant could even raise them. In tumultuous times, it is particularly important that our Nation's courts provide calm, orderly, and dispassionate forums for resolving disputes. I would grant mandamus to restore that order to the district court's proceeding.

I.

By all accounts, the State of Texas is facing a legal, humanitarian, and national-security crisis along its 1,254-mile border with Mexico. Texas Governor Greg Abbott has invoked the State's right of self-defense against invasion under Article I, § 10, cl. 3 of the Constitution. Governor Abbott has erected barriers to slow the unprecedented pace of illegal immigration across Texas's border. And the Biden Administration has repeatedly challenged the Governor's actions. In another recent border case, the Biden Administration "demand[ed] that you [the State of Texas] immediately remove any and all obstructions" along the Mexico border. Letter from Jonathan E. Meyer, DHS General Counsel, to Texas Attorney General Ken Paxton 1–2 (Jan. 22, 2024) (https://perma.cc/ZL57-346F). Governor Abbott flatly refused. The result is a federalism standoff that far transcends this case.

The district court's approach to this standoff is insupportable. Two days after we granted en banc rehearing of the district court's preliminary-injunction decision—and several months after it last did anything in this case—the district court *sua sponte* announced that it was taking the case to trial on an emergency timetable of the district court's own making. It explained:

No. 23-50632

> THE COURT: I am concerned not at all with the fact that this matter went en banc. I can assure you that if you were to talk to any of my colleagues, they will tell you that after the opinion came down from the Court of Appeals affirming my decision, I said, [*t*]*his is just the beginning. This thing is going en banc, guaranteed, one hundred percent guaranteed somebody will take it en banc.* And that's exactly what happened. I have been a federal judge for over 35 years, I've been sitting here in the Western District of Texas now 12 years. I know the landscape, so I knew that this was going to go en banc, particularly with the strenuous dissent written by my friend Judge Willett, who by the way, I have enormous respect for. Judge Willett is a brilliant legal mind and a fine judge, and I have a lot of respect for Judge Willett, so I don't want anybody to suggest otherwise. But we need to get to the merits of this case sooner rather than later.

Mtn. Ex. A, at 4–5 (emphasis in original). According to the district court, it predicted that we would rehear the panel's decision en banc. So it is unclear why, two days after the en banc order issued, the district court suddenly found an emergency in this case. Since the district court last did anything in its docket over four months earlier, the Government filed an amended complaint; Texas filed at least one dispositive legal motion; and the district court saw no need to act on any of it.

What's worse, when the district court announced an emergency trial two days after our en banc order, it suggested it had not even read the operative complaint; that it did not matter whether the defendant had answered the complaint; that pending, unread motions to dismiss were denied; and that the parties need not make any comments or objections because they could not change the court's *sua sponte* trial decision. Both sides were blindsided by this emergency declaration and by the court's decision to bypass the federal rules and regular pleading practice. *But see ante* at ___

No. 23-50632

(Douglas, J., concurring) ("[T]he parties were not blindsided."). The district court's explanation bears quoting at length:

> THE COURT: Each side is to disclose their experts within five days. Somebody looks like he's trying to jump up and say something. **It isn't going to change my mind on the trial.** Yes, sir.

> TEXAS: Your Honor, I would just point out that there's an amended complaint that was filed and the motions to dismiss—

> THE COURT: The motion to dismiss is going to be subsumed by the trial. I can't decide the motion to dismiss on the facts that we have. The facts are highly contested, so the motion to dismiss which you have filed, which—by the way, by filing a motion to dismiss, the State of Texas acknowledged that I have not lost jurisdiction over this case simply because there's an appeal in the Fifth Circuit of a preliminary injunction, and that's a smart move on your part, by the way, because that's well settled law.

> TEXAS: And Your Honor, we have not answered or had a need to answer in this case yet, and so I think that there are some preliminary things that need to happen before we can go down the road quite as quickly as the Court—

> THE COURT: You filed an amended complaint.

> THE GOVERNMENT: We did, Your Honor.

> **THE COURT: How much has changed in your amended complaint?**

> THE GOVERNMENT: We added the Treaty claim. The Rivers and Harbors Act claim stayed exactly the same. We added a claim that Texas's actions were contrary to the Treaty of Guadalupe Hidalgo.

> THE COURT: When is that answer due?

No. 23-50632

THE GOVERNMENT: The motion to dismiss is currently fully briefed and ready for disposition, so it will be due 15 days after the decision on the motion to dismiss.

THE COURT: Well, I'm going to deny the motion to dismiss without prejudice on the basis that there is no way I can make a ruling on it on the facts of the matter today. The Treaty of Hidalgo was part of the argument that was previously made. This is not something new.

**TEXAS: Your Honor, that is a new claim and that would be a pure question of law.** Our motion to dismiss says that the Treaty is not self-executing and that the United States does not have a cause of action to enforce it. It's not anything fact based in any way, so we think the Court could rule on that and at least narrow the issues for any trial. To have that just hanging out there when they've amended their complaint and we haven't had an opportunity to answer, we think—

**THE COURT: I know what your answer is. It'll take you five minutes to answer this complaint.** It's the same complaint except for the Treaty of Hidalgo.

TEXAS: Well, Your Honor, our deadline to answer has not arisen and will not arise until after you rule on our motion to dismiss which has been fully briefed.

THE COURT: Well, all right. Here is what I will do. I will withdraw my denial of the motion to dismiss. I will make a—I don't need any further argument on the Treaty of Hidalgo. That really has already been briefed. And have you submitted—do we have all the papers on that? We do, don't we?

THE GOVERNMENT: Yes, Your Honor, it's fully briefed.

THE COURT: All right. I'm going to decide that without further oral argument and I'll decide that promptly. And so we will go forward from there. Okay? So regardless of how I rule on that, we still have the other issue, so we still need the trial. Unless I grant the motion on the Treaty of Hidalgo, then that

No. 23-50632

goes up on appeal. **My concern is I don't want this thing bouncing back and forth to the Fifth Circuit on every issue with all kinds of unresolved issues. That's the concern I have.**

TEXAS: Your Honor, I would like to also point out that the other claim involving the Rivers and Harbors Act we do have as a matter of law and I think fact specific in the motion to dismiss that the State is not a proper object of injunctive relief enforcement for the statute, so there are both issues that are pure matters of law that could be disposed of that are briefed in our motion to dismiss.

THE COURT: Okay, well, I will get those decisions out as quickly as possible, probably right around the time we go to trial. I'll get them out. Don't worry. Get ready for trial. Okay? **There will be a trial.**

*Id.* at 17–20 (emphases added; party names supplied).

This colloquy is concerning. The district court evinced unawareness of the operative complaint. The court evinced unconcern that no answer had been filed. And the court evinced indifference over pending or unfiled dispositive motions. Rather, the court announced that none of this could change its mind: "Don't worry," the district court said. *Id.* at 20. "Get ready for trial. Okay? There will be a trial." *Ibid.*

While announcing that its decision had been made, the district court nonetheless assured everyone that it remained open-minded:

THE COURT: I certainly don't criticize Governor Abbott, never have. I thought that the suggestion and I made that statement that predicating—and even Judge Willett did not accept this—predicating the buoy on the theory that there was a war between the United States and illegal immigrants in the sense of a declared war of the United States where somehow the governor or any governor could assume the powers of the presidency and Congress, Congress has to declare war.

No. 23-50632

Franklin Delano Roosevelt, even though America—believe me, I grew up very close to Pearl Harbor, even though Pearl Harbor was bombed, thousands of Americans were killed in an unmitigated and unjustified sneak attack. President Roosevelt couldn't declare war himself, he had to go to Congress and he made the very famous speech which we've all seen hundreds of times. And Congress declared war on imperial Japan, not President Roosevelt. So a governor can't declare war, and Judge Willett didn't suggest that. Now, that doesn't mean that I somehow have a personal animus toward Governor Abbott, I don't. I absolutely do not. And I'm not going to say I'm going to rule for the State of Texas or rule for the government. I am going to look at this completely fresh. **And so can we have a trial date please?**

*Id.* at 16–17 (emphasis added).

## II.

Mandamus "is an extraordinary remedy for extraordinary causes." *United States v. Denson*, 603 F.2d 1143, 1146 (5th Cir. 1979) (en banc). In my view, this is an extraordinary case for two reasons.

*First*, it is well settled that mandamus is appropriate "to pursue the orderly administration of justice." 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FED. PRAC. & PROC. § 3934.1 (3d ed.); *see also id.* at n.31 (collecting cases); *In re United States*, 397 F.3d 274, 287 (5th Cir. 2005) (per curiam) (granting mandamus when a district court's "gross abuse of discretion" "stymied orderly appellate review"). In this case, the district court denied motions that it had not yet read; saw no need to wait for an as-yet-unfiled answer to an amended complaint it had not yet seen; and *sua sponte* suspended the Federal Rules of Civil Procedure that govern trial proceedings. For example, without any prior consultation or conversation between the parties, the district court ordered the parties to disclose their expert witnesses in five days; to close general

No. 23-50632

discovery in less than one month; and to be ready for trial two months after the January 19 status conference. And the district court found all of this necessary to prevent appeals to our court.

By contrast, Rule 12, Rule 26, Rule 33, Rule 34, Rule 36, and several others set time periods for disclosures, discovery, and the orderly administration of a trial docket. Those time periods obviously can be changed by agreement or for good cause. But they cannot be discarded *sua sponte* in the face of pending unread motions and unanswered operative pleadings. And they certainly should not be discarded in a case of monumental importance to our federal system, the rights and obligations of co-sovereign governments, and an international border crisis. And no matter how much discretion a district court might have over its docket, the court's decisions remain amenable to the ordinary rules of appellate jurisdiction. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2319–21 (2018).

*Second*, scrupulous adherence to the rules is particularly important in a case like this and in times like these. As the Legal Process scholars recognized many years ago:

> The alternative to disintegrating resort to violence is the establishment of regularized and peaceable methods of decision. The principle of institutional settlement expresses the judgment that decisions which are the duly arrived at result of duly established procedures of this kind ought to be accepted as binding on the whole society unless and until they are duly changed.

Henry M. Hart, Jr. & Albert M. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 4 (Cambridge, Mass., Tentative ed., 1958). Of course, one precondition to institutional settlement is judicial adherence to "duly established procedures." *Ibid.* The judge who bypasses such procedures and "simply lets

No. 23-50632

his judgment turn on the immediate result . . . implies that the courts are free to function as a naked power organ, that it is an empty affirmation to regard them, as ambivalently he so often does, as courts of law." *See* Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv. L. Rev. 1, 12 (1959).

We cannot announce results first and hear arguments second. If we can agree on nothing else, we must be able to agree to things like the Federal Rules of Civil Procedure. To the otherwise-banal principles of appellate jurisdiction. And to the principle that pleadings must be filed before a district court denies them.

For these reasons, mandamus is appropriate here. I respectfully dissent.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

February 09, 2024

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

          No. 23-50632   USA v. Abbott
                         USDC No. 1:23-CV-853

Enclosed is an order entered in this case.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Casey A. Sullivan, Deputy Clerk
                              504-310-7642

Ms. Munera Al-Fuhaid
Mr. Andrew Marshall Bernie
Mr. Monroe David Bryant Jr.
Mr. Matt A. Crapo
Mr. Philip Devlin
Mr. Michael Thomas Gray
Mr. Andrew D. Knudsen
Mr. Brian H. Lynk
Mr. Aaron Lloyd Nielson
Ms. Lanora Christine Pettit
Mr. Anthony J. Powell
Mr. Landon Wade
Mr. Ryan Daniel Walters
Mr. Coy Allen Westbrook