23-CV-00853      MOTION HEARING      03/19/2024      1

1              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2                  AUSTIN DIVISION

3  UNITED STATES OF AMERICA,        )
   Plaintiff,                       )
4                                   )
   vs.                              )Case No. 1:23-CV-00853
5                                   )Austin, Texas
   GREG ABBOTT, in his capacity     )
6  as Governor of the State of      )
   Texas, and THE STATE OF TEXAS    )March 19, 2024
7  Defendants.                      )
   ******************************************************

8

9              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE DAVID A. EZRA
10          SENIOR UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  FOR THE PLAINTIFF UNITED STATES OF AMERICA:

13  BRIAN LYNK, ESQUIRE
    ANDREW KNUDSEN, ESQUIRE
14  MARY KRUGER, ESQUIRE
    Department of Justice
15  Environment and Natural Resources Division
    P.O. Box 7611
16  Washington, DC   20044
    (202)514-2285
17  andrew.knudsen@usdoj.gov

18  FOR THE DEFENDANTS STATE OF TEXAS and GREG ABBOTT:

19  MUNERA AL-FUHAID, ESQUIRE
    MONROE DAVID BRYANT, ESQUIRE
20  JOHNATHAN STONE, ESQUIRE
    RYAN D. WALTERS, ESQUIRE
21  JACOB E. PRZADA, ESQUIRE
    KYLE TEBO, ESQUIRE
22  Texas Office of the Attorney General
    Special Litigation Division
23  209 W. 14th Street, 7th Floor
    Austin, Texas   78701
24  (512) 936-2172
    ryan.walters@oag.texas.gov

25

              U.S.D.C. Official Court Reporter
                  Lisa A. Blanks

1   APPEARANCES (CONT):

2   ALSO PRESENT:

3   James Sullivan, Esquire
    Trevor Ezell, Esquire
4

5

6

7

8

9

10

11

12

13

14

15  COURT REPORTER:
    Lisa A. Blanks, CSR, CRR, RPR
16  Official Court Reporter, U.S.D.C.
    262 West Nueva Street
17  San Antonio, Texas 78207
    Phone(210)244-5038
18  lisa_blanks@txwd.uscourts.gov

19  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription
20

21

22

23

24

25

1        *(Tuesday, March 19, 2024, in open court.)*

2                            *   *   *   *

3            THE CLERK:  Austin 23-CV-00853, United States of

4     America versus Abbott, et al.

5            THE COURT:  All right.  Good morning, Counsel, to all

6     of you.  Can I have appearances, please.

7            MS. AL-FUHAID:  Good morning, Your Honor.  Munera

8     Al-Fuhaid, David Bryant, Johnathan Stone, Kyle Tebo, Ryan

9     Walters and Jacob Przada on behalf of Governor Abbott and the

10    State of Texas.

11           THE COURT:  All right.  And how about the two

12    gentleman back there?  Let's not forget them.

13           MS. AL-FUHAID:  They're with the Governor's office,

14    Your Honor, Mr. Sullivan and Mr. Ezell.

15           THE COURT:  I know Mr. Sullivan.  Mr. Sullivan and I

16    have become very good friends over the years.  Mr. Sullivan's a

17    good man, very very efficient.

18           Okay.

19           MR. KNUDSEN:  Good morning, Your Honor.  This is

20    Andrew Knudsen on behalf of the United States.  With me are

21    Brian Lynk and Mary Kruger.

22           THE COURT:  Yes, good morning.

23           All right.  Counsel, this is your motion to dismiss,

24    and for those who are here, we have a lot of cases that

25    surround the border.  This is what we euphemistically call the

1   buoy case, all right, so there's no misunderstanding.

2         There's an SB4 case and another SB4 case that I'm not

3   handling, but this is the buoy case.

4         All right, Counsel, you can do it either from there

5   or you can do it from the podium, whichever you prefer.

6         MS. AL-FUHAID:  I'll do it from here, Your Honor.

7         Can you hear me?

8         THE COURT:  I sure can.

9         MS. AL-FUHAID:  Thank you, Judge Ezra.  May it please

10  the Court, this Court should dismiss the United States of

11  America's First Amended Complaint for two reasons:  First, it

12  should dismiss Count 2 of the amended complaint because

13  Article 7 of the Treaty of Guadalupe Hidalgo of 1848 is not

14  enforceable in a United States District Court.

15        Second, it should dismiss Count 1 of the amended

16  complaint because state governments and state officers are not

17  persons to whom Section 10 of the Rivers and Harbors

18  Appropriation Act of 1899 applies.

19        The 1848 Treaty of Guadalupe Hidalgo is not

20  self-executing and therefore it imposes no obligations on

21  Texas.

22        The United States' argument regarding the Treaty's

23  application to Texas in this matter is entirely grounded in the

24  notion that Article 7 of the Treaty is by itself binding on

25  Texas.

1          The United States Supreme Court has clarified for

2   more than 200 years of jurisprudence that the Constitution

3   allows the United States Senate to ratify a treaty and leave it

4   non-self-executing, which means that it cannot be enforced in

5   United States courts.

6          When the U.S. Senate ratified the Treaty of Guadalupe

7   Hidalgo, it made it clear that the Treaty was not

8   self-executing.

9          The Supreme Court in the Medellin case instructs that

10  this case should first look to the text of the Treaty itself

11  when determining whether a treaty is self-executing.

12         The text of Article 21 of the Treaty provides that

13  the exclusive remedy is that a party to the Treaty may have

14  recourse to mutual representations and specific negotiations

15  between the two countries.

16         It also specifies that the two Republics should

17  endeavor to settle their differences by the arbitration of

18  commissioners appointed on each side or by that of a friendly

19  nation.

20         THE COURT:  Counsel, could I interrupt you for just a

21  moment to ask you a question?

22         MS. AL-FUHAID:  Of course.

23         THE COURT:  Good.

24         There is a difference -- in this case, the United

25  States has used the Treaty as a cause of action, right?

1          MS. MUNERA:  It has asserted a cause of action, yes.

2          THE COURT:  Yes, based on the Treaty?

3          MS. AL-FUHAID:  Yes.

4          THE COURT:  So what you are challenging is whether

5    the Treaty can be a cause of action.  I want to distinguish

6    that from an argument that has been made and which I addressed

7    in another case, and that had to do -- and also in this case

8    earlier -- had to do with the impact of certain actions taken

9    by the Texas legislature on international relations with

10   Mexico.

11       That's a very different thing.  Would you agree with me?

12       I'm not saying that you should agree with me that it has

13   an impact, but that it's a different animal from having the

14   cause of action.

15          MS. AL-FUHAID:  Yes, Your Honor.

16          THE COURT:  Okay.  Go ahead, please.

17          MS. AL-FUHAID:  Nowhere in the text of the Treaty

18   does it contemplate resort to judicial remedies or contain any

19   directive to American courts or to Mexican courts.

20       Instead, the Treaty is an international commitment between

21   the United States and Mexico, and if any grievances under the

22   Treaty arise, they are to be remedied through diplomatic and

23   political courses of action.

24       It is for the United States and Mexico to determine how

25   they will comply with their international commitment to each

1   other.  But there is no obligation on Texas or on any other
2   state to comply with the Treaty because it is not
3   self-executing.
4        The core meaning of the Senate's decision to make the
5   Treaty non-self-executing is that if something in the Treaty is
6   going to change domestic law in the United States, then the
7   enactment of additional executing legislation is necessary.
8        Such a treaty does not become binding domestic law upon
9   ratification, but when Congress acts to change United States
10  law.
11       And the non-self-executing character of the Treaty of
12  Guadalupe Hidalgo is confirmed not only by the text of the
13  Treaty, but also by the actions that Congress and the President
14  took to enact numerous federal statutes implementing other
15  articles of the Treaty.
16       For over 175 years, the President and Congress have
17  consistently taken the position that the Treaty is not
18  self-executing.  Most of Congress' post ratification statutes
19  addressed Article 8's guarantee of preexisting title to land in
20  the territories that Mexico ceded to the United States pursuant
21  to the Treaty.
22       In 1851 Congress enacted, and the President signed into
23  law, a statute to execute the Treaty by creating a commission
24  to verify California land titles derived from the Spanish
25  government or derived from the Mexican government.

1        And the purpose of the statute was to implement

2   Article 8's provision protecting pretreaty land titles in

3   California.

4        The non-self-executing nature of the Treaty is also

5   demonstrated by a sequence of statutes executing the Treaty's

6   land title provisions in 1854.

7        Congress passed and the President signed into law the New

8   Mexico Surveyor General legislation.  In that legislation,

9   Congress directed the surveyor general to investigate Spanish

10  land grant claims and Mexican land grant claims in the

11  territory, and to recommend, through the Secretary of the

12  Interior, congressional approval or rejection of the claims.

13       Congress established similar surveyors general by statute

14  for Colorado and for Arizona in 1861.

15       In 1891, Congress enacted and the President signed into

16  law a statute forming a court of private land claims to execute

17  the Treaty by addressing the land grant claims in New Mexico,

18  Arizona, Utah, Nevada, Colorado, and in Wyoming.

19       And in 1889, the United States and Mexico, by treaty,

20  formed the International Boundary Commission, which is the

21  predecessor entity to the modern day International Boundary and

22  Water Commission, and they agreed that the agency would have

23  exclusive jurisdiction over disputes that arose under the 1848

24  Treaty.

25       In the Botiller case, Botiller v Dominguez, the Supreme

1  Court rejected an argument that the 1851 statute was invalid as

2  violating the terms of the Treaty.  In that case, the

3  challenger had alleged that the statute was invalid because it

4  failed to fulfill the Treaty's provision that Mexican land

5  titles in the ceded territories would be inviably respected,

6  and the challenger cited the Treaty's guarantee of existing

7  title.

8      The Court reasoned that if the Treaty was violated by that

9  statute, it was a matter of international concern because the

10 statute was enacted for the purpose of ascertaining the

11 validity of claims derived from the Mexican government, and the

12 two states would have to determine by treaty matters of

13 international concern related to any violation of that Treaty.

14     The Court ruled that it could not enforce the Treaty's

15 provisions by itself.  And the Court stated, "This Court, in a

16 class of cases like the present, has no power to set itself up

17 as the instrumentality for enforcing the provisions of a treaty

18 with a foreign nation which the government of the United States

19 as a sovereign power chooses to disregard."

20     Had the President or Congress considered the Treaty to be

21 self-executing, there would have been no need for any such

22 legislation.  The titles of landowners in territories ceded to

23 the United States under the Treaty simply would have been

24 entitled to be inviably respected in state and federal courts

25 as part of the supreme law of the land.

1      But Congress and the President instead believed

2   legislation was needed to execute the Treaty, and enacted

3   implementing legislation to do so in 1851, 1854, 1861, and

4   1891.

5      Now, under the Rivers and Harbors Act, a state government

6   and a state officer are not persons against whom federal

7   government may obtain injunctive relief, because the definition

8   of person in the Rivers and Harbors Act does not encompass

9   state governments or state officers.

10      First, state governments rely on the presumption that

11   person excludes the government, and the dictionary acts

12   presumptive definition of person which does not include state

13   governments.

14      In determining the meaning of any federal statute, the

15   word person only includes corporations, companies,

16   associations, firms, partnerships, joint stock companies, and

17   individuals, unless the context indicates otherwise.

18      THE COURT:  But hasn't -- Counsel, may I ask you a

19   question?  Hasn't the Supreme Court dealt with several cases in

20   which states were involved under the Rivers and Harbors Act?

21      MS. AL-FUHAID:  Well, when you say states were

22   involved, there is a case that it dealt with when a state sued

23   the federal government seeking to get the federal government to

24   stop building a dam.  That applied -- that case applied the

25   Rivers and Harbors Act to a federal government, not to a state

 1   government.  That's the U.S. v Arizona case.

 2            THE COURT:  Right.  I think there may be another one,

 3   but anyway, we'll hear from counsel for the government.

 4        I'm having a very difficult time thinking that Congress

 5   would have passed a law like the Rivers and Harbors Act and

 6   left it up to the states to just decide for themselves on -- I

 7   understand that there's an issue, and I'm sure you'll get to

 8   it, about the navigability of the Rio Grande River, which I

 9   think is either the third -- maybe the third largest river in

10   the United States.

11        Putting that aside, let's assume that it's navigable,

12   okay.  In some parts I think the State would concede it's

13   navigable.  How about the -- let's talk about the Mississippi

14   River for a minute.  I think we all would agree the Mississippi

15   River is a navigable waterway in the United States.

16        Although, by the way, it has gotten so low at times that

17   they've actually had to restrict navigation on it, the Coast

18   Guard, but let's assume that it's a navigable waterway.

19        Can you imagine each state deciding for themselves that

20   they are going to put an obstruction in the Mississippi River?

21   I mean, they have the resources, a lot more than a private

22   entity, and they're just going to put a big old something out

23   there, who knows what, and it's going to maybe not go all the

24   way across the river but certainly build a harbor there.

25        They want to enhance themselves so they put a harbor

1   with -- like they did in Normandy during World War II, you

2   know, they built these little harbors that were temporary until

3   the storm hit and they all blew away.

4       Assuming for just a moment that we're talking about a more

5   permanent harbor, they just decided they want to put a harbor

6   out there.

7       Illinois, for instance, and somebody else is -- *Wait a*

8   *minute, that's going to really obstruct navigation here*, and

9   then down the river somebody says, *Well, they're doing it,*

10  *we're going to do it, too, because we want that business.*

11          MS. AL-FUHAID:  If I may, Your Honor --

12          THE COURT:  I can't imagine that the Congress would

13  say, *Well, that's a good idea.*

14          MS. AL-FUHAID:  Well, the Court doesn't have to

15  reach -- in this matter, the Court doesn't have to reach the

16  issue of navigability to rule on this Rivers and Harbors Act,

17  this motion under the Rivers and Harbors Act, because if the

18  Court determines that -- if the Court agrees with the State --

19          THE COURT:  Well, yeah, I would have to hold that the

20  federal government doesn't have a standing, right?  Isn't that

21  what you're arguing?

22          MS. AL-FUHAID:  Well, not that the Government doesn't

23  have standing, but that the --

24          THE COURT:  It doesn't apply to the State, the State

25  can do whatever it wants.

1          MS. AL-FUHAID:  Well, that the Rivers and Harbors Act

2     does not apply to a state or a state officer.

3          THE COURT:  What you're saying, essentially, is that

4     the State -- in this case, Governor Abbott, has -- I guess it

5     was -- it wasn't a state -- it wasn't a law.  Governor Abbott

6     directed the buoy out there, right, in his executive authority,

7     correct?

8          MS. AL-FUHAID:  Yes, Your Honor.

9          THE COURT:  Okay.  So Governor Abbott decided he

10    wants to put this buoy out there, and there's all kinds of

11    conflicting opinions as to whether -- I've already ruled in one

12    portion of this case that it was a hazard to navigation.  Not

13    as much about the buoy itself, because that's pretty visible,

14    but there's these massive concrete pilings that kind of stick

15    up on either side of it that are hooked by chains, and they're

16    very dangerous.

17         Having grown up around the water my whole life and been on

18    the water, I know what can happen when a boat, particularly a

19    small boat, hits a concrete abutment or a pylon that's hidden.

20    It rips the whole bottom out of it and it can be a deadly

21    event.

22         And we have, admittedly, Border Patrol and DPS -- I think

23    it's DPS -- agents flying around in those airboats, they're

24    called airboats, whatever they are, but they still draft water.

25    They're not flying over the top.  And they hit one of these

1    concrete abutments and it's a bad situation.

2         What if the Governor decided, well, you know, those buoys

3    just aren't doing the job.  People can get around them or

4    whatever, right.  We're going to build a -- essentially a wall

5    in the water, a big tall wall in the water.  We're going to

6    build it for dozens and dozens of miles all along the

7    Rio Grande where it abuts Texas.  We're going to build a giant

8    wall in the water.  It can be done.  Just talk to the people of

9    Holland, okay.

10        And now people are not -- they're going to not only cross

11   the river, they're going to have to get over the river, but

12   this thing is way out there on the U.S. side, not the Mexican

13   side, okay.  We're going to build a big wall.

14        Under your view, he could do that, right?

15             MS. AL-FUHAID:  Potentially, Your Honor, but our

16   argument is not that Congress doesn't have commerce power to

17   stop any particular obstruction.  Our argument is that Congress

18   did not do that in the Rivers and Harbors Act by applying it to

19   States.

20             THE COURT:  Oh, I understand.  I mean, Congress could

21   certainly go back, and well, who knows, I mean, it can't pass

22   anything -- but assuming that you could get agreement among

23   members of Congress that this is a bad idea.  I don't think

24   you're going to get it now, but you're telling me that the

25   Rivers and Harbors Act -- and I agree with you.

1       I think that under your interpretation of the Rivers

2  and Harbors Act -- I'm not saying I agree with your

3  interpretation, but your interpretation of the Rivers and

4  Harbors Act, he could build a wall that goes from the bottom of

5  the river and extends up, say, 10, 15 feet, and you can do

6  that.  There's concrete that you can do.  I mean, it's -- all

7  the time they build piers out of concrete, even in salt water,

8  and this is not salt water.

9     So it just flummoxes me to think that Congress would think

10  that was okay under the Rivers and Harbors Act.  I just can't

11  imagine it.

12         MS. AL-FUHAID:  Well, there is a presumption --

13         THE COURT:  I mean, we're putting all the -- I mean,

14  I don't think you can -- we haven't seen it challenged yet

15  under environmental rules, but I can bet you that's coming

16  soon.  That would be a whole other ball of wax, because before

17  you did something like that, you probably would have to do an

18  environmental impact statement.

19         MS. AL-FUHAID:  Well, Your Honor, this presumption --

20         THE COURT:  I don't know that we have an

21  environmental impact statement for the buoys, but I don't think

22  so.

23         MS. AL-FUHAID:  I'm not aware of one, Your Honor.

24         THE COURT:  No.  I'm not trying to give anybody any

25  ideas.  I'm just saying -- go ahead, Counsel.

1        MS. AL-FUHAID:  Your Honor, this presumption that the

2    definition of person excludes states has created a reliable

3    legal structure against which Congress legislates, and that

4    structure is essential to preserving the appropriate balance of

5    power between the states and the federal government.

6        So Congress relies upon the presumptive definition and the

7    dictionary act definition of person so that it knows how the

8    word person will be interpreted and applied when it uses the

9    word in statutory language.

10       Here in the Rivers and Harbors Act there is no indication

11   that Congress intended to expand the definition of person to

12   include state governments or state officers.  To extend the

13   definition of person to encompass state governments, Congress

14   must make a clear statement that it intended to do so.

15       A helpful case for the Court to consider is the Wilson

16   case.  The Wilson case was decided in 1979 and discussed the

17   presumption that the term person does not ordinarily include

18   sovereign states and emphasized that this presumption is

19   especially strong when the statute imposes a burden or a

20   limitation rather than a benefit.

21       The Wilson Court noted that Congress must make its

22   intention to legally burden or impact the powers of sovereign

23   states vis-a-vis the federal government unmistakably clear in

24   the language of the statute.

25       The Wilson Court relied on the Cooper case in holding that

1    the term person excludes a sovereign state.  That case was

2    about whether the government could bring an action for civil

3    damages under the federal antitrust statutes seeking treble

4    damages.  The statute contained a comparable definition of

5    person to the definition in the Dictionary Act.

6        The Supreme Court relied on the presumptive definition of

7    person to exclude the sovereign and reasoned that it looked to

8    what Congress said to the text of the statute and found that

9    there was no affirmative indication in the text that Congress

10   intended to include the government.  That Court ruling was from

11   1941.

12       In 1955, Congress passed a law that allowed the government

13   to initiate civil actions for damages in antitrust matters.

14       In 1990, Congress passed another law allowing the

15   government to seek treble damages.  Not by changing the

16   definition of the term "person," but by enacting other

17   provisions of law that permitted the government to bring civil

18   actions and later on to seek treble damages.

19       In another example, in the Will case, the plaintiff sued a

20   state and a state official, seeking relief under a federal

21   civil rights statute, which provided that a person who violated

22   constitutional rights acting under a color of state law was

23   liable to the injured party.  The Court relied on cases like

24   Wilson to hold that the term "person" in the statute excluded

25   sovereign states and state officers.

 1          Yet another example is the Return Mail case in which the
 2   Supreme Court ruled that federal government was not a person
 3   with the ability to bring an action to review a patent after it
 4   was issued.  The Court applied the presumption that the
 5   definition of person in a statute excludes the sovereign.
 6          In the Vermont Agency of National Resources case, the
 7   Court emphasized that the term persons should not be understood
 8   to include states when doing so would alter the balance of
 9   power between the state government and the federal government.
10          Section 10 of the Rivers and Harbors Act generally makes
11   it unlawful to obstruct navigable capacity or to construct
12   certain structures in navigable rivers of the United States
13   without a permit to do so from the United States Army Corps of
14   Engineers.
15          Section 12 of the Rivers and Harbors Act defines the
16   parties to whom Section 10 applies and authorizes legal action
17   and legal remedies against them.
18          Now, the first sentence of Section 12 says, "Every person
19   in every corporation that shall violate any of the provisions
20   of that title, of those certain sections of the title, shall be
21   deemed guilty of a misdemeanor and can be punished by a fine or
22   by imprisonment or by both."
23          The second sentence says, "And further, the removal of any
24   structures or parts of structures erected in violation of the
25   provisions of the previously referenced sections may be

1   enforced by the injunction of any district court exercising

2   jurisdiction in any district in which said structures may

3   exist."  And it mentions that, "Proper proceedings to that end

4   may be instituted under the direction of the Attorney General."

5         So the second sentence related to the injunction refers to

6   the persons and the corporations in the first sentence.  So an

7   injunction can be obtained against the same persons and

8   corporations that can be convicted of a crime.

9         Here, there is nothing in the text or the context of the

10  Rivers and Harbors Act that makes unmistakably clear that in

11  using the term person, Congress intends to include the

12  sovereign states or state officials, and the legislative

13  history of the Act indicates that railroad companies were the

14  target of the statute.

15        The traditional legal definition of person excludes the

16  sovereign.  Congress legislates against a framework knowing

17  that its use of the word person does not include the sovereign

18  unless it affirmatively indicates otherwise.

19        When Congress passes laws that encompass the government,

20  other matters arise for consideration, such as sovereign

21  immunity, as one example.

22        Congress can change the law to subject states to

23  Section 10 of the Rivers and Harbors Act, but this Court should

24  not redefine "person" to include a sovereign state or state

25  officers.

1    And if the Court has no further questions, I would like to

2    reserve the remainder of my time for rebuttal.

3               THE COURT:  Absolutely.

4               MS. AL-FUHAID:  Thank you, Your Honor.

5               THE COURT:  Thank you very much.  Your argument was

6    very helpful.

7               All right, Counsel.

8               MR. KNUDSEN:  Good morning, Your Honor.  May it

9    please the Court, my name is Andrew Knudsen representing the

10   United States of America, the plaintiff.

11              Texas raises several novel legal arguments in support

12   of its Motion to Dismiss United States Amended Complaint, but

13   these arguments are flatly inconsistent with federal law and

14   applicable precedent and should be rejected.

15              First, regarding the United States' claim under the

16   Rivers and Harbors Act, Texas argues that the RHA is wholly

17   unenforceable against the states as a general matter.  But the

18   plain text of 33 U.S.C. 406, which is also referred to as

19   Section 12 of the RHA, authorizes injunctive relief for removal

20   of any structure regardless of whether it was constructed by a

21   state or a person or a corporation.

22              THE COURT:  Well, wait, wait, wait -- stop.  Where

23   does it say in there a state?  I don't think it says state.

24              MR. KNUDSEN:  Well, your Honor, it doesn't

25   specifically say state.  It says that -- it provides injunctive

1    relief for the removal of any structure or part of the

2    structure constructed in violation of specific other sections

3    of the RHA.

4            THE COURT:  Okay, but they -- you know, counsel

5    argued -- I'm -- I want to hear from you on this because it's

6    important.  Counsel argued that Section 12 is the operative as

7    to who the injunction can be enforced against.

8        Now, do you have -- I know you disagree with that,

9    obviously.  You just said so, and in your papers you said so,

10   but do you have any cases from the Supreme Court or otherwise

11   where the state was a defendant or a party in a Rivers and

12   Harbors Act case?

13           MR. KNUDSEN:  Well, two points in response to that,

14   Your Honor.  The only cases involving states before the Supreme

15   Court, I believe Your Honor has noted in the past, the case of

16   the Sanitary District of Chicago, which again, was not a case

17   against the State of Illinois, but it was a state involving --

18   a case involving a state chartered entity.  Texas hasn't

19   offered any reason why that should be treated differently for

20   the purposes of the RHA.

21           And also the Supreme Court's decision in the United

22   States versus Arizona, again, while it was not a case brought

23   against the state of Arizona, it's a case in which the Supreme

24   Court directly addressed this question of whether the RHA's

25   substantive prohibitions in sections like Section 9 and 10, and

1    the injunction relief it authorizes in Section 12, are limited

2    to persons and corporations, as Texas has argued here, and has

3    squarely said that it's not so limited, that it also includes

4    states and state officers as well as federal officers, which is

5    the party that was involved in that case.

6         Now, our position is -- is not whether -- this argument is

7    not a case -- excuse me, Your Honor.

8         This case is not one about whether the State of Texas is a

9    person under the RHA, despite the emphasis on that issue in

10   Texas' arguments, because the United States has never argued in

11   this case that Texas is a person for purposes of that statute.

12        Our position is that the injunctive relief authorized by

13   the second sentence of Section 12 33 U.S. 406 is not so limited

14   as the criminal relief -- criminal enforcement authority as

15   authorized by the first sentence.

16        THE COURT:  Are you arguing -- I want to make sure I

17   understand this now.

18        Are you arguing that the person here would be

19   Governor Abbott in his official capacity?

20        MR. KNUDSEN:  No.  Your Honor, our position is

21   that --

22        THE COURT:  If that's the case, then Governor Abbott

23   in his official capacity is really the State of Texas.

24        MR. KNUDSEN:  No, Your Honor.  Again, our position is

25   that the second sentence of Section 12 authorizing injunctive

1  relief is not limited to persons and corporations in the way

2  that the first sentence is; that it extends to any entity that

3  constructs a structure or an obstruction in navigable capacity

4  in the waters covered by the RHA.

5          THE COURT:  All right.  I'm sure that we'll hear some

6  rebuttal from counsel.

7          MR. KNUDSEN:  Certainly, Your Honor.  Well, I think

8  the text of Section 12 is clear on its face, though, that

9  district courts can issue injunctions for removal of any

10 structures constructed in violation of Sections 9, 10, and 11

11 of the RHA.  And there's no reason to --

12         THE COURT:  Well, I don't -- excuse me, I'm sorry, I

13 didn't mean to interrupt you.  Go ahead.

14         MR. KNUDSEN:  Well, Your Honor, I was going to say

15 there's no reason to read that second sentence in the provision

16 for injunctive relief as simply being a form of ancillary

17 relief in addition to the criminal penalties authorized by the

18 first sentence.

19     Essentially, the two sentences of Section 406 deal with

20 different topics and have different scopes.

21     So the first sentence deals with who can be subject to

22 criminal enforcement; not surprisingly, that's limited to

23 persons or corporations.

24     But the second sentence is dealing with an entirely

25 different question of what kinds of structures can be subject

1   to injunctive relief for removal under the RHA.  And the text

2   of that second sentence is clear that it applies to any

3   structure or part of a structure constructed in violation of

4   specific parts of the RHA.

5       There's nothing ambiguous about the use of the term "any."

6   Any should be read to mean literally any structure that's

7   constructed in violation of those provisions.

8       And to the extent that the text of Section 406 itself

9   isn't dispositive of this question, the Court should look to

10  the surrounding context of the statute as it's required to do

11  when interpreting the meaning of the statute.  And here the

12  relevant context for the injunctive relief authorized by

13  Section 12 is the provisions that it's providing enforcement

14  authority for.

15      In particular, in this case that includes Section 10 of

16  the RHA, which is what the United States is seeking to enforce

17  here, and it broadly prohibits the construction of any

18  obstruction to the navigable capacity of covered waters or the

19  construction of any other structure in those waters.

20      Again, Section 10 uses this broad language "any

21  structure."  It doesn't contain a parallel limitation to those

22  built by persons or corporations.  So again, on its face, it

23  applies to states as well.

24      And Texas, by its own actions, seems to have recognized

25  that, in general.  In the past year alone, the State of Texas

 1   and its departments have applied for permits under this exact

 2   provision of the RHA showing that they recognize that its

 3   requirements apply to states as well as persons and

 4   corporations.  And those specific permits are cited in our

 5   response to the motion to dismiss in our documents the Court

 6   can take judicial notice of.

 7        Section 12 also provides enforcement authority for another

 8   section of the RHA, Section 9, which prohibits the construction

 9   of any bridge, causeway, dam or dike without congressional

10   approval and review of the plans by appropriate federal

11   officials.

12        Again, that provision uses the broad language prohibiting

13   any construction of those structures without being limited to

14   persons or corporations.

15        But beyond that, it also has an explicit exclusion for

16   certain projects authorized by state legislatures.  The

17   language of that exclusion makes clear that state projects that

18   don't fall within that exclusion are covered by the general

19   prohibition of Section 9, and moreover, even the exclusion

20   itself still retains some federal oversight over those projects

21   authorized by state legislatures.  So again, that provision

22   clearly applies to works constructed by states.

23        And Texas, in its briefing and in its argument here,

24   hasn't offered any reason to this Court why Congress would

25   draft those prohibitions in Sections 9 and 10 of the RHA to

1  broadly include actions by states, but not, at the same time,

2  provide the United States enforcement authority to seek

3  injunctive relief to remove those structures when they're built

4  in violation of the RHA.

5       And I think the hypothetical that Your Honor suggested on

6  the Mississippi is a good one because it indicates the breadth

7  of what Texas is suggesting here.

8       To take it a step further, it would seem under Texas'

9  interpretation, a state, such as the State of Louisiana, could

10  effectively build a barrier blockading the entirety of the

11  Mississippi River, preventing traffic from flowing up river to

12  other states.  And the United States would not have a cause of

13  action under Section 12 to enforce the RHA and seek removal of

14  that barrier.  That's simply an implausible reading of the RHA.

15       We believe that the interpretation advanced by the United

16  States here is the one that best effectuates the congressional

17  purpose, which is that the RHA as a whole broadly prohibits

18  construction of any obstruction to structure and it provides a

19  corresponding right of relief to provide for injunctive relief

20  to remove those structures whether built by states or persons

21  or corporations, and that the first section of Section 12

22  simply provides a different form of relief through criminal

23  enforcement for a certain subset of entities that violate those

24  prohibitions.

25       Unless Your Honor has other questions on the RHA claim,

1  I'll proceed to address the Treaty claim.

2          THE COURT:  Sure.

3          MR. KNUDSEN:  By way of background, the second count

4  of the United States' amended complaint alleges that Texas'

5  construction of the floating barrier is preempted by the 1848

6  Treaty of Guadalupe Hidalgo.

7          And specifically that cause of action -- that claim

8  arises under Article 7 of the Treaty, which protects the right

9  of free navigation of the Rio Grande by citizens and vessels of

10 both countries, and it prohibits construction of any works that

11 may impede or interrupt, in whole or in part, that exercise of

12 that right of free navigation.

13         Notably, there's been much argument in this case

14 regarding whether the Rio Grande is a commercially navigable

15 water subject to the RHA scope, but the protection afforded by

16 Article 7 of the Treaty is not limited to commercial

17 navigation.  In fact, it includes all navigation by citizens

18 and vessels of both countries.  And that's a point that Texas

19 hasn't disputed in the briefing in this case.

20         But the amended complaint alleges that Texas'

21 construction of the barrier may impede or interrupt the

22 exercise of that right of free navigation on the Rio Grande and

23 that because treaty provisions are the supreme law of the land

24 under the Constitution's supremacy clause, then Texas'

25 construction of the barrier is prohibited.

 1           THE COURT:  Well, they don't contest any of that,

 2    with the exception of a very important point which counsel

 3    made, and that is that it is not a self-executing statute.  So

 4    I think -- I mean, self-executing.  So I think what you need to

 5    do is address whether it is or it isn't.

 6           MR. KNUDSEN:  That's right, Your Honor.  Texas has

 7    raised two legal arguments.  One is the question of

 8    self-execution.  The other is whether there is cause of action

 9    to enforce that.

10           THE COURT:  Well, it's not self-executing if you

11    don't have a cause of action.

12           MR. KNUDSEN:  Of course, Your Honor.

13           Now, the test for self-execution, as recognized by

14    the courts over -- since the founding of the country, is

15    fundamentally a question of evaluating the Treaty text and the

16    parties' post ratification actions' understanding of the Treaty

17    provision to determine whether the parties intended it to be

18    self-executing and have the effect of domestic law without

19    further action by the political branches.

20           Now, contrary to Texas' framing of this question,

21    numerous courts, including the Fifth Circuit in the United

22    States versus Postal, have made very clear that this is not an

23    inquiry that looks at the Treaty as a whole and determines

24    whether the Treaty is either entirely self-executing or

25    entirely not self-executing.  It actually proceeds on a

1   provision-by-provision basis.

2          So whether a specific provision of the Treaty is

3   self-executing or not has no bearing on whether a different

4   provision of that same treaty is.

5          It's actually extremely rare that a treaty would

6   directly address in a specific way the mode of its domestic

7   implementation by one of the parties or speaks specifically to

8   whether courts may enforce it or not.

9          In setting whether a treaty is self-executing

10  requires the Court to assess whether the text is sufficiently

11  precise and obligatory.  So it allows for direct application by

12  the Court.  And the Court also has to assess whether the Treaty

13  provision on its face envisions some kind of future action for

14  the political branches to give it effect or give more meaning

15  to its stipulations.

16         Here, the text of Article 7 is clear on its face.  It

17  says exactly what is protected and exactly what is prohibited

18  and it uses obligatory language to indicate its effect.

19         That treaty language is similar to the Treaty at

20  issue in the Supreme Court's decision in Asakura versus

21  Seattle.  That involved a treaty between the United States and

22  Japan, which stated that the citizens of both countries shall

23  have liberty to carry on trade in each other's countries.

24         The treaty provision didn't speak directly to whether

25  it's self-executing or not and didn't speak directly to how

1  courts were to go about implementing that in individual cases.

2         The treaty language on its face was simply obligatory

3  and precise in a way that allowed courts to directly enforce

4  it.

5         Similarly, there's nothing in Article 7 that suggests

6  there's a need for the political branches of the United States

7  or Mexico to take some further action to give effect to its

8  protection of navigation or to further flesh out the meaning of

9  that protection.

10         It states very clearly, again, that, "The exercise of

11  free navigation is to be protected and construction of works

12  that impede that right are prohibited."

13         This is dissimilar from other treaty provisions that

14  might speak in more contractual terms regarding what the

15  parties are going to do in the future.  For example, in the

16  Supreme Court's decision in Medellin versus Texas involving

17  enforcement of decisions by the International Court of Justice.

18         The relevant treaty language there said that the

19  parties will undertake to comply with ICJ decisions.  That kind

20  of language speaking to future intent that the Supreme Court

21  held is indicative that a treaty provision is not

22  self-executing, but that's entirely dissimilar from the treaty

23  provision we have here in Article 7.

24         In addition to the treaty text, the parties' post

25  ratification understanding is also relevant to interpreting the

 1   meaning of the provision.

 2            And here the post ratification actions by the United

 3   States and Mexico reflect an understanding that the protection

 4   of navigation in Article 7 is something that was already in

 5   effect at the time of ratification without the need for some

 6   further implementing legislation by Congress.

 7            In particular, several of the subsequent treaties

 8   between the two countries, including the 1853 Treaty and the

 9   1884 convention, discuss the protections in Article 7 as

10   something that's already in effect, and is to be preserved and

11   not interrupted by these subsequent agreements between the

12   parties; not as something that's still awaiting action by the

13   parties to give effect to.

14            Now Texas' arguments on this issue are primarily

15   focused on what they term an exclusive dispute resolution

16   provision in the 1848 Treaty.  What they're referring to is

17   Article 21 of that treaty which contains a mechanism to resolve

18   disputes between the parties.  That is, between the United

19   States and Mexico.

20            It does not provide some kind of a detailed dispute

21   resolution mechanism.  Essentially, what it says is that the

22   parties, to the extent disagreements arise between them --

23            THE COURT:  I've read it, Counsel.

24            MR. KNUDSEN:  Yes, so you'll recognize that it simply

25   says they'll resolve disagreements without hostility.

1          THE COURT:  Right.

2          MR. KNUDSEN:  To the extent that that even applies in

3    the event of disagreements about whether a work has been

4    constructed in violation of Article 7, which is not clear from

5    the face of the Treaty, that it's simply irrelevant to how the

6    United States can enforce its own treaty obligations against

7    its component parts against a state like Texas.

8          This is not a case involving a dispute between the

9    United States and Mexico.  This is a dispute between the United

10   States and one of its states that has acted contrary to the

11   United States' Treaty obligations in the 1848 Treaty.

12          Now, Texas has made a comparison to the Supreme

13   Court's decision in Medellin and framed that case as one that

14   turns on -- that turned on the existence of a dispute

15   resolution mechanism for enforcement of ICJ decisions.

16          We think that's an overly simplistic reading of the

17   Supreme Court's rationale in Medellin.  It's true that the ICJ

18   statute at issue in Medellin included provisions for what

19   happens when a party doesn't comply with an ICJ decision.

20          But it wasn't simply the existence of that provision

21   that led the Supreme Court to find that ICJ decisions were not

22   self-executing.  It was really the specific processes and

23   mechanisms by which that enforcement was to proceed.

24          Specifically, if a nation did not comply with an ICJ

25   decision, the relevant treaty language provided for a vote in

1  the UN Security Counsel to enforce the ICJ decision.

2           Importantly, that's a process in which the United

3  States has veto authority.  So the United States has the

4  opportunity in any vote on a resolution to enforce an ICJ

5  decision against it to veto that resolution.

6           The Supreme Court looked at the specifics of that

7  process and found that it was implausible to think that the

8  President and the Senate, when they ratified this Treaty, would

9  have understood it to be self-executing, because allowing that

10  kind of self-execution and applicability in domestic courts

11  would have been entirely incompatible with the process by which

12  the United States could elect to exercise its veto in the UN

13  Security Council proceeding.

14           None of those conflicts are presented here by giving

15  self-executing effect to Article 7 of the 1848 Treaty.

16           There's nothing about allowing the United States to

17  enforce Article 7's protections against Texas that would

18  interfere with its ability to engage in dispute resolution with

19  the country of Mexico to the extent that disagreements arise

20  between the two nations.

21           Finally, Texas has presented several arguments

22  regarding the self-executing nature of other provisions of the

23  1848 Treaty primarily focusing on Article 8 of the Treaty

24  involving treatment of property rights of Mexicans in the

25  territory ceded to the United States in that treaty.

1        As I noted before, it's black-letter law that

2  self-execution of treaty provisions is determined on a

3  provision-by-provision basis.

4        So again, there's nothing about the nature of

5  Article 8 or any other provision of the 1848 Treaty that is

6  really dispositive of the self-executing nature of Article 7.

7        So again, the legislation and Supreme Court decisions

8  addressing whether that provision was self-executing or not

9  simply have no bearing on the self-execution analysis here.

10        Finally, Your Honor, I'll turn to the argument that

11  the United States lacks a cause of action to enforce Article 7

12  of the Treaty.

13        This Court rejected that same argument just a few

14  weeks ago in granting the preliminary injunction in the SB4

15  case and held that the United States can pursue a nonstatutory

16  cause of action in equity to enjoin state action that's

17  preempted by the supremacy clause.

18        The same rationale applies here.  Texas has primarily

19  relied on the Supreme Court's decision in Armstrong, but again,

20  as this Court recognized, that case only held -- that case, in

21  fact, recognized that there exists a separate cause of action

22  in equity to enforce the supremacy clause.

23        And since the time the Supreme Court decided

24  Armstrong, it's also decided other cases in which the United

25  States has pursued a cause of action and equity to enforce the

1   supremacy clause, including United States versus Washington

2   just a few years later.

3         And the 5th Circuit has recognized the availability

4   of that equitable cause of action as well, including just last

5   year in Crown Castle Fiber versus City of Pasadena.

6         It's true that Congress can in some instances

7   displace the right of equitable relief under -- to enforce the

8   supremacy clause, which is, in fact, what the Supreme Court

9   found in its decision in Armstrong, but Texas hasn't, in this

10  case, identified any law passed by Congress that would displace

11  the equitable relief that the United States is seeking here.

12        If the Court has no further questions on any other

13  aspects of the motion to dismiss, the Court should deny the

14  motion to dismiss for the reasons so stated.

15        THE COURT:  Thank you very much, Counsel.  Your

16  argument has been quite helpful.

17        Counsel, you'd like a few minutes for rebuttal?

18        MS. AL-FUHAID:  Yes, Your Honor, just a few minutes.

19        THE COURT:  Sure.  Can you address, if you will -- I

20  don't want to throw you off here -- but the issue of the United

21  States' ability to pursue a supremacy clause argument and

22  equity, because it seems to me that counsel -- your opposing

23  counsel, has argued that the United States Supreme Court has

24  recognized an equitable cause of action under the supremacy

25  clause, and I'm going to be looking into that more carefully.

1              Obviously, I've already ruled on it in one case,

2    but --

3              MS. AL-FUHAID:  Well, Your Honor, the United States

4    and Mexico have only ever -- in later treaties, have never

5    provided for any sort of judicial remedy for any violation of

6    the Treaty of Guadalupe Hidalgo.  And instead, they agreed to

7    assign navigability disputes to the exclusive jurisdiction of

8    the International Boundary and Water Commission.  And these are

9    only diplomatic remedies.

10             Now, the international agreements do not by

11   themselves create a cause of action, and -- because that's

12   because the treaties are primarily claims just between

13   independent nations related to political and diplomatic

14   matters.

15             THE COURT:  Can I interrupt you for just a second?

16             MS. AL-FUHAID:  Yes.

17             THE COURT:  Because I think we need to get

18   clarification from opposing counsel so I can ask you the next

19   question, all right.

20             MS. AL-FUHAID:  Of course, Your Honor.

21             THE COURT:  When you are making this argument on the

22   supremacy clause giving the cause of action to the United

23   States, are you also including within that the cause of action

24   under the Rivers and Harbors Act, or is this just for the

25   Treaty?

1            MR. KNUDSEN:  No, Your Honor, this is simply for the
2   Treaty claim.
3            THE COURT:  That's what I understood.  All right.
4            Would you like to speak with co-counsel?  It's okay.
5            MS. AL-FUHAID:  That's okay, Your Honor.
6            THE COURT:  I'll give you a couple of minutes if you
7   need it.
8            MS. AL-FUHAID:  I think we're okay, Your Honor.
9   Thank you, though.
10           THE COURT:  Did you hear his argument?  He's only
11  confining -- if you didn't -- because I think you were talking
12  to co-counsel.
13           What's happening is that he's confining his supremacy
14  clause argument only to the Treaty.  He's not make a supremacy
15  clause argument for equitable relief under the Rivers and
16  Harbors Act.
17           I thought that was the case.  I wanted to be sure.
18           MS. AL-FUHAID:  Well, Your Honor, if that argument is
19  true, then there's no distinction between self-executing and
20  non-self-executing treaties.  That would make the concept of a
21  non-self-executing treaty irrelevant.
22           So the Supreme Court has recently, in the Medellin
23  case in 2008, has described how to determine whether a treaty
24  is self-executing or non-self-executing.
25           And one of the indicators that a treaty is

1  non-self-executing is the provision within the treaty of an

2  express diplomatic remedy.

3           And so the reference in Article 21 to agreeing to

4  mutually negotiate and do so without hostilities is a

5  diplomatic and political remedy.  So that is an indicator that

6  the Treaty is non-self-executing.

7           So that was why I raised the issue of the

8  International Boundary and Water Commission.

9           THE COURT:  I understand your argument.  Thank you

10  for that clarification.

11          MS. AL-FUHAID:  And Your Honor, the United States has

12  successfully argued in the Nino case that the 1848 Treaty does

13  not create a cause of action so they have successfully asserted

14  that in past cases.

15          THE COURT:  Okay.  Here's what I'm going to do on

16  this issue, because it is -- you can be seated, Counsel.  Are

17  you done?

18          MS. AL-FUHAID:  No, Your Honor, I had a couple more

19  points.  Not on the Treaty issue, though.

20          THE COURT:  Okay.  Go ahead.  I'm sorry, I did not

21  mean to cut you off.  I thought you were done.

22          MS. AL-FUHAID:  No, it's okay.  Actually, I do have

23  just a couple more points to make about the Treaty issue.  In

24  the Medellin case -- and counsel mentioned that contemplating a

25  future intent can be an indicator as to whether a treaty is

 1  ║self-executing or non-self-executing.

 2  ║        And Article 5 of the Treaty references -- it

 3  ║contemplates taxing to make rivers navigable.  So that

 4  ║contemplates future action, that would be another indication

 5  ║under the Medellin case that the treaty is non-self-executing.

 6  ║        And as far as applications for permits under the

 7  ║Rivers and Harbors Act -- you know, the State does not seek

 8  ║conflict with the federal government just for the sake of

 9  ║conflict.  But our position -- you know, perhaps this is the

10  ║first time this conflict has arisen regarding the Rivers and

11  ║Harbors Act so that's why it hasn't come up before.

12  ║        Now, as far as the Sanitary District case, which

13  ║relates to whether --

14  ║        THE COURT:  The Chicago case.

15  ║        MS. AL-FUHAID:  The Chicago case, yes.  That case did

16  ║not apply the Rivers and Harbors Act to a state.  It applied it

17  ║to a municipal corporation, to a municipality.

18  ║        THE COURT:  They were holding -- they were a part of

19  ║the state under Illinois law, I believe.

20  ║        MS. AL-FUHAID:  Well, it's a municipal governmental

21  ║entity.  But I would like to point your Honor to the Will case,

22  ║which was related to Federal Civil Rights Law, Section 42

23  ║U.S.C. Section 1983.

24  ║        THE COURT:  Sure, I'm familiar with the Will case.

25  ║        MS. AL-FUHAID:  In the Will case the Court held that

1   the -- that statute applied to the municipality, but it did not

2   apply to a state, because a state -- states were not persons.

3           THE COURT:  Yeah, but that's under -- 1983 has its

4   own body of law having to do --

5           MS. AL-FUHAID:  Well, of course.  It does have its

6   own body of law, but the definition of person, as a presumption

7   across all federal statutes, excludes the state unless Congress

8   affirmatively indicates that it's included.  So the Federal

9   Civil Rights Law is just one example.

10          THE COURT:  I don't know that the Will case really

11  helps you here, but you have some other good points.  I would

12  like to have you respond to this question:  You've pointed out

13  that in Chicago it was a municipal corporation, but there is no

14  indication in the language that is in the Rivers and Harbors

15  Act that would specifically say municipal corporations or

16  cities.  It doesn't say that, just like it doesn't say state.

17          MS. AL-FUHAID:  Yes, Your Honor, that's correct, that

18  language is not contained in the statute.

19          THE COURT:  Okay.  So why don't you go on to whatever

20  else you have to argue on the Rivers and Harbors Act and then

21  I'm going to circle around to this again.

22          MS. AL-FUHAID:  Okay.  Only one more point, Your

23  Honor. I'd like to refer the Court to the Atascadero State

24  Hospital case.  The United States has argued that the second

25  sentence of Section 12, because it authorizes an injunction to

 1   remove any structure, that it can refer to any structure even

 2   if it was not constructed by a person or a corporation in the

 3   first sentence of Section 12.

 4            But that reading is too broad.  And as an example of

 5   that -- it's too broad to bring in the state, to bring the

 6   state within the ambit of the statute because Congress has to

 7   specifically and affirmatively indicate it is subjecting the

 8   states to a statute when it chooses to do so.

 9            And as an example, in the Atascadero State Hospital

10   case, a statute provided for civil remedies for violations that

11   were committed by any recipient of federal assistance.  And the

12   Court in that case held that that was not the kind of

13   unequivocal statutory language that was sufficient to abrogate

14   the 11th Amendment when a state was such a recipient.

15            So the use of the word "any" was -- like any

16   obstruction -- any recipient like any obstruction here was not

17   enough to bring a state within the ambit of statute.

18            So Congress was not specific enough in the Rivers and

19   Harbors Act to be able to do that.

20            And if it wishes to be able to seek injunctive

21   relief -- if it wishes for the federal government to be able to

22   seek injunctive relief against a state under the Rivers and

23   Harbors Act, then Congress would have to amend the statute to

24   apply it to states.

25            And I have nothing further, Your Honor, unless the

1   Court has questions.

2           THE COURT:  No, I don't.

3           MS. AL-FUHAID:  Thank you.

4           THE COURT:  I am going to call for some very brief

5   supplemental briefing, not on the Rivers and Harbors Act,

6   that's not -- I mean, I can deal with that.  I think you both

7   have been very thorough and gotten your points across, and I

8   fully, I think, understand what your positions are, both from

9   your papers, which were very good on both sides, I might add,

10  and from your arguments, which were also very good on both

11  sides, and I appreciate your arguments.

12          But I am a little bit concerned about this very

13  tricky issue under the Treaty that we just discussed.  Remember

14  when I kind of asked -- we were discussing it and I kind of

15  said, *Well, just a minute,* and you said, *Oh, I'm sorry, I'm not*

16  *done*, and I said*, I'm sorry, I thought you were done,* because I

17  thought you were sitting down.

18          I'm -- I'd like some additional supplemental briefing

19  with some more citations on the standing issue under the --

20  because that's basically -- your key argument is -- the State's

21  key argument is that the statute isn't self-executing, that

22  basically the federal government has no cause of action against

23  a state, correct?

24          MS. AL-FUHAID:  Yes, Your Honor.

25          THE COURT:  I'd like to have some supplemental

1   briefing on that from both sides rather than have you just pop

2   something off the top of your head.  I think you both have done

3   an excellent job today, but I really want to take another hard

4   look at that, because it isn't as easy as it may sound.  And I

5   know you both have taken very firm positions on this, and there

6   are certainly arguments to be made on both sides and that's

7   always a problem for a court.

8          And so I do very much want to make sure that I make

9   the very best decision I can, and so I do want to get some

10  supplemental briefing.  How much -- no more than maybe, say,

11  seven pages or so, that should do it.  I'll give you ten pages,

12  okay.

13         MS. AL-FUHAID:  I just have one question, Your Honor.

14  Do you want the briefing to be on whether the Treaty is

15  self-executing as well?

16         THE COURT:  Yes.

17         MR. KNUDSEN:  Your Honor, I'm sorry, may I clarify,

18  too?  So this is addressing both self-execution and whether the

19  United States has a cause of action?

20         THE COURT:  Yes, that's right.  And any legal -- what

21  I'm looking for is as much law as you can give me, okay.

22  Because we're looking, we're not finding a lot, so I want to

23  give you the opportunity to see if maybe you can find something

24  that we haven't found.

25         I just got back from sitting on the Ninth Circuit in

1   San Francisco, and -- as you know, I do a few times a year, and

2   I guess it wasn't this sitting, but it was a previous sitting

3   that I had in Portland, Oregon in '23, where we had a similar

4   issue where we just couldn't get our hands around the law.

5            So we discussed it, the three judges on the panel,

6   and we decided we needed some supplemental briefing on that

7   issue and it was quite helpful to get that.

8            It's not unusual for a judge to ask for supplemental

9   briefing.  It's just like when I do a nonjury trial, I don't

10  have the lawyers get up in front of me and give a closing

11  argument.  I have them give me their closing argument in

12  writing.

13           Why?  So that they can have an opportunity to go back

14  over the transcript, go back over the record, incorporate the

15  law as they understand it and they've argued it, along with the

16  facts that have been developed, and give me that, and I can

17  read it.

18           And it's their best argument.  Not just somebody

19  standing up -- you have to do it in a jury trial, obviously.  I

20  was a trial lawyer.  But it isn't going to be your very best

21  argument like you have if you can sit down and provide it in

22  writing.

23           A very, very fine circuit judge, who was a very fine

24  trial lawyer, told me that that was the way that he preferred

25  it, and I thought that's a great idea.

1          And so this is going to be helpful to me I'm sure.

2    How much time do you need?

3          MS. AL-FUHAID:  I was going to ask the Court when the

4    Court wanted to receive --

5          THE COURT:  In spite of the fact that certain

6    judges -- not all, thank goodness -- certain judges on the

7    Fifth Circuit accused me of rushing things to cut off the Fifth

8    Circuit.  I never intend to do that, I never did it, and I

9    never would do it.  I mean, I have enormous respect for the

10   Fifth Circuit Court of Appeals.  I always have, continue to.

11         Now, it would be helpful if a few of those judges

12   wouldn't provide us with advisory opinions, which generally

13   federal judges are not allowed to do, according to the Supreme

14   Court, but that's their business and not mine.  I don't pay

15   attention to advisory opinions.  I look for the facts and the

16   law as they're developed in the court.

17         Yes, ma'am.

18         MS. AL-FUHAID:  Your Honor had asked how much time we

19   would want.

20         THE COURT:  Yes, how much time do you need?

21         MS. AL-FUHAID:  Perhaps a week, perhaps until

22   Wednesday of next week.

23         THE COURT:  If you think you can do it in a week, a

24   week is fine.  I'm happy to give you a little longer if you

25   need it.

1          MR. KNUDSEN:  Your Honor, the United States can work

2     on that timeline.

3          THE COURT:  All right.  I'll give you seven days from

4     today.

5          MS. AL-FUHAID:  Thank you, Your Honor.  Today is

6     Tuesday.

7          THE COURT:  All right.  So next Tuesday, okay.

8          MS. AL-FUHAID:  Okay.  Thank you, Your Honor.

9          THE CLERK:  It would be March 26th.

10          THE COURT:  March 26th by 5:00 p.m. Central time,

11     which would be 6:00 p.m. East Coast time.  I'm very attuned to

12     East Coast time now with Justice Alito and his getting things

13     done by 5:00.

14          Okay, Counsel, I want to really sincerely thank you

15     for your arguments today.  They've been very very helpful, and

16     I am going to start looking at this, obviously, again.  I

17     promised counsel that I would give it a fresh look and I intend

18     to do that.

19          This is a case.  This isn't SB4.  This is the buoy

20     case.  So I have written in the buoy case before, but this is a

21     different motion.  I want to make it very clear that I'm not

22     rushing into doing this motion for -- to dismiss -- hearing it.

23     Both counsel wanted me to hear it sooner rather than later.  Am

24     I correct?  So we can get this on the record.

25          MS. AL-FUHAID:  Yes, Your Honor.  Thank you for your

1    time.

2              MR. KNUDSEN:  Yes, sir.

3              THE COURT:  Because I've been accused of rushing

4    things through, which is -- heaven forbid.  Usually the

5    accusation is that judges sit on things and don't get them

6    filed; not that they rush them through.

7              But anyway, I will try to get this out as quickly as

8    I possibly can, consistent with taking into consideration your

9    supplemental briefing.  I'm certainly not going to ask you to

10   do supplemental briefing and then not pay any attention to it.

11             There's nothing worse -- and I know this as a trial

12   lawyer, there's nothing worse than to have lawyers come in,

13   make an impassioned argument that they worked very hard on and

14   then have the judge say, *Okay, I'm ready to make a ruling*, and

15   then read off their ruling, which means they didn't pay a bit

16   of attention to what they argued.  I can assure you it's not

17   happening with me and it's not happening here.

18             I'm going to stand in recess.  Thank you.  Please

19   have a good rest of the week.

20             (Proceedings concluded at 11:07 a.m.)

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF TEXAS

3

4        I certify that the foregoing is a correct transcript from

5   the record of proceedings in the above-entitled matter.  I

6   further certify that the transcript fees and format comply with

7   those prescribed by the Court and the Judicial Conference of

8   the United States.

9

10  Date signed:  March 21, 2024

11

12  /S/ Lisa A. Blanks

13  _____

    Lisa A. Blanks, CSR, CRR, RPR
14  Official Court Reporter
    262 West Nueva Street
15  San Antonio, Texas  78207
    (210)244-5038
16  lisa_blanks@txwd.uscourts.gov

17

18

19

20

21

22

23

24

25