# United States District Court
# Western District of Texas
# Austin Division

| | |
|---|---|
| United States of America, *Plaintiff*, v. Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas, *Defendants*. | No. 1:23-cv-00853-DAE |

# DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

**Table of Contents** ................................................................................................ ii
**Table of Authorities** ............................................................................................. iii
**Argument** .............................................................................................................. 1
   I.   Article VII of the 1848 Treaty is not self-executing. ....................................... 1
   II.  The United States has no cause of action to enforce Article VII of the Treaty. ............ 8
**Conclusion** ......................................................................................................... 10
**Certificate of Service** ......................................................................................... 11

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air France v. Saks*,
    470 U.S. 392 (1985) ............................................................................................................. 2

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ............................................................................................................. 9

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ............................................................................................................. 9

*Beazley v. Johnson*,
    242 F.3d 248 (5th Cir. 2001) ............................................................................................... 1

*Cameron Septic Tank Co. v. City of Knoxville*,
    227 U.S. 39 (1913) ........................................................................................................... 6, 7

*Choctaw Nation of Indians v. United States*,
    318 U.S. 423 (1943) ............................................................................................................. 2

*Doe v. Holder*,
    763 F.3d 251 (2d Cir. 2014) ................................................................................................ 4

*Frolova v. Union of Soviet Socialist Republics*,
    761 F.2d 370 (7th Cir. 1985) ............................................................................................... 3

*Garcia v. Purdy*,
    No. 13-cv-234, 2014 WL 12796880 (D.N.M. March 11, 2014) ....................................... 10

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ............................................................................................................. 9

*Huckins v. Duval Cnty., Fla.*,
    286 F.2d 46 (5th Cir. 1960) ................................................................................................. 9

*Medellin v. Texas*,
    552 U.S. 491 (2008) ............................................................................................. 2, 3, 4, 7, 8

*More v. Intelcom Support Servs., Inc.*,
    960 F.2d 466 (5th Cir. 1992) ............................................................................................... 1

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
    522 U.S. 479 (1998) ............................................................................................................. 7

*Newhall v. Sanger*,
    92 U.S. 761 (1875) ............................................................................................................6

*Newport & C. Bridge Co. v. U. S.*,
    105 U.S. 470 (1881) ........................................................................................................10

*Nino v. United States*,
    No. 13-cv-469, 2014 WL 1028575 (S.D. Cal. March 13, 2014) .................................10

*Republic of the Marshall Islands v. United States*,
    865 F.3d 1187 (9th Cir. 2017) ........................................................................................3

*Rodriguez v. Pan Am. Health Org.*,
    502 F. Supp. 3d 200 (D.D.C. 2020), *aff'd,* 29 F.4th 706 (D.C. Cir. 2022) ...............4

*Sanchez-Llamas v. Oregon*,
    548 U.S. 331 (2006) ..........................................................................................................8

*Summa Corp. v. California*,
    466 U.S. 198 (1984) ..........................................................................................................7

*Texas v. Florida*,
    306 U.S. 398 (1939) ..........................................................................................................8

*United States v. California*,
    655 F.2d 914 (9th Cir. 1980) ...........................................................................................8

*United States v. Postal*,
    589 F.2d 862 (5th Cir. 1979) ............................................................................... 1, 2, 7

*United States v. Rio Grande Dam & Irrigation Co*,
    184 U.S. 416 (1902) ..........................................................................................................5

*Vigil v. Hughes*,
    509 Fed. Appx. 796 (10th Cir. 2013) ..........................................................................10

*Wesson v. Warden of U.S. Penitentiary*,
    305 F.3d 343 (5th Cir. 2002) (per curiam) ..................................................................1

*Ysleta Del Sur Pueblo v. City of El Paso*,
    433 F. Supp. 3d 1020 (W.D. Tex. 2020), *aff'd*, No. 20-50313, 2021 WL
    5504744 (5th Cir. Nov. 23, 2021) ................................................................................10

*Yturbides Executors v. United States*,
    63 U.S. 290 (1860) ............................................................................................................6

*Zicherman v. Korean Air Lines Co., Ltd.*,
    516 U.S. 217 (1996) ...................................................................................................2

**Statutes**

Act of Mar. 3, 1851, ch. 41, 9 Stat. 632 (1851) ...............................................................3, 6

26 Stat. 1512, 1513 ................................................................................................................5

59 Stat. 1219 ..........................................................................................................................5

**Other Authorities**

John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 (1905) ...............................10

Rest. of Foreign Relations Law 4th, § 310, Cmt. 7 ...............................................................3

Rest. (Third) of Foreign Relations Law of the United States §907, Comment *a*
    (1986) ..........................................................................................................................8

In its amended complaint, the United States added a novel claim under Article VII of the 1848 Treaty of Guadalupe Hidalgo. That claim fails for multiple independent reasons. First, a treaty is presumed to be merely an international agreement, not domestic law enforceable in federal court. Second, even if a treaty is self-executing and can supply a federal rule of decision, it still is presumed not to furnish a cause of action to enforce its provisions. The United States cannot shoulder the burden of rebutting two heavy presumptions against its novel claim. Courts construing the 1848 Treaty have only ever found that it is *not* a source of self-executing federal law. And the United States has itself argued (successfully) that the 1848 Treaty furnishes no cause of action against itself. If the Treaty furnishes no right to sue a signatory (*i.e.*, the United States) it surely furnishes no right to sue a *non*-signatory (*i.e.*, Texas).

## ARGUMENT

### I.  Article VII of the 1848 Treaty is not self-executing.

Federal courts condition their authority to grant relief pursuant to treaties between the United States and foreign powers on a treaty's self-executing status. Both treaties that are self-executing and those that are not self-executing create international obligations; but only self-executing treaties are enforceable as domestic law in federal courts. *See, e.g.*, *United States v. Postal*, 589 F.2d 862, 878 (5th Cir. 1979); *Beazley v. Johnson*, 242 F.3d 248, 267 (5th Cir. 2001); *More v. Intelcom Support Servs., Inc.*, 960 F.2d 466, 469 (5th Cir. 1992); *Wesson v. Warden of U.S. Penitentiary*, 305 F.3d 343, 348 (5th Cir. 2002) (per curiam). In fact, an international treaty is presumed to be merely a diplomatic agreement "between independent nations" that "depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it." *Head Money Cases*, 112 U.S. 580, 598 (1884). "It is obvious that with all this *the judicial courts have nothing to do* and can give no redress." *Id.* (emphasis added). Instead, any supposed treaty "infraction becomes the subject of international negotiations and reclamations." *Id.*

A self-executing treaty—that is, a treaty that enjoys the status of "binding federal law in the absence of implementing legislation"—is the exception to the rule. *Medellin v. Texas*, 552 U.S.

1

491, 504–06 (2008). If a treaty is to have immediate domestic consequences, "one would expect that in these circumstances the United States [and the other signatories] would make that intention clear," *Postal*, 589 F.2d at 878. And "[a] treaty cannot be self-executing … to the extent that it involves governmental action that under the Constitution can be taken only by the Congress," *id*. at 877—such as regulating the channels of interstate commerce. Accordingly, to determine whether a treaty is self-executing courts must consult the text of the treaty, *Medellin*, 552 U.S. at 507 (citing *Air France v. Saks*, 470 U.S. 392, 396–397 (1985)), as well as the "postratification understanding of signatory nations" as to whether signatories have treated treaty provisions as domestic law, *id*. at 507 (quoting *Zicherman v. Korean Air Lines Co., Ltd*., 516 U.S. 217, 227–28 (1996) (treating the fact that signatories had no history of domestic enforcement of treaty terms as evidence against self-execution)); *see also Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943) (holding that Indian treaty was not self-executing in part because of historic disuse as a remedy at law). The fact that Plaintiff has never brought a domestic claim under the Treaty in its 175-year history demonstrates the United States' own post-ratification understanding of its non-self-executing nature.

Treaty text, post-ratification history, and federal court precedent all indicate that Article VII of the 1848 Treaty of Guadalupe Hidalgo is not self-executing. First, the Treaty establishes an exclusive non-judicial remedy to resolve disputes under *any* of its provisions, including Article VII. Second, after ratification of the Treaty, the United States and Mexico manifested that Article VII was not self-executing by routing any disputes over their obligations under that provision through Article XXI's remedial process and assigning a special-purpose, diplomatic organization "exclusive jurisdiction" over all disputes concerning structures erected in the Rio Grande. Third, similar provisions in the Treaty have been found by courts to be not self-executing.

**1.** The starting place for understanding a treaty is its text, and a textual "provision of an express diplomatic—that is, non-judicial—remedy is itself evidence that [treaty obligations] were not meant to be enforceable in domestic courts." *Medellin*, 552 U.S. at 509. Diplomatic remedies are especially strong evidence against self-execution when they are the sole remedy created by the

2

treaty. Rest. of Foreign Relations Law 4th, § 310, Cmt. 7.

The Treaty establishes an exclusive diplomatic remedy. Article XXI says that, in the event that "any disagreement should hereafter arise between the Governments of the two republics, whether with respect to the interpretation of any stipulations in this treaty, or with respect to any other particular concerning the political or commercial relations between the two nations," the signatories "do promise to each other that they will endeavour, in the most sincere and earnest manner, to settle the differences so arising … using, for this end, *mutual representations and pacific negotiations*." 9 Stat. 929, 938–39 (emphasis added). "[A]ny stipulation in this treaty" undoubtedly includes Article VII's stipulations. That means "any disagreement" over Article VII must be routed through Article XXI's dispute resolution process—the *only* remedy expressly created by the Treaty. The process that Article XXI establishes, moreover, is entirely diplomatic: It says only that the signatories "promise" to "endeavor" to make "sincere and earnest" efforts to conclude any disputes by negotiation or arbitration, whether by mutually appointed commissioners or "a friendly nation." *Id*. at 939. Much like the treaty in *Medellin*, which said that each party "undertakes to comply," the treaty here likewise depends "on the interest and the honor of the governments which are parties to it." 552 U.S. at 508.

Plainly, this is not a "directive to domestic courts" to enforce its provisions. *Id.* The Treaty text nowhere contemplates enforcement of any of its terms in American or Mexican courts. Courts cannot read the requisite intent into silence. Rather, "one would expect the ratifying parties to the relevant treat[y] to have clearly stated any intent" to give Article VII's navigation clause domestic effect. *Medellin*, 552 U.S. at 517. Indeed, *Medellin* regarded overtly expressed intent as important because construing a treaty provision to be self-executing would constrain state officials. *Id*.

Nor does it matter that Article VII uses obligatory language, *see, e.g.,* 9 Stat. at 928 ("shall be free and common"), because imperative language does not suffice to show self-execution. Obligatory language is a necessary condition for self-execution, *see Republic of the Marshall Islands v. United States*, 865 F.3d 1187, 1194 n.3 (9th Cir. 2017), but not a sufficient one. *See, e.g., Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373–76 (7th Cir. 1985) (describing other factors

3

aside from obligatory language important to self-execution inquiry); *Doe v. Holder*, 763 F.3d 251, 255 (2d Cir. 2014) ("even mandatory language may not be conclusive evidence that a provision is self-executing if the context and treaty objectives indicate otherwise."); *Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200, 223–25 (D.D.C. 2020) ("shall" does not suffice to show self-execution), *aff'd,* 29 F.4th 706 (D.C. Cir. 2022); *Medellin*, 552 U.S. at 533–34 & n. 1 (Stevens, J., concurring in the judgment) (use of "shall" does not make treaty provisions self-executing). Language furnishes evidence in favor of self-execution only when it speaks to instruct federal courts to apply the treaty domestically. *See* Rest. at § 310, Cmt. 5 (the import of obligatory and precise language is whether it renders treaty "suitable for direct application by the judiciary").

At the hearing on this motion to dismiss, the United States suggested this Court could ignore Article XXI because it refers to disputes "between the Governments of the two republics." *See* Hearing Tr. 31–32. But that argument is entirely self-defeating, in part because Article VII uses the same phrasing when it says that "neither [of the two republics] shall, without the consent of the other, construct any work that may impede or interrupt" navigation. The United States cannot simultaneously claim that Texas assumes the obligations of one of the signatory governments (in Article VII) only to turn around and claim that Texas is exempt from the prescribed remedy for disputes over those very obligations (in Article XXI). One of two things must be true: Either the navigability obligation and the diplomatic remedy apply only to the two signatories themselves—in which case the Treaty has nothing to do with Texas. Or else the navigability obligation and the diplomatic remedy apply to the signatories along with their members—in which case Article XXI controls this dispute. There simply is no way to write Article XXI out of the Treaty.

**2.** While Article XXI suffices by itself to show that "pacific negotiations" are the only recourse for all disputes under the Treaty, subsequent agreements between the United States and Mexico confirm both nations' understanding that the two nations must rely on a diplomatic process to resolve disputes arising under Article VII's navigation clause. The Convention of 1889,

4

for example, created the International Boundary Commission (the "Commission")[1] and assigned it "exclusive jurisdiction" over "[a]ll differences or questions" concerning "works that may be constructed" in the Rio Grande. 26 Stat. 1512, 1513. Article V of that Convention builds on the procedure laid out in the Treaty's Article XXI with a more sophisticated complaint and investigation process the Commission must follow in response to problematic "works." *Id*. at 1514–15. And it expressly states that the riparian "works" placed under the IBC's authority include those "prohibited by … *article VII* of the treaty of Guadalupe Hidalgo." *Id*. at 1515. These provisions were renewed by subsequent binational agreements. *See* 59 Stat. 1219, 1222 ("the term of the Convention of March 1, 1889 shall be considered to be indefinitely extended").

The Convention is powerful post-ratification evidence that both the United States and Mexico understood the 1848 Treaty in general—and Article VII in particular—to create mere international commitments, not binding federal law that automatically applies in domestic courts. The Convention expressly addresses Article VII and clearly entrusts its subject matter to the IBWC. Because the Senate has explicitly transferred "exclusive jurisdiction" to a binational organization, this Court would be usurping a role Congress deliberately withheld from the federal courts, if it continued to entertain Plaintiff's Treaty claim.

The Supreme Court has said as much. While hearing perhaps the only federal case to argue Article VII required removal of structures from the Rio Grande, the Court declined to address Article VII out of deference to the Convention's authority to adjudicate Article VII disputes: "by a convention [the Convention of 1889] … provision was made for an international boundary commission empowered, upon application by the local authorities, to inquire whether any works were being constructed on the Rio Grande which were forbidden by treaty stipulations." *United States v. Rio Grande Dam & Irrigation Co*, 184 U.S. 416, 417 (1902). When the Senate has spoken so lucidly, *causa finita*. This Court must respect the Senate's decision to confine Article VII

---

[1] Later treaties redubbed this body the "International Boundary and Water Commission" to reflect the growing importance of riparian water rights. *See* 59 Stat. 1219.

5

matters to an international forum by dismissing the Treaty claim.

**3.** As Texas explained before, additional evidence is supplied by the numerous federal statutes that Congress passed to implement Article VIII of the Treaty, and the United States's own statements in a 2004 GAO report that such laws were required because "the Treaty of Guadalupe Hidalgo … is not self-executing." *See* ECF 62 at 19–21. Federal courts have pointed to such post-ratification evidence as indicative of the fact that Article VIII of the 1848 Treaty is not self-executing. Perhaps unsurprisingly, the Supreme Court has concluded the fact that one section of a treaty is not self-executing provides evidence that another similar section is likewise not self-executing. *See Cameron Septic Tank Co. v. City of Knoxville*, 227 U.S. 39, 47–50 (1913) (relying on need for implementing legislation to execute one provision to infer others were not self-executing).

The language of Article VIII is similar to that of Article VII. The latter stipulates that navigation "shall be" unrestricted while Article VIII requires that "Mexicans … shall be" permitted to remain in established places of residences and that their pre-existing land rights "shall be inviolably respected." 9 Stat. at 929–30. Furthermore, each article sets out its commitments in roughly the same degree of detail. Article VII guarantees free navigation without specifying what sorts of works will be considered to "impede or interrupt" it, and anticipates implementing legislation ("If, for the purpose of making the said rivers navigable, or for maintaining them in such state, it should be necessary or advantageous to establish any tax or contribution, this shall not be done without the consent of both governments"); Article VIII protects pre-treaty property rights without providing for determination of title. After ratification, Congress deemed it necessary to enact legislation to implement Article VIII. A bevy of statutes, beginning in 1851 with the California Land Claims Act, established adjudicative procedures to clarify pre-treaty land claims in the new territories. *See generally* Act of Mar. 3, 1851, ch. 41, 9 Stat. 632 (1851).

The Supreme Court has regarded these enactments as the implementing legislation needed to carry a non-self-executing treaty provision into effect domestically. Indeed, the Court succinctly said of the 1851 Act that "Congress had passed laws to carry into effect the treaty stipulations." *Yturbides Executors v. United States*, 63 U.S. 290, 292 (1860); *see also Newhall v. Sanger*, 92 U.S.

6

761, 764–65 (1875) (describing the relationship between the Treaty and land claim statutes as the former creating a duty to respect "rights of private property" and the latter creating a process for "judicial hearing and determination" of title). In *Botiller v. Dominguez,* the Court rejected its authority to decide property claims under Article VIII, because putative violations of that article's protection of pre-treaty land rights were exclusively "a matter of international concern." 130 U.S. 238, 247 (1889). Instead, the *Botiller* Court could rely only on a statute as applicable federal law. More recently, the Supreme Court has reaffirmed that the 1851 Act was enacted by Congress "[t]o fulfill its obligations under the Treaty of Guadalupe Hidalgo and to provide for an orderly settlement of Mexican land claims." *Summa Corp. v. California*, 466 U.S. 198, 203, 206 (1984).

The similarity between Articles VIII and VII provides further evidence that the latter is likewise not self-executing. The language, clarity, and context of the two articles are largely the same. Courts give the same construction to similar language occurring within the same text, absent a strong reason to the contrary. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998); *see also Medellin*, 552 U.S. at 506 (stating a treaty should be interpreted like a statute). By concluding that Article VII is not self-executing, this Court would simply be tracing the logic of *Cameron Septic Tank Co.* As in that case, Article VII cannot be distinguished by "a more distinct and definite power of execution than the other provision[] possess[es]." 227 U.S. at 50.

The United States responds that a single treaty may contain both self-executing and non-self-executing provisions. *See* Hearing Tr. 33–34. Although *Postal* teaches that a single treaty may contain both self-executing and non-self-executing provisions, 589 F.2d at 884 n.35, it would be a misreading to claim that the self-executing character *vel non* of one treaty provision never has any bearing on another. Here, this Court should rely on the similarity of Article VIII to conclude that Article VII is also not self-executing. It is true that a Treaty could theoretically provide clear language indicating self-execution for one provision but omit such language for another. But that argument walks headfirst into the text of *this Treaty*—namely, Article XXI, which (as explained above) applies to "any disagreement" over "any stipulations in this treaty." On its face, then, the Treaty says that all its provisions should all be enforceable diplomatically.

7

Additionally, Plaintiff's principal argument in support of self-execution is the mandatory language used in Article VII, but Article VIII is written in the same language. The similarity between Articles VII and VIII fatally undermines any suggestion that the language of Article VII speaks for itself in favor of self-execution. The language of these two provisions is comparably precise and obligatory. So, if Article VIII is not self-executing, then the nearly identical deontic language that appears in Article VII—the "shalls"—are insufficient to find Article VII self-executing. Article VIII employs language that is just as obligatory as any found in Article VII, but the courts regard Article VIII as not self-executing. Thus, the imperative "shall" in Article VII cannot imply the type of "precise or obligatory" content indicative of a self-executing treaty.

## II.     The United States has no cause of action to enforce Article VII of the Treaty.

"Even when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" *Medellin*, 552 U.S. at 506 (quoting 2 Rest. (Third) of Foreign Relations Law of the United States §907, Cmt. *a*, p. 395 (1986)). "The federal government … may sue a state in federal court," but it "must first have a cause of action against the state." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980); *Texas v. Florida*, 306 U.S. 398, 411 (1939) (holding one sovereign may sue another if "a cause of action cognizable in equity is alleged and proved").

Here, Plaintiff purports to press its Treaty claim via the Supremacy Clause. *See* First Amended Complaint, ECF 60 at 4, 9. Naturally, the first hurdle Plaintiff faces is to demonstrate that the Treaty is self-executing; otherwise, Article VII is not the "supreme law of the land" but only an international accord. Only "a self-executing treaty binds the States pursuant to the Supremacy Clause." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006). Thus, this Court need not reach the issue of the existence of a cause of action if the Treaty is not self-executing.

Regardless, Plaintiff would not be entitled to maintain a claim pursuant to the Treaty even if it were enforceable domestic law, because "the Supremacy Clause is not the source of any federal

8

rights, and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (quotations omitted). Instead, the Supremacy Clause merely "creates a rule of decision" and "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 324. Actions "to enjoin unconstitutional actions by state and federal officers" must be brought under an applicable statute or common-law right of action, not the Supremacy Clause itself. *Id.* at 327.

At the hearing on this motion to dismiss, Plaintiff suggested for the first time—and contrary to its First Amended Complaint—that it was pressing this Treaty claim not under the Supremacy Clause but instead under "a separate cause of action in equity." *See* Mot. Hearing Tr. Mar. 19, 2024, at 34–35. As the Court is aware, Texas disagrees with this Court's conclusion in the SB4 litigation that the United States may proceed via an action in equity. But even taking that decision on its own terms, that decision does not help the United States here. This Court recognized that *Armstrong* does not "bar[] suits in equity that are not displaced by Congress." PI Order in Case No. 1:24-cv-8 (W.D. Tex.), ECF 42 at 25. Assuming that is true, the Plaintiff must still *identify* a pre-existing action in equity to show it has not been displaced. In its First Amended Complaint, it has not connected its Treaty claim to any traditional equitable action. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). And any equitable cause of action to enforce its navigability provision would be displaced by the Rivers and Harbors Act.

Since the Supremacy Clause does not furnish a standalone cause of action, the United States has never identified a traditional action in equity that could cover this dispute, and the Treaty does not contain an express right to seek relief, Plaintiff's only recourse would be to argue that the Treaty implies a cause of action. However, as a general matter, treaties do not create implied causes of action. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989). "It is not enough for the plaintiffs to show that their claim is dependent upon a treaty" to create a right of action arising under that treaty. *Huckins v. Duval Cnty., Fla.*, 286 F.2d 46, 49 (5th Cir. 1960).

Specifically, courts within and beyond the Fifth Circuit have been unwilling to find an

9

implied cause of action in the Treaty. *See Ysleta Del Sur Pueblo v. City of El Paso*, 433 F. Supp. 3d 1020, 1027 (W.D. Tex. 2020), *aff'd*, No. 20-50313, 2021 WL 5504744 (5th Cir. Nov. 23, 2021) ("The Fifth Circuit and other courts have consistently held that the Treaty of Guadalupe Hidalgo does not provide for a private action"); *Vigil v. Hughes*, 509 Fed. Appx. 796, 798 (10th Cir. 2013) (upholding district court ruling that Treaty of Guadalupe Hidalgo did not create an independent federal question about land title); *Garcia v. Purdy*, No. 13-cv-234, 2014 WL 12796880, at *12–*13 (D.N.M. March 11, 2014) (same); *Nino v. United States*, No. 13-cv-469, 2014 WL 1028575, at *6–*7 (S.D. Cal. March 13, 2014) (accepting United States' argument that there is no implied private right of action under the Treaty). That precedent addresses private parties who asserted claims under the Treaty, but because the federal government "is not exempt from the rules applicable to ordinary suitors," John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 (1905), Plaintiff's sovereign status does not create a cause of action unavailable to private plaintiffs.

The Treaty does not imply a cause of action, the Supremacy Clause on its own cannot supply one, and Plaintiff never identifies any established equity action it can employ here—so even aside from self-execution, Plaintiff lacks a cause of action for the treaty claim it has asserted.

\*   \*   \*

The lack of any claim by the United States against Texas under either the Rivers and Harbors Act or the Treaty does not mean that States have carte blanche to place obstacles in navigable waters. In such an event, Congress could act to make any particular obstruction unlawful, *see, e.g., Newport & C. Bridge Co. v. U. S.*, 105 U.S. 470, 479–81 (1881) (finding that Congress may resolve that a particular bridge was an unlawful obstruction to free navigation), or amend the Rivers and Harbors Act to explicitly apply to States.

## CONCLUSION

The Treaty's Article VII is not enforceable in this Court, and Plaintiff's claim for its violation should be dismissed.

Case 1:23-cv-00853-DAE   Document 105   Filed 03/26/24   Page 16 of 16

Date: March 26, 2024

KEN PAXTON
Attorney General of the State of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Respectfully submitted,

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Tex. State Bar No. 24125371
jacob.przada@oag.texas.gov

KYLE S. TEBO
Assistant Attorney General
Tex. State Bar No. 24137691
kyle.tebo@oag.texas.gov

**Counsel for Defendants**

## Certificate of Service

On March 26, 2024, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS