United States District Court
Western District of Texas
Austin Division

| | |
|---|---|
| United States of America,<br><br>  *Plaintiff*,<br><br>    v.<br><br>Greg Abbott, in his capacity as Governor of the State of Texas, and the State of Texas,<br><br>  *Defendants*. | No. 1:23-cv-00853-DAE |

## DEFENDANTS' RESPONSE TO PLAINTIFF UNITED STATES' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff cites as supplemental authority the Fifth Circuit's recent decision denying a motion to stay pending appeal this Court's order preliminarily enjoining the enforcement of S.B. 4. According to Plaintiff, the Fifth Circuit's stay opinion demonstrates that it has an equitable cause of action to enforce the 1848 Treaty of Guadalupe Hidalgo against Texas. ECF No. 107. The Fifth Circuit's decision is irrelevant for at least three reasons.

*First*, the Supreme Court has already explained that a litigant seeking to press a claim under a treaty absent implementing legislation must show two things: (1) that the treaty is self-executing, and (2) that the plaintiff has a cause of action:

> Only if the treaty contains stipulations which are self-executing, that is, require no legislation to make them operate, will they have the force and effect of a legislative enactment. … *Even when treaties are self-executing* in the sense that they create federal law, *the background presumption is that international agreements*, even those directly benefiting private persons, *generally do not create private rights or provide for a private cause of action in domestic courts*.

*Medellín v. Texas*, 552 U.S. 491, 505–06 n.3 (2008) (cleaned up) (emphasis added). The Fifth Circuit did not purport to overrule *Medellín*, nor could it do so. Instead, the Fifth Circuit addressed the fundamentally different question of how to litigate alleged statutory preemption. As Texas has explained elsewhere, the Fifth Circuit's preliminary view in the S.B. 4 litigation that the United

States may assert some undefined cause of action in equity is mistaken even in that specific context. But there is no basis in law or logic to extend that analysis far outside of its context, especially when doing so would run headlong into *Medellín's* holding that there is a "presumption" against non-statutory causes of action to enforce international agreements.

*Second*, the S.B. 4 litigation involves a putative equitable cause of action to assert preemption *where no explicit alternative remedy displaces any alleged equitable cause of action*. The Fifth Circuit thus found the United States could press its non-statutory challenge to S.B. 4 because "Texas cite[d] to no constitutional or statutory provision that expressly or impliedly displaces an action arising in equity." ECF No. 107 at 13.[1] This case, however, involves at least two remedies that would plainly displace any putative equitable cause of action: (1) the International Boundary and Water Commission's exclusive jurisdiction over disputes under the Treaty, *see* ECF No. 105 at 9–11 (discussing why this shows non-self-execution); and (2) the specific enforcement scheme created by the Rivers and Harbors Act over obstructions in navigable waters, *id*. at 14.

Even if the Treaty were self-executing, either of those specified remedies would displace any equitable cause of action. As "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), the Rivers and Harbors Act addressing the same conduct as Plaintiff maintains is governed by the Treaty[2] is dispositive and in no way contradicted by the Fifth Circuit's ruling. It would be "anomalous to impute … a judicially implied cause of action beyond the bounds [Congress has]

---

[1]   References to pagination for documents filed on this Court's electronic docket are to the stamped page numbers in the header of those filings.

[2]   To the extent there is a conflict between the relative scopes of the Treaty and the Rivers and Harbors Act—including whether any equitable cause of action to enforce the former has been displaced by the latter—the Rivers and Harbors Act governs because it was adopted later in time. *See Breard v. Greene*, 523 U.S. 371, 376 (1998) ("an Act of Congress … is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.") (quoting *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion) and citing *Whitney v. Robertson*, 124 U.S. 190, 194 (1888)).

delineated for [a] comparable express caus[e] of action." *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020) (finding limits of action under Section 1983 weighs against finding implied *Bivens* remedy) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 (1975)). And the IBWC's exclusive jurisdiction and diplomatic remedy necessarily means that any remedy outside that exclusive process is displaced.

*Third*, even apart from ordinary principles of displacement, there is special reason here to conclude that any putative equitable cause of action has been displaced. The Rivers and Harbors Act—unlike the Treaty—was enacted with the consent of the House of Representatives through the process of bicameralism and presentment. *See* 33 U.S.C. § 401 *et seq*. Congress—not the President and the Senate—may regulate the "channels of interstate commerce," such as navigable waterways. *United States v. Morrison*, 529 U.S. 598, 609 (2000). Plaintiff "cannot, by invoking [the court's] equitable powers, circumvent *Congress's*" chosen enforcement remedies. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) (emphasis added); *see also NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 893 (7th Cir. 1990) (Posner, J.) ("The principles of equitable jurisprudence are not suspended merely because a government agency is the plaintiff.") (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) and *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542–45 (1987)).

Indeed, if this Court were to find that the Plaintiff has an equitable cause of action to enforce the Treaty's navigability provisions, it would be granting the Executive Branch a power that the Constitution gives to Congress. *See, e.g., United States v. Postal*, 589 F.2d 862, 877 (5th Cir. 1979) ("A treaty cannot be self-executing … to the extent that it involves governmental action that under the Constitution can be taken only by the Congress."); *Rest. (Third) of Foreign Relations Law of the United States* § 111 cmt. I (1987) ("An international agreement cannot take effect as domestic law without implementation by Congress if the agreement would achieve what lies within the exclusive law-making power of Congress under the Constitution."); Curtis A. Bradley, *The Treaty Power and American Federalism, Part II*, 99 Mich. L. Rev. 98, 133 n.17 (2000) ("If separation of powers limitations apply to the treaty power, they prevent treaties from making certain domestic changes

(such as the creation of domestic criminal law or the appropriation of money) without the involvement of the House of Representatives.") (citing *Hopson v. Kreps*, 622 F.2d 1375, 1380 (9th Cir. 1980) and *The Over the Top*, 5 F.2d 838, 845 (D. Conn. 1925)); Lori Fisler Damrosch, *The Role of the United States Senate Concerning "Self-Executing" and "Non-Self-Executing" Treaties*, 67 Chi.-Kent L. Rev. 515, 528 (1991) (noting "the widespread view that at least a few subjects do require the participation of the House" rather than through treaties directly). Although these considerations counsel against finding a treaty provision self-executing (as Defendants have elsewhere explained),[3] they also independently demonstrate the impropriety of any equitable cause of action for the Executive Branch to enforce a treaty absent a cause of action created by Congress.

In short, Congress has the power to regulate interstate commerce, and Plaintiff is wrong to assert authority Congress has not provided it: "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Sandoval*, 532 U.S. at 291. With courts "[h]aving sworn off the habit of venturing beyond Congress's intent" to infer the existence of a cause of action, this Court should "not accept [Plaintiff's] invitation to have one last drink," *id.* at 287, and become the first tribunal to find that an executive agency has an equitable cause of action to enforce a treaty domestically.

In the 175-year history of the Treaty, Plaintiff has never sought to enforce it through an equitable cause of action—indeed, Plaintiff has never cited a single case where a court has found an equitable cause of action for the United States to enforce a treaty domestically. After all, "[a] non-self-executing treaty, by definition, is one that was ratified with the understanding that it is not

---

[3] It is unclear if Plaintiff has now disclaimed the theory that it could have an equitable cause of action to somehow enforce even a non-self-executing treaty provision. *See* ECF No. 104 at 16 n. 31 (Plaintiff noting "the separate issues of whether a treaty provision is self-executing *and, if so*, whether a particular party may sue to enforce it") (emphasis added). But if the Court finds Article VII of the Treaty to be non-self-executing, it need not address the issue of whether Plaintiff has an equitable cause of action—because a cause of action to enforce a provision that was not binding domestically would be fruitless. Needless to say, if the Court were to find that the United States had an equitable cause of action to enforce a non-self-executing treaty provision, it would even more fundamentally erase the prerogatives of Congress that the doctrine of non-self-execution serves to protect.

to have domestic effect of its own force. That understanding precludes the assertion that Congress has implicitly authorized the President—acting on his own—to achieve precisely the same result" *Medellín*, 552 U.S. at 526–27. The Court should dismiss the Treaty claim.

| | |
|---|---|
| Date: April 7, 2024 | Respectfully submitted, |
| | |
| KEN PAXTON | /s/ Ryan D. Walters |
| Attorney General of the State of Texas | RYAN D. WALTERS |
| | Chief, Special Litigation Division |
| BRENT WEBSTER | Tex. State Bar No. 24105085 |
| First Assistant Attorney General | ryan.walters@oag.texas.gov |
| | |
| RALPH MOLINA | DAVID BRYANT |
| Deputy Attorney General for Legal Strategy | Special Counsel |
| | Tex. State Bar No. 03281500 |
| Office of the Attorney General | david.bryant@oag.texas.gov |
| P. O. Box 12548, MC-009 | |
| Austin, TX 78711-2548 | MUNERA AL-FUHAID |
| (512) 936-2172 | Special Counsel |
| | Tex. State Bar No. 24094501 |
| | munera.al-fuhaid@oag.texas.gov |
| | |
| | JACOB E. PRZADA |
| | Special Counsel |
| | Tex. State Bar No. 24125371 |
| | jacob.przada@oag.texas.gov |
| | |
| | KYLE S. TEBO |
| | Assistant Attorney General |
| | Tex. State Bar No. 24137691 |
| | kyle.tebo@oag.texas.gov |
| | |
| | **Counsel for Defendants** |

**Certificate of Service**

On April 7, 2024, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

/s/ Ryan D. Walters
RYAN D. WALTERS