UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA,            §       No. 1:23-CV-853-DAE
                                     §
            Plaintiff,               §
                                     §
vs.                                  §
                                     §
GREG ABBOTT, in his capacity as      §
Governor of the State of Texas, and  §
THE STATE OF TEXAS,                  §
                                     §
            Defendants.              §

_____

<u>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS</u>

            Before the Court is a Motion to Dismiss Plaintiff's Amended

Complaint[1] ("Motion"), filed on December 6, 2023, by Greg Abbott, in his official

capacity as Governor of the State of Texas, and the State of Texas

(collectively, "Defendants" or "Texas").  (Dkt. # 62.)  The United States of

America ("Plaintiff" or "United States") filed its Response in Opposition to the

Motion on December 20, 2023.  (Dkt. # 63.)  Texas filed its Reply on January 10,

2024.  (Dkt. # 65.)

_____

[1] The United States filed its Amended Complaint on October 23, 2023.
(Dkt. # 60.)

1

The Court had a hearing on this matter on March 19, 2024. (Dkt. # 100.)  On March 26, 2024, Plaintiff filed a Supplemental Memorandum in Response to the Motion to Dismiss.  (Dkt. # 104.)  Defendants filed a Supplemental Memorandum in support of the Motion to Dismiss on the same day. (Dkt. # 105.)  On March 27, 2024, Plaintiff filed a Notice of Supplemental Authority.  (Dkt. # 107.)  Defendants replied to this Notice on April 7, 2024. (Dkt. # 108.)

Having considered the parties' arguments, the evidence presented, the oral advocacy, and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** Texas's Motion to Dismiss for the reasons that follow.

<u>BACKGROUND</u>

At the heart of this case is Texas's construction of a buoy barrier system across a roughly 1,000-foot stretch of the Rio Grande River near Eagle Pass, Texas.  On approximately July 10, 2023, without any federal authorization, Texas, at Governor Abbott's directive, began installing the barrier system in a portion of the Rio Grande approximately two miles south of the Camino Real International Bridge in Eagle Pass, Texas.  (Dkt. # 60 at ¶¶ 24–30.)  The completed buoy barrier is a floating barrier comprised of about 1,000 feet of four to six-foot spherical orange buoys with "associated infrastructure designed to anchor or fix it in place in the Rio Grande."  (<u>Id.</u>)

2

On July 24, 2023, the United States filed suit against Greg Abbott, in his official capacity as Governor of the State of Texas, and the State of Texas under Sections 12 and 17 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 406 and 413 ("RHA") for violating Section 10 of the RHA, 33 U.S.C. § 403.  (Dkt. # 1.)  On July 26, 2023, the United States filed a Motion for a Preliminary Injunction, asking this Court to enjoin Texas from further constructing or maintaining structures or obstructions in the navigable waters of the United States, except in compliance with the RHA and other applicable law. (Dkt. # 5 at ¶ 35.)  The United States also asked the Court to compel Texas to remove all extant structures and obstructions in the Rio Grande River at Texas's own expense.  (Dkt. # 5.)

On August 22, 2023, the Court held a hearing on the Preliminary Injunction Motion.  The Court granted the Motion in part on September 6, 2023, requiring Texas to move the buoy barrier to the bank of the Rio Grande River.[2] (Dkt. # 50.)  The same day, Texas appealed this Court's grant of the preliminary injunction to the Fifth Circuit.  (Dkt. # 51.)  The Fifth Circuit granted Texas's request for a stay of the preliminary injunction pending appeal.  (Dkt. # 53.)  On

---

[2] This Court was aware Texas intended to appeal this Court's order and did not wish to cause taxpayers the expense of removing the barrier from the river entirely only to pay to reinstall the barrier if the Court's order was reversed or stayed.

December 1, 2023, the Fifth Circuit affirmed this Court's preliminary injunction order.  United States of America v. Abbott, 23-50632, Dkt. # 98 (Dec. 1, 2023). The Court did not order immediate enforcement with its affirmed order, for the same reason previously cited.  On December 4, 2023, Texas petitioned for the preliminary injunction decision to be heard by the Fifth Circuit en banc. Id., Dkt. # 105.  The Fifth Circuit vacated the Panel opinion and granted the en banc petition on January 17, 2024.  Id., Dkts. # 115, 117.  The en banc hearing before the Fifth Circuit is set for May 2024.  Id., Dkt. # 119.

        While Texas pursued its appeal of this Court's preliminary injunction order, the United States filed an Amended Complaint, reasserting its original claim under the RHA and adding a claim under Article VII of the 1848 Treaty of Guadalupe Hidalgo ("Treaty").  (Dkt. # 60.)  Texas filed its Motion to Dismiss the Amended Complaint on December 6, 2023.  (Dkt. # 62.) Texas alleges that Section 12 of the RHA makes it clear the statute authorizes actions only against persons and corporations, not against sovereign states or their officials.  (Id. at 7.)  Texas also argues that the United States fails to adequately plead that the stretch of the Rio Grande River impacted by the buoy barrier is "navigable" or that the barrier is an "obstruction" or "structure" covered by Section 10 of the RHA.  (Id.)  As a result, Texas argues the United States' claim under the RHA should be dismissed.

4

Texas also asserts that the United States' Treaty claim fails because the Treaty (1) is not self-executing and cannot be enforced as domestic law, (2) provides no cause of action against the State, and (3) does not preempt Texas's deployment of the buoy barrier.  (Id.)

Texas therefore argues that this Court should dismiss all the United States' claims.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), courts should dismiss counts when a party fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss.  See Twombly, 550 U.S. at 555–56.  In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action.  See id. at 556–57.  "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions,"

and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

Review of a 12(b)(6) motion is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he [C]ourt accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).

## DISCUSSION

The Court first addresses Texas's arguments against the United States' Rivers and Harbors Act ("RHA") claims.  The Court then addresses Texas's arguments to dismiss the United States' 1848 Treaty of Guadalupe Hidalgo ("Treaty") claim.

## I.      RHA Claim

Texas alleges that Section 12 of the RHA authorizes actions only against persons and corporations, not against sovereign states or their officials. (Dkt. # 62 at 7.)  Texas also argues that the United States fails to adequately plead that the stretch of the Rio Grande River impacted by the buoy barrier is "navigable" or that the barrier is an "obstruction" or "structure" covered by Section 10 of the RHA.  (Id.)  Texas asserts the United States' claim under the RHA should be dismissed on these grounds.

### A.      Section 12 of the RHA is Enforceable Against States

Texas argues the RHA authorizes actions only against "persons" and "corporations," not against sovereign states like Texas or its officials.  (Dkt. # 62 at 2.)  Section 12's first sentence authorizes criminal penalties against "persons" and "corporations."  33 U.S.C. § 406.

> Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court.

Id.  Section 12's second sentence authorizes the removal of any structures erected in violation of the RHA, including by injunction.  Id.

7

> And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

Id. Texas asserts that the second sentence is cabined by the "persons" and "corporations" language of the first. (Dkt. # 62 at 3.) According to Texas, the words "And further" in the second sentence show that the injunctive relief authorized by the second sentence is merely "[a]ncillary to [the] criminal penalties" authorized in the first sentence. (Id. at 2–3.) Under this understanding, Texas asserts that United States may only seek injunctive relief against persons and corporations subject to criminal penalties under the RHA. This reading leaves no room for a civil suit against a state under the RHA.

Contrary to Texas's position, the Supreme Court has historically read the RHA to allow civil suits against states. In United States v. Arizona, the Court considered whether Section 12 cabins the availability of injunctive relief for Section 9 violations to actions against persons and corporations. 295 U.S. 174, 183–84 (1935). The Court found that the RHA's provisions "unmistakably disclose definite intention on the part of Congress effectively to safeguard rivers and other navigable waters against the unauthorized erection therein of dams or other structures for any purpose whatsoever." Id. at 184. Section 12's language therefore does not restrict the rest of the RHA to "apply only to work undertaken

8

by private parties."  Id.  The Court reasoned that "no such intention is expressed, and we are of opinion that none is implied."  Id.

Texas fails to explain why Section 12 constrains enforcement for violations of Section 10 but not violations under Section 9.  Section 9 prohibits the construction of any bridge, causeway, dam, or dike over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States without congressional approval.  33 U.S.C. § 401.  Section 10 similarly prohibits obstructions in navigable waterways of the United States.  33 U.S.C. § 403.  Under Arizona's reasoning, Section 12's second sentence would not limit injunctive relief for Section 10 violations to actions against persons and corporations because it does not limit the relief for the exceedingly similar Section 9 violations.

Texas argues that the Arizona Court's statement about the RHA's applicability to the States was dicta.  (Dkt. # 65 at 9.)  Texas argues this Court should instead apply the clear statement rule to look "for a clear statement of what the [statute] *includes*, not a clear statement of what it *excludes*." Raygor v. Regents of Univ. of Minn., 534 U.S. 533, 546 (2002) (emphases in original).  Texas argues the language of the RHA does not specifically mention application to the States, so liability cannot apply to the States.  (Dkt. # 65 at 7–9.)

Texas's argument ignores decades of precedent.  In Sanitary District of Chicago v. United States, the United States sued a state agency under the RHA

9

for diverting water from Lake Michigan without authorization from the federal government.  266 U.S. 405, 424 (1925).  The Court affirmed an injunction against the state agency in this civil action, which was filed under the authority of Section 12's second sentence.  Id. at 426, 432 ("The main ground is the authority of the United States to remove obstructions to interstate and foreign commerce. There is no question that this power is superior to that of the States to provide for the welfare or necessities of their inhabitants.")  As the Court reaffirmed ten years later in Arizona, the measures adopted in the RHA "purport to be applicable to all." 295 U.S. at 183–84.  This Court agrees that "[n]o valid reason has been or can be suggested why [these measures] should apply to private persons and not to federal and state officers."  Id.

Rather, this Court finds that Texas's novel interpretation of the RHA would improperly transform Section 10 and make it unenforceable against those most likely to construct the structures for which the RHA requires congressional authorization.  (Dkt. # 63 at 7.)  Injunctive relief under Section 10 has not traditionally been understood to be "ancillary" to criminal proceedings, and to change the understanding now would cut against decades of case law.  See Potomac River Ass'n, Inc. v. Lundeberg Maryland Seamanship Sch., Inc., 402 F. Supp. 344, 357 (D. Md. 1975) (noting the U.S. "has the authority to initiate criminal proceedings resulting in fines or imprisonment and may sue civilly for

removal of structures"); <u>see also</u>, <u>United States v. Kane</u>, 461 F. Supp. 554, 555 (E.D.N.Y. 1978) (granting injunctive relief under Section 12 in a civil action alleging violation of Section 10); <u>United States v. Bd. of Trustees of Florida Keys Cmty. College</u>, 531 F. Supp. 267, 269 (S.D. Fla. 1981) (same).  And Texas's own actions contradict its new understanding of the RHA.  Texas's Department of Transportation has recently applied to the Army Corps of Engineers ("Corps") multiple times for RHA Section 10 permits.  (Dkt. # 63 at 7, n. 2.)

Further, a contrary reading would leave each state the right, without authority or restriction, to put articles in navigable waters of the United States, even to the significant detriment to navigation.  When the RHA was adopted, much of this nation's commerce was conducted by river.  It cannot have been Congress's intent to exempt states from the RHA and allow them to place barriers in navigable waterways without recourse at a time when shipping was so important to the national economy.  Texas has not cited a single case to this Court indicating otherwise.

> **B.**   **<u>The United States Sufficiently Pleads the Stretch of the Rio Grande River Impacted by the Buoy Barrier is Navigable</u>**

The United States only needs to plead enough facts that the claim is plausible on its face to survive a 12(b)(6) Motion to Dismiss.  <u>Ashcroft</u>, 556 U.S. at 678.  The Court construes all well-pleaded facts as true and views them in the light most favorable to the plaintiff.  <u>In re Katrina</u>, 495 F.3d at 205 (quoting <u>Martin K.</u>

Eby Constr. Co., 369 F.3d at 464).  The United States sufficiently pleads that the stretch of the Rio Grande River near Eagle Pass, Texas impacted by the buoy barrier is a navigable water of the United States.[3]

First, Texas alleges the United States fails to "even identify" the part of the river impacted by the buoy barrier.  (Dkt. # 62 at 7.)  The United States identifies the relevant stretch as the "Rio Grande [River] in the vicinity of Eagle Pass, Texas."  (Dkt. # 60 at 2.)  The United States further specifies its focus is on the portion of the Rio Grande River in which "the unauthorized structures and obstruction exist."  (Id.)  Viewing the facts provided in the light most favorable to the plaintiff, the United States has identified which part of the river it alleges is navigable and has had its navigability impaired by the buoy barrier.

To obstruct the "navigable capacity of any of the waters of the United States," the stretch of the Rio Grande River near Eagle Pass identified by the United States must be navigable.  33 U.S.C. § 403.  Navigability is a factual

---

[3] The parties here focus their attention on whether the stretch of the river impacted by the barrier is navigable.  The Court notes that a barrier in an unnavigable stretch of a water may nevertheless be an obstruction of a navigable water if it impacts the navigable capacity of a downstream water area that is navigable.  See, e.g., United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 708 (1899) (remanding for determination of whether proposed construction of a dam in an unnavigable portion of the Rio Grande River [near New Mexico] would impact the navigability of a navigable portion of Rio Grande River).

question.  United States v. Appalachian Elec. Power Co., 311 U.S. 377, 405

(1940).  The Code of Federal Regulations provides that:

> Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commence. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.[4]

33 C.F.R. § 329.4.  Whether a watercourse is navigable at any "particular place"

must ultimately be "determined by evidence."  United States v. Rio Grande Dam &

Irrigation Co., 184 U.S. 690, 698 (1899).  Again, navigability turns on evidence—

geological reports, reports of engineers and the Secretary of War, histories, and

other sources of information—rather than on speculation.  See id., 184 U.S. at 694

(listing evidence relied upon by trial court in forming navigability determination).

Navigability may be established based on evidence of a water's

historic use *or its susceptibility to future use* if reasonable improvements were

made to the river to facilitate commerce.  See, e.g., Appalachian Elec., 311 U.S. at

407–09.  A waterway's use or potential use in interstate or foreign commerce bears

on its navigability for purposes of the RHA because "the source of the power of the

general government" to control navigable waters "arises out of its power to

---

[4] This definition applies to the authority of the Army Corps of Engineers with respect to the RHA.  See Appalachian Elec., 311 U.S. at 405.

regulate commerce with foreign countries and among the States."  Leovy v. United States, 177 U.S. 621, 633 (1900); see also Rio Grande Dam, 174 U.S. at 703 ("[I]n other words, the jurisdiction of the general government over interstate commerce and its natural highways vests in that government the right to take all needed measures to preserve the navigability of the navigable water course of the country, even against any state action.").

The United States, rather than merely stating the stretch of the Rio Grande River at issue is navigable without pleading more, alleges that the river is navigable because two separate federal agencies, the Coast Guard and the Army Corps of Engineers, have determined the stretch here is navigable.  (Dkt. # 60 at 5.) The United States cites these determinations and attaches them to its Amended Complaint.  The Court may properly consider the contents of the Amended Complaint in ruling on this Motion, including attachments to the Amended Complaint.  See Wolcott v. Sebelius, 635 F.3d 757, 762– 63 (5th Cir. 2011).  The determinations of both agencies support the United States' claim that the stretch of the Rio Grande River in dispute here is navigable.

Texas argues that the Coast Guard's navigability determination cited by the United States represents only the Coast Guard's opinion about the extent of its own jurisdiction.  (Dkt. # 65 at 10.)  This argument does nothing to undermine the value of this evidence: a federal agency charged by Congress with the authority

14

to determine navigable waters of the United States concluded that the Rio Grande River is a navigable waterway.  The agency did so well before this lawsuit was filed and as part of its statutory responsibility, not as an advocate for the United States in this case.  The United States pleads the stretch of the Rio Grande River at issue here is historically navigable with respect to international treaties and is subject to Coast Guard regulation.  (Dkt. # 60-2 at 1.)  That this stretch of the river is subject to international treaties and regulation by federal agencies concerned with commerce and navigation only underscores the sufficiency of the United States' pleading at this early stage.

The United States also attaches as evidence a December 20, 2011, Corp Report listing the Navigable Waters of the United States within the State of Texas as determined pursuant to Section 10 of the RHA.  (Dkt. # 60-1.)  This report establishes the Rio Grande River is navigable from "the Zapata-Webb County line upstream to the point of intersection of the Texas-New Mexico state line and Mexico."  (Id.)  That a federal agency found the river navigable supports the United States' claim that the stretch here is navigable under the RHA.

Congress itself, contemporaneous with the RHA's enactment, also acknowledged the navigability of the Rio Grande River near Eagle Pass.  In a statutory precursor to the 1899 RHA, Congress "authorize[d] the construction of a bridge over the Rio Grande River between the cities of Eagle Pass, Texas, and

15

Piedras Negras, Mexico" that required "free navigation of said river" to be

maintained and gave federal courts jurisdiction over cases "arising from an

obstruction or an alleged obstruction to the free navigation thereof."

23 Stat. 29 § 3 (1884); 23 Stat. 30 (1884); see also 42 Stat. 1482 (1923)

(authorizing construction of bridge between Eagle Pass and Piedras Negras "at a

point suitable to the interests of navigation across the Rio Grande").  A pair of

1890 statutes authorizing other commercial projects—electric wires and water

pipes—in the same area confirms Congress's interest in preserving the navigability

of this region of the Rio Grande River by providing redress in federal district court

should the construction of the electrical wires or piping "substantially or materially

obstruct[ ]" the "free navigation" of the Rio Grande River.  26 Stat. 495 (1890);

26 Stat. 502 (1890).  Congressional treatment of the Rio Grande River as navigable

underscores its navigability.[5]

Once a water is found to be navigable by Congress, it remains so until

Congress, not the courts, declares otherwise.  Econ. Power & Light v. United

States, 256 U.S. 113, 124 (1921) (if historically navigable waters "are to be

---

[5] Court cases from this period also establish historical navigability of the Rio
Grande River and discuss ferry companies operating between Eagle Pass and
Piedras Negras, transporting cotton, for instance.  See U.S. v. Weil, 35 Ct. Cl. 42,
77 (1900) ("At Eagle Pass there were ferryboats in which the cotton was crossed
over."); Tugwell v. Eagle Pass Ferry Co., 74 Tex. 480, 9 S.W. 120 (1888)
(resolving dispute between ferry companies operating between Eagle Pass and
Piedras Negras).

abandoned" due to changes in use or economic need, "it is for Congress, not the courts, so to declare"); Appalachian Elec., 311 U.S. at 408 ("When once found to be navigable, a water remains so."). While Congress has enacted "non-navigability" declarations for several waters, it has not done so for the Rio Grande River. See 311 U.S. 377, 408; 33 U.S.C. §§ 21-59. Congress could have and has not revoked the Rio Grande River's designation as a navigable waterway of the United States. This Court would have to either ignore or twist beyond recognition Supreme Court precedent to find the third longest river in the United States, in the impacted section, unnavigable. This Court will not engage in result-oriented jurisprudence.

The United States also incorporated in its Amended Complaint a verified photograph depicting a boat navigating the relevant portion of the Rio Grande River. (Dkt. # 60-4, Exhibit 1 at 3.) The Court may properly consider attachments to the Amended Complaint, including photographs. See Soar Tools, LLC v. Mesquite Oil Tools, Inc., No. 5:19-CV-243-H, 2020 WL 5500238, at *7 (N.D. Tex. Sept. 11, 2020) (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 499 (5th Cir. 2000) (finding a court can consider a photograph attached to a complaint in ruling on a motion to dismiss if the photo is referred to in the complaint and central to the complaint.) Texas argues attaching this photograph is not enough to allege the segment of the river is navigable. (Dkt. # 65 at 10.) In

17

doing so, Texas ignores the photograph's depiction of the Rio Grande River's susceptibility to future use in commerce.

Again, navigability may be shown based on evidence of a water's historic use *or its susceptibility to future use* if reasonable improvements were made to the river to facilitate commerce.  See, e.g., Appalachian Elec., 311 U.S. at 407–09.  It is not "necessary that the improvements should be actually completed or even authorized"; the RHA merely requires that the waterway is capable of future use with reasonable improvement.  Appalachian Elec., 311 U.S. at 408. Because "[i]mprovements in the methods of water transportation … may restore the usefulness" of a formerly navigated waterway, courts must recognize the ongoing power of the federal government to regulate it under the RHA, despite its modern disuse.  Econ. Power & Light, 256 U.S. at 124.  And "[s]mall traffic compared to the available commerce of the region is sufficient."  Appalachian Elec., 311 U.S. at 409.

Viewing the photograph in the light most favorable to Plaintiff, a boat navigating this stretch of the river shows the stretch is susceptible of use in interstate or international commerce.  The United States at this stage of litigation need not prove navigability with certainty.  The United States must sufficiently plead that navigability is plausible.  The photograph, contrary to Texas's statement

otherwise, bolsters the plausibility of the United States' allegation that the stretch of the Rio Grande River is navigable under the RHA.

### C.   The United States Sufficiently Pleads the Buoy Barrier is an "Obstruction" or "Structure" Under Section 10 of the RHA

Section 10 of the RHA bars the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  The parties do not dispute that the buoy barrier was placed without congressional authorization.  The United States sufficiently pleads the buoy barrier interferes with or diminishes the navigable capacity of the Rio Grande River and creates a hazard.  This is enough to plead a claim for relief under the RHA.

Texas argues the buoy barrier is not an obstruction or structure to which Section 10 applies.  (Dkt. # 62 at 7.)  While the Court is not bound by its reading of Section 10 adopted in the preliminary injunction order, Texas has not presented any added arguments or facts as to why the Court should change its reading.  The Court therefore finds its original reading of Section 10 valid.  The buoy barrier is an "obstruction" or "structure" to which Section 10 applies.

Texas then argues the United States' allegations that the buoy system is a prohibited obstruction or structure are mere conclusions.  (Dkt. # 65 at 10.) Texas states the United States "provides no facts" either (1) "connecting the buoys to the list of prohibited structures [under the RHA]" or (2) "alleging [the buoys]

19

interfere with commercial navigation along the length of the relevant segment of the Rio Grande." (Id.)

### 1.    The United States Sufficiently Pleads the Buoy Barrier is Plausibly a Structure under the RHA

The RHA defines structures as "any pier, boat dock, boat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, *or any other obstacle or obstruction*." 33 C.F.R. § 322.2(b) (emphasis added). In its Amended Complaint, the United States alleges the buoy barrier "consists of a string of buoys each of which is between 4 and 6 feet in diameter." (Dkt. # 60 at 6.) The "string of buoys may stretch for at least 1,000 feet." (Id.) The barrier further "appears to include associated infrastructure designed to anchor or fix it in place in the Rio Grande." (Id.) The Amended Complaint also alleges the Governor of Texas described the buoy barrier as a "floating marine barrier" that is "deployed in the Rio Grande River…." (Id. at 7.) The United States asserts these facts reflect the buoy barrier "as constructed [and] installed … constitutes a 'structure' within the meaning of [the] RHA…." and is "an obstruction to the navigable capacity of the Rio Grande." (Id. at 8.)

The United States does more than assert a mere legal conclusion that the buoy barrier is a structure or obstruction. The United States describes the

barrier's structure and placement, sufficiently pleading facts to support its claim

that the buoy barrier is a structure.  Viewing the well-pleaded facts in the light

most favorable to Plaintiff, a 1,000-foot barrier of large buoys connected to

infrastructure designed to anchor or fix it in place in the river, even if only

temporarily, is plausibly a structure under the RHA.  For example, near the time

when the RHA was enacted, the dictionary definition of a boom was "[a] strong

chain cable, or line of spars bound together, extended across a river or the mouth of

a harbor, to obstruct navigation or passage" or "[a] line of connected floating

timbers stretched across a river, or enclosing an area of water, to keep saw logs,

etc., from floating away."  Boom, Webster's Revised Unabridged Dictionary

(1913).[6]  The barrier as described by the United States in its Amended Complaint

could be a boom or another structure under the RHA.[7]  The United States has done

---

[6] In ruling on a motion to dismiss, the Court may consider "matters on which the court may take judicial notice."  Wolcott, 635 F.3d at 763 (citations omitted). Courts regularly and properly take judicial notice of dictionary definitions of terms.  See e.g., D.C. v. Heller, 554 U.S. 570, 584 (2008) (referencing three historical dictionaries to clarify the traditional meaning of "bear" arms at the time of the writing of the Second Amendment.)

[7] At this stage, the Court does not have to determine whether the buoy barrier is a boom or other structure under the RHA.  At trial, production of evidence and expert testimony could demonstrate the buoy barrier is a boom, other structure, or no structure.  All the Court finds at this stage is that the United States has pled facts sufficient to illustrate a plausible claim of relief under the RHA.

more than state a legal conclusion.  It has asserted well-pled facts to establish the buoy barrier is a plausible obstruction.

**2.      The United States Sufficiently Pleads the Buoy Barrier Obstructs the Rio Grande River**

To survive the 12(b)(6) Motion to Dismiss, the United States must have sufficiently pled that the buoy barrier obstructs, i.e. interferes with, or diminishes, the navigability of the Rio Grande River at Eagle Pass.  Rio Grande Dam, 174 U.S. at 709 (finding it is "a question of fact" whether something in a waterway "directly tends to obstruct (that is, interfere with or diminish) the navigable capacity of a stream.").  The United States easily meets this burden.

The Court may rely on attachments to the Amended Complaint and "documents incorporated into the complaint by reference" in ruling on a 12(b)(6) Motion to Dismiss.  Wolcott, 635 F.3d at 763.  The United States incorporated by reference an article published by the State of Texas in which the State asserted the purpose of the buoy barrier is to "mak[e] it more difficult to cross the Rio Grande." (Dkt. # 60 at ¶ 25.)  While Texas certainly does not refer to commercial navigation in this publication, a barrier that hinders the navigability of the river for human crossing plausibly inhibits navigation of the waterway by vessels as well.  And commercial navigation across the Rio Grande is not hypothetical—the Rio Grande River has been historically commercially navigable, as discussed at length above.

The United States attached to its Amended Complaint photographs of the buoy barrier that show it obstructs navigation.  (Dkt. # 60-4.)  The Court may properly consider the photograph attachments at this stage.  See Soar Tools, Inc., 2020 WL 5500238 at *7 (N.D. Tex. Sept. 11, 2020).  The photographs show that vessels would have to navigate around the buoy barrier and would be unable to cross through it or over it.  This inherently diminishes the navigability of the waterway.  The photographs show the buoy barrier is stationary, large, and could interfere with the ability of commercial vessels to navigate the Rio Grande River at Eagle Pass.  Because the buoy barrier plausibly threatens the commercial navigability to the Rio Grande River, the United States has sufficiently pled the buoy barrier diminishes the navigable capacity of the Rio Grande River and therefore obstructs it under the RHA.[8]  The Court denies Texas's Motion to Dismiss the RHA claim.

## II.    Article VII of the Treaty of Guadalupe Hidalgo and the "Invasion"

Texas asserts that the construction of the buoy barrier is an exercise of its "territorial rights," and that Article VII of the 1848 Treaty of Guadalupe Hidalgo explicitly does not preempt this right.  (Dkt. # 62 at 19.)  The Treaty

---

[8] It is also undisputed that Border Patrol and Texas Department of Safety boats travel the relevant stretch of the Rio Grande River on a regular basis.  (See, e.g., Dkt. # 60-4.)

reserves the "territorial rights of either republic," not those of a state within a republic.  Treaty of Peace, Friendship, Limits, & Settlement with the Republic of Mexico., 9 Stat. 922, 1848 WL 6374, at *4 (July 4, 1848).  This argument is accordingly not persuasive.

Texas also sees the construction of the barrier as "an inherent constitutional prerogative to protect its territorial sovereignty."  (Dkt. # 62 at 19.)  But if Texas seeks to justify its implementation of the buoy barrier because of an invasion at the border, that argument is foreclosed.  See United States v. State of Texas et al., No. 1:24-cv-008, Dkt. # 42 (Feb. 29, 2024).  To the extent Texas is attempting to assert some other power "to protect its territorial sovereignty … by excluding aliens," there is no basis for such power.

Article I, Section 10 of the U.S. Constitution limits the States' power to undertake certain activities.  U.S. Const. art. 1, § 10.  Clause 3 (the "State War Clause") says in full:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, *unless actually invaded*, or in such *imminent* Danger as *will not admit of delay*.

Id. art. 1, § 10, cl. 3 (emphasis added).

Section 4, (the "Guarantee Clause") provides that the federal government must protect states from invasions:

24

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

Id. art. IV, § 4.

These clauses, taken together, provide that a "state may respond to immediate military threats until 'resources of the federal government can reach the invasion.'" Texas, 1:24-cv-008, Dkt. # 42 at 65 (quoting United States v. Abbott, No. 1:23-CV-853, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023)).  Texas now wants to respond to immigration as a military threat, which is beyond "invasion" as described in the Constitution.  Id. at 67.  And even if this were an invasion as understood by the Founding Fathers, the federal government is already present and actively managing immigration at the border.

A. **The Founding Fathers did not Contemplate Immigration as an Invasion**

The Founding Fathers lived and fought in two major wars: the French and Indian War and the Revolutionary War.  These formidable experiences inform the meaning behind the invasion clause.  James Madison's most vivid childhood memories were of his fears of Indian attacks during the French and Indian War.[9] When the Constitution was enacted, the Founding Fathers conceptualized

---

[9] J.C.A. Stagg, James Madison: Life Before the Presidency, UVA MILLER CENTER, https://millercenter.org/president/madison/life-before-the-presidency (accessed April 10, 2024).

invasions as a part of war, not an "invasion" or "disaster" created by immigrants entering the United States.  The text, structure, and original understanding of the Constitution makes it clear that immigration does not constitute an invasion. Texas, 1:24-cv-008, Dkt. # 42 at 67.  Common usage of the term "invasion" during the late 1700s "predominantly referred to an 'invasion' as a hostile and organized military force, too powerful to be dealt with by ordinary judicial proceedings." Id. at 68.  And the text and structure of the War Clause shows that invasion "was to be used sparingly for temporary, exigent, and dangerous circumstances."  Id.  For instance, the phrase "actually invaded" is a term of art from the late 1700s used to refer specifically to a "military occupation that is ongoing" as opposed to imminent.  Id. at 71 (citing Joshua Treviño, The Meaning of Invasion Under the Compact Clause of the U.S. Constitution, at 6, Tex. Pub. Pol. Foundation (Nov. 2022)).  Indeed, every example of the Founding Fathers using the term "actually invaded" demonstrates our Framers used the term as a "wartime description of military hostilities," never in reference to immigration or "anything less than a coordinated armed hostile foreign power."  Id. at 71–73 (collecting passages by the Founding Fathers).

Looking to the Founding Father's understanding of invasions, the States needed the ability to independently defend themselves when federal resources were unable to reach attacks by foreign powers for many weeks or

months.  The United States now has a significant military presence in Texas, and federal military forces could be at the border within a matter of hours.  In addition, the Texas National Guard is on site and could be activated by the President in the case of a national emergency.  And Border Patrol is already at the border daily.

The State War Powers Clause grants a "narrow and time-constrained response" to the states in the "fact of imminent military emergency."  Texas, 1:24-cv-008, Dkt. # 42 at 74.  "It is not a plausible interpretation [of the State War Powers Clause] that the Framers, in carefully specifying Congress's exclusive duty to wage war and control immigration, intended to grant states the unilateral power to disrupt that balance whenever they disagreed with federal immigration policy."  Id.

And nothing in the "history and tradition of the United States" supports the broad reading of invasion Texas would have this Court adopt.  Id. at 79.  "From the Federalist Papers to ratification debates," there is little evidence to support Texas's understanding.  Id.  "In the Federalist Papers, every relevant invocation of [invasion] speaks in terms of organized, hostile military or naval actions."  Id. at 79–82 (expounding on Jay, Madison, and Hamilton's uses of "invasion," finding not one use of the word to refer to anything resembling immigration.)

Texas's new interpretation of its power to protect itself against alleged invasions goes far beyond the original and natural meaning of "invasion" and incurably exceeds the power granted to the States by our Founding Fathers.

**B.    The Management of Immigration is Committed Solely to the Federal Government**

To accept Texas's argument that immigration at the border constitutes an invasion, this Court would also have to ignore years of Supreme Court precedent that has clearly stated the enforcement and management of immigration laws is the sole province of the federal government, not the States.

Several constitutional provisions assign the federal government—not states—the authority to recognize and respond to invasions.  See U.S. Const. art. I., § 8, cl. 15 (power to call forth militia); art. I, § 9, cl. 2 (power to suspend habeas corpus); art. IV, § 4 (power to protect against invasion).  The Constitution assigns "the immigration and the status of aliens" exclusively to Congress.  Arizona, 567 at 394-95; New Jersey v. United States, 91 F.3d 463, 469 (3d Cir. 1996) (holding that the Naturalization Clause represents "a textually demonstrable constitutional commitment of immigration to the legislative branch"); see also Texas v. United States, 106 F.3d 661, 665 (5th Cir. 1997) (quoting Fiallo v. Bell, 430 U.S. 787, 792 (1977)) ("'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens.").

Texas has the right to defend itself from imminent armed invasions. But, as explained above, this authority to act independently only lasts until resources of the federal government can reach the invasion. Texas may not claim self-defense from an invasion at the border to justify a long-term usurping of congressional authority. Texas must pursue its right and duty to protect the people of Texas through congressionally authorized means or appropriate state action. Texas is a sovereign state, not a sovereign country.

## III.   <u>Treaty Claim</u>

Texas asserts the United States' claim that the buoy barrier violates the 1848 Treaty of Guadalupe Hidalgo fails because the Treaty (1) is not self-executing and cannot be enforced as domestic law, (2) provides no cause of action against the State, and (3) does not preempt Texas's deployment of the buoy barrier. (Dkt. # 62 at 7.)

### A.   <u>The Treaty is Not Self Executing</u>

The United States relies on Article VII of the Treaty of Guadalupe Hidalgo of 1848 to claim the Treaty preempts Texas's actions. (Dkt. # 62 at 15.) Article VII provides:

> The River Gila and the part of the Rio Bravo del Norte lying below the southern boundary of New Mexico, being, agreeably to the fifth article, divided in the middle between the two republics, the navigation of the Gila and the Bravo below said boundary shall be free and common to the vessels and citizens of both countries; and neither shall, without the consent of the other, construct any work that

29

may impede or interrupt, in whole or in part, the exercise of this right; not even for the purpose of favoring new methods of navigation. Nor shall any tax or contribution, under any denomination or title, be levied upon vessels or persons navigating the same or upon merchandise or effects transported thereon, except in the case of landing upon one of their shores. If for the purpose of making the said rivers navigable, or for maintaining in such state, it should be necessary or advantageous to establish any tax or contribution, this shall not be done without the consent of both governments. The stipulations contained in the present article shall not impair the territorial rights of either republic within its established limits.

Treaty of Peace, Friendship, Limits, & Settlement with the Republic of Mexico.,

9 Stat. 922, 1848 WL 6374, at *1 (July 4, 1848).

Texas asserts that a federal court is not the proper forum to litigate

actions under Article VII.  Article XXI of the Treaty provides a nonjudicial dispute

resolution procedure for any disputes that may arise under the Treaty.  (Dkt. # 62 at

9.)  Texas argues the Treaty is therefore not enforceable in federal court without

congressional implementation.  (Id.)

Treaty provisions that are not self-executing "can only be enforced

pursuant to legislation to carry them into effect."  Medellín v. Texas, 552 U.S. 491,

504–05 (2008) (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888)).  "[A]

treaty is equivalent to an act of the legislature, and hence self-executing, when it

operates of itself without the aid of any legislative provision."  Medellín, 552 U.S.

at 505 (citation omitted).  A treaty may have both self-executing and non-self-

executing provisions.  United States v. Postal, 589 F.2d 862, 884 n.35 (5th Cir.

1979).  Deciding whether a treaty is self-executing begins with the text.  Medellín,

552 U.S. at 506.  Courts also consider the background, "negotiation and drafting

history of the treaty as well as the post ratification understanding of signatory

nations" to determine whether a treaty provision is self-executing.  Id. at 507

(cleaned up.)  This may include whether a treaty provision anticipates "future

action through [signatory parties'] political branches" or "whether the treaty

provision is sufficiently precise or obligatory to be suitable for direct application

by the judiciary."  Id. at 508; Republic of the Marshall Islands v. United States,

865 F.3d 1187, 1194 n.3 (9th Cir. 2017).

### 1.    The Text of Article VII Does not Establish Self-Execution

"Aspirational language is the hallmark of a non-self-executing treaty."

Marshall Islands, 865 F.3d at 1196.  The United States argues the text of Article

VII conveys a clear intention that the provision is self-executing through its use of

imperative language: "shall."  (Dkt. # 63 at 11.)  The United States argues Article

VII creates an immediate prohibition on any work that "may impede or interrupts,

in whole or in part," the navigability of the Rio Grande River.  Treaty, 1848 WL

6374, at *1.  In the United States' view, this is distinct from the precatory language

used in other Articles that instead outlines a commitment by the parties to "take

future action through their political branches."  Medellín, 552 U.S. at 508.  For

example, while Article VI requires the parties to form an agreement only if it is

practicable and advantageous, the United States argues "shall" indicates Article

VII requires no future action from the parties to take effect and immediately

prohibits any work that degrades the Rio Grande River's navigability.

(Dkt. # 63 at 12.)

      Texas argues the United States is mistaken to rely on the word "shall"

alone to determine that Article VII is self-executing.  (Dkt. # 65 at 2.)  Such

language is not dispositive.  See, e.g., Tonkawa Tribe of Oklahoma v. Richards,

75 F.3d 1039, 1046 (5th Cir. 1996).  The Supreme Court has recognized that "even

when the operative treaty provisions use far more mandatory language,"

implementing legislation may still be required for domestic enforcement.

Medellín, 552 U.S. at 533–34.

      Article VII's language is far from strictly mandatory.  It states that

neither signatory shall construct any impediment in the Rio Grande River without

consent from both governments.  Treaty, 1848 WL 6374, at *1.  This tenement

anticipates *future action* for both countries to potentially consent to *future*

*construction*.  Additionally, both governments *in the future* shall only establish a

tax or contribution if it is necessary or advantageous and both governments

consent.  Id.  Even though "shall" is mandatory language, in context, the provision

still anticipates *future action by both governments* if they agree to future

construction in the Rio Grande River or if there is reason for a tax to be levied in

32

the future.  So, while construction without consent of both governments is

prohibited, the provision anticipates the governments may construct in the river in

the future if both parties agree.  And as discussed below, the failure of the

provision to establish any measures to be taken if there is unauthorized

construction in the Rio Grande River further suggests the provision is not self-

executing.

> ### 2.  <u>Legislative History Shows Congress Understood the Treaty to Require Implementing Legislation for Domestic Enforcement</u>

The United States argues the post-ratification history of the Treaty

confirms the parties' "intent that the free-navigation guarantee was immediately

binding upon ratification of the treaty, with no further action needed to effectuate

[the] provision."  (Dkt. # 63 at 12.)  The United States argues a subsequent

agreement between the United States and Mexico in 1853 showed the signatories

understood the 1848 Treaty's terms to already be in effect "as to the portion of the

Rio Grande that constituted the international boundary."  (<u>Id.</u> at 12–13 (citation

omitted.))  The United States also argues the Convention of 1884 recognized the

"mandatory and binding nature of Article VII," when it stated that certain lands,

which had "become separated" from their original boundary by natural movement

of the river, "shall continue to be under the jurisdiction of the country to which

they previously belonged."  (<u>Id.</u> (citing 24 Stat. 1013, art. V, 1886 WL 15138,

at *2 (Nov. 12, 1884.))  In the United States' view, the signatories' actions after the Treaty's enactment "recognized the obligatory, and already binding, nature of Article VII's free-navigation requirement."  (Id.)

Texas alleges the subsequent history of the Treaty confirms that it is not self-executing.  Texas argues the Treaty specifically contemplated future action would need to be taken to implement all its provisions, including Article VII. (Dkt. # 65 at 3.)  In support of this understanding, Texas cites multiple statutes that the President and Congress enacted following the Treaty's ratification to implement some of the Treaty's provisions.  (Dkt. # 62 at 11.)

For instance, Article VIII guaranteed preexisting title to land in the conquered territories.  See Treaty, 1848 WL 6374, at *5.  Even so, after the Treaty's ratification in 1848, questions and disputes about land titles in the former Mexican territories that had been ceded to the United States remained, especially in California.  (Dkt. # 62 at 11.)  To resolve these disputes, Congress in 1851 enacted a statute to implement the some of the Treaty provisions, known as the "Mexican Claims Act."  See Act of Mar. 3, 1851, ch. 41, 9 Stat. 632 (1851).  In this Act, Congress created a Commission to verify California land titles derived from the Spanish or Mexican Government.  (Id.)  The statute's purpose was to implement Article VIII's provision protecting pre-Treaty land titles in California.  See Yturbides Executors v. United States, 63 U.S. 290, 292 (1859) (discussing the

34

Mexican Claims Act and stating, "Congress had passed laws to carry into effect the treaty stipulations…."); see also Newhall v. Sanger, 92 U.S. 761, 764–65 (1875) (describing the Treaty as creating a duty to respect "rights of private property" but awaiting legislation to create processes for "judicial hearing and determination" of title).

And in 1854, Congress enacted another statute to implement provisions of the 1848 Treaty in New Mexico.  Act of July 22, 1854, ch. 103, § 8, 10 Stat. 309.  This Act directed the Surveyor General to investigate Spanish and Mexican land grant claims in the territory and to recommend—through the Secretary of the Interior—congressional approval or rejection of the claims.  Id.  In 1861 and 1863, Congress passed similar implementing legislation for Colorado and Arizona.  Act of Feb. 28, 1861, 12 Stat. 172; Act of Feb. 24, 1863, 12 Stat. 664.  In 1891, Congress enacted yet another statute to implement Treaty provisions by establishing a Court of Private Land Claims to address land grant claims in New Mexico, Arizona, Utah, Nevada, Colorado, and Wyoming.  Act of March 3, 1891, 26 Stat. 854.

If the Treaty were self-executing, no legislation would have been needed to implement any Treaty provisions.  The years-long history of Congress passing implementing legislation after the Treaty's 1848 ratification illustrates that the federal government did not interpret the Treaty as self-executing.  And while

35

one provision being non-self-executing does not prove all provisions are not self-executing, the language of Article VII anticipates future action just like Article VIII does.  The United States provides little justification beyond the use of "shall" in Article VII as to why only this one provision, out of all the treaty provisions, would alone be self-executing.

Moreover, the Government Accountability Office ("GAO") in 2004 found that the Treaty is not self-executing.  (See Dkt. # 65 at 4.)  The United States argues the GAO's report "cannot possibly establish that the entire 1848 Treaty is not self-executing," because it did not specifically address Article VII.  But the plain text of the report states that "the Treaty of Guadalupe Hidalgo was not a self-executing treaty, and thus it required implementing congressional action in order to take effect in the United States."  (Dkt. # 65 at 4.)  The report found Congress acted in 1851, 1854, and 1891 to implement Article VIII because the treaty was not self-executing.  (Id.)  This interpretation is "entitled to great weight" as evidence that the Treaty is not self-executing.  Medellín, 552 U.S. at 513 (citing Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184–85 (1982)); see also El Al Israel Airlines v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999).  And where a treaty is not self-executing, "the treaty addresses itself to the political, not the judicial department, and the legislature must execute the contract [treaty] before it can

become a rule for the Court."  Id. at 142 n.133 (citing Foster v. Neilson, 27 U.S. 283, 314–15 (1829)).

Far from settling disputes without requiring future legislative action or future action by the signatories, the Treaty here set aspirations for the future. Again, even Article VII itself contemplates future action if the parties find it necessary or advantageous to establish taxes to be levied upon vessels navigating the river.  See Treaty, 1848 WL 6374, at *1.  Congress also acted to implement other provisions of the Treaty domestically and did not do so for Article VII, even when the conditional taxation language of Article VII mirrors that of the provisions implemented.

The subsequent legislative history reflects the Treaty is not self-executing.  The federal government has never brought a domestic claim under the Treaty in its 175-year history.  See, e.g., Zicherman v. Korean Air Lines Co., 516 U.S. 217, 227–28 (1996) (finding a historical lack of domestic enforcement of treaty terms by signatories evidence that the terms were not self-executing).  And the federal government has consistently treated the Treaty as non-self-executing, only now attempting to argue self-execution.

**3.** **The Treaty Contemplates an Alternative to Federal Court Enforcement and Fails to Provide a Rule of Decision for Domestic Disputes**

Article XXI of the Treaty provides an alternative to federal court enforcement of the Treaty.  The United States asserts this alternative dispute resolution mechanism does not affect enforcement of the Treaty domestically.  (Dkt. # 63 at 13.)   It would only apply to disputes between countries.  For domestic enforcement, the United States argues that federal courts can fashion appropriate remedies to redress violations of Article VII.  (Dkt. # 63 at 12.)

That the Treaty fails to provide a rule of decision for a domestic court indicates the provision is not self-executing.  Marshall Islands, 865 F.3d at 1196 (treaty's call for negotiations on "effective measures" to cease nuclear arms race and achieve disarmament did not provide specific standards for courts); Doe v. Holder, 763 F.3d 251, 256 (2d Cir. 2014) (treaty provision was not self-executing because it "left to the signatory's discretion to determine what measures are 'appropriate' and 'within its means,' and what protection is sufficiently 'effective'").  While Article VII prohibits any construction that may impede or interrupt navigation of the Rio Grande River, it fails to state what measures should be taken upon a violation of the provision or to provide any specific standard or rule of decision for a domestic court to follow.  Marshall Islands, 865 F.3d at 1194–1196; Holder, 763 F.3d at 256.  Article VII does not state, for instance,

whether the remedy can or should be removal of the obstruction or award of damages to the aggrieved party.  See Treaty, 1848 WL 6374, at \*1.

The Supreme Court has given deference to the International Boundary and Water Commission to decide whether obstructions violate Article VII.  Rio Grande Dam, 184 U.S. at 417.  In 1902, the Court declined to address whether Article VII required removal of structures from the Rio Grande, instead giving deference to the Convention of 1889's alternative adjudication method.  Id.  The Court found a "provision was made for an international boundary commission… to inquire whether any works were being constructed on the Rio Grande which were forbidden by treaty stipulations."  Id.  The United States provides no basis for this Court to deviate now and find federal court enforcement appropriate: (1) in the face of a preferred international forum, (2) where the Treaty provides no rule of decision for a federal court to apply, and (3) where the Treaty has never been treated as self-executing and therefore lacks the power of domestic law.

Taking the text of Article VII along with the post ratification background, the 2004 GAO determination, and the lack of remedy provided in the provision for violations, this Court finds Article VII is not self-executing.  Without

congressional implementation, Article VII may not be enforced domestically.  The United States' claims arising under the Treaty are dismissed with prejudice.[10]

### B.    <u>The Supremacy Clause</u>

At the Motion to Dismiss hearing, the United States argued that treaty provisions are the supreme law of the land so under the Constitution's Supremacy Clause, Texas's construction of the barrier is prohibited.  (Dkt. #103 at 28:20–25.)

Despite the Supremacy Clause, not all treaties have the status of domestic law that is enforceable in the courts of the United States.  As discussed above, not all treaties are self-executing.  Non-self-executing treaties "can only be enforced pursuant to legislation to carry them into effect."  <u>Medellín</u>, 552 U.S. at 504–05.  This Court has found the Treaty to be non-self-executing.  Its provisions are not directly enforceable in federal courts without congressional action, even in suits by the United States under the Supremacy Clause.   <u>Medellín</u>, 552 U.S. at 505–06 n.3 ("Even when treaties are self-executing in the sense that they create federal law, the background presumption is that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.")  Nor does the United

---

[10] The Court's ruling in this case has no implication as to the impact and harm Operation Lone Star or Acts such as SB4 may have on the United States' relationship with Mexico or the harm that may result therefrom.  This is beyond the scope of this order.  This is not a situation where the United States has occupied and preempted the field of law, as is the case in SB4.

States plead any other equitable cause of action.  The Supremacy Clause alone does not make a non-self-executing treaty enforceable in U.S. courts.  <u>Id.</u>

CONCLUSION

The Court **DENIES** in part and **GRANTS** in part Texas's Motion to Dismiss.  (Dkt. # 62.)  The United States' claims under the RHA survive.  The United States' claims under the Treaty of Guadalupe Hidalgo are **DISMISSED with prejudice**.[11]

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, April 26, 2024.


                            _____
                            David Alan Ezra
                            Senior United States District Judge

---

[11] This Court notes that, as occurred previously in this case, both parties urged the Court to hear and rule on this motion as expeditiously as possible.