IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA, )
 )
   Plaintiff, )
 )
VS. ) CIVIL ACTION
 )
GREG ABBOTT IN HIS ) NO.: 1:23-cv-00853-DAE
CAPACITY AS GOVERNOR OF )
THE STATE OF TEXAS, AND )
THE STATE OF TEXAS, )
 )
   Defendants. )
------------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

JOHN TIMMEL

JUNE 5, 2024

------------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF JOHN

TIMMEL, produced as a witness at the instance of the

DEFENDANT, and duly sworn, was taken in the

above-styled and numbered cause on June 5, 2024, from

9:15 a.m. to 6:06 p.m., before Vanessa J. Theisen,

CSR in and for the State of Texas, and reported by

machine shorthand, at the offices of the U.S.

Attorney General's Office, 903 San Jacinto Boulevard,

Suite 334, Austin, Texas 78701, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached hereto.

**2**

```
1          A P P E A R A N C E S
2
3   FOR THE UNITED STATES OF AMERICA:
4       Mr. Brian H. Lynk
        Mr. Landon Wade
5       Trial Attorneys
        UNITED STATES DEPARTMENT OF JUSTICE
6       Environment & Natural Resources Division
        P.O. Box 7611
7       Washington, D.C. 20044-7611
        (202) 307-0930
8       Brian.Lynk@usdoj.gov
        Landon.Wade@usdoj.gov
9
10  FOR GREG ABBOTT IN HIS CAPACITY AS GOVERNOR OF THE
    STATE OF TEXAS, AND THE STATE OF TEXAS:
11
        Mr. Johnathan Stone
12      Mr. David Bryant
        Special Counsel
13      Office of the Attorney General
        P.O. Box 12548, MC-009
14      Austin, Texas 78711-2548
        (512) 936-2172
15      Johnathan.Stone@oag.texas.gov
        David.Bryant@oag.texas.gov
16
17  ALSO PRESENT (via Zoom Teleconference):
18      Ms. Kristyn Miller
        Mr. Kyle Tebo
19      Ms. Munera Al-Fuhaid
        Mr. Thomas Ciarametaro
20      Mr. Max Miller
        Ms. Hannah Coulter
21      Ms. Kimere Kimball
        Mr. Andrew Knudsen
22      Consulting Expert (undisclosed name)
        Consulting Expert (undisclosed name)
23      Consulting Expert (undisclosed name)
        Consulting Expert (undisclosed name)
24
25
```

**3**

```
1               INDEX
                                    PAGE
2   Appearances.........................  2
    JOHN TIMMEL
4   EXAMINATION BY MR. STONE................  7
        HEARING ON OBJECTIONS....................  133
5   EXAMINATION BY MR. STONE (Continued)......  143
    Changes and Signature.......................  296
6       Reporter's Certificate.........................  298
7
8           EXHIBITS
9   NO.     DESCRIPTION              PAGE
10
    1    Copy of Original Expert Report.........  11
11
    2    Supplemental Expert Report............  13
12
    3    January 24, 2024 Expert Designation....  15
13
    4    May 3, 2024 Expert Designation.........  17
14
    5    Not Marked..
15
    6    February 14, 2024 Timmel/Lynk Email
16       Exchange, Subject: USA v. Abbott
         Timmel's Interview Questions (CBP
17       follow-up)
         US0000587 - 0588.......................  20
18
    7    Interview Questions Sent to
19       Brian Lynk
         US0000585 - 0586.......................  22
20
    8    February 2024 Lynk/Timmel Email
21       Exchange, Subject: Information from
         IBWC (1st of several transmissions)
22       US0000596 - 0598.......................  29
23  9    February 2024 Rizzuti/All Email,
         Subject: Information
24       US0000794 - 0797.......................  45
25
```

**4**

```
1           INDEX (Continued)
2               EXHIBITS
3   NO.     DESCRIPTION              PAGE
4
    10    February 2024 Sorola/Cavazos/Lynk
5        Email, Subject: Follow-up Question
         from Timmel for CBP
6        US0000591 - 594.......................  48
7   11    Page 28, Exhibit 14, of Expert
         Opinion Report of John C. Timmel,
8        Marked By Witness During Deposition....102
9   12    March-April 2024 Timmel/Casner Email
         Exchange, Subject: USA v. Abbott:
10       Draft Report - USACOD Data
         US0000801 - 0803.....................153
11
12
13
14  REPORTER'S NOTE
    Quotation marks are used for clarity and do not
15  necessarily reflect a direct quote.
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1        THE VIDEOGRAPHER:  This is the
2   deposition of Captain John Timmel in the matter of
3   United States of America versus Greg Abbott, et al.
4        Our location is 903 San Jacinto
5   Boulevard, Suite 334 in Austin, Texas, and we are on
6   the record at 9:16 a.m., Central Time.
7        My name is Kristyn Miller, and my
8   business address is 9901 Brodie Lane, Austin, Texas,
9   78748.
10       Would all persons present please
11  introduce themselves for the record.
12       MR. STONE:  Johnathan Stone on behalf of
13  the State of Texas.  I'm joined by my co-counsel
14  David Bryant, as well as on Zoom by a number of
15  co-counsels and some consulting experts as well.
16       MR. LYNK:  Brian Lynk, Senior Trial
17  Counsel at the Department of Justice for the United
18  States.  I am joined by Landon Wade, assistant U.S.
19  attorney here; my colleagues from the environmental
20  defense section Kimere Kimball, Andrew Knudsen, and
21  Brian Harrison, as well as two law student interns at
22  our office, Max Miller and Hannah Holter.
23       I will note for the record an objection
24  we've made previously to there being any unidentified
25  individuals attending the deposition.  I understand
```

6

1 that Texas is not due to -- under the court's
2 scheduling order to disclose or identify their experts
3 until June 7th, but the scheduling order doesn't say
4 that the parties are excused from complying with the
5 provision of Rule 30 of the Federal Rules of Civil
6 Procedure that requires that everyone in attendance
7 at a deposition be identified on the record. So for
8 that reason, we continue to object.
9          MR. STONE: Sure. Just briefly, for the
10 record, this objection has been made before. We
11 intend to provide all these individuals when the
12 written transcript comes out, their identities.
13 We'll also be disclosing all of that I think the day
14 after tomorrow pursuant to the scheduling order. So
15 we'll be sharing their identities with the federal
16 government.
17          I'll also note that during the first
18 deposition of Adrian Cortez a couple of weeks ago
19 when this issue first came up, the Department of
20 Justice told us that they would be reaching out after
21 that deposition to discuss it to see if we could work
22 out an agreement on how we were going to handle the
23 situation, and we never heard back from them.
24          So, although they've continued to make
25 the objection, they haven't actually reached out to

7

1 us to try to work out some kind of arrangement of how
2 we could resolve this. Thank you.
3          THE REPORTER: All right. I need to
4 swear you in, please.
5          THE WITNESS: Yes.
6          (Witness sworn.)
7          JOHN TIMMEL,
8 having been first duly sworn, testified as follows:
9          EXAMINATION
10 BY MR. STONE:
11     Q. Could you -- before we start, I see that you
12 have some documents in front of you. Could you
13 identify the documents in front of you?
14     A. Yes, happy to. And I have a copy of the
15 expert opinion report that I provided to Brian Lynk
16 as well as a supplemental disclosure that I provided
17 to him as well.
18     Q. Okay. Excellent. Go ahead and give me
19 those documents.
20     A. (Complying.)
21     Q. Thank you. Could you spell your name for
22 the record?
23     A. Sure. It's John, J-O-H-N. C, as in
24 Charles. Timmel, T-I-M-M-E-L.
25     Q. Are you currently under the influence of any

8

1 drug or medication that would impact your ability to
2 testify truthfully today?
3     A. No, I am not.
4     Q. Are you currently suffering from any illness
5 or impairment that would impact your ability to
6 testify truthfully today?
7     A. No, I am not.
8     Q. Do you understand that your testimony today
9 is given under oath?
10     A. Yes.
11     Q. And it's the same as if you were testifying
12 when we have the jury trial in August in this case --
13 as if you were testifying before the jury?
14          MR. LYNK: Object to form.
15     A. Yes, I understand this.
16     Q. (BY MR. STONE) Do you understand that during
17 the course of the deposition we may take breaks?
18     A. Yes.
19     Q. And if you need to take a break -- I
20 typically take a break every hour, but if you need to
21 take a break earlier than that, you can just let me
22 know. Do you understand?
23     A. I do. Thank you.
24     Q. But if we do take a break, if there is a
25 pending question, I'll need you to answer the

9

1 question before we go on break. Do you understand?
2     A. I understand.
3     Q. Do you understand that, as you're going back
4 and forth with me in this question-and-answer format,
5 I need you to provide oral answers to my questions?
6     A. Yes, I understand that.
7     Q. Do you understand also that during the
8 course of the deposition there may be objections
9 there are lodged, but you'll still need to answer the
10 question?
11     A. I do.
12     Q. Do you understand if during the course of
13 the deposition I ask any questions that are vague or
14 you're not understanding, that you can ask me to
15 clarify?
16     A. Yes.
17     Q. Do you understand that -- I've got a couple
18 of terms, just to make this -- this a little bit
19 easier.
20          Do you understand when I use the term
21 "IBWC" I'm referring to the International Boundary
22 Water Commission?
23          MR. LYNK: Object to form.
24     A. I do.
25     Q. (BY MR. STONE) And do you understand that

10

1  when I use the term "commission" I'm also referring
2  to the IBWC?
3      A. I will accept that, yes.
4      Q. And all references I make to "the IBWC" or
5  "the Commission" I'm generally -- I'm talking about
6  the U.S. section unless I specify otherwise.  Do you
7  understand?
8      A. I accept that, yes.
9      Q. Okay.  Next, when I refer to the Rio Grande
10  River, I'm not going to be referring to the entire
11  river.  I'm specifically going to be referring to the
12  mile markers at issue here, which are mile markers
13  275.5 to 610.  Do you understand?
14      A. Yes, I do.
15      Q. So when I say, "Rio Grande River," I mean
16  mile marker 275.5 to 610.
17      A. Yes.
18      Q. Unless I specify otherwise, okay?
19      A. Okay.
20      Q. Similarly, when we use the word "reach," I'm
21  also referring to that same mile marker 275.5 to 610.
22  Do you understand?
23      A. I do.
24      Q. Unless I specify otherwise, okay?
25      A. Okay.  If I would like to go beyond that, I

11

1  will inform you, and you can let me know.
2      Q. Perfect.  Thank you.  I appreciate that.
3          So let's get started a little bit.  I
4  have a question -- a couple of preliminary questions,
5  but I want to start with what I'm going to mark as
6  Timmel Exhibit 1.  This is a copy of your original
7  expert report.
8          Are you able to see that on the screen
9  here?
10          (Timmel Exhibit 1 marked.)
11      A. I'm able to see the title page, yes.
12      Q. Does this appear to be -- what I've marked
13  as Timmel Exhibit 1 to be your initial expert report?
14      A. What I've seen so far, it is, yes.
15      Q. All right.  So I want to start with this --
16  and would it help if I gave you a paper copy?  I know
17  that you've got -- you brought a paper copy with you.
18      A. Yes.
19      Q. Would that be helpful to you?
20      A. Yes.  Thank you.
21      Q. Absolutely.  So I'm handing you a paper copy
22  of what we've marked as Timmel Exhibit 1.
23          I want to ask about this introductory
24  paragraph.  You state in the first sentence, correct,
25  that you were contacted by -- on September 28th of

12

1  2023 by someone named Brian Lynk, who is an attorney
2  with the Environment Defense Section of the
3  Department of Justice.  Do you recall that?
4      A. I do.
5      Q. Do you recognize Brian Lynk?
6      A. I do.
7      Q. Is he here in the room with you today?
8      A. He is.
9      Q. So after you -- you go on to say in the
10  second paragraph -- in the second sentence here --
11  and tell me if I'm reading this correctly -- I'll see
12  if there's a better way to position myself here.
13          Tell me if I'm reading this correctly,
14  "I responded to Mr. Lynk's email, had several phone
15  conversations with him, and on January 24th, 2024,
16  was notified that I was being retained to review and
17  analyze the situation, circumstances, and evidence
18  described in Section III and IV of this report, and
19  to render opinions as to the impact, if any, the
20  marine floating barrier installed in the Eagle Pass
21  section of the Rio Grande has upon the navigable
22  capacity of that waterway."  Did I read that
23  correctly?
24      A. You did.
25      Q. So you said you had several phone

13

1  conversations with him between September 28, 2023,
2  and January 24th or 2024, correct?
3      A. That's correct.
4      Q. How many is several?
5      A. Two or three.
6      Q. Two or three.  How long were those phone
7  conversations?
8      A. I think they varied.  Ten minutes long or
9  so.
10      Q. Was that the average for each of the two to
11  three phone calls?
12      A. I'm just -- I don't have an exact
13  recollection, but I would say somewhere between five
14  and ten minutes per phone call.
15      Q. Okay.  Let's see, since you did that initial
16  report -- I'm sharing what I'm marking as Timmel
17  Exhibit 2 -- you have produced last night a
18  supplemental expert report, which I'll hand you a
19  paper copy of.
20          (Timmel Exhibit 2 marked.)
21      A. Thank you.
22      Q. Do you recognize this document?
23      A. I do.
24      Q. What is this?
25      A. Since the submission of my original report,

John Timmel - 6/5/2024

14

1   I went on an additional site inspection trip
2   yesterday on the section of the Rio Grande in the
3   Eagle Pass area with CBP personnel on their vessels,
4   and I also -- since the submission of the report, I
5   received an honor last month, so I wanted to include
6   that in my CV.
7           And then through the course of reviewing
8   some documents that I just received just prior to the
9   submission of my report, doing a more thorough review
10  of them, I discovered some errors that I had based on
11  some testimony from one of the hearings that took
12  place, and I wanted to have the -- my report to be
13  absolutely correct.  So I wanted to make you aware of
14  those errors and correct them.
15      Q.  When you use the word "CBP," what do you
16  mean?
17      A.  Customs and Border Patrol.  During the site
18  inspections, I believe there's just some border
19  patrol as well.  And there's several agencies there,
20  and they seem to work together, and there will be
21  people from multiple agencies.  And so CBP is Customs
22  and Border Patrol.
23          MR. STONE:  Objection.  Nonresponsive.
24      Q.  (BY MR. STONE)  So am I understanding that
25  to you customs and border patrol, or CBP, includes

15

1   more than just CBP?
2       A.  No.
3       Q.  It doesn't include any of the other agencies
4   that CBP interacts with?
5       A.  No.
6       Q.  So when you use CBP, you just mean customs
7   and border patrol?
8       A.  That is correct.
9       Q.  Okay.  And if at any point in the deposition
10  you use the term "CBP," but you mean something else,
11  will you tell me?
12      A.  I will.
13          (Timmel Exhibit 3 marked.)
14      Q.  Okay.  Next I'm showing you what I've marked as
15  Timmel Exhibit 3.
16          Do you see what I've marked as Timmel
17  Exhibit 3 on the screen here?
18      A.  I do.
19      Q.  Do you recognize the date on this document
20  as January 24th, 2024?
21      A.  I can read that date, yes.
22      Q.  This was a document that you reviewed in
23  preparation for your expert report, correct?
24          Would you like to see the whole
25  document?

16

1       A.  Yes, I've seen that document.
2       Q.  This is the expert destination that was
3   submitted identifying you on January 24th of 2024,
4   right?
5       A.  Yes.
6       Q.  This was the same day that you were
7   contacted and told you would be an ex -- you
8   were being retained as an expert in this case,
9   correct?
10      A.  Yes.
11      Q.  And at the time on January 24th, when you
12  were notified that you were being retained as an
13  expert in this case -- I'm going to read the
14  highlighted portion on the scene and tell me if I'm
15  reading it correctly.
16          "Captain Timmel is expected to testify
17  regarding the impact upon navigability of the
18  buoy-barrier system deployed in the Rio Grande by the
19  State of Texas."  Did I read that correctly?
20      A.  You did.
21      Q.  Is that what you were retained to testify
22  about in this case?
23      A.  That's correct.
24      Q.  Next I'm showing you what I've marked as
25  Timmel Exhibit 4.

17

1           (Timmel Exhibit 4 marked.)
2       Q.  This is the expert designation made for you
3   in May.  Do you see this document on your screen?
4       A.  I do.
5       Q.  All right.  I'm going to scroll down.  Does
6   this document look similar to the prior document?
7       A.  It certainly looks similar in format.
8       Q.  All right.  And this document is dated May
9   3rd, 2024, correct?
10      A.  Yes.
11      Q.  On page 2 of Timmel Exhibit 4, do you see
12  a -- your expert designation here?
13      A.  I see some highlighted text, yes.
14      Q.  Okay.  I'm going to read the highlighted
15  text and tell me if I read it accurately.
16      A.  Okay.
17      Q.  "Captain Timmel is expected to testify
18  regarding the nature of the floating barrier system
19  deployed in the Rio Grande by the State of Texas and
20  the floating barrier system's impact upon the
21  navigability of the Rio Grande."  Did I read that
22  accurately?
23      A.  You did.
24      Q.  Okay.
25          MR. STONE:  Let's go off the record.

18

1      THE VIDEOGRAPHER: Off the record. The
2  time is 9:33.
3      (Recess 9:33 a.m. to 9:36 a.m.)
4      THE VIDEOGRAPHER: We're back on the
5  record. Time is 9:36.
6      Q. (BY MR. STONE) All right. Now, we just
7  read the sentence a moment ago that you are looking
8  at here, the highlighted sentence, right?
9      A. Yes.
10     Q. And now your testimony has changed, right?
11  Before you were testifying about the buoy system's
12  impact on navigability. Now you're also testifying
13  on the nature of the floating buoy-barrier system,
14  correct?
15     MR. LYNK: Object to form.
16     A. That's what that states, yes.
17     Q. (BY MR. STONE) Okay. Do you need a
18  comparison? Will it be easier for you if I show you
19  the January --
20     A. No, I -- I recall.
21     THE REPORTER: Y'all need to talk one at
22  a time, please.
23     Q. When did the scope of your expert testimony
24  in this case change?
25     MR. LYNK: Object to form.

19

1      A. Well, it certainly would have changed over
2  the course of the time between that January 24th date
3  and the date of this document.
4      MR. STONE: Object as nonresponsive.
5      Q. (BY MR. STONE) I'm asking you when
6  specifically the scope of your expert designation, if
7  you know, changed.
8      MR. LYNK: Object to form.
9      A. Well, I'm reading what that states, but
10  the -- what I am testifying to is spelled out in the
11  scope of the report that I include in my report.
12  There -- that says the "nature of the buoy system."
13     Primarily what I did in the report was
14  discuss that -- to the extent necessary, that I can
15  cover the topics that are included in the scope of
16  the report.
17     MR. STONE: Objection, nonresponsive.
18     Q. (BY MR. STONE) I'm showing you what I've
19  marked as Timmel Exhibit 3, the second page of it.
20  Do you see it on the screen?
21     A. I do.
22     Q. There's no mention of you being an expert on
23  the nature of the buoy system, is there?
24     MR. LYNK: Object to form.
25     A. No, there's not.

20

1      Q. (BY MR. STONE) Okay. Were you an expert on
2  January 24th of 2024 on the nature of the buoy
3  system, the buoys installed in the Rio Grande River?
4      A. No.
5      Q. On May 3rd, when this document was provided
6  to us, were you an expert on the nature of the
7  floating buoy-barrier system in the Rio Grande River?
8      MR. LYNK: Object to form.
9      A. No.
10     Q. (BY MR. STONE) Are you currently an expert
11  on the nature of the floating buoy-barrier system
12  deployed in the Rio Grande River?
13     A. No.
14     Q. Are you an expert on the floating barrier
15  system's impact upon the navigability of the Rio
16  Grande River?
17     A. I offer opinions on that, yes.
18     Q. So next I'm going to show you what I'm
19  marking as Timmel Exhibit 6.
20     (Timmel Exhibit 6 marked.)
21     Q. All right. Do you see this document on the
22  screen?
23     A. I do.
24     Q. Does this appear to be an email exchange you
25  had with Brian Lynk?

21

1      A. It does.
2      Q. Okay. I want to start at the bottom. But
3  let's situate ourselves in time.
4      So January 24th, 2024, you testified a
5  moment ago that that when you were contacted and
6  notified that you were being retained as an expert in
7  this case, right?
8      A. That is correct.
9      Q. So an January 26th, 2024, you sent this
10  email to -- two days later you sent this email to
11  Brian Lynk, correct?
12     A. Yes.
13     Q. And what do you say in this email here on
14  page 2 of what we've marked as Timmel Exhibit 6 to
15  Brian Lynk?
16     A. Would you like me to read that?
17     Q. Yes, go ahead and read it.
18     A. Okay. "Attached please find proposed review
19  questions for the CBP and IBWC officers, and any
20  other appropriate operators in Eagle Pass. It is in
21  somewhat of a raw form, but I want to get it to you
22  ASAP. I would be happy to discuss it with you
23  tonight or tomorrow afternoon if you would like.
24  Please be advised that I will have extremely limited
25  access to telephone or email until mid-afternoon. If

John Timmel - 6/5/2024

---

22

1  you need to reach me tomorrow, text will be the best
2  method of communication."
3      Q.  So you typed up -- if I'm reading this
4  correctly -- a list of interview questions for CBP
5  and IBWC.  Is that correct?
6      A.  That's correct.
7      Q.  And just for identification purposes, before
8  we move on, I want to confirm that I have a copy of
9  those documents.  So let's take a look.
10         I'm showing you what I'm marking as
11  Exhibit 7, Timmel Exhibit 7.
12         (Timmel Exhibit 7 marked.)
13     Q.  Do you see Timmel Exhibit 7 on your screen?
14     A.  I do.
15     Q.  Do you recognize this document?
16     A.  I do.
17     Q.  Is this the interview questions that you
18  sent to Brian Lynk?
19     A.  Yes.
20     Q.  Now, I see that there's two dates on this
21  document.  It says, "Questions" on January 6th of
22  2024, right?
23     A.  January 26.
24     Q.  Sorry.  January 26th of 2024?
25     A.  Yes, uh-huh.

---

23

1      Q.  And then it says it was amended on
2  February 1st of 2024, right?
3      A.  Yes, it did.
4      Q.  How was it -- how was this document amended?
5      A.  I don't recall just by looking at that
6  document.
7      Q.  Did you amend the document?
8      A.  I could have made some changes or added some
9  questions to it after the 26th, yes.
10     Q.  Did you create this document?
11     A.  I did.
12     Q.  Is this the way that the document looked
13  when you originally created it?
14     A.  Can you scroll down a little bit.
15     Q.  Sure.
16     A.  No, the other way please.
17     Q.  Oh, up?
18     A.  Up yes, uh-huh.  Yes, I'm fairly certain
19  that I created that document.
20     Q.  Okay.  So I see "Questions - 1/26/24" here
21  at the top of the document.  Do you see it?
22     A.  Yes.
23     Q.  But I don't see any subsequent indication
24  that there was more questions after February 1st of
25  2024.  Is that -- were there subsequent questions

---

24

1  after February 1st of 2024?
2      A.  I don't recall precisely, but there was
3  either some edits made to it or additional questions
4  added.
5      Q.  When you say there was "edits made to it,"
6  did you make the edits?
7      A.  Yes.  If there were any made, I would have
8  made them.
9      Q.  And if there was any questions added, would
10  you have added them?
11     A.  That's correct.
12     Q.  Did you also type in what appears to be the
13  answers on this document?
14     A.  No, I did not.  I believe this was a copy of
15  the questions that I submitted to the DOJ that were
16  sent to the CBP and that this was then sent back to
17  me with the answers on them.
18     Q.  Who filled in the answers to these
19  questions, if you know?
20     A.  I do not know.
21     Q.  But you relied on these answers in your
22  expert report?
23     A.  Yes.
24     Q.  Okay.  So let's go back to what I've marked
25  as Exhibit -- I'm not going to do share screen

---

25

1  anymore, just because it's a little bit easier.  I
2  may switch back later, but for now it's a little bit
3  easier if I keep going without it.
4         So on February 14th you receive a
5  response to your email, correct?
6      A.  Yes, I did receive that email.
7      Q.  And so for the record, I'm on Timmel
8  Exhibit 6 at page 1.
9         Could you read the response that you
10  received on February 14th of 2024?
11     A.  "Good afternoon, Brian.  With many thanks to
12  David for tracking down some responses in advance of
13  Tuesday and site visit.  Please see attached.  Both
14  David and Patrol Agents in Charge (PAIC) Micky
15  Donaldson will be available to discuss and [sic]
16  follow up questions -- discuss any follow up
17  questions with Timmel during the visit.  To the
18  extent any questions arise that they are unable to
19  run down in the moment, we will do our best to circle
20  back as soon as possible following the site visit.
21  Thanks.  Best, Kaitlyn."
22     Q.  And this email, it was forwarded to you,
23  right?
24     A.  That is correct.
25     Q.  It was actually sent to -- it appears to

---

26

1 have been sent to Brian Lynk.  Is that accurate?
2     A.  That's what it appearance to be, yes.
3     Q.  Who is Kaitlyn Charette?
4     A.  Well, just by reading it, she's the senior
5 attorney with the legal counsel division of the
6 office of general counsel, the U.S. Department of
7 Homeland Security.
8     Q.  This email mentions someone named David.  Do
9 you know who David is?
10     A.  I do not.
11     Q.  It also mentions Patrol Agent in Charge
12 Mickey Donaldson.
13     A.  Let me retract that.  It may refer to David
14 Sorola, who is a counselor for -- I'm trying to
15 remember his agency -- I think Immigration.
16     Q.  Do you know if that's referring to David
17 Sorola?
18     A.  I do not know for sure that it is, no.
19     Q.  Is David Sorola someone who is identified as
20 being carbon copied on this email?
21     A.  It appears that he is, yes.  Yes, it says
22 "David Sorola" there.
23     Q.  Did you actually meet somebody named David
24 Sorola -- strike that.
25          Have you met -- have you -- strike that.

27

1          Have you spoken with anybody named David
2 Sorola in this case?
3     A.  I have.
4     Q.  When did you speak with David Sorola?
5     A.  I spoke with him first on my first site
6 inspection on February 24th, and I spoke with him
7 again yesterday for a second site inspection.
8     Q.  Who is David Sorola?
9     A.  He is, to the best of my knowledge, an
10 attorney for Department of Homeland Security within
11 the -- I guess within the CBP there, works in Del Rio,
12 Texas.
13     Q.  How -- we're going to come back to the
14 conversation with David Sorola, but let me move on to
15 the Micky Donaldson.  Do you know a Micky Donaldson?
16     A.  Not that I recall.
17     Q.  Have you spoken with a Micky Donaldson about
18 this case?
19     A.  I would not have known that -- excuse me.  I
20 spoke with many people during the inspections whose
21 names I did not know.
22     Q.  Okay.  We're going to get into that in a few
23 minutes.  Let me keep going.
24          So at the top here I see the email --
25 does this -- strike that.  Let me start again.

28

1          Timmel Exhibit 6, page 1, does this
2 appear to be -- the top of this email thread, this
3 appears to be Brian Lynk forwarding you a copy of
4 that email that we just read.  Does that appear
5 accurate?
6     A.  That appears accurate, yes.
7     Q.  And it appears that there's an attachment to
8 this email.  Is that correct?
9     A.  Yes.
10     Q.  Could you read the body of this email for
11 the record?
12     A.  "Good evening, John.  Attached please find
13 answers from the CBP to written questions you
14 provided me on January 26th and (in amended form) on
15 February 1st and asked me to circulate.  As noted
16 below the CBP -- as noted below, CBP representatives
17 will be available to answer any follow-up questions
18 you may have during the Tuesday site visit -- site
19 tour.  Signed Brian Lynk."
20     Q.  And is that attachment what we've been
21 looking at as -- and what we have marked as Timmel
22 Exhibit 7?
23     A.  I believe it is, yes.
24     Q.  So this was provided to you -- this document
25 with these responses was provided to you by the

29

1 attorney Brian Lynk in this case?
2     A.  Yes.
3     Q.  But you don't know who actually filled out
4 the answers to this document?
5     A.  I don't actually, no.
6     Q.  Next I want to show what I'm marking as
7 Timmel Exhibit -- I'm sorry, I jumped ahead -- Timmel
8 Exhibit 8.  I went ahead and shared 9 with you guys,
9 but we'll get there.
10          (Timmel Exhibit 8 marked.)
11     Q.  Timmel Exhibit 8.  This is another set of
12 emails that were exchanged, and I want to go through
13 this.
14          So starting at page -- well, let me stop
15 for a minute and see.  Do you recognize this email
16 exchange?
17     A.  I would have to look at the entire document
18 to be certain.
19     Q.  Sure.  Do you see -- on Timmel Exhibit 8 do
20 you see your email or name on the email --
21     A.  I do.
22     Q.  -- at the top?  And this was a forward that
23 you received from Brian Lynk in this case?
24     A.  That's correct.
25     Q.  And as I scroll down, there is a series of

30

1  emails that were exchanged that were forwarded to you
2  by Brian Lynk?
3      A.  Yes.
4      Q.  All right.  So starting at the bottom with
5  the first email, what date was this sent?
6      A.  I'm confused as to that header.  It
7  appears -- okay, that header is for the email on the
8  continuing page.  It was sent on February 12th.
9      Q.  Okay.
10     A.  2024.
11     Q.  All right.  And there's a number of folks
12 that are carbon -- that this was sent -- this email
13 was sent to, right?
14     A.  Yes, sir.
15     Q.  The first name I see is Rebecca Rizzuti.  Do
16 you see that name?
17     A.  I do see that name.
18     Q.  Before I start with who it was sent to,
19 let's talk about who it was sent from.
20        Do you recognize this the name Jerry
21 Wall?
22     A.  I believe I've heard the name since I've
23 been retained for this case, but I don't know who
24 that person is.
25     Q.  Have you talked about the case with Jeremy

31

1  Wall?
2      A.  I have not.
3      Q.  Jeremy Wall sends the email to a number of
4  people, right?
5      A.  Yes, according to what the document states.
6      Q.  Right.  The document you relied on?
7      A.  Yes.
8      Q.  And the first name on the email that it was
9  sent to is Rebecca Rizzuti.  Do you recognize that
10 name?
11     A.  I do not.
12     Q.  Have you talked about this case with Rebecca
13 Rizzuti?
14     A.  I have not.
15     Q.  The next name on the email thread is Evelio
16 Siller.  Do you recognize that name?
17     A.  No, I do not.
18     Q.  Have you discussed this name [sic] with
19 Evelio Siller?
20     A.  No, I have not.
21     Q.  The next name on this email thread is -- or
22 the email is Mario Gomez.  Do you recognize that
23 name?
24     A.  No, I do not.
25     Q.  Have you had any conversations with Mario

32

1  Gomez, to the best of your knowledge, about this
2  case?
3      A.  Not that I'm aware of.  Again, I've spoke
4  with many people during the site inspections with the
5  CBP and some of their ancillary groups, and I don't
6  know all of their names.
7      Q.  During the site visit, did you speak with
8  any IBWC people?
9      A.  I believe that I did, but I cannot say with
10 certainty.
11     Q.  The next in this list is Juan Uribe.  Do you
12 remember -- do you recognize the name Juan Uribe?
13     A.  I do not.
14     Q.  Have you spoken about this case with a Juan
15 Uribe, to the best of your knowledge?
16     A.  Not to the best of my knowledge.
17     Q.  Next is a Francisco Martinez.  Do you
18 recognize that name?
19     A.  I do not.
20     Q.  Have you spoken about this case, to the best
21 of your knowledge, with a Francisco Martinez?
22     A.  Not unless he was present at the site
23 inspections.
24     Q.  Was he present?
25     A.  I do not know.

33

1      Q.  So to the best of your knowledge you haven't
2  discussed this case with someone named Francisco
3  Martinez?
4      A.  I would say I'm uncertain as to whether I
5  have.  So if that's the same as "to the best of my
6  knowledge," then I would answer that yes.
7      Q.  You're uncertain about who you spoke about
8  with this case during the site visit as it relates to
9  anyone, right?
10        MR. LYNK:  Object to form.
11     A.  No.  Can I recall their names?  No, I
12 cannot.
13     Q.  (BY MR. STONE)  Okay.  Jennifer Pena is the
14 next name on this list.  Do you recognize the name
15 Jennifer Pena?
16     A.  I do not.
17     Q.  To the best of your knowledge have you
18 discussed this case with a Jennifer Pena?
19     A.  No.
20     Q.  The next name on this list is Adrian Cortez.
21 Do you recognize that name?
22     A.  No, I do not.
23     Q.  Have you discussed this case with someone
24 named Adrian Cortez?
25     A.  Not to the best of my knowledge.

34

1    Q. So let's talk about the contents of this
2 email. It begins with -- and I'm on page 2 of Timmel
3 Exhibit 8 -- "All, for WAD equipment, see below,
4 separated by field office." Did I read that
5 correctly?
6    A. You did.
7    Q. What is WAD?
8    A. I'm not certain. I do not know.
9    Q. Okay. So the first -- we'll start from the
10 begi -- top, it says, "Mercedes," right?
11    A. Yes.
12    Q. Okay. What is Mercedes?
13    A. And individual who apparently responded to
14 some of these questions.
15    Q. I see. So Mercedes is a person. Was it one
16 of the persons that we discussed a moment ago that
17 the email was sent to?
18    A. I don't recall.
19    Q. Okay. So it looks like the person named
20 Mercedes lists four different things here. Is that
21 accurate?
22    A. Yes, there's four things enumerated, yes.
23    Q. Okay. Can you read number 1?
24    A. "Fan boat, 20 feet. Use it for tours for
25 IBWC HQ personal. Use it on Rio Grande, Arroyo,

35

1 Colorado, and flood ways (depth varies)."
2    Q. What are the dimensions of that fanboat as
3 discussed in number 1?
4    A. As discussed in number 1, approximately
5 20 feet in length.
6    Q. And the width?
7    A. I would estimate -- it's not stated. I do
8 not know for certain, but I estimate, 8 -- 8 to
9 9 feet.
10    Q. And what is the basis for that estimate if
11 you don't know what -- well, let me step back.
12       Do you know what fanboat is being
13 discussed here Mercedes?
14    A. Not specifically, no.
15    Q. So without knowing specifically what kind of
16 fanboat is being discussed by Mercedes, how do you
17 know that it's -- what did you say, 8 feet in width?
18    A. I would estimate that a fanboat that is
19 20 feet in length would be about 8 feet in width, but
20 I do not know with certainty.
21    Q. Could it be -- could it have a greater width
22 than 8 feet?
23    A. It could.
24    Q. Could it have a smaller width than 8 feet?
25    A. It could.

36

1    Q. How much weight can a -- let's go with what
2 your estimate was. Is that okay?
3    A. Sure.
4    Q. All right. So we've got a 20 feet by 8 feet
5 fanboat, right?
6    A. Yes, sir.
7    Q. Okay. How many people can ride on a --
8 strike that.
9       What would be the weight capacity of a
10 20-foot by 8-foot fanboat?
11    A. I do not know.
12    Q. Okay. So you don't know the weight
13 capacity. How many people could ride in a 8 by
14 20-foot fanboat?
15    A. During our site inspections we had five
16 individuals riding on them. There could potentially
17 have been a few more. But on boats there are
18 capacity plates that are attached on the inside of
19 the hull that specify the maximum weight and/or
20 number of passengers. I did not inspect that plate.
21       MR. STONE: Objection. Nonresponsive.
22    Q. (BY MR. STONE) Do you know if -- let me
23 start again.
24       When you went down to the Rio Grande
25 River and did this inspection, did you ride on a

37

1 fanboat that was 20 feet by 8 feet?
2    A. I rode on a fanboat or airboat that was
3 approximately of those dimensions.
4    Q. Okay. And you testified a -- you don't
5 remember, though, what the weight capacity was on
6 those fanboats that you rode during the site visit?
7    A. That's correct.
8    Q. But that's information that is available
9 because there's a little sign on the boat that tells
10 you what the weight capacity is?
11    A. Generally, yes.
12    Q. When you say, "generally, yes," I'm not
13 asking generally. I'm asking about the fanboats that
14 you rode.
15    A. I did not see -- look to see if there were
16 capacity plates on those boats.
17    Q. What is the minimum depth that a fanboat
18 that is 8 by 20 needs to operate?
19    A. Actually zero.
20    Q. Is it fair to say that it could literally
21 operate on grass?
22    A. On wet grass, yes, or a slippery surface,
23 yes. Ice.
24    Q. So let's move on to number 2 on this list.
25 I'm on Timmel Exhibit 8, number 10. So Mercedes

38

1 tells you next about number -- can you read that for
2 the record?
3       A. Number 2: "Kayaks approximately eight feet,
4 measures water in vicinity of gages, depth changes
5 with river height."
6       Q. And what are the approximate dimensions of
7 the kayak that's referenced here?
8       A. Well, what is given is approximately 8 feet
9 in length.
10      Q. And what's the width of the kayak?
11      A. It's not stated.
12      Q. Do you know what the width of the kayak is
13 that's being described by Mercedes?
14      A. I do not.
15      Q. How many people can ride in a -- in the
16 kayak discussed in number 2?
17      A. Would you like my estimation or -- kayaks
18 come in --
19      Q. Let me clarify. I'm not asking you to
20 guess. I'm asking if you know.
21      A. I do -- I'm sorry, I do not know.
22      Q. So if you know, what is the weight capacity
23 of the kayaks that are discussed in number 2 by
24 Mercedes?
25      A. I do not know.

39

1       Q. Let's go to number three. "Remote
2 control" -- well, you read it. Sorry. Could you
3 read number three for the record?
4       A. "Remote control boats (one 3 feet and one
5 five feet) used in vicinity of gages."
6       Q. How many people can ride in -- we'll start
7 with the first one -- in a 3-foot remote control
8 boat?
9       A. I do not know specifically about these boats
10 that are being described, but I would say none.
11      Q. Why would you say none?
12      A. Because it's a three foot long boat, and I
13 don't see how an individual could fit on that.
14      Q. How many boats that are three feet long are
15 there out there that people can ride in?
16      A. I'm not aware of any.
17      Q. The next one is 5-foot, right?
18      A. Yes.
19      Q. How many people could ride in the 5-foot
20 remote control boat discussed in number 3, if you
21 know?
22      A. I do not know.
23      Q. Do you know what the weight capacity is for
24 the 5-foot boat mentioned by Mercedes in number 3?
25      A. No.

40

1       Q. Next, could you read number 4?
2       A. 4, "ADCP (acoustic measuring devices), used
3 suspended from cable at depths greater than one meter
4 or wading instream (walking with equipment on
5 telescoping pole in the water) at depths below one
6 meter in vicinity of gages."
7       Q. What kind of craft is being described --
8 well, strike that.
9            What is ADCP?
10      A. I do not know.
11      Q. Is that a type of boat?
12      A. I don't know.
13      Q. Okay. So in forming your expert opinions in
14 this case from the email -- this portion of the email
15 that was sent from Mercedes, which portions of this
16 email did you rely on in forming your expert opinions
17 in this case?
18      A. None.
19      Q. None. Okay.
20           Next you receive an email from -- well,
21 it says -- it appears to say, "Falcon." Is that
22 accurate?
23      A. Yes.
24      Q. Okay. Is Falcon a person?
25      A. Looking at these now, seeing more of this

41

1 email, I believe these are the different dams and/or
2 gage sites on the river. I know Amistad is and
3 Presidio is, yes.
4       Q. Okay. So you recognize the names Falcon,
5 Amistad and Presidio on this email?
6       A. That's correct.
7       Q. But you didn't recognize the name Mercedes?
8       A. Not in the context in which it was
9 presented.
10      Q. Well, now you have seen the full context.
11 Where is Mercedes on the Rio Grande River?
12      A. I do not know.
13      Q. But you said you didn't rely on it --
14      A. No, I didn't rely on that.
15      Q. Okay. So next it says, "Falcon." Let's go
16 through each of these six. Let's start at the top.
17           Could you read the first one relating to
18 Falcon Dam? Sorry. Strike that. Let me start
19 again.
20           Could you read the first one relating to
21 Falcon?
22      A. If I may, I can possibly save you some time
23 by saying I did not rely on any information in that
24 paragraph in forming my opinions.
25      Q. I see. Okay.

42

1    A. But I'm happy to read it if you would like.
2    Q. I think it would be helpful.  Let's go
3  through a couple of them and we'll see, okay?
4    A. Okay.
5    Q. Start with number one.
6    A. Sure.  "20-foot dual motor johnboat.  Used
7  within a mile or so of each gage, used within the
8  first three miles below Falcon reservoir and in the
9  reservoir itself.  Used for measuring, help with dam
10  operations, tours to HQ, and others agencies."
11    Q. Is it your testimony -- well, you didn't --
12  actually, you didn't rely on this.  Is it your
13  testimony that a 20-foot dual motor johnboat could
14  operate on the Rio Grande River?
15    A. Yes.
16    Q. What is the basis for your opinion that a
17  20-foot dual motor johnboat can operate on the Rio
18  Grande River?
19    A. I've seen them operate.
20    Q. And did you travel the -- when did you
21  travel the entire stretch of the Rio Grande River?
22        MR. LYNK:  Object to form.
23    A. I'm sorry.  I thought that you were talking
24  about mile 275 to 600 --
25    Q. (BY MR. STONE)  Yeah, okay.  That's helpful.

43

1  Thank you.  I am talking about that stretch.
2        So when did you travel the Rio Grande
3  River mile marker 275.5 to mile marker 610?
4    A. I have not, but that's not the question that
5  you asked.
6    Q. All right.  The question I'm asking is when
7  did you travel --
8    A. I have not.
9    Q. Okay.  How many miles between mile marker
10  275.5 and 610 have you traveled on the Rio Grande
11  River?
12    A. I would estimate approximately five miles.
13    Q. So out of the 300-plus miles within that
14  reach, you've only been on the water for
15  approximately five miles of that stretch?
16    A. Yes, I've crossed the Rio Grande as a
17  tourist in other places, but actually on the water,
18  approximately five mills in the Eagle Pass area.
19    Q. So is it your testimony today that with
20  respect to that five-mile stretch a 20-foot dual
21  motor johnboat could operate?
22    A. Yes.
23    Q. A moment ago I asked you, though, if a
24  20-foot dual motor johnboat could operate on the
25  entire reach of -- from mile marker 275.5 to 610 on

44

1  the Rio Grande River.  Do you recall that?
2    A. I do.
3    Q. Okay.  So I'm going to ask that again.  Can
4  a 20-foot dual motor johnboat travel from mile marker
5  275.5 to mile marker 610?
6    A. I do not know.
7    Q. Other than the five-mile stretch that you
8  were on on the Rio Grande River, do you have any
9  personal knowledge of any other sections of the river
10  where a 20-foot dual motor johnboat could operate?
11    A. No.
12    Q. What is the -- let me move on.  Since you
13  didn't rely on this, I'm going to keep going.
14        Next there on Timmel Exhibit 8, we have
15  a discussion about Amistad.  Do you see that on the
16  screen?
17    A. I do.
18    Q. Did you rely on any of the information in
19  this portion of the email for your expert opinions in
20  this case?
21    A. The only thing that I relied upon in forming
22  my opinions regarding Amistad was discussions with
23  the people conducting the site inspections.  I asked
24  them about changing in water levels, and they said
25  yes, they did occur, and they occurred when Amistad

45

1  released water.  So I'm aware of that.
2        MR. STONE:  Objection.  Nonresponsive.
3    Q. (BY MR. STONE)  I'm asking you if you relied
4  on the information in Timmel Exhibit 8 on page 2 as
5  it relates to this discussion about Amistad.
6    A. No.
7    Q. Did you rely on the information in Timmel
8  Exhibit 8 as it relates to discussion about Presidio?
9    A. No.
10    Q. Did you rely on the information contained in
11  Timmel Exhibit 8 as it relates El Paso?
12    A. No.
13    Q. So looking at this email, is there anything
14  in this portion of the email, Timmel Exhibit 8, pages
15  2 and 3 -- it keeps going -- is there anything in
16  this email that you relied on for your expert
17  opinions in this case?
18    A. No.
19    Q. Next I'm going to show you what I'm marking
20  as Timmel Exhibit 9.
21        (Timmel Exhibit 9 marked.)
22    Q. Let me close this.  This is also an email
23  exchange.  Let me start at the top.
24        Do you see your -- so I'm on Timmel
25  Exhibit 9.  Do you see your name at all on the top of

46

1  this document as a recipient of this email?
2      A. I do not.
3      Q. Do you know if you received this email?
4      A. If that's part of a thread of another email
5  that has my name as a recipient, then I would say
6  yes. I do not know by viewing this, what you have on
7  the screen, as to whether or not I received it.
8      Q. Did you rely -- can you tell if you relied
9  on any of the information contained in this email for
10  your expert opinions?
11      A. I did not.
12          MR. LYNK: Object to form. Sorry. Go
13  ahead.
14      A. I did not.
15      Q. (BY MR. STONE) Okay. Let me do it piece by
16  piece, just to make sure, okay?
17          So I'm going to start Timmel Exhibit 9.
18  We have the first email sent from Juan Uribe on
19  February 12th of 2024, page 1. Did you rely on the
20  information contained in this email in forming your
21  expert opinions in this case?
22          MR. LYNK: Object to form.
23      A. No.
24      Q. (BY MR. STONE) Okay. Next email, and it
25  goes backwards in time. The next email is still

47

1  contained on page 1 of Timmel Exhibit 9. This is an
2  email sent from Rebecca Rizzuti on February 12th of
3  2024.
4          Did you rely on any of the information
5  contained in this email in forming your expert opinions
6  in this case?
7      A. Based on what's on the -- what I'm seeing on
8  the screen, I did not.
9      Q. Next I'm showing you -- I'm going to do it
10  piece by piece. I'm showing you what I've marked as
11  Timmel Exhibit 9, page 2, an email from Esteban
12  Martinez. Do you see it on the screen?
13      A. I do.
14      Q. Do you also see that you are not a recipient
15  of this mail?
16      A. I see that.
17      Q. All right. Did you rely on any of the
18  information contained in this email in forming your
19  opinions in this case?
20      A. No.
21      Q. Next I have an email, same page, sent from
22  Jeremy Wall on February 12th of 2024. Do you see
23  that on the screen?
24      A. I do.
25      Q. Do you see that your name is not a listed

48

1  recipient of this email?
2      A. I do not see my name listed, no.
3      Q. Did you rely on any of the information
4  contained in this email in forming your opinions in
5  this case?
6      A. In that entire email, you would have to
7  scroll down.
8      Q. Oh, sure.
9      A. Can you stop where it said, "Amistad,"
10  please? (Reading document.) No, I did not.
11      Q. Finally, I'm on page 3 of Timmel Exhibit 9.
12  I'm showing you an email sent from Rebecca Rizzuti on
13  February 11th of 2024. Do you see that email?
14      A. I do.
15      Q. Is your name listed as one of the
16  recipients?
17      A. No, it is not.
18      Q. Did you rely on any of the information
19  contained in this email in forming your expert
20  opinions in the case?
21      A. No.
22      Q. Next I'm showing you what I'm marking as
23  Exhibit 10.
24          (Timmel Exhibit 10 marked.)
25      Q. Do you see this document on your screen?

49

1      A. I do.
2      Q. This appears to be an email sent to you from
3  Brian Lynk on February 29th of 2024, correct?
4      A. That's correct.
5      Q. Actually, before we get there, you had a
6  site visit prior to February 29th of 2024, correct?
7      A. That's correct.
8      Q. When did you have a site visit?
9      A. On February 24th and then one yesterday.
10      Q. So I'm just going to -- we'll talk about the
11  one you did yesterday shortly. Let's start with just
12  the February 24th visit, okay?
13      A. Sure.
14      Q. When did you -- did you book that trip?
15      A. I requested that trip, but I did not -- I
16  booked the transportation to get me to Texas, but I
17  did not book it with CBP.
18      Q. What were the dates of your travel for the
19  site visit?
20      A. Well, I flew into San Antonio. I'm assuming
21  that would have been the -- I can make assumptions
22  for you. I can look in my records if that's
23  important. But if you would like me to make
24  assumptions, I'm happy to.
25      Q. I'm not asking you to make assumptions. I'm

50

1  just asking if you know.  Do you know when you
2  arrived for the site visit in Texas?
3      A.  In the day or two preceding the visit.
4      Q.  How long was the visit to Texas during which
5  you conducted a site visit at Eagle Pass?
6      A.  Three days.
7      Q.  Three days.  Did you visit Eagle Pass on the
8  first day of that visit?
9      A.  No.
10     Q.  What did you do on the first day of your
11 visit?
12     A.  Flew into San Antonio.
13     Q.  What did you do after you landed?
14     A.  Went to the hotel.
15     Q.  What did you do after you checked into the
16 hotel?
17     A.  Moved into the room and most likely went and
18 had dinner.
19     Q.  Did you discuss this case at all on the
20 first day of your site visit?
21     A.  I met with Brian Lynk, and we had some
22 discussions, yes.
23     Q.  Were those discussions over dinner?
24     A.  I'm not certain.  They were in the evening,
25 though.

51

1      Q.  After you checked into the hotel?
2      A.  Correct.
3      Q.  Where did you go to meet Brian Lynk?
4      A.  In the hotel lobby.
5      Q.  Approximately how long was that meeting?
6      A.  An hour.
7      Q.  Other than the one hour conversation you had
8  with Brian Lynk in the lobby of the hotel on day one
9  of your site visit, did you discuss this case with
10 anyone else?
11     A.  No.
12     Q.  So let's go to day two of your site visit.
13     A.  Uh-huh.
14     Q.  What did you do that morning?
15     A.  We had an early start.  There were a number
16 of people going on the visit all staying in the same
17 hotel.  We met in the lobby before sunrise, and -- I
18 was going to say boarded, but I got into several
19 vehicles and then drove from San Antonio to Eagle
20 Pass.
21     Q.  How many people were there that were with
22 you at this point?
23     A.  Total, approximately eight.
24     Q.  Eight people?  Who were the eight people?
25     A.  I don't recall all of their names.  I know

52

1  Kimere was there, but I don't recall her last name;
2  Brian Lynk; there was a gentleman from the Corps of
3  Engineers in the Houston area; there was a gentleman
4  from probably Chicago.  He's a professor at Loyola
5  University; and there were a few others, but I don't
6  recall all their names.
7      Q.  So I've got Brian Lynk, Kimere -- Kimere?
8      A.  Yes, uh-huh.
9      Q.  Someone from the Houston office, U.S. Army
10 Corps of Engineers, and a professor from Chicago?
11     A.  Right.
12     Q.  So four folks.
13     A.  Yes.  But there were some more -- there was
14 a lady who was with the U.S. attorney's office, and I
15 think another U.S. attorney and myself, and that's
16 all that I can recall.
17     Q.  Okay.  So I've got Brian Lynk and Kimere.
18 I've got two additional U.S. attorneys?
19     A.  Yes.
20     Q.  And then I've got someone from the U.S. Army
21 Corps of Engineers, Houston Office?
22     A.  Yes.
23     Q.  And then I've got a Chicago professor.  Is
24 that right?
25     A.  That's correct.

53

1      Q.  Six folks?
2      A.  Plus myself.
3      Q.  Plus yourself.  So seven folks?
4      A.  Yes.  Approximately, yes.
5          MR. LYNK:  I'll just note pronunciation
6  is Kimere.
7          MR. STONE:  Thank you.  I'm sorry.
8  Apologies, Kimere.  You're probably listening.
9          THE WITNESS:  Sorry, Kimere.
10         MR. STONE:  I'm sorry, Kimere.
11         THE WITNESS:  Sorry.
12     Q.  (BY MR. STONE)  Who was the gentleman from
13 the Houston office of the U.S. Army Corps of
14 Engineers?
15     A.  His first name is Christopher, I believe,
16 and I think he was a chief of operations, I believe.
17     Q.  Did he accompany you for the entirety of the
18 second day of your site visit?
19     A.  Well, we were split up into two cars, and
20 then on multiple boats on the site visit, so we
21 crossed paths with each other, but not the entire
22 time.
23     Q.  I see.  Did you discuss the case with
24 Christopher from the Houston U.S. Army Corps office?
25         MR. LYNK:  I'm going to object.  I

John Timmel - 6/5/2024

54

1  instruct not to answer that one, given the protection
2  of work product with consulting experts under the
3  federal rules.
4          You can ask a different question that --
5          MR. STONE: No, I can't.  I didn't ask
6  him about the contents of the question.  I asked him
7  if he spoke with him.  Your instruction was for him
8  to not answer whether he spoke to him, not the
9  contents.
10     Q.  (BY MR. STONE)  So are you refusing to
11  answer my question of whether or not you discussed
12  the case with Christopher?
13     A.  I am going to do what Mr. Lynk asks me to
14  do, yes.
15     Q.  On the second day of your site visit,
16  approximately how much of the day did you spend in
17  the presence of Christopher from the U.S. Army Corps'
18  Houston office?
19     A.  He was in the car when we drove down to
20  Eagle Pass, and so that's two hours or so.  And then
21  we sat in the same conference room when we were
22  briefed by CBP before going on the boats.  And then I
23  don't recall if we were on any of the same boats, but
24  we were not able to have conversations anyway, so I
25  don't know whether -- and then afterwards, before we

55

1  got on the road to head back, we had lunch together,
2  and I don't recall if he was in the vehicle on the
3  trip back.
4     Q.  How long was the drive from San Antonio to
5  Eagle Pass?
6     A.  About two and a half hours.
7     Q.  Was Christopher in the car with you during
8  that ride?
9     A.  On the trip down, yes.
10     Q.  What happened once you arrived in Eagle
11  Pass?
12     A.  We went to a CBP office and was briefed by
13  one of the commanders there, chief people there.  And
14  then we went to -- by the detention center, if that's
15  what you call it, the processing center, soft-sided
16  facility I think is what they called it, but did not
17  go in, and then we were taken to the boats.
18     Q.  So let's walk through each of those.  So
19  first you attended a briefing.  Who was present
20  during the briefing?
21     A.  All of the members of our party.
22     Q.  Was anyone else present during the briefing?
23     A.  Yes, a number of people from the CBP and
24  then the person who appeared to be the person in
25  charge -- I believe he was introduced to be the

56

1  person in charge -- who gave us just an overview
2  of -- and gave us an opportunity to ask some
3  questions.  And as far as I know, that was it.
4     Q.  How many people were present in addition --
5  let me strike that.
6          How many people were -- let me be
7  specific.  So -- let me see if I can make it easier.
8          The only other people that were present
9  apart from your party that arrived were CBP
10  personnel, correct?
11     A.  As far as I know.  I don't know who all was
12  in the room.
13     Q.  So you're not sure if they were CBP?
14     A.  They were all people in uniform.
15     Q.  Were they wearing CBP uniforms?
16     A.  Not certain.
17     Q.  What does a CBP uniform look like?
18     A.  Well, I saw several, depending upon what
19  their roles were.  So it looks like a military
20  uniform of sorts or law enforcement.
21     Q.  How many peop -- so everybody in the room
22  other than the party that you arrived with was in
23  uniform during this briefing, correct?
24     A.  I'm not certain.
25     Q.  Okay.  How many people, other than the party

57

1  that you arrived with, were present during the
2  briefing?
3     A.  Eight.
4     Q.  Eight additional people?
5     A.  I would estimate eight.
6     Q.  And you mentioned that the briefing was
7  given by someone who was identified as a CBP
8  commander.  Is that correct?
9     A.  I'm not sure if that's the proper term, but
10  one of the officers in charge.
11     Q.  What was his name?
12     A.  I saw -- he -- I think it's George Cavozas,
13  or however you say his last name.
14     Q.  George Cavarsos, Cavazas.
15     A.  Cavaloz or Cavaloza.
16     Q.  Something like that?
17     A.  Something like that.
18     Q.  Do you know what his -- do you know what
19  kind of rank he had?
20     A.  No.
21     Q.  How long was the presentation?
22     A.  10, 15 minutes.
23     Q.  Did you rely on any of the information that
24  you received during the presentation in forming your
25  expert opinions in this case?

58

1    A.  No.
2    Q.  What was the presentation about?
3    A.  A little bit of introduction to the Eagle
4  Pass section of the Rio Grande, what we would be
5  doing that day.  And there were some questions asked
6  about how many immigrants or people trying to cross
7  the river, what number of people there were, and
8  that's pretty much it.
9    Q.  Did you ask any questions during the
10  meeting?
11    A.  No.
12    Q.  At the conclusion of the 10- to 15-minute
13  meeting with George Cavazos, you mentioned that next
14  the group went to a detention center, right?
15    A.  Yes.
16    Q.  Where was that detention center in relation
17  to the briefing room or the -- strike that.
18         Where was the detention center in
19  relation to the room where you received the briefing?
20    A.  It was in the same compound or the same
21  area.
22    Q.  Just generally describe what the detention
23  center looked like.
24         MR. LYNK:  I'm going to object.  This is
25  beyond the scope of his opinions, and any

59

1  conversations he's having with U.S. personnel
2  accompanied by counsel that are not related to his
3  opinions would be work product.
4         MR. STONE:  Okay.
5         THE REPORTER:  I'm sorry, would be?
6         MR. LYNK:  Work product.
7         MR. STONE:  I don't know why you're
8  speaking right now.  I didn't ask him about a
9  conversation.  I asked him to describe what the
10  detention center looked like.  So while you're just
11  speaking about what the conversations are -- or.
12         MR. LYNK:  I'm speaking because it's
13  privilege objection, and you are allowed --
14         MR. STONE:  Are you instructing --
15         MR. LYNK:  -- to make speaking
16  objections.
17         MR. STONE:  Are you --
18         MR. LYNK:  Yes, I'm instructing --
19         MR. STONE:  Are you instructing him not
20  to answer about what the appearance of the detention
21  center was?
22         MR. LYNK:  Yes, I'm instructing him not
23  to answer about that.  There is nothing --
24         MR. STONE:  Are you --
25         MR. LYNK:  -- about that.

60

1    Q.  (BY MR. STONE)  Are you refusing to answer
2  my questions about what the appearance of the
3  detention center was when you visited it during your
4  site visit in this case?
5    A.  Yes, I am, as I was instructed.
6    Q.  Okay.  How long were you at the detention
7  center?
8         MR. LYNK:  I'm going to object and
9  instruct him not to answer.
10         MR. STONE:  Let's take a break.  I think
11  we're going to need to call the judge.
12         THE VIDEOGRAPHER:  Off the record.  Time
13  is 10:32.
14         (Recess 10:32 a.m. 11:01 a.m.)
15         THE VIDEOGRAPHER:  We're back on the
16  record.  The time is 11:01.
17         MR. STONE:  And just for the record, I
18  want to recount what just happened.  We did call
19  Justice Howell's -- let me start again.
20         While we took a break, we discussed with
21  opposing counsel, Mr. Brian Lynk, how to proceed.  We
22  called Magistrate Howell, who this case is assigned
23  to and who is the sitting duty judge right now.  We
24  called and left a message with his court deputy to
25  give us a call back and notify them that we've had an

61

1  issue come up and that we would like the judge to
2  rule.
3         So that's what's happened during the
4  break before we came back on the record.  Go ahead if
5  you want to make your privilege.
6         MR. LYNK:  Yes.  I will just note that
7  summary of what occurred is accurate.  I am objecting
8  to a question about how long the witness was at the
9  detention center of CBP on the grounds of law
10  enforcement privilege and instructing him not to
11  answer on that basis.
12         MR. STONE:  And just for the record, is
13  that also the reason why you are not answering the
14  question that was asked earlier?
15         THE WITNESS:  That is correct.
16    Q.  (BY MR. STONE)  Earlier we talked about
17  Christopher from the Houston U.S. Army Corps of
18  Engineers office, and you were instructed not to
19  answer questions about your conversations with him.
20  Do you recall that?
21    A.  I do.
22    Q.  Did you rely on any conversations that you
23  had with Christopher from the Houston office of the
24  U.S. Army Corps of Engineers in forming the bases for
25  your opinions in this case?

John Timmel - 6/5/2024

---

62

1    A.  No, I did not.

2    Q.  What happened after you left the detention

3  center?

4    A.  We were transported to the riverside to a

5  boat ramp to board the vessels.

6    Q.  And approximately what time was that?

7    A.  I have no idea.

8    Q.  Was it before lunchtime?

9    A.  Yes.  It was in the morning.

10   Q.  It was in the morning.  Where was the dock

11 that you were transported to?

12   A.  We were not transported to a dock.  It was a

13 boat ramp, and there are several in that area.  I

14 believe it was the Gonzalez ramp.

15   Q.  About how long did it take to transport you

16 from the detention center to the Gonzalez ramp?

17   A.  10 or 15 minutes.

18   Q.  During that 10- or 15-minute transfer to the

19 Gonzalez ramp, did you discuss this case with anyone

20 at CBP?

21   A.  No.

22   Q.  What happened once you arrived at the

23 Gonzalez ramp?

24   A.  We were given a safety briefing, put on

25 PFDs, personal flotation devices, and hearing

---

63

1  protection and boarded the boats.

2    Q.  How many boats were there?

3    A.  Two or three.

4    Q.  What type of boats were they?

5    A.  They were all airboats.

6    Q.  How many people were there, total, on the

7  trip at this point?

8    A.  I believe there were eight including myself

9  approximately.

10   Q.  So there were eight people, total, present

11 spread out among three boats?

12   A.  To the best of my knowledge.

13   Q.  Did you board a boat at that point?

14   A.  I did.

15   Q.  How many people were in the boat that you

16 boarded?

17   A.  Three, plus the operators.

18   Q.  How many operators were there?

19   A.  There was the person actually operating the

20 boat and then his mate or deckhand.  So there were

21 two personnel, CBP personnel.

22   Q.  And who else from the party that you arrived

23 in Eagle Pass with was on the boat with you during

24 this trip?

25   A.  I don't recall.

---

64

1    Q.  Was it Brian Lynk?

2    A.  I don't recall.

3    Q.  So on the airboat at this point, it's the

4  boat operator and one additional personnel from CBP

5  assisting him, correct?

6    A.  That is correct.

7    Q.  And then three people from your party of

8  seven?

9    A.  Well, there would have been three on two of

10 the boats and two on one of the boats.  We had three

11 on the boat I was on.

12   Q.  Who was the boat operator?

13   A.  I do not know.

14   Q.  Who was this CBP person assisting the boat

15 operator?

16   A.  I don't know.

17   Q.  Did you discuss the case with the CBP boat

18 operator?

19   A.  No.

20   Q.  Did you discuss this case with the CBP

21 assistant to the boat operator?

22   A.  No.

23   Q.  Was the noise generated by the airboat such

24 that you couldn't have conversations on the airboat

25 while traveling?

---

65

1    A.  Yes, but we were wearing headsets that were

2  connected wirelessly, and conversation could take

3  place; though, on the boat I was on, none that I

4  recall other than possibly some instructions or

5  comments by the operator.

6    Q.  Okay.  So the operator was connected to your

7  headset and could hear what conversation was taking

8  place?

9    A.  If we had some, he would have been able to

10 hear it, yes.

11   Q.  Was the boat operator a lawyer?

12   A.  No.

13   Q.  What did you guys discuss while you were on

14 that -- while you were on the airboat?

15   A.  We actually did not have discussion.

16   Q.  How long was the airboat ride?

17   A.  In total, a little over an hour.

18   Q.  And where did you go during the airboat

19 ride?

20   A.  We went up to the marine floating barrier

21 area.

22   Q.  Did you actually see the floating -- marine

23 floating barrier?

24   A.  I did.

25   Q.  For the purposes of this case it's going to

---

66

1  be easier if, when I say, "the marine flo" -- when I
2  say "buoys," I'm referring to the marine floating
3  barrier.  Do you understand?
4      A.  I have a bit of difficulty with that because
5  they're not buoys; they're floats.  If you want to
6  refer to it as "barrier" or something, but I have a
7  hard time agreeing to characterizing the barrier as
8  buoys.
9      Q.  I understand that you have a problem with me
10 characterizing it as buoys, but I'm asking if you
11 understand that that's what I mean when I use the
12 term "buoys"?
13     A.  Yes, if you insist.
14     Q.  Okay.  We'll get into the details about why
15 you think that they're not a buoy --
16     A.  Okay.
17     Q.  -- shortly.  But for the purposes of my
18 questions, I'm going to refer to them as "the buoys."
19     A.  Okay.
20     Q.  Approximately how long did it take to arrive
21 at the site where the buoys were located?
22     A.  Ten minutes.
23     Q.  How long were you at the site where the
24 buoys were located?
25     A.  30 minutes.

67

1      Q.  Did you travel by the airboat past the buoys
2  upstream?
3      A.  We did.
4      Q.  Did you travel past the buoys on the airboat
5  going downstream?
6      A.  Yes.
7      Q.  Did you circle around the buoys in the
8  airboat?
9      A.  We did.
10     Q.  So you went up, down, and around the
11 buoys --
12     A.  That is --
13     Q.  -- during this site visit?
14     A.  That is correct.
15     Q.  Was there any damage to the airboat while
16 you were going up, down, and around the buoys?
17     A.  There was no damage to the boat I was on.
18     Q.  Oh, was there damage to any of the other
19 boats that were there?
20     A.  It appeared that one of the boats that was
21 much closer to the barrier had touched or grounded on
22 one of the concrete barriers to some degree, but I
23 don't know if there was damage or not.
24     Q.  I think I understand.  I don't think I
25 appreciated it before.

68

1      Q.  Did you actually pull up and -- strike
2  that.
3          Did you touch the buoys?
4      A.  I did not touch the buoys.
5      Q.  Did you get close enough to touch the buoys?
6      A.  No, I did not get close enough to touch the
7  buoys.
8      Q.  Did the boat that potentially touched the
9  buoys -- strike that.
10         But it's your testimony today that you
11 observed one of the other airboats touch the buoys?
12     A.  No.
13     Q.  They touched the concrete blocks the buoys
14 are sitting on.  Is that more accurate?
15     A.  That's correct.
16     Q.  Did you get close enough to touch the
17 concrete barriers that the buoys are sitting on
18 during this site visit?
19     A.  No.
20     Q.  Of the three boats, how many of them got
21 close enough to touch the concrete where the buoys
22 are -- that the buoys sit on top of?
23     A.  I only saw the one.
24     Q.  How many people were on the boat that made
25 contact with the concrete that the buoys sit on?

69

1      A.  The two operators and two or three of the
2  passengers.
3      Q.  And approximately how deep was the water at
4  that time?
5      A.  In the vicinity of the barrier, three feet.
6      Q.  And there was no discussion at all during
7  this point while you spent 30 minutes going up, down,
8  and around the buoys, right?
9      A.  There was some discussion by the operator of
10 where we were and landmarks and what certain bridges
11 we were passing under were named, and I believe that
12 was the extent of it.
13     Q.  What happened after the 30 minutes or so
14 that you spent going up, down, and around the buoys?
15     A.  We went back toward -- in the direction of
16 the boat ramp where we had boarded.  We got to one of
17 the bridges, and we actually tied up to the bridge,
18 just put a line out and just sat there for about ten
19 minutes and just relaxed and looked around and took
20 all in, then got back underway and proceeded back to
21 the boat ramp.
22     Q.  How what bridge was that?
23     A.  I don't know.
24     Q.  Did you discuss the case at all during that
25 ten minutes or so that you were tied up at the

John Timmel - 6/5/2024

70

1  bridge --
2      A. No.
3      Q. -- relaxing?  What happened after you left
4  the area under the bridge where you were relaxing?
5      A. We returned to the boat ramp.
6      Q. What happened after you returned to the boat
7  ramp?
8      A. We disembarked, took off the equipment that
9  we had put on, and went back to the vehicles.
10     Q. And what happened after you went back to the
11 vehicles?
12     A. We went to a restaurant for lunch.
13     Q. And when you say, "we," do you mean the
14 original party that you left San Antonio with?
15     A. That is correct.
16     Q. Was there anyone else that attended the
17 lunch with you other than the party that you
18 originally left San Antonio with?
19     A. I don't know.
20     Q. What happened after you guys -- after you
21 finished lunch?
22     A. We got back in the vehicles and went back to
23 San Antonio.
24     Q. Approximately what time was that?
25     A. 1, 1:30 in the afternoon.

71

1      Q. So, in total, at the river around the --
2  strike that.
3      A. May I readdress that question?
4      Q. In a -- I've got a call coming in, so I
5  think this is the court.  Let's take the -- I hope
6  it's the court?
7          THE REPORTER:  Off the record?
8          MR. STONE:  Off the record.
9          THE VIDEOGRAPHER:  Off the record.  The
10 time is 11:15.
11         (Discussion off the record.)
12         THE VIDEOGRAPHER:  Back on the record.
13 The time is 11:20.
14     Q. (BY MR. STONE)  A moment ago you said that
15 you wanted to change the answer that you had just
16 given.  Do you recall that?
17     A. I did.  I had further recollection.
18         After we left the boat ramp, we went by
19 vehicle to a place on the bank of the river that
20 overlooked the barrier, and got out of the vehicles
21 and had an opportunity to look at the barrier from
22 that perspective and take photographs and so forth.
23     Q. Did you take photographs at that point?
24     A. I did.
25     Q. Who all was present with you at that time

72

1  when you were taking the photographs?
2      A. The party that I was with, plus the driver
3  of the vehicle, and -- the name I'm having problems
4  with again Cavaloza or -- he was there, and I
5  remember another young guy from CBP who was in the
6  vicinity.
7      Q. Was the driver of the vehicle a lawyer?
8      A. Not that I'm aware of.
9      Q. Is the Cavaloza individual a lawyer?
10     A. No.
11     Q. Okay.  He was present when you were taking
12 the pictures from that vantage point over --
13 looking -- overlooking the buoys, right?
14     A. That is correct.
15     Q. What did you guys talk about?
16     A. I --
17     Q. Strike that.  Let me start again.
18         You discuss you disc -- did you discuss
19 the case at that point?
20     A. I did not discuss the case per se.  What I
21 did do was ask questions as to how the barrier
22 affected the operations of his men.
23     Q. Okay.  And you directed those questions to
24 who?
25     A. To Cavaloza.

73

1      Q. Okay.  Generally, how long did this -- I'm
2  going to call it a meeting.  This -- well, strike
3  that.
4          Where exactly were you located?
5      A. We were on the bank at the -- right up to
6  the fence that -- with all the sea wire and razor
7  wire that overlooked the barrier on the U.S. side.
8      Q. And how long were you there approximately?
9      A. Ten minutes.
10     Q. So during this sort of ten-minute period,
11 what questions did you ask to Cavaloza?
12     A. I asked if the barrier had an impact on the
13 operation of his officers.
14     Q. And how did he respond?
15     A. That it did.
16     Q. Is that all he said?
17     A. No.
18     Q. Okay.  What else did he say?
19     A. He said that it created a hazard to
20 navigation, that after the barrier was moved from
21 closer to the center line to closer to the U.S. bank,
22 that the maneuvering space --
23         MR. STONE:  You're going to have to
24 stop.  I'm sorry we're going to have to take it back
25 up.

74

1          THE VIDEOGRAPHER:  Off the record time
2 is 11:23.
3          (Discussion off the record.)
4          THE VIDEOGRAPHER:  We're back on the
5 record.  Time is 11:24.
6          MR. STONE:  And just for the record, we
7 just spoke with Magistrate Howell's deputy, and we're
8 going to be speaking with the judge at 12:30 or 12:45
9 to resolve this privilege issue.
10     Q.  (BY MR. STONE)  So you were cut off mid
11 answer.  I want to give you a chance to go ahead and
12 finish your answer.
13          THE WITNESS:  Could the court reporter
14 repeat what I had said, please.
15          THE REPORTER:  Okay.  The question was,
16 "What else did he say?"
17          Answer:  "He said that it created a
18 hazard to navigation, that after the barrier was
19 moved from closer to the center line to closer to the
20 U.S. bank, that the maneuvering space" -- then
21 Mr. Stone said, "You're going to have to stop."
22          THE WITNESS:  So if I can just
23 continue there that the maneuvering space was greatly
24 reduced, that only -- while one of the fanboats could
25 operate at a time on the U.S. side of the barrier,

75

1 and that if there was a drowning victim on the other
2 side of the barrier from where a boat was located,
3 that they would have to go around the bar -- into the
4 barrier to get to them rather than going straight to
5 them, which it would take a little bit more time.
6     Q.  Did he say anything else?
7     A.  Not that I remember specifically.
8     Q.  Did you rely on the -- that conversation in
9 forming your expert opinions in this case?
10     A.  I relied on a number of things in forming my
11 opinions.  It's all covered under the bases of my
12 opinions within my report, but I did certainly rely
13 on some of what was said by the -- by Mr. Cavaloza
14 and the other CBP officers as to whether or not they
15 viewed it as being a hazard to navigation.
16     Q.  Well --
17          MR. STONE:  Objection.  Nonresponsive.
18     Q.  I'm going to ask it again.  I'm only asking
19 about the conversation you just described with
20 Cavaloza.  Did you rely on that in forming your
21 opinions in this case?
22     A.  No.
23     Q.  Okay.  What happened after you left the bank
24 side location after ten minutes?
25     A.  That is when we went to lunch.

76

1     Q.  Other than the party that you left San
2 Antonio with on that first -- strike that.
3          What happened when you got back to
4 San Antonio?
5     A.  We were dropped off at the hotel.
6     Q.  What did you do after you were dropped off
7 at the hotel?
8     A.  We -- I went back to my hotel room.
9     Q.  Did you have any subsequent meetings after
10 you were dropped off at your hotel room on day two of
11 your site visit about this case?
12     A.  I think we had niceties between the
13 participants, just saying it was nice meeting them
14 and see them again.  And I recall asking Mr. Lynk
15 if --
16     Q.  Let me stop you there.  So I don't want get
17 into the substance of your actual conversations with
18 Mr. Lynk.
19     A.  Okay.
20     Q.  Okay.  I'm just asking about existence of
21 meetings.  So I'll ask about time, manner, location,
22 but not contents.
23     A.  Okay.
24     Q.  All right.  Did you have any -- so day two
25 of your site visit back in February.  Other than the

77

1 conversations that you've described so far in your
2 testimony --
3     A.  Uh-huh.
4          THE WITNESS:  Sorry.
5     Q.  -- was there anyone else that you talked to
6 that you haven't identified?
7     A.  Not that I recall.
8     Q.  Were there any conversations that you had
9 that day with anyone from CBP that you relied on in
10 forming your expert opinions in this case?
11     A.  Some of the conversation that I had with
12 Mr. Cavaloza bolstered my opinions, but they did not
13 help me form my opinions.
14     Q.  When you say, "some of the conversations,"
15 are you specifically referring to the conversation
16 that you had -- that ten-minute conversation bank
17 side with Mr. Cavaloza?
18     A.  Yes, and I never said it was a ten-minute
19 conversation.  I said we were there for about ten
20 minutes.  The conversation was about five minutes
21 long.
22     Q.  So you had already formed your opinions by
23 the time you arrived on day two of the site visit in
24 this case.  Is that fair?
25          MR. LYNK:  Object to form.

78

1    A.  I had formed certain opinions based on the
2    research I had done and the evaluation of some of the
3    information that I had received.  So I already had my
4    basic opinions formed at that point.
5    Q.  (BY MR. STONE)  What opinion did you -- or
6    had you already formed that Mr. Cavaloza's
7    conversation with you merely bolstered?
8    A.  That the barrier is -- creates a hazard to
9    navigation and thereby it reduces navigable capacity
10   of the river.
11   Q.  So prior to the site visit, what information
12   did you rely on to form that opinion?  Strike that.
13   Strike that.
14        When did you first form that opinion?
15   A.  Shortly after I started to review case
16   information and learn some of the specifics of the
17   barriers, such as its length and width and location
18   in the river.
19   Q.  So this is back in September of 2023?
20        MR. LYNK:  Object to form.
21   A.  It would have been -- it would have been
22   late in 2023; not necessarily in September.  But
23   after I was first contacted by Mr. Lynk, I began
24   doing research on the barrier and -- just to decide
25   whether and -- one thing, whether I was a good fit

79

1    for the case or not.
2         And after seeing that I did and seeing
3    what I did, I -- it became apparent to me rather
4    early that it was certainly a hazard to navigation
5    and would reduce navigable capacity.
6    Q.  (BY MR. STONE)  So when did you first start
7    doing -- you said late 2023.  Strike that.  Let me
8    start again.
9         What research did you do in late 2023
10   that led you to conclude that the buoys were a hazard
11   to navigability?
12   A.  The research I did was things that were
13   covered that you had resources -- that you had access
14   to on the internet:  Different stories that had been
15   written about it, photographs that had been taken of
16   it that were published.
17        There was one story I read about a
18   gentleman who rented kayaks that could no longer do
19   that, and so I got information from that.
20   Q.  Did you actually speak to anybody when you
21   were forming these opinions back in late 2023?
22   A.  No.
23   Q.  Approximately how many news articles did you
24   read in late 2023 about the case that you relied on
25   in forming the opinion that the buoys were a hazard

80

1    to navigation?
2    A.  Well, I never really relied upon the news
3    stories that -- to form my opinions.  What I did was
4    use the -- primarily the visuals that were available
5    through them about the location and what the
6    structure looked like and so forth.  But there would
7    have been three or four articles.
8    Q.  Can you turn to page -- Timmel Exhibit 1,
9    that's your expert report.  Turn to page 34.
10   A.  Okay.
11   Q.  Okay.  I want you to go through this list
12   and tell me which of these documents you relied on in
13   late 2023 when you formed the opinion that the buoys
14   were a hazard to navigation.
15   A.  Well, they're not very descriptive in
16   nature, but I reviewed the Shelby declaration and --
17   Q.  Okay.  Hold on.  Let me --
18   A.  Shelnutt, I'm sorry.
19   Q.  Shelnutt declaration.  And that's on page 35
20   of Timmel Exhibit 1?
21   A.  It's on 34 on my copy.
22   Q.  Oh, it's on 34?  Oh, I see it.  Okay.
23        So you -- page 34 of Timmel Exhibit 1
24   you reviewed the Shelnutt declaration in the fall of
25   2023 and relied on that in forming your opinion that

81

1    the buoys were an obstruction to navigation, right?
2         MR. LYNK:  Object to form.
3    A.  I would need to see that document in order
4    to be able to answer that.
5    Q.  (BY MR. STONE)  So you're not sure if you
6    relied on that document in late 2023 in forming your
7    opinion?
8    A.  That is correct.
9    Q.  Okay.  Look at the rest of the list and tell
10   me if there are any documents on here that you re --
11   what documents on this list you relied on in the fall
12   of 2023 in forming your expert opinion -- forming the
13   opinion that the buoys were an obstruction to
14   navigation.
15   A.  If you go to page 35 --
16   Q.  Uh-huh.
17   A.  -- number 4, part A, Maps and Aerial photos.
18   Q.  Okay.  It says, "Received by email
19   January 26 of 2024," right?
20   A.  That's correct.
21   Q.  So you received those in the spring of 2024,
22   right?
23        MR. LYNK:  Object to form.
24   A.  Well, in winter of 2024.
25   Q.  (BY MR. STONE)  Well, my question is, again,

82

1   what documents did you rely on in late 2023 when you
2   formed the opinion that the buoys were an obstruction
3   to navigation from this list of documents in your
4   expert report?
5       A. Well, perhaps I -- I had an initial --
6   initial opinion that it was a hazard to navigation
7   primarily by visual inspection and photographs that
8   showed that I was able to find, and --
9           MR. STONE: Objection. Nonresponsive.
10      Q. (BY MR. STONE) I just want you to look at
11  this list here --
12      A. Okay.
13      Q. -- okay, in Timmel Exhibit 1, and just tell
14  me if it lists the documents that you were looking at
15  in the fall of 2023 when you formed the opinion that
16  the buoys were an obstruction to navigation.
17          MR. LYNK: Object to form.
18      A. I don't see any -- I don't see the articles
19  listed.
20      Q. (BY MR. STONE) Approximately how many
21  articles -- well, before we move on, just for the
22  sake of thoroughly, can you look at Timmel Exhibit
23  2, which is the supplemental next to you --
24      A. Yes.
25      Q. -- and see if maybe they're listed in there?

83

1   Can you look at Timmel Exhibit 2 and tell us -- do
2   you see in that supplemental whether it contains the
3   documents that you reviewed in 2023 in forming the
4   opinion that the buoys were an obstruction to
5   navigation?
6       A. No, I do not.
7       Q. Approximately how many documents did you
8   review in the fall of 2023 before forming the opinion
9   that the buoys were an obstruction to navigation?
10      A. As I recall, three or four news stories or
11  articles.
12      Q. Do you remember -- strike that.
13          What can you recall about those --
14  strike that.
15          Do you still have copies of those
16  articles?
17      A. I never had copies of them.  I just reviewed
18  them online.
19      Q. Do you remember where the news articles were
20  published?
21      A. No, I do not.
22      Q. Were they newspaper articles?
23      A. I think they were -- some of them were
24  newspaper articles and some of them were television
25  news station articles or stories.

84

1       Q. So you read -- you saw three or four
2   articles about the buoys and saw some images of the
3   buoys --
4       A. Yes.
5       Q. -- at that time --
6       A. Yes.
7       Q. -- correct?
8       A. Uh-huh.
9       Q. And then based on that, you concluded that
10  the buoys were an obstruction to navigation, right?
11      A. No. During that period of time I had
12  originally spoken with Mr. Lynk, and whenever I take
13  a case --
14      Q. Don't tell me about the contents of your
15  conversations with Mr. Lynk --
16      A. Okay.
17      Q. -- okay?
18      A. Okay. Whenever I take a case, I -- before I
19  accept the case, I like to have an opportunity to
20  review whatever information is available to me to
21  decide whether it's within my area of expertise or
22  not.
23          So I had seen news stories about the
24  barrier prior to Mr. Lynk contacting me, and then
25  after he spoke with me -- after he sent me the email

85

1   and we first spoke, I started doing research to see
2   whether or not it was within my area of expertise.
3   So I did not form any final opinions during that
4   period.  My opinions were in formation during that
5   time.
6       Q. So you formed an opinion, but it wasn't a
7   final opinion?
8           MR. LYNK: Object to form.
9       A. It's from the very first time I saw that and
10  after -- with the understanding that the question was
11  did I think the barrier created -- diminished the
12  navigability capacity of the river, that started me
13  thinking and started me thinking as to what would do
14  that.  And then I looked at different stories and,
15  based on primarily photographs that I looked at, that
16  it sure looked like a hazard to navigation and that I
17  thought I could be of -- that it was in my
18  wheelhouse, so to speak, of expertise.
19          MR. STONE: Let's go off the record for
20  a moment.
21          THE VIDEOGRAPHER: Off the record the
22  time is 11:42.
23          (Lunch recess 11:43 a.m. to 12:32.)
24          THE VIDEOGRAPHER: We're back on the
25  record.  The time is 12:32.

86

1   Q. (BY MR. STONE)  I want to go back and ask
2  you about what we've marked as Timmel Exhibit 7.
3         Do you see the document on the screen
4  right now?
5   A. I'm sorry?
6   Q. Do you see the document?
7   A. I do.
8   Q. Okay.  This is the answers that you received
9  to your questions that were emailed on -- well,
10  strike that.
11         These are the answers that you received
12  to some of the questions that you had in the case,
13  right?
14   A. That's correct.
15   Q. And earlier you testified that the
16  highlighted portion is what was filled in by some
17  unknown person, but you wrote the actual
18  non-highlighted question part, right?
19   A. That is correct.
20   Q. I want to go through each of these, and I
21  have some follow-up questions about them.
22   A. Okay.
23   Q. Could you read the first question?
24   A. Okay.  "Has the floating marine barrier
25  created any hazards to navigation for: a. Federal

87

1  agents?  If yes, how?"
2   Q. So let me stop you there.  It says, "a,"
3  right?
4   A. Yes.
5   Q. Was there a "b" ever to this document?
6   A. I don't recall.
7   Q. Earlier you testified if there -- strike
8  that.
9         There was an amendment made to this
10  document on February 1st, correct?
11   A. Yes.
12   Q. Earlier you testified that if there were any
13  amendments, you would have made them, right?
14   A. Yes.
15   Q. Okay.  And earlier I believe you testified
16  that if there were any amendments, you would have
17  added questions, right?
18   A. That's what the amendments would have been.
19   Q. You wouldn't have removed any questions,
20  though, right?
21   A. No.  If the document came back and there
22  weren't some answers, perhaps I would have, but -- I
23  don't believe so, no.
24   Q. To the best of your recollection, there was
25  only ever an "a" on this document?

88

1   A. Yes.
2   Q. What is the answer that you received back
3  from an unknown person in response to "a" of Timmel
4  Exhibit 7?
5   A. It says, "Yes, the concrete anchors to keep
6  the buoys in place create navigational hazards
7  (Dangers of striking anchors)" -- wait a second.  I'm
8  having a hard time -- "anchors) and the restricted
9  navigational hazards of traversing the area."
10   Q. Is that consistent with the opinion in this
11  case that you'd already formed in the fall of 2023?
12         MR. LYNK:  Object to form.
13   A. I -- the opinions I formed in fall of 2023
14  were preliminary opinions just based upon the
15  information that I was able to find online.  And
16  based on that information, I felt the barrier did
17  create a hazard to navigation and did reduce the
18  navigational capacity of the river.  But I would
19  never have that opinion based strictly on what I saw
20  online.  So I knew that I needed to see it in person
21  and review additional information and data and
22  evidence.
23         MR. STONE:  Objection.  Nonresponsive.
24   Q. (BY MR. STONE)  My question to you was if
25  this, what we just read, was consistent with the

89

1  opinion that you formed in the fall of 2023.
2         MR. LYNK:  Object to form.
3   A. Consistent with my preliminary opinion that
4  I had in 2023.
5   Q. (BY MR. STONE)  Did you -- all right.  We
6  just returned from a lunch break, right?
7   A. Yes.
8   Q. Who did you eat lunch with?
9   A. With Mr. Lynk.
10   Q. How long was that lunch?
11   A. The actual lunch itself was 15, 20 minutes.
12   Q. But we actually took about a 45-minute
13  break, right?
14   A. That is correct.
15   Q. And is it your -- prior to taking a break
16  you testified that you formed an opinion about this
17  case in the fall of 2023 as it relates to whether or
18  not the buoys constituted an obstruction to
19  navigation on the Rio Grande River, right?
20         MR. LYNK:  Object to form.
21   A. I formed a preliminary opinion to the extent
22  that I was comfortable in telling Mr. Lynk that I
23  thought I was appropriate to take on this case.
24         MR. STONE:  Okay.  Objection.
25  Nonresponsive.

90

1    Q.  (BY MR. STONE)  I'm asking you if you
2  testified earlier -- and we can read it back -- that
3  you formed an opinion about whether or not the buoys
4  constituted a hazard to navigation in the fall of
5  2023.  Do you recall that?
6    A.  I do.
7        MR. LYNK:  Object to form.
8    A.  Sorry.
9    Q.  (BY MR. STONE)  And now, after you returned
10  from lunch, you're changing your testimony to tell us
11  that that opinion was only preliminary, aren't you?
12        MR. LYNK:  Object to form.
13    A.  I am not changing my testimony.  I stated
14  that I had formed an opinion, and a preliminary
15  opinion is certainly an opinion.
16    Q.  (BY MR. STONE)  Did you use the word
17  "preliminary" opinion prior to going to lunch?
18    A.  I did not.
19    Q.  Okay.  But you only -- this whole
20  "preliminary opinion" thing is only after you
21  returned from lunch with Brian Lynk, right?
22        MR. LYNK:  Object to form.
23    A.  I did not use that word prior to lunch, if
24  that's what you're asking.
25    Q.  (BY MR. STONE)  That is what I'm asking.

91

1  Thank you.
2        Did you -- you testified earlier that
3  you relied on this document in forming your opinions
4  in this case, right?
5    A.  It influenced my opinions in this case; it
6  bolstered my opinions.  It reinforced the opinions I
7  had -- was in the process of developing.
8        MR. STONE:  Objection.  Nonresponsive.
9    Q.  (BY MR. STONE)  I'm just asking if you
10  relied on this document when you were forming your
11  opinions about this case.
12    A.  Yes.
13    Q.  And what opinion in this case do you have
14  that you relied on the answer to -- strike that.  I
15  asked about the whole documents, and I'm going to ask
16  about some specific questions as we go through.
17        For Timmel Exhibit -- Exhibit 7, in the
18  answer to question number 1, did you rely on this
19  answer in forming any opinions in this case?
20    A.  It bolstered my opinions and reinforced my
21  opinions.
22    Q.  When you say --
23    A.  Did I solely rely upon this?  No.
24    Q.  When you say that it bolstered your opinion,
25  is that because you already had an opinion about this

92

1  case before you ever saw this document?
2        MR. LYNK:  Object to form.
3    A.  Yes.
4    Q.  (BY MR. STONE)  And that opinion that you
5  had before you ever saw this document is the opinion
6  we talked about before from the fall of 2023, right?
7    A.  These questions were asked in 2024, so
8  somewhere between fall of 2023 and the time I asked
9  these questions, I had already formed an opinion.
10    Q.  And what was the opinion that you had formed
11  in this case between the fall of 2023 and this
12  communication that you had with Brian Lynk?
13    A.  That the barrier minimizes or reduces
14  navigable -- navigable capacity and the -- and
15  creates a hazard to navigation.
16    Q.  That's the same opinion that you testified
17  earlier today you formed in the fall of 2023, right?
18        MR. LYNK:  Object to form.
19    A.  Yes.
20    Q.  (BY MR. STONE)  Has that opinion ever
21  changed between when you formed it in the fall of
22  2023 and today?
23    A.  No.
24    Q.  Can you read number 2 on Timmel Exhibit 7?
25    A.  "Has the marine floating barrier impacted

93

1  the type of vessels utilizing the river?"  And the
2  answer is no.
3    Q.  Why would that be an important question to
4  ask in this case?
5    A.  Because did it reduce navigable capacity.
6    Q.  What do you mean when you say, "did it
7  reduce navigable capacity"?
8    A.  If a certain type of vessel could proceed up
9  and down the river in a certain part of the river
10  prior to the installation of the barrier and then it
11  could not afterwards, then that would certainly be a
12  reduction in navigable capacity.
13    Q.  I think you testified that the answer to
14  that was no, it hasn't had any impact on the type of
15  vessel utilizing the river, right?
16    A.  Yes, but I was told yesterday and I
17  experienced yesterday that in fact it has.
18    Q.  Well, we'll get to the -- we'll get to
19  yesterday.
20        So is it your testimony that you're no
21  longer relying on -- well, stop there.
22        Are you relying on the answer to number
23  2 in Timmel Exhibit 7 in this case?
24    A.  I considered it, but my opinion still stands
25  and did not waiver as a result of that answer.

94

1    Q. It's fair to say that you've been unwavering
2 in your expert opinion in this case since the fall of
3 2023, right?
4        MR. LYNK:  Object to form.
5    A. I have.
6    Q. (BY MR. STONE)  Excellent.  So, number 3.
7 Could you read number 3 for us from Timmel Exhibit 7?
8    A. "Has the marine floating barrier impacted
9 the number of vessels utilizing the river?"  And the
10 answer is yes.
11    Q. Why would that be an important question to
12 know in this case?
13    A. Well, "capacity" means the maximum volume or
14 the maximum ability of something to do something.
15 And if fewer vessels can traverse the river in the
16 area of the marine floating barrier than before, then
17 it has impacted navigable capacity.
18    Q. Did you rely on the answer to -- the answer
19 that you received to number 3 on Timmel Exhibit No. 7
20 in your opinions in this case?
21    A. It confirmed my opinions in this case.
22    Q. And instead of having to do this for each
23 question, I'm just going to ask for the whole
24 document.
25    A. Okay.

95

1    Q. Is the answer -- is your answer the same for
2 the whole document, that it just bolstered the
3 opinion you already had; you didn't rely on it in
4 forming an opinion in this case?
5    A. That is correct.  I'd formed my opinions
6 prior.
7    Q. Perfect.  Okay.  I won't bother you with
8 that question again and again.
9    A. Thank you.
10    Q. Let's go on to number 4.  Can you read the
11 question and answer for number 4 because I have some
12 follow-up questions.
13    A. "Has the marine floating barrier impacted
14 the density of vessel traffic, i.e., are vessels
15 forced to operate more closely together because of
16 the reduced area in which to operate?"
17        And the answer was "Yes, only one boat
18 can be in the area of the location of the buoys."
19    Q. But that's not true, right?  Because a
20 moment ago you testified that when you did your site
21 visit in February there were three boats that
22 accompanied you on that trip, and you guys went up,
23 down, and around the buoys, right?
24    A. Not at the same time, no.
25    Q. So you weren't able to go past the buoys at

96

1 the same time?
2    A. On the U.S. side of it, it was certainly one
3 vessel at a time and only one-way traffic.
4        On the other side you could have two
5 vessels at a time, but operating at a much slower
6 speed.
7    Q. Okay.  So let's try to orient this because
8 maybe I'm -- I want to make sure the record is clear
9 and the court can understand.
10        So approximately how many feet across is
11 the Rio Grande River in the location where the buoys
12 are?
13    A. Approximately 300 feet by inspection of
14 photographs, and that changes constantly depending
15 upon the stage of the river or the height of the
16 river.
17    Q. The day that you were there --
18    A. Yes.
19    Q. -- approximately -- for the site visit in
20 February, approximately how many feet across was the
21 Rio Grande River where the buoys were located?
22    A. I would say 250 to 300 feet.
23    Q. 250 to 300 feet.  And you were on an airboat
24 that was, I think you said, 8 feet wide and 20 feet
25 long?

97

1    A. Correct.
2    Q. And it's your testimony today that only one
3 boat at a time could pass by the buoys.  Is that
4 correct?
5    A. On the U.S. side of the barrier, yes.
6    Q. What do you mean "the U.S. side of the
7 barrier"?
8    A. Well, the barrier runs parallel to the
9 international border.  So on the U.S. side -- on one
10 side of it is U.S. territory, and the other side is
11 Mexican territory.
12    Q. I see.  So everything on the far side of the
13 buoys is Mexico?
14    A. Yes.
15    Q. And everything between the buoys and the
16 U.S. bank is U.S. waters, right?
17    A. That is correct -- no, not between the
18 buoys.  I'm sorry.  Between the international
19 boundary which is approximately located in the center
20 of the river, but it constantly moves with the rise
21 and fall of the height of the river.
22    Q. So we've got 300 feet across.
23    A. Approximately.
24    Q. Approximately.  And a moment ago you
25 testified that the buoys were the international

98

1  boundary, but now you're saying that's not accurate.
2  Is that correct?
3      A. I don't recall -- I don't believe I said
4  that. If I did, I misspoke. It's not the buoys.
5  It's -- I always said that the barriers was on the
6  U.S. side of the river, and then -- in fact, was
7  moved even closer to the U.S. side because of some
8  sort of issue with the boundary moving.
9      Q. Okay. Approximately how many feet from the
10 bank of the U.S. side were the buoys located on the
11 day that you did the site visit in February of 2024?
12     A. Maybe 75 feet. It depends on where along
13 the barrier at the down river end of it -- the up
14 river end of it, it -- the bank curves, so it
15 converges and it's much closer. Probably 40 feet,
16 40, 50 feet.
17     Q. So at the narrowest point between the U.S.
18 bank and the buoys it's approximately 40 feet?
19     A. Yes, but there is a shoal in that area that
20 restricts navigation of vessels in that area so it's
21 even constricted more.
22     Q. Okay. We'll come back to that.
23         At the widest point, how many feet from
24 the U.S. bank is the -- are the buoys?
25     A. This is all done by visual inspection, but a

99

1  hundred feet, maybe 125 -- no, a hundred feet.
2      Q. So between 140 feet to the U.S. bank from
3  widest to closest. That's where the buoys are
4  located in the Rio Grande River?
5      A. I'm sorry, repeat your question.
6      Q. All right. So the buoys are located between
7  100 feet and 40 feet from the U.S. bank?
8      A. Yes.
9      Q. How many feet are the buoys located at the
10 closest point to the international boundary in the
11 Rio Grande River on the day that you visited in
12 February of 2024?
13     A. On the closest point, probably about 50
14 feet.
15     Q. And at the furthest point, how many feet
16 away from the international boundary in the Rio
17 Grande River were the buoys located when you did the
18 site visit in February of 2024?
19     A. I need a clarification of your question
20 because when you asked this follow-up question, it
21 made me think that maybe I was getting it backwards.
22         So the international boundary is
23 approximately 150 feet from the U.S. border -- from
24 the U.S. bank of the river. And at --
25     Q. Let's look at your -- would it be helpful if

100

1  we just go ahead and take look at your expert report?
2      A. I would. I should have asked to do that.
3      Q. And I'm on page 28 of what we've marked as
4  Timmel Exhibit 1.
5      A. Yes.
6      Q. Okay. I'm going to give you a minute to
7  examine that, and then I'm going to ask these
8  questions again, okay?
9      A. And it should be pointed out that this
10 photograph was not taken on the day I was there.
11 This photograph was taken previously. So I'm not
12 aware of the stage of the river at the time that this
13 photograph was taken. And so I -- it would be very
14 difficult to compare it to the day I was there
15 because I don't know that the conditions were the
16 same.
17     Q. So is it fair to say that this aerial image
18 isn't helpful to you in determining how many feet the
19 buoys are from the U.S. bank and from the
20 international boundary on the day that you visited in
21 February of 2024?
22     A. Well, as you can see, the buoy line is not a
23 very precise straight line. It has a -- some slow
24 curves throughout it.
25         What it is helpful in doing is measuring

101

1  how far away it is from -- well, actually the
2  boundary line could change, the border line could
3  change as well. So to give one an approximate idea,
4  I think this is helpful; to give one precise numbers,
5  not so much.
6      Q. Okay.
7          MR. STONE: Landon, can I borrow your
8  pen?
9          MR. WADE: Sure.
10     Q. (BY MR. STONE) I'm giving you a pen.
11     A. Okay.
12     Q. I want you to mark on Exhibit No. 14, which
13 is on page 28 of your expert report, the location
14 where the buoys are so close to either the
15 international boundary or the U.S. bank that only one
16 airboat that is 8 feet wide and 20 feet long can pass
17 along it, going up or down the river.
18     A. Well, certainly at the north end of this,
19 and I can mark that.
20     Q. Please do.
21     A. It is one-way traffic. As a matter of fact,
22 the --
23     Q. Captain Timmel, I'm just asking you to mark
24 it.
25     A. Okay.

102

1     Q.  We'll go through them each.  Just go ahead
2  and mark them.
3     A.  I would say it's not safe to run two boats
4  through that area at any time.
5         What is not shown by this, sir, perhaps
6  what you don't realize, is there's not good water all
7  the way to the bank of the -- of the river.  There's
8  lots of shoal areas through here, many of which are
9  now exposed with vegetation growing on them that
10  weren't there the first time of my -- the time of my
11  first visit.
12     Q.  So would it be fair to say -- are you
13  circling the entire image?
14     A.  Yes.
15     Q.  Do you want to just go ahead and circle the
16  whole image?
17     A.  (Writing on document.)
18     Q.  All right.  Can I see that real quick?  I'll
19  mark this later, but I want to go ahead and flag it.
20  Can I have your pen?
21         MR. STONE:  I'm going to make this --
22  what number am I at, 10?
23         THE REPORTER:  11.
24         (Timmel Exhibit 11 marked.)
25         MR. STONE:  I'm going to make this

103

1  Timmel 11.
2     Q.  (BY MR. STONE)  I'm giving you back this
3  document.
4     A.  Thank you.
5     Q.  So you've marked the entirety of the stretch
6  here along the buoys between the U.S. bank and the
7  buoys as being unsafe for more than one airboat that
8  is 8 feet wide and 20 feet long to travel up and down
9  at the same time, correct?
10     A.  Yeah.  Can we go back to where we were -- to
11  that question, please?  That -- I would like to look
12  at that question if I may.
13     Q.  The question I asked you was to mark -- just
14  confirming what the image says that you marked, I
15  asked you to circle on the image where, along the
16  stretch of the buoys, you're testifying that two 8 by
17  20 -- or, sorry, more than one 8 by 20 airboat could
18  not simultaneously travel up and down.
19         And you circled the whole thing and said
20  that it was not safe for more than -- for what you
21  call one-way traffic at any time.  Do you recall
22  that?
23     A.  I do recall that.
24     Q.  Okay.
25     A.  And I'm uncertain as to exactly what I said.

104

1  It certainly reduces the level of safety for more
2  than one vessel to travel.
3         Does it make it unsafe?  Not in every
4  circumstance, but it certainly does in some
5  circumstances, and it makes it less safe than if the
6  barrier was not there.
7     Q.  Okay.  Let's go back to question 4 on Timmel
8  Exhibit 7.  This is really what we're talking about.
9  It says, only -- we started here with the answer to
10  question 4, which was, "Only one boat can be in the
11  area of the location of the buoys."  Do you see that
12  on the screen?
13     A.  I do.
14     Q.  All right.  And then we started talking
15  specifically about the buoys and where they are in
16  relation to the U.S. bank and the international
17  boundary, right?
18     A.  Correct.
19     Q.  Do you agree that only one boat -- and I
20  asked you -- strike that.
21         I said, "That's not true.  You were
22  there on your site visit in February with three
23  boats, and you guys went up, down, and around the
24  boys."  And you said, "Yes, it is true.  We couldn't
25  do it all at the same time."  Do you recall that?

105

1     A.  I do.
2     Q.  Okay.  Is it still your testimony -- strike
3  that.  Let me just ask.
4         Can only one boat travel up and down the
5  Rio Grande River at the location where the buoys are
6  located?
7     A.  No, that's not -- that's not accurate, no.
8         What is accurate that only one vessel
9  can move up or down the Rio Grande safely on the side
10  between the buoys and the U.S. bank, not the
11  entire -- we're not talking about the entire river
12  here.
13         The border is an imaginary line, and
14  there is enough water between the barrier and the
15  Mexican bank for more than one vessel to maneuver at
16  one time.
17     Q.  So it's your testimony that between the U.S.
18  bank and the buoys only one vessel, in this case an
19  airboat, can safely travel up and down at a time?
20     A.  You could -- the barrier is a thousand feet
21  long.  You could have more than one vessel moving in
22  front of or behind another vessel, but not side by
23  side, not overtaking each other, not passing each --
24  not meeting each other.
25     Q.  How close can an airboat, an 8 by 20

106

1 airboat, travel adjacent to another 8 by 20 airboat?
2     A. They can come right up alongside each other
3 if they're moving at a very slow rate of speed and
4 the operators were talented.
5     Q. So we have 8 feet adjacent to another 8
6 feet, right?
7     A. Okay.
8     Q. So we've got 16 feet, right?
9     A. Okay.
10     Q. So let's say we put a foot in between them.
11 So we've got 17 feet, okay? Two adjacent airboats
12 with one foot in between them can travel next to each
13 other but not between the U.S. bank and the buoys in
14 this case?
15     A. Not safely, no.
16     Q. And why can't they travel safely next to
17 each other going between the U.S. bank and the buoys
18 in this case traveling up or down the river?
19     A. Airboats have to have some speed ahead, and
20 they don't have ability to stop or go into neutral or
21 go into reverse. And if one of the two airboats were
22 to veer off course or were to sheer off of a shoal or
23 strike one of the concrete mooring blocks, it could
24 force them into the other boat, to collide with the
25 other boat.

107

1     Q. Is it your testimony that if the buoys were
2 not there, two airboats could travel in that same
3 stretch adjacent to each other --
4     A. Yeah --
5     Q. -- up and down the river?
6     A. -- yes. With a safe distance between them.
7     Q. And how much would a safe distance be in the
8 airboats that you've described?
9     A. It depends on the conditions and
10 circumstances.
11     Q. What about the conditions and circumstances
12 when you visited in February of 2024?
13     A. I would say 8 to 10 feet.
14     Q. 8 to 10 feet. Do you have a lot of
15 experience with airboats?
16     A. I have experience with airboats.
17     Q. When is the last time you drove an airboat?
18     A. I have -- it would have been 10 to 12 years
19 ago.
20     Q. Total, approximately how many times have you
21 driven an airboat?
22     A. Just once.
23     Q. So you've only ever driven an airboat one
24 time 12 years ago?
25     A. That's correct.

108

1     Q. Have you ever -- how many -- strike that.
2         Other than the trip -- other than the
3 one time you drove it -- you drove an airboat and
4 your trips to the Rio Grande River where you rode in
5 an airboat, approximately how many times have you
6 ridden on an airboat?
7     A. Six or seven times.
8     Q. How old are you?
9     A. I'm 68.
10     Q. 68. So six or seven times, other than those
11 three trips we just talked about, in your entire 68
12 years of living. Is that fair?
13     A. That's correct. I'm not suggesting I'm an
14 airboat spec -- expert.
15     Q. Okay. You're not an expert on airboats?
16     A. No, I'm not.
17     Q. You're not an expert on how far away
18 airboats have to stay in order to operate safely when
19 they're traveling next to each other?
20     A. I am an expert on safe boat operations, so I
21 feel I am qualified to offer an expert opinion on
22 that, yes.
23     Q. What is the basis for your expert opinion
24 that airboats cannot travel safely next to each other
25 between the bank of the Rio Grande Riv -- bank of

109

1 the -- the bank and the buoys in this case?
2     A. Well, with the anchors of the buoys not
3 being marked and the uncertainty of where they are
4 located and the inability to see how far the shoals
5 extend from the bank -- U.S. bank into the water so
6 as to determine what the width of safe navigable
7 water is in that area, it's just not safe, and it was
8 certainly reinforced by the answers to that question
9 number 4.
10         Boats, particularly airboats that are
11 flat-bottomed, are not like cars on a highway that
12 have wheels that hold them in place. They are
13 subject to currents and wind and can move back and
14 forth and do what they -- is known as yawing, which
15 is moving back and forth instead of up or down or
16 sideways, which makes it unsafe or less safe to
17 travel in close proximity to -- one boat to another.
18     Q. What's a shoal?
19     A. A shoal is a shallow area in the river.
20     Q. What impact do shoals have on airboats
21 traveling on the Rio Grande River in this area?
22     A. It would depend upon the depth of the shoal.
23     Q. Okay. Well, what about the -- I'm asking
24 about the shoals where the buoys are located. What
25 impact do the shoals where the buoys are located in

John Timmel - 6/5/2024

110

1  the Rio Grande River have on the ability of airboats
2  to travel up and down the Rio Grande River?
3      A. If they are too shallow, it can impede the
4  progress an of an airboat unless they go up and over
5  the shoal, which they're oftentimes not inclined to
6  do, or it could -- it would cause them to sheer a
7  little bit and not steer in a straight line.
8      Q. So you have identified two things.  The
9  second one was the impact a shoal could have is it
10 would -- it could prevent the airboat from traveling
11 in a straight line, right?
12     A. That's correct.
13     Q. And then the second one is the boat operator
14 may have to drive over the shoal.  Is that --
15     A. That's correct.
16     Q. So other than driving over the shoal or not
17 being able to drive in a straight line, would a shoal
18 have any other impact on an airboat -- would the
19 shoals where the buoys are located in the Rio Grande
20 River have any other impact on an airboat?
21     A. No.
22     Q. Let's go back to Timmel Exhibit 7.  Could
23 you read the question and answer for number 5?
24     A. "Does the marine floating barrier make
25 performing duties required by your job more

111

1  difficult?"
2          The answer is "Yes, navigational hazards
3  are rest" -- "Yes, navigational hazards and
4  restricted operating area" which is what essentially
5  I just said.
6      Q. Uh-huh.  And then number 7, could you read
7  the question and answer?  I have a follow-up about
8  this.
9      A. "Did you or any of your fellow officers
10 observe the installation of the marine floating
11 barrier?"  "Yes, I observed the installation daily to
12 report up the chain of command the State of Texas
13 progress."
14     Q. So it appears that the unknown person that
15 may be answering this document observed the
16 installation of the buoys.  Does that seem fair?
17     A. It does.
18     Q. So I want to go on to number 8.  It says,
19 "If yes," and then there is a series of questions.
20     A. Excuse me.  I was distracted.  Repeat that
21 last question please.
22     Q. Yeah, yeah.  It says, number 8, "If yes,"
23 and I want to ask about "c":  "What would you
24 estimate the deepest draft of any of those vessels to
25 be?"  And the answer is "Approximately 3 feet,"

112

1  right?
2      A. Can we go back to 7 first?  Can I answer --
3  I'm not -- I was thinking about something else, as I
4  was answering, that you were saying.
5      Q. Yeah.  My question about number 7 was it
6  appears that the person who is answering this
7  document is someone who observed the installation of
8  the buoys?
9      A. Yes.  It says it was.
10     Q. Okay.  Okay.  So I'm going to go on to 8.
11 It says, "If yes," and then -- we'll do this all
12 again -- "What would you estimate the deepest draft
13 of any of those vessels to be?"  And it says,
14 "Approximately 3 feet", right.
15     A. And you're looking at "c"?
16     Q. 8c.
17     A. Yeah.
18     Q. On Timmel Exhibit 7.
19     A. Okay, yes.
20     Q. What is a draft?
21     A. A draft is the depth of a vessel, how far it
22 extends into the water.
23     Q. Next I want to ask about number 10.  This is
24 still Timmel Exhibit 7, question 10.
25          Could you read the question and the

113

1  answer?
2      A. Yes.  "What size vessels can they
3  accommodate?"  And then the answer is "Airboats,
4  18 feet and the RSDV (Riverine Shallow Draft Vessel)
5  21 feet."
6      Q. And this question -- I didn't want to have
7  to read the whole answer.  It's a response to -- it's
8  a follow-up to question 9, which is about the boat
9  ramps in the Eagle Pass area, right?
10     A. Yes.
11     Q. So I want to ask about these specific boats.
12 We already talked about airboats, right?
13     A. We have, yes.
14     Q. So what is an RSDV?
15     A. RSVD.
16     Q. Oh, I'm sorry.  RS --
17     A. It's supposed to be --
18     Q. Is it or RSDV or RSVD?
19     A. It's RVSD.  It's a -- and they messed up the
20 spelling of the acronym.
21     Q. Sure.
22     A. It's Riverine Vessel Shallow Draft.
23     Q. And can you describe that type of craft to
24 us for the record?
25     A. I can.  It's -- in this case it's a 21-foot

114

1  boat.  It looks like a traditional boat, not
2  dissimilar to a center console boat, if you're
3  familiar with that, a typical fishing boat, with a
4  console in the center and steering wheel and so
5  forth.  But it is propelled by jets, not by outboard
6  motors or inboard motors.
7      Q.  What is the draft of an RVD -- did I do it
8  right?
9      A.  RVSD.
10      Q.  RVSD.  What is the draft of an RVSD?
11      A.  While it's not moving, about a foot and a
12  half, and while it's up on plane, about 8 inches.
13      Q.  What is the weight limit on an RVSD?
14      A.  I do not know.
15      Q.  Do you know what the maximum capacity for --
16  strike that.
17          What is the maximum number of people
18  that can be on an RVSD?
19      A.  Yesterday we had five.
20      Q.  Have you -- are you very familiar with
21  RVSDs?
22      A.  No.
23      Q.  Have you ever driven an RVSD?
24      A.  I've driven jet-powered boats and jet skis,
25  which are the same concept, but a riverine boat,

115

1  which is designed for extremely shallow draft and
2  shallow areas, no, I have not.
3      Q.  So the RVSD is kind of like a jet ski?
4      A.  Yes, very similar in terms of its
5  propulsion.
6      Q.  But in terms of its size, is it similar to a
7  jet ski?
8      A.  No, it's much larger.
9      Q.  So in your 68 years of living, you've -- I
10  think you testified you have never operated an RVSD?
11      A.  That is correct.
12      Q.  In your 68 years of living, approximately
13  how many times have you ridden on an RVSD?
14      A.  One time.
15      Q.  And was that one time yesterday?
16      A.  It was.
17      Q.  You're not an expert on RVSDs, are you?
18      A.  As a harbor pilot, I've been -- I've
19  conducted over 8,000 transits of different types of
20  vessels over the last 32 years, and one becomes very
21  familiar and very comfortable with underst -- being
22  able to understand different propulsion systems and
23  different types of vessels and being able to adapt
24  them and operate them.
25          So I have only been on one once.  I've

116

1  been on many -- maybe a dozen or so jet propelled
2  boats and countless jet skis.  So I feel like I have
3  a very good and thorough understanding of the boat
4  and how it operates and what its operating parameters
5  are.
6      Q.  Are you an expert on jet skis?
7      A.  No.
8      Q.  So you're not an expert on jet skis, but
9  you're an expert on RVSDs which operate just like a
10  jet ski?
11          MR. LYNK:  Object to form.
12      A.  If I stated that I was an expert on RVSDs,
13  then I misspoke.  I'm certainly not an expert on
14  those boats.
15      Q.  Okay.
16          MR. STONE:  I think the judge is on the
17  line, so let's take this call.
18          THE REPORTER:  Off the record?
19          MR. STONE:  Off the record.
20          THE VIDEOGRAPHER:  Off the record.  The
21  time is 1:16.
22          (Discussion off the record.)
23          THE VIDEOGRAPHER:  Back on the record
24  the time is 1:17.
25          MR. LYNK:  Did that call interrupt an

117

1  answer to a question?  I can't remember.
2          MR. STONE:  I think he was done.  You
3  were done, right?
4          THE WITNESS:  I don't recall.
5          THE REPORTER:  The last answer is "If I
6  stated I was an expert on RVSDs, then I misspoke."
7      Q.  (BY MR. STONE)  Let's switch to your
8  deposition -- I'm sorry -- to your expert report.  I
9  have some follow-up questions.
10          Does your expert report contain a
11  complete statement of all the opinions that you will
12  express in this case and the bases for them?
13      A.  At this time, yes.
14      Q.  Does your report, Timmel Exhibit 1, contain
15  the facts or data considered by you in forming all of
16  your opinions in this case that you're going to
17  express?
18      A.  It does.
19      Q.  Does it contain all the exhibits that will
20  be used to summarize or support your opinions in this
21  case?
22      A.  At this time, yes.
23      Q.  Did you write your expert report?
24      A.  I did.
25      Q.  Did you use any artificial intelligence in

118

1 the preparation of your expert report?
2     A. No, but I thought about it.
3     Q. Did anyone else assist you in writing the
4 expert report?
5     A. I had others proofread it for me, but nobody
6 writing any of the substantive material in it.
7     Q. How many hours approximately did you spend
8 writing your expert report?
9     A. I don't know.
10     Q. Are you billing in this case?
11     A. I am.
12     Q. Did you bill for the time that you spent
13 preparing your expert report?
14     A. I did.
15     Q. Approximately how many hours have you billed
16 so far in the case?
17     A. I'm estimating, but about 160.
18     Q. And of those 160 or so hours in the case
19 that you've billed so far, approximately how many of
20 them were spent working on your expert report?
21     A. A large number of them, but I would have to
22 go back and review my bills to know what I was
23 working on during the time I was working.
24     Q. Do you think you spent more than half of
25 your time that you billed in the case working on the

119

1 expert report?
2     A. I can't say definitively.
3     Q. Did you spend more than ten hours working on
4 the expert report?
5     A. Certainly.
6     Q. More than 20 hours?
7     A. Certainly.
8     Q. More than 40 hours?
9     A. Yes.
10     Q. More than 60 hours?
11     A. Yes.
12     Q. More than 80 hours, or two weeks?
13     A. I believe so.
14     Q. More than 120 hours?
15     A. I don't think so.
16     Q. So approximately somewhere between 80 and
17 120 hours?
18     A. If you're wanting an estimate, yes, that
19 would be my best estimate.
20     Q. But if we -- your bill would actually
21 reflect the actual amount of time that you spent
22 working on the expert report, right?
23     A. Very precisely.
24     Q. So let me ask some questions about some of
25 the attorney communications you have had in this

120

1 case.
2         What facts did the attorneys provide to
3 you that you considered in forming the opinions that
4 you would express in this case?
5     A. They provided all of the evidence that I
6 reviewed, all of the -- other than some of the photos
7 I took and observations I made during the site
8 visits, but all of the court documents and some trial
9 testimony, photographs. So the majority of the
10 documents, other than research that I have footnoted
11 as such that I did on my own.
12     Q. Okay. Can you turn to page 34 of your
13 expert report? This is the documents, materials, and
14 data considered. Let me know when you get there.
15     A. I'm there.
16     Q. Are any of the documents that are listed in
17 Section 7 of your expert report -- strike that.
18         Identify for me any documents in
19 Section 7 of your expert report that were not
20 provided to you by the attorneys in the case.
21     A. I would have to see a list of these
22 documents -- well, all of the hearing exhibits were
23 provided to me.
24         THE REPORTER: I'm sorry, all the what?
25         THE WITNESS: Hearing exhibits.

121

1     A. The item T, Shelby's [sic] declaration.
2 Item U. Again, the next page is the hearing
3 exhibits. The photos that were hearing exhibits.
4         If you go to number 5 on page 36, the
5 reference resources --
6     Q. Uh-huh.
7     A. -- those would be the references that are
8 referred to in the footnotes within the report, and
9 that was research I did independently.
10     Q. Okay.
11     A. Number 6, U.S. Regulations & Codes, A, B,
12 and C; websites, number 7. Those are all
13 independently found. And that continues through the
14 end of the list of documents and resources.
15     Q. So 5, 6, and 7 in section 7 of your expert
16 report are all documents that you independently found
17 and relied on?
18     A. That is correct.
19     Q. I have a question about the -- one of these
20 documents. It -- if you look under number 3 -- this
21 is on page 35, I believe.
22     A. Which letter?
23     Q. Number 3A.
24     A. 3A, okay. Yes, I see that. Okay.
25     Q. Documents from Cochrane Global, right?

122

1   A. Yes.
2   Q. When did you receive those documents?
3   A. According to what I have listed here, May
4   8th.
5   Q. And did you sign any kind of confidentiality
6   agreement in order to receive those documents?
7   A. I did.
8   Q. Did you sign it prior to May 8th?
9   A. Yes.
10   Q. Did you sign it on May 8th?
11   A. I don't recall. I signed it prior to
12   receiving the documents.
13   Q. Other than the documents that are listed
14   here that we've discussed, were there any other facts
15   that were provided to you by the attorneys in this
16   case that you relied on in forming your opinions in
17   this case?
18   A. Not that I recall.
19   Q. What data did the attorneys provide to you
20   that you considered in forming your opinions that
21   you're expressing in this case?
22   A. Well, I looked at all of it and reviewed and
23   analyzed and considered it all. Specifically which
24   parts of it, I'm uncertain.
25   Q. Is there any data that the attorneys

123

1   provided you, other than what is listed in Section 7
2   of your expert report, that you relied on in forming
3   your opinions that you've expressed in this case?
4   A. No.
5   Q. What assumptions did the attorneys in this
6   case provide to you that you considered in forming
7   your opinions in this case?
8   A. None that I'm aware of. None that I can
9   recall.
10   Q. You weren't asked to assume anything for the
11   purposes of this case and in forming your expert
12   opinions?
13   A. Absolutely not.
14   Q. Next I want to show you what we have marked
15   as Exhibit 10. Bear with me a minute. I need to
16   drop this in the chat for everyone else.
17   I'm showing you what we've marked as
18   Timmel Exhibit No. 10. So it's a series of emails.
19   Do you recognize these mails?
20   A. If you could scroll very slow -- oh, I'll
21   tell you when to move to the next section. I would
22   like to look at it all.
23   Cava -- Cavazos is the name I've been
24   looking for and grossly mispronouncing.
25   Q. I'm just asking if you --

124

1   A. I know. I was just making that comment if
2   that's all right.
3   I've seen that email, yes. You can go
4   to the next one.
5   Q. I will in just a moment.
6   A. Okay.
7   Q. So I want to start here at the top of Timmel
8   Exhibit 10. This is an email that was sent to -- to
9   you, John Timmel, right?
10   A. Correct.
11   Q. It was sent from Brian Lynk, right?
12   A. Correct.
13   Q. And the subject line says, "Follow-up
14   questions from Timmel for CPB [sic]," right?
15   A. Yes.
16   Q. It goes on to say, "Please find written
17   answers from George Cavazos at CPB to your recent
18   follow-up questions," right?
19   A. Yes.
20   Q. And it's a forwarded email, right?
21   A. Yes.
22   Q. Did you review this email thread prior to
23   today?
24   A. Yes.
25   Q. Did you rely on any of the information

125

1   contained in this email thread in forming your
2   opinions in this case?
3   A. Well, I would have to see the entire email
4   thread to be able --
5   Q. Sure.
6   A. -- to respond to that.
7   Q. Let's start at the very bottom and work our
8   way up.
9   MR. LYNK: Are you going to move at a
10   pace that he can actually see what you're scrolling?
11   Q. (BY MR. STONE) So the first email that we
12   have here is sent on February -- I'm on page 3 of
13   Timmel Exhibit 10.
14   A. Okay.
15   Q. Do you see the email that was sent on
16   February 28th of 2024?
17   A. I do.
18   Q. It was sent by David Sorola?
19   A. Correct.
20   Q. Who is David Sorola?
21   A. He is the counsel for CBP, I believe,
22   Immigration in Del Rio, Texas.
23   Q. And there's some other names on her as well
24   including Micky Donaldson. Do you know who Micky
25   Donaldson is?

John Timmel - 6/5/2024

126

1    A. I do not.
2    Q. There's a Belinda Garman.  Do you know who
3  Belinda Garman is?
4    A. I do not.
5    Q. There's a Megan Gray.  Do you know who Megan
6  Gray is?
7    A. No, I do not.
8    Q. The email says here -- and follow along and
9  tell me if I'm reading it correctly -- "Good
10  afternoon, George.  John Timmel, the maritime expert
11  out of Tampa whom I believe you met last week, has
12  follow-up questions that he needs answered.  He
13  addressed them to AUSA Brian Lynk, and although his
14  questions came through a separate email, I have cut
15  and pasted word for word below the relevant part of
16  his email with the questions he needs answered.
17  Please answer these today, or by tomorrow morning at
18  the latest, as Timmel is going out of town starting
19  on Friday, and he needs the information below before
20  he leaves.  Please respond to me, and I will work to
21  then provide the answers to AUSA Brian Lynk myself.
22  Thank you, David."  Did I read that accurately?
23    A. You did.
24    Q. Do you recall reaching out to -- reaching
25  out with a series of follow-up questions for CBP

127

1  after your site visit?
2    A. I do.
3    Q. And who did you direct those questions to?
4    A. Brian Lynk.
5    Q. Next we've got what is allegedly a word-for-
6  word copy of that email that you sent to Brian Lynk.
7  And there's a series of questions here, and I want to
8  go through each.
9        The first question, it says, "Airboat
10  Propulsion," right?
11    A. Yes.
12    Q. Now earlier you testified that you're not an
13  expert on airboats, right?
14    A. That's correct.
15    Q. So A -- under Airboat Propulsion, A,
16  Propeller Pitch, "Do the USBP airboats have
17  variable-pitch propellers?"  Did I read that
18  accurately?
19    A. Yes.
20    Q. What is USBP?
21    A. United States Border Patrol.
22    Q. What is a propeller pitch?
23    A. The pitch of a propeller is the slant of a
24  propeller, and, depending upon the pitch, as the
25  propeller spins, it's what pulls the vehicle or

128

1  vessel or plane through air, or, on a fan, it's
2  actually what propels the air.  And they can either
3  be fixed, which means it's a set pitch and it doesn't
4  move, or they can be variable, which means an
5  operator can change the pitch on them.
6    Q. Why was this an important piece of
7  information to know when forming your opinions in
8  this case?
9    A. Because every airboat that I had experience
10  with, that was the case, that they were fixed pitch.
11  And what that means is the vessel cannot stop moving
12  ahead other than by turning off the engine.  And then
13  when you do that, is the engine going to start again
14  when the time comes?
15        So what's very important to -- I wanted
16  to make sure when they were talking about the
17  airboats, if this was an airboat that had fixed pitch
18  or variable pitch that would give it more
19  maneuverability, and in fact they're fixed-pitch
20  propellers.
21    Q. Next it says, B, Reverse.  "Do the USBP
22  airboats have a reverse or am astern mode?  If so,
23  how does it do it?"  Did I read that accurately?
24    A. Yes.
25    Q. Okay.  So let's just, for the record, go

129

1  through some of the terms.  What is an astern mode?
2    A. It's a reverse in your car, same thing.
3    Q. Why would reverse be an important piece of
4  information to know, whether the airboats can
5  reverse, in forming your opinions in this case?
6    A. That would certainly determine how quickly
7  they could stop, or, if they're in a very confined
8  area, can they back out of that area.
9    Q. Next under C, you said "Idle speed.  When
10  the USBP boats are at idle speed, do they move
11  forward, astern, or neither."  Did I read that
12  accurately?
13    A. Yes.
14    Q. Why is that important information to know
15  about the airboats when forming an opinion in this
16  case?
17    A. Again, it's a -- seeking a verification of
18  the maneuverability of these particular airboats.
19    Q. Next is "D, Neutral.  Do the USBP airboats
20  have a neutral setting?  If yes, do the propellers
21  stop spinning when in neutral?"  Did I read that
22  accurately?
23    A. Yes.
24    Q. Why is that an important piece of
25  information to know in this case?

130

1    A.  Because if you can keep the engine running
2  but disengage the propeller -- that is, put it into
3  neutral -- then the vessel can sit stationary in a
4  place.  If you can't do that, then in order to be
5  stationary, of course discounting current and wind,
6  but just in terms of moving through the water by its
7  propulsion, it has to turn the engine off to do that.
8    Q.  Next is "E, Maneuverability.  Do the USBP
9  airboats, as maneuverable as boats of similar size
10  with inboard or outboard motors?"  Did I read that
11  accurately?
12    A.  You did.  It's poorly worded on my part.  It
13  should have said "Are they as maneuverable."  But
14  other than -- yes, you read it accurately.
15    Q.  Why would that be an important piece of
16  information to know in forming an opinion in this
17  case?
18    A.  Again, just in terms of trying to determine
19  whether or not navigable capacity is reduced, that --
20  if certain vessels are less maneuverable, then it
21  could be more restrictive on them than other types of
22  vessels.  But in either case, if it impacts their
23  ability to operate safely in an area, then that has
24  an influence on navigable capacity.
25    Q.  And the reason you had to ask is because you

131

1  didn't know this information already, right?
2    A.  I wanted to verify that.
3    Q.  So prior to this, you already knew the
4  propeller pitch of the airboats?
5    A.  I didn't know the pitch, but I knew they --
6  I was fairly certain that they were fixed-pitch based
7  on my experience with other boats.
8    Q.  And you already knew before you asked this
9  question whether or not the airboats could reverse?
10    A.  Yes, but I wanted to be sure.  Could not
11  reverse, yes.
12    Q.  And you knew that the -- you already knew
13  the idle speed, the neutral, and the maneuverability
14  questions that you asked, you already knew the
15  answers to those before you asked them as well?
16    A.  I did.  Looking for a confirmation.
17    Q.  Next I want to ask about the -- continuing
18  on with this document -- I'm still on Timmel
19  Exhibit 10 -- Changing Water Levels.  Do you see that
20  on the screen?
21    A.  Yes.
22    Q.  First question was "Do the water levels in
23  the Rio Grande River change?"
24    A.  That's correct.
25    Q.  Did you already know the answer to that

132

1  question before you asked it?
2    A.  I did.
3    Q.  The next question was "Do the water levels
4  in the Rio Grande change frequently?"  Do you see
5  that on the screen?
6    A.  Yes.
7    Q.  Did you already know the answer to that
8  question before you asked?
9    A.  I was less certain.  River levels change
10  depending upon a lot of things, if they're
11  unencumbered rivers, such as snowfall or rain and
12  things along those lines.
13    When you have rivers with dams above a
14  certain area, then the river level can either be kept
15  steady or it can change, but slowly or infrequently.
16  So I did not know that prior to that to answering --
17  to asking the question.
18    MR. STONE:  This is Judge Howell.
19    THE VIDEOGRAPHER:  Off the record.  Time
20  is 1:38 p.m.
21    (Brief pause.)
22    THE VIDEOGRAPHER:  Back on the record.
23  Time is 1:39.
24    (The following proceedings occurred
25  telephonically before Magistrate Howell.)

133

1    MR. STONE:  Excellent, Your Honor.  So
2  the two questions, Your Honor, that came up, we are
3  currently taking an expert deposition in this case
4  from one of the USA's experts, designated testifying
5  experts in the case.  He wrote an expert report, and
6  we're asking questions following up, obviously, on
7  that expert report.
8    He conducted a site visit back in
9  February of 2024, and we've asked some questions
10  about what he did during that site visit that he
11  discussed in his expert report.  We asked two
12  questions that we kind of got stymied on and that we
13  raised an objection.
14    The first one, we asked him to describe
15  the detention -- the CBP, customs and border patrol,
16  detention facility that he toured.  And the second
17  question was I asked him how long -- how long was
18  that tour of the CBP detention facility.
19    And Mr. Brian Lynk is here, and he
20  asserted a privilege and instructed the witness not
21  to answer, and I'll let him explain.
22    MR. LYNK:  Your Honor, speaking for the
23  United States, this the Brian Lynk from the
24  Department of Justice.
25    First, I want to -- I'll give a bit of

134

1  context.  The witness answered questions about a tour
2  he made of the floating barrier site in the river.
3  And as part of that he mentioned that one of the
4  things early on that day was a briefing, prior to
5  going into the river, with personnel from CBP and
6  with the others who were on the tour.  I allowed -- I
7  allowed him --
8         THE REPORTER:  Hang on.
9         MR. LYNK:  -- to answer all the
10  questions first --
11         (Simultaneous talking.)
12         JUDGE HOWELL:  -- phone a little closer
13  to you?
14         MR. LYNK:  Sure.
15         JUDGE HOWELL:  I'm not hearing you as
16  clearly as I was hearing Mr. Stone.
17         MR. LYNK:  Sorry about that.
18         So he answered all of the questions with
19  no instruction from me about the briefing he had been
20  given.  He was then asked where was he?  Where did
21  that briefing occur?  And he said in the CBP
22  detention facility.
23         Now, he was allowed to answer that
24  question.  The next question, as I recall it and as
25  my cocounsel sitting here from the U.S. attorney's

135

1  office recalled it, was what did the detention
2  facility look like.
3         And at that point I objected and
4  instructed him not to answer.  And I clarified off
5  record and will clarify now that law enforcement
6  privilege is the basis for instructing him.
7         I think for him to answer questions, you
8  know, what did he visually observe at the CBP
9  detention center clearly implicates the security
10  issues and concerns the CBP would naturally have
11  about their Eagle Pass facility.
12         It also has no connection to any
13  opinions in his report.  So not only does it
14  implicate the security risk, but there is simply no
15  need that Texas would reasonably have for this
16  information that would warrant overriding the
17  privilege and jeopardizing those concerns.
18         In terms of how long he was there, I
19  don't recall that actually being an additional
20  question.  I think counsel told me that it ought to
21  be a question he should be able to ask.  But in any
22  event, I would still say the same, that both of those
23  questions, because they relate to the visual
24  impressions of the detention center and his access to
25  it, implicate law enforcement privilege, and because

136

1  he doesn't express any opinions about this -- his
2  opinions are about the barrier in the river --
3  there's really no reason to risk and compromise CBP's
4  concerns and allow him to answer those.
5         MR. STONE:  Your Honor, may I respond?
6         JUDGE HOWELL:  Yes, but, I just want to
7  kind of -- as I've had this now described to me, a
8  couple of questions arise in my mind.  And I'm just
9  taking this on the fly, right?
10         MR. STONE:  Yes, Your Honor.
11         JUDGE HOWELL:  But, you know, the first
12  question that arises is this law enforcement
13  privilege.  I'm curious what a normal sort of
14  paradigmatic example of someone asserting a law
15  enforcement privilege, and both the factual scenario
16  of which it might be asserted but also who would be
17  asserting it.
18         The other question that arises in my
19  mind is to what extent that it might not be -- such
20  testimony might not be admissible in trial over such
21  a privilege, is it -- can they not solicit that
22  testimony and then, to the extent that it's
23  objectionable in terms of either using it in a filing
24  later or eventually at trial, can't that issue be
25  dealt with then?

137

1         So those are just a couple of questions
2  that arose in my mind.  But Mr. Stone, I'll give you
3  an opportunity to respond to the argument and address
4  my questions.  Mr. Link, L-I-N-K?
5         MR. STONE:  Yes.
6         MR. LYNK:  Yes, Brian Lynk.  Yes.
7         JUDGE HOWELL:  Thank you, Mr. Lynk.
8         MR. STONE:  All right.  Thank you, Your
9  Honor.  Yes, first I wanted to clarify, there were
10  two questions.  The first one was asking him to
11  describe the detention facility.  This witness
12  testified that he was given a tour of the detention
13  facility.  Those were his words, that he was given a
14  tour of the detention facility.
15         So our question to him was about what he
16  observed during his tour -- first was on the tour of
17  the detention facility, and the second one was how
18  long was the tour or how long was he at the detention
19  facility.  And both of those drew a privilege
20  assertion and an instruction not to answer.
21         Now the quintessential example sort of a
22  law enforcement privilege being asserted is typically
23  when there is an active investigation.  That's when
24  you're probably most likely encountering them, and
25  people assert the law enforcement privilege to

138

1 prevent a peace officer from testifying about an
2 active ongoing investigation.
3          In this case the privilege seems to be
4 being asserted about the conditions of the facility.
5 It's not even the conditions; just what was observed
6 while in the presence of a CBP detention facility.
7          I don't see how this is -- it doesn't go
8 to national security.  It doesn't go to any kind of
9 active investigation.  We're asking about a tour that
10 he took at the CBP detention facility, and we didn't
11 get any further than that into whether or not there
12 was conversations or he relied on them.  We were
13 unable to get any further into that because of the
14 privilege that was asserted.
15          So that's where we were headed with
16 that, Your Honor, to determine whether or not there
17 was any conversations this expert relied on while CBP
18 was giving him a tour of the detention facility and
19 talking with them.
20          MR. LYNK:  Your Honor, I do not recall
21 him testifying that he was given a tour of the
22 detention facility.  I believe that misstates his
23 testimony.  And I think if that's the basis on which
24 Texas would seek a ruling, his answer to the record,
25 the last one that he was able to give before

139

1 instructed, should be read back, to be clear what it
2 is that he had said.  But I don't believe that's what
3 he said.
4          I personally happen to have been on this
5 particular tour of the Eagle Pass floating barrier as
6 well at the facility, and so I will note that I also
7 personally don't recall him having been on a tour,
8 but I don't believe he testified to it in any event.
9 I don't think that's what he said.
10         He did definitely say he was given a
11 briefing by CBP, and he testified that -- when he
12 asked -- when asked "Where were you?  Where was that
13 briefing given," it was in the detention facility,
14 yes.  But he did not say he was given a tour of the
15 detention facility.  I do not recall that being his
16 testimony.
17         MR. STONE:  Your Honor, even Mr. Lynk,
18 in his response just now, described the trip as a
19 tour.  So, you know, we might just be talking about a
20 semantic issue here as it relates to "tour."
21         Obviously what we're trying to get at,
22 though, is the conversations that happened while he
23 was in the CBP detention facility and whether or not
24 he relied on them in forming his expert opinions.
25 And weren't able to get there.

140

1          Your Honor, if we could just -- if we
2 were -- if you overrule their objection, if they have
3 other objections as to relevance or any of these
4 other things, those are more appropriate for trial.
5 This was only a privilege assertion at this time, and
6 I don't think that they've laid -- I don't think that
7 they've laid out an argument for why the law
8 enforcement privilege would apply to what this
9 witness observed while -- if we're not going to use
10 the word "tour," while he was brought around the CBP
11 facility -- detention facility along with how long he
12 was there at the CBP detention facility during his
13 site visit to the buoys.
14         MR. LYNK:  Two points.  First, the only
15 tour I've described that the experts were taking part
16 in is the tour of the floating barrier in the river.
17         Second, you asked earlier how did this
18 implicate the law enforcement privilege.  The law
19 enforcement privilege ordinarily concerns the
20 disclosure of information that can reduce the
21 effectiveness of law enforcement techniques.
22         Disclosing information about the visual
23 impressions of the detention facility or the nature
24 of whatever access he was given, how long he was
25 there, is certainly information that could compromise

141

1 their security.
2          I will note in fact that on that day,
3 although he was not personally aware of this, there
4 was actually internet chatter regarding threats to,
5 you know, quote-unquote, "take over the facility"
6 that day.  So there is always and constantly security
7 concerns there, and I think to have him testify about
8 something, particularly when it has absolutely
9 nothing to do with his expert opinions in the case
10 here, is not warranted.  It doesn't compromise the
11 privilege, and the privilege should be sustained, the
12 objection should be sustained.
13         MR. STONE:  And I'll --
14         JUDGE HOWELL:  Okay.  So here -- so I'm
15 going to give you my ruling on this, and then y'all
16 can -- I think that should resolve it.
17         With respect to the line of questioning
18 regarding his tour or observation in connection with
19 the detention facility or the buoys, how long the
20 tour was, who he spoke with, this and that, regarding
21 the government's -- the United States' assertion of
22 the law enforcement privilege here, I am overruling
23 that objection to the extent that the United States
24 is relying on it to instruct its witness not to
25 testify in the deposition.

142

1    The admissibility at a later date for
2  use in some -- in connection with some filing in the
3  court or ultimately at a hearing or in trial I think
4  can be taken up with the court by the trial judge at
5  a later date. But in terms of eliciting the
6  testimony, I think the assertion and the objection,
7  my ruling on it here is sufficient and that he's not
8  -- I'm overruling the objection to the extent that it
9  is being relied on to instruct the witnesses not to
10  testify.
11    And I guess I would further add a caveat
12  that to the extent that there are concerns about
13  having this witness testify with respect to
14  information that could affect law enforcement
15  techniques, I think any portion of this transcript
16  that might arguably fall within that can be sealed
17  and, you know, addressed in such a way that it's not
18  publicly disclosed prior to getting a court ruling on
19  that.
20    And then to address the relevance aspect
21  of the objection, I agree that a relevance objection
22  here is not an appropriate basis to instruct a
23  witness not to testify. So I overrule that objection
24  as well to the extent that it is being relied on to
25  instruct the witness not to testify. Is there

143

1  anything else needed?
2    MR. STONE: No, Your Honor. Thank you.
3    MR. LYNK: Thank you, Your Honor.
4    THE WITNESS: Would this be a good time
5  to take a break?
6    MR. STONE: Yeah. We've been going --
7  can we go off the record?
8    THE VIDEOGRAPHER: Off the record. The
9  time is 1:51.
10    (Recess 1:51 p.m. to 2:02 p.m.)
11    THE VIDEOGRAPHER: We're back on the
12  record. Time is 2:02 p.m.
13    EXAMINATION (Continued)
14  BY MR. STONE:
15    Q. (BY MR. STONE) I want to pick back up on
16  the site visit that you did back in February of 2024,
17  okay?
18    A. Yes, sir.
19    Q. After you finished briefing that you
20  received from CBP, what did you do next?
21    A. We left the briefing building and went out
22  and sat in cars while some of the members -- the
23  expert witnesses did that while some of the
24  members -- government officials did a tour of the
25  soft-sided facility.

144

1    Q. So some members of the San A -- the party
2  that you traveled with from San Antonio took a tour
3  of the CBP -- CBP detention facilities?
4    MR. LYNK: I object on law enforcement
5  privilege grounds, but subject to the ruling today,
6  you can answer the question.
7    A. That is correct.
8    Q. (BY MR. STONE) Were you one of the
9  individuals who took a tour of the CBP detention
10  facilities?
11    A. I was not.
12    Q. You were sitting in the car when that
13  occurred?
14    A. That is correct.
15    Q. All right. Let's pick back up at Timmel
16  Exhibit 10, and I'm on -- page 4 is where we left
17  off.
18    Do you see under C, "When the water
19  levels in the Rio Grande change, how much do they
20  change?" Do you see that question?
21    A. I do.
22    Q. Did you already know the answer to that
23  question when you asked it?
24    A. I did not.
25    Q. Next is D, "When the water levels in the Rio

145

1  Grande change, how quickly do they change?" Do you
2  see that question?
3    A. I do.
4    Q. Did you also know the answer to that
5  question at the time that you asked it?
6    A. I did not.
7    Q. Why would that information be useful in
8  determining -- in forming your expert opinions in
9  this case?
10    A. Well, I think any instance the floating
11  marine barrier creates a hazard to navigation and
12  reduces navigable capacity, but if the change was
13  significant in height, it could even become a
14  stranding situation where somebody goes up past that
15  or in the area into in the vicinity of the barrier,
16  and if the water drops quickly and substantially
17  enough, they could -- their vessel could potentially
18  become stranded there.
19    Q. So I'm following here, you're saying that
20  the vessel could be on top of the buoys, and if the
21  water level dropped, the boat would be trapped on top
22  of the buoys?
23    A. That is correct.
24    Q. Under what scenario would a boat be on top
25  of the buoys?

146

1    A.  Any boat that was to go past those buoys
2  that were not aware that there's -- mooring blocks
3  were off to each side of that barrier.  There are no
4  signs that say -- there's no indication anywhere
5  either in publications or charts or on the floats
6  that say, "Danger.  Obstructions.  Concrete blocks
7  under water."  So there's nothing that says nobody
8  can go up right alongside there and tie up to it and
9  throw out a fishing line.
10   Q.  How much do the concrete blocks stick out
11  beyond where the buoys are that are floating above
12  them?
13   A.  Well, the buoys aren't floating above them.
14  The buoys are floating between two rows of the
15  concrete blocks.
16   Q.  I see.
17   A.  And they extend out approximately 10 feet to
18  either side of the -- of the floats.
19   Q.  And so as I understand it, in this scenario
20  a boat pulls up next to the buoys, they tie off next
21  to them, and they start fishing.  And if there is a
22  change in the water level that -- where the water
23  level dramatically drops, then the boat could be
24  stranded on those concrete blocks.  Is that accurate?
25   A.  Potentially, yes.

147

1    Q.  Potentially, okay.  The final question was,
2  "Do migrants ever use boats to cross the river?  If
3  so, how frequently to comparison to crossings without
4  boats?"  Do you see that on page 4 of Timmel Exhibit
5  10?
6    A.  I do.
7    Q.  Why would that be information that's
8  important in forming your experts opinions in this
9  case?
10   A.  Actually, I don't think it really is.  It
11  was a curiosity.  The barrier could potentially block
12  vessels pretty well, but as it's configured, I'm not
13  certain that it would block the movement of people
14  not in boats.  But it really has nothing to do with
15  my -- it's more of a curiosity than anything else.
16   Q.  So you don't think the buoys would -- strike
17  that.
18         So you don't think the buoys, as they're
19  currently configured, would obstruct a person
20  crossing the Rio Grande River that was not in a boat?
21   A.  Actually, that is either in or is not in a
22  boat.  They could easily go around it.
23   Q.  Wait.  All right.  So just so I'm clear, can
24  the -- so people in boats or not in boats can easily
25  go around the buoys, right?

148

1    A.  That's correct.
2    Q.  So you don't consider it a -- the buoys an
3  obstruction to people who are not in boats?
4    A.  That's really -- the buoys, in terms of
5  serving as a barrier against migration of people
6  traveling without a boat, is certainly outside my
7  area of expertise.  But with only a thousand foot
8  long barrier boats -- it's certainly an obstacle for
9  boats.  It's certainly a hazard to navigation and, as
10  it's configured where there is that narrow end down
11  at the south end of it where at low river stage the
12  shoals are very close to the surface and then
13  oftentimes exposed, it could be become an obstruction
14  as well for boat travel.
15         I'm not an expert on migrant moving.
16  I'm not suggesting that.  I'm only talking about the
17  movement of boats.
18         MR. STONE:  Objection.  Nonresponsive.
19   Q.  (BY MR. STONE)  You were there in February.
20  Could you -- and you said the water level was 3 feet
21  deep right,
22   A.  Yes, approximately.
23   Q.  Could you have just hopped out of the
24  airboat and walked around the buoys?
25   A.  Yes, in some areas.

149

1    Q.  Did you at any point hop out of the boat and
2  walk around the buoys?
3    A.  No.
4    Q.  Why not?
5    A.  I had no interest in doing that.
6    Q.  Just didn't want to get wet, right?
7    A.  Didn't want to get my feet wet, yeah.
8    Q.  Could you have climbed over the buoys, do
9  you think?
10   A.  I think I could have.  I certainly could
11  have 20 years ago and certainly could have 40 years
12  ago.
13   Q.  Do you think you could take an airboat over
14  the top of the buoys?
15   A.  No.
16   Q.  No?  Next I'm showing you -- I'm still on
17  Exhibit 10, but I want to go through the answers that
18  you received, so I'm on page 2.
19         Do you see this email sent from George
20  Cavazos?
21   A.  I do.
22   Q.  And this email was forwarded to you,
23  correct?
24   A.  Yes, it was.
25   Q.  I want to go through some of these answers.

**150**

1    So first, as it relates to the propeller
2  pitch on the airboats, the answer was "no," correct?
3    A. That's -- that's what it says, yes.
4    Q. And that was consistent the information you
5  already knew before you asked the question, right?
6    A. Yes.
7    Q. Same for Reverse, the answer was "no," which
8  was consistent with what you knew before you asked
9  the question, right?
10    A. Correct.
11    Q. This next was Idle Speed.  And he wrote, "At
12  idle speed airboats will move with the current, wind
13  speed, or drift."  Do you see that answer on the
14  screen?
15    A. I do.
16    Q. Was that consistent with what you knew prior
17  to asking the question?
18    A. Yes.
19    Q. Next it says, as it relates to "neutral,"
20  "There is no neutral setting, propellers are in
21  constant motion when the engine is on."  Do you see
22  that answer?
23    A. I do.
24    Q. And was that consistent with what you knew
25  prior to asking the question?

**151**

1    A. Yes.
2    Q. Finally, as it relates to maneuverability,
3  you said, "Do the USBP airboats" -- strike that.
4    You said, "Are the USBP airboats as
5  maneuverable as boats of similar size with inboard
6  outboard motors," right?
7    A. Yes.
8    Q. And the answer is, "less maneuverable,"
9  right?
10    A. Yes.
11    Q. And was that consistent with what you knew
12  prior to asking the question?
13    A. Yes.
14    Q. Final batch here, as relates to the Change
15  in Water Levels.  The question was, "Do the water
16  levels in the Rio Grande River change?"  And George
17  Cavazos responded "yes," right?
18    A. Yes.
19    Q. And then you said, "Do the water levels in
20  the Rio Grande change frequently?"  And he responded,
21  "yes," right?
22    A. Yes.
23    Q. And then you asked this, "When the water
24  levels in the Rio Grande change, how much do they
25  change?"  And the response was, "Varies on numerous

**152**

1  factors, release rate from Lake Amistad, runoff from
2  rains, and flash floods in the area," right?
3    A. Yes.
4    Q. So based on this answer, were you able to
5  determine how many feet the water level changes in
6  the Rio Grande area that you were asking about?
7    A. No, not from the answer to this question.
8    Q. The next question was, "When the water
9  levels in the Rio Grande change, how quickly do they
10  change?"  And the answer was, "As quickly as within
11  the hour to several days for slow or controlled water
12  releases from Lake Amistad."  Did I read that
13  correctly?
14    A. You did.
15    Q. So is it fair to -- based on that answer, do
16  you think that it would be unlikely that a person who
17  tied their boat next to the buoys for fishing
18  could -- the water level could change so quickly that
19  they would be stranded on top of the buoys?
20    A. No.  I think the first part of his answer
21  supports the fact that they could be.
22    Q. That they could be or couldn't be?
23    A. Could be stranded --
24    Q. Okay.  So the answer --
25    A. -- within an hour.

**153**

1    Q. Okay.  So because of the change in water
2  levels, within an hour that would be sufficient for
3  them to be stranded on top of the buoys?
4    A. Sure.
5    Q. -- the boat?  And then the final question is
6  "Do migrants ever use boats to cross the river?  If
7  so, how frequently in comparison to crossings without
8  boats?"
9    And the answers was yes -- answer was,
10  "Yes, migrants use rafts, small boats, and makeshift
11  rafts to cross the river.  Crossing by migrants using
12  this method is less frequent than migrants swimming
13  or wading across the river."  Did I read that
14  accurately?
15    A. Yes.
16    Q. But it's fair to say you didn't rely on that
17  in terms of your opinions in this case?
18    A. No.
19    Q. Final batch of emails and we'll be moving
20  on.
21    I'm sharing with you what I've marked as
22  Timmel Exhibit 12.
23    (Timmel Exhibit 12 marked.)
24    Q. All right.  This is a series of emails, and
25  it's only three pages, Timmel Exhibit 12.

154

1    Do you see on page 1 your name on the
2  "To" link?
3    A. I do.
4    Q. And this email was sent from Melanie Casner,
5  right?
6    A. That's correct.
7    Q. I want to start at the bottom of the thread,
8  though, with the original email.
9        So the email thread begins on March --
10  I'm on page 3 of Timmel Exhibit 12. This is an email
11  that you sent to Melanie Casner and carbon copied
12  Brian Lynk on, right?
13    A. Correct.
14    Q. And the dra -- the title -- the subject
15  matter, it says, "US v. Abbott, Draft Report USACOE
16  data," right?
17    A. Yes.
18    Q. What is USACOE?
19    A. U.S. Army Corps of Engineers.
20    Q. And who is Melanie Casner?
21    A. She is counsel for the U.S. Corps of
22  Engineers.
23    Q. In this email that you wrote to Melanie, you
24  said, "Hello, Melanie. As per our draft review Teams
25  meeting last night, here is the request for

155

1  information from the USACOE that I would like to
2  include in my report. Please let me know if you need
3  any additional information or clarification. Thank
4  you, USACOE - Jax." Do you see that?
5    A. I do.
6    Q. Is Jax a reference to Jacksonville?
7    A. It is.
8    Q. And then you said, "Shallowest pre and post
9  dredging depths of commercial channels in:
10  St. John's River - Jackson, Alafia River in Tampa,
11  and Big Bend Channel in Tampa. Did I read that
12  accurately?
13    A. Alafia River, but, yes.
14    Q. Alafia. And then next it says, "USACOE -
15  Galveston: Shallowest pre and post dredging depths
16  of commercial channels in: San Jacinta [sic] and
17  Other Texas Channels dredged in shallow waters." Did
18  I read that accurately?
19    A. You did.
20    Q. Why were you asking information about
21  dredging depths?
22    A. One of the things that a mariner or a
23  riverman must do to -- before operating on a river is
24  to know whether the body of water is a navigable
25  river of the United States.

156

1    One of the considerations is has it ever
2  been or could it be in the future navigable. And I
3  was exploring, based on my experience, because I have
4  piloted vessels and served as a ship's officer --
5  piloted vessels on the Alafia River and the Big Bend
6  Channel in Tampa, and both of those were very shallow
7  areas before they were -- before they were dredged
8  many years ago. And I've also served as a ship's
9  officer going through San Jacinto and Texas Ship
10  Channel -- that's Houston Ship Channel, and I know
11  they were very shallow at one time.
12    And what I was trying to do is compare
13  my experience to operating on rivers that were once
14  very shallow and now are thriving successful
15  commercial ports.
16    Q. I'm showing you what's been marked as Timmel
17  Exhibit 4. We looked at it earlier. Do you recall
18  this document when we talked about it earlier?
19    A. Can I see the top of it, please?
20    Q. Yeah. Your May 3rd, 2024 expert
21  designation.
22    A. Okay.
23    Q. I'm on page 2 in the highlighted section,
24  "Captain Timmel is expected to testify regarding the
25  nature of the floating barrier system deployed in the

157

1  Rio Grande River by the State of Texas and the
2  floating barrier system's impact upon the
3  navigability of the Rio Grande." Did I read that
4  accurately?
5    A. You did.
6    Q. Okay. There's nothing in here about you
7  being an expert on establishing navigability, is
8  there?
9        MR. LYNK: Object --
10    A. No, there is not.
11        THE REPORTER: Is --
12        MR. LYNK: I said, "object to form."
13        THE REPORTER: Okay. Thank you.
14    Q. (BY MR. STONE) But when you're asking for
15  this dredging information, you're asking for
16  information to establish navigability. Is that
17  accurate?
18    A. Yes.
19    Q. Okay. It doesn't -- none of this
20  information about dredging relates to your testimony
21  today as it relates to whether or not the buoys
22  constitute an obstruction in the Rio Grande River,
23  does it?
24    A. That's correct.
25    Q. And then I see a response here on April 15th

158

1 from Melanie Casner. Do you see it on the screen?
2 I'm on page 2 of 3.
3      A. Yes.
4      Q. "Hi, Captain Timmel. Thanks so much for
5 your patience. I'm going to send you seven documents
6 pertaining to the St. John's River, Alafia River and
7 Big Bend Channel. The documents are too big to send
8 in one email, so I'll send three in the first email
9 and four in second." Did I read that accurately?
10     A. You did.
11     Q. Okay. And then above, you responded on
12 April 16th, 2024, to Melanie Casner and Brian Lynk.
13 Do you see that on the screen?
14     A. I do.
15     Q. This is still on page 2. It says -- and
16 just follow along -- "Good morning Melanie," blank.
17 There appears to be a redacted portion of the e-mail
18 here. Do you see it on the screen?
19     A. I do.
20     Q. What did you write in the redacted section
21 here?
22     A. I have no idea.
23     Q. Do you see the second redacted paragraph?
24     A. I do.
25     Q. Do you remember you what wrote in the second

159

1 redacted sentence here?
2          MR. LYNK: I'm going to object. It was
3 redacted and it was redacted on privacy grounds.
4          MR. STONE: On what --
5          MR. LYNK: Privacy grounds, privacy.
6          MR. STONE: Privacy grounds.
7          MR. LYNK: Yes.
8          MR. STONE: So --
9          MR. LYNK: Personally identifying
10 information.
11         MR. STONE: Oh, so both of these
12 sentences contained personally identifying
13 information?
14         MR. LYNK: Yes, they did.
15         MR. STONE: Okay. And there was nothing
16 else contained in those redacted portions?
17         MR. LYNK: No.
18         MR. STONE: Okay. Let's -- well, let me
19 finish this email, and then I'll go back.
20     Q. (BY MR. STONE) It says personally -- it's
21 redacted because it contained personally identifying
22 information, i.e., somebody's address or cell phone
23 or Social Security number, right?
24     A. I don't recall.
25     Q. Do you remember the names of the persons

160

1 that were mentioned in these redacted sections?
2      A. No, I don't have that type of recall to look
3 at one of many emails and know what I had written
4 there at one point.
5      Q. Moving on, it says, "Lastly, when would it
6 be convenient for us to speak with another? I am
7 clear most of today, except for 9:30 a.m. until 11:30
8 a.m. and lunchtime.
9          Did you receive my email regarding
10 whether or not USCG 8th District ever issues Local
11 Notice to Mariners or broadcasts notices of mariners
12 pertaining to the upper Rio Grande River, in
13 particular in Eagle Pass section of it? If not,
14 where is their cutoff point on the Rio Grande River
15 above which they do not issue notices? Thank you
16 very much for your assistance in finding this
17 information." Did I read that accurately?
18     A. You did.
19     Q. What is a local notice to mariners?
20     A. A local notice to mariners is a document
21 that's published weekly or more often if necessary
22 that gives updates to professional mariners or
23 recreational users as well about changes in a
24 waterway that could have an impact on safe navigation
25 or modifications or changes or improvements.

161

1      Q. And what are broadcast notices to mariners?
2      A. Those are the same idea, but they can be
3 done immediately if there was the -- there are a lot
4 of broadcast notices for mariners that went out when
5 the ship struck the bridge in Philadelphia, the
6 container ship hit the bridge. And that's to get
7 information out over the radio immediately so that
8 people can receive the information more quickly.
9      Q. I want to go back down to page 3 of
10 Exhibit 12. What is the depth of -- the post
11 dredging depth of the St. John's River?
12     A. I am -- wasn't -- I did not get information
13 on that or, when I did, she sent some information,
14 but I determined it not to be helpful to me in this
15 case.
16     Q. Why wasn't it helpful to you in this case?
17     A. Because I never -- I've maneuvered up and
18 down the St. John's River in a -- in pleasure boats
19 and small recreational boats, but never a commercial
20 vessel, so I didn't feel like I had the experience
21 necessary to have it make a significant difference.
22     Q. What is the post dredging depth of the
23 San Jacinto?
24     A. I did not receive that information either.
25     Q. What is the post dredging depth of Big Bend?

162

1    A.  33 feet.
2    Q.  What is the post dredging depth of the
3  Alafia?
4    A.  30 feet.
5    Q.  What is the post dredging depth of the
6  Houston Ship Channel?
7    A.  What was sent to me was not really
8  decipherable that I felt comfortable with.
9    Q.  What depth of channel is required to make
10  channels navigable?  Let me strike that.
11       What is the depth a channel required to
12  make the channel a navigable water of the U.S.?
13    A.  That's not defined.
14    Q.  So it's fair to say that the examples you
15  just gave all involved 30 or more feet --
16    A.  Yes.
17    Q.  -- that we just talked about?
18    A.  But there's a lot of navigable channels that
19  are significantly less than that.  And it depends on
20  whether it's carrying commerce or not to a large
21  extent.
22    Q.  Following up on your request here, were you
23  able to review any local notices to mariners
24  involving the Rio Grande River?
25    A.  None in the -- no, I wasn't, and there --

163

1  the ones I was requesting, so the only ones that were
2  responded to, was up in the Eagle Pass area.
3    Q.  Did you review any broadcast notices to
4  mariners involving the Rio Grande River?
5    A.  No.
6    Q.  What is the minimum depth that you would
7  require to pilot a commercial vessel?
8    A.  It depends on the size and type of vessel.
9  There's no real answer to that.
10    Q.  With is the smallest commercial vessel that
11  you can pilot?
12    A.  Well, there's a lot of ferryboats and a lot
13  of charter boats and fishing boats and things like
14  that that can be quite small, and they're all
15  commercial vessels.  And they can have two or three
16  feet of draft.  Some of the multi-hull vessels have
17  even less draft than that.
18       So it's not a function of the draft of
19  the vessel or the depth of the water that makes the
20  channel navigable or not.
21    Q.  What is the smallest commercial vessel that
22  you have personally piloted?
23    A.  The Santa Maria.
24    Q.  And what was the size -- what was -- tell by
25  the Santa Maria.

164

1    A.  It was a replica ship of the Santa Maria,
2  and it was about 60 feet long and came into Tampa,
3  and I piloted that.
4       I also piloted the -- I guess I have an
5  affinity for these type of things -- when not-for-
6  profit companies bring vessels into -- at least into
7  Tampa Bay, we do the piloting pro bono whenever we
8  can.  And I always sort of like that kind of stuff,
9  so I did the Santa Maria.  I did the Golden Hind,
10  which was Sir Francis Drake's vessel.  Did the
11  America, the original sailing vessel for the
12  America's Cup, and then also a number of private
13  yachts and research vessels, small tugboats.
14    Q.  So the Santa Maria, the smallest commercial
15  vehicle that you've -- sorry -- smallest commercial
16  vessel that you've piloted.  What was the draft on
17  that vessel?
18    A.  I don't recall exactly.  This was a number
19  of years ago.  I'm sorry, I don't recall.
20    Q.  Did it have any cargo in it at the time that
21  you piloted it?
22    A.  Not commercial cargo, no.  It had crew
23  members and passengers on board.
24    Q.  And this was the historic vessel or is -- if
25  I search for the word "Santa Maria," is that the

165

1  proper name of the vessel itself?
2    A.  Yes.  It was a replica ship.
3    Q.  Replica.
4    A.  Uh-huh.
5    Q.  And did you testify a minute ago that it was
6  approximately 98 feet long?
7    A.  No.  I thought it was more in the vicinity
8  of 60 feet.
9    Q.  Okay.
10    A.  If that.  What's really shocking is when you
11  get aboard these replica vessels that are actual size
12  and to see how small they were and how many people
13  were on board.  And these people went out to sea when
14  they thought the earth was flat.
15    Q.  Would it -- if I represented to you that the
16  Santa Maria requires a 10-foot draft or has a 10-foot
17  draft, would that sound reasonable?
18    A.  That would surprise me that it's that deep.
19  I didn't want to guess, but I was thinking more in
20  the neighborhood of 7 or 8 feet.
21    Q.  Now I want to talk about your second trip
22  down to the site of the buoys, okay?
23    A.  Yes.
24    Q.  When did you most recently travel down to
25  visit the buoys?

1    A. I went down day before yesterday, but just
2  checked into a hotel after arrival.  Well, got dinner
3  and then went -- checked into the hotel, went to
4  dinner -- I forget the order.  But anyway, and then
5  yesterday actually did the site inspection.
6    Q. So you flew in on Monday, June 3rd?
7    A. To Austin, yes.
8    Q. To Austin.  And you checked into a hotel?
9    A. Not in Austin.  I checked into the Hampton
10  Inn in Eagle Pass.  We drove that day.
11    Q. I see.  So you flew into Austin on Monday,
12  June 3rd, and then drove down directly to Eagle Pass.
13  Is that right?
14    A. I was picked up at the airport, and we went
15  directly to Eagle Pass.
16    Q. Who picked you up?
17    A. Landon Wade.
18    Q. Approximately how long did it take to drive
19  to Eagle Pass?
20    A. Three and a half hours or so.
21    Q. Other than Landon Wade, who else was present
22  during the drive to Eagle Pass?
23    A. A gentleman with the Corps of Engineers from
24  Kansas City.
25    Q. Do you remember what this gentleman's name

1  was?
2    A. Yes.  Mike Chapman.
3    Q. And did you obtain any information from Mike
4  Chapman that you relied on in forming your opinions
5  in this case?
6    A. No.
7    Q. Did Mike Chapman provide you with any facts
8  that you relied on in forming your opinions in this
9  case?
10    A. No.
11    Q. So other than Landon and Mike Chapman, was
12  anyone else present in the vehicle when you drove to
13  Eagle Pass?
14    A. No.
15    Q. So you arrived in Eagle Pass on Monday,
16  June 3rd, and you checked into a hotel, right?
17    A. That's correct.
18    Q. Did you have any other meetings that day
19  related to this case?
20    A. No.
21    Q. On -- what happened on -- strike that.
22       So on Tuesday, June 4th, yesterday
23  morning --
24    A. Yes.
25    Q. -- at some point you visited the site again,

1  correct?
2    A. That is correct.
3    Q. What time -- did you leave from the hotel?
4    A. We did.
5    Q. Who all was present when you left the hotel
6  to go visit the site of the buoys?
7    A. Landon Wade and Mike Chapman.
8    Q. And -- strike that.
9       Approximately what time did you arrive
10  at the site of the -- well, strike that.
11       Approximately what time did you leave
12  the hotel?
13    A. Approximately 8:40.
14    Q. And where did you go after you left the
15  hotel?
16    A. Stopped by a gas station to buy some bottled
17  water and then went to a CBP office.
18    Q. CBP office in Eagle Pass?
19    A. Correct.
20    Q. What happened when you arrived at the CBP
21  office in Eagle Pass?
22    A. We were taken into a conference room and
23  given a very short briefing, and then went to the
24  boat ramp to board the vessels.
25    Q. Who gave you the briefing?

1    A. I don't recall his name, but I met him -- it
2  could have been the same person that gave us the
3  briefing in the previous, but I -- I don't recall his
4  name.
5    Q. Was it George Cavazos?
6    A. I don't recall.
7    Q. Would you recognize George Cavazos if you
8  saw him?
9    A. Yes.
10    Q. Approximately how long was the briefing?
11    A. 10, 15 minutes.
12    Q. And what was the briefing about?
13    A. Mostly about the stage of the river, the
14  height of the river, and what we wanted to see.
15    Q. What was the height of the river?
16    A. It was lower than the time I went before,
17  but higher than it had been when some other people
18  went to see it a few weeks ago.
19    Q. What other people -- what people went and
20  saw it -- strike that.
21       Who went and saw it a few weeks ago?
22    A. I know that Melanie Casner did, but I don't
23  know anybody else that was on that trip.
24    Q. Was it a PowerPoint presentation?
25    A. No.

170

1    Q. Were there any documents that you were
2  provided during the presentation?
3    A. No.
4    Q. Did you rely on any of the information you
5  were provided during the presentation in forming your
6  expert opinions in this case?
7    A. No.
8    Q. And you said that it was lower than last
9  time, but higher than a few weeks ago. Do you have
10 an actual foot depth that you can recall?
11   A. I do not, no. And it would depend on
12 where -- in terms of -- the stage of the river is one
13 thing, and it's taken at the gage points, and it
14 doesn't really mean a great deal to me, but it did to
15 the person from the Corps.
16       And what's more important to me is the
17 depth of the water. In this case at the barrier, and
18 that varies along the length of the barrier.
19   Q. The last time you visited in February it was
20 three feet deep approximately, you testified. Do you
21 recall that?
22   A. Yes.
23   Q. And how many feet deep was it -- well, it
24 was less than three, but how many feet approximately
25 was it yesterday when you visited?

171

1    A. Well, there -- the shoals were exposed. A
2  number of floats were sitting on land above the
3  height of the river. And so at some places it was
4  zero or less than zero. And then at the south end of
5  it the gentleman from the Corps got out a boat hook
6  and put it over the side. And in the area that we
7  were at, the south end, is about 3 1/2 feet.
8    Q. So it varied from, it sounds like, 3 1/2
9  feet to less than zero feet?
10   A. I would say negative 8 to 12 inches.
11   Q. Negative 8 to 12 inches. Were you able --
12 when you did the site visit yesterday, were you able
13 by airboat to go up and down the Rio Grande River
14 aroun -- beside the buoys?
15   A. I'm sorry?
16   Q. Yeah. Yesterday when you did the --
17   A. Uh-huh.
18   Q. -- site visit, did you travel up the river
19 past the buoys?
20   A. Yes.
21   Q. And did you travel down the river past the
22 buoys?
23   A. Yes.
24   Q. Were you able to travel around the buoys?
25   A. Originally I was in the RVSD vessel, the jet

172

1  boat, and we were not able to travel around it. The
2  operator of the boat said that it was his opinion
3  that we would run aground if we went on the other
4  side. And the jet boat has a jet that hangs down
5  below the hull of the boat, and that he could very
6  potentially damage that if we tried to go on the
7  other side.
8        So about halfway through the inspection,
9  I asked somebody if it would be possible to swap
10 boats for me to go over because I wanted to see the
11 other side because that's where the -- what I think
12 is most significant in terms of hazards to navigation
13 and reduction of navigable capacity.
14       And so I went onto the airboat, and then
15 we were able to go through to the other side.
16   Q. So on an airboat you were able to go arou --
17 circle the buoys?
18   A. That's correct. But the riverine boat only
19 had a foot and a half of draft, and he was
20 uncomfortable with taking it over there.
21   Q. Because of the water depth, right?
22   A. Correct. And the narrowness at the south
23 end.
24   Q. How many people were with you when you
25 did the -- when you did the site inspection on a

173

1  boat -- on the boat yesterday?
2    A. There -- originally there was four of us,
3  and we split up two on the RVSD and two on the
4  airboat.
5    Q. And who were the four people?
6    A. The four people was Mike Chapman, Landon
7  Wade, and David Sorola, and myself. And then two
8  people on each boat, the operator and the assistant.
9    Q. How many people were on the airboat with you
10 that you were able to circle the buoys in?
11   A. Five, total of five. I just went onto the
12 airboat and nobody left it.
13   Q. Were you also wearing headsets when you were
14 in the -- let me start this -- were you wearing
15 headsets when you were on the airboat?
16   A. Yes, but they -- it was not connected to the
17 airboat, and I was wearing it strictly for sound
18 protection, for hearing protection.
19   Q. So during that portion of the trip you
20 weren't able to converse with anybody?
21   A. That's correct.
22   Q. When you were on the RVSD, how many people
23 were aboard the RVSD with you when you were on that
24 boat?
25   A. A total of four.

1   Q.  Four people.  And just so I'm clear, who
2   were those four people again?
3   A.  It was the operator, his assistant, Mike
4   Chapman, and myself.
5   Q.  And was the operator -- the operator of the
6   boat, was he a lawyer?
7   A.  No.
8   Q.  Okay.  What did you -- did you talk about
9   the case while you were on that boat?
10   A.  No.
11   Q.  You didn't discuss the case at all while you
12   were on the RVSD?
13   A.  I didn't talk about the case at all, no.
14   Q.  What did you talk about while you were on
15   the RVSD?
16   A.  I asked them if they liked their job, and
17   they said, "Driving a boat all day, what's not to
18   like?"  I talked about the training they had to go
19   through so that they know the river well enough.  I
20   talked to them quite a bit about which areas within
21   the barrier, the vicinity of the barrier, what the
22   depths were there, what the currents were.  Talked
23   about when the height of the river changes, how
24   quickly -- how quickly it can change.  And he said in
25   some instances, it can -- you can sit someplace on

1   the edge of the river and watch it rise or fall.
2   I asked if it's ever like a tidal wave
3   coming down the river when they let go of the water,
4   and he goes, "No."  I asked what happens if they
5   cause damage to one of the boats, and they said that
6   can be a -- that an investigation takes place, and it
7   could have consequences if there was negligence.
8   We went past some boys on the side of
9   the river, and he said to me, "They're getting ready
10   to cross."  So I found that to be interesting.
11   He talked -- volunteered a lot about how
12   many drownings take place, you know, over time there.
13   He talked about how much money is made on the Mexican
14   side of bringing these people here and how little
15   money they -- CBP has, things of that nature.
16   Q.  And I have a couple follow-ups to that
17   conversation.  But first I just wanted to ask, how
18   did the airboat that you were in when you were going
19   around the buoys get over the shoals?  Did it just
20   drive over them?
21   A.  No, he was able to -- he was able to avoid
22   them, having, I guess, a lot of experience and
23   knowledge there.  But the river was certainly higher
24   than it sometimes is because I've seen photographs of
25   it where the blocks are exposed perhaps as much as

1   halfway.  So it depends on the depth of the river.
2   Yesterday he was able to maneuver around
3   it.  Those guys are really good handlers and -- well,
4   I guess if you spend all day going up and down a
5   stretch of water, you learn it pretty well.
6   Q.  All right.  Did the operator -- did you
7   discuss with the operator whether or not he takes any
8   boats out in that area at night?
9   A.  Not specifically, but I did ask him -- he
10   pointed out, because I asked if there's many
11   crossings and night, and pointed out a tower that had
12   very sophisticated cameras on it and had night vision
13   cameras and heat -- infrared cameras.  And they also
14   use drones quite a bit with sophisticated cameras on
15   it as well.
16   And then if something is spotted, then
17   they respond to it.  I don't know that they're making
18   patrols up and -- I didn't ask, and he didn't state
19   whether they're actually doing patrols on the -- it
20   would be extremely -- I don't know that they could do
21   that, though --
22   Q.  Did you --
23   A.  It would be dangerous.
24   Q.  Yeah.  At any point did -- at any point
25   during either site visit or during your course of

1   gathering information for this case, have you become
2   aware at any point of the U.S. border patrol
3   operating craft in the location where the buoys are
4   located at night?
5   A.  I did not ask and was not told.
6   Q.  When you said that it would dangerous, did
7   you mean because of the crime?
8   A.  No, I meant strictly from a navigational
9   perspective that these guys can really read the
10   river, and as we're going up and down, he's pointing
11   out rocks that you can't see because they're below
12   the surface, but there is a slight ripple or
13   there's -- or you can see a divergence of the current
14   someplace.  And then we went to -- when went south of
15   the boat ramp, there were rapids, you know, a lot of
16   rapids.
17   Actually, was it south or north?  I get
18   confused on that, but there were some areas in the
19   Eagle Pass area where in certain sections of the
20   river it was quite rocky and quite shallow.  And --
21   Q.  Did you --
22   A.  -- by "dangerous," you wouldn't be able to
23   see those visual cues at night.  And there are no
24   navigational buoys or aids there, so I don't know how
25   you would know where you were in relation to the

178

1  shoal areas and other dangers.
2      Q. So it's fair to say that it's your belief in
3  this case that the USCBP is not operating crafts in
4  the location where the buoys are at night?
5          MR. LYNK: Object to form.
6      A. I have no knowledge of that one way or
7  another. Unless they've got some navigation
8  instrumentation that I'm unaware of, I don't know how
9  they could do it safely. I wouldn't do it.
10     Q. (BY MR. STONE) You wouldn't do it. Would
11  you do it if the buoys weren't there?
12     A. No.
13     Q. You wouldn't operate a craft there at night
14  regardless of the buoys, right?
15     A. Not unless it was -- they installed
16  navigational buoys and they were lit and it was a
17  well marked path.
18     Q. You mentioned drownings, right?
19     A. Yes.
20     Q. Were you told of any drownings that occurred
21  at the location where the buoys are?
22     A. I was told that there was a body recovered
23  from the barrier, but it did not appear that it --
24  the drowning occurred there it. It appeared that it
25  had occurred further upriver and had drifted down

179

1  into the barrier and got stuck.
2      Q. And who gave you that information?
3      A. One of the boat operators. I don't remember
4  whether it was on the RVSD or the airboat.
5      Q. Had there been any drownings that -- strike
6  that.
7          So they recovered the body, but had
8  anyone actually drowned at the location where the
9  buoys were located that you're aware of?
10     A. Not that I'm aware of.
11     Q. You mentioned that there were some boys that
12  you observed on the Mexican side of the bank. Is
13  that correct?
14     A. Yes.
15     Q. And you said one of the operators told you
16  they were getting ready to cross?
17     A. That was his opinion. That's what he said,
18  yes.
19     Q. Did he say if they were going to cross where
20  the buoys were located?
21     A. No, it was not in the vicinity of the buoys.
22     Q. Is that because of the buoys?
23     A. He did not say.
24     Q. Did the operator tell -- make any statements
25  about the number of people who have illegally crossed

180

1  at the location exactly where the buoys are?
2          MR. LYNK: Object to form.
3      A. No.
4      Q. (BY MR. STONE) Did the operator say
5  anything about people climbing over the buoys?
6      A. No.
7      Q. Swimming under the buoys?
8      A. No.
9      Q. Earlier you testified that it would be
10  possible, when you were there on the February visit,
11  that you could have hopped out of the boat and just
12  walked around the buoys if you wanted. Do you recall
13  that?
14     A. Yes.
15     Q. Was the same true yesterday?
16     A. Yes.
17     Q. Did you hop out of the boat and walk around
18  the buoys?
19     A. I did not.
20     Q. Okay.
21     A. I felt like it. It was 106.
22     Q. Was there anything else that you discussed
23  with the RVSD operator during the course of your site
24  visit yesterday that you relied on or that's relevant
25  to your opinions in this case?

181

1      A. No.
2      Q. Approximately how long was the site visit
3  yesterday to the buoys?
4      A. I think we arrived at the boats probably
5  about 9:30 and was onboard until 11:45, so a little
6  over two hours.
7      Q. Was that entire two hours spent traveling to
8  the site of the buoys, around the buoys, and then
9  returning?
10     A. Well, I had an extended tour. We got back
11  down to the boat ramp, and Mike Chapman from the
12  Corps wanted to go beyond the boat ramp to -- and
13  that's where we were able to see some of the natural
14  rock formations and so forth. So we probably went
15  two miles that direction and then returned.
16     Q. Two miles further south?
17     A. Yes. Again, if I'm not confusing north and
18  south.
19     Q. And what were the -- can you describe the
20  condition of those rapids? Well, strike that.
21          Could you take -- strike that.
22          You were in the RVSD at this time,
23  right?
24     A. That's correct.
25     Q. Could you take the RVSD over those rapids?

182

```
1      A. No. You would avoid those rapids, as we
2  did.
3      Q. Was there a way to continue to travel down
4  the Rio Grande River past those rapids by -- in the
5  RVSD?
6      A. Yes.
7      Q. So the rapids weren't the entire width of
8  the river. They were only a portion of the river?
9      A. They were isolated sections.
10      Q. Isolated sections. Did you travel down to
11  Kingsbury Falls?
12      A. No, but that's an interesting question
13  because we had heard that that question had been
14  asked before, so we wanted to go see it, if it was
15  possible. And nobody that we talked to is aware of
16  where Kingsbury Falls is. And I Googled it, and we
17  couldn't -- nobody -- nobody is aware. It's a
18  mystery falls.
19      Q. Really?
20      A. Yep.
21      Q. So are the boat -- so the boat operators
22  didn't know where Kingsbury Fall was --
23      A. Nope.
24      Q. -- Falls was? And no one you spoke to
25  yesterday was familiar with where Kingsbury Falls is?
```

183

```
1      A. That is correct, nobody was aware of it.
2  They'd never heard of it.
3      Q. And you tried Googling it, and you
4  weren't -- well, let me start there. Did you try
5  Googling it?
6      A. I did.
7      Q. And were you able to find Kingsbury Falls on
8  Google?
9      A. I was able to find Kingsbury, Texas but not
10  Kingsbury Falls. Could you tell me where it is?
11      Q. Well, we will -- we'll -- the question
12  format of a deposition --
13      A. I know.
14      Q. -- I'll ask the questions --
15      A. Excuse me. I'm sorry.
16      Q. -- but I -- it may not be the last time we
17  talk about Kingsbury Falls. We'll see.
18      A. Okay.
19      Q. So I want to talk a bit about your
20  deposition. Let me show you what I've marked as
21  Timmel Exhibit No. 1.
22      A. About my report?
23      Q. I'm sorry, your report. We're in the
24  deposition, so I apologize.
25          Let me ask you about your -- it's been a
```

184

```
1  long day -- your expert report. And I just want to
2  start at the beginning, page 1. Starboard Ten,
3  Incorporated. Do you see that on the screen?
4      A. I do.
5      Q. So what is Starboard Ten, Incorporated?
6      A. That is the name of my company through which
7  I perform my harbor pilot duties and then developed
8  an expert witness services company, and I do that
9  business through Starboard Ten Incorporated as well.
10      MR. LYNK: Hey, just a quick question.
11  It's almost 3. Are you planning to go through a long
12  stretch of the report before another break?
13      MR. STONE: We can take another
14  five-minute break. That's fine.
15      THE VIDEOGRAPHER: Off the record. Time
16  is 2:57.
17      (Recess 2:57 p.m. to 3:08 p.m.)
18      THE VIDEOGRAPHER: We're back on the
19  record. Time is 3:08.
20      Q. (BY MR. STONE) So right now we are in what
21  we've marked as Timmel Exhibit 1. This is a copy of
22  your expert report, and I've got it up on the screen.
23          Do you see -- I'm on page 3. Do you see
24  it on the screen?
25      A. I do.
```

185

```
1      Q. I'm on the second paragraph from the top
2  beginning with, "The analysis and opinions." Do you
3  see that paragraph?
4      A. Yes, uh-huh.
5      Q. The second sentence of that paragraph -- let
6  me read it for you. Let me see if I can highlight
7  it. It's going to do a scan.
8          Okay. Let me cut to the gist. In that
9  sentence -- you have it, I believe, in front of you
10  if you want to go to page 3 of your expert report,
11  the second paragraph -- second sentence of the second
12  paragraph you mention consulting with your peers and
13  other experts in this case and that you relied on
14  those conversations in forming your opinions.
15          Tell me if I'm -- my recollection is
16  accurate after you've reviewed your expert report.
17      A. No, you're -- that's a misrepresentation.
18      Q. Okay. What does it say in that sentence
19  about your peers?
20      A. What it says is after -- well, I'll read it.
21  "Additional facts, data, and knowledge gleaned from
22  websites, consultation with peers, and other experts,
23  and from extensive research conducted during the
24  preparation of this report were also considered."
25      Q. And how did my question misrepresent that
```

186

1  sentence then?
2     A.  You said "other experts in this case."  And
3  these experts I conferred with were not in this case.
4     Q.  Okay.  You're going to have to help me a
5  little bit.  But before we get to that, let's start
6  with peers.
7     A.  Sure.
8     Q.  What -- and let me -- now that I've made
9  this a searchable document, I can highlight it.
10       All right.  What peers did you
11  consultate -- did you consult with in this case?
12     A.  I spoke with another pilot from Philadelphia
13  who also does expert witness work.  In fact, I had
14  him do a peer review of my report and asked him if
15  I -- not necessarily if he agreed with all of the
16  opinions, but if he agreed with the methodology and
17  the approach taken.
18       And I also spoke with my son, who is
19  also a harbor pilot, and talked to him about, you
20  know, hazards to navigation and things like that.
21     Q.  Other than those two individuals, did you
22  talk with any other peers or did you -- strike that.
23       Other than the two individuals that you
24  just identified, did you consult with any other peers
25  about this case?

187

1     A.  No.
2     Q.  Who is the peer that you consulted with from
3  Philadelphia?
4     A.  His name is Steve Richter, R-I-C-H-T-E-R.
5     Q.  Can you spell that last name one more time?
6     A.  R-I-C-H-T-E-R.
7     Q.  T-E-R.  And who is Steve Richter?
8     A.  He is a classmate and shipmate of mine from
9  when I was in New York Maritime College, and we both
10  graduated in 1981.  And he has served as a ship's
11  officer, a master, and a ship's pilot for many, many
12  years now.  And he also does expert witness work.
13     Q.  Was he retained as an expert in this case?
14     A.  No.
15     Q.  Did you share a copy -- strike that.
16       Did you share a draft of your expert
17  report with him to review?
18     A.  I had him look at it, yes.
19     Q.  Do you know if the copy of the draft that
20  you shared with Mr. Richter was shared with us
21  attorneys for the State of Texas in this case?
22     A.  It's the same -- it's the same report.
23     Q.  So there was no changes between that draft
24  that you shared with Mr. Richter and the final
25  version that was provided to us here today?

188

1     A.  That's correct.  He looked at this version
2  of the report.
3     Q.  Approximately when did Steve Richter look at
4  this version of your report?
5     A.  Last week.
6     Q.  So Steve Richter looked at the -- your
7  expert report after you wrote it and produced it to
8  us?
9     A.  Correct.
10     Q.  So it wasn't an actual draft of your report
11  that he looked at?
12     A.  That's correct.
13     Q.  So this report was produced on May 9th of
14  2024, right?
15     A.  Yes.
16     Q.  At the time that you wrote this report that
17  was published, had you consulted with Steve Richter
18  about this case?
19     A.  Not with Steve Richter, no.
20     Q.  Prior to May 9th, 2024, what peers did you
21  consult with about this case?
22     A.  I spoke to my son about it.
23     Q.  And when did you speak with your son about
24  this case?
25     A.  Shortly after I was retained.

189

1     Q.  Approximately how long was -- approximately
2  how many conversations did you have with your son
3  about this case?
4     A.  Oh, half a dozen or so.
5     Q.  What was the longest conversation that you
6  had with your son about this case?
7     A.  Five or ten minutes.
8     Q.  So is it fair to say that the conversations
9  were about -- the half dozen conversations with you
10  had -- conversations you had with your son about this
11  case were relatively short?
12     A.  Yes.
13     Q.  Did you meet with any attorneys in
14  preparation for your deposition testimony today?
15     A.  Yes.
16     Q.  How many times did you meet with attorneys
17  in preparation for your deposition testimony today?
18     A.  One time.
19     Q.  And when was that time?
20     A.  Last week.
21     Q.  What day last week?
22     A.  I think Thursday, but I'm not certain.
23     Q.  And how long was the meeting with the
24  attorneys in preparation for this deposition today?
25     A.  Maybe an hour or so, hour an a half.

190

1    Q.  So -- okay.  Excellent.  Thank you.
2         Let me go back to -- to the
3    consulting -- to the consultation with peers.  What
4    did your son say about your opinions in this case?
5    A.  I asked him if he thought the barrier
6    presented a hazard to navigation along the concrete
7    blocks and if he thought it would diminish navigable
8    capacity.
9    Q.  And what did he say?
10   A.  He said yes in both -- to both questions.
11   Q.  Has your son ever been to the location of
12   the buoys?
13   A.  No.
14   Q.  What was he basing his opinion on --
15   A.  Photographs --
16   Q.  -- if you know?
17   A.  -- and my conversation.
18   Q.  You also list "other experts."  What other
19   experts did you obtain about facts, data, and knowledge
20   from in this case?
21   A.  Repeat your question, please.
22   Q.  Sure.  I'm asking what facts, data, or
23   knowledge did you glean from other experts in this
24   case.
25        MR. LYNK:  Object to form.

191

1    A.  From other experts, none.
2    Q.  (BY MR. STONE)  Who are the other experts
3    that you're talking about in this sentence?
4    A.  It would have been Steve Richter.
5    Q.  But you didn't talk to Steve Richter until
6    after you wrote this report, right?
7    A.  That's true, yes.
8    Q.  So then what other -- you couldn't have
9    known that at the time you wrote the report, right?
10   A.  That's true.
11   Q.  So who are the other experts then -- it's
12   plural -- other experts then that you're talking
13   about in this sentence?
14   A.  That's a misstatement.
15   Q.  Not my question.  My question is not a
16   misstatement, right?
17   A.  Correct.
18   Q.  Okay.  The sentence a misstatement in the
19   expert report?
20   A.  That's right.
21   Q.  Okay.
22   A.  Well, the -- that -- that it was done prior
23   to the writing of the report.
24   Q.  Okay.  Next I want to go on to the next
25   section, which is Scope of Report.  And there are

192

1    seven questions that are posed here.  Do you see them
2    on the screen?
3    A.  I do.
4    Q.  It says, "This report" -- and I'm reading
5    from page -- this is page 3, I believe, of your
6    report under Scope of Report.  "This report strives
7    to provide answers to the following questions from a
8    professional mariner's and/or recreational boater's
9    perspective to help establish the standard of care."
10   Did I read that correctly?
11   A.  You did.
12   Q.  Okay.  So I want to bifurcate those two
13   different things.  When you're testifying in this
14   case as an expert, are you testifying as a
15   professional mariner or as a recreational boater?
16   A.  Both.
17   Q.  So the opinions that you're offering in this
18   case, are they -- are they intertwined, the
19   professional mariner and recreational boater?
20   A.  Yes.  My opinions apply in both cases.
21   Q.  Do the answers to any of the questions --
22   strike that.
23        Are the answers the same -- strike that.
24        Are your expert opinions the same in
25   this case both as a professional mariner and as a

193

1    recreational boater?
2    A.  Well, there are certain opinions that apply
3    only to a professional mariner such as having to
4    determine if a body of water is navigable water in
5    the U.S. or not.  But the fact that it's a navigation
6    hazard is applicable in both -- in both scenarios.
7    Q.  So is it fair to say that the only opinion
8    that's distinguishable between being a professional
9    mariner and a recreational boater in this case is the
10   determination that you talk about, which we'll get to
11   in a minute, about navigability of the water?
12   A.  I believe the barriers also decrease the
13   navigable capacity for recreation boats in that area
14   as well.  So I would say those two topics, those two
15   subjects.
16   Q.  Also are divergent.  Let me strike that.
17        I think we're just going to have to go
18   through, and I'll have to ask you each time --
19   A.  Okay.
20   Q.  -- "Is this a professional mariner opinion
21   or is this a recreational boater?"  I think that's
22   going to be the easiest.
23   A.  Okay.
24   Q.  Okay?  Let's start with the first question
25   here.  "How does a professional mariner determine if

194

1 a body of water that he or she is or is planning to
2 operate upon is classified as a navigable water and
3 with which rules they must comply?"  Did I read that
4 correctly?
5     A.  You did.
6     Q.  Did you write that question?
7     A.  Yes.
8     Q.  Were you asked in this case to answer that
9 question?
10    A.  No, I was asked to evaluate the impact, if
11 any, of the floating marine barrier on navigation and
12 the navigable capacity of the river.
13    Q.  How many times have you testified in the
14 past about whether or not a water is a navigable
15 water?
16    A.  I've testified numerous times about whether
17 a body water is subject to the inland rules of the
18 United States, and in order for them to be so, it
19 would have to be designated as a navigable water of
20 the United States or the state in which it was
21 located has adopted those rules.
22    Q.  How many times have you been -- let me do
23 this a little slower.
24        How many times have you -- how many
25 times have you, prior to -- strike that.

195

1        How many times in the past have you
2 testified as an expert on the subject of whether or
3 not a water is a navigable water?
4     A.  I have --
5        MR. LYNK:  Objection.  Form.  Sorry.  Go
6 ahead.
7     A.  I have not testified on -- to that.
8     Q.  (BY MR. STONE)  And is it fair to say in
9 this case you took it upon yourself to determine
10 whether or not this segment of the Rio Grande River
11 was a navigable water?
12    A.  In order for me to give opinions about
13 navigational hazards and whether a certain rule of
14 the road applies or not, you have to know whether
15 it's a navigable water of the United States.
16        So I felt it was necessary to establish
17 that in fact it was a navigable water.  So I took it
18 upon myself so that I had a basis or a foundation
19 for -- what I try to do is establish stepping stones
20 and lay the foundation from the simplest point and
21 then progress forward.
22    Q.  And what you said that you're doing here is
23 establishing the standard of care, correct?
24    A.  Yes.
25    Q.  What is the standard of care?

196

1     A.  Standard of care is what a professional
2 mariner would provide either in his capacity as an
3 officer on board a vessel or as captain on a vessel
4 to somebody else.
5     Q.  Would another definition of the standard of
6 care be -- tell me if this is fair -- "What a
7 reasonably prudent mariner would do in the same or
8 similar circumstances"?
9     A.  Yes.
10    Q.  Okay.  So with respect to question number 1,
11 are you answering this question as -- in your
12 capacity as a professional mariner or as a
13 recreational boater?
14    A.  Well, it starts out by saying, "How does a
15 professional mariner determine."  So as a
16 professional mariner.
17    Q.  And you're not -- so you're not weighing in
18 on question number 1 in your capacity as a
19 recreational boater, correct?
20    A.  That is correct.
21    Q.  Number 2 is "Utilizing the methodology
22 described above is the Eagle Pass section of the Rio
23 Grande River classified as a navigable water of the
24 United States as understood by professional mariners
25 and therefore subject to the U.S. Inland Roads of --

197

1 Rules of the Road?"  Did I read that accurately?
2     A.  You did.
3     Q.  Now, I know it's built into the question,
4 but I'm going to ask it anyway.  Are you providing an
5 opinion as a professional mariner as it relates to
6 question number 2, or as a recreational boater?
7     A.  As a professional mariner.
8     Q.  And with respect to number 1 -- I'm going to
9 go through and step back to 1 for a minute.  "How
10 does a professional mariner determine if a" -- strike
11 that.  Let me do it slower.
12        "How does a professional mariner
13 determine if a body of water that he or she is
14 planning to operate upon is classified as a navigable
15 water and with which rules they must comply?"
16        With respect to that question, are you
17 offering fact testimony or expert opinion?
18    A.  I'm not sure how to separate the two in this
19 case.
20    Q.  Are you an expert on the process that
21 mariners use to determine if a body of water is
22 classified as a navigable water?
23    A.  I've served as a mariner for 40 years, a
24 professional mariner for 40 years and as an adjunct
25 professor three different times in a maritime academy

198

1 and -- so, yes, I would say I'm an expert in that.
2 Q. Okay. How does a professional mariner
3 determine if a body of water that he or she is
4 operating on is classified as a navigable water and
5 with which rules they must comply?
6 A. How does that take place?
7 Q. Uh-huh.
8 A. That -- if you want to save yourself some
9 time, we can go to my opinions, because it goes
10 through all of that. But I'm happy to jump to that
11 and read it to you.
12 Q. Just briefly, just go ahead and answer the
13 question for us, though.
14 A. They're -- either you're knowledgeable of --
15 if it's deemed to be a navigable body -- a navigable
16 water of the United States because you're on a ship
17 that runs there all the time and you know it's
18 established or you look at a chart and it shows where
19 the line of demarcation is that changes the rules
20 that you follow from international rules of the road
21 to inland rules of the road, or you look in U.S.
22 Coast Pilot or, in some cases, a sailing -- Admiralty
23 Sailing Direction.
24     THE REPORTER:  I'm sorry, a what?
25     THE WITNESS:  Admiralty Sailing

199

1 Direction.
2 A. And then there are sometimes lists of bodies
3 of water that are considered to be U.S. navigable
4 waters in the CFRs and other federal publications.
5 And if you cannot be certain of the determination
6 based on those sources, you can go to the U.S. Coast
7 Guard or the Corps of Engineers and ask for a
8 determination.
9 Q. So if I'm understanding your answer
10 correctly, the answer to the first question of "How
11 does a professional mariner determine if a body of
12 water that he or she is or is planning to operate
13 upon is classified as a navigable water and with
14 which rules they must comply," the answer to that is
15 to look it up or ask the U.S. Coast Guard.  Is that
16 fair?
17 A. That's the short version of the answer, yes.
18 Q. So how does one obtain an expertise in doing
19 that, either looking something up or asking the Coast
20 Guard?
21     MR. LYNK:  Object to form.
22 A. By doing it for 40 years as a professional
23 mariner and by teaching it to cadets at a maritime
24 school.
25 Q. (BY MR. STONE)  If I knew how to look up

200

1 whether or not a body of water is classified as a
2 navigable water, would that make me an expert on it
3 too?
4     MR. LYNK:  Object to form.
5 A. No, I didn't -- no.
6 Q. (BY MR. STONE)  Does the definition of a
7 navigable water -- strike that.
8     Is there a single definition of
9 "navigable water"?
10 A. No.
11 Q. There's lots of different definitions of
12 navigable water, right?
13 A. Correct.
14 Q. In this case we're dealing with the
15 definition of navigable water as it relates to the
16 River and Harbors Act, right?
17     MR. LYNK:  Object to form.
18 A. Well, the bottom line is is it a navigable
19 water of the United States?  And the River and
20 Harbors Act is perhaps part of that but not -- that's
21 not the same thing.
22 Q. Are you a expert on the River and Harbors
23 Act?
24 A. I am not.
25 Q. Have you ever read the River and Harbors

201

1 Act?
2 A. I have referred to it and looked through it,
3 but no, I can't say I've read the entire thing.  Just
4 pertinent parts of it.
5 Q. What are the -- going to question number 2.
6 What is a U.S. -- what are the U.S. Inland Rules of
7 the Road?
8 A. What are they?
9 Q. Uh-huh.
10 A. They are a body of rules very similar in
11 verbiage and structure to the International Rules of
12 the Road by which mariners, both professional and
13 recreational, must operate -- under which they must
14 operate on inland waters.
15 Q. Did you just say recreational as well?
16 A. Yes.
17 Q. So a minute ago I asked you if, when you
18 were answering question number 2, you were doing it
19 as a professional mariner or a recreational boater,
20 and you said you were do -- you were answering that
21 question as a professional mariner.  Do you recall
22 that?
23 A. I do.
24 Q. Is it your testimony now that you're also
25 answering that question in your capacity as a

202

1 recreational boater?
2    A. No, I --
3        MR. LYNK: Object to form.
4    A. No, I would not expect a recreational boater
5 to go through this process to determine that. I
6 don't think they would even have a clue as to how to
7 do this.
8    Q. (BY MR. STONE) Were you asked to answer
9 question number 2, or was this also a question that
10 you formed on your own?
11    A. All of these questions are questions I
12 formed on my own.
13    Q. Thank you. That's helpful; I don't have to
14 do it for each.
15        Moving on to question number 3, "Are the
16 orange spheric components of the marine floating
17 barrier buoys or floats?" Do you see that question?
18    A. I do.
19    Q. When you answered that question, are you
20 answering that question in your capacity as a
21 professional mariner or as a recreational boater?
22    A. As a professional mariner.
23    Q. As a professional mariner only?
24    A. Yes.
25    Q. Why don't I just go through this whole list

203

1 with that line of questioning so I don't have to do
2 it again.
3        Four question number 4, "What type of
4 structure is the marine floating barrier that is
5 installed on the Eagle Pass section of the Rio
6 Grande?" Do you see that, question number 4?
7    A. I do.
8    Q. Are you answering -- in this case are you
9 answering that question as a professional mariner or
10 as a recreational boater?
11    A. As a professional mariner.
12    Q. Question number 5, "Does the marine floating
13 barrier create a navigational obstacle and/or
14 obstruction?" Do you see that question?
15    A. I do.
16    Q. In this case are you answering that question
17 as a professional mariner or as a recreational
18 boater?
19    A. Both.
20        MR. LYNK: Object to form.
21    Q. (BY MR. STONE) Question number 6, "Is the
22 marine floating barrier a hazard to navigation?" Do
23 you see that question?
24    A. Yes.
25    Q. Are you answering that question in this case

204

1 as in your capacity as a professional mariner or as a
2 recreational boater?
3    A. Both.
4    Q. And finally, question number 7, "Does the
5 marine floating barrier diminish the navigable
6 capacity of the Rio Grande?" Are you answering that
7 question in your capacity as a professional mariner
8 or as a recreational boater?
9    A. Both.
10    Q. Thank you for that clarification.
11        So under question number 3, "Are the
12 orange sphere components of the marine floating
13 barrier buoys or floats?" Do you see that on the
14 scene?
15    A. Yes.
16    Q. What is a buoy?
17    A. A buoy is a floating object that conveys
18 information to somebody such as a navigational buoy
19 would tell you which side of the channel -- you know,
20 limit of the channel edge or a slow speed zone or --
21 it conveys navigational information in some fashion
22 or another.
23    Q. And what is a float?
24    A. A float is something that supports something
25 in the water.

205

1    Q. Question number 4, "What type of structure
2 is the marine floating barrier?" Do you see that?
3    A. Yes.
4    Q. What is a structure?
5    A. A structure is the putting together of
6 different parts to create something.
7    Q. What type of structure is the marine
8 floating barrier?
9    A. A -- what is known in the maritime world as
10 a boom, B-O-O-M.
11    Q. What is a boom?
12    A. A boom is a string of floats that can
13 restrict an area, creating either an obstacle or an
14 obstruction, to prevent the movement of vessels.
15    Q. What is a weir?
16    A. A weir is very similar to a jetty. It's a
17 structure built frequently of rocks or some other
18 durable substance that is used to divert the water.
19    Q. What is a pier?
20    A. A pier is a dock of sorts that extends out
21 into a body of water.
22    Q. What is a wharf?
23    A. A wharf is -- could be a pier or key that
24 vessels moor alongside.
25    Q. What is a breakwater?

206

1    A.  A breakwater is a structure that is designed
2  to eliminate or reduce the destructive impact of
3  waves.
4    Q.  What is a bulkhead?
5    A.  A bulkhead is a wall that can make up a --
6  in the water that can make up a breakwater or other
7  structure.
8    Q.  How is a bulkhead different than a
9  breakwater?
10    A.  A bulkhead can be a breakwater.  A
11  breakwater could be a bulkhead but not necessarily.
12  It could also be a pile of rocks or just some other
13  substance.
14    Q.  What is a jetty?
15    A.  A jetty is a structure that extends out into
16  the water that is used to calm the waters between the
17  structures of the jetties.  You see them at inlets
18  quite a bit.
19    Q.  What is a dolphin?
20    A.  A dolphin is one or more pilings or poles or
21  metal pipes or many other things that are used to
22  hold vessels off of something such as a peer or to
23  secure mooring lines to.
24    Q.  Question number 5, "Does the marine floating
25  barrier create a navigational obstacle and/or

207

1  obstruction?"  Did I read that accurately?
2    A.  You did.
3    Q.  What is an obstacle?
4    A.  An obstacle is something that impedes the
5  progress of something, that slows something down, but
6  that can be surmounted.  Yeah, you can go around it
7  or over it or under it.
8    Q.  What is an obstruction?
9    A.  An obstruction is something that blocks the
10  movement of something through something.  You can
11  have an obstructed bowel or an obstructed drain on
12  your sink and stuff cannot go past it.
13    Q.  We're going to get deeper into your specific
14  opinions, but I want to wrap up with this.
15        So number 6 is "Is the marine floating
16  barrier a hazard to navigation," right?
17    A.  Yes.
18    Q.  What is a -- define for me what a hazard to
19  navigation is.
20    A.  A hazard to navigation is something that can
21  typically cause damage to a vessel or cause a
22  grounding or some other such marine incident as that.
23    Q.  Is it anything else?
24    A.  I'm sure that it could be expounded upon if
25  there is -- it could be a structure that somebody is

208

1  not aware of that they hit with their vessel.  It
2  could be a shoal.  It could be -- that's what's
3  coming to me at this point, but, yes, it could be
4  other things as well.
5    Q.  Number 7 finally, "Does the marine floating
6  barrier diminish the navigable capacity of the Rio
7  Grande?"  Do you see that question?
8    A.  I do.
9    Q.  What is navigable capacity?
10    A.  Well, to break it down, capacity is the
11  maximum volume or the maximum ability to produce
12  something.  And so navigable capacity would mean that
13  it -- how many vessels, how much -- how many vessels
14  can move through or at what speed would -- does it
15  slow it down?  So navigable capacity is how many
16  vessels can move through an area, a certain area, in
17  a certain amount of time.
18    Q.  So if I understand your -- if I understand
19  you correctly, navigable capacity is how many vessels
20  can pass through an area in a set amount of time?
21    A.  Yes.
22        MR. LYNK:  Object to form.
23    A.  That's certainly...
24    Q.  (BY MR. STONE)  Before we move on, we talked
25  earlier about the standard of care, right?

209

1    A.  Yes.
2    Q.  In which of these seven questions do you
3  opine on the standard of care?
4    A.  Well, it's certainly in the first one, "Are
5  you doing what a reasonable and prudent mariner would
6  do in the same or similar circumstances?"  So you're
7  discussing the standard of care there.
8        And the second one, there certainly is a
9  standard of care there as well, "Utilizing the
10  different methods, are you doing a complete and
11  thorough job and adequate research if necessary, or
12  particularly -- how far you need to go.  Do you in
13  fact need to reach out to authorities to make a
14  determination of which set of rules apply, U.S.
15  inland or international?"
16    Q.  Okay.  So let's take these one at a time,
17  just so I'm -- I think that's going to be a little
18  easier.
19        What is the standard of care -- starting
20  with question 1 what is the standard of care for a
21  professional mariner in determining whether a body of
22  water is classified as a navigable water?
23    A.  The standard of care would be if they do not
24  already know with certainty whether it is or is not a
25  navigable water of the United States, that they would

210

1  use certain resources to try to make a determination.
2  And if they're unable to do so using those resources,
3  then they can reach out to the Coast Guard or Corps
4  of Engineers.
5      Q.  And with respect to number 2, what is the
6  standard of care for determining whether the Eagle
7  Pass section of the Rio Grande River is classified as
8  a navigable water of the United States?
9      A.  If you were operating in that area and you
10  were unaware of its designation, then the standard of
11  care would be to thoroughly use the methodology
12  described previously in 1 to make that determination.
13      Q.  So the answer to number 2 is the same as the
14  answer to number 1 -- is that accurate -- as it
15  relates to the standard of care?
16      A.  Yes, essentially.
17      Q.  Okay.  For number 3, "Are the orange spheres
18  component -- orange sphere components of the marine
19  floating barriers buoys or floats?"  What is the
20  standard of care?
21      A.  That does not apply to this particular
22  again.
23      Q.  Does the -- what is the standard -- strike
24  that.  For number 4, "What type of structure is the
25  marine floating barrier that is installed in the

211

1  Eagle Pass section of the Rio Grande?"  What is the
2  standard of care as it relates to that question?
3      A.  It does not apply.
4      Q.  Does the standard of care apply as to
5  question 5, "Does the marine floating barrier create
6  a navigational obstacle and/or obstruction?"
7      A.  Yes, if you're maneuvering in that area, you
8  need to be aware of its presence.  You should know,
9  if the information is available, whether it has
10  concrete anchors that extend out on either side.  So
11  the standard of care would be to make a determination
12  as to whether or not the barrier is an obstacle or
13  obstruction and if it needs to be avoided.
14      Q.  That's what a reasonably prudent mariner
15  would do in the same or similar circumstances, right?
16      A.  Yes.  I mean, you would essentially know
17  that.
18      Q.  They would determine whether or not the --
19  they would first determine where the location of the
20  floating barriers are.  They would determine where the
21  concrete is in relation to it and how they would need
22  to navigate around to it ensure that they don't have
23  any kind of collision, right?
24      A.  That's right.  And if they can make the
25  distinction between the two, whether it's just an

212

1  obstacle that can be maneuvered around or some
2  obstruction, depending upon how they're trying to
3  pass it, that would be a very critical determination
4  to be made.
5      Q.  And if they didn't make that determination,
6  it would be fair to say that they were violating the
7  standard of care, right?
8      A.  Yes.
9      Q.  Number 6, what is the standard of care as it
10  relates to, "Is the marine floating barrier a hazard
11  to navigation?"
12      A.  Well, any mariner either professional or
13  recreational should always be using their senses,
14  situational awareness to -- that's the word I was
15  looking for -- to locate -- to first see and then
16  observe and then make a determination as to if
17  something in the water is a hazard to navigation or
18  not.
19      Q.  And in this case I guess you personally
20  witnessed somebody violating that standard of care,
21  huh?
22          MR. LYNK:  Object to form.
23      A.  Excuse me.  I'm not following your question.
24      Q.  (BY MR. STONE)  Right.  Didn't you testify
25  earlier that you watched one of the airboats collide

213

1  with the buoys?
2      A.  No.
3      Q.  Oh, you didn't witness one of the airboats
4  collide with the buoys during your February visit?
5      A.  No.  I observed one of the airboats touching
6  one of the concrete blocks.
7      Q.  Ah, I see, one of the concrete blocks.
8      A.  Not the floats themselves.
9      Q.  Thank you for that clarification.  That's
10  helpful to understand.
11          So you witnessed somebody, though -- you
12  just testified a moment ago that the standard of care
13  would be to be aware of those hazards and to navigate
14  around them, right?
15      A.  That's correct.
16      Q.  So you personally witnessed somebody from
17  CBP, one of these boat operators, violate the
18  standard of care by colliding with it.  Is that fair?
19          MR. LYNK:  Object to form.
20      A.  I would say they made a misjudgment and
21  thought they had adequate water to go over when in
22  fact they did not.  So if they were most prudent,
23  they would have not gone over the top of the anchor,
24  being uncertain as to how much clearance there was.
25      Q.  (BY MR. STONE)  Do you have an opinion on

214

1  whether or not that boat operator met the standard of
2  care in this case --
3       A.  Well --
4       Q.  -- for operating around the buoys?
5       A.  I would say anytime that you go into an area
6  and are uncertain as to whether there's enough
7  clearance and then you go into it -- that area
8  anyway, that that was a misjudgment and not meeting
9  the standard of care.
10      Q.  Are you aware of any other collisions that
11 have occurred with the buoys other than the one that
12 you -- strike that.  Be careful with my language
13 because when you hear "buoys," you're thinking about
14 just the floats.  So let me be very specific with my
15 language.
16           Other than what you personally witnessed
17 during the February visit, are you aware of any other
18 vessels colliding with either the floats or the
19 concrete blocks upon which they sit?
20      A.  I am not.
21      Q.  And is that a testament to boat operators
22 complying with the standard of care and being aware
23 of the buoys and where they lie in the water and
24 operating their boats and maneuvering around it?
25      A.  I'm just not aware.  I'm not saying that

215

1  there hasn't been others.  I'm just not aware of
2  them.
3       Q.  Is the -- finally, number 7, as it relates
4  to the standard of care, "Does the marine floating
5  barrier diminish the navigable capacity of the Rio
6  Grande?"  What is the -- if applicable, what is the
7  standard of care as it relates to that question?
8       A.  I would say it's not applicable.
9       Q.  Next I want to go to page 10 of your expert
10 report where you begin with answering the first
11 question we talked about a few minutes ago.  Let me
12 know when you get to page 10.
13      A.  I am on page 10.
14      Q.  So do you see under Discussion and Basis of
15 Opinions the first question is, "How does a
16 professional mariner determine" -- it's that first
17 question.  Do you see the answer below?
18      A.  Yes.
19      Q.  Okay.  So I want to read the first sentence,
20 and I've got a follow-up question.
21           You wrote, "It is essential that a
22 mariner/riverman is aware of which authority has
23 oversight of a waterway they are traversing and what
24 body of rules and regulations are in effect."  Did I
25 read that accurately?

216

1       A.  You did.
2       Q.  What is a riverman?
3       A.  A riverman is a professional mariner that
4  works on a river.
5       Q.  And how is that different than a mariner?
6       A.  Just on the body of waters on which they
7  operate.
8       Q.  So a riverman operates on rivers, and a
9  mariner operates on what?
10      A.  A mariner can operate both in open water and
11 on rivers and lakes.  A person on the Great Lakes is
12 a mariner.  A person who operates on the Mississippi
13 River, if they're solely operating on the river,
14 they're tugboats that run up and down, they would be
15 a riverman.  Professional mariners frequently go up
16 and down the Mississippi River as well.
17      Q.  Have you ever traveled up and down the
18 Mississippi River?
19      A.  Many times.
20      Q.  Many times.  So you're familiar with the
21 body of rules and regulations that are in effect that
22 govern the Mississippi River, right?
23      A.  I am.
24      Q.  Is the Mississippi River a navigable water?
25      A.  Yes.

217

1       Q.  How many times in the last ten years have
2  you traveled on a body of water that was unknown to
3  you?
4       A.  Unknown to me in that I had not been there
5  before and didn't know the waters or didn't know what
6  rules applied?
7       Q.  Sure.  So let me ask a more clarifying
8  question.
9           In the last ten years how many times
10 have you operated a boat on a body water for which
11 you were unaware whether or not it was a navigable
12 water of the United States?
13      A.  Not frequently, if at all.  I'm pretty much
14 aware of what waterways I'm operating on and what
15 rules apply.  Again, that's the essential -- that's
16 really about the only reason why it's important for a
17 mariner or a recreational boater to operate -- to
18 know if it's a navigable water or not is to know
19 whether or not the rule -- Inland Rules of the Road
20 apply.
21      Q.  So you testified a few -- a moment ago that
22 not very often in the last ten years have you
23 operated a boat on a body of water for which you did
24 not previously know whether it was a navigable water
25 of the United States?

218

1    A. I can't think of any.  None that I can
2  recall.
3    Q. Actually -- so the answer isn't like, not
4  many; it's actually none that you can recall at this
5  time?
6    A. Correct.
7    Q. How much time did -- so in your expert
8  report you talk about the process that you went
9  through in trying to determine for the purposes of
10  your testimony whether or not the segment of the Rio
11  Grande River where the buoys are located is a
12  navigable water, right?
13    A. Correct.
14    Q. And I want to step back, actually, before I
15  hone in on that, and ask big picture.
16        When you're testifying today as an
17  expert in this case, you're not talking about mile
18  marker 275.5 to 610, are you?  You're only testifying
19  about the area right around where the buoys are
20  located.  Is that accurate?
21    A. That's what I'm testifying to.  However, in
22  my research and analysis and supporting my opinions,
23  it's my understanding and belief that that entire
24  stretch is U.S. -- is navigable waters in the United
25  States.

219

1    Q. So you believe that the entire stretch of
2  mile marker 275.5 to 610 is a navigable water of the
3  U.S., right?
4    A. That's correct.
5    Q. Are there any other opinions that you have
6  in this case as it relates to mile markers 6 -- for
7  the entirety of mile markers 275.5 to 610?
8    A. No.  That -- not that I can think of at this
9  time -- well, that the Inland Rules of the Road apply
10  because of that determination.
11    Q. You talk in this section of your report
12  about the process that you went through in
13  determining, for the purposes of your opinions in
14  this case, that the Rio Grande River is a navigable
15  water, right?
16    A. Yes.
17    Q. Approximately how much time did you spend
18  determining -- strike that.
19        Approximately how long did it take you
20  to determine -- strike that.
21        Approximately how much time did you
22  spend determining that this portion of the Rio
23  Grande River is navigable?
24    A. I would estimate 10 or 15 hours.
25    Q. Now, you're 68 years old, right.

220

1    A. Yes.
2    Q. You've been a mariner for most of your life.
3  Is that fair?
4    A. Yes.
5    Q. Is there any other body of water that you've
6  spent 10 to 15 hours researching to determine whether
7  or not it was a navigable body of water?
8    A. No.  I could have spent a lot less time on
9  this, too, but I saw -- the first time I saw resource
10  from the Corps or Coast Guard that says it's
11  navigable, I would have stopped doing research.  But
12  I -- wanting to be completely thorough, I looked at
13  every resource that I could find that discussed it.
14    Q. So let's talk about each of them.  You
15  started with the Admirable -- Admiralty Sailing
16  Directions, right?
17    A. Yes.
18    Q. What are the Admiralty Sailing Directions?
19    A. They are sailing directions that are put out
20  by the National Geospatial-Intelligence Agency -- I
21  believe that I'm correct on that -- that provide
22  information for ocean-going mariners going to
23  different ports.
24    Q. What do the Admiralty Sailing Directions say
25  about mile marker 275.5 to 610 of the Rio Grande

221

1  River?
2    A. It's not listed.
3    Q. What does the Admiralty Sailing Directions
4  say about the Eagle Pass section of the Rio Grande
5  River?
6    A. It's not mentioned.
7    Q. So it doesn't mention Eagle Pass?
8    A. Right.
9    Q. And it doesn't mention mile marker 275.5 to
10  610, does it?
11    A. No.
12    Q. Next you talk about the United States Coast
13  Pilots, right?
14    A. Yes.
15    Q. What are the United States Coast Pilots?
16    A. The United States Coast Pilots are resources
17  that are published by the Department of Commerce with
18  NOAA and National Ocean Services that provide
19  information that's not easily portrayed on charts.
20  To mariners it lists rules and regulations, different
21  resources within an area and so forth.
22        So they're -- they're a series of
23  volumes of books that provide information about
24  different places either inland or along the coastline
25  of the United States that aid a mariner in making a

222

1 voyage plan and having a safe passage through that
2 area.
3     Q.  And what does the U.S. Coast Pilots say
4 about the Rio Grande River on mile marker 275.5 to
5 610?
6     A.  It does not address it.
7     Q.  Next you talk about the U.S. Notice to
8 Mariners in your report, right?
9     A.  Yes.
10     Q.  And they issue marine safety information,
11 correct?
12     A.  Correct.
13     Q.  What do -- what does -- strike that.
14         What are the U.S. notices to -- U.S.
15 Notice to Mariners say about the Rio Grande River for
16 mile marker 275.5 to 610?
17     A.  It does not address it.
18     Q.  You also mentioned Local Notice to Mariners
19 reports, right?
20     A.  That's correct.
21     Q.  I think we talked about those earlier,
22 didn't we, earlier in the day?
23     A.  We did.
24     Q.  All right.  What do the Local Notice to
25 Mariners say about the Rio Grande River from mile

223

1 marker 275.5 to 610?
2     A.  There was nothing I could find.
3     Q.  Next you talk about Broadcast Notice to
4 Mariners, right?
5     A.  Yes.
6     Q.  What is a Broadcast Notice to Mariners?
7     A.  Those are the notices that are given
8 verbally over radio broadcasts or through something
9 called NAVTEX, which is like the precursor to texts,
10 where they can send printed information over radio
11 waves to mariners about information that is of a more
12 immediate concern.
13     Q.  And I think we talked also about Broadcast
14 Notices to Mariners earlier in the day.  Do you
15 recall that as well?
16     A.  I do.
17     Q.  What do the Broadcast Notice to Mariners say
18 about the Rio Grande River from mile marker 275.5 to
19 610?
20     A.  They're not addressed.
21     Q.  Okay.
22     A.  That area is not addressed, or put it this
23 way:  In checking with the Coast Guard in that
24 district, they did not have any record of any
25 broadcast notices being given for that area anytime

224

1 recently.
2     Q.  Next you mention that you checked the CFR --
3     A.  Yes.
4     Q.  -- to see if it was a water that was
5 declared nonnavigable, right?
6     A.  That's correct.
7     Q.  And in doing that research, did you find any
8 information on the Rio Grande River mile marker 275.5
9 to 610?
10     A.  It was not in the list of waters that
11 were -- had been designated as not being navigable
12 waters of the U.S.
13     Q.  So at that point you talk in here about how
14 you defer them to looking at state law and the U.S.
15 Army Corps, right?
16     A.  Well, there's -- part G is actually U.S.
17 Coast Guard and Corps of Engineer published
18 instructions and studies.  So you can go to those.
19     Q.  Yeah, sorry.  I missed the Coast Guard in
20 there, right.
21     A.  Okay.
22     Q.  So I guess let me backtrack a little bit.
23 Earlier when we began talking in this section, you
24 said you spent about 10 to 15 hours researching
25 whether or not this section of the Rio Grande River

225

1 was a navigable water of the U.S., right?
2     A.  I did as an estimate.  It could be more or
3 less.  Well, it certainly couldn't be less, but it
4 could be more.
5     Q.  And then you said you could have
6 short-circuited that whole research and just relied
7 on what the Coast Guard said and the U.S. Army Corps
8 said about whether or not it was a navigable water,
9 right?
10     A.  Yes.
11     Q.  Other than the Coast Guard -- strike that.
12         Let's do them one step at a time.  What
13 did the Coast Guard say, from your research, about
14 whether or not mile marker 275.5 to 610 on the Rio
15 Grande River is a navigable water?
16     A.  Well, one of the sources are commandant
17 instructions, and Commandant Instruction 16731
18 entitled, "Navigability Determination, Rio Grande
19 River, Texas," that was issued October 19th of 1984
20 states that from 1947 to 1975 the Rio Grande was
21 listed among the navigational waters of the United
22 States.
23         And then in 1976, that list stopped
24 being maintained.  And then -- so it goes on to say
25 that "Under the rule, despite artificial or natural

226

1  obstructions, once a stream has been found to be of
2  navigable use, it remains so, the designated stretch
3  of the Rio Grande River" -- and here it is talking
4  about mile 0 to mile one thousand twelve forty seven.
5  So once it has been found to be of navigable use, it
6  remains so.  And "the designated stretch of the Rio
7  Grande River remains a navigable waterway of the
8  United States."  Pretty succinct.
9      Q.  So in 19 -- sorry.  Strike that.
10         So based on a document from the Coast
11  Guard in 1984 that talks about a study from 1947 to
12  1975 -- I shouldn't say "study."  Strike that.
13         Other than sources from the Coast Guard
14  and the U.S. Army Corps of Engineers, was there any
15  other sources that you relied on in determining that
16  the Rio Grande River from mile marker 275.5 to 610 is
17  a navigable water of the United States?
18      A.  No.  Let me -- let me answer that question
19  more thoroughly.  Within the U.S. Inland Rules of the
20  Road --
21         THE REPORTER:  Im sorry, the what?
22         THE WITNESS:  U.S. Inland Rules of the
23  Road.
24         THE REPORTER:  Thank you.
25      A.  -- the first rule is -- it discusses --

227

1      Q.  I'm just -- are you reading from a document
2  right now?
3      A.  I'm reading from my report, yes.
4      Q.  Which page of your report are you on?
5      A.  Page 17, part D, paragraph D.
6      Q.  Okay.  17D.
7      A.  It talks -- it, says, "United States Coast
8  Guard Inland Rules apply to all public waterways of
9  this state to the extent they are applicable."
10         That's within the -- I'm sorry, my eyes
11  are starting to go.  I'll just read it.  "The U.S.
12  Inland Rules of the Road apply to all 'navigable
13  waters of the United States.'  Supporting this, the
14  Water Safety Act, Chapter 31 of the Texas Parks and
15  Wildlife Code, which applies to all public waters of
16  the state and to all water craft navigating or moving
17  on the public water, states:  'The United States
18  Coast Guard Inland Rules of Road apply to all public
19  water of this state to the extent they are
20  applicable.'"
21      Q.  (BY MR. STONE)  Okay.  So if I'm
22  understanding you correctly, is your testimony today
23  that the U.S. Inland Rules of the Road defined mile
24  marker 275.5 to 610 of the Rio Grande River as a
25  navigable water?

228

1      A.  No, that's not what I was trying to say.  I
2  discuss it further into my report.  So if you go
3  beyond the Coast Guard and the Corps of Engineer, you
4  actually can look at laws established by Texas.  And
5  in the Texas Parks and Wildlife River Guide, it talks
6  about the navigability of waters and which rules
7  apply.
8         And there's two separate ways of
9  determining that.  One is navigable in fact, which
10  means it's actually being navigated.  And the other
11  is navigable by statute.  And then I discuss what the
12  two of those mean in more detail.
13         And then the navigable by statute
14  says --
15         THE REPORTER:  I'm sorry, the navigable
16  what, statute?
17         THE WITNESS:  Navigability by statute.
18      A.  -- "Under a law dating from 1837," it says,
19  "a stream is navigable so far as it retains an
20  average width of 30 feet" -- and emphasis on "average
21  width" -- "from its mouth to the" -- "from the mouth
22  up.  The width measured in distance between the banks
23  and" -- and then they say this, "A stream satisfying
24  the 30-foot rule is sometimes referred to as
25  statutorily navigable."  And then...

229

1      Q.  So is it your testimony today that every
2  body of water in Texas that maintains an average of
3  30 feet in width is a navigable water of the United
4  States?
5      A.  Based on the statute as listed by the Texas
6  Parks and Wildlife River Guide, that appears to be
7  the case.
8      Q.  Texas Parks and Wildlife River Guide is not
9  a law, is it?
10      A.  No, but --
11      Q.  It's just a document you saw on the
12  internet, right?  I'm just asking about the Texas
13  Parks and Wildlife River Guide.
14      A.  Yes, that is correct.
15      Q.  Okay.
16      A.  But it's published by the Texas.gov.
17      Q.  That may be true, but I want to hone in on
18  this.  So --
19      A.  Okay.
20      Q.  I just want to really -- let me get some
21  clarity here.
22         So it's your testimony today that every
23  body of water in Texas that maintains an average of
24  30 feet in width is a navigable water of the United
25  States?

230

1   A.  That's not my contention.  That's just what
2  is stated in that document.
3   Q.  So in your -- is that just a fact?
4   A.  I'm telling you that it is something that
5  was stated in that river guide.
6   Q.  Did you -- did you rely on that in forming
7  your opinions in this case?
8   A.  I didn't need to.
9   Q.  Do you have an opinion on whether or not
10  that renders the Rio Grande River -- this law that
11  you cite from 1837 renders the Rio Grande River from
12  mile marker 275.5 to 610 a navigable water of the
13  U.S.?
14   A.  I think it's something that corroborates
15  that, but in my opinion it's already been established
16  by both the Corps and the Coast Guard.
17   Q.  So going back about ten minutes ago to the
18  question I originally asked, other than the Coast
19  Guard and the U.S. Army Corps of Engineers, that
20  was -- that's all the documents that you relied on in
21  terms of concluding that the Rio Grande River from
22  mile marker 275 to 610 is a navigable water of the
23  U.S., right?
24   A.  Yes, I'll concede to that.
25   Q.  Okay.  So next question, number --

231

1   A.  Well, actually I'm going to -- if we can go
2  back just a little bit.  And I don't want to beat the
3  horse any more than you do.  But it talks about the
4  U.S. Inland Rules of the Road apply to all navigable
5  waters of the United States, and this is stated in
6  the Water Safety Act Chapter 31 of the Texas Parks
7  and Wildlife Code.  So I think it goes beyond a river
8  guide.  It's just reported in that document.
9   Q.  Okay.  So I feel like we answered questions
10  1 and 2 with the prior line of questioning, so I want
11  to start with question 3.
12   A.  Okay.
13   Q.  If you can turn to page 18 of your expert
14  report?
15   A.  Okay.
16   Q.  At the top it says, "Are the orange sphere
17  components of the marine floating barrier buoys or
18  floats?"  Do you see that?
19   A.  I do.
20   Q.  Earlier I asked to you define what a buoy is
21  and what a float is.  Do you recall that?
22   A.  I do.
23   Q.  Okay.  Is -- let me just sort of ask it
24  plainly.  Does the answer to this question change
25  anything in the case?

232

1   A.  To this question, no, not necessarily.
2   Q.  This is a semantic question.  Is that fair?
3    MR. LYNK:  Object to form.
4   A.  No, I don't think a buoy and a float are
5  interchangeable words or just a matter of semantics.
6  I think they are quite different and what -- again,
7  trying to use building blocks, what I'm going to want
8  to do is use these definitions to establish that the
9  structure is a boom, which is not made of buoys,
10  which is a structure, per se, and that's really what
11  I'm trying to establish.  Just laying the foundation.
12   Q.  (BY MR. STONE)  So the only -- it's fair to
13  say that the relevance of whether or not the orange
14  portion is a buoy or a float, its only relevance is
15  to whether or not the overall structure is a boom or
16  not.  Is that fair?
17    MR. LYNK:  Object to form.
18   A.  That is certainly one of the significant
19  aspects of it.
20   Q.  (BY MR. STONE)  If the orange floating
21  portion of the floating barrier, as we're calling it
22  right now -- if those were buoys, would it be a boom?
23   A.  If -- they're not buoys; they're floats, and
24  if it was constructed -- no, that -- that's --
25  question doesn't really make sense.

233

1   Q.  Okay.  Assume for a moment that the orange
2  floating portion of the -- the orange spheres on the
3  floating barrier -- assume for a moment that those
4  are buoys, okay?  Would you still define the floating
5  barrier as a boom?
6    MR. LYNK:  Object to form.
7   A.  If you were to take a group of buoys and
8  string them together, it would create a boom, and the
9  buoys would be serving as floats for that boom.
10    You're talking mostly about a matter of
11  function.  And a buoy could certain float something
12  on the surface of the water.  So it could they could
13  potentially -- you could take a navigational buoy and
14  get ten of them and put them in a string, and it
15  would serve the same purpose.  So whether that meets
16  the definition or not, I can't say.
17   Q.  (BY MR. STONE)  The definition of what?
18   A.  Of a boom.
19   Q.  So when I asked -- if I -- if I'm
20  understanding you correctly -- I asked you a
21  hypothetical.  I asked you to assume for the purposes
22  of your answer that the orange floating portions were
23  buoys.  And would that change your opinion of whether
24  or not the floating barrier is a boom or not?
25    And you testified, if I'm understanding

234

1  you correctly, that you cannot make that
2  determination?
3          MR. LYNK:  Object to form.
4      A.  No.  What I'm trying to say that if the
5  floats -- if you substituted buoys for floats, they
6  would then, by virtue of how they were being used, be
7  floats.  They were just shaped and designed like
8  buoys, but the function of that is to support
9  something to create a barrier to prevent things.
10         So, yes, I would say you could use buoys
11 and it would be -- serve the same function as a boom.
12 Whether technically it would be described as that or
13 not I think would be a matter of debate.
14     Q.  (BY MR. STONE)  So if I -- if we put a light
15 on each of the -- strike that.  Let me ask again.
16         If we put a light on top of the -- what
17 you've described as a float --
18     A.  Uh-huh.
19     Q.  -- would that make it a buoy, if we put a
20 navigational light on top of it?
21     A.  I don't know.  If you get -- if we could
22 jump ahead to the definition of a boom, it is an
23 obstacle strung or a continuous barrier usually
24 floating at water level within a navigable stretch of
25 water to control or block navigation.

235

1          So using that definition, yes, it would
2  be -- you could use buoys and create a boom.  You can
3  use trees to do that.  You can pretty much use
4  anything that floats.
5          MR. STONE:  Objection.  Nonresponsive.
6      Q.  (BY MR. STONE)  So my question is about
7  floats and buoys.
8      A.  Uh-huh.
9      Q.  I'm asking you if we put navigational lights
10 on top of the floats, would they become buoys?
11     A.  I don't know the answer to that question.
12     Q.  What is a buoy?
13     A.  A buoy is defined as a distinctly shaped and
14 marked float, something carrying a signal or signals,
15 anchored to a -- to mark a channel, anchorage,
16 navigational hazard, etcetera.
17         So if you took one of those spheres and
18 put a signal or signals on it that are supposed to
19 convey certain information, then, yes I would say
20 it's a buoy.
21     Q.  Okay.  We've gotten there, okay.  So it is a
22 buoy if I put -- if we put navigational lights on top
23 of these orange floating spheres, it could constitute
24 a buoy?
25     A.  It could constitute a buoy, but it would

236

1  have to have -- to be conveying signal or signals to
2  convey certain information.
3      Q.  Okay.  Let's keep going with this
4  hypothetical.  So now I've put navigational lights on
5  them.  It's -- we're communicating; there's a purpose
6  to it.
7          Is the floating barrier still a boom if
8  I've now transformed those floats into buoys?
9      A.  Yes.
10     Q.  Why?
11     A.  Because under the definition of a boom, it
12 states, is an obstacle strung or continuous barrier
13 usually floating at the water level with
14 navigational -- within the navigational stretch of
15 water to control or block navigation.
16     Q.  But isn't it fair to say, under this
17 hypothetical, that because we've made them buoys by
18 putting lights on top of them for navigational
19 purposes, their purpose is no longer to obstruct
20 navigation?  Would that be fair?
21         MR. LYNK:  Object to form.
22     A.  I don't think so, no.
23     Q.  (BY MR. STONE)  Now, you would agree with me
24 that most booms are typically spread lengthwise
25 across a body of water.  Is that fair?

237

1      A.  Not necessarily, no.
2      Q.  I'm not talking about necessarily; I'm
3  saying most.
4      A.  Booms are lengthwise.
5      Q.  Would you agree that booms primarily are
6  used lengthwise when they're used in a river?
7      A.  Running parallel to the river such as
8  these --
9      Q.  Running from --
10     A.  -- this one is?
11     Q.  No.
12     A.  Perpendicular.
13     Q.  Perpendicular to the water.  In other words
14 a bank to bank obstruction.  You depict it in --
15 let's go to page 21 of your expert report.
16         Do you see the image -- images on page
17 21 of your expert report?
18     A.  I do.
19     Q.  Okay.  Is -- would you agree that that's the
20 most common use of booms in rivers?
21     A.  Well, these days it's very frequently --
22 they're used around power plants and, since 911, with
23 enhanced security, around ship terminals that have
24 hazardous materials so they can come out and just
25 encompass it, and they can -- around power plants

238

1  particularly they run parallel with the direction of
2  the river.  And whether that's the most common use or
3  not, I don't know.
4       Q.  Are you an expert on booms?
5       A.  No.
6       Q.  Are you an expert on floats?
7       A.  No.
8       Q.  Are you an expert on buoys?
9       A.  No.
10      Q.  Have you ever built a boom?
11      A.  I have not.
12      Q.  Why don't we take a break for a few minutes?
13  We've been going for about an hour.
14          THE VIDEOGRAPHER:  Off the record.  The
15  time is 4:29.
16          (Recess 4:29 p.m. to 4:43 p.m.)
17          THE VIDEOGRAPHER:  We're back on the
18  record.  Time is 4:43.
19      Q.  (BY MR. STONE)  Before, just as we were
20  going on break, you said that you had a correction to
21  an answer that you gave to a prior question.  Do you
22  recall that?
23      A.  I do.  It wasn't a correction.  It was -- I
24  was going to add something, and I've decided it
25  doesn't add anything to it, so I'll just leave it as

239

1  it is.
2       Q.  Okay.  I have a couple of questions I wanted
3  to circle back on.
4          Does the Coast Guard define
5  "navigability" the same as the U.S. Army Corps of
6  Engineers?
7       A.  I don't know.
8       Q.  Is it fair to say that in your opinion, if
9  the U.S. Army Corps of Engineers says that a water is
10  a navigable water of the United States, then they
11  can't be wrong?
12      A.  I would accept it.  As a professional
13  mariner, if the Army Corps said something was a
14  navigable water, I would accept it as navigable.
15      Q.  Does the same apply to the Coast Guard?
16      A.  Yes.
17      Q.  Have you ever heard the term "highway of
18  commerce" before?
19      A.  Yes.
20      Q.  Where have you heard the term "highway of
21  commerce"?
22      A.  I don't know.  Just in conversation over the
23  years.
24      Q.  When is the last time you heard the term --
25  strike that.

240

1          Have you heard the term "highway of
2  commerce" used in relation to this case?
3       A.  I have not.
4       Q.  Do you have an opinion on whether or not the
5  Rio Grande River from mile marker 275 to 610 is a
6  highway of commerce?
7       A.  That's not in my area of expertise.  I
8  wouldn't feel good offering an opinion on that.
9       Q.  Next I want to go to page 27 of your expert
10  report.
11      A.  I'm there.
12      Q.  Actually, before we move on, I want to ask
13  another follow-up question.  What is the necessary
14  depth -- what is the minimum necessary depth for a
15  vessel carrying commercial cargo, in your opinion?
16      A.  I've never seen a definition for that.
17      Q.  So is it fair to say that you don't have an
18  opinion on what is the minimum necessary depth of
19  water for vessels carrying commercial cargo?
20      A.  That's correct.
21      Q.  You mentioned that you've traveled up and
22  down the Mississippi River, right?
23      A.  Yes, I have.
24      Q.  What is the -- is there a minimum -- is
25  there a minimum depth that the Mississippi River is

241

1  maintained at?
2       A.  That all depends on stage of the river.  I
3  know they dredge it to keep it at a certain level,
4  but I don't know -- I don't know the answer to that
5  question.
6       Q.  You mentioned a number of -- earlier in the
7  day we were asking about some post-dredging
8  waterways.  Do you recall that?
9       A.  I do.
10      Q.  And the minimum depth of all those waterways
11  that you could recall post-dredging was 30, 30 feet
12  deep, right?
13      A.  Of the ones that we discussed, yes.
14      Q.  And those waterways that we discussed
15  post-dredging were they able to handle commercial
16  traffic?
17      A.  They were.  We have docks in Tampa Bay that
18  handle commercial traffic that have a draft
19  restriction of 14 feet.
20      Q.  14 feet?  Is that -- would you say that
21  that's -- based on your experience as a mariner in
22  the United States that that's pretty normal?
23      A.  What do you mean by that?
24      Q.  Pretty normal as in having a draft of
25  14 feet?

242

1    A. I don't understand your question as to
2  what -- what do you mean by "normal." There's --
3  different docks have different -- and different
4  channels have different depths.
5    Q. Sure. So let me clarify since you brought
6  up Tampa Bay. There is commercial navigation that
7  occurs in Tampa Bay. Would you agree?
8    A. Yes.
9    Q. And the minimum depth in Tampa Bay is
10  14 feet?
11   A. No. The minimum depth in Tampa Bay is zero
12  feet in places. But if you're talking about
13  maintaining channels, maybe 12 feet or so, and it all
14  depends on the stage of the tide and where you're
15  going, yes.
16   Q. Okay. So the minimum depth in -- strike
17  that.
18       So the depth of the water in Tampa Bay
19  in the channel is 12 feet approximately?
20   A. No, the depth of the water in the majority
21  of the channel in Tampa Bay is 44 feet.
22   Q. Okay. Have you ever operated -- you know
23  what, let's take this piece by piece.
24       Have you ever operated a commercial
25  vessel -- strike that, strike that.

243

1        Have you ever operated a vessel carrying
2  commercial cargo?
3    A. When you say "operated," do you mean
4  piloted?
5    Q. Correct.
6    A. Yes, I have.
7    Q. When is the last time that you piloted a
8  vessel that was carrying commercial cargo?
9    A. Two years ago.
10   Q. Where was that?
11   A. In Tampa Bay.
12   Q. In Tampa Bay. What is the smallest body of
13  water that you have operated a vessel -- strike that.
14       Let's use piloted. What is the smallest
15  body of water that you have piloted a vessel carrying
16  commercial cargo?
17   A. Can you define --
18       THE REPORTER: I'm sorry?
19   A. Can you define "smallest body of water"?
20  I'm not sure what you mean by that.
21   Q. I mean depth.
22   A. Oh, depth. Okay. 12 feet.
23   Q. And what was the -- what was the width of --
24  oh, okay.
25       What was the -- let's dig into the

244

1  circumstances. Approximately how long ago was that,
2  that you piloted that vessel in the 12 feet of water
3  that was carrying commercial cargo?
4    A. Within the last six to eight years.
5    Q. And it's fair to say that you've never
6  operated a vessel carrying commercial cargo in less
7  than 12 feet of water, right?
8    A. Well, I've operated vessels not as a pilot,
9  but commercial vessels in probably six to eight feet
10  of water on the Ohio -- in portions of the Ohio
11  River.
12   Q. What cargo were those vessels carrying in
13  this six to eight feet of water?
14   A. They were not carrying cargo, but they were
15  commercial vessels.
16   Q. Okay. So I'm not asking just about
17  commercial vessels. I want to know about cargo
18  carrying --
19   A. Okay.
20   Q. -- vessels. What is -- is it fair to say
21  that the -- you have not operated a vessel carrying
22  commercial cargo in less than 12 feet of water?
23   A. That's correct.
24   Q. Does the Corps of Engineers maintain a
25  9-foot channel in the upper Mississippi River?

245

1    A. I don't know exactly what their
2  controlling -- their project depths are up there, but
3  I know they're somewhere in that area.
4    Q. I'm just curious. What was the cargo that
5  was on the vessel that you were operating in the
6  12 feet of water?
7    A. It was on a ship -- we used to call them
8  island hoppers. They're very small ships frequently.
9  They are like supply boats that used to work in the
10  oilfield, that then they go down to the Caribbean and
11  to Honduras and so forth.
12       And coming up, they carry tomato stakes.
13  What that means is sticks that farmers use to drive
14  into the ground so that the tomatoes can climb up
15  them as they grow. And I guess they're probably
16  cutting down ancient trees in Honduras to make those.
17       And then return cargo is used cars and
18  bicycles and anything that somebody in Central
19  America or the Caribbean on one of the islands might
20  need.
21   Q. Is it fair to say that you have not operated
22  a vessel carrying commercial cargo on the Rio Grande
23  River from mile marker 275.5 to mile marker 610?
24   A. Yes.
25   Q. Have you ever heard of anybody who has?

246

1  A.  No.  I've read -- I've read that they used
2  to carry -- yeah, the fur trappers used to transport
3  furs down through that area.  But that was a long
4  time ago.
5  Q.  It sounds like you've been involved in
6  some -- you were describing it -- some international
7  shipping.  Is that accurate?
8  A.  Most of the ships that I would pilot are
9  international vessels.
10  Q.  When you engage in international shipping,
11  that means the transport of goods from one country to
12  another, do you have to bring those goods through a
13  part of entry?
14  A.  Well, I'm not precisely sure of what a --
15  the definition of a port of entry is.  I know that in
16  all the ports that accept ships from international --
17  from other countries always have a customs and border
18  patrol and agriculture and immigration and all that
19  department within that.  If that constitutes a port
20  of entry, then I would say yes, so...
21  Q.  I'm going to go back to the Rio Grande River
22  and ask a question about bank-to-bank transfers.
23       You mentioned that you were in an
24  airboat when you were down there yesterday, right?
25  A.  Yes.

247

1  Q.  And an RVSD, right?
2  A.  Yes.
3  Q.  If you had -- let's -- my hypothetical,
4  okay?  Let's say you dock on the U.S. side.
5  A.  Okay.
6  Q.  And you filled your RVSD up with some kind
7  of commercial cargo.  Let's say avocados, okay?  Do
8  you know how many avocados you think you could have
9  loaded up into the RVSD?
10  A.  No idea.
11  Q.  For the purposes of this hypothetical, let's
12  say that you have basket of avocados.  Could you,
13  from the RVSD that you were in yesterday, carrying
14  your basket of avocados, have navigated the boat over
15  to the Mexican bank and unloaded your cargo?
16  A.  Yes.  I'm not saying it would be legal to do
17  that.
18  Q.  And that's where I'm going with this.  So
19  you physically could, right?
20  A.  Yes, physically.
21  Q.  But it wouldn't be legal, would it?
22  A.  Unless it was an established trade route, I
23  guess, that had a port of entry on the other side or
24  whatever.  That's certainly well out of my scope of
25  expertise.

248

1  Q.  But when you eng -- you have engaged in
2  international shipping, and there's inspections and
3  things like that that occur when you offload goods
4  into a different country, aren't there?
5  A.  Yes.
6  Q.  Did you observe any bank-to-bank commercial
7  activity during either of your site visits to the
8  location of the buoys?
9  A.  No.
10  Q.  Okay.  I took to you page 27 of your expert
11  report, and now I'm actually going to ask you a
12  question about it.
13       Earlier I asked you to define what an
14  obstacle is.  Do you recall that?
15  A.  I do.
16  Q.  Actually, before I move on, I'm -- I've got
17  one or two follow-up questions on that.
18       You mentioned Alafia river, right?
19  A.  Yes.
20  Q.  And I think you've -- talk about in your
21  report how that's the closest in terms of being
22  comparable to the Rio Grande River.  Do you recall
23  that?
24  A.  I don't recall making that statement, no.
25  Q.  Okay.  Is the Alafia River used for

249

1  commercial traffic?
2  A.  Yes.
3  Q.  What is the depth of the Alafia River?
4  A.  Presently, in the vicinity of 30 or 32 feet.
5  Q.  Would that -- would you need to have a
6  similar depth on the Rio Grande River to engage in
7  commercial traffic?
8  A.  Absolutely not.
9  Q.  In your opinion, are the buoys -- and by
10  that I mean the buoys as well as the concrete that is
11  associate with them.  In your opinion, are they an
12  obstacle?
13  A.  Yes.
14  Q.  Why?
15  A.  Well, as presently configured, they would be
16  an obstacle for airboats because they're something
17  that you have to go around.  It may impede your
18  progress a little bit, but you can surmount it and
19  you can go around and make it.  Particularly, if
20  you're trying to go from one side of the river to the
21  other, you have to go around the end of it to get
22  into it.
23       On the RVSD, they can't -- can be an
24  obstacle, depending upon the stage of the river, as
25  it wasn't -- not an obstacle -- I'm sorry -- an

250

1  obstruction as it was for us yesterday.
2      Q.  Well, we'll get to obstructions.  First I
3  want to stick with obstacles and work our way there.
4          You wrote that a buoy is an obst --
5  could be an obstacle?
6      A.  Yes.
7      Q.  You said that a channel marker can be an
8  obstacle, right?
9      A.  Yes.
10     Q.  A wreck could be an obstacle?
11     A.  Yes.
12     Q.  Could a balloon be an obstacle?
13     A.  If you didn't want to touch it.
14     Q.  Basically, anything in the water could
15  constitute an obstacle because you would have to go
16  around it in your boat.
17     A.  That's correct.
18     Q.  A person could be an obstacle?
19     A.  Yes.
20     Q.  A trash bag could be on obstacle if you
21  didn't want to -- if you didn't want to -- if you had
22  to maneuver around it?
23     A.  Yes.  If you didn't want to take a chance of
24  fouling your propeller.
25     Q.  When you were visiting the Rio Grande River,

251

1  your two site visits, did you notice any debris in
2  the river?
3      A.  Yes.
4      Q.  Would that debris constitute an obstacle?
5      A.  Most of it would be something you would just
6  go through and not go around.  But if it's large
7  enough, depending upon the size of your boat, yes, it
8  would constitute an obstacle.
9      Q.  So now I want to talk about obstructions.
10  Earlier you defined an obstruction, so we don't have
11  to do that again.  I'll cut to the chase.
12         In your opinion, are the buoys and the
13  associated concrete blocks an obstruction?
14     A.  Yes.  Well -- yes.
15     Q.  It seems like you said "yes," but you were
16  going to qualify that.
17     A.  No, I was trying to -- I was thinking
18  through it, and I was -- I answered my own question.
19     Q.  Do the buoys obstruct vessels from traveling
20  up and down the Rio Grande River?
21     A.  They do between the buoys and the U.S. bank.
22     Q.  Okay.  So we're on page 27 of your report.
23     A.  Yes.
24     Q.  Do you see under D where it says,
25  "Obstructions"?

252

1      A.  Yes.
2      Q.  Okay.  I'm going to read you that first
3  sentence, and I then I'm going to ask this question
4  again.  We're going to go back through this.
5          You wrote, "An obstruction is something
6  that completely clogs or blocks a passage."  Did I
7  read that correctly?
8      A.  Yes.
9      Q.  Okay.  And then you go on to the next
10  sentence and wrote -- and write, "If there is
11  something in a channel or river that cannot be
12  maneuvered around, it is an obstruction."  Did I read
13  that correctly?
14     A.  Yes.
15     Q.  Okay.  So I'm going to ask again, do the
16  buoys in this case constitute an obstruction in your
17  opinion?
18         MR. LYNK:  Object to form.
19     A.  If you are trying to get to the bank that's
20  within the floating barrier and the U.S. bank and
21  you're in a vessel such as that RVSD, yes, it could
22  create an obstruction and not allow you to get to it.
23     Q.  (BY MR. STONE)  So it's your testimony today
24  that the buoys obstruct -- well, let's do it by boat.
25  So there's only two boats we've talked about today

253

1  around the buoys, the RVSD and the airboat, right?
2      A.  Yes.
3      Q.  And is that the full scope of boats that
4  we're talking about that -- around the buoys in this
5  case?
6      A.  That we have discussed, yes.
7      Q.  Are there any other boats that we haven't
8  discussed that travel around these buoys that you're
9  aware of?
10     A.  Well, I saw johnboats and some other small
11  recreational boats and fishing boats on the river
12  while I was there.
13     Q.  What is a johnboat?
14     A.  A johnboat is a small -- generally small
15  blunt bowed vessel, rectangular in shape, and it's
16  got a slight rise in the bow.  One -- probably the
17  simplest of boats and least expensive boats.  Can be
18  rowed or powered.
19     Q.  What is the minimum depth you need to
20  operate a johnboat?
21     A.  Six inches, a foot maybe.  If it has an
22  engine, 18 inches.  18 inches to two feet.
23     Q.  All right.  So we've got johnboats,
24  airboats, and RVSDs?
25     A.  And kayaks.  I did not see any, but the

254

1  canoes perhaps.
2      Q.  Did you see kayaks while you were there?
3      A.  I did not.  I am aware that previously there
4  was a kayak charter business there at Shelby Park,
5  and it's no longer there at this time.
6      Q.  So there's no -- you're not aware of any
7  kayaking that takes place where the -- currently
8  where the buoys are located?
9      A.  I'm not personally aware of it, no.
10     Q.  Are you aware of any canoe activity in the
11  location where the buoys are --
12     A.  I did not see canoes, no.
13     Q.  Let's go through each of these.
14         Would the buoys obstruct a canoe
15  traveling up or down the Rio Grande River?
16     A.  No.
17     Q.  Would a -- okay.  Would the buoys obstruct a
18  kayak traveling up and down the Rio Grande River?
19     A.  I would like to go back to my previous
20  answer, because I am not certain of how low the river
21  can get.  But if it could get -- well, never mind.
22     Q.  Yeah, so I don't want to -- I don't want you
23  to try to think of scenarios where it would --
24  (Simultaneous talking).
25         Like, I mean, if there was no water in

255

1  it, then no vessel could navigate it.
2      A.  Yes.
3      Q.  Don't go too far down the -- I just want to
4  know what you're aware --
5      A.  Yes.
6      Q.  -- of, what you've actually observed and
7  what you're aware of.
8      A.  Yes, sir.
9      Q.  Based on your observations and the
10  information that you've reviewed in this case, do you
11  believe that a kayak could -- strike that.
12         Would the -- do the buoys obstruct
13  kayaks from moving up and down the Rio Grande River?
14     A.  No.
15     Q.  Do the buoys obstruct airboats moving up and
16  down the Rio Grande River?
17     A.  I do not know.
18     Q.  But it's fair to say that the buoys did not
19  obstruct airboats moving up and down the Rio Grande
20  River on either of the visits that you made?
21     A.  That's correct.
22     Q.  So even at 18 -- strike that.
23         I think you said yesterday the water
24  level at the lowest point was two feet?
25     A.  Yes.

256

1      Q.  Approximately?
2      A.  Well, the lowest point was --
3      Q.  Strike that.  You said negative.
4      A.  Negative, yeah.
5      Q.  You actually said that it's negative feet at
6  the lowest point.
7         And there was -- you were still able to
8  ride an airboat down the Rio Grande River where the
9  buoys are located, right?
10     A.  Yes.
11     Q.  So would you agree with me that the buoys
12  are not an obstruction to airboats traveling up and
13  down the Rio Grande River?
14     A.  Yes.
15     Q.  Even at negative water levels, right?
16     A.  Well, I don't know how extreme that negative
17  gets, but it could be on the U.S. side or the
18  barrier, but I'm not certain.
19     Q.  Are the buoys an obstruction for traveling
20  up and down the Rio Grande River in an RVSD?
21     A.  It was yesterday.
22     Q.  Are the buoys an obstruction to traveling up
23  and down the Rio Grande River in a johnboat?
24     A.  I don't know how to answer this question
25  because I don't want to give hypotheticals.  I'm not

257

1  certain how low the river could be, but it would not
2  surprise me if the river could get two feet lower
3  than it is -- was yesterday, and in that case the
4  answer would be yes.
5      Q.  So I just want to -- let me give you a
6  hypothetical.  Let's go with that RVSD -- with the
7  RVSD.
8         If you were half a mile upstream of the
9  buoys near Eagle Pass in an RVSD and you wanted to go
10  down the river to a half a mile past the buoys, would
11  you be able to accomplish that?
12     A.  Yes.
13     Q.  Why?
14     A.  You would go over on the Mexican side of the
15  barrier.
16     Q.  And that's true for every vessel that we've
17  talked about, right?
18     A.  Yes.
19     Q.  So you would agree with me that the buoys
20  are not an obstruction for anyone traveling -- with
21  the goal of traveling up or down the Rio Grande
22  River?
23     A.  As presently configured, no.
24     Q.  Because you could just pass the buoys on the
25  side closest to the Mexican waters, right?

258

1  A. Correct.
2  Q. So when you testi -- when you write in your
3  report that it is an obstruction, what you mean is
4  it's only an obstruction if you only wanted to pass
5  them on the side closest to the U.S. bank under
6  certain conditions?
7  A. As presently configured, yes.
8  Q. Next I want to go to page 28 of your report.
9  The question on this question number 6 out of 7, "Is
10 the marine floating barrier a hazard to navigation?"
11 Do you see that?
12 A. Yes.
13 Q. And what is your conclusion about whether or
14 not the buoys constitute a hazard to navigation?
15 A. That they do.
16 Q. Why do you think they constitute a hazard to
17 navigation?
18 A. Because the location of their mooring blocks
19 are not indicated, and, as far as I know, there's no
20 information available to a boater that would give a
21 description of that. So, certainly, they could pass
22 too close, not knowing that. And they're not
23 lighted, so a boat could strike them at night.
24      So, yes, I think they're a hazard to
25 navigation.

259

1  Q. Okay. So I got three -- it sounded like
2  there were three reasons that you just gave. The
3  first is that there is no indication of the width, so
4  an individual could mistakenly belie -- mistakenly
5  hit -- make contact with the concrete blocks. Was
6  that -- is that accurate as to the first reason that
7  they constitute a hazard to navigation?
8  A. Yes, no indication of the concrete blocks.
9  Q. But you did testify earlier that that's
10 something that the standard of care requires mariners
11 to be familiar with, right, as they operate around
12 the buoys?
13 A. I'm not understanding your question. I
14 don't -- being familiar with what is the standard of
15 care?
16 Q. Being familiar with the actual width of the
17 concrete barriers that are supporting the buoys such
18 that your craft does not make contact with them?
19 A. Well, it took me an awful lot of research to
20 get that information myself. I'm not sure how a
21 commercial vessel operator or a recreational boater
22 would ever get that. So how would they have a
23 standard of care if information is not available?
24 Q. Hm. Okay. Let me -- I apologize for saying
25 "okay" so much. It's a tic I have. It will be

260

1  throughout the transcript unfortunately.
2      Now this portion of the -- am I correct
3  that this is the portion of the expert report that
4  you had to correct in your supplemental because
5  there's -- some of the data was inaccurate in this?
6  A. The weight of the positioning mooring
7  anchors was incorrect.
8  Q. Now, the buoys have been in the Rio Grande
9  River since last summer, right?
10 A. Yes.
11 Q. It's been almost 12 months, right?
12 A. Yes.
13 Q. And earlier you testified the only instance
14 that you're familiar with of anybody in a vessel
15 making contact with the buoys was during that site
16 visit that you had in February, right?
17 A. That I am familiar with, yes.
18 Q. Earlier you testified that one of the boat
19 operators during that first site visit told you that
20 if there's any damage done to the boats they have to
21 create a record of it. Do you recall that?
22 A. If there's damage done to the boat, yes.
23 Q. Are you familiar with any reports of vessels
24 being damaged by the buoys?
25 A. A recreational boater would not have to

261

1  report that damage. I don't know who they would
2  report that to.
3  Q. Let's set aside recreational boaters. I'm
4  asking about CBP --
5  A. Okay.
6  Q. -- and specifically about CBP.
7  A. Okay.
8  Q. Are you familiar with any reports by CBP of
9  any of their vessels being damaged by making contact
10 with the buoys?
11 A. I would not have access to that information,
12 so the answer is no.
13 Q. Is that not information that you could be --
14 you could have been provided in this case?
15 A. I suppose if I had asked for it, but I'm not
16 sure that they would share that information.
17 Q. So let me get this straight. You're
18 rendering opinions in this case about the buoys being
19 a hazard to navigation, but you didn't ask for any
20 records about whether or not any vessels had been
21 damaged by making contact with the buoys over the
22 past year. Is that accurate?
23 A. That is, yes.
24 Q. And I believe you also testified that you
25 didn't ask any of the CBP personnel during your site

262

1  visits if they were familiar with any vessels making
2  contact with the buoys.  Is that accurate as well?
3      A.  That's correct.
4      Q.  So you had absolutely no curiosity as to
5  whether or not the buoys had actually harmed any
6  vessels due to their placement despite having an
7  opinion that they constituted a hazard to navigation.
8  Is that fair?
9          MR. LYNK:  Object to form.
10     A.  Yes, you can have a hazard to navigation
11  that has not yet caused a problem.  And I'm not
12  saying that it hasn't yet caused a problem; it's just
13  that I'm not aware of it.  But if it creates a
14  hazard, it's a hazard, whether there's a record of
15  previous incidents or not.
16     Q.  (BY MR. STONE)  Okay.  So in your opinion
17  it's a hazard and it doesn't matter if a boat has
18  never -- even though it's been there a year, a boat
19  has never made any contact with it?
20         MR. LYNK:  Object to farm.
21     A.  Repeat the question please.
22     Q.  (BY MR. STONE)  So in your opinion it's a
23  hazard, regardless of whether there's ever been an
24  instance of a boat or a vessel making contact with
25  it?

263

1      A.  Yes.
2      Q.  And that's why you didn't bother to ask if
3  there were any instances of it actually causing
4  damage to a vessel?
5          MR. LYNK:  Object to form.
6      A.  Frankly, it didn't occur to me to ask.
7      Q.  (BY MR. STONE)  Is that information that you
8  think would have been relevant to the conclusions
9  that you made in this case?
10         MR. LYNK:  Object to form.
11     A.  No.  I still think it's a hazard to
12  navigation.
13     Q.  (BY MR. STONE)  So it's fair to say,
14  regardless of whether or not a vessel made --
15  actually would -- strike that.
16         It's fair to say that regardless of the
17  answer of whether or not a vehicle -- a vehicle? --
18  a vessel has been damaged by making contacts --
19  contact with the buoys, it wouldn't impact your
20  opinions in this case; like you said earlier, you
21  have been unwavering in your opinion since the fall
22  2023, right?
23         MR. LYNK:  Object to form.
24     A.  I -- yes.
25     Q.  (BY MR. STONE)  Okay.  So the next instance

264

1  you give is that there's no lights on the buoys,
2  right?
3      A.  Correct.
4      Q.  That's a hazard.  But you also testified
5  that no reasonable mariner would operate a vessel at
6  nighttime in the area of the Rio Grande around the
7  buoys, right?
8      A.  I don't believe I used those words.  I said
9  I would not.  A fisherman in a johnboat may be very
10  comfortable in doing so.
11     Q.  Are you familiar with -- strike that.
12         Are you aware of any boats at all,
13  recreational or federal, operating in the vicinity of
14  the buoys at night?
15     A.  No, I'm not.
16     Q.  Is that information that you'd, you know,
17  want to know if you're testifying that without lights
18  the buoys constitute a hazard?
19     A.  I can tell you that the buoys, without
20  lights, constitute a hazard, just because somebody
21  could be out there.  Whether it made sense for them
22  to be or not, whether that happens every night or
23  once a year or once every two years, it's still a
24  hazard.
25         An analogy that keeps popping into my

265

1  mind is there's a wire that crosses a bicycle path,
2  and people know about it, and they duck underneath
3  it, and it doesn't hit them.  And nobody has been
4  injured yet.  That wire would still be a hazard.
5      Q.  But it wouldn't be a hazard if nobody rode
6  bikes on that path.
7          MR. LYNK:  Object to form.
8      Q.  (BY MR. STONE)  Right?
9      A.  No.
10     Q.  Just like these buoys without lights are not
11  a hazard if nobody operates boats -- operates vessels
12  there at night, right?
13         MR. LYNK:  Object to form.
14     A.  Yes.
15     Q.  (BY MR. STONE)  Isn't it fair to say,
16  without knowing whether or not boats actually operate
17  in that vicinity at night, you can't determine that
18  the buoys are a hazard unless they have lights
19  attached?
20     A.  If no boats travel on that -- the river in
21  the vicinity of the barrier, then it would not create
22  a hazard at night, if they don't travel at night.
23     Q.  You also mentioned a -- I'm on page 30 of
24  your expert report, final paragraph of Section 6.
25  Long day, so I apologize for slurring words.

266

1    There's a mention of a Jeremy Hall here,
2 Supervisory Hydrologic Technician for the U.S. IBWC.
3    A. I do, but it's Jeremy Wall, not Hall.
4    Q. Jeremy Wall. Did you actually speak with
5 Jeremy Wall?
6    A. No, I did not actually speak with him. This
7 was reported to me.
8    Q. Reported to you by who?
9    A. By an answer to one of those questions that
10 I submitted to be answered.
11    Q. Okay. Next I want to talk about -- well,
12 before I move on, what does Jeremy Wall say about
13 whether or not the buoys constitute an obstruction?
14    A. It says that the floating marine barrier
15 greatly diminishes the quality of the measurements
16 that his team takes and that they need to measure the
17 full channel width and that anything in the channel
18 would prevent them from doing this, if they could not
19 go over or around it.
20    Q. That's not really what he says, is it. Let
21 me -- let me read the quote.
22    A. Okay.
23    Q. He says, "All" -- so the question you asked
24 him was, "Does the marine floating barrier affect his
25 team while they're performing their duties?" And the

267

1 response is -- and tell me if I'm reading this
2 accurately, quote, "All measuring utilizes the full
3 channel width (varies by river height), anything in
4 the channel would prevent (if could not go over or
5 around) or greatly diminish the quality (can maneuver
6 closely around but could not measure the water
7 underneath or directly near the structure) of the
8 measurement," unquote. Did I read that accurately?
9    A. Yes.
10    Q. Nothing in this quoted sentence says that
11 the buoys have impaired the ability of USIBWC to
12 perform their duties, right?
13    MR. LYNK: Object to form.
14    A. No, I disagree. I think it's exactly what
15 he's saying there. He says that anything that's in
16 the way -- my editorializing -- such as the barrier
17 that does not allow them to do the entire width of
18 the river would affect the quality of their ability
19 to do measurements.
20    Q. (BY MR. STONE) He says here -- just --
21 okay. He says, "Anything in the channel that would
22 prevent (if you could not go over or around)." Let's
23 start there, right? That's what he says.
24    Anything in the river that would prevent
25 you from going over or around it could be an

268

1 obstruction, right?
2    A. Yeah, that's --
3    Q. Can you go -- can you take an airboat and go
4 around the buoys? The answer is, yes, you took an
5 airboat and went around the buoys, right?
6    MR. LYNK: Are you going to answer for
7 him or let him answer your first question?
8    A. The question -- the answer to if an airboat
9 could do it is yes, but he don't specify doing it
10 with an airboat.
11    Q. (BY MR. STONE) And the next portion here
12 says, "greatly" -- "or greatly diminishes the quality
13 (can maneuver closely around but you cannot measure
14 the water underneath or directly near the structure)
15 of the measurement." Did I read that correctly?
16    A. Yes.
17    Q. And you were literally on an airboat
18 yesterday that pulled up adjacent to the buoys and
19 they stuck a pole in the water and measured its
20 depth, right?
21    A. In one area that was 30 feet past the end of
22 the barrier. And there's a big difference between
23 sticking a boathook over the side and getting an
24 approximate idea -- can you touch the bottom or
25 not -- and doing accurate measurements.

269

1    Q. Does this -- does Jerry Wall say anywhere in
2 this sentence that IBWC are unable to measure the full
3 water near the buoys?
4    A. The way I interpret this is he was asked
5 does -- if the marine floating barrier affected his
6 team while performing their duties.
7    His response is -- and I'll say it with
8 emphasis -- is "All measurements utilize the full
9 channel width. Anything in the channel would prevent
10 or greatly diminish the quality around -- of the
11 measurement." And maybe he's -- you and I have a
12 different understanding of what his answer states.
13 His answer is like, "Yes, of course it's in the way.
14 It's -- anything that blocks us from doing this
15 affects the accuracy of the measurement or -- the
16 measurement. So, yeah, I -- we can go back and forth
17 on this, but I still interpret it completely
18 differently than you are.
19    Q. I understand. So I'm interpreting it as a
20 general response, not specific to the buoys, but a
21 general response about how IBWC conducts operations
22 on the Rio Grande River.
23    A. But if you read the statement, it says, "was
24 asked if the marine floating barrier affected his
25 team." And he says anything that gets in the way

270

1 affects the measurement.  So I think he answered it
2 very clearly.
3      Q.  I think we have -- it's fair to say -- and
4 since neither of us have talked to Jerry Wall, isn't
5 it fair to say that we're both just reading into what
6 we think this quote means?
7           MR. LYNK:  Object to form.
8      A.  I feel that it answers the question very
9 clearly.  I will say I will agree to disagree with
10 you on the -- what the meaning of that statement is.
11     Q.  (BY MR. STONE)  Did you ask that question
12 specifically to Jerry Wall?
13     A.  I asked that question -- if that question
14 could be conveyed to the CBP and other people
15 operating in a official capacity on that section of
16 the river, and it was conveyed to the appropriate --
17 to the authorities, the managers, supervisors of the
18 different teams there and answered and provided back
19 to me.
20     Q.  Okay.  So is it fair to say you don't know
21 if the question that was given to Jerry Wall was
22 exactly as you asked, "If the marine floating barrier
23 affected his team while performing their duties."
24          MR. LYNK:  Object to form.
25     A.  I was not present.  I presume that my

271

1 questions were given to him and -- as they are, yes.
2 I'm making an assumption, but, of course I don't
3 know.  I wasn't there.
4      Q.  (BY MR. STONE)  Let's go up to the prior
5 paragraph just before that, starting on page 29 and
6 going on to page 30.
7           It says, "CBP personnel, who, quote,
8 'observed the installation daily to report up chain
9 of command the state of Texas -- state of Texas'
10 progress stated that they had seen" -- I'll just stop
11 there.  Do you see that sentence?
12     A.  I do.
13     Q.  Do you know who those CBP personnel are?
14     A.  I do not know specifically, no.
15     Q.  This is just based on the answers that your
16 lawyers returned back to you, right?
17     A.  Yes.
18     Q.  It's that interview notes that we looked at
19 as Timmel Exhibit 7, right?
20     A.  I forget the exhibit number, but we
21 discussed this earlier, yes.
22     Q.  So we don't know who it was at CBP who
23 allegedly answered that question, right?
24     A.  I do not know personally, no.
25     Q.  But you're relying on it as the basis for

272

1 your opinion here that the -- that the buoys are a
2 hazard to navigation, right?
3      A.  No.  I rely upon it, that the buoys impact
4 the operations of the people working in that area,
5 not -- the question of whether or not it is a hazard
6 to navigation, in this -- this question was not
7 answered -- was not asked, rather.
8      Q.  Even though -- so it's in the Hazard to
9 Navigation section of your report, but it sounds
10 like -- are you saying that it more appropriately
11 belongs in a different portion of your report?
12     A.  I would have to look at that and see whether
13 it's in context or not, so.
14     Q.  Ultimately, the responses that you got back
15 from the unknown CBP personnel, this complete
16 stranger, ultimately all it did, though, was bolster
17 the opinions that you already had about the buoys,
18 fair?
19     A.  That is correct.  And I would like to say
20 that they're not -- presumably they're not unknown
21 people; they are unknown to me, but they're known to
22 the supervisors that these questions were given to.
23     Q.  Well, I'll represent to you that they are to
24 me too.
25     A.  Okay.

273

1      Q.  I don't know who they are either.
2           Same question for Jeremy Wall.  It's
3 fair to say that irrespect -- that Jeremy Wall's
4 response here that we -- we're reading in your report
5 ultimately it just bolstered the opinion that you
6 already had about the buoys, fair?
7      A.  Fair.
8      Q.  Final section, Question 7:  "Do the marine
9 floating barriers diminish the navigable capacity of
10 the Rio Grande?"  And we start with Rule 6, Safe
11 Speed.
12           What did you conclude about the buoys --
13 excuse me -- as it relates to the navigable capacity
14 of the Rio Grande River at safe speeds?
15     A.  That when vessels are operating in the
16 vicinity of the barrier that they -- in order to
17 operate at a safe speed, they will have to operate at
18 a reduced speed and/or fewer number of vessels --
19 well, actually, that comes under Risk of Collision,
20 so.
21           THE REPORTER:  That comes under what?
22           THE WITNESS:  Risk of Collision.  That's
23 another rule that's discussed later on.
24     Q.  So it's your testimony that you have to
25 operate around the buoys at a slower speed than if

274

1  the buoys were not there?
2      A.  Yes.
3      Q.  How much slower?
4      A.  That would be determined by the operator at
5  the time based on the conditions and circumstances.
6      Q.  So it's fair to say that there is -- let's
7  take this piece by piece.
8          When I get on the highway the speed
9  limit is 55 miles per hour, okay?
10     A.  Okay.
11     Q.  What is the safe speed limit for operating a
12 vehicle in this portion of the Rio Grande River?
13         MR. LYNK:  Object to form.
14     A.  There is no specified speeds as to what
15 constitutes a safe speed.  As it says, it is -- a
16 safe speed is -- requires that all vessels maintain a
17 speed that allows them to respond properly and be
18 stopped within a distance that allows them to avoid a
19 collision at all times.
20         And if you want to use a highway
21 analogy.  You've got road construction, and they've
22 got barriers and they've got lane changes.  What do
23 they do?  They reduce the speed.
24     Q.  Let me phrase this a little differently.
25 Let's -- hypothetical.  We're back in our RVSD boat,

275

1  okay?  And we are two miles upstream of the buoys,
2  and we want to travel downstream to half a mile past
3  the buoys.  How much slower do you have to travel
4  down the Rio Grande River past the buoys because of
5  their placement in the water?
6      A.  That would depend upon stage of the river,
7  the weather conditions, the strength of the current,
8  how many other vessels are in that area.
9      Q.  Okay.  Assume that there are no other
10 vessels, it is the middle of the afternoon, and clear
11 conditions.
12     A.  In that case, they could quite possibly
13 maintain the same speed as they were prior to
14 arriving in that section.
15     Q.  Okay.  I did it again.  So I understand you,
16 when you say that the buoys impact the safe speed,
17 what you mean is under certain conditions the buoys
18 can impact safe -- the safe speed of vessels
19 traveling up and down the Rio Grande River.  Is that
20 fair?
21         MR. LYNK:  Object to form.
22     A.  You could characterize it as that, yes.
23     Q.  (BY MR. STONE)  So if there was storm
24 conditions, the buoys might impact safe speeds
25 traveling up and down the Rio Grande River?

276

1      A.  Yes.
2      Q.  What sort of storm conditions would it
3  require to prevent an RVSD boat from -- impact the
4  speed of an RVSD boat traveling down the Rio Grande
5  River and passing the buoys on the side closest to
6  Mexico?  What sort of storm conditions would be
7  present such that the buoys impacted the safe speed
8  at which they could operate?
9      A.  What the buoys do is they reduce the width
10 of the safe navigable area.  If you've got winds that
11 are coming crosswise across a channel, and they have
12 a tendency to blow you -- to cause a vessel to drift
13 one way or another, then going through at a high rate
14 of speed could be problematic.
15         Also, if the wind is such that it's
16 creating rough water conditions on the river, that
17 could affect the handling capabilities of the vessel.
18 And if they have reduced room to navigate, that could
19 make it so that a safe speed would be a reduced speed
20 in that instance.
21     Q.  Can you turn to page 28 of your expert
22 report?  I want to ask some questions about the image
23 that you have of the Rio Grande River, Exhibit --
24 image number 14 --
25     A.  Yes.

277

1      Q.  -- on page 28.  So you testified earlier
2  today that the total width here from the U.S. to
3  Mexico side is approximately 300 feet, right?
4      A.  Yes.
5      Q.  And we're looking at buoys.  They're
6  approximately 100, 110 feet from the U.S. shore.  Is
7  that accurate?
8          MR. LYNK:  Object to form.
9      A.  As an estimate in this particular
10 photograph.
11     Q.  (BY MR. STONE)  Okay.  And I'm just going to
12 ask about this particular photograph.  So you've got
13 approximately 200 feet of width on the other side of
14 the buoys traveling down the Rio Grande River, right?
15     A.  Yes.
16     Q.  Okay.  What happens if you're -- let's go
17 back to our RVSD model, okay?  You're in the RVSD;
18 you're traveling down the Rio Grande River in the
19 area where the buoys are located.
20         What happens if you cross this
21 international boundary in the middle of the water
22 into Mexican waters as you're travelling down the Rio
23 Grande River?
24     A.  I'm sorry, if you cross the boundary?
25     Q.  Yeah.

278

1   A. Nothing.
2   Q. Nothing, right?
3   A. That I'm aware of.
4   Q. So you actually have 200 feet of water on
5   the other side of the buoys in order -- that you're
6   operating within if you're traveling up or down the
7   Rio Grande River in a vessel --
8   A. Okay.
9   Q. -- correct?  Is that correct?
10  A. Yeah.  Approximately, yes.
11  Q. So is it fair to say that in any of the
12  vessels we've talked about, the johnboat, RVSD,
13  canoe, a kayak, an airboat, you could freely
14  travel up and down the Rio Grande River where the
15  buoys are located without your safe speed being
16  impacted because you've got 200 feet of water to
17  travel across?
18          MR. LYNK:  Object to form.
19  A. Well, for those vessels that may or may not
20  be accurate, but there are other vessels that
21  potentially could be traveling on the water as well.
22  Even for the installation of the barrier, if it's in
23  deeper water, they're not going to be able to do that
24  with the position of mooring anchors with excavators.
25  They're going to have to use small tugs or push boats

279

1   or some sort of vessel and some sort of barge with a
2   crane on it.  And those vessels are far less
3   maneuverable, and certainly their speed can be
4   impacted.
5          So I think that you can't just talk
6   about the vessels that we've discussed, but what
7   potential vessels could be traveling on that
8   waterway.
9          MR. STONE:  Objection.  Nonresponsive.
10  Q. (BY MR. STONE) So I've only been asking --
11  I asked about the vessels that we were aware of --
12  that you were aware of that had conducted -- strike
13  that.
14          My question was about the vessels that
15  we discussed today that you were aware of in this
16  area.  I'm not asking about hypothetical vessels that
17  have never traversed this section of the Rio Grande
18  River.  I'm asking practically about actual vessels
19  that travel in this area, and you've identified five
20  different vessels:  The RVSDs, the airboats, canoes,
21  kayaks, and the johnboats, right?
22  A. Okay, yes.
23  Q. Would the buoys impact the safe speed of any
24  of those vessels traveling up and down the Rio Grande
25  River?

280

1   A. They could if the vessels were to be caught
2   in restricted visibility such as a shutout rain or
3   fog or smoke and they're traveling in the vicinity of
4   those buoys and their -- the width of -- the safe
5   width has been diminished.
6          So I would certainly say that you have
7   to travel at a slower speed to be a safe speed.
8   Q. You understand the Rio Grande is currently
9   under drought conditions, right?
10  A. I know a lot of the south is under drought
11  conditions, yes.
12  Q. When was the last time there was shutout
13  rain in the Rio Grande River area where the buoys are
14  located?
15  A. I have no idea.
16  Q. So it's just a hypothetical, like if there
17  was one day, a day where there was shutout rain,
18  hypothetically it could impact a boat, the safe speed
19  of a boat traveling up and down the Rio Grande River?
20  A. Yes, I would say if there was shutout rain,
21  that it would certainly do that, or smoke from fires.
22  That could -- might be a more common occurrence
23  there.
24  Q. You also mentioned fog, right?
25  A. Yes.

281

1   Q. Let's do each.  So how -- when you were
2   there yesterday and in February, did you observe fog?
3   A. No.
4   Q. Are you aware of fog in this area of the Rio
5   Grande River where the buoys are located?
6   A. I'm not aware if there is or is not fog
7   there.
8   Q. And it wouldn't be regular fog.  It would
9   need to be really dense for it to impact the safe
10  speed of a boat traveling up and down the Rio Grande
11  River?
12  A. It would have to --
13          MR. LYNK:  Object to form.
14  A. It would have to be fog that reduces
15  visibility.
16  Q. (BY MR. STONE)  And fog that reduces --
17  would you agree with me generally that fog that
18  accomplishes the reduction of visibility has to be
19  dense?
20          MR. LYNK:  Object to form.
21  A. I don't know what your definition of dense
22  is, but it would have to be dense enough that the
23  visibility is reduced.
24          Another thing is we're talking -- you're
25  talking about a single boat potentially traveling at

282

1  one time.  There could be a group of boats traveling,
2  and then if they were travelling in close proximity
3  to one another, to maintain a safe speed, they would
4  have to reduce their speed.
5      Q.  (BY MR. STONE)  What is the -- so you've
6  been there twice, right?
7      A.  I have.
8      Q.  And you've also looked at some images around
9  where the buoys are located, right?
10     A.  Yes.
11     Q.  What is the maximum number of boats that
12  you've seen in this section of the Rio Grande River?
13  I'm looking for a number.
14     A.  The first time we were there, there were
15  three or four state boats and four airboats, three or
16  four airboats.  So six to eight boats.
17     Q.  And what about yesterday?
18     A.  Three or four.
19     Q.  Three or four yesterday.  And of those six
20  boats you saw on the first trip that you took to the
21  site, how many of them were part of the tour that you
22  were being taken on?
23         MR. LYNK:  Object to form.
24     A.  Oh, I believe I said six to eight boats.
25  Half of them.

283

1      Q.  Approximately half.  And then yesterday when
2  you went to the site and you said you spent -- you
3  were there for a couple of hours, right?
4      A.  Yes.
5      Q.  In the course of a couple hours, you said
6  that you saw -- I think you -- it's getting late in
7  day.  I think you said five boats you saw?
8      A.  I don't recall.  I think that's right.
9      Q.  And approximately of the five boats, how
10  many were boats that were part of the tour that you
11  were taking with CBP?
12     A.  Two of them.
13     Q.  So aside from the tour that you were on on
14  both occasions, it sounds like you saw three or four
15  boats in the vicinity of the buoys when you visited
16  the site?
17     A.  I saw more than that, but some of them were
18  part of the tours.
19     Q.  Understood.  Finally, you mentioned smoke.
20  Did you see any smoke while you were doing the site
21  visit that would impair the safe speed of a vessel
22  traveling up and down the Rio Grande River?
23     A.  We did see some smoke.  It wasn't heavy
24  enough to impede visibility, but I have maneuvered
25  vessels in smoke dense enough to restrict visibility

284

1  before, but not yesterday.
2      Q.  Are you aware of any instances in the one
3  year since the buoys have been installed where there
4  was smoke so dense around the buoys that it would
5  impair the safe speed of a vessel traveling up or
6  down the Rio Grande River?
7      A.  I am not aware of that in particular;
8  however, I am aware that, as you mentioned, Texas is
9  in a drought condition, as is Florida and a lot of
10  other states, and wildfires are significant issues in
11  many different states.  So just because there hasn't
12  been a fire in the last year doesn't mean that there
13  could not be one.
14     Q.  So theoretically there could be like a --
15  strike that.
16         Did you see like a forest in the area of
17  the buoys?
18     A.  A forest?
19     Q.  Uh-huh.
20     A.  No.  What I did see was a dense growth of
21  trees that looked dead to me and very dry and a lot
22  of brush that would -- we actually -- it was
23  commented by someone -- I don't recall whom -- that
24  if there was a fire, this place would -- it would
25  be -- this would be a good -- a bad place for a fire,

285

1  I should say.  So there's certainly the potential for
2  wildfires.
3      Q.  Thank you.  Let's move on to page 31.  This
4  is B, Rule 7, Risk of Collision.
5      A.  Yes.
6      Q.  So similar question.  If you are -- and just
7  to clarify, this was another section, this page,
8  where you corrected some of the numbers in your
9  supplemental report, right?
10     A.  Yes.
11     Q.  So as it relates to risk of collision, what
12  is the risk of collision that the buoys represent to
13  any of the five types of vessels we've been
14  discussing traveling up and down the Rio Grande
15  River?
16     A.  Well, if they were traveling across the Rio
17  Grande River --
18     Q.  I'm asking about up and down the Rio Grande
19  River.
20     A.  Well, if they were to strike the barrier and
21  on at a high rate of speed, 20 to 25 miles an hour,
22  it could be very devastating.  The floats are secured
23  with 3,000-ton -- 3,000-pound and 150-pound cement
24  blocks, concrete blocks.  So if a smaller vessel
25  strikes it, the barrier is not going to move, and

286

1  you're going to go from a stop -- you know, from
2  whatever speed you're traveling at to zero rather
3  quickly, and the person could very likely be ejected
4  from the boat.
5         If they don't hit the -- if they're
6  going up and down the river and they don't hit the
7  floats themselves, they could strike the concrete
8  blocks, and that could have serious consequences as
9  well.
10  Q. So how does -- I'm sorry, let me step back
11  for a minute and go back to Safe Speeds.
12         So assuming that you were traveling up
13  and down the Rio Grande River in any of the five
14  boats we've talked about and the conditions did not
15  involve rain, fog, or smoke, would you agree with me
16  that the buoys would not represent a impedi -- would
17  not reduce the safe speed at which you could operate
18  under normal conditions?
19  A. It depends on the volume of traffic.
20  Q. Okay. Assume that there are -- for the
21  purposes of this, a total of three to four boats in
22  the general vicinity of the buoys.
23  A. Okay.
24  Q. All right? Do -- would the buoys, the
25  presence of the buoys reduce the safe speed in which

287

1  you could travel up and down the Rio Grande River in
2  any of the five vessels we've talked about?
3  A. Well, there's a lot of different potential
4  scenarios. I think what you're suggesting is a group
5  of perhaps traveling in --
6         THE REPORTER: I'm sorry, "a group of
7  vessels" --
8         THE WITNESS: Vessels traveling in maybe
9  close proximity or not going the same direction about
10  the same speed. Traffic could be crossing the river
11  as well. And what you've done is you've reduced the
12  area in which vessels can maneuver to avoid
13  collisions or allisions with the barrier itself. So
14  I stand on my opinion that safe speed would be
15  reduced in the area of the barrier because of the
16  reduced navigational width.
17  Q. Okay. So if we took any of the five vessels
18  that we've described and we lined them up next to
19  each other, okay? We've got 200 feet of water on the
20  other side that we're going to be traveling in on the
21  other side of the buoys. We've operating within 200
22  feed of water, okay?
23  Q. If you were to line up any --
24  A. That's assuming, of course, that there's not
25  shoaling on the other side of the river, and there's

288

1  generally decreased depth the closer you get to the
2  bank of the river. So you don't know that you have
3  200 feet.
4  Q. Would a -- okay. Let's say we have
5  150 feet. How about that? If we take three of any
6  of the vess -- of the five vessels that we've just
7  been discussing and we lined them up next to each
8  other with sufficient distance between them to travel
9  safely and we went down the Rio Grande River on a
10  normal day under regular conditions -- there's no
11  rain. There's no fog. There's no smoke. There's no
12  chickens crossing the road. We're just traveling
13  down the Rio Grande River -- would the buoys impact
14  the safe speed at which those vessels could travel?
15         MR. LYNK: Object to form.
16  A. Probably not, but if it was ten vessels,
17  then probably so.
18  Q. (BY MR. STONE) Same question as it relates
19  to risk of collision. If we lined up three of any
20  variation of the five vehicles -- vessels that we've
21  talked about in this case, we put them at spaces next
22  to each other that's whatever safe distance is
23  necessary between them and we sailed them down the
24  Rio Grande River within that, you know, 150 feet that
25  we have between the buoys and the Mexican side of the

289

1  water, would you agree with me that there's no risk
2  of collision under normal conditions on a regular
3  day?
4  A. No, I would not.
5  Q. Would you agree that buoys represent a risk
6  of collision to a boat no matter how many boats are
7  traveling up and down the Rio Grande River, no matter
8  how many boats are on the river?
9  A. I would say that it does.
10  Q. And that's just because of its mere presence
11  in the water it represents a risk of collision in
12  your opinion?
13  A. An example would be if two vessels were
14  traveling in opposite directions in the vicinity of
15  the barrier and one of them lost control of their
16  vessel and cut across the path -- a good example,
17  again, people understand cars and roads. You're
18  traveling down a two-lane highway and somebody is
19  coming towards you, and suddenly -- they're texting
20  on their phone or they've follow asleep or had a
21  heart attack or drunk, whatever the reason --
22  unexpectedly they cut across your lane.
23         If there is a stone wall to the right of
24  you, you cannot turn to the right to avoid that
25  vessel -- that vehicle. Now I'm doing it in the

290

1 reverse -- because there's no room to maneuver. So,
2 yes, it would certainly, in the scenario I just
3 provided, two vessels meeting each other in the
4 vicinity of that, it would reduce the -- particularly
5 if they're traveling at a higher speed and if they
6 haven't reduced their speed to a safe speed, a vessel
7 suddenly makes a turn, cuts across your bow, and
8 you've got a lot less room to maneuver, and it
9 increases the risk of collision.
10    Q. Are they -- okay. So let me ask this
11 slightly differently. So the question here is about
12 the navigable capacity of the Rio Grande River that
13 we're discussing right now, right?
14    A. Yes.
15    Q. What is the most number of boats -- and I'm
16 looking for a number -- that you're aware of that
17 have operated in the vicinity of the buoys?
18    A. My personal experience is, as I said before,
19 what was it, six to eight.
20    Q. With six to eight boats in the vicinity of
21 the buoys, would it impact -- let's, for the purposes
22 of this hypothetical, assume there's six to eight
23 boats; same situation as, say, yesterday or back in
24 February, operating in the vicinity of the buoys,
25 would it -- as well as the buoys being present, would

291

1 it impact the navigational capacity of the Rio Grande
2 River if you were in an RVSD two miles north of the
3 buoys and you wanted to travel down the Rio Grande
4 River to half a mile past where the buoys are
5 located?
6    A. If you're proceeding down -- if there's a
7 group of boats and they're all proceeding down or
8 coming up and you have to slow down to get to -- you
9 have to slow down when you get to the barrier, yes, I
10 think that reduces the capacity.
11    Q. So if there's not a group of boats all
12 traveling together, the boats are spread out just
13 like you saw in February when you visited and
14 yesterday when you visited -- I want you to -- I want
15 you to -- well, let's be very specific. Let's think
16 about yesterday. You were just there yesterday,
17 right?
18    A. Yes.
19    Q. Where the buoys were located. I want you to
20 visualize in your mind what it looks like when you
21 were on that boat by the buoys, okay?
22        Now I want you to think if you were on
23 an RVSD a couple miles north of where you were
24 located, traveling down the Rio Grande River under
25 the conditions that existed yesterday, would those

292

1 buoys represent a -- would those buoys diminish the
2 navigational capacity of the Rio Grande River for
3 you, traveling downstream in that RVSD?
4    A. Well, what you're doing is you want me to
5 say something, and you're presenting a hypothetical
6 with ideal conditions and few vessels, and you're
7 wanting me to base it on my personal observation of
8 what took place during my site inspections.
9        There's a lot of other days that -- I've
10 been there twice in how long? So how many other days
11 were there that I was not -- how many other days that
12 I was not there had many more vessels than that?
13        You can't make a determination on
14 something based on, "Well, if everything goes right
15 and there's ideal conditions and the river level is
16 high." If you want me to say in ideal conditions is
17 it possible that those vessels could make it past,
18 then the answer is yes.
19        But if you're trying to operate a vessel
20 safely, which means you're taking into account the
21 potential for something going wrong, then the answer
22 is no. I don't know how to make it any more clearer
23 than that.
24    Q. It's fair to say that you didn't ask anybody
25 about how many -- well, during either of your site

293

1 visits or in the six months that you've been an
2 expert on this case about how many vessels typically
3 operate in the vicinity of the buoys, right?
4        MR. LYNK: Object to form.
5    A. I did not.
6    Q. (BY MR. STONE) So the only information we
7 have is the two site visits that you did about the
8 number of vessels that typically operate in this
9 area, right?
10       MR. LYNK: Object to form.
11   A. Well, that does not mean that's what the
12 average is or what the standard is, so I don't
13 understand the relevance of what you're asking.
14   Q. (BY MR. STONE) You don't know how many
15 vessels typically operate on a given day in the
16 vicinity of the buoys, do you?
17   A. You're exactly right.
18   Q. And you don't know what the typical weather
19 conditions are like in the vicinity of the buoys, do
20 you?
21   A. I would think there would be the same
22 weather conditions as in all of Eagle Pass.
23   Q. And you know those weather conditions --
24   A. I do not, no.
25   Q. So the answer is yes, you don't know?

294

```
 1      A.  The answer is I don't know.
 2      Q.  And you didn't ask, right?
 3      A.  No.  What -- you've given me a lot of really
 4  good questions to ask after this deposition.
 5          MR. BRYANT:  I think you should take
 6  that as a compliment.
 7          MR. STONE:  Okay.  I will.  Let's do --
 8  let's go off the record.
 9          MR. LYNK:  Okay.
10          THE VIDEOGRAPHER:  Off the record.  Time
11  is 6:05.
12          (Brief pause.)
13          THE VIDEOGRAPHER:  All right.  We're
14  back on the record.  Time is 6:06.
15          MR. STONE:  Pass the witness.
16          MR. LYNK:  All right.  I do not have
17  questions.  All right.
18          THE REPORTER:  Before we go off the
19  record, do you want a copy of the transcript?
20          MR. LYNK:  Yes.
21          THE REPORTER:  Do you want a copy of the
22  video?
23          MR. LYNK:  Yes.
24          THE REPORTER:  Okay.
25          MR. LYNK:  I would like to expedite the
```

295

```
 1  transcript, but not the video.  Just normal for the
 2  video.
 3          MR. STONE:  We would like an expedited
 4  copy of both.
 5          THE REPORTER:  Okay.  How expedited?
 6          MR. STONE:  Could we get the video
 7  tomorrow?
 8          THE REPORTER:  I don't know.  That would
 9  be up to Brian.  If you did, that would probably be
10  tomorrow afternoon.
11          MR. STONE:  That's fine.
12          THE VIDEOGRAPHER:  Do you want your
13  video sync'd with the transcript?
14          THE REPORTER:  You won't get it
15  tomorrow.
16          MR. STONE:  We don't need it sync'd
17  tomorrow.
18          MR. LYNK:  We'll have the witness read
19  and sign.
20          THE VIDEOGRAPHER:  Off the record.  Time
21  is 6:07.
22          (Deposition concluded at 6:07 p.m.)
23
24          -- SIGNATURE REQUESTED --
25
```

296

```
 1              CHANGES AND SIGNATURE
 2  WITNESS NAME:  JOHN TIMMEL
 3  DATE OF DEPOSITION:  JUNE 5, 2024
 4  PAGE     LINE     CHANGE        REASON
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

297

```
 1          I, JOHN TIMMEL, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5          _____
 6                  JOHN TIMMEL
 7  THE STATE OF _____ )
 8  COUNTY OF _____ )
 9      Before me, _____, on this day
10  personally appeared JOHN TIMMEL, known to me (or
11  proved to me under oath or through _____)
12  (description of identity card or other document) to
13  be the person whose name is subscribed to the
14  foregoing instrument and acknowledged to me that he
15  executed the same for the purposes and consideration
16  therein expressed.
17
18      Given under my hand and seal of office, this
19  _____ day of _____, _____.
20
21          _____
22              NOTARY PUBLIC IN AND FOR
23              THE STATE OF _____
24  My commission expires: _____
25  _____ No Changes Made _____ Amendment Sheet(s) Attached
```

298

1      IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2          AUSTIN DIVISION
3  UNITED STATES OF AMERICA,  )
                 )
4      Plaintiff,  )
                 )
5  VS.         ) CIVIL ACTION
                 )
6  GREG ABBOTT IN HIS    ) NO.: 1:23-cv-00853-DAE
  CAPACITY AS  GOVERNOR OF  )
7  THE STATE OF TEXAS, AND   )
  THE STATE OF TEXAS,     )
8          )
      Defendants.  )
9

      REPORTER'S CERTIFICATION OF THE ORAL
10      DEPOSITION OF JOHN TIMMEL
          JUNE 5, 2024
11

12      I, Vanessa J. Theisen, a Certified
13  Shorthand Reporter in and for the State of Texas,
14  hereby certify to the following:
15      That the witness, JOHN TIMMEL, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony
18  given by the witness;
19      That the original deposition was delivered
20  to Mr. Brian Lynk.
21      That a copy of this certificate was served
22  on all parties and/or the witness shown herein on
23  June 11th, 2024.
24      I further certify that pursuant to FRCP
25  Rule 30(3) that the signature of the deponent:

299

1      _XX_ was requested by the deponent or a
2  party before the completion of the deposition and
3  that the signature is to be before any notary public
4  and returned within 30 days from date of receipt of
5  the transcript.
6      If returned, the attached Changes and
7  Signature Page contains any changes and the reasons
8  therefore:
9      _____ was not requested by the deponent or
10  a party before the completion of the deposition.
11      I further certify that I am neither
12  counsel for, related to, nor employed by any of the
13  parties or attorneys in the action in which this
14  proceeding was taken, and further that I am not
15  financially or otherwise interested in the outcome of
16  the action.
17      Certified to by me on this, the 10th day
18  of June, 2024.
19
20      _____
      VANESSA J. THEISEN, Texas CSR, RPR
21      Texas Cert No. 3238
      Expiration Date:  10/31/25
22      Integrity Legal Support Solutions
      Firm Registration No. 528
23      9901 Brodie Ln., Ste. 160-400
      Austin, Texas 78748
24      (512) 320-8690
      www.integritylegal.support
25

## Numbers

**1/2** 171:7,8
**1/26/24** 23:20
**100** 99:7 277:6
**106** 180:21
**10:32** 60:13,14
**10-foot** 165:16
  165:16
**110** 277:6
**11:01** 60:14,16
**11:15** 71:10
**11:20** 71:13
**11:23** 74:2
**11:24** 74:5
**11:30** 160:7
**11:42** 85:22
**11:43** 85:23
**11:45** 181:5
**11th** 48:13
**120** 119:14,17
**125** 99:1
**12:30** 74:8
**12:32** 85:23,25
**12:45** 74:8
**12th** 30:8 46:19 47:2,
  22
**140** 99:2
**14th** 25:4,10
**150** 99:23 288:5,24
**150-pound** 285:23
**15-minute** 58:12
  62:18
**15th** 157:25
**160** 118:17,18
**16731** 225:17
**16th** 158:12
**17D** 227:6
**1837** 228:18 230:11
**1947** 225:20 226:11
**1975** 225:20 226:12
**1976** 225:23
**1981** 187:10
**1984** 225:19 226:11
**19th** 225:19
**1:16** 116:21
**1:17** 116:24
**1:30** 70:25
**1:38** 132:20

**1:39** 132:23
**1:51** 143:9,10
**1st** 23:2,24 24:1
  28:15 87:10
**200** 277:13 278:4,16
  287:19,21 288:3
**2023** 12:1 13:1 78:19,
  22 79:7,9,21,24
  80:13,25 81:6,12
  82:1,15 83:3,8
  88:11,13 89:1,4,17
  90:5 92:6,8,11,17,
  22 94:3 263:22
**2024** 12:15 13:2
  15:20 16:3 17:9
  20:2 21:4,9 22:22,
  24 23:2,25 24:1
  25:10 30:10 46:19
  47:3,22 48:13 49:3,
  6 81:19,21,24 92:7
  98:11 99:12,18
  100:21 107:12
  125:16 133:9
  143:16 156:20
  158:12 188:14,20
**20-foot** 36:10,14
  42:6,13,17 43:20,
  24 44:4,10
**21-foot** 113:25
**24th** 12:15 13:2
  15:20 16:3,11 19:2
  20:2 21:4 27:6
  49:9,12
**250** 96:22,23
**26th** 21:9 22:24 23:9
  28:14
**275** 42:24 230:22
  240:5
**275.5** 10:13,16,21
  43:3,10,25 44:5
  218:18 219:2,7
  220:25 221:9 222:4,
  16 223:1,18 224:8
  225:14 226:16
  227:24 230:12
  245:23
**28th** 11:25 125:16
**29th** 49:3,6
**2:02** 143:10,12
**2:57** 184:16,17

**300** 96:13,22,23
  97:22 277:3
**3,000-pound** 285:23
**3,000-ton** 285:23
**300-plus** 43:13
**30-foot** 228:24
**334** 5:5
**3:08** 184:17,19
**3-foot** 39:7
**3rd** 17:9 20:5 156:20
  166:6,12 167:16
**45-minute** 89:12
**4:29** 238:15,16
**4:43** 238:16,18
**4th** 167:22
**5-foot** 39:17,19,24
**600** 42:24
**610** 10:13,16,21 43:3,
  10,25 44:5 218:18
  219:2,7 220:25
  221:10 222:5,16
  223:1,19 224:9
  225:14 226:16
  227:24 230:12,22
  240:5 245:23
**6:05** 294:11
**6:06** 294:14
**6:07** 295:21,22
**6th** 22:21
**78748** 5:9
**7th** 6:3
**8,000** 115:19
**8:40** 168:13
**8-foot** 36:10
**8th** 122:4,8,10
  160:10
**903** 5:4
**911** 237:22
**9901** 5:8
**9:16** 5:6
**9:30** 160:7 181:5
**9:33** 18:2,3
**9:36** 18:3,5
**9-foot** 244:25
**9th** 188:13,20

## A

**a.m** 5:6 18:3 18:3
  60:14 60:14 85:23

160:7,8
**Abbott** 5:3 154:15
**ability** 8:1,5 94:14
  106:20 110:1
  130:23 208:11
  267:11,18
**able** 11:8,11 54:24
  65:9 81:4 82:8
  88:15 95:25 110:17
  115:22,23 125:4
  135:21 138:25
  139:25 152:4
  162:23 171:11,12,
  24 172:1,15,16
  173:10,20 175:21
  175:21 176:2
  177:22 181:13
  183:7,9 241:15
  256:7 257:11
  278:23
**aboard** 165:11 173:23
**above** 132:13 146:11,
  13 158:11 160:15
  171:2 196:22
**Absolutely** 11:21
  14:13 123:13 141:8
  249:8 262:4
**academy** 197:25
**accept** 10:3,8 84:19
  239:12,14 246:16
**access** 21:25 79:13
  135:24 140:24
  261:11
**accommodate** 113:3
**accompanied** 59:2
  95:22
**accompany** 53:17
**accomplish** 257:11
**accomplishes** 281:18
**according** 31:5 122:3
**account** 292:20
**accuracy** 269:15
**accurate** 26:1 28:5,6
  34:21 40:22 61:7
  68:14 98:1 105:7,8
  146:24 157:17
  185:16 210:14
  218:20 246:7 259:6
  261:22 262:2
  268:25 277:7

278:20
**accurately** 17:15,22
  126:22 127:18
  128:23 129:12,22
  130:11,14 153:14
  155:12,18 157:4
  158:9 160:17 197:1
  207:1 215:25 267:2,
  8
**acoustic** 40:2
**acronym** 113:20
**across** 96:10,20
  97:22 153:13
  236:25 276:11
  278:17 285:16
  289:16,22 290:7
**Act** 200:16,20,23
  201:1 227:14 231:6
**active** 137:23 138:2,
  9
**activity** 248:7
  254:10
**actual** 76:17 86:17
  89:11 119:21
  165:11 170:10
  188:10 259:16
  279:18
**actually** 6:25 25:25
  26:23 29:3,5 37:19
  42:12 43:17 49:5
  63:19 65:15,22
  68:1 69:17 79:20
  89:12 101:1 119:20
  125:10 128:2
  135:19 141:4
  147:10,21 166:5
  176:19 177:17
  179:8 218:3,4,14
  224:16 228:4,10
  231:1 240:12
  248:11,16 255:6
  256:5 262:5 263:3,
  15 265:16 266:4,6
  273:19 278:4
  284:22
**adapt** 115:23
**add** 142:11 238:24,25
**added** 23:8 24:4,9,10
  87:17
**addition** 56:4

**additional** 14:1 24:3
  52:18 57:4 64:4
  88:21 135:19 155:3
  185:21
**address** 5:8 137:3
  142:20 159:22
  222:6,17
**addressed** 126:13
  142:17 223:20,22
**adequate** 209:11
  213:21
**adjacent** 106:1,5,11
  107:3 268:18
**adjunct** 197:24
**Admirable** 220:15
**Admiralty** 198:22,25
  220:15,18,24 221:3
**admissibility** 142:1
**admissible** 136:20
**adopted** 194:21
**Adrian** 6:18 33:20,24
**advance** 25:12
**advised** 21:24
**Aerial** 81:17 100:17
**affect** 142:14 266:24
  267:18 276:17
**affected** 72:22 269:5,
  24 270:23
**affects** 269:15 270:1
**affinity** 164:5
**after** 6:14,20 12:9
  23:9,24 24:1 50:13,
  15 51:1 62:2 69:13
  70:3,6,10,20,20
  71:18 73:20 74:18
  75:23,24 76:6,9
  78:15,23 79:2
  84:25 84:25 85:10
  90:9,20 127:1
  143:19 166:2
  168:14 185:16,20
  188:7,25 191:6
  294:4
**afternoon** 21:23
  25:11 70:25 126:10
  275:10 295:10
**afterwards** 54:25
  93:11
**again** 27:7,25 32:3
  36:23 41:19 44:3

60:19 72:4,17
75:18 76:14 79:8
81:25 95:8 95:8
100:8 112:12 121:2
128:13 129:17
130:18 167:25
174:2 181:17 203:2
210:22 217:15
232:6 234:15
251:11 252:4,15
275:15 289:17
**against** 148:5
**agencies** 14:19,21
15:3 42:10
**agency** 26:15 220:20
**Agent** 26:11
**Agents** 25:14 87:1
**ago** 6:18 18:7 21:5
34:16 43:23 71:14
95:20 97:24 107:19,
24 149:11,12 156:8
164:19 165:5
169:18,21 170:9
201:17 213:12
215:11 217:21
230:17 243:9 244:1
246:4
**agree** 104:19 142:21
236:23 237:5,19
242:7 256:11
257:19 270:9
281:17 286:15
289:1,5
**agreed** 186:15,16
**agreeing** 66:7
**agreement** 6:22 122:6
**agriculture** 246:18
**aground** 172:3
**ahead** 7:18 21:17
29:7,8 46:13 61:4
74:11 100:1 102:1,
15,19 106:19
128:12 195:6
198:12 234:22
**aid** 221:25
**aids** 177:24
**air** 128:1,2
**airboat** 37:2 64:3,23,
24 65:14,16,18
67:1,4,8,15 96:23

101:16 103:7,17
105:19,25 106:1
106:1 107:17,21,23
108:3,5,6,14 110:4,
10,18,20 127:9,15
128:9,17 148:24
149:13 171:13
172:14,16 173:4,9,
12,15,17 175:18
179:4 246:24 253:1
256:8 268:3,5,8,10,
17 278:13
**airboats** 63:5 68:11
106:11,19,21 107:2,
8,15,16 108:15,18,
24 109:10,20 110:1
113:3,12 127:13,16
128:17,22 129:4,15,
18,19 130:9 131:4,
9 150:2,12 151:3,4
212:25 213:3,5
249:16 253:24
255:15,19 256:12
279:20 282:15,16
**airport** 166:14
**Alafia** 155:10,13,14
156:5 158:6 162:3
248:18,25 249:3
**allegedly** 127:5
271:23
**allisions** 287:13
**allow** 136:4 252:22
267:17
**allowed** 59:13 134:6,
7,23
**allows** 274:17,18
**almost** 184:11 260:11
**along** 98:12 101:17
103:6,15 126:8
132:12 140:11
158:16 170:18
190:6 221:24
**alongside** 106:2
146:8 205:24
**already** 77:22 78:3,6
88:11 91:25 92:9
95:3 113:12 131:1,
3,8,12,14,25 132:7
144:22 150:5
209:24 230:15

272:17 273:6
**also** 6:13,17 9:7
10:1,21 14:4 18:12
24:12 26:11 45:22
47:14 61:13 135:12
136:16 139:6 145:4
156:8 164:4,12
173:13 176:13
185:24 186:13,18,
19 187:12 190:18
193:12,16 201:24
202:9 206:12
222:18 223:13
261:24 264:4
265:23 276:15
280:24 282:8
**although** 6:24 126:13
141:3
**always** 98:5 141:6
164:8 212:13
246:17
**amend** 23:7
**amended** 23:1,4 28:14
**amendment** 87:9
**amendments** 87:13,16,
18
**America** 5:3 164:11
245:19
**America's** 164:12
**Amistad** 41:2,5 44:15,
22,25 45:5 48:9
152:1,12
**among** 63:11 225:21
**amount** 119:21 208:17,
20
**analogy** 264:25
274:21
**analysis** 185:2
218:22
**analyze** 12:17
**analyzed** 122:23
**anchor** 213:23
**anchorage** 235:15
**anchored** 235:15
**anchors** 88:5,7,8
109:2 211:10 260:7
278:24
**ancient** 245:16
**ancillary** 32:5
**and/or** 36:19 41:1

192:8 203:13
206:25 211:6
273:18
Andrew 5:20
another 29:11 46:4
52:15 72:5 105:22
106:1,5 109:17
160:6 178:7 184:12,
13 186:12 196:5
204:22 240:13
246:12 273:23
276:13 281:24
282:3 285:7
answer 8:25 9:9
28:17 33:6 54:1,8,
11 59:20,23 60:1,9
61:11,19 71:15
74:11,12,17 81:4
88:2 91:14,18,19
93:2,13,22,25
94:10,18,18 95:1
95:1,11,17 104:9
110:23 111:2,7,25
112:2 113:1,3,7
117:1,5 126:17
131:25 132:7
133:21 134:9,23
135:4,7 136:4
137:20 138:24
144:6,22 145:4
150:2,7,13,22
151:8 152:4,7,10,
15,20,24 153:9
163:9 194:8 198:12
199:9,10,14,17
202:8 210:13,14
215:17 218:3
226:18 231:24
233:22 235:11
238:21 241:4
254:20 256:24
257:4 261:12
263:17 266:9 268:4,
6,7,8 269:12,13
292:18,21 293:25
294:1
answered 126:12,16
134:1,18 202:19
231:9 251:18
266:10 270:1,18

271:23 272:7
answering 61:13
111:15 112:4,6
132:16 196:11
201:18,20,25
202:20 203:8,9,16,
25 204:6 215:10
answers 9:5 24:13,17,
18,21 28:13 29:4
86:8,11 87:22
109:8 124:17
126:21 131:15
149:17,25 153:9
192:7,21,23 270:8
271:15
Antonio 49:20 50:12
51:19 55:4 70:14,
18,23 76:2,4 144:2
anybody 27:1 79:20
169:23 173:20
245:25 260:14
292:24
anymore 25:1
anyone 33:9 51:10
55:22 62:19 70:16
77:5,9 118:3
167:12 179:8
257:20
anything 45:13,15
75:6 123:10 143:1
147:15 180:5,22
207:23 231:25
235:4 238:25
245:18 250:14
266:17 267:3,15,21,
24 269:9,14,25
anytime 214:5 223:25
anyway 54:24 166:4
197:4 214:8
anywhere 146:4 269:1
apart 56:9
Apologies 53:8
apologize 183:24
259:24 265:25
apparent 79:3
apparently 34:13
appear 11:12 20:24
28:2,4 178:23
appearance 26:2
59:20 60:2

appeared 55:24 67:20
178:24
appears 24:12 25:25
26:21 28:3,6,7
30:7 40:21 49:2
111:14 112:6
158:17 229:6
applicable 193:6
215:6,8 227:9,20
applied 217:6
applies 195:14
227:15
apply 140:8 192:20
193:2 209:14
210:21 211:3,4
217:15,20 219:9
227:8,12,18 228:7
231:4 239:15
appreciate 11:2
appreciated 67:25
approach 186:17
appropriate 21:20
89:23 140:4 142:22
270:16
appropriately
272:10
approximate 38:6
101:3 268:24
approximately 35:4
37:3 38:3,8 43:12,
15,18 51:5,23 53:4
54:16 62:6 63:9
66:20 69:3 70:24
73:8 79:23 82:20
83:7 96:10,13,19,
20 97:19,23,24
98:9,18 99:23
107:20 108:5
111:25 112:14
115:12 118:7,15,19
119:16 146:17
148:22 165:6
166:18 168:9,11,13
169:10 170:20,24
181:2 188:3 189:1
189:1 219:17,19,21
242:19 244:1 256:1
277:3,6,13 278:10
283:1,9
April 157:25 158:12

**area** 14:3 43:18 52:3
58:21 62:13 65:21
70:4 84:21 85:2
88:9 94:16 95:16,
18 98:19,20 102:4
104:11 109:7,19,21
111:4 113:9 129:8
129:8 130:23
132:14 145:15
148:7 152:2,6
163:2 171:6 176:8
177:19 193:13
205:13 208:16
208:16,20 210:9
211:7 214:5,7
218:19 221:21
222:2 223:22,25
240:7 245:3 246:3
264:6 268:21 272:4
275:8 276:10
277:19 279:16,19
280:13 281:4
284:16 287:12,15
293:9
**areas** 102:8 115:2
148:25 156:7
174:20 177:18
178:1
**aren't** 90:11 146:13
248:4
**arguably** 142:16
**argument** 137:3 140:7
**arise** 25:18 136:8
**arises** 136:12,18
**Army** 52:9,20 53:13,
24 54:17 61:17,24
154:19 224:15
225:7 226:14
230:19 239:5,9,13
**arose** 137:2
**arou** 172:16
**aroun** 171:14
**around** 67:7,10,16
69:8,14,19 71:1
75:3 95:23 104:23
140:10 147:22,25
148:24 149:2
171:24 172:1
175:19 176:2
180:12,17 181:8

207:6 211:22 212:1
213:14 214:4,24
218:19 237:22,23,
25 249:17,19,21
250:16,22 251:6
252:12 253:1,4,8
259:11 264:6
266:19 267:5,6,22,
25 268:4,5,13
269:10 273:25
282:8 284:4
**arrangement** 7:1
**arrival** 166:2
**arrive** 66:20 168:9
**arrived** 50:2 55:10
56:9,22 57:1 62:22
63:22 77:23 167:15
168:20 181:4
**arriving** 275:14
**Arroyo** 34:25
**articles** 79:23 80:7
82:18,21 83:11,16,
19,22,24,25 84:2
**artificial** 117:25
225:25
**aside** 261:3 283:13
**ask** 9:13,14 11:23
44:3 54:4,5 56:2
58:9 59:8 72:21
73:11 75:18 76:21
86:1 91:15 93:4
94:23 100:7 105:3
111:23 112:23
113:11 119:24
130:25 131:17
135:21 175:17
176:9,18 177:5
183:14,25 193:18
197:4 199:7,15
217:7 218:15
231:23 234:15
240:12 246:22
248:11 252:3,15
261:19,25 263:2,6
270:11 276:22
277:12 290:10
292:24 294:2,4
**asked** 28:15 43:5,23
44:23 54:6 58:5
59:9 61:14 73:12

91:15 92:7,8 99:20
100:2 103:13,15
104:20 123:10
131:8,14,15 132:1,
8 133:9,11,14,17
134:20 139:12
139:12 140:17
144:23 145:5 150:5,
8 151:23 172:9
174:16 175:2,4
176:10 182:14
186:14 190:5 194:8,
10 201:17 202:8
230:18 231:20
233:19,20,21
248:13 261:15
266:23 269:4,24
270:13,22 272:7
279:11
**asking** 19:5 37:13
37:13 38:19,20
43:6 45:3 49:25
50:1 66:10 75:18
76:14,20 90:1,24,
25 91:9 101:23
109:23 123:25
132:17 133:6
137:10 138:9
150:17,25 151:12
152:6 155:20
157:14,15 190:22
199:19 229:12
235:9 241:7 244:16
261:4 279:10,16,18
285:18 293:13
**asks** 54:13
**asleep** 289:20
**aspect** 142:20
**aspects** 232:19
**assert** 137:25
**asserted** 133:20
136:16 137:22
138:4,14
**asserting** 136:14,17
**assertion** 137:20
140:5 141:21 142:6
**assigned** 60:22
**assist** 118:3
**assistance** 160:16
**assistant** 5:18 64:21

173:8 174:3
**assisting** 64:5,14
**associate** 249:11
**associated** 251:13
**assume** 123:10 233:1,
  3,21 275:9 286:20
  290:22
**assuming** 49:20
  286:12 287:24
**assumption** 271:2
**assumptions** 49:21,24,
  25 123:5
**astern** 128:22 129:1,
  11
**Attached** 21:18 25:13
  28:12 36:18 265:19
**attachment** 28:7,20
**attack** 289:21
**attendance** 6:6
**attended** 55:19 70:16
**attending** 5:25
**attorney** 5:19 12:1
  26:5 27:10 29:1
  52:15 119:25
**attorney's** 52:14
  134:25
**attorneys** 52:18
  120:2,20 122:15,19,
  25 123:5 187:21
  189:13,16,24
**August** 8:12
**Austin** 5:5,8 166:7,8,
  9,11
**authorities** 209:13
  270:17
**authority** 215:22
**available** 25:15
  28:17 37:8 80:4
  84:20 211:9 258:20
  259:23
**average** 13:10 228:20
  228:20 229:2,23
  293:12
**avocados** 247:7,8,12,
  14
**avoid** 175:21 182:1
  274:18 287:12
  289:24
**avoided** 211:13
**aware** 14:13 32:3

39:16 45:1 72:8
100:12 123:8 141:3
146:2 177:2 179:9,
10 182:15,17 183:1
208:1 211:8 213:13
214:10,17,22,25
215:1,22 217:14
253:9 254:3,6,9,10
255:4,7 262:13
264:12 278:3
279:11,12,15 281:4,
6 284:2,7,8 290:16
**awareness** 212:14
**away** 99:16 101:1
  108:17
**awful** 259:19

---

**B**

**back** 6:23 9:3 18:4
24:16,24 25:2,20
27:13 35:11 55:1,3
60:15,25 61:4
69:15,20,20 70:9,
10,22,22 71:12
73:24 74:4 76:3,8,
25 78:19 79:21
85:24 86:1 87:21
88:2 90:2 98:22
103:2,10 104:7
109:13,15 110:22
112:2 116:23
118:22 129:8
132:22 133:8 139:1
143:11,15,16
144:15 159:19
161:9 181:10
184:18 190:2 197:9
218:14 230:17
231:2 238:17 239:3
246:21 252:4
254:19 269:16
270:18 271:16
272:14 274:25
277:17 286:10,11
290:23 294:14
**backtrack** 224:22
**backwards** 46:25
  99:21
**bad** 284:25

**bag** 250:20
**balloon** 250:12
**bank** 71:19 73:5,21
74:20 75:23 77:16
97:16 98:10,14,18,
24 99:2,7,24
100:19 101:15
102:7 103:6 104:16
105:10,15,18
106:13,17 108:25
108:25 109:1,5,5
179:12 237:14
237:14 247:15
251:21 252:19,20
258:5 288:2
**banks** 228:22
**bank-to-bank** 246:22
  248:6
**bar** 75:3
**barge** 279:1
**barrier** 12:20 17:18,
20 20:14 65:20,23
66:3,6,7 67:21
69:5 71:20,21
72:21 73:7,12,20
74:18,25 75:2,4
78:8,24 84:24
85:11 86:24 88:16
92:13,25 93:10
94:8,16 95:13 97:5,
7,8 98:13 104:6
105:14,20 110:24
111:11 134:2 136:2
139:5 140:16
145:11,15 146:3
147:11 148:5,8
156:25 157:2
170:17,18 174:21
174:21 178:23
179:1 190:5 194:11
202:17 203:4,13,22
204:5,13 205:2,8
206:25 207:16
208:6 210:25 211:5,
12 212:10 215:5
231:17 232:21
233:3,5,24 234:9,
23 236:7,12 252:20
256:18 257:15
258:10 265:21

266:14,24 267:16
268:22 269:5,24
270:22 273:16
278:22 285:20,25
287:13,15 289:15
291:9
**barriers** 67:22 68:17
78:17 98:5 193:12
210:19 259:17
273:9 274:22
**base** 292:7
**based** 14:10 47:7
78:1 84:9 85:15
88:14,16,19 131:6
152:4,15 156:3
199:6 226:10 229:5
241:21 255:9
271:15 274:5
292:14
**bases** 61:24 75:11
117:12
**basic** 78:4
**Basically** 250:14
**basing** 190:14
**basis** 35:10 42:16
61:11 108:23 135:6
138:23 142:22
195:18 215:14
271:25
**basket** 247:12,14
**batch** 151:14 153:19
**Bay** 164:7 241:17
242:6,7,9,11,18,21
243:11,12
**Bear** 123:15
**beat** 231:2
**became** 79:3
**become** 145:13,18
148:13 177:1
235:10
**becomes** 115:20
**before** 6:10 7:11
8:13 9:1 18:11
22:7 30:18 49:5
51:17 54:22,25
61:4 62:8 67:25
82:21 83:8 84:18
92:1,5,6 94:16
126:19 131:8,15
132:1,8,25 138:25

150:5,8 155:23
156:7 156:7 166:1
169:16 182:14
184:12 186:5
208:24 217:5
218:14 238:19
239:18 240:12
248:16 266:12
271:5 284:1 290:18
294:18
**began** 78:23 224:23
**begi** 34:10
**begin** 215:10
**beginning** 184:2
185:2
**begins** 34:2 154:9
**behalf** 5:12
**behind** 105:22
**being** 5:24 12:16
16:8,12 19:22 21:6
26:20 35:12,16
38:13 39:10 40:7
75:15 103:7 109:3
110:17 115:21,23
135:19 137:22
138:4 139:15 142:9,
24 157:7 193:8
213:24 214:22
223:25 224:11
225:24 228:10
234:6 248:21
259:14,16 260:24
261:9,18 278:15
282:22 290:25
**belie** 259:4
**belief** 178:2 218:23
**believe** 14:18 24:14
28:23 30:22 32:9
41:1 53:15,16
55:25 62:14 63:8
69:11 87:15,23
98:3 119:13 121:21
125:21 126:11
138:22 139:2,8
185:9 192:5 193:12
219:1 220:21
255:11 261:24
264:8 282:24
**Belinda** 126:2,3
**belongs** 272:11

**below** 28:16 28:16
34:3 40:5 42:8
126:15,19 172:5
177:11 215:17
**Bend** 155:11 156:5
158:7 161:25
**beside** 171:14
**best** 22:1 25:19,21
27:9 32:1,15,16,20
33:1,5,17,25 63:12
87:24 119:19
**better** 12:12
**between** 13:1,13 19:2
43:9 76:12 92:8,11,
21 97:15,17,18
98:17 99:2,6 103:6
105:10,14,17
106:10,12,13,17
107:6 108:25
119:16 146:14
187:23 193:8
206:16 211:25
228:22 251:21
268:22 288:8,23,25
**beyond** 10:25 58:25
146:11 181:12
228:3 231:7
**bicycle** 265:1
**bicycles** 245:18
**bifurcate** 192:12
**Big** 155:11 156:5
158:7 158:7 161:25
218:15 268:22
**bikes** 265:6
**bill** 118:12 119:20
**billed** 118:15,19,25
**billing** 118:10
**bills** 118:22
**bit** 9:18 11:3 23:14
25:1,2 58:3 66:4
75:5 110:7 133:25
174:20 176:14
183:19 186:5
206:18 224:22
231:2 249:18
**blank** 158:16
**block** 147:11,13
234:25 236:15
**blocks** 68:13 106:23
146:2,6,10,15,24

175:25 190:7 207:9
213:6,7 214:19
232:7 251:13 252:6
258:18 259:5,8
269:14 285:24
285:24 286:8
**blow** 276:12
**blunt** 253:15
**board** 62:5 63:13
164:23 165:13
168:24 196:3
**boarded** 51:18 63:1,
16 69:16
**boat** 34:24 37:9 39:8,
12,20,24 40:11
62:5,13 63:13,15,
20,23 64:4,11,12,
14,17,21 65:3,11
67:17 68:8,24
69:16,21 70:5,6
71:18 75:2 95:17
97:3 104:10,19
105:4 106:24,25
108:20 109:17
110:13 113:8 114:1
114:1,2,3,25 116:3
145:21,24 146:1,20,
23 147:20,22 148:6,
14 149:1 152:17
153:5 168:24 171:5
172:1,2,4,5,18
173:1 173:1,8,24
174:6,9,17 177:15
179:3 180:11,17
181:11,12 182:21
182:21 213:17
214:1,21 217:10,23
247:14 250:16
251:7 252:24
258:23 260:18,22
262:17,18,24
274:25 276:3,4
280:18,19 281:10,
25 286:4 289:6
291:21
**boater** 192:15,19
193:1,9,21 196:13,
19 197:6 201:19
202:1,4,21 203:10,
18 204:2,8 217:17

258:20 259:21
260:25
**boater's** 192:8
**boaters** 261:3
**boathook** 268:23
**boats** 36:17 37:16
39:4,9,14 53:20
54:22,23 55:17
63:1,2,4,11 64:10
64:10 67:19,20
68:20 95:21 102:3
104:23 109:10
113:11 114:24
116:2,14 129:10
130:9 131:7 147:2,
4,14,24,24 148:3,8,
9,17 151:5 153:6,8,
10 161:18,19
163:13 163:13
172:10 175:5 176:8
181:4 193:13
214:24 245:9
252:25 253:3,7,11,
11,17,17 260:20
264:12 265:11,16,
20 278:25 282:1,11,
15,16,20,24 283:7,
9,10,15 286:14,21
289:6,8 290:15,20,
23 291:7,11,12
**bodies** 199:2
**body** 28:10 155:24
178:22 179:7 193:4
194:1,17 197:13,21
198:3,15 199:11
200:1 201:10
205:21 209:21
215:24 216:6,21
217:2,10,23 220:5,
7 229:2,23 236:25
243:12,15,19
**bolster** 272:16
**bolstered** 77:12 78:7
91:6,20,24 95:2
273:5
**bono** 164:7
**book** 49:14,17
**booked** 49:16
**books** 221:23
**boom** 205:10,11,12

232:9,15,22 233:5,
8,9,18,24 234:11,
22 235:2 236:7,11
238:10
**booms** 236:24 237:4,5,
20 238:4
**Border** 14:17,18,22,
25 15:7 97:9 99:23
101:2 105:13
127:21 133:15
177:2 246:17
**borrow** 101:7
**Both** 25:13 135:22
136:15 137:19
156:6 159:11 187:9
190:10 190:10
192:16,20,25 193:6
193:6 201:12
203:19 204:3,9
216:10 230:16
270:5 283:14 295:4
**bother** 95:7 263:2
**bottled** 168:16
**bottom** 21:2 30:4
125:7 154:7 200:18
268:24
**Boulevard** 5:5
**Boundary** 9:21 97:19
98:1,8 99:10,16,22
100:20 101:2,15
104:17 277:21,24
**bow** 253:16 290:7
**bowed** 253:15
**bowel** 207:11
**boys** 104:24 175:8
179:11
**break** 8:19,20,21,24
9:1 60:10,20 61:4
89:6,13,15 143:5
184:12,14 208:10
238:12,20
**breaks** 8:17
**breakwater** 205:25
206:1,6,9,10,11
**Brian** 5:16,21 7:15
12:1,5 20:25 21:11,
15 22:18 25:11
26:1 28:3,19 29:1,
23 30:2 49:3 50:21
51:3,8 52:2,7,17

60:21 64:1 90:21
92:12 124:11
126:13,21 127:4,6
133:19,23 137:6
154:12 158:12
295:9
**bridge** 69:17,22 70:1,
4 161:5,6
**bridges** 69:10,17
**Brief** 132:21 294:12
**briefed** 54:22 55:12
**briefing** 55:19,20,22
56:23 57:2,6 58:17,
19 62:24 134:4,19,
21 139:11,13
143:19,21 168:23,
25 169:3,10,12
**briefly** 6:9 198:12
**bring** 164:6 246:12
**bringing** 175:14
**broadcast** 161:1,4
163:3 223:3,6,13,
17,25
**broadcasts** 160:11
223:8
**Brodie** 5:8
**brought** 11:17 140:10
242:5
**brush** 284:22
**Bryant** 5:14
**building** 143:21
232:7
**built** 197:3 205:17
238:10
**bulkhead** 206:4,5,8,
10,11
**buoy** 18:11 19:12,23
20:2 66:15 100:22
204:16,17,18
231:20 232:4,14
233:11,13 234:19
235:12,13,20,22,24,
25 250:4
**buoy-barrier** 16:18
18:13 20:7,11
**buoys** 20:3 66:2,5,8,
10,12,18,21,24
67:1,4,7,11,16
68:3,4,5,7,9,11,13,
17,21,22,25 69:8,

14 72:13 79:10,25
80:13 81:1,13 82:2,
16 83:4,9 84:2,3,
10 88:6 89:18 90:3
95:18,23,25 96:11,
21 97:3,13,15,18,
25 98:4,10,18,24
99:3,6,9,17 100:19
101:14 103:6,7,16
104:11,15 105:5,10,
18 106:13,17 107:1
109:1,2,24,25
110:19 111:16
112:8 140:13
141:19 145:20,22,
25 146:1,11,13,14,
20 147:16,18,25
148:2,4,24 149:2,8,
14 152:17,19 153:3
157:21 165:22,25
168:6 171:14,19,22,
24 172:17 173:10
175:19 177:3,24
178:4,11,14,16,21
179:9,20,21,22
180:1,5,7,12,18
181:3,8,8 190:12
202:17 204:13
210:19 211:20
213:1,4 214:4,11,
13,23 218:11,19
231:17 232:9,22,23
233:4,7,9,23 234:5,
8,10 235:2,7,10
236:8,17 238:8
248:8 249:9,10
251:12,19,21
252:16,24 253:1,4,
8 254:8,11,14,17
255:12,15,18 256:9,
11,19,22 257:9,10,
19,24 258:14
259:12,17 260:8,15,
24 261:10,18,21
262:2,5 263:19
264:1,7,14,18,19
265:10,18 266:13
267:11 268:4,5,18
269:3,20 272:1,3,
17 273:6,12,25

274:1 275:1,3,4,16,
17,24 276:5,7,9
277:5,14,19 278:5,
15 279:23 280:4,13
281:5 282:9 283:15
284:3,4,17 285:12
286:16,22,24,25
287:21 288:13,25
289:5 290:17,21,24,
25 291:3,4,19,21
292:1 292:1 293:3,
16,19
**business** 5:8 184:9
254:4
**buy** 168:16

---

**C**

---

**cable** 40:3
**cadets** 199:23
**call** 13:14 55:15
60:11,18,25 71:4
73:2 103:21 116:17,
25 245:7
**called** 55:16 60:22,
24 223:9
**calling** 232:21
**calls** 13:11
**calm** 206:16
**came** 6:19 61:4 87:21
126:14 133:2 164:2
**cameras** 176:12,13,13,
14
**can** 8:21 9:14 11:1
15:21 19:14 23:14
33:11 34:23 36:1,7
38:1,15 39:6,15
41:22 42:17 44:3
46:8 48:9 49:21,22
52:16 54:4 56:7
74:22 80:8 82:22
83:1,13 90:2 92:24
94:15 95:10,18
96:9 100:22 101:7,
16,19 102:18,20
103:10 104:10
105:4,9,19,25
106:2,12 109:13
110:3 112:2 112:2
113:2,23,25 114:18

120:12 123:8 124:3 125:10 128:2,4,5 129:4,8 130:1,3 132:14,15 136:21 140:20 141:16 142:4,16 143:7 144:6 146:8 147:23, 24 156:19 161:2,8 163:11,14,15 164:8 170:10 174:24,25, 25 175:6 177:9,13 181:19 184:13 185:6 186:9 187:5 198:9 199:6 205:12 206:5,6,10 207:6 207:6,10,20 208:14, 16,20 210:3 211:24 212:1 216:10 218:1, 4 219:8 223:10 224:18 228:4 231:1, 13 235:2,3 237:24, 25 243:17,19 245:14 249:18,19, 23 250:7 253:17 254:21 262:10 264:19 267:5 268:3 268:3,13,24 269:16 275:18 276:21 279:3 287:12

**cannot** 32:9 33:12 108:24 128:11 199:5 207:12 234:1 252:11 268:13 289:24

**canoe** 254:10,14 278:13

**canoes** 254:1,12 279:20

**can't** 54:5 106:16 117:1 119:2 130:4 136:24 177:11 201:3 218:1 233:16 239:11 249:23 265:17 279:5 292:13

**capabilities** 276:17

**capacity** 12:22 36:9, 13,18 37:5,10,16 38:22 39:23 78:9 79:5 85:12 88:18

92:14 93:5,7,12 94:13,17 114:15 130:19,24 145:12 172:13 190:8 193:13 194:12 196:2,12,18 201:25 202:20 204:1,6,7 208:6,9,10,12,15, 19 215:5 270:15 273:9,13 290:12 291:1,10 292:2

**Captain** 5:2 16:16 17:17 101:23 156:24 158:4 196:3

**car** 54:19 55:7 129:2 144:12

**carbon** 26:20 30:12 154:11

**care** 192:9 195:23,25 196:1,6 208:25 209:3,7,9,19,20,23 210:6,11,15,20 211:2,4,11 212:7,9, 20 213:12,18 214:2, 9,22 215:4,7 259:10,15,23

**careful** 214:12

**cargo** 164:20,22 240:15,19 243:2,8, 16 244:3,6,12,14, 17,22 245:4,17,22 247:7,15

**Caribbean** 245:10,19

**carry** 245:12 246:2

**carrying** 162:20 235:14 240:15,19 243:1,8,15 244:3,6, 12,14,18,21 245:22 247:13

**cars** 53:19 109:11 143:22 245:17 289:17

**case** 8:12 16:8,13,22 18:24 21:7 27:2,18 29:1,23 30:23,25 31:12 32:2,14,20 33:2,8,18,23 40:14, 17 44:20 45:17 46:21 47:6,19 48:5, 20 50:19 51:9

53:23 54:12 57:25 60:4,22 61:25 62:19 64:17,20 65:25 69:24 72:19, 20 75:9,21 76:11 77:10,24 78:15 79:1,24 84:13,18, 19 86:12 88:11 89:17,23 91:4,5,11, 13,19 92:1,11 93:4, 23 94:2,12,20,21 95:4 105:18 106:14, 18 109:1 113:25 117:12,16,21 118:10,16,18,25 120:1,4,20 122:16, 17,21 123:3,6,7,11 125:2 128:8,10 129:5,16,25 130:17, 22 133:3,5 138:3 141:9 145:9 147:9 153:17 161:15,16 167:5,9,19 170:6, 17 174:9,11,13 177:1 178:3 180:25 185:13 186:2,3,11, 25 187:13,21 188:18,21,24 189:3, 6,11 190:4,20,24 192:14,18,25 193:9 194:8 195:9 197:19 200:14 203:8,16,25 212:19 214:2 218:17 219:6,14 229:7 230:7 231:25 240:2 252:16 253:5 255:10 257:3 261:14,18 263:9,20 275:12 288:21 293:2

**cases** 192:20 198:22

**Casner** 154:4,11,20 158:1,12 169:22

**caught** 280:1

**cause** 110:6 175:5 207:21 207:21 276:12

**caused** 262:11,12

**causing** 263:3

**Cava** 123:23

Cavaloz 57:15
Cavaloza 57:15 72:4,
  9,25 73:11 75:13,
  20 77:12,17
Cavaloza's 78:6
Cavarsos 57:14
Cavazos 58:13 123:23
  124:17 149:20
  151:17 169:5,7
caveat 142:11
Cavozas 57:12,14
CBP's 136:3
cell 159:22
cement 285:23
center 55:14,15
  58:14,16,18,23
  59:10,21 60:3,7
  61:9 62:3,16 73:21
  74:19 97:19 114:2,
  4 135:9,24
Central 5:6 245:18
certain 23:18 29:18
  34:8 35:8 50:24
  56:16,24 69:10
  78:1 93:8,9 130:20
  131:6 132:9,14
  147:13 177:19
  189:22 193:2
  195:13 199:5
  208:16,17 210:1
  233:11 235:19
  236:2 241:3 254:20
  256:18 257:1 258:6
  275:17
certainly 17:7 19:1
  75:12 79:4 90:15
  93:11 96:2 101:18
  104:1,4 109:8
  116:13 119:5,7
  129:6 140:25 148:6,
  8,9 149:10,11
  175:23 208:23
  209:4,8 225:3
  232:18 247:24
  258:21 279:3 280:6,
  21 285:1 290:2
certainty 32:10
  35:20 209:24
CFRs 199:4
chain 111:12 271:8

chance 74:11 250:23
change 18:24 71:15
  101:2,3 128:5
  131:23 132:4,9,15
  144:19,20 145:1
  145:1,12 146:22
  151:14,16,20,24,25
  152:9,10,18 153:1
  174:24 231:24
  233:23
changed 18:10 19:1,7
  92:21
changes 23:8 38:4
  96:14 152:5 160:23,
  25 174:23 187:23
  198:19 274:22
changing 44:24 90:10,
  13 131:19
Channel 155:11 156:6,
  10,10 158:7 162:6,
  9,11,12 163:20
  204:19,20 235:15
  242:19,21 244:25
  250:7 252:11
  266:17 266:17
  267:3,4,21 269:9
  269:9 276:11
channels 155:9,16,17
  162:10,18 242:4,13
Chapman 167:2,4,7,11
  168:7 173:6 174:4
  181:11
Chapter 227:14 231:6
characterize 275:22
characterizing 66:7,
  10
Charette 26:3
Charge 25:14 26:11
  55:25 56:1 57:10
Charles 7:24
chart 198:18
charter 163:13 254:4
charts 146:5 221:19
chase 251:11
chat 123:16
chatter 141:4
checked 50:15 51:1
  166:2,3,8,9 167:16
  224:2
checking 223:23

Chicago 52:4,10,23
chickens 288:12
chief 53:16 55:13
Christopher 53:15,24
  54:12,17 55:7
  61:17,23
circle 25:19 67:7
  102:15 103:15
  172:17 173:10
  239:3
circled 103:19
circling 102:13
circulate 28:15
circumstance 104:4
circumstances 12:17
  104:5 107:10,11
  196:8 209:6 211:15
  244:1 274:5
cite 230:11
City 166:24
Civil 6:5
clarification 99:19
  155:3 204:10 213:9
clarified 135:4
clarify 9:15 38:19
  135:5 137:9 242:5
  285:7
clarifying 217:7
clarity 229:21
classified 194:2
  196:23 197:14,22
  198:4 199:13 200:1
  209:22 210:7
classmate 187:8
clear 96:8 139:1
  147:23 160:7 174:1
  275:10
clearance 213:24
  214:7
clearer 292:22
clearly 134:16 135:9
  270:2,9
climb 245:14
climbed 149:8
climbing 180:5
clogs 252:6
close 45:22 68:5,6,
  16,21 101:14
  105:25 109:17
  148:12 258:22

282:2 287:9
**closely** 95:15 267:6
    268:13
**closer** 67:21 73:21
    73:21 74:19 74:19
    98:7,15 134:12
    288:1
**closest** 99:3,10,13
    248:21 257:25
    258:5 276:5
**clue** 202:6
**Coast** 198:22 199:6,
    15,19 210:3 220:10
    221:12,15,16 222:3
    223:23 224:17,19
    225:7,11,13 226:10,
    13 227:7,18 228:3
    230:16,18 239:4,15
**coastline** 221:24
**Cochrane** 121:25
**co-counsel** 5:13
**cocounsel** 134:25
**co-counsels** 5:15
**Code** 227:15 231:7
**Codes** 121:11
**colleagues** 5:19
**College** 187:9
**collide** 106:24
    212:25 213:4
**colliding** 213:18
    214:18
**collision** 211:23
    273:19,22 274:19
    285:4,11,12 288:19
    289:2,6,11 290:9
**collisions** 214:10
    287:13
**Colorado** 35:1
**come** 27:13 38:18
    61:1 98:22 106:2
    237:24
**comes** 6:12 128:14
    273:19,21
**comfortable** 89:22
    115:21 162:8
    264:10
**coming** 71:4 175:3
    208:3 245:12
    276:11 289:19
    291:8

**command** 111:12 271:9
**commandant** 225:16,17
**commander** 57:8
**commanders** 55:13
**comment** 124:1
**commented** 284:23
**comments** 65:5
**commerce** 162:20
    221:17 239:18,21
    240:2,6
**commercial** 155:9,16
    156:15 161:19
    163:7,10,15,21
    164:14,15,22
    240:15,19 241:15,
    18 242:6,24 243:2,
    8,16 244:3,6,9,15,
    17,22 245:22 247:7
    248:6 249:1,7
    259:21
**Commission** 9:22 10:1,
    5
**common** 237:20 238:2
    280:22
**communicating** 236:5
**communication** 22:2
    92:12
**communications**
    119:25
**companies** 164:6
**company** 184:6,8
**comparable** 248:22
**compare** 100:14
    156:12
**comparison** 18:18
    147:3 153:7
**complete** 117:11
    209:10 272:15
**completely** 220:12
    252:6 269:17
**compliment** 294:6
**comply** 194:3 197:15
    198:5 199:14
**complying** 6:4 7:20
    214:22
**component** 210:18
**components** 202:16
    204:12 210:18
    231:17
**compound** 58:20

**compromise** 136:3
    140:25 141:10
**concede** 230:24
**concept** 114:25
**concern** 223:12
**concerns** 135:10,17
    136:4 140:19 141:7
    142:12
**conclude** 79:10
    273:12
**concluded** 84:9
    295:22
**concluding** 230:21
**conclusion** 58:12
    258:13
**conclusions** 263:8
**concrete** 67:22 68:13,
    17,21,25 88:5
    106:23 146:6,10,15,
    24 190:6 211:10,21
    213:6,7 214:19
    249:10 251:13
    259:5,8,17 285:24
    286:7
**condition** 181:20
    284:9
**conditions** 100:15
    107:9,11 138:4,5
    258:6 274:5 275:7,
    11,17,24 276:2,6,
    16 280:9,11 286:14,
    18 288:10 289:2
    291:25 292:6,15,16
    293:19,22,23
**conducted** 50:5
    115:19 133:8
    185:23 279:12
**conducting** 44:23
**conducts** 269:21
**conference** 54:21
    168:22
**conferred** 186:3
**confidentiality**
    122:5
**configured** 147:12,19
    148:10 249:15
    257:23 258:7
**confined** 129:7
**confirm** 22:8
**confirmation** 131:16

confirmed 94:21
confirming 103:14
confused 30:6 177:18
confusing 181:17
connected 65:2,6
    173:16
connection 135:12
    141:18 142:2
consequences 175:7
    286:8
consider 148:2
considerations
    156:1
considered 93:24
    117:15 120:3,14
    122:20,23 123:6
    185:24 199:3
consistent 88:10,25
    89:3 150:4,8,16,24
    151:11
console 114:2,4
constant 150:21
constantly 96:14
    97:20 141:6
constitute 157:22
    235:23,25 250:15
    251:4,8 252:16
    258:14,16 259:7
    264:18,20 266:13
constituted 89:18
    90:4 262:7
constitutes 246:19
    274:15
constricted 98:21
constructed 232:24
construction 274:21
consult 186:11,24
    188:21
consultate 186:11
consultation 185:22
    190:3
consulted 187:2
    188:17
consulting 5:15 54:2
    185:12 190:3
contact 68:25 259:5,
    18 260:15 261:9,21
    262:2,19,24 263:19
contacted 11:25 16:7
    21:5 78:23

contacting 84:24
contacts 263:18
contain 117:10,14,19
contained 45:10 46:9,
    20 47:1,5,18 48:4,
    19 125:1 159:12,16,
    21
container 161:6
contains 83:2
contention 230:1
contents 34:1 54:6,9
    76:22 84:14
context 41:8,10
    134:1 272:13
continue 6:8 74:23
    182:3
continued 6:24
    143:13
continues 121:13
continuing 30:8
    131:17
continuous 234:23
    236:12
control 39:2,4,7,20
    234:25 236:15
    289:15
controlled 152:11
controlling 245:2
convenient 160:6
converges 98:15
conversation 27:14
    51:7 59:9 65:2,7
    75:8,19 77:11,15,
    16,19,20 78:7
    175:17 189:5
    190:17 239:22
conversations 12:15
    13:1,7 31:25 54:24
    59:1,11 61:19,22
    64:24 76:17 77:1,8,
    14 84:15 138:12,17
    139:22 185:14
    189:2,8,9,10
converse 173:20
convey 235:19 236:2
conveyed 270:14,16
conveying 236:1
conveys 204:17,21
copied 26:20 154:11
copies 83:15,17

copy 7:14 11:6,16,17,
    21 13:19 22:8
    24:14 28:3 80:21
    127:6 184:21
    187:15,19 294:19,
    21 295:4
Corps 52:2,10,21
    53:13,24 54:17
    61:17,24 154:19,21
    166:23 170:15
    171:5 181:12 199:7
    210:3 220:10
    224:15,17 225:7
    226:14 228:3
    230:16,19 239:5,9,
    13 244:24
correct 11:24 13:2,3
    14:13,14 15:8,23
    16:9,23 17:9 18:14
    21:8,11 22:5,6
    24:11 25:5,24 28:8
    29:24 37:7 41:6
    49:3,4,6,7 51:2
    52:25 56:10,23
    57:8 61:15 64:5,6
    67:14 68:15 70:15
    72:14 81:8,20 84:7
    86:14,19 87:10
    89:14 95:5 97:1,4,
    17 98:2 103:9
    104:18 107:25
    108:13 110:12,15
    115:11 121:18
    124:10,12 125:19
    127:14 131:24
    144:7,14 145:23
    148:1 149:23 150:2,
    10 154:6,13 157:24
    167:17 168:1,2,19
    172:18,22 173:21
    179:13 181:24
    183:1 188:1,9,12
    191:17 195:23
    196:19,20 200:13
    213:15 218:6,13
    219:4 220:21
    222:11,12,20 224:6
    229:14 240:20
    243:5 244:23
    250:17 255:21

258:1 260:2,4
262:3 264:3 272:19
278:9 278:9
**corrected** 285:8
**correction** 238:20,23
**correctly** 12:11,13,
23 16:15,19 22:4
34:5 126:9 152:13
192:10 194:4
199:10 208:19
227:22 233:20
234:1 252:7,13
268:15
**corroborates** 230:14
**Cortez** 6:18 33:20,24
**could** 6:21 7:2,11,12,
21 23:8 25:9 28:10
35:21 35:21,23,24,
25 36:13,16 37:20
39:2,13,19 40:1
41:17,20 42:13
43:21,24 44:10
65:2,7 74:13,24
79:18 85:17 86:23
93:8,11 94:7 96:4
97:3 101:2 101:2
103:17 105:20,21
106:23 107:2 110:6,
9,10,22 111:6
112:25 123:20
129:7 130:21 131:9,
10 140:1,25 142:14
145:13,17,17,20
146:23 147:11,22
148:13,20,23 149:8,
10,10,11,13 152:18
152:18,21,22,23
156:2 160:24 169:2
172:5 175:7 176:20
178:9 180:11
181:21,25 183:10
205:23 206:11,12
207:24,25 208:2
208:2,3 220:8,13
223:2 225:2,4,5
233:11,12,12,13
234:10,21 235:2,23,
25 241:11 247:8,12,
19 250:5,10,12,14,
18,20 252:21

254:21 255:1,11
256:17 257:1,2,24
258:21,23 259:4
261:13,14 264:21
266:18 267:4,6,22,
25 268:9 270:14
275:12,22 276:8,14,
17,18 278:13,21
279:7 280:1,18,22
282:1 284:13,14
285:22 286:3,7,8,
17 287:1,10 288:14
292:17 295:6
**couldn't** 64:24
104:24 152:22
182:17 191:8 225:3
**Counsel** 5:17 26:5,6
59:2 60:21 125:21
135:20 154:21
**counselor** 26:14
**countless** 116:2
**countries** 246:17
**country** 246:11 248:4
**couple** 6:18 9:17
11:4 42:3 136:8
137:1 175:16 239:2
283:3,5 291:23
**course** 8:17 9:8,12
14:7 19:2 106:22
130:5 176:25
180:23 269:13
271:2 283:5 287:24
**court** 60:24 71:5,6
74:13 96:9 120:8
142:3,4,18
**court's** 6:1
**cover** 19:15
**covered** 75:11 79:13
**craft** 40:7 113:23
177:3 178:13
227:16 259:18
**crafts** 178:3
**crane** 279:2
**create** 23:10 88:6,17
203:13 205:6
206:25 211:5 233:8
234:9 235:2 252:22
260:21 265:21
**created** 23:13,19
73:19 74:17 85:11

86:25
**creates** 78:8 92:15
145:11 262:13
**creating** 205:13
276:16
**crew** 164:22
**crime** 177:7
**critical** 212:3
**cross** 58:6 147:2
153:6,11 175:10
179:16,19 277:20,
24
**crossed** 43:16 53:21
179:25
**crosses** 265:1
**crossing** 147:20
153:11 287:10
288:12
**crossings** 147:3
153:7 176:11
**crosswise** 276:11
**cues** 177:23
**Cup** 164:12
**curiosity** 147:11,15
262:4
**curious** 136:13 245:4
**current** 130:5 150:12
177:13 275:7
**currently** 7:25 8:4
20:10 133:3 147:19
254:7 280:8
**currents** 109:13
174:22
**curves** 98:14 100:24
**Customs** 14:17,21,25
15:6 133:15 246:17
**cut** 74:10 126:14
185:8 251:11
289:16,22
**cutoff** 160:14
**cuts** 290:7
**cutting** 245:16

D

**daily** 111:11 271:8
**Dam** 41:18 42:9
**damage** 67:15,17,18,
23 172:6 175:5
207:21 260:20,22

261:1 263:4
**damaged** 260:24 261:9,
  21 263:18
**dams** 41:1 132:13
**Danger** 146:6
**dangerous** 176:23
  177:6,22
**Dangers** 88:7 178:1
**data** 88:21 117:15
  120:14 122:19,25
  154:16 185:21
  190:19,22 260:5
**date** 15:19,21 19:2,3
  30:5 142:1,5
**dated** 17:8
**dates** 22:20 49:18
**dating** 228:18
**David** 5:14 25:12,14
  26:8,9,13,16,19,22,
  23 27:1,4,8,14
  125:18,20 126:22
  173:7
**day** 6:13 16:6 50:3,8,
  10,20 51:8,12
  53:18 54:15,16
  58:5 76:10,24 77:9,
  23 96:17 98:11
  99:11 100:10,14,20
  134:4 141:2,6
  166:1,10 167:18
  174:17 176:4 184:1
  189:21 222:22
  223:14 241:7
  265:25 280:17
  280:17 283:7
  288:10 289:3
  293:15
**days** 21:10 50:6,7
  152:11 237:21
  292:9,10,11
**dead** 284:21
**deal** 170:14
**dealing** 200:14
**dealt** 136:25
**debate** 234:13
**debris** 251:1,4
**decide** 78:24 84:21
**decided** 238:24
**decipherable** 162:8
**deckhand** 63:20

**declaration** 80:16,19,
  24 121:1
**declared** 224:5
**decrease** 193:12
**decreased** 288:1
**deemed** 198:15
**deep** 69:3 148:21
  165:18 170:20,23
  241:12
**deeper** 207:13 278:23
**deepest** 111:24
  112:12
**defense** 5:20 12:2
**defer** 224:14
**define** 207:18 231:20
  233:4 239:4 243:17,
  19 248:13
**defined** 162:13
  227:23 235:13
  251:10
**definitely** 139:10
**definition** 196:5
  200:6,8,15 233:16,
  17 234:22 235:1
  236:11 240:16
  246:15 281:21
**definitions** 200:11
  232:8
**definitively** 119:2
**degree** 67:22
**Del** 27:11 125:22
**demarcation** 198:19
**dense** 281:9,19,21,22
  283:25 284:4,20
**density** 95:14
**Department** 5:17 6:19
  12:3 26:6 27:10
  133:24 221:17
  246:19
**depend** 109:22 170:11
  275:6
**depending** 56:18
  96:14 127:24
  132:10 212:2
  249:24 251:7
**depends** 98:12 107:9
  162:19 163:8 176:1
  241:2 242:14
  286:19
**depict** 237:14

**deployed** 16:18 17:19
  20:12 156:25
**deposition** 5:2,25
  6:7,18,21 8:17 9:8,
  13 15:9 117:8
  133:3 141:25
  183:12,20,24
  189:14,17,24 294:4
  295:22
**depth** 35:1 37:17
  38:4 109:22 112:21
  161:10,11,22,25
  162:2,5,9,11 163:6,
  19 170:10,17
  172:21 176:1
  240:14 240:14,18,
  25 241:10 242:9,11,
  16,18,20 243:21,22
  249:3,6 253:19
  268:20 288:1
**depths** 40:3,5 155:9,
  15,21 174:22 242:4
  245:2
**deputy** 60:24 74:7
**describe** 58:22 59:9
  113:23 133:14
  137:11 181:19
**described** 12:18
  39:10 40:7 75:19
  77:1 107:8 136:7
  139:18 140:15
  196:22 210:12
  234:12,17 287:18
**describing** 246:6
**description** 258:21
**descriptive** 80:15
**designated** 133:4
  194:19 224:11
  226:2,6
**designation** 17:2,12
  19:6 156:21 210:10
**designed** 115:1 206:1
  234:7
**despite** 225:25 262:6
**destination** 16:2
**destructive** 206:2
**detail** 228:12
**details** 66:14
**detention** 55:14
  58:14,16,18,22

59:10,20 60:3,6
61:9 62:2,16
133:15,16,18
134:22 135:1,9,24
137:11,12,14,17,18
138:6,10,18,22
139:13,15,23
140:11,12,23
141:19 144:3,9
**determination**
193:10 199:5,8
209:14 210:1,12
211:11 212:3,5,16
219:10 225:18
234:2 292:13
**determine** 109:6
129:6 130:18
138:16 152:5 193:4,
25 195:9 196:15
197:10,13,21 198:3
199:11 202:5
211:18,19,20
215:16 218:9
219:20 220:6
265:17
**determined** 161:14
274:4
**determining** 100:18
145:8 209:21 210:6
219:13,18,22
226:15 228:9
**devastating** 285:22
**developed** 184:7
**developing** 91:7
**devices** 40:2 62:25
**difference** 161:21
268:22
**different** 34:20 41:1
54:4 79:14 85:14
115:19,22,23
192:13 197:25
200:11 205:6 206:8
209:10 216:5
220:23 221:20,24
232:6 242:3 242:3
242:3,4 248:4
269:12 270:18
272:11 279:20
284:11 287:3
**differently** 269:18

274:24 290:11
**difficult** 100:14
111:1
**difficulty** 66:4
**dig** 243:25
**dimensions** 35:2 37:3
38:6
**diminish** 190:7 204:5
208:6 215:5 267:5
269:10 273:9 292:1
**diminished** 85:11
280:5
**diminishes** 266:15
268:12
**dinner** 50:18,23
166:2,4
**direct** 127:3
**directed** 72:23
**direction** 69:15
181:15 198:23
199:1 238:1 287:9
**Directions** 220:16,18,
19,24 221:3 289:14
**directly** 166:12,15
267:7 268:14
**disagree** 267:14
270:9
**disc** 72:18
**disclose** 6:2
**disclosed** 142:18
**disclosing** 6:13
140:22
**disclosure** 7:16
140:20
**discounting** 130:5
**discovered** 14:10
**discuss** 6:21 19:14
21:22 25:15,16
50:19 51:9 53:23
62:19 64:17,20
65:13 69:24 72:18
72:18,20 174:11
176:7 228:2,11
**discussed** 31:18 33:2,
18,23 34:16 35:3,4,
13,16 38:13,16,23
39:20 54:11 60:20
122:14 133:11
180:22 220:13
241:13,14 253:6,8

271:21 273:23
279:6,15
**discusses** 226:25
**discussing** 209:7
285:14 288:7
290:13
**discussion** 44:15
45:5,8 65:15 69:6,
9 71:11 74:3
116:22 215:14
**discussions** 44:22
50:22,23
**disembarked** 70:8
**disengage** 130:2
**dissimilar** 114:2
**distance** 107:6,7
228:22 274:18
288:8,22
**distinction** 211:25
**distinctly** 235:13
**distinguishable**
193:8
**distracted** 111:20
**District** 160:10
223:24
**divergence** 177:13
**divergent** 193:16
**divert** 205:18
**division** 26:5
**dock** 62:10,12 205:20
247:4
**docks** 241:17 242:3
**document** 13:22 15:19,
22,25 16:1 17:3,6,
6,8 19:3 20:5,21
22:15,21 23:4,6,7,
10,12,19,21 24:13
28:24 29:4,17 31:5,
6 46:1 48:10,25
81:3,6 86:3,6 87:5,
10,21,25 91:3,10
92:1,5 94:24 95:2
102:17 103:3
111:15 112:7
131:18 156:18
160:20 186:9
226:10 227:1
229:11 230:2
**documents** 7:12,13,19
14:8 22:9 80:12

81:10,11 82:1,3,14
83:3,7 91:15 120:8,
10,13,16,18,22
121:14,16,20,25
122:2,6,12,13
158:5,7 170:1
230:20
**Does** 11:12 17:5
20:24 21:1 27:25
28:1,4 56:17 104:3,
4 110:24 111:16,17
117:10,14,18,19
128:23 135:13
157:23 185:18
186:13 187:12
193:25 196:14
197:10,12 198:2,6
199:11,18 200:6
203:12 204:4
206:24 208:5,14
210:21,23 211:3,4,
5 215:4,15 221:3,
10 222:3,6,13,17
231:24 239:4,15
244:24 259:18
266:12,24 267:17
269:1 269:1,5
286:10 289:9
293:11
**doesn't** 6:3 15:3
128:3 136:1 138:7,
8 141:10 157:19
170:14 221:7,9
232:25 238:25
262:17 265:3
284:12
**doing** 14:9 58:5
78:24 79:7 85:1
100:25 149:5
176:19 195:22
199:18,22 201:18
209:5,10 220:11
224:7 264:10
266:18 268:9,25
269:14 283:20
289:25 292:4
**dolphin** 206:19,20
**Donaldson** 25:15
26:12 27:15 27:15,
17 125:24,25

**done** 78:2 98:25
117:2,3 161:3
191:22 260:20,22
287:11
**down** 17:5 23:14
25:12,19 29:25
36:24 48:7 54:19
55:9 67:10,16 69:7,
14 93:9 95:23
98:13 101:17 103:8,
18 104:23 105:4,9,
19 106:18 107:5
109:15 110:2
148:10 161:9,18
165:22,24 166:1,12
171:13,21 172:4
175:3 176:4 177:10
178:25 181:11
182:3,10 207:5
208:10,15 216:14,
16,17 240:22
245:10,16 246:3,24
251:20 254:15,18
255:3,13,16,19
256:8,13,20,23
257:10,21 275:4,19,
25 276:4 277:14,18,
22 278:6,14 279:24
280:19 281:10
283:22 284:6
285:14,18 286:6,13
287:1 288:9,13,23
289:7,18 291:3,6,7,
8,9,24
**downstream** 67:5
275:2 292:3
**dozen** 116:1 189:4,9
**dra** 154:14
**draft** 111:24 112:12,
20,21 113:4,22
114:7,10 115:1
154:15,24 163:16,
17,18 164:16
165:16,17 172:19
187:16,19,23
188:10 241:18,24
**drain** 207:11
**Drake's** 164:10
**dramatically** 146:23
**dredge** 241:3

**dredged** 155:17 156:7
**dredging** 155:9,15,21
157:15,20 161:11,
22,25 162:2,5
**drew** 137:19
**drift** 150:13 276:12
**drifted** 178:25
**drive** 55:4 110:14,17
166:18,22 175:20
245:13
**driven** 107:21,23
114:23,24
**driver** 72:2,7
**driving** 110:16
174:17
**drones** 176:14
**drop** 123:16
**dropped** 76:5,6,10
145:21
**drops** 145:16 146:23
**drought** 280:9,10
284:9
**drove** 51:19 54:19
107:17 108:3 108:3
166:10,12 167:12
**drowned** 179:8
**drowning** 75:1 178:24
**drownings** 175:12
178:18,20 179:5
**drug** 8:1
**drunk** 289:21
**dry** 284:21
**dual** 42:6,13,17
43:20,24 44:4,10
**duck** 265:2
**due** 6:1 262:6
**duly** 7:8
**durable** 205:18
**during** 6:17 8:16 9:7,
12 14:17 25:17
27:20 28:18 32:4,7
33:8 36:15 37:6
50:4 55:7,20,22
56:23 57:1,24 58:9
60:3 61:3 62:18
63:23 65:18 67:13
68:18 69:6,24
73:10 84:11 85:3,4
118:23 120:7
133:10 137:16

140:12 166:22
170:2,5 173:19
176:25 176:25
180:23 185:23
213:4 214:17 248:7
260:15,19 261:25
292:8,25
**duties** 110:25 184:7
266:25 267:12
269:6 270:23
**duty** 60:23

---

**E**

---

**each** 13:10 41:16
42:7 53:21 55:18
86:20 94:22 102:1
105:23 105:23,24
106:2,12,17 107:3
108:19,24 127:8
146:3 173:18 193:18
202:14 220:14
234:15 254:13
281:1 287:19 288:7,
22 290:3
**Eagle** 12:20 14:3
21:20 43:18 50:5,7
51:19 54:20 55:5,
10 58:3 63:23
113:9 135:11 139:5
160:13 163:2
166:10,12,15,19,22
167:13,15 168:18,
21 177:19 196:22
203:5 210:6 211:1
221:4,7 257:9
293:22
**earlier** 8:21 61:14,
16 86:15 87:7,12,
15 90:2 91:2 92:17
127:12 140:17
156:17,18 180:9
208:25 212:25
222:21,22 223:14
224:23 231:20
241:6 248:13
251:10 259:9
260:13,18 263:20
271:21 277:1
**early** 51:15 79:4

134:4
**earth** 165:14
**easier** 9:19 18:18
25:1,3 56:7 66:1
209:18
**easiest** 193:22
**easily** 147:22,24
221:19
**eat** 89:8
**edge** 175:1 204:20
**editorializing**
267:16
**edits** 24:3,5,6
**effect** 215:24 216:21
**effectiveness**
140:21
**eight** 38:3 51:23,24,
24 57:3,4,5 63:8,
10 244:4,9,13
282:16,24 290:19,
20,22
**either** 24:3 101:14
128:2 130:22
132:14 136:23
146:5,18 147:21
161:24 176:25
196:2 198:14
199:19 205:13
211:10 212:12
214:18 221:24
248:7 255:20 273:1
292:25
**ejected** 286:3
**eliciting** 142:5
**eliminate** 206:2
**else** 15:10 51:10
55:22 63:22 70:16
73:18 74:16 75:6
77:5 112:3 118:3
123:16 143:1
147:15 159:16
166:21 167:12
169:23 180:22
196:4 207:23
**email** 12:14 20:24
21:10 21:10,13,25
25:5,6,22 26:8,20
27:24 28:2,4,8,10
29:15,20,20 30:5,7,
12 31:3,8,15,21,22

34:2,17 40:14
40:14,16,20 41:1,5
44:19 45:13,14,16,
22 46:1,3,4,9,18,
20,24,25 47:2,5,11,
18,21 48:1,4,6,12,
13,19 49:2 81:18
84:25 124:3,8,20,
22 125:1,3,11,15
126:8,14,16 127:6
149:19,22 154:4,8,
9,10,23 158:8
158:8 159:19 160:9
**e-mail** 158:17
**emailed** 86:9
**emails** 29:12 30:1
123:18 153:19,24
160:3
**emphasis** 228:20
269:8
**encompass** 237:25
**encountering** 137:24
**end** 98:13,14 101:18
121:14 148:10,11
171:4,7 172:23
249:21 268:21
**enforcement** 56:20
61:10 135:5,25
136:12,15 137:22,
25 140:8,18,19,21
141:22 142:14
144:4
**eng** 248:1
**engage** 246:10 249:6
**engaged** 248:1
**engine** 128:12,13
130:1,7 150:21
253:22
**Engineer** 224:17
228:3
**Engineers** 52:3,10,21
53:14 61:18,24
154:19,22 166:23
199:7 210:4 226:14
230:19 239:6,9
244:24
**enhanced** 237:23
**enough** 68:5,6,16,21
105:14 145:17
174:19 214:6 251:7

281:22 283:24,25
ensure 211:22
entire 10:10 29:17
    42:21 43:25 48:6
    53:21 102:13
    105:11 105:11
    108:11 125:3 181:7
    182:7 201:3 218:23
    219:1 267:17
entirety 53:17 103:5
    219:7
entitled 225:18
entry 246:13,15,20
    247:23
enumerated 34:22
Environment 12:2
environmental 5:19
equipment 34:3 40:4
    70:8
errors 14:10,14
essential 215:21
    217:15
essentially 111:4
    210:16 211:16
establish 157:16
    192:9 195:16,19
    232:8,11
established 198:18
    228:4 230:15
    247:22
establishing 157:7
    195:23
Esteban 47:11
estimate 35:7,8,10,
    18 36:2 43:12 57:5
    111:24 112:12
    119:18,19 219:24
    225:2 277:9
estimating 118:17
estimation 38:17
etcetera 235:16
evaluate 194:10
evaluation 78:2
Evelio 31:15,19
even 98:7,21 138:5
    139:17 145:13
    163:17 202:6
    255:22 256:15
    262:18 272:8
    278:22

evening 28:12 50:24
event 135:22 139:8
eventually 136:24
ever 87:5,25 92:1,5,
    20 107:23 108:1
    114:23 147:2 153:6
    156:1 160:10 175:2
    190:11 200:25
    216:17 238:10
    239:17 242:22,24
    243:1 245:25
    259:22 262:23
every 8:20 104:3
    128:9 220:13 229:1,
    22 257:16 264:22,
    23
everybody 56:21
everyone 6:6 123:16
everything 97:12,15
    292:14
evidence 12:17 88:22
    120:5
exact 13:12
exactly 73:4 103:25
    164:18 180:1 245:1
    267:14 270:22
    293:17
examine 100:7
example 136:14
    137:21 289:13,16
examples 162:14
excavators 278:24
Excellent 7:18 94:6
    133:1 190:1
except 160:7
exchange 20:24 29:16
    45:23
exchanged 29:12 30:1
excuse 27:19 111:20
    183:15 212:23
    273:13
excused 6:4
Exhibit 11:6,10,13,
    22 13:17,20 15:13,
    15,17 16:25 17:1,
    11 19:19 20:19,20
    21:14 22:11 22:11,
    12,13 24:25 25:8
    28:1,22 29:7,8,10,
    11,19 34:3 37:25

44:14 45:4,8,11,14,
    20,21,25 46:17
    47:1,11 48:11,23,
    24 80:8,20,23
    82:13,22 83:1 86:2
    88:4 91:17 91:17
    92:24 93:23 94:7,
    19 100:4 101:12
    102:24 104:8
    110:22 112:18,24
    117:14 123:15,18
    124:8 125:13
    131:19 144:16
    147:4 149:17
    153:22,23,25
    154:10 156:17
    161:10 183:21
    184:21 271:19,20
    276:23
exhibits 117:19
    120:22,25 121:3
    121:3
existed 291:25
existence 76:20
expect 202:4
expected 16:16 17:17
    156:24
expedite 294:25
expedited 295:3,5
expensive 253:17
experience 107:15,16
    128:9 131:7 156:3,
    13 161:20 175:22
    241:21 290:18
experienced 93:17
expert 7:15 11:7,13
    13:18 15:23 16:2,8,
    13 17:2,12 18:23
    19:6,22 20:1,6,10,
    14 21:6 24:22
    40:13,16 44:19
    45:16 46:10,21
    47:5 48:19 57:25
    75:9 77:10 80:9
    81:12 82:4 94:2
    100:1 101:13
    108:14,15,17,20,21,
    23 115:17 116:6,8,
    9,12,13 117:6,8,10,
    23 118:1,4,8,13,20

119:1,4,22 120:13,
17,19 121:15 123:2,
11 126:10 127:13
133:3,5,7,11
138:17 139:24
141:9 143:23 145:8
148:15 156:20
157:7 170:6 184:1,
8,22 185:10,16
186:13 187:12,13,
16 188:7 191:19
192:14,24 195:2
197:17,20 198:1
200:2,22 215:9
218:7,17 231:13
237:15,17 238:4,6,
8 240:9 248:10
260:3 265:24
276:21 293:2
**expertise** 84:21 85:2,
18 148:7 199:18
240:7 247:25
**experts** 5:15 6:2
54:2 133:4,5
140:15 147:8
185:13,22 186:2,3
190:18,19,23 191:1,
2,11,12
**explain** 133:21
**exploring** 156:3
**exposed** 102:9 148:13
171:1 175:25
**expounded** 207:24
**express** 117:12,17
120:4 136:1
**expressed** 123:3
**expressing** 122:21
**extend** 109:5 146:17
211:10
**extended** 181:10
**extends** 112:22
205:20 206:15
**extensive** 185:23
**extent** 19:14 25:18
69:12 89:21 136:19,
22 141:23 142:8,12,
24 162:21 227:9,19
**extreme** 256:16
**extremely** 21:24
115:1 176:20

**eyes** 227:10

---

## F

**facilities** 144:3,10
**facility** 55:16
133:16,18 134:22
135:2,11 137:11,13,
14,17,19 138:4,6,
10,18,22 139:6,13,
15,23 140:11
140:11,12,23 141:5,
19 143:25
**fact** 93:17 98:6
101:21 128:19
141:2 152:21
186:13 193:5
195:17 197:17
209:13 213:22
228:9 230:3
**factors** 152:1
**facts** 117:15 120:2
122:14 167:7
185:21 190:19,22
**factual** 136:15
**fair** 37:20 77:24
94:1 100:17 102:12
108:12 111:16
152:15 153:16
162:14 178:2 189:8
193:7 195:8 196:6
199:16 212:6
213:18 220:3 232:2,
12,16 236:16,20,25
239:8 240:17 244:5,
20 245:21 255:18
262:8 263:13,16
265:15 270:3,5,20
272:18 273:3,6,7
274:6 275:20
278:11 292:24
**fairly** 23:18 131:6
**Falcon** 40:21,24 41:4,
15,18,21 42:8
**fall** 80:24 81:11
82:15 83:8 88:11,
13 89:1,17 90:4
92:6,8,11,17,21
94:2 97:21 142:16
175:1 182:22

263:21
**Falls** 182:11,16,18,
24,25 183:7,10,17
**familiar** 114:3,20
115:21 182:25
216:20 259:11,14,
16 260:14,17,23
261:8 262:1 264:11
**Fan** 34:24 128:1
**fanboat** 35:2,12,16,
18 36:5,10,14 37:1,
2,17
**fanboats** 37:6,13
74:24
**far** 11:14 56:3,11
77:1 97:12 101:1
108:17 109:4
112:21 118:16,19
209:12 228:19
255:3 258:19 279:2
**farm** 262:20
**farmers** 245:13
**fashion** 204:21
**February** 23:2,24
24:1 25:4,10 27:6
28:15 30:8 46:19
47:2,22 48:13 49:3,
6,9,12 76:25 87:10
95:21 96:20 98:11
99:12,18 100:21
104:22 107:12
125:12,16 133:9
143:16 148:19
170:19 180:10
213:4 214:17
260:16 281:2
290:24 291:13
**Federal** 6:5,15 54:3
86:25 199:4 264:13
**feed** 287:22
**feel** 108:21 116:2
161:20 231:9 240:8
270:8
**feet** 34:24 35:5,9,17,
19,19,22,24 36:4
36:4 37:1 37:1
38:3,8 39:4,5,14
69:5 96:10,13,20,
22,23,24,24 97:22
98:9,12,15,16,18,

23 99:1 99:1,2,7,7,
9,14,15,23 100:18
101:16 101:16
103:8 103:8 105:20
106:5,6,8,11
107:13,14 111:25
112:14 113:4,5
146:17 148:20
149:7 152:5 162:1,
4,15 163:16 164:2
165:6,8,20 170:20,
23,24 171:7,9,9
228:20 229:3,24
241:11,19,20,25
242:10,12,13,19,21
243:22 244:2,7,9,
13,22 245:6 249:4
253:22 255:24
256:5 257:2 268:21
277:3,6,13 278:4,
16 287:19 288:3,5,
24
**fellow** 111:9
**felt** 88:16 162:8
180:21 195:16
**fence** 73:6
**ferryboats** 163:12
**few** 27:22 36:17 52:5
169:18,21 170:9
215:11 217:21
238:12 292:6
**fewer** 94:15 273:18
**field** 34:4
**filing** 136:23 142:2
**filled** 24:18 29:3
86:16 247:6
**final** 85:3,7 147:1
151:14 153:5,19
187:24 265:24
273:8
**Finally** 48:11 151:2
204:4 208:5 215:3
283:19
**find** 21:18 28:12
82:8 88:15 124:16
183:7,9 220:13
223:2 224:7
**finding** 160:16
**fine** 184:14 295:11
**finish** 74:12 159:19

**finished** 70:21
143:19
**fire** 284:12,24,25
**fires** 280:21
**first** 6:17,19 7:8
11:24 27:5 27:5
30:5,15 31:8 34:9
39:7 41:17,20 42:8
46:18 50:8,10,20
53:15 55:19 76:2
78:14,23 79:6 85:1,
9 86:23 102:10,11
112:2 125:11 127:9
131:22 133:14,25
134:10 136:11
137:9,10,16 140:14
150:1 152:20 158:8
175:17 193:24
199:10 209:4
211:19 212:15
215:10,15,16,19
220:9 226:25 250:2
252:2 259:3,6
260:19 268:7
282:14,20
**fisherman** 264:9
**fishing** 114:3 146:9,
21 152:17 163:13
253:11
**fit** 39:13 78:25
**five** 13:13 36:15
39:5 43:12,15,18
77:20 114:19
173:11 173:11
189:7 279:19 283:7,
9 285:13 286:13
287:2,17 288:6,20
**five-mile** 43:20 44:7
**five-minute** 184:14
**fixed** 128:3,10,17
**fixed-pitch** 128:19
131:6
**flag** 102:19
**flash** 152:2
**flat** 165:14
**flat-bottomed**
109:11
**flew** 49:20 50:12
166:6,11
**flo** 66:1

**float** 204:23,24
231:21 232:4,14
233:11 234:17
235:14
**floating** 12:20 17:18,
20 18:13 20:7,11,
14 65:20,22,23
66:2 86:24 92:25
94:8,16 95:13
110:24 111:10
134:2 139:5 140:16
145:10 146:11,13,
14 156:25 157:2
194:11 202:16
203:4,12,22 204:5,
12,17 205:2,8
206:24 207:15
208:5 210:19,25
211:5,20 212:10
215:4 231:17
232:20,21 233:2,3,
4,22,24 234:24
235:23 236:7,13
252:20 258:10
266:14,24 269:5,24
270:22 273:9
**floats** 66:5 146:5,18
171:2 202:17
204:13 205:12
210:19 213:8
214:14,18 231:18
232:23 233:9 234:5
234:5,7 235:4,7,10
236:8 238:6 285:22
286:7
**flood** 35:1
**floods** 152:2
**Florida** 284:9
**flotation** 62:25
**fly** 136:9
**fog** 280:3,24 281:2,4,
6,8,14,16,17
286:15 288:11
**folks** 30:11 52:12
53:1,3
**follow** 25:16 25:16
126:8 158:16
198:20 289:20
**following** 25:20
132:24 133:6

145:19 162:22
192:7 212:23
**follows** 7:8
**follow-up** 28:17
86:21 95:12 99:20
111:7 113:8 117:9
124:13,18 126:12,
25 215:20 240:13
248:17
**follow-ups** 175:16
**foot** 39:12 106:10,12
114:11 148:7
170:10 172:19
253:21
**footnoted** 120:10
**footnotes** 121:8
**force** 106:24
**forced** 95:15
**forest** 284:16,18
**forget** 166:4 271:20
**form** 8:14 9:23 18:15,
25 19:8,24 20:8
21:21 28:14 33:10
42:22 46:12,22
77:13,25 78:12,14,
20 80:3 81:2,23
82:17 85:3,8 88:12
89:2,20 90:7,12,22
92:2,18 94:4
116:11 157:12
178:5 180:2 190:25
195:5 199:21 200:4,
17 202:3 203:20
208:22 212:22
213:19 232:3,17
233:6 234:3 236:21
252:18 262:9 263:5,
10,23 265:7,13
267:13 270:7,24
274:13 275:21
277:8 278:18
281:13,20 282:23
288:15 293:4,10
**format** 9:4 17:7
183:12
**formation** 85:4
**formations** 181:14
**formed** 77:22 78:1,4,
6 80:13 82:2,15
85:6 88:11,13 89:1,

16,21 90:3,14 92:9,
10,17,21 95:5
202:10,12
**forming** 40:13,16
41:24 44:21 46:20
47:5,18 48:4,19
57:24 61:24 75:9,
10,20 77:10 79:21,
25 80:25 81:6,12,
12 83:3,8 91:3,10,
19 95:4 117:15
120:3 122:16,20
123:2,6,11 125:1
128:7 129:5,15
130:16 139:24
145:8 147:8 167:4,
8 170:5 185:14
230:6
**forth** 9:4 71:22 80:6
109:14,15 114:5
181:14 221:21
245:11 269:16
**forty** 226:4
**forward** 29:22 129:11
195:21
**forwarded** 25:22 30:1
124:20 149:22
**forwarding** 28:3
**fouling** 250:24
**found** 121:13,16
175:10 226:1,5
**foundation** 195:18,20
232:11
**four** 34:20,22 52:12
80:7 83:10 84:1
158:9 173:2,5,6,25
174:1,2 203:3
282:15 282:15,16,
18,19 283:14
286:21
**Francis** 164:10
**Francisco** 32:17,21
33:2
**Frankly** 263:6
**freely** 278:13
**frequent** 153:12
**frequently** 132:4
147:3 151:20 153:7
205:17 216:15
217:13 237:21

245:8
**Friday** 126:19
**from** 5:19 6:4,23 8:4
14:11,21 28:13
29:23 30:19 34:9
40:3,14,15,20
43:25 44:4 46:18
47:2,11,21 48:12
49:2 51:19 52:2,4,
9,10,20 53:12,24
54:17 55:4,23 56:9
61:17,23 62:16
63:22 64:4,7 71:21
72:5,12 73:20
74:19 75:2 77:9
79:19 82:3 85:9
88:3 89:6 90:10,21
92:6 94:7 98:9,23
99:2 99:2,7,16,23,
23 100:19 100:19
101:1 109:5 110:10
121:25 124:11,14,
17 133:4,23 134:5,
19,25 138:1 143:20
144:2 149:19 152:1
152:1,7,12 154:4
155:1 158:1 166:23
167:3 168:3 170:15
171:5,8 177:8
178:23 181:11
185:1,21,23 186:12
187:2,8 190:20,23
191:1 192:5,7
195:20 198:20
213:16 220:10
222:25 223:18
225:13,20 226:10,
11,13,16 227:1,3
228:18,21,21
230:21 230:11,21
237:9 240:5 245:23
246:11,16,17
247:13 249:20
251:19 255:13
266:18 267:25
269:14 272:15
276:3 277:2,6
280:21 283:13
286:1 286:1,4
**front** 7:12,13 105:22

185:9
**full** 41:10 253:3
  266:17 267:2 269:8
**function** 163:18
  233:11 234:8,11
**fur** 246:2
**furs** 246:3
**further** 71:17 138:11,
  13 142:11 178:25
  181:16 228:2
**furthest** 99:15
**future** 156:2

---

### G

**gage** 41:2 42:7
  170:13
**gages** 38:4 39:5 40:6
**Galveston** 155:15
**Garman** 126:2,3
**gas** 168:16
**gathering** 177:1
**gave** 11:16 56:1,2
  162:15 168:25
  169:2 179:2 238:21
  259:2
**general** 26:6 269:20,
  21 286:22
**generally** 10:5 37:11,
  12,13 58:22 73:1
  253:14 281:17
  288:1
**generated** 64:23
**gentleman** 52:2,3
  53:12 79:18 166:23
  171:5
**gentleman's** 166:25
**George** 57:12,14
  58:13 124:17
  126:10 149:19
  151:16 169:5,7
**get** 11:3 21:21 27:22
  29:9 49:5,16 66:14
  68:5,6,16 75:4
  76:16 93:18 93:18
  120:14 138:11,13
  139:21,25 149:6,7
  161:6,12 165:11
  175:19 177:17
  186:5 193:10

207:13 215:12
229:20 233:14
234:21 249:21
250:2 252:19,22
254:21 254:21
257:2 259:20,22
261:17 274:8 288:1
291:8,9 295:6,14
**gets** 256:17 269:25
**getting** 99:21 142:18
  175:9 179:16
  268:23 283:6
**gist** 185:8
**give** 7:18 60:25
  74:11 100:6 101:3,
  4 128:18 133:25
  137:2 138:25
  141:15 195:12
  256:25 257:5
  258:20 264:1
**given** 8:9 38:8 54:1
  57:7 62:24 71:16
  134:20 137:12,13
  138:21 139:10,13,
  14 140:24 168:23
  223:7,25 270:21
  271:1 272:22
  293:15 294:3
**gives** 160:22
**giving** 101:10 103:2
  138:18
**glean** 190:23
**gleaned** 185:21
**Global** 121:25
**goal** 257:21
**goes** 46:25 124:16
  145:14 175:4 198:9
  225:24 231:7
  292:14
**going** 6:22 9:3 10:10,
  11 11:5 16:13 17:5,
  14 20:18 24:25
  25:3 27:13,22,23
  44:3,13,13 45:15,
  19 46:17 47:9
  49:10 51:16,18
  53:25 54:13,22
  58:24 60:8,11
  65:25 66:18 67:5,
  16 69:7,14 73:2,23,

24 74:8,21 75:4,18
90:17 91:15 94:23
100:6,7 101:17
102:21,25 106:17
112:10 117:16
125:9 126:18
128:13 134:5 140:9
141:15 143:6 156:9
158:5 159:2 175:18
176:4 177:10
179:19 185:7 186:4
193:17,22 197:4,8
201:5 207:13
209:17 220:22
230:17 231:1 232:7
236:3 238:13,20,24
242:15 246:21
247:18 248:11
251:16 252:2,3,4,
15 267:25 268:6
271:6 276:13
277:11 278:23,25
285:25 286:1,6
287:9,20 292:21
**Golden** 164:9
**Gomez** 31:22 32:1
**gone** 213:23
**Gonzalez** 62:14,16,19,
  23
**Good** 25:11 28:12
  78:25 102:6 116:3
  126:9 143:4 158:16
  176:3 240:8 284:25
  289:16 294:4
**goods** 246:11,12
  248:3
**Google** 183:8
**Googled** 182:16
**Googling** 183:3,5
**got** 9:17 11:17 36:4
  51:18 52:7,17,18,
  20,23 55:1 68:20
  69:16,20 70:22
  71:4,20 76:3 79:19
  97:22 106:8,11
  127:5 133:12 166:2
  171:5 178:7 179:1
  181:10 184:22
  215:20 248:16
  253:16,23 259:1

272:14 274:21,22,
22 276:10 277:12
278:16 287:19
290:8
**gotten** 235:21
**govern** 216:22
**government** 6:16
143:24
**government's** 141:21
**graduated** 187:10
**Grande** 10:9,15 12:21
14:2 16:18 17:19,
21 20:3,7,12,16
34:25 36:24 41:11
42:14,18,21 43:2,
10,16 44:1,8 58:4
89:19 96:11,21
99:4,11,17 105:5,9
108:4,25 109:21
110:1,2,19 131:23
132:4 144:19 145:1
147:20 151:16,20,
24 152:6,9 157:1,3,
22 160:12,14
162:24 163:4
171:13 182:4
195:10 196:23
203:6 204:6 208:7
210:7 211:1 215:6
218:11 219:14,22
220:25 221:4 222:4,
15,25 223:18 224:8,
25 225:15,18,20
226:3,7,16 227:24
230:10,11,21 240:5
245:22 246:21
248:22 249:6
250:25 251:20
254:15,18 255:13,
16,19 256:8,13,20,
23 257:21 260:8
264:6 269:22
273:10,14 274:12
275:4,19,25 276:4,
23 277:14,18,23
278:7,14 279:17,24
280:8,13,19 281:5,
10 282:12 283:22
284:6 285:14,17,18
286:13 287:1 288:9,

13,24 289:7 290:12
291:1,3,24 292:2
**grass** 37:21,22
**Gray** 126:5,6
**great** 170:14 216:11
**greater** 35:21 40:3
**greatly** 74:23 266:15
267:5 268:12
268:12 269:10
**Greg** 5:3
**grossly** 123:24
**ground** 245:14
**grounded** 67:21
**grounding** 207:22
**grounds** 61:9 144:5
159:3,5,6
**group** 58:14 233:7
282:1 287:4,6
291:7,11
**groups** 32:5
**grow** 245:15
**growing** 102:9
**growth** 284:20
**Guard** 199:7,15,20
210:3 220:10
223:23 224:17,19
225:7,11,13 226:11,
13 227:8,18 228:3
230:16,19 239:4,15
**guess** 27:11 38:20
142:11 164:4
165:19 175:22
176:4 212:19
224:22 245:15
247:23
**Guide** 228:5 229:6,8,
13 230:5 231:8
231:8
**guy** 72:5
**guys** 29:8 65:13
70:20 72:15 95:22
104:23 176:3 177:9

---

### H

**half** 55:6 114:12
118:24 166:20
172:19 189:4,9,25
257:8,10 275:2
282:25 283:1 291:4

**halfway** 172:8 176:1
**Hall** 266:1,3
**Hampton** 166:9
**hand** 13:18
**handing** 11:21
**handle** 6:22 241:15,
18
**handlers** 176:3
**handling** 276:17
**Hang** 134:8
**hangs** 172:4
**Hannah** 5:22
**happen** 139:4
**happened** 55:10 60:18
61:3 62:2,22 69:13
70:3,6,10,20 75:23
76:3 139:22 167:21
168:20
**happens** 175:4 264:22
277:16,20
**happy** 7:14 21:22
42:1 49:24 198:10
**harbor** 115:18 184:7
186:19
**Harbors** 200:16,20,22,
25
**hard** 66:7 88:8
**harmed** 262:5
**Harrison** 5:21
**has** 6:10 12:21 18:10
46:5 86:24 92:20,
25 93:17 94:8,17
95:13 100:23
126:11 130:7,23
135:12 141:8
147:14 156:1
165:16 172:4
175:15 187:10
190:11 194:21
211:9 215:22 226:1,
5 245:25 253:21
262:11,17,19
263:18 265:3 280:5
281:18
**hasn't** 93:14 215:1
262:12 284:11
**haven't** 6:25 33:1
77:6 253:7 290:6
**having** 7:8 59:1 72:3
88:8 94:22 139:7

142:13 175:22
193:3 222:1 241:24
262:6
**hazard** 73:19 74:18
75:15 78:8 79:4,10,
25 80:14 82:6
85:16 88:17 90:4
92:15 145:11 148:9
190:6 193:6 203:22
207:16,18,20
212:10,17 235:16
258:10,14,16,24
259:7 261:19 262:7,
10,14,14,17,23
263:11 264:4,18,20,
24 265:4,5,11,18,
22 272:2,5,8
**hazardous** 237:24
**hazards** 86:25 88:6,9
111:2,3 172:12
186:20 195:13
213:13
**head** 55:1
**headed** 138:15
**header** 30:6,7
**headset** 65:7
**headsets** 65:1 173:13,
15
**hear** 65:7,10 214:13
**heard** 6:23 30:22
182:13 183:2
239:17,20,24 240:1
245:25
**hearing** 62:25 120:22,
25 121:2,3 134:15,
16 142:3 173:18
**hearings** 14:11
**heart** 289:21
**heat** 176:13
**heavy** 283:23
**height** 38:5 96:15
97:21 145:13
169:14,15 171:3
174:23 267:3
**Hello** 154:24
**help** 11:16 42:9
77:13 186:4 192:9
**helpful** 11:19 42:2,
25 99:25 100:18,25
101:4 161:14,16

202:13 213:10
**here** 5:19 10:12 11:9
12:7,10,12 15:17
17:12 18:8 21:13
23:20 27:24 34:20
35:13 38:7 81:10
82:11 102:8 103:6
104:9 105:12 122:3,
14 124:7 125:12
126:8 127:7 133:19
134:25 139:20
141:10,14,22 142:7,
22 145:19 151:14
154:25 157:6,25
158:18,21 159:1
162:22 175:14
187:25 192:1
193:25 195:22
224:13 226:3
229:21 266:1
267:20 268:11
272:1 273:4 277:2
290:11
**He's** 52:4 59:1 142:7
177:10 267:15
269:11
**Hey** 184:10
**high** 276:13 285:21
292:16
**higher** 169:17 170:9
175:23 290:5
**highlight** 185:6
186:9
**highlighted** 16:14
17:13,14 18:8
86:16 156:23
**highway** 109:11
239:17,20 240:1,6
274:8,20 289:18
**Hind** 164:9
**historic** 164:24
**hit** 161:6 208:1
259:5 265:3 286:5,
6
**Hold** 80:17 109:12
206:22
**Holter** 5:22
**Homeland** 26:7 27:10
**Honduras** 245:11,16
**hone** 218:15 229:17

**honor** 14:5 133:1,2,
22 136:5,10 137:9
138:16,20 139:17
140:1 143:2,3
**hook** 171:5
**hop** 149:1 180:17
**hope** 71:5
**hopped** 148:23 180:11
**hoppers** 245:8
**horse** 231:3
**hotel** 50:14,16 51:1,
4,8,17 76:5,7,8,10
166:2,3,8 167:16
168:3,5,12,15
**hour** 8:20 51:6,7
65:17 152:11,25
153:2 189:25
189:25 238:13
274:9 285:21
**hours** 54:20 55:6
118:7,15,18 119:3,
6,8,10,12,14,17
166:20 181:6,7
219:24 220:6
224:24 283:3,5
**Houston** 52:3,9,21
53:13,24 54:18
61:17,23 156:10
162:6
**Howell** 60:22 132:18,
25
**Howell's** 60:19 74:7
**however** 57:13 218:21
284:8
**huh** 212:21
**hull** 36:19 172:5
**hundred** 99:1 99:1
**Hydrologic** 266:2
**hypothetical** 233:21
236:4,17 247:3,11
257:6 274:25
279:16 280:16
290:22 292:5
**hypothetically**
280:18
**hypotheticals**
256:25

I

**i.e** 95:14 159:22
**Ice** 37:23
**I'd** 95:5
**idea** 62:7 101:3
  158:22 161:2
  247:10 268:24
  280:15
**ideal** 292:6,15,16
**identification** 22:7
**identified** 6:7 26:19
  57:7 77:6 110:8
  186:24 279:19
**identify** 6:2 7:13
  120:18
**identifying** 16:3
  159:9,12,21
**identities** 6:12,15
**Idle** 129:9,10 131:13
  150:11,12
**I'll** 6:17 8:25 12:11
  13:18 53:5 76:21
  102:18 123:20
  133:21,25 137:2
  141:13 158:8
  159:19 183:14
  185:20 193:18
  227:11 230:24
  238:25 251:11
  269:7 271:10
  272:23
**illegally** 179:25
**illness** 8:4
**I'm** 5:13 9:21 10:1,5,
  5,10,11,20 11:5,11,
  21 12:11,13 13:12,
  16,16 15:14 16:13,
  14,24 17:5,14 19:5,
  9,18 20:18 20:18
  22:3,10,10 23:18
  24:25 25:7 26:14
  29:6,7 30:6 32:3
  33:4 34:2,8 37:12,
  13,25 38:19,20,21
  39:16 42:1,23 43:6
  44:3,13 45:1,3,19,
  19,24 46:17 47:7,9,
  9,10 48:11,12,22,
  22 49:10,20,24,25,
  25 50:24 53:7,10,
  25 56:24 57:9

58:24 59:5,12,18,
  22 60:8 66:2,10,18
  72:3,8 73:1,24
  75:18 75:18 76:20
  80:18 86:5 88:7
  90:1,25 91:9,15
  94:23 96:8 97:18
  99:5 100:3,6,7,11
  101:10,23 102:21,
  25 103:2,25 108:9,
  13,13,16 109:23
  112:3,10 113:16
  116:13 117:8
  118:17 120:15,24
  122:24 123:8,17,25
  125:12 126:9
  131:18 134:15
  136:8,13 141:14
  142:8 144:16
  145:19 147:12,23
  148:15,16,16
  149:16 149:16,18
  153:21 154:10
  156:16,23 158:2,5
  159:2 164:19
  171:15 174:1 178:8
  179:10 181:17
  183:15,23 184:23
  185:1,15 189:22
  190:22 192:4 197:4,
  8,18 198:1,10,24
  199:9 207:24
  209:17 212:23
  214:25 214:25
  215:1 217:13,14
  218:21 220:21
  227:1,3,10,21
  228:15 229:12
  230:4 231:1 232:7,
  11 233:19,25 234:4
  235:9 237:2 237:2
  240:11 243:18,20
  244:16 245:4
  246:14,21 247:16,
  18 248:11,16
  249:25 252:2,3,3,
  15 254:9 256:18,25
  259:13,20 261:3,15
  262:11,13 264:15
  265:23 267:1

269:19 271:2
  277:11,24 278:3
  279:16,18 281:6
  282:13 285:18
  286:10 287:6
  289:25 290:15
**image** 100:17 102:13,
  16 103:14,15
  237:16 276:22,24
**images** 84:2 237:16
  282:8
**imaginary** 105:13
**immediate** 223:12
**immediately** 161:3,7
**immigrants** 58:6
**Immigration** 26:15
  125:22 246:18
**impact** 8:1,5 12:19
  16:17 17:20 18:12
  20:15 73:12 93:14
  109:20,25 110:9,18,
  20 157:2 160:24
  194:10 206:2
  263:19 272:3
  275:16,18,24 276:3
  279:23 280:18
  281:9 288:13
  290:21 291:1
**impacted** 92:25 94:8,
  17 95:13 276:7
  278:16 279:4
**impacts** 130:22
**impair** 283:21 284:5
**impaired** 267:11
**impairment** 8:5
**impede** 110:3 249:17
  283:24
**impedes** 207:4
**impedi** 286:16
**implicate** 135:14,25
  140:18
**implicates** 135:9
**important** 49:23 93:3
  94:11 128:6,15
  129:3,14,24 130:15
  147:8 170:16
  217:16
**impressions** 135:24
  140:23
**improvements** 160:25

**inability** 109:4
**inaccurate** 260:5
**inboard** 114:6 130:10
    151:5
**inches** 114:12 171:10,
    11 253:21,22,22
**incident** 207:22
**incidents** 262:15
**inclined** 110:5
**include** 14:5 15:3
    19:11 155:2
**included** 19:15
**includes** 14:25
**including** 63:8
    125:24
**Incorporated** 184:3,5,
    9
**incorrect** 260:7
**increases** 290:9
**independently** 121:9,
    13,16
**indicated** 258:19
**indication** 23:23
    146:4 259:3,8
**individual** 34:13
    39:13 72:9 259:4
**individuals** 5:25
    6:11 36:16 144:9
    186:21,23
**influence** 7:25
    130:24
**influenced** 91:5
**inform** 11:1
**information** 37:8
    41:23 44:18 45:4,7,
    10 46:9,20 47:4,18
    48:3,18 57:23 78:3,
    11,16 79:19 84:20
    88:15,16,21 124:25
    126:19 128:7 129:4,
    14,25 130:16 131:1
    135:16 140:20,22,
    25 142:14 145:7
    147:7 150:4 155:1,
    3,20 157:15,16,20
    159:10,13,22
    160:17 161:7,8,12,
    13,24 167:3 170:4
    177:1 179:2 204:18,
    21 211:9 220:22

    221:19,23 222:10
    223:10,11 224:8
    235:19 236:2
    255:10 258:20
    259:20,23 261:11,
    13,16 263:7 264:16
    293:6
**infrared** 176:13
**infrequently** 132:15
**initial** 11:13 13:15
    82:5,6
**injured** 265:4
**inland** 194:17 196:25
    198:21 201:6,14
    209:15 217:19
    219:9 221:24
    226:19,22 227:8,12,
    18,23 231:4
**inlets** 206:17
**Inn** 166:10
**inside** 36:18
**insist** 66:13
**inspect** 36:20
**inspection** 14:1 27:6,
    7 36:25 82:7 96:13
    98:25 166:5 172:8,
    25
**inspections** 14:18
    27:20 32:4,23
    36:15 44:23 248:2
    292:8
**installation** 93:10
    111:10,11,16 112:7
    271:8 278:22
**installed** 12:20 20:3
    178:15 203:5
    210:25 284:3
**instance** 145:10
    260:13 262:24
    263:25 276:20
**instances** 174:25
    263:3 284:2
**instead** 94:22 109:15
**instream** 40:4
**instruct** 54:1 60:9
    141:24 142:9,22,25
**instructed** 60:5
    61:18 133:20 135:4
    139:1
**instructing** 59:14,18,

    19,22 61:10 135:6
**instruction** 54:7
    134:19 137:20
    225:17
**instructions** 65:4
    224:18 225:17
**instrumentation**
    178:8
**intelligence** 117:25
**intend** 6:11
**interacts** 15:4
**interchangeable**
    232:5
**interest** 149:5
**interesting** 175:10
    182:12
**International** 9:21
    97:9,18,25 99:10,
    16,22 100:20
    101:15 104:16
    198:20 201:11
    209:15 246:6,9,10,
    16 248:2 277:21
**internet** 79:14 141:4
    229:12
**interns** 5:21
**interpret** 269:4,17
**interpreting** 269:19
**interrupt** 116:25
**intertwined** 192:18
**interview** 22:4,17
    271:18
**into** 27:22 49:20
    50:12,15,17 51:1,
    18 53:19 66:14
    75:3 76:17 106:20,
    21,24 109:5 112:22
    130:2 134:5 138:11,
    13 145:15 164:2,6,
    6 166:2,3,8,9,11
    167:16 168:22
    179:1 197:3 205:21
    206:15 207:13
    214:5,7 228:2
    236:8 243:25
    245:14 247:9 248:4
    249:22 264:25
    270:5 277:22
    292:20
**introduce** 5:11

**introduced** 55:25
**introduction** 58:3
**introductory** 11:23
**investigation**
   137:23 138:2,9
   175:6
**involve** 286:15
**involved** 162:15
   246:5
**involving** 162:24
   163:4
**irrespect** 273:3
**island** 245:8
**islands** 245:19
**isn't** 100:18 218:3
   236:16 265:15
   270:4
**isolated** 182:9,10
**issue** 6:19 10:12
   61:1 74:9 98:8
   136:24 139:20
   160:15 222:10
**issued** 225:19
**issues** 135:10 160:10
   284:10
**item** 121:1,2
**its** 6:2 78:17 115:4,
   6 116:4 130:6
   141:24 210:10
   211:8 228:21
   232:14 268:19
   289:10
**It's** 7:23 8:11 25:1,
   2 35:7,17 38:11
   39:12 57:12 59:12
   64:3 65:25 68:10
   71:6 75:11 80:21,
   22 84:21 85:9 94:1
   97:2 98:4,5,15,18,
   20 102:3 105:17
   109:7 113:7 113:7,
   17,19,19,22,25,25
   114:11,12 115:8
   123:18 124:20
   127:25 128:1,3
   129:2,17 130:12
   136:22 138:5
   142:17 147:12,15
   148:8,9,10 153:16,
   25 159:20 162:14,

20 163:18 165:18
170:13 175:2 178:2
178:2 182:17
183:25 184:11
185:7 187:22
187:22 191:11
193:5 195:15 197:3
198:15,17 205:16
209:4 211:25 215:8,
16 217:16,18 218:4,
23 220:10 221:2,6
228:10 229:11,16,
22 230:14,15 231:8
232:12 235:20
236:5 237:21 244:5
251:6 252:23
253:15 254:5
255:18 256:5 258:4
259:25 260:11
262:12,14,17,18,22
263:11,13,16
264:23 266:3
267:14 269:13,14
270:3 271:18 272:8,
13 273:2,24 274:6
276:15 278:22
280:16 283:6
292:24
**itself** 42:9 89:11
165:1 287:13
**I've** 9:17 11:12,14
15:14,16 16:1,24
19:18 24:24 30:22
30:22 32:3 42:19
43:16 47:10 52:7,
17,18,20,23 71:4
114:24 115:18
115:18,25 123:23
124:3 136:7 140:15
153:21 156:8
161:17 175:24
183:20 184:22
186:8 194:16
197:23 201:3
215:20 236:4,8
238:24 240:16
244:8 246:1 246:1
248:16 279:10
292:9

<hr>

**J**

**Jacinta** 155:16
**Jacinto** 5:4 156:9
   161:23
**Jackson** 155:10
**Jacksonville** 155:6
**January** 12:15 13:2
   15:20 16:3,11
   18:19 19:2 20:2
   21:4,9 22:21,23,24
   28:14 81:19
**Jax** 155:4,6
**Jennifer** 33:13,15,18
**jeopardizing** 135:17
**Jeremy** 30:25 31:3
   47:22 266:1,3,4,5,
   12 273:2,3
**Jerry** 30:20 269:1
   270:4,12,21
**jet** 114:24 115:3,7
   116:1,2,6,8,10
   171:25 172:4 172:4
**jet-powered** 114:24
**jets** 114:5
**jetties** 206:17
**jetty** 205:16 206:14,
   15
**job** 110:25 174:16
   209:11
**John** 5:2 7:23 28:12
   124:9 126:10
**Johnathan** 5:12
**johnboat** 42:6,13,17
   43:21,24 44:4,10
   253:13,14,20
   256:23 264:9
   278:12
**johnboats** 253:10,23
   279:21
**John's** 155:10 158:6
   161:11,18
**joined** 5:13,18
**Juan** 32:11,12,14
   46:18
**judge** 60:11,23 61:1
   74:8 116:16 132:18
   142:4
**jump** 198:10 234:22
**jumped** 29:7

**June** 6:3 166:6,12
  167:16,22
**jury** 8:12,13
**Just** 6:9 8:21 9:18
  13:12 14:8 14:8,18
  15:1,6 18:6 22:7
  23:5 25:1 26:4
  28:4 46:16 49:10,
  11 50:1 53:5 56:1
  58:22 59:10 60:17,
  18 61:6,12 69:18
  69:18,19 71:15
  74:6,7,22 75:19
  76:13,20 78:24
  82:10,13,21 83:17
  88:14,25 89:6 91:9
  94:23 95:2 100:1
  101:23 102:1,15
  103:13 105:3
  107:22 108:11
  109:7 111:5 116:9
  123:25 124:1,5
  128:25 130:6,18
  136:6,8 137:1
  138:5 139:18,19
  140:1 147:23
  148:23 149:6
  158:16 162:15,17
  166:1 173:11 174:1
  175:17,19 180:11
  184:1,10 186:24
  193:17 198:12
  198:12 201:3,15
  202:25 206:12
  209:17 211:25
  213:12 214:14,25
  215:1 216:6 225:6
  227:1,11 229:11,12,
  20 230:1,3 231:2,8,
  23 232:5,11 234:7
  237:24 238:19,25
  239:22 244:16
  245:4 251:5 255:3
  257:5,24 259:2
  262:12 264:20
  265:10 267:20
  270:5 271:5,10,15
  273:5 277:11 279:5
  280:16 284:11
  285:6 288:6,12

  289:10 290:2
  291:12,16 295:1
**Justice** 5:17 6:20
  12:3 60:19 133:24

**K**

**Kaitlyn** 25:21 26:3
**Kansas** 166:24
**kayak** 38:7,10,12,16
  254:4,18 255:11
  278:13
**kayaking** 254:7
**Kayaks** 38:3,17,23
  79:18 253:25 254:2
  255:13 279:21
**keep** 25:3 27:23
  44:13 88:5 130:1
  236:3 241:3
**keeps** 45:15 264:25
**kept** 132:14
**key** 205:23
**Kimball** 5:20
**Kimere** 5:20 52:1,7,7,
  17 53:6,8,9,10
**kind** 7:1 35:15 40:7
  57:19 115:3 122:5
  133:12 136:7 138:8
  164:8 211:23 247:6
**Kingsbury** 182:11,16,
  22,25 183:7,9,10,
  17
**knew** 88:20 131:3,5,8,
  12,12,14 150:5,8,
  16,24 151:11
  199:25
**know** 8:22 11:1,16
  19:7 24:19,20 26:9,
  16,18 27:15,21
  29:3 30:23 32:6,25
  34:8 35:8,11,12,17,
  20 36:11,12,22
  38:12,20,21,22,25
  39:9,21,22,23
  40:10,12 41:2,12
  44:6 46:3,6 50:1
  50:1 51:25 54:25
  56:3,11,11 57:18
  57:18 59:7 64:13,
  16 67:23 69:23

  70:19 94:12 100:15
  114:14,15 118:9,22
  120:14 124:1
  125:24 126:2,5
  128:7 129:4,14,25
  130:16 131:1,5,25
  132:7,16 135:8
  136:11 139:19
  141:5 142:17
  144:22 145:4 155:2,
  24 156:10 160:3
  169:22,23 174:19
  175:12 176:17,20
  177:15,24,25 178:8
  182:22 183:13
  186:20 187:19
  190:16 195:14
  197:3 198:17
  204:19 209:24
  211:8,16 215:12
  217:5 217:5,18,18,
  24 234:21 235:11
  238:3 239:7,22
  241:3,4,4 242:22
  244:17 245:1,3
  246:15 247:8 255:4,
  17 256:16,24
  258:19 261:1
  264:16,17 265:2
  270:20 271:3,13,14,
  22,24 273:1 280:10
  281:21 286:1 288:2,
  24 292:22 293:14,
  18,23,25 294:1
  295:8
**knowing** 35:15 258:22
  265:16
**knowledge** 27:9 32:1,
  15,16,21 33:1,6,17,
  25 44:9 63:12
  175:23 178:6
  185:21 190:19,23
**knowledgeable**
  198:14
**known** 27:19 109:14
  191:9 205:9 272:21
**Knudsen** 5:20
**Kristyn** 5:7

**L**

**lady** 52:14
**laid** 140:6,7
**Lake** 152:1,12
**lakes** 216:11 216:11
**land** 171:2
**landed** 50:13
**landmarks** 69:10
**Landon** 5:18 101:7
  166:17,21 167:11
  168:7 173:6
**Lane** 5:8 274:22
  289:22
**language** 214:12,15
**large** 118:21 162:20
  251:6
**larger** 115:8
**last** 13:17 14:5 52:1
  57:13 107:17
  111:21 115:20
  117:5 126:11
  138:25 154:25
  170:8,19 183:16
  187:5 188:5 189:20,
  21 217:1,9,22
  239:24 243:7 244:4
  260:9 280:12
  284:12
**Lastly** 160:5
**late** 78:22 79:7,9,21,
  24 80:13 81:6 82:1
  283:6
**later** 21:10 25:2
  102:19 136:24
  142:1,5 273:23
**latest** 126:18
**law** 5:21 56:20 61:9
  135:5,25 136:12,14
  137:22,25 140:7,18,
  18,21 141:22
  142:14 144:4
  224:14 228:18
  229:9 230:10
**laws** 228:4
**lawyer** 65:11 72:7,9
  174:6
**lawyers** 271:16
**lay** 195:20
**laying** 232:11
**learn** 78:16 176:5

**least** 164:6 253:17
**leave** 168:3,11
  238:25
**leaves** 126:20
**led** 79:10
**left** 60:24 62:2 70:3,
  14,18 71:18 75:23
  76:1 143:21 144:16
  168:5,14 173:12
**legal** 26:5 247:16,21
**length** 35:5,19 38:9
  78:17 170:18
**lengthwise** 236:24
  237:4,6
**less** 104:5 109:16
  130:20 132:9 151:8
  153:12 162:19
  163:17 170:24
  171:4,9 220:8
  225:3 225:3 244:6,
  22 279:2 290:8
**let** 8:21 11:1 26:13
  27:14,23,25 29:14
  35:11 36:22 38:19
  41:18 44:12 45:22,
  23 46:15 56:5,6,7
  60:19 72:17 76:16
  79:7 80:17 87:2
  105:3 119:24
  120:14 133:21
  155:2 159:18
  162:10 173:14
  175:3 183:4,20,25
  185:5,6,8 186:8
  190:2 193:16
  194:22 197:11
  214:14 215:11
  217:7 224:22
  226:18 226:18
  229:20 231:23
  234:15 242:5 257:5
  259:24 261:17
  266:20,21 268:7
  274:24 286:10
  290:10
**let's** 11:3 13:15
  17:25 21:3 22:9
  24:24 30:19 34:1
  36:1 37:24 39:1
  41:15,16 42:2

49:11 51:12 55:18
  60:10 71:5 85:19
  95:10 96:7 99:25
  104:7 106:10
  110:22 116:17
  117:7 125:7 128:25
  144:15 159:18
  186:5 193:24
  209:16 220:14
  225:12 236:3
  237:15 242:23
  243:14,25 247:3,4,
  7,11 252:24 254:13
  257:6 261:3 267:22
  271:4 274:6,25
  277:16 281:1 285:3
  288:4 290:21
  291:15 291:15
  294:7,8
**letter** 121:22
**level** 104:1 132:14
  145:21 146:22,23
  148:20 152:5,18
  234:24 236:13
  241:3 255:24
  292:15
**levels** 44:24 131:19,
  22 132:3,9 144:19,
  25 151:15,16,19,24
  152:9 153:2 256:15
**lie** 214:23
**life** 220:2
**light** 234:14,16,20
**lighted** 258:23
**lights** 235:9,22
  236:4,18 264:1,17,
  20 265:10,18
**like** 10:25 15:24
  21:16,23 34:19
  38:17 42:1 49:23
  56:17,19 57:16,17
  58:23 59:10 61:1
  80:6 84:19 85:16
  103:11 109:11
  114:1 115:3 116:2,
  9 123:22 135:2
  155:1 161:20
  163:13 164:8 171:8
  174:18 175:2
  180:21 186:20

218:3 223:9 231:9
234:7 245:9 246:5
248:3 251:15
254:19,25 259:1
263:20 265:10
269:13 272:10,19
280:16 283:14
284:14,16 291:13,
20 293:19 294:25
295:3
**liked** 174:16
**likely** 50:17 137:24
286:3
**limit** 114:13 204:20
274:9,11
**limited** 21:24
**line** 69:18 73:21
74:19 100:22,23
101:2 101:2 105:13
110:7,11,17 116:17
124:13 141:17
146:9 198:19
200:18 203:1
231:10 287:23
**lined** 287:18 288:7,
19
**lines** 132:12 206:23
**Link** 137:4 154:2
**list** 22:4 32:11
33:14,20 37:24
80:11 81:9,11 82:3,
11 120:21 121:14
190:18 202:25
224:10 225:23
**listed** 47:25 48:2,15
82:19,25 120:16
122:3,13 123:1
221:2 225:21 229:5
**listening** 53:8
**lists** 34:20 82:14
199:2 221:20
**lit** 178:16
**literally** 37:20
268:17
**little** 9:18 11:3
23:14 25:1,2 37:9
58:3 65:17 75:5
110:7 134:12
175:14 181:5 186:5
194:23 209:17

224:22 231:2
249:18 274:24
**living** 108:12 115:9,
12
**loaded** 247:9
**lobby** 51:4,8,17
**Local** 160:10,19,20
162:23 222:18,24
**locate** 212:15
**located** 66:21,24
73:4 75:2 96:21
97:19 98:10 99:4,6,
9,17 105:6 109:4,
24,25 110:19 177:4
179:9,20 194:21
218:11,20 254:8
256:9 277:19
278:15 280:14
281:5 282:9 291:5,
19,24
**location** 5:4 75:24
76:21 78:17 80:5
95:18 96:11 101:13
104:11 105:5 177:3
178:4,21 179:8
180:1 190:11
211:19 248:8
254:11 258:18
**lodged** 9:9
**long** 13:6,8 39:12,14
50:4 51:5 55:4
57:21 60:6 61:8
62:15 65:16 66:20,
23 73:1,8 77:21
89:10 96:25 101:16
103:8 105:21
133:17 133:17
135:18 137:18
137:18 140:11,24
141:19 148:8 164:2
165:6 166:18
169:10 181:2 184:1,
11 189:1,23 219:19
244:1 246:3 265:25
292:10
**longer** 79:18 93:21
236:19 254:5
**longest** 189:5
**look** 17:6 22:9 29:17
37:15 49:22 56:17

71:21 81:9 82:10,
22 83:1 99:25
100:1 103:11
121:20 123:22
135:2 160:2 187:18
188:3 198:18,21
199:15,25 228:4
272:12
**looked** 23:12 58:23
59:10 69:19 80:6
85:14,15,16 122:22
156:17 188:1,6,11
201:2 220:12
271:18 282:8
284:21
**looking** 18:7 23:5
28:21 40:25 45:13
72:13 82:14 112:15
123:24 131:16
199:19 212:15
224:14 277:5
282:13 290:16
**looks** 17:7 34:19
56:19 114:1 291:20
**lost** 289:15
**lot** 107:14 132:10
161:3 162:18
163:12 163:12
175:11,22 177:15
220:8 259:19
280:10 284:9,21
287:3 290:8 292:9
294:3
**lots** 102:8 200:11
**low** 148:11 254:20
257:1
**lower** 169:16 170:8
257:2
**lowest** 255:24 256:2,
6
**Loyola** 52:4
**lunch** 55:1 70:12,17,
21 75:25 85:23
89:6,8,10,11 90:10,
17,21,23
**lunchtime** 62:8 160:8
**Lynk** 5:16 7:15 12:1,
5 20:25 21:11,15
22:18 26:1 28:3,19
29:1,23 30:2 49:3

50:21 51:3,8 52:2,
7,17 54:13 60:21
64:1 76:14,18
78:23 84:12,15,24
89:9,22 90:21
92:12 124:11
126:13,21 127:4,6
133:19,23 137:6,7
139:17 154:12
158:12

**Lynk's** 12:14

---

**M**

---

**made** 5:24 6:10 17:2
23:8 24:3,5,7,8
68:24 87:9,13
99:21 120:7 134:2
175:13 186:8 212:4
213:20 232:9
236:17 255:20
262:19 263:9,14
264:21
**Magistrate** 60:22
74:7 132:25
**mail** 47:15
**mails** 123:19
**maintain** 244:24
274:16 275:13
282:3
**maintained** 225:24
241:1
**maintaining** 242:13
**maintains** 229:2,23
**majority** 120:9
242:20
**make** 6:24 9:18 10:4
14:13 24:6 46:16
49:21,23,25 56:7
59:15 61:5 96:8
102:21,25 104:3
110:24 128:16
161:21 162:9,12
179:24 200:2 206:5,
6 209:13 210:1,12
211:11,24 212:5,16
232:25 234:1,19
245:16 249:19
259:5,18 276:19
292:13,17,22

**makes** 104:5 109:16
163:19 290:7
**makeshift** 153:10
**making** 124:1 176:17
221:25 248:24
260:15 261:9,21
262:1,24 263:18
271:2
**managers** 270:17
**maneuver** 105:15
176:2 250:22 267:5
268:13 287:12
290:1,8
**maneuverability**
128:19 129:18
130:8 131:13 151:2
**maneuverable** 130:9,
13,20 151:5,8
279:3
**maneuvered** 161:17
212:1 252:12
283:24
**maneuvering** 73:22
74:20,23 211:7
214:24
**manner** 76:21
**many** 13:4 25:11
27:20 32:4 36:7,13
38:15 39:6,14,19
43:9 51:21 56:4,6,
21,25 58:6 63:2,6,
15,18 68:20,24
79:23 82:20 83:7
96:10,20 98:9,23
99:9,15 100:18
102:8 107:20 108:1,
5 115:13 116:1
118:7,15,19 152:5
156:8 160:3 165:12
170:23,24 172:24
173:9,22 175:12
176:10 187:11
187:11 189:2,16
194:13,22,24,24
195:1 206:21
208:13 208:13,15,
19 216:19,20 217:1,
9 218:4 247:8
275:8 282:21
283:10 284:11

289:6,8 292:10,11,
12,25 293:2,14
**Maps** 81:17
**March** 154:9
**Maria** 163:23,25
164:1,9,14,25
165:16
**marine** 12:20 65:20,
22 66:1,2 86:24
92:25 94:8,16
95:13 110:24
111:10 145:11
194:11 202:16
203:4,12,22 204:5,
12 205:2,7 206:24
207:15,22 208:5
210:18,25 211:5
212:10 215:4
222:10 231:17
258:10 266:14,24
269:5,24 270:22
273:8
**mariner** 155:22
192:15,19,25 193:3,
9,20,25 196:2,7,12,
15,16 197:5,7,10,
12,23,24 198:2
199:11,23 201:19,
21 202:21,22,23
203:9,11,17 204:1,
7 209:5,21 211:14
212:12 215:16
216:3,5,9,10,12
217:17 220:2
221:25 239:13
241:21 264:5
**mariner/riverman**
215:22
**Mariners** 160:11
160:11,19,20,22
161:1,4 162:23
163:4 196:24
197:21 201:12
216:15 220:22
221:20 222:8,15,18,
25 223:4,6,11,14,
17 259:10
**mariner's** 192:8
**Mario** 31:22,25
**maritime** 126:10

187:9 197:25
199:23 205:9
**mark** 11:5 101:12,19,
23 102:2,19 103:13
235:15
**marked** 11:10,12,22
13:20 15:13,14,16
16:24 17:1 19:19
20:20 21:14 22:12
24:24 28:21 29:10
45:21 47:10 48:24
86:2 100:3 102:24
103:5,14 109:3
123:14,17 153:21,
23 156:16 178:17
183:20 184:21
235:14
**marker** 10:16,21 43:3
43:3,9,25 44:4,5
218:18 219:2
220:25 221:9 222:4,
16 223:1,18 224:8
225:14 226:16
227:24 230:12,22
240:5 245:23
245:23 250:7
**markers** 10:12 10:12
219:6,7
**marking** 13:16 20:19
22:10 29:6 45:19
48:22
**Martinez** 32:17,21
33:3 47:12
**master** 187:11
**mate** 63:20
**material** 118:6
**materials** 120:13
237:24
**matter** 5:2 101:21
154:15 232:5
233:10 234:13
262:17 289:6,7
**Max** 5:22
**maximum** 36:19 94:13,
14 114:15,17
208:11 208:11
282:11
**may** 8:17 9:8 17:3,8
20:5 25:2 26:13
28:18 41:22 71:3

103:12 110:14
111:15 122:3,8,10
136:5 156:20
183:16 188:13,20
229:17 249:17
264:9 278:19
278:19
**maybe** 82:25 96:8
98:12 99:1,21
116:1 189:25
242:13 253:21
269:11 287:8
**mean** 10:15 14:16
15:6,10 66:11
70:13 93:6 97:6
170:14 177:7
208:12 211:16
228:12 241:23
242:2 243:3,20,21
249:10 254:25
258:3 275:17
284:12 293:11
**meaning** 270:10
**means** 94:13 128:3,4,
11 228:10 245:13
246:11 270:6
292:20
**meant** 177:8
**measure** 266:16 267:6
268:13 269:2
**measured** 228:22
268:19
**measurement** 267:8
268:15 269:11,15,
16 270:1
**measurements** 266:15
267:19 268:25
269:8
**measures** 38:4
**measuring** 40:2 42:9
100:25 267:2
**medication** 8:1
**meet** 26:23 51:3
189:13,16
**meeting** 51:5 58:10,
13 73:2 76:13
105:24 154:25
189:23 214:8 290:3
**meetings** 76:9,21
167:18

**meets** 233:15
**Megan** 126:5 126:5
**Melanie** 154:4,11,20,
23,24 158:1,12,16
169:22
**members** 55:21 143:22,
24 144:1 164:23
**men** 72:22
**mention** 19:22 185:12
221:7,9 224:2
266:1
**mentioned** 39:24 57:6
58:13 134:3 160:1
178:18 179:11
221:6 222:18
240:21 241:6
246:23 248:18
265:23 280:24
283:19 284:8
**mentions** 26:8,11
**Mercedes** 34:10,12,15,
20 35:13,16 37:25
38:13,24 39:24
40:15 41:7,11
**mere** 289:10
**merely** 78:7
**message** 60:24
**messed** 113:19
**met** 26:25 50:21
51:17 126:11 169:1
214:1
**metal** 206:21
**meter** 40:3,6
**method** 22:2 153:12
**methodology** 186:16
196:21 210:11
**methods** 209:10
**Mexican** 97:11 105:15
175:13 179:12
247:15 257:14,25
277:22 288:25
**Mexico** 97:13 276:6
277:3
**Mickey** 26:12
**Micky** 25:14 27:15
27:15,17 125:24
125:24
**mid** 74:10
**mid-afternoon** 21:25
**middle** 275:10 277:21

might 136:16,19,20
    139:19 142:16
    245:19 275:24
    280:22
migrant 148:15
migrants 147:2 153:6,
    10,11,12
migration 148:5
Mike 167:2,3,7,11
    168:7 173:6 174:3
    181:11
mile 10:12 10:12,16,
    21 42:7,24 43:3
    43:3,9,25 44:4,5
    218:17 219:2,6,7
    220:25 221:9 222:4,
    16,25 223:18 224:8
    225:14 226:4 226:4,
    16 227:23 230:12,
    22 240:5 245:23
    245:23 257:8,10
    275:2 291:4
miles 42:8 43:9,12,
    13,15 181:15,16
    274:9 275:1 285:21
    291:2,23
military 56:19
Miller 5:7,22
mills 43:18
mind 136:8,19 137:2
    254:21 265:1
    291:20
mine 187:8
minimizes 92:13
minimum 37:17 163:6
    240:14,18,24,25
    241:10 242:9,11,16
    253:19
minute 29:15 100:6
    123:15 165:5
    193:11 197:9
    201:17 286:11
minutes 13:8,14
    27:23 57:22 62:17
    66:22,25 69:7,13,
    19,25 73:9 75:24
    77:20 77:20 89:11
    169:11 189:7
    215:11 230:17
    238:12

misjudgment 213:20
    214:8
mispronouncing
    123:24
misrepresent 185:25
misrepresentation
    185:17
missed 224:19
Mississippi 216:12,
    16,18,22,24 240:22,
    25 244:25
misspoke 98:4 116:13
    117:6
misstatement 191:14,
    16,18
misstates 138:22
mistakenly 259:4
    259:4
mode 128:22 129:1
model 277:17
modifications
    160:25
moment 18:7 21:5
    25:19 34:16 43:23
    71:14 85:20 95:20
    97:24 124:5 213:12
    217:21 233:1,3
Monday 166:6,11
    167:15
money 175:13,15
month 14:5
months 260:11 293:1
moor 205:24
mooring 106:23 146:2
    206:23 258:18
    260:6 278:24
more 14:9 15:1 23:24
    36:17 40:25 52:13
    68:14 75:5 95:15
    98:21 103:7,17,20
    104:1 105:15,21
    110:25 118:24
    119:3,6,8,10,12,14
    128:18 130:21
    140:4 147:15
    160:21 161:8
    162:15 165:7,19
    170:16 187:5
    206:20 217:7
    223:11 225:2,4

226:19 228:12
    231:3 272:10
    280:22 283:17
    292:12,22
morning 51:14 62:9,
    10 126:17 158:16
    167:23
most 50:17 137:24
    160:7 165:24
    172:12 213:22
    220:2 236:24 237:3,
    20 238:2 246:8
    251:5 290:15
Mostly 169:13 233:10
motion 150:21
motor 42:6,13,17
    43:21,24 44:4,10
motors 114:6 114:6
    130:10 151:6
mouth 228:21 228:21
move 22:8 27:14
    37:24 44:12 82:21
    105:9 109:13
    123:21 125:9 128:4
    129:10 150:12
    208:14,16,24
    240:12 248:16
    266:12 285:3,25
Moved 50:17 73:20
    74:19 98:7
movement 147:13
    148:17 205:14
    207:10
moves 97:20
moving 98:8 105:21
    106:3 109:15
    114:11 128:11
    130:6 148:15
    153:19 160:5
    202:15 227:16
    255:13,15,19
much 36:1 54:16 58:8
    67:21 96:5 98:15
    101:5 107:7 115:8
    144:19 146:10
    151:24 158:4
    160:16 175:13,25
    208:13 213:24
    217:13 218:7
    219:17,21 235:3

259:25 274:3 275:3
**multi-hull** 163:16
**multiple** 14:21 53:20
**must** 155:23 194:3
   197:15 198:5
   199:14 201:13
   201:13
**myself** 12:12 52:15
   53:2 63:8 126:21
   173:7 174:4 195:18
   259:20
**mystery** 182:18

---

**N**

---

**name** 5:7 7:21 29:20
   30:15,16,17,20,22
   31:8,10,15,16,18,
   21,23 32:12,18
   33:14 33:14,20,21
   41:7 45:25 46:5
   47:25 48:2,15 52:1
   53:15 57:11,13
   72:3 123:23 154:1
   165:1 166:25 169:1,
   4 184:6 187:4,5
**named** 12:1 26:8,23
   27:1 33:2,24 34:19
   69:11
**names** 27:21 32:6
   33:11 41:4 51:25
   52:6 125:23 159:25
**narrow** 148:10
**narrowest** 98:17
**narrowness** 172:22
**national** 138:8
   220:20 221:18
**natural** 181:13
   225:25
**naturally** 135:10
**nature** 17:18 18:13
   19:12,23 20:2,6,11
   80:16 140:23
   156:25 175:15
**navigability** 16:17
   17:21 18:12 20:15
   79:11 85:12 157:3,
   7,16 193:11 225:18
   228:6,17 239:5
**navigable** 12:21 78:9

79:5 92:14 92:14
93:5,7,12 94:17
109:6 130:19,24
145:12 155:24
156:2 162:10,12,18
163:20 172:13
190:7 193:4,13
194:2,12,14,19
195:3,11,15,17
196:23 197:14,22
198:4,15,15 199:3,
13 200:2,7,9,12,15,
18 204:5 208:6,9,
12,15,19 209:22,25
210:8 215:5 216:24
217:11,18,24
218:12,24 219:2,14,
23 220:7,11 224:11
225:1,8,15 226:2,5,
7,17 227:12,25
228:9,11,13,15,19,
25 229:3,24 230:12,
22 231:4 234:24
239:10,14,14 273:9,
13 276:10 290:12
**navigate** 211:22
   213:13 255:1
   276:18
**navigated** 228:10
   247:14
**navigating** 227:16
**navigation** 73:20
   74:18 75:15 78:9
   79:4 80:1,14 81:1,
   14 82:3,6,16 83:5,
   9 84:10 85:16
   86:25 88:17 89:19
   90:4 92:15 98:20
   145:11 148:9
   160:24 172:12
   178:7 186:20 190:6
   193:5 194:11
   203:22 207:16,19,
   20 212:11,17
   234:25 236:15,20
   242:6 258:10,14,17,
   25 259:7 261:19
   262:7,10 263:12
   272:2,6,9
**navigational** 88:6,9,

18 111:2,3 177:8,
24 178:16 195:13
203:13 204:18,21
206:25 211:6
225:21 233:13
234:20 235:9,16,22
236:4,14,14,18
287:16 291:1 292:2
**near** 257:9 267:7
   268:14 269:3
**necessarily** 78:22
   186:15 206:11
   232:1 237:1,2
**necessary** 19:14
   160:21 161:21
   195:16 209:11
   240:13,14,18
   288:23
**need** 7:3 8:19,20,25
   9:5,9 18:17,21
   22:1 60:11 81:3
   99:19 123:15
   135:15 155:2
   209:12,13 211:8,21
   230:8 245:20 249:5
   253:19 266:16
   281:9 295:16
**needed** 88:20 143:1
**needs** 37:18 126:12,
   16,19 211:13
**negative** 171:10,11
   256:3,4,5,15,16
**negligence** 175:7
**neighborhood** 165:20
**neither** 129:11 270:4
**neutral** 106:20
   129:19,20,21 130:3
   131:13 150:19,20
**never** 6:23 77:18
   80:2 83:17 88:19
   115:10 161:17,19
   183:2 240:16 244:5
   254:21 262:18,19
   279:17
**New** 187:9
**news** 79:23 80:2
   83:10,19,25 84:23
**newspaper** 83:22,24
**Next** 10:9 15:14
   16:24 20:18 29:6

31:15,21 32:11,17
33:14,20 38:1
39:17 40:1,20
41:15 44:14 45:19
46:24,25 47:9,21
48:22 58:13 82:23
106:12,16 108:19,
24 112:23 121:2
123:14,21 124:4
127:5 128:21 129:9,
19 130:8 131:17
132:3 134:24
143:20 144:25
146:20 146:20
149:16 150:11,19
152:8,17 155:14
191:24 191:24
215:9 221:12 222:7
223:3 224:2 230:25
240:9 252:9 258:8
263:25 266:11
268:11 287:18
288:7,21
**nice** 76:13
**niceties** 76:12
**night** 13:17 154:25
176:8,11,12 177:4,
23 178:4,13 258:23
264:14,22 265:12,
17,22,22
**nighttime** 264:6
**nobody** 118:5 146:7
173:12 182:15,17,
17 183:1 265:3,5,
11
**noise** 64:23
**none** 39:10,11 40:18,
19 65:3 123:8
123:8 157:19
162:25 191:1 218:1,
4
**non-highlighted**
86:18
**nonnavigable** 224:5
**Nonresponsive** 14:23
19:4,17 36:21 45:2
75:17 82:9 88:23
89:25 91:8 148:18
235:5 279:9
**Nope** 182:23

**normal** 136:13 241:22,
24 242:2 286:18
288:10 289:2 295:1
**north** 101:18 177:17
181:17 291:2,23
**note** 5:23 6:17 53:5
61:6 139:6 141:2
**noted** 28:15,16
**notes** 271:18
**not-for** 164:5
**nothing** 59:23 141:9
146:7 147:14 157:6
159:15 223:2
267:10 278:1,2
**Notice** 160:11,19,20
222:7,15,18,24
223:3,6,17 251:1
**notices** 160:11,15
161:1,4 162:23
163:3 222:14 223:7,
14,25
**notified** 12:16 16:12
21:6
**notify** 60:25
**Now** 18:6,10,12 22:20
25:2 40:25 41:10
59:8 60:23 86:4
90:9 98:1 102:9
127:12 134:23
135:5 136:7 137:21
139:18 156:14
165:21 184:20
186:8 187:12 197:3
201:24 219:25
227:2 232:22 236:4,
8,23 248:11 251:9
260:2,8 289:25
290:13 291:22
**number** 5:14 30:11
31:3 34:23 35:3,4
36:20 37:24,25
38:1,3,16,23 39:1,
3,20,24 40:1 42:5
51:15 55:23 58:7
75:10 81:17 91:18
92:24 93:22 94:6,7,
9,19 95:10,11
102:22 109:9
110:23 111:6,18,22
112:5,23 114:17

118:21 121:4,11,12,
20,23 159:23
164:12,18 171:2
179:25 196:10,18,
21 197:6,8 201:5,
18 202:9,15 203:3,
6,12,21 204:4,11
205:1 206:24
207:15 208:5 210:5,
13,14,17,24 212:9
215:3 230:25 241:6
258:9 271:20
273:18 276:24
282:11,13 290:15,
16 293:8
**numbers** 101:4 285:8
**numerous** 151:25
194:16

O

**oath** 8:9
**object** 6:8 8:14 9:23
18:15,25 19:4,8,24
20:8 33:10 42:22
46:12,22 53:25
58:24 60:8 77:25
78:20 81:2,23
82:17 85:8 88:12
89:2,20 90:7,12,22
92:2,18 94:4
116:11 144:4 157:9,
12 159:2 178:5
180:2 190:25
199:21 200:4,17
202:3 203:20
204:17 208:22
212:22 213:19
232:3,17 233:6
234:3 236:21
252:18 262:9,20
263:5,10,23 265:7,
13 267:13 270:7,24
274:13 275:21
277:8 278:18
281:13,20 282:23
288:15 293:4,10
**objected** 135:3
**objecting** 61:7
**objection** 5:23 6:10,

25 14:23 19:17
36:21 45:2 59:13
75:17 82:9 88:23
89:24 91:8 133:13
140:2 141:12,23
142:6,8,21,21,23
148:18 195:5 235:5
279:9
**objectionable**
136:23
**objections** 9:8 59:16
140:3
**observation** 141:18
292:7
**observations** 120:7
255:9
**observe** 111:10 135:8
212:16 248:6 281:2
**observed** 68:11
111:11,15 112:7
137:16 138:5 140:9
179:12 213:5 255:6
271:8
**obst** 250:4
**obstacle** 148:8
203:13 205:13
206:25 207:3,4
211:6,12 212:1
234:23 236:12
248:14 249:12,16,
24,25 250:5,8,10,
12,15,18,20 251:4,
8
**obstacles** 250:3
**obstruct** 147:19
236:19 251:19
252:24 254:14,17
255:12,15,19
**obstructed** 207:11
207:11
**obstruction** 81:1,13
82:2,16 83:4,9
84:10 89:18 148:3,
13 157:22 203:14
205:14 207:1,8,9
211:6,13 212:2
237:14 250:1
251:10,13 252:5,12,
16,22 256:12,19,22
257:20 258:3,4

266:13 268:1
**Obstructions** 146:6
226:1 250:2 251:9,
25
**obtain** 167:3 190:19
199:18
**obviously** 133:6
139:21
**occasions** 283:14
**occur** 44:25 134:21
248:3 263:6
**occurred** 44:25 61:7
132:24 144:13
178:20,24,25
214:11
**occurrence** 280:22
**occurs** 242:7
**Ocean** 221:18
**ocean-going** 220:22
**October** 225:19
**off** 17:25 18:1 60:12
70:8 71:7,8,9,11
74:1,3,10 76:5,6,
10 85:19,21 106:22
106:22 116:18,19,
20,22 128:12 130:7
132:19 135:4 143:7,
8 144:17 146:3,20
184:15 206:22
238:14 294:8,10,18
295:20
**offer** 20:17 108:21
**offering** 192:17
197:17 240:8
**office** 5:22 26:6
34:4 52:9,14,21
53:13,24 54:18
55:12 61:18,23
135:1 168:17,18,21
**officer** 138:1 156:4,
9 187:11 196:3
**officers** 21:19 57:10
73:13 75:14 111:9
**official** 270:15
**officials** 143:24
**offload** 248:3
**often** 160:21 217:22
**oftentimes** 110:5
148:13
**Ohio** 244:10 244:10

**oilfield** 245:10
**old** 108:8 219:25
**onboard** 181:5
**once** 55:10 62:22
107:22 115:25
156:13 226:1,5
264:23 264:23
**one** 14:11 18:21
34:15 39:4 39:4,7,
17 40:3,5 41:17,20
42:5 48:15 49:9,11
51:7,8 54:1 55:13
57:10 64:4,10
67:20,22 68:11,23
69:16 74:24 78:25
79:17 95:17 96:2
97:2,9 101:3,4,15
103:7,17 104:2,10,
19 105:4,8,15,16,
18,21 106:12,21,23
107:23 108:3
109:17 110:9,13
115:14,15,20,25
121:19 124:4 133:4,
14 134:3 137:10,17
138:25 144:8
155:22 156:1,11
158:8 160:3,4
170:12 175:5 178:6
179:3,15 182:24
187:5 189:18
199:18 206:20
209:4,8,16 212:25
213:3,5,6,7,17
214:11 225:12,16
226:4 228:9 232:18
235:17 237:10
245:19 246:11
248:17 249:20
253:16 260:18
266:9 268:21
276:13 280:17
282:1,3 284:2,13
289:15
**ones** 163:1 163:1
241:13
**one-way** 96:3 101:21
103:21
**ongoing** 138:2
**online** 83:18 88:15,

20
**only** 43:14 44:21
    56:8 68:23 74:24
    75:18 87:25 90:11,
    19,20 95:17 96:3
    97:2 101:15 104:9,
    10,19 105:4,8,18
    107:23 115:25
    135:13 140:5,14
    148:7,16 153:25
    163:1 172:18 182:8
    193:3,7 202:23
    217:16 218:18
    232:12,14 252:25
    258:4 258:4 260:13
    279:10 293:6
**onto** 172:14 173:11
**open** 216:10
**operate** 37:18,21
    42:14,17,19 43:21,
    24 44:10 74:25
    95:15,16 108:18
    115:24 116:9
    130:23 178:13
    194:2 197:14
    199:12 201:13,14
    216:7,10 217:17
    253:20 259:11
    264:5 265:16
    273:17 273:17,25
    276:8 286:17
    292:19 293:3,8,15
**operated** 115:10
    217:10,23 242:22,
    24 243:1,3,13
    244:6,8,21 245:21
    290:17
**operates** 116:4 216:8,
    9,12 265:11 265:11
**operating** 63:19 96:5
    111:4 116:4 155:23
    156:13 177:3 178:3
    198:4 210:9 214:4,
    24 216:13 217:14
    245:5 264:13
    270:15 273:15
    274:11 278:6
    287:21 290:24
**operation** 73:13
**operations** 42:10

53:16 72:22 108:20
    269:21 272:4
**operator** 64:4,12,15,
    18,21 65:5,6,11
    69:9 110:13 128:5
    172:2 173:8 174:3,
    5,5 176:6,7 179:24
    180:4,23 214:1
    259:21 274:4
**operators** 21:20
    63:17,18 69:1
    106:4 179:3,15
    182:21 213:17
    214:21 260:19
**opine** 209:3
**opinion** 7:15 42:16
    78:5,12,14 79:25
    80:13,25 81:7,12,
    13 82:2,6,15 83:4,
    8 85:6,7 88:10,19
    89:1,3,16,21 90:3,
    11,14,15,15,17,20
    91:13,24,25 92:4,5,
    9,10,16,20 93:24
    94:2 95:3,4 108:21,
    23 129:15 130:16
    172:2 179:17
    190:14 193:7,20
    197:5,17 213:25
    230:9,15 233:23
    239:8 240:4,8,15,
    18 249:9,11 251:12
    252:17 262:7,16,22
    263:21 272:1 273:5
    287:14 289:12
**opinions** 12:19 20:17
    40:13,16 41:24
    44:19,22 45:17
    46:10,21 47:5,19
    48:4,20 57:25
    58:25 59:3 61:25
    75:9,11,12,21
    77:10,12,13,22
    78:1,4 79:21 80:3
    85:3,4 88:13,14
    91:3,5,6,6,11,19,
    20,21 93:23 94:20,
    21 95:5 117:11,16,
    20 120:3 122:16,20
    123:3,7,12 125:2

128:7 129:5 135:13
    136:1,2 139:24
    141:9 145:8 147:8
    153:17 167:4,8
    170:6 180:25 185:2,
    14 186:16 190:4
    192:17,20,24 193:2
    195:12 198:9
    207:14 215:15
    218:22 219:5,13
    230:7 261:18
    263:20 272:17
**opportunity** 56:2
    71:21 84:19 137:3
**opposing** 60:21
**opposite** 289:14
**oral** 9:5
**orange** 202:16 204:12
    210:17,18 231:16
    232:13,20 233:1,2,
    22 235:23
**order** 6:2,3,14 81:3
    108:18 122:6 130:4
    166:4 194:18
    195:12 273:16
    278:5
**ordinarily** 140:19
**orient** 96:7
**original** 11:6 13:25
    70:14 154:8 164:11
**originally** 23:13
    70:18 84:12 171:25
    173:2 230:18
**other** 15:3 21:20
    23:16 43:17 44:7,9
    51:7 53:21 56:8,22,
    25 65:4 67:18
    68:11 70:17 75:1,
    14 76:1,25 96:4
    97:10 105:23,24
    106:2,13,17,24,25
    107:3 108:2 108:2,
    10,19,24 110:16,18,
    20 120:6,10 122:13,
    14 123:1 125:23
    128:12 130:14,21
    131:7 136:18 140:3,
    4 155:17 166:21
    167:11,18 169:17,
    19 172:3,7,11,15

178:1 185:13,22
186:2,21,22,23,24
190:18 190:18,23
191:1,2,8,11,12
199:4 205:17 206:6,
12,21 207:22 208:4
214:10,11,16,17
219:5 220:5 225:11
226:13,15 228:10
230:18 237:13
246:17 247:23
249:21 253:7,10
270:14 275:8,9
277:13 278:5,20
284:10 287:19,20,
21,25 288:8,22
290:3 292:9,10,11
**others** 42:10 52:5
118:5 134:6 215:1
**otherwise** 10:6,18,24
**ought** 135:20
**ourselves** 21:3
**out** 6:12,20,22,25
7:1 19:10 29:3
39:15 43:13 63:11
69:18 71:20 100:9
126:11,18,24,25
129:8 140:7 143:21
146:9,10,17 148:23
149:1 161:4,7
165:13 171:5 176:8,
10,11 177:11
180:11,17 196:14
205:20 206:15
209:13 210:3
211:10 220:19
237:24 247:24
258:9 264:21
291:12
**outboard** 114:5
130:10 151:6
**outside** 148:6
**over** 19:1 50:23
65:17 72:12 110:4,
14,16 115:19,20
136:20 141:5 149:8,
13 161:7 171:6
172:10,20 175:12,
19,20 180:5 181:6,
25 207:7 213:21,23

223:8,10 239:22
247:14 257:14
261:21 266:19
267:4,22,25 268:23
**overall** 232:15
**overlooked** 71:20
73:7
**overlooking** 72:13
**overriding** 135:16
**overrule** 140:2
142:23
**overruling** 141:22
142:8
**oversight** 215:23
**overtaking** 105:23
**overview** 56:1
**own** 120:11 202:10,12
251:18

---

**P**

**p.m** 132:20 143:10
143:10,12 184:17
184:17 238:16
238:16 295:22
**pace** 125:10
**page** 11:11 17:11
19:19 21:14 25:8
28:1 29:14 30:8
34:2 45:4 46:19
47:1,11,21 48:11
80:8,9,19,23 81:15
100:3 101:13
120:12 121:2,4,21
125:12 144:16
147:4 149:18 154:1,
10 156:23 158:2,15
161:9 184:2,23
185:10 192:5 192:5
215:9,12,13 227:4,
5 231:13 237:15,16
240:9 248:10
251:22 258:8
265:23 271:5,6
276:21 277:1 285:3,
7
**pages** 45:14 153:25
**paper** 11:16,17,21
13:19
**paradigmatic** 136:14

**paragraph** 11:24
12:10 41:24 158:23
185:1,3,5,11,12
227:5 265:24 271:5
**parallel** 97:8 237:7
238:1
**parameters** 116:4
**Park** 254:4
**Parks** 227:14 228:5
229:6,8,13 231:6
**part** 46:4 81:17
86:18 93:9 126:15
130:12 134:3
140:15 152:20
200:20 224:16
227:5 246:13
282:21 283:10,18
**participants** 76:13
**particular** 129:18
139:5 160:13
210:21 277:9,12
284:7
**particularly** 109:10
141:8 209:12 238:1
249:19 290:4
**parties** 6:4
**parts** 122:24 201:4
205:6
**party** 55:21 56:9,22,
25 63:22 64:7
70:14,17 72:2 76:1
144:1
**Paso** 45:11
**Pass** 12:20 14:3
21:20 43:18 50:5,7
51:20 54:20 55:5,
11 58:4 63:23 97:3
101:16 113:9
135:11 139:5
160:13 163:2
166:10,12,15,19,22
167:13,15 168:18,
21 177:19 196:22
203:5 208:20 210:7
211:1 212:3 221:4,
7 257:9,24 258:4,
21 293:22 294:15
**passage** 222:1 252:6
**passengers** 36:20
69:2 164:23

passing 69:11 105:23
    276:5
past 67:1,4 95:25
    145:14 146:1
    171:19,21 175:8
    182:4 194:14 195:1
    207:12 257:10
    261:22 268:21
    275:2,4 291:4
    292:17
pasted 126:15
path 178:17 265:1,6
    289:16
paths 53:21
patience 158:5
Patrol 14:17,19,22,
    25 15:7 25:14
    26:11 127:21
    133:15 177:2
    246:18
patrols 176:18,19
pause 132:21 294:12
peace 138:1
peer 186:14 187:2
    206:22
peers 185:12,19,22
    186:6,10,22,24
    188:20 190:3
pen 101:8,10 102:20
Pena 33:13,15,18
pending 8:25
peop 56:21
people 14:21 27:20
    31:4 32:4,8 36:7,
    13 38:15 39:6,15,
    19 44:23 51:16,21,
    24,24 55:13,23
    56:4,6,8,14,25
    57:4 58:6,7 63:6,
    10,15 64:7 68:24
    114:17 137:25
    147:13,24 148:3,5
    161:8 165:12,13
    169:17,19,19
    172:24 173:5,6,8,9,
    22 174:1,2 175:14
    179:25 180:5 265:2
    270:14 272:4,21
    289:17
per 13:14 72:20

154:24 232:10
    274:9
Perfect 11:2 95:7
perform 184:7 267:12
performing 110:25
    266:25 269:6
    270:23
perhaps 82:5 87:22
    102:5 175:25
    200:20 254:1 287:5
period 73:10 84:11
    85:4
Perpendicular
    237:12,13
person 30:24 34:15,
    19 40:24 55:24
    55:24 56:1 63:19
    64:14 86:17 88:3,
    20 111:14 112:6
    147:19 152:16
    169:2 170:15
    216:11,12 250:18
    286:3
personal 34:25 44:9
    62:25 290:18 292:7
personally 139:4,7
    141:3 159:9,12,20,
    21 163:22 212:19
    213:16 214:16
    254:9 271:24
personnel 14:3 56:10
    59:1 63:21 63:21
    64:4 134:5 261:25
    271:7,13 272:15
persons 5:10 34:16
    159:25
perspective 71:22
    177:9 192:9
pertaining 158:6
    160:12
pertinent 201:4
PFDs 62:25
Philadelphia 161:5
    186:12 187:3
phone 12:14,25 13:6,
    11,14 134:12
    159:22 289:20
photograph 100:10,11,
    13 277:10,12
photographs 71:22,23

72:1 79:15 82:7
    85:15 96:14 120:9
    175:24 190:15
photos 81:17 120:6
    121:3
phrase 274:24
physically 247:19,20
pick 143:15 144:15
picked 166:14,16
picture 218:15
pictures 72:12
piece 46:15,16 47:10
    47:10 128:6 129:3,
    24 130:15 242:23
    242:23 274:7 274:7
pier 205:19,20,23
pile 206:12
pilings 206:20
pilot 115:18 163:7,
    11 184:7 186:12,19
    187:11 198:22
    244:8 246:8
piloted 156:4,5
    163:22 164:3,4,16,
    21 243:4,7,14,15
    244:2
piloting 164:7
Pilots 221:13,15,16
    222:3
pipes 206:21
Pitch 127:16,22,23,
    24 128:3,5,10,17,
    18 131:4,5 150:2
place 14:12 65:3,8
    71:19 88:6 109:12
    130:4 175:6,12
    198:6 254:7 284:24,
    25 292:8
placement 262:6
    275:5
places 43:17 171:3
    221:24 242:12
plainly 231:24
plan 222:1
plane 114:12 128:1
planning 184:11
    194:1 197:14
    199:12
plants 237:22,25
plate 36:20

plates 36:18 37:16
please 5:10 7:4
    18:22 21:18,24
    23:16 25:13 28:12
    48:10 74:14 101:20
    103:11 111:21
    124:16 126:17,20
    155:2 156:19
    190:21 262:21
pleasure 161:18
plural 191:12
Plus 53:2,3 63:17
    72:2
point 15:9 51:22
    63:7,13 64:3 69:7
    71:23 72:12,19
    78:4 98:17,23
    99:10,13,15 135:3
    149:1 160:4,14
    167:25 176:24
    176:24 177:2
    195:20 208:3
    224:13 255:24
    256:2,6
pointed 100:9 176:10,
    11
pointing 177:10
points 140:14 170:13
pole 40:5 268:19
poles 206:20
poorly 130:12
popping 264:25
port 246:15,19
    247:23
portion 16:14 40:14
    44:19 45:14 86:16
    142:15 158:17
    173:19 182:8
    219:22 232:14,21
    233:2 260:2,3
    268:11 272:11
    274:12
portions 40:15
    159:16 233:22
    244:10
portrayed 221:19
ports 156:15 220:23
    246:16
posed 192:1
position 12:12

278:24
positioning 260:6
possible 25:20 172:9
    180:10 182:15
    292:17
possibly 41:22 65:4
    275:12
post 155:8,15 161:10,
    22,25 162:2,5
post-dredging 241:7,
    11,15
potential 279:7
    285:1 287:3 292:21
potentially 36:16
    68:8 145:17 146:25
    147:1,11 172:6
    233:13 278:21
    281:25
power 237:22,25
powered 253:18
PowerPoint 169:24
practically 279:18
pre 155:8,15
preceding 50:3
precise 100:23 101:4
precisely 24:2
    119:23 246:14
precursor 223:9
preliminary 11:4
    88:14 89:3,21
    90:11,14,17,20
preparation 15:23
    118:1 185:24
    189:14,17,24
preparing 118:13
presence 54:17 138:6
    211:8 286:25
    289:10
present 5:10 32:22,
    24 55:19,22 56:4,8
    57:1 63:10 71:25
    72:11 166:21
    167:12 168:5
    270:25 276:7
    290:25
presentation 57:21,
    24 58:2 169:24
    170:2,5
presented 41:9 190:6
presenting 292:5

Presently 249:4,15
    257:23 258:7
Presidio 41:3,5 45:8
presumably 272:20
presume 270:25
pretty 58:8 147:12
    176:5 217:13 226:8
    235:3 241:22,24
prevent 110:10 138:1
    205:14 234:9
    266:18 267:4,22,24
    269:9 276:3
previous 169:3
    254:19 262:15
previously 5:24
    100:11 210:12
    217:24 254:3
Primarily 19:13 80:4
    82:7 85:15 237:5
printed 223:10
prior 14:8 17:6 49:6
    78:11 84:24 89:15
    90:17,23 93:10
    95:6 122:8,11
    124:22 131:3
    132:16 134:4
    142:18 150:16,25
    151:12 188:20
    191:22 194:25
    231:10 238:21
    271:4 275:13
privacy 159:3,5,5,6
private 164:12
privilege 59:13 61:5,
    10 74:9 133:20
    135:6,17,25 136:13,
    15,21 137:19,22,25
    138:3,14 140:5,8,
    18,19 141:11
    141:11,22 144:5
pro 164:7
probably 52:4 53:8
    98:15 99:13 137:24
    181:4,14 244:9
    245:15 253:16
    288:16,17 295:9
problem 66:9 262:11,
    12
problematic 276:14
problems 72:3

Procedure 6:6
proceed 60:21 93:8
proceeded 69:20
proceeding 291:6,7
proceedings 132:24
process 91:7 197:20
  202:5 218:8 219:12
processing 55:15
produce 208:11
produced 13:17 188:7,
  13
product 54:2 59:3,6
professional 160:22
  192:8,15,19,25
  193:3,8,20,25
  196:1,12,15,16,24
  197:5,7,10,12,24
  198:2 199:11,22
  201:12,19,21
  202:21,22,23 203:9,
  11,17 204:1,7
  209:21 212:12
  215:16 216:3,15
  239:12
professor 52:4,10,23
  197:25
profit 164:6
progress 110:4
  111:13 195:21
  207:5 249:18
  271:10
project 245:2
pronunciation 53:5
proofread 118:5
propelled 114:5
  116:1
Propeller 127:16,22,
  23,24,25 130:2
  131:4 150:1 250:24
propellers 127:17
  128:20 129:20
  150:20
propels 128:2
proper 57:9 165:1
properly 274:17
proposed 21:18
propulsion 115:5,22
  127:10,15 130:7
protection 54:1 63:1
  173:18 173:18

provide 6:11 9:5
  120:2 122:19 123:6
  126:21 167:7 192:7
  196:2 220:21
  221:18,23
provided 7:15,16
  20:5 28:14,24,25
  120:5,20,23 122:15
  123:1 170:2,5
  187:25 261:14
  270:18 290:3
providing 197:4
provision 6:5
proximity 109:17
  282:2 287:9
prudent 196:7 209:5
  211:14 213:22
public 227:8,15,17,
  18
publications 146:5
  199:4
publicly 142:18
published 79:16
  83:20 160:21
  188:17 221:17
  224:17 229:16
pull 68:1
pulled 268:18
pulls 127:25 146:20
purpose 233:15 236:5,
  19
purposes 22:7 65:25
  66:17 123:11 218:9
  219:13 233:21
  236:19 247:11
  286:21 290:21
pursuant 6:14
push 278:25
put 62:24 69:18 70:9
  106:10 130:2 171:6
  220:19 223:22
  233:14 234:14,16,
  19 235:9,18,22,22
  236:4 288:21
putting 205:5 236:18

---

## Q

qualified 108:21
qualify 251:16

quality 266:15 267:5,
  18 268:12 269:10
question 8:25 9:1,10
  11:4 43:4,6 54:4,6,
  11 61:8,14 71:3
  74:15 81:25 85:10
  86:18,23 88:24
  91:18 93:3 94:11,
  23 95:8,11 99:5,19,
  20 103:11,12,13
  104:7,10 109:8
  110:23 111:7,21
  112:5,24,25 113:6,
  8 117:1 121:19
  127:9 131:9,22
  132:1,3,8,17
  133:17 134:24
  134:24 135:20,21
  136:12,18 137:15
  144:6,20,23 145:2,
  5 147:1 150:5,9,17,
  25 151:12,15 152:7,
  8 153:5 182:12,13
  183:11 184:10
  185:25 190:21
  191:15 191:15
  193:24 194:6,9
  196:10,11,18 197:3,
  6,16 198:13 199:10
  201:5,18,21,25
  202:9 202:9,15,17,
  19,20 203:3,6,9,12,
  14,16,21,23,25
  204:4,7,11 205:1
  206:24 208:7
  209:20 211:2,5
  212:23 215:7,11,15,
  17,20 217:8 226:18
  230:18,25 231:11,
  24 232:1,2,25
  235:6,11 238:21
  240:13 241:5 242:1
  246:22 248:12
  251:18 252:3
  256:24 258:9 258:9
  259:13 262:21
  266:23 268:7,8
  270:8,11,13,13,21
  271:23 272:5,6
  273:2,8 279:14

285:6 288:18
290:11
**question-and-answer**
9:4
**questioning** 141:17
203:1 231:10
**questions** 9:5,13
11:4 21:19 22:4,17,
21 23:9,20,24,25
24:3,9,15,19 25:16,
17,18 28:13,17
34:14 56:3 58:5,9
60:2 61:19 66:18
72:21,23 73:11
86:9,12,21 87:17,
19 91:16 92:7,9
95:12 100:8 111:19
117:9 119:24
124:14,18 126:12,
14,16,25 127:3,7
131:14 133:2,6,9,
12 134:1,10,18
135:7,23 136:8
137:1,4,10 183:14
190:10 192:1,7,21
202:11 202:11
209:2 231:9 239:2
248:17 266:9 271:1
272:22 276:22
294:4,17
**quick** 102:18 184:10
**quickly** 129:6 145:1,
16 152:9,10,18
161:8 174:24
174:24 286:3
**quintessential**
137:21
**quite** 163:14 174:20
176:14 177:20
177:20 206:18
232:6 275:12
**quote** 266:21 267:2
270:6 271:7
**quoted** 267:10
**quote-unquote** 141:5

**R**

**radio** 161:7 223:8,10
**rafts** 153:10,11

**rain** 132:11 280:2,13,
17,20 286:15
288:11
**rains** 152:2
**raised** 133:13
**ramp** 62:5,13,14,16,
19,23 69:16,21
70:5,7 71:18
168:24 177:15
181:11,12
**ramps** 113:9
**rank** 57:19
**rapids** 177:15,16
181:20,25 182:1,4,
7
**rate** 106:3 152:1
276:13 285:21
**rather** 75:4 79:3
272:7 286:2
**raw** 21:21
**razor** 73:6
**reach** 10:20 22:1
43:14,25 209:13
210:3
**reached** 6:25
**reaching** 6:20 126:24
126:24
**read** 12:22 15:21
16:13,19 17:14,15,
21 18:7 21:16,17
25:9 28:4,10 34:4,
23 38:1 39:2,3
40:1 41:17,20 42:1
79:17,24 84:1
86:23 88:25 90:2
92:24 94:7 95:10
110:23 111:6
112:25 113:7
126:22 127:17
128:23 129:11,21
130:10,14 139:1
152:12 153:13
155:11,18 157:3
158:9 160:17 177:9
185:6,20 192:10
194:3 197:1 198:11
200:25 201:3 207:1
215:19,25 227:11
246:1 246:1 252:2,
7,12 266:21 267:8

268:15 269:23
295:18
**readdress** 71:3
**reading** 12:11,13
16:15 19:9 22:3
26:4 48:10 126:9
192:4 227:1,3
267:1 270:5 273:4
**ready** 175:9 179:16
**real** 102:18 163:9
**realize** 102:6
**really** 80:2 104:8
136:3 147:10,14
148:4 162:7 165:10
170:14 176:3 177:9
182:19 217:16
229:20 232:10,25
266:20 281:9 294:3
**reason** 6:8 61:13
130:25 136:3
217:16 259:6
289:21
**reasonable** 165:17
209:5 264:5
**reasonably** 135:15
196:7 211:14
**reasons** 259:2
**Rebecca** 30:15 31:9,
12 47:2 48:12
**recall** 12:3 18:20
23:5 24:2 27:16
33:11 34:18 44:1
51:25 52:1,6,16
54:23 55:2 61:20
63:25 64:2 65:4
71:16 76:14 77:7
83:10,13 87:6 90:5
98:3 103:21,23
104:25 117:4
122:11,18 123:9
126:24 134:24
135:19 138:20
139:7,15 156:17
159:24 160:2
164:18,19 169:1,3,
6 170:10,21 180:12
201:21 218:2,4
223:15 231:21
238:22 241:8,11
248:14,22,24

260:21 283:8
284:23
**recalled** 135:1
**receive** 25:4,6 40:20
122:2,6 160:9
161:8,24
**received** 14:5,8
25:10 29:23 46:3,7
57:24 58:19 78:3
81:18,21 86:8,11
88:2 94:19 143:20
149:18
**receiving** 122:12
**recent** 124:17
**recently** 165:24
224:1
**Recess** 18:3 60:14
85:23 143:10
184:17 238:16
**recipient** 46:1,5
47:14 48:1
**recipients** 48:16
**recognize** 12:5 13:22
15:19 22:15 29:15
30:20 31:9,16,22
32:12,18 33:14,21
41:4,7 123:19
169:7
**recollection** 13:13
71:17 87:24 185:15
**record** 5:6,11,23 6:7,
10 7:22 17:25 18:1,
5 25:7 28:11 38:2
39:3 60:12,16,17
61:4,12 71:7,8,9,
11,12 74:1,3,5,6
85:19,21,25 96:8
113:24 116:18,19,
20,22,23 128:25
132:19,22 135:5
138:24 143:7,8,12
184:15,19 223:24
238:14,18 260:21
262:14 294:8,10,14,
19 295:20
**records** 49:22 261:20
**recount** 60:18
**recovered** 178:22
179:7
**recreation** 193:13

**recreational** 160:23
161:19 192:8,15,19
193:1,9,21 196:13,
19 197:6 201:13,15,
19 202:1,4,21
203:10,17 204:2,8
212:13 217:17
253:11 259:21
260:25 261:3
264:13
**rectangular** 253:15
**redacted** 158:17,20,
23 159:1,3,3,16,21
160:1
**reduce** 79:5 88:17
93:5,7 140:20
206:2 274:23 276:9
282:4 286:17,25
290:4
**reduced** 74:24 95:16
130:19 273:18
276:18,19 281:23
287:11,15,16 290:6
**reduces** 78:9 92:13
104:1 145:12
281:14,16 291:10
**reduction** 93:12
172:13 281:18
**refer** 10:9 26:13
66:6,18
**reference** 121:5
155:6
**referenced** 38:7
**references** 10:4
121:7
**referred** 121:8 201:2
228:24
**referring** 9:21 10:1,
10,11,21 26:16
66:2 77:15
**reflect** 119:21
**refusing** 54:10 60:1
**regarding** 16:17
17:18 44:22 141:4,
18,20 156:24 160:9
**regardless** 178:14
262:23 263:14,16
**regular** 281:8 288:10
289:2
**Regulations** 121:11

215:24 216:21
221:20
**reinforced** 91:6,20
109:8
**relate** 135:23
**related** 59:2 167:19
**relates** 33:8 45:5,8,
11 89:17 139:20
150:1,19 151:2,14
157:20,21 197:5
200:15 210:15
211:2 212:10 215:3,
7 219:6 273:13
285:11 288:18
**relating** 41:17,20
**relation** 58:16,19
104:16 177:25
211:21 240:2
**relatively** 189:11
**relaxed** 69:19
**relaxing** 70:3,4
**release** 152:1
**released** 45:1
**releases** 152:12
**relevance** 140:3
142:20,21 232:13,
14 293:13
**relevant** 126:15
180:24 263:8
**relied** 24:21 31:6
44:21 45:3,16 46:8
75:10 77:9 79:24
80:2,12,25 81:6,11
91:3,10,14 121:17
122:16 123:2
138:12,17 139:24
142:9,24 167:4,8
180:24 185:13
225:6 226:15
230:20
**rely** 40:16 41:13,14,
23 42:12 44:13,18
45:7,10 46:8,19
47:4,17 48:3,18
57:23 61:22 75:8,
12,20 78:12 82:1
91:18,23 94:18
95:3 124:25 153:16
170:4 230:6 272:3
**relying** 93:21,22

141:24 271:25
**remains** 226:2,6,7
**remember** 26:15 32:12
  37:5 72:5 75:7
  83:12,19 117:1
  158:25 159:25
  166:25 179:3
**Remote** 39:1,4,7,20
**removed** 87:19
**render** 12:19
**rendering** 261:18
**renders** 230:10,11
**rented** 79:18
**repeat** 74:14 99:5
  111:20 190:21
  262:21
**replica** 164:1 165:2,
  3,11
**report** 7:15 11:7,13
  12:18 13:16,18,25
  14:4,9,12 15:23
  19:11 19:11,13,16
  24:22 75:12 80:9
  82:4 100:1 101:13
  111:12 117:8,10,14,
  23 118:1,4,8,13,20
  119:1,4,22 120:13,
  17,19 121:8,16
  123:2 133:5,7,11
  135:13 154:15
  155:2 183:22,23
  184:1,12,22 185:10,
  16,24 186:14
  187:17,22 188:2,4,
  7,10,13,16 191:6,9,
  19,23,25 192:4,6,6,
  6 215:10 218:8
  219:11 222:8 227:3,
  4 228:2 231:14
  237:15,17 240:10
  248:11,21 251:22
  258:3,8 260:3
  261:1,2 265:24
  271:8 272:9,11
  273:4 276:22 285:9
**reported** 231:8 266:7,
  8
**reporter** 74:13
**reports** 222:19
  260:23 261:8

**represent** 272:23
  285:12 286:16
  289:5 292:1
**representatives**
  28:16
**represented** 165:15
**represents** 289:11
**request** 154:25
  162:22
**requested** 49:15
**requesting** 163:1
**require** 163:7 276:3
**required** 110:25
  162:9,11
**requires** 6:6 165:16
  259:10 274:16
**research** 78:2,24
  79:9,12 85:1
  120:10 121:9
  164:13 185:23
  209:11 218:22
  220:11 224:7 225:6,
  13 259:19
**researching** 220:6
  224:24
**reservoir** 42:8,9
**resolve** 7:2 74:9
  141:16
**resource** 220:9,13
**resources** 79:13
  121:5,14 210:1,2
  221:16,21
**respect** 43:20 141:17
  142:13 196:10
  197:8,16 210:5
**respond** 73:14 125:6
  126:20 136:5 137:3
  176:17 274:17
**responded** 12:14
  34:13 151:17,20
  158:11 163:2
**response** 25:5,9 88:3
  113:7 139:18
  151:25 157:25
  267:1 269:7,20,21
  273:4
**responses** 25:12
  28:25 272:14
**rest** 81:9 111:3
**restaurant** 70:12

**restrict** 205:13
  283:25
**restricted** 88:8
  111:4 280:2
**restriction** 241:19
**restrictive** 130:21
**restricts** 98:20
**result** 93:25
**retained** 12:16 16:8,
  12,21 21:6 30:23
  187:13 188:25
**retains** 228:19
**retract** 26:13
**return** 245:17
**returned** 70:5,6 89:6
  90:9,21 181:15
  271:16
**returning** 181:9
**reverse** 106:21
  128:21,22 129:2,3,
  5 131:9,11 150:7
  290:1
**review** 12:16 14:9
  21:18 78:15 83:8
  84:20 88:21 118:22
  124:22 154:24
  162:23 163:3
  186:14 187:17
**reviewed** 15:22 80:16,
  24 83:3,17 120:6
  122:22 185:16
  255:10
**reviewing** 14:7
**Richter** 187:4,7,20,
  24 188:3,6,17,19
  191:4,5
**ridden** 108:6 115:13
**ride** 36:7,13,25
  38:15 39:6,15,19
  55:8 65:16,19
  256:8
**riding** 36:16
**right** 7:3 11:15 16:4
  17:5,8 18:6,8,10
  20:21 21:7 22:22
  23:2 25:23 30:4,11,
  13 31:4,6 33:9
  34:10 36:4,5 39:17
  43:6 47:17 52:11,
  24 58:14 59:8

60:23 69:8 72:13
73:5 76:24 81:1,19,
22 84:10 86:4,13,
18 87:3,13,17,20
89:5,6,13,19 90:21
91:4 92:6,17 93:15
94:3 95:19,23
97:16 99:6 102:18
104:14,17 106:2,6,
8 110:11 112:1,14
113:9,12 114:8
117:3 119:22
121:25 124:2,9,11,
14,18,20 127:10,13
131:1 136:9 137:8
144:15 146:8
147:23,25 148:21
149:6 150:5,9
151:6,9,17,21
152:3 153:24 154:5,
12,16 159:23
166:13 167:16
172:21 176:6
178:14,18 181:23
184:20 186:10
188:14 191:6,9,16,
20 200:12,16
207:16 208:25
211:15,23,24 212:7,
24 213:14 216:22
218:12,19 219:3,15,
25 220:16 221:8,13
222:8,19,24 223:4
224:5,15,20 225:1,
9 227:2 229:12
230:23 232:22
240:22 241:12
244:7 246:24 247:1,
19 248:18 250:8
253:1,23 256:9,15
257:17,25 259:11
260:9,11,16 263:22
264:2,7 265:8,12
267:12,23 268:1,5,
20 271:16,19,23
272:2 277:3,14
278:2 279:21 280:9,
24 282:6,9 283:3,8
285:9 286:24
289:23,24 290:13

290:13 291:17
292:14 293:3,9,17
294:2,13,16,17
**Rio** 10:9,15 12:21
14:2 16:18 17:19,
21 20:3,7,12,15
27:11 34:25 36:24
41:11 42:14,17,21
43:2,10,16 44:1,8
58:4 89:19 96:11,
21 99:4,11,16
105:5,9 108:4,25
109:21 110:1,2,19
125:22 131:23
132:4 144:19,25
147:20 151:16,20,
24 152:6,9 157:1,3,
22 160:12,14
162:24 163:4
171:13 182:4
195:10 196:22
203:5 204:6 208:6
210:7 211:1 215:5
218:10 219:14,22
220:25 221:4 222:4,
15,25 223:18 224:8,
25 225:14,18,20
226:3,6,16 227:24
230:10,11,21 240:5
245:22 246:21
248:22 249:6
250:25 251:20
254:15,18 255:13,
16,19 256:8,13,20,
23 257:21 260:8
264:6 269:22
273:10,14 274:12
275:4,19,25 276:4,
23 277:14,18,22
278:7,14 279:17,24
280:8,13,19 281:4,
10 282:12 283:22
284:6 285:14,16,18
286:13 287:1 288:9,
13,24 289:7 290:12
291:1,3,24 292:2
**ripple** 177:12
**rise** 97:20 175:1
253:16
**risk** 135:14 136:3

273:19,22 285:4,11,
12 288:19 289:1,5,
11 290:9
**Riv** 108:25
**River** 10:10,11,15
20:3,7,12,16 36:25
38:5 41:2,11 42:14,
18,21 43:3,11 44:1,
8,9 58:7 71:1,19
78:10,18 85:12
88:18 89:19 93:1,9,
9,15 94:9,15 96:11,
15,16,21 97:20,21
98:6,13,14 99:4,11,
17,24 100:12
101:17 102:7 105:5,
11 106:18 107:5
108:4 109:19,21
110:1,2,20 131:23
132:9,14 134:2,5
136:2 140:16 147:2,
20 148:11 151:16
153:6,11,13 155:10
155:10,13,23,25
156:5 157:1,22
158:6 158:6 160:12,
14 161:11,18
162:24 163:4
169:13,14,15
170:12 171:3,13,18,
21 174:19,23 175:1,
3,9,23 176:1
177:10,20 182:4,8,
8 194:12 195:10
196:23 200:16,19,
22,25 210:7 216:4,
13,13,16,18,22,24
218:11 219:14,23
221:1,5 222:4,15,
25 223:18 224:8,25
225:15,19 226:3,7,
16 227:24 228:5
229:6,8,13 230:5,
10,11,21 231:7
237:6,7 238:2
240:5,22,25 241:2
244:11,25 245:23
246:21 248:18,22,
25 249:3,6,20,24
250:25 251:2,20

252:11 253:11 254:15,18,20 255:13,16,20 256:8, 13,20,23 257:1,2, 10,22 260:9 265:20 267:3,18,24 269:22 270:16 273:14 274:12 275:4,6,19, 25 276:5,16,23 277:14,18,23 278:7, 14 279:18,25 280:13,19 281:5,11 282:12 283:22 284:6 285:15,17,19 286:6,13 287:1,10, 25 288:2,9,13,24 289:7,8 290:12 291:2,4,24 292:2, 15

**Riverine** 113:4,22 114:25 172:18

**riverman** 155:23 216:2,3,8,15

**rivers** 132:11,13 156:13 216:8,11 237:20

**riverside** 62:4

**Rizzuti** 30:15 31:9, 13 47:2 48:12

**road** 55:1 195:14 197:1 198:20,21 201:7,12 217:19 219:9 226:20,23 227:12,18,23 231:4 274:21 288:12

**Roads** 196:25 289:17

**rock** 181:14

**rocks** 177:11 205:17 206:12

**rocky** 177:20

**rode** 37:2,6,14 108:4 265:5

**roles** 56:19

**room** 12:7 50:17 54:21 56:12,21 58:17,19 76:8,10 168:22 276:18 290:1,8

**rough** 276:16

**route** 247:22

**rowed** 253:18

**rows** 146:14

**Rule** 6:5 61:2 195:13 217:19 225:25 226:25 228:24 273:10,23 285:4

**Rules** 6:5 54:3 194:3, 17,21 197:1,15 198:5,19,20,21 199:14 201:6,10,11 209:14 215:24 216:21 217:6,15,19 219:9 221:20 226:19,22 227:8,12, 18,23 228:6 231:4

**ruling** 138:24 141:15 142:7,18 144:5

**run** 25:19 102:3 172:3 216:14 238:1

**running** 130:1 237:7, 9

**runoff** 152:1

**runs** 97:8 198:17

**RVSDs** 114:21 115:17 116:9,12 117:6 253:24 279:20

---

**S**

---

**safe** 102:3 103:20 104:5 107:6,7 108:20 109:6,7,16 160:24 222:1 273:10,14,17 274:11,15,16 275:16,18,18,24 276:7,10,19 278:15 279:23 280:4,7,18 281:9 282:3 283:21 284:5 286:11,17,25 287:14 288:14,22 290:6

**safely** 105:9,19 106:15,16 108:18, 24 130:23 178:9 288:9 292:20

**safety** 62:24 104:1 222:10 227:14 231:6

**said** 12:25 41:13

44:24 48:9 71:14 73:16,19 74:14,17, 21 75:13 77:18,19 79:7 96:24 98:3,5 103:19,25 104:21, 24 111:5 129:9 130:13 134:21 139:2,3,9 148:20 151:3,4,19 154:24 155:8 157:12 170:8 172:2 174:17,24 175:5,9 177:6 179:15,17 186:2 190:10 195:22 201:20 224:24 225:5,7,8 238:20 239:13 250:7 251:15 255:23 256:3,5 263:20 264:8 282:24 283:2, 5,7 290:18

**sailed** 288:23

**sailing** 164:11 198:22,23,25 220:15,18,19,24 221:3

**sake** 82:22

**same** 8:11 10:21 16:6 33:5 47:21 51:16 54:21,23 58:20 58:20 92:16 95:1, 24 96:1 100:16 103:9 104:25 107:2 114:25 129:2 135:22 150:7 161:2 169:2 180:15 187:22 187:22 192:23,24 196:7 200:21 209:6 210:13 211:15 233:15 234:11 239:5,15 273:2 275:13 287:9,10 288:18 290:23 293:21

**San** 5:4 49:20 50:12 51:19 55:4 70:14, 18,23 76:1,4 144:1, 2 155:16 156:9 161:23

Santa 163:23,25
  164:1,9,14,25
  165:16
sat 54:21 69:18
  143:22
satisfying 228:23
save 41:22 198:8
saw 56:18 57:12
  68:23 84:1,2 85:9
  88:19 92:1,5 169:8,
  20,21 220:9 220:9
  229:11 253:10
  282:20 283:6,7,14,
  17 291:13
say 6:3 10:15 12:9
  13:13 21:13 24:5
  32:9 33:4 35:17
  37:12,20 39:10,11
  40:21 46:5 51:18
  57:13 66:1,2 70:13
  73:18 74:16 75:6
  77:14 91:22,24
  93:6 94:1 96:22
  100:17 102:3,12
  106:10 107:13
  119:2 124:16
  135:22 139:10,14
  146:4,6 153:16
  162:14 171:10
  178:12 179:19,23
  180:4 185:18 189:8
  190:4,9 193:7,14
  195:8 198:1 201:3,
  15 212:6 213:20
  214:5 215:8 220:24
  221:4 222:3,15,25
  223:17 225:13,24
  226:12 228:1,23
  232:13 233:16
  234:4,10 235:19
  236:16 239:8
  240:17 241:20
  243:3 244:5,20
  245:21 246:20
  247:4,7,12 255:18
  263:13,16 265:15
  266:12 269:1,7
  270:3,5,9,20
  272:19 273:3 274:6
  275:16 278:11

280:6,20 285:1
  288:4 289:9 290:23
  292:5,16,24
saying 41:23 76:13
  98:1 112:4 145:19
  196:14 214:25
  237:3 247:16
  259:24 262:12
  267:15 272:10
says 19:12 22:21
  23:1 26:21 34:10
  40:21 41:15 81:18
  87:2 88:5 103:14
  104:9 111:18,22
  112:9,11,13 124:13
  126:8 127:9 128:21
  146:7 150:3,19
  154:15 155:14
  158:15 159:20
  160:5 185:20 192:4
  220:10 227:7
  228:14,18 231:16
  239:9 251:24
  266:14,20,23
  267:10,15,20,21,23
  268:12 269:23,25
  271:7 274:15
scan 185:7
scenario 136:15
  145:24 146:19
  290:2
scenarios 193:6
  254:23 287:4
scene 16:14 204:14
scheduling 6:2,3,14
school 199:24
scope 18:23 19:6,11,
  15 58:25 191:25
  192:6 247:24 253:3
screen 11:8 15:17
  17:3 19:20 20:22
  22:13 24:25 44:16
  46:7 47:8,12,23
  48:25 86:3 104:12
  131:20 132:5
  150:14 158:1,13,18
  184:3,22,24 192:2
scroll 17:5 23:14
  29:25 48:7 123:20
scrolling 125:10

sea 73:6 165:13
sealed 142:16
search 164:25
searchable 186:9
second 12:10 12:10
  19:19 27:7 53:18
  54:15 88:7 110:9,
  13 133:16 137:17
  140:17 158:9,23,25
  165:21 185:1,5,11,
  11,11 209:8
section 5:20 10:6
  12:2,18,21 14:2
  58:4 120:17,19
  121:15 123:1,21
  156:23 158:20
  160:13 191:25
  196:22 203:5 210:7
  211:1 219:11 221:4
  224:23,25 265:24
  270:15 272:9 273:8
  275:14 279:17
  282:12 285:7
sections 44:9 160:1
  177:19 182:9,10
secure 206:23
secured 285:22
Security 26:7 27:10
  135:9,14 138:8
  141:1,6 159:23
  237:23
see 6:21 7:11 11:8,
  11 12:11 13:15
  15:16,24 17:3,11,
  13 19:20 20:21
  22:13,20 23:20,21,
  23 25:13 27:24
  29:15,19,20 30:15,
  16,17 34:3,15
  37:15 37:15 39:13
  41:25 42:3 44:15
  45:24,25 47:12,14,
  16,22,25 48:2,13,
  25 53:23 56:7
  65:22 76:14 80:22
  81:3 82:18 82:18,
  25 83:2 85:1 86:3,
  6 88:20 97:12
  100:22 102:18
  104:11 109:4

120:21 121:24
125:3,10,15 131:19
132:4 138:7 144:18,
20 145:2 146:16
147:4 149:19
150:13,21 154:1
155:4 156:19
157:25 158:1,13,18,
23 165:12 166:11
169:14,18 172:10
177:11,13,23
181:13 182:14
183:17 184:3,23,23
185:3,6 192:1
202:17 203:6,14,23
204:13 205:2
206:17 208:7
212:15 213:7
215:14,17 224:4
231:18 237:16
251:24 253:25
254:2,12 258:11
271:11 272:12
283:20,23 284:16,
20
**seeing** 40:25 47:7
79:2 79:2
**seek** 138:24
**seeking** 129:17
**seem** 14:20 111:16
**seems** 138:3 251:15
**seen** 11:14 16:1
41:10 42:19 84:23
124:3 175:24
240:16 271:10
282:12
**segment** 195:10
218:10
**semantic** 139:20
232:2
**semantics** 232:5
**send** 158:5,7,8
223:10
**sends** 31:3
**Senior** 5:16 26:4
**sense** 232:25 264:21
**senses** 212:13
**sent** 21:9,10 22:18
24:16 24:16 25:25
26:1 30:5,8,12,13,

18,19 31:9 34:17
40:15 46:18 47:2,
21 48:12 49:2
84:25 124:8,11
125:12,15,18 127:6
149:19 154:4,11
161:13 162:7
**sentence** 11:24 12:10
18:7,8 159:1 185:5,
9,11,18 186:1
191:3,13,18 215:19
252:3,10 267:10
269:2 271:11
**sentences** 159:12
**separate** 126:14
197:18 228:8
**separated** 34:4
**September** 11:25 13:1
78:19,22
**series** 29:25 111:19
123:18 126:25
127:7 153:24
221:22
**serious** 286:8
**serve** 233:15 234:11
**served** 156:4,8
187:10 197:23
**services** 184:8
221:18
**serving** 148:5 233:9
**set** 29:11 128:3
208:20 209:14
261:3
**setting** 129:20
150:20
**seven** 53:3 64:8
108:7,10 158:5
192:1 209:2 226:4
**several** 12:14,25
13:4 14:19 51:18
56:18 62:13 152:11
**shallow** 109:19 110:3
113:4,22 115:1,2
155:17 156:6,11,14
177:20
**Shallowest** 155:8,15
**shape** 253:15
**shaped** 234:7 235:13
**share** 24:25 187:15,
16 261:16

**shared** 29:8 187:20
187:20,24
**sharing** 6:15 13:16
153:21
**sheer** 106:22 110:6
**Shelby** 80:16 254:4
**Shelby's** 121:1
**Shelnutt** 80:18,19,24
**she's** 26:4
**Ship** 156:9,10 161:5,
6 162:6 164:1
165:2 198:16
237:23 245:7
**shipmate** 187:8
**shipping** 246:7,10
248:2
**ship's** 156:4,8
187:10,11
**ships** 245:8 246:8,16
**shoal** 98:19 102:8
106:22 109:18,19,
22 110:5,9,14,16,
17 178:1 208:2
**shoaling** 287:25
**shoals** 109:4,20,24,
25 110:19 148:12
171:1 175:19
**shocking** 165:10
**shore** 277:6
**short** 168:23 189:11
199:17
**short-circuited**
225:6
**shortly** 49:11 66:17
78:15 188:25
**should** 100:2,9
130:13 135:21
139:1 141:11,12,16
211:8 212:13 285:1
294:5
**shouldn't** 226:12
**show** 18:18 20:18
29:6 45:19 123:14
183:20
**showed** 82:8
**showing** 15:14 16:24
19:18 22:10 47:9,
10 48:12,22 123:17
149:16 156:16
**shown** 102:5

**shows** 198:18
**shutout** 280:2,12,17,
    20
**sic** 25:15 31:18
    121:1 124:14
    155:16
**side** 73:7 74:25 75:2,
    24 77:17 96:2,4
    97:5,6,9,10,10,12
    98:6,7,10 105:9,22,
    23 146:3,18 171:6
    172:4,7,11,15
    175:8,14 179:12
    204:19 211:10
    247:4,23 249:20
    256:17 257:14,25
    258:5 268:23 276:5
    277:3,13 278:5
    287:20,21,25
    288:25
**sideways** 109:16
**sign** 37:9 122:5,8,10
    295:19
**signal** 235:14,18
    236:1
**signals** 235:14,18
    236:1
**Signed** 28:19 122:11
**significant** 145:13
    161:21 172:12
    232:18 284:10
**significantly**
    162:19
**signs** 146:4
**Siller** 31:16,19
**similar** 17:6,7 115:4,
    6 130:9 151:5
    196:8 201:10
    205:16 209:6
    211:15 249:6 285:6
**Similarly** 10:20
**simplest** 195:20
    253:17
**simply** 135:14
**Simultaneous** 134:11
    254:24
**simultaneously**
    103:18
**since** 13:15,25 14:4
    30:22 44:12 94:2

237:22 242:5 260:9
    263:21 270:4 284:3
**single** 200:8 281:25
**sink** 207:12
**sir** 30:14 36:6 102:5
    143:18 164:10
    255:8
**sit** 68:22,25 130:3
    174:25 214:19
**site** 14:1,17 25:13,
    20 27:5,7 28:18
    28:18 32:4,7,22
    33:8 36:15 37:6
    44:23 49:6,8,19
    50:2,5,20 51:9,12
    53:18,20 54:15
    60:4 66:21,23
    67:13 68:18 76:11,
    25 77:23 78:11
    95:20 96:19 98:11
    99:18 104:22 120:7
    127:1 133:8,10
    134:2 140:13
    143:16 165:22
    166:5 167:25 168:6,
    10 171:12,18
    172:25 176:25
    180:23 181:2,8
    248:7 251:1 260:15,
    19 261:25 282:21
    283:2,16,20 292:8,
    25 293:7
**sites** 41:2
**sitting** 60:23 68:14,
    17 134:25 144:12
    171:2
**situate** 21:3
**situation** 6:23 12:17
    145:14 290:23
**situational** 212:14
**six** 41:16 53:1 108:7,
    10 244:4,9,13
    253:21 282:16,19,
    24 290:19,20,22
    293:1
**size** 113:2 115:6
    130:9 151:5 163:8,
    24 165:11 251:7
**ski** 115:3,7 116:10
**skis** 114:24 116:2,6,

    8
**slant** 127:23
**slight** 177:12 253:16
**slightly** 290:11
**slippery** 37:22
**slow** 100:23 106:3
    123:20 152:11
    204:20 208:15
    291:8,9
**slower** 96:5 194:23
    197:11 273:25
    274:3 275:3 280:7
**slowly** 132:15
**slows** 207:5
**slurring** 265:25
**small** 153:10 161:19
    163:14 164:13
    165:12 245:8
    253:10,14,14
    278:25
**smaller** 35:24 285:24
**smallest** 163:10,21
    164:14,15 243:12,
    14,19
**smoke** 280:3,21
    283:19,20,23,25
    284:4 286:15
    288:11
**snowfall** 132:11
**Social** 159:23
**soft-sided** 55:15
    143:25
**solely** 91:23 216:13
**solicit** 136:21
**some** 5:15 7:1,12
    14:8,10,11,18
    17:13 23:8 23:8
    24:3 25:12 32:5
    34:14 41:22 50:21
    52:13 56:2 58:5
    65:4,9 67:22 69:9
    75:13 77:11,14
    78:2,16 83:23,24
    84:2 86:12,16,21
    87:22 91:16 95:11
    98:7 100:23 104:4
    106:19 117:9
    119:24 119:24
    120:6,8 125:23
    129:1 133:9 142:2

142:2 143:22,23
144:1 148:25
149:25 161:13
163:16 167:25
168:16 169:17
171:3 174:25 175:8
177:18 178:7
179:11 181:13
198:8,22 204:21
205:17 206:12
207:22 212:1
229:20 241:7 246:6
246:6 247:6 253:10
260:5 276:22 279:1
279:1 282:8 283:17,
23 285:8
**somebody** 26:23
145:14 172:9 196:4
204:18 207:25
212:20 213:11,16
245:18 264:20
289:18
**somebody's** 159:22
**someone** 12:1 26:8,19
33:2,23 52:9,20
57:7 112:7 136:14
284:23
**someplace** 174:25
177:14
**something** 15:10
57:16,17 66:6
94:14 94:14 112:3
141:8 176:16
199:19 204:24
204:24 205:6
206:22 207:4,5,5,9,
10,10,20 208:12
212:17 223:8 230:4,
14 233:11 234:9
235:14 238:24
239:13 249:16
251:5 252:5,11
259:10 292:5,14,21
**sometimes** 175:24
199:2 228:24
**somewhat** 21:21
**somewhere** 13:13 92:8
119:16 245:3
**son** 186:18 188:22,23
189:2,6,10 190:4,

11
**soon** 25:20
**sophisticated**
176:12,14
**Sorola** 26:14,17,19,
22,24 27:2,4,8,14
125:18,20 173:7
**Sorry** 22:24 29:7
38:21 39:2 41:18
42:23 46:12 53:7,9,
10,11 59:5 73:24
77:4 80:18 86:5
90:8 97:18 99:5
103:17 113:16
117:8 120:24
134:17 164:15,19
171:15 183:15,23
195:5 198:24
224:19 226:9,21
227:10 228:15
243:18 249:25
277:24 286:10
287:6
**sort** 73:10 98:8
136:13 137:21
164:8 231:23 276:2,
6 279:1 279:1
**sorts** 56:20 205:20
**sound** 165:17 173:17
**sounded** 259:1
**sounds** 171:8 246:5
272:9 283:14
**sources** 199:6 225:16
226:13,15
**south** 148:11 171:4,7
172:22 177:14,17
181:16,18 280:10
**space** 73:22 74:20,23
**spaces** 288:21
**speak** 27:4 32:7
79:20 85:18 160:6
188:23 266:4,6
**speaking** 59:8,11,12,
15 74:8 133:22
**spec** 108:14
**specific** 56:7 91:16
113:11 207:13
214:14 269:20
291:15
**specifically** 10:11

19:6 35:14,15 39:9
75:7 77:15 104:15
122:23 176:9 261:6
270:12 271:14
**specifics** 78:16
**specified** 274:14
**specify** 10:6,18,24
36:19 268:9
**speed** 96:6 106:3,19
129:9,10 131:13
150:11,12,13
204:20 208:14
273:11,17,18,25
274:8,11,15,16,17,
23 275:13,16,18
276:4,7,14,19,19
278:15 279:3,23
280:7 280:7,18
281:10 282:3,4
283:21 284:5
285:21 286:2,17,25
287:10,14 288:14
290:5,6,6
**speeds** 273:14 274:14
275:24 286:11
**spell** 7:21 187:5
**spelled** 19:10
**spelling** 113:20
**spend** 54:16 118:7
119:3 176:4 219:17,
22
**spent** 69:7,14 118:12,
20,24 119:21 181:7
220:6,8 224:24
283:2
**sphere** 204:12 210:18
231:16
**spheres** 210:17 233:2
235:17,23
**spheric** 202:16
**spinning** 129:21
**spins** 127:25
**split** 53:19 173:3
**spoke** 27:5,6,20 32:3
33:7 54:7,8 74:7
84:25 85:1 141:20
182:24 186:12,18
188:22
**spoken** 27:1,17 32:14,
20 84:12

spotted 176:16
spread 63:11 236:24
    291:12
spring 81:21
stage 96:15 100:12
    148:11 169:13
    170:12 241:2
    242:14 249:24
    275:6
stakes 245:12
stand 287:14
standard 192:9
    195:23,25 196:1,5
    208:25 209:3,7,9,
    19,20,23 210:6,10,
    15,20,23 211:2,4,
    11 212:7,9,20
    213:12,18 214:1,9,
    22 215:4,7 259:10,
    14,23 293:12
stands 93:24
Starboard 184:2,5,9
start 7:11 11:5,15
    21:2 27:25 30:18
    34:9 36:23 39:6
    41:16,18 42:5
    45:23 46:17 49:11
    51:15 60:19 72:17
    79:6,8 124:7 125:7
    128:13 146:21
    154:7 173:14 183:4
    184:2 186:5 193:24
    231:11 267:23
    273:10
started 11:3 78:15
    85:1,12,13 104:9,
    14 220:15
starting 29:14 30:4
    126:18 209:19
    227:11 271:5
starts 196:14
State 5:13 11:24
    16:19 17:19 111:12
    157:1 176:18
    187:21 194:20
    224:14 227:9,16,19
    271:9 271:9 282:15
stated 35:7 38:11
    90:13 116:12 117:6
    230:2,5 231:5

271:10
statement 117:11
    248:24 269:23
    270:10
statements 179:24
States 5:3,18 18:16
    19:9 31:5 127:21
    133:23 141:21,23
    155:25 194:18,20
    195:15 196:24
    198:16 200:19
    209:25 210:8
    217:12,25 218:25
    221:12,15,16,25
    225:20,22 226:8,17
    227:7,13,17,17
    229:4,25 231:5
    236:12 239:10
    241:22 269:12
    284:10,11
station 83:25 168:16
stationary 130:3,5
statute 228:11,13,16,
    17 229:5
statutorily 228:25
stay 108:18
staying 51:16
steady 132:15
steer 110:7
steering 114:4
step 35:11 197:9
    218:14 225:12
    286:10
stepping 195:19
Steve 187:4,7 188:3,
    6,17,19 191:4,5
stick 146:10 250:3
sticking 268:23
sticks 245:13
still 9:9 46:25
    83:15 93:24 105:2
    112:24 131:18
    135:22 149:16
    158:15 233:4 236:7
    256:7 263:11
    264:23 265:4
    269:17
Stone 5:12 74:21
    134:16 137:2
    289:23

stones 195:19
stop 29:14 48:9
    73:24 74:21 76:16
    87:2 93:21 106:20
    128:11 129:7,21
    271:10 286:1
Stopped 168:16
    220:11 225:23
    274:18
stories 79:14 80:3
    83:10,25 84:23
    85:14
storm 275:23 276:2,6
story 79:17
straight 75:4 100:23
    110:7,11,17 261:17
stranded 145:18
    146:24 152:19,23
    153:3
stranding 145:14
stranger 272:16
stream 226:1 228:19,
    23
strength 275:7
stretch 42:21 43:1,
    15,20 44:7 103:5,
    16 107:3 176:5
    184:12 218:24
    219:1 226:2,6
    234:24 236:14
strictly 88:19
    173:17 177:8
strike 26:24,25
    27:25 36:8 40:8
    41:18 56:5 58:17
    68:1,9 71:2 72:17
    73:2 76:2 78:12,13
    79:7 83:12,14
    86:10 87:7 91:14
    104:20 105:2
    106:23 108:1
    114:16 120:17
    147:16 151:3
    162:10 167:21
    168:8,10 169:20
    179:5 181:20,21
    186:22 187:15
    192:22,23 193:16
    194:25 197:10
    200:7 210:23

214:12 219:18,20
222:13 225:11
226:9,12 234:15
239:25 242:16,25,
25 243:13 255:11,
22 256:3 258:23
263:15 264:11
279:12 284:15
285:20 286:7
**strikes** 285:25
**striking** 88:7
**string** 205:12 233:8,
14
**strives** 192:6
**struck** 161:5
**structure** 80:6
201:11 203:4 205:1,
4,5,7,17 206:1,7,
15 207:25 210:24
232:9,10,15 267:7
268:14
**structures** 206:17
**strung** 234:23 236:12
**stuck** 179:1 268:19
**student** 5:21
**studies** 224:18
**study** 226:11,12
**stuff** 164:8 207:12
**stymied** 133:12
**subject** 109:13
124:13 144:5
154:14 194:17
195:2 196:25
**subjects** 193:15
**submission** 13:25
14:4,9
**submitted** 16:3 24:15
266:10
**subsequent** 23:23,25
76:9
**substance** 76:17
205:18 206:13
**substantially**
145:16
**substantive** 118:6
**substituted** 234:5
**successful** 156:14
**succinct** 226:8
**such** 64:23 78:17
120:11 132:11

136:19,20 142:17
193:3 204:18
206:22 207:22
237:7 252:21
259:17 267:16
276:7,15 280:2
**suddenly** 289:19
290:7
**suffering** 8:4
**sufficient** 142:7
153:2 288:8
**suggesting** 108:13
148:16 287:4
**Suite** 5:5
**summarize** 117:20
**summary** 61:7
**summer** 260:9
**sunrise** 51:17
**supervisors** 270:17
272:22
**Supervisory** 266:2
**supplemental** 7:16
13:18 82:23 83:2
260:4 285:9
**supply** 245:9
**support** 117:20 234:8
**supporting** 218:22
227:13 259:17
**supports** 152:21
204:24
**suppose** 261:15
**supposed** 113:17
235:18
**Sure** 6:9 7:23 23:15
26:18 29:19 36:3
42:6 46:16 48:8
49:13 56:13 57:9
81:5 85:16 96:8
101:9 113:21 125:5
128:16 131:10
134:14 153:4 186:7
190:22 197:18
207:24 217:7 242:5
243:20 246:14
259:20 261:16
**surface** 37:22 148:12
177:12 233:12
**surmount** 249:18
**surmounted** 207:6
**surprise** 165:18

257:2
**suspended** 40:3
**sustained** 141:11,12
**swap** 172:9
**swear** 7:4
**swimming** 153:12
180:7
**switch** 25:2 117:7
**sworn** 7:6,8
**sync'd** 295:13,16
**system** 16:18 17:18
18:13 19:12,23
20:3,7,11 156:25
**system's** 17:20 18:11
20:15 157:2
**systems** 115:22

---

**T**

**take** 8:17,19,20,21,
24 22:9 60:10
62:15 65:2 66:20
71:5,22,23 73:24
75:5 84:12,18
89:23 100:1 116:17
141:5 143:5 149:13
166:18 175:12
181:21,25 184:13
198:6 209:16
219:19 233:7,13
238:12 242:23
250:23 268:3 274:7
288:5 294:5
**taken** 55:17 79:15
100:10,11,13 142:4
168:22 170:13
186:17 282:22
**takes** 175:6 176:7
254:7 266:16
**taking** 65:7 72:1,11
89:15 133:3 136:9
140:15 172:20
283:11 292:20
**talented** 106:4
**talk** 18:21 30:19
34:1 49:10 72:15
165:21 174:8,13,14
183:17,19 186:22
191:5 193:10 218:8
219:11 220:14

221:12 222:7 223:3
224:13 248:20
251:9 266:11 279:5
**talked** 30:25 31:12
61:16 77:5 92:6
108:11 113:12
156:18 162:17
174:18,20,22
175:11,13 182:15
186:19 208:24
215:11 222:21
223:13 252:25
257:17 270:4
278:12 286:14
287:2 288:21
**talking** 10:5 42:23
43:1 104:8,14
105:11 128:16
134:11 138:19
139:19 148:16
191:3,12 218:17
224:23 226:3
233:10 237:2
242:12 253:4
254:24 281:24,25
**talks** 226:11 227:7
228:5 231:3
**Tampa** 126:11 155:10,
11 156:6 164:2,7
241:17 242:6,7,9,
11,18,21 243:11,12
**teaching** 199:23
**team** 266:16,25 269:6,
25 270:23
**Teams** 154:24 270:18
**technically** 234:12
**Technician** 266:2
**techniques** 140:21
142:15
**telephone** 21:25
**telephonically**
132:25
**telescoping** 40:5
**television** 83:24
**tell** 12:11,13 15:11
16:14 17:15 46:8
80:12 81:9 82:13
83:1 84:14 90:10
123:21 126:9
163:24 179:24

183:10 185:15
196:6 204:19
264:19 267:1
**telling** 89:22 230:4
**tells** 37:9 38:1
**Ten** 13:8,14 66:22
69:18,25 73:9
75:24 77:19 119:3
184:2,5,9 189:7
217:1,9,22 230:17
233:14 288:16
**tendency** 276:12
**ten-minute** 73:10
77:16,18
**term** 9:20 10:1 15:10
57:9 66:12 239:17,
20,24 240:1
**terminals** 237:23
**terms** 9:18 115:4,6
129:1 130:6,18
135:18 136:23
142:5 148:4 153:17
170:12 172:12
230:21 248:21
**territory** 97:10,11
**testament** 214:21
**testi** 258:2
**testified** 7:8 21:4
37:4 86:15 87:7,12,
15 89:16 90:2 91:2
92:16 93:13 95:20
97:25 115:10
127:12 137:12
139:8,11 170:20
180:9 194:13,16
195:2,7 213:12
217:21 233:25
260:13,18 261:24
264:4 277:1
**testify** 8:2,6 16:16,
21 17:17 141:7,25
142:10,13,23,25
156:24 165:5
212:24 259:9
**testifying** 8:11,13
18:11,12 19:10
103:16 133:4 138:1,
21 192:13,14
218:16,18,21
264:17

**testimony** 8:8 14:11
18:10,23 42:11,13
43:19 68:10 77:2
90:10,13 93:20
97:2 105:2,17
107:1 120:9 136:20,
22 138:23 139:16
142:6 157:20
189:14,17 197:17
201:24 218:10
227:22 229:1,22
252:23 273:24
**Texas** 5:5,8,13 6:1
16:19 17:19 27:12
49:16 50:2,4
111:12 125:22
135:15 138:24
155:17 156:9 157:1
183:9 187:21
225:19 227:14
228:4,5 229:2,5,8,
12,23 231:6 271:9
271:9 284:8
**Texas.gov** 229:16
**text** 17:13,15 22:1
**texting** 289:19
**texts** 223:9
**than** 8:21 15:1 35:22,
24 40:3 44:7 51:7
56:22,25 65:4
70:17 75:4 76:1,25
94:16 103:7,17,20
104:2,5 105:15,21
108:2 108:2,10
110:16 118:24
119:3,6,8,10,12,14
120:6,10 122:13
123:1 128:12
130:14,21 138:11
147:15 153:12
162:19 163:17
166:21 167:11
169:16,17 170:8,9,
24 171:4,9 175:24
186:21,23 206:8
214:11,16 216:5
225:11 226:13
230:18 231:3 244:7,
22 257:3 269:18
273:25 283:17

292:12,23

**Thank** 7:2,21 8:23
11:2,20 13:21 43:1
53:7 91:1 95:9
103:4 126:22 137:7,
8 143:2,3 155:3
157:13 160:15
190:1 202:13
204:10 213:9
226:24 285:3

**thanks** 25:11,21
158:4

**That's** 13:3 16:23
18:16 21:5 22:6
24:11 26:2,16
29:24 33:5 37:7,8
38:7,13 41:6 42:25
43:4 46:4 49:4,7,
22 52:15,25 54:20
55:14 57:9 58:8
61:3 66:11 68:15
80:9,19 81:20
86:14 87:18 90:24
92:16 95:19 98:1
99:3 104:21 105:7
105:7 107:25
108:13 110:12,15
124:2 127:14
131:24 137:23
138:15,23 139:2,9
147:7 148:1,4
150:3 150:3 154:6
156:10 157:24
160:21 161:6
162:13 167:17
172:11,18 173:21
179:17 180:24
181:13,24 182:12
184:14 185:17
188:1,12 191:7,10,
14,20 193:8,21
199:17 200:20
202:13 208:2,23
209:17 211:14,24
212:14 213:9,15
217:15 217:15
218:21 219:4
221:19 222:20
224:6 227:10 228:1
230:1 230:1,20

232:10,24 237:19
238:2 240:7,20
241:21,22 244:23
247:18,24 248:21
250:17 252:19
255:21 257:16
259:9 262:3 263:2
264:4 266:20
267:15,23 268:2
273:22,23 283:8
287:24 288:22
289:10 293:11
295:11

**their** 6:12,15 14:3
32:5,6 33:11 51:25
52:6 56:19 130:22
135:11 140:2 141:1
145:11 152:17
160:14 174:16
208:1 212:13
214:24 236:19
245:1,2 258:18
261:9 262:6 266:25
267:12,18 269:6
270:23 275:5 279:3
280:4 282:4 289:15,
20 290:6

**themselves** 5:11
213:8 286:7

**then** 14:7 23:1 24:16
33:6 46:5 49:9
51:19 52:20,23
53:20 54:20,22,25
55:14,17,24 63:20
64:7 69:20 74:20
84:9,24 85:14
93:10,11 94:16
98:6 100:7 104:14
110:13 111:6,19
112:11 113:3
116:13 117:6
126:21 128:12
130:3,4,20,23
132:14 134:20
136:22,25 141:15
142:20 146:23
148:12 151:19,23
153:5 155:8,14
157:25 158:11
159:19 164:12

166:3,4,12 168:17,
23 171:4 172:14
173:7 176:16
176:16 177:14
181:8,15 184:7
186:1 191:8,11,12
195:21 199:2 210:3,
10 212:15,16 214:7
225:5,23,24 228:11,
13,23,25 234:6
235:19 239:10
245:10,17 246:20
252:3,9 255:1
265:21 276:13
282:2 283:1 288:17
292:18,21

**theoretically**
284:14

**there** 5:24 8:24 9:8,
9 14:19,20 19:12,
23 23:24,25 24:2,5,
7,9 26:22 27:11
29:9,25 36:16,17
37:15 39:15 39:15
44:14 45:13,15
49:5 51:15,21 52:1,
2,3,5,13,13 55:13
55:13 58:5,7 59:23
62:13 63:2,6,8,10,
18,19,20 64:9
67:15,17,18,19,23
69:6,9,18 70:16
72:4 73:8 74:23
75:1 76:16 77:5,8,
19 79:17 80:6
81:10 82:25 87:2,5,
7,9,12,16,21,24
93:21 95:21 96:17
98:19 100:10,14
102:10 104:6,22
105:14 107:2
111:19 120:14,15
122:14,25 135:14,
18 137:9,23 138:11,
16 139:25 140:12,
25 141:3,6,7
142:12,25 145:18
146:3,8,21 148:10,
19 150:20 157:8,10
158:17 159:15

160:4 161:3 161:3
162:25 170:1 171:1
172:20 173:2 173:2
174:22 175:7,12,23
177:12,15,18,23,24
178:11,13,22,24
179:5,11 180:10,22
182:3 183:4 187:23
191:25 193:2
198:17 199:2 200:8
207:25 209:7,8,9
213:24 215:1 217:4
219:5 220:5 223:2
224:20 226:14
235:21 240:11,24,
25 242:6 245:2
246:24 248:4 250:3
252:10 253:7,12
254:2,3,4,5,25
256:7 259:2,3
262:18 263:3
264:21 265:12
267:15,23 270:18
271:3,11 274:1,6,
14 275:9,23 278:20
280:12,16,17,20,23
281:2,6,7 282:1,6,
14,14 283:3 284:3,
11,12,14,24 286:20
289:23 291:16
292:10,11,12
293:21
**thereby** 78:9
**therefore** 196:25
**there's** 12:12 14:18,
19 19:22,25 22:20
28:7 30:11 34:22
37:9 102:6,7
125:23 126:2,5
127:7 136:3 146:2,
4,7 157:6 162:18
163:9,12 176:10
177:13 200:11
214:6 224:16 228:8
236:5 242:2 248:2
252:25 254:6
258:19 260:5,20,22
262:14,23 264:1
265:1 266:1 268:22
285:1 287:3,24,25

288:10,11,11,11
289:1 290:1,22
291:6,11 292:9,15
**these** 6:11 24:18,21
28:25 34:14 39:9
40:25 41:1,16
79:21 80:12 86:11,
20 92:7,9 100:7
113:11 120:21
121:19 123:19
126:17 129:18
140:3 149:25
159:11 160:1 164:5
165:11,13 175:14
177:9 186:3 202:11
209:2,16 213:17
232:8 235:23 237:8,
21 253:8 254:13
265:10 272:22
**They'd** 183:2
**they're** 66:5 66:5,15
80:15 82:25 106:3
108:19 110:5
128:19 129:7
132:10 147:18
163:14 175:9
176:17,19 177:11
198:14 210:2 212:2
216:13,14 221:22
221:22 223:20
232:23 232:23
237:6,22 245:3,8,
15 249:16 258:22,
24 266:25 272:20
272:20,21 277:5
278:23,25 280:3
286:5 289:19 290:5
291:7
**they've** 6:24 140:6,7
178:7 274:21,22
289:20
**thing** 44:21 78:25
90:20 103:19 129:2
170:13 200:21
201:3 281:24
**things** 34:20,22
75:10 79:12 110:8
132:10,12 134:4
140:4 155:22
163:13 164:5

175:15 186:20
192:13 206:21
208:4 234:9 248:3
**think** 6:13 13:8
26:15 42:2 52:15
53:16 55:16 57:12
60:10 66:15 67:24
67:24 71:5 76:12
83:23 85:11 93:13
96:24 99:21 101:4
115:10 116:16
117:2 118:24
119:15 135:7,20
138:23 139:9 140:6
140:6 141:7,16
142:3,6,15 145:10
147:10,16,18 149:9,
10,13 152:16,20
172:11 181:4
189:22 193:17,21
202:6 209:17 218:1
219:8 222:21
223:13 230:14
231:7 232:4,6
234:13 236:22
247:8 248:20
254:23 255:23
258:16,24 263:8,11
267:14 270:1,3,6
279:5 283:6,7,8
287:4 291:10,15,22
293:21 294:5
**thinking** 85:13 85:13
112:3 165:19
214:13 251:17
**thorough** 14:9 116:3
209:11 220:12
**thoroughly** 210:11
226:19
**thoroughness** 82:22
**those** 7:19 13:6
14:14 22:9 37:3,6,
16 50:23 55:18
72:23 81:21 83:13,
15 108:10 111:24
112:13 116:14
118:18 121:7,12
122:2,6 127:3
131:15 132:12
135:17,22 136:4

137:1,13,19 140:4
146:1,24 156:6
159:16 161:2 174:2
176:3 177:23
181:20,25 182:1,4
185:14 186:21
192:12 193:14
193:14 194:21
199:6 210:2 213:13
222:21 223:7
224:18 228:12
232:22 233:3
235:17 236:8
241:10,14 244:12
245:16 246:12
264:8 266:9 271:13
278:19 279:2,24
280:4 282:19
288:14 291:25
292:1,17 293:23
**though** 37:5 43:23
50:25 65:3 87:20
139:22 154:8
176:21 198:13
213:11 262:18
272:8,16
**thought** 42:23 85:17
89:23 118:2 165:7,
14 190:5,7 213:21
**thousand** 105:20
148:7 226:4
**thread** 28:2 31:15,21
46:4 124:22 125:1,
4 154:7,9
**threats** 141:4
**three** 13:5,6,11 39:1,
3,12,14 42:8 50:6,
7 63:3,11,17 64:7,
9,10 68:20 69:1,5
80:7 83:10 84:1
95:21 104:22
108:11 153:25
158:8 163:15
166:20 170:20,24
197:25 259:1,2
282:15 282:15,18,
19 283:14 286:21
288:5,19
**thriving** 156:14
**through** 14:7 29:12

41:16 42:3 55:18
80:5,11 86:20
91:16 102:1,4,8
121:13 126:14
127:8 128:1 129:1
130:6 149:17,25
156:9 172:8,15
174:19 184:6,9,11
193:18 197:9
198:10 201:2 202:5,
25 207:10 208:14,
16,20 218:9 219:12
222:1 223:8 246:3,
12 251:6,18 252:4
254:13 276:13
**throughout** 100:24
260:1
**throw** 146:9
**Thursday** 189:22
**tic** 259:25
**tidal** 175:2
**tide** 242:14
**tie** 146:8,20
**tied** 69:17,25 152:17
**Time** 5:6 16:11 18:2,
5,22 19:2 21:3
41:22 46:25 53:22
60:12,16 62:6 66:7
69:4 70:24 71:10,
13,25 74:1,5,25
75:5 76:21 77:23
84:5,11 85:5,9,22,
25 88:8 92:8 95:24
96:1,3,5 97:3
100:12 102:4,10,10
103:9,21 104:25
105:16,19 107:17,
24 108:3 115:14,15
116:21,24 117:13,
22 118:12,23,25
119:21 128:14
132:19,23 140:5
143:4,9,12 145:5
156:11 164:20
168:3,9,11 169:16
170:9,19 175:12
181:22 183:16
184:15,19 187:5
188:16 189:18,19
191:9 193:18 198:9,

17 208:17,20
209:16 218:5,7
219:9,17,21 220:8,
9 225:12 238:15,18
239:24 243:7 246:4
254:5 274:5 280:12
282:1,14 294:10,14
295:20
**times** 107:20 108:5,7,
10 115:13 189:16
194:13,16,22,24,25
195:1 197:25
216:19,20 217:1,9
274:19
**Timmel** 5:2 7:24 11:6,
10,13,22 13:16,20
15:13,15,16 16:16,
25 17:1,11,17
19:19 20:19,20
21:14 22:11,12,13
25:7,17 28:1,21
29:7 29:7,10,11,19
34:2 37:25 44:14
45:4,7,11,14,20,21,
24 46:17 47:1,11
48:11,24 80:8,20,
23 82:13,22 83:1
86:2 88:3 91:17
92:24 93:23 94:7,
19 100:4 101:23
102:24 103:1 104:7
110:22 112:18,24
117:14 123:18
124:7,9,14 125:13
126:10,18 131:18
144:15 147:4
153:22,23,25
154:10 156:16,24
158:4 183:21
184:21 271:19
**title** 11:11 154:14
**today** 8:2,6,8 12:7
43:19 68:10 92:17,
22 97:2 124:23
126:17 144:5
157:21 160:7
187:25 189:14,17,
24 218:16 227:22
229:1,22 252:23,25
277:2 279:15

**together** 14:20 55:1
   95:15 205:5 233:8
   291:12
**told** 6:20 16:7 93:16
   135:20 177:5
   178:20,22 179:15
   260:19
**tomato** 245:12
**tomatoes** 245:14
**tomorrow** 6:14 21:23
   22:1 126:17 295:7,
   10,15,17
**tonight** 21:23
**too** 110:3 158:7
   200:3 220:9 255:3
   258:22 272:24
**took** 14:11 60:20
   69:19 70:8 89:12
   120:7 138:10 144:2,
   9 195:9,17 235:17
   248:10 259:19
   268:4 282:20
   287:17 292:8
**top** 23:21 27:24 28:2
   29:22 34:10 41:16
   45:23,25 68:22
   124:7 145:20,21,24
   149:14 152:19
   153:3 156:19 185:1
   213:23 231:16
   234:16,20 235:10,
   22 236:18
**topics** 19:15 193:14
**Total** 51:23 63:6,10
   65:17 71:1 107:20
   173:11,25 277:2
   286:21
**touch** 68:3,4,5,6,11,
   16,21 250:13
   268:24
**touched** 67:21 68:8,
   13
**touching** 213:5
**tour** 28:19 133:18
   134:1,6 137:12,14,
   16,16,18 138:9,18,
   21 139:5,7,14,19,
   20 140:10,15,16
   141:18,20 143:24
   144:2,9 181:10

   282:21 283:10,13
**toured** 133:16
**tourist** 43:17
**tours** 34:24 42:10
   283:18
**toward** 69:15
**towards** 289:19
**tower** 176:11
**town** 126:18
**tracking** 25:12
**trade** 247:22
**traditional** 114:1
**traffic** 95:14 96:3
   101:21 103:21
   241:16,18 249:1,7
   286:19 287:10
**training** 174:18
**transcript** 6:12
   142:15 260:1
   294:19 295:1,13
**transfer** 62:18
**transfers** 246:22
**transformed** 236:8
**transits** 115:19
**transport** 62:15
   246:2,11
**transportation**
   49:16
**transported** 62:4,11,
   12
**trapped** 145:21
**trappers** 246:2
**trash** 250:20
**travel** 42:20,21 43:2,
   7 44:4 49:18 67:1,
   4 103:8,18 104:2
   105:4,19 106:1,12,
   16 107:2 108:24
   109:17 110:2
   148:14 165:24
   171:18,21,24 172:1
   182:3,10 253:8
   265:20,22 275:2,3
   278:14,17 279:19
   280:7 287:1 288:8,
   14 291:3
**traveled** 43:10 144:2
   216:17 217:2
   240:21
**traveling** 64:25

   106:18 108:19
   109:21 110:10
   148:6 181:7 251:19
   254:15,18 256:12,
   19,22 257:20,21
   275:19,25 276:4
   277:14,18 278:6,21
   279:7,24 280:3,19
   281:10,25 282:1
   283:22 284:5
   285:14,16 286:2,12
   287:5,8,20 288:12
   289:7,14,18 290:5
   291:12,24 292:3
**travelling** 277:22
   282:2
**traverse** 94:15
**traversed** 279:17
**traversing** 88:9
   215:23
**trees** 235:3 245:16
   284:21
**Trial** 5:16 8:12
   120:8 136:20,24
   140:4 142:3,4
**tried** 172:6 183:3
**trip** 14:1 49:14,15
   55:3,9 63:7,24
   95:22 108:2 139:18
   165:21 169:23
   173:19 282:20
**trips** 108:4,11
**true** 95:19 104:21,24
   180:15 191:7,10
   229:17 257:16
**truthfully** 8:2,6
**try** 7:1 96:7 183:4
   195:19 210:1
   254:23
**trying** 26:14 58:6
   130:18 139:21
   156:12 212:2 218:9
   228:1 232:7,11
   234:4 249:20
   251:17 252:19
   292:19
**Tuesday** 25:13 28:18
   167:22
**tugboats** 164:13
   216:14

tugs 278:25
turn 80:8,9 120:12
    130:7 231:13
    276:21 289:24
    290:7
turning 128:12
twelve 226:4
twice 282:6 292:10
two 5:21 13:5,6,10
    21:10 22:20 50:3
    51:12 52:18 53:19
    54:20 55:6 63:3,21
    64:9,10 69:1 69:1
    76:10,24 77:23
    96:4 102:3 103:16
    106:11,21 107:2
    110:8 119:12 133:2,
    11 137:10 140:14
    146:14 163:15
    173:3 173:3,7
    181:6,7,15,16
    186:21,23 192:12
    193:14 193:14
    197:18 211:25
    228:8,12 243:9
    248:17 251:1
    252:25 253:22
    255:24 257:2
    264:23 275:1
    283:12 289:13
    290:3 291:2 293:7
two-lane 289:18
type 24:12 40:11
    63:4 93:1,8,14
    113:23 160:2 163:8
    164:5 203:3 205:1,
    7 210:24
typed 22:3
types 115:19,23
    130:21 285:13
typical 114:3 293:18
typically 8:20
    137:22 207:21
    236:24 293:2,8,15

---

U

---

uh-huh 22:25 23:18
    51:13 52:8 77:3
    81:16 84:8 111:6

121:6 165:4 171:17
    185:4 198:7 201:9
    234:18 235:8
    284:19
ultimately 142:3
    272:14,16 273:5
unable 25:18 138:13
    210:2 269:2
unaware 178:8 210:10
    217:11
uncertain 33:4,7
    103:25 122:24
    213:24 214:6
uncertainty 109:3
uncomfortable
    172:20
under 6:1 7:25 8:9
    54:2 69:11 70:4
    75:11 121:20
    127:15 129:9
    144:18 145:24
    146:7 180:7 192:6
    201:13 204:11
    207:7 215:14
    225:25 228:18
    236:11,16 251:24
    258:5 273:19,21
    275:17 280:9,10
    286:18 288:10
    289:2 291:24
underneath 265:2
    267:7 268:14
underst 115:21
understand 5:25 8:8,
    15,16,22 9:1,2,3,6,
    7,12,17,20,25 10:7,
    13,22 66:3,9,11
    67:24 96:9 115:22
    146:19 208:18
    208:18 213:10
    242:1 269:19
    275:15 280:8
    289:17 293:13
understanding 9:14
    14:24 85:10 116:3
    199:9 218:23
    227:22 233:20,25
    259:13 269:12
understood 196:24
    283:19

underway 69:20
unencumbered 132:11
unexpectedly 289:22
unfortunately 260:1
unidentified 5:24
uniform 56:14,17,20,
    23
uniforms 56:15
United 5:3,17 127:21
    133:23 141:21,23
    155:25 194:18,20
    195:15 196:24
    198:16 200:19
    209:25 210:8
    217:12,25 218:24
    221:12,15,16,25
    225:21 226:8,17
    227:7,13,17 229:3,
    24 231:5 239:10
    241:22
University 52:5
unknown 86:17 88:3
    111:14 217:2,4
    272:15,20,21
unless 10:6,18,24
    32:22 110:4 178:7,
    15 247:22 265:18
unlikely 152:16
unloaded 247:15
unquote 267:8
unsafe 103:7 104:3
    109:16
until 6:3 21:25
    160:7 181:5 191:5
unwavering 94:1
    263:21
updates 160:22
upon 12:21 16:17
    17:20 20:15 44:21
    56:18 80:2 88:14
    91:23 96:15 109:22
    127:24 132:10
    157:2 194:2 195:9,
    18 197:14 199:13
    207:24 212:2
    214:19 249:24
    251:7 272:3 275:6
upper 160:12 244:25
upriver 178:25
upstream 67:2 257:8

275:1
**Uribe** 32:11,12,15
46:18
**USA's** 133:4
**use** 9:20 10:1,20
14:15 15:6,10
34:24,25 66:11
80:4 90:16,23
117:25 140:9 142:2
147:2 153:6,10
176:14 197:21
210:1,11 226:2,5
232:7,8 234:10
235:2,3,3 237:20
238:2 243:14
245:13 274:20
278:25
**used** 39:5 40:2 42:6,
7,9 117:20 205:18
206:16,21 234:6
237:6 237:6,22
240:2 245:7,9,17
246:1,2 248:25
264:8
**useful** 145:7
**users** 160:23
**using** 136:23 153:11
210:2 212:13 235:1
**usually** 234:23
236:13
**utilize** 269:8
**utilizes** 267:2
**utilizing** 93:1,15
94:9 196:21 209:9

---

**V**

---

**vague** 9:13
**vantage** 72:12
**variable** 128:4,18
**variable-pitch**
127:17
**variation** 288:20
**varied** 13:8 171:8
**varies** 35:1 151:25
170:18 267:3
**veer** 106:22
**vegetation** 102:9
**vehicle** 55:2 71:19
72:3,7 127:25

164:15 167:12
263:17 263:17
274:12 289:25
**vehicles** 51:19 70:9,
11,22 71:20 288:20
**verbally** 223:8
**verbiage** 201:11
**verification** 129:17
**verify** 131:2
**version** 187:25 188:1,
4 199:17
**versus** 5:3
**very** 80:15 85:9
100:13,23 106:3
114:20 115:4,20,21
116:3 119:23
123:20 125:7
128:15 129:7
148:12 156:6,11,14
160:16 168:23
172:5 176:12
201:10 205:16
212:3 214:14
217:22 237:21
245:8 264:9 270:2,
8 284:21 285:22
286:3 291:15
**vess** 288:6
**vessel** 93:8,15 95:14
96:3 104:2 105:8,
15,18,21,22 112:21
113:4,22 128:1,11
130:3 145:17,20
161:20 163:7,8,10,
19,21 164:10,11,16,
17,24 165:1 171:25
196:3 196:3 207:21
208:1 240:15
242:25 243:1,8,13,
15 244:2,6,21
245:5,22 252:21
253:15 255:1
257:16 259:21
260:14 262:24
263:4,14,18 264:5
276:12,17 278:7
279:1 283:21 284:5
285:24 289:16,25
290:6 292:19
**vessels** 14:3 62:5

93:1 94:9,15 95:14
96:5 98:20 111:24
112:13 113:2
115:20,23 130:20,
22 147:12 156:4,5
163:15,16 164:6,13
165:11 168:24
205:14,24 206:22
208:13 208:13,16,
19 214:18 240:19
244:8,9,12,15,17,
20 246:9 251:19
260:23 261:9,20
262:1,6 265:11
273:15,18 274:16
275:8,10,18 278:12,
19,20 279:2,6,7,11,
14,16,18,20,24
280:1 283:25
285:13 287:2,7,8,
12,17 288:6,14,16,
20 289:13 290:3
292:6,12,17 293:2,
8,15
**vicinity** 38:4 39:5
40:6 69:5 72:6
145:15 165:7
174:21 179:21
249:4 264:13
265:17,21 273:16
280:3 283:15
286:22 289:14
290:4,17,20,24
293:3,16,19
**victim** 75:1
**video** 294:22 295:1,2,
6,13
**viewed** 75:15
**viewing** 46:6
**violate** 213:17
**violating** 212:6,20
**virtue** 234:6
**visibility** 280:2
281:15,18,23
283:24,25
**vision** 176:12
**visit** 25:13,17,20
28:18 32:7 33:8
37:6 49:6,8,12,19
50:2,3,4,5,7,8,11,

20 51:9,12,16
53:18,20 54:15
60:4 67:13 68:18
76:11,25 77:23
78:11 95:21 96:19
98:11 99:18 102:11
104:22 127:1 133:8,
10 140:13 143:16
165:25 168:6
171:12,18 176:25
180:10,24 181:2
213:4 214:17
260:16,19 283:21
**visited** 60:3 99:11
100:20 107:12
167:25 170:19,25
283:15 291:13,14
**visiting** 250:25
**visits** 120:8 248:7
251:1 255:20 262:1
293:1,7
**visual** 82:7 98:25
135:23 140:22
177:23
**visualize** 291:20
**visually** 135:8
**visuals** 80:4
**volume** 94:13 208:11
286:19
**volumes** 221:23
**volunteered** 175:11
**voyage** 222:1

W

**Wade** 5:18 166:17,21
168:7 173:7
**wading** 40:4 153:13
**wait** 88:7 147:23
**waiver** 93:25
**walk** 55:18 149:2
180:17
**walked** 148:24 180:12
**walking** 40:4
**Wall** 30:21 31:1,3
47:22 206:5 266:3,
4,5,12 269:1 270:4,
12,21 273:2 289:23
**Wall's** 273:3
**want** 11:5,15,23 21:2,

21 22:8 29:6,12
60:18 61:5 66:5
74:11 76:16 80:11
82:10 86:1,20 96:8
101:12 102:15,19
111:18,23 112:23
113:6,11 123:14
124:7 127:7 131:17
133:25 136:6
143:15 149:6,7,17,
25 154:7 161:9
165:19,21 183:19
184:1 185:10
191:24 192:12
198:8 207:14 215:9,
19 218:14 229:17,
20 231:2,10 232:7
240:9,12 244:17
250:3,13,21,21,23
251:9 254:22
254:22 255:3
256:25 257:5 258:8
264:17 266:11
274:20 275:2
276:22 291:14
291:14,19,22 292:4,
16 294:19,21
295:12
**wanted** 14:5,12,13
71:15 128:15 131:2,
10 137:9 169:14
172:10 175:17
180:12 181:12
182:14 239:2 257:9
258:4 291:3
**wanting** 119:18
220:12 292:7
**warrant** 135:16
**warranted** 141:10
**wasn't** 85:6 161:12,
16 162:25 188:10
238:23 249:25
271:3 283:23
**watch** 175:1
**watched** 212:25
**Water** 9:22 38:4 40:5
43:14,17 44:24
45:1 69:3 102:6
105:14 109:5,7
112:22 130:6

131:19,22 132:3
144:18,25 145:16,
21 146:7,22,22
148:20 151:15
151:15,19,23 152:5,
8,11,18 153:1
155:24 162:12
163:19 168:17
170:17 172:21
175:3 176:5 193:4
193:4,11 194:1,2,
14,15,17,19 195:3
195:3,11,15,17
196:23 197:13,15,
21,22 198:3,4,16
199:3,12,13 200:1,
2,7,9,12,15,19
204:25 205:18,21
206:6,16 209:22
209:22,25 210:8
212:17 213:21
214:23 216:10,24
217:2,10,12,18,23,
24 218:12 219:2,15
220:5,7 224:4
225:1,8,15 226:17
227:14,16,17,19,25
229:2,3,23,24
230:12,22 231:6
233:12 234:24,25
236:13,15,25
237:13 239:9,10,14
240:19 242:18,20
243:13,15,19 244:2,
7,10,13,22 245:6
250:14 254:25
255:23 256:15
267:6 268:14,19
269:3 275:5 276:16
277:21 278:4,16,21,
23 287:19,22 289:1,
11
**waters** 97:16 155:17
199:4 201:14
206:16 216:6 217:5
218:24 224:10,12
225:21 227:13,15
228:6 231:5 257:25
277:22
**waterway** 12:22

160:24 215:23
226:7 279:8
**waterways** 217:14
227:8 241:8,10,14
**wave** 175:2
**waves** 206:3 223:11
**way** 12:12 23:12,16
102:7 125:8 142:17
178:6 182:3 223:23
250:3 267:16 269:4,
13,25 276:13
**ways** 35:1 228:8
**wearing** 56:15 65:1
173:13,14,17
**weather** 275:7 293:18,
22,23
**websites** 121:12
185:22
**week** 126:11 188:5
189:20,21
**weekly** 160:21
**weeks** 6:18 119:12
169:18,21 170:9
**weighing** 196:17
**weight** 36:1,9,12,19
37:5,10 38:22
39:23 114:13 260:6
**weir** 205:15,16
**well** 5:14,15,21 7:16,
17 14:19 19:1,9
26:4 29:14 35:11
38:8 39:2 40:8,20
41:10 42:11 49:20
53:19 56:18 64:9
73:2 75:16 80:2,15
81:24,25 82:5,21
86:9 93:18,21
94:13 97:8 100:22
101:1,3,18 109:2,
23 120:22 122:22
125:3,23 131:15
139:6 142:24
145:10 146:13
147:12 148:14
159:18 160:23
163:12 166:2
168:10 170:23
171:1 174:19 176:3,
5,15 178:17 181:10,
20 183:4,11 184:9

185:20 191:22
193:2,14 196:14
200:18 201:15
208:4,10 209:4,9
212:12 214:3
216:16 219:9
223:15 224:16
225:3,16 231:1
237:21 244:8
246:14 247:24
249:10,15 250:2
251:14 252:24
253:10 254:21
256:2,16 259:19
262:2 266:11
272:23 273:19
278:19,21 285:16,
20 286:9 287:3,11
290:25 291:15
292:4,14,25 293:11
**We'll** 6:13,15 29:9
34:9 39:6 42:3
49:10 66:14 93:18
93:18 98:22 102:1
112:11 153:19
183:11,17 193:10
250:2 295:18
**went** 14:1 29:8 36:24
50:14,17 55:12,14
58:14 65:20 67:10
69:15 70:9,10,12,
22 71:18 75:25
76:8 95:22 104:23
143:21 161:4
165:13 166:1,3,3,
14 168:17,23
169:16,18,19,21
172:3,14 173:11
175:8 177:14
177:14 181:14
218:8 219:12 268:5
283:2 288:9
**We're** 18:4 27:13,22
60:11,15 73:24
74:4,7 85:24 104:8
105:11 133:6 138:9
139:21 140:9
143:11 177:10
183:23 184:18
193:17 200:14

207:13 232:21
236:5 238:17
251:22 252:4 253:4
270:5 273:4 274:25
277:5 281:24
287:20 288:12
290:13 294:13
**weren't** 87:22 95:25
102:10 123:10
139:25 173:20
178:11 182:7 183:4
**wet** 37:22 149:6,7
**we've** 5:24 11:22
21:14 28:20 36:4
60:25 86:2 97:22
100:3 106:8,11
122:14 123:17
127:5 133:9 143:6
184:21 235:21
236:17 238:13
252:25 253:23
257:16 278:12
279:6 285:13
286:14 287:2,18,19,
21 288:6,20
**wharf** 205:22,23
**whatever** 84:20
140:24 247:24
286:2 288:22
289:21
**what's** 38:10 47:7
61:3 109:18 128:15
156:16 165:10
170:16 174:17
208:2
**wheel** 114:4
**wheelhouse** 85:18
**wheels** 109:12
**whenever** 84:12,18
164:7
**whether** 33:4 46:7
54:8,11,25 75:14
78:25 78:25 83:2
84:21 85:2 89:17
90:3 129:4 130:19
131:9 138:11,16
139:23 155:24
157:21 160:10
162:20 176:7,19
179:4 194:14,16

195:2,10,13,14
200:1 209:21,24
210:6 211:9,12,18,
25 214:1,6 217:11,
19,24 218:10 220:6
224:25 225:8,14
230:9 232:13,15
233:15,23 234:12
238:2 240:4 258:13
261:20 262:5,14,23
263:14,17 264:21,
22 265:16 266:13
272:5,12
**which** 10:12 13:18
40:15 41:8 50:4
75:5 80:12 82:23
95:16 97:19 101:12
102:8 104:10
109:14,16 110:5
111:4 113:8 114:25
115:1 116:9 121:22
122:23 128:3,4
136:16 138:23
150:7 160:15
164:10 174:20
184:6 191:25
193:10 194:3,20
197:15 198:5
199:14 201:12,13
204:19 209:2,14
214:19 215:22
216:6 217:10,23
223:9 227:4,15
228:6,9 232:9,10
276:8 286:17,25
287:12 288:14
292:20
**while** 59:10 60:20
64:25 65:13,14
67:15 69:7 74:24
114:11,12 138:6,17
139:22 140:9,10
143:22,23 174:9,11,
14 253:12 254:2
266:25 269:6
270:23 283:20
**who** 12:1 24:18 26:3,
9,14,19 27:8 29:3
30:18,19,23 33:7
34:13 51:24 52:14

53:12 55:19,24
56:1,11 57:7 60:22,
23 63:22 64:12,14
71:25 72:5,24
79:18 89:8 112:6,7
125:20,24 126:2,5
127:3 134:6 136:16
141:20 144:9 148:3
152:16 154:20
166:16,21 168:5,25
169:21 173:5 174:1
179:2,25 186:13,18
187:2,7 191:2,11
216:12 245:25
261:1 266:8 271:7,
13,22,22 273:1
**whole** 15:24 90:19
91:15 94:23 95:2
102:16 103:19
113:7 202:25 225:6
**whom** 126:11 284:23
**whose** 27:20
**Why** 39:11 59:7 61:13
66:14 93:3 94:11
106:16 128:6 129:3,
14,24 130:15 140:7
145:7 147:7 149:4
155:20 161:16
202:25 217:16
236:10 238:12
249:14 257:13
258:16 263:2
**wide** 96:24 101:16
103:8
**widest** 98:23 99:3
**wildfires** 284:10
285:2
**Wildlife** 227:15
228:5 229:6,8,13
231:7
**will** 5:23 10:3 11:1
14:20 15:11,12
18:18 21:24 22:1
25:15,19 28:17
61:6 117:11,19
124:5 126:20 135:5
139:6 141:2 150:12
183:11 259:25
270:9 270:9 273:17
294:7

**wind** 109:13 130:5
150:12 276:15
**winds** 276:10
**winter** 81:24
**wire** 73:6,7 265:1,4
**wirelessly** 65:2
**within** 27:10,11 42:7
42:7 43:13 75:12
84:21 85:2 121:8
142:16 152:10,25
153:2 174:20
221:21 226:19
227:10 234:24
236:14 244:4
246:19 252:20
274:18 278:6
287:21 288:24
**without** 25:3 35:15
147:3 148:6 153:7
264:17,19 265:10,
16 278:15
**Witness** 7:6 61:8
133:20 134:1
137:11 140:9
141:24 142:13,23,
25 184:8 186:13
187:12 213:3
294:15 295:18
**witnessed** 212:20
213:11,16 214:16
**witnesses** 142:9
143:23
**won't** 95:7 295:14
**word** 10:20 14:15
90:16,23 126:15
126:15 127:6
140:10 164:25
212:14
**worded** 130:12
**word-for** 127:5
**words** 137:13 232:5
237:13 264:8
265:25
**work** 6:21 7:1 14:20
54:2 59:3,6 125:7
126:20 186:13
187:12 245:9 250:3
**working** 118:20,23,23,
25 119:3,22 272:4
**works** 27:11 216:4

**world** 205:9
**wouldn't** 87:19
   177:22 178:9,10,13
   240:8 247:21
   263:19 265:5 281:8
**wrap** 207:14
**wreck** 250:10
**write** 117:23 158:20
   194:6 252:10 258:2
**Writing** 102:17 118:3,
   6,8 191:23
**written** 6:12 28:13
   79:15 124:16 160:3
**wrong** 239:11 292:21
**wrote** 86:17 133:5
   150:11 154:23
   158:25 188:7,16
   191:6,9 215:21
   250:4 252:5,10

**Y**

**yachts** 164:13
**Y'all** 18:21 141:15
**yawing** 109:14
**year** 261:22 262:18
   264:23 284:3,12
**years** 107:18,24
   108:12 115:9,12,20
   149:11 149:11
   156:8 164:19
   187:12 197:23,24
   199:22 217:1,9,22
   219:25 239:23
   243:9 244:4 264:23
**Yep** 182:20
**yesterday** 14:2 27:7
   49:9,11 93:16,17,
   19 114:19 115:15
   166:1,5 167:22
   170:25 171:12,16
   173:1 176:2 180:15,
   24 181:3 182:25
   246:24 247:13
   250:1 255:23
   256:21 257:3
   268:18 281:2
   282:17,19 283:1
   284:1 290:23
   291:14,16,16,25

**yet** 262:11,12 265:4
**York** 187:9
**you'd** 88:11 264:16
**you'll** 9:9
**young** 72:5
**you're** 9:3,14 18:12
   33:7 53:8 56:13
   59:7,10 73:23
   74:21 81:5 90:10,
   24 93:20 98:1
   103:16 108:15,17
   112:15 114:2
   115:17 116:8,9
   117:16 119:18
   122:21 125:10
   127:12 137:24
   145:19 157:14,15
   179:9 185:17 186:4
   191:3,12 192:13,17
   195:22 196:17
   196:17 198:14,16
   201:24 209:6 211:7
   214:13 216:20
   218:16,17,18
   219:25 233:10
   242:12,14 249:20
   252:21 253:8 254:6
   255:4,7 260:14
   261:17 264:17
   271:25 277:16,17,
   18,22 278:5,6
   281:24 286:1,2
   287:4 289:17
   290:16 291:6 292:4,
   5,6,19,20 293:13,
   17
**yourself** 53:3 195:9
   198:8
**you've** 11:17 43:14
   77:1 94:1 103:5
   107:8,23 115:9
   118:19 123:3
   164:15,16 185:16
   220:2,5 234:17
   240:21 244:5 246:5
   248:20 255:6,10
   274:21 276:10
   277:12 278:16
   279:19 282:5,8,12
   287:11 287:11

   290:8 293:1 294:3

**Z**

**zero** 37:19 171:4
   171:4,9 242:11
   286:2
**zone** 204:20
**Zoom** 5:14