# Ciarametaro Deposition Transcript Excerpts

1              UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRIC OF TEXAS
2                     AUSTIN DIVISION
3       - - - - - - - - - - - - - - - - - - - - x
4       UNITED STATES OF AMERICA
5            Plaintiff
6       vs.                      CA No. 1:23-CV-00853-DAE
7       GREG ABBOTT, in his capacity as
8       GOVERNOR OF THE STATE OF TEXAS,
9       and THE STATE OF TEXAS
10           Defendants
11      - - - - - - - - - - - - - - - - - - - - x
12
13            DEPOSITION of THOMAS CIARAMETARO
14            Tuesday, July 9, 2024 - 9:22 a.m.
15             US Attorney's Office for the
16               District of Massachusetts
17              1 Courthouse Way, Suite 9200
18              Boston, Massachusetts 02210
19
20
21      Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR
22      Job No. CS6783958
23
24
25

| | |
|---|---|
| 1 | What types of law would you |
| 2 | consider yourself to be an expert in? |
| 3 | A   Maritime law, Chapter 90B, Mass. |
| 4 | General Laws, boating laws, maritime navigation |
| 5 | laws, stuff like that. |
| 6 | Q   Okay. |
| 7 | Would you -- |
| 8 | A   Federal laws, maritime federal laws. |
| 9 | Q   Would you consider yourself a legal |
| 10 | expert in interpretation of the Rivers and |
| 11 | Harbors Act? |
| 12 | A   No. |
| 13 | Q   Are you offering any -- in your |
| 14 | report any legal interpretations of the Rivers |
| 15 | and Harbors Act? |
| 16 | A   I believe I do, yes. |
| 17 | Q   Are you offering those as opinions to |
| 18 | be considered or just as background information |
| 19 | about the case? |
| 20 | A   Background information and |
| 21 | definitionwise, or certain definitions, |
| 22 | quotations from the Rivers and Harbors Act, and |
| 23 | as background information. |
| 24 | Q   Did you -- did you do that research |
| 25 | yourself or did you -- or was that something |

```
 1    that you had to rely on others --
 2         A    I didn't rely on anybody, but I -- it
 3    was a combination of research that was provided
 4    and research that I did on my own.
 5         Q    Are there any assumptions you were
 6    asked to make by Texas that you then agreed to
 7    make and incorporate into your opinion?
 8         A    I was given some definitions in which
 9    I did not rely on.  Due to my experience,
10    education and training, I came to my own
11    conclusions.
12         Q    Okay.
13              So there's no -- so your report
14    does not include any definitions that you just
15    accepted and relied on from someone else.
16    If -- anything in there is something that you
17    had independently determined?
18         A    There are, I believe, two definitions
19    in here which were given to me by the State of
20    Texas, but I did not solely rely on them to
21    make my determinations.
22         Q    Okay.
23              Which two were those?
24         A    I'd have to look.  I believe there
25    may actually be one...
```

```
 1                  (The deponent read the
 2       document.)
 3           A    Oh, no, it's two -- navigable
 4       waters --
 5           Q    Can you mention for the court
 6       reporter what page?
 7           A    Oh, sorry, page 9 of Exhibit 1,
 8       navigable waters.  And I believe the term
 9       "buoy" on page 18 of Exhibit 1.  I believe
10       that's it, unless I'm overlooking something.
11           Q    And so the one -- so on page 9,
12       navigable waters, that would be beginning from
13       the sixth line down on that page?
14           A    Just let me make sure... yeah, I
15       believe so.
16           Q    So would I understand that correctly
17       to be the portion from that line through the
18       end of that page?
19           A    Correct.
20           Q    Okay.  That's the navigable waters
21       definition you referred to.
22                    And then on page 18, buoys.
23       Would I understand correctly that you're
24       referring to the beginning of the first line of
25       text on that page?
```

1    A    Yes, sir.
2    Q    And from there, how far down?
3    A    Just that first paragraph.
4    Q    Okay.
5         So that first paragraph of, I
6    think, seven lines?
7    A    Correct.
8    Q    Six lines.  I can't count.  Sorry.
9         (Laughter.)
10   A    Yeah.  Six.  Six.
11   Q    Thank you.
12        Do you consider yourself to be
13   an expert in economics?
14   A    No.
15   Q    So are you -- so, for example, you
16   testified earlier that some of the factors that
17   would go into whether a waterway is a highway
18   of commerce would be the conditions physically
19   of the waterway and some would be the
20   infrastructure, right?
21   A    Correct.
22   Q    I take it you're not offering
23   opinions in this case about -- from an
24   economist's point of view about, you know,
25   whether the cost and benefits would justify

```
 1   may be a -- just go ahead and take a little
 2   lunch break?
 3                  MS. AL-FUHAID:  That sounds good
 4   to me.
 5                  Want to take lunch?
 6                  THE DEPONENT:  Sure, yeah.
 7   Could use a head break anyway, so...
 8                  (Discussion off the record.)
 9                  (Lunch recess.)
10   BY MR. LYNK:
11       Q    Earlier today we looked at three
12   passages in the report that you identified as
13   definitions from counsel.
14                  I wanted to ask you about one
15   other paragraph.
16       A    Okay.
17       Q    This is paragraph -- the last
18   paragraph on page 8 of Exhibit 1.
19       A    Oh, page 8, sorry.
20                  (The deponent read the
21   document.)
22       Q    Do you see a paragraph that starts,
23   "The RHA generally applies to 'navigable'
24   waters of the US," and then it continues?
25       A    Yes.  I believe part of this
```

```
 1    definition is -- is part of the other ones and
 2    part of it is mine.
 3              I think I -- I think -- oh, I
 4    thought we went over this with navigable
 5    waters.  I guess it just starts back a little
 6    farther.
 7         Q    Got it.  You're right.
 8         A    Yeah, yeah, sorry.
 9         Q    If you turn to the next page --
10         A    Yeah, so --
11         Q    -- there's a paragraph that starts
12    "Navigable waters."  So basically --
13         A    It just --
14         Q    -- that's a continuing part of this
15    passage?
16         A    Correct.
17         Q    Okay.
18         A    Yes.
19         Q    All right.
20              So when we were talking about
21    the definitions from counsel and when we
22    referred to the one that at that point you said
23    starts on page 9, you just corrected to say
24    it's this passage starting here, the last
25    paragraph of page 8, and continuing through
```

```
 1     page 9, correct?
 2         A    That is correct.
 3         Q    Got it.
 4              And as to this one and the other
 5     two you mentioned in your testimony, those are
 6     the three definitions received from counsel?
 7         A    Correct.
 8         Q    And as to each of those, it would be
 9     accurate to say you didn't separately research
10     them or separately develop those?
11              You received those from counsel?
12         A    I received these from counsel but did
13     not rely on them for the conclusions in my
14     report.
15         Q    Okay.
16              You didn't rely on them for the
17     conclusions in your report, and they weren't --
18     these three things weren't things that you
19     developed yourself while you worked on your
20     report?
21         A    Correct.
22         Q    Okay.
23              And I -- so I wouldn't expect --
24     there's no other discussion in the report that
25     relies on these three definitions, the --
```

```
 1                 When I say "three," I mean your
 2      earlier testimony referred to two other places.
 3           A     Correct.
 4           Q     I could go back and verify which
 5      pages, but you understand what I was referring
 6      to, correct?
 7           A     I do.
 8           Q     Do you anticipate that you would
 9      testify at trial about those three definitions?
10           A     I do.
11           Q     You would testify about them?
12           A     To the -- my concurrence with them,
13      that I agree with them, and that my conclusions
14      that I've -- based on my training, experience
15      and education correspond with these
16      definitions.
17           Q     So do you consider yourself
18      independently qualified to speak to -- of a
19      definition set forth that begins, "The RHA
20      generally applies," and then continuing through
21      the next page?  Is that something you are
22      qualified to give an opinion about?
23           A     Yes, yes.
24           Q     Earlier you said you were not a legal
25      expert in the Rivers and Harbors Act, right?
```

1    advice on whether the application had been done
2    in a way that made it approvable under the
3    Rivers and Harbors Act?
4         A    I have given advice to people in my
5    official capacity as to their application
6    process that relates to these permits as a
7    municipal level of review.
8         Q    Would you have -- and you were a
9    public official, I take it, as the Gloucester
10   harbormaster?
11        A    Correct.
12        Q    Would you have held yourself out to
13   the City of Gloucester as someone they could
14   look to for a legal opinion as to whether the
15   permit application was legally correct?
16        A    Yes, yes.
17        Q    And you have done that?
18        A    People, for example, that want to
19   apply for a dock and gangway in front of their
20   home, their first step in that process, which
21   is -- eventually will be an Army Corps
22   Engineering permit, their very first step is
23   the Gloucester harbormaster's office.
24        Q    But you would specifically -- you
25   would be comfortable representing to them that

```
 1    you could legally advise them on --
 2         A    I would give them opinions on
 3    different avenues and the legal process in
 4    which it was to obtain.
 5                  I wouldn't represent them in any
 6    kind of courtroom setting, but part of my job
 7    was to advise and educate on the legal process
 8    or the processes on obtaining permits, not in a
 9    lawyer capacity, just as a public official and
10    a department head in which these structures
11    fell under my jurisdiction.
12         Q    This passage that we're looking at
13    that starts on page 8, about eight lines down,
14    it quotes some language from, it looks to be a
15    court case called United States v. Republic
16    Steel Corporation.
17                  Do you see that?
18         A    I do.
19         Q    So would you say that you have the
20    expertise, for example, to interpret the
21    significance of that court case and how it
22    might apply in any subsequent cases?
23         A    No.
24         Q    And was there a reason that you took
25    these definitions from counsel rather than
```

```
 1    writing them yourself?
 2        A    I fully agree with these definitions,
 3    so I felt no need to write them for myself.  I
 4    concur with the definitions that are -- were
 5    supplied to me.
 6              After doing a full analysis of
 7    the entirety of this report, I felt that these
 8    definitions were concurrent with my own
 9    conclusions.
10        Q    Did you ask for definitions to be
11    provided?
12        A    I don't believe so.
13        Q    Okay.
14              Did you need these legal
15    definitions in order to write the remainder of
16    your report?
17        A    I did not.
18        Q    So they are not significant to the
19    conclusions you reach in your report?
20        A    Correct.
21        Q    There's -- I wanted to look at
22    page 32 of your report.  And do you see about
23    five lines from the bottom of the page, there's
24    a sentence that says, "The buoys are not
25    permanently moored"?
```

1      A     Mm-hmm.
2      Q     What do you mean by saying that
3   they're not "permanently moored"?
4      A     They could be removed.  Generally,
5   moorings are temporary in nature, so just like
6   the mooring balls we observed out here in
7   Boston Harbor on the way out to lunch, those
8   are temporarily moored and can easily be
9   removed or moved, depending on a variety of
10  circumstances, whether a bigger boat needs to
11  go there, you could move the moorings farther
12  or closer apart, or you could remove them
13  altogether.
14            It's not -- moorings are
15  generally temporary in nature, in my
16  experience.
17     Q     Moorings are generally temporary in
18  nature.
19            Can there ever be a circumstance
20  in which something is permanently moored in the
21  water?
22     A     Yeah, usually pile-supported
23  structures, like pilings, stuff like that.
24     Q     Can you explain just -- just for the
25  benefit of the record, what would be a

1    Mr. Lynk's questions that that entire paragraph
2    was provided to you by counsel for Texas.
3                Was that entire paragraph, in
4    fact, provided to you, or does it contain any
5    of your own separate conclusions?
6         A    Well, the top couple sentences are my
7    conclusion, and the bottom one, two, three
8    sentences are mine.
9                The -- what I was referring to
10   is the actual -- I guess it would be the center
11   of the paragraph where it pertains to the
12   actual definition under United States v. Hall:
13   "Structures may" -- "must affect," the actual
14   definition.  But, "The buoys do not affect the
15   course, location, or condition of the
16   Rio Grande River in such a manner as to impact
17   its navigable capacity, for all reasons
18   discussed elsewhere in this report; therefore,
19   the buoys are not structures," that belongs to
20   me.  That is my work and my opinion.
21               And the top, "Finally, the buoys
22   are not structures under the RHA.  'Structures'
23   means 'any pier, boat dock, boat ramp, wharf,
24   dolphin, weir, boom, breakwater, bulkhead,
25   revetment, riprap, jetty, artificial island,

```
 1    reef, permanent structure, power or
 2    transmission lines, permanently moored floating
 3    vessel, pilings,'" that's my work as well.
 4         Q    Well, let me ask you about that.
 5         A    Well, not the --
 6              Not quite that far.  No, I
 7    believe that is -- I believe that -- I believe
 8    that I wrote the top part of this.  I can't
 9    remember specifically.
10              I think I may have changed a few
11    things in here, but definitely the bottom.
12         Q    Okay.
13         A    I don't recall how far down I went
14    with this definition, but I know that --
15         Q    Did you -- I'm sorry.  I didn't mean
16    to cut you off.
17         A    No, go for it.  I'm just trying to
18    think back now.
19         Q    The second sentence, the second
20    sentence of the paragraph --
21         A    Mm-hmm.
22         Q    -- where it says -- the first word of
23    that sentence, "structures"?
24         A    Correct.
25         Q    Is that from the regulatory
```

```
 1   definition or is that your own definition?  Or
 2   was that -- was that supplied to you?
 3        A    I know that I added some to this
 4   definition.  I'm not sure, I'm not exactly sure
 5   where I stopped and started here.
 6                (The deponent read the
 7   document.)
 8        A    "The buoys are..." that is mine.  So
 9   I believe the definition starts at
10   "structures," that was provided to me, now
11   reading through this entire thing here.
12        Q    Okay.
13        A    So the first sentence and the last
14   three.
15        Q    The last three lines or the last --
16        A    The last three lines, yes.
17                (Simultaneous speech.)
18                (Reporter interrupted.)
19        A    Sorry about that.
20                I'm trying to just think back
21   because I know I changed stuff in this opinion
22   a couple times, so I'm just trying to make sure
23   I'm going on the record with the right thing
24   here.
25                Yeah, "Finally, the buoys are
```

1    not other structures under the RHA."  That's
2    me.
3                "Structure" starts the
4    definition.  And then the last three sentences,
5    where "The buoys do not affect the course,
6    location," that's where I come back in as well.
7         Q    Okay.
8         A    I had changed some of these opinions
9    a few times, so I was just trying to think
10   back, make sure that I'm back -- I'm speaking
11   accurately here.
12        Q    Okay.
13                  Now, I'd like to direct your
14   attention to page 19 of your report --
15        A    Mm-hmm.  Okay.
16        Q    -- to Figure 15.
17        A    Yup.
18        Q    Now, you testified earlier in
19   response to one of Mr. Lynk's questions that
20   you took this picture on the day of your site
21   visit to Eagle Pass; is that correct?
22        A    Yes.
23        Q    And you also testified earlier that
24   in this spot, you believe that it would be
25   possible to climb over the buoys.