# Iakovou Deposition Transcript Excerpts

```
                                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION
 3     UNITED STATES OF AMERICA,   )
                                   )
 4               PLAINTIFF,        )
                                   )
 5     VS.                         )    CIVIL ACTION
                                   )  NO. 1:23-CV-00853-DAE
 6     GREG ABBOTT, IN HIS         )
       CAPACITY AS GOVERNOR OF     )
 7     THE STATE OF TEXAS, AND     )
       THE STATE OF TEXAS,         )
 8                                 )
                 DEFENDANTS.       )
 9
       **********************************************************
10                       ORAL DEPOSITION OF
11                   ELEFTHERIOS IAKOVOU, PH.D.
12                         July 11, 2024
13     **********************************************************
14
15            ORAL DEPOSITION of ELEFTHERIOS IAKOVOU, PH.D.,
16     produced as a witness at the instance of the Plaintiff,
17     and duly sworn, was taken in the above-styled and
18     numbered cause on the 11th day of July, 2024, from
19     9:10 a.m. to 4:00 p.m., before Anica Diaz, CSR, RPR,
20     CRR, in and for the State of Texas, reported by machine
21     shorthand, at the Offices of U.S. Attorney's Office for
22     the Wester District of Texas, 903 San Jacinto Boulevard,
23     Suite 334, Austin, Texas, pursuant to the Federal Rules
24     of Civil Procedure and the provisions stated on the
25     record or attached.
```

```
 1   ballpark figures.  Yes, that's a -- that's a number that
 2   makes -- that hinders, that undermines the commercial
 3   navigability of a river of 600 miles because of huge
 4   delays in the overall door-to-door transportation time.
 5                 And I'd be more than happy to make the
 6   point in the report that for private shippers to use
 7   corridors, any corridor, could be rail, heavy duty
 8   trucks, deep sea -- or from deep sea to rail, or from
 9   deep sea to barge.  We've got to provide quick,
10   reliable, again and again, seamless; otherwise, they
11   will go away.  And if they go away, they ain't going to
12   come back.
13                 And that's the reason the majority of the
14   ports around the globe, including the U.S., do whatever
15   it takes, do whatever it takes to ensure that these
16   great shippers -- so when I talk about a shipper, I'm
17   not talking about about vessel carrier, right?  I'm
18   talking about the Walmarts, the Targets of the world
19   that are shipped, right?  The Dells.  They do whatever
20   it takes to attract these great shippers in the ports
21   and port container terminals.
22                 And they have often sleepless nights, as
23   you guy as counselors, whenever somebody gives a call
24   and tells them that, you know what, a shipment of Dell
25   computers is more than 24 hours delayed at your port.
```

```
 1   Because Dell works on the just in time that I talk a
 2   little bit about it with phenomenal negative
 3   ramifications in the business.
 4              So these great players demand for the
 5   infrastructure to be had in a certain way; otherwise,
 6   they are not use it.  They will go somewhere else.  It's
 7   a very aggressive environment.  And following what
 8   happened with COVID -- and I go at great lengths in the
 9   report to describe this.  The environment is changing
10   dramatically.  Supply chains are going through seismic
11   changes.
12              And I think if we collectively -- for me,
13   there's no Texas/U.S.  Collectively, if we want to think
14   how we address aging infrastructure in the U.S., we have
15   to take into account how the nation is moving for the
16   years ahead.  We have to think about, what is the issue
17   of disruptions that are coming up?  What is the issue of
18   near sort manufacturing in Mexico?  How does that impact
19   demands on our ports?  I pause here.
20      Q.   I want to go back to something you mentioned
21   earlier regarding the information you got from counsel.
22   You said that they gave you a -- a few legal terms that
23   would be relevant to your work on this report, right?
24      A.   Uh-huh.
25      Q.   Which terms in particular did Texas define for
```

1    you and ask you to use?
2         A.  The new term, Counselor, that I wasn't aware
3    was Highway of Commerce.  So I did my due diligence.
4    For example, I found a couple of books on Amazon dating,
5    I believe, 18-something, 1880 and then 1920.  I looked
6    at the definitions and, clearly, what I saw is, you
7    know -- by the way, this is the time where the federal
8    government in the U.S. was funding, specifically, for
9    example, inland waterways to grow commerce, right?  To
10   grow commerce how?  North/south, right?  And then rail
11   comes and it goes west/east, and rail picks up most of
12   the capabilities of inland.
13              So that's a term, it was used by the Feds
14   and federal agencies in the earlier times.  The books
15   that I found on Amazon, which I kind of liked it because
16   I was able to understand a little bit, where is this
17   coming from?  Archaic, of course.  But the actual
18   definitions that I found, and one of them was provided
19   by counselor from before, is absolutely nothing but the
20   intermodal logistics infrastructure networks of today.
21              In other words, we're talking about
22   corridors of rail, ocean, waterborne, tracks, right?
23   How they connect together to serve commerce, global and
24   increasingly fragmented centralized/decentralized supply
25   chains.  And I believe that's the only term that I

1     wasn't aware of that was given to me.
2          Q.   Did Texas provide you a particular definition
3     of highway of commerce or did they simply ask you to
4     develop your own definition of that?
5          A.   I didn't develop, I searched.  I searched,
6     right, and I found two or three.  Here, I apologize, I
7     might was given -- the counselor, Mr. Stone, sent an
8     email with some general guidance, right, some glossary
9     of terms.  It might -- highway of commerce might have
10    been -- might have had one definition there in that
11    glossary.  But I went ahead and added and searched,
12    right, and I included that in the report.
13         Q.   Do you remember what any of the other terms
14    were --
15         A.   Yeah.
16         Q.   -- in that message?
17         A.   So there was a bunch of things in the message
18    about buoys, floating barriers, which for me, as you can
19    understand, I'm not an expert.  And, frankly, I don't
20    have an interest, right?  So I didn't go and look there,
21    even though I heard the discussions and the arguments
22    between Texas and U.S. about floating barriers as
23    opposed to buoys.
24              But the important things for me were
25    commercial navigation as per the record of legal -- what

1   is it?  Legal activities, legal -- record of legal
2   outputs, right, from historical trials.  That's what I
3   looked at.
4       Q.  Was this message from counsel for Texas
5   directed to all of the retained experts generally or
6   just to you?
7       A.  Yes.  It was -- it was to all the retained -- I
8   think it was a June 3rd message.  So he tried to
9   provide, I think, a common basis for people to start
10  speaking the same language.
11      Q.  So what's your understanding of the importance
12  of the concept of highway of commerce in this case?
13      A.  The importance?
14      Q.  Yes.
15      A.  It's huge, right?  Highway of commerce is how
16  do we build in the U.S., in Texas, the network of
17  corridors that we have, land, rail, water, to facilitate
18  commerce.
19      Q.  Well, and before we get into that idea, my
20  question was more about --
21      A.  Uh-huh, please.
22      Q.  -- what is the significance of that issue to
23  this case?
24      A.  Oh, very much so.  I think it's very
25  significant because commercial navigation -- and this is

```
 1   out of this baby was -- apologize for the baby -- from
 2   this document is the means markers 275.5 to 610.
 3                I didn't want to -- respectfully, nothing
 4   there gave me additional guidance, cost-benefit analysis
 5   on navigability of waters.  And I remember
 6   the -- there's a lot of other stuff that talks, and I
 7   remember visibly, the -- when I went through booms,
 8   piers, wharfs, jetties, that didn't add much value to my
 9   work.  But, yes.  Yeah, that was shared, I think it was
10   the beginning of June.
11        Q.   Okay.  Do you recall more specifically when in
12   June that would have been?
13        A.   Early June.  Definitely early June.  So we
14   submitted the 14th, June 3rd is one date that I'm
15   thinking.  I wish I had my laptop with me.  Yeah.
16        Q.   Do you recall when you started working on
17   preparing your report?
18        A.   Earlier than that.
19        Q.   Okay.
20        A.   Yeah, earlier than that.  I will say late May.
21   Late May, I started.
22        Q.   And do you recall if Texas' other experts were
23   included on that email?
24        A.   Oh, yeah.  That was the idea.  There was -- I
25   think the counselor wanted to give some common
```

```
 1    understanding of how navigation was treated before, some
 2    common terms that people start discussing, using the
 3    same platform of understanding.
 4          Q.   Okay.
 5          A.   But for me, it doesn't affect it.  It did not
 6    much affect anything of what I've done.
 7          Q.   So as far as you know, were all of Texas'
 8    testifying experts included on the email that was sent
 9    to you containing these terms?
10          A.   That, I don't know.  I think -- that,
11    Counselor, I don't know simply because I don't know the
12    complete list of the testifiable [sic] experts that
13    Texas is using.  I know the group that I worked with
14    that have been in my meetings:  Ancil Taylor, Doug
15    Shields, Carlos Rubinstein and Herman, his partner.
16                  Occasionally, we had one of the
17    environmentalists, I think.  So I'm not sure what is the
18    complete list.  I don't think they sent that to me.  I
19    didn't even bother to ask.
20          Q.   Do you know if Dr. Zou was included on the
21    list --
22          A.   Yes, yes.
23          Q.   -- on that email?
24          A.   Yeah.  I'm pretty sure he was.  Yeah, I forgot
25    to mention him.
```

1    Q.  Was there a Mr. Banks included on the email?
2    A.  That, I don't know.  That name doesn't ring a
3    bell to me.
4    Q.  Was there a Mr. Sierra Matero on the email?
5    A.  Sierra Matero, TJ, right?
6    Q.  TJ.
7    A.  Yeah.  I only saw him -- I don't know about the
8    email.  I only met this guy on a call once.  I don't
9    think so.  I don't -- I think this gentleman showed up
10   months later in the process.
11   Q.  Do you recall the names Maegers or Harts?
12   A.  Hart, no.  But Maegers was the
13   environmentalist.  I'm not sure if that is included in
14   the email list also.
15   Q.  Okay.
16   A.  So I thought, I'm more of a part of an
17   engineering team.  That's why I'm thinking about Doug
18   Shields, Rick Rubinstein, Tong Zou, and Ancil Taylor.
19              I'm not privy, in other words, what Texas
20   is doing with the other -- because I know they told me
21   they're doing also environmental, they're doing I think
22   history, but not my cup of tea.  Outside of my work.
23   Q.  Did you rely on any of the definitions in this
24   list in preparing your report?
25   A.  Not really.  What I've done is, as I told you

1    before, is for navigability.  Maybe it's my naive
2    thinking, but I wanted to grab one or two definitions
3    that, historically, can be used in the legal circles.
4    Does -- the same way I try to do with the highway of
5    commerce and try to fuse it in my own -- in my own
6    words.
7                 In other words, instead of me showing up
8    and say my story, I try to say what -- how has
9    this -- have these terms been used so far in
10   litigations?  How have these terms been used for
11   people -- in the ecosystem of litigation outside of my
12   craft.  That's what I try to do.  But affecting my
13   expert report, absolutely not.  And I can document that
14   at any point in time.  I mean, it's evident by reading
15   my report, right, that this is --
16        Q.  Well, I mean, in turning to the second page of
17   Exhibit 2 --
18        A.  Sure.
19        Q.  -- you see the definition provided for
20   commercial navigation at Item No. 4?
21        A.  Item No. 4.  Which is item No. 4?  Is
22   it -- four of the page number, Item H?
23        Q.  No.  Numeral four, Commercial Navigation.
24   Towards the bottom of the page.
25        A.  Okay.  Commercial navigation, yes, sir.  That's

1          That the terms that are used in Exhibit 2
2    that are in this document are straight from the
3    pleadings that were provided to all of the experts in
4    this case.  These are essentially verbatim quotes pulled
5    from the pleadings that were provided to all of the
6    experts in this case.
7          So there's nothing -- and none of the
8    experts were asked to assume that any of these terms
9    were definitions for the purposes of this case.  So I
10   just want to make sure that's clear for the record.
11         With that, let's take a brief five-minute
12   break and then come back.  I don't have much.
13         THE WITNESS:  That's okay.  Yeah.
14         MR. KNUDSEN:  Yeah.
15         (Break taken from 2:48 p.m. to 3:02 p.m.)
16         MR. KNUDSEN:  Okay.  We're back on the
17   record.  I'd just to formally state for the record that
18   we're requesting production of the original email or
19   emails to Dr. Iakovou and the other experts that Texas
20   identified that include the list of items that's
21   provided in Exhibit 2.
22         MR. STONE:  Okay.
23         MR. KNUDSEN:  This is a document that has
24   facts or assumptions that Texas has given to its experts
25   that they -- at least one has relied on in preparing his

```
 1    expert reports, and we're entitled to those under
 2    Rule 6.
 3                MR. STONE:  We will not produce it.  As you
 4    heard testimony from -- they were not relied on by this
 5    expert.  To the extent that there was any reliance on
 6    any specific terms, he provided them to you.
 7                I also copied and pasted the terms that
 8    were provided from that correspondence directly into the
 9    email and provided it you.  I'm not giving you the guys
10    the original email.
11                You -- the testimony from -- first of all,
12    no expert that you guys have asked so far in this case
13    relied on any of the terms on this term sheet for their
14    expert opinions.  Also, all of these terms are coming
15    straight of the pleadings that were provided to all of
16    the experts, and none of them relied on them for their
17    opinions in this case.
18                This is -- anyway, no, we're not providing
19    it.  You guys can take it up with the court if you want.
20                MR. KNUDSEN:  And, to be clear, it's clear
21    from comparing Exhibit 2, the list, and Dr. Iakovou's
22    report that for at least one of these terms he used word
23    for word the same definition in his report that was
24    provided in this list.  So at least in some sense, he
25    has clearly relied on one of these terms.
```

 1                 And, you know, I would just state as well
 2     that providing a set of terms and definitions and
 3     concepts to use as a baseline for all experts to use,
 4     constitutes providing assumptions for them to use in
 5     developing their opinions.  So we disagree and plea that
 6     we're entitled to this document.
 7                 MR. STONE:  Our experts clearly did not use
 8     these for the same baseline and for definitions.  I hear
 9     your argument, and if it were true, then you would be
10     correct, but it's not true.
11                 Our experts did not use these terms as a
12     baseline, and the one example that you have here of
13     commercial navigation is quoted in his report, and he
14     testified already that he got it from me, that he got
15     this term from us from the dictionary.
16                 So it's -- I mean, we're battling over
17     dictionary definitions.  This is -- I don't know.  This
18     is a wild conversation.  Again, we provided it to you.
19     I just provided you during the course of this deposition
20     with the terms that we provided to them.  And you've
21     heard the testimony, no one relied on any of these
22     except for Leftherios, and only as to one definition
23     here, which is commercial navigation --
24                 MR. KNUDSEN:  Well --
25                 MR. STONE:  -- which he quoted.