# Alexander Deposition Transcript Excerpts

Kathy Ann Alexander PhD                                    July 8, 2024

                                                        Page 1

 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION
 3       UNITED STATES OF AMERICA,    )
                                      )
 4               Plaintiff,           )
                                      )
 5       v.                           )   Case
                                      )   No. 1:23-cv-00853-DAE
 6       GREG ABBOTT, in his          )
         capacity as GOVERNOR OF      )
 7       THE STATE OF TEXAS, and      )
         THE STATE OF TEXAS,          )
 8                                    )
                 Defendants.          )
 9
10
11
12                     ORAL DEPOSITION OF
13                  KATHY ANN ALEXANDER, PhD
14                    Monday, July 8, 2024
15
16              ORAL DEPOSITION OF KATHY ANN ALEXANDER, PhD,
     produced as a witness at the instance of the Plaintiff,
17   United States of America, and duly sworn, was taken in
     the above-styled and numbered cause on the 8th of
18   July, 2024, from 9:04 a.m. to 11:48 a.m., before Sharon
     Ross, Certified Shorthand Reporter in and for the State
19   of Texas, reported by computerized stenotype machine, at
     the US Attorney's Office for the Western District of
20   Texas, 903 San Jacinto Boulevard, Suite 334, Austin,
     Texas 78701, pursuant to the Federal Rules of Civil
21   Procedure and/or any provisions stated on the record or
     attached hereto.
22
23
     Reported by:
24   SHARON ROSS, Texas CSR #1961,
     Hawaii CSR #432, RMR, CRR, CRC
25   Realtime Systems Administrator
     Job No. CS6783937

Kathy Ann Alexander PhD

Page 8

1            (Discussion off the record.)

2       Q.  (BY MR. HARRISON)  And the court reporter is

3    recording everything that's said here and can only

4    record words.

5            So I ask that you answer each question with

6    a verbal response and also avoid the uh-huhs and the

7    huh-uhs which are common in our everyday conversation

8    but hard for the court reporter to capture.

9            Do you understand?

10      A.  Yes.

11      Q.  Have you taken or do you intend to take any

12   medication that would affect your ability to testify

13   truthfully or accurately today?

14      A.  No.

15      Q.  From time to time your counsel may object to my

16   questions of you.  After the objection, you are to go

17   ahead and answer the question unless he instructs you

18   not to do so.

19            Do you understand?

20      A.  Yes.

21      Q.  And we'll try to take a few breaks as necessary

22   but if you need a break at any time, please let me know,

23   and we can do so.

24            And the only thing that I ask is that a

25   question cannot be pending while we take a break.

Kathy Ann Alexander PhD                                          July 8, 2024

                                                                Page 9

1        A.   Okay.

2        Q.   Dr. Alexander, what did you do to prepare for

3    today's deposition?

4        A.   I met with my attorneys and I -- that's

5    basically it.

6        Q.   What did -- when you say "my attorneys," do you

7    mean those within TCEQ or with the Texas Attorney

8    General's Office?

9        A.   Both.

10       Q.   Did you review any documents?

11       A.   No.  Well -- excuse me.  I did look at my

12   opinion.  So if that's considered to be a document,

13   then, yes.

14       Q.   Here, I'll show you it.  When you say

15   "opinion," I'm showing you what we can mark as Alexander

16   1.

17                  (Alexander Exhibit 1 marked.)

18       Q.   (BY MR. HARRISON)   If I can direct your

19   attention to Page 8, would you say your opinion is

20   that -- is the substance contained on Pages 8 through

21   11?

22       A.   Yes.

23                  (Mr. Herman Settlemeyer is now present.)

24       Q.   (BY MR. HARRISON)   Did you review any other

25   documents to prepare?

1           A.  No.

2           Q.  When did you meet with your lawyers to prepare

3     for today's deposition?

4           A.  Last week.

5           Q.  And about how long did that meeting take?

6           A.  Oh, two and a half hours or so.

7           Q.  Have you spoken to anyone else in preparation

8     for your deposition today?

9           A.  No.

10          Q.  Have you spoken to any of the experts that

11    Texas has retained in this case?

12          A.  No.

13          Q.  Did you do anything else to prepare?

14          A.  No.

15          Q.  You said you had been deposed about 20 times

16    before.  Were you serving as an expert witness in all of

17    those depositions?

18          A.  Yes.

19          Q.  Let's start with the most recent one which I

20    think you said was last year.  Do you recall the nature

21    of that case and the name of it?

22          A.  Yes.  It was the application by the Port of

23    Corpus Christi Authority of Nueces County for a water

24    use permit.

25          Q.  And what was the general subject matter of your

Kathy Ann Alexander PhD                                    July 8, 2024

Page 11

1    deposition testimony?

2        A.  Generally the implementation of the Texas Water

3    Code, TCEQ's rules, and granting a water right.

4        Q.  And you were testifying on behalf of TCEQ?

5        A.  Yes.

6        Q.  Did you also provide testimony in that case at

7    a court or administrative hearing?

8        A.  Yes.

9        Q.  What about prior to the Corpus Christi

10   application?  When was the --

11       A.  The City of Wichita Falls' application for a

12   water use permit, 13404.

13       Q.  And what was your test -- what was your

14   testimony concerning in that case?

15       A.  The Tex -- implementation of the Texas Water

16   Code, TCEQ's rules, and TCEQ policy and reviewing a

17   water right application.

18       Q.  And did you also provide testimony at a court

19   or administrative hearing for that matter?

20       A.  Yes.

21       Q.  When was the -- when were those proceedings?

22       A.  I believe they were in the 2023, '24 time

23   frame.

24       Q.  And I'll ask about maybe just one more, then.

25               Any deposition testimony prior to the City

Kathy Ann Alexander PhD                                July 8, 2024

Page 13

1        A.   Yes.

2        Q.   And were you testifying an ex -- as an expert

3    for TCEQ in that matter?

4        A.   Yes.

5        Q.   And what was the substance of your testimony

6    there?

7        A.   The same as the other cases.

8        Q.   And you were deposed in that matter?

9        A.   Yes.

10        Q.   Was that a -- also a judicial proceeding?  Did

11    it go beyond an administrative hearing and go to a

12    judicial proceeding?

13        A.   Yes.

14        Q.   Did you provide testimony at any hearing or

15    trial in front of the -- for the judicial proceeding?

16        A.   No.

17        Q.   Did you submit pretrial -- written pretrial

18    testimony or anything similar to that?

19        A.   I don't understand the --

20        Q.   Sure.

21        A.   -- quest --

22        Q.   Did you submit anything to the judicial -- for

23    the judicial proceedings, whether it be written

24    testimony or a declaration or something along those

25    lines?

Kathy Ann Alexander PhD                                    July 8, 2024

Page 14

1        A.  No.

2        Q.  Have you ever testified in a case where you

3    were not serving as an expert?

4        A.  No.

5        Q.  What have you been asked to do in this case?

6        A.  I'm here as -- in a representative capacity for

7    the TCEQ and I'm here to talk about Texas Water Code and

8    its associated regulations and water rights permitting.

9        Q.  Were you provided with any assumptions by

10   Texas' counsel to form your opinions?

11       A.  I was asked to look at several things, yes.

12       Q.  What were those several things that you were

13   asked to look at?

14       A.  My understanding is that there was some

15   discussion of different things that could be done in the

16   Rio Grande, and I was asked to weigh in on those from a

17   water rights permitting perspective, which is the

18   substance of my opinions.

19       Q.  What were you told the different things that

20   could be done were?

21       A.  I think there were suggestions about dredging

22   or locks and dams.  I think those are embodied in items

23   5, 6, and 7 in my opinions.

24       Q.  Were you provided any information as it

25   pertains to the dredging or locks and dams?

Kathy Ann Alexander PhD                                    July 8, 2024

Page 15

1          A.   No.

2          Q.   Were you provided with any other facts to help

3     you form the basis of your opinions?

4          A.   No.

5          Q.   Were you provided with any documents?

6          A.   I might have looked at some of the documents in

7     this case.

8          Q.   Do you recall which ones those were?

9          A.   I think I have looked at some of the deposition

10    testimony and briefly looked at the many court filings

11    that the attorneys had done, but I didn't do a

12    in-thorough review and analysis of any of that material.

13    It was just to situate myself for kind of what we were

14    talking about today.

15         Q.   Sure.  What were the deposition testimonies

16    that you reviewed?

17         A.   I looked at Adrian Cortez' deposition.

18         Q.   Anyone else?

19         A.   I think there were a couple others.  I don't

20    recall the names.  I -- like I said, I did not like

21    study them or anything like that.

22         Q.   Was one Tim MacAllister?

23         A.   It could have been.

24         Q.   But not Ben Johnson?

25         A.   I have no idea.  It's been several months.

Kathy Ann Alexander PhD                                    July 8, 2024

                                                    Page 16

 1   So -- and, again, I didn't --

 2        Q.  Sure.

 3        A.  -- study them.

 4        Q.  Captain John Timmel?

 5        A.  I don't recall.

 6        Q.  Was there anything -- or do you know

 7   Mr. Cortez?

 8        A.  Yes.

 9        Q.  How do you know Mr. Cortez?

10        A.  We served together on the Rio Grande high

11   quality work group and he -- we do have interactions

12   with the International Boundary and Water Commission.

13             THE REPORTER:  Could you speak up just a

14   little bit?  Thank you.

15        Q.  (BY MR. HARRISON)  In reviewing the --

16   Mr. Cortez' deposition testimony, is there anything that

17   you recall you disagreeing with in his deposition

18   testimony?

19        A.  I think I'd have to say that some of his --

20   some of the text in there related to Texas water rights

21   management may not have been presented in the way that

22   we would have done it as the entity that manages water

23   rights in Texas.

24        Q.  Anything else that you would disagree with from

25   his testimony?

Kathy Ann Alexander PhD                              July 8, 2024

                                                    Page 17

1          A.  Not that I recall.

2          Q.  You also said you looked at some of the court

3     filings.  Do you recall which court filings you may have

4     reviewed?

5          A.  There were quite a number.  Y'all have been

6     trading paper back and forth.  So -- and I'm not an

7     attorney.  So I don't recall specific items, no.

8          Q.  Did any of the documents you reviewed, the

9     deposition testimony, or the court filings, help form

10    the basis of your -- of the opinions that you reached

11    here?

12         A.  No.

13         Q.  Did you speak to anyone about the opinions that

14    you formed?

15         A.  Not -- not anyone except for what I've already

16    mentioned.

17         Q.  Did you review any of the expert reports in

18    this case?

19         A.  No.

20         Q.  Dr. Alexander, you are employed with the Texas

21    Commission on Environmental Quality?

22         A.  Yes.

23         Q.  And so we'll refer to that as TCEQ today, if

24    that's -- that's fine?

25         A.  That's great.  Thank you.

Page 18

1          Q.   What is your position with TCEQ?

2          A.   I'm the senior policy and technical analyst for

3     TCEQ's Water Availability Division.

4          Q.   And what do you do in that role?

5          A.   I provide support to the water rights

6     permitting and Watermaster Programs and to the deputy

7     director of the Water Availability Division.

8          Q.   And what does the Water Availability Division

9     do?

10         A.   The Water Availability Division covers the

11    water rights permitting program, the Watermaster

12    Programs for the three Watermaster areas that we have

13    and it also -- we have a groundwater protection

14    component with which I don't have much interaction.  I'm

15    pretty focused on surface water.

16         Q.   And when you -- so the permitting would be for

17    the permitting of water rights or water permits?

18         A.   Yes.

19         Q.   And then you said the Watermaster -- there are

20    three of those.  Could you briefly explain?

21         A.   So we have Watermaster Programs in the Brazos

22    River basin, obviously in the Rio Grande; and we also

23    have the South Texas and Concho program that covers

24    basically basins from Corpus Christi up through the

25    Lavaca River and also the Concho River

Page 23

```
 1                  MR. HARRISON:  Yes, it's the June 14th,

 2      2024, letter to Brian Lynk.

 3                  MR. TEBO:  Thank you.

 4          Q.  (BY MR. HARRISON)  I'm on Page 8 and --

 5      starting on Page 8 and, I guess, Pages 9 through the top

 6      of 11 as well.

 7                  And if you need to take a minute to read

 8      them to yourself, please let me know; but do the seven

 9      numbered paragraphs on Pages 9 through 11 of Exhibit 1

10      accurately reflect the information and opinions that you

11      are testifying to in this case?

12          A.  Yes.

13          Q.  And do the seven numbered paragraphs on Pages 9

14      through 11 of Exhibit 1 contain all of the opinions and

15      testimony that you intend to offer at trial?

16          A.  Yes.

17          Q.  Have you been asked to form any other opinions

18      in this case?

19          A.  No.

20          Q.  Have you been asked to do anything else in this

21      case?

22          A.  No.

23          Q.  If I could -- if we could go to the paragraph

24      below No. 11 on Page 8.

25          A.  (Witness complies.)
```

Kathy Ann Alexander PhD                                    July 8, 2024

Page 24

1          Q.   First sentence there says, "Dr. Alexander is

2     not retained or specially employed to provide expert

3     testimony in this case.  Dr. Alexander is a person whose

4     duties regularly involve giving expert testimony in

5     matters relating to water rights" and permitting

6     "management in Texas."

7               Is that a correct -- is that a correct

8     statement?

9          A.   That's basically what it says there.  I believe

10    that actual text says "expert testimony in matters

11    relating to water rights permitting and management in

12    Texas."

13         Q.   Okay.  So in your current role at TCEQ, your

14    duties include regularly giving expert testimony on

15    water rights, permitting, and management?

16         A.   Yes.

17         Q.   And that's what you'll be providing testimony

18    in this case about?

19         A.   Yes.

20         Q.   So a few lines down in that paragraph, it says,

21    "Dr. Alexander is expected to testify regarding"; and

22    then there is a list where it says, "which includes such

23    as."  What -- and the first one is "interbasin

24    transfers."

25               What testimony do you intend to provide

Kathy Ann Alexander PhD                                      July 8, 2024

                                                            Page 25

1    about interbasin transfers?

2         A.   So to the extent that interbasin transfers are

3    part of the water rights permitting regulatory scheme,

4    if I was asked questions about that, I would provide

5    those answers.

6         Q.   What are interbasin transfers?

7         A.   Under Texas Water Code section 11.085, it's the

8    move re -- movement of state water from one river basin

9    to another.

10        Q.   Next on the list it says, "water availability

11   determinations."

12             What testimony do you intend to provide

13   about water availability determinations?

14        A.   So I think that's embodied in my list of

15   opinions, and part of my job duties are to make

16   assessments of whether there's water available for

17   appropriation.

18             And I don't believe there's water available

19   for appropriation in the Rio Grande, as I've stated in

20   my opinions.

21        Q.   Next on the list says, "Texas' hydrology,

22   regulatory" -- or "Texas' hydrology."

23             What testimony do you intend to provide

24   about Texas' hydrology?

25        A.   To the extent that hydrology guides water

Page 30

1    operations?

2         A.  Well, to the extent that we're in a drought,

3    they absolutely affect operations of the Tex -- of the

4    Rio Grande Watermaster.

5         Q.  So the next item is "implementation and the

6    operation of relevant treaties, laws, regulations, and

7    policies."

8              What are the relevant treaties that you're

9    referring to here?

10        A.  The 1944 Water Treaty between the US and

11   Mexico.

12        Q.  And what are the relevant laws that you're

13   referring to?

14        A.  Again, the Texas Water Code and supplemental

15   regulations.

16        Q.  And what are the relevant policies?

17        A.  As embodied in TCEQ's rules.

18        Q.  Okay.

19        A.  Those -- those type of things, yes.

20        Q.  Are you providing any testimony as to the

21   operation of relevant federal laws?

22        A.  No.  There are no relevant federal laws in

23   water rights permitting.

24        Q.  The next item is "relevant federal, state,

25   local, and tribal entities."

Page 31

```
 1              Who are the relevant federal, state, local,
 2    and tribal entities?
 3         A.  That's a pretty broad question.  Can you --
 4         Q.  Sure.  So maybe like --
 5         A.  -- narrow that down a little bit?
 6         Q.  Let's break it up.  So you'll -- what testimony
 7    do you intend to provide about the relevant federal
 8    entities involved?
 9         A.  So I'm here, again, to provide information on
10    TCEQ's water rights permitting program, Chapter 11, and
11    its implementing regulations.
12              So to the extent that some of our
13    operations are guided by, for example, the International
14    Boundary and Water Commission and its role in ensuring
15    that water is delivered to Texas under the treaty, there
16    may be some information related to that, if I were
17    asked.
18         Q.  What is TCEQ's role in implementing the 1944
19    Water Treaty?
20         A.  TCEQ doesn't have a role in implementing the
21    treaty.  The treaty is intended to provide the water for
22    Texas uses -- uses.  And once the water has been
23    provided, then Texas law governs how it's used and how
24    we operate the Rio Grande.
25         Q.  And then the last item in the list -- or in the
```

1    paragraph on Page 8 of Exhibit 1 says "reasonableness of

2    possible improvements to make the Rio Grande River

3    suitable for navigation as proposed by the USA,

4    including between Mile Markers 275.5 and 610."

5                      Are you providing -- are you providing an

6    expert opinion on the reasonableness of the possible

7    improvements?

8         A.   Yes.   That's items 5, 6, and 7 in my opinion.

9         Q.   What do you mean by "reasonableness"?

10        A.   So if something's not possible, it's probably

11   not reasonable; and I think that's what I've set out in

12   opinions 5, 6, and 7.

13        Q.   And then when you say "possible improvements,"

14   are those the two that we discussed earlier, the

15   dredging and the canal?

16        A.   The dredging, the locks and dams, new water

17   rights for navigation under Texas law, the items 5, 6,

18   and 7, in my opinion.

19        Q.   All right.   If you could look at paragraph 1 on

20   Page 9 of Exhibit 1.

21        A.   (Witness complies.)

22        Q.   It says, quote, "State water is defined by

23   Texas law as 'the ordinary flow, underflow, and tides of

24   every flowing river, natural stream, and lake, and of

25   every bay or arm of the Gulf of Mexico, and the storm

Kathy Ann Alexander PhD                                July 8, 2024

Page 33

1   water [sic], floodwater, and rainwater of every river,

2   natural stream, canyon, ravine, depression, and

3   watershed in the state' and is in the property of the

4   state."

5           This is a quote from Texas Water Code

6   11.021(a)?

7       A.  Yes.

8       Q.  What happens for water that flows into Texas

9   from outside of the state?  Does that become state water

10  once it crosses into the State of Texas?

11      A.  So I'm not sure I understand your question.

12      Q.  Sure.  So if there's a river that flows between

13  a state and Texas, does the water become Texas state

14  water once that water comes into the state?

15      A.  Yes.

16      Q.  The next sentence says, "The US share of water

17  flowing in the Rio Grande is state water."

18           What is the basis for that statement?

19      A.  So the basis for that statement is that the

20  water that's in the Rio Grande, once it's delivered by

21  Mexico, is for Texas' use; and that makes it state

22  water.

23      Q.  And then the next sentence says, "State water

24  may be used for the beneficial purposes of use defined

25  in the Texas Water Code and TCEQ's rules; and it cites

Kathy Ann Alexander PhD                                July 8, 2024

Page 48

1          Q.   Are you aware of any water that's been reserved

2     from appropriation by TCEQ?

3          A.   No.

4          Q.   But it would be possible to do that, correct?

5          A.   Yes.

6          Q.   The second sentence on paragraph 2, Page 9,

7     Exhibit 1, says "There" -- sorry to keep jumping back

8     and forth.

9          A.   That's okay.

10         Q.   "There are water rights in the State of Texas

11    that include navigation as an authored beneficial

12    purpose of use; however, none of those water rights are

13    in the Rio Grande."

14               Did I read that correctly?

15         A.   Yes.

16         Q.   And what is the basis for this statement?

17         A.   A review of our records.

18         Q.   So while there are no water rights currently in

19    the Water [sic] Grande that include navigation as a

20    beneficial purpose of use, is that to say that that

21    could never be the case?

22         A.   I'm not sure I understand your question.

23         Q.   Sure.  Is it possible that navigation could be

24    included as an authorized beneficial use in the future?

25         A.   If a water right holder for a Texas water right

Kathy Ann Alexander PhD                                    July 8, 2024

Page 49

1    requested it.

2          Q.  And it could also be an incidental use to

3    another one of the beneficial uses, correct?

4          A.  Yes.

5          Q.  And so just because water has been appropriated

6    for municipal use doesn't mean that it can't be used for

7    navigation?

8          A.  What that -- so what an incidental use is -- is

9    that is as the water is, for example, released from

10   storage to a downstream user, as it travels down the

11   stream to its ultimate beneficial consumptive use, it

12   may have ancillary benefits such as environment -- the

13   environment or navigation or whatever but it's not an

14   additional amount --

15         Q.  Uh-huh.

16         A.  -- in addition to the municipal use.

17         Q.  And so just because there have -- there are no

18   water rights appropriated for navigation doesn't mean

19   that a -- water cannot be navigable, correct?

20              MR. TEBO:  Objection, form.

21         A.  I don't understand that question at all.

22         Q.  (BY MR. HARRISON)  Looking at the next two

23   sentences, paragraph 2, it says, "In wa" -- Page 9 --

24         A.  Uh-huh.

25         Q.  -- "In water rights that authorize navigation,

Kathy Ann Alexander PhD                                      July 8, 2024

Page 50

1    navigation is not the only beneficial use authorized in

2    the water right.  Navigation is an incidental use

3    whereby water that is diverted or released for other

4    purposes could also be used to support navigation as

5    part of the water" rights -- "water right holder's

6    operations."

7                    And that's what we just talked about?

8         A.   Yes.

9         Q.   And then the last sentence, it says, "The use

10   of water for navigation would not be in addition to the

11   authorized beneficial purposes of use in the water right

12   such as municipal, agricultural, or industrial use."

13                   And that's the same thing that we were

14   also --

15        A.   Yes.

16        Q.   What in paragraph 2 on Page 9 of Exhibit 1

17   constitutes your expert opinion?

18        A.   So just like with statement 1, this is my

19   expert opinion about how water rights for navigation

20   uses or other non-consumptive uses would work in the

21   State of Texas based on my experience in water rights

22   permitting.

23        Q.   So moving to paragraph 3, it says, "Water

24   rights in other parts of the state include provisions to

25   protect navigation use, such as subordination of other

Kathy Ann Alexander PhD                                    July 8, 2024

Page 51

1    uses to navigation or cancellation of the water right if

2    the water is needed for navigation.   These provisions

3    were included in the water right at the time the

4    water ... was originally granted" -- or "water right was

5    originally granted."

6              Did I read that correctly?

7         A.   Yes.

8         Q.   And what's the basis for that statement?

9         A.   My knowledge of water rights permitting in

10   Texas and what's in particular permits based on 25 years

11   of experience and knowledge of specific permits.

12        Q.   And such provisions are not included for any

13   water rights on the Rio Grande --

14        A.   No --

15        Q.   -- to your knowledge?

16        A.   No, they're not.

17        Q.   The same question on paragraph 3, what in

18   paragraph 3 constitutes your expert opinion?

19        A.   This is based on my 25 years of experience,

20   knowledge of the Water Code and TCEQ's rules and what's

21   embodied in water rights in the State of Texas in terms

22   of their authorizations.

23              (Mr. Johnathan Stone is no longer present.)

24        Q.   (BY MR. HARRISON)   Paragraph 4 starts at the

25   bottom of Page 9.   It says, "TCEQ's Water Rights

Kathy Ann Alexander PhD                                    July 8, 2024

                                                          Page 52

1    Permitting program manages the water rights permitting

2    process, which includes issuing new water rights or

3    amending existing water rights" and cites to the Texas

4    Administrative Code Chapters 295, 297, and 303.

5              Could you explain the water rights

6    permitting process for a new water right?

7    A.  So a person who wants to -- are you talking an

8    appropriation just so we're clear?

9    Q.  Yes, yes, that --

10   A.  So if someone wants to appropriate water in the

11   State of Texas, they -- we have an administrative

12   process that begins with a pre-application meeting.

13             They complete the forms and give us all the

14   information that's required on those forms.

15             We perform a technical review of the

16   application -- for most applications.  I'm speaking very

17   generally.

18   Q.  Uh-huh.

19   A.  There's nuances, you know, and various types of

20   applications; but we would do a technical review and

21   come to a determination.  And for new appropriations,

22   Texas Water Code 11.34 gives us the criteria that we

23   would use for making those determinations.

24   Q.  What is part of the technical review?

25   A.  At -- that's an extremely broad question.  So

Kathy Ann Alexander PhD                                July 8, 2024

Page 55

1    correct.

2         Q.  You said the Federal Government holds a few

3    water rights permits across the state.  What permits are

4    you aware of that they have?

5         A.  There are some water use permits or

6    certificates of adjudication for things like wildlife

7    refuges where they're -- the federal entity is diverting

8    state water to support the refuge.

9              I mean, that's what mostly comes to mind

10   when I'm thinking about the Federal Government

11   permitting.

12        Q.  Are there any, to your knowledge, for federal

13   civil works projects?

14        A.  There may be, yes.  I don't think I can name

15   them off the top of my head, though.

16        Q.  Do you have any idea or sense of what projects

17   those might be or where they may be located?

18        A.  I'd have to review TCEQ's records in order to

19   look at that.

20        Q.  Do you know who the applicants might have been

21   in those situations?

22        A.  I -- are you talking about the permit holders

23   or --

24        Q.  So you -- yes.  So you had said that the

25   Federal Government holds a few permits, and so I was

Kathy Ann Alexander PhD                                    July 8, 2024

                                                           Page 56

1    just asking if you know who the applicants were for

2    those permits.

3          A.  So I'm aware of the US Army Corps of Engineers

4    holds a water right for a -- like a duck pond area by

5    Lake Somerville.

6               The Fish and Wildlife Service holds water

7    rights for wildlife refuges.

8               The Bureau of Reclamation was identified as

9    an owner on several of their projects, I believe, in --

10   when they were originally issued.

11         Q.  And those would have been issued back in the

12   1950s, '60s, '70s or --

13         A.  It would vary depending on kind of when the

14   project was initiated.  So I -- you know, I don't have

15   an exact date range to give you.

16         Q.  Were any of the Federal Government permits that

17   were issued for purposes of navigation?

18         A.  Not that I'm aware of.

19         Q.  Were any of the Federal Government permits that

20   you're referencing on the Rio Grande?

21         A.  I believe some of the wildlife refuges could be

22   on the Rio Grande, but I'm not like 100 percent sure

23   about that.

24         Q.  If we could turn to paragraph 5 on Page 10 of

25   Exhibit 1, it says, quote, "Releasing water solely for

Kathy Ann Alexander PhD                                    July 8, 2024

                                                          Page 57

1    the" purposes -- "solely for the purpose of raising the

2    water depth in the Rio Grande for purposes of navigation

3    is not reasonable because in Texas water right would be

4    required" -- I'll stop there.

5              And it cites to Texas Water Code section

6    11.121; is that correct?

7        A.   Yes.

8        Q.   What do you mean by -- when you say "not

9    reasonable"?

10       A.   So if something's not possible, it's not

11   reasonable.  I think I've already answered that

12   question.

13       Q.   But navigation -- I think we've talked about

14   this.  Navigation could be an incidental benefit from

15   other beneficial uses, correct?

16       A.   It could be.

17       Q.   And so if the use of water was occurring for

18   other beneficial uses and that resulted in benefits for

19   navigational purposes, a water right would not be

20   required, correct?

21       A.   Can you state that again?

22       Q.   Sure.  So if the water -- if the use of the

23   water was occurring for other beneficial uses and

24   navigation was an incidental benefit of that use, they

25   wouldn't need a water right for navigation, would they?

Kathy Ann Alexander PhD                                   July 8, 2024

Page 58

1         A.   If someone was using the water for a beneficial

2    purpose of use, navigation, they would need to add that

3    purpose of use to their water right.

4         Q.   So the rest of the sentence there says, quote,

5    "acquiring a ... water right would not be possible for

6    the following reasons:  a, there is no water available

7    for a new appropriation of water in the Rio Grande."

8              So I think we've talked about this a little

9    bit, but what does that mean?

10        A.   That means that in order -- in order to get a

11   new water right or a new appropriation, water has to be

12   found available.  That's in section 11.134 of the Texas

13   Water Code.

14             And so there is no water in excess of the

15   needs of the appropriators in the Rio Grande.  So that

16   means there's no water available for a new

17   appropriation.  All the water has been spoken for.

18        Q.   So no water currently available?

19        A.   I think there's no water available for a new

20   appropriation in the Rio Grande.

21        Q.   Are you also speaking for in the future as

22   well?

23        A.   I think there's no water available for

24   appropriation in the Rio Grande.

25             I don't -- I don't under -- I don't -- in

Kathy Ann Alexander PhD                                       July 8, 2024

Page 59

1    looking at the amount of water that's supplied by the

2    watershed, I don't see there being a substantial

3    increase in that in the future.

4                    And like we've talked about before, even if

5    there were, all the existing uses would have to be 100

6    percent fully satisfied before we could grant a new

7    water right.

8         Q.  But there's still a chance that water could

9    become available for a new appropriation in the future,

10   correct?

11        A.  I don't see how that's possible.

12        Q.  Say that if the drought no longer becomes --

13   there's no longer a drought but there's periods of

14   increased rain and water, would -- would that increase

15   then potentially provide additional water that could be

16   available for a new appropriation?

17        A.  So when we're looking at water availability for

18   a new appropriation, it's based on a long-term

19   historical record that includes both droughts and high

20   flows.

21                    So simply having a couple of high-flow

22   years is not going to change the determination of water

23   availability in any basin across the state.

24                    Oh, I'm sorry.

25        Q.  Oh, no worries.

Kathy Ann Alexander PhD                                    July 8, 2024

Page 68

1    but maybe I'll ask you again or I'll ask something -- an

2    earlier question.

3                   So if I was a -- if I owned land on the

4    river -- on a river, a state water, and I needed to do

5    bank stabilization work, would I need a water right or

6    permit in order to have my contractor come in and fix

7    the bank or repair or do construction to the bank?

8         A.   It depends.

9         Q.   So if they needed to put a barge in the water

10   to stabilize the bank, would that require a water right

11   or permit?

12        A.   I don't believe putting a barge in the water

13   would require a permit.

14        Q.   If they put construction equipment in the

15   water, would that -- would that require a permit?

16        A.   I don't think that would require a permit

17   either.

18        Q.   But if they determined -- say the contractor

19   determined that in order to stabilize the bank, I needed

20   to build a bulkhead or do something along those lines.

21   Is that a point at which I would need to get a water

22   right?

23        A.   You know, I think those determinations are made

24   on facts in an application.  I think, you know, you have

25   to have the exact parameters of the project in front of

Kathy Ann Alexander PhD                                    July 8, 2024

Page 69

1    you to make that kind of decision -- or I would, anyway.

2         Q.  So the second sentence of paragraph 6 says,

3    "TCEQ" -- of paragraph 6 says, "TCEQ has issued water

4    rights for these types of projects; however, acquiring a

5    new or amended water right in the Rio Grande would not

6    be reasonable as outlined in statement 5."

7              When you say "these types of projects,"

8    what do you mean?

9         A.  Dredging bank stabilization.

10        Q.  Are you aware of a dredging project in the Rio

11   Grande where TCEQ has issued a water right?

12        A.  No, but I am aware of dredging projects in

13   other parts of the state where TCEQ has issued a water

14   right because, as I state, if any of the aspect of the

15   project involves storing, taking, or diverting state

16   water, a water right would be required.

17        Q.  Are there any other reasons why acquiring a new

18   or amended water right would not be reasonable other

19   than the ones listed in paragraph 5?

20        A.  No.  I mean, water availability is a threshold

21   question when making a determination on whether a new

22   permit can be granted.

23              And if there's limited to no water

24   available for any uses, then we wouldn't be able to

25   issue a new water right.

Kathy Ann Alexander PhD                                    July 8, 2024

Page 70

1          Q.  So the next sentence of paragraph 6 says, "Even

2     if weirs, debris, and other obstacles were removed,

3     releasing water solely for the purpose of raising the

4     water depth in the Rio Grande is also not reasonable

5     because a Texas water right would be required" -- I'll

6     stop there.

7                    What is a weir?

8          A.  It can be a -- it's a structure that can be put

9     along or in a river.

10         Q.  (BY MR. HARRISON)  Does surface water get

11    diverted when there are weirs in the water?

12         A.  It can be.  A weir can be used to facilitate a

13    diversion.

14         Q.  And do weirs require a water right permit?

15         A.  They can.

16         Q.  What do you mean by "debris"?

17         A.  I think the intent of that was to talk about if

18    you went and dredged and moved any kind of -- what

19    someone might perceive as obstructions or whatever from

20    the river, that even if you did that, it -- you still

21    couldn't make a release of water outside the incidental

22    uses that we've talked about for navigation purposes

23    without water right, which is not possible to get.

24         Q.  So like debris -- debris would be things like

25    tree limbs or leaves or tree parts, things like that?

1          A.   Yeah, or, you know, anything else that could

2    have been put in the waterway.

3          Q.   Man-made objects?

4          A.   Somebody could put trash or cars or anything

5    like that.  It could also be -- people -- people do

6    those sorts of things.

7          Q.   And can surface water get diverted when there

8    is debris in the water?

9          A.   I mean, if someone has an authorized diversion,

10   they can -- they may -- or it may -- the debris may or

11   may not interfere with their diversion.  I mean, that's

12   pretty broad.

13         Q.   What do you mean by, quote, "other obstacles"?

14         A.   I was just trying to be comprehensive.

15         Q.   So would removal of other obstacles potentially

16   require a water right or permit?

17         A.   I think it just depends, again, on the nature

18   of the project and the specifics as embodied in the

19   water right permit application.

20         Q.   Would other obstacles include nets or netting?

21         A.   I mean, I don't know that that's an obstacle

22   but, again, I would have to -- it would depend on

23   project specifics.

24              And, you know, I can't really answer those

25   type of questions without the specific projects in front

Kathy Ann Alexander PhD                                    July 8, 2024

Page 72

1   of me.

2        Q.  Would a cableway be an obstacle?

3        A.  On obstacle to what?

4        Q.  Well, would it constitute an "other obstacle"

5   that you reference in paragraph 6?

6        A.  I don't know.

7        Q.  Would anchors constitute an obstacle or "other

8   obstacle" that you reference in paragraph 6?

9        A.  I wasn't talking specifically when I said

10  "other obstacles."  I mean, we could go down a long --

11       Q.  Sure.

12       A.  -- laundry list if you'd like; but I'm speaking

13  more generally.

14       Q.  But is it your opinion, then, that the removal

15  of other obstacles would require a water right or

16  permit?

17       A.  If any of that was part of a dredging or bank

18  stabilization project or other project that required

19  storing, taking, or diverting state water, a water right

20  permit from TCEQ would be required.

21       Q.  The Texas Water Code prohibits obstructing of

22  any navigable stream, correct?

23       A.  There are some provisions related to that.

24            (Alexander Exhibit 6 marked.)

25       Q.  (BY MR. HARRISON)  I'll show you what's marked

Kathy Ann Alexander PhD                                July 8, 2024

Page 73

1      as Alexander Exhibit 6.

2                    This is Texas Water Code 11.096.  Do you

3      see that?

4           A.   Yes.

5           Q.   And what -- is this the provision of the Texas

6      Water Code that you agreed about that prohibits the

7      obstruction of navigable streams in Texas?

8           A.   That's the one I was thinking about, yes.

9           Q.   And it says, quote, "No person may obstruct the

10     navigation of any stream which can be navigated by

11     steamboats, keelboats or flatboats by cutting and

12     felling trees or by building on or across the stream any

13     dike, milldam, bridge, or other obstruction."

14                    Did I read that correctly?

15          A.   Yes.

16          Q.   And the Texas TCEQ's regulations define person

17     to include -- I think we talked about this --

18     individuals, corporations, correct?

19          A.   Yes.

20          Q.   Municipalities?

21          A.   Yes.

22          Q.   Irrigation districts?

23          A.   Yes.

24          Q.   And Texas agencies as well?

25          A.   Yes.

Kathy Ann Alexander PhD                                    July 8, 2024

                                                              Page 74

1           Q.  And the Water Code also gives TCEQ the

2     authority to investigate issues related to obstruction

3     of navigable streams, correct?

4           A.  I believe so.

5           Q.  Are you familiar with the floating buoy

6     barriers at issue in this litigation?

7           A.  Somewhat.

8           Q.  How are you familiar?

9           A.  I mean, I read the news.

10          Q.  Have you been to the site in Eagle Pass?

11          A.  No.

12          Q.  Have you seen pictures?

13          A.  I believe I've seen pictures.

14          Q.  Is any surface water being diverted by the

15    floating barriers?

16          A.  I don't know.

17          Q.  How would you make the determination on whether

18    surface water was being diverted by the floating

19    barriers?

20          A.  I think we would go out and look at the

21    project, review the photographs, et cetera; but I didn't

22    see any evidence of any diversion by the floating

23    barriers as we would define "diversion."

24          Q.  How do you define "diversion"?

25          A.  As removing water from the watercourse.

Page 75

1          Q.  But I thought -- you testified earlier that

2      there's no de minimis level of diversion that's

3      necessary to implicate the need for a water right or

4      permit.

5                    So how would -- how were you able to make

6      that determination with -- without doing anything more?

7          A.  Reviewing the photographs that I've seen, I

8      mean, I -- you know, I -- to the best of my knowledge,

9      there's nothing about that project that would require a

10     water right from TCEQ.

11         Q.  You said one of the things that TCEQ may do is

12     go out and look at the project.  Are you aware of anyone

13     from TCEQ going to look at the floating barriers?

14         A.  I'm not aware of that, no.

15         Q.  What about -- are you familiar with the -- that

16     below the surface of the floating barriers there's an

17     anti-dive net?

18         A.  No.

19         Q.  Were you -- in the photos that you saw, were

20     you also able to see that there were anchors with the

21     floating barriers?

22         A.  No.

23         Q.  If a tourism company like, say, a rafting

24     company were to buy up water rights for the purpose of

25     navigation so that it could have kayaks or rafts, what

Kathy Ann Alexander PhD                            July 8, 2024

Page 79

1    of their project so -- but, you know, there are certain

2    types of dredging, as I state in here, that could --

3    that could require a water right permit from TCEQ.

4         Q.  Then the next sentence says, "A Texas water

5    right authorizing a new appropriation of water would be

6    required for each dam and lock and the reservoirs

7    created by them."

8              What is the basis for your statement that a

9    new water right would be required for each of them --

10   each dam and lock and reservoir?

11        A.  So a new water right would be required for each

12   one.  It could be -- someone could theoretically apply

13   for a water right that authorized multiple structures.

14   We do have that in Texas.

15             But each one would need to be listed and

16   set out in the water right permit or they could be done

17   as individual permits.  That's the discretion of the

18   permit -- of the permit applicant.

19        Q.  And who would be the permit -- permit applicant

20   responsible for obtaining the water right in that

21   situation?

22        A.  I have no idea.

23        Q.  Then the last -- your last sentence at the

24   bottom of Page 10, paragraph 7, "Acquiring a new water

25   right for maintaining locks, dams, and reservoirs would

Kathy Ann Alexander PhD                                    July 8, 2024

Page 80

1    not be reasonable because acquiring a new Texas water

2    right would not be possible."

3                    I think we've talked about this before.

4    When you say "not be reasonable," is the reasonable

5    standard the same as what you discussed before?

6         A.   Yes.

7         Q.   And that's because it -- actually is that

8    because the -- a new water right would not be possible

9    to be acquired?

10        A.   Yes.

11        Q.   Is TCEQ accepting new water rights -- or is

12   TCEQ accepting new water right permit applications for

13   water rights on the Rio Grande currently?

14        A.   I'm not aware of any but, again, anyone could

15   certain -- could apply but TCEQ would also look at water

16   availability.

17                    And if there's no water available under

18   Texas Water Code 11.134, we wouldn't be able to grant a

19   new water right.

20                    So, I mean, someone could apply for

21   anything they wanted to; but that doesn't mean that it

22   can be granted under statute and rule.

23        Q.   So are you saying, then, that a congressionally

24   authorized project to aid navigation is impossible

25   because the Corps could not obtain a Texas water right

Kathy Ann Alexander PhD                                    July 8, 2024

Page 81

1    or water use permit?

2         A.   I think a Texas water right permit would be

3    required, and I don't believe that would be possible.

4    That's what my opinion says.

5         Q.   But the Corps or the federal sponsor could

6    apply for the appropriation to Texas, correct?

7         A.   They could apply, yes.

8         Q.   Is it possible the Corps could take existing

9    water rights through condemnation if the project

10   authorizes them to do that?

11        A.   I don't know.

12        Q.   Do you have any new water right application

13   pending from the Corps on these potential navigation

14   projects?

15        A.   Not that I'm aware of.

16        Q.   And so are you providing an opinion that a

17   water right would not issue based on a nonexistent

18   application to TCEQ?

19        A.   Okay.  Can --

20        Q.   I can rephrase.

21        A.   Okay.

22        Q.   So there's no pending application that you're

23   aware of for a water right with respect to a

24   hypothetical navigation project, correct?

25        A.   That's correct.

Kathy Ann Alexander PhD                                    July 8, 2024

Page 82

1          Q.  If TCEQ does not have a pending application,

2     then how are you in a position to prejudge the

3     determination that would be issued as a result of

4     that -- of that application?

5          A.  Well, if you're asking me do I know that

6     there -- how do I know that there's no water available

7     for appropriation, I would say 25 years of experience in

8     Texas water rights permitting gives me the ability to

9     make that statement.

10         Q.  And you don't see that as a pre-decisional

11    result?

12         A.  No.  I think that there are various river

13    basins across the state, including the Rio Grande, where

14    it would not be possible to grant a new appropriation of

15    water because the water has already been committed to

16    other users.

17              So it's not -- the Rio Grande isn't special

18    in that respect.

19         Q.  You had testified earlier that the Corps had --

20    that you had worked on the Corps water supply reservoirs

21    projects.  Could you identify those?

22         A.  So I think what I had talked about is that we

23    had worked with the Corps of Engineers on various things

24    related to their water supply reservoirs.

25              I mean, that could range anywhere from the

Kathy Ann Alexander PhD                                    July 8, 2024

Page 83

1    water supply rule that the Corps proposed and then

2    withdrew to working with various Corps of Engineers

3    facilities to ensure that they are releasing water when

4    required for the Texas uses because the Corps has the

5    bucket and Texas has the water.

6                    I'm also working -- there's a Corps project

7    currently underway to look at drought contingency

8    planning for two of their projects or groups of

9    projects.  And I am working with the Corps and its

10   consultants on that.

11                   So I think, to answer your question, yes,

12   we do work with the Corps of Engineers.

13        Q.  But none of those things that you describe

14   include or involve water right applications or permits?

15        A.  No.

16        Q.  Other than what's on paragraphs 1 through 7 of

17   Exhibit 1, are you providing any other expert opinions

18   in this matter?

19        A.  No.

20        Q.  Have you been asked to form any other opinions

21   in this matter?

22        A.  No.

23        Q.  Are there any other areas pertaining to this

24   matter that we haven't discussed that you have prepared

25   opinions on?

Kathy Ann Alexander PhD                                    July 8, 2024

Page 84

1          A.   No.

2          Q.   In your position at TCEQ, do you conduct water

3     availability models and modeling?

4          A.   I use the water availability models in my

5     position at TCEQ.

6          Q.   And do you do that modeling for other Texas

7     agencies if they ask?

8          A.   I'm not aware of us doing that.  Other Texas

9     agencies may have their own internal staff or

10    consultants that would do that work.

11         Q.   We were talking earlier about the definition of

12    "navigable stream" under the TCEQ regulations 279 -- or

13    297.1(35).

14              And as part of that I think you said that

15    certain uses on a Texas navigable stream require a water

16    rights permit.  What -- what would those uses be?

17         A.   So I think what I was referring to in that

18    question and answer was that there are certain uses that

19    are exempt from water rights permitting under the Texas

20    Water Code for domestic and livestock purposes, in

21    particular, a domestic and livestock reservoir

22    impounding 200 acre-feet or less.

23              But such a reservoir, in order to be exempt

24    from the permitting process, cannot be located on a

25    navigable stream.  So that's what I was referring to.

Kathy Ann Alexander PhD                                    July 8, 2024

Page 85

1        Q.  Were you ever contacted by anyone in other

2   Texas agencies concerning the floating barriers at issue

3   in the case?

4        A.  No.

5        Q.  Are you aware of any of your TCEQ colleagues

6   that were contacted by other Texas agencies about the

7   barriers?

8        A.  No.

9              MR. HARRISON:  That's all I have.  I'll

10  pass the witness.

11             MR. TEBO:  Thank you.

12             MR. HARRISON:  Thank you, Dr. Alexander.

13                   EXAMINATION

14  BY MR. TEBO:

15       Q.  Dr. Alexander, did you testify today that you

16  had te -- that you had previously -- well, excuse me.

17             Dr. Alexander, did you testify that TCEQ

18  cannot grant new use rights solely for navigational

19  purposes?

20       A.  Yes.

21       Q.  Are you an expert on how TCEQ understands the

22  state statutes that it is subject to?

23       A.  Yes.

24       Q.  Did you testify that under TCEQ's own internal

25  understanding of those statutes, it is not authorized to

Kathy Ann Alexander PhD                                    July 8, 2024

Page 86

1    grant water rights solely for navigational purposes?

2         A.  Yes.

3         Q.  Did you testify that you had testified on

4    behalf of TCEQ before?

5         A.  Yes.

6         Q.  Is it common for you to testify on behalf of

7    TCEQ more frequently than once or twice per year?

8         A.  It's typically not more frequently than once or

9    twice per year.  Although, 2022 through 2024 was an

10   exception.

11        Q.  But in an average year, would you say that, at

12   most, you testify approximately twice or so per year?

13        A.  Yeah, once or twice, that's correct.

14        Q.  Thank you.  To the best of your knowledge, do

15   the buoys that Texas has deployed in the Rio Grande

16   River near Eagle Pass store, take, or divert state

17   water?

18        A.  They do not.

19        Q.  And you haven't seen or heard anything tending

20   to suggest that the buoys do store, take, or divert

21   water?

22        A.  I have not.

23        Q.  Dr. Alexander, did you testify that you were

24   familiar with the treaties and laws that regulate water

25   use of the Rio Grande -- of the waters of the Rio Grande

Kathy Ann Alexander PhD                                    July 8, 2024

                                                              Page 87

```
 1    River?

 2          A.   Yes.

 3          Q.   And you testified that that included the 1944

 4    Water Treaty between the United States and Mexico?

 5          A.   Yes.

 6          Q.   Are you also familiar with other binational

 7    water treaties that relate to the waters of the Rio

 8    Grande River?

 9          A.   Yes.

10          Q.   Is it fair to say that you are generally

11    familiar with the binational treaties that relate to the

12    waters of the Rio Grande River?

13          A.   Yes.

14          Q.   Did you testify about interactions between TCEQ

15    and the IBWC?

16          A.   Okay.  I --

17          Q.   I'm sorry.  Did you testify today concerning

18    typical interactions between TCEQ and the International

19    Boundary and Water Commission?

20          A.   Yes, in very general terms.

21          Q.   Yeah, in general terms.

22               Did you say that the -- or would you say

23    that the IBWC handles the distribution of waters between

24    the United States and Mexico, whereas TCEQ handles water

25    pit -- permitting to the US share of waters?
```

Kathy Ann Alexander PhD                              July 8, 2024

Page 88

1

2                 MR. HARRISON:  Objection, form.

3          A.  I think that's accurate, yes.

4          Q.  (BY MR. TEBO)  And did you testify today that

5     Texas has primary jurisdiction over the US share of

6     waters of the Rio Grande?

7          A.  Yes, I did.

8          Q.  And by that -- I mean, by Texas having primary

9     jurisdiction to the US waters for the Rio Grande, by

10    that phrase did you mean that Texas controls the use of

11    US waters of the Rio Grande?

12         A.  Yes.

13         Q.  Did you also mean by that phrase that state law

14    and not federal law governs the use of those waters?

15         A.  Yes.

16         Q.  Would any use of the Rio Grande's waters by the

17    US Army Corps of Engineers or other federal entities be

18    subject to approval by Texas including through TCEQ?

19         A.  For a water rights permit, yes, it would.

20         Q.  Has any court determined that the Rio Grande

21    River is a navigable stream under state law?

22                 MR. HARRISON:  Objection, form.

23         A.  Not that I'm aware of.

24         Q.  (BY MR. TEBO)  And does state law itself define

25    the Rio Grande as a navigable stream?

Kathy Ann Alexander PhD                                July 8, 2024

Page 89

1          A.  No.

2          Q.  Did you testify that you're an expert on

3     conditions -- on the river conditions of the Rio Grande

4     River?

5          A.  Yes.

6          Q.  In light of that expertise, are you aware of

7     any actual navigation that takes place on the Rio Grande

8     River?

9          A.  I am not.

10          Q.  Now, if navigation is granted as an incidental

11     use to an existing water right, is the right holder

12     entitled to use any additional water for navigation

13     purposes?

14          A.  Not in addition to what's already been

15     appropriated.

16          Q.  So you're saying that that water right user is

17     restricted to the exact quantity granted by his original

18     water right?

19               MR. HARRISON:  Objection, form.

20          A.  That's correct.

21          Q.  (BY MR. TEBO)  Let me just restate the

22     question.  Is the original water right user in that

23     scenario restricted to the exact quantity granted by his

24     water right?

25          A.  Yes.