# Banks Deposition Transcript Excerpts

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION
 3     UNITED STATES OF AMERICA,    )
                                    )
 4            Plaintiff,            )
                                    )
 5     v.                           ) Case
                                    ) No. 1:23-cv-00853-DAE
 6     GREG ABBOTT, in his          )
       capacity as GOVERNOR OF      )
 7     THE STATE OF TEXAS, and      )
       THE STATE OF TEXAS,          )
 8                                  )
              Defendants.           )
 9
10
11
12                    ORAL DEPOSITION OF
13                      MICHAEL BANKS
14                  Wednesday, July 10, 2024
15
16          ORAL DEPOSITION OF MICHAEL BANKS, produced as
     a witness at the instance of the Plaintiff, United
17   States of America, and duly sworn, was taken in the
     above-styled and numbered cause on the 10th of
18   July, 2024, from 9:10 a.m. to 12:43 p.m., before Sharon
     Ross, Certified Shorthand Reporter in and for the State
19   of Texas, reported by computerized stenotype machine, at
     the US Attorney's Office for the Western District of
20   Texas, 903 San Jacinto Boulevard, Suite 334, Austin,
     Texas 78701, pursuant to the Federal Rules of Civil
21   Procedure and/or any provisions stated on the record or
     attached hereto.
22
23
     Reported by:
24   SHARON ROSS, Texas CSR #1961,
     Hawaii CSR #432, RMR, CRR, CRC
25   Realtime Systems Administrator
     Job No. CS6790218
```

1       A.   I don't recall.  I was given a series of
2   questions to answer and these were the -- these were the
3   responses to those questions.  I don't remember the
4   date.
5       Q.   Was the set of questions produced by counsel in
6   this case?
7       A.   I believe so.
8       Q.   Are there any changes you -- well, let me ask:
9   Did -- does this disclosure accurately capture your
10  opinions in this case?
11      A.   It does.  The only thing that I see in here
12  that I may disagree with is the percentage of increase
13  in border-related deaths.  I think that's an
14  approximate, not an exact.
15              I just wanted to make sure that -- I
16  don't -- I didn't see if it said an estimated increase
17  but....
18      Q.   So in paragraph 4 you might say:  Saw
19  approximately --
20      A.   547 (incomprehensible).
21      Q.   -- 547 percent.
22              THE REPORTER:  Wait.  Can you repeat what
23  you said?
24              THE WITNESS:  I agree.  I would say
25  approximately 547 percent.

```
 1                THE REPORTER:  Thank you.
 2       Q.   (BY MS. LOWRY)  Would you make any other
 3   changes to the opinions captured in this disclosure?
 4                MR. BRYANT:  Mr. Banks, take your time and
 5   review --
 6       Q.   (BY MS. LOWRY)  We'll go through the --
 7                MR. BRYANT:  -- review the document as much
 8   as you need to --
 9                THE WITNESS:  Okay.
10                MR. BRYANT:  -- before you answer that.
11       Q.   (BY MS. LOWRY)  And we will go through them one
12   by one; but if there's anything that jumps out at you at
13   the top level, now would be the time.
14                MS. LOWRY:  If we could also pause -- we
15   might need to go off the record -- the guest joining us
16   by Zoom cannot hear.
17                (Discussion off the record.)
18       A.   Yeah, nothing else.
19       Q.   (BY MS. LOWRY)  In forming these opinions, have
20   you relied on any particular facts not summarized in
21   this disclosure?
22       A.   I mean, I'm sure there's a lot of facts that I
23   didn't put in here.  I mean, this is -- this is a
24   summarat -- a summarization of a lot of data.
25                And so there's a lot more data -- finite
```

```
 1   data that is not put in here, but it's data I used to
 2   come to that decision.
 3        Q.   What types of data?
 4        A.   Crossing data from CBP's public website,
 5   reports from both TMD, Texas Military Department, and
 6   Texas Department of Public Safety, from officers and
 7   agents on the scene in addition to my own personal
 8   observations from the extensive amount of time that I
 9   have spent in the Eagle Pass area around the buoys.
10        Q.   What types of TMD reports?
11        A.   They do a report that shows where they have
12   people manned and located, and so they have requirements
13   to report.
14             For example, if a TMD soldier sees someone
15   approach the buoys, go around the buoys, or attempt to
16   go over the buoys, those listening and observation posts
17   would report that, also, any reports from TMD or DPS or
18   the absence of reports for rescues in and around buoys.
19        Q.   Are those reports made in writing?
20        A.   Yes, I mean, if there's a report.  If they see
21   nothing, then obviously there's no report.  They would
22   only report contact.
23        Q.   And in what form do those reports come in
24   writing?
25        A.   They're -- I mean, Excel spreadsheet via email.
```

```
 1   I'm sure there's some Word documents as well, but they
 2   usually....
 3        Q.   Did you review specific reports in forming
 4   these opinions?
 5        A.   No.  I mean, we get -- we get a daily snapshot
 6   of everything that's happened.  And so any significant
 7   incidents, if it -- if there were an incident of someone
 8   approaching the buoys or climbing on the buoys, it would
 9   be in that daily snapshot which is -- actually I don't
10   even think that's Word or Excel.  I think that's just
11   straight email format.
12        Q.   Who typically authors those reports?
13        A.   TMD, Texas Military Department, does a report;
14   and DPS, the Department of Public Safety, does a report.
15        Q.   Is the author typically the same person or does
16   it change?
17        A.   I think the -- the quality control department
18   is the same group of people, but the actual author of
19   the document would change daily depending on who was
20   assigned to what location.
21        Q.   Besides the TMD and DPS reports that you
22   mentioned, are there any sort of standardized reports
23   that you receive regarding this situation in this
24   segment of the border?
25        A.   Right.  Those are --
```

```
 1                MR. BRYANT:  Well, I believe that the
 2   witness was getting into privileged areas by describing
 3   communications with people.  I recall in Del Rio you
 4   were quite concerned about this witness.
 5                MS. LOWRY:  Do you have --
 6                MR. BRYANT:  Disclosing that --
 7                MS. LOWRY:  -- an assertion of privilege to
 8   raise?
 9                MR. BRYANT:  I want all of us to respect
10   all of the privileges that are applicable under the law.
11                MS. LOWRY:  Are you asserting a privilege
12   right now?
13                MR. BRYANT:  No.
14                MS. LOWRY:  Thank you.
15       Q.  (BY MS. LOWRY)  If you can please complete your
16   answer.  You mentioned you spent time in Eagle Pass
17   during the Haitian migrant crisis and on two other
18   occasions?
19       A.  Correct.
20       Q.  Can you explain what your duties were on those
21   two other occasions?
22       A.  My duties were to assess why that sector was
23   unable to process and move migrants at the rate other
24   sectors were.
25       Q.  Do you hold any licenses or certifications to
```

```
 1   operate CBP boats?
 2        A.   No.
 3        Q.   Do you know if the individual agents that
 4   operate the boats hold any licenses or certifications?
 5        A.   They are required to.
 6        Q.   What are those licenses?
 7        A.   They have to be certified as a boat operator or
 8   as a -- you have a boat operator, and then the other one
 9   is a vessel commander.
10        Q.   And you do not hold those certifications?
11        A.   Neither.
12        Q.   When did you leave CBP?
13        A.   January of 2023.
14        Q.   Why did you leave CBP?
15        A.   I didn't feel that I could uphold my oath and
16   the policies that were being put into place.
17        Q.   After you left CBP, what did you do
18   professionally?
19        A.   I was employed by the Office of the Governor.
20        Q.   When did you start that position?
21        A.   I believe I retired on the 23rd of -- I'm not
22   sure of the exact date but I think I retired on the 23rd
23   of January and I believe sometime between the 25th and
24   the 30th I was employed by -- I started the position
25   with the Office of the Governor.
```

1      Q.   What was your title when you accepted the
2   position with the Office of the Governor?
3      A.   The title with the Office of the Governor?
4      Q.   Uh-huh.
5      A.   Special advisor to the governor on border
6   matters.
7      Q.   Was that a newly created appointment?
8      A.   I believe so.
9      Q.   And that is a political appointment?
10     A.   I'm not appointed.  I applied for a job that
11  they -- they opened -- or applied for a job and then I
12  got the job.  It's not an appointed position.
13     Q.   Is your title the same now as it was when you
14  started with the Office of the Governor?
15     A.   It is.
16     Q.   What are your job duties as a special advisor?
17     A.   So I advise the governor on border security.  I
18  advise them on tactical and operations.
19              I think I'd best describe it as I look at
20  the things that did not work in the Border Patrol and
21  make sure we don't repeat those in the state.  And then
22  I look at things that did work and I try to repeat those
23  in the state.
24              And so basically I utilize the experience I
25  have in border security operations and advise the

1    governor and his team.
2         Q.   How do you spend your average day?
3         A.   I'm either in El Paso, Eagle Pass, Del Rio,
4    Laredo.  I spend my average day on the border traveling
5    east and west, meeting with the soldiers, meeting with
6    the troopers, meeting with Border Patrol agents that are
7    out and about along the border.
8         Q.   How much time do you spend physically present
9    along the border -- anywhere in Texas on the border?
10        A.   At least 95 percent.
11        Q.   Of your working day?
12        A.   Of my entire working year and a half since I've
13   been on this job.
14        Q.   When was the last time you went to Eagle Pass?
15        A.   Last week.
16        Q.   How often would you say you go there?
17        A.   I was there for two days last week.  I was
18   there for three days the week before.  And I'd have to
19   go back into the calendar but I probably spend an
20   average -- and, again, this is an estimate; I'd have to
21   look at a calendar -- two to three days per week in
22   Eagle Pass.
23        Q.   When was the last time that you personally saw
24   the floating barrier in Eagle Pass?
25        A.   It would have been last week or the week before

```
 1   floating barrier?
 2        A.   Yes.
 3        Q.   Is it from a fixed position?
 4        A.   I don't know.  It could be from drones or a
 5   fixed position.  I'm not sure of the actual -- I mean,
 6   I've seen the video.  I'm just not sure what device they
 7   recorded it with.
 8        Q.   I guess I'm trying to understand if you've
 9   seen, for example, like the same exact perspective over
10   multiple days for video of the floating barrier.
11        A.   I'd have to go back and watch the videos again
12   to see if -- what the perspective of it was.
13        Q.   How often would you say you receive videos of
14   the barrier?
15        A.   Typically during briefings they'll -- we'll get
16   a briefing.  In the briefing they'll discuss it and show
17   the videos but, you know, it -- I don't -- video is not
18   something we send out constantly unless it's requested.
19        Q.   About how many videos of the floating barrier
20   would you say that you have seen?
21        A.   A lot.  I -- I can't give you a number.
22        Q.   How often are these briefings that you're
23   talking about?
24        A.   I've -- I'll have to go back and look at the
25   calendar.  Typically they're when we do tours and
```

```
 1   visits.
 2              When we have legislators or Congressmen who
 3   want to come down and see what's going on, we'll brief
 4   them and we'll show them but I can't -- I couldn't give
 5   you an honest number.
 6       Q.  Do you know if there are any kind of long-term
 7   positioned cameras around the floating barrier?
 8       A.  I do not know.
 9       Q.  For the -- so apart from what may be video, you
10   said there are individuals assigned to monitor the
11   floating barrier?
12       A.  Correct.
13       Q.  How many individuals?
14       A.  Typically they're posting anywhere from two to
15   three.  So it's either two or three person per shift.
16       Q.  You obviously have not personally monitored the
17   floating barriers 24/7 since they were installed?
18       A.  Correct.
19       Q.  You're relying on reports from individuals who
20   are assigned to that shift?
21       A.  Correct.
22       Q.  Do you receive any reports specifically from
23   the individuals assigned to monitor the floating
24   barrier?
25       A.  You mean the soldiers assigned to the -- no, I
```

```
 1   do not.
 2        Q.   In what form do you -- we've been -- we talked
 3   about the daily TMD and DPS reports that you receive.
 4   Do you receive any other regular reports regarding the
 5   floating barrier?
 6        A.   No, periodic if there is any significant change
 7   in anything but other than that, I don't -- I just get
 8   the daily summary.
 9        Q.   Do you recall any specific significant events
10   that were brought to your attention regarding the
11   floating barrier outside of the daily reports?
12        A.   There have been several that were publicly
13   posted and that later were corrected or retracted but --
14   so I wouldn't consider them significant because they
15   were determined to be not factual, so, no, not that I
16   can think of.
17        Q.   You can't recall any specific significant
18   events outside the daily report regarding the floating
19   barriers that were raised to your attention?
20        A.   No, that's not what I said.  I have.
21        Q.   Okay.
22        A.   However, those reports were later debunked as
23   not being factual.  So they're no longer significant.
24        Q.   Okay.
25        A.   Right.
```

```
 1    Q.  Aside from that instance, are there any others?
 2    A.  No, not that I can recall.
 3        MR. BRYANT:  We've been going a little more
 4  than an hour.  Whenever you reach an appropriate place,
 5  let's take a break.
 6        MS. LOWRY:  Now would be a fine time.
 7        MR. BRYANT:  Okay.  Thank you.
 8  10:34         (Recess from 10:18 a.m. to a.m.)
 9    Q.  (BY MS. LOWRY)  How many Texas personnel are
10  regularly stationed in the area of the floating barrier?
11    A.  We keep saying "regularly," and that's hard for
12  me to answer a "regularly" question because tactically
13  we shift numbers based on traffic and needs.  And it can
14  change daily.  It can change hourly.
15        So I can't answer how many are regularly
16  assigned there.  There is no regularly assigned number.
17  All I know is that they are required to keep at least
18  one LPOP with oversight over the buoys.
19    Q.  So people -- are there any Texas personnel
20  besides the LPOPs that are required to maintain the 24/7
21  surveillance that are permanently stationed at the
22  floating barrier?
23    A.  Okay.  Can you repeat that?
24    Q.  So aside from whoever is monitoring the barrier
25  24/7 -- you've said that's required to be at least one
```

1           MR. BRYANT:  Please ask your questions.
2           MS. LOWRY:  Please only assert appropriate
3    objections.
4       Q.   (BY MS. LOWRY)  Mr. Banks, if someone traveled
5    from Mexico around the barrier and entered the United
6    States, would you consider that person to have been
7    effectively deterred?
8           MR. BRYANT:  Objection to form.
9       A.   So if they made their way, if -- the way you
10   la -- the way the question is laid out, if they left
11   with the intent to enter and they still entered here
12   (indicating), then the buoy didn't deter them from
13   crossing in this location.  It only deterred them from
14   crossing in this location (indicating).
15      Q.   (BY MS. LOWRY)  Have you personally seen or
16   heard any reports of individuals making it past the
17   floating barrier to the bank and turning back?
18      A.   Repeat the question.
19      Q.   Yeah.  Have you either yourself seen or been --
20   has been -- it been reported to you that individuals
21   made it beyond -- closer to the United States than the
22   floating barrier to the bank and then turned back south
23   in this area?
24           MR. BRYANT:  Objection to form.
25      A.   In the area of the buoy?

1      Q.   (BY MS. LOWRY)  Correct.
2      A.   Yes.
3      Q.   How many approximately of those people would
4   you say?
5      A.   I mean, we've had thousands of turn-back
6   souths.  So it -- it would be impossible for me to say
7   exactly how many.
8           Again, the buoy is part of a in-depth --
9   defense in-depth and so if they get past the buoys and
10  go to an area that has wire and decides not to cross,
11  they turn back south.
12     Q.   And that person -- strike that.
13          When you say -- so there have been zero
14  observed crossings directly over the floating barrier,
15  correct?
16     A.   Correct.
17     Q.   If there were individual instances of
18  individuals crossing over the barrier -- I understand
19  you've not received those reports; but if there were,
20  would you still consider the floating barrier to be
21  effective?
22          MR. BRYANT:  Objection, form.
23     A.   Absolutely.
24     Q.   (BY MS. LOWRY)  How many people would have to
25  go over the floating barrier before you would consider

```
 1   it not effective?
 2        A.   Every individual that is deterred from making
 3   an illegal entry into the country is a success in our
 4   mission to ensure that migrants report to the port of
 5   entry and present themselves so they can be determined
 6   who they are.
 7             So if one single got-away is deterred by
 8   those buoys, that is a success for us because we have no
 9   idea what the intention of that got-away is.
10        Q.   So is it your opinion that so long as one
11   person is effectively deterred, then that infrastructure
12   is effective?
13        A.   It is my opinion that any time that
14   infrastructure deters anyone from entering the country,
15   it is effectively doing its job.
16        Q.   Okay.  If -- be it Texas or CBP built a 3-foot
17   wide pole in the Rio Grande and it was 25 feet high so
18   nobody could climb over it -- 3 feet wide, 25 feet
19   high -- and no migrants could travel over the pole but
20   they could fairly easily walk around it, would you
21   consider that pole to be an effective deterrent?
22             MR. BRYANT:  Objection, form.
23        A.   I'm having a hard time understanding the
24   hypothetical.  You're saying one pole, 3 foot wide, 25
25   foot high?
```