# Ciarametaro Deposition Transcript Excerpts

Page 1

1                UNITED STATES DISTRICT COURT

                 FOR THE WESTERN DISTRIC OF TEXAS

2                AUSTIN DIVISION

3     - - - - - - - - - - - - - - - - - - - - x

4     UNITED STATES OF AMERICA

5          Plaintiff

6     vs.                    CA No. 1:23-CV-00853-DAE

7     GREG ABBOTT, in his capacity as

8     GOVERNOR OF THE STATE OF TEXAS,

9     and THE STATE OF TEXAS

10         Defendants

11    - - - - - - - - - - - - - - - - - - - - x

12

13             DEPOSITION of THOMAS CIARAMETARO

14             Tuesday, July 9, 2024 - 9:22 a.m.

15              US Attorney's Office for the

16               District of Massachusetts

17               1 Courthouse Way, Suite 9200

18               Boston, Massachusetts 02210

19

20

21    Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

22    Job No. CS6783958

23

24

25

Thomas Ciarametaro                                    July 9, 2024

Page 57

```
 1              What types of law would you
 2    consider yourself to be an expert in?
 3         A    Maritime law, Chapter 90B, Mass.
 4    General Laws, boating laws, maritime navigation
 5    laws, stuff like that.
 6         Q    Okay.
 7              Would you --
 8         A    Federal laws, maritime federal laws.
 9         Q    Would you consider yourself a legal
10    expert in interpretation of the Rivers and
11    Harbors Act?
12         A    No.
13         Q    Are you offering any -- in your
14    report any legal interpretations of the Rivers
15    and Harbors Act?
16         A    I believe I do, yes.
17         Q    Are you offering those as opinions to
18    be considered or just as background information
19    about the case?
20         A    Background information and
21    definitionwise, or certain definitions,
22    quotations from the Rivers and Harbors Act, and
23    as background information.
24         Q    Did you -- did you do that research
25    yourself or did you -- or was that something
```

Thomas Ciarametaro                                July 9, 2024

Page 58

1    that you had to rely on others --

2         A    I didn't rely on anybody, but I -- it

3    was a combination of research that was provided

4    and research that I did on my own.

5         Q    Are there any assumptions you were

6    asked to make by Texas that you then agreed to

7    make and incorporate into your opinion?

8         A    I was given some definitions in which

9    I did not rely on.  Due to my experience,

10   education and training, I came to my own

11   conclusions.

12        Q    Okay.

13             So there's no -- so your report

14   does not include any definitions that you just

15   accepted and relied on from someone else.

16   If -- anything in there is something that you

17   had independently determined?

18        A    There are, I believe, two definitions

19   in here which were given to me by the State of

20   Texas, but I did not solely rely on them to

21   make my determinations.

22        Q    Okay.

23             Which two were those?

24        A    I'd have to look.  I believe there

25   may actually be one...

Thomas Ciarametaro                                    July 9, 2024

Page 59

```
 1                    (The deponent read the

 2      document.)

 3           A    Oh, no, it's two -- navigable

 4      waters --

 5           Q    Can you mention for the court

 6      reporter what page?

 7           A    Oh, sorry, page 9 of Exhibit 1,

 8      navigable waters.  And I believe the term

 9      "buoy" on page 18 of Exhibit 1.  I believe

10      that's it, unless I'm overlooking something.

11           Q    And so the one -- so on page 9,

12      navigable waters, that would be beginning from

13      the sixth line down on that page?

14           A    Just let me make sure... yeah, I

15      believe so.

16           Q    So would I understand that correctly

17      to be the portion from that line through the

18      end of that page?

19           A    Correct.

20           Q    Okay.  That's the navigable waters

21      definition you referred to.

22                    And then on page 18, buoys.

23      Would I understand correctly that you're

24      referring to the beginning of the first line of

25      text on that page?
```

Thomas Ciarametaro                                    July 9, 2024

Page 60

1          A    Yes, sir.

2          Q    And from there, how far down?

3          A    Just that first paragraph.

4          Q    Okay.

5               So that first paragraph of, I

6     think, seven lines?

7          A    Correct.

8          Q    Six lines.  I can't count.  Sorry.

9               (Laughter.)

10         A    Yeah.  Six.  Six.

11         Q    Thank you.

12              Do you consider yourself to be

13    an expert in economics?

14         A    No.

15         Q    So are you -- so, for example, you

16    testified earlier that some of the factors that

17    would go into whether a waterway is a highway

18    of commerce would be the conditions physically

19    of the waterway and some would be the

20    infrastructure, right?

21         A    Correct.

22         Q    I take it you're not offering

23    opinions in this case about -- from an

24    economist's point of view about, you know,

25    whether the cost and benefits would justify

Thomas Ciarametaro                                    July 9, 2024

Page 61

1    creating the infrastructure in the Rio Grande

2    that might give rise to greater river-borne

3    commerce?

4         A    Not specifically, but I do know that

5    part of the Army Corps's process in improving

6    infrastructure, such as dredging, is to do a

7    cost-benefit analysis.

8         Q    And is that an understanding you

9    gained from your involvement in applications to

10   the USACE?

11        A    Yes.  And being involved in

12   implementing a dredging plan and project that

13   we -- I presented along with others to the

14   Corps.

15             The dredging of the Annisquam

16   River was a multiyear convincing, if you will,

17   of getting federal funding, because it's

18   considered a shallow-draft navigation project.

19             So there's a cost-benefit

20   analysis piece that was particularly tough for

21   us to prove, because the commerce that

22   typically uses that area is not considered

23   commerce by the Army Corps's definition, which

24   is commercial fishing.

25             It's a commercial fishing port.

Thomas Ciarametaro                                    July 9, 2024

Page 62

1      So I'm pretty familiar with that process.  Very

2      familiar.

3          Q    And so you're saying in that -- in

4      that project, the commercial fishing was not

5      considered as a commerce?

6          A    Correct.

7          Q    How were you able to surmount that?

8          A    The lack of navigability at tides --

9      certain tides created a public safety -- a

10     threat to public safety and to first

11     responders.  So that's how we were ultimately

12     able to surmount that, was Gloucester's an

13     island.  It's separated by the Annisquam River.

14     So if you had an emergency, let's say, on the

15     north side, you would have to travel 17 miles

16     out and around to get to that emergency.  Coast

17     Guard rescue boats, harbormaster, local police,

18     at certain tides, because it was so shallow,

19     were unable to navigate the river, thus

20     increasing, you know, response time

21     exponentially.

22              So that's the case that we ended

23     up making and ultimately getting funding.

24         Q    Okay.

25              And that ultimately led to the

Thomas Ciarametaro                                    July 9, 2024

Page 64

1    prior to working on this case?

2         A    I had been to the southern portion

3    near South Padre Island a long time ago, that

4    area.  I don't remember the specific area we

5    were in.

6                   We were on boats traversing the

7    Gulf area, but southern portion.

8         Q    Okay.

9                   You hadn't been further upriver

10   on the Rio Grande --

11        A    No, sir.

12        Q    -- prior to this case?

13        A    No, sir.

14        Q    And since being involved with this

15   case, you have visited the Rio Grande in the

16   vicinity of where the floating barrier is

17   located; is that right?

18        A    Yes, sir.

19        Q    And if I refer to "floating barrier,"

20   will you understand that to be the connected

21   objects -- buoys, as they're referred to --

22   that have been placed in the river and became

23   the subject of a lawsuit?

24        A    I would.

25        Q    Okay.

Thomas Ciarametaro                                    July 9, 2024

Page 65

1              And have you visited that area

2     just one occasion or more than one?

3         A    Just once.

4         Q    Okay.

5              Was that June 7th of this year?

6         A    Yes, sir.

7         Q    Okay.

8              And with whom did you take the

9     tour that day on June 7th of that area?

10        A    DPS, Department of Public Safety,

11    Texas.  I believe their state police.

12        Q    Did any Texas counsel attend with

13    you?

14        A    No.

15        Q    Do you know if any other consultants

16    to Texas in the case attended with you besides

17    yourself?

18        A    Just me.

19        Q    Can you describe what things -- what

20    parts of the area did you get to see that day?

21        A    I believe it's called Shelby Park, is

22    where I met the state police officers.  Walked

23    around that area in the park and then proceeded

24    roughly two to two-and-a-half miles southbound

25    on the Rio Grande River until we got to the

Thomas Ciarametaro                                    July 9, 2024

Page 66

1     buoy barrier.

2          Q    And about how much time did you

3     spend, you know, within sight of the buoy

4     barrier?

5          A    Maybe an hour to an hour and a half,

6     maybe, roughly.

7          Q    And that day as you were headed there

8     to observe it, were there particular things

9     that you intended to try to observe about, any

10    particular details that were going to be

11    important for you?

12         A    The placement, how it was placed, how

13    it was constructed.  I had a good

14    understanding, because from my report, on

15    page 18, you can see the buoys on land.

16                   So I had kind of a good

17    understanding on what they were and how they

18    worked before I had gotten there.  Observed the

19    depth of water, stuff like that.

20         Q    And what did you -- once you got

21    there, what did you observe about the depth of

22    the water?  What was its depth at that time?

23         A    It varied, but certain parts of the

24    river seemed to be three to four feet deep; and

25    some parts of the river, there was no water at

Thomas Ciarametaro                                          July 9, 2024

Page 69

1                          And they said that they're

2       supposed to know, but they rarely do know if

3       there's going to be a release.  And then what

4       that kind of looks like, how high the water can

5       get or low it can get.

6          Q    What did they say in terms of how

7       high and how low the water can get?

8          A    They said it can vary a couple of

9       feet in certain areas.  Other areas still

10      remained dry depending on the topography of the

11      river, high spots or low spots.

12                          They said it really just kind of

13      all depends on where you're at specifically in

14      the river.

15         Q    Did you ask them about if there's any

16      sort of typical seasonal variation in the water

17      depth?

18         A    I did not bring up seasonal

19      variation, no.

20         Q    And you mentioned seeing a 14-foot

21      Border Patrol boat out that day.

22                          Did you see any other boats on

23      that stretch of the river that day?

24         A    No.

25         Q    Earlier I asked you about the other

Thomas Ciarametaro                                    July 9, 2024

Page 70

```
 1    cases in your list where you're involved as an

 2    expert.

 3                    I think I had asked this, but do

 4    any of those cases involve a river

 5    specifically, that type of waterway?

 6         A    No.

 7         Q    You mentioned that there were just

 8    two definitions given for Texas, you've already

 9    explained where those were, on page 9 and 18.

10                    I just want to make sure, there

11    is a paragraph on page 32, the second paragraph

12    there when you get to that page.

13                    Do you see the sentence that

14    begins, "Finally, the buoys are not other

15    structures" --

16         A    That was also provided, and I had

17    previously misspoken.  This was also provided.

18    I forgot that this was down towards the bottom

19    of the report.

20         Q    Okay.  Got it.

21         A    So --

22         Q    Okay.

23                    So in terms of definitions given

24    to you by Texas --

25         A    Mm-hmm.
```

Thomas Ciarametaro                                          July 9, 2024

Page 71

1        Q        -- it would be the ones you testified

2    about on page 9 and 18 --

3        A        Correct.

4        Q        -- and this paragraph on page 32?

5        A        Yes, sir.

6        Q        From -- and it's about, I'll say, a

7    ten-line paragraph beginning, "Finally, the

8    buoys are not other structures"?

9        A        Correct.

10       Q        Okay.

11                And that is the only portion of

12   your report that discusses that topic, correct?

13       A        I believe so.

14       Q        I just want to ask you something

15   about your -- this is --

16                I'm looking at Exhibit 2,

17   page 39 of 42, and there's a section on your

18   education and training.

19       A        Which page was that again, sir?

20       Q        Page 39 --

21       A        Yeah.

22       Q        -- of 42 in Exhibit 2.

23       A        Yes.

24                (The deponent read the

25   document.)

Thomas Ciarametaro                                    July 9, 2024

Page 72

1          Q    So it mentions associate of applied

2     science, fire science, at North Shore Community

3     College.

4          A    Correct.

5          Q    And can you explain what you studied?

6          A    It's chem fire and hazmat, and it's

7     exactly that.  It's fire science, the science

8     of hazardous materials and combustion and fire.

9          Q    Okay.

10               And then -- and then after that,

11    you acquired a bachelor of science from

12    Endicott College, correct?

13         A    Yes.

14         Q    And it refers to homeland security,

15    criminal justice.

16               Is that specifically -- was

17    there a specific major -- like, is it bachelor

18    of science in --

19         A    Criminal justice concentrated in

20    Homeland Security studies.

21         Q    Okay.  Understood.

22               So the -- so the degree is

23    criminal justice but within that you had a

24    concentration in homeland security?

25         A    Correct.

Thomas Ciarametaro                                    July 9, 2024

                                              Page 140

1          A    Yes.

2          Q    And this was -- you testified

3    earlier -- I was asking you, you know, what are

4    the options for improving the river's

5    navigability, and I believe you said that

6    dredging or locks and dams would be the -- were

7    the two options; is that right?

8          A    Mm-hmm.  Yes.

9          Q    Okay.

10              And in this case, have you

11   attempted to quantify, like, how extensive, for

12   example, dredging would have to be in order to

13   make that stretch of the Rio Grande a navigable

14   channel?

15         A    I have not quantified it on paper.

16   My experience is it would be very substantial,

17   considering most parts of the Rio Grande River

18   right now have no water in them or very little

19   water, and to dredge to a depth that would

20   support some kind of commerce is uncalculable

21   to me.  But I'm sure it is being -- it, you

22   know, is quantifiable, for sure.

23         Q    Okay.

24         A    But I'm not going to throw a number

25   at it, because I just don't know.

Page 141

1              I know it would be a giant

2       project, considering the smaller projects I've

3       been involved in, and how long and expensive

4       they were to complete.

5           Q    But you've not gone through the

6       exercise in this case of attempting to

7       conceptually identify what would be the scale

8       of the project here, correct?

9           A    Correct.

10          Q    And then you've not attempted to

11      quantify what would be the cost of that project

12      at that scale?

13          A    Correct.

14          Q    Okay.

15              And part of that sentence I

16      read, towards the end, it refers to "sufficient

17      quantities to justify the commercial

18      navigation."

19              I take it you've also not

20      attempted to sort of define a threshold, like

21      what is sufficient to make the project

22      worthwhile?

23          A    If it's not in my report, I haven't

24      quantified it.

25          Q    Okay.

Thomas Ciarametaro                                      July 9, 2024

Page 142

1                      And the next sentence says,

2       "Addressing the nearly 600-foot elevation

3       changes over the 335-mile stretch from Eagle

4       Pass to Laredo, Texas, would require an

5       impractical amount of resources and

6       infrastructure investment."

7                      Do you see that?

8            A    I do.

9            Q    And again, I take it you've not

10      attempted to sort of quantify, like, the

11      threshold at which a resource investment would

12      be impractical for a project?

13           A    No.

14           Q    The prior page, page 4, enumerated

15      paragraph 1, there's a sentence there, it says,

16      "The Rio Grande River between mile markers

17      275.5 and 610, and particularly in the Eagle

18      Pass area, does not meet the criteria of a

19      navigable waterway conducive to commercial

20      navigation such that it can operate as a

21      highway of commerce."

22                      Do you see that sentence?

23           A    I do.

24           Q    You recall -- I was asking you

25      earlier if -- if a specific water, the

Thomas Ciarametaro                                    July 9, 2024

                                                 Page 149

1                        EXAMINATION
2     BY MS. AL-FUHAID:
3          Q    I have some cross.  Okay.
4                    Mr. Ciarametaro, T.J., you
5     testified earlier in response to one of
6     Mr. Lynk's questions that you are a legal
7     expert in maritime laws.
8                    Do you recall that?
9          A    I do.
10         Q    You are not a lawyer, correct?
11         A    Correct.
12         Q    When you said that you were a legal
13    expert in maritime laws, what did you mean?
14         A    I mean throughout the course of my
15    training and experience in my jobs, I've become
16    very proficient at those specific parts of the
17    law, such as maritime navigation laws or
18    maritime rules of the road.
19                    I'm an expert in that, and those
20    are laws, so I'm -- that's what I meant by
21    that.
22         Q    So would it be more accurate to say
23    that you're a navigation expert rather than a
24    legal expert?
25         A    Yes.  I am not a lawyer.

Thomas Ciarametaro                                          July 9, 2024

Page 150

```
 1          Q    So you also testified that you're not
 2     a legal expert on the Rivers and Harbors Act.
 3                    Do you recall that?
 4          A    I do.
 5          Q    What did you mean by that?
 6          A    So I mean I'm not a lawyer.  Again, I
 7     am an expert in the laws pertaining to
 8     permitting all these -- all structures, piers,
 9     docks, boat ramps, under the Rivers and Harbors
10     Act, but I'm not a legal expert on the
11     document, but I am an expert in the permitting
12     process, which is outlined in this report.
13          Q    And so is it accurate to say that you
14     have offered opinions on that process under the
15     Rivers and Harbors Act but not legal opinions?
16          A    Yes.  Legal opinions are left up to
17     the court.
18          Q    Now, I'd like you to turn to
19     Exhibit 1, page -- let's see -- page 32.
20          A    Okay.
21          Q    And it's the last paragraph under
22     opinion No. 4.  I'd like to direct your
23     attention to that paragraph.
24          A    Okay.
25          Q    Is it your opinion that the buoys do
```

Thomas Ciarametaro                                        July 9, 2024

                                                        Page 151

 1      not affect the course of the Rio Grande River
 2      in such a manner as to impact its navigable
 3      capacity?
 4          A     Correct.
 5          Q     What is the basis for that opinion
 6      that the buoys do not affect the course of the
 7      Rio Grande River in that manner?
 8          A     For all things that we discussed
 9      today in this deposition, my personal
10      experience in that area, being on a boat and
11      witnessing that area firsthand, the totality of
12      this entire report gives me that opinion.
13          Q     And is it your opinion that the buoys
14      do not affect the location of the Rio Grande
15      River in a manner as to impact its navigable
16      capacity?
17          A     Yes.
18          Q     What's the basis for that opinion?
19          A     Same as what I just gave for the do
20      not affect the course.
21          Q     And is it your opinion that the buoys
22      do not affect the condition of the Rio Grande
23      River in such a manner as to impact its
24      navigable capacity?
25          A     Yes.

Thomas Ciarametaro                                    July 9, 2024

                                                 Page 152

1        Q     What is the basis for that opinion?

2        A     Again, all the research and all the

3    photographs and all the documentation inside

4    this report, plus my firsthand eyewitness of

5    the buoy barrier in the Rio Grande gives me --

6    gives me that opinion.

7        Q     Now, earlier you and Mr. Lynk

8    discussed some projects that you have worked on

9    under which you sought Section 10 permits from

10   the US Army Corps of Engineers under the Rivers

11   and Harbors Act.

12              Do you recall discussing that

13   with him?

14       A     Yes, I do.

15       Q     How many years of experience do you

16   have doing the permitting process under the

17   Rivers and Harbors Act -- under Section 10 of

18   the Rivers and Harbors Act?

19       A     Roughly nine.

20       Q     And can you estimate as to how

21   many -- just an estimate, not an exact

22   number -- can you estimate how many projects

23   you have worked on that involve that permitting

24   process?

25       A     I've been involved in that process

Thomas Ciarametaro                           July 9, 2024

Page 153

1    from people -- private people trying to permit

2    those processes -- trying to obtain those

3    permits, or are you looking for myself

4    actively, or all together?

5          Q    All together.

6          A    Hundreds.

7          Q    Have you -- have some of those --

8    have some of those projects been for the

9    placement of -- strike that.

10              Have you been involved in any

11   projects -- set aside whether under Section 10

12   or not, just any projects at all in which you

13   placed buoys in a waterway?

14         A    Yes.

15         Q    Can you give some examples of such

16   projects?

17         A    Gloucester Harbor or Gloucester

18   proper, the municipality has between, like,

19   1400, 15- or 16- -- between 1400 and 1600

20   permitted moorings, mooring balls and mooring

21   buoys that are privately held but permitted

22   through the city and my department.

23              The City of Gloucester has 30

24   transient mooring buoys that we install, take

25   care of, maintain and move periodically.

Thomas Ciarametaro                                    July 9, 2024

                                              Page 169

1     regulatory authority to -- to enact or enforce.

2          Q    But if you had legal questions, would

3     you consult the appropriate attorneys for the

4     city?

5          A    Yeah, or the state or -- yes,

6     absolutely.

7          Q    And you would not suggest to city

8     officials that they consult you about legal

9     issues, correct?

10         A    No.  I have -- no.

11              MS. AL-FUHAID:  I have no

12     further questions.

13              MR. LYNK:  Some cross.

14

15                  FURTHER EXAMINATION

16     BY MR. LYNK:

17         Q    You were testifying about an

18     opinion -- well, first, let me ask you, just to

19     make it really clear, you've been testifying

20     about a paragraph on page 32.  And originally

21     in your testimony you described it as a

22     paragraph consisting of a definition received,

23     but you were explaining subsequently that there

24     could be aspects of this that were from you and

25     aspects that were received definition.

Thomas Ciarametaro                                    July 9, 2024

                                                    Page 170

1              Do you recall the testimony?

2         A    I do.

3         Q    Might it be accurate that the first

4    sentence of this paragraph, which says,

5    "Finally, the buoys are not other structures

6    under the RHA," and the concluding sentence,

7    "The buoys do not affect the course, location,"

8    and it goes on to finish that sentence, do I

9    take it that those were yours?

10        A    That's correct.

11        Q    And then the remainder of this

12   paragraph has -- refers to a couple of

13   regulatory provisions and gives a quote or at

14   least description of content of those, and it

15   includes also a citation to a statute and a

16   case citation; is that right?

17        A    Correct.

18        Q    Would you say that that content would

19   be the received definition portion, or are you

20   saying some of that also was yours?

21        A    No, that is -- that is the definition

22   portion.  You are correct in your statement.

23        Q    Okay.

24        A    I got a little confused earlier,

25   because I had changed some stuff here, and --

Thomas Ciarametaro                                  July 9, 2024

Page 171

1      but looking back and reading it thoroughly

2      again, that's a correct statement.

3           Q     Understood.   Glad to clear it up.

4                      And in the second sentence of

5      the paragraph, in the received definition, it

6      appears to be quoting a regulatory definition

7      of "structures," right?

8           A     Correct.

9           Q     And it gives a long list of things.

10     It includes -- one of the things included in

11     the list is "aid to navigation."

12                      Do you see that?

13          A     Correct.

14          Q     Is it your understanding that aids to

15     navigation -- buoys can be aids to navigation?

16          A     Buoys are -- can be, yes, absolutely.

17          Q     Okay.

18                      So is it fair to say there may

19     be circumstances where a buoy would be covered

20     by this regulatory definition?

21          A     Yes.   Per- -- my understanding is

22     it's permanently affixed aids to navigation

23     that never move.

24          Q     The last sentence, you were

25     testifying about earlier that the buoys -- in

Thomas Ciarametaro                                          July 9, 2024

                                                  Page 172

1      part, it says, "do not affect the course of the

2      Rio Grande River."

3                     Do you see that?

4           A    I do.

5           Q    And you explained generally what

6      that's based on.

7           A    (Nods.)

8           Q    But I wondered, in determining that

9      the buoys do not affect the course of the

10     Rio Grande River, did you attempt to take into

11     account any information that would look at, you

12     know, what are the circumstances as of when

13     they were first placed versus what are the

14     circumstances now?

15          A    No.  This is based on my

16     accountability of what I saw now and where they

17     are now.

18          Q    And did -- do you have an

19     understanding of roughly when they were first

20     placed into the Rio Grande?

21          A    I believe it's been just over a year.

22     I think it was June of 2023, I think.  I -- if

23     my memory serves me correctly.

24          Q    Okay.

25                     Roughly a year ago from today?

Thomas Ciarametaro                                      July 9, 2024

Page 173

1          A      Mm-hmm.

2          Q      And so if I understand your previous

3     answer, you did not attempt to develop

4     information that would look at, okay, you know,

5     this was the conditions of the river very

6     locally to this placement in June-July of 2023,

7     and then we're going to compare that to what

8     it's like in June or July of 2024?

9          A      I've seen photographs of where they

10    were before on the Internet.  I have not seen a

11    firsthand account, but they're still placed in

12    the same geographic location.

13                    They're just moved, which would

14    be to the east, X amount of feet.

15         Q      Have you attempted to look at whether

16    there have been any localized changes in

17    current, for example, within the close vicinity

18    of where the buoys were placed during this past

19    year?

20         A      If it's not in my report, I didn't

21    have an opinion on it.

22         Q      Okay.

23                    And when you talk about the

24    "course," what is the course of the Rio Grande?

25    What does that mean?

Thomas Ciarametaro                                    July 9, 2024

Page 174

1          A      The direction of water flow.

2          Q      Direction of water flow.

3          A      (Nods.)

4          Q      Okay.

5                 So this is -- so this opinion

6     is -- generally, it's based on your

7     point-in-time observation when you made your

8     site visit in June of 2024?

9          A      Correct.  And subsequent videos of

10    the Rio Grande and so on.

11         Q      Okay.

12                So subsequent -- videos taken

13    subsequently to the date of your site visit?

14         A      Yes.

15         Q      But not videos taken during the

16    period prior to that?

17         A      I don't believe so.

18         Q      Okay.

19                And the same would be true in

20    terms of what you looked at regarding

21    condition?  It would be the day of your site

22    visit and videos subsequent but not information

23    prior?

24         A      No, I -- there's information prior

25    from -- in the report.  I think it's on page --

Thomas Ciarametaro                                July 9, 2024

Page 175

1                    Quite a bit of information on

2      the prior, actually.   Just let me find it here.

3                    (Pause.)

4           A     There's information here on page 11

5      of Exhibit 1 from 2001, first time in recorded

6      history, the Rio Grande was too weak to flow.

7                    And I also have information

8      about an excursion here.   In 2014, journalists

9      tried to traverse the entirety of the

10     Rio Grande River and were unable to due to the

11     lack of water in the Rio Grande.

12                   It's called -- page 12.

13     Figure 4 has a photo of a man walking a canoe

14     down the river because it was too shallow to

15     even canoe in certain parts.

16                   So there's quite a bit of

17     information historically about the flow and the

18     depths of the Rio Grande in this report.

19          Q    Those references are from prior to

20     the first placement of this buoy barrier,

21     right?

22          A    Correct.

23          Q    Okay.

24                   So -- so to -- so it would be

25     accurate to say that in looking at the buoys

Thomas Ciarametaro                                    July 9, 2024

                                                    Page 176

1       not having affected condition, you had earlier

2       information -- historic information, as you

3       called it, and information about the condition

4       at the time of the site visit, and video

5       information afterward, but not information

6       during the period from roughly June 2023 up

7       until before the site visit?

8            A    Correct.

9            Q    Can buoys cause very localized

10      eddies, for example, in the water?

11           A    They can.

12           Q    Can they cause localized changes in

13      direction of flow?

14           A    In -- changes in direction of flow?

15           Q    Yes.

16           A    No, in a river, no.

17           Q    Eddies, yes.   Not changes in flow.

18      All right.

19                    And is that -- is that -- would

20      that be an example of something that you looked

21      at specifically in determining that the buoys

22      didn't affect the course or condition?

23           A    Yes.

24           Q    Okay.

25                    And again, you would have looked

Thomas Ciarametaro                                    July 9, 2024

Page 177

1    at that during your site visit, you would have

2    looked at the video that was taken afterward,

3    not evidence taken during the period from

4    June 2023 up until the site visit?

5         A    I believe that's correct.

6         Q    You mentioned that you -- you

7    testified about the number of permit

8    applications you had been involved with and

9    whether any were for buoys.

10                   Have you ever been involved with

11   something that resembles this buoy barrier,

12   like a thousand-foot connected string of buoys?

13        A    Nothing quite that long.

14        Q    Okay.

15                   Have you ever applied for a

16   permit for any type of structure of that size?

17        A    No.  Of buoys?  No.

18        Q    Okay.

19                   Any type of structure that size?

20        A    Not quite a thousand feet.  Probably

21   200 -- 2- to 300-foot pier, pile-supported pier

22   with a docking gangway attached.

23        Q    Okay.

24                   Have you -- for any of the buoys

25   that you placed, were they moored with concrete