# Magers Deposition Transcript Excerpts

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                       AUSTIN DIVISION
3    UNITED STATES OF AMERICA,   )
                                 )
4              Plaintiff,        )
                                 )
5    v.                          ) Case
                                 ) No. 1:23-cv-00853-DAE
6    GREG ABBOTT, in his         )
     capacity as GOVERNOR OF     )
7    THE STATE OF TEXAS, and     )
     THE STATE OF TEXAS,         )
8                                )
               Defendants.       )
9
10
11
12                 ORAL DEPOSITION OF
13                CHRISTINE MARIE MAGERS
14                Tuesday, July 9, 2024
15
16         ORAL DEPOSITION OF CHRISTINE MARIE MAGERS,
     produced as a witness at the instance of the Plaintiff,
17   United States of America, and duly sworn, was taken in
     the above-styled and numbered cause on the 9th of
18   July, 2024, from 9:43 a.m. to 6:14 p.m., before Sharon
     Ross, Certified Shorthand Reporter in and for the State
19   of Texas, reported by computerized stenotype machine, at
     the US Attorney's Office for the Western District of
20   Texas, 903 San Jacinto Boulevard, Suite 334, Austin,
     Texas 78701, pursuant to the Federal Rules of Civil
21   Procedure and/or any provisions stated on the record or
     attached hereto.
22
23
     Reported by:
24   SHARON ROSS, Texas CSR #1961,
     Hawaii CSR #432, RMR, CRR, CRC
25   Realtime Systems Administrator
     Job No. CS6789938

```
 1   analysis?
 2        A.   Correct.
 3        Q.   So does that entail the impacts of a river's
 4   navigability?
 5             So I'm just trying to figure out more or
 6   less like what exactly you're advising a project
 7   proponent about a river's navigable capacity.
 8        A.   So usually I work with the applicant or client
 9   to identify potentially navigable waters, potentially
10   jurisdictional waters and wetlands, and prepare a
11   wetland delineation report and jurisdictional
12   determination application.
13             Then I work with the Corps of Engineers to
14   provide data for them to be able to make a final
15   determination that also gets verified by the EPA.
16        Q.   And why is that?
17        A.   Again, that is their jurisdiction.
18        Q.   Okay.  Were you asked to make a jurisdictional
19   determination in this case?
20        A.   No.
21        Q.   Did you make a jurisdictional determination in
22   this case?
23        A.   No.
24        Q.   Under the Corps' national economic
25   determination procedures, do you know who is responsible
```

1    for determining a project's costs outweigh its benefits?

2         A.  I believe it's the Corps of Engineers,

3    whichever is the sponsor district for a project.

4         Q.  So somebody within the --

5         A.  Within the agency, yes.

6         Q.  -- agency.  What is your background in dam and

7    reservoir operations?

8         A.  I'm not an expert in the operations of dams or

9    reservoirs.

10        Q.  Are you an engineer?

11        A.  No.  I've worked with a lot of dam engineers,

12   though.

13        Q.  D-A-M engineers?

14        A.  I had to slip that in.

15        Q.  What is your background, if any, in the

16   operation of the Amistad and Falcon International

17   Reservoirs?

18        A.  I'm not an expert in the operation of those.

19        Q.  Do you have any background, though, in the

20   operation of those dams --

21        A.  No.

22        Q.  -- or reservoirs?

23        A.  No, no.

24        Q.  How, if at all, does your training as a

25   certified wildlife biologist offer insight into the

1   operation of Amistad and Falcon International Dams and
2   Reservoirs?
3           A.   They are unrelated.
4           Q.   Do you have any reason to believe that
5   Mr. Cortez does not have expertise in the operation of
6   Amistad and Falcon International Dams and Reservoirs?
7           A.   Yeah.  I stated in my report my opinion that he
8   did say that he was a qualified hydrologist and, based
9   on the information provided, was an expert in the
10  operations.
11              Well, no, I have it stated in my report.
12  I'll look at that.  Yes.  Based on the expert report
13  provided by Mr. Cortez, he's a qualified expert on the
14  US operation of the dams and reservoirs and hydrology.
15          Q.   What is your background in the flow regime in
16  the area downstream of Amistad International Dam?
17          A.   I'm not a hydrologist.  That's not my
18  expertise.
19          Q.   Do you have any background in the flow regime
20  in the area downstream of Amistad International Dam?
21          A.   I have experience describing different sections
22  of the Rio Grande for projects but not assessing the
23  flow regime in general.
24          Q.   And how, if at all, does your training as a
25  certified wildlife biologist offer insight into the flow

1  regime?
2           MR. STONE:  Objection, form.
3      A.  The only applicability would be how a change in
4  flow would affect a protected species habitat or
5  directly impact a species.
6      Q.  (BY MS. PEREZ)  Do you have any reason to
7  believe that Mr. Cortez did not -- does not have
8  expertise in the flow regime in the area downstream of
9  Amistad International Dam?
10     A.  No.
11     Q.  What is your background in current navigational
12  uses of the Rio Grande?
13     A.  My background is based on the information
14  provided in the expert reports, my site visits and
15  references cited in my report.
16     Q.  So other than your involvement in this
17  litigation, are you saying you do not have any
18  background or experience in current navigational uses of
19  the Rio Grande?
20          MR. STONE:  Objection, form.
21     A.  No, I have experience.
22     Q.  (BY MS. PEREZ)  What experience?
23     A.  Personal experience in boats, fishing boats,
24  and observing the use of kayaks and boats in the river
25  for the past 25 years.

1     Q.  Was it fishing and kayaking in the same segment
2  of the Rio Grande?
3     A.  No, it was actually a little further up, some
4  in Amistad and then also been to Devils River and Pecos
5  and downstream.
6           So as it's effective -- it was when I was
7  younger and 16 with a -- totally paying attention to
8  what segment we were in.  So....
9     Q.  So how, if at all, does your training as a
10 certified wildlife biologist offer insight into the
11 current navigational uses of the Rio Grande?
12          MR. STONE:  Objection, form.
13    A.  Those are unrelated.
14          THE REPORTER:  I'm sorry?
15          THE WITNESS:  Those are unrelated.
16    Q.  (BY MS. PEREZ)  Do you have any reason to
17 believe that Mr. Cortez does not have expertise in
18 current navigational uses of the Rio Grande?
19    A.  I don't believe that was his stated expertise
20 nor did I -- huh -- didn't look at that.
21          I'd have to review again but I -- he was
22 a -- stated as an expert on operation of Amistad and
23 Falcon dams and reservoirs and flow regime areas
24 downstairs -- downstream.
25    Q.  So if you can go to Page 2 of your report which

1  is Exhibit 1 --
2       A.  Uh-huh.
3       Q.  -- and the first state -- sentence in the first
4  paragraph is "Mr. Cortez is stated to be an expert
5  on" -- and you can skip down --
6       A.  Yeah, it does have -- yeah, he did list that as
7  one of them.
8       Q.  -- to "current navigational uses of the Rio
9  Grande" --
10      A.  Uh-huh.
11      Q.  -- "within the responsibility of the
12 commission."
13      A.  Yes.
14      Q.  Do you have any reason to believe that
15 Mr. Cortez does not have expertise in current
16 navigational uses of the Rio Grande?
17      A.  Based on information he provided, it seemed
18 like his expertise was contradictory.  Some of his
19 statements supported navigation, and some did not
20 through different segments of the re -- this section.
21      Q.  So based on contradictions that you found in
22 Mr. Cortez' report, you have reason to believe that
23 Mr. Cortez did not have expertise in current
24 navigational uses of the Rio Grande; is that correct?
25      A.  Correct.

```
 1        A.   No, that's not a thing.
 2        Q.   When did you start as an expert in this case --
 3   start your work?
 4        A.   End of April so -- I don't remember the exact
 5   date but mid to end of April.
 6        Q.   And when did you come to the conclusion that
 7   the cost of the hypothetical projects would outweigh the
 8   benefits of improving navigation?
 9        A.   And so maybe a few weeks into the process of
10   seeing the magnitude of impacts to the resources.
11        Q.   Was that sometime in May?
12        A.   Yes.
13        Q.   First week or last week of May?
14        A.   We'll go with mid-May.
15        Q.   What portion -- so the -- going back to
16   Exhibit 1, the report that you coauthored with Sandi
17   Hart --
18        A.   Uh-huh.
19        Q.   -- what portion of the report did you author?
20        A.   That -- the specific sections that I authored
21   independently are listed in -- was it section 1 -- 11.0.
22             But I did a quality review of all sections
23   of the document, so read through all of it; but
24   specifically I prepared the figures and wrote the
25   summary of expert opinions and reviewing the four USA
```

1   expert reports as well as just providing regulatory
2   guidance of -- as we developed the project and handled
3   our approach to the project.
4        Q.   What portion of the report did Ms. Hart author?
5        A.   She authored the naviga -- I want the specific
6   sections here so I don't say it wrong.
7             She was quality control for the cultural
8   resources section, Appendix D of the report.  She
9   reviewed the summary of expert opinions that I wrote
10  relating review and opinion of the Cortez, MacAllister,
11  Timmel, and Johnson expert reports, added to the
12  navigable in fact and navigable by statute sections and
13  also provided regulatory guidance throughout the
14  document development.
15       Q.   Okay.  So specifically who drafted section 1,
16  the summary of background --
17       A.   Me.
18       Q.   -- qualifications?
19       A.   That was -- so I did the Executive Summary, the
20  Summary of Background/Qualifications.  I wrote my
21  paragraph in 1.0, the one relative to mine; and she
22  wrote hers.
23       Q.   And who drafted section 2, Summary of Expert
24  Opinions?
25       A.   I did.

1      Q.  Who drafted the -- section 3, review and
2   opinion of Cortez, MacAllister and Timmel and Johnson
3   expert reports?
4      A.  I did.
5      Q.  Were you asked to critique the United States
6   expert reports by the State of Texas attorneys?
7      A.  I was -- yes, I was asked to review and give an
8   opinion on if their stated expertise was supported by
9   the information in their report.
10      Q.  So in your review of Mis -- Dr. Johnson,
11   Mr. Johnson -- I'm going to say the Johnson report --
12      A.  Uh-huh.
13      Q.  -- you mention that -- is it correct that you
14   mention you needed NEPA documentation for historic
15   navigation?
16      A.  I noted he didn't include the assessment of
17   environmental impacts for navigation.
18      Q.  For navigation predating NEPA's enactment?
19      A.  No.  It was -- he made the -- so I'll say that
20   he made a statement of -- saying that the cost for such
21   improvements was about 25,760 per year -- that was
22   from -- this is on Page 5 of my report -- and then
23   projecting those dollar amounts to -- just using
24   inflation, to project that to be worth 18 million in
25   2024, seeing it's well within the range of

```
                                                        Page 124
 1    appropriations regularly made.
 2               That cost did not appear to include the
 3    cost of doing a NEPA analysis, engineering and design,
 4    public involvement.
 5               Based on my experience with other projects,
 6    such as the Brazos Island Harbor project that had a much
 7    greater cost for a relatively much smaller project.
 8        Q.   Does your report include the cost of NEPA
 9    documentation for the hypothetical projects?
10        A.   No.  There's no way it could because the
11    specific need and purpose and identified specific
12    projects with impacts was not provided or identified.
13        Q.   So you mention in your report -- Page 3 of your
14    report that flow data can be collected by non-watercraft
15    means, such as additional gauges that would have fewer
16    environmental impacts; is that correct?
17        A.   Yes.
18        Q.   Did you analyze the environmental impacts of
19    any existing or proposed gauges in the Rio Grande?
20        A.   No.
21        Q.   Why not?
22        A.   Because this was only presented as an
23    alternative that should be looked at, that impacts from
24    it should be considered.  If the need of the project is
25    to provide navigation for the collection of the data,
```