# Rubinstein Deposition Transcript Excerpts

Page 1

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                     AUSTIN DIVISION

3

UNITED STATES OF            §
4  AMERICA,                  §
                            §  CIVIL ACTION NO.
5     PLAINTIFF,            §  1:23-CV-00853-DAE
                            §
6  V.                       §
                            §
7  GREG ABBOTT, IN HIS      §
   CAPACITY AS GOVERNOR OF  §
8  THE STATE OF TEXAS, AND  §
   THE STATE OF TEXAS,      §
9                           §
      DEFENDANTS.          §

10

11

12

                      ORAL DEPOSITION OF
13                     CARLOS RUBINSTEIN
                        JULY 9, 2024

14

15

16

        ORAL DEPOSITION OF CARLOS RUBINSTEIN, produced as
17  a witness at the instance of the Plaintiff and duly
    sworn, was taken in the above styled and numbered
18  cause on Tuesday, July 9, 2024, from 9:34 a.m. to
         p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in
19  and for the State of Texas, reported by computerized
    stenotype machine, at the U.S. Attorney's Office for
20  the Western District of Texas, 903 San Jacinto
    Boulevard, Austin, Texas, pursuant to the Federal
21  Rules of Civil Procedure and any provisions stated
    on the record herein.

22

23

24

25  Job No. CS 6783952

Carlos Rubinstein                                               July 9, 2024

                                                              Page 82

1          Q.    What do you mean by "reasonable

2     improvements"?

3          A.    That means I -- one, I don't see how you

4     can overcome the cost benefit of wanting to

5     undertake those -- those improvements.  There is no

6     demand for that type of use.  And within

7     reasonableness, particularly as it relates to this

8     report, there's no way to do that and still protect

9     the existing uses of water that are of a higher end

10    use.

11               If you try to make this navigable, I do

12    not find a way that you can do so without negatively

13    impacting existing rights and that is specifically

14    prohibited in the Texas Water Code.

15               So all of that goes into the

16    reasonableness from my perspective.

17         Q.    What reasonable improvements did you

18    consider in forming that opinion?

19         A.    The ones that we highlighted in our

20    report as if you consider dredging, those are the

21    impacts that would occur.  If you consider taking

22    water, which I hope you don't because there's

23    problems with that, and you released it for

24    additional water to make a navigation, those are --

25    those are the two that I consider or that we

Carlos Rubinstein                                        July 9, 2024

Page 83

```
 1   consider.
 2        Q.   Did you -- those are the two that were
 3   considered in your report.  Were there others that
 4   you considered that are not included in the report?
 5        A.   I don't know what else you could
 6   consider.  I mean, you know, if you talk to
 7   engineers, they'll all tell you that you can always
 8   engineer a solution.  I'm sure that there's
 9   something out there that I haven't considered, but
10   the two that came to mind are dredging or taking
11   water that you don't have a right to and neither one
12   is reasonable and those are the most common ones I
13   would have thought of.  Anything else that is
14   available to it, to me, would make it even less
15   reasonable.
16        Q.   Have you ever designed or constructed any
17   navigation features?
18        A.   Not at all.
19        Q.   All right.  Paragraph 9 says, quote:  We
20   believe that the undertaking of improvements, which
21   in our opinion are not warranted due to lack of
22   demand for the dedication and use of water for
23   navigation, to make the Rio Grande suitable for use
24   as a highway for interstate or foreign commerce and
25   trade in the normal ways that commerce and trade
```

Carlos Rubinstein                                      July 9, 2024

Page 84

1    presently are carried on via navigation will cause

2    negative socioeconomic impacts to existing water

3    right holders, decrease water conveyance efficiency

4    and disrupt existing higher end uses of water

5    including domestic and municipal uses.

6              Did I read that correctly?

7        A.    Absolutely.

8        Q.    You're not an economist, are you?

9        A.    I'm not an economist, but as a function

10   of socioeconomic impacts, my work, particularly at

11   the Water Development Board, is a consideration that

12   we definitely had to undertake for any water

13   management strategy.

14       Q.    What do you mean by "socioeconomic

15   impacts"?

16       A.    So socioeconomic -- you asked earlier

17   about the cases that I've been involved in and you

18   asked -- remember the most recent case, the

19   groundwater case, those permit considerations have

20   to include socioeconomic impacts.  I am familiar

21   with that and I testified on those.

22             Socioeconomic impacts also mean, for

23   example, let's say that you -- you live along the

24   I-35 corridor like we all do and you live close to

25   Dallas and Dallas keeps buying water from East

Carlos Rubinstein

Page 133

```
 1              What would the impacts be for Mexico

 2     water users?

 3         A.    There are some of the ones that are also

 4     enumerated here.  For example, let's say you wanted

 5     to dredge the river and at the same time rectify the

 6     channel.  Navigation, in my mind, the more bends in

 7     a river, the more difficult it is to navigate it.

 8              So what some entities have done is they

 9     have rectified or straightened the channel.  Any

10     time you do that, whether it's a Mexican water right

11     holder or a U.S. Texas water right holder, to the

12     extent that you move the channel away from their

13     diversion point, that's one negative impact.

14              If you dredge, while you're dredging, you

15     can also kick up a lot of sediment.  And from a

16     treatment of water perspective, you can increase

17     costs for treatment for potable purposes, for

18     example.

19              If it's a sediment you kick up,

20     sedimentation is also of high salinity, which does

21     exist in the river in some parts, you can increase

22     the salinity of the water, which is detrimental

23     particularly for crops.  The others you and I have

24     talked about this morning.

25              Depending on how you are going to dredge
```

Carlos Rubinstein                                          July 9, 2024

Page 134

1    and then find the water to keep the channel charged,

2    as I call it, you would increase potentially --

3    well, you potentially would increase additional bank

4    storage of loss, but in my mind you would also

5    increase evaporative losses.

6              But I think they're enumerated in the

7    others that we'll have in here.

8         Q.    Sure.  Did you study or conduct any

9    analysis on the impact from rectifying the channel?

10        A.    No.  As we mentioned earlier, the U.S.

11   hadn't provided any data.  And so it's just our

12   opinion of the expected impacts and concerns that we

13   have and others should have should this be pursued.

14        Q.    And did you study or analyze the impact

15   on sediment and treatment?

16        A.    No, it's just my personal knowledge

17   having been involved in this for almost 40 years.

18        Q.    And same question about whether you

19   studied or analyzed the salinity issues that you

20   mentioned and the potential impact that that may

21   have here?

22        A.    I did not, but to this question and the

23   previous one you just asked, when I did work for the

24   predecessor or the Water Commission, the predecessor

25   to the TCEQ, it involved water quality sampling as

Carlos Rubinstein                                      July 9, 2024

Page 135

1    well and sediment sampling was a big portion of

2    that.  So I am familiar with the constituents that

3    are commonly found in various parts of the river.

4         Q.   So Paragraph 2 says:  Mexico's approval

5    will likely be required as they and their water

6    users will be impacted.

7              How would Mexico's water users be

8    impacted beyond what we just discussed?

9         A.   Beyond what we just discussed, the only

10   thing I would add -- and I think we've discussed it

11   earlier -- is they also will be impacted by

12   increased losses.  But everything else I think you

13   and I just covered in general terms.  There might be

14   additional impacts to some of them.

15             Remember I mentioned earlier that Mexico

16   typically diverts its water by gravity?  If you

17   change the head pressure, that could impact them

18   potentially because I don't know it for a fact, then

19   that might be an additional impact that I would have

20   a concern.

21        Q.   So you are assuming that there would be a

22   loss of water to Mexico, then?

23        A.   Yes.  Or a loss of water or loss of

24   access to water.  They're two different things.

25        Q.   And under the treaty, United States only

Carlos Rubinstein                                        July 9, 2024

Page 155

1        Q.    So let's turn to the next section on

2    Page 12 of Exhibit 1:  Impacts to Texas's water

3    users if water is dedicated or released for future

4    navigation.

5        A.    Yes, sir.

6        Q.    And so this is the second improvement

7    that you considered that we've discussed today.

8              Correct?

9        A.    Yes, sir.

10       Q.    And this is -- this improvement with the

11   lock system or increased water flow and channel

12   assumes that additional water releases would be

13   required?

14       A.    How else are you going to increase the --

15   the depth of the river to a place where it would be

16   able to allow for the passage of larger-scale boats.

17             I mean, like we mentioned at the very

18   beginning, if you don't have the water, you can't

19   have navigation.

20       Q.    When you say "larger-scale boats" are you

21   referring to what we were talking about earlier

22   about the intercoastal and the ports with the large

23   barges and the freighters and those sorts of...

24       A.    That's fair enough.  Yes, sir.

25       Q.    What did you assume for the lock and

Carlos Rubinstein

Page 156

1    channel system in the second improvement?

2        A.    I did not assume costs.   I did not assume

3    engineering factors, because I just don't do that.

4    I did expect, and I think it's reasonable, that if

5    you're going to build a lock, because I have been

6    through locks before.  I know the water that is

7    required to fill and empty.  I know what that -- as

8    we mentioned repeatedly today, any time you do

9    anything with water, you're losing it.  I know the

10   impacts that that would make.  There's just not that

11   water available.

12            And there is a side issue.  We talked

13   earlier this morning, I think, about the

14   inextricable nature of the volume of water in the

15   international reservoirs.  You remove it from the

16   international reservoirs to be -- to make what is

17   absolutely not needed, but somebody wants to build a

18   lock system, you cannot account for that water for

19   allocation.  You have now impacted all water right

20   holders.  That's the basis for that.

21       Q.    How many lock systems did you assume for

22   purposes of this second hypothetical?

23       A.    I hope that nobody ever thinks of

24   building a lock system.  I'm just saying if somebody

25   thinks that that is an option, it comes with a lot

Page 157

1    of negative impacts as it relates to water.  I did

2    not make a determination of how many would be

3    needed.

4         Q.    Did you make a determination on the size

5    of the channel or the depth?

6         A.    Tangentially my knowledge of the

7    intercoastal and its depth, my knowledge of the

8    waterway and the turning basin at the port of

9    Harlingen, I figured that at a minimum you needed

10   12- to 15-feet, at a minimum.  I don't know how wide

11   it would have to be, and the meandering section of

12   the river would end up being a determining factor so

13   that you could actually navigate it.

14              Those are just, in my mind, at least

15   starting points that I would consider.  Because they

16   have -- I have a reference point.

17        Q.    Did you consider -- or where did you

18   assume that the lock systems would be located, if

19   anywhere?

20        A.    I didn't.

21              MR. TEBO:  Objection; form.

22        A.    I didn't.  I'm just saying because there

23   has been no specificity put forward by the U.S.,

24   if -- you can release water and make it -- and try

25   to make it usable two ways.

Carlos Rubinstein                                                    July 9, 2024

Page 159

1    United States to promote navigation on the Rio

2    Grande would have a negative impact to the property

3    interest benefits and enjoyment of use by Texas

4    water right holders.

5              Did I read that correctly?

6         A.    You did.

7         Q.    And that goes to the point you were just

8    making?

9         A.    Yes, sir, it absolutely does.

10        Q.    So I know we talked about -- I think

11   we've talked about this or touched on it earlier,

12   but navigation can be an incidental use for -- of a

13   beneficial use.  Correct?

14        A.    The Water Code allows you to seek a

15   permit to add navigation.  But, again, let's not

16   forget all of the other burdens that are on the

17   applicant to be able to sustain why it should be

18   granted.

19        Q.    What is the basis for your statement that

20   promoting navigation would have a negative impact to

21   the property interest benefits and enjoyment of use

22   by Texas water right holders?

23        A.    What we've been talking about at length

24   today.  You're changing how the river is used,

25   you're going to be changing its efficiency, you're

Carlos Rubinstein

Page 160

1   going to be changing where water is being stored and

2   used at any given time.

3            Any time you reduce the efficiency of the

4   operations of the river, you are impacting existing

5   water right holders.  It is that simple.

6       Q.    And so is it your opinion, then, that

7   there is a negative impact for all Texas water right

8   holders?

9       A.    Yes.  And more so, even though it may --

10  well, there'll be additional water in this segment

11  at one given point.  All of those water right

12  holders are still dependent on the stock resources.

13           The stock resource is water at the lake.

14  You're going to be reducing that.  So while I may

15  benefit at one time because also I have a real fat

16  river going by my house or my farm, at the end of

17  the month I better not complain that I didn't get an

18  allocation.  That's why.

19      Q.    The federal government, through the Army

20  Corps of Engineers and other federal agencies,

21  conducted civil works projects in Texas.  Correct?

22               MR. TEBO:  Objection; form.

23      A.    I would not be surprised.  If -- in fact,

24  I think you're right.  There are Corps of Engineers

25  reservoirs in other parts of Texas.

Carlos Rubinstein

July 9, 2024

Page 161

1       Q.    If Congress authorized a project to aid

2   navigation on the Rio Grande, is it your testimony

3   that such a project requires the federal government

4   to obtain a water right from Texas?

5       A.    Okay.   One more time.

6       Q.    Sure.

7       A.    Or if you can just expand on it,

8   because I -- the way you asked it, yes.

9       Q.    Okay.   Well, I want to make sure -- I

10   want to make sure we're not talking past each other,

11   so...

12       A.    Yeah.

13       Q.    If Congress authorizes a project to aid

14   navigation on the Rio Grande, is it your testimony

15   that that project requires a water right permit from

16   the State of Texas?

17       A.    How else are you going to give it that

18   use, and where is the water going to come from to

19   satisfy that project?

20            Without knowing the particulars of how

21   you would make it navigable, yes, absolutely.   I can

22   see where that's going to require a water right, at

23   a minimum, just to add the use.

24       Q.    What federal civil works projects in

25   Texas has the federal government obtained water

Carlos Rubinstein                                July 9, 2024

Page 162

1     rights or used permits from TCEQ for?

2          A.     One that comes to mind are some

3     reservoirs in East Texas that the Corps, I believe,

4     operates.  I'm sure there are many others.  I

5     wouldn't be surprised if some of the Highland Lakes

6     had Army Corps attachment.  I would not be

7     surprised.  There might be numerous.

8          Q.     Are you aware of any that -- any water

9     rights permits for projects that were done in aid of

10    navigation?

11         A.     I'm not aware of that, sir.

12         Q.     So are you saying that any federal

13    project to aid navigation is impossible because the

14    Corps cannot obtain a water right permit from the

15    State of Texas?

16         A.     On the Rio Grande?

17         Q.     On the Rio Grande.

18         A.     I don't know how you overcome -- as a --

19    when it comes to water issues, one of the critical

20    things that you first have to overcome, and the EPA

21    is a stickler on this, is purpose and need.  Where

22    is the need?

23              I don't see how you overcome that

24    obstacle.  I don't think you get to a credible

25    application, but you're entitled to file one, you

Carlos Rubinstein                                    July 9, 2024

Page  163

1    know, and the Commission will consider it based on

2    its merits.  I just don't see how you overcome some

3    real hard barriers.

4         Q.    So you're not saying that the Corps or

5    the federal sponsor could not apply for

6    appropriation.  You're just saying that it would be

7    very difficult, if not impossible, for them to

8    submit a successful application for a water right

9    permit?

10        A.    That's very well stated.  They could

11   apply.  The burden is on the applicant to overcome

12   its burden to prove a need.  I don't think you'd get

13   there.

14        Q.    Could Congress approve a federal project

15   that allows the Corps or a federal sponsor to take

16   existing water rights through condemnation or other

17   authorization?

18        A.    Y'all are attorneys.  I am sure that if

19   they did that, there would be hundreds of lawsuits

20   on a takings claim.  You know, let's face it.

21   Sometimes legislatures do dumb things.  Right?

22        Q.    Do you agree that federal authority over

23   navigation under the -- do you agree that federal

24   authority over navigation is superior to Texas's

25   authority over state waters?

Carlos Rubinstein                                          July 9, 2024

Page 164

1              MR. TEBO:   Objection; form.

2        A.    I don't think those dots connect.   I

3    don't disagree that the federal government, because

4    of the discussion we had earlier this morning on the

5    commerce clause, has absolute primacy over those

6    matters, but I also believe that the primacy of the

7    use of state waters cannot be hindered either.   And

8    if you do, I'm not a lawyer, but I'm sure there'll

9    be hundreds of lawsuits for a taking.

10             Because in particular, in this instance,

11   the water rights have been fully adjudicated.   There

12   is no extra water.   So you're dealing with

13   somebody's property right.

14        Q.    So Paragraph 4 at the bottom of Page 12

15   says:   Would Mexico participate in this project for

16   the reasons explained above?   We don't think so.

17             We've already talked about some of the

18   reasons already.   Are there any others that form the

19   basis of this statement?

20        A.    I think we have covered them all, but,

21   you know, the cost, the benefit, why are you even

22   doing this, how would it impact, without knowing any

23   specifics because none have been put forward, I

24   don't see how you could convince Mexico to actually

25   allow this to occur, particularly purpose and need.

Carlos Rubinstein                                                    July 9, 2024

1     There is absolutely no need.

2                I can tell you that I know for a fact

3     that if the Brownsville weir dam were constructed,

4     it would also have a huge benefit to Matamoros at

5     their diversion point because their diversion point

6     would be in the pool.  But they still haven't

7     approved that one because they have what can be very

8     legitimate concerns about the impacts of a rising

9     water table on their residents.  So if you can't

10    even get that weir dam approved, I don't know how

11    you get anything else done.

12                You see what I'm saying?

13        Q.    So Paragraph 5 on Page 13 says -- posed

14    the question:  How much water would be required to

15    facilitate this project?

16                Let's say for discussion purposes it's

17    100,000 acre-feet annually.  How did you determine

18    to use the 100,000 acre-feet annually here?

19        A.    I just picked it out as a number.  We

20    both did, actually.  It -- because we think it's a

21    substantial amount that you would need in that

22    segment.  I actually think you're going to need a

23    heck of a lot more than that.  This is a very

24    conservative number, but we just picked it for

25    argument's sake.  It isn't the -- the value.  It's

Carlos Rubinstein

Page 166

1   to make the point further down that we're making

2   that every acre-foot that you take that is currently

3   allocated to the conservation pool and you remove it

4   from the conservation pool by unilateral action, you

5   are having a one-to-one negative impact on all

6   existing water.

7           We could have put a million.  We could

8   have put 50,000.  It doesn't matter.  The point is

9   you move an acre-foot out of conservation.  You take

10  it out of the allocation process.  You have

11  negatively impacted all existing rights.  That's

12  what we mean.

13      Q.    So the 100,000 acre-feet number was not a

14  calculation or something that you derived from

15  the --

16      A.    We could replace it with 50,000 if you'd

17  like or 200,000.  The point was not the volume as a

18  computation of volume would be required.  The point

19  we're making is you're taking water out of the

20  conservation pool that's already been fully

21  allocated and that represents a negative impact.

22  That's the point we're making.  It is not a

23  calculation that three locks are going to require

24  this.  That is not it at all.

25      Q.    So in 5A, it says:  Would this water be

Carlos Rubinstein                                    July 9, 2024

Page 177

1    finished.

2              So your question, then, that you pose is:

3    How would the reservoir operations that you just

4    described be adjusted in the event of the increased

5    water flow and releases that would occur?

6         A.    Particularly, as it impacts the

7    conservation pool, because the conservation pool is

8    fully adjudicated.  So who's going to be calling for

9    that water now?

10        Q.    Page 14, first paragraph at the top at

11   the end of it, it says:  The United States has not

12   provided answers or specificity relative to these

13   important considerations.

14             Were Congress to approve a project to aid

15   in navigation on -- of the Rio Grande, is it your

16   understanding that implementation of any such

17   project would include a notice and comment period?

18             MR. TEBO:  Objection; form.

19        A.    I would not be surprised.  Not only that,

20   I also think it would require a NEPA finding of no

21   significant impact.  Things like that.  Substantial

22   reviews.

23        Q.    And then in the next paragraph four lines

24   down it says:  We believe the economic costs of

25   creating such a system of navigation on the Rio

Carlos Rubinstein                                      July 9, 2024

                                          Page  178

1    Grande would be economically unfeasible.

2              And I think we've talked today about

3    how -- you didn't do specific calculations for

4    analysis of -- of quantifying those analyses for

5    your report?

6         A.    I did not.  The statement is -- I think

7    we've covered it during the day -- based on my

8    experience and that of Herman's as well.  The fact

9    that there's no need, the fact that you can't

10   quantify a benefit, can't even point to who would be

11   using it.  It's just infeasible.

12        Q.    Infeasible from an economic perspective?

13        A.    And a sustainability.  Remember I

14   mentioned viable, feasible, and sustainable?  I

15   don't even think it's viable.  I don't think it

16   meets any of the three.  But yes.

17        Q.    And the -- your basis for that is not as

18   an economist but based on your experience and

19   background?

20        A.    Absolutely.

21        Q.    So if you go down, the third line,

22   actually move up one, it says:  Most anything can

23   have an engineered solution.

24        A.    Okay.  Now, let me find it.

25        Q.    Oh, sorry.  Same paragraph, third line

Carlos Rubinstein                                      July 9, 2024

1    the paragraph that starts with "Could the Rio

2    Grande..."

3          A.    Yes, I'm there with you now.

4          Q.    Sure.

5                "So could the Rio Grande become a

6    commercially navigable waterway with the

7    intercoastal canal or similar systems, could lock

8    and dams be constructed on the Rio Grande.

9    Constructionwise, it's possible.  Most anything can

10   have an engineered solution but not always a

11   feasible or correct action to undertake."

12               Did I read that correctly?

13         A.    Yes, you did.

14         Q.    And that's this -- this is kind of the

15   discussion that we've been having since lunch about

16   the reasons for your opinion on that?

17         A.    And even, I think, before lunch.

18         Q.    Before lunch.

19         A.    Yeah.

20         Q.    So fair to say that improvements to

21   navigation can be -- can be made?

22         A.    Like we said, most anything can be

23   engineered.  It doesn't mean that it's needed.  It

24   doesn't mean that it makes sense.

25         Q.    And then towards the bottom of that

Carlos Rubinstein                                                      July 9, 2024

Page 186

1    When I was city manager in Brownsville and we were

2    building a third bridge and we were issuing debt for

3    it, the sustainability, which we have talked about

4    of that bridge as a project came -- was also

5    something we had to justify.

6            And one of the elements, for example, is

7    commerce telling us, and me as city manager, we will

8    not use your bridge unless you build a direct

9    connection to the expressway.  And guess what?  We

10   did.  And all of that highlights the importance of

11   timeliness and cost-effectiveness.  When I was city

12   manager in Brownsville, commerce, believe it or not,

13   requested an overweight corridor to transport more

14   goods over one particular highway near Brownsville

15   and they got it.

16       Q.    When you say "commerce," what do you mean

17   by that?

18       A.    Cargo from the port.  Take your pick.  It

19   could be petrochemical, refined products.  It can be

20   grain.

21       Q.    So is it those entities that were

22   reaching out to the -- to you and the City to say

23   build the overweight -- or overweight roads or --

24   I'm just trying to understand the...

25       A.    Two distinct issues I'm -- that I'm

Carlos Rubinstein                                    July 9, 2024

Page 187

1    referencing.  The interconnections between the

2    bridge and the expressway was all kind of commerce,

3    including vehicular traffic.

4              But in particular, truckloads of moving

5    packaged goods, things like that.  The overweight

6    corridor was to move goods that were arriving at the

7    port of Brownsville to Matamoros.  And they

8    required -- requested not from the City, but the

9    City had to participate in it, an overweight

10   designation for the connector between the port and

11   the Gateway international bridge.

12        Q.   Is that the bridge commonly also referred

13   to as the Veterans Bridge?

14        A.   Gateway is not the Veterans Bridge.

15   Gateway is the second new bridge, quote, unquote.

16   Veterans is the bridge I reference where we did the

17   connector to the expressway.  The overweight

18   corridor was to get more freight by truck from the

19   port to Gateway.  And it's right downtown.

20        Q.   Besides your experience with the

21   development and construction of the -- what we've

22   just discussed with the Gateway Bridge and the

23   corridor, did you do any economic analysis or

24   calculations to determine economic feasibility for

25   moving the river back to -- or moving the river back

Carlos Rubinstein                    July 9, 2024

Page 188

1    to river transport for navigation?

2         A.    No.

3         Q.    Do you know who authorized the

4    construction of the Veterans Bridge?

5         A.    It was -- who authorized it?

6         Q.    Uh-huh.

7         A.    A lot of -- okay.  It's a joint project

8    between Cameron County and the City of Brownsville.

9    It was -- it had to receive a presidential permit,

10   so that had to be whoever was president or the

11   administration in '96, '97.  And we issued --

12   jointly issued the debt, "we" being the City of

13   Brownsville and Cameron County.  And so we were the

14   U.S. sponsors.  I don't know who was the Mexican

15   sponsor.

16        Q.    Was any part of it federally

17   appropriated?

18        A.    I don't know, but, in honesty, remember

19   the connector that I referenced to connect the

20   bridge to the expressway?  That -- that came from

21   highway funds, and those are reappropriated -- you

22   can split hairs.

23              We all pay a gas tax that goes to the

24   feds.  The feds return it to the states and that's

25   where that bridge was paid for.  So it was a return

Carlos Rubinstein                                        July 9, 2024

Page 189

1    of money we all had already paid in gas tax.  I

2    guess you could call it reappropriated or we just

3    got our money back.  Take your pick.

4         Q.    Were any water rights or permits obtained

5    as part of the construction of the Gateway Bridge or

6    the Veterans Bridge?

7         A.    None that I'm aware of.  None that I

8    know -- I don't know of any that exist.

9         Q.    Let's go to Page 15, the reasons for

10   opinions.  And I realize we have probably talked

11   about a fair number of these, but I want to make

12   sure that I'm not missing anything.

13        A.    You bet.

14        Q.    So under reasons for opinions, physical

15   barriers, No. 1 it says:  There is insufficient

16   water supply in the Rio Grande upstream from Laredo,

17   now and in the foreseeable future, to make any

18   necessary improvements to make navigation feasible.

19             And just to confirm from what we

20   discussed earlier, you did not do any calculations

21   or analysis to determine how much insufficient water

22   supply there is?

23        A.    There is no water available.  It's a

24   fact.  We do determinations based on water

25   availability models.  Water availability models take

Carlos Rubinstein                                    July 9, 2024

Page 192

1    They don't add or detract from my opinion.

2         Q.    In Paragraph 2 under treaty and

3    regulatory barriers, you note that:  To reprioritize

4    the use of the Rio Grande for water navigation would

5    inflict serious hardship on cities and consumers.

6              Again, you did not do any analysis or

7    calculations on what the hardships would be on

8    cities and consumers.  Is that correct?

9         A.    No.  This is a factual statement.  And I

10   think we covered that in previous questions, where

11   we talked about what happens when you increase the

12   silt, what happens when you rectify river -- that's

13   what we're really referencing.

14        Q.    And the same would be for the -- on

15   farmers in both United States and Mexico?

16        A.    One additional consideration there,

17   remember, but we've talked about it, is where they

18   lie in the priority of allocation.  So the farmer

19   actually would be hit even harder.

20        Q.    Under "Economic Barriers and Needed

21   Consents," you note that it says:  The negative

22   socioeconomic impact to existing users of water from

23   an unwanted reapportionment of water to navigation.

24              What analysis did you do to determine

25   that the reapportionment would be unwanted?

Carlos Rubinstein                                             July 9, 2024

Page 193

```
 1        A.    Unwarranted.

 2        Q.    Unwarranted.

 3        A.    There's no need for navigation.  It's

 4   that simple.  It's not warranted.  There's no

 5   demonstrated demand.

 6        Q.    And in the next line of Paragraph 1, it

 7   says:  Coupled with potential costs to improve and

 8   maintain navigation on the relevant stretch of the

 9   Rio Grande where there is no demonstrated demand

10   it's difficult to justify.

11              What is the relevant stretch that you're

12   referring to here?

13        A.    The segment that is part -- that you-all

14   have agreed, the mile markers.  That's what I mean.

15        Q.    275.5 to 610?

16        A.    Yes.  But I also think that that

17   opinion -- I hold that opinion of the river itself,

18   but in particular that segment, yes.

19        Q.    Did you quantify what the potential costs

20   to improve navigation would be?

21        A.    No, because I'm not justifying or

22   advancing that that should be undertaken.  I...

23        Q.    It's -- oh, I'm sorry.

24        A.    Yeah, no.  It's just...

25        Q.    And same question about whether you
```

Carlos Rubinstein                                            July 9, 2024

                                                        Page 194

1    determined or analyzed what the potential costs to

2    maintain navigation might be?

3         A.    No, I did not.  That's correct.

4         Q.    No. 2 under Economic Barriers and Needed

5    Consents on Page 16, it says that:  Improvements to

6    the relevant stretch of the Rio Grande to make it

7    commercial -- commercially navigable would require

8    large financial resources appropriated by the

9    Congress of the United States and by Mexico that are

10   a very doubtful ability.

11             How do you know that any improvements

12   would require funding from Mexico?

13        A.    Because the treaty specifies that when

14   you're going to undertake joint projects in the

15   river, that you are supposed to cost share or

16   determine the cost share factor.  It is true on how

17   we build the two international reservoirs.  It's

18   true on how the El Morillo drain operates, it's true

19   on Anzalduas, it's true of Retamal.  That's just a

20   fact.

21        Q.    But if it was not a joint project, then

22   that would not -- there would not be a cost -- a

23   cost sharing?

24        A.    I guess conceivably there -- there could

25   be one.  I mean, but then you would be shifting the

Carlos Rubinstein                                    July 9, 2024

Page 195

1    whole burden to fund a project that isn't needed to

2    one entity.  But I guess that's a determination that

3    could be made.

4         Q.    And then the last section, Paragraph 3,

5    under "Economic barriers and needed consents," says

6    that:  Improvements to the relevant stretch of the

7    Rio Grande to make it commercially navigable could

8    not be accomplished by the Army Corps of Engineers

9    which has no authorization or ability to operate

10   Amistad Dam, to dredge in the channel of the

11   Rio Grande, to remove plant species from the

12   Rio Grande, or to stabilize the banks of the

13   Rio Grande.

14             Who, in your opinion, has -- and I

15   think the -- who has -- who, in your opinion, has

16   the authority to do that?

17        A.    Next sentence:  These actions would have

18   to be accomplished and approved by the IBWC.

19             The treaty is very clear.

20        Q.    Could Congress delegate the authority to

21   the Army Corps of Engineers or other federal

22   agencies?

23             MR. TEBO:  Objection; form.

24        A.    If they -- I'm -- I'm going to give you

25   an absolute example of if Congress tried to do that,