# Settemeyer Deposition Transcript Excerpts

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION
 3
    UNITED STATES OF          §
 4  AMERICA,                  §
                             §  CIVIL ACTION NO.
 5      PLAINTIFF,            §  1:23-CV-00853-DAE
                             §
 6  V.                        §
                             §
 7  GREG ABBOTT, IN HIS       §
    CAPACITY AS GOVERNOR OF   §
 8  THE STATE OF TEXAS, AND   §
    THE STATE OF TEXAS,       §
 9                            §
        DEFENDANTS.           §
10
11
12
                    ORAL DEPOSITION OF
13                HERMAN ROBERT SETTEMEYER
                      JULY 10, 2024
14
15
16
        ORAL DEPOSITION OF HERMAN ROBERT SETTEMEYER,
17   produced as a witness at the instance of the
     Plaintiff and duly sworn, was taken in the above
18   styled and numbered cause on Wednesday, July 10,
     2024, from 9:07 a.m. to 11:47 a.m., before TAMARA
19   CHAPMAN, CSR, RPR-CRR in and for the State of Texas,
     reported by computerized stenotype machine, at the
20   U.S. Attorney's Office for the Western District of
     Texas, 903 San Jacinto Boulevard, Austin, Texas,
21   pursuant to the Federal Rules of Civil Procedure and
     any provisions stated on the record herein.
22
23
24
25   Job No. CS 6783965
```

Herman Robert Settemeyer                               July 10, 2024

Page 36

1     relating to the releases of water through the dams,

2     how those releases are made.

3          Q.    Are there specific portions of Exhibit 1,

4     your expert report, that address issues particular

5     to hydraulics and engineering?

6          A.    I don't think so.

7          Q.    As an engineer, do you use modeling?

8          A.    I am not a modeler.  You know, when I was

9     working at the agency, you know, the agency used

10    models.  We used models.  I say "we."  Through

11    the -- excuse me -- in particular the Rio Grande

12    Compact there was models used by the various

13    agencies to assist in the compact deliveries.  I

14    mean, I think the Corps originated a model and it

15    was used -- that Corps model was used to calculate

16    the deliveries between New Mexico, Colorado, and

17    Texas.  Myself, I am not a modeler.  I do not write

18    models.  I don't actually even run the models.

19         Q.    So is the other side of that coin, that

20    you do more technical evaluations and those sorts of

21    analysis as an engineer?

22               MR. TEBO:  Objection; form.

23         A.    Well, as an engineer advisor to the Rio

24    Grande Compact Commission we oversaw the accounting

25    of water deliveries between the states.  We oversaw

Herman Robert Settemeyer                                    July 10, 2024

Page 37

1     how those models operated, what parameters went into

2     those models.  If those parameters changed, how that

3     would impact the various deliveries downstream.

4                And so, you know, in relation to models,

5     you know, I know how they operate, I know what they

6     do, I know what parameters go into the models.

7                When I was actually the section manager

8     at the TCEQ for that period of time, that's when we

9     implemented the development of the water development

10    models that are used today to administer water

11    rights within Texas.

12                So while I didn't actually do the models

13    and write the models, we hired -- put out and

14    prepared the specifications and hired the

15    consultants that actually did those models back in

16    the -- around the year 2000.

17        Q.    Did you perform any technical evaluations

18    to form your opinions in this case?

19        A.    No.  No.  My opinions are really based on

20    my education and years and years and years of

21    experience associated with the Rio Grande.  And an

22    understanding of not only the Rio Grande Compact,

23    but the 1906 and 1944 treaty with Mexico.

24                MR. HARRISON:  Can we take a quick

25    break?

Herman Robert Settemeyer                                      July 10, 2024

Page 38

1                    THE WITNESS:  Sure.

2                         (Break.)

3         Q.    Earlier you said that the opinions you

4    reached in this case were based on your education

5    and experience.  What experience are you basing --

6    what experience were you referring to?

7         A.    My experience associated with the Rio

8    Grande through the Rio Grande Compact efforts,

9    through my involvement with the 1906 treaty

10   deliveries, the 1944 treaties, our experience in

11   meeting with the International Boundary and Water

12   Commission, both the U.S. and Mexico sections over

13   various treaty issues.  Experience with

14   investigations that I have done associated with the

15   Rio Grande, tours I've done of the Rio Grande basin,

16   not only in Texas, but in New Mexico, Colorado,

17   Mexico, as well, through my experience of

18   administering water rights.

19                    I think as Commissioner Rubinstein

20   alluded to yesterday, I mean, I was responsible for

21   drafting and processing the water rights for the

22   Brownsville weir a long, long time ago, and I

23   processed change of use applications on the Rio

24   Grande for converting water from my irrigation use

25   to a municipal use.

Herman Robert Settemeyer                                    July 10, 2024

Page 49

1               So navigation is a beneficial use under

2      Texas Water Code and it's also listed under the

3      treaty?

4          A.    Yes.

5          Q.    My question is:  Outside of that context

6      are you providing an expert opinion on navigation?

7          A.    I don't think so.

8          Q.    Are you providing an expert opinion on

9      interstate and foreign commerce?

10         A.    No.

11         Q.    Are you providing an expert opinion on

12     trade?

13         A.    In what regard?

14         Q.    So in Paragraph 8, for example, you note

15     that:  There are no reasonable improvements that

16     could be made to --

17               And then it goes on:  To make this and

18     other Rio Grande segments navigable or suitable for

19     use as a highway for interstate or foreign commerce

20     and trade in the normal ways that commerce and trade

21     presently are carried on via navigation?

22         A.    Yes, that's our opinion.

23         Q.    Are you providing an expert opinion on --

24     on trade?

25         A.    Only to the extent, I guess, that in my

Herman Robert Settemeyer                    July 10, 2024

Page 50

1    years of experience of the Rio Grande that I have

2    not seen the Rio Grande used as a mechanism to move

3    products from one location to another.  And I would

4    call that -- I would classify that as trade.

5         Q.    Is there any other background or

6    experience that would qualify you to provide an

7    expert opinion on trade?

8         A.    Just my years of experience in

9    understanding the river.

10        Q.    Are you providing an expert opinion on

11   economics?

12        A.    No.

13        Q.    What do you mean by -- in a couple of the

14   paragraphs here, Paragraphs 7, 8, and 9, what do you

15   mean by "highway for interstate or foreign commerce

16   and trade"?

17        A.    A means to move products from one

18   location to another.

19        Q.    Did you come up with that term?

20        A.    Well, it was -- I don't remember whether

21   it was me or Carlos, to be honest with you.  But

22   it's, you know, both of us agree that that's a fair

23   statement.

24        Q.    If it came from Carlos, do you know where

25   he may have gotten the term from?  Mr. Rubinstein

Herman Robert Settemeyer                           July 10, 2024

Page 51

1       that is.

2                   MR. TEBO:  Objection; form.

3           A.   We're talking about "highway for

4       commerce," is that the term we're talking about?

5           Q.    Yes.  Highway for interstate or foreign

6       commerce and trade.

7           A.    And we're talking really about highway?

8           Q.    Well, I think the whole phrase:  The

9       highway for interstate or foreign commerce and trade

10      in the normal ways that commerce and trade are

11      presently carried on via navigation.

12          A.    Well, thank you.  If -- like the

13      intercoastal waterway and, you know, the Mississippi

14      and -- and other streams that are used as highways

15      of -- of commerce, ways of moving that stuff instead

16      of on a gravel, concrete road, they're used to move

17      it on these waterways.  I mean, I'm familiar with

18      the Intercoastal Waterway.  I'm -- I haven't

19      necessarily seen that much on the Mississippi

20      itself, but I've seen it overassociated with the

21      locks and dams in Louisiana and Arkansas associated

22      I think with the Red River.  You know, I've seen the

23      lock and dams and how they operate.

24                  So using the term "highway of -- for

25      interstate commerce," it just made sense to me that

Page 52

1    that's a term that would be a reasonable way to

2    express that.

3         Q.    And so I -- just so I understand, in your

4    answer you mention the Intercoastal Waterway and the

5    Mississippi River as two examples of what you would

6    consider are highways of commerce?

7         A.    Yes.

8         Q.    And what is your experience or background

9    in making those sorts of determinations on what

10   constitutes a highway of commerce?

11        A.    Like I mentioned earlier, you know, I've

12   seen portions of the Intercoastal Waterway, I've

13   seen locks and dams associated with -- with

14   navigation aspects associated with streams in -- in

15   Louisiana as well as Arkansas.

16             I understand that, you know, there's --

17   the Mississippi is used to move products up and down

18   the river from one location to another.

19             Just from my -- my personal experience

20   and understanding of the movement of goods and

21   products.

22        Q.    Have you ever designed or constructed any

23   navigation features or projects?

24        A.    No.

25        Q.    Look at Page 15 of Exhibit 1:  Historical

Page 53

```
1    visual observation of authors regarding Rio Grande

2    navigation.

3         A.    I'm sorry?

4         Q.    Under the section Historical visual

5    observations, Page 14.  I'm sorry.  Here you go.

6    And based on this section is it your testimony that

7    you have never seen commercial navigation activity

8    on the Rio Grande?

9         A.    Yes, I have not seen any commercial.

10        Q.    And when you say "commercial navigation

11   activity," are you meaning barges and freighters and

12   vessels like that?

13        A.    Vessels that would move --

14              MR. TEBO:  Objection; form.

15        A.    Vessels that would move products from one

16   location to another location, commercial projects --

17   projects.

18        Q.    Would you consider the use of

19   smaller-type vessels commercial navigation activity

20   if they were -- if they met your definition of

21   moving goods or people from one location to another?

22        A.    If a vessel was capable of moving goods

23   and products from one location to another, then that

24   would be considered navigation to move those

25   products.
```

Herman Robert Settemeyer                    July 10, 2024

Page 55

1    Rio Grande.  The model shows there's no additional

2    water available for appropriation.

3              Even taking that a little bit farther, I

4    mean, the agency -- the agency -- the legislature

5    passed instream flow legislation to set aside water

6    for environmental flow needs for the rivers and

7    streams.

8              There was not an environmental flow set

9    aside on the Rio Grande because there's no

10   additional water available to meet those needs.  And

11   the legislation precluded going in and curtailing

12   existing water rights to meet those instream uses.

13             I probably wandered off your question

14   there.

15        Q.   But you would agree, though, that

16   circumstances could change such that the demands and

17   needs, and the ability to use the water could

18   ultimately result in the ability to use it in aid of

19   navigation or for improvements?

20        A.   Well, I have this saying.  You never say

21   never.  If that meant impacting existing water

22   rights, I would say that's pretty close to never.

23        Q.   On Page 13, Paragraph 5, there's a

24   question that you posed:  How much water would be

25   required to facilitate this project?

Herman Robert Settemeyer                                    July 10, 2024

Page 56

```
 1              Let's say for discussion purposes it's
 2     100,000 acre-feet annually.  Mr. Rubinstein
 3     testified yesterday that you both just picked out
 4     the 100,000 acre-feet annually number.
 5              Do you agree with that?
 6          A.   Yes.  I mean, it kind of goes back to the
 7     two scenarios we looked at.  You're either going to
 8     have to dredge the Rio Grande or you're going to
 9     have to release more water.  And we just kind of
10     picked a number to kind of identify issues
11     associated with increasing the water supply.
12          Q.   On Page 15, under "Reasons for Opinions"
13     it says "physical barriers."  You say:  There's
14     insufficient water supply in the Rio Grande upstream
15     from Laredo, now and in the foreseeable future, to
16     make any necessary improvements to make navigation
17     feasible.
18              But doesn't this assume that additional
19     water supply would be needed to make any necessary
20     improvements to make navigation feasible?
21              MR. TEBO:  Objection; form.
22          A.   Well, it would also mean that the --
23     under the current operation of the Rio Grande today,
24     even using the existing supplies we have, and the
25     varying conditions of the river through the years,
```

Herman Robert Settemeyer                    July 10, 2024

Page 57

1    that we don't really see any way to make

2    improvements that'll allow for navigation in the way

3    navigation means to us.

4         Q.    At the bottom of Page 15 to the top of

5    16, under "Treaty and Regulatory Variation No. 2,"

6    could you explain your methodology used to form the

7    opinion that reprioritizing the use of Rio Grande

8    water for navigation would inflict serious hardship

9    on cities and consumers?

10        A.    Yes.  As we've talked about before, the

11   Rio Grande is fully appropriated, the Rio Grande is

12   overappropriated.  The Rio Grande is a fast --

13   particularly the lower Rio Grande, is a very

14   fast-growing populated area with increased demands

15   for water supplies for municipal primarily, and as

16   well as industrial uses.

17             Taking water from an existing

18   higher-priority use and converting it to something

19   else is going to have serious impacts on those -- on

20   that region and the ability to meet its water

21   demands in the future.

22        Q.    Did you perform any analysis or

23   calculations to reach that conclusion?

24        A.    I didn't perform any calculations.  I

25   mean, the Texas water plan addresses the water needs

1   of the various regions in the State of Texas.  And

2   so I think the water plan itself provides

3   information related to the needs of the region, not

4   only the lower Rio Grande, but the entire Rio

5   Grande.

6          Q.    And your economic barriers and needed

7   consents, No. 1 on Page 16, could you explain the

8   methodology you used to form your opinion that the

9   potential costs to improve and maintain navigation

10  on the relevant stretch of the Rio Grande, where

11  there is no demonstrated demand, is difficult to

12  justify?

13         A.    Okay.  Repeat the first part of your

14  question.

15         Q.    What was the methodology that you used to

16  form that opinion?

17         A.    My -- my experience and understanding of

18  the -- of the Rio Grande of the needs for the water

19  users, the way the water is distributed to the water

20  users.  And, you know, water is actually available

21  to the water users.  If you reapportion the water to

22  something else, you would ultimately be taking water

23  away from the existing water users who basically

24  today don't have the -- don't have a necessary

25  amount of water need now to meet their demands, and

Herman Robert Settemeyer                    July 10, 2024

Page 59

1      their demands into the future.

2           Q.     And when you say "relevant stretches"

3      that -- between Mile Marker 275.5 and 610?

4           A.     Well, the statement "maintain navigation

5      on the relevant stretch" is the segment that you

6      talked about.  If additional water is required to

7      meet the navigation in those segments, it's going to

8      impact all water users on the Rio Grande.

9           Q.     Did you quantify or estimate the

10     potential costs to improve navigation?

11          A.     No.

12          Q.     Did you quantify or estimate the

13     potential costs to maintain navigation?

14          A.     No.

15          Q.     On Page 21 of Exhibit 1, at the bottom it

16     says -- the last paragraph says:  We disagree with

17     the United States' contention that it can

18     unilaterally decide the subject portion of the Rio

19     Grande is commercially navigable and take water from

20     existing water rights holders for the United States'

21     navigation desire, even when no such activity or

22     demands exists.

23               Did I read that correctly?

24          A.     Yes.

25          Q.     And what is the basis for that statement?

Herman Robert Settemeyer

Page 60

1          A.    Well, basically -- basically it's kind of

2      generally taken from the pleadings that I was able

3      to read that -- you know, that U.S.'s contention

4      about navigability on the Rio Grande and -- and

5      the -- their ideas of making the Rio Grande

6      navigable.

7                     MR. HARRISON:  Can I take five

8      minutes?

9                     MR. TEBO:  Sure.

10                     (Break.)

11          Q.    Mr. Settemeyer, are the basis for all of

12      your opinions -- any of your opinions different than

13      Mr. Rubinstein's?

14          A.    I don't think so.

15                     MR. HARRISON:  I'll pass the witness.

16                     EXAMINATION

17      BY MR. TEBO:

18          Q.    Mr. Settemeyer, did you testify today

19      about the relevance of water availability to the

20      feasibility of improvements to the Rio Grande River?

21          A.    Yes.

22          Q.    And did you testify that the waters of

23      the Rio Grande River are fully appropriated?

24          A.    Fully appropriated and overappropriated.

25          Q.    Does your report state that the waters

Herman Robert Settemeyer                                    July 10, 2024

Page 61

```
 1     are overappropriated to the best of your
 2     recollection?
 3          A.    I don't know if the report states that
 4     it's overappropriated.  I know it states that it's
 5     fully appropriated.
 6          Q.    I understand.
 7                Were a portion of the current -- scratch
 8     that.
 9                If some of the current rights holders to
10     waters of the Rio Grande River were to abandon their
11     rights, thereby freeing up some of the waters, are
12     there uses not related to navigation that would
13     likely get priority to appropriate those waters?
14          A.    Well, first of all, if water rights were
15     freed up or canceled or abandoned that would provide
16     additional water, that water would be used by the
17     existing water rights because the stream is
18     overappropriated.
19                If there was enough water somehow created
20     within the Rio Grande, there is documented
21     additional demands of the region that would need to
22     be supplied for higher priority use than navigation.
23          Q.    Would you clarify a little bit of your
24     answer?  Specifically what documented -- I think
25     documented demands, did you say, are you referring
```

Herman Robert Settemeyer                                        July 10, 2024

Page 74

1      considered in our report was the increased releases

2      from Amistad to increase navigation.  Those

3      increased releases could be made but they're going

4      to impact existing water rights and as such -- first

5      of all, TCEQ is not going to issue a water right for

6      that purpose for those increased uses that's going

7      to impact existing water rights, they're prohibited

8      by statute from doing such.

9            Q.    Understood.

10                 Is it within the scope of IBWC's

11     authority to unilaterally decide to make those water

12     releases?

13           A.    Not a water belonging to Texas, no.

14           Q.    Were you asked today whether you had

15     provided expert opinion on navigation?

16           A.    Yes.

17           Q.    Were you asked today whether you provided

18     expert opinion on trade?

19           A.    Yes.

20           Q.    Were you asked today whether you had

21     provided an expert -- any expert opinion as to

22     foreign or interstate commerce?

23           A.    I believe so.

24           Q.    Were you asked today whether you provided

25     any expert opinion as to economics?

Herman Robert Settemeyer                                    July 10, 2024

Page 75

1          A.    Yes.

2          Q.    Now, are you or are you not an expert

3     with respect to the subject areas, i.e., navigation,

4     trade, foreign or interstate commerce, economics,

5     per se?

6                    MR. HARRISON:  Objection; form.

7          A.    Can we go through those one at a time?

8          Q.    Oh, sure.  So, yeah.

9                    Well, let me just ask you this:  Are you

10    capable -- are you an expert on the subject of

11    navigation as it bears on the use of the waters of

12    the Rio Grande River?

13         A.    I would be -- I'm an expert on the

14    release of water on the Rio Grande River from the

15    reservoirs for navigation purposes to -- to the

16    detriment of existing water users.

17         Q.    And are you an expert on the subject of

18    trade as it would bear on the use of the waters of

19    the Rio Grande River?

20         A.    Well, again, if trade required additional

21    water releases from the reservoir, they would impact

22    water users, I would be an expert in that regard,

23    yes.

24         Q.    And similarly, are you an expert on the

25    subject matter of foreign or interstate commerce as

Herman Robert Settemeyer                                              July 10, 2024

Page 76

1      well as economics -- well, we'll do it one at a

2      time.

3                  Are you an expert on the subject matter

4      of foreign or interstate commerce as it relates to

5      the use of the waters of the Rio Grande River?

6           A.    I would be -- I would be an expert

7      relate -- relating similarly to the -- what we

8      discussed before about the use of water for those

9      purposes which would impact existing water rights.

10          Q.    And are you an expert on the subject

11     matter of economics as it would relate on the use of

12     the waters from the Rio Grande River?

13          A.    No, I don't think so.

14          Q.    Could you form an opinion about economic

15     matters to the extent that those matters had an

16     impact on water rights and water right -- and water

17     users on the Rio Grande River?

18          A.    I could form an opinion and express an

19     opinion that if the uses of those waters impacted

20     existing water rights in impacted municipal users,

21     irrigation users, industrial users, I could

22     certainly understand it, that that would have an

23     economic impact on those entities, yes.

24          Q.    Understood.

25                  MR. TEBO:  I think that's it for me.

Herman Robert Settemeyer                    July 10, 2024

Page 77

1    Thank you, Mr. Settemeyer.

2                    THE WITNESS:  Thank you.

3                      EXAMINATION

4    BY MR. HARRISON:

5        Q.    You were asked about the navigation use

6    squatter rights just a moment ago.  Does the lack of

7    Texas water rights for navigation make a river

8    nonnavigable?

9        A.    I don't know.

10       Q.    You were also asked about whether you

11   were an expert on various subjects as those would

12   bear as to the use of the waters of the Rio Grande

13   River.  And you said for some of those that you were

14   an expert only as to whether there were additional

15   water releases implicated.  Is that correct?

16       A.    I believe so.

17       Q.    And so that would cover the expert

18   subject matter of trade?

19       A.    Anything that would require

20   excess water -- additional water releases that would

21   impact our existing water rights.

22       Q.    So the scope of your expert opinion and

23   testimony on trade, for example, is only as it

24   relates to whether there are additional water

25   releases?

Herman Robert Settemeyer

Page 78

1           MR. TEBO:  Objection; form.

2      A.    I believe that's correct.

3      Q.    And same question for foreign or

4  interstate commerce, your expert opinion is only as

5  to whether additional water releases are warranted?

6           MR. TEBO:  Objection; form.

7      A.    It would be whether additional water

8  releases are made which would impact existing water

9  rights.

10      Q.    And you were also asked about forming

11  opinions on economic matters and you said that you

12  would -- you understood that you were providing

13  testimony on whether there were impacts on uses

14  based on water releases and water rights.  Is that

15  correct?

16      A.    No.  What I intended to say -- I don't

17  know if I did or not.  What I intended to say was

18  that if situations arose where entities in Texas

19  were deprived of their water supplies, whether

20  that's a municipality, an irrigator, industrial

21  user, et cetera, that those deprivation of supplies

22  would have an economic impact on those entities.

23      Q.    You're not providing expert opinion on

24  what that economic impact would be, just simply that

25  there would be an economic impact.  Correct?

Herman Robert Settemeyer                                    July 10, 2024

Page 79

1          A.      That's correct.   We did not do a study to

2     identify.   Now, it's my understanding that there are

3     studies that have been done but we did not do a

4     study.

5              Q.   And so you --

6                     MR. HARRISON:   That's all I have.

7                     THE STENOGRAPHER:   Same order as

8     yesterday?

9                     MR. TEBO:   Yes, please.

10                     (Deposition concluded at 11:47 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25