Thomas Ciarametaro                                    July 9, 2024

                                                    Page 1

1              UNITED STATES DISTRICT COURT

               FOR THE WESTERN DISTRIC OF TEXAS

2              AUSTIN DIVISION

3    - - - - - - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA

5         Plaintiff

6    vs.                    CA No. 1:23-CV-00853-DAE

7    GREG ABBOTT, in his capacity as

8    GOVERNOR OF THE STATE OF TEXAS,

9    and THE STATE OF TEXAS

10        Defendants

11   - - - - - - - - - - - - - - - - - - - x

12

13           DEPOSITION of THOMAS CIARAMETARO

14           Tuesday, July 9, 2024 - 9:22 a.m.

15            US Attorney's Office for the

16             District of Massachusetts

17            1 Courthouse Way, Suite 9200

18            Boston, Massachusetts 02210

19

20

21   Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

22   Job No. CS6783958

23

24

25

Thomas Ciarametaro                                    July 9, 2024

Page 57

1          What types of law would you
2    consider yourself to be an expert in?
3          A    Maritime law, Chapter 90B, Mass.
4    General Laws, boating laws, maritime navigation
5    laws, stuff like that.
6          Q    Okay.
7          Would you --
8          A    Federal laws, maritime federal laws.
9          Q    Would you consider yourself a legal
10   expert in interpretation of the Rivers and
11   Harbors Act?
12         A    No.
13         Q    Are you offering any -- in your
14   report any legal interpretations of the Rivers
15   and Harbors Act?
16         A    I believe I do, yes.
17         Q    Are you offering those as opinions to
18   be considered or just as background information
19   about the case?
20         A    Background information and
21   definitionwise, or certain definitions,
22   quotations from the Rivers and Harbors Act, and
23   as background information.
24         Q    Did you -- did you do that research
25   yourself or did you -- or was that something

Thomas Ciarametaro                                    July 9, 2024

Page 58

1    that you had to rely on others --

2          A    I didn't rely on anybody, but I -- it

3    was a combination of research that was provided

4    and research that I did on my own.

5          Q    Are there any assumptions you were

6    asked to make by Texas that you then agreed to

7    make and incorporate into your opinion?

8          A    I was given some definitions in which

9    I did not rely on.  Due to my experience,

10   education and training, I came to my own

11   conclusions.

12         Q    Okay.

13              So there's no -- so your report

14   does not include any definitions that you just

15   accepted and relied on from someone else.

16   If -- anything in there is something that you

17   had independently determined?

18         A    There are, I believe, two definitions

19   in here which were given to me by the State of

20   Texas, but I did not solely rely on them to

21   make my determinations.

22         Q    Okay.

23              Which two were those?

24         A    I'd have to look.  I believe there

25   may actually be one...

Thomas Ciarametaro                                          July 9, 2024

1               (The deponent read the

2      document.)

3          A    Oh, no, it's two -- navigable

4      waters --

5          Q    Can you mention for the court

6      reporter what page?

7          A    Oh, sorry, page 9 of Exhibit 1,

8      navigable waters.  And I believe the term

9      "buoy" on page 18 of Exhibit 1.  I believe

10     that's it, unless I'm overlooking something.

11         Q    And so the one -- so on page 9,

12     navigable waters, that would be beginning from

13     the sixth line down on that page?

14         A    Just let me make sure... yeah, I

15     believe so.

16         Q    So would I understand that correctly

17     to be the portion from that line through the

18     end of that page?

19         A    Correct.

20         Q    Okay.  That's the navigable waters

21     definition you referred to.

22               And then on page 18, buoys.

23     Would I understand correctly that you're

24     referring to the beginning of the first line of

25     text on that page?

Thomas Ciarametaro                                    July 9, 2024

Page 60

1          A     Yes, sir.

2          Q     And from there, how far down?

3          A     Just that first paragraph.

4          Q     Okay.

5                So that first paragraph of, I

6     think, seven lines?

7          A     Correct.

8          Q     Six lines.  I can't count.  Sorry.

9                (Laughter.)

10         A     Yeah.  Six.  Six.

11         Q     Thank you.

12               Do you consider yourself to be

13    an expert in economics?

14         A     No.

15         Q     So are you -- so, for example, you

16    testified earlier that some of the factors that

17    would go into whether a waterway is a highway

18    of commerce would be the conditions physically

19    of the waterway and some would be the

20    infrastructure, right?

21         A     Correct.

22         Q     I take it you're not offering

23    opinions in this case about -- from an

24    economist's point of view about, you know,

25    whether the cost and benefits would justify

Thomas Ciarametaro                                    July 9, 2024

Page 61

1    creating the infrastructure in the Rio Grande

2    that might give rise to greater river-borne

3    commerce?

4         A    Not specifically, but I do know that

5    part of the Army Corps's process in improving

6    infrastructure, such as dredging, is to do a

7    cost-benefit analysis.

8         Q    And is that an understanding you

9    gained from your involvement in applications to

10   the USACE?

11        A    Yes.  And being involved in

12   implementing a dredging plan and project that

13   we -- I presented along with others to the

14   Corps.

15             The dredging of the Annisquam

16   River was a multiyear convincing, if you will,

17   of getting federal funding, because it's

18   considered a shallow-draft navigation project.

19             So there's a cost-benefit

20   analysis piece that was particularly tough for

21   us to prove, because the commerce that

22   typically uses that area is not considered

23   commerce by the Army Corps's definition, which

24   is commercial fishing.

25             It's a commercial fishing port.

Thomas Ciarametaro                                    July 9, 2024

Page 62

 1    So I'm pretty familiar with that process.  Very

 2    familiar.

 3         Q    And so you're saying in that -- in

 4    that project, the commercial fishing was not

 5    considered as a commerce?

 6         A    Correct.

 7         Q    How were you able to surmount that?

 8         A    The lack of navigability at tides --

 9    certain tides created a public safety -- a

10    threat to public safety and to first

11    responders.  So that's how we were ultimately

12    able to surmount that, was Gloucester's an

13    island.  It's separated by the Annisquam River.

14    So if you had an emergency, let's say, on the

15    north side, you would have to travel 17 miles

16    out and around to get to that emergency.  Coast

17    Guard rescue boats, harbormaster, local police,

18    at certain tides, because it was so shallow,

19    were unable to navigate the river, thus

20    increasing, you know, response time

21    exponentially.

22                   So that's the case that we ended

23    up making and ultimately getting funding.

24         Q    Okay.

25                   And that ultimately led to the

Page 64

1    prior to working on this case?

2        A    I had been to the southern portion

3    near South Padre Island a long time ago, that

4    area.  I don't remember the specific area we

5    were in.

6             We were on boats traversing the

7    Gulf area, but southern portion.

8        Q    Okay.

9             You hadn't been further upriver

10   on the Rio Grande --

11       A    No, sir.

12       Q    -- prior to this case?

13       A    No, sir.

14       Q    And since being involved with this

15   case, you have visited the Rio Grande in the

16   vicinity of where the floating barrier is

17   located; is that right?

18       A    Yes, sir.

19       Q    And if I refer to "floating barrier,"

20   will you understand that to be the connected

21   objects -- buoys, as they're referred to --

22   that have been placed in the river and became

23   the subject of a lawsuit?

24       A    I would.

25       Q    Okay.

1          And have you visited that area
2     just one occasion or more than one?
3          A    Just once.
4          Q    Okay.
5               Was that June 7th of this year?
6          A    Yes, sir.
7          Q    Okay.
8               And with whom did you take the
9     tour that day on June 7th of that area?
10         A    DPS, Department of Public Safety,
11    Texas.  I believe their state police.
12         Q    Did any Texas counsel attend with
13    you?
14         A    No.
15         Q    Do you know if any other consultants
16    to Texas in the case attended with you besides
17    yourself?
18         A    Just me.
19         Q    Can you describe what things -- what
20    parts of the area did you get to see that day?
21         A    I believe it's called Shelby Park, is
22    where I met the state police officers.  Walked
23    around that area in the park and then proceeded
24    roughly two to two-and-a-half miles southbound
25    on the Rio Grande River until we got to the

Thomas Ciarametaro                                    July 9, 2024

Page 66

1    buoy barrier.

2         Q    And about how much time did you

3    spend, you know, within sight of the buoy

4    barrier?

5         A    Maybe an hour to an hour and a half,

6    maybe, roughly.

7         Q    And that day as you were headed there

8    to observe it, were there particular things

9    that you intended to try to observe about, any

10   particular details that were going to be

11   important for you?

12        A    The placement, how it was placed, how

13   it was constructed.  I had a good

14   understanding, because from my report, on

15   page 18, you can see the buoys on land.

16             So I had kind of a good

17   understanding on what they were and how they

18   worked before I had gotten there.  Observed the

19   depth of water, stuff like that.

20        Q    And what did you -- once you got

21   there, what did you observe about the depth of

22   the water?  What was its depth at that time?

23        A    It varied, but certain parts of the

24   river seemed to be three to four feet deep; and

25   some parts of the river, there was no water at

Thomas Ciarametaro                                                July 9, 2024

Page 69

```
 1                        And they said that they're
 2        supposed to know, but they rarely do know if
 3        there's going to be a release.  And then what
 4        that kind of looks like, how high the water can
 5        get or low it can get.
 6             Q    What did they say in terms of how
 7        high and how low the water can get?
 8             A    They said it can vary a couple of
 9        feet in certain areas.  Other areas still
10        remained dry depending on the topography of the
11        river, high spots or low spots.
12                        They said it really just kind of
13        all depends on where you're at specifically in
14        the river.
15             Q    Did you ask them about if there's any
16        sort of typical seasonal variation in the water
17        depth?
18             A    I did not bring up seasonal
19        variation, no.
20             Q    And you mentioned seeing a 14-foot
21        Border Patrol boat out that day.
22                        Did you see any other boats on
23        that stretch of the river that day?
24             A    No.
25             Q    Earlier I asked you about the other
```

Thomas Clarametaro                                      July 9, 2024

Page 70

```
1    cases in your list where you're involved as an
2    expert.
3                    I think I had asked this, but do
4    any of those cases involve a river
5    specifically, that type of waterway?
6         A    No.
7         Q    You mentioned that there were just
8    two definitions given for Texas, you've already
9    explained where those were, on page 9 and 18.
10                   I just want to make sure, there
11   is a paragraph on page 32, the second paragraph
12   there when you get to that page.
13                   Do you see the sentence that
14   begins, "Finally, the buoys are not other
15   structures" --
16        A    That was also provided, and I had
17   previously misspoken.  This was also provided.
18   I forgot that this was down towards the bottom
19   of the report.
20        Q    Okay.  Got it.
21        A    So --
22        Q    Okay.
23                   So in terms of definitions given
24   to you by Texas --
25        A    Mm-hmm.
```

Thomas Claurametaro                                    July 9, 2024

Page 71

1          Q    -- it would be the ones you testified

2     about on page 9 and 18 --

3          A    Correct.

4          Q    -- and this paragraph on page 32?

5          A    Yes, sir.

6          Q    From -- and it's about, I'll say, a

7     ten-line paragraph beginning, "Finally, the

8     buoys are not other structures"?

9          A    Correct.

10         Q    Okay.

11                   And that is the only portion of

12    your report that discusses that topic, correct?

13         A    I believe so.

14         Q    I just want to ask you something

15    about your -- this is --

16                   I'm looking at Exhibit 2,

17    page 39 of 42, and there's a section on your

18    education and training.

19         A    Which page was that again, sir?

20         Q    Page 39 --

21         A    Yeah.

22         Q    -- of 42 in Exhibit 2.

23         A    Yes.

24                   (The deponent read the

25    document.)

Thomas Ciarametaro                                    July 9, 2024

Page 72

1          Q    So it mentions associate of applied

2     science, fire science, at North Shore Community

3     College.

4          A    Correct.

5          Q    And can you explain what you studied?

6          A    It's chem fire and hazmat, and it's

7     exactly that.  It's fire science, the science

8     of hazardous materials and combustion and fire.

9          Q    Okay.

10                    And then -- and then after that,

11    you acquired a bachelor of science from

12    Endicott College, correct?

13         A    Yes.

14         Q    And it refers to homeland security,

15    criminal justice.

16                    Is that specifically -- was

17    there a specific major -- like, is it bachelor

18    of science in --

19         A    Criminal justice concentrated in

20    Homeland Security studies.

21         Q    Okay.  Understood.

22                    So the -- so the degree is

23    criminal justice but within that you had a

24    concentration in homeland security?

25         A    Correct.

Thomas Ciarametaro

Page 140

```
 1              A    Yes.

 2              Q    And this was -- you testified

 3      earlier -- I was asking you, you know, what are

 4      the options for improving the river's

 5      navigability, and I believe you said that

 6      dredging or locks and dams would be the -- were

 7      the two options; is that right?

 8              A    Mm-hmm.  Yes.

 9              Q    Okay.

10                   And in this case, have you

11      attempted to quantify, like, how extensive, for

12      example, dredging would have to be in order to

13      make that stretch of the Rio Grande a navigable

14      channel?

15              A    I have not quantified it on paper.

16      My experience is it would be very substantial,

17      considering most parts of the Rio Grande River

18      right now have no water in them or very little

19      water, and to dredge to a depth that would

20      support some kind of commerce is uncalculable

21      to me.  But I'm sure it is being -- it, you

22      know, is quantifiable, for sure.

23              Q    Okay.

24              A    But I'm not going to throw a number

25      at it, because I just don't know.
```

Thomas Ciarametaro                                    July 9, 2024

                                                    Page 141

1              I know it would be a giant

2     project, considering the smaller projects I've

3     been involved in, and how long and expensive

4     they were to complete.

5         Q    But you've not gone through the

6     exercise in this case of attempting to

7     conceptually identify what would be the scale

8     of the project here, correct?

9         A    Correct.

10        Q    And then you've not attempted to

11    quantify what would be the cost of that project

12    at that scale?

13        A    Correct.

14        Q    Okay.

15             And part of that sentence I

16    read, towards the end, it refers to "sufficient

17    quantities to justify the commercial

18    navigation."

19             I take it you've also not

20    attempted to sort of define a threshold, like

21    what is sufficient to make the project

22    worthwhile?

23        A    If it's not in my report, I haven't

24    quantified it.

25        Q    Okay.

Page 142

1              And the next sentence says,

2    "Addressing the nearly 600-foot elevation

3    changes over the 335-mile stretch from Eagle

4    Pass to Laredo, Texas, would require an

5    impractical amount of resources and

6    infrastructure investment."

7              Do you see that?

8         A    I do.

9         Q    And again, I take it you've not

10   attempted to sort of quantify, like, the

11   threshold at which a resource investment would

12   be impractical for a project?

13        A    No.

14        Q    The prior page, page 4, enumerated

15   paragraph 1, there's a sentence there, it says,

16   "The Rio Grande River between mile markers

17   275.5 and 610, and particularly in the Eagle

18   Pass area, does not meet the criteria of a

19   navigable waterway conducive to commercial

20   navigation such that it can operate as a

21   highway of commerce."

22              Do you see that sentence?

23        A    I do.

24        Q    You recall -- I was asking you

25   earlier if -- if a specific water, the

Thomas Ciarametaro                                July 9, 2024

Page 149

1                        EXAMINATION

2       BY MS. AL-FUHAID:

3            Q     I have some cross.  Okay.

4                        Mr. Ciarametaro, T.J., you

5       testified earlier in response to one of

6       Mr. Lynk's questions that you are a legal

7       expert in maritime laws.

8                        Do you recall that?

9            A     I do.

10           Q     You are not a lawyer, correct?

11           A     Correct.

12           Q     When you said that you were a legal

13      expert in maritime laws, what did you mean?

14           A     I mean throughout the course of my

15      training and experience in my jobs, I've become

16      very proficient at those specific parts of the

17      law, such as maritime navigation laws or

18      maritime rules of the road.

19                        I'm an expert in that, and those

20      are laws, so I'm -- that's what I meant by

21      that.

22           Q     So would it be more accurate to say

23      that you're a navigation expert rather than a

24      legal expert?

25           A     Yes.  I am not a lawyer.

Thomas Ciarametaro                                          July 9, 2024

Page 150

1          Q     So you also testified that you're not

2     a legal expert on the Rivers and Harbors Act.

3                     Do you recall that?

4          A     I do.

5          Q     What did you mean by that?

6          A     So I mean I'm not a lawyer.  Again, I

7     am an expert in the laws pertaining to

8     permitting all these -- all structures, piers,

9     docks, boat ramps, under the Rivers and Harbors

10    Act, but I'm not a legal expert on the

11    document, but I am an expert in the permitting

12    process, which is outlined in this report.

13         Q     And so is it accurate to say that you

14    have offered opinions on that process under the

15    Rivers and Harbors Act but not legal opinions?

16         A     Yes.  Legal opinions are left up to

17    the court.

18         Q     Now, I'd like you to turn to

19    Exhibit 1, page -- let's see -- page 32.

20         A     Okay.

21         Q     And it's the last paragraph under

22    opinion No. 4.  I'd like to direct your

23    attention to that paragraph.

24         A     Okay.

25         Q     Is it your opinion that the buoys do

Thomas Ciarametaro                                        July 9, 2024

Page 151

1        not affect the course of the Rio Grande River

2        in such a manner as to impact its navigable

3        capacity?

4               A       Correct.

5               Q       What is the basis for that opinion

6        that the buoys do not affect the course of the

7        Rio Grande River in that manner?

8               A       For all things that we discussed

9        today in this deposition, my personal

10       experience in that area, being on a boat and

11       witnessing that area firsthand, the totality of

12       this entire report gives me that opinion.

13              Q       And is it your opinion that the buoys

14       do not affect the location of the Rio Grande

15       River in a manner as to impact its navigable

16       capacity?

17              A       Yes.

18              Q       What's the basis for that opinion?

19              A       Same as what I just gave for the do

20       not affect the course.

21              Q       And is it your opinion that the buoys

22       do not affect the condition of the Rio Grande

23       River in such a manner as to impact its

24       navigable capacity?

25              A       Yes.

Thomas Ciarametaro                                    July 9, 2024

Page 152

1        Q    What is the basis for that opinion?

2        A    Again, all the research and all the

3   photographs and all the documentation inside

4   this report, plus my firsthand eyewitness of

5   the buoy barrier in the Rio Grande gives me --

6   gives me that opinion.

7        Q    Now, earlier you and Mr. Lynk

8   discussed some projects that you have worked on

9   under which you sought Section 10 permits from

10  the US Army Corps of Engineers under the Rivers

11  and Harbors Act.

12             Do you recall discussing that

13  with him?

14       A    Yes, I do.

15       Q    How many years of experience do you

16  have doing the permitting process under the

17  Rivers and Harbors Act -- under Section 10 of

18  the Rivers and Harbors Act?

19       A    Roughly nine.

20       Q    And can you estimate as to how

21  many -- just an estimate, not an exact

22  number -- can you estimate how many projects

23  you have worked on that involve that permitting

24  process?

25       A    I've been involved in that process

Thomas Ciarametaro                                    July 9, 2024

                                              Page 153

1     from people -- private people trying to permit

2     those processes -- trying to obtain those

3     permits, or are you looking for myself

4     actively, or all together?

5          Q    All together.

6          A    Hundreds.

7          Q    Have you -- have some of those --

8     have some of those projects been for the

9     placement of -- strike that.

10                   Have you been involved in any

11    projects -- set aside whether under Section 10

12    or not, just any projects at all in which you

13    placed buoys in a waterway?

14         A    Yes.

15         Q    Can you give some examples of such

16    projects?

17         A    Gloucester Harbor or Gloucester

18    proper, the municipality has between, like,

19    1400, 15- or 16- -- between 1400 and 1600

20    permitted moorings, mooring balls and mooring

21    buoys that are privately held but permitted

22    through the city and my department.

23                   The City of Gloucester has 30

24    transient mooring buoys that we install, take

25    care of, maintain and move periodically.

Page 169

```
 1    regulatory authority to -- to enact or enforce.

 2         Q    But if you had legal questions, would

 3    you consult the appropriate attorneys for the

 4    city?

 5         A    Yeah, or the state or -- yes,

 6    absolutely.

 7         Q    And you would not suggest to city

 8    officials that they consult you about legal

 9    issues, correct?

10         A    No.  I have -- no.

11              MS. AL-FUHAID:  I have no

12    further questions.

13              MR. LYNK:  Some cross.

14

15              FURTHER EXAMINATION

16    BY MR. LYNK:

17         Q    You were testifying about an

18    opinion -- well, first, let me ask you, just to

19    make it really clear, you've been testifying

20    about a paragraph on page 32.  And originally

21    in your testimony you described it as a

22    paragraph consisting of a definition received,

23    but you were explaining subsequently that there

24    could be aspects of this that were from you and

25    aspects that were received definition.
```

Thomas Ciarametaro                                    July 9, 2024

Page 170

```
 1                    Do you recall the testimony?
 2          A    I do.
 3          Q    Might it be accurate that the first
 4     sentence of this paragraph, which says,
 5     "Finally, the buoys are not other structures
 6     under the RHA," and the concluding sentence,
 7     "The buoys do not affect the course, location,"
 8     and it goes on to finish that sentence, do I
 9     take it that those were yours?
10          A    That's correct.
11          Q    And then the remainder of this
12     paragraph has -- refers to a couple of
13     regulatory provisions and gives a quote or at
14     least description of content of those, and it
15     includes also a citation to a statute and a
16     case citation; is that right?
17          A    Correct.
18          Q    Would you say that that content would
19     be the received definition portion, or are you
20     saying some of that also was yours?
21          A    No, that is -- that is the definition
22     portion.  You are correct in your statement.
23          Q    Okay.
24          A    I got a little confused earlier,
25     because I had changed some stuff here, and --
```

Thomas Ciarametaro                                     July 9, 2024

Page 171

1    but looking back and reading it thoroughly

2    again, that's a correct statement.

3         Q    Understood.  Glad to clear it up.

4                   And in the second sentence of

5    the paragraph, in the received definition, it

6    appears to be quoting a regulatory definition

7    of "structures," right?

8         A    Correct.

9         Q    And it gives a long list of things.

10   It includes -- one of the things included in

11   the list is "aid to navigation."

12                   Do you see that?

13        A    Correct.

14        Q    Is it your understanding that aids to

15   navigation -- buoys can be aids to navigation?

16        A    Buoys are -- can be, yes, absolutely.

17        Q    Okay.

18                   So is it fair to say there may

19   be circumstances where a buoy would be covered

20   by this regulatory definition?

21        A    Yes.  Per- -- my understanding is

22   it's permanently affixed aids to navigation

23   that never move.

24        Q    The last sentence, you were

25   testifying about earlier that the buoys -- in

Thomas Ciarametaro                                                    July 9, 2024

                                                        Page 172

1        part, it says, "do not affect the course of the

2        Rio Grande River."

3                    Do you see that?

4            A    I do.

5            Q    And you explained generally what

6        that's based on.

7            A    (Nods.)

8            Q    But I wondered, in determining that

9        the buoys do not affect the course of the

10       Rio Grande River, did you attempt to take into

11       account any information that would look at, you

12       know, what are the circumstances as of when

13       they were first placed versus what are the

14       circumstances now?

15           A    No.  This is based on my

16       accountability of what I saw now and where they

17       are now.

18           Q    And did -- do you have an

19       understanding of roughly when they were first

20       placed into the Rio Grande?

21           A    I believe it's been just over a year.

22       I think it was June of 2023, I think.  I -- if

23       my memory serves me correctly.

24           Q    Okay.

25                    Roughly a year ago from today?

Thomas Ciarametaro                                July 9, 2024

Page 173

1          A     Mm-hmm.

2          Q     And so if I understand your previous

3      answer, you did not attempt to develop

4      information that would look at, okay, you know,

5      this was the conditions of the river very

6      locally to this placement in June-July of 2023,

7      and then we're going to compare that to what

8      it's like in June or July of 2024?

9          A     I've seen photographs of where they

10     were before on the Internet.  I have not seen a

11     firsthand account, but they're still placed in

12     the same geographic location.

13                    They're just moved, which would

14     be to the east, X amount of feet.

15         Q     Have you attempted to look at whether

16     there have been any localized changes in

17     current, for example, within the close vicinity

18     of where the buoys were placed during this past

19     year?

20         A     If it's not in my report, I didn't

21     have an opinion on it.

22         Q     Okay.

23                    And when you talk about the

24     "course," what is the course of the Rio Grande?

25     What does that mean?

Thomas Ciarametaro                                      July 9, 2024

Page 174

1        A       The direction of water flow.

2        Q       Direction of water flow.

3        A       (Nods.)

4        Q       Okay.

5                So this is -- so this opinion

6    is -- generally, it's based on your

7    point-in-time observation when you made your

8    site visit in June of 2024?

9        A       Correct.  And subsequent videos of

10   the Rio Grande and so on.

11       Q       Okay.

12               So subsequent -- videos taken

13   subsequently to the date of your site visit?

14       A       Yes.

15       Q       But not videos taken during the

16   period prior to that?

17       A       I don't believe so.

18       Q       Okay.

19               And the same would be true in

20   terms of what you looked at regarding

21   condition?  It would be the day of your site

22   visit and videos subsequent but not information

23   prior?

24       A       No, I -- there's information prior

25   from -- in the report.  I think it's on page --

1                    Quite a bit of information on

2       the prior, actually.   Just let me find it here.

3                    (Pause.)

4            A      There's information here on page 11

5       of Exhibit 1 from 2001, first time in recorded

6       history, the Rio Grande was too weak to flow.

7                    And I also have information

8       about an excursion here.   In 2014, journalists

9       tried to traverse the entirety of the

10      Rio Grande River and were unable to due to the

11      lack of water in the Rio Grande.

12                    It's called -- page 12.

13      Figure 4 has a photo of a man walking a canoe

14      down the river because it was too shallow to

15      even canoe in certain parts.

16                    So there's quite a bit of

17      information historically about the flow and the

18      depths of the Rio Grande in this report.

19           Q      Those references are from prior to

20      the first placement of this buoy barrier,

21      right?

22           A      Correct.

23           Q      Okay.

24                    So -- so to -- so it would be

25      accurate to say that in looking at the buoys

Thomas Ciarametaro                                    July 9, 2024

Page 176

1    not having affected condition, you had earlier

2    information -- historic information, as you

3    called it, and information about the condition

4    at the time of the site visit, and video

5    information afterward, but not information

6    during the period from roughly June 2023 up

7    until before the site visit?

8           A    Correct.

9           Q    Can buoys cause very localized

10   eddies, for example, in the water?

11          A    They can.

12          Q    Can they cause localized changes in

13   direction of flow?

14          A    In -- changes in direction of flow?

15          Q    Yes.

16          A    No, in a river, no.

17          Q    Eddies, yes.  Not changes in flow.

18   All right.

19               And is that -- is that -- would

20   that be an example of something that you looked

21   at specifically in determining that the buoys

22   didn't affect the course or condition?

23          A    Yes.

24          Q    Okay.

25               And again, you would have looked

Thomas Ciarametaro                                    July 9, 2024

Page 177

1       at that during your site visit, you would have

2       looked at the video that was taken afterward,

3       not evidence taken during the period from

4       June 2023 up until the site visit?

5           A     I believe that's correct.

6           Q     You mentioned that you -- you

7       testified about the number of permit

8       applications you had been involved with and

9       whether any were for buoys.

10                     Have you ever been involved with

11      something that resembles this buoy barrier,

12      like a thousand-foot connected string of buoys?

13          A     Nothing quite that long.

14          Q     Okay.

15                     Have you ever applied for a

16      permit for any type of structure of that size?

17          A     No.  Of buoys?  No.

18          Q     Okay.

19                     Any type of structure that size?

20          A     Not quite a thousand feet.  Probably

21      200 -- 2- to 300-foot pier, pile-supported pier

22      with a docking gangway attached.

23          Q     Okay.

24                     Have you -- for any of the buoys

25      that you placed, were they moored with concrete