Thomas Ciarametaro                                    July 9, 2024

Page 1

1                UNITED STATES DISTRICT COURT

                 FOR THE WESTERN DISTRIC OF TEXAS

2                AUSTIN DIVISION

3      - - - - - - - - - - - - - - - - - - - - x

4      UNITED STATES OF AMERICA

5           Plaintiff

6      vs.                    CA No. 1:23-CV-00853-DAE

7      GREG ABBOTT, in his capacity as

8      GOVERNOR OF THE STATE OF TEXAS,

9      and THE STATE OF TEXAS

10          Defendants

11     - - - - - - - - - - - - - - - - - - - - x

12

13              DEPOSITION of THOMAS CIARAMETARO

14              Tuesday, July 9, 2024 - 9:22 a.m.

15               US Attorney's Office for the

16                District of Massachusetts

17                1 Courthouse Way, Suite 9200

18                Boston, Massachusetts 02210

19

20

21     Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

22     Job No. CS6783958

23

24

25

Page 2

1  APPEARANCES:
2
3  U.S. Department of Justice
4  Environment and Natural Resources Division
5  Environmental Defense Section
6    Brian H. Lynk, AUSA
7    PO Box 7611
8    Washington, District of Columbia 20044-7611
9    202.514.6187
10   brian.lynk@usdoj.gov
11   Counsel for the United States of
12   America, et al.
13
14  Texas Office of the Attorney General
15   Munera Al-Fuhaid, AAG
16   300 W. 15th Street
17   Austin, Texas 78701
18   512.463.2100
19   munera.al-fuhaid@oag.texas.gov
20   Counsel for defendants
21
22  Also present:  John Timmel
23
24
25

Page 3

1                    I N D E X
2
3  WITNESS:
4
5  THOMAS P. CIARAMETARO
6    Examination by Mr. Lynk       4, 168
7    Examination by Ms. Al-Fuhaid    148
8
9              E X H I B I T S
10
11  Exhibit 1  Expert Witness Report          4
12  Exhibit 2  Summary Report                 4
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                  P R O C E E D I N G S
2
3        (Exhibit 1 marked for
4  identification.)
5        (Exhibit 2 marked for
6  identification.)
7
8        THOMAS P. CIARAMETARO, a witness
9  having been duly sworn, on oath deposes and
10  says as follows:
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                    EXAMINATION
2  BY MR. LYNK:
3    Q   Would you please state your name for
4  the record.
5    A   Thomas P. Ciarametaro, Jr.
6    Q   And have you submitted an expert
7  report in a case called United States v.
8  Abbott?
9    A   I have.
10   Q   I'm going to hand you what's been
11  marked as Exhibit 1.
12       MR. LYNK:  And here's a copy.
13       MS. AL-FUHAID:  Thank you.
14  BY MR. LYNK:
15   Q   Just take a look at that.  See if you
16  recognize it.
17   A   I do.
18   Q   And this is a 42-page document titled
19  "Expert Witness Report" with your name on the
20  front; is that right?
21   A   Yes, sir.
22   Q   And as you look through that, let me
23  know if you recognize that to be an accurate
24  copy of your report in this case.
25   A   All appears to be here, sir.

Thomas Ciarametaro                                                July 9, 2024

Page 6

1    Q   And I'll ask some more questions
2 about it later, but just in general, that
3 report -- have you done any further report in
4 this case since this one, which I believe is
5 dated June 14th?
6    A   I have not.
7    Q   And are you currently preparing any
8 additional opinions beyond those that are set
9 forth in this report?
10   A   I am not.
11   Q   And as of today, would you consider
12 this to be a complete statement of your expert
13 opinions in the case?
14   A   For the information I've received so
15 far, yes.
16   Q   Okay.
17       And I'll hand you what's been
18 marked as Exhibit 2.
19   A   Okay.
20       (The deponent read the
21 document.)
22 BY MR. LYNK:
23   Q   And this document -- would I be
24 correct in describing it as running from a
25 page 36 to page 42 of 42, and as having a --

Page 7

1 what appears to be a court case information at
2 the top?
3    A   Yes.
4    Q   And specifically case
5 1:23-cv-00853-DAE, and then it says
6 "Document 122-5," filed June 14, 2024; is that
7 accurate?
8    A   Yes.
9    Q   It has your name at the top, and it
10 appears to be your CV?
11   A   Correct.
12   Q   And having looked at it, do you
13 recognize it as an accurate copy of your CV?
14   A   I do.
15   Q   Sitting here today, you know, about
16 three weeks later, would you say this is still
17 an up-to-date copy of your CV?
18   A   Yes.
19   Q   Okay.
20       So there's nothing you would --
21 if you were writing it now, there is nothing
22 you would add at this moment to that list?
23   A   No.
24   Q   Okay.
25       Have you been deposed before?

Page 8

1    A   Yes.
2    Q   And I believe on Exhibit 2, there is
3 a list of some cases in which you've given
4 testimony; is that right?  Specifically --
5    A   A list of cases that I've worked on.
6    Q   Got it.  So this would be Exhibit 2,
7 page 39 of 42, is there a list starting near
8 the bottom of that page with the heading "Case
9 Involvement"?
10   A   Correct.
11   Q   And the first two matters listed
12 there with bullets, each have a parenthetical
13 at the end that says "Federal Officer"; is that
14 right?
15   A   Correct.
16   Q   Can you explain what's meant in those
17 instances with the parenthetical?
18   A   Yes, sir.  I was a US Coast Guard
19 boarding officer involved in these two cases.
20 That's it.
21   Q   Okay.
22       Were those -- did you give
23 testimony in either of those?
24   A   The second one, I did.
25   Q   Okay.

Page 9

1    A   Deposition testimony.
2    Q   And then the next bullet, and it
3 appears the ones afterward, each have a
4 parenthetical that says "Expert Witness"; is
5 that right?
6    A   Correct.
7    Q   And then continuing on the next page,
8 I see three more cases bulleted with that
9 parenthetical as well; is that right?
10   A   Correct.
11   Q   So those are all cases in which you
12 have provided services as an expert witness?
13   A   Yes, sir.
14   Q   And did you write an expert report in
15 all of those cases?
16   A   Some of them are ongoing, and I have
17 not completed an expert report.  One of them, I
18 believe.  I would say 98 percent of them, I did
19 write some kind of report for.
20   Q   And have you given testimony in any
21 of those cases?
22   A   I have not.
23   Q   And are these all cases that are
24 occurring or have occurred in the last four
25 years?

3 (Pages 6 - 9)

Page 10

1    A   Some of them, I think, are a little
2  older than four years, and some of them are
3  happening now, including this one that I have
4  listed.
5    Q   And if you -- if you were giving a
6  complete list of cases in which you have
7  testified as an expert in the past four years,
8  would there be anything else you'd need to list
9  that's not here?
10   A   No.
11   Q   Okay.
12           Roughly how many expert reports
13 would you say that you have written in cases to
14 date, including the one -- this case?
15   A   Six to eight.  Maybe a little -- I
16 could count them out, actually.
17           (Pause.)
18   A   Seven.
19   Q   So seven including the current expert
20 report in this case?
21   A   Do I have it listed here?
22           (The deponent read the
23 document.)
24   A   I guess this would make eight.
25   Q   And including today, in how many

Page 11

1  cases have you given testimony as an expert?
2    A   Just today.
3    Q   So let's -- you have -- okay.
4           So this is your first time
5  testifying as an expert, and you've mentioned
6  involvement in cases as a federal officer.
7  Probably worth going through just some of the
8  basics.
9           Obviously I'll be asking you a
10 series of questions today.  Do you understand
11 that?
12   A   Yes, sir.
13   Q   You know that you're testifying under
14 oath, right?
15   A   Correct.
16   Q   And your obligation is to give an
17 honest answer if you know an answer to the
18 question?
19   A   Yes, sir.
20   Q   At times, you may hear an objection
21 from the attorney that's next to you.
22           You realize that, correct?
23   A   Correct.
24   Q   After an objection has been given,
25 unless you -- unless she were to instruct you

Page 12

1  not to answer, it's still then your obligation
2  to answer the question if you know.
3           Do you understand that?
4    A   Yes, sir.
5    Q   We will all, of course, try -- I'll
6  try not to talk over your answer.  You'll try
7  not to talk over her objection or my question,
8  et cetera, and we'll try to keep the record as
9  clean as we can.
10           Are you ready to do that?
11   A   Yes, sir.
12   Q   Are you on any medication today that
13 you believe might affect your memory?
14   A   I am not.
15   Q   Are you on any medication today that
16 you believe might affect your ability to
17 testify truthfully and accurately?
18   A   No.
19   Q   Any other reason you would not be
20 able to testify truthfully or accurately today?
21   A   No.
22   Q   Did you do anything to prepare for
23 today's deposition?
24   A   I went over my expert report and
25 spoke with the attorney sitting next to me.

Page 13

1           Other than that, no.
2    Q   How many times did you -- or how many
3  occasions did you speak with your attorney to
4  prepare for the deposition?
5    A   Four.
6    Q   And about how much time would you say
7  you spent preparing for today's deposition?
8    A   In total?
9    Q   Yes.
10   A   Probably eight hours.
11   Q   And how much time would you say that
12 you spent on the work that led to completion of
13 the expert report, Exhibit 1, that we looked
14 at?
15   A   Between 80, 90 hours, I would say.
16   Q   Okay.
17   A   Give or take on either side of that.
18 I'd have to look back to get exact number, but
19 that's my estimate.
20   Q   Was there -- do you recall a point in
21 time when you were first contacted to consider
22 providing services as an expert in this case?
23   A   I do.
24   Q   About when was that?
25   A   I believe that was in April of 2024.

Thomas Ciarametaro                                           July 9, 2024

Page 14

1      Q    And are you directly retained by the
2    State of Texas or in some other fashion?
3      A    Some other fashion.
4      Q    Okay.
5            Could you explain that, please?
6      A    I believe it's the expert -- I'd say
7    it's listed in here.  So I don't want to get
8    the name wrong for the record.
9      Q    "In here" meaning Exhibit 1?
10     A    In Exhibit 1, yes, sir.  I get
11   confused with the two different companies.
12   This one is ExpertConnect Litigation Support
13   LLC.
14     Q    So you were contacted initially
15   sometime in April 2024.  And did you commence
16   your work as an expert in that same month?
17     A    I did not.
18     Q    Were you then contacted at a later
19   date before you began working as an expert?
20     A    I was.
21     Q    Okay.
22           About when was that?
23     A    I believe it was in early May.  Maybe
24   it was the end of April.  I'm not 100 percent
25   sure on the date, but between the end of April

Page 15

1    and early May.
2      Q    Okay.
3            In that time frame, generally?
4      A    Yes, sir.
5      Q    And is that the point where you began
6    to actually work on an assignment as an expert
7    witness?
8      A    I had not yet.
9      Q    So when was the next point in time
10   after that that you were in contact with Texas
11   about potentially working on the case?
12     A    I officially started working on the
13   case for Texas, I believe it was the last week
14   in May.
15     Q    So earlier, when you were saying
16   rough estimate 80 to 90 hours or so of work
17   leading to the report, would you say that --
18   are you referring to what you had done from the
19   last week of May forward?
20     A    Yes, sir.
21     Q    Other than yourself, was there anyone
22   else at Five Fathoms Consulting who assisted in
23   putting together the report?
24     A    No.
25     Q    And no one else outside of Five

Page 16

1    Fathoms Consulting?  This was just your own
2    work?
3      A    My own work, yes, sir.
4      Q    And at the time you began, roughly
5    the last week of May or so, to work on the
6    case, did you have in mind an understanding of
7    what is the scope of what I am considering as
8    an expert?
9      A    Yes, I did.
10     Q    Okay.
11           Could you explain what your
12   understanding was?
13     A    My understanding was to determine if
14   the Rio Grande River was a navigable waterway,
15   if it was suitable for navigation period and/or
16   commercial navigation purposes.
17           And I was also asked to give an
18   opinion on the effectiveness of the buoy
19   barrier that is placed in the Rio Grande River
20   currently.
21     Q    And you consider yourself to have the
22   requisite expertise to develop opinions on each
23   of those subjects?
24     A    Yes, I do.
25     Q    Okay.

Page 17

1            Can you explain, in your mind
2    what is the expertise that qualifies you to
3    determine if the Rio Grande is a navigable
4    waterway?
5      A    I've had a commercial captain's
6    license for 16 years, I believe.  I have
7    been -- I have 11 years' active duty experience
8    in the United States Coast Guard as a
9    boatswain's mate.
10           I am currently a chief
11   boatswain's mate in the US Coast Guard
12   Reserves, and I'm the senior enlisted Reserve
13   officer at Coast Guard Station Gloucester.
14           I was a navigation and
15   operations officer on a Coast Guard patrol
16   boat, a variety of other qualifications that
17   are listed throughout my CV.
18     Q    Can you explain a bit more about your
19   commercial captain's license?
20           Does it license you to captain
21   boats up to a certain tonnage?
22     A    It does.
23     Q    And what is that?
24     A    One hundred gross tons.
25     Q    Okay.

5 (Pages 14 - 17)

Page 18

1            Have you ever sought a license
2  to captain vessels with a higher tonnage than
3  100 gross tons?
4       A    I have not.
5       Q    Do you have -- have you ever
6  captained a vessel carrying commercial cargo?
7       A    I have.
8       Q    You have?
9       A    (Nods.)
10      Q    Just once or more than one occasion?
11      A    Multiple occasions.
12      Q    Okay.
13           Can you give me examples of
14  vessels carrying commercial cargo that you
15  captained?
16      A    Commercial activities, I guess
17  pilings or bulkheads, sheet pilings, mooring
18  balls, chain, such -- such -- mostly
19  construction material.
20      Q    Okay.
21           And who were you employed by at
22  that time?
23      A    One of my best friends owns a company
24  called Marine Solutions, and I have worked
25  sporadically over the last ten years with him

Page 19

1  part-time -- not -- I wouldn't even say a
2  part-time basis.  As-needed.
3           If I have a day off and he needs
4  an extra guy type of deal, best friend helping
5  out a best friend who owns a business in the
6  marine construction field.
7       Q    Okay.
8       A    So I would consider that commercial
9  cargo.
10      Q    Okay.
11           So these are materials that
12  might be used to actually build marine
13  structures, nautical structures?
14      A    Construction, yes, sir.
15      Q    When you were captaining that vessel,
16  do you recall what waterways you would be
17  using, or waterway?
18      A    Inland and international waterways.
19      Q    Here in Massachusetts or --
20      A    Mostly in Massachusetts, yes.
21      Q    Was it one specific vessel or has it
22  been more than one?
23      A    Multiple vessels.
24      Q    Do you recall the dimensions of the
25  vessels in terms of the length and draft?

Page 20

1       A    Yes, 50-ish feet.  50-foot length.
2       Q    50-foot length?
3       A    Yeah.
4       Q    You would -- you said more than one
5  vessel, but you'd say they were all --
6       A    Smaller push boats and stuff like
7  that.  I guess vessels ranging from 20 to 50
8  feet.
9       Q    20 to 50 feet?
10      A    Mm-hmm.
11      Q    And are you able similarly to give a
12  range of what the draft of the vessels was?
13      A    Between three and eight feet.
14      Q    And you mentioned these would have
15  been -- so you would have used some of these
16  vessels on inland waterways at times --
17      A    Correct.
18      Q    -- and international at times?
19      A    Correct.
20      Q    Any of those waterways rivers,
21  specifically?
22      A    One of them, yes.
23      Q    Which river?
24      A    The Annisquam River.
25      Q    Can you spell "Annisquam" for the

Page 21

1  court reporter?
2       A    A-N-N-I-S-Q-U-A-M.
3       Q    Was it one specific vessel that
4  you've taken on that river or more than one?
5       A    More than one.
6       Q    Okay.
7           And would you be able to
8  estimate the range of lengths of vessels you've
9  captained on the Annisquam River?
10      A    Up to 50 feet.
11      Q    And what's the low end of the range?
12      A    16-foot Zodiac.
13      Q    So 16 to 50 feet.
14           What would be the range of
15  drafts of vessels that you've captained on the
16  Annisquam River?
17      A    Up to eight feet.
18      Q    Okay.
19           And what would be the low end of
20  that range?
21      A    18 inches.
22      Q    All these vessels were carrying one
23  or another of the types of commercial materials
24  you mentioned?
25      A    No.  Those are just vessels in

Page 22

1  general that I've operated on the Annisquam
2  River.  The larger vessel, mostly the 50-foot
3  mooring barges, is what we were using for
4  commercial activity.
5      Q   Okay.
6          Have you ever used a vessel
7  smaller than a 50-foot mooring barge for
8  commercial activity?
9      A   Not carrying any commerce, no.
10     Q   All right.
11         So you mentioned not carrying
12 anything.  Have you used vessels for commercial
13 activity other than carrying cargo?
14     A   No.
15     Q   Have you ever been involved in
16 commercial boat tours, for example?
17     A   Very briefly, whale watching.  Filled
18 in one time for a captain.
19     Q   Okay.
20         Was that somewhere in this
21 region as well?
22     A   Correct.
23     Q   And would you consider that whale
24 watching tour to be a form of commercial
25 activity?

Page 23

1          MS. AL-FUHAID:  Objection.
2  Form.
3      A   It's for hire, so yes.
4      Q   Is there any other commercial
5  navigation, captaining vessels that you have
6  been involved in besides what you've been
7  describing in your testimony the last few
8  minutes?
9      A   I don't believe so.
10     Q   And you've mentioned you have -- is
11 it 11 years' active duty experience with the US
12 Coast Guard?
13     A   Yes, sir.
14     Q   Can you describe more what -- what
15 did you -- what were your duties over the
16 course of that active duty period?
17     A   Most all of my duties are listed in
18 my CV, but if you'd like me to go over, up to
19 you.  There's quite a few in here over the
20 course of my career.
21     Q   Sure.
22         When did you first -- you
23 enlisted at some point --
24     A   Correct.
25     Q   -- in the Coast Guard?

Page 24

1          What year was that?
2      A   2007.
3      Q   Okay.
4          And so at that point, did you
5  have a rank or title?
6      A   Yeah, it was right out of boot camp,
7  seaman.
8      Q   Okay.
9          And did there come a point when
10 that rank or title changed?
11     A   Yes.
12     Q   And when was that?
13     A   Boatswain's Mate, A School.
14     Q   And about when did you become a
15 Boatswain's Mate, A School?
16     A   2008.
17     Q   Okay.
18         And how did your -- your duties
19 or your operational obligations change at that
20 point?
21     A   You gained a lot more responsibility
22 once you receive your rating.  I was stationed
23 in Virginia at the time.  Before, I was in
24 North Carolina.  And my entire -- the entire
25 unit I was at changed.

Page 25

1      Q   And after becoming a Boatswain's Mate
2  A School, what was the next point in time when
3  you had a change in rank or title?
4      A   I believe it was when I was stationed
5  on a Coast Guard cutter, coastal patrol,
6  110-foot ship.
7      Q   And about when was that?  About when
8  did that begin?
9      A   Let me look at Exhibit 2, my CV, give
10 you the exact date.
11         (The deponent read the
12 document.)
13     A   2011.
14     Q   And from that point, how long were
15 you stationed on that Coast Guard cutter?
16     A   Just over two years.
17     Q   So what were your operational duties
18 when you were stationed on the Coast Guard
19 cutter?
20     A   I was the first lieutenant, so I was
21 the deck boss for the Coast Guard cutter.  I
22 was the navigation officer for the Coast Guard
23 cutter.
24         I was a boarding officer.  I was
25 a small boat coxswain.  I was onboard training

7 (Pages 22 - 25)

Page 26

1  team instructor.  I was also the chart petty
2  officer.
3           I believe that would cover most
4  of my qualifications onboard.
5     Q   When you were the navigation officer,
6  what specifically did you do in that capacity?
7     A   You are responsible for maintaining
8  and updating all navigational charts on the
9  vessel and keeping up with current
10 publications, making sure everything's current.
11    Q   And generally what waters did that
12 ship patrol, without giving obviously any
13 sensitive information?
14    A   Sure.  I mean, all -- out to 200
15 nautical miles from North Carolina to Nova
16 Scotia, and interior, Hudson River, bunch of
17 different places, and everything interior
18 pretty much that was navigable for a vessel of
19 that size.
20    Q   And do you recall about how long you
21 were -- you functioned as a navigation officer?
22    A   The entire time.
23    Q   Okay.
24    A   I was also a deck watch officer on
25 that boat.  I forgot that.  Deck watch officer,

Page 27

1  conning officer, person who drives the ship.
2     Q   Have you served as a navigation
3  officer for a Coast Guard vessel at any earlier
4  or later point, or was this the one time you
5  did that?
6     A   I was the nav petty officer before --
7  actually, I've been it at most -- most units
8  I've been at.  The one prior to the Coast Guard
9  cutter, I was a nav officer there, and past
10 that, at Coast Guard Station Boston for a brief
11 period of time I was a navigational chart petty
12 officer.
13    Q   Did you ever have to make your own
14 discretionary decision as to whether a water
15 that the vessel was considering -- in which it
16 was considering operating was navigable?
17    A   Yes.
18    Q   Okay.
19           Did you ever do that
20 specifically for a river?
21    A   Yes.
22    Q   Okay.
23           Which river, or was it more than
24 one?
25    A   More than one.

Page 28

1     Q   Okay.
2           Can you -- do you recall which
3  rivers?
4     A   Hudson River, Potomac River.  Trying
5  to think.  I'm trying to think of other places.
6           I believe that's it.  That's all
7  in the Coast Guard as -- in a Coast Guard
8  capacity.  Intracoastal waterways, which I
9  consider rivers, I guess, part and partially,
10 rivers, down in Florida.
11    Q   So the Hudson --
12    A   New River, I believe --
13    Q   Sorry.
14    A   Sorry.  New River.  I'm sure I'll
15 think of other ones as the time goes by, but...
16    Q   At this moment, those are the ones
17 you can --
18    A   Correct.
19    Q   So can you explain what -- what is it
20 specifically that you did to make that
21 determination about the Hudson River?
22    A   Well, you look at local charts,
23 navigational equipment, Coast Pilot and other
24 publications, Local Notice to Mariners, regular
25 Notice to Mariners.

Page 29

1           You use a variety of those
2  things in completion to determine where you're
3  going and if it's navigable, aids to
4  navigation, so on and so forth.
5     Q   When that part -- when you say if
6  it's navigable, could you explain that a bit
7  more?  What are you looking at?
8     A   Depths of water.  The totality of all
9  of that combined, to make sure it's safe or
10 you're able to actually navigate that area and
11 not, per se, run the ship aground or, you know,
12 damage the ship or endanger the crew.
13    Q   And after you looked at all that
14 information, was there anyone to whom you had
15 to make a recommendation yes or no?
16    A   The captain.
17    Q   The captain.
18           And this would be, I assume,
19 prior to commencing on a route or itinerary
20 that might take you through that river?
21    A   Correct.
22    Q   As part of that process, did you look
23 at whether there was any boat or ship traffic
24 carrying cargo?
25    A   You have an AIS system on the boat

Page 30

1   that shows you commercial vessels, generally
2   over 65 feet.  And you do a navigation brief as
3   well, which when you conduct the nav brief, you
4   talk about all those things.
5       Q   All right.
6           Explain the AIS a bit more, if
7   you can, please.
8       A   It's Automatic Identification System
9   that's on most commercial vessels over 65 feet
10  in length.  Doesn't have to be -- people can
11  have it under that length, but it -- it pretty
12  much shows you the name of the vessel, the
13  number assigned to the vessel, can show you
14  course and other information, course and speed
15  information and other information.
16      Q   And is that type of information
17  important to assess the safety of pursuing a
18  route or not?
19      A   Yes.
20      Q   Okay.
21          And is there any other
22  information that the AIS was giving you that
23  was necessary to make the determination of
24  navigability?
25      A   No.

Page 31

1       Q   When -- you mentioned the Potomac
2   River.  Would the process be the same as what
3   you just described for the Hudson River?
4       A   Yes.
5       Q   Okay.
6           And similarly for the New River
7   and the Intracoastal Waterway generally?
8       A   Mm-hmm, yes.
9       Q   Do you -- in these processes that
10  you've been describing, did it involve any
11  aspect of determining whether a water was a
12  federal water or not, a water of the United
13  States or not?
14      A   I don't -- no.  No.
15      Q   Do you have -- how would you -- would
16  you consider yourself an expert in
17  navigability?
18      A   Yes.
19      Q   And how would you generally define --
20  when you're looking at a river, to you, do you
21  have a definition of what makes a river
22  navigable?
23      A   I think you need to look at
24  everything that we just spoke about and make
25  a -- you know, conduct an analysis of all of

Page 32

1   that and put the totality of all the
2   circumstances that pertain to the waterway
3   together and make a determination if something
4   is navigable or not.
5       Q   Do you recall going through this
6   analysis and determining that a specific river
7   was not navigable during your tenure as a
8   navigation officer with the Coast Guard?
9       A   No, I -- we -- I did not.
10      Q   Okay.
11          The cases listed in Exhibit 2
12  that had the notation "Expert Witness," are any
13  of those cases in which you offered or are
14  expecting to offer an opinion on whether a
15  river is navigable?
16      A   A river?  No.
17      Q   Okay.
18          Are there any of those cases in
19  which you have offered or expect to offer an
20  opinion about whether some other type of water
21  is navigable?
22      A   No.
23      Q   So is this the first case in which
24  you've given an expert opinion on that subject?
25      A   Yes.

Page 33

1       Q   Just to be clear, I believe -- you
2   said this is the first time you've testified in
3   deposition as an expert.
4       A   Correct.
5       Q   So you -- I'm correct that you've not
6   previously testified in court as an expert?
7       A   Correct.
8       Q   Have you testified in court in
9   another capacity?
10      A   Yes, as a boarding officer.
11      Q   Once or more than once?
12      A   Twice, I believe.
13      Q   And generally, what --
14      A   Maybe three times.
15      Q   Generally, what did those cases
16  involve?
17      A   One was boating under the influence,
18  another one was a fisheries case, and another
19  one was also a boating under the influence that
20  turned into serious injury to a party that was
21  onboard.
22      Q   Have you ever been -- do you have any
23  experience personally in your work with
24  dredging?
25      A   Yes.

Page 34

1    Q   Explain that.  What experience do you
2  have with dredging?
3    A   I've been involved in two dredge
4  projects, one in Gloucester Harbor and one in
5  the Annisquam River, which is also situated in
6  Gloucester.
7    Q   And when was -- roughly when was the
8  dredging project in Gloucester Harbor?
9    A   2017 or '18.
10   Q   And what was your connection to that
11 project?
12   A   I was the port director/harbormaster
13 for the City of Gloucester, so direct
14 involvement.
15   Q   Okay.
16       And in what ways did you get
17 involved specifically with the dredging
18 project?
19   A   Support liaison for, you know, the
20 Army Corps of Engineers, the Department of
21 Environmental Protection, Coastal Zone
22 Management.
23       It's a total collaboration
24 between the state, city and federal government,
25 so you're the representative for the -- for the

Page 35

1  municipality for the dredge project.
2    Q   And so it was the Gloucester Harbor
3  itself that was being dredged or a portion of
4  it?
5    A   Part of it.
6    Q   Okay.
7        And were you involved in
8  designing the plan for the dredging?
9    A   No.
10   Q   And did you have to -- was it your
11 role to approve that design?
12   A   I had -- we had -- we have say -- we
13 had say as a municipality in -- in the whole
14 process but not specifically to the actual
15 design.
16   Q   Okay.
17       And were you involved in
18 implementing the dredging once the design was
19 approved?
20   A   It was -- this was farmed out to a
21 private contractor.
22   Q   Okay.
23       So a private contractor carried
24 out that work?
25   A   For that, yes.

Page 36

1    Q   Was that contractor supervised by any
2  entity?
3    A   I believe the Army Corps of
4  Engineers' representative.
5    Q   And as far as you know, in that
6  instance, was it the responsibility of the Army
7  Corps of Engineers to review and approve the
8  plan for the dredging?
9    A   They're one entity that did for sure.
10   Q   Okay.
11       And there were others?
12   A   Yes.
13   Q   Okay.
14       Who would you say besides US
15 Army Corps of Engineers?
16   A   Department of Environmental
17 Protection and Coastal Zone Management.
18   Q   Okay.
19       And that would be Massachusetts
20 Department of Environmental Protection?
21   A   Yes, MassDEP.
22   Q   And Coastal Zone Management, is that
23 also a state agency?
24   A   It is.
25   Q   Any others besides those -- that

Page 37

1  federal agency and those state agencies?
2    A   Local Waterways Board Commission and
3  harbormaster and the conser- -- local
4  conservation commission gets involved as well.
5    Q   So you coordinated with others.
6        You would not say you personally
7  approved the dredge project?
8    A   Correct.
9    Q   And then you mentioned a dredging
10 project in the Annisquam River also?
11   A   Yes.
12   Q   And if I were asking those same
13 questions, would there be any different details
14 about how that process worked?
15   A   Yes.  We have lots of -- there's lots
16 of Coast Guard aids to navigation in that
17 river, federal aids to navigation, and there's
18 a lot of -- there's private aids to navigation
19 in that river.
20       There are, I believe, between
21 600 and 800 mooring buoys in that river, and
22 all of that stuff had to be coordinated through
23 me to be removed or relocated.
24       And the federal stuff was with
25 the Coast Guard to be removed or relocated

10 (Pages 34 - 37)

Page 38

1 during the time of dredging. So there was a
2 much -- the process was much more
3 comprehensive.
4    Q   You mentioned private aids to
5 navigation.
6          What are those?
7    A   There's certain tributaries that come
8 off of the Annisquam River that have private
9 aids to navigation that are not federal aids to
10 navigation, so they are -- either local marinas
11 have them to mark an entrance, no-wake -- we
12 have no-wake buoys that the city had which
13 could be considered an aid to navigation.
14          All that stuff has to be removed
15 during -- you know, pre-dredge and then put
16 back post-dredge.
17    Q   Okay.
18          So a no-wake buoy would be an
19 example of a private aid to navigation?
20    A   (Nods.)
21    Q   How does it perform its function?
22 You know, is there --
23    A   It gives a mariner information.
24    Q   Go ahead. Say what you -- what's
25 your answer?

Page 39

1    A   Oh. It's gives a mariner information
2 and knowledge for the area.
3    Q   So what is it specifically the
4 mariner is looking for?
5          Is there something about the way
6 that the no-wake buoy is placed or where it's
7 placed that conveys information?
8    A   They're placed sporadically
9 throughout the entire waterway.
10    Q   And then from the mariner's
11 perspective, what is it you're interpreting
12 when you see them?
13    A   The speed in which you should
14 proceed.
15    Q   So you mentioned that there are a
16 number of tributaries to the Annisquam River,
17 for example, right?
18    A   (Nods.)
19    Q   Were there no-wake buoys placed in
20 the vicinity of any of those tributaries?
21    A   Some of them.
22    Q   So to your recollection, like, where
23 would the no-wake buoy be placed?
24    A   At the entrance.
25    Q   So the mouth of the tributary as it

Page 40

1 enters into the larger river?
2    A   Yes, some of them.
3    Q   Okay.
4          And, like, at what distance
5 from -- from that point?
6    A   I don't understand.
7    Q   How far would the buoy be, you know,
8 let's say in feet or meters from -- from the
9 mouth of the tributary?
10    A   Depends on which tributary.
11    Q   Was there a range that you recall?
12    A   Could be between 50 yards or
13 sometimes 20 feet from the channel.
14    Q   And would it be important to place it
15 at a certain distance that's going to be
16 effective in communicating information to the
17 mariners as they pass?
18    A   Yes.
19    Q   Okay.
20          And so how would you know, for
21 example, if you placed that buoy too far away
22 from the tributary?
23          Like, what would be that point
24 where it's no longer effective in communicating
25 the information?

Page 41

1    A   I guess if you don't see it, then
2 it's not effective.
3    Q   In other words, if you -- you might
4 already pass the spot where there's going to be
5 a change in conditions and you still haven't
6 seen the buoy yet, then it hasn't been placed
7 correctly.
8          Is that how you would say it?
9    A   I think every scenario dictates a
10 different placement of the buoy, and there's no
11 specific answer to that question.
12    Q   Okay.
13          So there's not sort of a
14 universal approach that one could adopt and say
15 this is how you place no-wake buoys?
16    A   Correct.
17    Q   In working on the project and being
18 aware of those, coming in after --
19          Were you there when the no-wake
20 buoys were placed?
21    A   I personally placed some no-wake
22 buoys in the river.
23    Q   You've personally placed them?
24    A   Yes.
25    Q   And some were placed by others?

Page 42

1    A   Yeah.
2    Q   For those placed by others, would you
3 consider yourself able to understand just by
4 looking at it, like, I know why they placed it
5 in this spot and not another spot 10 meters
6 away?
7    A   No.
8    Q   Have you ever been involved in
9 seeking permits under the Rivers and Harbors
10 Act?
11   A   Yes.
12   Q   In what capacity?
13   A   Harbormaster.
14   Q   Okay.
15       Was that something that occurred
16 often during the period you were a
17 harbormaster?
18   A   We either -- yes.  I was either
19 involved in applying or involved in a level of
20 review for others that were applying.
21   Q   And you were harbormaster for --
22 during what period?
23   A   2016 to '24.
24   Q   And this is for the Gloucester Harbor
25 specifically?

Page 43

1    A   Yes, sir.
2    Q   And how do you spell Gloucester?  For
3 you -- you may know.
4        THE REPORTER:  I live here.
5        MR. LYNK:  That's what I
6 figured.
7        (Laughter.)
8 BY MR. LYNK:
9    Q   So -- so can you give me an example
10 of what would be the type of thing that, you
11 know, during this tenure you sometimes had
12 to -- were involved in getting a Rivers and
13 Harbors Act Section 10 permit for?
14   A   Piers, docks, gangways, permanent
15 pile placement, commercial marina, bulkheads
16 replacement and seawall replacement.  Stuff
17 like that.
18   Q   Okay.
19       So these would have been
20 permits -- applications to the US Army Corps of
21 Engineers for permits?
22   A   In Massachusetts, they go to the
23 Department of Environmental Protection first
24 and then they send them to the Corps and the
25 Corps sends them back, and the license is

Page 44

1 ultimately issued from MassDEP --
2    Q   Okay.
3    A   -- but there is a Corps license
4 attached to it, but the actual overall permit
5 is issued through MassDEP.
6    Q   Okay.
7        Were all of those -- were all of
8 the applications that you can recall during
9 your tenure as harbormaster successful,
10 resulted in a permit?
11   A   Yes.
12   Q   So none of the applications were
13 denied?
14   A   No.  Some -- no.
15   Q   Did any of them require the
16 application to be modified in some way to get
17 the permit?
18   A   That I applied or was involved in
19 applying for?  No.
20   Q   That you were involved?
21   A   No.
22   Q   Okay.
23       And did the permits -- did the
24 permits speak to -- were there any permits
25 that -- in which there was sort of a USACE

Page 45

1 determination as to what type of covered thing
2 this was under the statute or their
3 regulations?
4    A   I'm sure there was.
5    Q   Okay.
6        Do you recall any specifics
7 about that?
8    A   I do not.
9    Q   Do you recall any instances in which
10 it was specifically determined that the thing
11 that you sought a permit for would be
12 considered an other structure?
13   A   No.
14   Q   Have you ever personally been
15 involved in an analysis of whether -- prior to
16 this case whether some sort of nautical thing
17 would be an other structure under the
18 statutory --
19   A   No.
20   Q   Okay.
21       Were any of those permit
22 applications specifically for buoys?
23   A   No.
24   Q   No individual buoys and no attached
25 buoys either?

12 (Pages 42 - 45)

Page 46

1    A    No.
2    Q    Okay.
3         Outside of your tenure as the
4  Gloucester Harbormaster, have you at any other
5  point been involved in seeking a permission
6  from the state or federal government for a
7  buoy?
8    A    No.
9    Q    Okay.
10        Or attached buoys?
11   A    No.
12   Q    And in terms of when you got the
13 permit applications you did mention, did you
14 write those applications?
15   A    Some of them, or assisted in writing.
16 We usually have a consultant as well that we
17 work in tandem with.
18        MR. LYNK:  Why don't we take a
19 little bit of a break.  It's about ten after
20 10:00.
21        (Recess.)
22 BY MR. LYNK:
23   Q    You mentioned earlier you've not been
24 involved in determining if a waterway was a
25 federal water of the United States, correct,

Page 47

1  prior to this case?
2    A    Determine -- like making -- I'm a
3  little confused on the question.
4    Q    Sure.
5         So, for example, you mentioned
6  that when you -- as a navigation officer, you
7  described a process of determining if a
8  waterway was navigable before commencing
9  through it.
10   A    Correct.
11   Q    And you mentioned at least four that
12 you could recall:  Hudson River, Potomac, New
13 River and Intracoastal Waterways, right?
14   A    (Nods.)
15   Q    So I think I'm correct that it wasn't
16 a part of your process in those instances to
17 determine is this a federally regulated
18 waterway, you know, water of the United States?
19        It was not part of your process;
20 is that right?
21   A    I'm always -- well, you're always
22 aware of where you are, and you consciously
23 know if you're, you know, in state waters,
24 federal waters, international waters.
25        But it's not a specific part of

Page 48

1  the process.  It's more of an awareness thing
2  of knowing where you are geographically.
3    Q    Okay.
4         Would it be fair to say it's
5  received information as opposed to you
6  determining on your own whether it's true or
7  not?
8    A    Yes.  Or learned information.
9    Q    Okay.
10        But you were not doing your own
11 independent evaluation to decide if there was a
12 federal water --
13   A    No.
14   Q    Okay.
15        And that would -- that would
16 hold -- that would be the same for each of
17 those four examples?
18   A    Correct.
19   Q    And that's not something you've done
20 for the Gloucester Harbor or the Annisquam
21 River?
22   A    I know my -- the area in which I was
23 responsible, and I know what waters are
24 federally regulated and which are not.
25   Q    Okay.

Page 49

1         So there -- so what things were
2  you determining as opposed to having an
3  awareness already when you did -- when you went
4  through the process you described earlier for
5  the four types of waterways or four examples of
6  waterways in your Coast Guard tenure?
7    A    Can you repeat the first part of that
8  question?
9    Q    You testified you were aware of the
10 status of the waterway.
11   A    (Nods.)
12   Q    So you, as the navigation officer,
13 and looking at the various sources of
14 information you've talked about, making your
15 recommendation to the captain, in that moment
16 then what were you making a determination
17 about?
18   A    If it's safe to navigate.
19   Q    Okay.
20        And -- and so that -- would it
21 be fair to say that that could be a different
22 question than is a water a federal water or a
23 state water?
24   A    That could -- yes.
25   Q    And you mentioned -- you testified

Page 50

1  earlier about the Annisquam River.
2        What was the purpose -- you
3  recall -- you testified as well there was a
4  dredging project in the Annisquam, right,
5  during your tenure as the Gloucester
6  harbormaster?
7     A   Right.
8     Q   Do you recall what was the goal of
9  that dredging project in that river?
10    A   To restore the depth of the river at
11  mean low water.
12    Q   Okay.
13        Can you explain "mean low water"
14  to us non-nautical people?
15        (Laughter.)
16    A   In Massachusetts, Gloucester
17  specifically, we have roughly a 10-foot tidal
18  range, high tide, low tide.  Mean low water is
19  the average of the low tides.
20        So they wanted to restore the
21  depth of the river back to its authorized
22  depth.
23    Q   And what was the authorized depth?
24    A   Eight feet.
25    Q   And prior to implementing the

Page 51

1  project, what was the actual depth?
2     A   It varied.
3     Q   Okay.
4        Are you able to give a range of
5  what it was at the time?
6     A   It's 3 nautical miles, roughly 3.3
7  nautical miles, the Annisquam River.  And the
8  depths varied from, at mean low water from --
9  believe it or not, down to a foot and a half
10  to, like, four to five feet, and then there was
11  obviously areas that were over eight feet or,
12  you know, some as deep as 20 feet, just for the
13  natural flow of the -- of the river.
14    Q   Okay.
15        So then if they -- to --
16  restoring the depth to its authorized depth of
17  eight means that it would be at least eight
18  throughout --
19    A   A minimum of eight after,
20  post-dredge.
21    Q   Okay.
22        A minimum of eight feet and then
23  some places could then be deeper?
24    A   Correct.  And they -- if it was
25  already over eight feet, they wouldn't dredge

Page 52

1  there, because it was already deeper than the
2  authorized depth which they were trying to
3  restore.
4     Q   Understood.
5        So -- so parts of that -- of
6  that river were at the authorized depth or
7  could have been a little more, but parts were
8  less, and the goal of the project was to make
9  the river consistently at least at the
10  authorized depth?
11    A   Correct.
12    Q   Was the project successful, to your
13  knowledge?
14    A   Yes, it was.
15    Q   So they were able to meet the goal of
16  restoring the river to the authorized depth?
17    A   Correct.
18    Q   And prior to the project, what was
19  your recollection about what types of vessels
20  typically would use that waterway?
21    A   Recreational vessels and
22  commercial -- some commercial vessels.  Mostly
23  recreational.  Not a lot of commercial before
24  the dredging because of the depth of the water,
25  unless it was high tide, because then you have

Page 53

1  an extra, you know, ten feet of water.
2     Q   And did the -- did the types of
3  vessel traffic change after the implementation
4  of the dredging project?
5     A   Yes, it did.
6     Q   And how did it change?
7     A   There was much more commercial
8  activity post-dredge.
9     Q   Can you give examples of the
10  commercial activity, to the extent you know.
11    A   Small barges and push boats,
12  commercial fishing trawlers, marine
13  construction activity, stuff like that.
14    Q   What would be the -- you said small
15  barges.
16        Are you able to give, like,
17  typical dimensions in terms of length and
18  depth -- I mean draft, excuse me, for small
19  barges?
20    A   It varies vessel to vessel, barge to
21  barge.  Depends on what the load is.  There's
22  so many variables, it's hard to give an
23  estimate.
24    Q   In general, you would say -- would
25  you say that the Annisquam River was a river

Page 54

1  that -- where commercial navigation was
2  occurring prior to the dredge project?
3      A   Limited basis because of the draft,
4  or the depth of the river.
5      Q   And then would you say that after the
6  implementation of the dredge project, that
7  there's been commercial navigation occurring in
8  the Annisquam?
9      A   There's been more, yes.
10     Q   There's been more?
11         Would you say the Annisquam
12  River is a highway of commerce?
13         MS. AL-FUHAID:  Objection.
14  Form.
15     A   I would say there's commercial
16  activity there.  I don't know if I would call
17  it a "highway of commerce."
18         I don't believe the Army Corps
19  of Engineers considers commercial fishing
20  commerce, so no.
21     Q   And what is your basis for that
22  statement?
23     A   It was not -- commercial fishing was
24  not considered commerce when we were trying to
25  get the Army Corps to fund the project.  They

Page 55

1  did not consider commercial fishing as
2  commerce.
3         I don't -- that's -- that's
4  their -- that's their rules, not mine.
5      Q   Okay.
6         Is "highway of commerce" a term
7  that you personally have a definition for, or
8  does it personally have a meaning to you?
9      A   It has a meaning, yes.
10     Q   What is it?
11     A   I would consider Boston Harbor a
12  highway of commerce.  There's a big Conley
13  Terminal here.  There's a big -- it's a
14  decent-size port.  There's a lot of commercial
15  tankers and barges and goods that are offloaded
16  and onloaded, imported and exported out of
17  here.
18         I would consider that a highway
19  of commerce.
20     Q   Are you able to define a threshold
21  where that term begins to be descriptive of a
22  waterway?
23         MS. AL-FUHAID:  Objection.
24  Form.
25     A   I guess if there's no infrastructure

Page 56

1  to support commerce, then that's where I would
2  draw the line.  Or if there's not reasonable,
3  you know, depths of water; the area is not
4  navigable; there's no shoreside facilities;
5  there's no support infrastructure; there's no
6  shipyards or repair facilities or fuel or --
7  so...
8      Q   So some of what you just described
9  has to do with actual physical conditions of
10  the waterway itself, and then some of what you
11  described has to do with whether the
12  infrastructure to support navigation is in
13  place, correct?
14     A   For commerce.
15     Q   Right.
16     A   Correct.
17     Q   But just to be clear, like, not all
18  of those factors you described are actual
19  characteristics of the river?
20     A   Correct.
21     Q   Okay.
22         Do you consider yourself to have
23  legal expertise?
24     A   Yes, some.
25     Q   Okay.

Page 57

1         What types of law would you
2  consider yourself to be an expert in?
3      A   Maritime law, Chapter 90B, Mass.
4  General Laws, boating laws, maritime navigation
5  laws, stuff like that.
6      Q   Okay.
7         Would you --
8      A   Federal laws, maritime federal laws.
9      Q   Would you consider yourself a legal
10  expert in interpretation of the Rivers and
11  Harbors Act?
12     A   No.
13     Q   Are you offering any -- in your
14  report any legal interpretations of the Rivers
15  and Harbors Act?
16     A   I believe I do, yes.
17     Q   Are you offering those as opinions to
18  be considered or just as background information
19  about the case?
20     A   Background information and
21  definitionwise, or certain definitions,
22  quotations from the Rivers and Harbors Act, and
23  as background information.
24     Q   Did you -- did you do that research
25  yourself or did you -- or was that something

Thomas Ciarametaro                                    July 9, 2024

Page 58

1   that you had to rely on others --
2      A   I didn't rely on anybody, but I -- it
3   was a combination of research that was provided
4   and research that I did on my own.
5      Q   Are there any assumptions you were
6   asked to make by Texas that you then agreed to
7   make and incorporate into your opinion?
8      A   I was given some definitions in which
9   I did not rely on.  Due to my experience,
10  education and training, I came to my own
11  conclusions.
12     Q   Okay.
13         So there's no -- so your report
14  does not include any definitions that you just
15  accepted and relied on from someone else.
16  If -- anything in there is something that you
17  had independently determined?
18     A   There are, I believe, two definitions
19  in here which were given to me by the State of
20  Texas, but I did not solely rely on them to
21  make my determinations.
22     Q   Okay.
23         Which two were those?
24     A   I'd have to look.  I believe there
25  may actually be one...

Page 59

1          (The deponent read the
2   document.)
3      A   Oh, no, it's two -- navigable
4   waters --
5      Q   Can you mention for the court
6   reporter what page?
7      A   Oh, sorry, page 9 of Exhibit 1,
8   navigable waters.  And I believe the term
9   "buoy" on page 18 of Exhibit 1.  I believe
10  that's it, unless I'm overlooking something.
11     Q   And so the one -- so on page 9,
12  navigable waters, that would be beginning from
13  the sixth line down on that page?
14     A   Just let me make sure... yeah, I
15  believe so.
16     Q   So would I understand that correctly
17  to be the portion from that line through the
18  end of that page?
19     A   Correct.
20     Q   Okay.  That's the navigable waters
21  definition you referred to.
22         And then on page 18, buoys.
23  Would I understand correctly that you're
24  referring to the beginning of the first line of
25  text on that page?

Page 60

1      A   Yes, sir.
2      Q   And from there, how far down?
3      A   Just that first paragraph.
4      Q   Okay.
5          So that first paragraph of, I
6   think, seven lines?
7      A   Correct.
8      Q   Six lines.  I can't count.  Sorry.
9          (Laughter.)
10     A   Yeah.  Six.  Six.
11     Q   Thank you.
12         Do you consider yourself to be
13  an expert in economics?
14     A   No.
15     Q   So are you -- so, for example, you
16  testified earlier that some of the factors that
17  would go into whether a waterway is a highway
18  of commerce would be the conditions physically
19  of the waterway and some would be the
20  infrastructure, right?
21     A   Correct.
22     Q   I take it you're not offering
23  opinions in this case about -- from an
24  economist's point of view about, you know,
25  whether the cost and benefits would justify

Page 61

1   creating the infrastructure in the Rio Grande
2   that might give rise to greater river-borne
3   commerce?
4      A   Not specifically, but I do know that
5   part of the Army Corps's process in improving
6   infrastructure, such as dredging, is to do a
7   cost-benefit analysis.
8      Q   And is that an understanding you
9   gained from your involvement in applications to
10  the USACE?
11     A   Yes.  And being involved in
12  implementing a dredging plan and project that
13  we -- I presented along with others to the
14  Corps.
15         The dredging of the Annisquam
16  River was a multiyear convincing, if you will,
17  of getting federal funding, because it's
18  considered a shallow-draft navigation project.
19         So there's a cost-benefit
20  analysis piece that was particularly tough for
21  us to prove, because the commerce that
22  typically uses that area is not considered
23  commerce by the Army Corps's definition, which
24  is commercial fishing.
25         It's a commercial fishing port.

16 (Pages 58 - 61)

Thomas Ciarametaro                                          July 9, 2024

Page 62

1  So I'm pretty familiar with that process.  Very
2  familiar.
3      Q   And so you're saying in that -- in
4  that project, the commercial fishing was not
5  considered as a commerce?
6      A   Correct.
7      Q   How were you able to surmount that?
8      A   The lack of navigability at tides --
9  certain tides created a public safety -- a
10  threat to public safety and to first
11  responders.  So that's how we were ultimately
12  able to surmount that, was Gloucester's an
13  island.  It's separated by the Annisquam River.
14  So if you had an emergency, let's say, on the
15  north side, you would have to travel 17 miles
16  out and around to get to that emergency.  Coast
17  Guard rescue boats, harbormaster, local police,
18  at certain tides, because it was so shallow,
19  were unable to navigate the river, thus
20  increasing, you know, response time
21  exponentially.
22          So that's the case that we ended
23  up making and ultimately getting funding.
24      Q   Okay.
25          And that ultimately led to the

Page 63

1  approval of the dredging project?
2      A   Correct.
3      Q   Was a cost-benefit analysis required
4  as part of the project?
5      A   I believe a cost-benefit analysis is
6  required of any Army Corps dredge project.
7      Q   Do you know if a cost-benefit
8  analysis was done in this instance?
9      A   I believe it was.
10      Q   By whom?
11      A   By the Army Corps.
12      Q   Okay.
13          Did you recall seeing it at some
14  point?
15      A   I believe I did at some point.
16      Q   Do you remember any details of it?
17      A   I do not.
18      Q   But in any event, those public safety
19  issues, emergency response considerations
20  enabled the USACE in that instance to approve
21  this dredging project even though they had
22  indicated that the commercial fishing was not
23  considered commerce?
24      A   Yes.
25      Q   Had you ever visited the Rio Grande

Page 64

1  prior to working on this case?
2      A   I had been to the southern portion
3  near South Padre Island a long time ago, that
4  area.  I don't remember the specific area we
5  were in.
6          We were on boats traversing the
7  Gulf area, but southern portion.
8      Q   Okay.
9          You hadn't been further upriver
10  on the Rio Grande --
11      A   No, sir.
12      Q   -- prior to this case?
13      A   No, sir.
14      Q   And since being involved with this
15  case, you have visited the Rio Grande in the
16  vicinity of where the floating barrier is
17  located; is that right?
18      A   Yes, sir.
19      Q   And if I refer to "floating barrier,"
20  will you understand that to be the connected
21  objects -- buoys, as they're referred to --
22  that have been placed in the river and became
23  the subject of a lawsuit?
24      A   I would.
25      Q   Okay.

Page 65

1          And have you visited that area
2  just one occasion or more than one?
3      A   Just once.
4      Q   Okay.
5          Was that June 7th of this year?
6      A   Yes, sir.
7      Q   Okay.
8          And with whom did you take the
9  tour that day on June 7th of that area?
10      A   DPS, Department of Public Safety,
11  Texas.  I believe their state police.
12      Q   Did any Texas counsel attend with
13  you?
14      A   No.
15      Q   Do you know if any other consultants
16  to Texas in the case attended with you besides
17  yourself?
18      A   Just me.
19      Q   Can you describe what things -- what
20  parts of the area did you get to see that day?
21      A   I believe it's called Shelby Park, is
22  where I met the state police officers.  Walked
23  around that area in the park and then proceeded
24  roughly two to two-and-a-half miles southbound
25  on the Rio Grande River until we got to the

17 (Pages 62 - 65)

Thomas Ciarametaro                                                July 9, 2024

Page 66

1   buoy barrier.
2      Q    And about how much time did you
3   spend, you know, within sight of the buoy
4   barrier?
5      A    Maybe an hour to an hour and a half,
6   maybe, roughly.
7      Q    And that day as you were headed there
8   to observe it, were there particular things
9   that you intended to try to observe about, any
10  particular details that were going to be
11  important for you?
12     A    The placement, how it was placed, how
13  it was constructed.  I had a good
14  understanding, because from my report, on
15  page 18, you can see the buoys on land.
16         So I had kind of a good
17  understanding on what they were and how they
18  worked before I had gotten there.  Observed the
19  depth of water, stuff like that.
20     Q    And what did you -- once you got
21  there, what did you observe about the depth of
22  the water?  What was its depth at that time?
23     A    It varied, but certain parts of the
24  river seemed to be three to four feet deep; and
25  some parts of the river, there was no water at

Page 67

1   all.
2      Q    And when you say "parts of the
3   river," are you able to define, like, how long
4   was the stretch of river that you surveyed on
5   that site visit?
6      A    Two to three nautical miles in total.
7      Q    Part of that distance upriver from
8   the buoy barrier and part downriver, or was it
9   all upriver?
10     A    That's correct, part up and down.
11     Q    Okay.
12         And what -- what type of vessel
13  were you -- I assume you were in a waterborne
14  vessel for this visit?
15     A    Correct.
16     Q    And what type of vessel was it?
17     A    Airboat or a fan boat.
18     Q    Were there any other accompanying
19  vessels in the group or just that one?
20     A    There was not.
21     Q    Did you seek any information from the
22  DPS about, you know, their use of vessels in
23  the river, other than on that day?
24     A    I don't believe so.  I may have
25  asked -- I believe I did ask if they use other

Page 68

1   types of boats, and one of the gentlemen
2   indicated that --
3         Actually, we saw a small little
4   border patrol boat up by the park that was
5   maybe 14 feet in length.  I think that was
6   pretty much the extent of the conversation
7   about that.
8      Q    And did you seek any information from
9   DPS that day about what they'd observed in
10  terms of depth of the water on other dates, you
11  know, besides the one day you were visiting?
12     A    I did.
13     Q    And what did they tell you?
14     A    I asked if the river was high or low
15  or what -- the average -- is this the average
16  depth.
17         I also asked about their
18  experience with releases from the dam and if
19  they had -- the way the Border Patrol and Texas
20  DPS situated their boats on the river, they
21  just kind of bow them up on the banking.  I was
22  wondering if there was a dam -- a controlled
23  release, if they would know ahead of time so
24  their boat, you know, so the boats didn't wash
25  away.

Page 69

1         And they said that they're
2   supposed to know, but they rarely do know if
3   there's going to be a release.  And then what
4   that kind of looks like, how high the water can
5   get or low it can get.
6      Q    What did they say in terms of how
7   high and how low the water can get?
8      A    They said it can vary a couple of
9   feet in certain areas.  Other areas still
10  remained dry depending on the topography of the
11  river, high spots or low spots.
12         They said it really just kind of
13  all depends on where you're at specifically in
14  the river.
15     Q    Did you ask them about if there's any
16  sort of typical seasonal variation in the water
17  depth?
18     A    I did not bring up seasonal
19  variation, no.
20     Q    And you mentioned seeing a 14-foot
21  Border Patrol boat out that day.
22         Did you see any other boats on
23  that stretch of the river that day?
24     A    No.
25     Q    Earlier I asked you about the other

18 (Pages 66 - 69)

Thomas Clarametaro                                    July 9, 2024

Page 70

1    cases in your list where you're involved as an
2    expert.
3           I think I had asked this, but do
4    any of those cases involve a river
5    specifically, that type of waterway?
6       A   No.
7       Q   You mentioned that there were just
8    two definitions given for Texas, you've already
9    explained where those were, on page 9 and 18.
10           I just want to make sure, there
11   is a paragraph on page 32, the second paragraph
12   there when you get to that page.
13           Do you see the sentence that
14   begins, "Finally, the buoys are not other
15   structures" --
16      A   That was also provided, and I had
17   previously misspoken.  This was also provided.
18   I forgot that this was down towards the bottom
19   of the report.
20      Q   Okay.  Got it.
21      A   So --
22      Q   Okay.
23           So in terms of definitions given
24   to you by Texas --
25      A   Mm-hmm.

Page 71

1       Q   -- it would be the ones you testified
2    about on page 9 and 18 --
3       A   Correct.
4       Q   -- and this paragraph on page 32?
5       A   Yes, sir.
6       Q   From -- and it's about, I'll say, a
7    ten-line paragraph beginning, "Finally, the
8    buoys are not other structures"?
9       A   Correct.
10      Q   Okay.
11           And that is the only portion of
12   your report that discusses that topic, correct?
13      A   I believe so.
14      Q   I just want to ask you something
15   about your -- this is --
16           I'm looking at Exhibit 2,
17   page 39 of 42, and there's a section on your
18   education and training.
19      A   Which page was that again, sir?
20      Q   Page 39 --
21      A   Yeah.
22      Q   -- of 42 in Exhibit 2.
23      A   Yes.
24           (The deponent read the
25   document.)

Page 72

1       Q   So it mentions associate of applied
2    science, fire science, at North Shore Community
3    College.
4       A   Correct.
5       Q   And can you explain what you studied?
6       A   It's chem fire and hazmat, and it's
7    exactly that.  It's fire science, the science
8    of hazardous materials and combustion and fire.
9       Q   Okay.
10           And then -- and then after that,
11   you acquired a bachelor of science from
12   Endicott College, correct?
13      A   Yes.
14      Q   And it refers to homeland security,
15   criminal justice.
16           Is that specifically -- was
17   there a specific major -- like, is it bachelor
18   of science in --
19      A   Criminal justice concentrated in
20   Homeland Security studies.
21      Q   Okay.  Understood.
22           So the -- so the degree is
23   criminal justice but within that you had a
24   concentration in homeland security?
25      A   Correct.

Page 73

1       Q   And what -- what -- what was the
2    content of that?  Like what sorts of courses
3    did you take?
4       A   Introduction to terrorism to national
5    security to lots of intelligence courses.
6    There was -- I took an international borders
7    course, I believe, investigation into
8    terrorism.
9           I can't remember.  It was a lot
10   of -- a lot of courses like that,
11   international -- international disputes,
12   history of international disputes, stuff like
13   that.
14      Q   And have you done any -- have you
15   done any graduate education since acquiring the
16   bachelor's?
17      A   I have not.
18      Q   And since then in your career have
19   you -- have you made use of your training or
20   your education in criminal justice?
21      A   I believe it's definitely helped.
22      Q   Okay.
23           In what ways?
24      A   Well, being a boarding officer in the
25   United States Coast Guard and having a degree

19 (Pages 70 - 73)

Thomas Ciarametaro                                                    July 9, 2024

Page 74

1  in criminal justice and understanding how, you
2  know, our judicial and legal system works, I
3  think it goes hand-in-hand, gives you an
4  overall, much broader aspect of how things
5  work.
6      Q   Would you say that it had an
7  applicability in your work as the harbormaster
8  for Gloucester Harbor or not?
9      A   Yes, it was applicable.
10     Q   Okay.
11         In what way?
12     A   As the harbormaster, you are --
13 your -- the entire department is enacted to
14 enforce Mass. General Law Chapter 90B, which is
15 all the boating laws and regulations for the
16 Commonwealth.
17         So you quasi do law enforcement,
18 so a criminal justice degree is relevant.
19     Q   Was there any point in the period you
20 mentioned you were the harbormaster that any
21 nautical structures were deployed specifically,
22 you know, to prevent illegal activity of some
23 sort?
24     A   We deployed buoys to deter certain
25 activity, but no structures for specific

Page 75

1  targeted illegal activity.
2      Q   Okay.
3          How did you use buoys to deter
4  activity?
5      A   Marine events.  We have lots of
6  permitted marine event permits, such as, you
7  know, festivals and fireworks and so on and so
8  forth, so we'll use buoys to keep certain
9  people out of certain areas.
10         Or a lot of our beaches coincide
11 with boating areas, so we'll use sequential
12 buoys to mark off certain areas where boats are
13 not allowed, or to deter people from going in
14 there completely.
15         There's also some swim races
16 that we'll use buoys to mark off areas to deter
17 people from going in there.
18     Q   And when you say "deter," is it --
19 for example, the swim race example, I assume --
20 is it -- it's physically possible to go between
21 such buoys if one really wants to?
22     A   I suppose it's -- I suppose you
23 could.  Certain aspects, some buoys we
24 interlace together, so you would -- if you were
25 in a prop boat, you would damage your prop or

Page 76

1  foul your propeller or propulsion system, but I
2  guess it is physically possible to maybe get
3  through there.
4      Q   Okay.
5          And so when you say "deter,"
6  does that always mean "deter" in the sense you
7  just described, like something that would
8  sufficiently be a barrier such that it would
9  actually be damaging if one tried to take a
10 vessel past --
11     A   It could.
12     Q   Okay.
13         And the buoy barrier in the
14 Rio Grande, would you say that description
15 would apply to that as well?
16     A   Yes.
17     Q   All right.
18         It would be potentially damaging
19 if someone tried to take a vessel across the
20 stretch of the river in which the buoy barrier
21 is placed?
22         MS. AL-FUHAID:  Objection.
23 Vague -- form.
24     A   Like running over the barrier with
25 something?

Page 77

1      Q   I'll ask that, yeah.
2          If someone were to want to cross
3  from bank to bank in the stretch where the
4  barrier was placed, would it likely damage
5  their vessel?
6      A   Yes.
7      Q   And is the buoy barrier -- did you
8  get a sense during your site visit about
9  roughly how close to the US bank the barrier is
10 relative to how far from the opposite bank it
11 is placed?
12     A   I did.
13     Q   Is it closer to one than the other?
14     A   It is.
15     Q   Which one?
16     A   The United States'.
17     Q   Okay.
18         If you were estimating the
19 breadth of the river in that stretch, how much
20 of it is on the US side versus how much is
21 opposite?
22         What would you say?  Like, what
23 fraction is on the US side?
24     A   I would say that it's -- if you split
25 the river in half, it would be 25 percent of

20 (Pages 74 - 77)

Thomas Ciarametaro                                July 9, 2024

Page 78

1  the US's side, so it's two -- I would say it's
2  two-thirds of the way.
3        So if you drew a line from the
4  Mexico side to the United States side, it would
5  be two-thirds of the way across the river.
6    Q   Okay.  Right.
7        Yeah.  So if you were standing
8  on the Mexico side and measuring it that way,
9  you'd say you got to get about two-thirds
10 across before where it's placed?
11   A   Correct.
12   Q   And roughly the remaining portion of
13 the river --
14   A   The remaining third.
15   Q   Remaining third, okay.
16       Would you say that -- okay.  You
17 said you saw -- there was a 14-foot Border
18 Patrol boat out that day.
19       You weren't on it, on your tour?
20   A   No.
21   Q   For a boat of that size, would you
22 say that it is equally safe to pass the barrier
23 on the US side versus the side where the
24 two-thirds of the river is located, or would
25 you say it's more safe to pass where the

Page 79

1  two-thirds of the river was located?
2    A   It was deeper water in the two-thirds
3  of the river.  So generally when you're on a
4  vessel of any size, deeper water is always
5  better.
6    Q   Okay.
7        So that -- so it's deeper water
8  on that side, and it would be a safer passage
9  on that side?
10   A   Correct.
11   Q   Does the -- how was the barrier
12 moored?
13   A   With concrete blocks.
14   Q   Do you have a sense of quantity, like
15 how many or --
16   A   I have a sense of how many, but I'm
17 not -- I -- I don't believe I delineated it in
18 the report, but I know I read how many were
19 there.
20       I believe it was in Captain
21 Timmel's report that I read how many were in
22 there, but I don't recall offhand.
23   Q   Do those -- do you have some sense of
24 the dimensions in terms of, you know, if you're
25 looking -- let's say if someone were standing

Page 80

1  on the buoy barrier, like roughly where would
2  the blocks be?
3        Do they extend outward for some
4  distance?
5    A   They do extend outward for some
6  distance.
7    Q   Okay.
8        Both out towards the middle of
9  the river and then out towards the US bank?
10   A   Both sides.
11   Q   Okay.
12       In general, would you -- so if
13 someone were piloting a vessel -- again, let's
14 say that 14-foot Border Patrol vessel -- in the
15 vicinity of where the buoy barrier is located,
16 would you say it is safer to pass at a distance
17 where you're outside the reach of those
18 concrete blocks or would it be safer to pass in
19 between the barrier and the concrete blocks?
20   A   You would need to be outside the
21 concrete blocks.  The concrete blocks are not
22 that far from the barrier.
23   Q   Do you have an estimate you consider
24 reliable as to how far they are from the
25 barrier?

Page 81

1    A   I believe I have -- I don't know if
2  it's in this -- yes, it is in this report.
3        On Exhibit 1, page 20, you can
4  see that the -- that each style block is four
5  to four-ish feet away, five feet away, and
6  that's where they appeared to be for most of
7  the barrier.
8    Q   You said -- you're looking at
9  page 20?
10   A   Correct.
11   Q   And you're looking at one of the
12 figure -- photos on this page?
13   A   Figure 18.
14   Q   Figure 18, okay.
15   A   You can see the center buoy has a
16 yellow tag on it, and just below that yellow
17 tag, there's one of the mooring blocks.
18   Q   Okay.
19       So this is a mooring block where
20 the top of the block is exposed on top of the
21 water?
22   A   Correct, yes.
23   Q   Are all these pictures of the buoy
24 barrier on page 19 and 20 pictures that you
25 took?

21 (Pages 78 - 81)

Page 82

1    A   Yes.

2    Q   Okay.

3        And obviously you took them the

4  day of your site visit.

5    A   Correct.

6    Q   Okay.

7        Have you looked at any photos of

8  the buoys from after the point where it had

9  been fully placed in the river but -- like on a

10  date other than your site visit?

11   A   I believe I've seen those on --

12  online, yes, when researching this.

13  I think my original -- yeah, I

14  thought there was one in here.  My draft had it

15  and then I replaced it with my own photos.

16   Q   And then picture -- Figure 17, it

17  seems, might be an example of you can see the

18  buoy barrier?

19   A   Mm-hmm.

20   Q   The orange buoy barrier.

21       Are any of the concrete blocks

22  visible in this picture or no?

23   A   One of them is, it looks like.

24   Q   Okay.

25       So looking at that photo, if one

Page 83

1  were to start from the lowest portion of the

2  orange buoy barrier and orient their eyes a

3  little bit to the left and a little bit down,

4  is that where you're looking at?

5    A   Correct.

6    Q   Okay.

7        And you understand that to be

8  one of the mooring blocks?

9    A   It is one of them.

10   Q   Okay.

11       So in that instance, it's not

12  quite above the water but close enough to the

13  surface to see it?

14   A   Correct.

15   Q   And what is your -- would you be able

16  to estimate, if one's trying to say what's the

17  width, you know, from the concrete blocks

18  mooring this on one side to the concrete blocks

19  mooring this on the other side, roughly what's

20  the width?

21   A   Of the entirety of the barrier?

22   Q   Yes.

23   A   Just a visual eye estimate on the

24  day, maybe 20 feet to 25 feet.

25       The placement -- it's not 100 --

Page 84

1  the barrier is not 100 percent a straight line.

2  It's -- but I would say that that's probably --

3  I would say between 18 and 25 feet, depending

4  on where you are.

5    Q   Okay.

6        And do you have information on

7  the width of the river in that stretch?

8    A   I do, but I do not believe it's -- it

9  is located in this report, the entire width of

10  the river.

11       I don't recall off the top of my

12  head.  But I do remember reading it and seeing

13  it.

14   Q   So you're not -- you wouldn't be able

15  sitting here to estimate what the width is; is

16  that correct?

17   A   I would estimate the width there to

18  be 300 feet.

19   Q   Okay.  All right.

20       So --

21   A   Maybe a little wider.  Roughly,

22  though, give or take 50 feet on either side of

23  that.

24   Q   Is there -- do you know what the

25  width is of the Annisquam River?

Page 85

1    A   It varies.

2    Q   Okay.

3        What -- is there an estimated

4  range of -- of its width?

5    A   Of the entirety of the river?

6    Q   Yes.

7    A   At its narrowest -- well, there's a

8  couple of bridges, so that's your control

9  point.  So that's 35 feet.

10   Q   Okay.

11   A   Thirty-five -- 38 feet, actually, to

12  be exact.

13   Q   That dimension, is that bridge

14  clearance or is that width?

15   A   No, it's the breadth of the channel

16  that goes through the river.

17   Q   Okay.  Okay.

18   A   And then at its widest, some places

19  are, you know, 800 to 1,000 feet wide at high

20  tide.  Again, 10-foot tidal range, you lose a

21  lot of that shallow water.  You can't navigate

22  anymore because there's no water.  So it's --

23  it varies depending on the tide.

24   Q   Okay.

25       And that's at high tide, you

22 (Pages 82 - 85)

Thomas Ciarametaro                                                July 9, 2024

Page 86

1    said?
2        A    Yes.
3        Q    What about at mean low tide?
4        A    You have areas that are 250 feet
5    wide.
6        Q    Okay.
7        A    Yeah.
8            150 feet to 200 feet, I'd say.
9        Q    What about the Gloucester Harbor?  Do
10   you recall -- like, is there -- how does it
11   work?
12           Is there sort of an entrance to
13   the harbor that all vessels would have to use?
14       A    There's actually two.
15       Q    Two entrances?
16       A    Yeah.  There's two channels that come
17   in and then ultimately end up in one channel
18   and then they split off again into two
19   channels.
20       Q    Okay.
21           And so do -- do you know what
22   the width is of those channels, the two
23   channels?
24       A    Between -- the actual marked federal
25   channel is between 150 to 300 feet wide,

Page 87

1    depending on where exactly you are.  It varies.
2        Q    Okay.
3            And that would be -- that would
4    apply to both of them, both of the two
5    channels?
6        A    Yeah.
7        Q    Okay.
8            And what is the depth at that
9    location -- at those locations?
10       A    When you first get to the entrance of
11   the harbor, it's -- I believe it's about
12   35 feet.  But as you proceed into the harbor,
13   in the inner harbor where the channels split
14   again, the north and south channels, it's
15   between 18 and 30 feet.
16           I think the controlling depth or
17   the authorized depth is 18 and a half feet in
18   the inner harbor.
19       Q    Okay.
20           For inland waterways, including
21   rivers, are you -- would you consider yourself
22   an expert in what the required minimum depths
23   are?
24       A    Yes.
25       Q    Okay.

Page 88

1            What's the basis for that
2    expertise?
3        A    There's Corps requirements, Army
4    Corps Engineer requirements.  So for federal --
5    I would be for a federal project -- or federal
6    channels.  As far as, like, little tributaries
7    and waterways that are not navigable or not
8    marked for navigation, I wouldn't know the
9    depths.
10       Q    Okay.
11       A    If there's no publication or no
12   information on them, then I wouldn't know, but
13   I do know that it's between eight and nine feet
14   for the Army Corps of Engineers for a federally
15   marked channel.
16       Q    So between eight and nine feet
17   minimum depth for a federally marked channel
18   under Army Corps of Engineer regulations?
19       A    Yeah, for dredge -- for federal --
20   for federal channels.
21       Q    All right.
22           And that would be true for all
23   types of federal channels or does it depend on
24   what waterway network?
25       A    To my knowledge, that's for

Page 89

1    federal -- federal channels or federal project
2    areas.
3            Each area has its own
4    controlling depth.  To my understanding, that's
5    the minimum.
6        Q    I take it, just like the experience
7    with Annisquam, there can be times when the
8    actual depth is less than the minimum?
9        A    Pre-dredge, it was.
10       Q    Right.
11       A    Yes.  Shoaling happens.
12       Q    So that can be true with -- well, and
13   obviously, the dredge project there obviously
14   was a federal -- federally funded project,
15   correct?
16       A    Mostly.
17       Q    Mostly?
18       A    Mostly.  There was some state funding
19   in there to get us over the -- get us to the
20   finish line.
21       Q    Okay.
22           So would it be fair to say that
23   waterways -- federal waterways may have a
24   minimum depth but may not in actuality at every
25   moment in time be at that minimum depth?

23 (Pages 86 - 89)

Thomas Ciarametaro                                                July 9, 2024

Page 90

1    A   Correct.
2    Q   You mentioned, I think, when you did
3  your site visit you asked DPS if the day you
4  were there was sort of a high water, low water,
5  somewhere in between, right?
6    A   (Nods.)
7    Q   What did they say about that?
8    A   They said it's been consistently that
9  depth for quite some time.
10   Q   Okay.
11         Talking about consistently just
12  during this year or were they saying further
13  back than that?
14   A   Didn't specify.
15   Q   Okay.
16         So do you know whether there
17  have been times when there's been higher water
18  in the vicinity of the buoy barrier such that
19  none of the concrete mooring blocks are
20  visible?
21   A   Do I know if there was?  Yes.
22   Q   Okay.
23         Has that happened?
24   A   I believe it has, yes.
25   Q   Okay.

Page 91

1         Would you consider that to add
2  to the potential risk if a vessel is passing
3  by, if the water is high enough that none of
4  them are visible?
5         MS. AL-FUHAID:  Objection.
6  Form.
7    A   I would say it's all in the same,
8  because if you were going to navigate or
9  traverse a vessel, that -- if there was a
10  physical barrier there, you wouldn't --
11         More than likely, you wouldn't
12  run a vessel that close to a physical barrier
13  anyways, so it's all one and the same when you
14  have so much more river to navigate around.
15   Q   Is there a distance -- understanding
16  that the -- the barrier itself, the orange
17  part, is not the full width of it --
18   A   Correct.
19   Q   -- due to the attached blocks, is
20  there a distance from the orange barrier -- the
21  orange part, talking about as you go out
22  towards the middle of the river and closer to
23  the Mexican side -- is there a distance that
24  you would consider to be a safe distance for a
25  vessel?

Page 92

1    A   I guess it would depend on a variety
2  of things.
3    Q   What would those be?
4    A   If you were in a motorized vessel or
5  a fan boat, if you were in a rowboat.  Most of
6  the deeper water was on the Mexican side, so
7  you would maintain a pretty large distance away
8  from the buoy barrier to traverse the river, to
9  pass by it.  Or I would.
10   Q   Okay.
11         How would you -- can you clarify
12  what would "pretty large" be, in your opinion?
13   A   Well, you would still have almost
14  two-thirds of the river without any barrier
15  obstruction, so 75 percent-ish.
16   Q   Were it not placed there, is it fair
17  to say it would be safer to pilot a vessel,
18  let's say a motorized vessel, closer to the US
19  side than with these buoys in place there?
20         MS. AL-FUHAID:  Objection.
21  Form.
22   A   Well, some of the -- it's very
23  shallow where those buoys are placed in some
24  areas of the barrier.  So barrier or no
25  barrier, I don't think it would be any safer,

Page 93

1  because you would probably run aground.
2         Again, the depth -- your real
3  depth of water is more towards the Mexican side
4  than the US side.  It's very shoaled on the US
5  side of the river.
6    Q   If someone were in the water on the
7  US side of where the buoy barrier is located
8  and in distress, and somebody wanted to reach
9  that area and get them out of the water, would
10  this potentially impede their ability to get
11  there as quickly as possible?
12   A   No.
13   Q   Why not?
14   A   We were unobstructedly able to
15  traverse and circumnavigate the buoys just as
16  easy on the Mexican side as we were the US
17  side.
18   Q   And that was in a fan boat or
19  airboat?
20   A   Fan boat, airboat.
21   Q   And you did pass by the barrier on
22  each side, the US bank side and then the
23  open-water Mexican --
24   A   Numerous times.
25   Q   Okay.

24 (Pages 90 - 93)

Page 94

1     A   In Figures 16 and 17, I think you can
2   actually see our wake as we traversed the US
3   side.
4     Q   Are you -- do you have any
5   information as to whether the barrier has
6   always, since it was first placed, been in its
7   current location or whether it has at some
8   point been moved from one location to another?
9     A   I was told that it was -- well, I've
10   seen photos of it slightly farther over, and
11   then I was --
12           I asked that specific question
13   while it was down there after the fact, if it
14   had been moved after the visit.  And they said
15   that it was farther over and it has been moved
16   more towards the US side.
17     Q   Okay.
18           So, I believe in your report,
19   you state that it was strategically placed; is
20   that right?  Do you recall?
21     A   Yes.
22     Q   As an example, page 32?
23     A   Yes.
24     Q   You see that statement there?
25     A   Let me get to it.  Yes -- let's see.

Page 95

1           (The deponent read the
2   document.)
3     A   Yeah, "by strategically situating
4   these barriers."  I see it.
5     Q   Okay.
6           So, "By strategically situating
7   these barriers on shoal waters along the
8   eastern bank of the river the barriers enhanced
9   border security without unnecessarily impeding
10   the movement of Class A or Class 1 vessels,
11   these buoy barriers in no way diminish the
12   ability of the vessels to traverse the
13   Rio Grande River."
14           Is that -- did I read the
15   sentence correctly?
16     A   Yes, you did.
17     Q   Okay.
18           So in giving that opinion, you
19   are referring to where the buoy barrier is
20   placed now, correct?
21     A   Correct.
22     Q   So you are not -- you are not, I
23   assume, giving an opinion one way or another
24   about the prior location in which the buoys
25   were originally placed that you were shown at

Page 96

1   some point?
2     A   No, I'm not.
3     Q   Okay.
4           And you're not anticipating
5   doing that in this case, giving an opinion
6   about the original placement of the buoy
7   barriers?
8     A   No.
9     Q   And when you say "strategically
10   situated," are you referring to an intentional
11   strategy at the time of placement?
12     A   It appears that the buoys, in my
13   opinion, were placed in a certain area where it
14   gets -- it's deeper and then it starts to
15   shallow up, where you would be able to easily
16   potentially stand up.
17           So the barriers would block
18   somebody from swimming and standing and walking
19   because it's so much shallower on that side of
20   the river, so...
21           And then due to my experience --
22   my education on this matter, or my -- not
23   education but my knowledge that I've gained on
24   this matter, that was a high-traffic area.
25           So that's a strategic -- when

Page 97

1   you have a high-traffic area of border
2   crossings or human crossings, then it's safe
3   for me to assume that that was a strategic move
4   for them to put them there.
5     Q   So that's something that -- that's
6   your impression and you're assuming it to have
7   been a strategic choice, but did you ever get
8   information to verify, was that the actual
9   thinking or plan?
10     A   I believe there's some articles that
11   are in this report that talk about why the --
12   why they chose that area to place those buoys,
13   and it's because it was a high-traffic area or
14   area of concern.  So that's a strategic move.
15     Q   Could you show me what part of the
16   report you're referring to, or what sources?
17     A   Right on page 7, there's a URL here.
18   "Operation Lone Star Boosts Border Response
19   with New Marine Barriers."
20           I believe this is the article
21   that talks about why they chose that area.
22     Q   Okay.
23     A   Or it may be the very next one on
24   page 8.  I can't -- I can't remember what -- I
25   can't, you know...

Thomas Ciarametaro                                            July 9, 2024

Page 98

1    Q   I understand.
2        Just to be clear on the record,
3    you're saying it could be either or both of
4    what's cited on page 7, "Press Release:
5    Operation Lone Star Boosts Border Response with
6    New Marine Barriers" --
7    A   Mm-hmm.
8    Q   -- "Office of the Texas Governor
9    (July 14, 2023)," right?
10   A   Yes.
11   Q   And then the other one you're
12   referring to is a citation, Sarah Fortinsky,
13   "Texas city declares emergency over migrant
14   crossings" by The Hill, September 21, 2023,
15   right?
16   A   Yes, sir.
17   Q   Okay.
18       Any other sources besides
19   potentially one or both of those that you would
20   mention as sources of information about the
21   strategic thinking of the placement?
22   A   Just what I -- the DPS officers
23   stated that that entire area, Eagle Pass, was
24   a -- a very active area for illegal border
25   crossings.

Page 99

1    Q   And you're referring to the DPS
2    officers you spoke to during your site tour?
3    A   Correct.
4    Q   The ones that took you on the tour?
5    A   Correct.
6    Q   And at the time -- the two articles,
7    at the time these were published, or at least
8    at the time the first one was published in
9    July, do you know, was the buoy barrier in its
10   current placement or was it in a different
11   placement?
12   A   I'm not sure.
13   Q   Okay.
14       And same question as to the
15   September 21st.
16   A   I'm not sure.
17   Q   Okay.
18       And is your recollection that
19   those articles or one or both speak to efficacy
20   of the placement in terms of safety or in terms
21   of deterring illegal activity, or is it both?
22   A   I would suspect it is both, but I'm
23   not 100 percent sure.  I wasn't there to place
24   or in the talks to place the buoy barrier.
25   Q   I just mean your recollection of

Page 100

1    what's reported in the articles.
2    A   I believe it's to -- it was placed
3    there to prevent -- and I -- I -- I think one
4    of the articles also talks about some safety
5    aspects of it.
6    Q   Okay.
7        But you can't recall which one?
8    A   I can't recall.
9    Q   Anything besides the -- these news
10   articles in terms of information specifically
11   documenting the thinking of those planning the
12   placement that you -- that you...
13   A   Maybe some documents in discovery
14   where they explained why, but I don't know the
15   specific documents off the top of my head.
16       But I do recall reading about
17   the thought of why they placed them in that
18   region, but it coincides with what we just
19   talked about.
20   Q   Do you recall the author of the
21   document or documents you're thinking of?
22   A   I do not.
23   Q   Have you reviewed anything authored
24   by Cochrane?
25   A   I believe so.

Page 101

1    Q   Have you reviewed anything that you
2    may have seen with a marking that said
3    "attorneys' eyes only"?
4    A   I don't recall seeing anything like
5    that.
6    Q   Okay.
7        As part -- so was it part of
8    your assignment in terms of becoming an expert
9    on the case to develop an opinion as to whether
10   the current placement of the buoy barrier is
11   one that maximizes its safety relative to any
12   vessels this might pass through that stretch of
13   the river?
14   A   It was my assignment to give an
15   opinion on the overall -- what my believing on
16   the overall effectiveness was on the buoy
17   barrier as a whole, and to determine whether it
18   was a hazard to navigation or -- or vessels
19   traversing the area.
20   Q   Okay.
21       Now, when something is a hazard
22   to navigation, does that generally mean that it
23   is then impossible to pilot a vessel in the
24   vicinity of that thing, whatever it might be?
25   A   No.

26 (Pages 98 - 101)

Thomas Ciarametaro                                              July 9, 2024

Page 102

1    Q   So it can be possible to pilot
2  vessels through an area notwithstanding that
3  there is a hazard?
4    A   Correct.
5    Q   Okay.
6          That doesn't mean necessarily
7  the hazard has ceased to exist?  It just means
8  it is possible still to pilot the vessel?
9    A   Correct.
10   Q   Okay.
11         Have you experienced examples of
12 that, like, for example, in your duties with
13 the Coast Guard?
14   A   Yeah, floating debris.
15   Q   Okay.
16   A   Logs, trees, parts of wreckage after
17 hurricanes or storms.  Those are all -- can be
18 hazardous in navigation.  Missing aids to
19 navigation, stuff like that.
20   Q   Okay.
21         Is there anything about -- is
22 there anything currently in place in the
23 vicinity of the buoy barrier that would
24 communicate to someone traveling in a vessel --
25 waterborne vessel where the mooring blocks are?

Page 103

1    A   No.
2    Q   You were talking -- you said that
3  part of your task in the case was to consider
4  the effectiveness of the buoy barrier, and I
5  assume part of that was effectiveness in terms
6  of deterring the crossing of illegal migrants?
7    A   Correct.
8    Q   And what -- what did you do to
9  evaluate that?
10   A   Well, it's -- it's outlined
11 throughout my report.  And in my opinion,
12 looked at the overall construction of it, what
13 the intended use was for.
14         And my opinion states that
15 pretty much anything that you do to act as a
16 deterrent or a barrier is overall effective in
17 deterring certain types of human behavior.
18   Q   Can you point me to what part of the
19 report you consider --
20   A   -- I have an opinion specifically on
21 it here -- I want to read it --
22   Q   Let's not talk over each other.
23   A   Oh, sorry.
24   Q   It's my fault as much as yours.
25   A   Sorry.  Opinion 3.

Page 104

1    Q   Okay.
2          What page does that start?
3    A   Page 26 of Exhibit 1.
4    Q   So from page 26, about two-thirds of
5  the way down, through the top of page 28?
6    A   Correct.
7          (Counsel read document.)
8    Q   Have you as part of your evaluation
9  sought any data to ascertain, you know, have
10 there been changes in the number of crossings
11 in this stretch of the river, you know, from --
12 from the period before the buoy barrier was
13 placed compared to the period after it was
14 placed?
15   A   Not specific to the barrier itself.
16   Q   Okay.
17         Did you seek from the DPS
18 officer that was doing your site visit at least
19 their anecdotal information on, you know, what
20 have they seen in terms of crossings from
21 before the barrier was placed in that area
22 versus after?
23   A   They stated in the last six to eight
24 months that border crossings were significantly
25 down in that region, as low as 20 a day.  And

Page 105

1  the peak a few years ago was -- could be in the
2  thousands.
3    Q   And did they attribute that to this
4  buoy barrier or did they think there were other
5  reasons?
6    A   They attributed it to everything that
7  was going on down there between Border Patrol
8  patrols, them, razor wire, National Guard, the
9  buoy barrier, overall presence in total in that
10 region.
11         They said it was, you know, a
12 combination of everything that they had been
13 doing or trying to do.
14   Q   All right.
15         You haven't attempted, I assume,
16 to sort of statistically take into account all
17 those factors and isolate to what extent the
18 buoy barrier may be contributing to that change
19 in what they observed?
20   A   No, I have not.
21   Q   And you're not aware of anybody else
22 having done that type of a study?
23   A   I am not.
24   Q   Did you -- are you aware of other
25 expert reports submitted in the case on behalf

27 (Pages 102 - 105)

Thomas Ciarametaro                                                    July 9, 2024

Page 106

1  of Texas?
2      A   I am.
3      Q   Did you read of any those reports?
4      A   I did.
5      Q   Do you recall which ones?
6      A   I have them listed.  I don't know
7  if... Ancil Taylor.  I can't recall everyone's
8  name off the top of my head, but as I list them
9  in here, the pleadings, declarations, appellate
10 filings, and then the documents produced for
11 the USA -- the other -- I have it listed as the
12 "other Texas reports."
13     Q   So there -- there was a -- an author
14 named Taylor?  That's one that you recall
15 reviewing?
16     A   Ancil Taylor.
17     Q   Ancil Taylor.
18         Did you read a report by someone
19 named Shields?
20     A   I don't recall.
21     Q   That name doesn't sound familiar?
22     A   I read so many documents relating to
23 this, I don't want to speak untruthfully.
24     Q   Okay.
25         Do you recall reading a report

Page 107

1  by authors named Hart and Magers?
2      A   I don't believe I did.
3      Q   Okay.
4          Do you recall reading a report
5  by authors named Settemeyer and Rubinstein?
6      A   I don't believe I -- I don't recall.
7      Q   Do you recall reading a report by
8  a -- someone named Zhao, Z-H-A-O?
9      A   No.
10     Q   Okay.
11     A   I -- I don't believe I read any -- I
12 believe I only read reports that were -- one
13 supplemental report for Texas and the reports
14 for the USA.
15     Q   Okay.
16         So do you think the Taylor
17 report may have been the only Texas expert
18 report that you reviewed?
19     A   Just the -- not even his report.  A
20 supplemental, I reviewed.
21     Q   Okay.
22         And that was -- after it had
23 been signed by him?
24     A   Correct.
25     Q   Okay.

Page 108

1          Was there any Texas expert with
2  whom you had conversations prior to signing
3  your report?
4      A   Just one.
5      Q   And who was that?
6      A   Ancil Taylor.
7      Q   Okay.
8          Did -- and did Mr. Taylor
9  provide you any factual information or data
10 that you relied on in reaching your opinion?
11     A   The only factual data he -- I was
12 privy to was after I had already submitted my
13 report.
14     Q   Okay.
15     A   It was a supplemental report.
16     Q   And then in terms -- again, in terms
17 of conversation, did he -- in those, did he
18 provide you any assumptions that you relied on?
19     A   No.
20     Q   Okay.
21         And then -- and he's the only
22 expert you recall having conversations with.
23     A   Yes.
24     Q   Okay.
25         And then aside from his

Page 109

1  supplemental report, other expert reports
2  you've looked at would have been reports of
3  United States' experts?
4      A   Correct.
5      Q   And I'm guessing you looked at the
6  report from John Timmel, who is here today?
7      A   Correct.
8      Q   Did you look at a report by Adrian
9  Cortez?
10     A   I did.
11     Q   Did you look at a report by a
12 gentleman named MacAllister?
13     A   I did.
14     Q   And did you look at a report by a
15 professor named Dr. Ben Johnson?
16     A   I'm not a -- I -- if it was part of
17 the discovery that was given to me, then I
18 reviewed it.  It sounds familiar.
19     Q   Okay.  All right.
20         You're -- you are not, I take
21 it, offering opinions in the case about
22 historic navigation of the Rio Grande?
23     A   No.
24     Q   Okay.
25         You're not offering any critique

28 (Pages 106 - 109)

Thomas Ciarametaro                                                                July 9, 2024

Page 110

1  of anybody else's opinion about historic
2  navigation?
3      A   No.
4      Q   Are you offering any opinions in the
5  case about water rights or the ability to use
6  flows, you know, of water within the
7  Rio Grande?
8      A   It's not in my report.
9      Q   Okay.
10         Are you offering opinions about
11 the efficacy of ways of increasing the
12 navigability of this stretch of the Rio Grande?
13     A   I do offer some -- there is some
14 opinion in here about how you could do that or
15 what it would take to do that, so yes.
16     Q   Okay.
17         Can you -- can you show me what
18 part of the report you're thinking of?
19     A   It's Opinion 2. Pretty much all of
20 the page 24 of Exhibit 1 talks about a lot of
21 this stuff.
22         Cost, topography of the river,
23 depths. I think there's some other places,
24 too. Let me just take a quick gander through
25 it here.

Page 111

1          (The deponent read the
2  document.)
3      A   Page 5 of Exhibit 1, "The Rio Grande
4  poses significant challenges to transporting
5  commercial cargo on vessels or barges. Its
6  unsuitability for such purposes stems from
7  substantial obstacles, including the need for
8  extensive dredging," locks systems, because of
9  the nearly 600 foot of elevation changes in
10 this 335-mile stretch.
11         I think it's referenced
12 throughout the report, but mostly in Opinion 2,
13 you'd say.
14     Q   So particularly, just now, you've
15 been looking at page 5 of -- I think it's
16 numbered paragraph 3.
17         Would that be sort of a summary
18 of this opinion?
19     A   Yes, sir.
20     Q   And then also Opinion 2 from the
21 bottom of page 24 to the -- about two-thirds of
22 the way through page 26?
23     A   That's correct.
24     Q   And you did not -- did you evaluate a
25 specific proposal or hypothetical project

Page 112

1  proposal for an improvement, did you?
2      A   After my report was submitted, there
3  was a supplemental from Ancil that showed costs
4  and all the various dams and sills and areas
5  that would -- and I believe there was a cost
6  analysis to certain things.
7          But it was a brief review. It
8  wasn't a real serious analysis, but it was
9  after this report was written.
10     Q   Okay.
11         And that was a supplemental from
12 Taylor. Do you recall the date of that?
13     A   I don't recall the date. It was
14 recently. Very recent. I've reviewed it in
15 the last week or so.
16     Q   Okay.
17         So has he done two reports in
18 the case, like one report and then a
19 supplemental or is it just a --
20     A   I believe so.
21     Q   But if he did two, his first one is
22 not what you looked at?
23     A   No.
24     Q   Just the supplemental.
25         Did you help him develop any of

Page 113

1  the information that's in the supplemental or
2  you just reviewed it after it was complete?
3      A   Just reviewed it.
4      Q   Okay.
5          And you haven't -- I assume you
6  have not independently reached your own
7  conclusions to corroborate whatever his
8  findings were in the supplemental?
9      A   So I did pick certain
10 latitude/longitude -- longitudinal geographic
11 points in his report and Googled them to see
12 what they were, and most of them show up on
13 Google Images in some fashion.
14         I just picked a handful of them
15 to kind of just check it -- check it out, see
16 if it was -- continued to align with my report,
17 which it did.
18     Q   Okay.
19         And when you say "align" with
20 your report, how do you mean?
21     A   That the Rio Grande is not navigable
22 for all the reasons outlined in this report.
23     Q   Did his supplemental have any
24 discussion of costs of options to improve the
25 river for navigation?

29 (Pages 110 - 113)

Thomas Ciarametaro                                                    July 9, 2024

Page 114

1     A   I believe it did.
2     Q   All right.
3           And is that something that you
4   independently looked at to verify --
5     A   No.
6     Q   -- if those numbers were accurate?
7     A   It has no reflection on my opinions.
8     Q   Okay.
9           So you wouldn't -- you don't
10  independently have an opinion as to what it
11  would cost?
12    A   I do.  Not an exact figure, but I
13  know it's a monumental amount.  Just from
14  seeing smaller navigation projects and going
15  and looking at what would need to happen here,
16  I know that it would be a substantial number.
17  I don't have an exact figure, though.  But I
18  know it would be very -- very costly.
19    Q   And do you have a specific type of
20  project in mind when you say that?
21          Like, are you referring to --
22  for example, lock and dam, is that what you're
23  thinking of or --
24    A   Yeah, locks or dams.  Or, you know, I
25  have other dredge projects in this region, and

Page 115

1   I know what the cost of them were.
2           So comparing how small those
3   were to -- to, you know, a 335-mile stretch of
4   river, I can just imagine what the number would
5   be.
6           I probably couldn't even write
7   it on a paper.
8     Q   Are you aware there are ways that a
9   navigable channel can be improved that don't
10  involve dredging?
11    A   Not that I'm aware of.
12    Q   Are there different methods of
13  improvement that may have different costs
14  associated with it?
15    A   I'm sure that you could have a series
16  of lock systems that were flooded out that you
17  could minimize the amount of dredging in a
18  hypothetical situation.  But other than that,
19  no.
20    Q   Okay.
21          So would you say that generally,
22  either use of locks and dams or dredging are
23  the only two ways to increase the navigability
24  of a river system?
25    A   Yes.

Page 116

1     Q   Okay.
2           And would you say that those two
3   approaches have the same cost or can the costs
4   vary?
5     A   I would assume that the costs would
6   vary.
7     Q   And have you developed any specific
8   at least hypothetical cost estimate of what it
9   would cost to undertake either of those
10  approaches in this stretch of the Rio Grande?
11    A   Just looked at the numbers that
12  Mr. Taylor put together, as he is the dredging
13  expert.
14    Q   Okay.
15          So you would not be in a
16  position, I take it, to testify one way or the
17  other as to whether his numbers are reliable
18  estimates?
19    A   I don't know what his cost per cubic
20  foot was, but I know what the cost of cubic --
21  probably not, no, no.
22    Q   And you haven't been asked to do that
23  in this case?
24    A   No.
25    Q   Okay.

Page 117

1           And that opinion is not in this
2   report?
3     A   Correct.
4     Q   Earlier when I was asking you about,
5   you know, when there's a hazard to navigation,
6   it's still possible to pilot a vessel and you
7   said yes, generally, would it be your
8   assumption that all vessel captains are equally
9   experienced?
10    A   No.
11    Q   Okay.
12          There's going to be a range?
13  Some are more experienced than others?
14    A   (Nods.)
15    Q   And if one is trying -- for example,
16  in your capacity as harbormaster, to the extent
17  that you were looking at what measures might be
18  necessary to maintain safe use of a harbor,
19  would your goal be to take into account that
20  varying degree of experience of those using
21  vessels?  You want to make sure it's safe for
22  everyone who's going to use it?
23    A   You always train and maintain to the
24  lowest level of skill or knowledge.
25    Q   And that general principle should

30 (Pages 114 - 117)

Thomas Ciarametaro                                          July 9, 2024

Page 118

1    apply across waterways when looking at
2    navigation safety issues?
3        A   It could depend on what you are --
4    if, you know, the degree in which, you know, if
5    you're in a jet ski or if you're on a
6    thousand-foot container ship, that will
7    obviously be different and -- to the degree in
8    which you determine, you know, navigability,
9    you know.
10            If you have a vessel that drafts
11   50 feet and the port's 30 feet deep, it's not
12   navigable to your vessel.
13       Q   But -- but if, you know, if you
14   expected ten people to pilot the same type of
15   vessel, you know, through the entrance to the
16   harbor, for example, you're going to want to
17   make sure it's, you know -- measures are taken
18   to assure safety for all ten, not just for the
19   best pilots?
20       A   Correct.
21       Q   Okay.
22            When we were looking at the
23   picture on page 19 of your report, I think it's
24   Figure 15 -- this is a picture of the buoy
25   barrier on the day you visited, right?

Page 119

1        A   Yes.
2        Q   Would it be possible, if a person is,
3    you know, trying to wade across the river,
4    would it be possible for them to climb over it,
5    the buoy barrier?
6        A   In this specific area?  Yes.
7        Q   Okay.
8            Did you ask the DPS officers
9    during your site visit if they had seen that
10   happen?
11       A   I did not.
12       Q   Okay.
13            And they didn't on their own
14   mention whether they had seen that or not?
15       A   They did not.
16       Q   Have you seen just in the news
17   articles since the barrier was placed any
18   pictures of people wading at least around the
19   buoy barrier?
20       A   I believe I have a photo in this
21   report of before it was actually installed, of
22   people walking in the vicinity, but I haven't
23   seen anything besides that.
24            MR. LYNK:  Okay.
25            It's almost noon.  I think it

Page 120

1    may be a -- just go ahead and take a little
2    lunch break?
3            MS. AL-FUHAID:  That sounds good
4    to me.
5            Want to take lunch?
6            THE DEPONENT:  Sure, yeah.
7    Could use a head break anyway, so...
8            (Discussion off the record.)
9            (Lunch recess.)
10   BY MR. LYNK:
11       Q   Earlier today we looked at three
12   passages in the report that you identified as
13   definitions from counsel.
14            I wanted to ask you about one
15   other paragraph.
16       A   Okay.
17       Q   This is paragraph -- the last
18   paragraph on page 8 of Exhibit 1.
19       A   Oh, page 8, sorry.
20            (The deponent read the
21   document.)
22       Q   Do you see a paragraph that starts,
23   "The RHA generally applies to 'navigable'
24   waters of the US," and then it continues?
25       A   Yes.  I believe part of this

Page 121

1    definition is -- is part of the other ones and
2    part of it is mine.
3            I think I -- I think -- oh, I
4    thought we went over this with navigable
5    waters.  I guess it just starts back a little
6    farther.
7        Q   Got it.  You're right.
8        A   Yeah, yeah, sorry.
9        Q   If you turn to the next page --
10       A   Yeah, so --
11       Q   -- there's a paragraph that starts
12   "Navigable waters."  So basically --
13       A   It just --
14       Q   -- that's a continuing part of this
15   passage?
16       A   Correct.
17       Q   Okay.
18       A   Yes.
19       Q   All right.
20            So when we were talking about
21   the definitions from counsel and when we
22   referred to the one that at that point you said
23   starts on page 9, you just corrected to say
24   it's this passage starting here, the last
25   paragraph of page 8, and continuing through

31 (Pages 118 - 121)

Thomas Ciarametaro                                                    July 9, 2024

Page 122

1    page 9, correct?
2        A   That is correct.
3        Q   Got it.
4            And as to this one and the other
5    two you mentioned in your testimony, those are
6    the three definitions received from counsel?
7        A   Correct.
8        Q   And as to each of those, it would be
9    accurate to say you didn't separately research
10   them or separately develop those?
11           You received those from counsel?
12       A   I received these from counsel but did
13   not rely on them for the conclusions in my
14   report.
15       Q   Okay.
16           You didn't rely on them for the
17   conclusions in your report, and they weren't --
18   these three things weren't things that you
19   developed yourself while you worked on your
20   report?
21       A   Correct.
22       Q   Okay.
23           And I -- so I wouldn't expect --
24   there's no other discussion in the report that
25   relies on these three definitions, the --

Page 123

1            When I say "three," I mean your
2    earlier testimony referred to two other places.
3        A   Correct.
4        Q   I could go back and verify which
5    pages, but you understand what I was referring
6    to, correct?
7        A   I do.
8        Q   Do you anticipate that you would
9    testify at trial about those three definitions?
10       A   I do.
11       Q   You would testify about them?
12       A   To the -- my concurrence with them,
13   that I agree with them, and that my conclusions
14   that I've -- based on my training, experience
15   and education correspond with these
16   definitions.
17       Q   So do you consider yourself
18   independently qualified to speak to -- of a
19   definition set forth that begins, "The RHA
20   generally applies," and then continuing through
21   the next page?  Is that something you are
22   qualified to give an opinion about?
23       A   Yes, yes.
24       Q   Earlier you said you were not a legal
25   expert in the Rivers and Harbors Act, right?

Page 124

1        A   So not -- I am an expert in the areas
2    that apply to this report.  So the Rivers and
3    Harbors Act is a gigantic document that has to
4    do with more than just permitting.
5            For the subject of this report,
6    I'm an expert in the section of the Rivers and
7    Harbors Act that I talk about and give an
8    opinion on.
9        Q   So which parts of the Rivers and
10   Harbors Act statute would you consider yourself
11   to be a legal expert at?
12       A   All the things that are outlined in
13   this report that have to do with permitting of
14   structures.
15       Q   And what provisions of the Rivers and
16   Harbors Act statute do those things relate to?
17       A   I don't know off the top of my head
18   what provision it is, but it's what is outlined
19   in this report.
20       Q   Have you ever -- you said you've been
21   associated with Section 10 permit applications,
22   correct, in your work?
23       A   Yes, Chapter 91.
24       Q   Did you ever give legal advice with
25   respect to those permit applications, legal

Page 125

1    advice on whether the application had been done
2    in a way that made it approvable under the
3    Rivers and Harbors Act?
4        A   I have given advice to people in my
5    official capacity as to their application
6    process that relates to these permits as a
7    municipal level of review.
8        Q   Would you have -- and you were a
9    public official, I take it, as the Gloucester
10   harbormaster?
11       A   Correct.
12       Q   Would you have held yourself out to
13   the City of Gloucester as someone they could
14   look to for a legal opinion as to whether the
15   permit application was legally correct?
16       A   Yes, yes.
17       Q   And you have done that?
18       A   People, for example, that want to
19   apply for a dock and gangway in front of their
20   home, their first step in that process, which
21   is -- eventually will be an Army Corps
22   Engineering permit, their very first step is
23   the Gloucester harbormaster's office.
24       Q   But you would specifically -- you
25   would be comfortable representing to them that

32 (Pages 122 - 125)

Thomas Ciarametaro                                                July 9, 2024

1  you could legally advise them on --
2      A   I would give them opinions on
3  different avenues and the legal process in
4  which it was to obtain.
5          I wouldn't represent them in any
6  kind of courtroom setting, but part of my job
7  was to advise and educate on the legal process
8  or the processes on obtaining permits, not in a
9  lawyer capacity, just as a public official and
10 a department head in which these structures
11 fell under my jurisdiction.
12     Q   This passage that we're looking at
13 that starts on page 8, about eight lines down,
14 it quotes some language from, it looks to be a
15 court case called United States v. Republic
16 Steel Corporation.
17         Do you see that?
18     A   I do.
19     Q   So would you say that you have the
20 expertise, for example, to interpret the
21 significance of that court case and how it
22 might apply in any subsequent cases?
23     A   No.
24     Q   And was there a reason that you took
25 these definitions from counsel rather than

1  writing them yourself?
2      A   I fully agree with these definitions,
3  so I felt no need to write them for myself.  I
4  concur with the definitions that are -- were
5  supplied to me.
6          After doing a full analysis of
7  the entirety of this report, I felt that these
8  definitions were concurrent with my own
9  conclusions.
10     Q   Did you ask for definitions to be
11 provided?
12     A   I don't believe so.
13     Q   Okay.
14         Did you need these legal
15 definitions in order to write the remainder of
16 your report?
17     A   I did not.
18     Q   So they are not significant to the
19 conclusions you reach in your report?
20     A   Correct.
21     Q   There's -- I wanted to look at
22 page 32 of your report.  And do you see about
23 five lines from the bottom of the page, there's
24 a sentence that says, "The buoys are not
25 permanently moored"?

1      A   Mm-hmm.
2      Q   What do you mean by saying that
3  they're not "permanently moored"?
4      A   They could be removed.  Generally,
5  moorings are temporary in nature, so just like
6  the mooring balls we observed out here in
7  Boston Harbor on the way out to lunch, those
8  are temporarily moored and can easily be
9  removed or moved, depending on a variety of
10 circumstances, whether a bigger boat needs to
11 go there, you could move the moorings farther
12 or closer apart, or you could remove them
13 altogether.
14         It's not -- moorings are
15 generally temporary in nature, in my
16 experience.
17     Q   Moorings are generally temporary in
18 nature.
19         Can there ever be a circumstance
20 in which something is permanently moored in the
21 water?
22     A   Yeah, usually pile-supported
23 structures, like pilings, stuff like that.
24     Q   Can you explain just -- just for the
25 benefit of the record, what would be a

1  pile-supported structure, an example of that?
2      A   A dock or gangway, a gangway to a
3  dock.  Like, for example, the one in front of
4  Fan Pier here, there's hundreds of feet of
5  dock.  There's permanent pilings driven into
6  the seabed floor that are designed for
7  permanent placement.
8          Moorings are, by law in
9  Massachusetts, or to Corps standards, are not
10 considered permanent structures, so they're not
11 permitted under those provisions.
12     Q   Have you ever encountered a question
13 about a houseboat and whether it was
14 permanently moored or not?
15     A   I have.
16     Q   When have you seen that come up?
17     A   Our region of Massachusetts, we have
18 quite a few houseboats.  A little different
19 than the ones you've seen in Seattle that are
20 along bulkheads or piers.  Ours are on
21 moorings.
22         The Annisquam River, the Essex
23 River, the Ipswich River has dozens of
24 houseboats.  They were registered as boats in
25 such a manner where they have MS numbers or are

33 (Pages 126 - 129)

Thomas Ciarametaro                                          July 9, 2024

Page 130

1  federally documented in some cases if they met
2  the tonnage.
3        But this topic's come up quite a
4  bit, especially in this area of houseboats, and
5  they're not -- they're not considered
6  permanently moored because they're affixed to a
7  mooring.
8        And it ices in here in the
9  wintertime.  Our inland waters get icy and
10 those things have to be removed.  Houseboats
11 are not left out all winter.  They would be
12 frozen in and damaged, so...
13    Q   So in this area, you would say none
14 of the houseboats would be considered
15 permanently moored?
16    A   Correct.
17    Q   Any other example besides what you
18 were describing earlier of something -- a
19 nautical structure that might be permanently
20 moored?
21    A   Not that I can think of.
22    Q   And when you said a piling is used to
23 affix a dock, for example, to a waterways, is
24 that something different from mooring or is
25 that part -- a type of mooring, in your view?

Page 131

1    A   A mooring is a -- is a -- what I
2  consider a mooring is a round or a cement
3  disk -- doesn't have to be round -- to a chain
4  to some kind of floating buoy that the entire
5  structure -- or the entire apparatus is
6  considered a mooring.
7        A piling is a -- is a permanent
8  pole made of fiberglass, steel or wood that is
9  driven into the ground for the intention of not
10 being removed, ever.
11    Q   Okay.
12    A   Or unless it, you know, breaks, or a
13 hurricane or something like that happens.
14    Q   And you refer on page 5 of your
15 report, if you look at numbered paragraph 5 on
16 the bottom of that page --
17    A   Mm-hmm.
18    Q   -- you refer to the use of temporary
19 buoys.
20        Do you see that?
21    A   I do.
22    Q   And so you're saying that the buoy
23 barrier at issue in this case is temporary?
24    A   Yes, because it can be easily moved,
25 and I think earlier in the deposition we talked

Page 132

1  about the barrier was moved, so this would fit
2  my conclusion here.
3    Q   Are you making any assumptions about
4  how long it will remain in its current
5  placement?
6    A   It's not up to me to decide how long
7  it's going to remain there.
8    Q   Okay.
9        But just to be clear, when you
10 say it's temporary, that's not based on a
11 specific assumption that, you know, they'll --
12 they'll take it out in a year or they'll take
13 it out in six months or something like that?
14    A   No.
15    Q   Okay.
16        Even if it were to remain in
17 place indefinitely, in your use of the term,
18 you would still consider it a temporary --
19    A   Correct.
20    Q   -- placement?
21    A   I would.
22    Q   Okay.
23        You also talk on this page of
24 the report, page 5, about -- do you see a
25 sentence at the top, "I found no evidence of

Page 133

1  commercial navigation traveling upstream and/or
2  downstream on the Rio Grande River between
3  river miles 275.5 and 610, including in the
4  Eagle Pass area"?
5        Do you see that sentence?
6    A   I do.
7    Q   And you've mentioned on June 7th, you
8  took a tour of, like, two to three nautical
9  miles of the river, correct?
10    A   Correct.
11    Q   And that was in the vicinity of Eagle
12 Pass and the buoy barrier.
13        Have you toured any other
14 portion of the river between river miles 275.5
15 and 610?
16    A   I have not physically toured it, but
17 I have watched an entirety of a helicopter
18 video, which is part of my report, photographs
19 from that, that have gone through the entire
20 stretch of 275.5 to 610.  And some of those
21 photos are in -- excuse me -- start on -- let's
22 see here.
23        (Pause.)
24    A   They're in here somewhere.
25        (Pause.)

Thomas Ciarametaro                                                July 9, 2024

Page 134

1    A   They start on page 15 of Exhibit 1,
2  and they go to page 17 of Exhibit 1, and these
3  are just a few examples throughout the entirety
4  of the videos.
5    Q   And so this was a video that
6  ultimately looks at that entire stretch between
7  those two mile markers?
8    A   Yes.
9    Q   All right.
10       And it's all taken the same day,
11  I assume, as far as you --
12    A   I believe so.
13    Q   Do you have any data relating to
14  commercial navigation or absence apart from
15  that visual data as reflected in the video
16  taken that day and then your own visual
17  observations the day of your tour?
18    A   That included -- coupled with the
19  research of -- researching if any commercial
20  navigation has -- has or does take place on the
21  Rio Grande.  I found no evidence anywhere that
22  concludes that there's anything commercial
23  happening because of all the reasons outlined
24  in this report.
25    Q   All right.

Page 135

1       And are you familiar with
2  whether there were ever kayak or canoe tours in
3  the Rio Grande?
4    A   I see signs for kayak or canoe tours.
5    Q   Okay.
6       But that isn't something you
7  encountered in your research?  Or you saw
8  signs --
9    A   I saw signs.  I saw signs for it
10  while I was down there.  I may have passed over
11  something on the Internet about it at some
12  point, but I don't recall specifically.
13       But I do recall seeing signs
14  when I was in Eagle Pass for kayak and canoe
15  tours.
16    Q   Okay.
17       If there were kayak and canoe
18  tours at a point in time, would that be a
19  commercial navigation activity?
20       MS. AL-FUHAID:  Objection.
21  Form.
22    A   Again, the Corps definitions by
23  themselves don't consider recreational boating
24  commercial commerce, or commercial activity, so
25  no.

Page 136

1    Q   And in saying that, that comes from
2  the experience you've had with the Corps's
3  review of dredging projects, correct?
4    A   Correct.
5       And laws pertaining to commerce
6  as a federal boarding officer.  Commercial and
7  recreational boating laws are much different.
8    Q   Okay.
9       And ultimately -- in one of the
10  projects you mentioned there was an application
11  for a dredging project, and it ultimately was
12  improved, notwithstanding the lack of what you
13  would consider commercial navigation or what
14  the Corps, as you understood, considered it?
15    A   I'm not sure what the overall
16  entirety on how it was approved, but there was
17  an analysis done, and originally it did not
18  meet the specifications because of everything
19  that I said earlier in the deposition, because
20  they don't consider commercial fishing or
21  recreational boating commerce.
22       But I guess throughout the
23  course, processes could be -- in the
24  cost-benefit analysis, there is -- public
25  safety is obviously weighed in on that.

Page 137

1    Q   Right.
2       And your testimony earlier was
3  that consideration of public safety and
4  facilitating emergency response, which would
5  otherwise be very lengthy --
6    A   Mm-hmm.
7    Q   -- were factors in the approval of
8  that project?
9    A   Yes.
10    Q   Okay.
11       And so those are not -- those --
12  those two factors in and of themselves are not
13  commercial navigation, correct?
14       MS. AL-FUHAID:  Objection.
15  Form.
16    A   I -- I don't believe so.
17    Q   Okay.
18       Any other research that you
19  would add that you've done relating to the
20  current existence or absence of commercial
21  navigation within these mile markers?
22    A   Looked at publications such as -- or
23  websites such as MarineTraffic to see if
24  there's ever been or is currently any vessels
25  situated within the Rio Grande River, AIS

35 (Pages 134 - 137)

Thomas Ciarametaro                                        July 9, 2024

Page 138

1  traffic, marine traffic.
2        Again, out of all my research, I
3  found nothing that would constitute commerce
4  along the Rio Grande.
5     Q   Would you make a distinction in
6  thinking about different waterborne
7  activities -- is there a principal distinction
8  you would make between kayak tours and whale
9  watching tours?
10        MS. AL-FUHAID:  Objection.
11  Form.
12     A   Repeat the question.
13     Q   In -- in talking about different
14  types of waterborne vessel activity, is there a
15  distinction that you would make -- principal
16  distinction that you would make between a kayak
17  tour of a river and a whale watching tour?
18        MS. AL-FUHAID:  Objection.
19  Form.
20     A   Yeah, there's a distinction.  Kayak
21  tours require little to no water to operate in,
22  and a whale watch boat requires multiple feet
23  of water to operate in.
24        They also operate under Coast
25  Guard -- they're a Coast Guard-inspected

Page 139

1  passenger vessel.
2        I mean, there's multiple
3  differences between kayak tours and a whale
4  watch boat.  Numerous safety requirements all
5  the way down to FCC requirements for radios.
6     Q   Is it your assumption that kayak
7  tours aren't subject to any sorts of regulatory
8  oversight or requirements?
9     A   Other than wearing a life jacket
10  during certain times of years, in this state,
11  not that I'm aware of.
12     Q   And, again, page 5 of your report,
13  under the paragraph enumerated 3 --
14     A   Mm-hmm.
15     Q   -- you have a sentence that says --
16  and you're referring -- "it" meaning the Rio
17  Grande River -- "Its unsuitability for such
18  purposes stems from substantial obstacles,
19  including the need for extensive dredging and
20  the implementation of a complex system of locks
21  to obtain the necessary depth to vessels or
22  barges carrying commercial cargo in sufficient
23  quantities to justify the commercial
24  navigation."
25        Do you see that sentence?

Page 140

1     A   Yes.
2     Q   And this was -- you testified
3  earlier -- I was asking you, you know, what are
4  the options for improving the river's
5  navigability, and I believe you said that
6  dredging or locks and dams would be the -- were
7  the two options; is that right?
8     A   Mm-hmm.  Yes.
9     Q   Okay.
10        And in this case, have you
11  attempted to quantify, like, how extensive, for
12  example, dredging would have to be in order to
13  make that stretch of the Rio Grande a navigable
14  channel?
15     A   I have not quantified it on paper.
16  My experience is it would be very substantial,
17  considering most parts of the Rio Grande River
18  right now have no water in them or very little
19  water, and to dredge to a depth that would
20  support some kind of commerce is uncalculable
21  to me.  But I'm sure it is being -- it, you
22  know, is quantifiable, for sure.
23     Q   Okay.
24     A   But I'm not going to throw a number
25  at it, because I just don't know.

Page 141

1        I know it would be a giant
2  project, considering the smaller projects I've
3  been involved in, and how long and expensive
4  they were to complete.
5     Q   But you've not gone through the
6  exercise in this case of attempting to
7  conceptually identify what would be the scale
8  of the project here, correct?
9     A   Correct.
10     Q   And then you've not attempted to
11  quantify what would be the cost of that project
12  at that scale?
13     A   Correct.
14     Q   Okay.
15        And part of that sentence I
16  read, towards the end, it refers to "sufficient
17  quantities to justify the commercial
18  navigation."
19        I take it you've also not
20  attempted to sort of define a threshold, like
21  what is sufficient to make the project
22  worthwhile?
23     A   If it's not in my report, I haven't
24  quantified it.
25     Q   Okay.

36 (Pages 138 - 141)

Thomas Claranetaro                                          July 9, 2024

Page 142

1        And the next sentence says,
2   "Addressing the nearly 600-foot elevation
3   changes over the 335-mile stretch from Eagle
4   Pass to Laredo, Texas, would require an
5   impractical amount of resources and
6   infrastructure investment."
7        Do you see that?
8   A   I do.
9   Q   And again, I take it you've not
10  attempted to sort of quantify, like, the
11  threshold at which a resource investment would
12  be impractical for a project?
13  A   No.
14  Q   The prior page, page 4, enumerated
15  paragraph 1, there's a sentence there, it says,
16  "The Rio Grande River between mile markers
17  275.5 and 610, and particularly in the Eagle
18  Pass area, does not meet the criteria of a
19  navigable waterway conducive to commercial
20  navigation such that it can operate as a
21  highway of commerce."
22       Do you see that sentence?
23  A   I do.
24  Q   You recall -- I was asking you
25  earlier if -- if a specific water, the

Page 143

1   Annisquam, was a highway of commerce.
2        But I guess more generally, do
3   you consider the term "navigable waterway" to
4   mean the same thing as the term "highway of
5   commerce" such that all navigable waterways are
6   highways of commerce?
7   A   No, they're different.
8   Q   Okay.
9        How are they different?
10  A   A navigable waterway could be, for
11  instance, the Annisquam River or its
12  tributaries that are buoy-marked.
13       You know, they have aids to
14  navigation.  They have charts.  They have US
15  Coast Pilot information or other information or
16  publications that mariners use to determine
17  navigability of a waterway.
18       A highway of commerce is more of
19  a commercial port that has all of those
20  characteristics plus a lot of other
21  infrastructure to support it, and is known for
22  or is being currently used as a waterway of
23  high commerce or high traffic.
24  Q   Okay.
25  A   Such as President Roads in Boston

Page 144

1   Harbor here into Conley Terminal.  That's a
2   much different scenario.  Both navigable
3   waterways but both used for very different
4   purposes.
5   Q   Okay.
6        So some navigable waterways may
7   be at a point in time a highway of commerce,
8   and other navigable waterways may not be a
9   highway of commerce?
10  A   Correct.
11  Q   On page 33, about four lines down,
12  there's a sentence that says, "Over 75 percent
13  of the river" -- referring to the Rio Grande --
14  "remains open and unobstructed, with the
15  deepest portions of the river encompassed
16  within this 75 percent that lacks buoy
17  barriers."
18       Do you see that sentence?
19  A   I do.
20  Q   Earlier when I was asking you about
21  where you observed the barrier placed and how
22  much of the river was on the side, you know,
23  from the barrier to the -- to the deepest part
24  and then to the Mexican side, I think you said
25  that was about two-thirds.

Page 145

1        So if I'm reading -- reading
2   this now and understanding what you testified
3   today, would I be reading this right to --
4   that, you know, over two-thirds of the river
5   remains open and unobstructed?
6   A   Two-thirds, which I believe is 66.66
7   percent to 75 percent.  I gave it a percentage
8   here.  I gave it -- you know, a fraction
9   earlier --
10  Q   Right.
11  A   -- but it's within the ballpark of
12  being correct.
13  Q   I understand.
14       At page 26 of the report,
15  there's a reference about -- well, about a
16  third of the way down, do you see a reference
17  to "Any proposed project of this magnitude
18  would undoubtedly undergo stringent
19  cost-benefit analysis, as mandated by the US
20  Army Corps of Engineers"?
21       Do you see that -- that part of
22  that sentence?
23  A   I do.
24  Q   And then, you've mentioned this
25  earlier.  Just to be clear, are there -- apart

Page 146

1  from your own experience with applications to
2  the Corps, is there anything else that you're
3  relying on to discuss what the Corps of
4  Engineers mandates in connection with projects
5  to improve navigability?
6      A   I understand the -- the means in
7  which the Army Corps funds dredge projects.  So
8  that's also part of my opinion here, is that
9  there is a work plan that is presented from the
10  Corps to Congress to pass for funding for
11  projects that are mostly deep-draft projects,
12  such as Boston Harbor, Baltimore, Tampa, such
13  like that.  Those make it to the Corps work
14  plan.
15          And then there are shallow-draft
16  navigation projects that are supplemental after
17  the fact.  Those are all part of this opinion,
18  coupled with the cost-benefit analysis that
19  would have to be done to try to get a project
20  of this magnitude funded.
21          So I know that that's the
22  process in which the Corps uses, and that's the
23  process in which Congress authorizes funds for
24  these types of projects.
25      Q   Do you know whether there can be any

Page 147

1  circumstances in which there are exceptions to
2  the requirement -- or, as you understand it,
3  for cost-benefit analysis?
4      A   I guess part of it could be public
5  safety.
6      Q   Okay.
7          Could there be other
8  circumstances or --
9      A   Not that I am aware of.
10      Q   And later on the page, do you see a
11  reference to "stringent economic criteria
12  mandated by regulatory authorities and
13  international treaties"?
14          This is still on page 26.
15      A   Mm-hmm.  Yes.
16      Q   There in that sentence, what
17  regulatory authorities are you referring to?
18      A   Department of Environmental
19  Protection, US Army Corps of Engineers.  I
20  can't imagine how many towns or local
21  conservation commissions in Texas the
22  Rio Grande borders that would have a say in
23  this.
24          It's a bordering waterway
25  between two countries, so I'm not sure of the

Page 148

1  regulatory process on the Mexico side of the
2  country, but stuff like that.
3      Q   Okay.
4          And I -- are you an expert in
5  the international -- in international treaties
6  that may apply?
7      A   No, I'm not.
8          MR. LYNK:  Let's go off the
9  record for a minute.
10          (Discussion off the record.)
11          MR. LYNK:  I'll pass the
12  witness.
13          MS. AL-FUHAID:  Okay.
14
15
16
17
18
19
20
21
22
23
24
25

Page 149

1          EXAMINATION
2  BY MS. AL-FUHAID:
3      Q   I have some cross.  Okay.
4          Mr. Ciarametaro, T.J., you
5  testified earlier in response to one of
6  Mr. Lynk's questions that you are a legal
7  expert in maritime laws.
8          Do you recall that?
9      A   I do.
10      Q   You are not a lawyer, correct?
11      A   Correct.
12      Q   When you said that you were a legal
13  expert in maritime laws, what did you mean?
14      A   I mean throughout the course of my
15  training and experience in my jobs, I've become
16  very proficient at those specific parts of the
17  law, such as maritime navigation laws or
18  maritime rules of the road.
19          I'm an expert in that, and those
20  are laws, so I'm -- that's what I meant by
21  that.
22      Q   So would it be more accurate to say
23  that you're a navigation expert rather than a
24  legal expert?
25      A   Yes.  I am not a lawyer.

Thomas Ciarametaro                                              July 9, 2024

Page 150

1    Q   So you also testified that you're not
2  a legal expert on the Rivers and Harbors Act.
3         Do you recall that?
4    A   I do.
5    Q   What did you mean by that?
6    A   So I mean I'm not a lawyer.  Again, I
7  am an expert in the laws pertaining to
8  permitting all these -- all structures, piers,
9  docks, boat ramps, under the Rivers and Harbors
10  Act, but I'm not a legal expert on the
11  document, but I am an expert in the permitting
12  process, which is outlined in this report.
13    Q   And so is it accurate to say that you
14  have offered opinions on that process under the
15  Rivers and Harbors Act but not legal opinions?
16    A   Yes.  Legal opinions are left up to
17  the court.
18    Q   Now, I'd like you to turn to
19  Exhibit 1, page -- let's see -- page 32.
20    A   Okay.
21    Q   And it's the last paragraph under
22  opinion No. 4.  I'd like to direct your
23  attention to that paragraph.
24    A   Okay.
25    Q   Is it your opinion that the buoys do

Page 151

1  not affect the course of the Rio Grande River
2  in such a manner as to impact its navigable
3  capacity?
4    A   Correct.
5    Q   What is the basis for that opinion
6  that the buoys do not affect the course of the
7  Rio Grande River in that manner?
8    A   For all things that we discussed
9  today in this deposition, my personal
10  experience in that area, being on a boat and
11  witnessing that area firsthand, the totality of
12  this entire report gives me that opinion.
13    Q   And is it your opinion that the buoys
14  do not affect the location of the Rio Grande
15  River in a manner as to impact its navigable
16  capacity?
17    A   Yes.
18    Q   What's the basis for that opinion?
19    A   Same as what I just gave for the do
20  not affect the course.
21    Q   And is it your opinion that the buoys
22  do not affect the condition of the Rio Grande
23  River in such a manner as to impact its
24  navigable capacity?
25    A   Yes.

Page 152

1    Q   What is the basis for that opinion?
2    A   Again, all the research and all the
3  photographs and all the documentation inside
4  this report, plus my firsthand eyewitness of
5  the buoy barrier in the Rio Grande gives me --
6  gives me that opinion.
7    Q   Now, earlier you and Mr. Lynk
8  discussed some projects that you have worked on
9  under which you sought Section 10 permits from
10  the US Army Corps of Engineers under the Rivers
11  and Harbors Act.
12         Do you recall discussing that
13  with him?
14    A   Yes, I do.
15    Q   How many years of experience do you
16  have doing the permitting process under the
17  Rivers and Harbors Act -- under Section 10 of
18  the Rivers and Harbors Act?
19    A   Roughly nine.
20    Q   And can you estimate as to how
21  many -- just an estimate, not an exact
22  number -- can you estimate how many projects
23  you have worked on that involve that permitting
24  process?
25    A   I've been involved in that process

Page 153

1  from people -- private people trying to permit
2  those processes -- trying to obtain those
3  permits, or are you looking for myself
4  actively, or all together?
5    Q   All together.
6    A   Hundreds.
7    Q   Have you -- have some of those --
8  have some of those projects been for the
9  placement of -- strike that.
10         Have you been involved in any
11  projects -- set aside whether under Section 10
12  or not, just any projects at all in which you
13  placed buoys in a waterway?
14    A   Yes.
15    Q   Can you give some examples of such
16  projects?
17    A   Gloucester Harbor or Gloucester
18  proper, the municipality has between, like,
19  1400, 15- or 16- -- between 1400 and 1600
20  permitted moorings, mooring balls and mooring
21  buoys that are privately held but permitted
22  through the city and my department.
23         The City of Gloucester has 30
24  transient mooring buoys that we install, take
25  care of, maintain and move periodically.

Page 154

1         We've replaced numerous buoys
2  and boundary buoys for marine events over the
3  years, schooner races, fireworks, no-swim
4  areas, temporarily closed beaches for
5  pollution.
6         Every year we annually put in 30
7  no-wake buoys through all -- throughout
8  navigable waterways of Gloucester and
9  tributaries.
10         No-anchor buoys in certain areas
11 for certain times of year, certain events, such
12 as fireworks, where a barge is going to come
13 in.  We'll put buoys and buoy barriers up
14 around certain areas and coves so boats don't
15 get -- you know, aren't in there while the
16 fireworks are going off.  Hundreds of buoys.
17    Q    Do you recall whether for any of
18 those projects for placing buoys in the -- in a
19 waterway, like you just mentioned, did you seek
20 and obtain a permit from the US Army Corps of
21 Engineers under Section 10?
22    A    No.  No, I did not.
23    Q    Why did you not seek a permit under
24 Section 10 before placing those buoys?
25    A    310 CMR, which is Code of

Page 155

1  Massachusetts Regulations -- I think it's
2  Chapter 9, Waterways -- discusses all of when
3  you would need to further your permitting
4  process along -- up to the DEP or to the Army
5  Corps of Engineers.
6         And mooring buoys are not --
7  are -- are held and issued by the local
8  authority.  So the local authority in that case
9  was me, the harbormaster.
10         So if you are looking for a
11 mooring permit to put in a mooring ball or
12 buoy, you get on a local list, and the issuing
13 authority is the municipality.  It's not the
14 Army Corps of Engineers.
15    Q    When determining whether something
16 that you -- a project that was going to result
17 in something being placed -- some object being
18 placed in a waterway, how did you determine
19 whether to seek a permit from US Army Corps of
20 Engineers?
21    A    It's outlined in 310 CMR Chapter 9 on
22 when you need to seek those types of permits.
23 General rule of thumb is a permanent structure
24 that is below the mean high-water mark.  So the
25 average high-water mark for the year or the

Page 156

1  average high tide mark, any structure that is
2  permanently placed and is below that, you need
3  to get a -- in this state, it's called a
4  Chapter 91 permit, which is a DEP and a Corps
5  permit.
6         Those are, again, permanent
7  structures.  They have not-permanent
8  structures, such as Section 10A of Chapter 91,
9  which is a temporary float permit or a dock
10 permit where the infrastructure is removable
11 and nothing is permanent below the high-water
12 mark, you do not need to seek a Corps permit
13 for.
14    Q    So is it accurate to say -- well, do
15 you consider the buoys -- buoys to be a
16 structure needing a permit?
17    A    No, I do not.
18    Q    Why is that?  What is the basis for
19 your opinion?
20    A    For all reasons I just explained, to
21 include that they are not structures, they are
22 mooring balls, they're buoys.  And the law does
23 not require you to permit and get a federal
24 court order for, you know, temporary placement
25 of buoys or moorings that are not permanent.

Page 157

1    Q    Is that understanding of the law, is
2  that based on your training, education and
3  experience?
4    A    Yes.
5    Q    Is it your opinion that the buoys you
6  observed in the Rio Grande River, the buoys
7  that Texas placed, are they similar to the
8  buoys that you have placed that did not need
9  permits?
10    A    Buoys are -- they're similar in
11 material.  The sizes vary.  But a buoy is a
12 buoy is a buoy, you know.  They come in all
13 different shapes or sizes.
14    Q    Now, you -- I would like to direct
15 you back to that paragraph on page 32 that
16 begins with the first sentence, "Finally, the
17 buoys are not other structures under the RHA."
18    A    I see it.
19    Q    Now, I would like you to read that
20 paragraph.
21    A    The entirety?
22    Q    Well, I mean, you can -- you can read
23 it to yourself.
24         And I want to ask you, you had
25 testified earlier in response to one of

Thomas Ciarametaro                                          July 9, 2024

Page 158

1  Mr. Lynk's questions that that entire paragraph
2  was provided to you by counsel for Texas.
3          Was that entire paragraph, in
4  fact, provided to you, or does it contain any
5  of your own separate conclusions?
6      A   Well, the top couple sentences are my
7  conclusion, and the bottom one, two, three
8  sentences are mine.
9          The -- what I was referring to
10  is the actual -- I guess it would be the center
11  of the paragraph where it pertains to the
12  actual definition under United States v. Hall:
13  "Structures may" -- "must affect," the actual
14  definition.  But, "The buoys do not affect the
15  course, location, or condition of the
16  Rio Grande River in such a manner as to impact
17  its navigable capacity, for all reasons
18  discussed elsewhere in this report; therefore,
19  the buoys are not structures," that belongs to
20  me.  That is my work and my opinion.
21          And the top, "Finally, the buoys
22  are not structures under the RHA.  'Structures'
23  means 'any pier, boat dock, boat ramp, wharf,
24  dolphin, weir, boom, breakwater, bulkhead,
25  revetment, riprap, jetty, artificial island,

Page 159

1  reef, permanent structure, power or
2  transmission lines, permanently moored floating
3  vessel, pilings,'" that's my work as well.
4      Q   Well, let me ask you about that.
5      A   Well, not the --
6          Not quite that far.  No, I
7  believe that is -- I believe that -- I believe
8  that I wrote the top part of this.  I can't
9  remember specifically.
10          I think I may have changed a few
11  things in here, but definitely the bottom.
12      Q   Okay.
13      A   I don't recall how far down I went
14  with this definition, but I know that --
15      Q   Did you -- I'm sorry.  I didn't mean
16  to cut you off.
17      A   No, go for it.  I'm just trying to
18  think back now.
19      Q   The second sentence, the second
20  sentence of the paragraph --
21      A   Mm-hmm.
22      Q   -- where it says -- the first word of
23  that sentence, "structures"?
24      A   Correct.
25      Q   Is that from the regulatory

Page 160

1  definition or is that your own definition?  Or
2  was that -- was that supplied to you?
3      A   I know that I added some to this
4  definition.  I'm not sure, I'm not exactly sure
5  where I stopped and started here.
6          (The deponent read the
7  document.)
8      A   "The buoys are..." that is mine.  So
9  I believe the definition starts at
10  "structures," that was provided to me, now
11  reading through this entire thing here.
12      Q   Okay.
13      A   So the first sentence and the last
14  three.
15      Q   The last three lines or the last --
16      A   The last three lines, yes.
17          (Simultaneous speech.)
18          (Reporter interrupted.)
19      A   Sorry about that.
20          I'm trying to just think back
21  because I know I changed stuff in this opinion
22  a couple times, so I'm just trying to make sure
23  I'm going on the record with the right thing
24  here.
25          Yeah, "Finally, the buoys are

Page 161

1  not other structures under the RHA."  That's
2  me.
3          "Structure" starts the
4  definition.  And then the last three sentences,
5  where "The buoys do not affect the course,
6  location," that's where I come back in as well.
7      Q   Okay.
8      A   I had changed some of these opinions
9  a few times, so I was just trying to think
10  back, make sure that I'm back -- I'm speaking
11  accurately here.
12      Q   Okay.
13          Now, I'd like to direct your
14  attention to page 19 of your report --
15      A   Mm-hmm.  Okay.
16      Q   -- to Figure 15.
17      A   Yup.
18      Q   Now, you testified earlier in
19  response to one of Mr. Lynk's questions that
20  you took this picture on the day of your site
21  visit to Eagle Pass; is that correct?
22      A   Yes.
23      Q   And you also testified earlier that
24  in this spot, you believe that it would be
25  possible to climb over the buoys.

41 (Pages 158 - 161)

Thomas Ciarametaro                                                July 9, 2024

Page 162

1          Do you recall saying that?
2     A    I do.
3     Q    Why do you believe that?
4     A    This is towards the end of the buoys
5    where -- I believe it would be the north side,
6    and they're aground here because the water
7    level is quite low.  Or they appear to be
8    aground.
9     Q    Did you try to climb over them?
10    A    I did not.
11    Q    Did you observe anybody climbing over
12    them during the time that you visited the site?
13    A    I did not.
14    Q    When you -- when you were in Eagle
15    Pass on your site visit, did you -- did you
16    touch the buoys?
17    A    The ones on land, I did.
18    Q    So you did touch them?
19    A    Mm-hmm.  Yes.
20    Q    Did you touch the ones that are --
21    that are in the water?
22    A    No.
23    Q    Do you believe it would be possible
24    for you to have climbed over, or for a person
25    to have climbed over the buoys that are resting

Page 163

1    or floating in the water?
2     A    The ones that are floating?  No.
3     Q    Why do you believe that would not be
4    possible?
5     A    They're quite large.  And from a
6    swimming position, they spin, so there's no --
7    nothing to grip onto.  There's no handles.
8    There's nothing.
9          I'm not sure how it would be
10    possible to go from a swimming position and
11    climb over those, since they do rotate.
12    Q    Do you believe a person could walk up
13    to them and climb over them in the water?
14    A    I'm not sure.  Probably -- they would
15    be difficult to get over from the -- from the
16    water.
17    Q    Did the buoys that you touched which
18    were on land, did they spin when you touched
19    them?
20    A    They did.
21    Q    Why do you believe it would be
22    possible to climb over the ones that are on
23    land and not the ones over in the water, given
24    that they both spin?
25    A    It would just be easier by nature to

Page 164

1    try to get over an obstacle when you were
2    standing vice swimming.
3     Q    But you did not observe anyone doing
4    that?
5     A    I did not.
6     Q    Or attempting to do that?
7     A    I did not.
8          And, again, this is the first --
9    this is like the top string where the buoys
10    start, and then the rest of them that go south
11    are -- are in deeper water.  This is like a
12    little shoal area here.
13    Q    Now, Mr. Lynk asked you earlier about
14    the possibility of the buoys damaging a vessel
15    that was trying to navigate from bank to bank
16    across the river.
17          Do you recall him asking you
18    about that?
19    A    I do.
20    Q    And I believe you testified -- I'm
21    not quoting you directly, but you testified
22    something to the effect that you believed that
23    the buoys could damage a vessel if a vessel
24    collided with it.
25          Do you recall saying that?

Page 165

1     A    I do.
2     Q    Why do you believe that?
3     A    So if you T-boned these with any -- I
4    mean, they're a structure that are there.
5    Anything that is not water could potentially
6    damage a vessel.
7          You'd have to run, you know,
8    horizontal to the river from one side to the
9    other to hit them head-on.  That's -- that's my
10    answer.
11    Q    Now, when you -- when you
12    navigated -- when you went on your -- went on
13    your airboat up to the buoys --
14    A    Mm-hmm.
15    Q    -- were you piloting that boat?
16    A    I was not.
17    Q    Was a DPS officer piloting the boat?
18    A    He was.
19    Q    Were you able to safely navigate
20    around the string of buoys?
21    A    Numerous times.
22    Q    On any of the times that you went
23    around the buoys, did the boat collide with
24    either the buoys or with the anchoring blocks?
25    A    It did not.

42 (Pages 162 - 165)

Thomas Ciarametaro                                                July 9, 2024

Page 166

1    Q   Now, when you mentioned earlier that
2  if the buoys would -- you mentioned if someone
3  T-boned them, do you -- that could cause damage
4  to a vessel.  Is that -- would that situation
5  occur if a vessel drove directly into the
6  anchoring block or to the buoys?
7    A   Correct.
8        And you obvious -- you'd have to
9  have some headway on.  You'd have to have some
10 speed to really cause damage.
11   Q   What about navigation up and down --
12 up or down the river?
13       If a boat was traveling on the
14 river, do you believe that the buoys are a
15 hazard to navigation in that situation?
16   A   I do not.
17   Q   Did you -- when you visited the site
18 of the buoys in Eagle Pass, did you observe any
19 vessel collide with the buoys?
20   A   I did not.
21   Q   Did you observe any vessel colliding
22 with the anchoring blocks?
23   A   I did not.
24   Q   Did the DPS officers who escorted you
25 mention anything to you about observing

Page 167

1  collisions with the buoys?
2    A   They did not.
3    Q   Were the -- were the buoys easily
4  visible to you?
5    A   Yes.
6    Q   How far away were you when you first
7  observed them, approximately?
8    A   Maybe 5 to 600 -- 500 yards, maybe.
9  400 yards, 400 yards-ish.
10       You could see them from quite a
11 ways away, bright orange and four feet tall.
12   Q   Do you believe it's possible for
13 vessels to safely travel around the buoys?
14   A   Yes.
15   Q   Now, you -- you discussed earlier
16 with Mr. Lynk about your -- your role as
17 harbormaster with the city -- with the City of
18 Gloucester, and you mentioned something to him
19 about your expertise in the permitting process.
20       Now, I think you said that
21 you're a legal expert in that process.  Do you
22 recall saying that to him?
23   A   Yes.
24   Q   What did you mean by that?
25   A   I mean as an agent of the municipal

Page 168

1  government, I was an expert in advising that
2  process, not as a -- again, not as a lawyer --
3  I'm not an attorney -- but as an agent of the
4  government and who is named by statute to be a
5  regulatory authority in that process, I am an
6  expert in it.
7    Q   So you were a regulator that was part
8  of this process?  Is that what you're saying?
9    A   Correct.  And an advisor, certain
10 roles, for, you know, residents, to advise on
11 how to obtain certain permits.
12   Q   But you didn't act as the city's
13 lawyer in this process, correct?
14   A   No.
15   Q   And you didn't tell them they should
16 seek legal advice from you; is that correct?
17   A   No.  We do do regulatory authority
18 and have the ability to -- let's say you
19 installed something that wasn't permitted.  We
20 have the ability to fine you.
21       My department has the ability to
22 charge you with criminal process if the fines
23 go unpaid.
24       So it's a little bit of both.
25 You kind of advise, but you're also a

Page 169

1  regulatory authority to -- to enact or enforce.
2    Q   But if you had legal questions, would
3  you consult the appropriate attorneys for the
4  city?
5    A   Yeah, or the state or -- yes,
6  absolutely.
7    Q   And you would not suggest to city
8  officials that they consult you about legal
9  issues, correct?
10   A   No.  I have -- no.
11       MS. AL-FUHAID:  I have no
12 further questions.
13       MR. LYNK:  Some cross.
14
15       FURTHER EXAMINATION
16 BY MR. LYNK:
17   Q   You were testifying about an
18 opinion -- well, first, let me ask you, just to
19 make it really clear, you've been testifying
20 about a paragraph on page 32.  And originally
21 in your testimony you described it as a
22 paragraph consisting of a definition received,
23 but you were explaining subsequently that there
24 could be aspects of this that were from you and
25 aspects that were received definition.

43 (Pages 166 - 169)

Thomas Ciarametaro                                                July 9, 2024

Page 170

1        Do you recall the testimony?
2      A  I do.
3      Q  Might it be accurate that the first
4  sentence of this paragraph, which says,
5  "Finally, the buoys are not other structures
6  under the RHA," and the concluding sentence,
7  "The buoys do not affect the course, location,"
8  and it goes on to finish that sentence, do I
9  take it that those were yours?
10     A  That's correct.
11     Q  And then the remainder of this
12  paragraph has -- refers to a couple of
13  regulatory provisions and gives a quote or at
14  least description of content of those, and it
15  includes also a citation to a statute and a
16  case citation; is that right?
17     A  Correct.
18     Q  Would you say that that content would
19  be the received definition portion, or are you
20  saying some of that also was yours?
21     A  No, that is -- that is the definition
22  portion.  You are correct in your statement.
23     Q  Okay.
24     A  I got a little confused earlier,
25  because I had changed some stuff here, and --

Page 171

1  but looking back and reading it thoroughly
2  again, that's a correct statement.
3      Q  Understood.  Glad to clear it up.
4          And in the second sentence of
5  the paragraph, in the received definition, it
6  appears to be quoting a regulatory definition
7  of "structures," right?
8      A  Correct.
9      Q  And it gives a long list of things.
10  It includes -- one of the things included in
11  the list is "aid to navigation."
12         Do you see that?
13     A  Correct.
14     Q  Is it your understanding that aids to
15  navigation -- buoys can be aids to navigation?
16     A  Buoys are -- can be, yes, absolutely.
17     Q  Okay.
18         So is it fair to say there may
19  be circumstances where a buoy would be covered
20  by this regulatory definition?
21     A  Yes.  Per- -- my understanding is
22  it's permanently affixed aids to navigation
23  that never move.
24     Q  The last sentence, you were
25  testifying about earlier that the buoys -- in

Page 172

1  part, it says, "do not affect the course of the
2  Rio Grande River."
3         Do you see that?
4      A  I do.
5      Q  And you explained generally what
6  that's based on.
7      A  (Nods.)
8      Q  But I wondered, in determining that
9  the buoys do not affect the course of the
10  Rio Grande River, did you attempt to take into
11  account any information that would look at, you
12  know, what are the circumstances as of when
13  they were first placed versus what are the
14  circumstances now?
15     A  No.  This is based on my
16  accountability of what I saw now and where they
17  are now.
18     Q  And did -- do you have an
19  understanding of roughly when they were first
20  placed into the Rio Grande?
21     A  I believe it's been just over a year.
22  I think it was June of 2023, I think.  I -- if
23  my memory serves me correctly.
24     Q  Okay.
25         Roughly a year ago from today?

Page 173

1      A  Mm-hmm.
2      Q  And so if I understand your previous
3  answer, you did not attempt to develop
4  information that would look at, okay, you know,
5  this was the conditions of the river very
6  locally to this placement in June-July of 2023,
7  and then we're going to compare that to what
8  it's like in June or July of 2024?
9      A  I've seen photographs of where they
10  were before on the Internet.  I have not seen a
11  firsthand account, but they're still placed in
12  the same geographic location.
13         They're just moved, which would
14  be to the east, X amount of feet.
15     Q  Have you attempted to look at whether
16  there have been any localized changes in
17  current, for example, within the close vicinity
18  of where the buoys were placed during this past
19  year?
20     A  If it's not in my report, I didn't
21  have an opinion on it.
22     Q  Okay.
23         And when you talk about the
24  "course," what is the course of the Rio Grande?
25  What does that mean?

44 (Pages 170 - 173)

Page 174

1    A    The direction of water flow.
2    Q    Direction of water flow.
3    A    (Nods.)
4    Q    Okay.
5         So this is -- so this opinion
6    is -- generally, it's based on your
7    point-in-time observation when you made your
8    site visit in June of 2024?
9    A    Correct.  And subsequent videos of
10   the Rio Grande and so on.
11   Q    Okay.
12        So subsequent -- videos taken
13   subsequently to the date of your site visit?
14   A    Yes.
15   Q    But not videos taken during the
16   period prior to that?
17   A    I don't believe so.
18   Q    Okay.
19        And the same would be true in
20   terms of what you looked at regarding
21   condition?  It would be the day of your site
22   visit and videos subsequent but not information
23   prior?
24   A    No, I -- there's information prior
25   from -- in the report.  I think it's on page --

Page 175

1         Quite a bit of information on
2    the prior, actually.  Just let me find it here.
3         (Pause.)
4    A    There's information here on page 11
5    of Exhibit 1 from 2001, first time in recorded
6    history, the Rio Grande was too weak to flow.
7         And I also have information
8    about an excursion here.  In 2014, journalists
9    tried to traverse the entirety of the
10   Rio Grande River and were unable to due to the
11   lack of water in the Rio Grande.
12        It's called -- page 12.
13   Figure 4 has a photo of a man walking a canoe
14   down the river because it was too shallow to
15   even canoe in certain parts.
16        So there's quite a bit of
17   information historically about the flow and the
18   depths of the Rio Grande in this report.
19   Q    Those references are from prior to
20   the first placement of this buoy barrier,
21   right?
22   A    Correct.
23   Q    Okay.
24        So -- so to -- so it would be
25   accurate to say that in looking at the buoys

Page 176

1    not having affected condition, you had earlier
2    information -- historic information, as you
3    called it, and information about the condition
4    at the time of the site visit, and video
5    information afterward, but not information
6    during the period from roughly June 2023 up
7    until before the site visit?
8    A    Correct.
9    Q    Can buoys cause very localized
10   eddies, for example, in the water?
11   A    They can.
12   Q    Can they cause localized changes in
13   direction of flow?
14   A    In -- changes in direction of flow?
15   Q    Yes.
16   A    No, in a river, no.
17   Q    Eddies, yes.  Not changes in flow.
18   All right.
19        And is that -- is that -- would
20   that be an example of something that you looked
21   at specifically in determining that the buoys
22   didn't affect the course or condition?
23   A    Yes.
24   Q    Okay.
25        And again, you would have looked

Page 177

1    at that during your site visit, you would have
2    looked at the video that was taken afterward,
3    not evidence taken during the period from
4    June 2023 up until the site visit?
5    A    I believe that's correct.
6    Q    You mentioned that you -- you
7    testified about the number of permit
8    applications you had been involved with and
9    whether any were for buoys.
10        Have you ever been involved with
11   something that resembles this buoy barrier,
12   like a thousand-foot connected string of buoys?
13   A    Nothing quite that long.
14   Q    Okay.
15        Have you ever applied for a
16   permit for any type of structure of that size?
17   A    No.  Of buoys?  No.
18   Q    Okay.
19        Any type of structure that size?
20   A    Not quite a thousand feet.  Probably
21   200 -- 2- to 300-foot pier, pile-supported pier
22   with a docking gangway attached.
23   Q    Okay.
24        Have you -- for any of the buoys
25   that you placed, were they moored with concrete

45 (Pages 174 - 177)

Page 178

1  blocks?
2     A   Yes.
3     Q   Okay.
4         (Pause.)
5     Q   You mentioned having -- earlier you
6  testified about pilings, the use of pilings,
7  like, for piers, for example?
8     A   (Nods.)
9     Q   Once those have been installed, is it
10  possible to remove them?
11    A   It is possible.
12    Q   Okay.
13        So when you say -- when you
14  refer to something as "permanent," you're not
15  saying that "permanent" means it could never
16  then be removed?
17    A   Anything can be removed with a big
18  enough piece of equipment.  I go off of whether
19  it needs to be permitted as permanent.
20        So when I say pilings are
21  driven, those are -- those are defined by the
22  Corps and by waterways regulations as
23  permanent, a permanent structure, not easily
24  removable, doesn't take a lot to disassemble,
25  so on and so forth.

Page 179

1         So that's how the law is in the
2  permitting process.  Piling is a permanent
3  structure and needs to be permitted as such.
4         MR. LYNK:  All right.  I'll pass
5  the witness.
6         MS. AL-FUHAID:  Nothing further.
7         MR. LYNK:  All right.
8         (Discussion off the record.)
9         MR. LYNK:  I do want an
10  expedited transcript.
11        MS. AL-FUHAID:  I would also
12  like an expedited transcript.
13        (Discussion off the record.)
14        MR. LYNK:  Let's get the rough.
15  What the heck.
16        MS. AL-FUHAID:  I want the
17  rough, too.
18        (Whereupon, the proceedings
19  adjourned at 2:36 p.m.)
20
21
22
23
24
25

Page 180

1              C E R T I F I C A T E
2         I, Jill K. Ruggieri, Registered Merit
3  Reporter and Certified Realtime Reporter, do certify
4  that the deposition of THOMAS CIARAMETARO, in
5  the above-captioned matter, on July 9, 2024, was
6  recorded by me; that the witness provided
7  satisfactory evidence of identification, as
8  prescribed by Executive Order 455 (03-13) issued by
9  the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
11  the Commonwealth of Massachusetts; that the
12  transcript produced by me is a true record and
13  accurate record of the proceedings to the best of my
14  ability; that I am neither counsel for, related to,
15  nor employed by any of the parties to the above
16  action; and further that I am not a relative or
17  employee of any attorney or counsel employed by the
18  parties thereto, nor financially or otherwise
19  intere                              action.
20
21
22         Jill K. Ruggieri, RPR, RMR, FCRR, CRR
23
24  Transcript review was requested of the reporter.
25

Page 181

1  WITNESS:  THOMAS CIARAMETARO
2
3         SIGNATURE PAGE/ERRATA SHEET
4
5  PAGE  LINE  CHANGE OR CORRECTION AND REASON
6  ___  ___  _____
7  ___  ___  _____
8  ___  ___  _____
9  ___  ___  _____
10 ___  ___  _____
11 ___  ___  _____
12 ___  ___  _____
13 ___  ___  _____
14 ___  ___  _____
15 ___  ___  _____
16 ___  ___  _____
17 ___  ___  _____
18 ___  ___  _____
19 ___  ___  _____
20 ___  ___  _____
21 ___  ___  _____
22 ___  ___  _____
23 ___  ___  _____
24 ___  ___  _____
25 ___  ___  _____

Page 182

```
                         182
 1  ____  ____  _____
 2  ____  ____  _____
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
```

24  I have read the transcript of my deposition taken
on July 9, 2024.  Except for any
25  corrections or changes noted above, I hereby
Job No. CS6783958

Page 184

1  Munera Al-Fuhaid, AAG
2  munera.al-fuhaid@oag.texas.gov
3          July 12, 2024
4  RE:   United States Of America v. The State Of Texas
5      7/9/2024, Thomas Ciarametaro (#6783958)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 183

subscribe to the transcript as an accurate record
                         183
1  of the statements made by me.
2  Signed under the pains and penalties of perjury.
   Deponent: _____ ___/___/2024
3      THOMAS CIARAMETARO
   On this ___ day of _____, 202__, before me,
4  the undersigned notary public, personally appeared
   THOMAS CIARAMETARO, who presented satisfactory
5  evidence of identification, to wit,
   _____ , and signed this document in my
6  presence.
7  _____
   Notary Public in and for _____
8  My commission expires _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Job No. CS6783958

[00853 - 500]

Page 1

**0**

**00853** 1:6 7:5
**02210** 1:18
**03-13** 180:8

**1**

**1** 1:17 3:11 4:3
5:11 13:13
14:9,10 59:7,9
81:3 95:10
104:3 110:20
111:3 120:18
134:1,2 142:15
150:19 175:5
**1,000** 85:19
**10** 42:5 43:13
50:17 85:20
124:21 152:9
152:17 153:11
154:21,24
**100** 14:24 18:3
83:25 84:1
99:23
**10:00** 46:20
**10a** 156:8
**11** 17:7 23:11
175:4
**110** 25:6
**12** 175:12
184:3
**122-5** 7:6
**14** 7:6 68:5
69:20 78:17
80:14 98:9
**1400** 153:19,19
**14726** 180:21
**148** 3:7

**14th** 6:5
**15** 118:24
134:1 153:19
161:16
**150** 86:8,25
**15th** 2:16
**16** 17:6 21:12
21:13 94:1
153:19
**1600** 153:19
**168** 3:6
**17** 62:15 82:16
94:1 134:2
**18** 21:21 34:9
59:9,22 66:15
70:9 71:2
81:13,14 84:3
87:15,17
**182** 182:1
**183** 183:1
**19** 81:24
118:23 161:14
**1:23** 1:6 7:5

**2**

**2** 3:12 4:5 6:18
8:2,6 25:9
32:11 71:16,22
110:19 111:12
111:20 177:21
**20** 20:7,9 40:13
51:12 81:3,9
81:24 83:24
104:25
**200** 26:14 86:8
177:21
**2001** 175:5

**20044-7611** 2:8
**2007** 24:2
**2008** 24:16
**2011** 25:13
**2014** 175:8
**2016** 42:23
**2017** 34:9
**202** 183:3
**202.514.6187**
2:9
**2023** 98:9,14
172:22 173:6
176:6 177:4
**2024** 1:14 7:6
13:25 14:15
173:8 174:8
180:5 182:24
183:2 184:3
**21** 98:14
**21st** 99:15
**24** 42:23
110:20 111:21
**25** 77:25 83:24
84:3
**250** 86:4
**26** 104:3,4
111:22 145:14
147:14
**275.5** 133:3,14
133:20 142:17
**28** 104:5
**2:36** 179:19

**3**

**3** 51:6 103:25
111:16 139:13
**3.3** 51:6

**30** 87:15
118:11 153:23
154:6 184:16
**300** 2:16 84:18
86:25 177:21
**310** 154:25
155:21
**32** 70:11 71:4
94:22 127:22
150:19 157:15
169:20
**33** 144:11
**335** 111:10
115:3 142:3
**35** 85:9 87:12
**36** 6:25
**38** 85:11
**39** 8:7 71:17,20

**4**

**4** 3:6,11,12
142:14 150:22
175:13
**400** 167:9,9
**42** 5:18 6:25,25
8:7 71:17,22
**455** 180:8

**5**

**5** 111:3,15
131:14,15
132:24 139:12
167:8
**50** 20:1,1,2,7,9
21:10,13 22:2
22:7 40:12
84:22 118:11
**500** 167:8

**512.463.2100**
  2:18

**6**

**600**  37:21
  111:9 142:2
  167:8
**610**  133:3,15
  133:20 142:17
**65**  30:2,9
**66.66**  145:6
**6783958**  184:5

**7**

**7**  97:17 98:4
**7/9/2024**  184:5
**75**  92:15
  144:12,16
  145:7
**7611**  2:7
**78701**  2:17
**7th**  65:5,9
  133:7

**8**

**8**  97:24 120:18
  120:19 121:25
  126:13
**80**  13:15 15:16
**800**  37:21
  85:19

**9**

**9**  1:14 59:7,11
  70:9 71:2
  121:23 122:1
  155:2,21 180:5
  182:24
**90**  13:15 15:16

**90b**  57:3 74:14
**91**  124:23
  156:4,8
**9200**  1:17
**98**  9:18
**9:22**  1:14

**a**

**a.m.**  1:14
**aag**  2:15 184:1
**abbott**  1:7 5:8
**ability**  12:16
  93:10 95:12
  110:5 168:18
  168:20,21
  180:14
**able**  12:20
  20:11 21:7
  29:10 42:3
  51:4 52:15
  53:16 55:20
  62:7,12 67:3
  83:15 84:14
  93:14 96:15
  165:19
**above**  83:12
  180:5,15
  182:25 184:6
**absence**  134:14
  137:20
**absolutely**
  169:6 171:16
**accepted**  58:15
**accompanying**
  67:18
**account**  105:16
  117:19 172:11
  173:11

**accountability**
  172:16
**accuracy**  184:9
**accurate**  5:23
  7:7,13 114:6
  122:9 149:22
  150:13 156:14
  170:3 175:25
  180:13 183:1
**accurately**
  12:17,20
  161:11
**acknowledg...**
  184:12
**acquired**  72:11
**acquiring**
  73:15
**act**  42:10 43:13
  57:11,15,22
  103:15 123:25
  124:3,7,10,16
  125:3 150:2,10
  150:15 152:11
  152:17,18
  168:12
**action**  180:16
  180:19
**active**  17:7
  23:11,16 98:24
**actively**  153:4
**activities**  18:16
  138:7
**activity**  22:4,8
  22:13,25 53:8
  53:10,13 54:16
  74:22,25 75:1
  75:4 99:21
  135:19,24

**138:14
actual**  35:14
  44:4 51:1 56:9
  56:18 86:24
  89:8 97:8
  158:10,12,13
**actuality**  89:24
**actually**  10:16
  15:6 19:12
  27:7 29:10
  58:25 68:3
  76:9 85:11
  86:14 94:2
  119:21 175:2
**add**  7:22 91:1
  137:19
**added**  160:3
**additional**  6:8
**addressing**
  142:2
**adjourned**
  179:19
**adopt**  41:14
**adrian**  109:8
**advice**  124:24
  125:1,4 168:16
**advise**  126:1,7
  168:10,25
**advising**  168:1
**advisor**  168:9
**affect**  12:13,16
  151:1,6,14,20
  151:22 158:13
  158:14 161:5
  170:7 172:1,9
  176:22
**affected**  176:1

**affix** 130:23
**affixed** 130:6
  171:22
**afterward** 9:3
  176:5 177:2
**agencies** 37:1
**agency** 36:23
  37:1
**agent** 167:25
  168:3
**ago** 64:3 105:1
  172:25
**agree** 123:13
  127:2
**agreed** 58:6
**aground** 29:11
  93:1 162:6,8
**ahead** 38:24
  68:23 120:1
**aid** 38:13,19
  171:11
**aids** 29:3 37:16
  37:17,18 38:4
  38:9,9 102:18
  143:13 171:14
  171:15,22
**airboat** 67:17
  93:19,20
  165:13
**ais** 29:25 30:6
  30:22 137:25
**al** 2:12,15 3:7
  5:13 23:1
  54:13 55:23
  76:22 91:5
  92:20 120:3
  135:20 137:14
  138:10,18

148:13 149:2
169:11 179:6
179:11,16
184:1
**align** 113:16,19
**allotted** 184:19
**allowed** 75:13
**altogether**
  128:13
**america** 1:4
  2:12 184:4
**amount** 114:13
  115:17 142:5
  173:14
**analysis** 31:25
  32:6 45:15
  61:7,20 63:3,5
  63:8 112:6,8
  127:6 136:17
  136:24 145:19
  146:18 147:3
**anchor** 154:10
**anchoring**
  165:24 166:6
  166:22
**ancil** 106:7,16
  106:17 108:6
  112:3
**anecdotal**
  104:19
**annisquam**
  20:24,25 21:9
  21:16 22:1
  34:5 37:10
  38:8 39:16
  48:20 50:1,4
  51:7 53:25
  54:8,11 61:15

62:13 84:25
89:7 129:22
143:1,11
**annually** 154:6
**answer** 11:17
  11:17 12:1,2,6
  38:25 41:11
  165:10 173:3
**anticipate**
  123:8
**anticipating**
  96:4
**anybody** 58:2
  105:21 110:1
  162:11
**anymore** 85:22
**anyway** 120:7
**anyways** 91:13
**apart** 128:12
  134:14 145:25
**apparatus**
  131:5
**appear** 162:7
**appearances**
  2:1
**appeared** 81:6
  183:4
**appears** 5:25
  7:1,10 9:3
  96:12 171:6
**appellate** 106:9
**applicability**
  74:7
**applicable** 74:9
  184:8
**application**
  44:16 125:1,5
  125:15 136:10

**applications**
  43:20 44:8,12
  45:22 46:13,14
  61:9 124:21,25
  146:1 177:8
**applied** 44:18
  72:1 177:15
**applies** 120:23
  123:20
**apply** 76:15
  87:4 118:1
  124:2 125:19
  126:22 148:6
**applying** 42:19
  42:20 44:19
**approach**
  41:14
**approaches**
  116:3,10
**appropriate**
  169:3
**approvable**
  125:2
**approval** 63:1
  137:7
**approve** 35:11
  36:7 63:20
**approved**
  35:19 37:7
  136:16
**approximately**
  167:7
**april** 13:25
  14:15,24,25
**area** 29:10 39:2
  48:22 56:3
  61:22 64:4,4,7
  65:1,9,20,23

89:3 93:9
96:13,24 97:1
97:12,13,14,21
98:23,24
101:19 102:2
104:21 119:6
130:4,13 133:4
142:18 151:10
151:11 164:12
**areas** 51:11
69:9,9 75:9,11
75:12,16 86:4
89:2 92:24
112:4 124:1
154:4,10,14
**army** 34:20
36:3,6,15
43:20 54:18,25
61:5,23 63:6
63:11 88:3,14
88:18 125:21
145:20 146:7
147:19 152:10
154:20 155:4
155:14,19
**article** 97:20
**articles** 97:10
99:6,19 100:1
100:4,10
119:17
**artificial**
158:25
**ascertain** 104:9
**aside** 108:25
153:11
**asked** 16:17
58:6 67:25
68:14,17 69:25

70:3 90:3
94:12 116:22
164:13
**asking** 11:9
37:12 117:4
140:3 142:24
144:20 164:17
**aspect** 31:11
74:4
**aspects** 75:23
100:5 169:24
169:25
**assess** 30:17
**assigned** 30:13
**assignment**
15:6 101:8,14
**assisted** 15:22
46:15
**associate** 72:1
**associated**
115:14 124:21
**assume** 29:18
67:13 75:19
95:23 97:3
103:5 105:15
113:5 116:5
134:11
**assuming** 97:6
**assumption**
117:8 132:11
139:6
**assumptions**
58:5 108:18
132:3
**assure** 118:18
**attached** 44:4
45:24 46:10
91:19 177:22

184:11
**attempt** 172:10
173:3
**attempted**
105:15 140:11
141:10,20
142:10 173:15
**attempting**
141:6 164:6
**attend** 65:12
**attended** 65:16
**attention**
150:23 161:14
**attorney** 2:14
11:21 12:25
13:3 168:3
180:17 184:13
**attorneys**
101:3 169:3
**attorney's** 1:15
**attribute** 105:3
**attributed**
105:6
**ausa** 2:6
**austin** 1:2 2:17
**author** 100:20
106:13
**authored**
100:23
**authorities**
147:12,17
**authority**
155:8,8,13
168:5,17 169:1
**authorized**
50:21,23 51:16
52:2,6,10,16
87:17

**authorizes**
146:23
**authors** 107:1
107:5
**automatic** 30:8
**available** 184:6
**avenues** 126:3
**average** 50:19
68:15,15
155:25 156:1
**aware** 41:18
47:22 49:9
105:21,24
115:8,11
139:11 147:9
**awareness** 48:1
49:3

**b**

**b** 3:9
**bachelor** 72:11
72:17
**bachelor's**
73:16
**back** 13:18
38:16 43:25
50:21 90:13
121:5 123:4
157:15 159:18
160:20 161:6
161:10,10
171:1
**background**
57:18,20,23
**ball** 155:11
**ballpark**
145:11

**balls** 18:18
128:6 153:20
156:22
**baltimore**
146:12
**bank** 77:3,3,9
77:10 80:9
93:22 95:8
164:15,15
**banking** 68:21
**barge** 22:7
53:20,21
154:12
**barges** 22:3
53:11,15,19
55:15 111:5
139:22
**barrier** 16:19
64:16,19 66:1
66:4 67:8 76:8
76:13,20,24
77:4,7,9 78:22
79:11 80:1,15
80:19,22,25
81:7,24 82:18
82:20 83:2,21
84:1 90:18
91:10,12,16,20
92:8,14,24,24
92:25 93:7,21
94:5 95:19
99:9,24 101:10
101:17 102:23
103:4,16
104:12,15,21
105:4,9,18
118:25 119:5
119:17,19

131:23 132:1
133:12 144:21
144:23 152:5
175:20 177:11
**barriers** 95:4,7
95:8,11 96:7
96:17 97:19
98:6 144:17
154:13
**based** 123:14
132:10 157:2
172:6,15 174:6
**basically**
121:12
**basics** 11:8
**basis** 19:2 54:3
54:21 88:1
151:5,18 152:1
156:18
**beaches** 75:10
154:4
**becoming** 25:1
101:8
**began** 14:19
15:5 16:4
**beginning**
59:12,24 71:7
**begins** 55:21
70:14 123:19
157:16
**behalf** 105:25
**behavior**
103:17
**believe** 6:4 8:2
9:18 12:13,16
13:25 14:6,23
15:13 17:6
23:9 25:4 26:3

28:6,12 33:1
33:12 36:3
37:20 51:9
54:18 57:16
58:18,24 59:8
59:9,15 63:5,9
63:15 65:11,21
67:24,25 71:13
73:7,21 79:17
79:20 81:1
82:11 84:8
87:11 90:24
94:18 97:10,20
100:2,25 107:2
107:6,11,12
112:5,20 114:1
119:20 120:25
127:12 134:12
137:16 140:5
145:6 159:7,7
159:7 160:9
161:24 162:3,5
162:23 163:3
163:12,21
164:20 165:2
166:14 167:12
172:21 174:17
177:5
**believed**
164:22
**believing**
101:15
**belongs** 158:19
**ben** 109:15
**benefit** 61:7,19
63:3,5,7
128:25 136:24
145:19 146:18

147:3
**benefits** 60:25
**best** 18:23 19:4
19:5 118:19
180:13
**better** 79:5
**beyond** 6:8
**big** 55:12,13
178:17
**bigger** 128:10
**bit** 17:18 29:6
30:6 46:19
83:3,3 130:4
168:24 175:1
175:16
**block** 81:4,19
81:20 96:17
166:6
**blocks** 79:13
80:2,18,19,21
80:21 81:17
82:21 83:8,17
83:18 90:19
91:19 102:25
165:24 166:22
178:1
**board** 37:2
**boarding** 8:19
25:24 33:10
73:24 136:6
**boat** 17:16
22:16 25:25
26:25 29:23,25
67:17 68:4,24
69:21 75:25
78:18,21 92:5
93:18,20
128:10 138:22

139:4 150:9
151:10 158:23
158:23 165:15
165:17,23
166:13
**boating** 33:17
33:19 57:4
74:15 75:11
135:23 136:7
136:21
**boats** 17:21
20:6 53:11
62:17 64:6
68:1,20,24
69:22 75:12
129:24 154:14
**boatswain's**
17:9,11 24:13
24:15 25:1
**boned** 165:3
166:3
**boom** 158:24
**boosts** 97:18
98:5
**boot** 24:6
**border** 68:4,19
69:21 78:17
80:14 95:9
97:1,18 98:5
98:24 104:24
105:7
**bordering**
147:24
**borders** 73:6
147:22
**borne** 61:2
**boss** 25:21

**boston** 1:18
27:10 55:11
128:7 143:25
146:12
**bottom** 8:8
70:18 111:21
127:23 131:16
158:7 159:11
**boundary**
154:2
**bow** 68:21
**box** 2:7
**breadth** 77:19
85:15
**break** 46:19
120:2,7
**breaks** 131:12
**breakwater**
158:24
**brian** 2:6
**brian.lynk** 2:10
**bridge** 85:13
**bridges** 85:8
**brief** 27:10
30:2,3 112:7
**briefly** 22:17
**bright** 167:11
**bring** 69:18
**broader** 74:4
**build** 19:12
**bulkhead**
158:24
**bulkheads**
18:17 43:15
129:20
**bullet** 9:2
**bulleted** 9:8

**bullets** 8:12
**bunch** 26:16
**buoy** 16:18
38:18 39:6,23
40:7,21 41:6
41:10 46:7
59:9 66:1,3
67:8 76:13,20
77:7 80:1,15
81:15,23 82:18
82:20 83:2
90:18 92:8
93:7 95:11,19
96:6 99:9,24
101:10,16
102:23 103:4
104:12 105:4,9
105:18 118:24
119:5,19 131:4
131:22 133:12
143:12 144:16
152:5 154:13
155:12 157:11
157:12,12
171:19 175:20
177:11
**buoys** 37:21
38:12 39:19
41:15,20,22
45:22,24,25
46:10 59:22
64:21 66:15
70:14 71:8
74:24 75:3,8
75:12,16,21,23
82:8 92:19,23
93:15 95:24
96:12 97:12

127:24 131:19
150:25 151:6
151:13,21
153:13,21,24
154:1,2,7,10
154:13,16,18
154:24 155:6
156:15,15,22
156:25 157:5,6
157:8,10,17
158:14,19,21
160:8,25 161:5
161:25 162:4
162:16,25
163:17 164:9
164:14,23
165:13,20,23
165:24 166:2,6
166:14,18,19
167:1,3,13
170:5,7 171:15
171:16,25
172:9 173:18
175:25 176:9
176:21 177:9
177:12,17,24
**business** 19:5

**c**

**c** 4:1 180:1,1
**ca** 1:6
**call** 54:16
**called** 5:7
18:24 65:21
126:15 156:3
175:12 176:3
**camp** 24:6

canoe   135:2,4
135:14,17
175:13,15
capacity   1:7
26:6 28:8 33:9
42:12 117:16
125:5 126:9
151:3,16,24
158:17
captain   17:20
18:2 22:18
29:16,17 49:15
79:20
captain's   17:5
17:19
captained   18:6
18:15 21:9,15
captaining
19:15 23:5
captains   117:8
captioned
180:5
care   153:25
career   23:20
73:18
cargo   18:6,14
19:9 22:13
29:24 111:5
139:22
carolina   24:24
26:15
carried   35:23
carrying   18:6
18:14 21:22
22:9,11,13
29:24 139:22
case   5:7,24 6:4
6:13 7:1,4 8:8

10:14,20 13:22
15:11,13 16:6
32:23 33:18
45:16 47:1
57:19 60:23
62:22 64:1,12
64:15 65:16
96:5 101:9
103:3 105:25
109:21 110:5
112:18 116:23
126:15,21
131:23 140:10
141:6 155:8
170:16
cases   8:3,5,19
9:8,11,15,21
9:23 10:6,13
11:1,6 32:11
32:13,18 33:15
70:1,4 126:22
130:1
cause   166:3,10
176:9,12
ceased   102:7
cement   131:2
center   81:15
158:10
certain   17:21
38:7 40:15
57:21 62:9,18
66:23 69:9
74:24 75:8,9
75:12,23 96:13
103:17 112:6
113:9 139:10
154:10,11,11
154:14 168:9

168:11 175:15
certified   180:3
certify   180:3
cetera   12:8
chain   18:18
131:3
challenges
111:4
change   24:19
25:3 41:5 53:3
53:6 105:18
181:5
changed   24:10
24:25 159:10
160:21 161:8
170:25
changes   104:10
111:9 142:3
173:16 176:12
176:14,17
182:25 184:10
channel   40:13
85:15 86:17,25
87:14 88:15,17
115:9 140:14
channels   86:16
86:19,22,23
87:5,13 88:6
88:20,23 89:1
chapter   57:3
74:14 124:23
155:2,21 156:4
156:8
characteristics
56:19 143:20
charge   168:22
chart   26:1
27:11

charts   26:8
28:22 143:14
check   113:15
113:15
chem   72:6
chief   17:10
choice   97:7
chose   97:12,21
ciarametaro
1:13 3:5 4:8
5:5 149:4
180:4 181:1
183:3,4 184:5
circumnavigate
93:15
circumstance
128:19
circumstances
32:2 128:10
147:1,8 171:19
172:12,14
citation   98:12
170:15,16
cited   98:4
city   34:13,24
38:12 98:13
125:13 153:22
153:23 167:17
167:17 169:4,7
city's   168:12
clarify   92:11
class   95:10,10
clean   12:9
clear   33:1
56:17 98:2
132:9 145:25
169:19 171:3

Case 1:23-cv-00853-DAE Document 177-5 Filed 07/18/24 Page 55 of 91
Thomas Ciarametaro                                            July 9, 2024
[clearance - concrete]                                              Page 8

clearance
  85:14
climb  119:4
  161:25 162:9
  163:11,13,22
climbed  162:24
  162:25
climbing
  162:11
close  77:9
  83:12 91:12
  173:17
closed  154:4
closer  77:13
  91:22 92:18
  128:12
cmr  154:25
  155:21
coast  8:18 17:8
  17:11,13,15
  23:12,25 25:5
  25:15,18,21,22
  27:3,8,10 28:7
  28:7,23 32:8
  37:16,25 49:6
  62:16 73:25
  102:13 138:24
  138:25 143:15
coastal  25:5
  34:21 36:17,22
cochrane
  100:24
code  154:25
coincide  75:10
coincides
  100:18
collaboration
  34:23

college  72:3,12
collide  165:23
  166:19
collided  164:24
colliding
  166:21
collisions  167:1
columbia  2:8
combination
  58:3 105:12
combined  29:9
combustion
  72:8
come  24:9 38:7
  86:16 129:16
  130:3 154:12
  157:12 161:6
comes  136:1
comfortable
  125:25
coming  41:18
commence
  14:15
commencing
  29:19 47:8
commerce  22:9
  54:12,17,20,24
  55:2,6,12,19
  56:1,14 60:18
  61:3,21,23
  62:5 63:23
  135:24 136:5
  136:21 138:3
  140:20 142:21
  143:1,5,6,18
  143:23 144:7,9
commercial
  16:16 17:5,19

18:6,14,16
19:8 21:23
22:4,8,12,16
22:24 23:4
30:1,9 43:15
52:22,22,23
53:7,10,12
54:1,7,15,19
54:23 55:1,14
61:24,25 62:4
63:22 111:5
133:1 134:14
134:19,22
135:19,24,24
136:6,13,20
137:13,20
139:22,23
141:17 142:19
143:19
commission
  37:2,4 183:8
commissions
  147:21
commonwealth
  74:16 180:9,11
communicate
  102:24
communicati...
  40:16,24
community
  72:2
companies
  14:11
company  18:23
compare  173:7
compared
  104:13

comparing
  115:2
complete  6:12
  10:6 113:2
  141:4
completed  9:17
  184:16
completely
  75:14
completion
  13:12 29:2
complex
  139:20
comprehensive
  38:3
concentrated
  72:19
concentration
  72:24
conceptually
  141:7
concern  97:14
concludes
  134:22
concluding
  170:6
conclusion
  132:2 158:7
conclusions
  58:11 113:7
  122:13,17
  123:13 127:9
  127:19 158:5
concrete  79:13
  80:18,19,21,21
  82:21 83:17,18
  90:19 177:25

concur  127:4
concurrence
  123:12
concurrent
  127:8
condition
  151:22 158:15
  174:21 176:1,3
  176:22
conditions  41:5
  56:9 60:18
  173:5
conducive
  142:19
conduct  30:3
  31:25
confused  14:11
  47:3 170:24
congress
  146:10,23
conley  55:12
  144:1
connected
  64:20 177:12
connection
  34:10 146:4
conning  27:1
consciously
  47:22
conser  37:3
conservation
  37:4 147:21
consider  6:11
  13:21 16:21
  19:8 22:23
  28:9 31:16
  42:3 55:1,11
  55:18 56:22

57:2,9 60:12
80:23 87:21
91:1,24 103:3
103:19 123:17
124:10 131:2
132:18 135:23
136:13,20
143:3 156:15
consideration
  137:3
considerations
  63:19
considered
  38:13 45:12
  54:24 57:18
  61:18,22 62:5
  63:23 129:10
  130:5,14 131:6
  136:14
considering
  16:7 27:15,16
  140:17 141:2
considers
  54:19
consistently
  52:9 90:8,11
consisting
  169:22
constitute
  138:3
constructed
  66:13
construction
  18:19 19:6,14
  53:13 103:12
consult  169:3,8
consultant
  46:16

consultants
  65:15
consulting
  15:22 16:1
contact  15:10
contacted
  13:21 14:14,18
contain  158:4
container
  118:6
content  73:2
  170:14,18
continued
  113:16
continues
  120:24
continuing  9:7
  121:14,25
  123:20
contractor
  35:21,23 36:1
contributing
  105:18
control  85:8
controlled
  68:22
controlling
  87:16 89:4
conversation
  68:6 108:17
conversations
  108:2,22
conveys  39:7
convincing
  61:16
coordinated
  37:5,22

copies  184:14
copy  5:12,24
  7:13,17
corporation
  126:16
corps  34:20
  36:3,7,15
  43:20,24,25
  44:3 54:18,25
  61:14 63:6,11
  88:3,4,14,18
  125:21 129:9
  135:22 136:14
  145:20 146:2,3
  146:7,10,13,22
  147:19 152:10
  154:20 155:5
  155:14,19
  156:4,12
  178:22
corps's  61:5,23
  136:2
correct  6:24
  7:11 8:10,15
  9:6,10 11:15
  11:22,23 20:17
  20:19 22:22
  23:24 28:18
  29:21 33:4,5,7
  37:8 41:16
  46:25 47:10,15
  48:18 51:24
  52:11,17 56:13
  56:16,20 59:19
  60:7,21 62:6
  63:2 67:10,15
  71:3,9,12 72:4
  72:12,25 78:11

79:10 81:10,22
82:5 83:5,14
84:16 89:15
90:1 91:18
95:20,21 99:3
99:5 102:4,9
103:7 104:6
107:24 109:4,7
111:23 117:3
118:20 121:16
122:1,2,7,21
123:3,6 124:22
125:11,15
127:20 130:16
132:19 133:9
133:10 136:3,4
137:13 141:8,9
141:13 144:10
145:12 149:10
149:11 151:4
159:24 161:21
166:7 168:9,13
168:16 169:9
170:10,17,22
171:2,8,13
174:9 175:22
176:8 177:5
**corrected**
121:23
**correction**
181:5
**corrections**
182:25
**correctly** 41:7
59:16,23 95:15
172:23
**correspond**
123:15

**corroborate**
113:7
**cortez** 109:9
**cost** 60:25 61:7
61:19 63:3,5,7
110:22 112:5
114:11 115:1
116:3,8,9,19
116:20 136:24
141:11 145:19
146:18 147:3
**costly** 114:18
**costs** 112:3
113:24 115:13
116:3,5
**counsel** 2:11,20
65:12 104:7
120:13 121:21
122:6,11,12
126:25 158:2
180:14,17
184:14
**count** 10:16
60:8
**countries**
147:25
**country** 148:2
**couple** 69:8
85:8 158:6
160:22 170:12
**coupled** 134:18
146:18
**course** 12:5
23:16,20 30:14
30:14 73:7
136:23 149:14
151:1,6,20
158:15 161:5

170:7 172:1,9
173:24,24
176:22
**courses** 73:2,5
73:10
**court** 1:1 7:1
21:1 33:6,8
59:5 126:15,21
150:17 156:24
**courthouse**
1:17
**courtroom**
126:6
**cover** 26:3
**covered** 45:1
171:19
**coves** 154:14
**coxswain** 25:25
**created** 62:9
**creating** 61:1
**crew** 29:12
**criminal** 72:15
72:19,23 73:20
74:1,18 168:22
**criteria** 142:18
147:11
**critique** 109:25
**cross** 77:2
149:3 169:13
**crossing** 103:6
**crossings** 97:2
97:2 98:14,25
104:10,20,24
**crr** 1:21 180:22
**cs** 184:15
**cs6783958** 1:22
182:25 183:25

**cubic** 116:19
116:20
**current** 10:19
26:9,10 94:7
99:10 101:10
132:4 137:20
173:17
**currently** 6:7
16:20 17:10
102:22 137:24
143:22
**cut** 159:16
**cutter** 25:5,15
25:19,21,23
27:9
**cv** 1:6 7:5,10
7:13,17 17:17
23:18 25:9

---

### d

**d** 3:1 4:1
**dae** 1:6 7:5
**dam** 68:18,22
114:22
**damage** 29:12
75:25 77:4
164:23 165:6
166:3,10
**damaged**
130:12
**damaging** 76:9
76:18 164:14
**dams** 112:4
114:24 115:22
140:6
**data** 104:9
108:9,11
134:13,15

**date** 7:17 10:14
14:19,25 25:10
82:10 112:12
112:13 174:13
**dated** 6:5
**dates** 68:10
**day** 19:3 65:9
65:20 66:7
67:23 68:9,11
69:21,23 78:18
82:4 83:24
90:3 104:25
118:25 134:10
134:16,17
161:20 174:21
183:3
**days** 184:16
**deal** 19:4
**debris** 102:14
**decent** 55:14
**decide** 48:11
132:6
**decision** 27:14
**deck** 25:21
26:24,25
**declarations**
106:9
**declares** 98:13
**deep** 51:12
66:24 118:11
146:11
**deeper** 51:23
52:1 79:2,4,7
92:6 96:14
164:11
**deepest** 144:15
144:23

**defendants**
1:10 2:20
**defense** 2:5
**define** 31:19
55:20 67:3
141:20
**defined** 178:21
**definitely**
73:21 159:11
**definition**
31:21 55:7
59:21 61:23
121:1 123:19
158:12,14
159:14 160:1,1
160:4,9 161:4
169:22,25
170:19,21
171:5,6,20
**definitions**
57:21 58:8,14
58:18 70:8,23
120:13 121:21
122:6,25 123:9
123:16 126:25
127:2,4,8,10
127:15 135:22
**definitionwise**
57:21
**degree** 72:22
73:25 74:18
117:20 118:4,7
**delineated**
79:17
**denied** 44:13
**dep** 155:4
156:4

**department**
2:3 34:20
36:16,20 43:23
65:10 74:13
126:10 147:18
153:22 168:21
**depend** 88:23
92:1 118:3
**depending**
69:10 84:3
85:23 87:1
128:9
**depends** 40:10
53:21 69:13
**deployed** 74:21
74:24
**deponent** 6:20
10:22 25:11
59:1 71:24
95:1 111:1
120:6,20 160:6
183:2 184:13
**deposed** 7:25
**deposes** 4:9
**deposing**
184:13
**deposition** 1:13
9:1 12:23 13:4
13:7 33:3
131:25 136:19
151:9 180:4
182:24
**depth** 50:10,21
50:22,23 51:1
51:16,16 52:2
52:6,10,16,24
53:18 54:4
66:19,21,22

68:10,16 69:17
87:8,16,17
88:17 89:4,8
89:24,25 90:9
93:2,3 139:21
140:19
**depths** 29:8
51:8 56:3
87:22 88:9
110:23 175:18
**describe** 23:14
65:19
**described** 31:3
47:7 49:4 56:8
56:11,18 76:7
169:21
**describing** 6:24
23:7 31:10
130:18
**description**
76:14 170:14
**descriptive**
55:21
**design** 35:11
35:15,18
**designed** 129:6
**designing** 35:8
**details** 37:13
63:16 66:10
**deter** 74:24
75:3,13,16,18
76:5,6
**determination**
28:21 30:23
32:3 45:1
49:16
**determinations**
58:21

Thomas Ciarametaro

July 9, 2024

[determine - dredging]

Page 12

**determine**
16:13 17:3
29:2 47:2,17
101:17 118:8
143:16 155:18
**determined**
45:10 58:17
**determining**
31:11 32:6
46:24 47:7
48:6 49:2
155:15 172:8
176:21
**deterrent**
103:16
**deterring**
99:21 103:6,17
**develop** 16:22
101:9 112:25
122:10 173:3
**developed**
116:7 122:19
**dictates** 41:9
**differences**
139:3
**different** 14:11
26:17 37:13
41:10 49:21
99:10 115:12
115:13 118:7
126:3 129:18
130:24 136:7
138:6,13 143:7
143:9 144:2,3
157:13
**difficult** 163:15
**dimension**
85:13

**dimensions**
19:24 53:17
79:24
**diminish** 95:11
**direct** 34:13
150:22 157:14
161:13
**direction** 174:1
174:2 176:13
176:14
**directly** 14:1
164:21 166:5
**director** 34:12
**disassemble**
178:24
**discovery**
100:13 109:17
**discretionary**
27:14
**discuss** 146:3
**discussed**
151:8 152:8
158:18 167:15
**discusses** 71:12
155:2
**discussing**
152:12
**discussion**
113:24 120:8
122:24 148:10
179:8,13
**disk** 131:3
**disputes** 73:11
73:12
**distance** 40:4
40:15 67:7
80:4,6,16
91:15,20,23,24

92:7
**distinction**
138:5,7,15,16
138:20
**distress** 93:8
**distric** 1:1
**district** 1:1,16
2:8
**division** 1:2 2:4
**dock** 125:19
129:2,3,5
130:23 156:9
158:23
**docking** 177:22
**docks** 43:14
150:9
**document** 5:18
6:21,23 7:6
10:23 25:12
59:2 71:25
95:2 100:21
104:7 111:2
120:21 124:3
150:11 160:7
183:5
**documentation**
152:3
**documented**
130:1
**documenting**
100:11
**documents**
100:13,15,21
106:10,22
**doing** 48:10
96:5 104:18
105:13 127:6
152:16 164:3

**dolphin** 158:24
**downriver** 67:8
**downstream**
133:2
**dozens** 129:23
**dps** 65:10
67:22 68:9,20
90:3 98:22
99:1 104:17
119:8 165:17
166:24
**dr** 109:15
**draft** 19:25
20:12 53:18
54:3 61:18
82:14 146:11
146:15
**drafts** 21:15
118:10
**draw** 56:2
**dredge** 34:3
35:1 37:7
38:15,16 51:20
51:25 53:8
54:2,6 63:6
88:19 89:9,13
114:25 140:19
146:7
**dredged** 35:3
**dredging** 33:24
34:2,8,17 35:8
35:18 36:8
37:9 38:1 50:4
50:9 52:24
53:4 61:6,12
61:15 63:1,21
111:8 115:10
115:17,22

116:12 136:3
136:11 139:19
140:6,12
**drew** 78:3
**driven** 129:5
131:9 178:21
**drives** 27:1
**drove** 166:5
**dry** 69:10
**due** 58:9 91:19
96:21 175:10
**duly** 4:9
**duties** 23:15,17
24:18 25:17
102:12
**duty** 17:7
23:11,16

**e**

**e** 3:1,9 4:1,1
180:1,1
**eagle** 98:23
133:4,11
135:14 142:3
142:17 161:21
162:14 166:18
**earlier** 15:15
27:3 46:23
49:4 50:1
60:16 69:25
117:4 120:11
123:2,24
130:18 131:25
136:19 137:2
140:3 142:25
144:20 145:9
145:25 149:5
152:7 157:25

161:18,23
164:13 166:1
167:15 170:24
171:25 176:1
178:5
**early** 14:23
15:1
**easier** 163:25
**easily** 96:15
128:8 131:24
167:3 178:23
**east** 173:14
**eastern** 95:8
**easy** 93:16
**economic**
147:11
**economics**
60:13
**economist's**
60:24
**eddies** 176:10
176:17
**educate** 126:7
**education**
58:10 71:18
73:15,20 96:22
96:23 123:15
157:2
**effect** 164:22
**effective** 40:16
40:24 41:2
103:16
**effectiveness**
16:18 101:16
103:4,5
**efficacy** 99:19
110:11

**eight** 10:15,24
13:10 20:13
21:17 50:24
51:11,17,17,19
51:22,25 88:13
88:16 104:23
126:13
**either** 8:23
13:17 38:10
42:18,18 45:25
84:22 98:3
115:22 116:9
165:24
**elevation** 111:9
142:2
**else's** 110:1
**emergency**
62:14,16 63:19
98:13 137:4
**employed**
18:21 180:15
180:17
**employee**
180:17
**enabled** 63:20
**enact** 169:1
**enacted** 74:13
**encompassed**
144:15
**encountered**
129:12 135:7
**endanger**
29:12
**ended** 62:22
**endicott** 72:12
**enforce** 74:14
169:1

**enforcement**
74:17
**engineer** 88:4
88:18
**engineering**
125:22
**engineers**
34:20 36:4,7
36:15 43:21
54:19 88:14
145:20 146:4
147:19 152:10
154:21 155:5
155:14,20
**enhanced** 95:8
**enlisted** 17:12
23:23
**enters** 40:1
**entire** 24:24,24
26:22 39:9
74:13 84:9
98:23 131:4,5
133:19 134:6
151:12 158:1,3
160:11
**entirety** 83:21
85:5 127:7
133:17 134:3
136:16 157:21
175:9
**entity** 36:2,9
**entrance** 38:11
39:24 86:12
87:10 118:15
**entrances**
86:15
**enumerated**
139:13 142:14

environment
2:4
environmental
2:5 34:21
36:16,20 43:23
147:18
equally 78:22
117:8
equipment
28:23 178:18
errata 181:3
184:11,13,16
erratas 184:15
escorted
166:24
especially
130:4
essex 129:22
estimate 13:19
15:16 21:8
53:23 80:23
83:16,23 84:15
84:17 116:8
152:20,21,22
estimated 85:3
estimates
116:18
estimating
77:18
et 2:12 12:8
evaluate 103:9
111:24
evaluation
48:11 104:8
event 63:18
75:6
events 75:5
154:2,11

eventually
125:21
everyone's
106:7
everything's
26:10
evidence
132:25 134:21
177:3 180:7
183:5
exact 13:18
25:10 85:12
114:12,17
152:21
exactly 72:7
87:1 160:4
examination
3:6,7 5:1 149:1
169:15
example 22:16
38:19 39:17
40:21 43:9
47:5 60:15
75:19,19 82:17
94:22 102:12
114:22 117:15
118:16 125:18
126:20 129:1,3
130:17,23
140:12 173:17
176:10,20
178:7
examples 18:13
48:17 49:5
53:9 102:11
134:3 153:15
except 182:24

exceptions
147:1
excursion
175:8
excuse 53:18
133:21
executive 180:8
exercise 141:6
exhibit 3:11,12
4:3,5 5:11 6:18
8:2,6 13:13
14:9,10 25:9
32:11 59:7,9
71:16,22 81:3
104:3 110:20
111:3 120:18
134:1,2 150:19
175:5
exist 102:7
existence
137:20
expect 32:19
122:23
expected
118:14
expecting
32:14
expedited
179:10,12
expensive
141:3
experience
17:7 23:11
33:23 34:1
58:9 68:18
89:6 96:21
117:20 123:14
128:16 136:2

140:16 146:1
149:15 151:10
152:15 157:3
experienced
102:11 117:9
117:13
expert 3:11 5:6
5:19 6:12 9:4
9:12,14,17
10:7,12,19
11:1,5 12:24
13:13,22 14:6
14:16,19 15:6
16:8 31:16
32:12,24 33:3
33:6 57:2,10
60:13 70:2
87:22 101:8
105:25 107:17
108:1,22 109:1
116:13 123:25
124:1,6,11
148:4 149:7,13
149:19,23,24
150:2,7,10,11
167:21 168:1,6
expertconnect
14:12
expertise 16:22
17:2 56:23
88:2 126:20
167:19
experts 109:3
expires 183:8
explain 8:16
14:5 16:11
17:1,18 28:19
29:6 30:6 34:1

50:13 72:5
128:24
**explained** 70:9
100:14 156:20
172:5
**explaining**
169:23
**exponentially**
62:21
**exported** 55:16
**exposed** 81:20
**extend** 80:3,5
**extensive** 111:8
139:19 140:11
**extent** 53:10
68:6 105:17
117:16
**extra** 19:4 53:1
**eye** 83:23
**eyes** 83:2 101:3
**eyewitness**
152:4

**f**

**f** 180:1
**facilitating**
137:4
**facilities** 56:4,6
**fact** 94:13
146:17 158:4
**factors** 56:18
60:16 105:17
137:7,12
**factual** 108:9
108:11
**fails** 184:18
**fair** 48:4 49:21
89:22 92:16

171:18
**familiar** 62:1,2
106:21 109:18
135:1
**fan** 67:17 92:5
93:18,20 129:4
**far** 6:15 36:5
40:7,21 60:2
77:10 80:22,24
88:6 134:11
159:6,13 167:6
**farmed** 35:20
**farther** 94:10
94:15 121:6
128:11
**fashion** 14:2,3
113:13
**fathoms** 15:22
16:1
**fault** 103:24
**fcc** 139:5
**fcrr** 1:21
180:22
**federal** 8:13
11:6 31:12
34:24 37:1,17
37:24 38:9
46:6,25 47:24
48:12 49:22
57:8,8 61:17
86:24 88:4,5,5
88:19,20,23
89:1,1,1,14,23
136:6 156:23
**federally** 47:17
48:24 88:14,17
89:14 130:1

**feet** 20:1,8,9,13
21:10,13,17
30:2,9 40:8,13
50:24 51:10,11
51:12,22,25
53:1 66:24
68:5 69:9 81:5
81:5 83:24,24
84:3,18,22
85:9,11,19
86:4,8,8,25
87:12,15,17
88:13,16
118:11,11
129:4 138:22
167:11 173:14
177:20
**fell** 126:11
**felt** 127:3,7
**festivals** 75:7
**fiberglass**
131:8
**field** 19:6
**figure** 81:12,13
81:14 82:16
114:12,17
118:24 161:16
175:13
**figured** 43:6
**figures** 94:1
**filed** 7:6
**filings** 106:10
**filled** 22:17
**finally** 70:14
71:7 157:16
158:21 160:25
170:5

**financially**
180:18
**find** 175:2
**findings** 113:8
**fine** 168:20
**fines** 168:22
**finish** 89:20
170:8
**fire** 72:2,6,7,8
**fireworks** 75:7
154:3,12,16
**first** 8:11 11:4
13:21 23:22
25:20 32:23
33:2 43:23
49:7 59:24
60:3,5 62:10
87:10 94:6
99:8 112:21
125:20,22
157:16 159:22
160:13 164:8
167:6 169:18
170:3 172:13
172:19 175:5
175:20
**firsthand**
151:11 152:4
173:11
**fisheries** 33:18
**fishing** 53:12
54:19,23 55:1
61:24,25 62:4
63:22 136:20
**fit** 132:1
**five** 15:22,25
51:10 81:5
85:11 127:23

**float** 156:9
**floating** 64:16
   64:19 102:14
   131:4 159:2
   163:1,2
**flooded** 115:16
**floor** 129:6
**florida** 28:10
**flow** 51:13
   174:1,2 175:6
   175:17 176:13
   176:14,17
**flows** 110:6
**follows** 4:10
**foot** 20:1,2
   21:12 22:2,7
   25:6 50:17
   51:9 69:20
   78:17 80:14
   85:20 111:9
   116:20 118:6
   142:2 177:12
   177:21
**forgot** 26:25
   70:18
**form** 22:24
   23:2 54:14
   55:24 76:23
   91:6 92:21
   135:21 137:15
   138:11,19
**forth** 6:9 29:4
   75:8 123:19
   178:25
**fortinsky** 98:12
**forward** 15:19
**foul** 76:1

**found** 132:25
   134:21 138:3
**four** 9:24 10:2
   10:7 13:5
   47:11 48:17
   49:5,5 51:10
   66:24 81:4,5
   144:11 167:11
**fraction** 77:23
   145:8
**frame** 15:3
**friend** 19:4,5
**friends** 18:23
**front** 5:20
   125:19 129:3
**frozen** 130:12
**fuel** 56:6
**fuhaid** 2:15,19
   3:7 5:13 23:1
   54:13 55:23
   76:22 91:5
   92:20 120:3
   135:20 137:14
   138:10,18
   148:13 149:2
   169:11 179:6
   179:11,16
   184:1,2
**full** 91:17
   127:6
**fully** 82:9
   127:2
**function** 38:21
**functioned**
   26:21
**fund** 54:25
**funded** 89:14
   146:20

**funding** 61:17
   62:23 89:18
   146:10
**funds** 146:7,23
**further** 6:3
   64:9 90:12
   155:3 169:12
   169:15 179:6
   180:16

## g

**g** 4:1
**gained** 24:21
   61:9 96:23
**gander** 110:24
**gangway**
   125:19 129:2,2
   177:22
**gangways**
   43:14
**general** 2:14
   6:2 22:1 53:24
   57:4 74:14
   80:12 117:25
   155:23
**generally** 15:3
   26:11 30:1
   31:7,19 33:13
   33:15 79:3
   101:22 115:21
   117:7 120:23
   123:20 128:4
   128:15,17
   143:2 172:5
   174:6
**gentleman**
   109:12

**gentlemen** 68:1
**geographic**
   113:10 173:12
**geographically**
   48:2
**getting** 43:12
   61:17 62:23
**giant** 141:1
**gigantic** 124:3
**give** 8:22 11:16
   13:17 16:17
   18:13 20:11
   25:9 43:9 51:4
   53:9,16,22
   61:2 84:22
   101:14 123:22
   124:7,24 126:2
   153:15
**given** 8:3 9:20
   11:1,24 32:24
   58:8,19 70:8
   70:23 109:17
   125:4 163:23
**gives** 38:23
   39:1 74:3
   151:12 152:5,6
   170:13 171:9
**giving** 10:5
   26:12 30:22
   95:18,23 96:5
**glad** 171:3
**gloucester**
   17:13 34:4,6,8
   34:13 35:2
   42:24 43:2
   46:4 48:20
   50:5,16 74:8
   86:9 125:9,13

125:23 153:17
153:17,23
154:8 167:18
**gloucester's**
62:12
**go** 23:18 38:24
43:22 60:17
75:20 91:21
120:1 123:4
128:11 134:2
148:8 159:17
163:10 164:10
168:23 178:18
**goal** 50:8 52:8
52:15 117:19
**goes** 28:15 74:3
85:16 170:8
**going** 5:10 11:7
29:3 32:5
40:15 41:4
66:10 69:3
75:13,17 91:8
105:7 114:14
117:12,22
118:16 132:7
140:24 154:12
154:16 155:16
160:23 173:7
**good** 66:13,16
120:3
**goods** 55:15
**google** 113:13
**googled** 113:11
**gotten** 66:18
**government**
34:24 46:6
168:1,4

**governor** 1:8
98:8 180:9
**graduate** 73:15
**grande** 16:14
16:19 17:3
61:1 63:25
64:10,15 65:25
76:14 95:13
109:22 110:7
110:12 111:3
113:21 116:10
133:2 134:21
135:3 137:25
138:4 139:17
140:13,17
142:16 144:13
147:22 151:1,7
151:14,22
152:5 157:6
158:16 172:2
172:10,20
173:24 174:10
175:6,10,11,18
**greater** 61:2
**greg** 1:7
**grip** 163:7
**gross** 17:24
18:3
**ground** 131:9
**group** 67:19
**guard** 8:18
17:8,11,13,15
23:12,25 25:5
25:15,18,21,22
27:3,8,10 28:7
28:7 32:8
37:16,25 49:6
62:17 73:25

102:13 105:8
138:25,25
**guess** 10:24
18:16 20:7
28:9 41:1
55:25 76:2
92:1 121:5
136:22 143:2
147:4 158:10
**guessing** 109:5
**gulf** 64:7
**guy** 19:4

**h**

**h** 2:6 3:9 107:8
**half** 51:9 65:24
66:5 77:25
87:17
**hall** 158:12
**hand** 5:10 6:17
74:3,3
**handful** 113:14
**handles** 163:7
**happen** 114:15
119:10
**happened**
90:23
**happening**
10:3 134:23
**happens** 89:11
131:13
**harbor** 34:4,8
35:2 42:24
48:20 55:11
74:8 86:9,13
87:11,12,13,18
117:18 118:16
128:7 144:1

146:12 153:17
**harbormaster**
34:12 37:3
42:13,17,21
44:9 46:4 50:6
62:17 74:7,12
74:20 117:16
125:10 155:9
167:17
**harbormaster's**
125:23
**harbors** 42:9
43:13 57:11,15
57:22 123:25
124:3,7,10,16
125:3 150:2,9
150:15 152:11
152:17,18
**hard** 53:22
**hart** 107:1
**hazard** 101:18
101:21 102:3,7
117:5 166:15
**hazardous** 72:8
102:18
**hazmat** 72:6
**head** 84:12
100:15 106:8
120:7 124:17
126:10 165:9
**headed** 66:7
**heading** 8:8
**headway** 166:9
**hear** 11:20
**heck** 179:15
**held** 125:12
153:21 155:7

helicopter
   133:17
help   112:25
helped   73:21
helping   19:4
high   50:18
   52:25 68:14
   69:4,7,11
   85:19,25 90:4
   91:3 96:24
   97:1,13 143:23
   143:23 155:24
   155:25 156:1
   156:11
higher   18:2
   90:17
highway   54:12
   54:17 55:6,12
   55:18 60:17
   142:21 143:1,4
   143:18 144:7,9
highways
   143:6
hill   98:14
hire   23:3
historic   109:22
   110:1 176:2
historically
   175:17
history   73:12
   175:6
hit   165:9
hmm   20:10
   31:8 70:25
   82:19 98:7
   128:1 131:17
   137:6 139:14
   140:8 147:15

159:21 161:15
162:19 165:14
173:1
hold   48:16
home   125:20
homeland
   72:14,20,24
honest   11:17
horizontal
   165:8
hour   66:5,5
hours   13:10,15
   15:16
houseboat
   129:13
houseboats
   129:18,24
   130:4,10,14
hudson   26:16
   28:4,11,21
   31:3 47:12
human   97:2
   103:17
hundred   17:24
hundreds
   129:4 153:6
   154:16
hurricane
   131:13
hurricanes
   102:17
hypothetical
   111:25 115:18
   116:8

**i**

ices   130:8

icy   130:9
identification
   4:4,6 30:8
   180:7 183:5
identified
   120:12
identify   141:7
illegal   74:22
   75:1 98:24
   99:21 103:6
images   113:13
imagine   115:4
   147:20
impact   151:2
   151:15,23
   158:16
impede   93:10
impeding   95:9
implementati...
   53:3 54:6
   139:20
implementing
   35:18 50:25
   61:12
important
   30:17 40:14
   66:11
imported   55:16
impossible
   101:23
impractical
   142:5,12
impression
   97:6
improve
   113:24 146:5
improved
   115:9 136:12

improvement
   112:1 115:13
improving   61:5
   140:4
inches   21:21
include   58:14
   156:21
included
   134:18 171:10
includes
   170:15 171:10
including   10:3
   10:14,19,25
   87:20 111:7
   133:3 139:19
incorporate
   58:7
increase
   115:23
increasing
   62:20 110:11
indefinitely
   132:17
independent
   48:11
independently
   58:17 113:6
   114:4,10
   123:18
indicated   63:22
   68:2
individual
   45:24
influence   33:17
   33:19
information
   6:14 7:1 26:13
   29:14 30:14,15

30:15,16,22
38:23 39:1,7
40:16,25 48:5
48:8 49:14
57:18,20,23
67:21 68:8
84:6 88:12
94:5 97:8
98:20 100:10
104:19 108:9
113:1 143:15
143:15 172:11
173:4 174:22
174:24 175:1,4
175:7,17 176:2
176:2,3,5,5
**infrastructure**
55:25 56:5,12
60:20 61:1,6
142:6 143:21
156:10
**initially**  14:14
**injury**  33:20
**inland**  19:18
20:16 87:20
130:9
**inner**  87:13,18
**inside**  152:3
**inspected**
138:25
**install**  153:24
**installed**
119:21 168:19
178:9
**instance**  36:6
63:8,20 83:11
143:11

**instances**  8:17
45:9 47:16
**instruct**  11:25
**instructor**  26:1
**intelligence**
73:5
**intended**  66:9
103:13
**intention**  131:9
**intentional**
96:10
**interested**
180:19
**interior**  26:16
26:17
**interlace**  75:24
**international**
19:18 20:18
47:24 73:6,11
73:11,12
147:13 148:5,5
**internet**  135:11
173:10
**interpret**
126:20
**interpretation**
57:10
**interpretations**
57:14
**interpreting**
39:11
**interrupted**
160:18
**intracoastal**
28:8 31:7
47:13
**introduction**
73:4

**investigation**
73:7
**investment**
142:6,11
**involve**  31:10
33:16 70:4
115:10 152:23
**involved**  8:19
22:15 23:6
34:3,17 35:7
35:17 37:4
42:8,19,19
43:12 44:18,20
45:15 46:5,24
61:11 64:14
70:1 141:3
152:25 153:10
177:8,10
**involvement**
8:9 11:6 34:14
61:9
**ipswich**  129:23
**ish**  20:1 81:5
92:15 167:9
**island**  62:13
64:3 158:25
**isolate**  105:17
**issue**  131:23
**issued**  44:1,5
155:7 180:8
**issues**  63:19
118:2 169:9
**issuing**  155:12
**itinerary**  29:19

**j**

**jacket**  139:9

**jet**  118:5
**jetty**  158:25
**jill**  1:21 180:2
180:22
**job**  1:22 126:6
182:25 183:25
**jobs**  149:15
**john**  2:22
109:6
**johnson**  109:15
**journalists**
175:8
**jr**  5:5
**judicial**  74:2
**july**  1:14 98:9
99:9 173:6,8
180:5 182:24
184:3
**june**  6:5 7:6
65:5,9 133:7
172:22 173:6,8
174:8 176:6
177:4
**jurisdiction**
126:11
**justice**  2:3
72:15,19,23
73:20 74:1,18
**justify**  60:25
139:23 141:17

**k**

**k**  1:21 180:2,22
**kayak**  135:2,4
135:14,17
138:8,16,20
139:3,6

**keep** 12:8 75:8
**keeping** 26:9
**kind** 9:19
66:16 68:21
69:4,12 113:15
126:6 131:4
140:20 168:25
**know** 5:23 7:15
11:13,17 12:2
29:11 31:25
34:19 36:5
38:15,22 40:7
40:20 42:4
43:3,11 47:18
47:23,23 48:22
48:23 51:12
53:1,10 54:16
56:3 60:24
61:4 62:20
63:7 65:15
66:3 67:22
68:11,23,24
69:2,2 74:2,22
75:7 79:18,24
81:1 83:17
84:24 85:19
86:21 88:8,12
88:13 90:16,21
97:25 99:9
100:14 104:9
104:11,19
105:11 106:6
110:6 114:13
114:16,18,24
115:1,3 116:19
116:20 117:5
118:4,4,8,9,13
118:15,17

119:3 124:17
131:12 132:11
140:3,22,25
141:1 143:13
144:22 145:4,8
146:21,25
154:15 156:24
157:12 159:14
160:3,21 165:7
168:10 172:12
173:4
**knowing** 48:2
**knowledge**
39:2 52:13
88:25 96:23
117:24
**known** 143:21

**l**

**lack** 62:8
136:12 175:11
**lacks** 144:16
**land** 66:15
162:17 163:18
163:23
**language**
126:14
**laredo** 142:4
**large** 92:7,12
163:5
**larger** 22:2
40:1
**latitude** 113:10
**laughter** 43:7
50:15 60:9
**law** 57:1,3
74:14,17 129:8
149:17 156:22

157:1 179:1
**laws** 57:4,4,5,8
57:8 74:15
136:5,7 149:7
149:13,17,20
150:7
**lawsuit** 64:23
**lawyer** 126:9
149:10,25
150:6 168:2,13
**leading** 15:17
**learned** 48:8
**led** 13:12 62:25
**left** 83:3 130:11
150:16
**legal** 56:23
57:9,14 74:2
123:24 124:11
124:24,25
125:14 126:3,7
127:14 149:6
149:12,24
150:2,10,15,16
167:21 168:16
169:2,8 184:23
**legally** 125:15
126:1
**length** 19:25
20:1,2 30:10
30:11 53:17
68:5
**lengths** 21:8
**lengthy** 137:5
**level** 42:19
117:24 125:7
162:7
**liaison** 34:19

**license** 17:6,19
17:20 18:1
43:25 44:3
**lieutenant**
25:20
**life** 139:9
**likely** 77:4
91:11
**limited** 54:3
**line** 56:2 59:13
59:17,24 71:7
78:3 84:1
89:20 181:5
**lines** 60:6,8
126:13 127:23
144:11 159:2
160:15,16
**list** 7:22 8:3,5,7
10:6,8 70:1
106:8 155:12
171:9,11
**listed** 8:11 10:4
10:21 14:7
17:17 23:17
32:11 106:6,11
**litigation** 14:12
**little** 10:1,15
46:19 47:3
52:7 68:3 83:3
83:3 84:21
88:6 120:1
121:5 129:18
138:21 140:18
164:12 168:24
170:24
**live** 43:4
**llc** 14:13

**load**   53:21
**local**   28:22,24
   37:2,3 38:10
   62:17 147:20
   155:7,8,12
**localized**
   173:16 176:9
   176:12
**locally**   173:6
**located**   64:17
   78:24 79:1
   80:15 84:9
   93:7
**location**   87:9
   94:7,8 95:24
   151:14 158:15
   161:6 170:7
   173:12
**locations**   87:9
**lock**   114:22
   115:16
**locks**   111:8
   114:24 115:22
   139:20 140:6
**logs**   102:16
**lone**   97:18 98:5
**long**   25:14
   26:20 64:3
   67:3 132:4,6
   141:3 171:9
   177:13
**longer**   40:24
**longitude**
   113:10
**longitudinal**
   113:10
**look**   5:15,22
   13:18 25:9

   28:22 29:22
   31:23 58:24
   109:8,11,14
   125:14 127:21
   131:15 172:11
   173:4,15
**looked**   7:12
   13:13 29:13
   82:7 103:12
   109:2,5 112:22
   114:4 116:11
   120:11 137:22
   174:20 176:20
   176:25 177:2
**looking**   29:7
   31:20 39:4
   42:4 49:13
   71:16 79:25
   81:8,11 82:25
   83:4 111:15
   114:15 117:17
   118:1,22
   126:12 153:3
   155:10 171:1
   175:25
**looks**   69:4
   82:23 126:14
   134:6
**lose**   85:20
**lot**   24:21 37:18
   52:23 55:14
   73:9,10 75:10
   85:21 110:20
   143:20 178:24
**lots**   37:15,15
   73:5 75:5
**low**   21:11,19
   50:11,13,18,18

   50:19 51:8
   68:14 69:5,7
   69:11 86:3
   90:4 104:25
   162:7
**lowest**   83:1
   117:24
**lunch**   120:2,5,9
   128:7
**lynk**   2:6 3:6 5:2
   5:12,14 6:22
   43:5,8 46:18
   46:22 119:24
   120:10 148:8
   148:11 152:7
   164:13 167:16
   169:13,16
   179:4,7,9,14
**lynk's**   149:6
   158:1 161:19

## m

**m**   21:2
**macallister**
   109:12
**made**   73:19
   125:2 131:8
   174:7 183:1
**magers**   107:1
**magnitude**
   145:17 146:20
**maintain**   92:7
   117:18,23
   153:25
**maintaining**
   26:7
**major**   72:17

**make**   10:24
   27:13 28:20
   29:9,15 30:23
   31:24 32:3
   52:8 58:6,7,21
   59:14 70:10
   117:21 118:17
   138:5,8,15,16
   140:13 141:21
   146:13 160:22
   161:10 169:19
**makes**   31:21
**making**   26:10
   47:2 49:14,16
   62:23 132:3
**man**   175:13
**management**
   34:22 36:17,22
**mandated**
   145:19 147:12
**mandates**
   146:4
**manner**   129:25
   151:2,7,15,23
   158:16
**marina**   43:15
**marinas**   38:10
**marine**   18:24
   19:6,12 53:12
   75:5,6 97:19
   98:6 138:1
   154:2
**mariner**   38:23
   39:1,4
**mariner's**
   39:10
**mariners**   28:24
   28:25 40:17

Thomas Ciarametaro

July 9, 2024

143:16

**marinetraffic**
137:23

**maritime** 57:3
57:4,8 149:7
149:13,17,18

**mark** 38:11
75:12,16
155:24,25
156:1,12

**marked** 4:3,5
5:11 6:18
86:24 88:8,15
88:17 143:12

**markers** 134:7
137:21 142:16

**marking** 101:2

**mass** 57:3
74:14

**massachusetts**
1:16,18 19:19
19:20 36:19
43:22 50:16
129:9,17 155:1
180:9,11

**massdep** 36:21
44:1,5

**mate** 17:9,11
24:13,15 25:1

**material** 18:19
157:11

**materials**
19:11 21:23
72:8

**matter** 96:22
96:24 180:5

**matters** 8:11

**maximizes**
101:11

**mean** 26:14
50:11,13,18
51:8 53:18
76:6 86:3
99:25 101:22
102:6 113:20
123:1 128:2
139:2 143:4
149:13,14
150:5,6 155:24
157:22 159:15
165:4 167:24
167:25 173:25

**meaning** 14:9
55:8,9 139:16

**means** 51:17
102:7 146:6
158:23 178:15

**meant** 8:16
149:20

**measures**
117:17 118:17

**measuring**
78:8

**medication**
12:12,15

**meet** 52:15
136:18 142:18

**memory** 12:13
172:23

**mention** 46:13
59:5 98:20
119:14 166:25

**mentioned**
11:5 20:14
21:24 22:11

23:10 31:1
37:9 38:4
39:15 46:23
47:5,11 49:25
69:20 70:7
74:20 90:2
122:5 133:7
136:10 145:24
154:19 166:1,2
167:18 177:6
178:5

**mentions** 72:1

**merit** 180:2

**met** 65:22
130:1

**meters** 40:8
42:5

**methods**
115:12

**mexican** 91:23
92:6 93:3,16
93:23 144:24

**mexico** 78:4,8
148:1

**middle** 80:8
91:22

**migrant** 98:13

**migrants** 103:6

**mile** 111:10
115:3 134:7
137:21 142:3
142:16

**miles** 26:15
51:6,7 62:15
65:24 67:6
133:3,9,14

**mind** 16:6 17:1
114:20

**mine** 55:4
121:2 158:8
160:8

**minimize**
115:17

**minimum**
51:19,22 87:22
88:17 89:5,8
89:24,25

**minute** 148:9

**minutes** 23:8

**missing** 102:18

**misspoken**
70:17

**mm** 20:10 31:8
70:25 82:19
98:7 128:1
131:17 137:6
139:14 140:8
147:15 159:21
161:15 162:19
165:14 173:1

**modified** 44:16

**moment** 7:22
28:16 49:15
89:25

**month** 14:16

**months** 104:24
132:13

**monumental**
114:13

**moored** 79:12
127:25 128:3,8
128:20 129:14
130:6,15,20
159:2 177:25

**mooring** 18:17
22:3,7 37:21

81:17,19 83:8
83:18,19 90:19
102:25 128:6
130:7,24,25
131:1,2,6
153:20,20,24
155:6,11,11
156:22
**moorings**
128:5,11,14,17
129:8,21
153:20 156:25
**motorized** 92:4
92:18
**mouth** 39:25
40:9
**move** 97:3,14
128:11 153:25
171:23
**moved** 94:8,14
94:15 128:9
131:24 132:1
173:13
**movement**
95:10
**multiple** 18:11
19:23 138:22
139:2
**multiyear**
61:16
**munera** 2:15
184:1
**munera.al** 2:19
184:2
**municipal**
125:7 167:25
**municipality**
35:1,13 153:18

155:13

**n**

**n** 3:1 4:1 21:2,2
**name** 5:3,19
7:9 14:8 30:12
106:8,21
**named** 106:14
106:19 107:1,5
107:8 109:12
109:15 168:4
**narrowest** 85:7
**national** 73:4
105:8
**natural** 2:4
51:13
**nature** 128:5
128:15,18
163:25
**nautical** 19:13
26:15 45:16
50:14 51:6,7
67:6 74:21
130:19 133:8
**nav** 27:6,9 30:3
**navigability**
30:24 31:17
62:8 110:12
115:23 118:8
140:5 143:17
146:5
**navigable**
16:14 17:3
26:18 27:16
29:3,6 31:22
32:4,7,15,21
47:8 56:4 59:3
59:8,12,20

88:7 113:21
115:9 118:12
120:23 121:4
121:12 140:13
142:19 143:3,5
143:10 144:2,6
144:8 151:2,15
151:24 154:8
158:17
**navigate** 29:10
49:18 62:19
85:21 91:8,14
164:15 165:19
**navigated**
165:12
**navigation**
16:15,16 17:14
23:5 25:22
26:5,21 27:2
29:4 30:2 32:8
37:16,17,18
38:5,9,10,13
38:19 47:6
49:12 54:1,7
56:12 57:4
61:18 88:8
101:18,22
102:18,19
109:22 110:2
113:25 114:14
117:5 118:2
133:1 134:14
134:20 135:19
136:13 137:13
137:21 139:24
141:18 142:20
143:14 146:16
149:17,23

166:11,15
171:11,15,15
171:22
**navigational**
26:8 27:11
28:23
**near** 8:7 64:3
**nearly** 111:9
142:2
**necessarily**
102:6
**necessary**
30:23 117:18
139:21
**need** 10:8
31:23 80:20
111:7 114:15
127:3,14
139:19 155:3
155:22 156:2
156:12 157:8
**needed** 19:2
**needing** 156:16
**needs** 19:3
128:10 178:19
179:3
**neither** 180:14
**network** 88:24
**never** 171:23
178:15
**new** 28:12,14
31:6 47:12
97:19 98:6
**news** 100:9
119:16
**nine** 88:13,16
152:19

nods 18:9
38:20 39:18
47:14 49:11
90:6 117:14
172:7 174:3
178:8
non 50:14
noon 119:25
north 24:24
26:15 62:15
72:2 87:14
162:5
notary 180:10
183:4,7
notation 32:12
note 184:10
noted 182:25
notice 28:24,25
notwithstand...
102:2 136:12
nova 26:15
number 13:18
30:13 39:16
104:10 114:16
115:4 140:24
152:22 177:7
numbered
111:16 131:15
numbers 114:6
116:11,17
129:25
numerous
93:24 139:4
154:1 165:21

**o**

o 4:1 107:8

oag.texas.gov
2:19 184:2
oath 4:9 11:14
object 155:17
objection 11:20
11:24 12:7
23:1 54:13
55:23 76:22
91:5 92:20
135:20 137:14
138:10,18
objects 64:21
obligation
11:16 12:1
obligations
24:19
observation
174:7
observations
134:17
observe 66:8,9
66:21 162:11
164:3 166:18
166:21
observed 66:18
68:9 105:19
128:6 144:21
157:6 167:7
observing
166:25
obstacle 164:1
obstacles 111:7
139:18
obstruction
92:15
obtain 126:4
139:21 153:2
154:20 168:11

obtaining
126:8
obvious 166:8
obviously 11:9
26:12 51:11
82:3 89:13,13
118:7 136:25
occasion 18:10
65:2
occasions 13:3
18:11
occur 166:5
occurred 9:24
42:15
occurring 9:24
54:2,7
offer 32:14,19
110:13
offered 32:13
32:19 150:14
offering 57:13
57:17 60:22
109:21,25
110:4,10
offhand 79:22
office 1:15 2:14
98:8 125:23
officer 8:13,19
11:6 17:13,15
25:22,24 26:2
26:5,21,24,25
27:1,3,6,9,12
32:8 33:10
47:6 49:12
73:24 104:18
136:6 165:17
officers 65:22
98:22 99:2

119:8 166:24
official 125:5,9
126:9
officially 15:12
officials 169:8
offloaded
55:15
oh 39:1 59:3,7
103:23 120:19
121:3
okay 6:16,19
7:19,24 8:21
8:25 10:11
11:3 13:16
14:4,21 15:2
16:10,25 17:25
18:12,20 19:7
19:10 21:6,18
22:5,19 24:3,8
24:17 26:23
27:18,22 28:1
30:20 31:5
32:10,17 34:15
35:6,16,22
36:10,13,18
38:17 40:3,19
41:12 42:14
43:18 44:2,6
44:22 45:5,20
46:2,9 48:3,9
48:14,25 49:19
50:12 51:3,14
51:21 55:5
56:21,25 57:6
58:12,22 59:20
60:4 62:24
63:12 64:8,25
65:4,7 67:11

70:20,22 71:10
72:9,21 73:22
74:10 75:2
76:4,12 77:17
78:6,15,16
79:6 80:7,11
81:14,18 82:2
82:6,24 83:6
83:10 84:5,19
85:2,10,17,17
85:24 86:6,20
87:2,7,19,25
88:10 89:21
90:10,15,22,25
92:10 93:25
94:17 95:5,17
96:3 97:22
98:17 99:13,17
100:6 101:6,20
102:5,10,15,20
104:1,16
106:24 107:3
107:10,15,21
107:25 108:7
108:14,20,24
109:19,24
110:9,16
112:10,16
113:4,18 114:8
115:20 116:1
116:14,25
117:11 118:21
119:7,12,24
120:16 121:17
122:15,22
127:13 131:11
132:8,15,22
135:5,16 136:8

137:10,17
140:9,23
141:14,25
143:8,24 144:5
147:6 148:3,13
149:3 150:20
150:24 159:12
160:12 161:7
161:12,15
170:23 171:17
172:24 173:4
173:22 174:4
174:11,18
175:23 176:24
177:14,18,23
178:3,12
**older** 10:2
**onboard** 25:25
26:4 33:21
**once** 18:10
24:22 33:11,11
35:18 65:3
66:20 178:9
**one's** 83:16
**ones** 9:3 28:15
28:16 71:1
99:4 106:5
121:1 129:19
162:17,20
163:2,22,23
**ongoing** 9:16
**online** 82:12
**onloaded** 55:16
**open** 93:23
144:14 145:5
**operate** 138:21
138:23,24
142:20

**operated** 22:1
**operating**
27:16
**operation**
97:18 98:5
**operational**
24:19 25:17
**operations**
17:15
**opinion** 16:18
32:14,20,24
58:7 92:12
95:18,23 96:5
96:13 101:9,15
103:11,14,20
103:25 108:10
110:1,14,19
111:12,18,20
114:10 117:1
123:22 124:8
125:14 146:8
146:17 150:22
150:25 151:5
151:12,13,18
151:21 152:1,6
156:19 157:5
158:20 160:21
169:18 173:21
174:5
**opinions** 6:8,13
16:22 57:17
60:23 109:21
110:4,10 114:7
126:2 150:14
150:15,16
161:8
**opposed** 48:5
49:2

**opposite** 77:10
77:21
**options** 113:24
140:4,7
**orange** 82:20
83:2 91:16,20
91:21 167:11
**order** 127:15
140:12 156:24
180:8
**orient** 83:2
**original** 82:13
96:6
**originally**
95:25 136:17
169:20
**outcome**
180:19
**outlined**
103:10 113:22
124:12,18
134:23 150:12
155:21
**outside** 15:25
46:3 80:17,20
**outward** 80:3,5
**overall** 44:4
74:4 101:15,16
103:12,16
105:9 136:15
**overlooking**
59:10
**oversight** 139:8
**own** 16:1,3
27:13 48:6,10
58:4,10 82:15
89:3 113:6
119:13 127:8

134:16 146:1
158:5 160:1
**owns**  18:23
19:5

**p**

**p**  3:5 4:1,8 5:5
**p.m.**  179:19
**padre**  64:3
**page**  5:18 6:25
6:25 8:7,8 9:7
59:6,7,9,11,13
59:18,22,25
66:15 70:9,11
70:12 71:2,4
71:17,19,20
81:3,9,12,24
94:22 97:17,24
98:4 104:2,3,4
104:5 110:20
111:3,15,21,22
118:23 120:18
120:19 121:9
121:23,25
122:1 123:21
126:13 127:22
127:23 131:14
131:16 132:23
132:24 134:1,2
139:12 142:14
142:14 144:11
145:14 147:10
147:14 150:19
150:19 157:15
161:14 169:20
174:25 175:4
175:12 181:3,5

**pages**  123:5
**pains**  183:2
**paper**  115:7
140:15
**paragraph**
60:3,5 70:11
70:11 71:4,7
111:16 120:15
120:17,18,22
121:11,25
131:15 139:13
142:15 150:21
150:23 157:15
157:20 158:1,3
158:11 159:20
169:20,22
170:4,12 171:5
**parenthetical**
8:12,17 9:4,9
**park**  65:21,23
68:4
**part**  19:1,2
28:9 29:5,22
35:5 47:16,19
47:25 49:7
61:5 63:4 67:7
67:8,10 91:17
91:21 97:15
101:7,7 103:3
103:5,18 104:8
109:16 110:18
120:25 121:1,2
121:14 126:6
130:25 133:18
141:15 144:23
145:21 146:8
146:17 147:4
159:8 168:7

172:1
**partially**  28:9
**particular**  66:8
66:10
**particularly**
61:20 111:14
142:17
**parties**  180:15
180:18
**parts**  52:5,7
65:20 66:23,25
67:2 102:16
124:9 140:17
149:16 175:15
**party**  33:20
**pass**  40:17 41:4
78:22,25 80:16
80:18 92:9
93:21 98:23
101:12 133:4
133:12 135:14
142:4,18
146:10 148:11
161:21 162:15
166:18 179:4
**passage**  79:8
121:15,24
126:12
**passages**
120:12
**passed**  135:10
**passenger**
139:1
**passing**  91:2
**past**  10:7 27:9
76:10 173:18
**patrol**  17:15
25:5 26:12

68:4,19 69:21
78:18 80:14
105:7
**patrols**  105:8
**pause**  10:17
133:23,25
175:3 178:4
**peak**  105:1
**penalties**  183:2
**people**  30:10
50:14 75:9,13
75:17 118:14
119:18,22
125:4,18 153:1
153:1
**percent**  9:18
14:24 77:25
84:1 92:15
99:23 144:12
144:16 145:7,7
**percentage**
145:7
**perform**  38:21
**period**  16:15
23:16 27:11
42:16,22 74:19
104:12,13
174:16 176:6
177:3
**periodically**
153:25
**perjury**  183:2
**permanent**
43:14 129:5,7
129:10 131:7
155:23 156:6,7
156:11,25
159:1 178:14

Thomas Ciarametaro                                              July 9, 2024

178:15,19,23
178:23 179:2
**permanently**
127:25 128:3
128:20 129:14
130:6,15,19
156:2 159:2
171:22
**permission**
46:5
**permit** 43:13
44:4,10,17
45:11,21 46:13
124:21,25
125:15,22
153:1 154:20
154:23 155:11
155:19 156:4,5
156:9,10,12,16
156:23 177:7
177:16
**permits** 42:9
43:20,21 44:23
44:24,24 75:6
125:6 126:8
152:9 153:3
155:22 157:9
168:11
**permitted** 75:6
129:11 153:20
153:21 168:19
178:19 179:3
**permitting**
124:4,13 150:8
150:11 152:16
152:23 155:3
167:19 179:2

**person** 27:1
119:2 162:24
163:12
**personal** 151:9
**personally**
33:23 37:6
41:21,23 45:14
55:7,8 183:4
**perspective**
39:11
**pertain** 32:2
**pertaining**
136:5 150:7
**pertains**
158:11
**petty** 26:1 27:6
27:11
**photo** 82:25
119:20 175:13
**photographs**
133:18 152:3
173:9
**photos** 81:12
82:7,15 94:10
133:21
**physical** 56:9
91:10,12
**physically**
60:18 75:20
76:2 133:16
**pick** 113:9
**picked** 113:14
**picture** 82:16
82:22 118:23
118:24 161:20
**pictures** 81:23
81:24 119:18

**piece** 61:20
178:18
**pier** 129:4
158:23 177:21
177:21
**piers** 43:14
129:20 150:8
178:7
**pile** 43:15
128:22 129:1
177:21
**piling** 130:22
131:7 179:2
**pilings** 18:17
18:17 128:23
129:5 159:3
178:6,6,20
**pilot** 28:23
92:17 101:23
102:1,8 117:6
118:14 143:15
**piloting** 80:13
165:15,17
**pilots** 118:19
**place** 40:14
41:15 56:13
92:19 97:12
99:23,24
102:22 132:17
134:20
**placed** 16:19
39:6,7,8,19,23
40:21 41:6,20
41:21,23,25
42:2,4 64:22
66:12 76:21
77:4,11 78:10
82:9 92:16,23

94:6,19 95:20
95:25 96:13
100:2,17
104:13,14,21
119:17 144:21
153:13 155:17
155:18 156:2
157:7,8 172:13
172:20 173:11
173:18 177:25
**placement**
41:10 43:15
66:12 83:25
96:6,11 98:21
99:10,11,20
100:12 101:10
129:7 132:5,20
153:9 156:24
173:6 175:20
**places** 26:17
28:5 51:23
85:18 110:23
123:2
**placing** 154:18
154:24
**plaintiff** 1:5
**plan** 35:8 36:8
61:12 97:9
146:9,14
**planning**
100:11
**pleadings**
106:9
**please** 5:3 14:5
30:7
**plus** 143:20
152:4

po 2:7
point 13:20
  15:5,9 23:23
  24:4,9,20 25:2
  25:14 27:4
  40:5,23 46:5
  60:24 63:14,15
  74:19 82:8
  85:9 94:8 96:1
  103:18 121:22
  135:12,18
  144:7 174:7
points 113:11
pole 131:8
police 62:17
  65:11,22
pollution 154:5
port 34:12
  55:14 61:25
  143:19
port's 118:11
portion 35:3
  59:17 64:2,7
  71:11 78:12
  83:1 133:14
  170:19,22
portions
  144:15
poses 111:4
position 116:16
  163:6,10
possibility
  164:14
possible 75:20
  76:2 93:11
  102:1,8 117:6
  119:2,4 161:25
  162:23 163:4

163:10,22
  167:12 178:10
  178:11
post 38:16
  51:20 53:8
potential 91:2
potentially
  15:11 76:18
  93:10 96:16
  98:19 165:5
potomac 28:4
  31:1 47:12
power 159:1
pre 38:15 89:9
prepare 12:22
  13:4
preparing 6:7
  13:7
prescribed
  180:8
presence 105:9
  183:6
present 2:22
presented
  61:13 146:9
  183:4
president
  143:25
press 98:4
pretty 26:18
  30:11 62:1
  68:6 92:7,12
  103:15 110:19
prevent 74:22
  100:3
previous 173:2
previously 33:6
  70:17

principal 138:7
  138:15
principle
  117:25
prior 27:8
  29:19 45:15
  47:1 50:25
  52:18 54:2
  64:1,12 95:24
  108:2 142:14
  174:16,23,24
  175:2,19
private 35:21
  35:23 37:18
  38:4,8,19
  153:1
privately
  153:21
privy 108:12
probably 11:7
  13:10 84:2
  93:1 115:6
  116:21 163:14
  177:20
proceed 39:14
  87:12
proceeded
  65:23
proceedings
  179:18 180:13
process 29:22
  31:2 35:14
  37:14 38:2
  47:7,16,19
  48:1 49:4 61:5
  62:1 125:6,20
  126:3,7 146:22
  146:23 148:1

150:12,14
  152:16,24,25
  155:4 167:19
  167:21 168:2,5
  168:8,13,22
  179:2
processes 31:9
  126:8 136:23
  153:2
produced
  106:10 180:12
professor
  109:15
proficient
  149:16
project 34:8,11
  34:18 35:1
  37:7,10 41:17
  50:4,9 51:1
  52:8,12,18
  53:4 54:2,6,25
  61:12,18 62:4
  63:1,4,6,21
  88:5 89:1,13
  89:14 111:25
  114:20 136:11
  137:8 141:2,8
  141:11,21
  142:12 145:17
  146:19 155:16
projects 34:4
  114:14,25
  136:3,10 141:2
  146:4,7,11,11
  146:16,24
  152:8,22 153:8
  153:11,12,16
  154:18

prop  75:25,25
propeller  76:1
proper  153:18
proposal
  111:25 112:1
proposed
  145:17
propulsion
  76:1
protection
  34:21 36:17,20
  43:23 147:19
prove  61:21
provide  108:9
  108:18
provided  9:12
  58:3 70:16,17
  127:11 158:2,4
  160:10 180:6
providing
  13:22
provision
  124:18
provisions
  124:15 129:11
  170:13
public  62:9,10
  63:18 65:10
  125:9 126:9
  136:24 137:3
  147:4 180:10
  183:4,7
publication
  88:11
publications
  26:10 28:24
  137:22 143:16

published  99:7
  99:8
purpose  50:2
purposes  16:16
  111:6 139:18
  144:4
pursuing  30:17
push  20:6
  53:11
put  32:1 38:15
  97:4 116:12
  154:6,13
  155:11
putting  15:23

**q**

qualifications
  17:16 26:4
qualified
  123:18,22
qualifies  17:2
quantifiable
  140:22
quantified
  140:15 141:24
quantify
  140:11 141:11
  142:10
quantities
  139:23 141:17
quantity  79:14
quasi  74:17
question  11:18
  12:2,7 41:11
  47:3 49:8,22
  94:12 99:14
  129:12 138:12

questions  6:1
  11:10 37:13
  149:6 158:1
  161:19 169:2
  169:12
quick  110:24
quickly  93:11
quite  23:19
  83:12 90:9
  129:18 130:3
  159:6 162:7
  163:5 167:10
  175:1,16
  177:13,20
quotations
  57:22
quote  170:13
quotes  126:14
quoting  164:21
  171:6

**r**

r  4:1 180:1
race  75:19
races  75:15
  154:3
radios  139:5
ramp  158:23
ramps  150:9
range  20:12
  21:8,11,14,20
  40:11 50:18
  51:4 85:4,20
  117:12
ranging  20:7
rank  24:5,10
  25:3

rarely  69:2
rather  126:25
  149:23
rating  24:22
razor  105:8
reach  80:17
  93:8 127:19
reached  113:6
reaching
  108:10
read  6:20
  10:22 25:11
  59:1 71:24
  79:18,21 95:1
  95:14 103:21
  104:7 106:3,18
  106:22 107:11
  107:12 111:1
  120:20 141:16
  157:19,22
  160:6 182:24
  184:9
reading  84:12
  100:16 106:25
  107:4,7 145:1
  145:1,3 160:11
  171:1
ready  12:10
real  93:2 112:8
realize  11:22
really  69:12
  75:21 166:10
  169:19
realtime  180:3
reason  12:19
  126:24 181:5
  184:11

**reasonable**
56:2
**reasons** 105:5
113:22 134:23
156:20 158:17
**recall** 13:20
19:16,24 26:20
28:2 32:5
40:11 44:8
45:6,9 47:12
50:3,8 63:13
79:22 84:11
86:10 94:20
100:7,8,16,20
101:4 106:5,7
106:14,20,25
107:4,6,7
108:22 112:12
112:13 135:12
135:13 142:24
149:8 150:3
152:12 154:17
159:13 162:1
164:17,25
167:22 170:1
**receipt** 184:17
**receive** 24:22
**received** 6:14
48:5 122:6,11
122:12 169:22
169:25 170:19
171:5
**recent** 112:14
**recently** 112:14
**recess** 46:21
120:9
**recognize** 5:16
5:23 7:13

**recollection**
39:22 52:19
99:18,25
**recommenda...**
29:15 49:15
**record** 5:4 12:8
14:8 98:2
120:8 128:25
148:9,10
160:23 179:8
179:13 180:12
180:13 183:1
**recorded** 175:5
180:6
**recreational**
52:21,23
135:23 136:7
136:21
**reef** 159:1
**refer** 64:19
131:14,18
178:14
**reference**
145:15,16
147:11
**referenced**
111:11 184:6
**references**
175:19
**referred** 59:21
64:21 121:22
123:2
**referring** 15:18
59:24 95:19
96:10 97:16
98:12 99:1
114:21 123:5
139:16 144:13

147:17 158:9
**refers** 72:14
141:16 170:12
**reflected**
134:15
**reflection**
114:7
**regarding**
174:20
**region** 22:21
100:18 104:25
105:10 114:25
129:17
**registered**
129:24 180:2
**regular** 28:24
**regulated**
47:17 48:24
**regulations**
45:3 74:15
88:18 155:1
178:22
**regulator**
168:7
**regulatory**
139:7 147:12
147:17 148:1
159:25 168:5
168:17 169:1
170:13 171:6
171:20
**relate** 124:16
**related** 180:14
**relates** 125:6
**relating** 106:22
134:13 137:19
**relative** 77:10
101:11 180:16

**release** 68:23
69:3 98:4
**releases** 68:18
**relevant** 74:18
**reliable** 80:24
116:17
**relied** 58:15
108:10,18
**relies** 122:25
**relocated** 37:23
37:25
**rely** 58:1,2,9,20
122:13,16
**relying** 146:3
**remain** 132:4,7
132:16
**remainder**
127:15 170:11
**remained**
69:10
**remaining**
78:12,14,15
**remains** 144:14
145:5
**remember**
63:16 64:4
73:9 84:12
97:24 159:9
**removable**
156:10 178:24
**remove** 128:12
178:10
**removed** 37:23
37:25 38:14
128:4,9 130:10
131:10 178:16
178:17

| | | | |
|---|---|---|---|
| **repair**  56:6 | 158:18 161:14 | **research**  57:24 | **retained**  14:1 |
| **repeat**  49:7 | 173:20 174:25 | 58:3,4 122:9 | **return**  184:13 |
| 138:12 | 175:18 | 134:19 135:7 | 184:16 |
| **replaced**  82:15 | **reported**  100:1 | 137:18 138:2 | **revetment** |
| 154:1 | **reporter**  1:21 | 152:2 | 158:25 |
| **replacement** | 21:1 43:4 59:6 | **researching** | **review**  36:7 |
| 43:16,16 | 160:18 180:3,3 | 82:12 134:19 | 42:20 112:7 |
| **report**  3:11,12 | 180:24 | **resembles** | 125:7 136:3 |
| 5:7,19,24 6:3,3 | **reports**  10:12 | 177:11 | 180:24 184:7 |
| 6:9 9:14,17,19 | 105:25 106:3 | **reserve**  17:12 | **reviewed** |
| 10:20 12:24 | 106:12 107:12 | **reserves**  17:12 | 100:23 101:1 |
| 13:13 15:17,23 | 107:13 109:1,2 | **residents** | 107:18,20 |
| 57:14 58:13 | 112:17 | 168:10 | 109:18 112:14 |
| 66:14 70:19 | **represent** | **resource** | 113:2,3 |
| 71:12 79:18,21 | 126:5 | 142:11 | **reviewing** |
| 81:2 84:9 | **representative** | **resources**  2:4 | 106:15 |
| 94:18 97:11,16 | 34:25 36:4 | 142:5 | **rha**  120:23 |
| 103:11,19 | **representing** | **respect**  124:25 | 123:19 157:17 |
| 106:18,25 | 125:25 | **responders** | 158:22 161:1 |
| 107:4,7,13,17 | **republic** | 62:11 | 170:6 |
| 107:18,19 | 126:15 | **response**  62:20 | **right**  5:20 8:4 |
| 108:3,13,15 | **requested** | 63:19 97:18 | 8:14 9:5,9 |
| 109:1,6,8,11 | 180:24 | 98:5 137:4 | 11:14 22:10 |
| 109:14 110:8 | **require**  44:15 | 149:5 157:25 | 24:6 30:5 |
| 110:18 111:12 | 138:21 142:4 | 161:19 | 39:17 47:13,20 |
| 112:2,9,18 | 156:23 | **responsibility** | 50:4,7 56:15 |
| 113:11,16,20 | **required**  63:3,6 | 24:21 36:6 | 60:20 64:17 |
| 113:22 117:2 | 87:22 | **responsible** | 76:17 78:6 |
| 118:23 119:21 | **requirement** | 26:7 48:23 | 84:19 88:21 |
| 120:12 122:14 | 147:2 | **rest**  164:10 | 89:10 90:5 |
| 122:17,20,24 | **requirements** | **resting**  162:25 | 94:20 97:17 |
| 124:2,5,13,19 | 88:3,4 139:4,5 | **restore**  50:10 | 98:9,15 105:14 |
| 127:7,16,19,22 | 139:8 | 50:20 52:3 | 109:19 114:2 |
| 131:15 132:24 | **requires** | **restoring**  51:16 | 118:25 121:7 |
| 133:18 134:24 | 138:22 | 52:16 | 121:19 123:25 |
| 139:12 141:23 | **requisite**  16:22 | **result**  155:16 | 134:9,25 137:1 |
| 145:14 150:12 | **rescue**  62:17 | **resulted**  44:10 | 140:7,18 145:3 |
| 151:12 152:4 | | | 145:10 160:23 |

170:16 171:7
175:21 176:18
179:4,7
**rights** 110:5
**rio** 16:14,19
17:3 61:1
63:25 64:10,15
65:25 76:14
95:13 109:22
110:7,12 111:3
113:21 116:10
133:2 134:21
135:3 137:25
138:4 139:16
140:13,17
142:16 144:13
147:22 151:1,7
151:14,22
152:5 157:6
158:16 172:2
172:10,20
173:24 174:10
175:6,10,11,18
**riprap** 158:25
**rise** 61:2
**risk** 91:2
**river** 16:14,19
20:23,24 21:4
21:9,16 22:2
26:16 27:20,23
28:4,4,12,14
28:21 29:20
31:2,3,6,20,21
32:6,15,16
34:5 37:10,17
37:19,21 38:8
39:16 40:1
41:22 47:12,13

48:21 50:1,9
50:10,21 51:7
51:13 52:6,9
52:16 53:25,25
54:4,12 56:19
61:2,16 62:13
62:19 64:22
65:25 66:24,25
67:3,4,23
68:14,20 69:11
69:14,23 70:4
76:20 77:19,25
78:5,13,24
79:1,3 80:9
82:9 84:7,10
84:25 85:5,16
91:14,22 92:8
92:14 93:5
95:8,13 96:20
101:13 104:11
110:22 113:25
115:4,24 119:3
129:22,23,23
133:2,3,9,14
133:14 137:25
138:17 139:17
140:17 142:16
143:11 144:13
144:15,22
145:4 151:1,7
151:15,23
157:6 158:16
164:16 165:8
166:12,14
172:2,10 173:5
175:10,14
176:16

**river's** 140:4
**rivers** 20:20
28:3,9,10 42:9
43:12 57:10,14
57:22 87:21
123:25 124:2,6
124:9,15 125:3
150:2,9,15
152:10,17,18
**rmr** 1:21
180:22
**road** 149:18
**roads** 143:25
**role** 35:11
167:16
**roles** 168:10
**rotate** 163:11
**rough** 15:16
179:14,17
**roughly** 10:12
16:4 34:7
50:17 51:6
65:24 66:6
77:9 78:12
80:1 83:19
84:21 152:19
172:19,25
176:6
**round** 131:2,3
**route** 29:19
30:18
**rowboat** 92:5
**rpr** 1:21
180:22
**rubinstein**
107:5
**ruggieri** 1:21
180:2,22

**rule** 155:23
**rules** 55:4
149:18
**run** 29:11
91:12 93:1
165:7
**running** 6:24
76:24

**s**

**s** 3:9 4:1 21:2
**safe** 29:9 49:18
78:22,25 91:24
97:2 117:18,21
**safely** 165:19
167:13
**safer** 79:8
80:16,18 92:17
92:25
**safety** 30:17
62:9,10 63:18
65:10 99:20
100:4 101:11
118:2,18
136:25 137:3
139:4 147:5
**sarah** 98:12
**satisfactory**
180:7 183:4
**saw** 68:3 78:17
135:7,9,9
172:16
**saying** 15:15
62:3 90:12
98:3 128:2
131:22 136:1
162:1 164:25
167:22 168:8

says 4:10 7:5
8:13 9:4
127:24 139:15
142:1,15
144:12 159:22
170:4 172:1
scale 141:7,12
scenario 41:9
144:2
school 24:13,15
25:2
schooner 154:3
science 72:2,2
72:7,7,11,18
scope 16:7
scotia 26:16
se 29:11
seabed 129:6
seaman 24:7
seasonal 69:16
69:18
seattle 129:19
seawall 43:16
second 8:24
70:11 159:19
159:19 171:4
section 2:5
43:13 71:17
124:6,21 152:9
152:17 153:11
154:21,24
156:8
security 72:14
72:20,24 73:5
95:9
see 5:15 9:8
39:12 41:1

170:20 178:15
65:20 66:15
69:22 70:13
81:4,15 82:17
83:13 94:2,24
94:25 95:4
113:11,15
120:22 126:17
127:22 131:20
132:24 133:5
133:22 135:4
137:23 139:25
142:7,22
144:18 145:16
145:21 147:10
150:19 157:18
167:10 171:12
172:3
seeing 63:13
69:20 84:12
101:4 114:14
135:13
seek 67:21 68:8
104:17 154:19
154:23 155:19
155:22 156:12
168:16
seeking 42:9
46:5
seemed 66:24
seems 82:17
seen 41:6 82:11
94:10 101:2
104:20 119:9
119:14,16,23
129:16,19
173:9,10
send 43:24

sends 43:25
senior 17:12
sense 76:6 77:8
79:14,16,23
sensitive 26:13
sent 184:14
sentence 70:13
95:15 127:24
132:25 133:5
139:15,25
141:15 142:1
142:15,22
144:12,18
145:22 147:16
157:16 159:19
159:20,23
160:13 170:4,6
170:8 171:4,24
sentences
158:6,8 161:4
separate 158:5
separated
62:13
separately
122:9,10
september
98:14 99:15
sequential
75:11
series 11:10
115:15
serious 33:20
112:8
served 27:2
serves 172:23
services 9:12
13:22

set 6:8 123:19
153:11
settemeyer
107:5
setting 126:6
seven 10:18,19
60:6
shallow 61:18
62:18 85:21
92:23 96:15
146:15 175:14
shallower
96:19
shapes 157:13
sheet 18:17
181:3 184:11
shelby 65:21
shields 106:19
ship 25:6 26:12
27:1 29:11,12
29:23 118:6
shipyards 56:6
shoal 95:7
164:12
shoaled 93:4
shoaling 89:11
shore 72:2
shoreside 56:4
show 30:13
97:15 110:17
113:12
showed 112:3
shown 95:25
shows 30:1,12
side 13:17
62:15 77:20,23
78:1,4,4,8,23
78:23 79:8,9

83:18,19 84:22
91:23 92:6,19
93:3,4,5,7,16
93:17,22,22
94:3,16 96:19
144:22,24
148:1 162:5
165:8
**sides**  80:10
**sight**  66:3
**sign**  184:12
**signature**
180:21 181:3
**signed**  107:23
183:2,5 184:19
**significance**
126:21
**significant**
111:4 127:18
**significantly**
104:24
**signing**  108:2
**signs**  135:4,8,9
135:9,13
**sills**  112:4
**similar**  157:7
157:10
**similarly**  20:11
31:6
**simultaneous**
160:17
**sir**  5:21,25 8:18
9:13 11:12,19
12:4,11 14:10
15:4,20 16:3
19:14 23:13
43:1 60:1
64:11,13,18

65:6 71:5,19
98:16 111:19
**site**  67:5 77:8
82:4,10 90:3
99:2 104:18
119:9 161:20
162:12,15
166:17 174:8
174:13,21
176:4,7 177:1
177:4
**sitting**  7:15
12:25 84:15
**situated**  34:5
68:20 96:10
137:25
**situating**  95:3
95:6
**situation**
115:18 166:4
166:15
**six**  10:15 60:8
60:10,10
104:23 132:13
**sixth**  59:13
**size**  26:19
55:14 78:21
79:4 177:16,19
**sizes**  157:11,13
**ski**  118:5
**skill**  117:24
**slightly**  94:10
**small**  25:25
53:11,14,18
68:3 115:2
**smaller**  20:6
22:7 114:14
141:2

**solely**  58:20
**solutions**  18:24
184:23
**somebody**  93:8
96:18
**sorry**  28:13,14
59:7 60:8
103:23,25
120:19 121:8
159:15 160:19
**sort**  41:13
44:25 45:16
69:16 74:23
86:12 90:4
105:16 111:17
141:20 142:10
**sorts**  73:2
139:7
**sought**  18:1
45:11 104:9
152:9
**sound**  106:21
**sounds**  109:18
120:3
**sources**  49:13
97:16 98:18,20
**south**  64:3
87:14 164:10
**southbound**
65:24
**southern**  64:2
64:7
**speak**  13:3
44:24 99:19
106:23 123:18
**speaking**
161:10

**specific**  19:21
21:3 32:6
41:11 47:25
64:4 72:17
74:25 94:12
100:15 104:15
111:25 114:19
116:7 119:6
132:11 142:25
149:16
**specifically**  7:4
8:4 20:21 26:6
27:20 28:20
34:17 35:14
39:3 42:25
45:10,22 50:17
61:4 69:13
70:5 72:16
74:21 100:10
103:20 125:24
135:12 159:9
176:21
**specifications**
136:18
**specifics**  45:6
**specify**  90:14
**speech**  160:17
**speed**  30:14
39:13 166:10
**spell**  20:25
43:2
**spend**  66:3
**spent**  13:7,12
**spin**  163:6,18
163:24
**split**  77:24
86:18 87:13

**spoke** 12:25 31:24 99:2
**sporadically** 18:25 39:8
**spot** 41:4 42:5 42:5 161:24
**spots** 69:11,11
**stand** 96:16
**standards** 129:9
**standing** 78:7 79:25 96:18 164:2
**star** 97:18 98:5
**start** 83:1 104:2 133:21 134:1 164:10
**started** 15:12 160:5
**starting** 8:7 121:24
**starts** 96:14 120:22 121:5 121:11,23 126:13 160:9 161:3
**state** 1:8,9 5:3 14:2 34:24 36:23 37:1 46:6 47:23 49:23 58:19 65:11,22 89:18 94:19 139:10 156:3 169:5 184:4
**stated** 98:23 104:23

**statement** 6:12 54:22 94:24 170:22 171:2
**statements** 183:1
**states** 1:1,4 2:11 5:7 17:8 31:13 46:25 47:18 73:25 77:16 78:4 103:14 109:3 126:15 158:12 184:4
**station** 17:13 27:10
**stationed** 24:22 25:4,15,18
**statistically** 105:16
**status** 49:10
**statute** 45:2 124:10,16 168:4 170:15
**statutory** 45:18
**steel** 126:16 131:8
**stems** 111:6 139:18
**step** 125:20,22
**stopped** 160:5
**storms** 102:17
**straight** 84:1
**strategic** 96:25 97:3,7,14 98:21
**strategically** 94:19 95:3,6 96:9

**strategy** 96:11
**street** 2:16
**stretch** 67:4 69:23 76:20 77:3,19 84:7 101:12 104:11 110:12 111:10 115:3 116:10 133:20 134:6 140:13 142:3
**strike** 153:9
**string** 164:9 165:20 177:12
**stringent** 145:18 147:11
**structure** 45:12 45:17 129:1 130:19 131:5 155:23 156:1 156:16 159:1 161:3 165:4 177:16,19 178:23 179:3
**structures** 19:13,13 70:15 71:8 74:21,25 124:14 126:10 128:23 129:10 150:8 156:7,8 156:21 157:17 158:13,19,22 158:22 159:23 160:10 161:1 170:5 171:7
**studied** 72:5
**studies** 72:20
**study** 105:22

**stuff** 20:6 37:22,24 38:14 43:16 53:13 57:5 66:19 73:12 102:19 110:21 128:23 148:2 160:21 170:25
**style** 81:4
**subject** 32:24 64:23 124:5 139:7
**subjects** 16:23
**submitted** 5:6 105:25 108:12 112:2
**subscribe** 183:1
**subsequent** 126:22 174:9 174:12,22
**subsequently** 169:23 174:13
**substantial** 111:7 114:16 139:18 140:16
**successful** 44:9 52:12
**sufficient** 139:22 141:16 141:21
**sufficiently** 76:8
**suggest** 169:7
**suitable** 16:15
**suite** 1:17
**summary** 3:12 111:17

**supervised** 36:1
**supplemental** 107:13,20 108:15 109:1 112:3,11,19,24 113:1,8,23 146:16
**supplied** 127:5 160:2
**support** 14:12 34:19 56:1,5 56:12 140:20 143:21
**supported** 128:22 129:1 177:21
**suppose** 75:22 75:22
**supposed** 69:2
**sure** 14:25 23:21 26:10,14 28:14 29:9 36:9 45:4 47:4 59:14 70:10 99:12,16,23 115:15 117:21 118:17 120:6 136:15 140:21 140:22 147:25 160:4,4,22 161:10 163:9 163:14
**surface** 83:13
**surmount** 62:7 62:12
**surveyed** 67:4

**suspect** 99:22
**swim** 75:15,19 154:3
**swimming** 96:18 163:6,10 164:2
**sworn** 4:9 180:10
**system** 29:25 30:8 74:2 76:1 115:24 139:20
**systems** 111:8 115:16

**t**

**t** 3:9 165:3 166:3 180:1,1
**t.j.** 149:4
**tag** 81:16,17
**take** 5:15 13:17 29:20 46:18 60:22 65:8 73:3 76:9,19 84:22 89:6 105:16 109:20 110:15,24 116:16 117:19 120:1,5 125:9 132:12,12 134:20 141:19 142:9 153:24 170:9 172:10 178:24
**taken** 21:4 118:17 134:10 134:16 174:12 174:15 177:2,3 182:24

**talk** 12:6,7 30:4 97:11 103:22 124:7 132:23 173:23
**talked** 49:14 100:19 131:25
**talking** 90:11 91:21 103:2 121:20 138:13
**talks** 97:21 99:24 100:4 110:20
**tall** 167:11
**tampa** 146:12
**tandem** 46:17
**tankers** 55:15
**targeted** 75:1
**task** 103:3
**taylor** 106:7,14 106:16,17 107:16 108:6,8 112:12 116:12
**team** 26:1
**tell** 68:13 168:15
**temporarily** 128:8 154:4
**temporary** 128:5,15,17 131:18,23 132:10,18 156:9,24
**ten** 18:25 46:19 53:1 71:7 118:14,18
**tenure** 32:7 43:11 44:9 46:3 49:6 50:5

**term** 55:6,21 59:8 132:17 143:3,4
**terminal** 55:13 144:1
**terms** 19:25 46:12 53:17 68:10 69:6 70:23 79:24 99:20,20 100:10 101:8 103:5 104:20 108:16,16 174:20
**terrorism** 73:4 73:8
**testified** 10:7 33:2,6,8 49:9 49:25 50:3 60:16 71:1 140:2 145:2 149:5 150:1 157:25 161:18 161:23 164:20 164:21 177:7 178:6
**testify** 12:17,20 116:16 123:9 123:11
**testifying** 11:5 11:13 169:17 169:19 171:25
**testimony** 8:4 8:23 9:1,20 11:1 23:7 122:5 123:2 137:2 169:21 170:1 184:9,17

**texas** 1:1,8,9
2:14,17 14:2
15:10,13 58:6
58:20 65:11,12
65:16 68:19
70:8,24 98:8
98:13 106:1,12
107:13,17
108:1 142:4
147:21 157:7
158:2 184:4
**text** 59:25
**thank** 5:13
60:11
**thereto** 180:18
**thing** 43:10
45:1,10,16
48:1 101:24
143:4 160:11
160:23
**things** 29:2
30:4 49:1
65:19 66:8
74:4 92:2
112:6 122:18
122:18 124:12
124:16 130:10
151:8 159:11
171:9,10
**think** 10:1 28:5
28:5,15 31:23
41:9 47:15
60:6 68:5 70:3
74:3 82:13
87:16 90:2
92:25 94:1
100:3 105:4
107:16 110:23

111:11,15
118:23 119:25
121:3,3 130:21
131:25 144:24
155:1 159:10
159:18 160:20
161:9 167:20
172:22,22
174:25
**thinking** 97:9
98:21 100:11
100:21 110:18
114:23 138:6
**third** 78:14,15
145:16
**thirds** 78:2,5,9
78:24 79:1,2
92:14 104:4
111:21 144:25
145:4,6
**thirty** 85:11
**thomas** 1:13
3:5 4:8 5:5
180:4 181:1
183:3,4 184:5
**thoroughly**
171:1
**thought** 82:14
100:17 121:4
**thousand** 118:6
177:12,20
**thousands**
105:2
**threat** 62:10
**three** 7:16 9:8
20:13 33:14
66:24 67:6
120:11 122:6

122:18,25
123:1,9 133:8
158:7 160:14
160:15,16
161:4
**threshold**
55:20 141:20
142:11
**throw** 140:24
**thumb** 155:23
**tidal** 50:17
85:20
**tide** 50:18,18
52:25 85:20,23
85:25 86:3
156:1
**tides** 50:19
62:8,9,18
**time** 11:4 13:6
13:11,21 15:3
15:9 16:4
18:22 19:1,2
22:18 24:23
25:2 26:22
27:4,11 28:15
33:2 38:1 51:5
62:20 64:3
66:2,22 68:23
89:25 90:9
96:11 99:6,7,8
135:18 144:7
162:12 174:7
175:5 176:4
184:18
**timeframe**
184:8
**times** 11:20
13:2 20:16,18

33:14 89:7
90:17 93:24
139:10 154:11
160:22 161:9
165:21,22
**timmel** 2:22
109:6
**timmel's** 79:21
**title** 24:5,10
25:3
**titled** 5:18
**today** 6:11 7:15
10:25 11:2,10
12:12,15,20
109:6 120:11
145:3 151:9
172:25
**today's** 12:23
13:7
**together** 15:23
32:3 75:24
116:12 153:4,5
**told** 94:9
**tonnage** 17:21
18:2 130:2
**tons** 17:24 18:3
**took** 73:6 81:25
82:3 99:4
126:24 133:8
161:20
**top** 7:2,9 81:20
81:20 84:11
100:15 104:5
106:8 124:17
132:25 158:6
158:21 159:8
164:9

topic 71:12
topic's 130:3
topography
  69:10 110:22
total 13:8
  34:23 67:6
  105:9
totality 29:8
  32:1 151:11
touch 162:16
  162:18,20
touched 163:17
  163:18
tough 61:20
tour 22:24 65:9
  78:19 99:2,4
  133:8 134:17
  138:17,17
toured 133:13
  133:16
tours 22:16
  135:2,4,15,18
  138:8,9,21
  139:3,7
towards 70:18
  80:8,9 91:22
  93:3 94:16
  141:16 162:4
towns 147:20
traffic 29:23
  53:3 96:24
  97:1,13 138:1
  138:1 143:23
train 117:23
training 25:25
  58:10 71:18
  73:19 123:14
  149:15 157:2

transcript
  179:10,12
  180:12,24
  182:24 183:1
  184:6,19
transient
  153:24
transmission
  159:2
transporting
  111:4
travel 62:15
  167:13
traveling
  102:24 133:1
  166:13
traverse 91:9
  92:8 93:15
  95:12 175:9
traversed 94:2
traversing 64:6
  101:19
trawlers 53:12
treaties 147:13
  148:5
trees 102:16
trial 123:9
tributaries
  38:7 39:16,20
  88:6 143:12
  154:9
tributary 39:25
  40:9,10,22
tried 76:9,19
  175:9
true 48:6 88:22
  89:12 174:19
  180:12

truthfully
  12:17,20
try 12:5,6,6,8
  66:9 146:19
  162:9 164:1
trying 28:4,5
  52:2 54:24
  83:16 105:13
  117:15 119:3
  153:1,2 159:17
  160:20,22
  161:9 164:15
tuesday 1:14
turn 121:9
  150:18
turned 33:20
twice 33:12
two 8:11,19
  14:11 25:16
  34:3 58:18,23
  59:3 65:24,24
  67:6 70:8 78:1
  78:2,5,9,24
  79:1,2 86:14
  86:15,16,18,22
  87:4 92:14
  99:6 104:4
  111:21 112:17
  112:21 115:23
  116:2 122:5
  123:2 133:8
  134:7 137:12
  140:7 144:25
  145:4,6 147:25
  158:7
type 19:4 30:16
  32:20 43:10
  45:1 67:12,16

70:5 105:22
  114:19 118:14
  130:25 177:16
  177:19
types 21:23
  49:5 52:19
  53:2 57:1 68:1
  88:23 103:17
  138:14 146:24
  155:22
typical 53:17
  69:16
typically 52:20
  61:22

**u**

u 21:2
u.s. 2:3
ultimately 44:1
  62:11,23,25
  86:17 134:6
  136:9,11
unable 62:19
  175:10
uncalculable
  140:20
under 11:13
  30:11 33:17,19
  42:9 45:2,17
  88:18 125:2
  126:11 129:11
  138:24 139:13
  150:9,14,21
  152:9,10,16,17
  153:11 154:21
  154:23 157:17
  158:12,22
  161:1 170:6

183:2

**undergo**
145:18

**undersigned**
183:4

**understand**
11:10 12:3
40:6 42:3
59:16,23 64:20
83:7 98:1
123:5 145:13
146:6 147:2
173:2

**understanding**
16:6,12,13
61:8 66:14,17
74:1 89:4
91:15 145:2
157:1 171:14
171:21 172:19

**understood**
52:4 72:21
136:14 171:3

**undertake**
116:9

**undoubtedly**
145:18

**unit** 24:25

**united** 1:1,4
2:11 5:7 17:8
31:12 46:25
47:18 73:25
77:16 78:4
109:3 126:15
158:12 184:4

**units** 27:7

**universal** 41:14

**unnecessarily**
95:9

**unobstructed**
144:14 145:5

**unobstructedly**
93:14

**unpaid** 168:23

**unsuitability**
111:6 139:17

**untruthfully**
106:23

**updating** 26:8

**upriver** 64:9
67:7,9

**upstream**
133:1

**url** 97:17

**us's** 78:1

**usa** 106:11
107:14

**usace** 44:25
61:10 63:20

**usdoj.gov** 2:10

**use** 29:1 52:20
67:22,25 73:19
75:3,8,11,16
86:13 103:13
110:5 115:22
117:18,22
120:7 131:18
132:17 143:16
178:6

**used** 19:12
20:15 22:6,12
130:22 143:22
144:3 184:19

**uses** 61:22
146:22

**using** 19:17
22:3 117:20

**usually** 46:16
128:22

| v |
|---|

**v** 5:7 126:15
158:12 184:4

**vague** 76:23

**variables** 53:22

**variation** 69:16
69:19

**varied** 51:2,8
66:23

**varies** 53:20
85:1,23 87:1

**variety** 17:16
29:1 92:1
128:9

**various** 49:13
112:4

**vary** 69:8
116:4,6 157:11

**varying** 117:20

**verify** 97:8
114:4 123:4
184:9

**veritext** 184:14
184:23

**veritext.com**
184:15

**versus** 77:20
78:23 104:22
172:13

**vessel** 18:6
19:15,21 20:5
21:3 22:2,6
26:9,18 27:3

27:15 30:12,13
53:3,20,20
67:12,14,16
76:10,19 77:5
79:4 80:13,14
91:2,9,12,25
92:4,17,18
101:23 102:8
102:24,25
117:6,8 118:10
118:12,15
138:14 139:1
159:3 164:14
164:23,23
165:6 166:4,5
166:19,21

**vessels** 18:2,14
19:23,25 20:7
20:12,16 21:8
21:15,22,25
22:12 23:5
30:1,9 52:19
52:21,22 67:19
67:22 86:13
95:10,12
101:12,18
102:2 111:5
117:21 137:24
139:21 167:13

**vice** 164:2

**vicinity** 39:20
64:16 80:15
90:18 101:24
102:23 119:22
133:11 173:17

**video** 133:18
134:5,15 176:4
177:2

**videos** 134:4
174:9,12,15,22
**view** 60:24
130:25
**virginia** 24:23
**visible** 82:22
90:20 91:4
167:4
**visit** 67:5,14
77:8 82:4,10
90:3 94:14
104:18 119:9
161:21 162:15
174:8,13,22
176:4,7 177:1
177:4
**visited** 63:25
64:15 65:1
118:25 162:12
166:17
**visiting** 68:11
**visual** 83:23
134:15,16
**vs** 1:6

**w**

**w** 2:16
**wade** 119:3
**wading** 119:18
**wake** 38:11,12
38:18 39:6,19
39:23 41:15,19
41:21 94:2
154:7
**walk** 163:12
**walked** 65:22
**walking** 96:18
119:22 175:13

**want** 14:7
70:10 71:14
77:2 103:21
106:23 117:21
118:16 120:5
125:18 157:24
179:9,16
**wanted** 50:20
93:8 120:14
127:21
**wants** 75:21
**wash** 68:24
**washington** 2:8
**watch** 26:24,25
138:22 139:4
**watched**
133:17
**watching** 22:17
22:24 138:9,17
**water** 27:14
29:8 31:11,12
31:12 32:20
46:25 47:18
48:12 49:22,22
49:23 50:11,13
50:18 51:8
52:24 53:1
56:3 66:19,22
66:25 68:10
69:4,7,16 79:2
79:4,7 81:21
83:12 85:21,22
90:4,4,17 91:3
92:6 93:3,6,9
93:23 110:5,6
128:21 138:21
138:23 140:18
140:19 142:25

155:24,25
156:11 162:6
162:21 163:1
163:13,16,23
164:11 165:5
174:1,2 175:11
176:10
**waterborne**
67:13 102:25
138:6,14
**waters** 26:11
47:23,24,24
48:23 59:4,8
59:12,20 95:7
120:24 121:5
121:12 130:9
**waterway**
16:14 17:4
19:17 31:7
32:2 39:9
46:24 47:8,18
49:10 52:20
55:22 56:10
60:17,19 70:5
88:24 142:19
143:3,10,17,22
147:24 153:13
154:19 155:18
**waterways**
19:16,18 20:16
20:20 28:8
37:2 47:13
49:5,6 87:20
88:7 89:23,23
118:1 130:23
143:5 144:3,6
144:8 154:8
155:2 178:22

**way** 1:17 39:5
44:16 68:19
74:11 78:2,5,8
95:11,23 104:5
111:22 116:16
125:2 128:7
139:5 145:16
**ways** 34:16
73:23 110:11
115:8,23
167:11
**we've** 154:1
**weak** 175:6
**wearing** 139:9
**websites**
137:23
**week** 15:13,19
16:5 112:15
**weeks** 7:16
**weighed**
136:25
**weir** 158:24
**went** 12:24
49:3 121:4
159:13 165:12
165:12,22
**western** 1:1
**whale** 22:17,23
138:8,17,22
139:3
**wharf** 158:23
**wide** 85:19
86:5,25
**wider** 84:21
**widest** 85:18
**width** 83:17,20
84:7,9,15,17
84:25 85:4,14

86:22 91:17
**winter**   130:11
**wintertime**
   130:9
**wire**   105:8
**wit**   183:5
**witness**   3:3,11
   4:8 5:19 9:4,12
   15:7 32:12
   148:12 179:5
   180:6 181:1
   184:8,10,12,18
**witnessing**
   151:11
**wondered**
   172:8
**wondering**
   68:22
**wood**   131:8
**word**   159:22
**words**   41:3
**work**   13:12
   14:16 15:6,16
   16:2,3,5 33:23
   35:24 46:17
   74:5,7 86:11
   124:22 146:9
   146:13 158:20
   159:3
**worked**   8:5
   18:24 37:14
   66:18 122:19
   152:8,23
**working**   14:19
   15:11,12 41:17
   64:1
**works**   74:2

**worth**   11:7
**worthwhile**
   141:22
**wreckage**
   102:16
**write**   9:14,19
   46:14 115:6
   127:3,15
**writing**   7:21
   46:15 127:1
**written**   10:13
   112:9
**wrong**   14:8
**wrote**   159:8

| x |
|---|

**x**   1:3,11 3:1,9
   173:14

| y |
|---|

**yards**   40:12
   167:8,9,9
**yeah**   20:3 24:6
   42:1 59:14
   60:10 71:21
   77:1 78:7
   82:13 86:7,16
   87:6 88:19
   95:3 102:14
   114:24 120:6
   121:8,8,10
   128:22 138:20
   160:25 169:5
**year**   24:1 65:5
   90:12 132:12
   154:6,11
   155:25 172:21
   172:25 173:19

**years**   9:25 10:2
   10:7 17:6,7
   18:25 23:11
   25:16 105:1
   139:10 152:15
   154:3
**yellow**   81:16
   81:16
**yup**   161:17

| z |
|---|

**z**   107:8
**zhao**   107:8
**zodiac**   21:12
**zone**   34:21
   36:17,22

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.