1

```
1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2
    UNITED STATES OF AMERICA,    )
3                                )
              PLAINTIFF,         )
4                                )
    VS.                          ) NO. 1:23-CV-00853-DAE
5                                )
    GREG ABBOTT, IN HIS          )
6   CAPACITY AS GOVERNOR OF      )
    THE STATE OF TEXAS, AND      )
7   THE STATE OF TEXAS,          )
                                 )
8             DEFENDANTS.        )

9

10      WARNING! This unedited rough draft of the
    proceedings was produced in Realtime and is not
11  certified. The rough draft transcription may not be
    cited or used in any way or at any time to rebut or
12  contradict the certified transcription of proceedings.
    There will be discrepancies in this form and the final
13  form, because this Realtime transcription has not been
    edited, proofread, corrected, finalized, indexed, or
14  certified. There will also be a discrepancy in page
    numbers appearing on the unedited rough draft and the
15  edited, proofread, corrected, and certified final.

16

17

18

19

20

21

22

23
```

24

25

2

1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are now on the

3    record.  This begins video number one in the deposition

4    of Mario Gomez in the matter of United States v Greg

5    Abbott, et al., in the U.S. District Court for the

6    Western Division of Texas Austin Division.

7                    Today is Tuesday, July 16th, 2024, and the

8    time is 1:01 p.m.  This deposition is being taken remote

9    via Zoom at the request of the office of assistant -- of

10   the Attorney General, Assistant Attorney General,

11   Special Litigation Division.  The videographer is

12   Zachary Loyd of Magna Legal Service.  The court reporter

13   is Natalie Martin of Magna Legal Service.

14                   Will counsel and all parties present state

15   their appearance and whom they represent.

16             MR. BRYANT:  My name is David Bryant.  I'm

17   with the office of the Attorney General of Texas,

18   representing the defendants in this action.  And I see

19   that my colleague, Johnathan Stone, who also represents

20   the defendants is on Zoom with us.

21             MS. KRUGER:  My name is Mary Kruger.  I'm

22  an assistant United States Attorney in the Western

23  District of Texas.  I represent the United States of

24  America, the plaintiff.

25                 And I'm joined by our witness.  You can go

                                                              3

1  ahead and introduce yourself.

2                 THE WITNESS:  Oh, Mario Gomez, with the

3  International Boundary of water --

4                 THE REPORTER:  Sorry, you sound a little

5  bit quiet.  Would you mind repeating that?

6                 THE VIDEOGRAPHER:  Yes.

7                 MS. KRUGER:  Let me pull it closer.

8                 THE WITNESS:  Yes.  Mario Gomez with the

9  International Boundary and Water Commission.

10                THE VIDEOGRAPHER:  The court reporter may

11  now swear in the witness.

12                THE REPORTER:  Okay.  My name's Natalie

13  Martin.  I'm the court reporter for today.  My CSR

14  number is 11867.  Reporting this deposition remotely in

15  Houston, Texas, via stenographic means.

16                Mr. Gomez, if you could raise your right

17  hand with me.  Do you swear or affirm the testimony

18  you're going to give today will be the truth, the whole

19  truth, and nothing but the truth?

```
20                 THE WITNESS:  I do.

21                 THE REPORTER:  Okay.  Just speak up a

22   little louder for me.

23                 MS. KRUGER:  Yeah, I think --

24                 THE WITNESS:  I do.

25                 MS. KRUGER:  Feel free to talk loud.  I
```

                                                    4


```
 1   know you're very soft spoken.

 2                      MARIO GOMEZ,

 3   having been first duly sworn, testified as follows:

 4                      EXAMINATION

 5   BY MR. BRYANT:

 6        Q.  Mr. Gomez, could you state your full name for

 7   the record?

 8        A.  Mario Gomez.

 9        Q.  First of all, I want to thank you for making

10   the effort to be present here today.  Your attorney

11   advised me that you've had some illness recently.  And

12   I -- I hope you're feeling better, and I assume you are,

13   or you wouldn't be here.  Because if you didn't feel

14   like you could do this, we could do it another time.

15                 Are you -- do you feel like you're well

16   enough to testify truthfully and accurately?

17        A.  Yes, sir.
```

18      Q.  Okay.  Thank you.  You mentioned that you're

19   employed by the International Boundary and Water

20   Commission.  Is that the U.S. section of the IBWC?

21      A.  That is correct.

22      Q.  How long have you been employed by the U.S.

23   section of the IBWC?

24      A.  I started in 2004 as a power plant engineer.  I

25   moved on to area manager in 2013 or '14.

                                                    5

1      Q.  Okay.

2      A.  I'm currently regional manager.

3      Q.  Okay.  And what is your base or headquarters in

4   your current role with US IBWC?

5      A.  Well, our headquarters is in El Paso, 4191

6   North Mesa, El Paso, Texas.  But I work as regional

7   manager for the middle section.  So my -- my base office

8   right now would be in Laredo, Texas.

9      Q.  And could you describe generally the -- the

10   region for which you have responsibility within U.S.

11   IBWC?

12      A.  The region would be called the middle Rio

13   Grande, which would cover from the Presidio Texas field

14   office, Amistad field office, Laredo field office, down

15   to -- field office --

16                    (Reporter interruption for clarification.)

17                    THE WITNESS:  Falcon field office.

18      Q.  (BY MR. BRYANT)  Thank you.  And for what types

19   of operations or other activities do you have

20   responsibility in your role as regional manager of --

21   within the US IBWC?

22      A.  My duties would include operation and

23   maintenance of dams in the power plants.  That's what

24   the main focus of my duties would entail.

25      Q.  Okay.  And has that been generally true

                                                           6

1    throughout your time with US IBWC?

2                    That you've been involved with the

3    maintenance and operations of dams?

4       A.  Yes.

5       Q.  Okay.  Now, I think in -- that you gave a short

6    deposition roughly a year ago in this case; is that

7    correct?

8       A.  Yes.

9       Q.  And I think that at that time you -- you either

10   agreed or didn't disagree when someone called you a,

11   quote, dam operation specialist, unquote, is --

12                    MS. KRUGER:  Objection; form.

13      Q.  (BY MR. BRYANT)  -- is that a fair description?

14      A.  I'm a -- can you repeat that?  Dam operation --

15      Q.  Dam operation specialist.

16      A.  I know my title is supervisor, general

17  engineer.  And I go by other titles, area manager.  So I

18  don't know about that --

19      Q.  Okay.  Are you a licensed engineer?

20      A.  No.

21      Q.  Are you -- is part of your job responsibility

22  involve the subject releasing water from dams operated

23  by the US IBWC?

24      A.  Back at that point -- back in the days, yes, as

25  area manager.  I'm currently more of the regional.  So,

                                                        7

1  an area manager means that there's a manager on-site

2  that I'm called in Amistad Dams.

3              So they would be more responsible for the

4  releases of the dam.  In my current position, as

5  regional, I would just help in other -- and support them

6  in other areas.

7      Q.  And it sounds to me -- and please correct me if

8  I'm wrong -- like you -- you once were directly involved

9  for water releases from US IBWC dams, but now you're

10  probably two levels above, in terms of responsibility

11  and management?

12    A.  Just one level.  But, yes --

13    Q.  Okay.  Just one level.

14    A.  At one point, yes, I was there -- I was there

15  at the dam.  And I was responsible for releases.

16    Q.  Okay.  And so even though you don't directly

17  control the releases now, you have oversight of US IBWC

18  operations involving water releases from its dams?

19    A.  Yes.  Yes.

20    Q.  Okay.  I want to talk to you now mainly about

21  the last year, kind of from the summer of 2023 to the

22  summer of 2024.

23           As of the summer of 2023, when you gave

24  your deposition, I think you were on temporary duty at

25  Amistad Dam; is that right?

8

1    A.  Yes.

2    Q.  But at that time, your -- your primary focus

3  was Falcon Dam?

4    A.  Yes.

5    Q.  Okay.  Now, at that time, in June or July of

6  2023, did you have any part of your job responsibilities

7  at or near Eagle Pass, Texas?

8    A.  Yes.

9    Q.  Okay.  What were your job responsibilities at

10   Eagle Pass, Texas, in the summer of 2023?

11        A.  As acting area manager at the time for the

12   Amistad Dam field office.

13        Q.  Okay.

14        A.  Part of my responsibilities were floodplain

15   inspection.  So, floodplain inspection's just entitled

16   observe and report any site conditions of the Rio Grande

17   river flood area.

18        Q.  So the floodplain inspection doesn't have a

19   direct connection to dam operation, does it?

20        A.  Floodplain inspect -- can you repeat the

21   question?

22        Q.  Is it fair to say that inspections of

23   floodplains and activities in floodplains is not

24   directly connected to the maintenance and operation of

25   dams?

                                                        9

1        A.  To the operation, maybe not the maintenance.

2   Operation wise, because -- well, when you release water

3   from the dam, we want to make sure water can convey

4   through the river channel.

5        Q.  Okay.  As of the summer of 2023, were you

6   also -- had a job function relating to the floodplain

7   below Falcon Dam?

8      A.  No.  I was acting at Amistad.  So my area

9  responsibility was Amistad, and just downstream of

10 Amistad.

11     Q.  Okay.  And Eagle Pass is about how far

12 downstream from Amistad Dam?

13     A.  I'm not -- it's an hour drive.  So --

14     Q.  Okay.

15     A.  -- not too -- you know, but...

16     Q.  Aside from this matter of floodplain

17 inspections, did you have any other responsibilities in

18 Eagle Pass or the -- the Eagle Pass area in Maverick

19 County, Texas, as of summer of 2023?

20     A.  No.  I mean, as area manager, my -- the

21 floodplain inspection.  But it's maintaining contact

22 with emergency management coordinators, the Eagle Pass,

23 either the city, county level, just in case there's

24 flood releases.

25              So it's just making contact with any

                                                    10


1  emergency first responders.  As area manager, those

2  would be my primary responsibilities.

3      Q.  And by the way, I didn't mention this,

4  Mr. Gomez, but if at any time in this deposition, you

5  want to take a break, other than in the middle of a

6   question, I'm fine with it.  You just say that and

7   we'll -- we will accommodate you.

8        A.  Okay.

9        Q.  As of the summer of 2023, did you have any

10  responsibility with respect to any kind of survey work

11  in the Rio Grande river?

12       A.  Responsibilities as to -- the survey, I just

13  facilitated I guess, at that time.  There -- I know

14  there was survey work done.  And my role in that was to

15  facilitate that work that had happened.

16       Q.  Okay.  Your role was not to actually perform

17  any of the work?

18       A.  Correct.

19       Q.  And is that true throughout the time you've

20  been with US IBWC?

21       A.  Yes.

22       Q.  In no 2023 and 2024, have you had any job

23  responsibilities or duties with respect to evaluating or

24  approving proposed structures that might be put in the

25  Rio Grande river?

                                                        11


1        A.  Reviewing as --

2        Q.  Reviewing and approving?

3        A.  Reviewing as part of the area manager, we get

4      proposals any type of proposals, the agency forwards

5      down to the air manager level and we get to review any

6      developments and make our comments.

7      Q.  Okay.  And to whom do you provide those

8      comments?

9      A.  To our realty office.

10      Q.  And is it the realty office that does the

11      ultimate evaluation in either approval or denial of

12      permits or licenses to place structures in the Rio

13      Grande river for the US IBWC?

14      A.  They handle the process.  So I -- you know, I

15      know they handle the process.

16      Q.  Okay.  It's not your final decision on those

17      matters --

18      A.  No.

19      Q.  -- as area manager?

20      A.  No.

21      Q.  And you're not a direct participant in the

22      final decision, you just provide your comments?

23      A.  Correct.  I just provide comments.

24      Q.  Okay.  And in 2023 and 2024, have you had any

25      duties related to navigation on the Rio Grande river,

12

1      either by IBWC or anybody else?

2      A.  No.  Not that I recall.

3      Q.  Yeah.  Is that true throughout the entire

4  period of your employment with US IBWC?

5      A.  For navigation?

6      Q.  Yes.

7      A.  Throughout my career as IBWC?

8      Q.  Yes, sir.

9      A.  We've navigated the river for -- I've seen our

10  stream measurements, when we carry out stream

11  measurements in the Laredo area in the 2010 flood, I was

12  there for that stream measurement.  And we did river

13  cross sections, also in the Laredo area, was carried out

14  by our survey team.  And they -- they had to navigate

15  that area of the river.  So those are two instances that

16  I can recall.

17      Q.  Okay.  Are those the only two instances you can

18  recall?

19      A.  Yes.

20      Q.  We're going to talk in your deposition about

21  the -- the buoys that Texas placed in the Rio Grande

22  river in July 2023.  I'll probably refer to them as

23  either the buoys or floating buoy barrier because that's

24  a term that the United States has used at times in this

25  litigation.

```
 1                   Will you understand what I am referring to

 2      if I use those terms?

 3           A.  Yes.

 4           Q.  Okay.  Did you have any duties for the US IBWC

 5      in determining any impacts of the floating buoy barrier

 6      on the IBWC?

 7                   MS. KRUGER:  Objection; form.

 8                   You can answer.

 9                   THE WITNESS:  Can you repeat?

10           Q.  (BY MR. BRYANT)  Sure.  Did you have any

11      duties, in terms of assessing the impact, if any, of the

12      floating buoy barrier on IBWC operations?

13           A.  No.  I can't say that --

14           Q.  Were you -- were you asked to, in any way,

15      assess what you thought might be or would be the effects

16      of the floating buoy barrier on anyone beside the IBWC?

17           A.  No.  I can't say.

18           Q.  Now, have you ever navigated on any vessel in

19      the Rio Grande between Amistad Dam and Falcon Reservoir?

20           A.  I did a kayak trip in --

21           Q.  Anything else?

22           A.  No.

23           Q.  Is it fair to say that you -- you never

24      navigated on the section of the Rio Grande between
```

25  Amistad Dam and Falcon Reservoir as part of your job

1  with US IBWC?

2      A.  You could say that.  Yes.

3      Q.  And your cake trip, I'm guessing -- but I want

4  you to tell me if I'm right -- was recreational in

5  nature?

6      A.  Yes.

7      Q.  And approximately when did you do that?

8      A.  2013, maybe.

9      Q.  About 2013?

10     A.  Yes.

11     Q.  Do you have -- I think I know the answer to

12  this, but please tell me if I'm wrong.

13             So, you have no experience in the

14  navigation of the Rio Grande by the US IBWC?

15             MS. KRUGER:  Objection; form.

16             THE WITNESS:  Navigation that I'm aware of

17  by IBWC would be --

18     Q.  (BY MR. BRYANT)  Yes.

19     A.  -- I'll refer to again, it would be when we did

20  our river cross sections in the Laredo area.  But -- and

21  we traveled -- or the -- I'll say the survey team

22  traveled up and down the river for that area.  And also

23  do a cross section to do a flow measurement back in 2010

24  is toward -- I saw our boat cross -- do a cross section

25  of the river for a stream measure.

15

1       Q.  Okay.  Do you have any experience at all with

2  navigation of the Rio Grande by IBWC in the Maverick

3  County, Texas or Eagle Pass areas?

4       A.  No, sir.

5       Q.  Have you ever been involved in any negotiations

6  of minutes between the U.S. and Mexican sections of the

7  IBWC?

8       A.  No, sir.

9       Q.  Now, about a year ago, roughly, did you sign a

10  declaration that was filed in this case?

11       A.  Yes.

12             MR. BRYANT:  And do you happen to have --

13  or does your attorney have a copy of that declaration

14  with you?

15             MS. KRUGER:  Yeah, I have the file copy.

16  Document 5-2, on the record, if you want me to give that

17  to him?

18             MR. BRYANT:  Yes, please.  I'm going to ask

19  him some questions about that, if that's okay.

20             MS. KRUGER:  That includes those pictures

21   on the back of that?

22            MR. BRYANT:  Yes.  Some photographs.

23            MS. KRUGER:  Yeah.

24   Q.  (BY MR. BRYANT)  Do you have that in front of

25   you, Mr. Gomez?

16

1    A.  Yes, sir.

2            MR. BRYANT:  And Counsel, I would make the

3    request that -- doesn't have to be right now, but at

4    some point, that we mark that document, or a copy

5    thereof, as Exhibit 1 to Mr. Gomez's deposition today.

6    Is that okay?

7            MS. KRUGER:  Yes, that's fine.  Do you want

8    me just to write it down on this hard copy?

9            MR. BRYANT:  That would be great.  If it's

10   a extra copy that you can --

11           MS. KRUGER:  Yeah, not --

12           MR. BRYANT:  -- use for that purpose.

13           MS. KRUGER:  -- Exhibit 1 and I just wrote

14   that on it.  I don't have a sticker.

15           MR. BRYANT:  Thank you.

16           (Exhibit No. 1 was marked.)

17   Q.  (BY MR. BRYANT)  And Mr. Gomez, can you

18   identify Exhibit 1 as the declaration that you signed

19   and that was filed in this case as document 5.2?

20       A.  Yes.

21       Q.  Okay.  This document, among other things,

22   describes a meeting that you attended on June 12th,

23   2023.  Do you recall that meeting today?

24       A.  Yes.

25       Q.  How did that meeting come about?

                                                        17


1        A.  If I recall correctly, there -- I believe that

2    there was some media outlets or some reports of buoys in

3    the water.  And I think it was a -- headquarters was,

4    like, one means -- asking if that's fine with me, and if

5    I knew anything, and I could not.  I did not know of

6    anything.

7                So, I think I may have deferred to my --

8    our security personnel, see if they knew anybody with

9    DPS, see if they could schedule a meeting, that they

10   could talk to us, and let us know a little bit more

11   about the buoys.  And they did.  And that's how this

12   meeting came together.

13       Q.  Okay.  So is it fair to say that the meeting

14   that occurred on June 12th, 2023 was a result of your

15   efforts to get in touch with DPS and learn about the --

16   the buoys?

17     A.  Yes.

18     Q.  And do you recall who at US IBWC headquarters

19  had asked you to obtain information about the -- the

20  buoys?

21     A.  No -- not -- not at this moment.

22     Q.  Okay.  Do you recall that there was a press

23  conference that was held by a Texas Governor Abbott a

24  couple of days before that meeting in which the --

25  Texas's plan to put the buoys in the river was publicly

                                                      18

1  announced?

2     A.  No.  I do not recall.

3     Q.  Okay.  And is it correct that four

4  representatives of US IBWC attended that meeting with

5  D- -- Texas DPS representatives?

6     A.  Yes.

7     Q.  Okay.  And who were the US IBWC representatives

8  who attended that meeting?

9     A.  Myself; our assistant area manager at the time,

10  Mr. Demetrius Gaines; our safety of dams engineer at the

11  time, Mr. Evelio Siller; and our security -- our

12  captain, Luise Martinez.

13     Q.  Okay.  And at that time, did Mr. Evelio Siller

14  report to you?

15     A.  Yes.

16     Q.  Now, where did that meeting take place?

17     A.  That place -- that meeting took place at the

18 Eagle Pass DPS office.

19     Q.  Now, there are some notes attached to your

20 declaration that described that meeting.  Do you see

21 those?

22     A.  Yes.

23     Q.  Were those notes taken by Mr. Siller at your

24 direction or request?

25     A.  Well, I don't know if it was my request, but

                                                          19


1 it's just -- I guess, like, protocol, or just a habit,

2 that we may have a meeting, we take our notes.  So, you

3 could make -- make of it.

4     Q.  Okay.  And so you don't recall, you know,

5 ordering him or requesting him to make the notes.  But

6 he made notes, and that was not unusual?

7     A.  Correct.

8     Q.  Okay.  Did he take the notes in handwriting?

9     A.  I cannot say.

10     Q.  Okay.  These are nicely -- appear to be nicely

11 typed up notes.  Do you recall anybody -- Mr. Siller

12 having at the meeting equipment that would allow him to

13  do that?

14      A.  I cannot recall.

15      Q.  Do you know whether or not he, or anybody else,

16  edited the original notes that he took at the meeting?

17      A.  I do not know.

18      Q.  Okay.

19      Q.  Now, in the notes, it indicates that -- and I'm

20  looking at the first bullet point, Mr. Gomez -- it

21  states, quote, Buoy project is part of Govenor Greg

22  Abbott's Operation Lone Star Initiative.

23          What -- what was your understanding of what

24  the Operation Lone Star Initiative was?

25      A.  The Lone Star Initiative was just -- at that

                                                        20


1  point, it was just the buoys, installation that this was

2  going on already.  I was not too --

3      Q.  Oh- --

4      A.  -- that --

5      Q.  -- Okay.  Were you aware at the time of, or

6  prior to the meeting, that Texas had deployed National

7  Guard troops to the border area?

8      A.  Okay.  Yes.  Okay.

9      Q.  Okay.  And so did you understand that having

10  National Guard troops down at the border area was part

11  of the Operation Lone Star Initiative?

12      A.  Yes.

13      Q.  And either at the time of the meeting, or soon

14  thereafter, did you see that Texas had placed concertina

15  wire in some areas along the -- the border, on the U.S.

16  side of the border?

17      A.  Yes.

18      Q.  That was concertina wire that you saw in the

19  Eagle Pass area?

20      A.  Yes.

21      Q.  And it was located, in part, near where the

22  buoys were placed?

23      A.  Yes.

24      Q.  Did you understand the concertina wire was also

25  part of the Operation Lone Star Initiative?

                                                        21


1      A.  Okay.

2      Q.  I don't want you to take my word.  I'm asking

3  you about your --

4              MS. KRUGER:  I don't want you to interrupt

5  you, David, but you need to answer yes or no --

6              THE WITNESS:  Okay.

7              MS. KRUGER:  -- if you don't say yes --

8              THE WITNESS:  Okay.

9          MS. KRUGER:  -- but if you didn't know,

10  say, just --

11          THE WITNESS:  Okay.  I understand.  Yes.

12     Q.  (BY MR. BRYANT)  Okay.  So did you understand,

13  as of the time of the meeting or before that, that

14  Govenor Abbott planned to place the buoys in the river

15  as part of Texas' effort to protect its borders?

16     A.  Okay.  Yes.

17     Q.  And did you understand that the buoys were part

18  of Texas' efforts to protect its borders against illegal

19  immigration and human trafficking and drug smuggling and

20  other criminal activities going across the -- the Rio

21  Grande river?

22     A.  Yes.  To protect its borders against...

23     Q.  And do you still have that understanding as to

24  that's why Texas has the buoys in the water near Eagle

25  Pass today?

                                                    22


1     A.  Yes.

2     Q.  And a matter of fact, in that first bullet

3  point in the notes that are part of your declaration

4  that's Exhibit 1, the second sentence says, quote, The

5  City of Eagle Pass are 100 percent on board with the

6  DPS/Texas National Guard operation for border security.

7               So, did you understand, as of June 12th,

8    that the DPS in Texas National Guard operations in the

9    Eagle Pass area were there for border security?

10        A.  Yes.

11        Q.  Now, my understanding is that during that

12   meeting, the Texas DPS representatives told your -- your

13   group about several potential test sites for the -- the

14   buoys within the Rio Grande river; is that correct?

15        A.  Yes.

16        Q.  And did you later see the -- the one site at

17   which Texas placed the buoys in the Rio Grande river?

18        A.  Yes.

19        Q.  And it -- was that site about two miles

20   downstream from the Camino Real International Bridge in

21   Eagle Pass?

22        A.  Yes.

23        Q.  And as far as you know, Texas has not placed

24   buoys in any other location in the entire 1,200-plus

25   miles of the Rio Grande river, at least so far?

                                                    23


1         A.  No.  I cannot say.

2         Q.  Okay.  You're not aware of the placing buoys at

3    any of the other potential test sites that they

4    discussed with you on June 12th, 2023?

5       A.  No.

6       Q.  Okay.  The site where the buoys were actually

7   placed, is that site that is two miles downstream from

8   the international bridge outside the actual city limits

9   of Eagle Pass?

10      A.  I don't know where the city limits rest.

11      Q.  Okay.  Now, in the meeting on June 12th, 2023,

12  do you recall -- and I'm looking at bullet point four --

13  were you told that, quote, The buoys system will be

14  installed at three strategic locations to prevent

15  drownings, unquote?

16      A.  Yes.

17      Q.  So, did you you said that one of the purposes

18  of Texas in placing the buoys in the Rio Grande was to

19  prevent drownings?

20      A.  That's what we were informed of.  Yes.

21      Q.  Okay.  Do you have any reason to doubt that?

22      A.  No.

23      Q.  And do you happen to know whether or not there

24  had previously been drownings of people crossing the

25  river in the Eagle Pass area?

                                                        24


1       A.  I'm not aware of.

2       Q.  Okay.  Do you know if there have been any

3    drownings at the site of -- site the buoys were placed

4    in the Rio Grande river at any time in the year or so

5    that they have been in the river?

6        A.  I'm not aware of that.

7        Q.  Okay.  Do you know whether there have been

8    drownings in the Rio Grande river upstream and/or

9    downstream from the buoys during the year that the buoys

10   have been in the river?

11       A.  I do not know that information.

12       Q.  Now, in the notes that are attached to your

13   declaration that's Exhibit 1 to your deposition, at the

14   bottom of that page it states, quote, Project plans were

15   not shared at this meeting.  Local operation has been

16   instructed to point IBWC to the State of Texas land

17   office for further project details and further

18   communication in the future.

19              Was that something that DPS told your group

20   at the June 12th, 2023, meeting?

21       A.  If I recall, yes.

22       Q.  Okay.  And do you know if anyone on behalf of

23   the US IBWC, in fact, did contact the State of Texas

24   general land office to get more project details

25   regarding the floating buoy barrier?

1      A.  I'm not aware of that.

2      Q.  Do you know of anyone at US IBWC who ever

3  communicated or attempted to communicate with the Texas

4  general land office after June 12th, 2023, regarding the

5  floating buoy barrier or that project?

6      A.  No.  I do not know if anybody contacted.

7      Q.  Do you know of anybody with the U.S. Army Core

8  of Engineers who ever contacted or attempted to contact

9  the Texas general land office to get the details

10  regarding Texas' plans to place buoys in the Rio Grande

11  river?

12      A.  I do not know if they did.

13      Q.  Okay.  And is that the same answer with respect

14  to anybody and all the other parts of the United States

15  Government?

16          Do you have any knowledge that anybody in

17  the United States Government ever followed up and

18  contacted the Texas general land office for details

19  regarding the -- the plans to place the floating buoy

20  barrier in the Rio Grande river?

21      A.  No.  I do not know if anybody contacted the --

22      Q.  Okay.

23      A.  -- land office.

24      Q.  Do you recall what the date was when you first

25  saw the floating buoy barrier actually in the Rio Grande

1  river?

2          And feel free to refer to Exhibit 1 if it

3  will help jog your memory.

4      A.  That's what I'm going -- I have here, date of

5  the picture 07 --

6          MS. KRUGER:  If you don't mind, this is

7  the -- what was filed with the court.  So that's just

8  the referencing the exhibit.  But you can flip back to

9  your affidavit if you want.

10          THE WITNESS:  July 13th.

11      Q.  (BY MR. BRYANT)  Okay.  July 13th, 2023?

12      A.  Was when I -- yes, I took the core of engineer

13  for the Mexican section down to...

14      Q.  Okay.  And I do see that there was a reference

15  to some photos -- in paragraph 10 of your declaration

16  there's a reference to some photos that you took on

17  July 10th, 2023.  But it sounds like it was of equipment

18  out on the shore, and not of the buoys in the water; is

19  that right?

20      A.  Yes.

21      Q.  Okay.  So the first time you actually saw the

22  buoys in the water was July 13th?

23      A.  Could be.  Could be July 13th or July 12th, but

24  it was...

25      Q.  Okay.  And you drove -- it says in paragraph 11

1  of your declaration that you drove personnel from the

2  Mexican section of the commission to the location where

3  the -- the floating buoy barrier had been placed in the

4  river; is that correct?

5      A.  Yes.

6      Q.  What -- what personnel do you recall driving to

7  the site of the floating buoy barrier on July 13th,

8  2023?

9      A.  Personnel from the Mexican section?

10      Q.  Yes.  That's what I'm asking about right now.

11      A.  It was one staff engineer, Enriquez.

12      Q.  Anybody else?

13      A.  No.

14      Q.  And who else did you drive to the site of the

15  floating buoy barrier on July 13, 2023?

16      A.  It was two, if I remember, from the U.S. Army

17  Core of Engineer.

18      Q.  What are their names, to the extent you recall?

19      A.  I cannot recall the names.

20      Q.  Can't recall either one of their names?

21      A.  No.

22      Q.  Did you have difficulty in getting to the site

23   of the floating buoy barriers, was there any kind of

24   security problem that you had to overcome in order to

25   get to that site on July 13th, 2023?

                                                        28

1      A.  No.

2      Q.  And what was your purpose in going to the site

3   of the floating buoy barrier on July 13, 2023, with the

4   other people who you have -- who you took there then?

5      A.  The core of engineers staff, personnel, had

6   not -- and were not familiar with, I guess, the area or

7   the buoy site.  And our Mexican section, they hadn't

8   seen the buoys from the Mexican side.

9              And so I -- we -- I took them, at the Core,

10   towards the -- coordinated, and we said if I could take

11   them out, so I took them out.  And same with Mexico.

12      Q.  And did they tell you in the course of that

13   process that they were not familiar with the -- with the

14   Eagle Pass area?

15      A.  The Core?  Yes.

16      Q.  Did they indicate that this -- this trip would

17   be the first time that they had -- had been to the Eagle

18   Pass area?

19      A.  I don't recall them saying that it was their

20   first trip.

21        Q.  Okay.  And what conversation, if any, do you

22   recall there being within your group once you arrived at

23   the site of the floating buoy barrier on July 13th,

24   2023?

25        A.  I can't recall right now.  It was -- it's been

29

1    a while, right?  Just that we finally located them,

2    because we had not seen them in the water.  So, that's

3    the best I can recall.

4         Q.  Okay.  Do you recall having any conversation

5    with the U.S. Army Core of Engineer's representatives,

6    or even witnessing maybe conversation they had among

7    themselves, regarding the navigability of the Rio Grande

8    river at that point?

9         A.  No.

10        Q.  Do you recall them discussing at all whether or

11   not they were there to enforce some federal law or laws?

12        A.  No.

13        Q.  Do you recall them discussing, in any way, any

14   permits that might or might not be required for the

15   floating buoy barriers on that trip?

16        A.  No.  I cannot recall.

17        Q.  Have you ever had any further contact with

18   any -- or employees of the U.S. Army Core of Engineers

19   pertaining, in any way, to the floating buoy barriers

20   after July 13th, 2023?

21        A.  No.

22        Q.  What conversation, if any, do you recall either

23   having or witnessing during that site visit on

24   July 13th, 2023, with the gentlemen from the Mexican

25   section of the IBWC?

                                                        30

1         A.  Just that he had seen them from the Mexican

2    side -- of his side of the river.  And I told him I

3    can't see them on the U.S. side.  And then he finally

4    gave me, like, a coordinate system.  And that's how we

5    got there, more or less.

6         Q.  Okay.  Once you got to the location of the

7    floating buoy barriers, or on the way to or from that

8    location, do you recall any conversation with the

9    Mexican representative of the IBWC?

10        A.  No.

11        Q.  Okay.  Did the Mexican representative of the

12   IBWC, in your presence, make any complaints about the

13   placement of the floating buoy barriers in the Rio

14   Grande?

15        A.  No.  Not that I recall.

16        Q.  Did that gentleman give you any indication as

17   to any actions that he planned to take as a result of

18   the visit to the location of the floating buoy barriers

19   on July 13th, 2023?

20        A.  No.

21        Q.  Now, in your declaration, that is Exhibit 1 to

22   your deposition, there is reference to an event on

23   July 20th, 2023.  That's in paragraph 17 of your

24   declaration.

25        A.  Okay.

                                                          31


1        Q.  Were you present at the site of the floating

2   buoy barriers on that date?

3        A.  Yes.

4        Q.  And why were you there?

5        A.  I was there because we did not have a U.S.

6   survey team at that -- that the accompany them.  So it

7   would have to be me.

8        Q.  Okay.  And were you requested by the Mexican

9   section of IBWC to be present near the site of the

10   floating buoy barriers on that occasion?

11        A.  I don't know if they requested.  I know we

12   usually -- when there's work -- when either section's

13   going to carry work in the river, and if we were to, you

14  know, approach -- like, the U.S. was to approach the

15  Mexican riverbank, I would coordinate with our Mexican

16  section and let them -- inform them and let them know I

17  will be in the area, I would like to carry this work

18  out.

19          So that was pretty much my role there, was

20  to -- our Mexican section had said if want to do this

21  survey in this area.  So I was there just to let -- make

22  sure our -- our guard people, our National Guard people

23  would know that the Mexican section will be in the river

24  and they will be approaching the U.S. side of the river

25  embankment.  Just to let them know that they do not

                                                        32

1  intend to cross.  And that they just intend to take some

2  survey and then go back into the Mexico.

3      Q.  Okay.  And did you notify the Texas National

4  Guard troops of that fact on July 20th?

5      A.  Yes.

6      Q.  Okay.  Do you recall the individual or

7  individuals who you notified at Texas National Guard on

8  that occasion?

9      A.  No.  But I know I had to because I had to go

10  through Shelby Park.  And I had to check in with DPS and

11  let them know that I need to access that area.  So --

12     Q.  Okay.  Did you --

13     A.  -- but I don't --

14     Q.  I'm sorry, didn't mean to cut you off --

15     A.  I don't remember the individual.

16     Q.  Okay.  Did you know any of the Texas National

17  Guard personnel in Shelby Park at that time?

18     A.  No.  I did not.  No.

19     Q.  Did you attempt to get in touch with somebody

20  who was in a -- a officer or somehow in charge of the

21  Texas National Guard troops at Shelby Park to provide

22  that information on July 20th?

23     A.  It -- I think I might have deferred to our --

24  our security side, our offi- -- security side working,

25  Mr. Steban Martinez.  I think he may have been the one

                                                                 33


1  that facilitated, coordinated, so I could access this

2  area and further our Mexican section to the --

3     Q.  Okay.  In paragraph 17, it says that, "On

4  July 20th, the Mexican section of the commission planned

5  to survey the riverbed just upstream of the buoy

6  system."

7                And how far upstream did they plan to

8  survey the river?

9     A.  I would say right at the buoy site, at the edge

10   of the buoy system.

11       Q.  Just at the upstream edge of the buoy system?

12       A.  Yes.

13       Q.  Do you have any understanding as to whether

14   that survey work had been planned for a significant

15   period of time?  Or whether it was scheduled in response

16   to the floating buoy barrier being placed in the Rio

17   Grande river?

18       A.  I cannot say.  I cannot.  No.

19       Q.  Do you have any understanding as to how often

20   the Mexican section of the -- of the IBWC surveys the

21   Rio Grande river in the Eagle Pass area?

22       A.  No.  I'm not sure of that.

23       Q.  Okay.  It says that, "A survey requires the

24   Mexican section personnel place a piece of equipment

25   near the Mexican riverbank.  And then cross the river

                                                          34


1   and place another piece of equipment on or near the U.S.

2   riverbank."

3              Was that, in fact, done on July 20th, 2023?

4       A.  Yes.

5       Q.  And was that survey completed?

6       A.  I believe so.

7       Q.  And what -- could you describe the equipment

8   that was used on that occasion and placed on or near the

9   U.S. riverbank?

10       A.  Well, the equipment should be, like, a pole.

11   And on top, it should have, like, a satellite link.  And

12   it just gives out a GPS coordinate elevation.  That

13   should be the type of equipment that --

14       Q.  Okay.  And about how tall is that pole?

15       A.  6 feet, 7 feet.

16       Q.  Okay.  And about how heavy is that equipment --

17       A.  I --

18       Q.  -- roughly?

19       A.  -- could not say.

20       Q.  Did you actually -- have you actually handled

21   that equipment?

22       A.  No.

23       Q.  Did you do anything physically that day to help

24   or participate in the survey?  Or did you just

25   facilitate it as you've described it?

                                                            35


1        A.  I facilitated and observed.

2        Q.  Okay.  And can you tell me anything else that

3   you observed at the -- at or near the site of the

4   floating buoy barrier on July 20th, 2023?

5        A.  No.  I cannot.

6     Q.  Okay.  Did you have any -- any conversation or

7   communication with any Texas personnel at or near the

8   floating buoy barrier on July 20th, 2023?

9     A.  With DPS personnel?

10    Q.  Could be DPS, could be Texas National Guard.

11  But really any Texas personnel.

12    A.  Just at the Shelby Park, on my check-in.  And

13  then while I was there, while the survey was being

14  carried out, maybe I did have one interaction just --

15  let them -- maybe National Guard, just let them know

16  that that person in the water was, you know, he was

17  working for us and he was just carrying out a -- a

18  survey.

19    Q.  Okay.  Were there any kind of problems or

20  difficulties that you or the Mexican section personnel

21  had with any Texas personnel on July 20th, 2023?

22    A.  No.

23    Q.  Were the Texas personnel generally cooperative

24  with the effort that was being made by you and the

25  Mexican section of the IBWC on that occasion?

36

1     A.  Yes.

2     Q.  Did the presence in the floating buoy barrier

3   in the Rio Grande on that occasion prevent or impede the

4   Mexican section of IBWC from accomplishing what they

5   wanted to accomplish?

6       A.  I mean, they accomplished it.  So, I cannot say

7   how big, you know, what the impediment was, but they did

8   manage to accomplish it.

9       Q.  Okay.  Did they express to you that they had

10  been impeded or blocked or otherwise interfered with in

11  the work they were trying to accomplish on July 20th,

12  2023?

13      A.  No.

14      Q.  Have you seen the floating buoy barriers in the

15  Rio Grande river at any time since July 2023?

16      A.  My -- my -- what do you call it?  My work at

17  Amistad field office ended about the end of August, part

18  of September.  And -- so I might have seen it sometime

19  in August, or not.  But that was -- I know I have not

20  seen it since I left Amistad.

21      Q.  Okay.  So you could say with -- with certainty

22  that you have not seen the floating buoy barrier since

23  the end of August 2023?

24      A.  Yes.

25      Q.  Okay.  Do you recall any point in time in

                                                        37

1   August 2023, when the floating buoy barrier was moved?

2      A.  Do I remember?

3      Q.  Do you recall that that occurred?

4      A.  Yes.

5      Q.  Okay.  What do you recall about how it came

6  about that the floating buoy barrier was moved in

7  August 2023?

8      A.  Actually, I mean, I did not see it move.  But I

9  think that is a time that I did see that the -- the news

10  coming out from our govern, Greg Abbott, saying that

11  they had been moved.  So --

12          MR. BRYANT:  Okay.  Mr. Gomez, we've been

13  going about an hour.  Why don't we give about a

14  ten-minute break to give everybody a break to stretch

15  their legs, or whatever they want to do?

16          THE WITNESS:  Okay.

17          THE VIDEOGRAPHER:  We are going off record.

18  The time is 2 o'clock p.m.

19          (Short recess.)

20          THE VIDEOGRAPHER:  We are going back on the

21  record.  The time is 2:11 p.m.

22      Q.  (BY MR. BRYANT)  Mr. Gomez, I'm going to ask

23  you a few more questions about your declaration that

24  was -- that is Exhibit 1 to your deposition.

25          In paragraph 16 of the declaration it

1  states, quote, floating barriers are an impediment to

2  the sections crossing independently in this part of the

3  river, unquote.

4           What -- were the floating barriers an

5  impediment to the Mexican section of the IBWC crossing

6  the river to do its survey on July 20th, 2023?

7       A.  Well, I guess because given their -- their net,

8  they could cross onto the U.S., as long as -- you know,

9  they go -- the edge of the upstream or the downside,

10  they can cross over the river.  So --

11       Q.  And they were able to cross upstream and do

12  their survey on July 20th, 2023?

13       A.  Yes.

14       Q.  And so the -- the floating buoy barriers were

15  not an impediment to doing their -- getting their work

16  done that day?

17       A.  Correct.

18       Q.  Have you ever been present at any occasion

19  where the floating buoy barriers were an impediment to

20  any actions of either the Mexican or U.S. sections of

21  the IBWC?

22       A.  No.

23       Q.  Have you ever been told that the floating buoy

24  barriers actually were an impediment to the Mexican or

25  U.S. sections of the IBWC doing any work that it needed

39

 1  to do in the Rio Grande river?

 2      A.  No.

 3      Q.  Have you ever heard that the floating buoy

 4  barriers were an impediment or an obstruction to any

 5  kind of activity that the Mexican or American -- or U.S.

 6  sections of the IBWC wanted to accomplish in the Rio

 7  Grande river?

 8              MS. KRUGER:  Objection; form.

 9              Go ahead.

10              THE WITNESS:  No.

11      Q.  (BY MR. BRYANT)  Have you ever seen any vessel

12  obstructed in its use of the Rio Grande river by the

13  floating buoy barriers?

14      A.  No.

15      Q.  Have you ever been told of the floating buoy

16  barriers operating as an obstruction to any navigation

17  of the Rio Grande river?

18      A.  No.

19      Q.  When you viewed the floating buoy barriers in

20  July 2023, was it apparent to you that vessels could

21  easily go around them, if they wanted to go around them?

22      A.  I saw vessels go around them.

23      Q.  Okay.  Now, we were talking a little bit about

24  the buoys, floating buoy barriers, being moved in

25  August 2023.

40

1               What, if any, information do you have about

2   why that occurred?

3       A.  I don't have it.

4       Q.  Do you know anything about the -- where the

5   floating buoy barriers were located after they were

6   moved in August 2023?

7       A.  No.

8       Q.  Have you -- strike that.

9               Do you have any reason to believe that the

10  floating buoy barriers have been located outside U.S. or

11  Texas territory at any time since August 2023?

12      A.  No.

13      Q.  Did you either hear about or read about any

14  controversy regarding whether the floating buoy barriers

15  were partly in Mexican territory, on the Mexican side of

16  the international boundary?

17      A.  No.

18      Q.  Have you ever had any communications with

19  either the Mexican section of IBWC or any other

20  representative of the Mexican government complaining

21    about the floating buoy barriers?

22         A.  No.  Not -- not that I recall.

23         Q.  On July 20th, 2023, when you were at the site

24    of the floating buoy barriers, did anybody make any

25    request to Texas personnel present at that time to do

41

1     anything to facilitate the survey work that the Mexican

2     section of the IBWC wanted to do?

3          A.  Again -- can you ask that question again?

4          Q.  Sure.  On July 20th, 2023, did either you or

5     anybody with the Mexican section of IBWC request that

6     anybody connected with the Texas government do anything

7     to help facilitate the survey work that the Mexican

8     section wanted to do on that occasion?

9          A.  No.  No.  Not that I recall.  Just DPS was

10    going to be on-site for access.

11         Q.  Is it fair to say that the concertina wire

12    didn't obstruct the work that the Mexican section of

13    IBWC wanted to do in the river on July 20th, 2023?

14         A.  Yes, you could say.

15         Q.  Are you either personally aware or have you

16    heard of any harm of any kind that the floating buoy

17    barrier has done while it's been in the Rio Grande

18    river?

19    A.  No.

20        Q.  In your declaration, I believe there's a

21   reference to surveys and other engineering work that the

22   Mexican section of the IBWC does from time to time in

23   the Rio Grande river.  That's in paragraph 15 of your

24   declaration.

25            Do you see that?

                                                    42


1     A.  Yes.

2         Q.  And we've talked a little bit about the

3    surveying work that is done.  What other engineering

4    work were you referring to in paragraph 15?

5         A.  I was referring to stream measurement, river

6    measurement, stream measurement.  So that would entail

7    measuring how much water is in the river at a particular

8    point in time.

9         Q.  Okay.  And how is that accomplished by either

10   the Mexican or the U.S. sections of IBWC?

11        A.  This work is -- it -- it requires the use of

12   equipment, usually it's either, like, a floating --

13   like, a boat, floating boat, that either can be

14   hand-dragged, weighted, or either hydrotech can drag

15   this piece of floating equipment from one side of the

16   riverbank.  And if a river is low enough, they can walk

17   all the way to the Mexican side of the riverbank.  And

18   they may do that two to three times, get an accurate

19   measurement.

20            So -- and that's if the river is low

21   enough.  If it's a little bit higher, they can do -- a

22   robot operate it.  And then if it's really high, then

23   they would require an actual boat with an actual

24   motorboat so they can drag this equipment.  What this

25   equipment is, it has some sensors underneath it.  And it

43

1   measures depth, velocity of water.  And it helps us --

2   gives us how much water is in the dam.

3   Q.  Is that type of work done on a regular basis in

4   the Rio Grande river?  Or only on one-off occasions

5   on -- when there's a particular need to do it?

6   A.  No.  This -- it's water is what we call, water

7   account.  It's a different working unit that I get to

8   oversee.  But water accounting is important to our

9   mission.  Water accounting, it gives -- we have to

10   calculate how much each country is contributing to the

11   river and how much each country is taking out of it.

12            So that's why these measurements are

13   important to know how much water fits inside the river.

14   That's under normal condition.  Under flood conditions,

15   then we need to know how much water is -- either -- it's

16   in the river.

17           But we need to know to predict how much

18   water is in the -- how much reservoir is gonna rise, you

19   know, within two or three days.  So that's why it's

20   important for us.

21   Q.  Okay.  And my question is -- is whether it is

22   done on some type of regular scheduled basis in all the

23   parts of the Rio Grande or whether it's more on a as

24   needed basis.

25   A.  There is a schedule, but it's not my work unit

44

1   that I get to oversee.  It will be another work unit.

2   Q.  Okay.  Do you know whether or not that type of

3   engineering operation has occurred or was needed at the

4   particular site of the floating buoy barriers in the Rio

5   Grande?

6   A.  No.  I would not know.

7   Q.  Was the purpose of the survey work that was

8   done near the site of the floating buoy barriers, a

9   little bit upstream on July 20th, 2023, to measure the

10   width of the Rio Grande river at that point?

11   A.  I can't say what the -- really to what, you

12   know, the purpose.  But, yeah -- I mean, yes, you're

13  taking a -- like, what do you call it?  A -- you're

14  doing survey work, you can get that information with the

15  river width.

16      Q.  Okay.  So certainly, one of the pieces of

17  information that the Mexican section of IBWC obtained by

18  doing the survey work on July 20th, 2023, was to obtain

19  a determination of the width of the river at that point

20  on that occasion?

21          MS. KRUGER:  Objection; form.

22          THE WITNESS:  I can't -- can't say.

23      Q.  (BY MR. BRYANT)  Okay.  Now, at any time on or

24  prior to July 2023, did you learn that either the United

25  States or the Core of Engineers or IBWC planned to

45

1  legally challenge what Texas had done in placing the

2  floating buoy barriers in the Rio Grande river?

3      A.  I cannot say.  I cannot recall.

4      Q.  Do you recall when you became aware that the

5  the United States Government or any part of it was

6  considering the possibility of legally challenging the

7  placement of the floating buoy barriers in the river?

8      A.  No.

9      Q.  Okay.  This lawsuit was filed on July 24th,

10  2023.  Were you involved in any discussions that led up

11   to the filing of this lawsuit?

12            MS. KRUGER:  Objection to the extent that

13   it's calling for attorney-client protected.

14            So, you can answer, but, please --

15   Q.  (BY MR. BRYANT)  Yeah.  I'm not asking for you

16   to give me the details of the discussions.  I'm just

17   asking whether you were a part of any such discussions.

18   A.  I cannot recall.

19   Q.  Do you recall having any communications with

20   any attorneys for the IBWC, or any other part of the

21   United States Government, relating in any way to the

22   floating buoy barriers prior to the date the lawsuit was

23   filed, July 20th -- 24th, 2023?

24   A.  No.  I cannot recall.

25   Q.  Did you do anything to assist attorneys for the

                                                          46

1   United States or the IBWC in July 2023?

2   A.  No.

3   Q.  Do you recall whether you were part of any

4   deliberations or decisions by the IBWC in July 2023

5   relating in any way to the floating buoy barriers?

6   A.  No.

7   Q.  Okay.  Mr. Gomez, in this lawsuit, the United

8   States was asked to produce some documents.  And the

9    United States refused to produce certain documents and

10   said that they were subject to a legal protection or

11   privilege.  That's, you know, not an unusual part of

12   litigation.

13             And the United States produced to Texas

14   something called a privilege log, where they list

15   communications that they have decided not to produce

16   to -- to Texas in -- in the lawsuit.  And in the

17   privilege log that the United States provided to Texas,

18   one of the things they list is a communication dated

19   July 17th, 2023, at 1218.  Says that it is from Mario

20   Gomez to Isela Canava and there was a copy to someone

21   whose last name is Aranda.

22             Do you know anybody within IBWC whose last

23   name is Aranda?

24        A.   Yeah.

25        Q.   Okay.  And I bet you know how to pronounce his

                                                          47

1    or her first name, but I don't.  It's spelled

2    X-O-C-H-I-T-L.  Do you know that person?

3         A.   Yes.

4         Q.   What -- how do you pronounce that full name?

5         A.   Xochitl.

6         Q.   Okay.  And is that a -- is that a male or a

7   female?

8       A.  Female.

9       Q.  Okay.  And what role does Ms. Aranda have

10  within the IBWC?

11      A.  She is the chief of O&M division.

12      Q.  I'm sorry, the chief of what?

13      A.  O&M division.

14      Q.  Okay.  What is that division?

15      A.  That's -- my supervisor.

16      Q.  Okay.  So at that time, was she your supervisor

17  in July of 2023?

18      A.  Yes.

19      Q.  Okay.  The privilege log that the United States

20  provided to us has a column called "privilege

21  justification."  And for that particular July 17th, 2023

22  document, it says, quote, Predecisional US IBWC

23  deliberations regarding draft survey in communication

24  regarding same, attorney-client and attorney work

25  product privilege justification not logged, pursuant to

                                                        48

1   protective order.

2               So, do you recall that communication at

3   all?

4       A.  No.

5      Q.  Based on the information I've given you, do you

6   have any reason to believe that that was a communication

7   to or from an attorney?

8                    MS. KRUGER:  Objection; form.

9                    You can answer.

10                   THE WITNESS:  No.

11     Q.  (BY MR. BRYANT)  Do you have any reason to

12  believe that any attorney received a copy of that

13  communication that you apparently sent to Ms. Canava?

14                   MS. KRUGER:  Objection; form.

15                   Go ahead.

16                   THE WITNESS:  No.

17     Q.  (BY MR. BRYANT)  Now, it is described as a,

18  quote, Predecisional US IBWC deliberations regarding

19  draft survey and communication regarding same.

20                   Do you know what draft survey was referred

21  to in your July 17th, 2023 communication to Ms. Canava?

22     A.  No.

23     Q.  The next document on this privilege log is

24  another communication from you, dated July 17, 2023.

25  This time at 1504.  From Mario Gomez to Isela Canava,

                                                           49

1   with a copy to Ms. Aranda.

2                    It's also described as a, quote,

3    Predecisional US IBWC deliberations regarding draft

4    survey and communication regarding same, attorney-client

5    and attorney work product privilege justifications is

6    not logged pursuant to protective order.

7                    But I would add that both the previous

8    July 17th communication and this July 17th communication

9    at 1504 state the privilege claimed was attorney-client,

10   attorney work product, deliberative process common

11   interest privilege.

12                   Do you have any understanding as to any

13   connection of the communication listed that occurred on

14   July 17th, at 1504, had to any work of any attorneys?

15                   MS. KRUGER:  Objection; form.

16                   You can go ahead and answer.

17                   THE WITNESS:  No.

18       Q.  (BY MR. BRYANT)  And do you know of any

19   deliberative process that that communication was a part

20   of?

21                   MS. KRUGER:  Objection; form.

22                   THE WITNESS:  No.

23       Q.  (BY MR. BRYANT)  Again, it refers to a draft

24   survey.  Do you recall any draft survey that you were

25   communicating with Ms. Canava about on July 17th, 2023,

1   or thereabouts?

2       A.  No.

3       Q.  Okay.  The next document that is listed in the

4   privilege log provided by the United States of America

5   to Texas describes a communication dated July 24th,

6   2023, at 2100.

7               It is stated that it came from Mario Gomez.

8   And went to Rebecca Rizzuti, Jennifer Pena, John

9   Claudio, Ramon Macias, Ms. Aranda, William Finn, and

10  Jeremy Wall.  Those were the addressees.

11              And then the people copied were Frank

12  Fisher, Leslie Grijalva, Sally Spener, Frankie Pinon,

13  Joel Saldivar, Luise Martinez, and Demetrius Gaines.

14              And I know that I'm -- have mispronounced

15  some of those names, I apologize.  But do you recognize

16  all those names?

17      A.  Yes.

18      Q.  Are any of those people outside the U.S.

19  section of the IBWC?

20      A.  No.  I don't believe so.

21      Q.  Okay.  And this is described as an

22  attorney-client, attorney work product, deliberative

23  process privilege that is claimed.  And the privilege

24  justification is described as "Predecisional US IBWC

25  deliberations in communication regarding Texas' floating

1  barrier installation and repositioning potential

2  discussions with Texas regarding same attorney-client

3  and attorney work product privilege, justification not

4  logged pursuant to protective order."

5          Do you have any recollection at all of a

6  communication on or about July 24th, 2023, at 2100, on

7  any of those subjects?

8          MS. KRUGER:  Objection to form.

9          THE WITNESS:  No.

10     Q.  (BY MR. BRYANT)  Do you recall -- strike that.

11          Are any of the addressees attorneys for

12  IBWC?

13     A.  I can't remember the name of the lawyer.

14     Q.  Okay.  I'll read them again.  It's Rebecca

15  Rizzuti, Jennifer Pena --

16     A.  She's a lawyer.  Both --

17     Q.  Okay.  Both of --

18     A.  -- both of --

19     Q.  -- those first two?

20     A.  Yes.

21     Q.  And do you recall whether or not you were --

22  you sought legal advice from anybody within IBWC on or

23  about July 24th, 2023?

24            MS. KRUGER:  Objection; form.

25            THE WITNESS:  No.

1     Q.  (BY MR. BRYANT)  Do you recall receiving any

2  legal advice from anybody -- from any attorneys inside

3  or outside of US IBWC on or about July 24th, 2023?

4            MS. KRUGER:  Objection; form.

5            THE WITNESS:  No.  I do not recall.

6     Q.  (BY MR. BRYANT)  Okay.  And again, it says that

7  the the reason for the -- the privilege was claimed was,

8  quote, Predecisional US IBWC deliberations and

9  communication regarding Texas' floating barrier

10  installation and repositioning.

11            Do you have any understanding as to what

12  that repositioning refers to?

13     A.  No.

14     Q.  The justification also states it relates to,

15  quote, Potential discussions with Texas.

16            Do you recall having communications with

17  people within IBWC around July 24th, 2023, regarding

18  potential discussions with Texas?

19            MS. KRUGER:  Objection; form.

20            THE WITNESS:  No.

21     Q.  (BY MR. BRYANT)  Okay.  What is the role of

22   John Claudio within US IBWC?  Or what was that role as

23   of July 2023?

24        A.  I believe his title is a chief of realty, the

25   realty office.

53

1        Q.  Okay.  And what was the role of Ramon Macias

2   within US IBWC, as of July 2023?

3        A.  I believe that would be principle engineer, or

4   engineering.

5        Q.  What was the role of William Finn within US

6   IBWC, as of July 2023?

7        A.  I believe it was chief water accounting

8   division.

9        Q.  And what was the role of Jeremy Wall within US

10   IBWC, as of July 2023?

11        A.  I don't know his title, but he falls under the

12   water accounting division office.

13        Q.  Okay.  One of the people copied on that

14   July 24th, 2023 communication was Frank Fisher.  What

15   was his role within US IBWC, as of July 2023?

16        A.  If I recall correctly, he was public affairs.

17        Q.  Okay.  Another person copied on the

18   communication was Leslie Grijalva.  What was his or her

19   role within US IBWC, as of July 2023?

20      A.  She's under the public affairs office.  I'm not

21  sure her title.

22      Q.  Okay.  There's a reference to Sally Spener.

23  What was her role within US IBWC, as of July 2023?

24      A.  She is our agency's secretary.

25      Q.  There's a reference to a Frankie Pinon.  What

                                                          54

1  was his or her role within US IBWC as of July 2023?

2      A.  I believe he falls under the realty office

3  also.

4      Q.  There's also a reference as a person who was

5  copied on this communication, a person named Joel

6  Saldivar.  What was Mr. Saldivar's role within US IBWC,

7  as of July 2023?

8      A.  He falls under the realty office.

9      Q.  I think you've already identified the other

10  people who were copied on the communication, which is

11  Luise Martinez and Demetrius Gaines.

12              I'm going to ask you about the next and

13  final document that has your name on it, that was

14  claimed as privileged -- on the privilege log that the

15  United States provided to Texas.

16              That is a document dated July 24th, 2023,

17  at 2041.  It states that it was from Mario Gomez to

18   Rebecca Rizzuti, Jennifer Pena, Evelio Siller, Isela

19   Canava, John Claudio, Ramon Macias, Ms. Aranda, William

20   Finn, and Jeremy Wall.

21             And people copied were Frank Fisher, Leslie

22   Grijalva, Sally Spener, Frankie Pinon, Joel Saldivar,

23   Luise Martinez, and Demetrius Gaines.

24             It appears to be the same group as on the

25   previous July 24th, 2023, communication that's listed.

                                                          55


1   And attorney-client, attorney work product, deliberative

2   processes privileges claim.  And the privilege

3   justification is described as, quote, Predecisional US

4   IBWC deliberations and communication regarding Texas'

5   floating barrier installation and repositioning.

6   Potential discuss discussions with Texas regarding same,

7   attorney-client and attorney work product privilege,

8   justification not logged pursuant to protective order.

9             Do you have any recollection at all of the

10   communication that is described that you sent on

11   July 24, 2023, at 2041?

12             MS. KRUGER:  Objection; form.

13             THE WITNESS:  No.

14   Q.  (BY MR. BRYANT)  Okay.  Now, it appears these

15   last two communications were at 8:00 or 9:00 at night.

16            Do you have any information at all as to

17   why you would have been sending communications to

18   attorneys on these subjects at 8:00 or 9:00 at night?

19        A.  No.

20        Q.  Were these emails?

21            MS. KRUGER:  Objection; form.

22            THE WITNESS:  I have not seen them.

23        Q.  (BY MR. BRYANT)  I'm sorry?

24        A.  I -- yes, I guess -- I guess, but I have not

25   seen --

                                                    56


1         Q.  Okay.  Is it -- is it your practice sometimes

2    to send business related emails from your home in the

3    evening?

4         A.  Sometimes, or those carry on.

5         Q.  Okay.  Now, it appears that these

6    communications were sent on the evening of the day that

7    this lawsuit was filed.

8             Does that at all refresh your recollection

9    as to why you were communicating with these folks within

10   IBWC, apparently, regarding Texas' floating buoy barrier

11   installation and repositioning and potential discussions

12   with Texas regarding same?

13            MS. KRUGER:  Objection; form.

14              THE WITNESS:  No.

15      Q.  (BY MR. BRYANT)  Do you recall ever being

16  involved, in July 2023, with any discussions about

17  asking Texas to reposition the floating buoy barrier?

18              MS. KRUGER:  Objection; form.

19              THE WITNESS:  No.

20      Q.  (BY MR. BRYANT)  I think I know the answer to

21  this, but I want to ask to be sure.  This last

22  communication that was on July 24, 2023, at 2041.

23              Do you have any recollection at all as to

24  that communication?  Or why you sent it?

25              MS. KRUGER:  Objection; form.

                                                        57


1               THE WITNESS:  No.

2       Q.  (BY MR. BRYANT)  And you don't recall any legal

3   advice that you were either seeking or receiving at --

4   from IBWC lawyers at that time?

5               MS. KRUGER:  Objection; form.

6               THE WITNESS:  No.

7       Q.  (BY MR. BRYANT)  To your knowledge, has there

8   ever been any use of the Rio Grande river to ship goods

9   and trade anywhere up and down the Rio Grande?

10      A.  I would not know.

11      Q.  So you don't know of any instances in which the

12  Rio Grande has been used to ship goods as part of

13  commerce or trade?

14      A.  No.  I do not know.

15      Q.  And to your knowledge, has the Rio Grande ever

16  been used at a highway of commerce at any point upstream

17  of the current location of the Falcon Dam?

18      A.  I would not know.

19      Q.  Now, if somebody wanted to ship goods and trade

20  up and down the Rio Grande river today, would Falcon Dam

21  be an obstacle to doing so?

22          MS. KRUGER:  Objection; form.

23          THE WITNESS:  We -- in the dam?

24      Q.  (BY MR. BRYANT)  The Falcon Dam.  Yes.  Would

25  that be an obstacle to somebody who wanted to ship goods

                                                        58

1  in commerce or trade from any place above Falcon Dam to

2  any place on the Rio Grande below the dam?

3          MS. KRUGER:  Objection; form.

4          THE WITNESS:  It looks like, yes, the dam

5  would be --

6      Q.  (BY MR. BRYANT)  Okay.  Falcon Dam doesn't have

7  any locks, does it, that can be used to transport a

8  vessel from the Falcon Reservoir direction down to the

9  Rio Grande, below Falcon Dam?

10      A.  No.

11      Q.  And so anybody who wanted to take a vessel from

12  above Falcon Dam to the Rio Grande, below the Falcon

13  Dam, as things exist now, would have to take that vessel

14  out of the water and go around the dam?

15      A.  That would probably be correct.

16      Q.  And has there ever been any discussion, to your

17  knowledge, of creating any locks within the Falcon Dam

18  that would allow vessels to travel from Falcon Reservoir

19  to the Rio Grande, below Falcon Dam directly?

20      A.  No.  I do not know.

21      Q.  Do you have any idea how much it might cost to

22  create a lock in Falcon Dam that would allow vessels to

23  transit directly from Falcon Reservoir to the Rio

24  Grande, below Falcon Dam?

25      A.  No.

                                                      59


1       Q.  Fair to say it would be an enormous cost?

2               MS. KRUGER:  Objection; form.

3               THE WITNESS:  I would not know.

4       Q.  (BY MR. BRYANT)  And is the situation

5   fundamentally the same up in Amistad Dam in that there

6   are no locks?

7       A.  Yes.

8      Q.  And is it also true that anybody who wanted to

9  ship any cargo or goods from Amistad Reservoir, or any

10  point in the Rio Grande upstream of Amistad Reservoir,

11  to the Rio Grande below Amistad Dam could not do so

12  directly and would have to take the vessel out of the

13  Rio Grande river and travel on land around the dam?

14           MS. KRUGER:  Objection; form.

15           THE WITNESS:  Yes.  I would think so.

16      Q.  (BY MR. BRYANT)  Okay.  And is it -- is it also

17  true that you don't have any idea of the -- of the cost

18  that would be involved in making it possible to allow a

19  vessel to carry trade goods above Amistad Dam, to travel

20  direction to Rio Grande river below Amistad Dam?

21      A.  No.  I would not know.

22      Q.  Okay.  Between Amistad Dam and Falcon Dam,

23  on -- what are the largest few cities on the U.S. side?

24      A.  I guess Eagle Pass and Laredo Texas.

25      Q.  Okay.  Would -- would Del Rio also be in that

                                                          60

1  area between Amistad Dam and Falcon Dam?

2      A.  Del Rio would be downstream.  No -- yes.  Yes.

3  I think Del Rio is below.

4      Q.  Okay.  So Del Rio is somewhat downstream from

5  Amistad Dam?

6      A.  Yes.

7      Q.  Okay.  And what are the largest cities between

8  Amistad Dam and Falcon Dam on the Mexican side of the

9  Rio Grande?

10      A.  Laredo comes to mind, but I don't know what

11  other cities there may be.

12      Q.  Piedras Negras?

13      A.  Piedras Negras.  Okay.

14      Q.  Okay.  Any others that come to mind?

15      A.  No.

16      Q.  Are you aware of any shipping of legal goods

17  that has ever occurred between any two cities that you

18  have named as being between Amistad Dam and Falcon Dam?

19          MS. KRUGER:  Objection; form.

20          THE WITNESS:  No.  I would not know.

21      Q.  (BY MR. BRYANT)  Okay.  Now, are you aware of

22  any port facilities that exist anywhere on the Rio

23  Grande above Falcon Dam?

24      A.  No.  I do not know.

25      Q.  Are you aware of any port facilities on the Rio

                                                        61

1  Grande below Falcon Dam?

2      A.  No.

3      Q.  Based on your work with US IBWC, I guess for

4    about 20 years, do you believe that it would be feasible

5    to make improvements to the Rio Grande river to make it

6    usable as a highway of commerce any place above Falcon

7    Dam?

8                MS. KRUGER:  Objection; form.

9                THE WITNESS:  No.  I would not know that.

10        Q.  (BY MR. BRYANT)  Are you aware of any need or

11   demand by anybody to ship goods down the Rio Grande for

12   the purposes of commerce or trade at this time?

13        A.  No.  I do not know.

14        Q.  Now, you know about water releases from Amistad

15   and Falcon Dam to some extent because that's either

16   directly or has -- has been directly and is now

17   indirectly within your area of responsibility, right?

18        A.  Yes.

19        Q.  Okay.  Would it be feasible to release water

20   from Amistad Dam in quantities sufficient to make the

21   Rio Grande capable of carrying cargo ships that would

22   carry goods for purposes of trade down the Rio Grande

23   river?

24                MS. KRUGER:  Objection; form.

25                THE WITNESS:  I would not know.

                                                          62

1         Q.  (BY MR. BRYANT)  I'm sorry?

2      A.  No.  I would not know.

3      Q.  Okay.  Do you know that currently there's --

4  that Amistad Reservoir is much lower than its normal

5  elevation of water within the reservoir?

6      A.  Amistad is very --

7      Q.  Is it close to being --

8          THE REPORTER:  I'm sorry -- I'm sorry.  Can

9  you repeat your answer?

10         THE WITNESS:  Yes.  Amistad Reservoir is

11  low.

12         THE REPORTER:  Thank you.  I'm sorry.

13     Q.  (BY MR. BRYANT)  Is Amistad Reservoir close to

14  being as low as it has ever been in your career at US

15  IBWC?

16     A.  Yeah.  I do not know.

17     Q.  Okay.  Is the current level of Falcon Reservoir

18  also lower than usual?

19     A.  It -- Falcon is very low.

20     Q.  Okay.  At least given the current conditions,

21  would it be feasible to release large amounts of water

22  from Amistad Dam for purposes of enhancing navigation of

23  the river?

24         MS. KRUGER:  Objection; form.

25         THE WITNESS:  I do not know.

1    Q.  (BY MR. BRYANT)  Are you saying you do not

2  know, or it would not be?

3    A.  I do not know what we would need for cost.

4         MR. BRYANT:  Okay.  It's been about another

5  hour.  Why don't we take another ten-minute break, and

6  then I think we can finish up pretty quickly?

7         MS. KRUGER:  Okay.  Thanks.  We'll go

8  off -- we'll be back at 3:10.

9         THE VIDEOGRAPHER:  All right.  We are going

10  off record.  The time is 3 o'clock p.m.

11         (Short recess.)

12         THE VIDEOGRAPHER:  We are back on the

13  record.  The time is 3:13 p.m.

14    Q.  (BY MR. BRYANT)  Mr. Gomez, what did you do to

15  prepare for your deposition today?

16    A.  I drove to San Antonio and reviewed my

17  deposition from last time.  And that was all.

18    Q.  Okay.  Did you -- did you have a conversation

19  with your attorneys?

20    A.  Yes.

21    Q.  About how long did that conversation last?

22    A.  I would say -- I mean, we talked for -- I got

23  here -- I got here about 10:30 or 11:00.  So, from 11:00

24  to 1:00.

25        Q.  In reviewing your deposition, did you note

                                                                64

1    anything in your deposition that you thought needed to

2    be revised or explained?

3         A.  No.

4         Q.  Let's talk for a second about your declaration

5    that's Exhibit 1 to your deposition today.  Did you

6    personally prepare any or all of that declaration?  Or

7    was it prepared by others and then presented to you to

8    be reviewed?

9         A.  Yes.  I believe that's more along the lines of

10   what --

11        Q.  So, it was -- it was presented to you by

12   someone who asked you to review it?

13        A.  Yes.

14        Q.  And who presented it to you?

15        A.  Our legal.  Not sure -- one of our legal.

16        Q.  Do you recall who it was?

17        A.  No.  Ms. Rebecca, Rebecca Rizzuti.

18        Q.  Okay.  Yeah.  I think that I -- we -- we

19   mentioned Rebecca Rizzuti and Jennifer Pena.  Can you

20   say it was Ms. Rizzuti?

21        A.  I -- I would say so.  Yes.

22        Q.  Okay.  And do you recall any revision to the

23  draft that you either wanted to be made, or made

24  yourself?

25       A.  Yes.  There was revision.

65

1       Q.  Okay.  Were there any revisions in that last

2  part of the declaration pertains to survey and

3  engineering work in the Rio Grande at or near the site

4  of the floating buoy barrier?

5       A.  No.  I -- I can't recall -- I can't recall the

6  revisions that I did.

7       Q.  Okay.  Now, in the declaration, we've talked

8  about paragraph 15, 16, and 17.  And in paragraph 16, it

9  states, quote, Floating barriers are an impediment to

10  the sections crossing independently in this part of the

11  river.

12             Could you explain what you mean by the word

13  "independently" in that provision -- or in that

14  paragraph?

15       A.  Without the assistance of other staff, one

16  single person, I guess that's what I meant.

17       Q.  Now, in putting that paragraph number 16 right

18  before paragraph 17, did you intend to suggest or imply

19  that the floating buoy barriers were an impediment to

20  the Mexican section doing its work on July 20th, 2023?

21       A.  No.

22       Q.  Okay.  And I think, if I understand your

23  testimony correctly, the floating buoy barriers were not

24  an impediment to the Mexican section doing its survey

25  work on July 20th, 2023; is that right?

66

1            MS. KRUGER:  Objection; form.

2            THE WITNESS:  Yes.

3       Q.  (BY MR. BRYANT)  And, in fact, you've never

4  actually seen any instance where the floating buoy

5  barriers were an impediment to either the Mexican or the

6  U.S. sections of IBWC doing any kind of work; is that

7  right?

8       A.  Correct.

9       Q.  Have you ever seen anybody from the water

10  accounting division of US IBWC do anything in the

11  vicinity of the floating buoy barriers?

12       A.  No.

13       Q.  Do you have any knowledge as to -- with --

14  regardless of having personally seen it, do you have any

15  knowledge of anybody from the water accounting division

16  of U.S. -- floating buoy barriers?

17       A.  No.

18            (Reporter interrupted for clarification.)

19            MR. BRYANT:  I will do my best.  And

20  Mr. Gomez, if what I now ask you is anything different

21  than you remember the -- the question, please let me

22  know.

23      Q.  (BY MR. BRYANT)  Have you ever learned, by any

24  means, whether it's your personal observation or through

25  third-party sources of the water accounting division of

                                                        67


 1  US IBWC conducting any activity at or near the site of

 2  the floating -- floating buoy barriers in the Rio Grande

 3  river?

 4            MS. KRUGER:  Objection; form.

 5            THE WITNESS:  No.

 6      Q.  (BY MR. BRYANT)  Okay.  Prior to the

 7  discussions that you've had with your attorneys in

 8  connection with this deposition, have you -- do you

 9  recall ever having any attorneys -- discussions with any

10  attorneys that pertained to the floating buoy barriers?

11      A.  No.

12      Q.  Have you ever had any conversation or

13  communications with anyone at the Army Core of Engineers

14  relating, in any way, to the floating buoy barriers

15  other than the one site visit that you have described

16  that occurred on July 13th, 2023?

17      A.  No.

18      Q.  Have you ever had any conversations with anyone

19 connected with the Mexican Government regarding the

20 floating buoy barriers, aside from the occasion on

21 July 13, 2023, when a person from the Mexican section of

22 U.S. IBW- -- of IBWC had a site visit at the site of

23 floating buoy barriers in the incident we talked about

24 on July 20th, 2023?

25      A.  No.

                                                    68

1       Q.  Prior to the time that you went to work for the

2 US IBWC, what, if any, prior employment did you have

3 that, in any way, prepared you to work for the US IBWC?

4       A.  I was fresh out of school.  I graduated in '03.

5       Q.  Okay.  And what school did you graduate from in

6 20 -- '03?

7       A.  Yes.  Texas A&M University, Kingsville.

8       Q.  And what did you get your degree in from Texas

9 A&M Kingsville?

10      A.  Master's in electrical engineering.

11      Q.  In your 20 or so years working for the US IBWC,

12 could you describe what kinds of boats you have actually

13 seen operating on the Rio Grande river between --

14 anywhere between Amistad Dam and Falcon Dam.

15        A.  Boats that I've seen are the kayaks.  And DHS,

16   their boats that they operate and patrol the river.  And

17   our boats, where we do our stream measurements.  And

18   that's all I can say.

19        Q.  Okay.  Have you seen Border Patrol boats on

20   that river?

21        A.  Yes.

22        Q.  Okay.  And have you seen DPS boats on the

23   river?

24        A.  Yes.

25        Q.  Okay.  And what would you say is the largest

                                                             69

1    boat that you have ever seen on the stretch of the river

2    between Amistad Dam and Falcon dam?

3         A.  Largest boat would be the airboat that --

4         Q.  Okay.

5         A.  -- DHS had.

6         Q.  Okay.  And those are boats that typically have

7    no more than two or three people on them?

8         A.  I don't know how big they are.  They have the

9    big fans, the airboat --

10        Q.  Okay.

11        A.  -- I don't know how many people it can have.

12        Q.  And in the 20 years you've been with US IBWC,

13  have you ever seen boats operating on the Rio Grande

14  river at night or when it's dark?

15      A.  No.

16      Q.  Is the nature of that stretch of the river such

17  that it would be dangerous to operate that -- operate

18  any kind of boat on the Rio Grande when it's dark?

19      A.  I would not know.

20          MR. BRYANT:  Okay.  I'll pass the witness.

21          MS. KRUGER:  Thank you.

22                  EXAMINATION

23  BY MS. KRUGER:

24      Q.  You were asked what you did to prepare today,

25  and you mentioned reading your deposition.  Did you also

                                                        70


1  read over the declaration.

2      A.  Yes, declaration.

3      Q.  And went over some of the disclosures the

4  United States sent me?

5      A.  Correct.

6      Q.  Okay.  You were also asked if you had had

7  discussions with any attorney prior to preparing for

8  today.

9          Did you prepare with DOJ attorneys when you

10  were deposed before?  Last year.

11      A.  Last year, yes.

12      Q.  Okay.  And you talked with DOJ attorneys around

13  that period of time as well --

14      A.  Yes.

15      Q.  -- right?

16      A.  Yes.

17      Q.  Okay.  And have you, at various times, talked

18  to agency counsel attorneys about this case?

19              MR. BRYANT:  Objection to form.

20              THE WITNESS:  Not that I know.

21      Q.  (BY MS. KRUGER)  Okay.  You were also asked

22  about your -- the purposes of crossing the river.  And

23  you testified that there was survey work and then also

24  water measurement work.

25              Can you describe what is necessary when you

                                                        71


1  do the water measurement work?

2      A.  Yeah.  To take a stream measurement, you need

3  the sensor, a radar, or a sensor.  And you need that to

4  sit on top of the water.  And you need to drag it.

5  That's the equipment that we're using.  That I've seen

6  use.  It sits on top of the water, the river water.

7              And you have to drag it from one side of

8  the river side.  And you have to drag it all the way to

9    the other side of the embankment of the river.  And if

10   it's low enough, you can -- our hydro techs can walk --

11   the water gets a little bit higher, there will be a

12   boat, you know, and -- the bigger the water, or the

13   higher the river, the bigger the boat.

14        Q.  Would you need a boat with an engine, then, to

15   pull it?

16        A.  Yes.

17        Q.  And does it need to go from shore to shore?

18        A.  Yes.

19        Q.  Okay.  And that would be a lateral movement

20   across the river?

21        A.  Yes.

22        Q.  And when you say "there's an impediment at the

23   buoys," can you go laterally across the river with that

24   equipment in the exact spot where the buoys are located?

25        A.  No.

                                                        72


1        Q.  Why not?

2        A.  Well, the boat will crash through the buoy.

3        Q.  Okay.  You could go through do measurement

4    above the buoys or downstream of the buoy; is that --

5             MR. BRYANT:  Objection to form; leading.

6             THE WITNESS:  You could do it above, just

7    outside the range of the buoys.

8        Q.  (BY MS. KRUGER)  Let me ask that question a

9    different way.  Okay.

10            How could you do it, if you wanted to

11   conduct that same route?

12       A.  The only way that this equipment could not

13   leave the water.  So we have to drag it from one side to

14   the other side to get the exact measurement.

15       Q.  So when you saw the Mexican section on

16   July 20th conduct these -- the survey that was done, was

17   that to get a water measurement, to your knowledge?

18            MR. BRYANT:  Objection; leading.

19            THE WITNESS:  No.

20       Q.  (BY MS. KRUGER)  You said in addition to the

21   water flow measurement, that it can also -- the sections

22   you need to cross for a survey; is that correct?

23       A.  Yes.

24            MR. BRYANT:  Objection; form.

25       Q.  (BY MS. KRUGER)  Could, in your view, a person

                                                        73

1    right at the buoys independently conduct a survey across

2    where the buoys are located?

3        A.  I don't know.  I don't think that --

4            (Reporter interrupted for clarification.)

5            THE WITNESS:  I don't believe a single

6   person can do that.

7       Q.  (BY MS. KRUGER)  Okay.  Why not?

8       A.  To cross that section, you carry that survey,

9   point survey marker, both, and walk across the river.  I

10  believe they do it every 10 feet.  So, yes.  So -- they

11  would have to go jump under these -- or travel upstream.

12      Q.  So does this require a lateral movement across

13  the river?

14      Q.  Okay.  You -- could you do that above the

15  buoys?

16      A.  Yes.

17      Q.  On July 20th, you saw the Mexican section

18  conduct a survey above the location of the buoys; is

19  that correct?

20      A.  Yes.

21           MR. BRYANT:  Objection; form.

22      Q.  (BY MS. KRUGER)  Did you ever see anybody

23  conduct a lateral movement across the river at the

24  buoys?

25      A.  No.

                                                    74


1       Q.  Do you think the buoys are an impediment to

2   crossing at the location they're located?

3                 MR. BRYANT:  Objection to form.

4                 THE WITNESS:  Yes.

5      Q.  (BY MS. KRUGER)  You stated you have no

6  experience with navigation with the -- your work with

7  the IBWC.

8                 Have you ever been in these boats that the

9  IBWC has?

10     A.  At the reservoir -- Falcon Dam Reservoir, I've

11  been in a boat.

12     Q.  And you've observed IBWC use the other boats

13  that you've mentioned in that division?

14     A.  Yes.  I have seen them.

15     Q.  So you were asked about paragraph 16 of your

16  declaration, right?  It says, "Floating barriers are an

17  impediment to the sections crossing independently in

18  this part of the river."

19                 What do you mean about "this part of the

20  river"?

21     A.  There -- at the -- where that buoy -- that area

22  where the buoy's in the river.

23                 (Reporter interrupted for clarification.)

24                 THE WITNESS:  That -- that section of the

25  river, where the buoys are in the middle of the river.

75

1                    MS. KRUGER:  No further questions.

2                    MR. BRYANT:  No further questions.

3                    Again, Mr. Gomez, thank you so much for

4     being here and testifying and when you probably -- there

5     are probably days when you would feel better than you

6     feel today.  But you -- you seem to be able to smile.

7     And I'm glad that you feel that well and wish you the

8     best.  Thank you.

9                    MS. KRUGER:  He's only smiling because it

10    looks like you are going to let him go home now.

11                   THE REPORTER:  And Ms. Kruger, if I can

12    just get your order on the record?

13                   MS. KRUGER:  We'll take -- we don't need

14    the video.  We'll take one copy of the transcript.

15                   THE REPORTER:  Okay.  And read and sign?

16                   MS. KRUGER:  Yes, please.

17                   THE REPORTER:  Okay.  Perfect.

18                   THE VIDEOGRAPHER:  All right.  Are y'all

19    done.  All right.  We are going off record?

20                   We are going off the record.  The time --

21    okay.  We are going off the record.  The time is

22    3:55 p.m., this concludes video.

23                   (Proceedings concluded at 3:36 p.m.)

24

25