# **EXHIBIT 2**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION
 3      UNITED STATES OF AMERICA,    )
                                     )
 4              Plaintiff,           )
                                     )
 5      v.                           ) Case
                                     ) No. 1:23-cv-00853-DAE
 6      GREG ABBOTT, in his          )
        capacity as GOVERNOR OF      )
 7      THE STATE OF TEXAS, and      )
        THE STATE OF TEXAS,          )
 8                                   )
                Defendants.          )
 9
10
11
12                    ORAL DEPOSITION OF
13                 KATHY ANN ALEXANDER, PhD
14                   Monday, July 8, 2024
15
16          ORAL DEPOSITION OF KATHY ANN ALEXANDER, PhD,
    produced as a witness at the instance of the Plaintiff,
17  United States of America, and duly sworn, was taken in
    the above-styled and numbered cause on the 8th of
18  July, 2024, from 9:04 a.m. to 11:48 a.m., before Sharon
    Ross, Certified Shorthand Reporter in and for the State
19  of Texas, reported by computerized stenotype machine, at
    the US Attorney's Office for the Western District of
20  Texas, 903 San Jacinto Boulevard, Suite 334, Austin,
    Texas 78701, pursuant to the Federal Rules of Civil
21  Procedure and/or any provisions stated on the record or
    attached hereto.
22
23
    Reported by:
24  SHARON ROSS, Texas CSR #1961,
    Hawaii CSR #432, RMR, CRR, CRC
25  Realtime Systems Administrator
    Job No. CS6783937
```

```
 1        Q.  First sentence there says, "Dr. Alexander is
 2   not retained or specially employed to provide expert
 3   testimony in this case.  Dr. Alexander is a person whose
 4   duties regularly involve giving expert testimony in
 5   matters relating to water rights" and permitting
 6   "management in Texas."
 7               Is that a correct -- is that a correct
 8   statement?
 9        A.  That's basically what it says there.  I believe
10   that actual text says "expert testimony in matters
11   relating to water rights permitting and management in
12   Texas."
13        Q.  Okay.  So in your current role at TCEQ, your
14   duties include regularly giving expert testimony on
15   water rights, permitting, and management?
16        A.  Yes.
17        Q.  And that's what you'll be providing testimony
18   in this case about?
19        A.  Yes.
20        Q.  So a few lines down in that paragraph, it says,
21   "Dr. Alexander is expected to testify regarding"; and
22   then there is a list where it says, "which includes such
23   as."  What -- and the first one is "interbasin
24   transfers."
25               What testimony do you intend to provide
```

```
 1                Who are the relevant federal, state, local,
 2   and tribal entities?
 3         A.   That's a pretty broad question.  Can you --
 4         Q.   Sure.  So maybe like --
 5         A.   -- narrow that down a little bit?
 6         Q.   Let's break it up.  So you'll -- what testimony
 7   do you intend to provide about the relevant federal
 8   entities involved?
 9         A.   So I'm here, again, to provide information on
10   TCEQ's water rights permitting program, Chapter 11, and
11   its implementing regulations.
12                So to the extent that some of our
13   operations are guided by, for example, the International
14   Boundary and Water Commission and its role in ensuring
15   that water is delivered to Texas under the treaty, there
16   may be some information related to that, if I were
17   asked.
18         Q.   What is TCEQ's role in implementing the 1944
19   Water Treaty?
20         A.   TCEQ doesn't have a role in implementing the
21   treaty.  The treaty is intended to provide the water for
22   Texas uses -- uses.  And once the water has been
23   provided, then Texas law governs how it's used and how
24   we operate the Rio Grande.
25         Q.   And then the last item in the list -- or in the
```

1    paragraph on Page 8 of Exhibit 1 says "reasonableness of
2    possible improvements to make the Rio Grande River
3    suitable for navigation as proposed by the USA,
4    including between Mile Markers 275.5 and 610."
5              Are you providing -- are you providing an
6    expert opinion on the reasonableness of the possible
7    improvements?
8         A.   Yes.  That's items 5, 6, and 7 in my opinion.
9         Q.   What do you mean by "reasonableness"?
10        A.   So if something's not possible, it's probably
11   not reasonable; and I think that's what I've set out in
12   opinions 5, 6, and 7.
13        Q.   And then when you say "possible improvements,"
14   are those the two that we discussed earlier, the
15   dredging and the canal?
16        A.   The dredging, the locks and dams, new water
17   rights for navigation under Texas law, the items 5, 6,
18   and 7, in my opinion.
19        Q.   All right.  If you could look at paragraph 1 on
20   Page 9 of Exhibit 1.
21        A.   (Witness complies.)
22        Q.   It says, quote, "State water is defined by
23   Texas law as 'the ordinary flow, underflow, and tides of
24   every flowing river, natural stream, and lake, and of
25   every bay or arm of the Gulf of Mexico, and the storm

```
 1    requested it.
 2         Q.  And it could also be an incidental use to
 3    another one of the beneficial uses, correct?
 4         A.  Yes.
 5         Q.  And so just because water has been appropriated
 6    for municipal use doesn't mean that it can't be used for
 7    navigation?
 8         A.  What that -- so what an incidental use is -- is
 9    that is as the water is, for example, released from
10    storage to a downstream user, as it travels down the
11    stream to its ultimate beneficial consumptive use, it
12    may have ancillary benefits such as environment -- the
13    environment or navigation or whatever but it's not an
14    additional amount --
15         Q.  Uh-huh.
16         A.  -- in addition to the municipal use.
17         Q.  And so just because there have -- there are no
18    water rights appropriated for navigation doesn't mean
19    that a -- water cannot be navigable, correct?
20              MR. TEBO:  Objection, form.
21         A.  I don't understand that question at all.
22         Q.  (BY MR. HARRISON)  Looking at the next two
23    sentences, paragraph 2, it says, "In wa" -- Page 9 --
24         A.  Uh-huh.
25         Q.  -- "In water rights that authorize navigation,
```

1    navigation is not the only beneficial use authorized in
2    the water right.  Navigation is an incidental use
3    whereby water that is diverted or released for other
4    purposes could also be used to support navigation as
5    part of the water" rights -- "water right holder's
6    operations."
7              And that's what we just talked about?
8        A.   Yes.
9        Q.   And then the last sentence, it says, "The use
10   of water for navigation would not be in addition to the
11   authorized beneficial purposes of use in the water right
12   such as municipal, agricultural, or industrial use."
13             And that's the same thing that we were
14   also --
15       A.   Yes.
16       Q.   What in paragraph 2 on Page 9 of Exhibit 1
17   constitutes your expert opinion?
18       A.   So just like with statement 1, this is my
19   expert opinion about how water rights for navigation
20   uses or other non-consumptive uses would work in the
21   State of Texas based on my experience in water rights
22   permitting.
23       Q.   So moving to paragraph 3, it says, "Water
24   rights in other parts of the state include provisions to
25   protect navigation use, such as subordination of other

1   uses to navigation or cancellation of the water right if
2   the water is needed for navigation.  These provisions
3   were included in the water right at the time the
4   water ... was originally granted" -- or "water right was
5   originally granted."
6              Did I read that correctly?
7       A.   Yes.
8       Q.   And what's the basis for that statement?
9       A.   My knowledge of water rights permitting in
10  Texas and what's in particular permits based on 25 years
11  of experience and knowledge of specific permits.
12      Q.   And such provisions are not included for any
13  water rights on the Rio Grande --
14      A.   No --
15      Q.   -- to your knowledge?
16      A.   No, they're not.
17      Q.   The same question on paragraph 3, what in
18  paragraph 3 constitutes your expert opinion?
19      A.   This is based on my 25 years of experience,
20  knowledge of the Water Code and TCEQ's rules and what's
21  embodied in water rights in the State of Texas in terms
22  of their authorizations.
23              (Mr. Johnathan Stone is no longer present.)
24      Q.   (BY MR. HARRISON)  Paragraph 4 starts at the
25  bottom of Page 9.  It says, "TCEQ's Water Rights

1  just asking if you know who the applicants were for
2  those permits.
3        A.   So I'm aware of the US Army Corps of Engineers
4  holds a water right for a -- like a duck pond area by
5  Lake Somerville.
6                 The Fish and Wildlife Service holds water
7  rights for wildlife refuges.
8                 The Bureau of Reclamation was identified as
9  an owner on several of their projects, I believe, in --
10 when they were originally issued.
11       Q.   And those would have been issued back in the
12 1950s, '60s, '70s or --
13       A.   It would vary depending on kind of when the
14 project was initiated.  So I -- you know, I don't have
15 an exact date range to give you.
16       Q.   Were any of the Federal Government permits that
17 were issued for purposes of navigation?
18       A.   Not that I'm aware of.
19       Q.   Were any of the Federal Government permits that
20 you're referencing on the Rio Grande?
21       A.   I believe some of the wildlife refuges could be
22 on the Rio Grande, but I'm not like 100 percent sure
23 about that.
24       Q.   If we could turn to paragraph 5 on Page 10 of
25 Exhibit 1, it says, quote, "Releasing water solely for

1   the" purposes -- "solely for the purpose of raising the
2   water depth in the Rio Grande for purposes of navigation
3   is not reasonable because in Texas water right would be
4   required" -- I'll stop there.
5               And it cites to Texas Water Code section
6   11.121; is that correct?
7        A.   Yes.
8        Q.   What do you mean by -- when you say "not
9   reasonable"?
10       A.   So if something's not possible, it's not
11  reasonable.  I think I've already answered that
12  question.
13       Q.   But navigation -- I think we've talked about
14  this.  Navigation could be an incidental benefit from
15  other beneficial uses, correct?
16       A.   It could be.
17       Q.   And so if the use of water was occurring for
18  other beneficial uses and that resulted in benefits for
19  navigational purposes, a water right would not be
20  required, correct?
21       A.   Can you state that again?
22       Q.   Sure.  So if the water -- if the use of the
23  water was occurring for other beneficial uses and
24  navigation was an incidental benefit of that use, they
25  wouldn't need a water right for navigation, would they?

1      A.   If someone was using the water for a beneficial
2   purpose of use, navigation, they would need to add that
3   purpose of use to their water right.
4      Q.   So the rest of the sentence there says, quote,
5   "acquiring a ... water right would not be possible for
6   the following reasons:  a, there is no water available
7   for a new appropriation of water in the Rio Grande."
8           So I think we've talked about this a little
9   bit, but what does that mean?
10     A.   That means that in order -- in order to get a
11  new water right or a new appropriation, water has to be
12  found available.  That's in section 11.134 of the Texas
13  Water Code.
14           And so there is no water in excess of the
15  needs of the appropriators in the Rio Grande.  So that
16  means there's no water available for a new
17  appropriation.  All the water has been spoken for.
18     Q.   So no water currently available?
19     A.   I think there's no water available for a new
20  appropriation in the Rio Grande.
21     Q.   Are you also speaking for in the future as
22  well?
23     A.   I think there's no water available for
24  appropriation in the Rio Grande.
25           I don't -- I don't under -- I don't -- in

```
 1    you to make that kind of decision -- or I would, anyway.
 2         Q.   So the second sentence of paragraph 6 says,
 3    "TCEQ" -- of paragraph 6 says, "TCEQ has issued water
 4    rights for these types of projects; however, acquiring a
 5    new or amended water right in the Rio Grande would not
 6    be reasonable as outlined in statement 5."
 7              When you say "these types of projects,"
 8    what do you mean?
 9         A.   Dredging bank stabilization.
10         Q.   Are you aware of a dredging project in the Rio
11    Grande where TCEQ has issued a water right?
12         A.   No, but I am aware of dredging projects in
13    other parts of the state where TCEQ has issued a water
14    right because, as I state, if any of the aspect of the
15    project involves storing, taking, or diverting state
16    water, a water right would be required.
17         Q.   Are there any other reasons why acquiring a new
18    or amended water right would not be reasonable other
19    than the ones listed in paragraph 5?
20         A.   No.  I mean, water availability is a threshold
21    question when making a determination on whether a new
22    permit can be granted.
23              And if there's limited to no water
24    available for any uses, then we wouldn't be able to
25    issue a new water right.
```

1         Q.   So the next sentence of paragraph 6 says, "Even
2    if weirs, debris, and other obstacles were removed,
3    releasing water solely for the purpose of raising the
4    water depth in the Rio Grande is also not reasonable
5    because a Texas water right would be required" -- I'll
6    stop there.
7                   What is a weir?
8         A.   It can be a -- it's a structure that can be put
9    along or in a river.
10        Q.   (BY MR. HARRISON)  Does surface water get
11   diverted when there are weirs in the water?
12        A.   It can be.  A weir can be used to facilitate a
13   diversion.
14        Q.   And do weirs require a water right permit?
15        A.   They can.
16        Q.   What do you mean by "debris"?
17        A.   I think the intent of that was to talk about if
18   you went and dredged and moved any kind of -- what
19   someone might perceive as obstructions or whatever from
20   the river, that even if you did that, it -- you still
21   couldn't make a release of water outside the incidental
22   uses that we've talked about for navigation purposes
23   without a water right, which is not possible to get.
24        Q.   So like debris -- debris would be things like
25   tree limbs or leaves or tree parts, things like that?

1        A.  Yeah, or, you know, anything else that could
2    have been put in the waterway.
3        Q.  Man-made objects?
4        A.  Somebody could put trash or cars or anything
5    like that.  It could also be -- people -- people do
6    those sorts of things.
7        Q.  And can surface water get diverted when there
8    is debris in the water?
9        A.  I mean, if someone has an authorized diversion,
10   they can -- they may -- or it may -- the debris may or
11   may not interfere with their diversion.  I mean, that's
12   pretty broad.
13       Q.  What do you mean by, quote, "other obstacles"?
14       A.  I was just trying to be comprehensive.
15       Q.  So would removal of other obstacles potentially
16   require a water right or permit?
17       A.  I think it just depends, again, on the nature
18   of the project and the specifics as embodied in the
19   water right permit application.
20       Q.  Would other obstacles include nets or netting?
21       A.  I mean, I don't know that that's an obstacle
22   but, again, I would have to -- it would depend on
23   project specifics.
24                And, you know, I can't really answer those
25   type of questions without the specific projects in front

```
 1    of me.
 2         Q.   Would a cableway be an obstacle?
 3         A.   On obstacle to what?
 4         Q.   Well, would it constitute an "other obstacle"
 5    that you reference in paragraph 6?
 6         A.   I don't know.
 7         Q.   Would anchors constitute an obstacle or "other
 8    obstacle" that you reference in paragraph 6?
 9         A.   I wasn't talking specifically when I said
10    "other obstacles."  I mean, we could go down a long --
11         Q.   Sure.
12         A.   -- laundry list if you'd like; but I'm speaking
13    more generally.
14         Q.   But is it your opinion, then, that the removal
15    of other obstacles would require a water right or
16    permit?
17         A.   If any of that was part of a dredging or bank
18    stabilization project or other project that required
19    storing, taking, or diverting state water, a water right
20    permit from TCEQ would be required.
21         Q.   The Texas Water Code prohibits obstructing of
22    any navigable stream, correct?
23         A.   There are some provisions related to that.
24                   (Alexander Exhibit 6 marked.)
25         Q.   (BY MR. HARRISON)  I'll show you what's marked
```

1   not be reasonable because acquiring a new Texas water
2   right would not be possible."
3             I think we've talked about this before.
4   When you say "not be reasonable," is the reasonable
5   standard the same as what you discussed before?
6        A.   Yes.
7        Q.   And that's because it -- actually is that
8   because the -- a new water right would not be possible
9   to be acquired?
10       A.   Yes.
11       Q.   Is TCEQ accepting new water rights -- or is
12  TCEQ accepting new water right permit applications for
13  water rights on the Rio Grande currently?
14       A.   I'm not aware of any but, again, anyone could
15  certain -- could apply but TCEQ would also look at water
16  availability.
17            And if there's no water available under
18  Texas Water Code 11.134, we wouldn't be able to grant a
19  new water right.
20            So, I mean, someone could apply for
21  anything they wanted to; but that doesn't mean that it
22  can be granted under statute and rule.
23       Q.   So are you saying, then, that a congressionally
24  authorized project to aid navigation is impossible
25  because the Corps could not obtain a Texas water right

```
 1    or water use permit?
 2         A.   I think a Texas water right permit would be
 3    required, and I don't believe that would be possible.
 4    That's what my opinion says.
 5         Q.   But the Corps or the federal sponsor could
 6    apply for the appropriation to Texas, correct?
 7         A.   They could apply, yes.
 8         Q.   Is it possible the Corps could take existing
 9    water rights through condemnation if the project
10    authorizes them to do that?
11         A.   I don't know.
12         Q.   Do you have any new water right application
13    pending from the Corps on these potential navigation
14    projects?
15         A.   Not that I'm aware of.
16         Q.   And so are you providing an opinion that a
17    water right would not issue based on a nonexistent
18    application to TCEQ?
19         A.   Okay.  Can --
20         Q.   I can rephrase.
21         A.   Okay.
22         Q.   So there's no pending application that you're
23    aware of for a water right with respect to a
24    hypothetical navigation project, correct?
25         A.   That's correct.
```

1      Q.   If TCEQ does not have a pending application,
2   then how are you in a position to prejudge the
3   determination that would be issued as a result of
4   that -- of that application?
5      A.   Well, if you're asking me do I know that
6   there -- how do I know that there's no water available
7   for appropriation, I would say 25 years of experience in
8   Texas water rights permitting gives me the ability to
9   make that statement.
10     Q.   And you don't see that as a pre-decisional
11  result?
12     A.   No.  I think that there are various river
13  basins across the state, including the Rio Grande, where
14  it would not be possible to grant a new appropriation of
15  water because the water has already been committed to
16  other users.
17               So it's not -- the Rio Grande isn't special
18  in that respect.
19     Q.   You had testified earlier that the Corps had --
20  that you had worked on the Corps water supply reservoirs
21  projects.  Could you identify those?
22     A.   So I think what I had talked about is that we
23  had worked with the Corps of Engineers on various things
24  related to their water supply reservoirs.
25               I mean, that could range anywhere from the

```
 1   River?
 2        A.  Yes.
 3        Q.  And you testified that that included the 1944
 4   Water Treaty between the United States and Mexico?
 5        A.  Yes.
 6        Q.  Are you also familiar with other binational
 7   water treaties that relate to the waters of the Rio
 8   Grande River?
 9        A.  Yes.
10        Q.  Is it fair to say that you are generally
11   familiar with the binational treaties that relate to the
12   waters of the Rio Grande River?
13        A.  Yes.
14        Q.  Did you testify about interactions between TCEQ
15   and the IBWC?
16        A.  Okay.  I --
17        Q.  I'm sorry.  Did you testify today concerning
18   typical interactions between TCEQ and the International
19   Boundary and Water Commission?
20        A.  Yes, in very general terms.
21        Q.  Yeah, in general terms.
22             Did you say that the -- or would you say
23   that the IBWC handles the distribution of waters between
24   the United States and Mexico, whereas TCEQ handles water
25   pit -- permitting to the US share of waters?
```

```
 1
 2               MR. HARRISON:  Objection, form.
 3        A.  I think that's accurate, yes.
 4        Q.  (BY MR. TEBO)  And did you testify today that
 5   Texas has primary jurisdiction over the US share of
 6   waters of the Rio Grande?
 7        A.  Yes, I did.
 8        Q.  And by that -- I mean, by Texas having primary
 9   jurisdiction to the US waters for the Rio Grande, by
10   that phrase did you mean that Texas controls the use of
11   US waters of the Rio Grande?
12        A.  Yes.
13        Q.  Did you also mean by that phrase that state law
14   and not federal law governs the use of those waters?
15        A.  Yes.
16        Q.  Would any use of the Rio Grande's waters by the
17   US Army Corps of Engineers or other federal entities be
18   subject to approval by Texas including through TCEQ?
19        A.  For a water rights permit, yes, it would.
20        Q.  Has any court determined that the Rio Grande
21   River is a navigable stream under state law?
22               MR. HARRISON:  Objection, form.
23        A.  Not that I'm aware of.
24        Q.  (BY MR. TEBO)  And does state law itself define
25   the Rio Grande as a navigable stream?
```