# **<u>EXHIBIT 3</u>**

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION
 3
     UNITED STATES OF           §
 4   AMERICA,                   §
                                §  CIVIL ACTION NO.
 5      PLAINTIFF,              §  1:23-CV-00853-DAE
                                §
 6   V.                         §
                                §
 7   GREG ABBOTT, IN HIS        §
     CAPACITY AS GOVERNOR OF    §
 8   THE STATE OF TEXAS, AND    §
     THE STATE OF TEXAS,        §
 9                              §
        DEFENDANTS.             §
10
11
12
                       ORAL DEPOSITION OF
13                      CARLOS RUBINSTEIN
                          JULY 9, 2024
14
15
16
          ORAL DEPOSITION OF CARLOS RUBINSTEIN, produced as
17   a witness at the instance of the Plaintiff and duly
     sworn, was taken in the above styled and numbered
18   cause on Tuesday, July 9, 2024, from 9:34 a.m. to
            p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in
19   and for the State of Texas, reported by computerized
     stenotype machine, at the U.S. Attorney's Office for
20   the Western District of Texas, 903 San Jacinto
     Boulevard, Austin, Texas, pursuant to the Federal
21   Rules of Civil Procedure and any provisions stated
     on the record herein.
22
23
24
25   Job No. CS 6783952
```

1   manager for the City of Brownsville?
2        A.   That is correct.
3        Q.   Go back to Exhibit 1, Page 1.
4             On the cover, it notes that you and
5   Herman Settemeyer prepared the report.  Is that
6   right?
7        A.   Correct.
8        Q.   You mentioned earlier Mr. Settemeyer is
9   one of the partners with you at RSAH20?
10       A.   That is correct.
11       Q.   Looking at the table of contents on
12  Page 2, is there a way to break down the content of
13  what portions you drafted and which portions
14  Mr. Settemeyer drafted?
15       A.   Not really, because we cooperated and
16  coedited the document as we were building it.
17       Q.   Were either of you the primary drafter or
18  the one that kind of took the pen on it?
19       A.   We transferred the pen between us.  As I
20  made edits and then I'd send it to Herman.  Herman
21  made edits, sent it back to me.  So the pen moved
22  quite a bit.  Herman started the initial draft and
23  we just took off from there.
24       Q.   Turn to Page 3.
25       A.   Yes, sir.

1    Q.   The summary of opinions.  Are these ten
2    items all of the opinions that you expect to offer
3    at trial in this case?
4    A.   Yes.  And in the document, we add
5    additional information as to the basis of our
6    opinion.  We raise a lot of other questions, but
7    these are the ten opinions that we concluded with.
8    Q.   For each of these ten, if we need to go
9    through them we can, but is your opinion and
10   Mr. Settemeyer's opinion the same?
11   A.   They are, yes, sir.
12   Q.   So you are both expressing the same
13   opinion as to all ten of these opinions?
14   A.   Yes, sir.
15              MR. TEBO:  Objection; form.
16              THE WITNESS:  I apologize.
17              MR. TEBO:  That's all right.
18   Q.   Did you and Mr. Settemeyer disagree about
19   any opinions, either contained within the summary or
20   that are not expressed?
21              MR. TEBO:  Objection; form.
22   A.   No.
23              MR. HARRISON:  So we've been going
24   about an hour.  Do you want to take a break or --
25              THE WITNESS:  Yes.

1   border in the segments we're talking about, that was
2   done in Minute 309.
3           Those are examples.
4       Q.  I may have misheard in your answer, but I
5   just want to make sure.  You had mentioned the
6   potential cooperation for a treatment plant and you
7   said that could be contemplated by a treaty.  Did
8   you mean by a minute?
9       A.  A minute.
10      Q.  Okay.
11      A.  If I said a treaty, I misspoke.
12      Q.  And I may have misheard, too, so thank
13  you for clarifying.
14      A.  Yeah.  And to be clear, we have
15  cooperated, in (unintelligible) and also near
16  Tijuana.
17      Q.  Yeah.
18      A.  But I meant by a minute.
19      Q.  Okay.  That's what I thought.  And I may
20  have misheard, too, so --
21      A.  If I misspoke, I apologize.  Thanks for
22  catching it.
23      Q.  So if you look on Page 8 about midway
24  down right after the Footnote 17, it says:  All
25  water use from the Rio Grande requires a water right

```
 1    from the TCEQ.
 2              Did I read that correctly?
 3       A.     Yes, you did.
 4       Q.     And it cites to what we've talked about
 5    before, Chapter 303 of the Texas Administrative Code
 6    and then also the Texas Water Code that's 11.081.
 7    Correct?
 8       A.     Correct.  And others, but yes, in
 9    particular.
10       Q.     And so you need a permit -- a person
11    needs a permit if they're going to store, take, or
12    divert water?
13       A.     The only time you do not need a permit is
14    if you're going to put it to domestic or livestock
15    use and your use is going to be 200 acre-feet or
16    less.  Those are permit-exempt conditions absent
17    that in an emergency use, like, you're going to have
18    to fight a fire.
19       Q.     Okay.
20       A.     Other than that, you absolutely need a
21    permit.  Fair enough?
22       Q.     And the statute that Texas Water Code
23    specifically excludes the domestic livestock use
24    that you just mentioned?
25       A.     It is a statutory exemption.  You are
```

```
 1   correct.
 2            And to be clear, livestock use is
 3   watering your cows.  It is not watering the pasture.
 4   That's irrigation.  That requires a permit.  It is
 5   that specific.
 6       Q.    And so a permit, then, is required for
 7   the storage, taking, or diversion of water under the
 8   Texas Water Code.  Is that correct?
 9       A.    Yes, sir.
10       Q.    So what is a storage?
11       A.    Storage, we talked about it several times
12   this morning.  If you build a structure
13   perpendicular to the banks, that retains water and
14   it creates a pool behind it, that gives you a
15   storage right.  That gives you a storage purpose.
16   Fair enough?
17       Q.    So what would -- so are there other
18   examples of a storage besides that?
19       A.    Yeah.  Yes, you could have off-channel
20   storage where you take water from the river and you
21   have an off-channel impoundment.  That also could be
22   storage.
23       Q.    Do you need a water right or permit for
24   the off-channel impoundment?
25       A.    Absolutely.
```

```
 1   diverts?
 2        A.   No.  Not -- you're going to be in trouble
 3   if you do that.  I think the Water Code is very
 4   clear that you need a permit.
 5             And there are other regulations that come
 6   into play as well, not just the Water Code.
 7        Q.   So say you were talking about the
 8   Maverick Dam and the canal.  So if -- if the
 9   Maverick -- if the entity that operates the Maverick
10   canal and reservoir or dam needs to do work to
11   stabilized the -- the river bank or something along
12   those lines, would they need a water permit to do --
13   or a water right permit to do that?
14        A.   I don't know.  I think it depends on
15   whether water will be consumed or required.  I would
16   think that they're going to be doing more
17   maintenance work on their actual canal.
18             I've been to the diversion point many
19   times.  I've also been to the return point.  It is a
20   substantial well-constructed facility there.  Does
21   it need -- I'll tell you what the biggest problem
22   there is, is the naturally occurring giant cane.  It
23   is prolific there.  And that impacts water more
24   than -- and could impact navigation as well.  Huge
25   problem there.  But I don't see the Maverick
```

1  time-beneficial ways in which we have developed both
2  countries to move people and goods, that the river
3  can ever compete.  I just don't see it.
4       Q.   And the rest of Paragraph 8 we -- we've
5  already talked about the Brownsville Weir Dam and
6  those issues.
7            I'll move on to Paragraph 9 where it
8  says:  Dredging the Rio Grande would be a
9  never-ending project.  Inflows to the Rio Grande
10 would cause never-ending silt accumulation which
11 would need to be maintained.  Would IBWC be the
12 entity responsible?
13           Did I read that correctly?
14      A.   You did.
15      Q.   Are you aware of any federal or
16 nonfederal navigation projects that don't require
17 maintenance dredging?
18      A.   No, it's -- I -- the statement that I'm
19 making the basis for it is the fact that I know for
20 a fact that any time water moves and is somehow
21 impeded, it will cause siltation.
22           And that -- and it's -- the Amistad Dam
23 has to be re-rated every ten years because it's
24 silting up.  Falcon Dam has to be re-rated every ten
25 years because it's silting.  Anzalduas is re-rated.

1    The discharge channel below Anzalduas is re-rated.
2    That's what water does.
3         Q.   So dredging seems to be a fact of life?
4         A.   Well, yes.  And -- and actually, I'm glad
5    you said that because the Brownsville ship channel
6    in any lifetime has had to be redredged multiple
7    times as an example.  But it shouldn't surprise
8    anybody that that occurs.  That's just a factor of
9    what happens with water.
10        Q.   And IBWC does sediment removal dredging
11   in the Rio Grande and around Amistad and Falcon?
12        A.   No.  The -- no.  Dredging, believe it or
13   not, is one of the most cost -- silt removal is one
14   of the most cost -- costly things you can undertake.
15   Because it's not -- again, it's a never-ending deal.
16             The only time that I am aware that IBWC
17   dredged a portion of the river is that time that I
18   mentioned earlier where the river, because of low
19   flow, stopped flowing in the Gulf, and they went out
20   there with a backhoe or two and they dug out the
21   channel so it couldn't go back in.
22             Dredging is very cost prohibitive.  But
23   in some situations, you don't have a choice.  Right.
24   Now, it doesn't mean that IBWC won't go down to a
25   gaping session and dredge it out to return to the

1    previous curve that they have.  Again, it's not what
2    you want to be doing.
3         Q.   Paragraph 10 poses the question:  What
4    would be the environmental impacts associated with
5    such a project?
6              So are you suggesting that before such a
7    project began, the environmental impacts need to be
8    studied?
9         A.   Yes.  And I think your experts pointed to
10   the same thing when they referenced NEPA.  I think
11   we're both saying the same thing different ways.
12        Q.   No. 11 on the bottom of -- bottom of --
13   bottom of Page 11 of Exhibit 1 says:  Who would be
14   the economic beneficiaries of this project?
15             By "projects" you mean the dredging
16   project?
17        A.   The dredging to restore navigational
18   purpose.  Who's going to benefit from that when the
19   need doesn't exist?  That's what we're asking.
20        Q.   The need doesn't exist currently, but
21   there's a possibility that there may be a need in
22   the future?
23        A.   Again, I think it's a -- it's what you
24   asked earlier.  It's -- for that need to exist, it
25   would have to be one, feasible; two, in my mind more

1    cost competitive than the other existing intermodal
2    ways.  I don't see that occurring.
3         Q.    So Subsection A of Paragraph 11 -- of
4    Page 11.
5         A.    Subsection A?
6         Q.    Subsection 11(A).
7         A.    Yes, sir.
8         Q.    It says:  Both Carlos Rubinstein and
9    Herman Settemeyer have attended numerous meetings
10   with the IBWC both United States and Mexico
11   sessions, as well as with the Department of State
12   during their careers with the TCEQ.  Never was
13   constructing a project to make the Rio Grande
14   commercially navigable ever discussed.
15              Is it the mission of IBWC to develop and
16   construct projects to aid in navigation?
17        A.    I don't know.  We're just stating the
18   fact.  Navigation and the desire to make the river
19   navigable has never come up, ever.  That's all we're
20   saying.
21              And IBWC has purview, direct purview,
22   over the Rio Grande.  In those discussions, it has
23   never come up.  That's all we're saying.
24              And then, again, we go back to the fact
25   that navigation is referenced in the treaty, yet it

1    doesn't exist.  There's no purpose for it.  No
2    demonstrative use.
3         Q.    And the same question as to Department of
4    State.  Is it the mission of the State Department to
5    develop and construct projects in aid of navigation?
6         A.    IBWC is a -- my term -- a subsidiary of
7    the Department of State.  It does deal as an
8    international stream to -- with our relations to
9    Mexico.  That is a purview of the Department of
10   State.  I -- in my experience, significant issues on
11   the Rio Grande involve both the IBWC and the
12   Department of State, that's why we mentioned that.
13        Q.    11(B) says -- I don't know, about halfway
14   down:  At no time have they witnessed a need for, or
15   a use of the river for commercial navigation.
16              What do you mean by "commercial
17   navigation"?
18        A.    I think we've talked about it at length
19   today.  It's the -- the type of navigation
20   associated more, in my mind, with what you see on
21   the intercoastal canal, at the active ports along
22   the Gulf.  What you even see on the Mississippi
23   River.  The movement of large freight using very
24   large boats to move oars, timber, materials.  Never
25   has that occurred in my lifetime in the Rio Grande.

1    Q.    If Congress authorized a project to aid
2    navigation on the Rio Grande, is it your testimony
3    that such a project requires the federal government
4    to obtain a water right from Texas?
5    A.    Okay.  One more time.
6    Q.    Sure.
7    A.    Or if you can just expand on it,
8    because I -- the way you asked it, yes.
9    Q.    Okay.  Well, I want to make sure -- I
10   want to make sure we're not talking past each other,
11   so...
12   A.    Yeah.
13   Q.    If Congress authorizes a project to aid
14   navigation on the Rio Grande, is it your testimony
15   that that project requires a water right permit from
16   the State of Texas?
17   A.    How else are you going to give it that
18   use, and where is the water going to come from to
19   satisfy that project?
20         Without knowing the particulars of how
21   you would make it navigable, yes, absolutely.  I can
22   see where that's going to require a water right, at
23   a minimum, just to add the use.
24   Q.    What federal civil works projects in
25   Texas has the federal government obtained water

```
 1   rights or used permits from TCEQ for?
 2        A.    One that comes to mind are some
 3   reservoirs in East Texas that the Corps, I believe,
 4   operates.  I'm sure there are many others.  I
 5   wouldn't be surprised if some of the Highland Lakes
 6   had Army Corps attachment.  I would not be
 7   surprised.  There might be numerous.
 8        Q.    Are you aware of any that -- any water
 9   rights permits for projects that were done in aid of
10   navigation?
11        A.    I'm not aware of that, sir.
12        Q.    So are you saying that any federal
13   project to aid navigation is impossible because the
14   Corps cannot obtain a water right permit from the
15   State of Texas?
16        A.    On the Rio Grande?
17        Q.    On the Rio Grande.
18        A.    I don't know how you overcome -- as a --
19   when it comes to water issues, one of the critical
20   things that you first have to overcome, and the EPA
21   is a stickler on this, is purpose and need.  Where
22   is the need?
23              I don't see how you overcome that
24   obstacle.  I don't think you get to a credible
25   application, but you're entitled to file one, you
```

```
 1   Grande would be economically unfeasible.
 2            And I think we've talked today about
 3   how -- you didn't do specific calculations for
 4   analysis of -- of quantifying those analyses for
 5   your report?
 6       A.   I did not.  The statement is -- I think
 7   we've covered it during the day -- based on my
 8   experience and that of Herman's as well.  The fact
 9   that there's no need, the fact that you can't
10   quantify a benefit, can't even point to who would be
11   using it.  It's just infeasible.
12       Q.   Infeasible from an economic perspective?
13       A.   And a sustainability.  Remember I
14   mentioned viable, feasible, and sustainable?  I
15   don't even think it's viable.  I don't think it
16   meets any of the three.  But yes.
17       Q.   And the -- your basis for that is not as
18   an economist but based on your experience and
19   background?
20       A.   Absolutely.
21       Q.   So if you go down, the third line,
22   actually move up one, it says:  Most anything can
23   have an engineered solution.
24       A.   Okay.  Now, let me find it.
25       Q.   Oh, sorry.  Same paragraph, third line
```

1        Q.   Are there any other topics that you
2   intend to provide opinion testimony on at trial that
3   we have not discussed today?
4        A.   Not that -- I -- if -- if you would ask
5   me questions that would want to peel the onion back
6   some more, we could.  But they would be along the
7   topics that we talked about.  As you interview other
8   witnesses and they provide testimony, it might
9   trigger something additional, but at this time, no.
10               MR. HARRISON:  Can we go off the
11  record for a second.
12                      (Break.)
13       Q.   In Exhibit 1, are there any of the
14  opinions expressed here that you have that are
15  different than Mr. Settemeyer's?
16       A.   I don't believe so.  Not at all.
17       Q.   And are there any of the bases for the
18  opinions in Exhibit 1 different between you and
19  Mr. Settemeyer?
20       A.   The -- the vantage point at which we view
21  the river, Mr. Settemeyer, as you can surmise from
22  his résumé, has spent considerable much more time
23  than I ever did on the actual adjudication and the
24  permitting of water rights.
25               I correspondingly spend more time on the

1   there's no way to resolve it, they have to deny it.
2   It's not their choice.
3        Q.    In other words, TCEQ would have to deny
4   the application, they don't even have an option?
5              MR. HARRISON:  Objection; form.
6        A.    Unless they can be overcome by special
7   conditions, yes.
8        Q.    Is that statement also true for
9   applications to amend an existing water right to add
10  a nonconsumptive use such as navigation?
11       A.    I believe so.  Yes.
12       Q.    Given your familiarity with existing
13  water rights on the Rio Grande, do you think it
14  likely that amending existing water rights to add
15  navigation as an incidental use would prejudice
16  superior right -- would prejudice preferential water
17  use rights?
18       A.    For all the reasons I've stated during
19  the deposition, they absolutely would.
20       Q.    During your tenure at TCEQ, have you ever
21  rejected or witnessed being rejected or modified an
22  application -- I'm sorry.  Let me rephrase that
23  question.  It got a little messy.
24             During your tenure at TCEQ, have you ever
25  rejected or modified an application for a water

1    impacts on water rights and water rights holders --
2    or, I'm sorry, water rights holders?
3        A.   Based on my almost a decade as being
4    specifically Rio Grande water, and more than a
5    decade dealing in -- actually, the vast majority of
6    my career dealing with the Rio Grande, no, I did not
7    need to perform a calculation.
8        Q.   So just to ask, did you rely on your
9    years of experience at TCEQ, years living along the
10   river, your deep familiarity with the Rio Grande
11   River, to arrive at your opinions with respect to
12   the feasibility of improvements to enhance
13   navigation?
14       A.   Absolutely.
15              MR. HARRISON:  Objection; form.
16              THE WITNESS:  Sorry.
17       A.   Absolutely.
18              MR. TEBO:  Thank you.  No further
19   questions on cross.
20              MR. HARRISON:  I don't have anything
21   else.  Thank you, Mr. Rubinstein.
22              (Deposition concluded at 4:04 p.m.)
23
24
25