# **EXHIBIT 4**

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                         AUSTIN DIVISION
3
    UNITED STATES OF              §
4   AMERICA,                      §
                                  §   CIVIL ACTION NO.
5       PLAINTIFF,                §   1:23-CV-00853-DAE
                                  §
6   V.                            §
                                  §
7   GREG ABBOTT, IN HIS           §
    CAPACITY AS GOVERNOR OF       §
8   THE STATE OF TEXAS, AND       §
    THE STATE OF TEXAS,           §
9                                 §
        DEFENDANTS.                §
10
11
12
                         ORAL DEPOSITION OF
13                   HERMAN ROBERT SETTEMEYER
                          JULY 10, 2024
14
15
16
        ORAL DEPOSITION OF HERMAN ROBERT SETTEMEYER,
17   produced as a witness at the instance of the
     Plaintiff and duly sworn, was taken in the above
18   styled and numbered cause on Wednesday, July 10,
     2024, from 9:07 a.m. to 11:47 a.m., before TAMARA
19   CHAPMAN, CSR, RPR-CRR in and for the State of Texas,
     reported by computerized stenotype machine, at the
20   U.S. Attorney's Office for the Western District of
     Texas, 903 San Jacinto Boulevard, Austin, Texas,
21   pursuant to the Federal Rules of Civil Procedure and
     any provisions stated on the record herein.
22
23
24
25    Job No. CS 6783965

1    one, and we finally -- we finally did the
2    adjudication.
3          Q.   So the Bosque?
4          A.   Bosque.
5          Q.   Bosque, Upper Trinity, and Upper/Lower
6    Red River, those were sometime in the late 1970s or
7    early 1980s?
8          A.   Yes.
9          Q.   Upper Rio Grande you mentioned was around
10   1995?
11         A.   Generally around that time.
12         Q.   Mr. Rubinstein testified yesterday that
13   you coauthored and coedited Exhibit 1, which is your
14   expert report.
15              Do you agree with that?
16         A.   Yes.
17         Q.   He also testified that there would be no
18   way to easily break down or identify which sections
19   he drafted and which sections you drafted.
20              Do you agree with that?
21         A.   Yes.
22         Q.   Are you able to identify which sections
23   or content are facts forming your opinion versus
24   those forming Mr. Rubinstein's opinion within the
25   expert report?

```
 1         A.    No.
 2         Q.    Do you agree with Mr. Rubinstein that the
 3   two of you came to all of the same conclusions and
 4   opinions in Exhibit 1?
 5               MR. TEBO:  Objection; form.
 6         A.    Yes.
 7         Q.    Exhibit 1, Page 3.  This is the summary
 8   of opinions, and there are ten opinions summarized
 9   here.
10               Do you see those?
11         A.    Yes, sir.
12         Q.    So are all of these -- are all of these
13   the same opinions that you have also for
14   Mr. Rubinstein as well?
15         A.    Would you repeat that?
16         Q.    Sure.  Is there any difference in the
17   opinions expressed -- summarized 1 through 10 on
18   Page 3 that you have that are different than
19   Mr. Rubinstein's?
20         A.    No.  These -- these summary of opinions
21   that we put in our report are -- are the opinions of
22   both authors.
23         Q.    Are any of the opinions unique to
24   just you?
25         A.    No.
```

1         Q.    Are any of the bases or facts underlying
2    these opinions different for you than
3    Mr. Rubinstein?
4               MR. TEBO:  Objection; form.
5         A.    I don't think so.
6         Q.    Did you independently conduct any
7    additional analysis or calculations that
8    Mr. Rubinstein did not do to help form your
9    opinions?
10        A.    No.
11        Q.    When did you first form your opinions in
12   this case?
13        A.    Well, once we were retained and we were
14   provided documents associated with the filings that
15   had been previously filed in the case and -- and
16   we -- I read through those filings and then thought
17   about what was said in those filings and thought
18   about based on my previous education as well as my
19   40 years of experience most of which has been on the
20   Rio Grande throughout time, that -- that, you know,
21   the opinions generated here were the opinions that
22   we -- we had developed over our historical expertise
23   from the different jobs associated -- and we had
24   associated with the Rio Grande and processing of
25   water rights and the administration of water rights

1    Mr. Rubinstein and Mr. Settemeyer -- and for
2    yourself -- and if you need to take a moment to do
3    that, feel free -- are there any -- what are the
4    differences in the expected topics of testimony
5    between the two?
6                   MR. TEBO:  Objection; form, beyond
7    the scope.
8         A.   I mean, it's kind of hard to -- I think
9    they're pretty much the same in general.  There's a
10   little bit of wording differences.
11        Q.   If I represented to you that your topics
12   of expected testimony are the same except for yours
13   include hydraulics and engineering, would that --
14   would you have reason to --
15        A.   I think -- I believe that's correct.  I
16   don't see hydraulics and engineering in Mr. --
17   Mr. Rubinstein's portion of it.  I am a registered
18   professional engineer within the State of Texas, and
19   it does include hydraulics here.
20        Q.   And what specific opinions and testimony
21   are you expected to provide regarding hydraulics and
22   engineering?
23        A.   You know, hydraulics is kind of the
24   operation of the dams, I think, in this regard.  And
25   I would suspect that they may want some testimony

1    relating to the releases of water through the dams,
2    how those releases are made.
3         Q.   Are there specific portions of Exhibit 1,
4    your expert report, that address issues particular
5    to hydraulics and engineering?
6         A.   I don't think so.
7         Q.   As an engineer, do you use modeling?
8         A.   I am not a modeler.  You know, when I was
9    working at the agency, you know, the agency used
10   models.  We used models.  I say "we."  Through
11   the -- excuse me -- in particular the Rio Grande
12   Compact there was models used by the various
13   agencies to assist in the compact deliveries.  I
14   mean, I think the Corps originated a model and it
15   was used -- that Corps model was used to calculate
16   the deliveries between New Mexico, Colorado, and
17   Texas.  Myself, I am not a modeler.  I do not write
18   models.  I don't actually even run the models.
19        Q.   So is the other side of that coin, that
20   you do more technical evaluations and those sorts of
21   analysis as an engineer?
22             MR. TEBO:  Objection; form.
23        A.   Well, as an engineer advisor to the Rio
24   Grande Compact Commission we oversaw the accounting
25   of water deliveries between the states.  We oversaw

1    amending the treaty.  He discussed IBWC rules
2    associated with administering the treaty.
3             It's my personal opinion that amending
4    the treaty would be an extremely complex operation.
5    Developing rules through the IBWC, the way I
6    understand it, is -- is not a public process.  So,
7    you know, amending those rules to what could affect
8    Texas water users and Texas's ability to use the
9    U.S. share of treaty deliveries, we would be
10   concerned if those rules were amended, particularly
11   if we didn't -- I shouldn't say "we" because I'm not
12   with the TCEQ anymore.
13            But I mean Texas would be concerned about
14   amending those rules that would impact water
15   deliveries to our water users.  But I -- what I
16   really want to say is amending the treaty is --
17   would be an extremely complex proposition.
18       Q.   And then on Page 18 of Exhibit 1, the
19   next section to the portion of this section
20   discusses the -- Mr. Tim -- Timothy McAllister.
21            Do you know Mr. McAllister?
22       A.   No.
23       Q.   And you said you had -- you attended,
24   virtually attended, portions of his deposition?
25       A.   Yes.

1      A.   Well, basically -- basically it's kind of
2   generally taken from the pleadings that I was able
3   to read that -- you know, that U.S.'s contention
4   about navigability on the Rio Grande and -- and
5   the -- their ideas of making the Rio Grande
6   navigable.
7              MR. HARRISON:  Can I take five
8   minutes?
9              MR. TEBO:  Sure.
10                   (Break.)
11     Q.   Mr. Settemeyer, are the basis for all of
12   your opinions -- any of your opinions different than
13   Mr. Rubinstein's?
14     A.   I don't think so.
15             MR. HARRISON:  I'll pass the witness.
16                    EXAMINATION
17   BY MR. TEBO:
18     Q.   Mr. Settemeyer, did you testify today
19   about the relevance of water availability to the
20   feasibility of improvements to the Rio Grande River?
21     A.   Yes.
22     Q.   And did you testify that the waters of
23   the Rio Grande River are fully appropriated?
24     A.   Fully appropriated and overappropriated.
25     Q.   Does your report state that the waters

1    are overappropriated to the best of your
2    recollection?
3         A.   I don't know if the report states that
4    it's overappropriated.  I know it states that it's
5    fully appropriated.
6         Q.   I understand.
7              Were a portion of the current -- scratch
8    that.
9              If some of the current rights holders to
10   waters of the Rio Grande River were to abandon their
11   rights, thereby freeing up some of the waters, are
12   there uses not related to navigation that would
13   likely get priority to appropriate those waters?
14        A.   Well, first of all, if water rights were
15   freed up or canceled or abandoned that would provide
16   additional water, that water would be used by the
17   existing water rights because the stream is
18   overappropriated.
19             If there was enough water somehow created
20   within the Rio Grande, there is documented
21   additional demands of the region that would need to
22   be supplied for higher priority use than navigation.
23        Q.   Would you clarify a little bit of your
24   answer?  Specifically what documented -- I think
25   documented demands, did you say, are you referring

1    perform data-driven calculations to arrive at a
2    number of your opinions?
3         A.   That's correct.
4         Q.   Did you need to perform data-driven
5    calculations to ascertain that the Rio Grande
6    currently lacks enough water to facilitate actual
7    navigation?
8              MR. HARRISON:  Objection; form.
9         A.   No.
10        Q.   Did you need to perform data-driven
11   calculations to ascertain that attempts to improve
12   the Rio Grande River for navigation would have
13   severe impacts on Texas water rights holders?
14             MR. HARRISON:  Objection; form.
15        A.   No.
16        Q.   Did you need to perform data-driven
17   calculations to arrive at any of the opinions in
18   your expert report?
19        A.   No.
20             MR. HARRISON:  Objection; form.
21        Q.   Did you rely on your years of experience
22   at TCEQ, other agencies, to arrive at the opinions
23   in your expert report?
24        A.   Yes.
25             MR. HARRISON:  Objection; form.

1    Q.   Did you rely on anything else?
2    A.   No.
3    Q.   Was your experience and the knowledge you
4  accumulated therefrom adequate in your judgment to
5  support the opinions contained in your expert
6  report?
7    A.   Yes.  From my experience and from my work
8  on the Rio Grande and other areas of the state, that
9  experience and knowledge of the existing information
10 that is currently available provided me the
11 opportunities to make these recommendations.
12   Q.   And specifically could I direct your
13 attention to Pages 15 and 16 of your expert report,
14 the paragraph at the bottom of Page 15 that is
15 number 2, were you asked today about that paragraph
16 of your expert report?
17   A.   I don't know if I was specifically asked
18 about that paragraph.  I don't remember.
19   Q.   That's all right.  Does that paragraph
20 ask about -- oh, sorry.  Does that paragraph state
21 that reprioritization of the uses of the Rio Grande
22 for navigation purposes would inflict serious
23 hardship on cities and consumers in both the United
24 States and Mexico?
25   A.   Yes.

1    which use would individual scaled boating be
2    classified?
3         A.   I would classify individual boating as a
4    recreational use.  And when I was at TCEQ -- that's
5    how I would have done it when I was at TCEQ.
6         Q.   Are improvements to make the Rio Grande
7    River in Texas into a river susceptible to
8    navigation feasible?
9         A.   No.
10        Q.   Are they practical?
11        A.   No.
12        Q.   Are they reasonable?
13        A.   No.
14        Q.   Mr. Settemeyer, were you asked today
15   about your -- about the portion of your expert
16   report that assesses the US expert report prepared
17   by Mr. Adrian Cortez?
18        A.   Yes.  Somewhat, yes.
19        Q.   Do you believe that Mr. Cortez's report
20   adequately considered the impact of increased water
21   releases on Texas water rights?
22        A.   I don't think his report considered that.
23        Q.   Would you consider that to be an
24   important aspect of any of the proposals for such
25   releases?