# EXHIBIT

# 2

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION
 3    UNITED STATES OF AMERICA,    )
                                   )
 4              Plaintiff,         )
                                   )
 5    v.                           ) Case
                                   ) No. 1:23-cv-00853-DAE
 6    GREG ABBOTT, in his          )
      capacity as GOVERNOR OF      )
 7    THE STATE OF TEXAS, and      )
      THE STATE OF TEXAS,          )
 8                                 )
                Defendants.        )
 9
10
11
12                    ORAL DEPOSITION OF
13                       MICHAEL BANKS
14                 Wednesday, July 10, 2024
15
16          ORAL DEPOSITION OF MICHAEL BANKS, produced as
      a witness at the instance of the Plaintiff, United
17    States of America, and duly sworn, was taken in the
      above-styled and numbered cause on the 10th of
18    July, 2024, from 9:10 a.m. to 12:43 p.m., before Sharon
      Ross, Certified Shorthand Reporter in and for the State
19    of Texas, reported by computerized stenotype machine, at
      the US Attorney's Office for the Western District of
20    Texas, 903 San Jacinto Boulevard, Suite 334, Austin,
      Texas 78701, pursuant to the Federal Rules of Civil
21    Procedure and/or any provisions stated on the record or
      attached hereto.
22
23
      Reported by:
24    SHARON ROSS, Texas CSR #1961,
      Hawaii CSR #432, RMR, CRR, CRC
25    Realtime Systems Administrator
      Job No. CS6790218
```

```
                                                               Page 2

 1                          APPEARANCES
 2
     For Plaintiff, United States of America:
 3
            Faith Lowry
 4          US DEPARTMENT OF JUSTICE
            Civil Federal Programs Branch
 5          1100 L Street
            Washington, DC  20005
 6          202.305.2532
            Faith.e.lowry@usdoj.gov
 7
                  - and -
 8
            Landon A. Wade
 9          US DEPARTMENT OF JUSTICE
            United States Attorney's Office
10          903 San Jacinto Boulevard, Suite 334
            Austin, Texas  78701
11          512.916.5858
            Landon.wade@usdoj.gov
12
                  - and -
13
            Kimere Kimball (via Zoom)
14          US DEPARTMENT OF JUSTICE
            Environment & Natural Resource Division
15          150 M Street NE
            Washington, DC  20001
16          202.514.2285
            Kimere.kimball@usdoj.gov
17
18   For Defendants Greg Abbott, in his capacity as Governor
     of the State of Texas, and The State of Texas:
19
            David Bryant
20          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
            PO Box 122548, Capitol Station
21          Austin, Texas  78711-2548
            512.936.2266
22          David.bryant@oag.texas.gov
23                - and -
24
25
```

```
 1                APPEARANCES (Continued)
 2       Patrick K. Sweeten
         Trevor Ezell
 3       Caleb Gunnels
         OFFICE OF THE GOVERNOR
 4       PO Box 12428
         Austin, Texas  78711
 5       512.463.1788
         Patrick.sweeten@gov.texas.gov
 6       Trevor.ezell@gov.texas.gov
         Caleb.gunnels@gov.texas.gov
 7
 8   Also Present:
 9       Armando Salinas, Jr.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  traffic that was coming across.
2            Because so many more have been funneled
3  downriver closer to the port of entry, it has reduced
4  the amount of law enforcement and military we need in
5  that area.
6       Q.   Okay.  But you say here, "No illegal
7  cross-border activity has happened."
8       A.   At the buoys, correct.
9       Q.   You mean at the buoys themselves?
10      A.   Correct.
11      Q.   You do not mean that there have been no illegal
12 crossings on the bank for 1500 feet on either side of
13 the buoys?
14      A.   Correct.
15      Q.   So when you say this portion of the border
16 there is no illegal cross-border activity, you're really
17 referring to the floating barrier itself?
18      A.   The portion of buoys at the floating barrier
19 co -- or the portion of the river that the floating
20 barrier covers.
21      Q.   Itself?
22      A.   Right.
23      Q.   Next you say, "While employed at CBP, Mr. Banks
24 is aware of the agency engaging in the process of
25 putting the very same buoys in the Rio Grande River.

```
 1   However, when the administration changed, the buoy
 2   contracts were shelved.  The decision to shelf the buoys
 3   was not an operational, legal, or safety decision but
 4   instead a political one."
 5             Without getting into the specifics of what
 6   happened -- I'm not asking you -- and I believe you've
 7   not been authorized to disclose the substance of those
 8   conversations that you were having while you were at
 9   CBP, but I want to get into the basis of your knowledge.
10             So not the specific conversations, but were
11   you personally involved in the process of putting what
12   you describe as the very same buoys in the Rio Grande
13   River?
14        A.   Was I involved in the delivery of discussions?
15   Yes, not all of them, but at least one specific one.
16        Q.   One specific conversation?
17        A.   (Witness nods head.)
18        Q.   Do you recall other specific conversations?
19        A.   So one in the delivery process and determining
20   who, when, what, where, and how and then one in the "we
21   will not" conversation.
22        Q.   Were you personally involved in any way in a
23   procurement process?
24        A.   No.
25        Q.   Were you part of CBP's procurement office?
```

1     A.  No.

2     Q.  You mention the decision to shelf the buoys.
3  By that, do you mean ultimately CBP did not procure a
4  floating barrier?

5     A.  So since I wasn't in the procurement
6  department, does signing a contract constitute
7  procurement if the shel -- or if the buoys haven't been
8  delivered?

9     Q.  Let's pause.  And, again, not getting into
10 those --

11    A.  Right.

12    Q.  I'm just asking what you mean by "shelved."

13    A.  I mean it was:  Cancel the contract.  We're not
14 putting anything that's considered infrastructure on the
15 border.

16    Q.  Okay.  Were you personally involved in the
17 consideration of that decision?

18    A.  I'm trying to figure out how to answer the
19 question as honestly as possible.  Can you repeat it one
20 more time?

21    Q.  Were you personally involved in that decision?

22    A.  In the decision to?

23    Q.  The consideration of that decision.

24            MR. BRYANT:  Objection to form.

25    A.  In the decision to?

1       Q.  (BY MS. LOWRY)  Whatever the substance is
2    regarding the buoys, were you personally involved in the
3    decision-making or were you just told about the
4    decisions that had been made?
5       A.  My opinion was asked and given.
6       Q.  Okay.  Looking at your fourth opinion in
7    Exhibit 1, can you please read that into the record?
8              THE REPORTER:  Slowly.
9              THE WITNESS:  Sorry.  I'm from Georgia and
10   I'm supposed to talk slow, but I don't.
11      A.  In conditions -- are the conditions in recent
12   years in the Rio Grande area where the buoys are
13   located -- I'm going to read it again.  You messed me up
14   when you slowed me down.
15              "The conditions in recent years in the Rio
16   Grande area where the buoys are located have
17   deteriorated to such an extent that placing the buoys
18   was necessary.  Over the last three and a half years,
19   the Eagle Pass area has become not only a major public
20   safety issue but also a humanitarian crisis.
21              "The Del Rio Sector where the buoys were
22   located saw a 547 percent increase in cross-border
23   related deaths over the last three and a half years.
24              "Prior to the installation of the buoys,
25   there were thousands of illegal" migrants -- or

```
 1    "immigrants huddled under a bridge with thousands more

 2    held in retention ponds adjacent to the bridge and

 3    thousands more still crossing with federal law

 4    enforcement doing nothing to stop the flow."

 5         Q.   Does that accurately capture your opinion?

 6         A.   I do believe that -- I was looking at death

 7    numbers yesterday, and it is a 447 percent increase, not

 8    a 547 percent.

 9         Q.   Okay.  Thank you.  Are there any other changes

10    or caveats you would like to add to this opinion?

11         A.   No.

12         Q.   Besides the data on the number of

13    border-related deaths, what other data did you look at

14    in forming this opinion?

15         A.   Total number of crossings, communications with

16    the mayor, with the Chief of Police of Eagle Pass, with

17    the fire department, the fire chief.

18              It's -- it's quite a bit of data.  It is

19    and it's ever changing but communicating with local

20    stakeholders, city councilmen, mayors, law enforcement,

21    fire department, communicating with COs of hospitals on

22    the bed space in hospitals and then, of course, CBP data

23    and our own internal data.

24         Q.   When you say the conditions in recent years in

25    the Rio Grande area where the buoys are located have
```

Michael Banks
July 10, 2024

Page 106

1  deteriorated, what do you mean by "the Rio Grande area"?
2      A.  So specifically the Eagle Pass area -- and I
3  want to be careful because I know there's Eagle Pass
4  north and south and a lot of this is kind of on the seam
5  of these two stations; but I'm referring to Eagle Pass,
6  Rio Grande, and all the small communities in that area.
7      Q.  When, in your opinion, did the placement of the
8  floating barrier become necessary?
9      A.  Shortly before it went in.  So it went in July.
10 So I think my advice regarding the buoys came up in --
11 sometime in June.
12     Q.  June 2023?
13     A.  Yes.
14     Q.  Prior to that you did not consider it
15 necessary?
16     A.  It -- I don't -- it's not that you don't
17 consider something necessary.  It's you're looking at
18 all available options.
19         And when you're doing things and they're
20 having an impact but not as great of an impact as you
21 need to give the communities the relief that they
22 deserve, you have to start looking at additional --
23 additional things.
24         And, again, based on my experience with
25 CBP, I -- these things had never been pla -- actually

```
 1   placed by CBP in the river.  So we didn't know for a
 2   fact if they would or would not work, but what we did
 3   know is that -- what I knew is that many of the experts
 4   in CBP --
 5        Q.   Okay.  That's -- I think -- are we relying on
 6   the conversations you had within CBP while employed
 7   there?
 8        A.   This would be conversations with prior CBP
 9   after I re -- after I retired and after they had retired
10   in regards to the buoys.
11        Q.   Okay.  So after, not while you were employed at
12   CBP?
13        A.   Correct.
14        Q.   Okay.
15        A.   And it's speaking with many of them that were
16   maybe involved in the delivery process, that would be a
17   question that --
18        Q.   Then we're not going to get into it.  Thank
19   you.
20             The -- in your opinion, what is the
21   threshold where the floating barrier will no longer be
22   necessary?
23        A.   You know, I don't know that there's a magic
24   number.  I think you -- I mean, honestly the magic
25   number would be nobody crosses the border illegally.
```