# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | CASE NO. 1:23-CV-00853-DAE |
| GREG ABBOTT, in his capacity as GOVERNOR OF THE STATE OF TEXAS, and THE STATE OF TEXAS, | |
| *Defendants.* | |

## DEFENDANTS' SUPPLEMENTAL BRIEF

## TABLE OF AUTHORITIES

### Cases

*Binderup v. Attorney General*,
  836 F.3d 336 (3d Cir. 2016) (en banc) .................................................. 14

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021) (per curiam), aff'd in part, vacated in part, rev'd
  in part, 599 U.S. 255 (2023) ........................................................... 3, 9

*Carter v. United States*,
  325 F.2d 697 (5th Cir. 1963) (en banc) (per curiam)............................. 4

*Deutsche Bank Nat'l Tr. Co. v. Burke*,
  902 F.3d 548 (5th Cir. 2018) ............................................................ 17

*Doe v. Beaumont ISD*,
  240 F.3d 462 (5th Cir. 2001) (en banc) (Wiener, J., concurring in part and
  dissenting in part) .......................................................................... 13

*Gen. Univ. Sys., Inc. v. HAL, Inc.*,
  500 F.3d 444 (5th Cir. 2007) ............................................................ 14

*Gene & Gene, L.L.C. v. BioPay L.L.C.*,
  624 F.3d 698 (5th Cir. 2010) ............................................................ 22

*Harness v. Watson*,
  47 F.4th 296 (5th Cir. 2022), cert. denied, 143 S. Ct. 2426 (2023) .......... 9

*Harris v. Sentry Title Co.*,
  806 F.2d 1278 (5th Cir. 1987) ........................................................... 18

*In re Deepwater Horizon*,
  928 F.3d 394 (5th Cir. 2019) ............................................................ 18

*In re Sanford Fork & Tool Co.*,
  160 U.S. 247 (1895) ........................................................................ 18

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) (Thomas, J., concurring in Part I and Parts III–VI and
  concurring in the judgment) ............................................................. 12

*June Med. Servs. v. Russo*,
  591 U.S. 299 (2020), *abrogated by Dobbs v. Jackson Women's Health
  Organization*, 597 U.S. 215 (2022) ................................................... 16

*King v. Palmer*,
  950 F.2d 771 (D.C. Cir. 1991) (en banc) ............................................. 13

*Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, L.L.C.*,
   850 F. App'x 213 (5th Cir. 2021) .......................................................................... 17

*Mallory v. Norfolk S. Ry.*,
   600 U.S. 122 (2023) ............................................................................................. 11

*Marks v. United States*,
   430 U.S. 188 (1977) ............................................................................................. 12

*Meltzer v. Bd. of Pub. Instruction of Orange Cty.*,
   577 F.2d 311 (5th Cir. 1978) (en banc) (per curiam) ............................................ 4

*Nichols v. United States*,
   511 U.S. 738 (1994) ............................................................................................. 13

*ODonnell v. Goodhart*,
   900 F.3d 220 (5th Cir. 2018) ............................................................................... 18

*Oklahoma v. Texas*,
   258 U.S. 574 (1922) ............................................................................................... 2

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) (en banc) (Benavides, J., concurring in part and
   dissenting in part) ............................................................................................... 13

*Ramos v. Louisiana*,
   590 U.S. 83 (2020) (Alito, J., dissenting) ............................................................ 13

*Rapanos v. United States*,
   547 U.S. 715 (2006), *abrogated by Sackett v. EPA*, 598 U.S. 651 (2023) ............ 16

*Sackett v. EPA*,
   598 U.S. 651 (2023) ............................................................................................. 16

*United States v. Abbott*,
   No. 23-50632 (5th Cir. Sept. 23, 2024) ........................................................... 8, 14

*United States v. Acosta*,
   509 F.2d 539 (5th Cir. 1975) (en banc) (per curiam) ............................................ 4

*United States v. Appalachian Elec. Power Co.*,
   311 U.S. 377 (1940) ........................................................................................ 20, 23

*United States v. Askew*,
   529 F.3d 1119 (D.C. Cir. 2008) (en banc) (Kavanaugh, J., dissenting) .............. 14

*United States v. Duron-Caldera*,
   737 F.3d 988 (5th Cir. 2013) ............................................................................... 13

*United States v. Eckford,*
   910 F.2d 216 (5th Cir. 1990) ................................................................. 13

*United States v. Fischer,*
   64 F.4th 329 (D.C. Cir. 2023) ............................................................... 14

*United States v. Garza,*
   No. 5:12-CR-323-DAE, 2016 WL 3087067 (W.D. Tex. May 31, 2016), aff'd,
   685 Fed. App'x 299 (5th Cir. 2017) ..................................................... 17

*United States v. Henry,*
   709 F.2d 298 (5th Cir. 1983) (en banc) ................................................. 9

*United States v. Holmes,*
   537 F.2d 227 (5th Cir. 1976) ................................................................... 4

*United States v. McFarland,*
   311 F.3d 376 (5th Cr. 2002) (en banc) (per curiam) ............................. 3

*United States v. Pineiro,*
   470 F.3d 200 (5th Cir. 2006) ................................................................. 18

*United States v. Seale,*
   570 F.3d 650 (5th Cir. 2009) ................................................................... 3

*United States v. Teel,*
   691 F.3d 578 (5th Cir. 2012) ................................................................. 17

*United States v. Torres-Ramirez,*
   213 F.3d 978 (7th Cir. 2000) ................................................................. 14

*United States v. Vargas,*
   74 F.4th 673 (5th Cir. July 24, 2023) , cert. denied, 144 S. Ct. 828 (2024) ........... 9

*Villareal v. City of Laredo,*
   94 F.4th 374 (5th Cir. 2024) ................................................................... 9

*Whole Woman's Health v. Paxton,*
   10 F.4th 430 (5th Cir. 2021) (en banc) ................................................. 13

## Other Authorities

Fed. R. App. P. 41(a) ................................................................................. 8

A little under two months ago, the en banc Fifth Circuit issued a lengthy opinion announcing that it "REVERSE[D] the district court's order granting a preliminary injunction, and REMAND[ED] with instructions to vacate the preliminary injunction and for further proceedings consistent with this opinion." En Banc Op. 4, 30 (Willett, J.). During a status conference on August 6, 2024, this Court raised the possibility that the en banc Fifth Circuit's decision was actually "a nine-nine split" and might not be "precedential" at all. Tr. 4, 8, 12, 13, 17, 18, 24. Because "there are law professors and other judges out there who feel [it] isn't the case" that "Judge Willett's opinion controls," in other words, "the parties are going to have to address" the issue and the district court will "need to make a ruling on" that question. Tr. 4, 13, 18. Per this Court's order, Defendants Greg Abbott, in his capacity as Governor of Texas, and the State of Texas (collectively, "Texas") respectfully submit this supplemental brief addressing the impact of the en banc Fifth Circuit's decision.

**1.** Considering this Court's sound observation that "there's going to have to be some parsing of these opinions and looking at them carefully," Tr. 5, Texas begins with a careful description of what the lead opinion held. Judge Willett, writing for nine of the Fifth Circuit Judges who sat en banc, concluded that this Court "abuse[d] its discretion in granting a preliminary injunction," and held the following:

- "[T]he district court clearly erred in finding that the United States will likely prove that the barrier is in a navigable stretch of the Rio Grande." Op. 3; *see also Op.* 19.

- To establish commercial navigability, the plaintiff must show that a river is "[1] of practical service [2] as a highway of commerce." Op. 7.

- This standard operates as "a significant constraint" on what qualifies as a navigable water because it requires showing that commercial traffic is routine (not "sporadic") and that such commercial traffic moves "*along*" the watercourse (not across it). Op. 7–8.

- Because navigability requires a segment-by-segment approach, the only evidence that counts is evidence *specifically* about the "disputed segment[] of the river," rather than evidence about some larger stretch of which the disputed segment is merely a part. Op. 8–9, 14–15.

1

- Accordingly, even assuming commercial traffic across a watercourse—rather than along it as a highway—could somehow furnish evidence of navigability, it could do so "only [for] the narrow path *where the ferries traveled*" across the river. Op. 18.

- Evidence that is otherwise insufficient to show navigability does not somehow become probative by being repackaged into other government "findings." *E.g.*, Op. 12 n.44 (discounting 1984 determination that recycled precatory treaties); Op. 12 n.45 (discounting 2011 document that recycled 1975 study); Op. 14 (discounting 1975 study that recycled precatory treaties).

- With respect to past navigability:

  o nineteenth-century treaties and statutes referencing "navigability" were merely precatory, Op. 10–12 (citing *Oklahoma v. Texas*, 258 U.S. 574 (1922));

  o the 1975 study did not concern the specific segment at issue in this case, documented (at best) sporadic commercial traffic, and conceded (at worst) no real traffic north of Roma, Op. 12–15; and

  o cross-river ferry cases did not involve use of the river "as a highway," but instead (as Supreme Court precedent and federal statutes recognize) involved traversing the river as "an obstacle," Op. 15–18.

- With respect to future navigability:

  o the plaintiff must show not "the mere potential for improvements," but that improvements would be "reasonable" based on "a balance between cost and need at a time when the improvement would be useful," Op. 19–20;

  o the 1975 study and the 1850 report merely said improvement was "possible," with no discussion of the costs and benefits of such improvement, or whether that cost-benefit tradeoff was reasonable, Op. 21–22;

  o pointing to present circumstances that are currently insufficient to show navigability (*e.g.*, the use of kayaks) may suggest the possibility of improvements that would be sufficient (*e.g.*, the use of "bigger [commercial] watercraft"), but it furnishes no "tangible" evidence about the costs or benefits of such improvements, Op. 22–23; and

  o "generalized statements" about the capacity to use dams to increase water flow say nothing about "why repurposing water from the dams would be cost-effective for *this river*," Op. 23.

- "The dissenting opinions' impressionistic review of the record and the caselaw leaves unchecked the district court's clear errors." Op. 24.

- To win a preliminary injunction, the United States was required to satisfy *Winter*'s "traditional four-factor test," regardless of whether the Rivers and Harbors Act could be deemed "a public interest-statute." Op. 25–26.

2

- "[A]ppealing to harms which the [preliminary] injunction cannot resolve"—and indeed perpetuates, by ordering that "the barrier [be] *moved*, not *removed*"—cannot justify affirming that injunction. Op. 26–28.

- "The district court's analysis of the[] equitable factors was unpersuasive, unsubstantiated, and incorrect." Op. 30:

  - Texas's uncontradicted evidence indicates the buoy system does not threaten safety, whereas "the district court tried to spin the river's naturally treacherous conditions as evidence that the *barrier* is dangerous" based on rank speculation, Op. 28–29.

  - Because the United States is unlikely to succeed on the RHA claim (because the disputed stretch is not navigable), the district court was also wrong to worry about an impairment to (non-existent) navigation. Op. 29–30.

Based on these detailed conclusions, the en banc Fifth Circuit reversed this Court's order granting a preliminary injunction. Op. 30.

**2.** During the status conference of August 6, 2024, this Court suggested that Judge Willett's opinion may not be "precedential" because Chief Judge Richman and Judge Ho wrote separate opinions. *See* Tr. 4, 15, 18. But, by practice, the Fifth Circuit announces when the "en banc court is equally divided." *Brackeen v. Haaland*, 994 F.3d 249, 267–68 (5th Cir. 2021) (per curiam), *affirmed in part, vacated in part, reversed in part*, 599 U.S. 255 (2023).[1] Here, the Fifth Circuit conspicuously did not do so. To the contrary, perhaps the only thing on which *all* members of the Fifth Circuit agreed is that Judge Willett's decision is the controlling decision of that court.

Start with those opinions supporting the same basic judgment—*i.e.*, that the United States was *not* entitled to a preliminary injunction. All of them refer to Judge

---

[1] *See also, e.g.*, *United States v. Seale*, 570 F.3d 650, 650 (5th Cir. 2009)–51 (5th Cir. 2009) (en banc) (per curiam); *United States v. McFarland*, 311 F.3d 376, 377 (5th Cr. 2002) (en banc) (per curiam); *Meltzer v. Bd. of Pub. Instruction of Orange Cty.*, 577 F.2d 311, 312 (5th Cir. 1978) (en banc) (per curiam); *United States v. Holmes*, 537 F.2d 227, 227(5th Cir. 1976)–28 (5th Cir. 1976) (en banc) (per curiam); *United States v. Acosta*, 509 F.2d 539, 539 (5th Cir. 1975) (en banc) (per curiam); *Carter v. United States*, 325 F.2d 697, 698 (5th Cir. 1963) (en banc) (per curiam).

Willett's opinion as speaking for "the majority" of the en banc Fifth Circuit or authoritatively on behalf of "the court":

- "I join the majority opinion in full." Op. 31 (Oldham, J., concurring).

- "[I]t is a complete answer to say that the statutory analysis in the majority opinion is correct …." Op. 31 (Oldham, J., concurring).

- "The majority correctly does that here and renders an opinion that will end this litigation on the merits." Op. 33 (Oldham, J., concurring).

- "Thankfully, the majority opinion does nothing to interfere with the wire case." Op. 34 (Oldham, J., concurring).

- "Precisely the same is true in the buoy case, as the majority opinion correctly holds." Op. 34 n.* (Oldham, J., concurring).

- "I largely agree with the majority opinion's thorough analysis of this case." Op. 35 (Richman, C.J., concurring in the judgment).

- "However, I disagree with the majority opinion's conclusion that the United States cannot establish this section of the Rio Grande is navigable through evidence of bank-to-bank ferry traffic." Op. 35 (Richman, C.J., concurring in the judgment).

- "The majority opinion's conclusion that only 'evidence that th[is] stretch of the river can sustain trade or travel along its length' can establish navigability is likely incorrect." Op. 35 (Richman, C.J., concurring in the judgment).

- "The majority opinion nonetheless argues that because ferries that travel bank-to-bank 'do not leverage the river's flow and course to transport goods or people along the river,' they do not 'use[] the river as a highway' as required by Supreme Court precedent." Op. 35–36 (Richman, C.J., concurring in the judgment).

- "As a result, the majority opinion draws the inquiry too narrowly." Op. 37 (Richman, C.J., concurring in the judgment).

- "Judge Oldham urges the court to avoid the Governor's invasion defense, and the court agrees." Op. 41 n.2 (Ho, J., concurring in the judgment in part and dissenting in part).

If any doubt remained about whether Judge Willett spoke for a majority, or whether Chief Judge Richman and Judge Ho instead should be lumped in with the

seven dissenters, the dissenting judges themselves dispel it. They likewise refer to Judge Willett's opinion—*thirty-seven times*—as making pronouncements on behalf of a "majority" of the en banc Fifth Circuit, on practically every holding recited above:

- "As Judge Douglas highlights in her comprehensive dissent, <u>the majority</u> improperly rejects the factual evidence supporting historical navigability . . . ." Op. 74 (Higginson, J., dissenting).

- "I agree with her in full, and write separately only to underscore the legal error <u>the majority</u> commits in announcing its new requirement for river navigability." Op. 74 (Higginson, J., dissenting).

- "In doing so, <u>the majority</u> disregards the Supreme Court's broad understanding of commerce . . . ." Op. 74 (Higginson, J., dissenting).

- "First, <u>the majority's decision</u> runs contrary to the Supreme Court's expansive understanding of commerce." Op. 74 (Higginson, J., dissenting).

- "Overlooking this centuries-old pedigree, <u>the majority</u> isolates the single word 'highway' to craft out of whole cloth a new judicially-created rule." Op. 77 (Higginson, J., dissenting).

- "[T]here is no actual legal basis for the test <u>the majority</u> seeks to introduce." Op. 77 (Higginson, J., dissenting).

- The authority "that <u>the majority</u> cites is one paragraph from an 'out-of-circuit district court opinion . . . .'" Op. 77 (Higginson, J., dissenting).

- "At a minimum, <u>the majority's new requirement</u> is an insufficient basis to find that the district court abused its discretion . . . ." Op. 77 (Higginson, J., dissenting).

- "Furthermore, <u>the majority's proffered standard</u> rests on a flawed theory." Op. 77 (Higginson, J., dissenting).

- "<u>The majority</u> offers no explanation for why the directionality inherent to a man-made 'highway' on land should constrain the directionality of traffic on water." Op. 77 (Higginson, J., dissenting).

- "[T]he atextual and ahistorical proposition <u>the majority</u> uses to displace the Supreme Court's centuries-old formulation of navigability threatens to remove Army Corps Section 10 authority from any border river that serves as a state border . . . ." Op. 78 (Higginson, J., dissenting).

- "<u>The majority's novel test</u> not only departs from precedent, but also creates a definition of navigability specific to rivers that inexplicably excludes trade and travel between states or foreign countries that crosses rivers." Op. 79 (Higginson, J., dissenting).

- "<u>The majority</u> concludes that the district court abused its discretion in granting preliminary relief to the United States." Op. 80 (Douglas, J., dissenting).

- "Despite the majority's opinion, a review of the record in this case makes clear that the United States is likely to succeed on the merits of its RHA claim." Op. 80 (Douglas, J., dissenting).

- "[T]he United States' burden at this stage is not nearly as demanding as the majority urges." Op. 81 (Douglas, J., dissenting).

- "I emphasize the majority's statement that the 'definition of navigability is broad' . . . ." Op. 83 (Douglas, J., dissenting).

- "[T]he majority does not attempt to address [certain historical references to navigation] despite the Supreme Court's statement that this type of evidence is sufficient in and of itself to show navigability." Op. 84 (Douglas, J., dissenting).

- "It is harder still to imagine what the United States could put forth that would satisfy the majority." Op. 85 (Douglas, J., dissenting).

- "The majority raises a few arguments seeking to undercut this evidence . . . ." Op. 86 (Douglas, J., dissenting).

- "To begin, the majority dismisses historical evidence of commercial ferry traffic between Eagle Pass and Piedra Negras." Op. 86 (Douglas, J., dissenting).

- "The majority dismisses *Rio Grande Dam*, claiming that the court did not have evidence to support a navigability finding." Op. 86 (Douglas, J., dissenting).

- "But the Supreme Court expressly relied on affidavits in making this statement and it should not be so easily dismissed by the majority." Op. 86 (Douglas, J., dissenting).

- "The majority likewise finds support in *Crow*, but its use is unpersuasive." Op. 87 (Douglas, J., dissenting).

- "The majority opinion also relies on *St. Clair Cnty. v. Interstate Sand & Car Transfer Co.* for the proposition that ferries are" a continuation of land-based highways that cross a river as an obstacle from one landing point to another. Op. 87 n.5 (Douglas, J., dissenting).

- "But *St. Clair* is more nuanced than that, and does not support the majority's position . . . ." Op. 87 n.5 (Douglas, J., dissenting).

- "The majority in no way attempts to grapple with the Rio Grande's position as the international boundary between the United States and Mexico—a defining characteristic of the river." Op. 88 (Douglas, J., dissenting).

- "Next, the majority dismisses four separate acts of Congress as irrelevant to a determination of navigability." Op. 89 (Douglas, J., dissenting).

- "Finally, the majority errs in its navigability analysis in one final way: accepting Texas's position (without explanation) that navigability must be assessed based upon a segment-by-segment approach." Op. 90 (Douglas, J., dissenting).

6

- "I find no support for such a narrow segment-by-segment approach under the RHA nor does <u>the majority</u> offer one." Op. 90 (Douglas, J., dissenting).

- "I am not persuaded by <u>the majority's reasoning</u>" rejecting the alternative holding on future navigability "and would again affirm the district court's conclusion." Op. 92 (Douglas, J., dissenting).

- "<u>The majority</u>, ever forgetting the standard of review, again demands far more (an entire cost-benefit analysis) from the United States than this stage of litigation requires." Op. 93 (Douglas, J., dissenting).

- "<u>The majority</u> attempts to poke holes in the evidence to render it insufficient." Op. 93 (Douglas, J., dissenting).

- "Instead of properly accepting these findings on a preliminary injunction, <u>the majority</u> instead reweighs the evidence to support its desired result." Op. 93 (Douglas, J., dissenting).

- "Had it held off on taking a preliminary injunction en banc, <u>the majority</u> could have weighed in with greater force, as it would not be constrained by this standard of review." Op. 93–94 (Douglas, J., dissenting).

- "<u>The majority</u>, having concluded that the district court abused its discretion in granting the United States relief, notes that it need not and does not reach" the Self-Defense Clause argument. Op. 98 (Douglas, J., dissenting).

- "<u>The majority</u> faults the scope of the injunctive relief . . . as failing to remedy the United States' diplomatic harms." Op. 103 (Douglas, J., dissenting).

- "<u>The majority</u> errs in reversing the district court's decision." Op. 105 (Douglas, J., dissenting).

The words "the plurality" or "plurality opinion" appear nowhere in 105 pages of written opinions. *Cf. United States v. Vargas*, 74 F.4th 673, 677 n.† (5th Cir. 2023) (en banc) (describing how portions of the lead opinion for the en banc Fifth Circuit did *not* command a majority); *id.* at 701, 709–11 (Elrod, J., dissenting) (referring to those specific portions as a "plurality opinion" that speak only for a "plurality of judges"). The only "judges" (or "law professors") who have suggested Judge Willett's opinion is anything other than the controlling, precedential, majority opinion of the en banc Fifth Circuit are not actual members of that Court. *See* Tr. 4, 8, 13, 18.

Echoing the language quoted above, the en banc Fifth Circuit has now sent down a mandate that takes the unusual step of directing that "the case is REMANDED . . . for further proceedings consistent with *the majority opinion* of the

court." Judgment, *United States v. Abbott*, No. 23-50632, CM/ECF Doc. 274-2, at 2 (5th Cir. Sept. 23, 2024) (emphasis added); *see also* FED. R. APP. P. 41(a).[2] Likely a direct response to this Court's professed confusion, the Fifth Circuit has made its marching orders unmistakably clear: Any further proceedings in this case must be consistent with Judge Willett's opinion. After all, "[t]he principle that a district court may not violate the mandate of a circuit court of appeals and may not alter the law of the case so established is basic." *United States v. Henry*, 709 F.2d 298, 306 (5th Cir. 1983) (en banc).

**3.** During the status conference, this Court also suggested that the en banc Fifth Circuit may have produced only "a nine-nine split." *See* Tr. 4, 12, 18. Set aside the fact that if that were true, the Fifth Circuit would have said so. This notion that the en banc Fifth Circuit split evenly, nine to nine, necessarily counts Chief Judge Richman and Judge Ho with the seven dissenters. *See* Tr. 4, 15, 18. That is wrong.

There is no basis to conclude that either Chief Judge Richman's vote or Judge Ho's vote aligns with those seven dissenters, based on the relief they would afford or the judgment they would support. Judge Higginson, writing for all seven dissenters, objected primarily to the legal standard laid out in the majority opinion because (in his view) those "requirement[s] for river navigability" were too strict. So, he would have *affirmed* the award of a preliminary injunction. Op. 74–79. Judge Douglas, writing for the same seven dissenters, objected primarily that the clear-error standard constrained the Fifth Circuit's ability to correct this Court's determinations

---

[2] Such explicit reference to the "majority opinion" of the en banc Fifth Circuit is far from boilerplate even in divided en banc decisions. *See, e.g.*, Judgment, *Villareal v. City of Laredo*, 94 F.4th 374 (5th Cir. 2024) (omitting any such instruction); Judgment, *United States v. Vargas*, No. 21-20140 (5th Cir. July 24, 2023) (same); Judgment, *Harness v. Watson*, No. 19-60632 (5th Cir. Aug. 24, 2022) (same); Judgment, *Brackeen v. Haaland*, No. 18-11479 (5th Cir. Apr. 6, 2021) (same).

about the evidence the United States mustered to support its navigability assertion. So, she too would "affirm the district court in full"—with respect to both past and future navigability—leaving the injunction in place. Op. 80, 92, 94, 105.

Neither Chief Judge Richman's opinion nor Judge Ho's supported the relief the dissenters advocated—*i.e.*, maintaining the preliminary injunction. Chief Judge Richman agreed that it was necessary to reverse this Court's preliminary-injunction decision on the merits: "The United States has not presented evidence that commercial traffic has navigated or with reasonable modifications could navigate along, or across, the 1,000-foot stretch of the Rio Grande that contains the floating barrier. Accordingly, there is no evidence in the current record that would support the conclusion that this segment of the Rio Grande is navigable under the Supreme Court's precedent. The United States has not demonstrated a likelihood of success on the merits." Op. 35 (Richman, C.J., concurring in the judgment).

Judge Ho likewise "agree[d] that the preliminary injunction should be reversed," but "g[o]t to that place through a different path." Op. 41, 65 (Ho, J., concurring in the judgment in part and dissenting in part). Namely, because all parties agree that Texas's exercise of self-defense authority under Article I, Section 10, Clause 3 presents a non-justiciable political question, he concluded that this constitutional affirmative defense barred exercising jurisdiction over the United States's statutory claim. Op. 42, 58–61. Accordingly, he would reverse the award of a preliminary injunction, seemingly "instruct the district court to dismiss this case" (nominally) without prejudice, and "not allow the district court to proceed to trial in any case where the [political-question] doctrine precludes jurisdiction." Op. 41, 63.

A careful analysis of the *reasoning* in the separate opinions confirms that, regardless of what one labels Judge Willett's opinion, this Court is bound by every word of it. *See, e.g.*, *Mallory v. Norfolk Southern Ry.*, 600 U.S. 122, 146 n.11 (2023)

("While various separate writings accompany this opinion, it should be apparent a majority of the Court today agrees" on seven different propositions.).

Chief Judge Richman explained that she "largely agree[d]" with Judge Willett's opinion, in all but one respect: She would have said that cross-river traffic could also theoretically demonstrate navigability under different circumstances. Op. 35–36. Just as important, though, is what her opinion did *not* say. It nowhere suggested the inclusion of cross-river traffic helps the United States in this case. After all, Chief Judge Richman agreed "the United States has not demonstrated a likelihood of success on the merits." Op. 35. In other words, *not even* the inclusion of cross-river traffic could establish navigability here. Not *past* navigability—because any prior cross-river traffic was either sporadic, not commercial, or not occurring at the disputed segment. And not *future* navigability—because the United States exhibited no awareness of costs, offered no benefits of encouraging cross-river traffic by watercraft in the disputed stretch, and made no showing why any resulting cost-benefit balance would be reasonable. Presumably, that is why Judge Oldham could write that "[t]he majority … renders an opinion that *will end this litigation* on the merits," notwithstanding Chief Judge Richman's separate opinion. Op. 33 (Oldham, J., concurring) (emphasis added).

Judge Ho, for his part, agreed that "[i]t's far from clear that there is in fact any actual conflict between Texas's actions and federal law." Op. 61. To the extent this cryptic statement signaled agreement with the majority on the merits, it was entirely proper because a majority of his colleagues found the en banc Fifth Circuit had jurisdiction. *See, e.g. Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (Thomas, J., concurring in Part I and Parts III–VI and concurring in the judgment). But even if it did not, his decision (at most) sits out this debate over the statute's meaning, thereby decreasing the denominator in the search for a majority opinion concerning the statute from eighteen to seventeen. Nine judges voted for Judge Willett's reading of

the law and for all of the propositions recounted above. *Supra* at 2–4. One additional judge approved of all those propositions, except for the categorical exclusion of cross-river traffic. Op. 35–37 (Richman, C.J., concurring in the judgment). And seven others voted for everything opposite the majority opinion. Nine out of the seventeen judges who clearly opined on the meaning of the Rivers and Harbors Act—that is, a *majority*—signed onto every word of Judge Willett's opinion. Rather than a 9-9 split, the en banc Fifth Circuit produced (at worst) a 9-1-7 split on a single issue of statutory interpretation, with a 10-7 split on the bulk of the Rivers and Harbors Act.

**4.** To the extent that the United States asserts a different position based on *Marks v. United States*, 430 U.S. 188 (1977), that is also wrong. Under the *Marks* approach to reading Supreme Court opinions, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. at 193 (internal quotation marks and citation omitted). "The *Marks* rule is controversial," *Ramos v. Louisiana*, 590 U.S. 83, 148 (2020) (Alito, J., dissenting), though, and its "test is more easily stated than applied," *Nichols v. United States*, 511 U.S. 738, 745 (1994). This is so because "*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc); *see also Whole Woman's Health v. Paxton*, 10 F.4th 430, 440 (5th Cir. 2021) (en banc) (citing *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013), and *United States v. Eckford*, 910 F.2d 216, 219 n.8 (5th Cir. 1990)).

The Fifth Circuit has not squarely held that the *Marks* rule governs the reading of *its own* opinions. That said, some Fifth Circuit Judges have suggested as much. *See Okpalobi v. Foster*, 244 F.3d 405, 436 n.6 (5th Cir. 2001) (en banc) (Benavides, J., concurring in part and dissenting in part); *Doe v. Beaumont ISD*, 240

F.3d 462, 483 & n.3 (5th Cir. 2001) (en banc) (Wiener, J., concurring in part and dissenting in part). In this they are not alone. *See, e.g.*, *United States v. Torres-Ramirez*, 213 F.3d 978, 982 (7th Cir. 2000) (Easterbrook, J.); *Binderup v. Attorney General*, 836 F.3d 336, 356 (3d Cir. 2016) (en banc) (separate opinion of Ambro, J.); *United States v. Askew*, 529 F.3d 1119, 1150 (D.C. Cir. 2008) (en banc) (Kavanaugh, J., dissenting); *but see United States v. Fischer*, 64 F.4th 329, 341 n.5 (D.C. Cir. 2023) (separate opinion of Pan, J.) ("But this court has never applied *Marks* to its own cases. It seems that only one federal appellate court has done so, . . . and there is good reason not to extend *Marks* any further.").

So, assuming for argument's sake that *Marks* applies here, this Court remains bound by the en banc Fifth Circuit's own reading of the opinions it handed down in this case—as reflected in its mandate. Under "[t]he mandate rule," this Court "must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *Gen. Univ. Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (internal quotation marks and citation omitted). Here, the en banc Fifth Circuit's mandate explicitly calls for "further proceedings consistent with *the majority opinion* of the court." Judgment, *United States v. Abbott*, No. 23-50632, CM/ECF Doc. 274-2, at 2 (5th Cir. Sept. 23, 2024) (emphasis added). And we know that Judge Willett's is "the majority opinion" on behalf of "the court," because every member of the Fifth Circuit said so—some many times over. *See, e.g.*, Op. 31, 33 & n.* (Oldham, J., concurring); Op. 35, 37 (Richman, C.J., concurring in the judgment); Op. 74 (Higginson, J., dissenting); Op. 80, 87 n.5 (Douglas, J., dissenting); *see also* Op. 4, 30 (majority opinion of Willett, J.) (remanding "for further proceedings consistent with *this* opinion" (emphasis added)).

That leaves nothing for this Court to do in the way of *Marks* analysis, because the en banc Fifth Circuit has already done whatever *Marks* may demand. Perhaps the assembled Fifth Circuit Judges understood Judge Ho as having provided Judge

Willett with a tenth vote—and thus a commanding majority out of eighteen—on the entire question of statutory interpretation. *See Op.* 61 (Ho, J., concurring in the judgment in part and dissenting in part) ("It's far from clear that there is in fact any actual conflict between Texas's actions and federal law."). Or perhaps they viewed Judge Ho as having sidelined himself entirely on the question of statutory interpretation, such that Judge Willett's nine-vote opinion represented a majority out of seventeen who engaged on that question. *See supra* at 10–12; *cf. United States v. Cundiff*, 555 F.3d 200, 208 (6th Cir. 2009) ("Taken literally, *Marks* instructs lower courts to choose the 'narrowest' concurring opinion and to ignore dissents."). Either way, the en banc Fifth Circuit has now counted the votes it cast, and mandated adherence to Judge Willett's majority opinion. For this Court to do otherwise on remand "would replace judicial hierarchy with judicial anarchy," *M.D. ex rel. Stukenberg v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020)—particularly where, as here, neither party has even asked the Court to do so, *see United States v. Sineneng-Smith*, 590 U.S. 371 (2020) (noting that although there are "circumstances in which a modest initiating role for a court is appropriate," as a general matter "courts are essentially passive instruments of government") (alteration omitted).

This analysis is not affected by the two Supreme Court cases that this Court asked the parties to address (likely explaining why neither side had ever cited them): *Rapanos v. United States*, 547 U.S. 715 (2006), *abrogated by Sackett v. EPA*, 598 U.S. 651 (2023), and *June Medical Services v. Russo*, 591 U.S. 299 (2020), *abrogated by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). *See* Tr. 12–13. As their subsequent citation history makes clear, both of those opinions have been outpaced by more recent Supreme Court precedent. For example, if the analogy this Court was trying to draw was to some lower courts that followed Justice Kennedy's opinion rather than the plurality opinion in *Rapanos*—as justification for following some opinion other than Judge Willett's here—the Supreme Court has fixed that

13

mistake. In *Sackett*, it rejected Justice Kennedy's opinion and "conclude[d] that the *Rapanos* plurality was correct." *Saclett v. EPA*, 598 U.S. 651, 671 (2023). More importantly, though, and for the reasons explained above, this case does not involve (as those cases did) the absence of a controlling opinion on the statutory question.

**5.** The en banc Fifth Circuit's controlling determinations are now the law of the case and have important consequences for the conduct of any trial in this case.

"Under the law-of-the-case doctrine, the district court on remand must abstain from reexamining an issue of fact or law that has already been decided on appeal." *United States v.* (W.D. Tex. May 31, 2016) (Ezra, J.) (citing *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012)). A "corollary of the law of the case doctrine," "the mandate rule requires a district court on remand to effect our mandate and to do nothing else." *Deutsche Bank Nat'l Tr. Co. v. Burke*, 902 F.3d 548, 551 (5th Cir. 2018). The mandate rule therefore "prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal," and importantly "[t]his prohibition covers issues decided both expressly and by necessary implication." *United States v. Garza*, No 5:12-CR-323-DAE, 2016 WL 3087067 at *2 (W.D. Tex. May 31, 2016) (Ezra, J.), aff'd, 685 Fed. App'x 299 (5th Cir. 2017)  (quoting *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006)).

The mandate rule ties the hands of the district court and offers tightly limited discretion to revisit a superior court's opinion. Specifically, lower courts may deviate "only in strictly limited, compelling circumstances where '(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision on the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." *Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, L.L.C.*, 850 F. App'x 213, 216 (5th Cir. 2021) (quoting *Hopwood v. Texas*, 236 F.3d 256, 272 (5th Cir. 2000)). This framework is unchanged when jurisdiction is remanded to the trial court following a pre-trial appeal. *See id.;*

*ODonnell v. Goodhart,* 900 F.3d 220, 223-25 (5th Cir. 2018), *rev'd on other grounds.* Outside of these extraordinary exceptions, "the district court…must proceed within the letter and spirit of the mandate." *Pineiro,* 470 F.3d at 205.

 The "first step" in applying the mandate rule "is figuring out what [the] mandate said." *In re Deepwater Horizon*, 928 F.3d 394, 398 (5th Cir. 2019). Here, the Fifth Circuit has made this an easy task by directing this Court to proceed "consistent with the majority opinion of this court." Judgment at 2. Given that the entire en banc Circuit Court regarded Judge Willett's opinion as "the majority opinion," the mandate clearly instructs this Court to defer to the conclusions reached by that opinion. A lower court is bound to observe "the further proceedings…specified in the mandate of the Court of Appeals." *Harris v. Sentry Title Co.*, 806 F.2d 1278, 1279 (5th Cir. 1987). Because the en banc Fifth Circuit's mandate directs this Court to follow Judge Willett's opinion, it is the law of the case. *See In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895) ("The opinion delivered by this court at the time of rendering its decree may be consulted to ascertain what was intended by its mandate").

 The conclusions reached by the en banc Fifth Circuit's controlling opinion shed informative light on many of the issues and arguments that have occupied this Court during pre-trial litigation. The following are a handful of examples.

 *First*, cross-river traffic cannot establish the navigability of a river under the RHA. As explained above, a majority of the Fifth Circuit Judges who expressly considered the navigability standard—at least nine out of seventeen—concluded that cross-river traffic is not qualifying use of a river "as a commercial highway" under Supreme Court precedent. Op. 8 n.30 (collecting citations). "Bank-to-bank ferry traffic does not supply the necessary evidence that the stretch of the river can sustain trade or travel along its length," and therefore does not count towards use or suitability of use as a "highway of commerce." Op. 16. Chief Judge Richman's opinion on cross-river traffic—which traverses the river as an obstacle—does not control.

*Second*, even assuming cross-river traffic could theoretically provide an alternative route to showing navigability as Chief Judge Richman suggested, her own opinion provides no help to the United States. After all, she announced that the United States's cross-river ferry argument is not likely to succeed *in this case*. Even after considering "bank-to-bank ferry traffic," she concluded that the "United States has not demonstrated a likelihood of success on the merits" of its statutory claim. Op. 35. To the extent the United States puts on evidence at trial about the ferry traffic it has previously pointed to, that will be insufficient as a matter of law.

*Third*, just as importantly, the en banc Fifth Circuit cabined even this alternative argument. To the extent cross-river traffic could itself constitute evidence of navigability (rather than evidence of facts about the river, like its depth, that might make it navigable up-and-down), the United States would still need to show that such cross-river traffic occurred at the disputed stretch and that the character of any such traffic was commercial. Op. 18–19. Chief Judge Richman agreed. She indicated the navigability analysis must focus on "this section"—*i.e.*, "the 1,000-foot stretch of the Rio Grande that contains the floating barrier." Op. 35, 37. And only "a *commercial* ferry . . . operating across this portion of the river until the barrier was installed" could be relevant. Op. 35. The United States has presented no evidence that cross-river commercial traffic ever occurred at the site of the floating barrier. Nor has it pointed to anything beyond personal or recreational craft and hand-pulled rafts moving bank-to-bank by rope.

*Fourth,* during the status conference, this Court raised questions about how to apply the navigability standard to *different* types of watercourses. Tr. 15 ("What do you do with a lake?"). This is just the argument that the dissenters made and a majority of the en banc Fifth Circuit rejected. *Compare Op.* 78 (Higginson, J., dissenting), *with Op.* 17 (majority opinion of Willett, J.). At trial, this Court cannot

16

deflect attention away from the disputed stretch of water at issue here—a knee-deep river—to focus on what it may believe are harder cases.

*Fifth*, almost all of Judge Douglas's arguments, which hinge on the standard of review at the preliminary-injunction stage, will give no aid to the United States at trial. In fact, they highlight how the United States's burden will only get heavier as this case goes forward. For example, when complaining that the United States should not have been obliged to make any showing about reasonable improvements to win a preliminary injunction, the dissenters appeared to concede that, at trial, the United States *would* need to furnish "an entire cost-benefit analysis" to win a permanent injunction. Op. 93.

*Sixth*, the en banc Court determined that the various treaties and statutes the United States has relied on at the preliminary-injunction phase, as well as the Supreme Court's dicta regarding navigability in *Rio Grande Dam*, are not merely inadequate, but *irrelevant* to the issue of navigability. Op. 14. "Navigability is a question of fact," Op. 6 (citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 405 (1940)), accordingly unsubstantiated declarations of navigability, including those made by the government, will not cut it as evidence of navigability.  Language in the statutes and treaties was "precautionary" or "merely precatory," because it was bereft of factual findings showing actual or possible navigation. Op. 10–12. Similarly, because *Rio Grande Dam* "never made . . . factual findings" of navigability about the "particular place between [river's] mouth and its source" that is at issue here, "it cannot stand as proof of navigability" in this case. Op. 10-11.Language in the statutes and treaties was "precautionary" or "merely precatory," because it was bereft of findings showing actual or possible navigation. Op. 10–12. Similarly, because *Rio Grande Dam* "never made . . . factual findings" of navigability about the "particular place between [river's] mouth and its source" that is at issue here, "it cannot stand as proof of navigability" in this case. Op. 14–15. Both the letter and spirit of the Fifth

Circuit's mandate, therefore, require this Court to refrain from considering the Treaty of Guadalupe-Hidalgo, the Gadsden Purchase Treaty, the statutes cited at the preliminary-injunction phase,[3] other documents referencing possible navigation somewhere in the Rio Grande, and any sources recycling such precatory statements, like the Convention of 1889 and the Coast Guard's "Navigability Determination."

The majority opinion is clear that it rejected these sources not because they were inadequate evidence but because they were not relevant evidence at all. Merely declaring that a waterway as navigable does not make it so. Official sources, like the treaties and statutes in the record, are not probative of navigability if they do not "contain the necessary factual findings that the Rio Grande was used or susceptible of use in commerce." Op. 10-–11.

The "letter" of the Fifth Circuit's mandate, therefore, requires this Court to refrain from considering the Treaty of Guadalupe-Hidalgo, the Gadsden Purchase Treaty, and the bevy of statutes that were before it on appeal.[4] But the "spirit" of the Court's mandate further requires this Court to exclude any document that makes pro forma assertions of navigability without basing that determination on the facts on the ground. *Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 702 (5th Cir. 2010) ("The mandate rule… forecloses relitigation of issues *expressly or impliedly* decided by the appellate court") (emphasis added). At minimum, this would rule out the Convention of 1889, which recycles the Treaty of Guadalupe-Hidalgo's precatory language, any other sources recycling such precatory statements and the Coast

---

[3] *See* Act of Mar. 4, 1923, 67 Cong. Ch. 254, 42 Stat. 1482; Act of Sept. 30, 1890, 51 Cong. Ch. 1122, 26 Stat. 502; Act of Sept. 27, 1890, 51 Cong. Ch. 1002, 26 Stat. 495; Act of May 29, 1884, 48 Cong. Ch. 57, 23 Stat. 29.

[4] These were Act of Mar. 4, 1923, 67 Cong. Ch. 254, 42 Stat. 1482; Act of Sept. 30, 1890, 51 Cong. Ch. 1122, 26 Stat. 502; Act of Sept. 27, 1890, 51 Cong. Ch. 1002, 26 Stat. 495; Act of May 29, 1884, 48 Cong. Ch. 57, 23 Stat. 29.

Guard's "Navigability Determination," Pl. Original Compl. Att. 2, flatly declaring the Rio Grande to be navigable and subject to its jurisdiction..

*Seventh*, the majority opinion concluded that the 1975 USACE Navigability Study did not suffice to prove either historic navigability or susceptibility to navigation following reasonable improvements. Alleged instances of up-river navigation in an 1850 expedition discussed by the Study are "too sporadic and exceptional to establish" navigability based on past use. Op 13. Likewise, the Study's failure to provide even "some evidence of costs and benefits" fatally undermines the United States's assertions about the possibility of future navigation following reasonable improvements now, based on the Chapman expedition. Op. 21–22.

Furthermore, in light of the majority's rejection of unsubstantiated navigability determinations, the Study itself cannot be used as evidence for navigability. The determination it makes that the middle Rio Grande is navigable and therefore subject to USACE's jurisdiction does not tend to show the River is navigable in fact.

*Eighth*, the majority opinion from the en banc Fifth Circuit confirms that "a balance of cost and need" is always required to show susceptibility to future navigation following "reasonable improvements." Op. 19 (citing *Appalachian Elec.*, 311 U.S. at 307–08). When contending that reasonable improvement can open a river to future commercial navigation, the requisite showing must take the form of an analysis of "prospective costs and benefits" and must prove that the "costs are . . . . . . justified by benefits." Op. 19–20, 23. Showing that "improvements are possible" is not enough. Op. 20.

As the majority observes, nothing presented to this Court at the preliminary injunction stage tended to show that benefits of improvements were likely to outweigh costs. Op. 21-23. In fact, thus far the United States has offered "nothing tangible about the improvements' costs or benefits." Op. 23. And the hypothetical

possibility that water releases from the Falcon and Amistad dams could be "judiciously used to provide sufficient flow for continuous navigation" does not support navigability without a further showing of reasonableness. Op. 21-22 (quoting the 1975 USACE Navigability Study). Yet during pre-trial proceedings the United States has staked its arguments related to reasonable improvements on the possibility of water releases without evidence of the costs and benefits. Pl. Reply Mtn PI, 37 ECF at 4-5. This no longer flies following the mandate.

*Eighth*, the majority opinion from the en banc Fifth Circuit confirms that "a balance of cost and need" is always required to show susceptibility to future navigation following "reasonable improvements." Op. 19 (citing *Appalachian Elec.*, 311 U.S. at 307–08). When contending that reasonable improvement can open a river to future commercial navigation, the requisite showing must take the form of an analysis of "prospective costs and benefits" and must prove that the "costs are . . . justified by benefits." Op. 19–20, 23. Showing that "improvements are possible"—which is all the United States has ever claimed here—is not enough. Op. 20. The United States's argument, staked as it is on the possibility of water releases from the Falcon and Amistad Dams but without evidence of costs, benefits, and reasonableness, is a non-starter.

\*　　\*　　\*

In sum, Judge Willett's opinion is the law of this case on remand. The en banc Fifth Circuit unanimously credited it as speaking for the court, and underlined its controlling status in the mandate directing this Court to proceed "consistent with the majority opinion." That puts to rest any uncertainty as to which opinion controls. Going forward, the parties' arguments, their evidence, and this Court's rulings are bound by the standards laid out in Judge Willett's opinion. These include its holdings that cross-river traffic is not qualifying use of a river as a commercial highway; that mere references to a river's navigable capacity in general are not relevant evidence

about a particular stretch; and that such references do not become probative just by being recycled into conclusory, self-serving assertions from the federal government.

Consequently, numerous pieces of "evidence" that cluttered the preliminary-injunction record have been swept into the dustbin of inadmissibility. And the standard the United States must meet to prove the disputed stretch of river is susceptible to future commercial navigation requires "substantially different" evidence than what was presented in support of preliminary relief. All of that has not only simplified any future litigation in this case. It has, as Judge Oldham observed, announced legal standards that effectively "will end this litigation on the merits." Op. 33 (Oldham, J., concurring).

Date: September 27, 2024

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal
Strategy

AUSTIN KINGHORN
Deputy Attorney General for Legal
Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

OFFICE OF THE TEXAS ATTORNEY GENERAL
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

Respectfully submitted,

*/s/ David Bryant*
DAVID BRYANT
Senior Special Counsel
Texas State Bar No. 03281500
david.bryan@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Texas State Bar No. 24125371
jacob.przada@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Texas State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

KYLE S. TEBO
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

ZACHARY BERG
Special Counsel
Texas State Bar No. 24107706
zachary.berg@oag.texas.gov

JOHNATHAN STONE
Chief, Consumer Protection Division
Texas State Bar No. 24071779
johnathan.stone@oag.texas.gov

COUNSEL FOR PLAINTIFF, STATE OF
TEXAS

## CERTIFICATE OF SERVICE

I certify that on September 27, 2024, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/David Bryant*
DAVID BRYANT
Senior Special Counsel