**Exhibit C**

```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
               Plaintiff,        )
                                 )
v.                               )
                                 )  No.: 1:23-cv-00853-DAE
GREG ABBOTT, in his capacity     )
as Governor of the State of      )
Texas, and THE STATE OF          )
TEXAS,                           )
                                 )
               Defendants.       )




          -----------------------------------

          ORAL AND VIDEOTAPED DEPOSITION OF

                   TIM MACALLISTER

                    MAY 31, 2024

          -----------------------------------
```

    ORAL AND VIDEOTAPED DEPOSITION OF TIM MACALLISTER,

produced as a witness at the instance of the DEFENDANTS, and

duly sworn, was taken in the above-styled and numbered cause on

May 31, 2024, from 9:10 a.m. to 3:23 p.m., before Amber Garcia,

Notary Public in and for the State of Texas, reported by

machine shorthand, at the U.S. Attorney's Office, Burnett

Plaza, 801 Cherry Street, Unit 34, Suite 1700, Fort Worth,

Texas 76102, pursuant to the Federal Rules of Civil Procedure.

**2**

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. ANDREW KNUDSEN
U.S. Attorney's Office - Department of Justice
601 N. W. Loop 410
Suite 600
San Antonio, Texas 78216
Phone: (210) 384-7100
Andrew.knudsen@usdoj.gov

MS. KATHERINE T. ROONEY
U.S. Army Corps of Engineers - Assistant District Counsel
Phone: (817) 886-1149
Katherine.t.rooney@usace.army.mil

FOR THE DEFENDANTS:

MR. DAVID BRYANT
Office of the Attorney General - Special Counsel for Civil
Litigation
300 W. 15th Street
Austin, Texas 78701
Phone: (512) 936-2275
David.bryant@oag.texas.gov

ALSO PRESENT:

James Deel, Jr., Videographer
Bryan Harrison, U.S Department of Justice (Via Zoom)
Kimere Kimball,  U.S Department of Justice (Via Zoom)
Melanie Casner, U.S. Army Corps of Engineers (Via Zoom)
Ancil Taylor, Dredging Consulting (Via Zoom)
Johnathan Stone, Office of the Attorney General (Via Zoom)
Consulting Expert (Via Zoom)
Consulting Expert (Via Zoom)
Consulting Expert (Via Zoom)

---

**3**

INDEX

|  | PAGE |
|---|---|
| Appearances........................................ | 2 |

TIM MACALLISTER

| Examination by Mr. Bryant........................ | 7 |
| Examination by Mr. Knudsen...................... | 163 |
| Further Examination by Mr. Bryant............. | 167 |
| Signature and Changes............................ | 170 |
| Reporter's Certificate............................... | 172 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 1/24/2024 Letter | 32 |
| Exhibit 2 | 5/3/2024 Letter | 33 |
| Exhibit 3 | Expert Opinion Report | 35 |
| Exhibit 4 | Table of River Mileages | 97 |
| Exhibit 5 | First Amended Complaint | 100 |
| Exhibit 6 | 1975 Navigability Study | 103 |
| Exhibit 7 | IBWC - About Us | 111 |
| Exhibit 8 | 33 CFR Part 239 | 112 |
| Exhibit 9 | Message from the President of the United States | 113 |
| Exhibit 10 | 5/22/2024 News Story | 116 |
| Exhibit 11 | Binational Border Solutions | 126 |
| Exhibit 12 | IBWC - Rio Grande Canalization Project | 127 |
| Exhibit 13 | Government Printing Office Excerpt | 128 |
| Exhibit 14 | Gateways to Commerce | 130 |

---

**4**

EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | Interactive Chart for East Coast | 131 |
| Exhibit 16 | Intracoastal Waterway Shipping Route | 131 |
| Exhibit 17 | Wikipedia Tennessee-Tombigbee Waterway | 133 |

---

**5**

P R O C E E D I N G S

1  THE VIDEOGRAPHER:  This is the deposition of Tim
2  MacAllister in the matter of the United States of America
3  versus Greg Abbott, et al.  Our location is Burnett Plaza,
4  Suite 1700 in Fort Worth, Texas, and we are on the record at
5  9:10 a.m.  My name is James Deel, Jr., and my business address
6  is 9901 Brodie Lane, Austin, Texas 78748.  Would all persons
7  present please introduce themselves for the record.
8      MR. KNUDSEN:  This is Andrew Knudsen, trial
9  attorney of the U.S. Department of Justice on behalf of the
10 plaintiffs.  In addition in the office here, I have Katy Rooney
11 with the U.S. Army Corps of Engineers, Assistant District
12 Counsel.
13     MR. BRYANT:  I'm David Bryant.  I'm with the
14 office of the Attorney General of Texas in Austin, Texas,
15 representing the defendants in this case.
16     THE REPORTER:  Mr. MacAllister, will you raise
17 your right hand --
18     MS. KIMBALL:  Oh -- this is Kimere Kimball from
19 the U.S. Department of Justice.  And I believe Bryan Harrison
20 is also trying to join and may join in the next few minutes.
21     MR. KNUDSEN:  Online, I also believe we have
22 Melanie Casner from the U.S. Army Corps of Engineers, assistant
23 counsel, who I think is not able to chime in via microphone.
24     THE REPORTER:  Is that everybody?

6

1       MR. KNUDSEN:  Are there any -- are there
2   participants from the State of Texas on the line?  Are there
3   any consulting experts listed on the attendance list?  As I --
4   as I look at the list, I see four consulting experts listed on
5   the attendance listed who don't have names identified.
6   Counsel, can you identify those participants?
7       MR. BRYANT:  No, I don't know who those might
8   be, but we will identify them in accordance with the parties'
9   agreements and the Rules of Civil Procedure.  This issue's come
10   up in both of the first two depositions we've had, and
11   Mr. Stone of the Texas Attorney General's Office has explained
12   the position of the State on this matter.  There will be
13   disclosures, as I believe that we have a deadline coming up
14   soon to disclose expert witnesses, and we intend to comply with
15   the scheduling order, and the Court's agreements -- or
16   agreements of the parties in that regard.
17       MR. KNUDSEN:  Well, we -- we object under
18   Rule 30(b)(5) of the Federal Rules of Civil Procedure, which
19   requires that every deposition must begin with on the record
20   statement, including the identity of all persons present, so we
21   lodge a -- a standing objection to the participation of these
22   unnamed participants.
23       MR. BRYANT:  And I will say that the -- any
24   persons who are on the -- online are merely observing, and will
25   not participate or say anything during the proceeding today.

7

1               TIM MACALLISTER,
2   having been first duly sworn, testified as follows:
3               EXAMINATION
4   BY MR. BRYANT:
5       Q.  Could you state your full name, sir?
6       A.  Timothy Lee MacAllister.
7       Q.  And are you employed with the U.S. Army Corps of
8   Engineers?
9       A.  Yes, I am.
10       Q.  Are you employed here in Fort Worth, Texas?
11       A.  Yes, I am.
12       Q.  And how long have you been employed by the U.S. Army
13   Corps of Engineers?
14       A.  A total of a little over 29 years.
15       Q.  Did you begin that job either during or shortly after
16   you completed your college career?
17       A.  During.
18       Q.  Okay.  And did you graduate from Tarleton State
19   University with a bachelor's degree in range management?
20       A.  Yes, sir.
21       Q.  Okay.  What year did you do that?
22       A.  1996.
23       Q.  Okay.  And did you actually begin work with the Army
24   Corps of Engineers here in Fort Worth in 1995?
25       A.  I began my career in school in '95 at Proctor Lake.

8

1       Q.  Thank you.  And when did you start working here at
2   Fort Worth?
3       A.  In the district office itself, in 2009.
4       Q.  Okay.  And what is your current title with the Corps
5   of Engineers?
6       A.  I'm the chief of operations.
7       Q.  And is that, specifically, for the Fort Worth
8   District?
9       A.  Yes, sir.
10       Q.  And have you held that title since 2013?
11       A.  Yes, sir.
12       Q.  Could you describe, in basic form, your
13   responsibilities as chief of operations for the Fort Worth
14   District of the Corps of Engineers?
15       A.  I have -- I have the responsibility of operating and
16   maintaining 25 multiple purpose reservoirs across the state to
17   include flood risk management activities, water supply,
18   recreational activities, natural resources and hydropower
19   generation at a few locations.
20       Q.  Do you have -- strike that.
21           You -- you refer to "25 reservoirs."
22           Do you have any responsibilities with respect to
23   rivers as opposed to reservoirs?
24       A.  I have the -- it's called a "Completed Works
25   Program."  The -- I have the responsibility of ensuring that

9

1   our sponsors maintain levy systems and/or improvements --
2   channel improvements across, whether it's creeks or rivers,
3   such as the levies in downtown Dallas and -- and Fort Worth
4   that, kind of thing.
5       Q.  Aside from those responsibilities, do you have any
6   responsibilities with respect to rivers within the Fort Worth
7   District area?
8       A.  Maintenance activities only in those areas that are
9   associated with the project itself, and as well as any, when
10   we're under the operations part of it, ensuring that reservoir
11   releases are kept in accordance with our -- our water control
12   manuals.
13       Q.  Okay.  You used the term "project," and I've seen it
14   used in your report as well.
15           Could you explain for somebody who's not
16   familiar with that terminology what you mean by a "project"?
17       A.  Sure.  Yes, sir.  The common, I guess, like, almost a
18   colloquialism, at -- at some points people say "lakes."  And so
19   for the common user, yes, you're going to go to a lake, whether
20   it's Lewisville or -- or somewhere like that.  Because these
21   are multiple purpose reservoirs, we discuss them and describe
22   them as "projects," because there's more than ju- -- there's
23   more to it than just having a -- a single-purpose water supply
24   reservoir, if you will.  So "project" just connotates that
25   there's multiple reasons for it being there.

10

1   Q.   Would you refer to a river or part of a river as a
2   "project"?
3       A.   The portions associated with -- with any individual
4   project, yes, sir, any of those 25.
5   Q.   Okay.
6       A.   And I would also con-- -- using the Metroplex area as
7   an example, the Trinity watershed, there's seven reservoirs
8   that feed into the Trinity watershed under -- under the
9   operations and program.  And so all of it is -- is managed as
10  one system, if you will.
11      Q.   Speaking of the Rio Grande River, would you refer to
12  the area of the Rio Grande River downstream from Amistad Dam as
13  a "project"?
14      A.   Not for me, no, sir.
15      Q.   Okay.  And why not?
16      A.   I have -- I do not have the responsibility of
17  operations and maintenance of that area.
18      Q.   Okay.  And when you say "you do not," you mean, more
19  broadly, that the Fort Worth District does not?
20      A.   I mean, the operations division itself does not.  I
21  do not.  It's not on my side of the shop.
22      Q.   Thank you.
23           Now, I believe you've been designated by the
24  United States of America as an expert witness in connection
25  with this case; is that correct?

11

1       A.   Yes, sir.
2       Q.   And have you ever acted as an expert witness in any
3   other proceeding?
4       A.   I haven't -- a witness, yes, but not an expert
5   witness.
6       Q.   Okay.  Have you ever given any expert opinions for
7   the purpose of any litigation prior to this case?
8       A.   Only in a bankruptcy matter.
9       Q.   And have you ever given a deposition before today?
10      A.   No, sir.
11      Q.   Have you ever testified in court before -- before
12  this case?
13      A.   Just the one I just referenced on the bankruptcy
14  matter.
15      Q.   Okay.  And could you describe just briefly what that
16  bankruptcy matter was about?
17      A.   One of our projects in Central Texas, a commercial
18  concession lessee was having substantial difficulties.  We had
19  to take some actions, and the person's response was that they
20  couldn't deal with what we were asking them to do, so they --
21  well, filed for bankruptcy protection, and we went through the
22  process to adjudicate that issue.
23      Q.   When were you asked to serve as a expert in
24  connection with this case?
25      A.   It was over 10 years ago.  I don't remember the exact

12

1   date.
2       Q.   I'm sorry.  When I say "this case," I'm referring to
3   the case we're --
4       A.   Oh --
5       Q.   -- in today.
6       A.   -- sorry.
7           Could you repeat the question, please?  I
8   apologize.
9       Q.   Yeah.  When were you first asked to serve as an
10  expert in connection with the case we're here for today?
11      A.   It was earlier this year.  I -- the -- the date, I --
12  sorry, I -- I do not recall.
13      Q.   Okay.  And who made that request?
14      A.   Office Counsel within the Fort Worth District.
15      Q.   What training or experience do you have with respect
16  to dredging bodies of water, whether they are rivers or
17  reservoirs?
18      A.   On the reservoirs themselves, the dredging activities
19  that we've done include areas around boat ramps, as well as
20  areas around intake structures.  Intake structures, meaning,
21  like, our outlet work areas to release water.  We've also
22  permitted activities with water supply customers who have
23  requested areas to dredge around their water intake structures
24  to increase their ability to -- to pull water from reservoirs.
25      Q.   Have you ever had any training with respect to

13

1   dredging operations?
2       A.   On the -- just on- -- on-the-job type training, yes,
3   sir.
4       Q.   Okay.  So it was --
5       A.   As far as -- yeah.
6       Q.   -- on-the-job training rather than any formal or
7   academic training?
8       A.   Correct.
9       Q.   What, if any, experience have you had in dredging
10  rivers?
11      A.   Just the -- some areas of channels directly below the
12  dam.  That's -- as far as the main body of the river further
13  down, no.
14      Q.   And when you refer to "immediately below the dam,"
15  could you give me an estimate of --
16      A.   It depend- --
17      Q.   -- how far below the dam?
18      A.   Yes, sir.  It depends on the -- the project.  In some
19  areas, we have a couple hundred feet or a couple thousand feet;
20  in other areas, we may have a mile or more.
21      Q.   And are those -- when you say "we," are those things
22  that -- say, instances in which you have personally supervised
23  or directed dredging?
24      A.   Typically, the -- we -- we call it a "dewatering
25  activity" where we remove water from the -- behind the dam on

14

1  the outlet works.  It's called a "sediment basin."  We usually
2  go further down inside the channel itself and create cofferdams
3  and such.  And then with that activity, we often have to dredge
4  out certain areas, so we can have access and be able to put in
5  our temporary construction dam.  Sometimes with the water
6  bladder, if you will, and other times a constructed dam.
7      Q.  Again, you use the term "we," in your answer.
8          Were those operations you described ones that
9  you personally supervised or directed?
10     A.  Yes, sir.
11     Q.  Okay.  And have you ever supervised or directed
12  dredging operations in any part of the Rio Grande River?
13     A.  I have not.
14     Q.  Have you ever dredged or supervised dredging
15  operations for the purposes of making a river navigable?
16     A.  No, sir.
17     Q.  Have you ever had any responsibilities with respect
18  to making a river or waterway susceptible for use in commercial
19  navigation?
20     A.  For -- just to the degree that I described earlier
21  around bank- -- about boat ramps and such.
22     Q.  Is -- strike that.
23          Do you refer to yourself as a recreation
24  specialist?
25     A.  I have had -- held that title, yes.

15

1      Q.  And what does that mean?
2      A.  As part of the project, you know, that's one of
3  the activities that we are responsible for is the ongoing
4  recreation in those areas.  Recreation encompasses a very, very
5  large swath.  Recreation often means something different --
6  vastly different to -- from one person to the next.  Could mean
7  boating, fishing, hiking, birding, some people could refer to
8  hunting as a recreational activity.  All of those things
9  combined, plus more, are recreational activities.
10     Q.  Is it fair to say that there are lots of -- of types
11  of recreational activities --
12     A.  Yes, sir.
13     Q.  -- but they are all engaged in, essentially, for
14  enjoyment?
15     A.  Yes, sir.
16     Q.  Rather than for profit?
17     A.  Depends on the -- the situation.  We have commercial
18  activities on our areas that are -- we refer to those as
19  "recreation leases."  Typically, going to be a park and
20  recreation lease where we may partner with.  Could be the
21  State, could be a municipality, or even a commercial concession
22  for a marina who offer boat rentals and -- and that kind of
23  thing.
24     Q.  But in all of those, the -- the end user of the
25  recreation is using it for the purposes of enjoyment; is that

16

1  right?
2      A.  For those portions, yes, sir.
3      Q.  Okay.  Now, do you have any training with respect to
4  navigation on the Rio Grande River?
5      A.  I do not.
6      Q.  Do you have any personal experience conducting
7  navigation on the Rio Grande River?
8      A.  I do not.
9      Q.  And do you have any experience at all with commercial
10  navigation on the Rio Grande River?
11     A.  I do not.
12     Q.  Do you have any experience with commercial navigation
13  on any of the rivers in the Fort Worth District or outside the
14  Fort Worth District?
15     A.  I have no -- nothing outside the Fort Worth District
16  for sure.  Navigation activities inside the Fort Worth District
17  on our reservoirs for commercial activities with the recreation
18  leases and such, yes.
19     Q.  Now, my understanding is that -- and I've seen
20  documents that indicate that the Fort Worth District goes down
21  to the Rio Grande River between what's referred to as "River
22  Miles 275.5 to 610."
23          Are you familiar with that?
24     A.  Yes, sir.
25     Q.  Okay.  And I may, in the deposition, just use -- just

17

1  refer to the "275 to 610 stretch," and I want you to understand
2  that I'm referring to the portion of the river over which the
3  Fort Worth District has jurisdiction or -- exercises power.
4          Have you actually been on vessels in the
5  Rio Grande River anywhere between 275 and 610?
6      A.  Yes, sir.
7      Q.  Where?
8      A.  Specifically, at Eagle Pass.
9      Q.  Okay.  Anyplace else?
10     A.  No, sir.
11     Q.  And on how many occasions have you been on the
12  Rio Grande River at Eagle Pass?
13     A.  One time.
14     Q.  When was that?
15     A.  I believe the day is May 21st.
16     Q.  Of what year?
17     A.  Of -- I'm sorry.  Of this year, yes, sir.
18     Q.  So that was after you completed your expert report in
19  this case?
20     A.  Yes, sir.
21     Q.  And with respect to that one visit to Eagle Pass,
22  you've never been on the Rio Grande River in the 275 to 610
23  stretch?
24     A.  That's correct.
25     Q.  What was the occasion for you being on the river on

18

1  May 21st, 2024?

2      A.  To make a site visit of the area that I had reviewed
3  information on to verify areas with my own eyes.

4      Q.  And what area on the river at Eagle Pass did you
5  visit on that day?

6      A.  We met with the Border Patrol and they have a launch
7  site where they access through private property.  Pretty good
8  piece upstream as far as the number of miles.  It's -- I would
9  estimate it to be around a mile, maybe -- maybe, you know, give
10  or take a couple hundred feet.  But upstream from there -- and
11  then from, like, Shelby Park area, and then down past the
12  bridges and then past the -- the objects -- the floating
13  objects inside the water at this point in time, and then
14  verified, kind of, where those were, just took a look at how
15  things were -- were set up at the time, so that -- that general
16  area.

17      Q.  Okay.  And did you go any substantial distance beyond
18  the -- what I refer to as the "floating buoy barrier"?

19      A.  No, sir.

20      Q.  Other than simply see what you could see on the -- on
21  the Rio Grande that day at Eagle Pass, did you engage in any
22  other activities at Eagle Pass that day that pertained in any
23  way to your expert report or your opinions?

24      A.  No, sir.

25      Q.  Did you get any information from the Border Patrol?

19

1      A.  Yes, sir.  To a degree, just asked a couple of
2  questions about is the -- you know, as far as flow rates,
3  what -- what it was like that day, is this about normal or, you
4  know, that -- that kind of stuff, yes, sir.

5      Q.  Did you have any discussion with the Border Patrol as
6  to whether or not they operate any boats on the Rio Grande
7  River at night?

8      A.  I did not discuss night operations, no, sir.

9      Q.  Do you know whether or not they do?

10      A.  I'm understanding that they have.  I don't know how
11  often.  I -- I just -- anecdotally, I'm aware that they said
12  that they have before, but as far as, like, recently, I have --
13  I don't know.

14      Q.  Do you know when you got that information?

15      A.  Everything would've been on May 21st.

16      Q.  About -- well, strike that.

17         As you rode on the river that day, did you go
18  under some bridges?

19      A.  Yes, sir.

20      Q.  Did you go under two international bridges that carry
21  vehicle traffic, and one that carries rail traffic?

22      A.  I'm sure that the rail traffic is in there, yes, sir.
23  However, I did not single that out while I was --

24      Q.  Okay.

25      A.  -- on the river.  But yes, it was more than one

20

1  vehicular bridge.

2      Q.  And are the floating buoy barriers some distance
3  downstream from all of the -- all of the bridges at Eagle Pass?

4      A.  Not -- not far, yes, sir.

5      Q.  What would be your estimate of the distance?

6      A.  Couple hundred feet.  Maybe -- maybe even more.
7  Maybe 1,000 feet.  I -- I really don't recall.  I wasn't --
8  wasn't concerned about the dis- -- distance between the buoys
9  and the bridge.

10      Q.  What type of boat did you travel in with the Border
11  Patrol on May 21st?

12      A.  Airboat.

13      Q.  Did you have any discussions to why the Border Patrol
14  uses an airboat boat at that location?

15      A.  I didn't, specifically, ask, but my -- just by
16  looking at the ease of getting to more than -- more areas more
17  easily and read- -- readily with the number of opportunities
18  that they could have on a day-to-day basis where water could be
19  higher or lower.  My assumption is, is because it's a matter of
20  ease.

21      Q.  And is your assumption that it is also a reflection
22  of the fact that at some times in places, the Rio Grande River
23  is shallow, has rocks, has snags, et cetera?

24      A.  Yes, sir.

25         MR. KNUDSEN:  Objection, form.

21

1         THE WITNESS:  Oh.

2      Q.  (BY MR. BRYANT)  And as you travel down the river
3  near Eagle Pass past the floating buoy barrier, were you able
4  to -- was the Border Patrol able to get down past that barrier
5  without difficulty?

6         MR. KNUDSEN:  Objection, form.

7         You can answer.

8         THE WITNESS:  Okay.  I was like, I don't know
9  what that means.  I apologize.

10      A.  So on the airboat boat, yes, sir.

11      Q.  (BY MR. BRYANT)  Okay.  And by the way, your attorney
12  has a right to object to anything, but unless he instructs you
13  not to answer or gives you some other instruction, we just let
14  him make his objection for the record, and then you can answer
15  the question.

16      A.  Okay.  Thank you.

17      Q.  And did the Border Patrol boat have any difficulty
18  turning around near the buoys and going back upstream?

19      A.  On one occasion, yes.

20      Q.  What did you observe in that occasion?

21      A.  The -- trying to get -- the Border Patrol captain of
22  that vessel was trying to get us closer, and what -- when he
23  was maneuvering the vessel through there, we did run up on one
24  anchor.

25      Q.  And when you say "closer," are you referring to he

22

1  wanted to get you closer to the -- to the buoy barrier
2  structure?
3     A.  Yes, sir.  That's correct.
4     Q.  Okay.  And so he was able to avoid that if he had
5  wanted to?  There was plenty of room in the river away from the
6  buoys?
7        MR. KNUDSEN:  Objection, form.
8     A.  In those instances, it depends on flow rate, it
9  depends on visual, it depends on -- because the -- the --the
10 structure that we hit was just under the water surface.
11    Q.  (BY MR. BRYANT)  Okay.  And I understand that it
12 certainly depends on the conditions, but is it fair to say that
13 had the Border Patrol driver wanted to avoid the floating buoy
14 barrier, there was plenty of room for that to be accomplished?
15       MR. KNUDSEN:  Objection, form.
16    A.  I'm trying to think about it.  The barrier as it sat
17 where I was just discussing the -- the -- the anchor that was
18 not readily viewable is what we struck.  As far as the -- the
19 buoy barrier itself, then, yes, you can avoid that in an
20 airboat.
21    Q.  (BY MR. BRYANT)  Okay.  And can you also, if you
22 wish, avoid any related structures?
23       MR. KNUDSEN:  Objection, form.
24    A.  In my experience as operation s chief, we have flood
25 risk management reservoirs.  We have -- we place on purpose

23

1  signs that say "underwater obstructions may be there at
2  different elevations."  So in the case that I was discussing on
3  that, depending upon any -- in any manmade structure that's
4  placed in there, you may not have that on a chart, you may not
5  have that on any kind of a thing, so that becomes -- that's --
6  the issue at hand is that that was placed in the water, he hit
7  it, he probably didn't realize that one was there, wasn't
8  assuming that was there, didn't appear to be attached to the --
9  to the buoys, so...
10       MR. BRYANT:  Objection, nonresponsive.
11    Q.  (BY MR. BRYANT)  Now, my question is, how far across
12 was the Rio Grande River at -- on the day that you visited the
13 floating buoy barrier site?
14    A.  I did not even consider the -- I mean, thousand feet.
15 I...
16    Q.  So --
17    A.  Did you ask -- you're asking about the width --
18    Q.  -- best -- best estimate you can make, a thousand
19 feet in width?
20    A.  You're --- but you're discussing the width of it,
21 yes?
22    Q.  Yes, sir.
23    A.  Okay.  I -- sir, I don't know.  I -- I did not
24 really -- I wasn't focused in on how wide the river was.  I was
25 focused in on where the -- the structure was placed.

24

1     Q.  Okay.  Was the structure aligned, generally, up and
2  down the river rather than across it?
3     A.  It was aligned parallel to the shoreline, yes, sir.
4     Q.  And did it appear to be on the Texas side of the
5  river or the U.S. side of the river?
6     A.  It was further on that side than it was on the --
7  from the middle, yes, sir.
8     Q.  Okay.  If you consider the area of the Rio Grande
9  River that you covered on May 21st, would you -- could you give
10 me an estimate as to how many feet or miles of the river you
11 traveled up and down that day?
12    A.  It's hard to -- to give you a -- a really good
13 estimate on how far.  We went -- we were about -- on the river
14 for about 30, 45 minutes, something to that degree.  We went
15 down to the buoys, the barrier, if you will, and then turned
16 around and went back up to the launching site.  But I --
17    Q.  Is it fair to -- fair to say no more than a few
18 miles?
19    A.  Yes, sir.  It could be characterized as that.
20    Q.  Okay.  The -- is it fair to say that the -- of the,
21 roughly, 335 miles between 275 and 610, you only have personal
22 experience even seeing a few miles?
23       MR. KNUDSEN:  Object to form.
24    A.  As far as seeing it in person, I have seen more than
25 that in person.  I've only been on the water in that spot.

25

1     Q.  (BY MR. BRYANT)  Okay.  Are there any charts that
2  provide detail as to the depth of the Rio Grande River between
3  275 and 610 as of any date?
4     A.  I'm not aware of any -- I did not re- -- research
5  that.
6     Q.  Is there any way for you to find out how deep the
7  river is at any point between 275 and 610 other than either
8  going there yourself or getting a report from someone who
9  asked?
10       MR. KNUDSEN:  Object to form.
11    A.  The -- I'm not aware of a chart.  In order to obtain
12 depths, then, because of flow rates and because of things that
13 can occur in the river, such as shoaling and sedimentation
14 being dropped and that can very -- you would -- I don't have --
15 have a chart, no, sir.  I would have to go see it.
16    Q.  (BY MR. BRYANT)  And you not only have no chart, but
17 you -- you don't have any system of reports that would inform
18 you on that subject?
19       MR. KNUDSEN:  Object to form.
20    A.  I do not -- oh, sorry.  I do not have that chart, no.
21    Q.  (BY MR. BRYANT)  Okay.  And I assume you don't know
22 of any such source of information that exists, whether you've
23 reviewed it personally or not?
24       MR. KNUDSEN:  Object to form.
25    A.  If you're asking how would I go about seeing if there

26

1  is one, I would contact IBWC, as well as Texas Parks &
2  Wildlife.  And possibly USGS.
3      Q.  Okay.  You've referred to "IBWC."
4          Could you explain what that is for --
5      A.  Oh --
6      Q.  -- someone who's not familiar with it?
7      A.  The International Boundary and Water Commission, the
8  entity that operates and maintains the reservoirs above and
9  below Eagle Pass.  Amistad is above, and Falcon reservoir is
10 below.
11     Q.  Okay.  And so what responsibility, if any, does IBWC
12 have for the stretch of the Rio Grande River between 275 and
13 610?
14     A.  IBWC has the responsibility to ensure flow rates are
15 kept in occurrence with their water control manual.
16     Q.  Any other responsibility?
17     A.  I'm not aware.
18     Q.  And is that a shared responsibility with the Corps of
19 Engineers or is that solely the responsibility of IBWC?
20     A.  As far as the operations of the reservoirs, it's
21 the -- it's IBWC.
22     Q.  Yes.  My question was actually about maintaining the
23 flow rates between the reservoirs?
24     A.  It is the responsibility of I- -- of the IBWC.
25     Q.  And not the Corps of Engineers?

27

1      A.  Not to my knowledge, no, sir.
2      Q.  Okay.  I think earlier in your testimony you
3  mentioned that some or all of the reservoirs in the Fort Worth
4  District are multipurpose reservoirs; is that correct?
5      A.  That -- that is correct.
6      Q.  Let's talk about Lake Amistad for a second.
7          Is that a multipurpose reservoir?
8      A.  Yes, sir.
9      Q.  What's its primary purpose?
10     A.  Flood control.  Excuse me.
11     Q.  And what are --
12     A.  I apologize --
13     Q.  What are its other purposes?
14     A.  The purposes include flood control, water
15 conservation to be utilized for other purposes, hydropower,
16 natural resources, recreation, those kind of activities, yes,
17 sir.
18     Q.  Okay.  Is commercial navigation a purpose of Lake
19 Amistad?
20     A.  My understanding is, it is.
21     Q.  And what is the source of that understanding?
22     A.  The -- well, I've reviewed the 1975 finding or
23 document that reaffirmed and declared the Rio Grande River
24 navigable in that area.  There's references in there.  There's
25 also references of navigation from IBWC itself.

28

1      Q.  You didn't list commercial navigation as being a
2  purpose of Lake Amistad in your original answer.
3          Can you give me any specific information from
4  the 1975 study, which we will look at in more detail, as to
5  what in that study tells you that Lake Amistad has as a
6  purpose, commercial navigation?
7          MR. KNUDSEN:  Object to form.
8      A.  It's -- it's stated in the paper.
9      Q.  (BY MR. BRYANT)  Okay.  Has anybody you've ever dealt
10 with at IBWC said that commercial navigation is a purpose of
11 Lake Amistad?
12         MR. KNUDSEN:  Object to form.
13     A.  I've not had any conversations with IBWC about that.
14     Q.  (BY MR. BRYANT)  Can you point to any documents
15 authored by IBWC that list commercial navigation as a purpose
16 of Lake Amistad?
17         MR. KNUDSEN:  Object to form.
18     A.  I -- I did not look for any of that.
19     Q.  (BY MR. BRYANT)  And I believe it states in your
20 report that you have no training or experience with any
21 determinations of navigability under the Rivers and Harbors
22 Act; is that correct?
23     A.  That is correct.
24     Q.  And do you have any experience or training with
25 respect to handling any permit applications under the Rivers

29

1  and Harbors Act?
2      A.  I do not, no.
3      Q.  Do you have any training or experience with decisions
4  whether or not to grant permits under the Rivers and Harbors
5  Act?
6      A.  No.
7      Q.  Would you agree that you're not qualified to do any
8  of those things?
9      A.  Agreed.
10     Q.  And would you agree that you're not qualified to
11 provide any expert opinions that relate to the Rivers and
12 Harbors Act or to navigability under the Rivers and Harbors
13 Act?
14         MR. KNUDSEN:  Object to form.
15     A.  I would not.
16     Q.  (BY MR. BRYANT)  You would agree that you are not
17 qualified or you would disagree?
18     A.  I would -- I would not agree with your statement.
19     Q.  Okay.
20     A.  The -- you had a two-part statement.  Could you
21 restate it?
22     Q.  Sure.  I want to be -- I -- I don't want us to have a
23 lack of clarity on anything.
24         Would you agree that you are not qualified to
25 provide any expert opinions that relate to the Rivers or --

30

1  Rivers and Harbors Act?
2          MR. KNUDSEN:  Object to form.
3      A.  The -- the information that I utilize in conjunction
4  with the Rivers and Harbors Act is provided to me by the
5  regulatory function of the Corps of Engineers.  I am not in a
6  regulatory function to issue permits or make determinations.
7      Q.  (BY MR. BRYANT)  I understand that.
8          And my question is, would you agree that you are
9  not qualified by training or experience to provide any expert
10  opinions relating to the navigability of any body of water
11  under the Rivers and Harbors Act?
12          MR. KNUDSEN:  Object to form.
13      A.  I would disagree with that.
14      Q.  (BY MR. BRYANT)  Why so?
15      A.  Because it's not my job to determine whether
16  something is navigable, but it is my job to receive information
17  that states it is, and then act appropriately within those
18  bounds.
19      Q.  I understand.  But would you say that you are an
20  expert on determining whether or not a body of water is
21  navigable under the Rivers and Harbors Act?
22          MR. KNUDSEN:  Object to form.
23      A.  Yeah.  What I'm saying is, as I am bound in my role
24  to follow what has already been declared and determined.
25      Q.  (BY MR. BRYANT)  I agree with that.

31

1          And it seems to me that a quarrel area to that
2  is that you're not qualified to make those judgments
3  independently and on your own, but only to accept the
4  determinations that other parts of the Corps of Engineers has
5  made; is that fair?
6          MR. KNUDSEN:  Object to form.
7      A.  I would say to -- to a certain degree.  However,
8  because of my roles and responsibilities as ops chiefs -- as
9  ops chief, I would be almost certainly requested to provide
10  information to help inform that decision.  But no, it would not
11  be my decision to -- to conclude.
12      Q.  (BY MR. BRYANT)  Do you know the definition of
13  "navigability" under the Rivers and Harbors Act?
14      A.  I'm familiar with it, yes, sir.
15      Q.  And have you ever read any of the cases in which the
16  Courts have defined or clarified the meaning of "navigability"
17  under the Rivers and Harbors Act?
18      A.  I have not read court cases, other than court cases
19  referenced inside the 1975 study.  And to clarify that, I did
20  not read those entire cases.  I read the excerpts that were
21  in -- contained inside the study.
22      Q.  Have you ever read the Rivers and Harbors Act?
23      A.  Just the portions that I've read inside the study.
24      Q.  Only the portions that are quoted in the 1975 Corps
25  of Engineers Navigability Study?

32

1      A.  As far as the act itself, yes, sir.
2      Q.  Okay.
3          MR. BRYANT:  Let's take a break for just a
4  second, mark some exhibits.  If you need to -- by the way, take
5  -- feel free to call for a break anytime you need one.
6          THE WITNESS:  Okay.
7          MR. BRYANT:  But if you want to take a break
8  right now --
9          THE WITNESS:  Sure.
10          MR. BRYANT:  That's -- that's fine.  You'll want
11  to take off your --
12          THE VIDEOGRAPHER:  The time is 9:51 a.m., and
13  we're off the record.
14          (Recess taken from 9:51 a.m. to 10:02 a.m.)
15          THE VIDEOGRAPHER:  The time is 10:02 a.m., and
16  we're back on the record.
17          (MacAllister Exhibit 1 was marked.)
18      Q.  (BY MR. BRYANT)  All right.  Mr. MacAllister, I've
19  had a document marked as Exhibit 1 to your deposition.
20          Is that in front of you?
21      A.  Yes, sir.  Oh, I'm sorry.  Yes, sir.  It is.
22      Q.  Okay.  And have you seen this document before?
23      A.  I have not.
24      Q.  Okay.  I'd like for you to look on the second page.
25          Do you see your name there?

33

1      A.  Yes, sir.
2      Q.  You still live in Ponder, Texas?
3      A.  Yes, sir.
4      Q.  Exhibit 1 says, quote, Mr. Macallister's expected --
5  expected to testify regarding the capability of potential
6  improvements to water management, dam operation, and dredging
7  for further improving the navigational capacity of the Rio
8  Grande.
9          Is that an accurate statement of what you expect
10  to testify about in this case?
11      A.  Yes, sir.
12      Q.  Anything else?
13      A.  No, sir.
14      Q.  All right.  And let's take a quick look at Exhibit 2
15  to your deposition.
16          (MacAllister Exhibit 2 was marked.)
17      Q.  (BY MR. BRYANT)  Have you seen Exhibit 2 before
18  today?
19      A.  No, sir.
20      Q.  Could you please look at Exhibit 2, Page 2.
21          Do you see where your name appears?
22      A.  Yes, sir.
23      Q.  And is that the same description of what you're
24  expected to testify about that existed, and we read on
25  Exhibit 1 to your deposition?

34

1          MR. KNUDSEN:  Object to form.
2      A.  Yes -- it appears to be, yes, sir.
3      Q.  (BY MR. BRYANT)  Okay.  And this one that's dated
4  May 3rd, 2024, is the statement as to what you're expected to
5  testify about on MacAllister Exhibit 2 accurate as of today?
6      A.  (Reading.)
7          MR. KNUDSEN:  Object to form.
8      A.  Yes.  Sorry.
9      Q.  (BY MR. BRYANT)  Okay.  And you don't expect to
10 testify in this case regarding any matters other than those
11 that are stated next to your name on MacAllister Exhibit 2?
12     A.  Yeah.  That's my expectation, yes.
13     Q.  Have you completed all of the work that you expect to
14 complete or need to complete in order to render the expert
15 opinions that you have set forth in your expert report in this
16 case?
17     A.  Yes, sir.
18         MR. KNUDSEN:  Object to form.
19     A.  Yes, sir.
20     Q.  (BY MR. BRYANT)  You don't, at this point, expect to
21 do any additional work or render any additional or modified
22 opinions?
23     A.  At this time, no, sir.
24     Q.  Okay.  Let's look at what's been marked as Exhibit 3
25 to your deposition.

35

1          (MacAllister Exhibit 3 was marked.)
2      Q.  (BY MR. BRYANT)  Can you identify Exhibit 3?
3      A.  Yes, sir.  This appears to be a copy of the report
4  I've provided.
5      Q.  Okay.  And to be clear, did you originally supply a
6  report dated May 8th, 2024?
7      A.  I -- I believe that's the right date, yes, sir.
8      Q.  And was that report supplemented on May 29th?  It
9  says "2023," but I assume that means 2024; is that correct?
10     A.  Yes, sir.  That -- that is correct.
11     Q.  Okay.
12     A.  That should be 2024.
13     Q.  Okay.  That was the day before yesterday?
14     A.  Yes, sir.  Well, it's --
15     Q.  Okay.  And what -- what changes, if any, did you make
16 between the report May 8th, 2024, and the report as
17 supplemented on May 29th, 2024?
18     A.  Just disclosing that May 21st, there was a trip, and
19 that I had reviewed portions of Mr. Cortez's report.
20     Q.  Okay.  And did the trip that you made to Eagle Pass
21 and its vicinity on May 21st, 2024, in any way change any of
22 your opinions in this case?
23     A.  No, sir.
24     Q.  Did that trip in any way change your reasoning for
25 any of your opinions in this case?

36

1      A.  No, sir.
2      Q.  Did your review of the expert report by Mr. Cortez
3  change any of your opinions in this case?
4      A.  No, sir.
5      Q.  And did your review of Mr. Cortez' expert report
6  change any of your reasoning or support for your opinions in
7  this case?
8      A.  In one instance, it did the -- what I was
9  predominantly looking for was information pertaining to
10 seasonal flows.
11     Q.  And how did the information that you got from
12 Mr. Cortez' report change or inform your opinion in this case?
13     A.  Just anecdotally, I had basic information about flows
14 when they were and were not higher, typically speaking, on a
15 seasonal basis.  I use the word "seasonal" in my report, and I
16 verified through Mr. Cortez's information on water releases
17 and/or spring flows and/or other runoff when those times of the
18 year were -- were better than others as far as amount of water.
19     Q.  In arriving at your opinions in this case, did you
20 speak with any other Army Corps of Engineer personnel?
21     A.  As far as, like, developing the report itself or
22 obtaining information --
23     Q.  For your report or your opinions in the report.
24     A.  Earlier on, I did have one discussion with Mr. Chris
25 Frabotta, and asked him for pictures of dredging equipment.

37

1      Q.  And there are some photos of some dredging equipment.
2  In your report, was Mr. Frabotta the source of
3  those photos?
4      A.  He forwarded me those photos, yes, sir.
5      Q.  Okay.  Is he with the Corps of Engineers?
6      A.  Yes, sir.
7      Q.  And where does he work?
8      A.  He is the chief of operations for the Galveston
9  District.
10     Q.  Okay.  And are those photos of dredging equipment, do
11 they depict any dredging equipment that has ever been used in
12 the Fort Worth District?
13     A.  Yes, sir.
14     Q.  Where?
15     A.  O.C. Fisher for one in front of the dam at O.C.
16 Fisher.  We've also used backhoes.  Basically, what we used was
17 mechanical means to remove silt sedimentation at a couple
18 different locations, whether it's at Lewisville Lake, like I
19 said, O.C. Fisher below the embankments in some of the
20 streambeds.
21         Would the dredging equipment that is shown in
22 photographs in your expert report be appropriate for use in the
23 Rio Grande River anywhere in the stretch between 275 and 610?
24     A.  It appears to be so.  And I say "appears" on purpose
25 because I do not have a geologic report there.  But you can use

38

1  the types of equipment, typically, to dredge those areas,
2  especially in the shallower, sandy, silty sedimentation areas.
3      Q.   And when you say "the equipment," you're referring to
4  the equipment that is pictured in the report?
5      A.   That's correct.  The -- the equipment itself, it's a
6  representative photo on Page 8 of a backhoe dredge.  For lack
7  of a better way of describing it, it's a simple backhoe that is
8  in this photo floating on a barge or work platform.
9      Q.   And would the equipment shown as a clamshell dr- --
10  dredge also be appropriate for use in the Rio Grande River
11  between Miles 275 and 610?
12     A.   Where the soil's appropriate, yes, sir.
13     Q.   In arriving at your expert opinions and doing the
14  work that's reflected in your expert report, did you speak with
15  anybody at IBWC?
16     A.   Not to develop the report, no, sir.
17     Q.   And did you speak with anyone else other than Chris
18  Frabotta?
19     A.   Not to develop the report, no, sir.
20     Q.   Now, did you list in the report all of the documents
21  that you considered in your work that led to the report?
22     A.   Yes, sir.
23     Q.   And does that list appear on Page 11 of Exhibit 3 to
24  your deposition?
25     A.   Yes, sir, it does.

39

1      Q.   Did you speak to anyone who conducts or ever has
2  conducted any commercial navigation on the 275 to 610 stretch?
3          MR. KNUDSEN:  Object to form.
4      A.   I have not -- sorry.  No, sir, I have not.
5      Q.   (BY MR. BRYANT)  There's a reference on Page 11 to
6  Defendants' Objections and Answers to Plaintiff's First Set of
7  Interrogatories.
8          Were there any answers in that material that
9  contributed to your report or your work in this case?
10     A.   In a -- the way understand this, and if this is not
11  accurate, I apologize.  But what -- that information provided a
12  basis for some of the -- the understandings I have from what
13  the State had done, and that's where I got the information for,
14  you know, this is where this has been placed or that's been
15  placed or this type of activity.  But as far as that goes, no,
16  I mean...
17     Q.   Okay.  Are you referring, specifically, to the
18  floating buoy barriers?
19     A.   Yes, sir.
20     Q.   Okay.  Anything else?
21     A.   Not right off the -- not right off the top of my
22  head, no, sir.
23     Q.   Okay.  There's a reference to the Carrizo Cane State
24  Eradication Program.
25     A.   Yes, sir.

40

1      Q.   What information did you learn or review about that
2  subject that was part of the work of your expert report?
3      A.   The short version of that would be Carrizo cane is --
4  or the Arundo species or Arundo donax species is very
5  problematic -- can cause problems.  And so I knew that the
6  State had been working on a -- a program to get that further
7  under control, so I just reviewed that to see what the status
8  of that was.
9      Q.   Does the Army Corps of Engineers in any way
10  participate in that State of Texas program?
11     A.   From my understand- -- I do not.  The Corps of
12  Engineers research biologist may -- may do that with the State.
13  I'm -- I'm not familiar if they are or not.
14     Q.   Are you aware of anybody in the Fort Worth District
15  who in any way participates in that State of Texas Carrizo cane
16  eradication program?
17         MR. KNUDSEN:  Object to form.
18     A.   I -- I know that offices would have had -- I don't
19  know ind- -- individuals would have been, no, sir.
20  Offices, I believe, that would ha- -- would be involved with
21  that would be regulatory, and I believe ERDC, which is Engineer
22  Research and Develop- -- Design [sic] Center.  So -- they
23  probably have, but I -- I don't know.  My point in reading the
24  Carrizo cane was not to determine who all was involved, but to
25  see what the status of the program was.

41

1      Q.   Okay.  And is it fair to say that you have had no
2  personal involvement in or interaction with the State of Texas
3  Carrizo cane eradication program?
4      A.   Yes, that's correct.
5      Q.   Okay.  Now, your expert report that is Exhibit 3 to
6  your deposition includes a summary of your opinions on Page 2.
7          Do you see that?
8      A.   Yes, sir.
9      Q.   The first opinion summary is, "The Rio Grande,
10  between River Miles 275 to 610, has sufficient water flows to
11  support navigation of the waterway by Class A and Class -- is
12  that I or 1?
13     A.   1, yes, sir.
14     Q.   "1 vessels."
15         Conclusion or Opinion B is summarized as, quote,
16  The Rio Grande between the River Miles 275.5 through 610 is
17  presently navigated by Class A and Class I vessels.  And
18  summary of Opinion C is, quote, Reasonable improvements can be
19  made in the Rio Grande between Rivers Miles 275.5 to 610 to
20  enhance and incrementally improve navigation.
21         Now, all of those opinions use the word
22  "navigation" or "navigated."  Could you give me, as best you
23  can, the -- the definition or the meaning of navigation as
24  you're using it in your opinions in this case?
25     A.   Sir, yes, sir.  Essentially, it is intended to say a

42

1 usable body of water with a vessel.
2    Q.   So it's use of a body of water by a vessel?
3    A.   In this situation, yes.
4    Q.   Okay.  Is it fair to say that you don't have any
5 opinions or express any opinions in this report as to the
6 meaning of navigation as used in the Rivers and Harbors Act?
7        MR. KNUDSEN:  Object to form.
8    A.   I would not agree with that.  When -- when you're
9 talking about navigation, I'm talking about the ability to use
10 a vessel in -- in a body of water.  As far as how it -- the way
11 I understand the Rivers and Harbors Act, it is my belief that
12 those opinions com- -- comply with what that intent is when the
13 Rivers and Harbors Act start -- talks about has it been used,
14 is it used or can improvements be made to -- to improve
15 navigation.
16    Q.   (BY MR. BRYANT)  Is it fair to say that the
17 definition of "navigation" as used in your expert report simply
18 refers to the use of a vessel on a body of water, and does not
19 necessarily require use of a vessel for commerce or trade?
20    A.   I think -- and the intent, it depends on what the
21 intent of commerce or trade is, because I do know that there's
22 folks that rent vessels.  That's a commerce.  I don't -- I
23 don't pretend to say I understand all of the -- the definitions
24 of commerce and trade.  But economic activities do occur
25 associated with that body of water, yes, sir.

43

1        However, the -- it is accurate to state that
2 when I'm talking about "navigation," I'm speaking of using a
3 vessel on the water to get to and from Point A to Point B.
4    Q.   And is it fair to say that the way you use navigation
5 in your report might or might not include use of the vessel --
6 vessel for commerce or trade?  Might just be for recreation --
7    A.   It could be --
8    Q.   -- might just be for commerce and trade?
9    A.   Correct.  That's -- that's a fair statement.
10    Q.   Okay.  And in your opinions in the expert report, you
11 talk about the possibility of making some improvements in the
12 Rio Grande River from 275 to 610 by changing the present
13 practices as to releases of water from Amistad Dam; is that
14 right?
15    A.   That's correct, yes, sir.
16    Q.   And do you have any opinions as to what amounts of
17 water would need to be released from Amistad beyond what's now
18 being released to achieve those improvements?
19    A.   In order to answer that question, you would have to
20 have the full design of one or more of the improvements that
21 I've discussed in here to determine how much water would need
22 to be additionally supplied.
23    Q.   And you have not either made such a design or caused
24 anyone to make such a design today?
25    A.   No, sir.  I have not.

44

1    Q.   So is it fair to say that you have no opinion at this
2 time as to what amounts of water would need to be released from
3 Amistad Dam beyond current practices to achieve the
4 improvements to navigation that you envision in your report?
5    A.   It would be fair to say that depending on the scope
6 that I was given, that we would have to know what the
7 expectation was to implement how much water.  There's not -- I
8 can't really say it's going to take X number of -- of more CFS
9 flow rate without knowing how much of an improvement we're --
10 we're seeking.  And in order to do that, I would have to know
11 what the -- the expectations would be for what type of -- of
12 additional vessels or what have you.
13    Q.   Okay.  So as a result of those things, today, you
14 have no opinion on the amount of additional releases of water
15 from Amistad Dam that would be necessary to achieve any
16 particular level of improvement of navigation of the Rio Grande
17 River from 275 to 610?
18    A.   I do not have a flow number, no, sir.  I -- I
19 don't -- because it depends, again, on what other incremental
20 activities we would perform in conjunction with that.  It --
21 and it could be -- it just depends on what that is.  It depends
22 on what the goal is.
23    Q.   Okay.  And you don't have a particular goal in mind
24 with respect to your expert opinions?
25    A.   The only -- the only assumptions that I was given was

45

1 that I had funding and authorizations to go do so, treaties, I
2 didn't have to worry about that.  So could incremental
3 increases to the ability to utilize the river be achieved.
4    Q.   Do you have any opinion as to the timing of
5 additional releases from Amistad Dam that would be necessary to
6 achieve any particular level of improvement of navigation in
7 the Rio Grande River from 275 to 610?
8    A.   Again, I would need to know more information on what
9 the expectation would be.  There's going to be dryer months,
10 dryer periods, there's going to be wetter periods.  It depends
11 on what the request would be to determine how much we would
12 need and when we would need it, what would be the most
13 feasible, that -- that kind of thing.
14    Q.   Do you have any opinion as to what levels in the Rio
15 Grande River from 275 to 610 are needed to enable the use of
16 that stretch as a highway for commerce or trade?
17        MR. KNUDSEN:  Object to form.
18    A.   It would depend upon the level of -- of -- of
19 commerce and trade taking place, and that would equate to a
20 certain vessel, and then if that's what one of the constraints
21 were, then we would use that to determine what -- what the
22 additional amounts and/or depth would need to be.
23    Q.   (BY MR. BRYANT)  Okay.  And is it fair to say that as
24 you sit here, you have no opinions on that subject until
25 someone gives you a -- a -- some specifications as to the

46

1 vessels that would be using the river for commerce and trade?
2         MR. KNUDSEN:  Object to form.
3     A.  Yes, sir -- yes, sir.  That's correct.
4     Q.  (BY MR. BRYANT)  Okay.  So for example, if I -- or if
5 the United States were to tell you, "We need to accommodate
6 vessels that have a draft of at least six feet," would you have
7 any opinion today as to what amounts and timing of releases
8 would be necessary to accomplish that in the Rio Grande River
9 stretch 275 to 610?
10    A.  I would not as far as releases goes, no.
11    Q.  Do you know whether that would even be possible?
12    A.  I would assume that it would be possible as far as
13 the -- the order of precedence as water is used in a -- in a --
14 like, at Amistad, for instance, if you utilize the waters for a
15 different reason, for different purposes, if you -- you know,
16 that kind of thing, then you may be able to do that.
17        Again, the biggest issue would be if you had
18 that -- that depth, we've already discussed that there are, you
19 know, shallow areas, that's the bigger issue that you would
20 have to, you know, overcome first.
21    Q.  Okay.  Let me see if I can understand that one.
22        I assume that if you're going to accommodate
23 ships that had a draft of at least six feet, there would have
24 to be a channel in the Rio Grande River from 275 to 610 that
25 was greater than six feet deep; is that right?

47

1         MR. KNUDSEN:  Object to form.
2     A.  You would have to have an appropriate depth
3 throughout that entire stretch.
4     Q.  (BY MR. BRYANT)  And is it fair to say that in the
5 event of vessels with six-feet draft, it would be -- an
6 appropriate depth would be, to some extent, greater than six
7 feet?
8     A.  Typically speaking, yes, that would need to be
9 greater than six feet.
10    Q.  Okay.  And have you done any work to determine what
11 improvements would be necessary to accomplish either a channel
12 that would accomplish -- that would accommodate vessels with
13 drafts of six feet or any other particular amount of draft,
14 whether it's 3 feet, 6 feet, 9 feet or 12 feet?
15        MR. KNUDSEN:  Object to form.
16    Q.  (BY MR. BRYANT)  Or any other?
17        MR. KNUDSEN:  Same.
18    A.  The -- the activities that I've discussed inside the
19 report is what I have considered as far as --
20    Q.  (BY MR. BRYANT)  Okay.
21    A.  -- shoaling or shallow areas, you're going to have,
22 topographically speaking, more shallow areas in others than
23 you're going to have the potential of sedimentation falling out
24 and causing areas, so those would have to be taken care of.
25    Q.  And I did not see any reference in your report to

48

1 accommodating vessels of any particular draft; is that correct?
2     A.  That is correct.  Yes, sir.
3     Q.  Okay.  Now, you talked about Class A and Class I
4 vessels.
5     A.  Yes, sir.
6     Q.  And what's the typical maximum draft of vessels in
7 those classes?
8     A.  Class A is your canoes and kayaks, that kind of an
9 activity.  They're going to be, you know -- you say "typical
10 draft," we're talking about maximums and minimums right now.
11    Q.  Okay.
12    A.  So not necessarily what, you know, someone may
13 desire, but as a kayak and canoe guy myself, you know, you can
14 get into, you know, three, four inches of water and maneuver
15 around just fine.  Class I, there are vessels that can go down
16 and have a draft of as little as four or five inches also.
17 Again, maybe not the most practical dips.  You would want more
18 than that, you know, 18 to 2 -- 18 inches to 2 feet, probably,
19 for Class I.
20    Q.  Okay.  And so if you put those two together, Class A
21 and Class I, is the maximum draft around two feet?
22    A.  I would not -- I wouldn't say a "maximum draft," no,
23 sir.  It depends on the -- the hull type, depends on the --
24 propulsion type, it depends on a lot of different factors.
25    Q.  What would you estimate as a maximum?

49

1         MR. KNUDSEN:  Object to form.
2     A.  I would -- I would have to have what type of vessel
3 it is and what -- what you're doing with it, and how much
4 weight's going to be on it and that stuff to determine an
5 approximate.  I -- it's -- I'm not trying to be evasive here,
6 sir, I'm just -- it's -- it's one of those situations where
7 it -- it greatly depends on the type of vessel, the type of
8 propulsion, and what the intended use of that vessel is.
9     Q.  (BY MR. BRYANT)  If you look at a Class A vessel or a
10 Class I vessel, what would you say is the maximum weight of
11 goods and personnel that they could safely carry?
12        MR. KNUDSEN:  Object to form.
13    A.  And again, it's going to greatly vary from one vessel
14 to another.  I personally have a 17-foot -- 17-and-a-half-foot
15 aluminum craft vessel.  You can put 3 to 4 people in that, 750
16 pounds, 800 pounds.  However, you can have a Class I pontoon
17 barge that's 20 feet that can hold a lot more than that, you
18 know, 8 people, you know, well -- well over 400 pounds.  So it
19 just -- it -- it greatly depends on the types of vessel and the
20 type of -- of hull, the type of propulsion, and the intended
21 use.
22    Q.  (BY MR. BRYANT)  You list in your expert report a
23 number of potential sources of improvements to the Rio Grande
24 River from Mile 275 to 610.
25    A.  Yes, sir.

50

1    Q.  Do you have any opinion as to the costs of doing any
2  or all of those improvements --
3          MR. KNUDSEN:  Object to form.
4    Q.  (BY MR. BRYANT)  -- throughout that stretch?
5          MR. KNUDSEN:  Sorry.  Object to form.
6    A.  I did not develop any cost estimates for these.
7    Q.  (BY MR. BRYANT)  Are you aware of any cost estimates?
8          MR. KNUDSEN:  Object to form.
9    A.  I'm not.
10   Q.  (BY MR. BRYANT)  Whether -- whether or not you
11 developed them personally or not?
12   A.  Oh, no, sir.  I'm not aware of any cost estimates.
13   Q.  Are you aware of any quantification of economic
14 benefits that could be derived from doing any or all of the
15 proposed improvements suggested in your expert report on the
16 Rio Grande between 275 and 610?
17         MR. KNUDSEN:  Object to form.
18   A.  Part of the assumptions provided to me was that the
19 feasibility of such and the economics and such wa- -- was
20 already taken into account, and that I had carte blanche to do
21 what needed to be done.
22   Q.  (BY MR. BRYANT)  Okay.  So it's fair to say that
23 you -- you didn't do any attempt of a quantification of any
24 economic benefits from doing any or all of the improvements
25 that are set forth in your expert report?

51

1    A.  I did not put any estimates together, no, sir.
2    Q.  And you're not aware of any estimates that exist from
3  any other source?
4          MR. KNUDSEN:  Object to form.
5    A.  I'm -- I'm not aware of any.  I didn't research any
6  of that.
7    Q.  (BY MR. BRYANT)  Do you have any opinion as to
8  whether and to what extent commercial navigation of the river
9  stretch between 275 and 610 would increase if any or all of the
10 proposed improvements that you describe in your expert report
11 were accomplished?
12         MR. KNUDSEN:  Object to form.
13   A.  This is -- again, the assumption is that I was given
14 a set of -- set of assumptions that incremental -- that I had
15 the authority and the money to implement incremental
16 activities.  So depending on how much you want to do is what --
17 is what I would -- we would have to go, then, study.  I can't
18 give you an answer to that.  I...
19   Q.  (BY MR. BRYANT)  So there are no assumptions that you
20 made as to whether or to what extent any of the improvements
21 that you suggest would increase the amount of commercial
22 navigation in the 275 to 610 stretch?
23         MR. KNUDSEN:  Object to form.
24   A.  Correct.  I did not consider that whatsoever.  I
25 considered is it possible to make incremental improvements.

52

1    Q.  (BY MR. BRYANT)  Do you have any opinions as to when
2  any of the possible improvements suggested in your expert
3  report can or should be made?
4          MR. KNUDSEN:  Object to form.
5    A.  That -- that's not -- I didn't study any of that, and
6  that was not the -- the -- the request at hand.
7    Q.  (BY MR. BRYANT)  Is it correct that Lake Amistad has
8  no locks or other means that would allow a vessel to travel
9  directly from Amistad Reservoir to the Rio Grande River below
10 the dam?
11   A.  That's my understanding, yes, sir.
12   Q.  Is it correct that Falcon Dam has no locks that would
13 allow a vessel to travel from the Falcon Reservoir to the
14 Rio Grande River below Falcon Dam directly?
15   A.  That's my understanding, yes, sir.
16   Q.  Okay.  Do you have any opinions as to whether it
17 would be possible to modify either of those dams to allow
18 vessels to travel from above the dam to the Rio Grande River
19 below the dam without putting the -- putting the vessel on land
20 and going around the dam?
21   A.  To -- to verify or clarify the question, sir.
22   Q.  Okay.
23   A.  Are you -- are you asking is it possible to put a
24 lock in?
25   Q.  That would be the --

53

1    A.  I --
2    Q.  -- that would be the obvious way to do it from my
3  standpoint, but I didn't limit you to that.
4    A.  Understood.  Yes, sir.
5          I'm not an engineer and I'm not a designer.
6  However, provided the level of funding needed, if we were told
7  to go do it, I'm sure that we can -- we could put a lock in.
8    Q.  Would you recommend it?
9    A.  If that's what Congress asked us to go do, then
10 that's what we would go do.
11   Q.  If Congress didn't ask you, would you propose it?
12   A.  It's not my job to propose it, so it's -- I --
13   Q.  Would you agree that it would be pretty impractical
14 in comparison to any benefits that could be gained?
15         MR. KNUDSEN:  Object to form.
16   A.  Yeah.  I really don't have a basis to make that
17 judgment because it would depend on the project totally.
18   Q.  (BY MR. BRYANT)  In your opinion marked A -- summary
19 marked A, it states that the Rio Grande between River Miles 275
20 to 610 has, quote, Sufficient water flows to support navigation
21 of the waterway, unquote.
22         How do you define "sufficient flows"?
23   A.  Can vessels currently use it?  And by my
24 observations, the answer's "yes."
25   Q.  And is the answer "yes" only for Class A and Class I

54

1  vessels?
2      A.  As far as what I looked into what would be -- what
3  my -- the current state of the river, I would say that that's
4  the most reasonable expectation, yes, sir.
5      Q.  Is it fair to say that you could not express the
6  opinion that the river currently has sufficient flows to
7  support navigation by vessels that are longer or larger than
8  are in Class A and Class I?
9          MR. KNUDSEN:  Object to form.
10     A.  Anecdotally, there's been -- and I -- it's part of
11 the information that I talk about in here, up and down the
12 Rio Grande there were -- under internet searches, and as well
13 as even under one photo that was of the barge that was used by
14 the State to place some of the buoys, those are -- I -- not 100
15 percent sure how big the barge was, because I just saw the
16 vessel.  I didn't see the -- the make and model.
17         However, there are larger than Class I vessels
18 in certain stretches of the river.  As far as how often, it's
19 going to depend on water flow.  But typically speaking, Class I
20 and lower is a more reasonable expectation at this time.
21     Q.  (BY MR. BRYANT)  Okay.  And so my -- my question was,
22 whether or not you would be willing to express an opinion or
23 that you have an opinion as to whether there are currently
24 sufficient water flows to support navigation of the waterway
25 from 275 to 610 by larger vessels than Class A or Class I?

55

1          MR. KNUDSEN:  Object to form.
2      A.  The reason I said Class A and Class 1 in this report
3  was because Class -- anything larger than the Class 1 vessels
4  would be very difficult to -- to use at this point in time,
5  yes, sir.
6      Q.  (BY MR. BRYANT)  Okay.  And because of that, you
7  would not be able to state an opinion at this time as to
8  whether or not there's sufficient water flows to support those
9  larger vessels?
10     A.  Other than at certain periods of time when the water
11 flows are higher.
12     Q.  Any particular height that is nec- -- would be
13 necessary for you to state such an opinion?
14         MR. KNUDSEN:  Object to form.
15     A.  I can't give you a -- an amount -- a flow rate, if
16 you will.  The -- one of the biggest concerns would be the more
17 narrow spots, if you had to turn the vessel around, tho- --
18 those kind of things.  That's why I was saying that a Class 1
19 and lower would be most practical at this point in time.
20     Q.  (BY MR. BRYANT)  Is it fair to say that you could not
21 provide an opinion that the 275.5 to 610 stretch is currently
22 navigable by vessels with a draft of six feet or greater?
23         MR. KNUDSEN:  Object to the form.
24     A.  I'd say in portions it is, and in portion s it's not.
25     Q.  (BY MR. BRYANT)  Okay.  What portions is it navigable

56

1  by such vessels?
2      A.  The areas that I went and looked at with the Border
3  Patrol in particular is one example of an area that most of
4  that is.  However, there were two spots between the areas that
5  we went that would be dif- -- you would not be able to get a
6  draft of six feet through there.
7      Q.  Can -- and of course that's the only part of the
8  river you've ever seen, right?
9      A.  Correct.  Well, not co- -- not seen.  Been on.
10     Q.  Is -- is that -- is there any other part of the
11 335-mile stretch covered by the Fort Worth District that you
12 could state can currently accommodate vessels with drafts of
13 six feet or greater?
14     A.  It will most likely be the entire length of that
15 would be just like what I saw.  Portions would be able to, and
16 portions would not be able to.
17     Q.  And you can't say which ones?
18     A.  Well, at this point today, it may be this spot, and a
19 year from now, it could be at a different spot.  It depends on
20 sedimentation, it depends on all those kind of things.
21     Q.  Is that stretch of the river -- river a stretch that
22 in which the depth of the water can vary dramatically?
23     A.  Yes, sir.
24     Q.  And is it a stretch of the river in which the depth
25 of the water can vary significantly in a short period of time?

57

1          MR. KNUDSEN:  Object to form.
2      A.  Flash flooding can occur, yes, sir, in a hurry.  And
3  then it can be taken over by a drought, and so you can have too
4  much or little water.
5      Q.  (BY MR. BRYANT)  It is also true that the depth of
6  the river can change dramatically just from releases from
7  Amistad Dam?
8          MR. KNUDSEN:  Object to form.
9      A.  It can, depending upon, you know, the -- the flow
10 rates from the dam, then that would be compounded by rainfall
11 and spring flow as well.
12     Q.  (BY MR. BRYANT)  Are you aware of an area in the 275
13 to 610 stretch that is or has been known as Kingsbury Falls?
14     A.  No, sir, I'm not.
15     Q.  Are you aware of any falls or rapids in the Rio
16 Grande River in the 275 to 610 stretch?
17     A.  Just is what's referenced in the report, the 1975
18 report.
19     Q.  Are you aware of an area in the 275 to 610 stretch
20 that is or was known as Las Islitas?
21     A.  No, sir.
22     Q.  Are you aware of a stretch of the Rio Grande River in
23 the 275 to 610 stretch in which there are a large number of
24 islands that largely block the passage of vessels up and down
25 the river?

58

1          MR. KNUDSEN: Object to form.
2     A.   On the area that we went, there is a -- an island, if
3 you will, that -- that you would have to go around, yes, sir.
4     Q.   (BY MR. BRYANT) That's near Eagle Pass?
5     A.   Yes, sir.
6     Q.   Are you aware of any other part of the 335-mile
7 stretch from 275 to 610 in which there are islands that can
8 block vessels from going up or down the Rio Grande River?
9     A.   No.  There currently ve- -- may very well be.
10    Q.   Are you aware of any vessel that has traveled the
11 entire 275 to 610 stretch of the Rio Grande River?
12    A.   Just as what's referenced inside the 1975 report.
13    Q.   Are you aware of any instances in your 29 years with
14 the Fort Worth District in which anyone who shipped commercial
15 goods on the Rio Grande River from Eagle Pass or Piedras Negras
16 to cities further downstream in the Rio Grande?
17    A.   I'm not aware of it.
18    Q.   Are you aware of any instances in the 29 years with
19 the Fort Worth District in which commercial goods have been
20 shipped on the Rio Grande from Eagle Pass or Piedras Negras to
21 any cities or other points on the Rio Grande upriver from Eagle
22 Pass or Piedras Negras?
23    A.   I'm not aware of it.
24    Q.   Are you aware of any commercial shipments in your 29
25 years with Fort Worth District on the Rio Grande from El Paso

59

1 to any points within the 275 to 610 stretch of the Rio Grande?
2     A.   I'm not aware.
3     Q.   Are you aware of any commercial shipments on the Rio
4 Grande from any -- any points in the Albuquerque District in
5 the Corps of Engineers to any points in the 275 to 610 stretch
6 of the Rio Grande covered by the Fort Worth District?
7     A.   I'm not aware of any of those.
8     Q.   Are you aware of any commercial shipments or goods on
9 the Rio Grande in your 29 years from any point in the 275 to
10 610 stretch of the Rio Grande to any points that are in the
11 Galveston District of the Army Corps of Engineers?
12    A.   I'm not aware of any.
13    Q.   And are you aware of any commercial shipments or
14 goods on the Rio Grande in your 29 years from any point in the
15 275 to 610 stretch of the Rio Grande covered by the Fort Worth
16 District to the Gulf of Mexico or to any foreign ports?
17    A.   I'm not aware.
18    Q.   Is it fair to say that you're not aware of any
19 current or past use of the Rio Grande in the 275 to 610 stretch
20 as a highway of a commercial shipping or trade to any other
21 state or any foreign country?
22          MR. KNUDSEN: Object to form.
23    A.   Yeah.  The only references of the navigation of that
24 area that would be similar to that is inside the 1975 report.
25    Q.   (BY MR. BRYANT) And could you point out anything,

60

1 even in that report, that would fit that description?
2     A.   Just discussions that it's possible.
3     Q.   Just the discussion that it could be possible?
4     A.   Yes, sir.
5     Q.   Has the Fort Worth District of the Corps of Engineers
6 granted any permits, licenses, leases or construction contracts
7 that are now in effect for businesses to operate for profit on
8 the Rio Grande anywhere between 275 and 610?
9          MR. KNUDSEN: Object to form.
10    A.   Yeah.  I don't believe that's our -- ours to issue
11 permits for.
12    Q.   (BY MR. BRYANT) Whose -- whose is it?
13    A.   I would assume that would be IBWC.
14    Q.   Okay.  Are you aware of any such permits or licenses
15 or concessions granted by the IBWC for that 275 to 610 stretch
16 of river?
17    A.   I'm not.
18    Q.   We touched a little bit earlier on this term
19 "project."
20          Would you consider any of the Rio Grande between
21 275 and 610 to be Corps of Engineers project waters?
22          MR. KNUDSEN: Object to form.
23    A.   Not in the definition that I use "project," no, sir.
24    Q.   (BY MR. BRYANT) Okay.  In 36 CFR Section 327.3, it
25 states, and I'm just paraphrasing here, that the placement

61

1 and/or operation of any vessel or watercraft for a fee or
2 profit upon project waters or lands is prohibited except as
3 author- -- authorized by permit, lease, license or concession
4 contract with the Department of the Army.
5          Is it your testimony that no such permits,
6 leases, licenses or concession contracts have been issued by
7 the Army or the Army Corps of Engineers with respect to the
8 Rio Grande River between Miles 275.5 and 610?
9          MR. KNUDSEN: Object to form.
10    A.   Part 3 -- Title 36, Part 327 applies to fee-owned
11 properties where we operate and maintain the entirety of the
12 project.  And the -- the items that you -- that you listed may
13 occur on those for those project areas, as long as it is under
14 an appropriate real estate instrument.  We don't issue real
15 estate instruments for those type of activities on the Rio
16 Grande.
17    Q.   (BY MR. BRYANT) So is the answer to my question that
18 you're not aware of any such leases -- leases, licenses,
19 permits or concession contracts that the Army or the Army Corps
20 of Engineers has issued or granted with respect to the 275 to
21 610 stretch?
22          MR. KNUDSEN: Object to form.
23    A.   Yeah.  I am not aware of any.
24    Q.   (BY MR. BRYANT) And is it also true that you're not
25 aware of any such permits, licenses, leases or contracts issued

62

1 by any other governmental entity for operations on the 275 to
2 610 stretch for a fee or a profit?
3          MR. KNUDSEN:  Object to form.
4      A.  Well, the only -- I'm not aware of those activities
5 due to that not -- not being something that I would have looked
6 into for -- for purposes of increasing the potential of
7 navigation.  So I -- I did not review -- substantially review
8 anything.  I did a couple of small looks and saw some rental
9 agreements like I had talked about earlier that local folks may
10 use that for -- for their businesses.  If they have to have a
11 permit, I'm not aware of who they would have gotten the permit
12 from.
13     Q.  (BY MR. BRYANT)  Okay.  Are you -- are you aware of
14 any permits, licenses, leases or concessions that the Army or
15 Army Corps of Engineers have granted for -- for profit
16 activities on Amistad Reservoir?
17          MR. KNUDSEN:  Object to form.
18     A.  I'm not aware of any, and we don't issue permits for
19 commercial concessions on Amistad.
20     Q.  (BY MR. BRYANT)  Are you aware of any such permits,
21 licenses, leases or concessions with respect to Falcon
22 Reservoir?
23          MR. KNUDSEN:  Object to form.
24     A.  Same.  We -- I don't have any.
25     Q.  (BY MR. BRYANT)  Are you aware of any commercial

63

1 fi- -- fishing operations on the stretch of Rio Grande between
2 275 to 610?
3          MR. KNUDSEN:  Object to form.
4      A.  If "commercial" is defined as fishing guides, there's
5 references online that can readily be found.  But as far as
6 issuing a permit or knowing firsthand about them, other than a
7 quick search on the internet, no.
8      A.  I'm not aware of any.
9      Q.  (BY MR. BRYANT)  And another -- strike that.
10          Are you aware of any conduct of a -- a business
11 to catch fish for a profit or sell fish caught in the river --
12     A.  Oh, okay.
13     Q.  -- for a profit?
14          MR. KNUDSEN:  Object to form.
15     A.  I'm not aware of any, no, sir.
16     Q.  (BY MR. BRYANT)  Okay.  What, if any, channel
17 maintenance activities does the Fort Worth District of the Army
18 Corps of Engineers engage in now with respect to the 275 to 610
19 stretch of the Rio Grande River?
20     A.  I'm not aware of any.
21     Q.  And is that true for the entire 29 years you've been
22 with the Fort Worth District?
23     A.  Correct.  I'm not aware of any -- any activities.
24     Q.  Your expert report suggests various types of work
25 within the channel of the Rio Grande River in that stretch as a

64

1 possible improvement to navigation of the river; is that
2 correct?
3      A.  Yes, sir.
4      Q.  Would the Army Corps of Engineers have the authority
5 to do that?
6          MR. KNUDSEN:  Object to form.
7      A.  The assumptions that I was given was that Congress
8 has -- has already authorized that.  And then if we were to do
9 so, then yes, we would have -- they would have the authority to
10 move forward.
11     Q.  (BY MR. BRYANT)  Absent a congressional act, would
12 the Corps of Engineers have authority under its current
13 congressional authority to improve the channel of the
14 Rio Grande River between 275 to 610?
15          MR. KNUDSEN:  Object to form.
16     A.  I'm -- I'm not the chief of civil works, so that --
17 that would be a civil works project.  I operate and maintain
18 civil works projects, but they've already gone through the
19 process that you're describing.  If -- if an entity that had
20 the authority to -- to do that asked for us to go do it, then I
21 believe, yes, we would have the authority -- overarching
22 authority to do it, but we would need additional authority from
23 Congress for a specific project.
24     Q.  (BY MR. BRYANT)  Would the Army Corps of Engineers
25 also need the approval of any other governmental bodies, such

65

1 as the IBWC?
2          MR. KNUDSEN:  Object to form.
3      A.  In that process, there would be a sponsor.  My
4 assumption in this case would be the IBWC.  In that process
5 would also be the National Environmental Policy Act.  We would
6 have to -- there's -- there's things inside there that we would
7 coordinate with other entities, Federal entities, State
8 governments, as well as, potentially, the municipalities.
9      Q.  (BY MR. BRYANT)  If I understand your answer
10 correctly, accomplishing the improvements suggested in your
11 expert report that involved activities in the channel of the
12 Rio Grande between 275 to 610 would require consent not only of
13 Congress, but also a sponsor, such as the IBWC; is that
14 correct?
15          MR. KNUDSEN:  Object to form.
16     A.  It would -- it would require a sponsor.  As far as
17 consent, that -- that would be assumed if the sponsor came to
18 us and said, "We would like to do that."
19     Q.  (BY MR. BRYANT)  That's part of sponsoring, is
20 consent to what is being sponsored, right?
21     A.  So -- so yes.  The sponsor would -- would ask us,
22 "Can -- can we -- can we do this, and can you assist with
23 that?"
24     Q.  Okay.  And if I understand your answer correctly, it
25 would also require environmental clearances of various types?

66

1    A.  Yes, sir.
2    Q.  And what agencies of what governments would that
3  clearance have to come from?
4    A.  Just various land managing agencies within the United
5  States Government.  We also coordinate with all local sponsors
6  or governmental entities as well as the states.  So just, you
7  know, within the state, I believe, TCEQ would be involved,
8  Texas Commission on Environmental Quality would be involved,
9  EPA would be involved, U.S. Fish and Wildlife.  Tho- -- those
10  types of folks would be involved to ensure that -- that all of
11  the elements of the National Environmental Policy Act were
12  adhered to and addressed.
13    Q.  Okay.  Would it require compliance with any Texas
14  laws?
15       MR. KNUDSEN:  Object to form.
16    A.  It would -- it would require us to coordinate with
17  Texas, yes.  As far as the actual laws, if there's a Texas law,
18  I'm not aware of which law it would be.  However, I am aware
19  that the State's basic tenets are -- for the types of
20  activities that I'm discussing, for instance, I've referenced
21  TCEQ, is based in regulations and law that comes from the
22  Federal Government, so it's, kind of, all wrapped into one
23  thing.
24    Q.  (BY MR. BRYANT)  Okay.  And when you use the term
25  "coordinate with," does that encompass the idea that the other

67

1  group with whom you're coordinating has to agree to the course
2  of action that is proposed?
3    A.  That's definitely the hope, yes, sir.  The -- the --
4  when I say "coordinate with," it is on a good faith effort to
5  make sure that if I've got -- if the Corps of Engineers, not I,
6  Tim, but if the Corps of Engineers has folks that are
7  performing those functions, live elsewhere, they may not have
8  firsthand knowledge of something, then they're going to
9  coordinate with those entities that would, whether it's
10  invasive species, State listed species, whether it's co- -- you
11  know, whatever the case is, that's what the coordination is
12  there for.  Could be historical, cultural, just all kinds of
13  different things.
14    Q.  Okay.  And again, I'm trying to get down to the
15  fundamental question of if you attempt to coordinate and you
16  don't see 100 percent eye to eye, can the Corps of Engineers go
17  ahead and do what it thinks is best or does it need actual
18  consent from the coordinating agencies?
19       MR. KNUDSEN:  Object to form.
20    A.  Being that I've not been in that situation, the
21  desire is always to coordinate, and if we don't completely
22  agree, we typically come to an agreement on what is -- what --
23  what can and can't work.  And if we have to make adjustments,
24  then we typically do.
25    Q.  (BY MR. BRYANT)  Okay.  Would you need to coordinate

68

1  with any Mexican authorities, either the government of Mexico
2  or at the states of Coahuila or Tamaulipas in order to
3  accomplish what is proposed in your expert report as reasonable
4  improvements to the Rio Grande River in the 275 to 610 stretch?
5       MR. KNUDSEN:  Object to form.
6    A.  I was provided an assumption that that had already
7  been done.  So as far as that -- that goes, my assumption is
8  that -- yes.
9    Q.  (BY MR. BRYANT)  Okay.  Well, let me give you an
10  assumption that it was not done.
11       Would you need to do it?
12       MR. KNUDSEN:  Object to form.
13    A.  My general practice is, of course, anyone that's
14  affected by such an activity is -- that's the purpose of NEPA
15  is to reach out and coordinate with those entities that could
16  be affected.
17    Q.  (BY MR. BRYANT)  Are you aware of any endangered
18  species that would be affected by any of the improvements that
19  are proposed in your expert report?
20       MR. KNUDSEN:  Object to form.
21    A.  Yeah.  I didn't re- -- research that.  Just -- but
22  off the top of my head, I'm not currently aware of any species
23  that would be affected.
24    Q.  (BY MR. BRYANT)  Would such an investigation need to
25  be done before any of those reasonable improvements could be

69

1  undertaken?
2       MR. KNUDSEN:  Object to form.
3    A.  Yeah.  That was an assumption that those kind of
4  activities were already done, but that's part of NEPA, yes,
5  sir.
6    Q.  (BY MR. BRYANT)  Was the assumption that you were
7  given was that all necessary per- -- permissions and
8  investigations had been done, so that there were no regulatory
9  obstacles or issues with respect to any of the reasonable
10  improvements?
11       MR. KNUDSEN:  Object to form.
12    A.  The assumptions I was given was that all clearances
13  had already been obtained, and authorization was provided.
14    Q.  (BY MR. BRYANT)  Do you have any knowledge as to what
15  depth of river channels have been implemented by the Corps of
16  Engineers and other districts in order to enable commercial
17  navigation on other rivers in the United States besides the
18  Rio Grande?
19       MR. KNUDSEN:  Object to form.
20    A.  Yeah.  I -- I didn't research any of that.  I'm not
21  aware of what those depths are.
22    Q.  (BY MR. BRYANT)  Okay.  So you have no information as
23  to the depth of the channels that the Corps of Engineer ma- --
24  Corps of Engineers maintains, for example, in the Mississippi
25  River to enable the navigation of the river?

70

1         MR. KNUDSEN: Object to form.
2      A.   I'm not -- I'm not aware of what those averages are,
3   no, sir.
4      Q.   (BY MR. BRYANT) Are you aware of the width of the
5   channel that is maintained by the Army Corps of Engineers in
6   other inland U.S. waterways to enable commercial navigation?
7         MR. KNUDSEN: Object to form.
8      A.   I did not research any of that. I'm not aware, sir.
9      Q.   (BY MR. BRYANT) Are you aware of the minimum depth
10  of the channel required for the intracoastal waterway around
11  parts of the coast of the United States?
12     A.   I'm not aware of the depths.
13     Q.   Are you aware of the depth of the channel required
14  for commercial navigation on the Tennessee and Tombigbee
15  Rivers?
16        MR. KNUDSEN: Object to form.
17     A.   I'm not aware of what those...
18     Q.   (BY MR. BRYANT) Do you have any knowledge as to the
19  estimated cost for creating a channel of the minimum depth --
20  depth required for commercial navigation elsewhere by the Corps
21  of Engineers in the 275 to 610 stretch of the Rio Grande River?
22        MR. KNUDSEN: Object to form.
23     A.   I'm not aware of any of those.
24     Q.   (BY MR. BRYANT) Is that the same answer if I ask you
25  that question for the stretch of the Rio Grande River from the

71

1   El Paso -- from El Paso to the Gulf of Mexico?
2         MR. KNUDSEN: Object to form.
3      A.   That's correct.
4      Q.   (BY MR. BRYANT) And is the answer the same if I ask
5   you that question for the portion of the Rio Grande River from
6   Eagle Pass to the Gulf of Mexico?
7         MR. KNUDSEN: Object to form.
8      A.   Yes, that's correct.
9      Q.   (BY MR. BRYANT) Do you have any estimates for the
10  cost of dredging a channel in a river -- any river in the
11  United States suitable for commercial navigation per mile?
12        MR. KNUDSEN: Object to form.
13     A.   I do not have any of those estimates, no.
14     Q.   (BY MR. BRYANT) And you don't have that for any
15  portions of the Rio Grande River either?
16        MR. KNUDSEN: Object to form.
17     A.   I do not, no.
18     Q.   (BY MR. BRYANT) Has the Fort Worth District ever
19  requested from Congress funds to improve navigation anywhere in
20  the 275 to 610-mile stretch of the Rio Grande covered by the
21  Fort Worth District?
22     A.   I'm not aware of that. I don't know.
23     Q.   Are you aware of any request from Congress for any
24  funds to do any improvements for purposes of navigation
25  anywhere in the Rio Grande River?

72

1      A.   I'm not aware of that, no. And, specifically,
2   staying between the 275 to 610 range, I can't speak on behalf
3   of Galveston District.
4      Q.   Well, I understand that that's your territory.
5      A.   Right.
6      Q.   If you happen to know anything --
7      A.   Certainly.
8      Q.   -- in the Albuquerque District or the Galveston
9   District, I would request that you tell me that.
10     A.   Yes, sir. Understood.
11     Q.   And you don't know anything?
12     A.   All I know is we have -- Galveston District takes
13  care of navigation in their district. I don't -- I would
14  assume they ask for funding, yes, sir.
15     Q.   But you have no knowledge of whether they do or not?
16     A.   I have no knowledge of what they ask for.
17     Q.   And do you know of any funding that Congress has ever
18  granted for any improvements for the purposes of navigation to
19  any part of the Rio Grande River?
20     A.   I can't speak to the part that's not -- that's
21  outside of my 275 to 610. We do have navigation down there as
22  the Corps of Engineers, but I don't -- I don't deal with that.
23  I don't ask for budget request money. I don't -- I don't deal
24  with that, so I can't say that -- that it's not asked for. I
25  just -- I'm not aware of it.

73

1      Q.   My request was about funds that are -- have actually
2   been granted by Congress. Are you aware of any such funds
3   being granted by Congress for any improvements to navigation to
4   the Rio Grande River at any locations?
5      A.   In specificity, no.
6      Q.   If congress-- additional congressional funding were
7   not available, would any or all of the reasonable improvements
8   envisioned in your expert report be feasible within the current
9   avail- -- budget available to the Fort Worth District for an
10  engineer?
11        MR. KNUDSEN: Objection, form.
12     A.   I -- I have no authorization to do anything, so
13  whether it had funding or not would be irrelevant.
14     Q.   (BY MR. BRYANT) I agree.
15        But if you -- if you put aside authorization --
16     A.   We're -- we're project --
17     Q.   -- would you have funding?
18     A.   We're project funded, so if there's no authorization,
19  I don't have a project to -- to put money in. So I can't -- I
20  can't take funding from another project, and put it on that.
21     Q.   Okay. Has anybody, to your knowledge, done any kind
22  of survey of where dredging would be needed in the 275 to 610
23  stretch in order to accommodate commercial navigation?
24     A.   Not to my knowledge.
25     Q.   Do you have any information as to where within the

74

1 275 to 610 stretch one would need to do dredging in order to
2 accomplish the reasonable improvements envisioned in your
3 expert report?
4   A.  A quantified amount, I'm not aware of.  No, I don't
5 have that -- that information.
6   Q.  Okay.  You mentioned "quantified amount," but I'm
7 also asking just the locations.
8   A.  Well, fine.  Yes, sir.  I -- I don't know how many
9 locations that would be.
10   Q.  You -- you don't know the locations or the amount of
11 dredging necessary?
12   A.  The -- correct.  I mean, I don't have a design to go
13 ascertain what that would be.
14   Q.  Are the reasonable improvements that are envisioned
15 in your expert reports one that would be accomplished only on
16 the U.S. side of the Rio Grande River?
17   A.  That would depend on the design.  It -- it would
18 strictly depend on the design, and it would vary by location.
19   Q.  Are there locations where the improvements would not
20 be effective unless they could be made on the Mexican side --
21       MR. KNUDSEN:  Object- --
22   Q.  (BY MR. BRYANT)  -- of the Rio Grande River.
23       MR. KNUDSEN:  Objection to form.
24   A.  For the types of improvements I'm talking about where
25 we -- I mean, I talked -- I did talk about shoaling, but I also

75

1 talk about topography.  If we want to keep it all on the United
2 States side, I'm sure we can figure it out and engineer it and
3 dig it out where we needed to.  If we wanted to coordinate with
4 others and make sure that it was -- you know, it just depends
5 on the authorization, it depends on the design, depends on --
6 on all those things.
7   Q.  (BY MR. BRYANT)  Are there portions of the 275 to 610
8 stretch where there's significant shoaling on the Mexican side
9 of the international boundary in the Rio Grande River?
10       MR. KNUDSEN:  Object to form.
11   A.  From aerial views where you can see shoaling take
12 place, there's shoaling in various locations.  Some of it is
13 on -- on each side, yes, sir.
14   Q.  (BY MR. BRYANT)  Are there areas in which there
15 cannot be substantial improvement in the navigation of a
16 stretch within the 275 to 610 range without improvement on the
17 Mexican side of the international boundary?
18       MR. KNUDSEN:  Object to form.
19   A.  Yeah.  I have no -- no basis to say "yes" or "no."
20 It would depend on design.
21   Q.  (BY MR. BRYANT)  Are there any plans that you know of
22 to even create such a design?
23   A.  No, sir.  Not that I'm aware of.
24   Q.  If the reasonable improvements that you envision in
25 your expert report that involve dredging were to be made, what

76

1 would be done with the dredge material?
2   A.  Again, that would be -- there's an assumption that we
3 have already acquired appropriate disposal sites through the
4 authorization process, through -- through the acquisition
5 process -- land acquisition process to dispose of those
6 materials at the predetermined sites.
7   Q.  Okay.  I understand you were asked to make that
8 assumption.
9       Do you know if that assumption is in any way
10 based on reality?
11       MR. KNUDSEN:  Object to form.
12   Q.  (BY MR. BRYANT)  In other words, do such sites exist,
13 to your knowledge?
14   A.  There are -- there's no disposal sites at this point
15 in time because there's no need for disposal sites, because
16 we -- we don't -- we're not doing that right now.
17   Q.  If the substantial improvements envisioned in your
18 expert report were made that involve dredging, would that
19 involve a one time effort or would there be a nec- -- necessity
20 for ongoing maintenance dredging?
21   A.  You would have to have maintenance dredging to
22 maintain appropriate channel ducts.
23   Q.  Are you able to give any estimates as to the extent
24 of that maintenance dredging that would be necessary?
25   A.  No.  It would, again, depend on scope and -- and that

77

1 kind of thing.
2   Q.  And is it correct, then, that you can't give any
3 estimate as to the cost of that maintenance dredging?
4   A.  I was not asked to provide any estimates on cost.
5   Q.  And is it correct that you can't, as you sit here
6 today, provide any estimates on cost?
7   A.  Correct.  I would have to have a design.
8   Q.  Would you, personally, be competent to create such a
9 design?
10       MR. KNUDSEN:  Object to form.
11   A.  I would be competent to create the operations and
12 maintenance manual.  As far as the design of the actual
13 structures themselves, no, I would not be that person.
14   Q.  (BY MR. BRYANT)  Okay.  Do you know if there are any
15 arch- -- archeological sites or artifacts in the 275 to 610
16 stretch of the Rio Grande River that would be disturbed or
17 affected if the reasonable improvements envisioned by your
18 expert report were made?
19   A.  I'm not aware of any exact sites, but with the
20 history of the area, I'm sure there are.  And that's why we
21 would have to run the NEPA process.
22   Q.  And is it impossible at -- at this point to estimate
23 the time or cost that would be required to accomplish that?
24       MR. KNUDSEN:  Object to form.
25   A.  I -- I would -- I wouldn't even hazard to guess on

78

1  the amount of time right now.
2      Q.   (BY MR. BRYANT)  Or cost?
3      A.   Or cost.
4      Q.   Is it correct that none of the reasonable
5  improvements envisioned in your expert report have been
6  proposed or discussed with Army Corps of Engineers
7  headquarters?
8      A.   I'm not aware if they have or not.  But to my
9  knowledge, no.
10      Q.   Is it correct that none of the improvements
11  envisioned in your expert report have been proposed to or
12  discussed with IBWC?
13      A.   Not to my knowledge, no, sir.
14      Q.   Is it correct that none of the substantial
15  improvements envisioned by your expert report have been
16  proposed to or discussed with the government of Mexico?
17      A.   That's correct.
18      Q.   Is it correct that none of the improvements proposed
19  or suggested within your expert report have today been proposed
20  to or discussed with any agencies of Texas or with any parts of
21  the State Government of Texas?
22      A.   Not to my knowledge, no, sir.
23      Q.   Other than the office of the attorney general?
24           And is it correct that none of the substantial
25  improvements that are envisioned in your expert report have

79

1  been discussed with the U.S. Department of State or any other
2  U.S. Government agencies?
3      A.   That's correct.  Not to my knowledge.
4      Q.   Are there other Army Corps of Engineer districts
5  where dredging of inland waterways is a common or ongoing
6  activity?
7           MR. KNUDSEN:  Object to form.
8      A.   Yes, sir.  Yes, sir.
9      Q.   (BY MR. BRYANT)  And you have not discussed any of
10  the substantial improvements envisioned in your expert report
11  with anybody from any of those districts today?
12      A.   With the exception of the reference to Chris Frabotta
13  earlier to obtain some things, no, sir, I have not discussed
14  this with any other -- other district.
15      Q.   Okay.  When you spoke about your interaction with
16  Mr. Frabotta, you mentioned the dredging machine photos.
17           What else was your -- of your interaction with
18  Mr. Frabotta related in any way to your expert report or any
19  improvements suggested in it?
20      A.   Just -- just the discussion about the machinery.
21  I -- you know, I just asked him if I was going to use
22  mechanical dredging activities, do you have some photos?  I've
23  done it before, but we didn't take photos, and I was in the
24  middle of it, and so he provided -- provided those photos to
25  me.

80

1      Q.   Why didn't you discuss with anybody in districts
2  where the Corps of Engineers regularly does dredging what would
3  be required to accomplish that on the Rio Grande River?
4           MR. KNUDSEN:  Object -- and I'm going to
5  actually instruct the witness not to answer that to the extent
6  it asks for work product.
7           MR. BRYANT:  I don't think it does.
8      Q.   (BY MR. BRYANT)  So my question is, why didn't you
9  discuss with other people in the Corps of Engineers who do that
10  type of dredging on an ongoing basis what is required, what the
11  costs are, how practical it is or isn't, things like that?
12           MR. KNUDSEN:  I'll object.
13           Are you asking for information obtained from --
14  from Counsel within the Corps of Engineers?
15           MR. BRYANT:  No.
16           THE WITNESS:  I'm good?
17           MR. KNUDSEN:  Object to form.
18           You can answer.
19      A.   Okay.  So the biggest reason is, is I was provided
20  the assumptions that cost was not a factor, and don't get
21  bogged down in trying to figure out how much this would cost.
22  As stated earlier, the clearances were already assumed to be
23  provided and such.  As far as the types of activities, just
24  throughout my career of being in different conferences,
25  different discussions, there's nothing in there that I would

81

1  expect anyone else to -- to bring up and -- and state this
2  method or that method, because we're really talking about
3  methodologies, not -- not -- not all the other items that you
4  mentioned.
5      Q.   (BY MR. BRYANT)  Is it fair to say that you were told
6  as an assumption for your work that cost was irrelevant?
7      A.   I wasn't told cost was irrelevant.  I was told that
8  authorization was provided, and costs were not an -- were not
9  an issue, meaning that Congress had fun- -- had provided
10  whatever the funds needed were.
11      Q.   And were you told as an assumption for your work that
12  timing was irrelevant?
13      A.   I didn't consider timing as far as -- I mean, I
14  assume that any and all of those types of things were all done.
15  The question at hand was, can we make incremental improvements?
16      Q.   And were you told as an assumption for all of your
17  work that you had every clearance and agreement necessary from
18  any other public or private party?
19      A.   That -- that's correct, yes, sir.
20      Q.   All right.  Now, I think you mentioned earlier in
21  your testimony that there was some amount of dredging done by
22  the Fort Worth District in the Rio Grande River just below
23  Amistad Dam at some point.
24           When did that occur?
25           MR. KNUDSEN:  Object to form.

82

1    A.  I didn't -- I don't recall saying that.  I've --
2  we've not dredged anything below the Amistad Dam.
3    Q.  (BY MR. BRYANT)  Okay.  I misunderstood or
4  misremembered.
5        Where in the 275.5 to 610 stretch of the Rio
6  Grande River has the Fort Worth District ever done any
7  dredging?
8    A.  I'm not aware of any.
9    Q.  Which was the dam that I'm thinking of that you told
10  me that -- was that --
11    A.  I just --
12    Q.  -- O.C. Fisher or was that something --
13    A.  O.C. Fisher was on the front side on the embankment
14  that I used as an example, and then there was a few areas that
15  I mentioned, like, Lewisville as a dewatering activity where we
16  might do some dredging behind there to -- to clear out the
17  areas.
18    Q.  Okay.  So the Fort Worth District of the Corps --
19  Corps of Engineers has no history of dredging the Rio Grande in
20  this 275 to 610 stretch?
21        MR. KNUDSEN:  Object to form.
22    A.  To my knowledge, that's correct.
23    Q.  (BY MR. BRYANT)  So Fort Worth District has no
24  history as to how much that might cost?
25        MR. KNUDSEN:  Object to form.

83

1    A.  I'm trying to think of how to answer that.  The --
2  it's not that there -- it's -- if we've never done it in that
3  area, then we would have to apply all the principles and
4  practices and wage rates and everything else to determine what
5  that would be.  But it's not that we don't -- it's because we
6  haven't had a contract down there to do such, so...
7    Q.  (BY MR. BRYANT)  Okay.  And because the Fort Worth
8  District has never done any dredging in the Rio Grande in the
9  275 to 6-- -- 610 stretch, you can't know the extent of
10  maintenance dredging that would be necessary to maintain any
11  channel once created?
12        MR. KNUDSEN:  Object to form.
13    A.  Again, that would go back to the design.  So as I sit
14  here without a design in knowing what depth we're trying to
15  maintain, I -- I don't have the capability of giving you an
16  answer.
17    Q.  (BY MR. BRYANT)  Okay.  Does the Fort Worth District
18  have any history that you know of of doing anything to maintain
19  or improve the navigability of the 275 to 610 stretch of the
20  Rio Grande River?
21    A.  Not to my knowledge.
22    Q.  Now, we touched earlier briefly on Cane and other
23  plant species control.
24        Does your program of substantial improvements
25  referred to in your expert report envision anything beyond the

84

1  current Texas program?
2    A.  It would be essentially expanding it further along,
3  you know, just enhancing that program by additional efforts,
4  funding, whatever might be needed.
5    Q.  Is there any quantification of the expansion or the
6  additional efforts that are envisioned in your expert report?
7    A.  It -- no, I don't have a quantify -- quantity on
8  that, no.
9    Q.  Does your expert report envision that nothing would
10  be done on the Mexican side of the international boundary to
11  deal with the -- the Carrizo cane or other problem plant
12  species?
13    A.  No, sir.  The way I -- my assumptions were that if it
14  needed to be done on that side, they would do it on that side,
15  because clearances and authorizations were granted.
16    Q.  Are you aware of any instances in which the Army
17  Corps of Engineers in the Fort Worth District has actually
18  attempted to get or gotten consent from Mexican authorities to
19  do anything on the Mexican side of the international boundary?
20    A.  That's outside the scope of what I would -- no, I
21  have -- I don't know if they did -- if Con-- the Corps
22  wouldn't go seek that.  It would just act on behalf of what
23  Congress did, so above and beyond any of that, no, I'm not
24  aware of anything else.
25    Q.  So as far as you understand, that would require

85

1  congressional action?
2    A.  It -- it would for us to have the authority to -- to
3  work on things, yes, sir.
4    Q.  Do you have any understanding as to the time required
5  to --
6        MR. BRYANT:  Let's -- let's go off the record
7  for a second.
8        THE WITNESS:  Okay.
9        MR. BRYANT:  We may be having some technical
10  difficulties.
11        THE VIDEOGRAPHER:  The time is 11:34 a.m., and
12  we're off the record.
13        (Recess taken from 11:34 a.m. to 12:35 p.m.)
14        THE VIDEOGRAPHER:  The time is 12:35 p.m., and
15  we're back on the record.
16    Q.  (BY MR. BRYANT)  Mr. MacAllister, before our lunch
17  break, we were discussing the suggestions for improvements to
18  navigation in the Rio Grande River stretch from 275 to 610 that
19  were discussed in your expert report, and particularly the
20  concept of control of Carrizo cane and other undesirable plant
21  species.
22        Do you have any quantification as to how much
23  improvements could reasonably be expected to obtain -- be
24  obtained in navigation from the improvements you suggest in
25  your report?

86

1    A.  With regard, specifically, to Carrizo cane that we --
2    Q.  Yes.
3    A.  No, sir.
4    Q.  Do you have any quantifications to the extent of
5  improvements in navigation that could be obtained from all of
6  the suggestions for improvements that are included in your
7  expert report?
8    A.  Not without a design, no.
9    Q.  Another topic that you discussed in your expert
10 report as a potential improvement would be improvements in
11 water releases from Amistad.
12        Isn't all of the water in Amistad Dam already
13 allocated for various uses other than navigation?
14        MR. KNUDSEN:  Object to form.
15    A.  I believe that's correct.
16    Q.  (BY MR. BRYANT)  Does IBWC now manage releases from
17 Amistad so as to attempt to best satisfy the needs of holders
18 of water rights in accordance with priorities agreed to by the
19 United States and Mexico by treaty?
20    A.  That's my understanding.
21    Q.  And in treaties between the United States and Mexico,
22 particularly the 1944 Treaty, aren't there priorities for uses
23 of the waters in the Rio Grande River, including Amistad and
24 Falcon?
25    A.  That's my understanding.

87

1    Q.  And what are those priorities?
2    A.  As -- as mentioned earlier this morning, Flood Risk
3  Management would hold the water back, utilization of water
4  releases for hydropower, water consumption, whether it's
5  municipal, irrigation, so forth --
6    Q.  And --
7    A.  -- and utilize the water in the -- behind the dam for
8  recreation and/or natural resources activities as well.
9    Q.  And currently, are all of the waters in Amistad
10 Reservoir needed to satisfy water rights holders with respect
11 to irrigation and municipal uses?
12    A.  To my understanding, yes, sir.
13    Q.  So would any change in releases from Amistad, such as
14 those suggested in your expert report, require, first, the
15 approval of IBWC?
16        MR. KNUDSEN:  Object to form.
17    A.  It's my understanding it would, yes.
18    Q.  (BY MR. BRYANT)  I'm sorry.  I didn't hear you.
19    A.  I said, it's my understanding that it would, yes.
20    Q.  Okay.  And given the priorities by treaty, would it
21 require changes in the treaties between the United States and
22 Mexico?
23    A.  Depending on the -- it would depend on the level of
24 change in utilization of water.
25    Q.  Is it correct that navigation is the fifth-level

88

1  priority under the current treaties between the U.S. and
2  Mexico?
3    A.  That's my understanding.
4    Q.  And so with the devotion of any releases -- with a
5  change of release priorities who prioritize water for
6  navigation require that the rights holders with respect to uses
7  of pri-- higher priorities, either consent to relinquish
8  their rights or for the -- the governments that create those
9  rights to change the priorities?
10        MR. KNUDSEN:  Object to form.
11    A.  I think the best way to answer -- that I can answer
12 that is to say that the assumption I was given was that those
13 authorities were deemed completed, if you will, to -- to
14 utilize the water as needed for this -- for this scenario.
15    Q.  (BY MR. BRYANT)  I do understand that you've been
16 given the assumption that magically all clearances will be
17 provided, and all funding will be provided.
18        But regardless of that, I'm asking what -- what
19 would have to be done to do that?  Do you agree that it would
20 require changes in the current treaties between the U.S. and
21 Mexico; and therefore, would require the cooperation of both
22 the U.S. Government and the Mexican Government?
23        MR. KNUDSEN:  Object to form.
24    A.  Yeah.  I am absolutely not an expert on the treaties,
25 and so I -- I don't want to say that it would, but I would

89

1  absolutely say yes, it would require coordination with all
2  stakeholders involved, including Mexico.
3    Q.  (BY MR. BRYANT)  And would it also -- would you
4  expect in -- in the event that would propose that all of those
5  holders of water rights with higher priority in navigation
6  would take a dim view of such a proposal?
7        MR. KNUDSEN:  Object to form.
8    A.  I don't know if they would take a dim view, but I
9  would certainly say they would want to be made whole regardless
10 how water was allocated.
11    Q.  (BY MR. BRYANT)  And are you aware that many of the
12 cities in Texas and Mexico down river from Amistad Dam are and
13 have been under- -- undergoing substantial growth?
14    A.  I'm not aware of the level of growth.  I'm aware it's
15 grown, yes, sir.
16    Q.  And do you also understand that their demand for
17 water is expected to grow significantly over time?
18        MR. KNUDSEN:  Object to form.
19    A.  If there's growth, then they'll have to have more
20 water, yes, sir.
21    Q.  (BY MR. BRYANT)  And do you know whether or not some
22 of those cities expect to have growth in their water needs,
23 such that all of the sources of water in the Rio Grande are
24 insufficient?
25        MR. KNUDSEN:  Object to form.

90

1     A.  I'm -- I'm aware that water is in scarcity in many
2  areas across the state, and that most people -- most entities
3  are looking for more, yes, sir.
4     Q.  (BY MR. BRYANT)  And do you know whether the
5  implementation, the suggestions that you make regarding water
6  releases from Amistad could have the effect of depriving
7  citizens of cities in the Rio Grande Valley from getting the
8  water that they need for their everyday activities?
9        MR. KNUDSEN:  Object to form.
10    A.  It would depend on the design of the project itself.
11    Q.  (BY MR. BRYANT)  And at this point, you don't have
12 any i- -- idea what that design would be?
13    A.  I have no design, no, sir.
14    Q.  Okay.  How does the Army Corps of Engineers know what
15 amount of water is in Amistad Reservoir at any given time, if
16 it does?
17    A.  The reservoir itself is -- is operated and maintained
18 by IBWC, and they have records that if we need to know, we can
19 ask them fairly easily, and readily coordinate with them.
20    Q.  Are -- are those frequently published or is it
21 required that you make requests?
22    A.  I believe it's both.
23    Q.  Okay.  What effects would the releases from Amistad
24 Dam and particularly the changes in releases that you suggest
25 in your expert report have on hydroelectric power generation at

91

1  Amistad Dam?
2     A.  Again, you would have to go through what is the
3  design, when are you going to make the releases, and how do you
4  maximize utilization of the water for multiple purposes, rather
5  than just for a singular purpose.
6     Q.  And so you don't know the answer to that at this
7  time --
8     A.  At this time, I don't.
9     Q.  -- because you don't have a design?
10    A.  Correct.  Yes, sir.
11    Q.  Are there any water rights in existence today to
12 water from the Amistad Reservoir or the Rio Grande River for
13 the purpose of navigation?
14    A.  Not to my knowledge.
15    Q.  Have there ever been?
16    A.  I -- I don't know if that's -- I don't know.
17    Q.  What governmental body would have to grant such water
18 rights for them to come into existence?
19    A.  Well, International Boundary and Water Commission is
20 the one operate that maintains those reservoirs for the
21 purposes -- the multiple purposes, so they would have to be the
22 ones involved with determining if that would be an option.
23    Q.  And does the IBWC grant water rights or does it
24 simply conduct its operations with respect to the dam in
25 accordance with the water rights granted by governments in the

92

1  U.S. on the one hand, and governments in Mexico on the other?
2     A.  It is my understanding that IBWC does not grant water
3  rights.  They manage the water rights that are already spoken
4  for.
5     Q.  And who does grant water rights with respect to
6  waters in Amistad Dam or the Rio Grande within the United
7  States?
8     A.  I'm unsure of who actually grants the water right.
9     Q.  Are you familiar with a person who has the position
10 of the Water Master with respect to water in the U.S. from the
11 Rio Grande River?
12    A.  I'm familiar of a Water Master position.  I'm not
13 sure of who the Water Master is for the Rio Grande, no.
14    Q.  And do you know what the Water Master does?
15    A.  Essentially, balances out and determines needs,
16 priorities and such with the different entities that have a
17 right to the water.
18    Q.  And so is the person who is the Water Master with
19 respect to United States rights to take water from the Rio
20 Grande a Federal official?
21    A.  The -- the Water Master is who you're talking about?
22    Q.  Yes.
23    A.  I'm not aware of who the Water Master works for for
24 the Rio Grande.
25    Q.  Does the Water Master grant water rights with respect

93

1  to the U.S. share of waters from the Rio Grande and from
2  Amistad Reservoir?
3        MR. KNUDSEN:  Object to form.
4     A.  I'm familiar more with the Water Master on the, like,
5  for instance, Brazos River Basin, and the roles that they play.
6  I do not know, because this is international boundary, if that
7  Water Master enjoys the same rights or if that's different.  So
8  I -- I have no basis to answer.
9     Q.  (BY MR. BRYANT)  Your report refers to water supply
10 contracts from Army Corps of Engineer reservoirs to supply
11 water.
12        Is it necessary for a party who receives water
13 pursuant to such contracts to have water rights to receive that
14 water?
15    A.  Yes, sir.
16    Q.  Are those water rights either granted by or approved
17 by the Texas Council on Environmental Quality?
18    A.  That's my understanding, yes, sir.
19    Q.  I think you mentioned earlier in your testimony that
20 there are problems to navigation associated with both too
21 little and too much water in the 275 to 610 stretch of the Rio
22 Grande River; is that right?
23        MR. KNUDSEN:  Object to form.
24    A.  I believe I was referring to that the potential could
25 exist for either, yes.

94

1    Q.   (BY MR. BRYANT)  And as envisioned in your expert
2  report, would the Army Corps of Engineers have any ability to
3  monitor the Rio Grande River in the 275 to 610 stretch to
4  determine what water levels are not too little and not too
5  much, but just right, for that entire 335-mile stretch?
6    A.   Are you asking can we do that if we needed to?  Yes.
7  Can we do that today?  I do not believe that we have the --
8  the -- the river gate system, as it sits today, but that would
9  be part of the design that I've described so far.
10    Q.   So part of the design that does not exist, but would
11  be required in order to implement the proposed improvements,
12  would be a system of gauging the depths of the river at -- at
13  points between 275.5 and 610?
14        MR. KNUDSEN:  Object to form.
15    A.   Not necessarily the depths, but the flow rates at
16  different gauging stations, if that's what was part of the
17  design.
18    Q.   (BY MR. BRYANT)  Do you have any estimates as to what
19  such a gauging system would cost?
20    A.   As -- I don't.  I don't have any -- I don't have an
21  estimate.
22    Q.   Do you have any idea as to how many gauging stations
23  in that 335-mile stretch of the Rio Grande River would be
24  required?
25    A.   That would depend on the ultimate design.

95

1    Q.   So you have no idea at this point?
2    A.   I don't know.  Not without a design, I do not.
3    Q.   And would there also need to be a system to monitor
4  the depth of the river in that stretch at various points or
5  would it only be the water flow?
6    A.   You would have to have some mechanisms to determine
7  depths, yes.
8    Q.   And do you have any estimate of the cost of such a
9  depth monitoring system?
10    A.   No, I do not.
11    Q.   Do you have any idea as to how many points at which
12  monitors to determine the depth would be required in the
13  335-mile stretch?
14    A.   No.
15    Q.   Would all of the reasonable improvements put together
16  that you envision in the -- in your expert report permit the
17  navigation of the Rio Grande by significantly larger vessels
18  than Class A or Class 1 vessels?
19        MR. KNUDSEN:  Object to form.
20    A.   If we were provided that scope to design and
21  construct, yes.
22    Q.   (BY MR. BRYANT)  Is there a point at which designs of
23  systems to accommodate commercial vehicles in the Rio Grande
24  would come up against the fact that the total water in the Rio
25  Grande Valley or in the Rio Grande Basin is both limited and

96

1  significantly variable, such that it just wouldn't be possible?
2        MR. KNUDSEN:  Object to form.
3    A.   There -- there is limited water available in any
4  river- -- rivering system, and that is a factor when you're
5  developing the design, so...
6    Q.   (BY MR. BRYANT)  So, for example, if the President of
7  the United States and Congress said, "We want you to create
8  channels in the Rio Grande that would handle the same vessels
9  that the Mississippi River now handles," would that run up
10  against the fact that there's just not enough water to do that?
11        MR. KNUDSEN:  Object to form.
12    A.   Again, it would depend -- at this stage of the game
13  without any additional water supply sources, it would be
14  difficult.  No -- no doubt about that.  But again, a design for
15  a navigation system can include all kinds of different things,
16  including additional reservoirs, pump back systems, just all
17  kinds of different opportunities.  I'm not an engineer, so I
18  can't speak to exactly how those -- you know, the -- I know the
19  of them.  As far as the reasonableness as you've described, I
20  don't know.
21    Q.   (BY MR. BRYANT)  Would you agree that it's impossible
22  for the -- any design and any engineers to put as much water in
23  the Rio Grande River as there now is in the Mississippi River?
24        MR. KNUDSEN:  Object to form.
25    A.   Based on climate itself, the amount of rainfall does

97

1  not equal on the Ri- -- on the -- for the Rio Grande as it does
2  over there, so I -- that's about the best I can answer.
3    Q.   (BY MR. BRYANT)  Do you have any information as to
4  how much revenue is currently derived from commercial
5  navigation on the 275 to 610 stretch of the Rio Grande River?
6    A.   I have no information on that.
7    Q.   Okay.  Do you know of any convenient source of such
8  information?
9        MR. KNUDSEN:  Object to form.
10    A.   Again, the only thing that I've looked up was simple
11  searches that discussed people's activities -- commercial
12  activities associated with the river.
13    Q.   (BY MR. BRYANT)  And none of those involved up or
14  down river commerce in -- in goods or trade; is that right?
15        MR. KNUDSEN:  Object to form.
16    A.   It -- it involved ecotourism on the river itself both
17  up and down.  It involved those kind of activities.
18    Q.   (BY MR. BRYANT)  And none others?
19    A.   Not that I saw, no, sir.
20    Q.   Okay.  Let's look at what's been marked as Exhibit 4.
21        (MacAllister Exhibit 4 was marked.)
22    Q.   (BY MR. BRYANT)  Mr. MacAllister, this is a document
23  that was marked as Exhibit 5 to a recent deposition of Adrian
24  Cortez.  And you're familiar with Mr. Cortez as an IBC- -- -WC
25  employee?

98

1    A.  Yes, sir.

2    Q.  Do you know him personally?

3    A.  I've never met him.

4    Q.  Okay.  This is a Table of River Mileages that begins

5  with 0.00 at the Gulf of Mexico, and ends in the general

6  vicinity of El Paso at River Mile 1253.96.

7        Do you see that?

8    A.  Yes, sir.

9        MR. KNUDSEN:  Object to form.

10        THE WITNESS:  Oh, sorry.

11    Q.  (BY MR. BRYANT)  Have you seen this document before?

12    A.  I have not reviewed this document, no.

13    Q.  Okay.  And the main reason I bring it up is, aside

14  from setting forth the river miles of various points on the

15  river, it doesn't seem to me to correspond with the Army Corps

16  of Engineers numbering of river miles.  We've been talking

17  about 275 to 610, and that's the -- those are the numbers taken

18  from the 1975 Navigability Study.

19        But could you examine Exhibit 4 and tell me

20  whether the river miles listed here are consistent with the

21  river miles as calibrated by the Army Corps of Engineers in the

22  1975 Navigability Study?

23        MR. KNUDSEN:  Objection to form.

24    A.  I -- I would have to have more time than this and

25  more resources than this to try to see if there's something

99

1  different.  As far as the Corps of Engineers, the 1975 document

2  is what I've referenced.

3    Q.  (BY MR. BRYANT)  Yeah.

4    A.  That's going to be done by hand, and as far as any

5  new -- I'm not sure how they've calculated these, so I

6  really -- I can't make that assumption right now.  I can't -- I

7  can't tell you -- I can't provide you a -- an answer to what

8  you're asking me right now.

9    Q.  Okay.  If you look at the second page of Exhibit 4,

10  it states that the "Distances along the Rio Grande taken from

11  the International Boundary maps approved by the commission in

12  Minute Number 253, September 23, 1976."

13    A.  Where -- oh, got ya.

14    Q.  Is the beginning of the Fort Worth District's of the

15  Corps of Engineers farthest downstream at the county line

16  between Zapata and Webb County?

17        MR. KNUDSEN:  Objection to form.

18    Q.  (BY MR. BRYANT)  Or do you know what point it is?

19    A.  It's the -- it's the area -- it's -- it's stated in

20  the 1975 report, and that corresponds with the 2011

21  determination, and that's the numbers -- those are the river

22  miles that I've used.

23    Q.  Okay.  Well, we'll get to that, and maybe we can

24  pinpoint it further.

25        Would you take a look at Exhibit 5?

100

1        (MacAllister Exhibit 5 was marked.)

2    Q.  (BY MR. BRYANT)  Have you seen that Exhibit 5 before?

3    A.  I have not reviewed this, no.

4    Q.  Okay.  This is the First Amended Complaint filed in

5  this action by the United States of America.

6        Could you take a look at Paragraph 24 on Page 6

7  of Exhibit 5?

8    A.  Okay.

9    Q.  In that paragraph, the United States alleges that

10  Texas or people acting on their behalf in July of 2023 placed a

11  floating barrier in the Rio Grande approximately two miles

12  south of the Camino Real International Bridge, Eagle Pass,

13  Texas.  I think earlier in your testimony you thought it was

14  just a few hundred feet.

15        Do you have any explanation as to whether you

16  think now it was two miles or whether you think that this

17  allegation's incorrect?

18        MR. KNUDSEN:  Object to form.

19    A.  I have no idea really where you're going with that

20  one, other than to say, when I -- when I answered you earlier,

21  I told you I wasn't real sure.  I wasn't there to compare

22  distances between bridges and the buoys in there.

23    Q.  (BY MR. BRYANT)  Okay.  Let's look at Attachment 1 to

24  Exhibit 5, which is at the end of the numbered pages just after

25  Page 12.

101

1    A.  Okay.

2    Q.  Okay.  Is this the December 20, 2011, list that you

3  referred to earlier in your testimony?

4    A.  Yes.

5    Q.  Now, midway or probably 80 percent of the way through

6  the first paragraph, it states, quote, Navigable waters in the

7  Galveston District are determined on a case-by-case basis and,

8  therefore, are not included in this list, unquote.

9        Do you know if that's still accurate?

10    A.  I don't know about those.

11    Q.  Do you have any idea why the Corps of Engineers makes

12  a general determination of navigability for all of the rivers

13  listed, but not for navigable waters in the Galveston District?

14    A.  I have no idea.

15    Q.  Okay.  And this list states that as to the Rio

16  Grande, quote, From the Zapata-Webb county line upstream to the

17  point of intersection with the Texas-New Mexico state line and

18  Mexico.

19        So is it the position of the Army Corps of

20  Engineers according to this document that every bit of the Red

21  River -- I'm sorry -- the Rio Grande River from the Zapata-Webb

22  county line upstream to the Texas-New Mexico state line near

23  El Paso is a navigable water of the United States?

24        MR. KNUDSEN:  Object to form.

25    A.  As per this document, yes, sir.

102

1    Q.  (BY MR. BRYANT)  And is that still the position of
2    the Army Corps of Engineers today?
3           MR. KNUDSEN:  Object to form.
4    A.  As far as I'm aware, yes, sir.
5    Q.  (BY MR. BRYANT)  And do you know of any basis for
6    that determination other than the 1975 Navigability Study?
7           MR. KNUDSEN:  Object to form.
8    A.  The '75 study references that it was deemed navigable
9    before between the United States and Mexico.  To what degree
10   and how they've determined that?  I'm not sure.  In 1975, they
11   utilized the -- those -- that piece -- those pieces of
12   information to reaffirm that it's still declared navigable.
13   Q.  (BY MR. BRYANT)  Okay.
14   A.  That -- that's all I have.
15   Q.  All right.  So you're not aware of any evidence of
16   navigability that is not set forth in the 1975 Navigability
17   Study?
18          MR. KNUDSEN:  Object to form.
19   A.  Yeah.
20   Q.  (BY MR. BRYANT)  As to the Rio Grande?
21   A.  Yeah.  I -- I'm not in regulatory.  I'm -- I go by
22   the information provided to me, like I said earlier.
23   Q.  I understand.
24          But I --
25   A.  Yeah.  I mean, I'm not aware of anything other than

103

1    those --
2    Q.  I understand it's not your job, but you might know
3    things that are not your job.
4    A.  Right.  No, I'm just saying, I don't have any other
5    information other than that.
6    Q.  Okay.  Then let's look at Exhibit 6.
7           (MacAllister Exhibit 6 was marked.)
8    Q.  (BY MR. BRYANT)  Can you identify Exhibit 6, which is
9    also Cortez Exhibit 6?
10   A.  Oh, yes, sir.  Oh, that's where I got confused.  I
11   was looking at 5.  Anyway, sorry about that.
12   Q.  And my question was whether you can identify
13   Exhibit 6?
14   A.  Oh, yes, sir.  Yes.
15   Q.  What is it?
16   A.  This is the Navigability Study from 1975 that I've
17   referenced.
18   Q.  Okay.  Could you please look at Page 6 entitled,
19   there's Paragraph Number 7 on Page 6 entitled "Potential use
20   for interstate commerce."  And A says, "If in natural
21   condition:  The Rio Grande can be navigated during periods of
22   sufficient flow only by fishing boats and other shallow draft
23   craft."
24          Was that -- is that statement still true today?
25   A.  That's, essentially, what I'm stating with Class 1

104

1    bo- -- boats and smaller.
2    Q.  That's what -- that's the way it's fair to describe
3    Class A and Class 1 boats?
4    A.  For this -- for the intent of this report that I
5    made, yes, sir.
6    Q.  Okay.  And B says, "If improved," quote, Improvement
7    of the Rio Grande for navigation is physically possible.
8    Storage in the Falcon and Amistad Reservoirs would have to be
9    judiciously used to provide sufficient flow for continuous
10   navigation.  Since navigation has fifth priority under existing
11   treaties, there's little likelihood of change.
12          Do you disagree with anything in those
13   statements that I just read?
14          MR. KNUDSEN:  Object to form.
15   A.  I don't disagree that it's written there.  I mean, I
16   don't know -- I mean, it's -- it's a document that was just
17   stating the -- the conditions and if you improved it, what you
18   would have to do.
19   Q.  (BY MR. BRYANT)  Are you saying that you have nothing
20   you disagree with or that you just have no opinion of that?
21   A.  I have no further opinion of that.
22   Q.  No further opinion beyond what?
23   A.  I have no further opinion of what it states.
24   Q.  Okay.
25   A.  To me -- it's a statement of fact to me.

105

1    Q.  Do you agree that there's, today, little likelihood
2    of change of the priorities of the use of water for navigation?
3           MR. KNUDSEN:  Object to form.
4    A.  Yeah.  I have no basis to judge that, sir.
5    Q.  (BY MR. BRYANT)  Next statement in that paragraph
6    says, quote, The area is adequately served by other
7    transportation modes, thus making economic justification appear
8    doubtful.
9           Do you take any issue with that?
10   A.  I don't.
11          MR. KNUDSEN:  Object to form.
12   A.  The -- I continue to go back to, if incremental
13   improvements could be made, was where I was going with this,
14   and the assumptions I was given was that these kind of things
15   had been worked out to assume those things, so that's why the
16   report was created and crafted the way -- in the manner it is.
17   Q.  (BY MR. BRYANT)  Okay.
18   A.  It's not my job, sir, quite frankly, to -- to figure
19   out whether or not Mexico and the United States or Texas would
20   agree to -- to the wa- -- how -- how they use the water.
21   That's --
22   Q.  Well, I understood that was part of your assumptions.
23   But do you have any -- this -- this is stating the view of the
24   Army Corps of Engineers that the area around the Rio Grande is
25   adequately served by other transportation modes, such as

106

1 highways and railroads. And as a result, economic
2 justification for improvements of the Rio Grande appears
3 doubtful.
4        Do you agree with that?
5        MR. KNUDSEN: Object to form.
6    A.  If he wrote it in 1975, at that point in time, I'm
7 sure that was the way it was at that time.
8    Q.  (BY MR. BRYANT) Okay.
9    A.  I don't have enough information at this point in time
10 to provide any type of a agreement that that's still the same
11 or not.
12   Q.  Okay. You don't have any knowledge about the current
13 economic situation with respect to transportation of commerce
14 on the Rio Grande River --
15       MR. KNUDSEN: Object to form. Sorry.
16   Q.  (BY MR. BRYANT)  -- whether it's competitive with
17 highways or rails?
18       MR. KNUDSEN: Object to form.
19   A.  I've never seen -- I've never seen anything to -- to
20 tell me would it -- if it would be or not.
21   Q.  (BY MR. BRYANT) The Army Corps of Engineers in the
22 1975 study in the same paragraph then states, quote, There
23 would be serious ecological ob- -- objections to any
24 channelization, unquote.
25       Do you agree with that?

107

1        MR. KNUDSEN: Object to form.
2    A.  When I spoke about the NEPA process earlier, any of
3 those ob- -- objections that could arise would be dealt with
4 under that process. If there's any, then you look at them, and
5 determine whether or not they're something you can overcome or
6 not.
7    Q.  (BY MR. BRYANT) Okay. And you have no opinion as to
8 whether or not any objections could be overcome?
9    A.  Again, I was given the assumptions that it was, and I
10 did not think about that one as far as, like -- I was just
11 using the assumption that all clearances were -- were provided.
12   Q.  And you still haven't formed any judgment as to
13 whether there would be serious ecological objections to any of
14 the reasonable improvements that you suggest in your expert
15 report?
16       MR. KNUDSEN: Object to form.
17   A.  With -- with the assumptions that I was provided, my
18 conclusions are that those were, if there were any, they would
19 have been overcome.
20   Q.  (BY MR. BRYANT) Okay. But you took that as a given,
21 you didn't think about whether you agree with that yourself,
22 right?
23   A.  That's correct. Yes, sir.
24   Q.  Okay. Okay. Let's look back at Page 14 of the 1975
25 study, which is Exhibit 6 to your deposition.

108

1    A.  Yes, sir.
2    Q.  Are you there?
3    A.  Yes, sir.
4    Q.  Okay. It says under the heading of "Present Use,"
5 quote, At present, there is no commercial activity occurring
6 within the study area, which would qualify as substantial items
7 of commerce.
8        Do you have any agreement or disagreement with
9 that statement as of 1975?
10       MR. KNUDSEN: Object to form.
11   A.  It's a statement written by -- in the study, and I
12 assume it to be accurate.
13   Q.  (BY MR. BRYANT) Okay. Is that also correct today?
14       MR. KNUDSEN: Object to form.
15   A.  I -- as I said earlier, as far as the type of
16 commercial activity or anything like that going on in the
17 river, I did not do any studies to -- to -- other than the --
18 the quick internet search.
19   Q.  (BY MR. BRYANT) So do you have no opinion as to
20 whether that statement is still accurate today?
21       MR. KNUDSEN: Object to form.
22   A.  It appears that in 1975 and today, that's probably
23 accurate. To what degree, if there's any changes to -- to
24 those -- those main activities, I'm not sure.
25   Q.  (BY MR. BRYANT) Okay. And let's look at the third

109

1 paragraph on Page 14. It says, quote, In reviewing the several
2 cases on recreational craft as the sole ingredient of
3 navigation, it appears that the Rio Grande River within the
4 study area does not meet the present-use test as laid down in
5 the Rochester case, supra.
6        Do you have any disagreement with that statement
7 as of 1975?
8        MR. KNUDSEN: Object to form.
9    A.  I assume that that's an accurate statement as per
10 1975, and I have not reviewed the Rochester case.
11   Q.  (BY MR. BRYANT) Okay. And do you have any reason to
12 believe it's not an accurate statement today?
13       MR. KNUDSEN: Object to form.
14   A.  I -- I've not reviewed the Rochester case, so I'm not
15 sure of all of the information that that would contain.
16   Q.  (BY MR. BRYANT) So you don't have an opinion on
17 that -- on that matter at this point without going and
18 reviewing some cases?
19       MR. KNUDSEN: Object to form.
20   A.  Well, I mean, the -- the whole paragraph is
21 predicated on whatever the Rochester case contains, so if I
22 don't -- if I'm not familiar with the Rochester case, I don't
23 feel comfortable saying "yes" or "no."
24   Q.  (BY MR. BRYANT) Okay. I'm just -- and I'm not
25 arguing with you.

110

```
 1    A.  Right.
 2    Q.  I'm just asking you to confirm that at this point,
 3  you don't have an opinion without doing some more work or some
 4  reading?
 5         MR. KNUDSEN:  Object to form.
 6    A.  I would say that that's accurate, yes.
 7    Q.  (BY MR. BRYANT)  Okay.  Now, under C, "Future Use,"
 8  the Corps in 1975 said, quote, There are no authorized plans to
 9  improve the Rio Grande River for navigation in the area of
10  study.
11         So far as you know, was that correct in 1975?
12         MR. KNUDSEN:  Object to form.
13    A.  As far as I'm aware, yes, sir.
14    Q.  (BY MR. BRYANT)  And is that correct today?
15         MR. KNUDSEN:  Object to form.
16    A.  As far as I'm aware.
17    Q.  (BY MR. BRYANT)  And is it also correct that there
18  are no known plans or proposals or designs at this point for
19  any improvements in the Rio Grande River for navigation in the
20  275 to 610 area?
21    A.  I'm not aware of any.
22    Q.  Okay.  Now, in the questions that I've asked, I have
23  used a term that's used in the 1975 study, which is the "study
24  area."
25         Do you have an understanding that that is the
```

111

```
 1  275 to 610 stretch of the Rio Grande River that is covered by
 2  the Fort Worth District?
 3         MR. KNUDSEN:  Object to form.
 4    A.  That's my understanding, yes.
 5    Q.  (BY MR. BRYANT)  Do you have any knowledge as to
 6  whether historically there was any commercial navigation of the
 7  Rio Grande River between 275 and 610, talking about before
 8  1975?
 9         MR. KNUDSEN:  Object to form.
10    A.  The only references to navigation that I'm aware of
11  are contained inside this report.
12    Q.  (BY MR. BRYANT)  You don't have any independent
13  knowledge on that subject?
14    A.  I do not, no, sir.
15    Q.  Okay.  Let's look briefly at Exhibit 7.
16         (MacAllister Exhibit 7 was marked.)
17    Q.  (BY MR. BRYANT)  Have you seen Exhibit 7 or parts of
18  it before?
19    A.  Yes.  This appears to be information contained on
20  their website.
21    Q.  Okay.  And is that a website that you've reviewed?
22    A.  I -- I have -- yes, I've looked around on their
23  website, yes, sir.
24    Q.  Okay.  On the third page of Exhibit 7, there is a
25  discussion of the boundary and water treaties between the
```

112

```
 1  United States and Mexico.
 2         Do you see that?
 3    A.  Yes, sir.
 4    Q.  I think we may have covered this, but are you -- have
 5  you ever read any of those treaties?
 6    A.  Just excerpts.
 7    Q.  Okay.  And do you know whether any of those treaties
 8  that are still in effect require the United States to do
 9  anything in particular with respect to navigation of the Rio
10  Grande River?
11    A.  I'm not aware.  I have not read anything about that,
12  no, sir.
13    Q.  Okay.  Let's take a look at Exhibit 8.
14         THE WITNESS:  Oh, okay.  I was like...
15         (MacAllister Exhibit 8 was marked.)
16    Q.  (BY MR. BRYANT)  This is selection of Federal
17  regulations regarding the definition of "Navigable Waters of
18  U.S."
19         Have you seen these before?
20    A.  Not in its entirety, no.  I probably have read
21  excerpts.
22    Q.  Okay.  Have -- have you used any part of the
23  regulations in Exhibit 8 in your work in the last 29 years in
24  the Fort Worth District?
25    A.  Only as far as -- and I would have to review this in
```

113

```
 1  its entirety, but I will -- I guess I'll qualify it by saying,
 2  for the portions that are deemed navigable on my projects, then
 3  this would apply, yes.  But as far as reviewing this and
 4  knowing this by heart, no, I do not know.
 5    Q.  Okay.  And you don't have occasion to refer to
 6  Exhibit 8 in your work.  You -- as you described earlier, when
 7  you're advised that particular waters are navigable, you take
 8  them as navigable?
 9    A.  Yes, sir.  That's correct.
10    Q.  And you don't go back and try to analyze --
11    A.  Correct.
12    Q.  -- whether any particular waters within the Fort
13  Worth District are or are not navigable under the law?
14    A.  Correct.  Yes, sir.
15    Q.  Okay.  Let's take a look at Exhibit 9.
16         (MacAllister Exhibit 9 was marked.)
17    Q.  (BY MR. BRYANT)  Please take whatever time you need
18  to just look and tell me whether you recall having seen Exhibit
19  9 before or any part of it.
20    A.  I mean, just right off the bat, no, sir, I don't -- I
21  don't believe that I've reviewed this.  No, sir.  I'm -- I'm
22  pretty confident I've not reviewed this before.
23    Q.  Okay.  This is a Report of the American Section of
24  the International Water Commission that was accompanied by a
25  message from the president of the United States, and submitted
```

114

1 to Congress in 1930. Let's look at Page 12.
2    A.   Yes, sir.
3    Q.   You see the portion of the document down towards the
4 bottom that is headed "Rio Grande"?
5    A.   Yes, sir.
6    Q.   It states, quote, With respect to the Rio Grande, the
7 treaties provide that the navigation of the actually navigable
8 main channels of the river is made free and common to the
9 citizens of both country and neither country may, without the
10 consent of the other, construct any work that may impede or
11 interrupt the navigation.
12        Do you have any knowledge as to whether the
13 treaties still provide to that effect today?
14        MR. KNUDSEN:  Object to form.
15    A.   Yeah.  I -- I have not reviewed that, so I don't
16 know.
17    Q.   (BY MR. BRYANT)  Okay.  The next sentence says,
18 quote, There's never been any practical navigation on the 1,044
19 miles of river from El Paso to Roma, unquote.
20        Do you know where Roma, Texas, is?
21    A.   Not right off, no, sir.
22    Q.   Okay.  Do you know that it is substantially
23 downstream of the 275 mark on the Rio Grande River?
24        MR. KNUDSEN:  Object to form.
25    A.   Okay.  I'll take your word for it.

116

1    A.   I have no basis to make that determination.
2    Q.   (BY MR. BRYANT)  Okay.  You just have -- have no
3 opinion on that subject?
4    A.   I have no opinion, yes, sir.
5    Q.   Okay.  The next statement is, quote, It is therefore
6 apparent that the conditions which form the basis of the
7 agreement in the old treaties concerning navigation of the Rio
8 Grande and Colorado Rivers have so completely changed that the
9 spirit is dead, if not the letter, of those parts of the
10 treaties which deal with navigation.
11        Do you have any knowledge or opinion as to
12 whether that's still correct today?
13        MR. KNUDSEN:  Object to form.
14    A.   I have no -- I have no opinion on it.
15    Q.   (BY MR. BRYANT)  Okay.  Let's take a look at
16 Exhibit 10.
17        (MacAllister Exhibit 10 was marked.)
18    Q.   (BY MR. BRYANT)  I'd like for you to take a look at
19 Exhibit 10, and tell me if you can identify it.
20    A.   It is a news story of the Corps that says "Army Corps
21 of Engineers sets priorities for inland waterways projects."
22    Q.   And when was this story written?
23    A.   It is dated May 22nd of 2024.
24    Q.   And does it set -- does it describe what is referred
25 to as the, Corps of Engineers work plan, unquote?

115

1    Q.   (BY MR. BRYANT)  Okay.  You know it's not in the Fort
2 Worth District?
3    A.   I'm not --
4    Q.   A portion; is that right?
5        MR. KNUDSEN:  Object to form.
6    A.   If it's below 275, that's my understanding, it would
7 not be within my district.
8    Q.   (BY MR. BRYANT)  Okay.  And even aside from taking my
9 word for it, you never heard of Roma being in the Fort Worth
10 District?
11    A.   No, sir.
12    Q.   Okay.  Is it correct -- would you take issue with the
13 statement of the International Water Commission to Congress
14 that, quote, There's never been any practical navigation on the
15 1,044 miles of river from El Paso to Roma as of the time they
16 made it in 1930?
17        MR. KNUDSEN:  Object to form.
18    A.   Yeah.  I -- I would assume that's so.
19    Q.   (BY MR. BRYANT)  And looking on the next page on the
20 second full paragraph, it states, As these developments have
21 gone forward, well-established highways and railroads have been
22 built, thus rendering navigation on the Rio Grande unnecessary,
23 unquote.
24        Is that still true today?
25        MR. KNUDSEN:  Object to form.

117

1    A.   In the first sentence, yes, sir, it does.
2    Q.   And that sets forth the agency's priorities for
3 spending its budget across numerous projects and studies in 50
4 states and territories in the District of Columbia for the
5 upcoming year.
6        Is there -- are there any of those plans and
7 expenditures that involved the Rio Grande River?
8        MR. KNUDSEN:  Object to form.
9    A.   I have no way to form an opinion on that.
10    Q.   (BY MR. BRYANT)  Well, do you see any mention of
11 anything regarding the Rio Grande River or the Fort Worth
12 District in the article?
13        MR. KNUDSEN:  Object to form.
14    A.   Well, the article is written -- appears to be written
15 by somebody not inside the Corps of Engineers, and I don't know
16 what the context of the article was, if it was associated with
17 anything else, and it appears to be discussing a few projects
18 in the middle of the first page that are not in the Corps of
19 Engineer- -- not in the Fort Worth District.  So I don't -- I
20 don't know.  I'm not aware of any projects under the work plan.
21    Q.   (BY MR. BRYANT)  Okay.
22    A.   However, I would not necessarily be made aware if
23 there were any projects under the work plan.
24    Q.   Would you expect to be made aware of them if they
25 were in the Fort Worth District?

118

1    A. If it was at the -- at the time, like I said earlier
2  this morning, if -- from the civil works chief standpoint, they
3  would be aware if there was.  At some point, if there was a
4  project that was going to be operated and maintained by the
5  Corps of Engineers, then certainly, I would be made aware of
6  it.
7    Q. Okay.  Are you aware of any plans or proposals that
8  may be submitted to Army Corps of Engineers headquarters for
9  improvements to the Rio Grande River?
10     MR. KNUDSEN: Object to form.
11   A. I am not aware.
12   Q. (BY MR. BRYANT) Okay.  Now, we mentioned earlier
13 that you have a bachelor's degree in range management, so --
14   A. Yes, sir.
15   Q. -- I assume from that, you know something about the
16 ranching business?
17   A. I used to.
18   Q. Would that be a fair assumption or a bad assumption?
19   A. It's -- I would say it's not as fair as it used to
20 be, but yes.  A little bit, yes, sir.
21   Q. Now, if you were a rancher operating near Eagle Pass
22 and you wanted to ship cattle to Laredo or Nuevo Laredo, would
23 you regard it as practical to ship them down the Rio Grande in
24 a boat in Class A or Class 1?
25     MR. KNUDSEN: Object to form.

119

1    A. In those vessels, no, sir.
2    Q. (BY MR. BRYANT) Okay.  Would you consider it
3  practical to ship them down the Rio Grande in any other vessel
4  that's not in Class A or Class 1?
5      MR. KNUDSEN: Object to form.
6    A. Only if a substantial project had been undertaken and
7  substantial-sized vessels could be utilized.
8    Q. (BY MR. BRYANT) Okay.  But not in -- you would not
9  ship them down the river in the Rio Grande in its current
10 natural state?
11     MR. KNUDSEN: Object to form.
12   A. Correct.  It's impractical at this point, yes.
13   Q. (BY MR. BRYANT) Okay.  And it would -- would you
14 agree that it would be impractical and uneconomical as compared
15 to sending your cattle to Nuevo Laredo by truck on a highway?
16     MR. KNUDSEN: Object to the form.
17   A. It's either going -- it's going -- there's going to
18 be a -- the best economic opportunity would be sought, yes,
19 sir.  I'll put it that way.  It could be rail, it could be
20 whatever it might be.
21   Q. (BY MR. BRYANT) It could be rail or it could be
22 truck, but it wouldn't be --
23   A. In the current state of the river --
24   Q. -- up and down the --
25   A. In the current state of the Rio Grande, no, sir, it

120

1  would not.
2    Q. Okay.  And would you agree that it would be faster to
3  send your cattle to Nuevo Laredo by rail or truck as compared
4  to by boat down the Rio Grande?
5      MR. KNUDSEN: Object to form.
6    A. At this point in time, yes, sir.  I apologize.
7  Getting all choked up about cows.
8    Q. (BY MR. BRYANT) If you need to take a break --
9    A. No, I just inhaled at the wrong time.
10   Q. -- please do, because I've been coughing a lot too.
11     And would you agree that it'd be safer for the
12 cattle to send them by rail or truck then on a small boat down
13 the Rio Grande in its current state?
14     MR. KNUDSEN: Object to form.
15   A. That would be accurate, yes, sir.
16   Q. (BY MR. BRYANT) And would you agree that it would --
17 that it would -- strike that.
18     Would you agree that shipment on the Rio Grande
19 on a Class A or Class 1 vessel as the Rio Grande now stands
20 would be the slowest, most dangerous, and most expensive
21 alternative for getting those cattle from Eagle Pass to Nuevo
22 Laredo?
23     MR. KNUDSEN: Objection to form.
24   A. It would be extremely difficult, yes, sir.
25   Q. (BY MR. BRYANT) Now, even if all the reasonable

121

1  improvements that you envision in your expert report were
2  accomplished, would you expect that it would still be more
3  practical to -- to ship cattle or other commodities from Eagle
4  Pass to Nuevo Laredo via truck or rail as compared with a
5  vessel going down the Rio Grande?
6      MR. KNUDSEN: Object to form.
7    A. There's a lot of variables in-- -- included in with
8  what your -- your scenario is.  And whereas I understand that
9  you're using Laredo as the approximate 275-mile marker, if you
10 were going to utilize something to ship all the way down, you
11 would not just stop there.  You would continue to go.  So in
12 order to -- to determine whether you would or would not, you
13 would have to have an appropriate design constructed project,
14 and then you would want to use the most economic way you could.
15   Q. (BY MR. BRYANT) Okay.  And can you envision a
16 situation if the improvements that you suggest in your report
17 were accomplished, where it would be preferable to send cattle
18 or commodities from Eagle Pass down river to Laredo or beyond
19 as compared with alternative means of transportation?
20     MR. KNUDSEN: Objection to form.
21   A. At that point, it would depend on what's going on
22 in-- -- inside the market for all kinds of different variables
23 that would be very difficult to make the statement right now.
24 If -- if -- because we're -- my assumption is, I mean, you did
25 state, correct, that this was assuming the project was built

122

1  as --
2     Q.  (BY MR. BRYANT)  Assuming the improvements in your
3  report were accomplished.
4     A.  So yes, if we had a project built to the level that
5  could sustain that type of activity, then the other variables
6  that you would have to then, you know, take a look at is, what
7  are the shipping costs in different ways.
8     Q.  Okay.  Now, even if you accomplished all of the
9  improvements that are envisioned in your report, you still
10  don't have a way to get cattle or other commodities past Falcon
11  Dam on the Rio Grande River, do you?
12        MR. KNUDSEN:  Object to form.
13    A.  In order to do that, you would have to install a
14  lock.
15    Q.  (BY MR. BRYANT)  And that's not something that you're
16  suggesting in your expert report, is it?
17    A.  For what -- for what my report was, no.
18    Q.  Okay.  So that's actually why I picked Laredo, so we
19  wouldn't have to --
20    A.  Understood.  Understood.
21    Q.  -- to deal with the -- with Falcon Dam.
22        But your report does not suggest or does not
23  state any particular level of improvement, so --
24    A.  That's correct.
25    Q.  -- there are -- isn't it possible that there are

123

1  improvements that you could make in every category that you
2  describe, it still wouldn't be enough to make it possible to
3  ship some heavy commodities down the Rio Grande River even to
4  Laredo; is that right?
5        MR. KNUDSEN:  Objection to form.
6     A.  I would say, depending on the design and its
7  potential.  But again, I would have to have a full blown design
8  to determine are we -- what level and depth are we trying to
9  get to.
10    Q.  (BY MR. BRYANT)  Are you aware of any demand for
11  commercial navigation currently in the stretch from 275 to 610
12  on the Rio Grande River?
13        MR. KNUDSEN:  Object to form.
14    A.  I'm not ma-- I've -- I've not -- not been made
15  aware of any -- any additional commercial navigation, no, sir.
16    Q.  (BY MR. BRYANT)  Okay.  You're not -- you haven't
17  been contacted or heard of anybody contacted by businesses who
18  want to ship anything on the Rio Grande River, you know, from
19  275 to 610?
20    A.  No, sir.
21    Q.  Are you aware of any products or goods that are
22  produced in the area of Texas or Mexico near Rio Grande Miles
23  275 to 610 that would be suitable to ship -- be shipped on that
24  stretch of the Rio Grande River?
25        MR. KNUDSEN:  Object to form.

124

1     A.  Yeah.  I have -- I have no basis to form an opinion
2  on that.
3     Q.  (BY MR. BRYANT)  Okay.  Is there currently
4  international criminal activity by cartels on and near the 275
5  to 610 stretch of the Rio Grande River in the Fort Worth
6  District?
7        MR. KNUDSEN:  Object to form.
8     A.  Personal firsthand knowledge, no.  Reports on the
9  media is all I can assume.  That -- that's all I know about.
10    Q.  (BY MR. BRYANT)  Do you have any reason to be- -- to
11  doubt that that does exist in that 335-mile stretch?
12    A.  No, I have no reason to doubt it.
13    Q.  Does that international criminal activity by cartels
14  adversely affect the potential of the Rio Grande River for
15  commercial navigation on that stretch of the river?
16        MR. KNUDSEN:  Object to form.
17    A.  I really have no basis to form an opinion on that.
18    Q.  (BY MR. BRYANT)  Are you aware of any prospect in the
19  foreseeable future of elimination of international criminal
20  activity by cartels on or near the Rio Grande River from 275 to
21  610?
22        MR. KNUDSEN:  Object to form.
23    A.  I'm not sure I really understand the scope of the --
24  of the question, sir.
25    Q.  (BY MR. BRYANT)  Do you see any reasonable prospect

125

1  that anyone using that river will not have to deal with the
2  possibility of international criminal activity near the river?
3        MR. KNUDSEN:  Object to form.
4     A.  I -- I have no basis to form an opinion on -- on
5  that.
6     Q.  (BY MR. BRYANT)  Did you in any way take into account
7  the existence of criminal cartel activity along the 275 to 610
8  stretch in your expert report?
9     A.  No, sir.
10    Q.  Your report foresaw [sic] experiences and activities
11  in the Fort Worth District on other Corps reservoirs like Lake
12  Whitney, Sam Rayburn and Lake Lewisville.
13        Do any other Fort Worth District Corps
14  reservoirs or rivers have comparable challenges to navigation
15  from international criminal cartels like those that operate on
16  or near Miles 275 to 610?
17        MR. KNUDSEN:  Object to form.
18    A.  I'm not aware of any.
19    Q.  (BY MR. BRYANT)  When you were given your assignment
20  in this case, were you also asked to assume away the Sinaloa
21  drug cartel?
22    A.  It was not considered in any way.
23    Q.  Your expert report references possible vessel rental
24  businesses on the Rio Grande in the 275 to 610 stretch.
25        How many of those businesses exist today?

126

1      A.  I didn't do an exhaustive search.  I found a couple
2  of them.  One was called the Eppies [sic], and then there was
3  another group that I did see down in the Laredo area.
4      Q.  So is the answer that you don't know how many there
5  are --
6      A.  Correct.
7      Q.  -- but you have read of the advertisements from two?
8      A.  Yes, sir.
9      Q.  And you have no idea how much business they do?
10     A.  I did not ask for any reports, no, sir.
11     Q.  And you have not, personally, used those businesses
12  yourself, I assume?
13     A.  No, sir, I have not.
14     Q.  And you haven't had any personal dealings with them
15  of any kind?
16     A.  No, sir.  I have not had any contact whatsoever with
17  them.
18     Q.  Let's take a look at Exhibit 11.
19         (MacAllister Exhibit 11 was marked.)
20     Q.  (BY MR. BRYANT)  Once you've reviewed Exhibit 11,
21  could you identify it, please?
22     A.  It appears to be a report, International Boundary and
23  Water Commission, United States and Mexico, United States
24  Section for Binational Border Solutions.  Strategic Plan Fiscal
25  Years 2021 through 2025, and it says to be revised September of

127

1  2022.
2      Q.  Okay.  Is this the strategic plan for that
3  organization that is now in effect?
4      A.  That's my assumption.  I've not reviewed this.
5      Q.  Okay.  Could you please review it enough to determine
6  whether or not any part of the strategic plan of the United
7  States Section of the IBWC involves any improvements to the Rio
8  Grande River for purposes of navigation?
9          MR. KNUDSEN:  Object to form.
10     Q.  (BY MR. BRYANT)  And I understand it might take you a
11  little time to do that.  Please take whatever time you need.
12     A.  So as a -- with a quick review, I do not see anything
13  associated with increasing navigability.
14     Q.  Okay.  And did you see any other proposed changes to
15  the Rio Grande River within the strategic plan?
16         MR. KNUDSEN:  Objection to form.
17     A.  The only thing -- again, quickly glancing through it,
18  for a matter of time here, I did see some discussion about
19  environmental sustainability flow type, but I -- I don't
20  believe they said "environmental flows," but they talked about
21  it ecologically speaking increasing flows or maintaining flows
22  appropriately.
23     Q.  (BY MR. BRYANT)  Okay.  Could you take a look at
24  Exhibit 12 to your deposition?
25         (MacAllister Exhibit 12 was marked.)

128

1      A.  Oh, all right.
2      Q.  (BY MR. BRYANT)  Please review Exhibit 12 to your
3  deposition and tell me if you have seen this document or any
4  part of it before.
5      A.  I don't recall seeing this -- or reviewing this
6  document, no.
7      Q.  Okay.  This pertains to something called the Rio
8  Grande Canalization Project.
9          Have you ever heard of that?
10     A.  I have not.
11     Q.  Okay.  This looks like a program to canalize 105
12  miles upstream of El Paso that was -- looks like it was first
13  approved in 1999, and they were still working on it in 2021.
14         Does that refresh your recollection about any
15  project you ever heard of?
16         MR. KNUDSEN:  Object to form.
17     A.  I have not had any dealings with this, no, sir.
18     Q.  (BY MR. BRYANT)  Okay.  Let's look at Exhibit 13 to
19  your deposition.
20         (MacAllister Exhibit 13 was marked.)
21     Q.  (BY MR. BRYANT)  Oh, this an excerpt from a website
22  of the U.S. General Printing -- Government Printing Office, I
23  believe.
24     A.  Okay.
25     Q.  And the subject is U.S. Army Corps of Engineers

129

1  Navigational Charts.  It states, "The U.S. inland navigation
2  system consists of 8,200 miles of navigable rivers main- --
3  maintained by the U.S. Army Corps of Engineers."
4          Is any part of the Rio Grande within that 8,200
5  miles of navigable rivers maintained by the U.S. Army Corps of
6  Engineers?
7          MR. KNUDSEN:  Object to form.
8      A.  Not to my knowledge, no, sir.
9      Q.  (BY MR. BRYANT)  And where the Army Corps of
10  Engineers does manage those navigable rivers, they produce a
11  suite of navigational chart books, portfolios that are designed
12  to promote safe navigation in those waters.
13         Could you quickly look through Exhibit 13 and
14  see if you see any such navigational charts the Corps of
15  Engineers has created for any part of the Rio Grande River?
16     A.  There's nothing listed in this document.
17     Q.  And is it correct, to your knowledge, that the U.S.
18  Army Corps -- Corps of Engineers has never produced any
19  navigational charts, books, portfolios for navigation of any
20  part of the Rio Grande River?
21         MR. KNUDSEN:  Object to form.
22     A.  I -- I don't know.  I have no basis to form that
23  opinion.
24     Q.  (BY MR. BRYANT)  Okay.  Let's take a look at Exhibit
25  14 to your deposition.

---

130

1          (MacAllister Exhibit 14 was marked.)
2     Q.  (BY MR. BRYANT)  Have you ever seen Exhibit 14 or any
3  part of it?
4     A.  No.
5     Q.  Okay.  Is this a Army Corps of Engineers publication?
6          MR. KNUDSEN:  Object to form.
7     A.  I do not know.  The front page makes it appear that
8  it's a joint publication, possibly, National Park Service,
9  Rocky Mountain Regional, along with the United States Army
10  Corps of Engineers.
11     Q.  (BY MR. BRYANT)  Okay.  The first page of Exhibit 14
12  references the U.S. Army Corps of Engineers 9-foot channel
13  project on the upper Mississippi River.
14          Do you have any knowledge about that project?
15     A.  No, sir, I do not.
16     Q.  Okay.  On Page 13 of the document it states, quote,
17  As originally planned in the 1920s, the 9-Foot Channel Project
18  was comprised of 26 locks of dams and their associated pools
19  that extended from St. Paul, Minnesota, south to Alton,
20  Illinois.
21          Do you have any knowledge as to why the U.S.
22  Army Corps of Engineers chose to initiate the 9-Foot Channel
23  Project in the upper Mississippi River?
24          MR. KNUDSEN:  Object to form.
25     A.  No, sir, I don't know.

---

131

1     Q.  (BY MR. BRYANT)  And do you have any knowledge as to
2  why Congress funded that project?
3          MR. KNUDSEN:  Object to form.
4     A.  No, sir, I don't know.
5     Q.  (BY MR. BRYANT)  Take a look at Exhibit 15.
6          (MacAllister Exhibit 15 was marked.)
7     Q.  (BY MR. BRYANT)  Could you identify Exhibit 15?
8     A.  It's an online interactive chart for the East Coast.
9     Q.  Have you ever seen that document before?
10     A.  I've seen variations of the -- of the -- the map.
11     Q.  Do you know what the minimum channel depth that is
12  maintained in that area along the east coast of the United
13  States for navigational purposes?
14     A.  No, sir, I don't.
15     Q.  Let's look at Exhibit 16.
16          (MacAllister Exhibit 16 was marked.)
17          MR. KNUDSEN:  I'm not sure I have a copy of
18  that, Counsel.
19          MR. BRYANT:  Okay.  Which one, 15, 16?
20          MR. KNUDSEN:  16.
21          MR. BRYANT:  Okay.  Let's see if we can come up
22  with one for you.
23          MR. KNUDSEN:  Mine stopped at 15.
24          MR. BRYANT:  Okay.  Why don't you borrow mine?
25          MR. KNUDSEN:  Thank you.

---

132

1     Q.  (BY MR. BRYANT)  Can you identify that document?
2     A.  It appears to be a Intercoastal Waterway of
3  Louisiana.
4     Q.  Okay.  And is there a reference in that document --
5  that exhibit to the depth of the channel that's maintained
6  there?
7          MR. KNUDSEN:  Object to form.
8     A.  (Reading.)  States that the lowest controlling depth
9  is 6.1 feet.  Intracoastal Waterway provides a 12-foot deep
10  channel, 6-foot deep Okeechobee Waterway in southern Florida.
11  It appears to vary.  (Reading.)  Okay.  Yeah.
12     Q.  (BY MR. BRYANT)  Do you know whether or not it would
13  be feasible to create a 6-foot channel in the Rio Grande River
14  from Mile 275 to 610?
15          MR. KNUDSEN:  Objection to form.
16     A.  I -- I have not reviewed anything to make that
17  assumption.  I just assumed that that had been done as part of
18  my assumption, so I didn't study at all on that part to see
19  whether or not something was feasible.
20     Q.  (BY MR. BRYANT)  So you don't you know whether it's
21  feasible or not feasible, you were just told to assume it was
22  feasible?
23     A.  Yes, sir.
24          MR. KNUDSEN:  Objection to form.
25     Q.  (BY MR. BRYANT)  Okay.  And who told you that -- gave

---

133

1  you all these assumptions?
2     A.  That was based on the assumptions I was provided when
3  I was first contacted to see, assuming that I had these
4  assumptions in hand, could I make incremental changes and --
5  and enhancements to the Rio Grande.
6     Q.  And were all of those assumptions provided to you by
7  attorneys for the United States?
8     A.  Yes.
9     Q.  Now, is it also correct that you don't have any idea
10  what it would cost to create a 6-foot channel in the stretch of
11  the Rio Grande River from 275 to 610?
12     A.  Yeah.  I --
13          MR. KNUDSEN:  Object to form.
14     A.  I currently don't know what that would cost.
15     Q.  (BY MR. BRYANT)  And you don't have any idea whether
16  if that were done it would have any significant economic
17  benefits; is that correct?
18          MR. KNUDSEN:  Object to form.
19     A.  I was not provided any information to state one way
20  or the other.
21     Q.  (BY MR. BRYANT)  Okay.  Let's look at Exhibit 17.
22          (MacAllister Exhibit 17 was marked.)
23          THE WITNESS:  Oh, I assume this is -- you're
24  like, "That's my job."  Sorry.
25     Q.  (BY MR. BRYANT)  You please take whatever time you

---

---

134

1 need to review the document, and then if you can, identify
2 Exhibit 17.
3          MR. KNUDSEN: I don't have a copy of that one
4 either.
5          MR. BRYANT: Well, Andrew, you're just about to.
6 There you go.
7          MR. KNUDSEN: Thank you very much.
8     A. Okay.
9     Q. (BY MR. BRYANT) Can you identify that document?
10    A. It's a Wikipedia printout of a description of the
11 Tennessee-Tombigbee Waterway.
12    Q. Okay. And are you familiar at all independently of
13 that exhibit of the Tennessee-Tombigbee Waterway?
14    A. I'm aware it exists, yes, sir.
15    Q. Okay. Have you ever seen it physically?
16    A. I've not been on it, no, sir.
17    Q. Okay. Was that created in the 1980s?
18    A. There's references that predate the 1980s in here.
19 We're going back to Mr. Roosevelt. President Roosevelt took
20 office and wanted to work on infrastructure projects, and so
21 from there on, it had various levels of support.
22    Q. Okay. Was the U.S. Army Corps of Engineers involved
23 in that project?
24    A. Yes, sir.
25    Q. And in doing any of your work, have you considered

---

135

1 the experience of the Army Corps of Engineers in the
2 Tennessee-Tombigbee project or any of the other inland river
3 projects that the Army Corps of Engineers has accomplished over
4 the last century?
5     A. Just insofar as we've done them. When we were
6 provided the mechanism to go do so, then we responded to what
7 Congress asked us to do. I'm --
8     Q. Yes. But I'm asking you whether you used any of the
9 experience or the lessons from any of those projects in your
10 work in this case?
11    A. No, sir. I did not compare any of those things, no,
12 sir.
13    Q. Okay.
14    A. I apologize. I misunderstood the question.
15    Q. Well, I may not have been clear.
16         MR. BRYANT: We've been at it about an hour and
17 a half. Why don't we take a break, and I'll try to get us
18 ready for the last lap of the deposition?
19         THE WITNESS: Sure. Yes, sir.
20         THE VIDEOGRAPHER: The time is 2:08 p.m., and
21 we're off the record.
22         (Recess taken from 2:08 p.m. to 2:15 p.m.)
23         THE VIDEOGRAPHER: The time is 2:15 p.m., and
24 we're back on the record.
25    Q. (BY MR. BRYANT) Mr. MacAllister, we've talked about

---

136

1 various assumptions that were given to you or that you were
2 asked to make in connection with your work in this case.
3          As far as I know, there's not a statement or a
4 list of those assumptions in your report, is there?
5     A. I don't believe there is, no, sir.
6     Q. Okay. Were you given any or all of those assumptions
7 in any kind of written or digital form?
8     A. I don't believe so. It was just on a -- a
9 teleconference.
10    Q. Okay. Then I would really appreciate it if we could
11 go through it and create a list of the assumptions that
12 underlie your -- underlies your expert work in this case to be
13 sure we're just as complete as we can be.
14         Is one -- one of the assumptions, as I recall,
15 is that whatever money is needed will be there?
16    A. Yes, sir.
17    Q. A second assumption is, you don't have to identify
18 benefits that would come from the improvements in any economic
19 manner?
20         MR. KNUDSEN: Object to form.
21    A. The assumption was that that had already been
22 determined is -- is what -- not necessarily that it wasn't
23 considered, but considered that it's true.
24    Q. (BY MR. BRYANT) That it's not necessary for you to
25 determine --

---

137

1     A. Correct.
2     Q. -- because it had already been either determined or
3 assumed?
4     A. Yes, sir.
5     Q. Okay. And is there an assumption that the benefits
6 as determined or assumed would equal or outweigh any cost of
7 the improvements that are in your report?
8         MR. KNUDSEN: Object to form.
9     A. That's -- yes, I did consider it, basically, in that
10 fashion as a project that was already authorized and gone
11 through all of that, and that we had obtained funding.
12    Q. (BY MR. BRYANT) Okay. And was another of the
13 assumptions that underlies your report that Congress had
14 approved or would approve whatever improvements you deemed
15 needed?
16         MR. KNUDSEN: Object to form.
17    A. Yes, sir.
18    Q. (BY MR. BRYANT) And was another assumption that the
19 IBWC would cooperate and -- and, in fact, carry out what was
20 needed to -- to effectuate the improvements you thought would
21 be helpful?
22         MR. KNUDSEN: Object to form.
23    A. Yes, that would be a fair assumption. Yes, sir.
24    Q. (BY MR. BRYANT) Okay. And was another assumption
25 that you would receive the consent or cooperation of the

---

138

1  government of Mexico?
2      A.  Yes, sir.
3          MR. KNUDSEN:  Object to form.
4      Q.  (BY MR. BRYANT)  And was another assumption that the
5  United States and Mexico would make whatever changes to their
6  treaties or agreements were necessary to effectuate the
7  improvements?
8          MR. KNUDSEN:  Hold on.  Object to form.
9      A.  Yes.
10     Q.  (BY MR. BRYANT)  Now I'm doing the coughing.  Excuse
11  me.
12     A.  No worries.
13     Q.  And was another assumption of your work that all
14  holders of water rights on the Rio Grande or Amistad would
15  either consent to the program of improvements or be compensated
16  in some way, so that they would not object?
17         MR. KNUDSEN:  Object to form.
18     A.  Essentially, I, kind of, looked at more of a
19  consensus, that we had all come to a consensus.  "We," meaning,
20  not the Corps, but whoever was involved.
21     Q.  (BY MR. BRYANT)  All of the water rights holders?
22     A.  Would have all been in consensus to move forward with
23  the project.
24     Q.  Okay.  Was another assumption that the State of Texas
25  and its agencies would -- would consent or cooperate to the

139

1  extent necessary to bring about the improvements?
2          MR. KNUDSEN:  Object to form.
3      A.  Yes, sir.  It would include all governmental
4  entities.
5      Q.  (BY MR. BRYANT)  And was another assumption that the
6  government of Mexico would not only consent or not object to
7  the -- the improvements that you propose, but they would carry
8  out those improvements that needed to be done on the Mexican
9  side of the international boundary?
10         MR. KNUDSEN:  Object to form.
11     A.  I didn't, specifically, think of that as far as,
12  like, you know, thinking they would be ob- -- obligated.  I was
13  thinking that whatever treaties needed to be adjusted or
14  however that worked out would've been worked out.
15     Q.  (BY MR. BRYANT)  Okay.  And in other words, that the
16  assumption about treaty changes would include obligating Mexico
17  to do what needed to be done on its side of the international
18  boundary?
19         MR. KNUDSEN:  Object to form.
20     A.  Could -- just that it could.  I don't know whether
21  it -- because it was a very broad brush stroke that said that,
22  basically, the path is clear, we need to go do these
23  activities.
24     Q.  (BY MR. BRYANT)  Okay.  And can you think of any
25  other assumptions that we haven't talked about that are

140

1  implicit in the program of possible improvements for the
2  purposes of improving navigation on the Rio Grande River from
3  275 to 610 that is envisioned in your report?
4          MR. KNUDSEN:  Object to form.
5      A.  I think we've discussed everything for the most part,
6  and I think there may be some -- yeah, we touched on the NEPA.
7  NEPA itself is so broad, and it touches so many things.  I hate
8  to throw an umbrella out like that.  But essentially, that if
9  it has to do with the NEPA process, that -- that that part has
10  been covered, the internal permitting processes for different
11  ag- -- just all of that has been taken care of.
12     Q.  (BY MR. BRYANT)  You -- you did mention that, and I
13  left it out.  But I believe that the assumption would be that
14  not only all environmental clearances would be obtained, but
15  all other regulatory clearances, whether it be endangered
16  species or effects on water quality or effects on archeological
17  sites or anything that any applicable U.S. Federal, Texas State
18  or Mexican Federal or Mexican State governments might have in
19  the way of legal or regulatory requirements would be swept
20  aside, and this project would be cleared?
21         MR. KNUDSEN:  Object to form.
22     A.  Well, the assumption was that any and all of that
23  would have been handled prior to.  It wouldn't have
24  circumvented anything.  It would have been after that had been
25  completed.

141

1      Q.  (BY MR. BRYANT)  Okay.  And you have no assumption or
2  estimation as to how long it would take to get to that point if
3  you started applying every effort to do it today, whether it'd
4  take a year, 5 years, 10 years or whatever period?
5          MR. KNUDSEN:  Object to form.
6      A.  Yeah.  I -- I don't know how -- I would not be able
7  to give you an estimate at this point.
8      Q.  (BY MR. BRYANT)  And you have no -- no assurance that
9  in the real world all of those things could -- could be
10  accomplished regardless of the time, you're just asked to
11  assume they had been accomplished?
12         MR. KNUDSEN:  Object to form.
13     A.  That's correct, yes, sir.
14     Q.  (BY MR. BRYANT)  And you have no idea or estimate as
15  to how much it would cost to pursue all of those efforts that
16  are implicit in the assumptions that would have to be met prior
17  to the program of reasonable improvements being implemented?
18         MR. KNUDSEN:  Object to form.
19     A.  No, I do not put any effort into that type of an
20  estimate, no, sir.
21     Q.  (BY MR. BRYANT)  Okay.  Can you think of any other
22  assumptions that are implicit in your expert report?
23     A.  Not -- no.  Those are...
24     Q.  This may be within that regulatory realm, but I think
25  it -- we discussed it's also an assumption that whatever bodies

142

1  are responsible for granting water rights would grant whatever
2  water rights for navigation are necessary in order to
3  accomplish the improvements?
4      A.  Yes, sir.
5          MR. KNUDSEN:  Object to form.
6      A.  Yes, sir, that was an assumption.
7      Q.  (BY MR. BRYANT)  And so that's an assumption even
8  though, to your knowledge, no water rights for navigation have
9  ever been granted on the Rio Grande?
10         MR. KNUDSEN:  Object to form.
11     A.  I don't know what's been discussed inside that
12 document -- the 1975 document, I'm not aware of the dis-- -- any
13 other discussions about it.
14     Q.  (BY MR. BRYANT)  We may have touched on this already.
15         Do other modes of transportation, such as rail
16 and highway, currently satisfy all the commercial
17 transportation needs of the area around the 275 to 610 stretch
18 of the Rio Grande River?
19         MR. KNUDSEN:  Object to form.
20     A.  I'm not sure if that's -- I don't know.  I'm --
21 there's -- I don't know which modes of transportation and
22 commerce shipments that they -- I don't know.
23     Q.  (BY MR. BRYANT)  Okay.  But you are aware that --
24 you're not aware of any --
25     A.  Those are the only options, yes, sir.  At this point

143

1  in time, yes, sir.
2      Q.  That's right.
3          And you're not aware of anybody saying "These
4  options are inadequate.  I want to ship goods down the Rio
5  Grande River"?
6      A.  I have not heard that, no, sir.
7      Q.  Okay.  We talked about Class A and Class 1 vessels.
8          How would vessels of that size be able to travel
9  down the Rio Grande River from Mile Number 610 to 275 over the
10 rapids and sills that exist in that stretch?
11         MR. KNUDSEN:  Objection to form.
12     A.  They would have to go along with the overall design
13 between those two locations.  There would have to be some
14 deepening, there would have to be, you know, things like that
15 applied to it.
16     Q.  (BY MR. BRYANT)  Okay.  And so you would agree that
17 such vessels can't go the length of that stretch of river as it
18 now stands in its natural condition?
19         MR. KNUDSEN:  Object to form.
20     A.  Depending on flows, at this point, yes, that's --
21 that's correct.
22     Q.  (BY MR. BRYANT)  Okay.
23     A.  Except -- well, I think I've got to qualify that
24 because Class A -- you lumped them both together, and so I
25 appreciate that -- that.  So Class A, I would say, from

144

1  everything I've seen, both in person and the aerial, that yes,
2  Class A can navigate the preponderance of those areas.
3          Class 1, depending on the types of hulls and the
4  types of drives associated with that vessel could navigate
5  quite a bit, would have some tr- -- troublesome spots depending
6  on water flows.  Some spots would probably be unpassable with
7  low flows.  That -- but other path -- at the same time, those
8  areas at some points during the year could be passable with
9  higher flows.
10     Q.  Are you aware of any of the operations of the ports
11 of Harlingen/Brownsville down river on the Rio Grande?
12     A.  No, sir.
13     Q.  Do you know whether any cargo that is offloaded at
14 those ports or at any other gulf ports is transshipped up the
15 Rio Grande for any distance in the modern era?
16         MR. KNUDSEN:  Object to form.
17     A.  Just on a personal basis, I've -- I've been in the
18 Rio Grande Valley, and I don't -- can't give you a -- an
19 absolute number, like, river mile number, but just certain --
20 certain levels up, yes, there's some -- a little bit of
21 commerce that goes back and forth down -- but outside of my
22 district, and outside of my specific dealings.
23     Q.  (BY MR. BRYANT)  Okay.
24     A.  But not -- not any -- I don't know what kind of --
25 that -- I just know the vessels have been down there.

145

1      Q.  Is it fair to say that you're unaware of any goods
2  that have been shipped through the Gulf of Mexico that, then,
3  are shipped up the Rio Grande as far as Miles 275?
4          MR. KNUDSEN:  Object to form.
5      A.  Yes, that's correct.  I'm not aware.
6      Q.  (BY MR. BRYANT)  Is it fair to say that there is no
7  intermodal networks that today use the Rio Grande River --
8          MR. KNUDSEN:  Object to form.
9      Q.  (BY MR. BRYANT)  -- to your knowledge?
10     A.  Yeah.  To my knowledge, I'm -- I'm not aware, sir.  I
11 don't know.
12     Q.  Is it fair to say that you're not aware of any
13 commercial navigation in the 275 to 610 stretch of the Rio
14 Grande that supports interstate or international commerce --
15         MR. KNUDSEN:  Object to form.
16     Q.  (BY MR. BRYANT)  -- today?
17     A.  Today, I'm not aware of any, no, sir.
18     Q.  Okay.  And is that also true for any historical
19 periods you're aware of?
20         MR. KNUDSEN:  Object to form.
21     A.  I've not done a thorough research on that, but no,
22 sir, I'm not aware of any.
23     Q.  (BY MR. BRYANT)  Okay.
24     A.  Other than -- I mean, there's references here and
25 there that I've read throughout the years about traversing

146

1  from -- you know, but not -- not recently.

2     Q.  Are you aware of any current uses of Class A or

3  Class 1 vessels in the 275 to 610 stretch for uses other than

4  recreation and law enforcement?

5        MR. KNUDSEN:  Object to form.

6     A.  Just a couple of those instances where people have

7  ecotourism and rentals.

8     Q.  (BY MR. BRYANT)  There are a couple of reasonable

9  improvements that we have not really mentioned, but are

10  mentioned in your report.  One is bank stabilization.

11       Where would you propose that bank stabilization

12  be done within the 275 to 610 range of the Rio Grande River?

13    A.  Just in the areas where you have higher levels of

14  erosion.  Depending on what those levels are, depending on the

15  soil type, depending on the slopes and such -- excuse me --

16  that would be just a few different ways that you could attempt

17  to do so.

18    Q.  Have you or anybody else made any attempt to identify

19  the areas within that 275 to 610 stretch -- stretch of the

20  river that would need bank stabilization efforts to accomplish

21  the improvements you envisioned in your report?

22       MR. KNUDSEN:  Object to form.

23    A.  No, sir, I have not quantified that, no.

24    Q.  (BY MR. BRYANT)  And no one else has, to your

25  knowledge?

147

1     A.  Not -- not to my knowledge, no, sir.

2     Q.  Do you know whether there's a couple or 20 or 200 or

3  which number would be closest?

4        MR. KNUDSEN:  Object to form.

5     A.  I think the -- the most accurate way to say that is,

6  is that it's not necessarily a total number of places.  It's

7  sporadic throughout, and depending on the severity of

8  something, we would want to do something about that if we were

9  to make incremental improvements.

10    Q.  (BY MR. BRYANT)  Okay.  And if such bank

11  stabilization improvements were made, would those be one time

12  efforts or would those require ongoing maintenance?

13    A.  It would most likely require ongoing maintenance if

14  it was a constructed means.  The goal would be to use as many

15  natural means when you slope it back and use appropriate

16  vegetation to limit the ongoing O&M.

17    Q.  There is also a mention in your report the

18  possibility of adding boat ramps, I assume, for Class A and

19  Class 1 vessels in the 275 to 610 stretch; is that a correct

20  assumption?

21    A.  Predominantly, yes, sir.

22    Q.  Okay.  And have you or anybody else done any kind of

23  assessment as to the number or location of boat ramps that

24  would be needed to --

25    A.  No, sir.

148

1     Q.  -- improve navigation in that stretch?

2        MR. KNUDSEN:  Object to form.

3     A.  No, sir.  That would, again, come along with an

4  overall design if we were to apply it.

5     Q.  (BY MR. BRYANT)  Another subject that is mentioned in

6  your expert report is the possibility of removing snags and

7  vegetations in the river from Mile 275 to 610.

8        Do you -- or have you or anybody else, to your

9  knowledge, done any work to identify where that currently needs

10  to be done?

11    A.  Just same answer for boat ramps and bank

12  stabilization, it would just depend, and we would go in there

13  and figure it out at the time the design was being performed.

14    Q.  Okay.  And am I correct in assuming that that is a

15  effort that would require ongoing maintenance or additional

16  work, it wouldn't be a you do it one time and everything's

17  fixed?

18    A.  It -- it would require ongoing maintenance to

19  maintain the area, yes.

20    Q.  Okay.  Now, is it true that over time the demands on

21  the waters of the Rio Grande and the 275 to 610 range have

22  continually increased because of additional needs for

23  irrigation, as well as municipal uses downstream?

24       MR. KNUDSEN:  Object to form.

25    A.  I would have to say that's an assumption.  I've not

149

1  read -- I've not read the reports on -- on how much that's

2  changed over the years.

3     Q.  (BY MR. BRYANT)  In determining a program of

4  reasonable improvements, would it be necessary to make some

5  assessment of how much the -- the water supply available in the

6  river would change in the future by the time that the

7  reasonable improvements could be accomplished?

8        MR. KNUDSEN:  Object to form.

9     A.  That would have to be taken into account as far as

10  the long-term objectives.  If -- if you were going to

11  reallocate waters for certain different purposes or if you were

12  going to try to use them as a reuse or however you were going

13  to do it.

14    Q.  (BY MR. BRYANT)  So in other words, if you want to

15  improve navigation in that stretch of the river, you would have

16  to get some idea of what the other demands for the -- the water

17  in the river would be at the time that the improvements could

18  be accomplished, because if there's much less river water at

19  that time, what might seem feasible now wouldn't be feasible

20  then --

21       MR. KNUDSEN:  Object to form.

22    Q.  (BY MR. BRYANT)  -- is that fair?

23    A.  It's -- it's fair to say that that has to -- you have

24  to look at the expectations of growth and such whenever you're

25  doing those types of designs, and that would be under the

150

1 feasibility study part.
2    Q.   Okay.  And so at this point, you have not done that
3 in any way in your expert report?
4    A.   That's correct, yes, sir.
5    Q.   And I don't think your expert report even mentions
6 the need to address the changes in future water needs in the
7 river; is that right?
8    A.   That is correct, yes, sir.
9    Q.   Have you ever heard of anybody referred to as the
10 "TCEQ Rio Grande Water Master"?
11    A.   No, sir.  I mean, I -- I know who TCEQ is and the --
12 as I referenced earlier, I'm familiar with -- that the -- that
13 there's a Water Master for the Brazos.  I don't know who the
14 TCEQ person is for Rio.
15    Q.   Do you know whether the TCEQ Water Master takes
16 advantage of side inflows when allocating water from the Rio
17 Grande River?
18        MR. KNUDSEN:  Object to form.
19    A.   I'm not -- I'm not aware if they do or don't.  And
20 when you mean "side inflows," I'm assuming that that means
21 water running from tributaries into the Rio Grande.  So my
22 assumption is, is that that is water of the state of Texas, and
23 TCEQ Water Master has the authority to utilize those waters.
24    Q.   (BY MR. BRYANT)  Are there diversion dams along the
25 Rio Grande River in the 275 to 610 stretch?

151

1    A.   I believe there's a irrigation diversion dam that
2 runs -- it's above -- it's -- I -- it's above where -- it's
3 above Eagle Pass, I'm just trying to think of where, I believe.
4 I'm trying to remember where it starts.  I'm trying picture it
5 in my head right now, but yes, sir, there's --
6    Q.   Is it between Eagle Pass and Amistad Dam?
7    A.   I believe it is.
8    Q.   Okay.
9    A.   And I believe it comes down and it empties --
10    Q.   And can you explain what that diversion dam is for
11 somebody who's not familiar with it?
12    A.   They utilize it when -- when water's released or
13 available within the river, it's di- -- water's diverted for
14 agricultural irrigational purposes.  It comes back down later
15 on through a -- I think there's a small hydropower plant, if I
16 remember correctly, but...
17    Q.   And who makes the decisions as to whether and how
18 much money -- water to divert from the Rio Grande flow to the
19 diversion dam?
20    A.   The -- well, it's got through either the TCEQ person
21 or IBWC, who is responsible for releasing waters to the water
22 right holders.
23    Q.   Okay.  And so is that an additional complication that
24 would have to be taken into account in designing any plan of
25 reasonable improvements, such as that is envisioned in your

152

1 expert report?
2        MR. KNUDSEN:  Object to the form.
3    A.   As a water right holder, yes, sir.  That would have
4 to be taken into account.
5    Q.   (BY MR. BRYANT)  Do you know whether the IBWC does
6 channel maintenance activities in the 275 to 610 stretch of the
7 Rio Grande River?
8    A.   I -- I don't know if they do or not.
9    Q.   Now, I think your -- your expert report refers to the
10 potential improvements that we've discussed as being, quote,
11 reasonable improvements.
12        Could you explain what makes them reasonable to
13 you?
14    A.   My interpretation of "reasonable" is fairly -- in
15 this instance, is readily accessible, easy to get to, you know,
16 there's not a lot of -- there's no new technology, you can use
17 existing technologies to perform those tasks, those kind of
18 things.
19    Q.   Now, I think you said earlier that one of the
20 purposes of Amistad Reservoir is recreation; is that right?
21    A.   Yes, sir.
22    Q.   Would releasing more water from the Amistad Dam to
23 support navigation conflict to somewhat -- to some extent with
24 the recreational purpose of the Amistad Reservoir?
25        MR. KNUDSEN:  Object to form.

153

1    A.   As with any -- because it's a multipurpose reservoir,
2 utilizing one allocation over another or instead of another
3 or -- can become a conflict, and that has to be dealt with as
4 part of that feasibility study.  And then as far as the design
5 goes, to try to minimize those impacts.
6    Q.   (BY MR. BRYANT)  I think your report mentions illegal
7 artifact hunters on the 275 to 610 stretch.
8        Do you recall that?
9        MR. KNUDSEN:  Object to form.
10    A.   I don't -- I don't think I put that in there.
11    Q.   (BY MR. BRYANT)  Okay.
12    A.   If I did, I -- if I did, I had forgotten that I put
13 it in there.  But art- -- I may have mentioned that I had
14 artifact hunters in my reservoirs, but I don't recall putting
15 it in my report.
16    Q.   Okay.  Could you look at your report at Page 3?
17    A.   Yes, sir.  That's not my report.
18    Q.   Is that Exhibit 4 or 3?
19        MR. KNUDSEN:  That was Exhibit 3.
20        MR. BRYANT:  3, yes.
21    Q.   (BY MR. BRYANT)  Okay.  Exhibit 3.
22    A.   You said Page 3, correct?
23    Q.   Exhibit 3, Page 3 --
24    A.   Okay.
25    Q.   -- first partial paragraph.

154

1     A.  Okay.
2     Q.  It states, quote, Maintenance activities include
3  providing access to our dam structures, removal of trash,
4  slash, debris, placing of regulatory buoys, conducting boundary
5  lane surveillance, loading, slash, unloading equipment and
6  detection of illegal artifact hunters.
7     A.  Correct.  Yes.
8     Q.  So now, do you recall that you did use that -- that
9  phrase in your report?
10    A.  Well, I used the term, yes, sir.  I thought you
11 were -- I thought you were asking if I said we needed to
12 consider -- did I put it in my report that we needed to
13 consider illegal artifact hunters in the Rio Grande if we made
14 these improvements.  But what that right here synopsizes is the
15 activities that I'm responsible for on the waterways, that I'm
16 charged with the O&M of.  So I apologize for -- if -- if that
17 was going off the -- a different direction.
18    Q.  No problem.
19        Have you or your -- anybody with the Fort Worth
20 District, to your knowledge, encountered illegal artifact
21 hunters on the Rio Grande River or near the Rio Grande River?
22    A.  Not to my knowledge.
23    Q.  Okay.  There's also a reference to, on Page 3, on
24 conducting boundary line surveillance, unquote.
25        What does that refer to?

155

1     A.  I -- I discussed the term "project" earlier, and at
2  our projects we have property that's fee-owned by the Federal
3  Government, and in some cases we also have flow agreements
4  owned by the Federal Government, and those boundaries -- we
5  protect those boundaries from encroachment from others.  You
6  know, from building homes out there or using it as private
7  exclusive use for -- for -- for the purpose of adjacent
8  landowners enjoyment of it, because it's Federal property.
9     Q.  Could you explain what you know about the number and
10 type of water partners there are with respect to the 275 to 610
11 stretch of the Rio Grande River?
12    A.  As far as the "water partners," are you referring to
13 the folks that own water rights or --
14    Q.  Yes.  It would include that, yes.
15    A.  All right.  So I'm aware that there are people that
16 own water rights for municipal use, for irrigation use, and
17 obviously, there's a hydropower contingent that -- that is
18 responsible for producing hydropower when available.
19    Q.  Do you know anything about the number --
20    A.  Oh, no, sir.  I do not --
21    Q.  -- or the details of those water rights?
22    A.  I do not, no, sir.
23    Q.  I think your expert report references water supply
24 contracts.
25    A.  Yes, sir.

156

1     Q.  Do you know any of the details of the water supply
2  contracts relating to the Rio Grande River?
3     A.  I've not read those water supply contracts, no, sir.
4     Q.  During your 29 years with the Fort Worth District,
5  how many applications for permits with respect to the 275 to
6  610 stretch of the Rio Grande River have been made to the Fort
7  Worth District?
8         MR. KNUDSEN:  Object to form.
9     A.  That would be a question that would -- I can't
10 answer.  That would have to go to the regulatory program.
11    Q.  (BY MR. BRYANT)  You just don't know that answer?
12    A.  I don't know, no, sir.
13    Q.  And you similarly don't know how many permits have
14 been granted in the 29 years by the Fort Worth District?
15    A.  That's in the regulatory district -- regulatory, so
16 yes, sir, I don't -- I don't have the number for that.
17    Q.  Okay.  And is it also correct that you don't know how
18 many active permits there are today that have been granted by
19 the Fort Worth District for activities related to the Rio
20 Grande River in the 275 to 610 stretch?
21    A.  That's correct.
22    Q.  Are you in-- -- aware of any instances in which parts
23 of the Rio Grande had been chucked off because of Carrizo cane
24 or other undesirable plant species?
25    A.  I'm aware that it's a nuisance species that can cause

157

1  that to occur, and I'm aware that because of the potential of
2  that occurring, that the State and the Federal Government
3  partners, I believe, have worked together to try to develop
4  ways to handle the encroachment of that, so that doesn't occur,
5  what you're talking about.
6     Q.  And has that, in fact, occurred during your time at
7  the Corps with respect to any areas in the 275 to 610 range of
8  the Rio Grande?
9     A.  I'm -- I'm aware of -- I've not, personally, been
10 involved with it, no, sir.  However, I'm aware just by visual
11 observation that, yes, there's been Carrizo cane removed.  I'm
12 also aware that there's programs where biological agents are
13 utilized rather than chemical or mechanical to slowly pull back
14 the the -- the cane and have it slowly be re-vegetated with
15 other -- other types of vegetation, more favorable.
16    Q.  Would you agree that reservoirs that you mentioned in
17 your expert report like Sam Rayburn or Lake Lewisville or Lake
18 Whitney are very different than the Amistad Reservoir in terms
19 of uses of the reservoir, the annual precipitation in the area,
20 and other characteristics?
21        MR. KNUDSEN:  Object to form.
22    A.  I'd say annual -- annual precipitation, yes, sir.  I
23 have various annual precipitations from Rayburn to Whitney.
24 There's going to be -- further west you go, less annual
25 precipitation there is.  However, the multipurpose nature of

158

1 the reservoir is, essentially, the same as -- as Whitney.
2    Q.   (BY MR. BRYANT)  We talked a little bit about the --
3 about the backhoes that are pictured in your report.
4         Do you have any estimate -- estimate as to the
5 weight that would be -- how much those weigh?
6    A.   It would depend on the size of the machine.  But as
7 far as -- and the size of the machine would depend upon -- be
8 dependent upon the need as shown by the design, so you're going
9 to use the smallest machine possible.  So there are excavators
10 out there that weigh, you know, 4-, 5,000 pounds, and there's
11 excavators that weigh a great deal more than that.
12    Q.   I'm really talking about the ones that are pictured
13 in your report.  Do you have any estimate --
14    A.   I don't know -- I don't know how much that one
15 weighs.  The report was a picture to show, essentially, what an
16 excavator looks like.
17    Q.   Okay.  And if you put one of the excavators that are
18 pictured in your report on a barge, what would need to be the
19 draft of the body of water that would be necessary to
20 accommodate that?
21         MR. KNUDSEN:  Object to form.
22    A.   It would depend, again, on the -- the barge type, how
23 wide is the barge, the flotation material that you would use on
24 the barge, and it would also depend on how big of an excavator.
25 So you would just have to figure out those -- those variables

159

1 and run the calculation.
2    Q.   (BY MR. BRYANT)  One -- your expert report also
3 mentions the possibility of placing riprap on shorelines --
4    A.   Yes, sir.
5    Q.   -- in the Rio Grande River.
6         What permits would be necessary from other
7 governmental bodies besides the Corps of Engineers in order to
8 do that?
9    A.   From the bank stabilization standpoint, there would
10 be the -- we would take into account 404.  However, we don't
11 usually self-i- -- we self-identify and we follow the same
12 ones.  We usually don't self-permit.  We do follow the exact
13 same principles.  As far as any other permits, I'm not aware of
14 what other permits would be needed.
15    Q.   Okay.  Would you need permits from the State of Texas
16 if you placed that type of riprap on the Texas side of the Rio
17 Grande River?
18    A.   Depending on who owns the river, you possibly -- you
19 would want to coordinate for sure, and if possible -- if
20 needed, then we could do that, yes.
21    Q.   Do you know whether any studies would be necessary to
22 be done in order to get any permissions to place riprap on the
23 Texas side of the Rio Grande River in your 275 to 610 stretch?
24         MR. KNUDSEN:  Object to form.
25    A.   I'm not aware of any -- of any studies that have gone

160

1 on.
2         MR. BRYANT:  Let's take a short break, and then
3 let's finish up.
4         THE VIDEOGRAPHER:  The time is 2:59 p.m., and
5 we're off the record.
6         (Recess taken from 2:59 p.m. to 3:02 p.m.)
7         THE VIDEOGRAPHER:  The time is 3:02 p.m., and
8 we're back on the record.
9    Q.   (BY MR. BRYANT)  Mr. MacAllister, are you aware of or
10 have any information about any goods that are now or have ever
11 been shipped across the Rio Grande -- Grande River at the
12 current site of the float- -- floating buoy barrier?
13    A.   Not to my knowledge, no, sir.
14    Q.   Are you aware of any current commercial navigation
15 across the Rio Grande River between Eagle Pass and Nuevo -- and
16 Nu- -- I'm sorry -- Piedras Negras?
17         MR. KNUDSEN:  Object to form.
18    A.   No, sir, I'm not aware.  I don't know.
19    Q.   (BY MR. BRYANT)  Okay.  If I understand your expert
20 correct -- report correctly, you are not able, at this time, to
21 determine any program of reasonable improvements that would
22 improve navigation on the Rio Grande River in the 275 to 610
23 stretch by any reasonably specific increment; is that correct?
24         MR. KNUDSEN:  Object to form.
25    A.   When I -- the way I use the word "increment" in the

161

1 report is that you can do things such as those items in there,
2 and you can do them one by one and have minor incremental
3 enhancement or you could combine them to have a larger
4 incremental enhancement, but it would depend upon what's the
5 scope of that enhancement, what -- what -- what's the goal,
6 what -- what is the -- how much of an enhancement are we trying
7 to get to?
8    Q.   (BY MR. BRYANT)  And you don't have a goal, and
9 haven't been given a goal at this point?
10    A.   Correct.  Yes, sir.
11    Q.   And therefore, you can and have listed improvements
12 that you think could incrementally enhance navigation, but you
13 can't say today, "We could do this much of these improvements
14 and achieve a specific level of enhancement"?  That's all --
15 you have to be determined sometime in the future?
16         MR. KNUDSEN:  Object to form.
17    A.   Well, the first part of that would be qualified
18 inside a Class A or a Class 1 vessel.  And the second part of
19 that would be defining which levels, which areas.  Do you want
20 the whole thing, do you want just portions of it?  So no, I
21 don't have a -- an incremental plan to run the entirety of
22 the -- of the river, no.  I would have to have the remainder of
23 the scope identified.
24    Q.   (BY MR. BRYANT)  Right.  And -- and at this point,
25 you don't have a plan to accomplish any of those improvements

162

1  on any specific portion of the 275 to 610 stretch; is that
2  right?
3      A.   That's correct.  An incremental enhancement, just
4  meaning, those -- these are the types of activities that could
5  be performed throughout the area depending on the level of
6  scope that would be requested.
7      Q.   All right.  And similarly, for all those
8  improvements, the timing, the cost, the benefits, if any, are
9  all undetermined as of the time you completed your expert
10  report --
11         MR. KNUDSEN:  Object to form.
12     Q.   (BY MR. BRYANT)  -- is that right?
13     A.   The assumption was that it had been authorized by
14  Congress, and so those activities would have been -- the --
15  it's assumed that if Congress had authorized the project, that
16  all of that would have been taken into account.  And whatever
17  Congress said was favorable, then that's what we -- that's the
18  reason we went and did it.
19     Q.   Okay.  I -- I understand that the assumption is, it's
20  all taken care of.  But is it also true that you can't know
21  what the cost would be, you couldn't calculate the cost until
22  you get more specifics as to what is to be done, and what's
23  the -- what's the goal?
24     A.   To further define the scope, yes, that's correct.
25     Q.   Okay.

163

1      A.   That's correct.
2      Q.   And is it also fair to say that at the time of
3  completion of your expert report, you cannot quantify the
4  extent of the improvements that would be necessary to the 275
5  to 610 stretch of the Rio Grande River to make it reasonably
6  suitable for use as a highway of commerce and trade up and down
7  the Rio Grande River?
8         MR. KNUDSEN:  Object to form.
9      A.   That was outside the scope of what I was actually
10  doing.  I cannot provide that information.  That's correct.
11        MR. BRYANT:  Okay.  I'll pass the witness.
12        MR. KNUDSEN:  Thanks.  Can we take a 5-minute
13  break?
14        MR. BRYANT:  Okay.
15        MR. KNUDSEN:  Thank you.
16        THE VIDEOGRAPHER:  The time is 3:09 p.m., and
17  we're off the record.
18        (Recess taken from 3:09 p.m. to 3:15 p.m.)
19        THE VIDEOGRAPHER:  The time is 3:15 p.m., and
20  we're back on the record.
21               EXAMINATION
22  BY MR. KNUDSEN:
23     Q.   Mr. MacAllister, I -- this is Andrew Knudsen, Counsel
24  for the plaintiff.  I just have a few questions to ask you
25  about your testimony this -- this morning.

164

1         Do you remember earlier in this deposition
2  discussing the need for congressional authorization for the
3  Corps to carry out projects?
4      A.   Yes.
5      Q.   Did you say in the course of your testimony that a
6  sponsor would be necessary for any such projects?
7      A.   Yes.
8      Q.   Okay.  Did you state that the IBWC could be a sponsor
9  for a project on the Rio Grande?
10     A.   Yes.
11     Q.   Okay.  Would the -- would the IBWC need to be the
12  sponsor for projects on the Rio Grande?
13     A.   Probably not.  I mean, I'm sure that there's others
14  that could step in and be that sponsor.
15     Q.   Okay.  In the -- in -- in the course of this case,
16  have you been asked to offer any opinions on historic uses of
17  the Rio Grande?
18     A.   I don't think I've been -- well, I mean, I've been
19  asked if I'm aware of -- of historic uses, yes.
20     Q.   Have you been asked to offer any -- any expert
21  opinions or expert testimony on historic uses of the Rio
22  Grande?
23     A.   Yes.
24     Q.   I'm sorry?
25     A.   Yes.

165

1      Q.   By who?
2      A.   By Mr. -- by the State.
3      Q.   Has the United States asked you to offer any opinions
4  on historical uses?
5      A.   Oh, no, sir.
6      Q.   Okay.  Has the United States asked you to offer any
7  opinions on historical navigation of the Rio Grande?
8      A.   No, sir.
9      Q.   Are you an expert on historic uses of the Rio Grande?
10     A.   No, sir.
11     Q.   Are you an expert on historic navigation of the Rio
12  Grande?
13     A.   No, sir.
14     Q.   Have you done any research on those topics?
15     A.   No, sir.
16     Q.   All right.  Can you turn to Exhibit 9 to your
17  deposition?
18     A.   Let me make sure I grab the right one.  Sorry.  I got
19  them all out of order now.  I'm all screwed up.  3, 4 --
20  actually, I'm pretty good.  6.  Okay.  Now, I'm not.  Okay.
21  Which page?
22     Q.   Turn to Page 12, please.
23     A.   Okay.
24     Q.   And do you see at the bottom of the page where this
25  document is discussing the Rio Grande?

166

1    A.  Yes.
2    Q.  And do you recall earlier in your deposition
3  answering questions about the -- this section of this document?
4    A.  Yes, I was specifically remembering about Roma.
5    Q.  Okay.  And you remember answering questions about
6  whether there has ever been any practical navigation on the
7  1,044 miles of river from El Paso to Roma?
8    A.  Yes.
9    Q.  Okay.  Do you, yourself, have any information to
10  assess the accuracy of what's in this document?
11    A.  No.
12    Q.  Okay.  Thank you.
13        Do you recall earlier in today's testimony being
14  asked if the Fort Worth District grants permits or licenses or
15  leases for commercial activities on the Rio Grande?
16    A.  Yes.
17    Q.  Okay.  Does the -- does the Army Corps of Engineers
18  permit commercial activity, generally?
19    A.  On -- on our projects, yes.  On -- on our fee-owned
20  projects, we have commercial activities, such as recreation
21  leases and marina leases and that -- that kind of activity,
22  yes, sir.
23    Q.  Is the Corps responsible for issuing permits to carry
24  out commercial activity or to carry out projects that im- --
25  impact natural resources within its jurisdiction?

167

1    A.  On -- in the operations and maintenance world where
2  we own the areas and fee, it could be both.  Where I don't
3  owe -- own things and fee, it's -- it has to do with the
4  regulatory program.
5    Q.  Okay.
6    A.  So I mean, if -- if there's recreational and
7  commercial activities, but there's also -- water partners may
8  ask for a intake structure, and that typically has to go
9  through the NEPA process, which would then end up, ultimately,
10  they would have to be issued a -- a permit of -- a 404 permit
11  or a Section 10 or whatever -- whatever the -- wherever it's
12  located.
13    Q.  Okay.
14    A.  That's what I meant by "it could be both."
15    Q.  Does the regulatory division of the Fort Worth
16  District have jurisdiction over issuance of permits under Clean
17  Water Acts Section 404 in the Rio Grande?
18    A.  It's my understand they do, yes.
19    Q.  And does the regulatory division have jurisdiction
20  over creating permits under the Rivers and Harbors Act in the
21  Rio Grande?
22    A.  It's my understanding they do, yes.
23    Q.  Okay.
24        MR. KNUDSEN:  No further questions.
25        FURTHER EXAMINATION

168

1  BY MR. BRYANT:
2    Q.  Mr. MacAllister, in your work that went into the
3  expert report, did you make any effort to identify what types
4  of commodities or products would be candidates for
5  transportation on the Rio Grande River, either now or at any
6  future dates?
7    A.  No, sir, I did not.
8    Q.  Why not?
9        MR. KNUDSEN:  Objection to form.
10    A.  The -- I was simply asked to -- within the scope of
11  what I was asked to do, it wouldn't -- it's not relevant.
12    Q.  (BY MR. BRYANT)  So you did not regard identifying
13  potential subjects of commercial navigation in the 275 to 610
14  stretch as being relevant to any of your work on this case?
15        MR. KNUDSEN:  Object to form.  I'm also going to
16  object to this as outside the scope of redirect.
17        You can answer.
18    A.  Okay.  What I was asked to do was discuss the
19  enhancements that could be made for Class A and Class 1
20  vessels.  The types of activities associated with that is
21  either use personal -- personal use for personal enjoyment,
22  ecotourism, potential fishing guides, that kind of thing.  So
23  to that degree, yes, I did consider that.  But as far as
24  anything as -- as may have been described earlier or requested
25  for information earlier, no, I didn't go past that.

169

1    Q.  (BY MR. BRYANT)  Okay.  And do you know how many
2  fishing guides, if any, currently operate on the 275 to 610
3  stretch of the Rio Grande River?
4    A.  Yeah, I do not know.
5        MR. KNUDSEN:  Object to form.  And again, beyond
6  the scope of redirect.
7        MR. BRYANT:  Pass the witness.
8        MR. KNUDSEN:  I have no further questions for
9  the witness.
10        MR. BRYANT:  Mr. MacAllister, thank you very
11  much for your --
12        THE WITNESS:  Yes, sir.
13        MR. BRYANT:  -- for spending your day with us
14  and for your knowledge.  Appreciate it.  And wish you a good
15  weekend.
16        THE WITNESS:  Thank you.
17        MR. BRYANT:  Let's close the deposition.
18        THE VIDEOGRAPHER:  The time is 3:23 p.m., and
19  we're off the record.
20        (End of proceedings at 3:23 p.m.)
21
22
23
24
25

170

```
1            CHANGES AND SIGNATURE
2  WITNESS NAME:  TIM MACALLISTER    DATE:  MAY 31, 2024
3  PAGE LINE      CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

172

```
1            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
2                  AUSTIN DIVISION
3  UNITED STATES OF AMERICA,    )
                                )
4         Plaintiff,     )
                                )
5  v.                    )
                                )  No.: 1:23-cv-00853-DAE
6  GREG ABBOTT, in his capacity   )
   as Governor of the State of   )
7  Texas, and THE STATE OF       )
   TEXAS,                 )
8                                )
         Defendants.     )
9
10
11          REPORTER'S CERTIFICATION
12          ORAL DEPOSITION OF
13          TIM MACALLISTER
14          MAY 31, 2024
15
16
17     I, Amber Garcia, Notary Public in and for the State of
18 Texas, hereby certify to the following:
19     That the witness, TIM MACALLISTER, was duly sworn by the
20 officer and that the transcript of the oral deposition is a
21 true record of the testimony given by the witness;
22     I further certify that pursuant to FRCP Rule 30 (e) (1)
23 that the signature of the deponent:
24 _____x_____ was requested by the deponent or a party before
25 the completion of the deposition and returned within 30 days
```

171

```
1            I, TIM MACALLISTER, have read the foregoing
   deposition and hereby affix my signature that same is true and
2  correct, except as noted above.
3
4
5            TIM MACALLISTER
6  THE STATE OF _____
7  COUNTY OF _____
8   Before me, _____, on the day
   personally appeared TIM MACALLISTER, known to me (or proved
9  to me under oath or through _____) to be
   the person whose name is subscribed to the foregoing
10 instrument and acknowledged to me that he executed the
   same for the purposes and consideration therein
11 expressed.
12  Given under my hand and seal of office this
   _____ day of_____, A.D. 2011.
13
14
15  _____
16 Notary Public
   In and for the State of _____
17
18
19
20
21
22
23
24
25
```

173

```
1  from date of receipt of the transcript.  If returned, the
2  attached Changes and Signature Page contains any changes and
3  the reasons therefor;
4   _____ was not requested by the deponent or a party
5  before the completion of the deposition.
6    I further certify that I am neither attorney nor counsel
7  for, related to, nor employed by any of the parties to the
8  action in which this testimony was taken.
9    Further, I am not a relative or employee of any attorney
10 of record in this cause, nor do I have a financial interest in
11 the action.
12  Subscribed and sworn to on this the 10th day of June,
13 2024.
14
15
16  _____
   Amber Garcia, Notary No. 13426953-9
17  Expiration Date:  3/24/2027
   Integrity Legal Support Solutions
18  Firm Registration No. #528
   9901 Brodie Ln, Ste. 160-400
19  Austin, Texas 78748
   (512) 320-8690
20
21
22
23
24
25
```

## Numbers

**0.00** 98:5
**100** 54:14 67:16
**1,000** 20:7
**1,044** 114:18 115:15
166:7
**105** 128:11
**10:02** 32:14,15
**11:34** 85:11,13
**1253.96** 98:6
**12:35** 85:13,14
**12-foot** 132:9
**1700** 5:5
**17-and-a-half-foot**
49:14
**17-foot** 49:14
**1920s** 130:17
**1930** 114:1 115:16
**1944** 86:22
**1975** 27:22 28:4
31:19,24 57:17
58:12 59:24 98:18,
22 99:1,20 102:6,
10,16 103:16 106:6,
22 107:24 108:9,22
109:7,10 110:8,11,
23 111:8 142:12
**1976** 99:12
**1980s** 134:17,18
**1995** 7:24
**1996** 7:22
**1999** 128:13
**200** 147:2
**2009** 8:3
**2011** 99:20 101:2
**2013** 8:10
**2021** 126:25 128:13
**2022** 127:1
**2023** 35:9 100:10
**2024** 18:1 34:4 35:6,
9,12,16,17,21
116:23
**2025** 126:25
**21st** 17:15 18:1
19:15 20:11 24:9
35:18,21
**22nd** 116:23
**253** 99:12

**275** 17:1,5,22 24:21
25:3,7 26:12 37:23
38:11 39:2 41:10
43:12 44:17 45:7,
15 46:9,24 49:24
50:16 51:9,22
53:19 54:25 57:12,
16,19,23 58:7,11
59:1,5,9,15,19
60:8,15,21 61:20
62:1 63:2,18 64:14
65:12 68:4 70:21
71:20 72:2,21
73:22 74:1 75:7,16
77:15 82:20 83:9,
19 85:18 93:21
94:3 97:5 98:17
110:20 111:1,7
114:23 115:6
123:11,19,23 124:4,
20 125:7,16,24
132:14 133:11
140:3 142:17 143:9
145:3,13 146:3,12,
19 147:19 148:7,21
150:25 152:6 153:7
155:10 156:5,20
157:7 159:23
160:22 162:1 163:4
168:13 169:2
**275.5** 16:22 41:16,19
55:21 61:8 82:5
94:13
**275-mile** 121:9
**29th** 35:8,17
**2:08** 135:20,22
**2:15** 135:22,23
**2:59** 160:4,6
**30b5** 6:18
**327** 61:10
**327.3** 60:24
**335** 24:21
**335-mile** 56:11 58:6
94:5,23 95:13
124:11
**3:02** 160:6,7
**3:09** 163:16,18
**3:15** 163:18,19
**3:23** 169:18,20
**3rd** 34:4

**400** 49:18
**404** 159:10 167:10,17
**5,000** 158:10
**5-minute** 163:12
**6.1** 132:9
**610** 16:22 17:1,5,22
24:21 25:3,7 26:13
37:23 38:11 39:2
41:10,16,19 43:12
44:17 45:7,15 46:9,
24 49:24 50:16
51:9,22 53:20
54:25 55:21 57:13,
16,19,23 58:7,11
59:1,5,10,15,19
60:8,15,21 61:8,21
62:2 63:2,18 64:14
65:12 68:4 70:21
72:2,21 73:22 74:1
75:7,16 77:15 82:5,
20 83:9,19 85:18
93:21 94:3,13 97:5
98:17 110:20 111:1,
7 123:11,19,23
124:5,21 125:7,16,
24 132:14 133:11
140:3 142:17 143:9
145:13 146:3,12,19
147:19 148:7,21
150:25 152:6 153:7
155:10 156:6,20
157:7 159:23
160:22 162:1 163:5
168:13 169:2
**610-mile** 71:20
**6-foot** 132:10,13
133:10
**750** 49:15
**78748** 5:7
**800** 49:16
**8,200** 129:2,4
**8th** 35:6,16
**9901** 5:7
**9:10** 5:6
**9:51** 32:12,14
**9-foot** 130:12,17,22

## A

**a.m** 5:6 32:12,14,14,

15 85:11,13
**Abbott** 5:4
**ability** 12:24 42:9
  45:3 94:2
**able** 5:24 14:4 21:3,
  4 22:4 46:16 55:7
  56:5,15,16 76:23
  141:6 143:8 160:20
**above** 26:8,9 52:18
  84:23 151:2 151:2,
  3
**Absent** 64:11
**absolute** 144:19
**absolutely** 88:24
  89:1
**academic** 13:7
**accept** 31:3
**access** 14:4 18:7
  154:3
**accessible** 152:15
**accommodate** 46:5,22
  47:12 56:12 73:23
  95:23 158:20
**accommodating** 48:1
**accompanied** 113:24
**accomplish** 46:8
  47:11,12 68:3 74:2
  77:23 80:3 142:3
  146:20 161:25
**accomplished** 22:14
  51:11 74:15 121:2,
  17 122:3,8 135:3
  141:10,11 149:7,18
**accomplishing** 65:10
**accordance** 6:8 9:11
  86:18 91:25
**according** 101:20
**account** 50:20 125:6
  149:9 151:24 152:4
  159:10 162:16
**accuracy** 166:10
**accurate** 33:9 34:5
  39:11 43:1 101:9
  108:12,20,23 109:9,
  12 110:6 120:15
  147:5
**achieve** 43:18 44:3,
  15 45:6 161:14
**achieved** 45:3
**acquired** 76:3

**acquisition** 76:4,5
**across** 8:16 9:2
  23:11 24:2 90:2
  117:3 160:11,15
**Act** 28:22 29:1,5,12,
  13 30:1,4,11,17,21
  31:13,17,22 32:1
  42:6,11,13 64:11
  65:5 66:11 84:22
  167:20
**acted** 11:2
**acting** 100:10
**action** 67:2 85:1
  100:5
**actions** 11:19
**active** 156:18
**activities** 8:17,18
  9:8 12:18,22 15:3,
  9,11,18 16:16,17
  18:22 27:16 42:24
  44:20 47:18 51:16
  61:15 62:4,16
  63:17,23 65:11
  66:20 69:4 79:22
  80:23 87:8 90:8
  97:11,12,17 108:24
  125:10 139:23
  152:6 154:2,15
  156:19 162:4,14
  166:15,20 167:7
  168:20
**activity** 13:25 14:3
  15:8 39:15 48:9
  68:14 79:6 82:15
  108:5,16 122:5
  124:4,13,20 125:2,
  7 166:18,21,24
**Acts** 167:17
**actual** 66:17 67:17
  77:12
**actually** 7:23 17:4
  26:22 73:1 80:5
  84:17 92:8 114:7
  122:18 163:9
  165:20
**adding** 147:18
**addition** 5:11
**additional** 34:21
  34:21 44:12,14
  45:5,22 64:22 73:6

84:3,6 96:13,16
  123:15 148:15,22
  151:23
**additionally** 43:22
**address** 5:6 150:6
**addressed** 66:12
**adequately** 105:6,25
**adhered** 66:12
**adjacent** 155:7
**adjudicate** 11:22
**adjusted** 139:13
**adjustments** 67:23
**Adrian** 97:23
**advantage** 150:16
**adversely** 124:14
**advertisements**
  126:7
**advised** 113:7
**aerial** 75:11 144:1
**affect** 124:14
**affected** 68:14,16,18,
  23 77:17
**after** 7:15 17:18
  100:24 140:24
**Again** 14:7 44:19
  45:8 46:17 48:17
  49:13 51:13 67:14
  76:2,25 83:13 91:2
  96:12,14 97:10
  107:9 123:7 127:17
  148:3 158:22 169:5
**against** 95:24 96:10
**agencies** 66:2,4
  67:18 78:20 79:2
  138:25
**agency's** 117:2
**agents** 157:12
**ago** 11:25
**agree** 29:7,10,16,18,
  24 30:8,25 42:8
  53:13 67:1,22
  73:14 88:19 96:21
  105:1,20 106:4,25
  107:21 119:14
  120:2,11,16,18
  143:16 157:16
**Agreed** 29:9 86:18
**agreement** 67:22
  81:17 106:10 108:8
  116:7

**agreements** 6:9,15,16
  62:9 138:6 155:3
**agricultural** 151:14
**ahead** 67:17
**Airboat** 20:12,14
  21:10 22:20
**Albuquerque** 59:4
  72:8
**aligned** 24:1,3
**allegation's** 100:17
**alleges** 100:9
**allocated** 86:13
  89:10
**allocating** 150:16
**allocation** 153:2
**allow** 52:8,13,17
**almost** 9:17 31:9
**along** 84:2 99:10
  125:7 130:9 131:12
  143:12 148:3
  150:24
**already** 30:24 46:18
  50:20 64:8,18 68:6
  69:4,13 76:3 80:22
  86:12 92:3 136:21
  137:2,10 142:14
**also** 5:21,22 10:6
  12:21 20:21 22:21
  27:25 37:16 38:10
  48:16 57:5 61:24
  64:25 65:5,13,25
  66:5 74:7,25 89:3,
  16 95:3 103:9
  108:13 110:17
  125:20 133:9
  141:25 145:18
  147:17 154:23
  155:3 156:17
  157:12 158:24
  159:2 162:20 163:2
  167:7 168:15
**alternative** 120:21
  121:19
**Alton** 130:19
**aluminum** 49:15
**always** 67:21
**Amended** 100:4
**America** 5:3 10:24
  100:5
**American** 113:23

**Amistad** 10:12 26:9
  27:6,19 28:2,5,11,
  16 43:13,17 44:3,
  15 45:5 46:14 52:7,
  9 57:7 62:16,19
  81:23 82:2 86:11,
  12,17,23 87:9,13
  89:12 90:6,15,23
  91:1,12 92:6 93:2
  104:8 138:14 151:6
  152:20,22,24
  157:18
**amount** 36:18 44:14
  47:13 51:21 55:15
  74:4,6,10 78:1
  81:21 90:15 96:25
**amounts** 43:16 44:2
  45:22 46:7
**analyze** 113:10
**anchor** 21:24 22:17
**and/or** 9:1 36:17
  36:17 45:22 61:1
  87:8
**Andrew** 5:9 134:5
  163:23
**anecdotally** 19:11
  36:13 54:10
**annual** 157:19,22,22,
  23,24
**another** 49:14 63:9
  73:20 86:9 126:3
  137:12,18,24 138:4,
  13,24 139:5 148:5
  153:2 153:2
**answer** 14:7 21:7,13,
  14 28:2 43:19
  51:18 53:25 61:17
  65:9,24 70:24 71:4
  80:5,18 83:1,16
  88:11 88:11 91:6
  93:8 97:2 99:7
  126:4 148:11
  156:10,11 168:17
**answered** 100:20
**answering** 166:3,5
**Answers** 39:6,8
**answer's** 53:24
**anybody** 28:9 38:15
  40:14 73:21 79:11
  80:1 123:17 143:3

  146:18 147:22
  148:8 150:9 154:19
**anyone** 38:17 39:1
  43:24 58:14 68:13
  81:1 125:1
**Anyplace** 17:9
**anything** 6:25 21:12
  29:23 33:12 39:20
  55:3 59:25 62:8
  72:6,11 73:12 82:2
  83:18,25 84:19,24
  102:25 104:12
  106:19 108:16
  112:9,11 117:11,17
  123:18 127:12
  132:16 140:17,24
  155:19 168:24
**anytime** 32:5
**Anyway** 103:11
**anywhere** 17:5 37:23
  60:8 71:19,25
**apologize** 12:8 21:9
  27:12 39:11 120:6
  135:14 154:16
**apparent** 116:6
**appear** 23:8 24:4
  38:23 105:7 130:7
**appears** 33:21 34:2
  35:3 37:24 37:24
  106:2 108:22 109:3
  111:19 117:14,17
  126:22 132:2,11
**applicable** 140:17
**applications** 28:25
  156:5
**applied** 143:15
**applies** 61:10
**apply** 83:3 113:3
  148:4
**applying** 141:3
**appreciate** 136:10
  143:25 169:14
**appropriate** 37:22
  38:10,12 47:2,6
  61:14 76:3,22
  121:13 147:15
**appropriately** 30:17
  127:22
**approval** 64:25 87:15
**approve** 137:14

approved 93:16 99:11
    128:13 137:14
approximate 49:5
    121:9
approximately
    100:11
arch 77:15
archeological 77:15
    140:16
area 9:7 10:6,12,17
    18:2,4,11,16 24:8
    27:24 31:1 56:3
    57:12,19 58:2
    59:24 77:20 83:3
    99:19 105:6,24
    108:6 109:4 110:9,
    20,24 123:22 126:3
    131:12 142:17
    148:19 157:19
    162:5
areas 9:8 12:19,20,
    21,23 13:11,19,20
    14:4 15:4,18 18:3
    20:16 38:1,2 46:19
    47:21,22,24 56:2,4
    61:13 75:14 82:14,
    17 90:2 144:2,8
    146:13,19 157:7
    161:19 167:2
aren't 86:22
arguing 109:25
arise 107:3
Army 5:12,23 7:7,12,
    23 36:20 40:9
    59:11 61:4,7,7,19,
    19 62:14,15 63:17
    64:4,24 70:5 78:6
    79:4 84:16 90:14
    93:10 94:2 98:15,
    21 101:19 102:2
    105:24 106:21
    116:20 118:8
    128:25 129:3,5,9,
    18 130:5,9,12,22
    134:22 135:1,3
    166:17
around 12:19,20,23
    14:21 18:9 21:18
    24:16 48:15,21
    52:20 55:17 58:3

70:10 105:24
    111:22 142:17
arriving 36:19 38:13
art 153:13
article 117:12,14,16
artifact 153:7,14
    154:6,13,20
artifacts 77:15
Arundo 40:4 40:4
ascertain 74:13
Aside 9:5 73:15
    98:13 115:8 140:20
ask 20:15 23:17
    53:11 65:21 70:24
    71:4 72:14,16,23
    90:19 126:10
    163:24 167:8
asked 11:23 12:9
    19:1 25:9 36:25
    53:9 64:20 72:24
    76:7 77:4 79:21
    110:22 125:20
    135:7 136:2 141:10
    164:16,19,20 165:3,
    6 166:14 168:10,11,
    18
asking 11:20 23:17
    25:25 52:23 74:7
    80:13 88:18 94:6
    99:8 110:2 135:8
    154:11
asks 80:6
assess 166:10
assessment 147:23
    149:5
assignment 125:19
assist 65:22
Assistant 5:12,23
associated 9:9 10:3
    42:25 93:20 97:12
    117:16 127:13
    130:18 144:4
    168:20
assume 25:21 35:9
    46:12,22 60:13
    72:14 81:14 105:15
    108:12 109:9
    115:18 118:15
    124:9 125:20
    126:12 132:21

133:23 141:11
    147:18
assumed 65:17 80:22
    132:17 137:3,6
    162:15
assuming 23:8 121:25
    122:2 133:3 148:14
    150:20
assumption 20:19,21
    51:13 65:4 68:6,7,
    10 69:3,6 76:2,8,9
    81:6,11,16 88:12,
    16 99:6 107:11
    118:18 118:18
    121:24 127:4
    132:17,18 136:17,
    21 137:5,18,23,24
    138:4,13,24 139:5,
    16 140:13,22 141:1,
    25 142:6,7 147:20
    148:25 150:22
    162:13,19
assumptions 44:25
    50:18 51:14,19
    64:7 69:12 80:20
    84:13 105:14,22
    107:9,17 133:1,2,4,
    6 136:1,4,6,11,14
    137:13 139:25
    141:16,22
assurance 141:8
attached 23:8
Attachment 100:23
attempt 50:23 67:15
    86:17 146:16,18
attempted 84:18
attendance 6:3,5
attorney 5:10,15
    6:11 21:11 78:23
attorneys 133:7
Austin 5:7,15
author 61:3
authored 28:15
authorities 68:1
    84:18 88:13
authority 51:15 64:4,
    9,12,13,20,21,22,
    22 85:2 150:23
authorization 69:13
    73:12,15,18 75:5

76:4 81:8 164:2

**authorizations** 45:1
84:15

**authorized** 61:3 64:8
110:8 137:10
162:13,15

**avail** 73:9

**available** 73:7,9
96:3 149:5 151:13
155:18

**averages** 70:2

**avoid** 22:4,13,19,22

**aware** 19:11 25:4,11
26:17 40:14 50:7,
12,13 51:2,5 57:12,
15,19,22 58:6,10,
13,17,18,23,24
59:2,3,7,8,12,13,
17,18 60:14 61:18,
23,25 62:4,11,13,
18,20,25 63:8,10,
15,20,23 66:18
66:18 68:17,22
69:21 70:2,4,8,9,
12,13,17,23 71:22,
23 72:1,25 73:2
74:4 75:23 77:19
78:8 82:8 84:16,24
89:11,14,14 90:1
92:23 102:4,15,25
110:13,16,21
111:10 112:11
117:20,22,24 118:3,
5,7,11 123:10,15,
21 124:18 125:18
134:14 142:12,23,
24 143:3 144:10
145:5,10,12,17,19,
22 146:2 150:19
155:15 156:22,25
157:1,9,10,12
159:13,25 160:9,14,
18 164:19

**away** 22:5 125:20

**B**

**bachelor's** 7:19
118:13

**back** 21:18 24:16

32:16 83:13 85:15
87:3 96:16 105:12
107:24 113:10
134:19 135:24
144:21 147:15
151:14 157:13
160:8 163:20

**backhoe** 38:6,7

**backhoes** 37:16 158:3

**bad** 118:18

**balances** 92:15

**bank** 14:21 146:10,11,
20 147:10 148:11
159:9

**bankruptcy** 11:8,13,
16,21

**barge** 38:8 49:17
54:13,15 158:18,22,
23,24

**barrier** 18:18 21:3,4
22:1,14,16,19
23:13 24:15 100:11
160:12

**barriers** 20:2 39:18

**based** 66:21 76:10
96:25 133:2

**basic** 8:12 36:13
66:19

**Basically** 37:16
137:9 139:22

**basin** 14:1 93:5
95:25

**basis** 20:18 36:15
39:12 53:16 75:19
80:10 93:8 101:7
102:5 105:4 116:1,
6 124:1,17 125:4
129:22 144:17

**bat** 113:20

**become** 153:3

**becomes** 23:5

**before** 11:9,11,11
19:12 32:22 33:17
35:13 68:25 79:23
85:16 98:11 100:2
102:9 111:7,18
112:19 113:19,22
128:4 131:9

**began** 7:25

**begin** 6:19 7:15,23

**beginning** 99:14

**begins** 98:4

**behalf** 5:10 72:2
84:22 100:10

**behind** 13:25 82:16
87:7

**being** 9:25 17:25
25:14 28:1 43:18
62:5 65:20 67:20
73:3 80:24 115:9
141:17 148:13
152:10 166:13
168:14

**belief** 42:11

**believe** 5:20,22 6:13
10:23 17:15 28:19
35:7 40:20,21
60:10 64:21 66:7
86:15 90:22 93:24
94:7 109:12 113:21
127:20 128:23
136:5,8 140:13
151:1,3,7,9 157:3

**below** 13:11,14,17
26:9,10 37:19 52:9,
14,19 81:22 82:2
115:6

**benefits** 50:14,24
53:14 133:17
136:18 137:5 162:8

**besides** 69:17 159:7

**best** 23:18 23:18
41:22 67:17 86:17
88:11 97:2 119:18

**better** 36:18 38:7

**between** 16:21 17:5
20:8 24:21 25:2,7
26:12,23 35:16
37:23 38:11 41:10,
16,19 50:16 51:9
53:19 56:4 60:8,20
61:8 63:1 64:14
65:12 72:2 86:21
87:21 88:1,20
94:13 99:16 100:22
102:9 111:7,25
143:13 151:6
160:15

**beyond** 18:17 43:17
44:3 83:25 84:23

104:22 121:18 169:5
**big** 54:15 158:24
**bigger** 46:19
**biggest** 46:17 55:16 80:19
**Binational** 126:24
**biological** 157:12
**biologist** 40:12
**birding** 15:7
**bit** 60:18 101:20 118:20 144:5,20 158:2
**bladder** 14:6
**blanche** 50:20
**block** 57:24 58:8
**blown** 123:7
**boat** 12:19 14:21 15:22 20:10,14 21:10,17 118:24 120:4,12 147:18,23 148:11
**boating** 15:7
**boats** 19:6 103:22 104:1,3
**bodies** 12:16 64:25 141:25 159:7
**body** 13:12 30:10,20 42:1,2,10,18,25 91:17 158:19
**bogged** 80:21
**books** 129:11,19
**Border** 18:6,25 19:5 20:10,13 21:4,17, 21 22:13 56:2 126:24
**borrow** 131:24
**both** 6:10 88:21 90:22 93:20 95:25 97:16 114:9 143:24 144:1 167:2,14
**bottom** 114:4 165:24
**bound** 30:23
**boundaries** 155:4,5
**Boundary** 26:7 75:9, 17 84:10,19 91:19 93:6 99:11 111:25 126:22 139:9,18 154:4,24
**bounds** 30:18

**Brazos** 93:5 150:13
**break** 32:3,5,7 85:17 120:8 135:17 160:2 163:13
**bridge** 20:1,9 100:12
**bridges** 18:12 19:18, 20 20:3 100:22
**briefly** 11:15 83:22 111:15
**bring** 81:1 98:13 139:1
**broad** 139:21 140:7
**broadly** 10:19
**Brodie** 5:7
**brush** 139:21
**Bryan** 5:20
**Bryant** 5:14
**budget** 72:23 73:9 117:3
**building** 155:6
**built** 115:22 121:25 122:4
**buoy** 18:18 20:2 21:3 22:1,13,19 23:13 39:18 160:12
**buoys** 20:8 21:18 22:6 23:9 24:15 54:14 100:22 154:4
**Burnett** 5:4
**business** 5:6 63:10 118:16 126:9
**businesses** 60:7 62:10 123:17 125:24,25 126:11

---

## C

**calculate** 162:21
**calculated** 99:5
**calculation** 159:1
**calibrated** 98:21
**call** 13:24 32:5
**called** 8:24 14:1 126:2 128:7
**came** 65:17
**Camino** 100:12
**can** 6:6 14:4 21:7,14 22:19,21 23:18 25:13,14 28:3,14 35:2 37:25 40:5

41:18,23 42:14 46:21 48:13,15 49:15,16,17 52:3 53:7,23 56:7,12,22, 25 57:2,3,3,6,9 58:7 63:5 65:22 65:22 65:22 65:22 67:16,23 75:2,11 80:18 81:15 88:11 90:18 94:6,7 96:15 97:2 99:23 103:8, 12,21 107:5 116:19 121:15 124:9 131:21 132:1 134:1, 9 136:13 139:24 141:21 144:2 151:10 152:16 153:3 156:25 161:1, 2,11 163:12 165:16 168:17
**Canalization** 128:8
**canalize** 128:11
**candidates** 168:4
**Cane** 39:23 40:3,15, 24 41:3 83:22 84:11 85:20 86:1 156:23 157:11,14
**cannot** 75:15 163:3, 10
**canoe** 48:13
**canoes** 48:8
**can't** 44:8 51:17 55:15 56:17 67:23 72:2,20,24 73:19, 20 77:2,5 83:9 96:18 99:6 99:6,7, 7 143:17 144:18 156:9 161:13 162:20
**capability** 33:5 83:15
**capacity** 33:7
**captain** 21:21
**care** 47:24 72:13 140:11 162:20
**career** 7:16,25 80:24
**cargo** 144:13
**carries** 19:21
**Carrizo** 39:23 40:3, 15,24 41:3 84:11

85:20 86:1 156:23
157:11
**carry** 19:20 49:11
137:19 139:7 164:3
166:23,24
**carte** 50:20
**cartel** 125:7,21
**cartels** 124:4,13,20
125:15
**case** 5:16 10:25 11:7,
12,24 12:2,3,10
17:19 23:2 33:10
34:10,16 35:22,25
36:3,7,12,19 39:9
41:24 65:4 67:11
109:5,10,14,21,22
125:20 135:10
136:2,12 164:15
168:14
**case-by-case** 101:7
**cases** 31:15,18,18,20
109:2,18 155:3
**Casner** 5:23
**catch** 63:11
**category** 123:1
**cattle** 118:22 119:15
120:3,12,21 121:3,
17 122:10
**caught** 63:11
**cause** 40:5 156:25
**caused** 43:23
**causing** 47:24
**Center** 40:22
**Central** 11:17
**century** 135:4
**certain** 14:4 31:7
45:20 54:18 55:10
144:19,20 149:11
**certainly** 22:12 31:9
72:7 89:9 118:5
**cetera** 20:23
**challenges** 125:14
**change** 35:21,24 36:3,
6,12 57:6 87:13,24
88:5,9 104:11
105:2 149:6
**changed** 116:8 149:2
**changes** 35:15 87:21
88:20 90:24 108:23
127:14 133:4 138:5

139:16 150:6
**changing** 43:12
**channel** 9:2 14:2
46:24 47:11 63:16,
25 64:13 65:11
70:5,10,13,19
71:10 76:22 83:11
130:12,17,22
131:11 132:5,10,13
133:10 152:6
**channelization**
106:24
**channels** 13:11 69:15,
23 96:8 114:8
**characteristics**
157:20
**characterized** 24:19
**charged** 154:16
**chart** 23:4 25:11,15,
16,20 129:11 131:8
**charts** 25:1 129:1,14,
19
**chemical** 157:13
**chief** 8:6,13 22:24
31:9 37:8 64:16
118:2
**chiefs** 31:8
**chime** 5:24
**choked** 120:7
**chose** 130:22
**Chris** 36:24 38:17
79:12
**chucked** 156:23
**circumvented** 140:24
**cities** 58:16,21
89:12,22 90:7
**citizens** 90:7 114:9
**Civil** 6:9,18 64:16,
17,18 118:2
**clamshell** 38:9
**clarified** 31:16
**clarify** 31:19 52:21
**clarity** 29:23
**Class** 41:11 41:11,17,
17 48:3 48:3,8,15,
19,20,21 49:9,10,
16 53:25 53:25
54:8 54:8,17,19,25,
25 55:2 55:2,3,3,
18 95:18 95:18

103:25 104:3 104:3
118:24 118:24
119:4 119:4 120:19
120:19 143:7 143:7,
24,25 144:2,3
146:2,3 147:18,19
161:18 161:18
168:19 168:19
**classes** 48:7
**Clean** 167:16
**clear** 35:5 82:16
135:15 139:22
**clearance** 66:3 81:17
**clearances** 65:25
69:12 80:22 84:15
88:16 107:11
140:14,15
**cleared** 140:20
**climate** 96:25
**close** 169:17
**closer** 21:22,25 22:1
**closest** 147:3
**Coahuila** 68:2
**coast** 70:11 131:8,12
**cofferdams** 14:2
**college** 7:16
**colloquialism** 9:18
**Colorado** 116:8
**Columbia** 117:4
**com** 42:12
**combine** 161:3
**combined** 15:9
**come** 6:9 66:3 67:22
91:18 95:24 131:21
136:18 138:19
148:3
**comes** 66:21 151:9,14
**comfortable** 109:23
**coming** 6:13
**commerce** 42:19,21,22,
24 43:6,8 45:16,19
46:1 97:14 103:20
106:13 108:7
142:22 144:21
145:14 163:6
**commercial** 11:17
14:18 15:17,21
16:9,12,17 27:18
28:1,6,10,15 39:2
51:8,21 58:14,19,

24 59:3,8,13,20
62:19,25 63:4
69:16 70:6,14,20
71:11 73:23 95:23
97:4,11 108:5,16
111:6 123:11,15
124:15 142:16
145:13 160:14
166:15,18,20,24
167:7 168:13
**Commission** 26:7 66:8
91:19 99:11 113:24
115:13 126:23
**commodities** 121:3,18
122:10 123:3 168:4
**common** 9:17,19 79:5
114:8
**comparable** 125:14
**compare** 100:21
135:11
**compared** 119:14
120:3 121:4,19
**comparison** 53:14
**compensated** 138:15
**competent** 77:8,11
**competitive** 106:16
**Complaint** 100:4
**complete** 34:14 34:14
136:13
**completed** 7:16 8:24
17:18 34:13 88:13
140:25 162:9
**completely** 67:21
116:8
**completion** 163:3
**compliance** 66:13
**complication** 151:23
**comply** 6:14 42:12
**compounded** 57:10
**comprised** 130:18
**con** 10:6 84:21
**concept** 85:20
**concerned** 20:8
**concerning** 116:7
**concerns** 55:16
**concession** 11:18
15:21 61:3,6,19
**concessions** 60:15
62:14,19,21
**conclude** 31:11

**Conclusion** 41:15
**conclusions** 107:18
**condition** 103:21
143:18
**conditions** 22:12
104:17 116:6
**conduct** 63:10 91:24
**conducted** 39:2
**conducting** 16:6
154:4,24
**conducts** 39:1
**conferences** 80:24
**confident** 113:22
**confirm** 110:2
**conflict** 152:23
153:3
**confused** 103:10
**Congress** 53:9,11
64:7,23 65:13
71:19,23 72:17
73:2,3,6 81:9
84:23 96:7 114:1
115:13 131:2 135:7
137:13 162:14,15,
17
**congressional** 64:11,
13 73:6 85:1 164:2
**conjunction** 30:3
44:20
**connection** 10:24
11:24 12:10 136:2
**connotates** 9:24
**consensus** 138:19
138:19,22
**consent** 65:12,17,20
67:18 84:18 88:7
114:10 137:25
138:15,25 139:6
**conservation** 27:15
**consider** 23:14 24:8
51:24 60:20 81:13
119:2 137:9 154:12,
13 168:23
**considered** 38:21
47:19 51:25 125:22
134:25 136:23
136:23
**consistent** 98:20
**consists** 129:2
**constraints** 45:20

**construct** 95:21
114:10
**constructed** 14:6
121:13 147:14
**construction** 14:5
60:6
**consulting** 6:3,4
**consumption** 87:4
**contact** 26:1 126:16
**contacted** 123:17
123:17 133:3
**contain** 109:15
**contained** 31:21
111:11,19
**contains** 109:21
**context** 117:16
**contingent** 155:17
**continually** 148:22
**continue** 105:12
121:11
**continuous** 104:9
**contract** 61:4 83:6
**contracts** 60:6 61:6,
19,25 93:10,13
155:24 156:2,3
**contributed** 39:9
**control** 9:11 26:15
27:10,14 40:7
83:23 85:20
**controlling** 132:8
**convenient** 97:7
**conversations** 28:13
**cooperate** 137:19
138:25
**cooperation** 88:21
137:25
**coordinate** 65:7 66:5,
16,25 67:4,9,15,21,
25 68:15 75:3
90:19 159:19
**coordinating** 67:1,18
**coordination** 67:11
89:1
**copy** 35:3 131:17
134:3
**Corps** 5:12,23 7:7,13,
24 8:4,14 26:18,25
30:5 31:4,24 36:20
37:5 40:9,11 59:5,
11 60:5,21 61:7,19

62:15 63:18 64:4,
12,24 67:5,6,16
69:15,23,24 70:5,
20 72:22 78:6 79:4
80:2,9,14 82:18,19
84:17,21 90:14
93:10 94:2 98:15,
21 99:1,15 101:11,
19 102:2 105:24
106:21 110:8
116:20 116:20,25
117:15,18 118:5,8
125:11,13 128:25
129:3,5,9,14,18,18
130:5,10,12,22
134:22 135:1,3
138:20 157:7 159:7
164:3 166:17,23
**correct** 10:25 13:8
17:24 22:3 27:4,5
28:22,23 35:9,10
38:5 41:4 43:9,15
46:3 48:1,2 51:24
52:7,12 56:9 63:23
64:2 65:14 71:3,8
74:12 77:2,5,7
78:4,10,14,17,18,
24 79:3 81:19
82:22 86:15 87:25
91:10 107:23
108:13 110:11,14,
17 113:9,11,14
115:12 116:12
119:12 121:25
122:24 126:6
129:17 133:9,17
137:1 141:13
143:21 145:5
147:19 148:14
150:4,8 153:22
154:7 156:17,21
160:20,23 161:10
162:3,24 163:1,10
**correctly** 65:10,24
151:16 160:20
**correspond** 98:15
**corresponds** 99:20
**Cortez** 36:2,5,12
97:24 97:24 103:9
**Cortez's** 35:19 36:16

**cost** 50:6,7,12 70:19
71:10 77:3,4,6,23
78:2,3 80:20,21
81:6,7 82:24 94:19
95:8 133:10,14
137:6 141:15 162:8,
21,21
**costs** 50:1 80:11
81:8 122:7
**coughing** 120:10
138:10
**Could** 7:5 8:12 9:15
11:15 12:7 13:15
15:6,7,20,21 18:20
20:18 20:18 24:9,
19 26:4 29:20
33:20 41:22 43:7
44:21 45:2 49:11
50:14 53:7,14 54:5
55:20 56:12,19
59:25 60:3 67:12
68:15,25 74:20
85:23 86:5 90:6
93:24 98:19 100:6
103:18 105:13
107:3,8 119:7,19,
19,21,21 121:14
122:5 123:1 126:21
127:5,23 129:13
131:7 133:4 136:10
139:20 139:20
141:9 141:9 144:4,
8 146:16 149:7,17
152:12 153:16
155:9 159:20 161:3,
12,13 162:4 164:8,
14 167:2,14 168:19
**couldn't** 11:20
162:21
**Council** 93:17
**Counsel** 5:13,24 6:6
12:14 80:14 131:18
163:23
**country** 59:21 114:9
114:9
**county** 99:15,16
101:16,22
**couple** 13:19 13:19
18:10 19:1 20:6
37:17 62:8 126:1

146:6,8 147:2
**course** 56:7 67:1
68:13 164:5,15
**court** 11:11 31:18
31:18
**Court's** 6:15
**Courts** 31:16
**covered** 24:9 56:11
59:6,15 71:20
111:1 112:4 140:10
**cows** 120:7
**craft** 49:15 103:23
109:2
**crafted** 105:16
**create** 14:2 75:22
77:8,11 88:8 96:7
132:13 133:10
136:11
**created** 83:11 105:16
129:15 134:17
**creating** 70:19
167:20
**creeks** 9:2
**criminal** 124:4,13,19
125:2,7,15
**cultural** 67:12
**current** 8:4 44:3
54:3 59:19 64:12
73:8 84:1 88:1,20
106:12 119:9,23,25
120:13 146:2
160:12,14
**currently** 53:23 54:6,
23 55:21 56:12
58:9 68:22 87:9
97:4 123:11 124:3
133:14 142:16
148:9 169:2
**customers** 12:22

---

**D**

---

**Dallas** 9:3
**Dam** 10:12 13:12,14,
17,25 14:5,6 33:6
37:15 43:13 44:3,
15 45:5 52:10,12,
14,18,19,20 57:7,
10 81:23 82:2,9
86:12 87:7 89:12

90:24 91:1,24 92:6
122:11,21 151:1,6,
10,19 152:22 154:3
**dams** 52:17 130:18
150:24
**dangerous** 120:20
**date** 12:1,11 25:3
35:7
**dated** 34:3 35:6
116:23
**dates** 168:6
**David** 5:14
**day** 17:15 18:5,21,22
19:3,17 23:12
24:11 35:13 169:13
**day-to-day** 20:18
**dead** 116:9
**deadline** 6:13
**deal** 11:20 72:22,23
84:11 116:10
122:21 125:1
158:11
**dealings** 126:14
128:17 144:22
**dealt** 28:9 107:3
153:3
**debris** 154:4
**December** 101:2
**decision** 31:10,11
**decisions** 29:3
151:17
**declared** 27:23 30:24
102:12
**Deel** 5:6
**deemed** 88:13 102:8
113:2 137:14
**deep** 25:6 46:25
132:9,10
**deepening** 143:14
**defendants** 5:16 39:6
**define** 53:22 162:24
**defined** 31:16 63:4
**defining** 161:19
**definitely** 67:3
**definition** 31:12
41:23 42:17 60:23
112:17
**definitions** 42:23
**degree** 7:19 14:20
19:1 24:14 31:7

102:9 108:23
118:13 168:23
**demand** 89:16 123:10
**demands** 148:20
149:16
**Department** 5:10,20
61:4 79:1
**depend** 13:16 45:18
53:17 54:19 74:17,
18 75:20 76:25
87:23 90:10 94:25
96:12 121:21
148:12 158:6,7,22,
24 161:4
**dependent** 158:8
**depending** 23:3 44:5
51:16 57:9 87:23
123:6 143:20 144:3,
5 146:14 146:14,15
147:7 159:18 162:5
**depends** 13:18 15:17
22:8,9,9,12 42:20
44:19,21,21 45:10
48:23 48:23,24
49:7,19 56:19,20
75:4,5,5
**depict** 37:11
**deposition** 5:2 6:19
11:9 16:25 32:19
33:15,25 34:25
38:24 41:6 97:23
107:25 127:24
128:3,19 129:25
135:18 164:1
165:17 166:2
169:17
**depositions** 6:10
**depriving** 90:6
**depth** 25:2 45:22
46:18 47:2,6 56:22,
24 57:5 69:15,23
70:9,13,19,20
83:14 95:4,9,12
123:8 131:11 132:5,
8
**depths** 25:12 69:21
70:12 94:12,15
95:7
**derived** 50:14 97:4
**describe** 8:12 9:21

11:15 51:10 104:2
116:24 123:2
**described** 14:8,20
94:9 96:19 113:6
168:24
**describing** 38:7
64:19
**description** 33:23
60:1 134:10
**Design** 40:22 43:20,
23,24 74:12,17,18
75:5,20,22 77:7,9,
12 83:13,14 86:8
90:10,12,13 91:3,9
94:9,10,17,25 95:2,
20 96:5,14,22
121:13 123:6,7
143:12 148:4,13
153:4 158:8
**designated** 10:23
**designed** 129:11
**designer** 53:5
**designing** 151:24
**designs** 95:22 110:18
149:25
**desire** 48:13 67:21
**detail** 25:2 28:4
**details** 155:21 156:1
**detection** 154:6
**determination** 99:21
101:12 102:6 116:1
**determinations**
28:21 30:6 31:4
**determine** 30:15
40:24 43:21 45:11,
21 47:10 49:4 83:4
94:4 95:6,12 107:5
121:12 123:8 127:5
136:25 160:21
**determined** 30:24
101:7 102:10
136:22 137:2,6
161:15
**determines** 92:15
**determining** 30:20
91:22 149:3
**develop** 38:16,19
40:22 50:6 157:3
**developed** 50:11
**developing** 36:21

96:5
**developments** 115:20
**devotion** 88:4
**dewatering** 13:24
82:15
**dif** 56:5
**different** 15:5,6
23:2 37:18 46:15
46:15 48:24 56:19
67:13 80:24,25
92:16 93:7 94:16
96:15,17 99:1
121:22 122:7
140:10 146:16
149:11 154:17
157:18
**difficult** 55:4 96:14
120:24 121:23
**difficulties** 11:18
85:10
**difficulty** 21:5,17
**dig** 75:3
**digital** 136:7
**dim** 89:6,8
**dips** 48:17
**directed** 13:23 14:9,
11
**direction** 154:17
**directly** 13:11 52:9,
14
**dis** 20:8 142:12
**disagree** 29:17 30:13
104:12,15,20
**disagreement** 108:8
109:6
**disclose** 6:14
**disclosing** 35:18
**disclosures** 6:13
**discuss** 9:21 19:8
80:1,9 168:18
**discussed** 43:21
46:18 47:18 78:6,
12,16,20 79:1,9,13
85:19 86:9 97:11
140:5 141:25
142:11 152:10
155:1
**discussing** 22:17
23:2,20 66:20
85:17 117:17 164:2

165:25
**discussion** 19:5
36:24 60:3 79:20
111:25 127:18
**discussions** 20:13
60:2 80:25 142:13
**disposal** 76:3,14,15
**dispose** 76:5
**distance** 18:17 20:2,
5,8 144:15
**Distances** 99:10
100:22
**District** 5:12 8:3,8,
14 9:7 10:19 12:14
16:13,14,15,16,20
17:3 27:4 37:9,12
40:14 56:11 58:14,
19,25 59:4,6,11,16
60:5 63:17,22
71:18,21 72:3,8,9,
12,13 73:9 79:14
81:22 82:6,18,23
83:8,17 84:17
101:7,13 111:2
112:24 113:13
115:2,7,10 117:4,
12,19,25 124:6
125:11,13 144:22
154:20 156:4,7,14,
15,19 166:14
167:16
**districts** 69:16 79:4,
11 80:1
**District's** 99:14
**disturbed** 77:16
**diversion** 150:24
151:1,10,19
**divert** 151:18
**diverted** 151:13
**division** 10:20
167:15,19
**document** 27:23 32:19,
22 97:22 98:11,12
99:1 101:20,25
104:16 114:3 128:3,
6 129:16 130:16
131:9 132:1,4
134:1,9 142:12
142:12 165:25
166:3,10

**documents** 16:20
28:14 38:20
**does** 10:19,20 15:1
26:11 37:7 38:23,
25 40:9 42:18
63:17 66:25 67:17
80:2,7 83:17,24
84:9 86:16 90:14,
16 91:23 91:23
92:2,5,14,25 94:10
96:25 97:1 109:4
116:24 116:24
117:1 122:22
122:22 124:11,13
128:14 129:10
152:5 154:25
166:17 166:17
167:15,19
**doesn't** 98:15 157:4
**doing** 38:13 49:3
50:1,14,24 76:16
83:18 110:3 134:25
138:10 149:25
163:10
**donax** 40:4
**done** 12:19 39:13
47:10 50:21 68:7,
10,25 69:4,8 73:21
76:1 79:23 81:14,
21 82:6 83:2,8
84:10,14 88:19
99:4 132:17 133:16
135:5 139:8,17
145:21 146:12
147:22 148:9,10
150:2 159:22
162:22 165:14
**doubt** 96:14 124:11,
12
**doubtful** 105:8 106:3
**down** 13:13 14:2
16:20 18:11 21:2,4
24:2,11,15 48:15
54:11 57:24 58:8
67:14 72:21 80:21
83:6 89:12 97:14,
17 109:4 114:3
118:23 119:3,9,24
120:4,12 121:5,10,
18 123:3 126:3

143:4,9 144:11,21,
  25 151:9,14 163:6
**downstream** 10:12
  20:3 58:16 99:15
  114:23 148:23
**downtown** 9:3
**draft** 46:6,23 47:5,
  13 48:1,6,10,16,21,
  22 55:22 56:6
  103:22 158:19
**drafts** 47:13 56:12
**dramatically** 56:22
  57:6
**dredge** 12:23 14:3
  38:1,6,10 76:1
**dredged** 14:14 82:2
**dredging** 12:16,18
  13:1,9,23 14:12,14
  33:6 36:25 37:1,10,
  11,21 71:10 73:22
  74:1,11 75:25
  76:18,20,21,24
  77:3 79:5,16,22
  80:2,10 81:21 82:7,
  16,19 83:8,10
**driver** 22:13
**drives** 144:4
**dropped** 25:14
**drought** 57:3
**drug** 125:21
**dryer** 45:9,10
**ducts** 76:22
**due** 62:5
**duly** 7:2
**during** 6:25 7:15,17
  103:21 144:8 156:4
  157:6

**E**

**each** 75:13
**Eagle** 17:8,12,21
  18:4,21,22 20:3
  21:3 26:9 35:20
  58:4,15,20,21 71:6
  100:12 118:21
  120:21 121:3,18
  151:3,6 160:15
**earlier** 12:11 14:20
  27:2 36:24 60:18

62:9 79:13 80:22
  81:20 83:22 87:2
  93:19 100:13,20
  101:3 102:22 107:2
  108:15 113:6 118:1,
  12 150:12 152:19
  155:1 164:1 166:2,
  13 168:24,25
**ease** 20:16,20
**easily** 20:17 90:19
**East** 131:8,12
**easy** 152:15
**ecological** 106:23
  107:13
**ecologically** 127:21
**economic** 42:24 50:13,
  24 105:7 106:1,13
  119:18 121:14
  133:16 136:18
**economics** 50:19
**ecotourism** 97:16
  146:7 168:22
**effect** 60:7 90:6
  112:8 114:13 127:3
**effective** 74:20
**effects** 90:23 140:16
  140:16
**effectuate** 137:20
  138:6
**effort** 67:4 76:19
  141:3,19 148:15
  168:3
**efforts** 84:3,6
  141:15 146:20
  147:12
**either** 7:15 25:7
  43:23 47:11 52:17
  68:1 71:15 88:7
  93:16,25 119:17
  134:4 137:2 138:15
  151:20 168:5,21
**elements** 66:11
**elevations** 23:2
**elimination** 124:19
**else** 17:9 33:12
  38:17 39:20 79:17
  81:1 83:4 84:24
  117:17 146:18,24
  147:22 148:8
**elsewhere** 67:7 70:20

**embankment** 82:13
**embankments** 37:19
**employed** 7:7,10,12
**employee** 97:25
**empties** 151:9
**enable** 45:15 69:16,
  25 70:6
**encompass** 66:25
**encompasses** 15:4
**encountered** 154:20
**encroachment** 155:5
  157:4
**end** 15:24 100:24
  167:9 169:20
**endangered** 68:17
  140:15
**ends** 98:5
**enforcement** 146:4
**engage** 18:21 63:18
**engaged** 15:13
**Engineer** 36:20 40:21
  53:5 69:23 73:10
  75:2 79:4 93:10
  96:17 117:19
**Engineers** 5:12,23
  7:8,13,24 8:5,14
  26:19,25 30:5 31:4,
  25 37:5 40:9,12
  59:5,11 60:5,21
  61:7,20 62:15
  63:18 64:4,12,24
  67:5,6,16 69:16,24
  70:5,21 72:22 78:6
  80:2,9,14 82:19
  84:17 90:14 94:2
  96:22 98:16,21
  99:1,15 101:11,20
  102:2 105:24
  106:21 116:21,25
  117:15 118:5,8
  128:25 129:3,6,10,
  15,18 130:5,10,12,
  22 134:22 135:1,3
  159:7 166:17
**enhance** 41:20 161:12
**enhancement** 161:3,4,
  5,6,14 162:3
**enhancements** 133:5
  168:19
**enhancing** 84:3

enjoyment 15:14,25
    155:8 168:21
enjoys 93:7
enough 96:10 106:9
    123:2 127:5
ensure 26:14 66:10
ensuring 8:25 9:10
entire 31:20 47:3
    56:14 58:11 63:21
    94:5
entirety 61:11
    112:20 113:1
    161:21
entities 65:7 65:7
    66:6 67:9 68:15
    90:2 92:16 139:4
entitled 103:18,19
entity 26:8 62:1
    64:19
Environmental 65:5,
    25 66:8,11 93:17
    127:19,20 140:14
envision 44:4 75:24
    83:25 84:9 95:16
    121:1,15
envisioned 73:8 74:2,
    14 76:17 77:17
    78:5,11,15,25
    79:10 84:6 94:1
    122:9 140:3 146:21
    151:25
Eppies 126:2
equal 97:1 137:6
equate 45:19
equipment 36:25 37:1,
    10,11,21 38:1,3,4,
    5,9 154:5
era 144:15
Eradication 39:24
    40:16 41:3
erosion 146:14
especially 38:2
essentially 15:13
    41:25 84:2 92:15
    103:25 138:18
    140:8 158:1,15
estate 61:14,15
estimate 13:15 18:9
    20:5 23:18 24:10,
    13 48:25 77:3,22

94:21 95:8 141:7,
    14,20 158:4 158:4,
    13
estimated 70:19
estimates 50:6,7,12
    51:1,2 71:9,13
    76:23 77:4,6 94:18
estimation 141:2
evasive 49:5
even 15:21 20:6
    23:14 24:22 46:11
    54:13 60:1 75:22
    77:25 115:8 120:25
    122:8 123:3 142:7
    150:5
event 47:5 89:4
ever 11:2,6,9,11
    12:25 14:11,14,17
    28:9 31:15,22
    37:11 39:1 56:8
    71:18 72:17 82:6
    91:15 112:5 128:9,
    15 130:2 131:9
    134:15 142:9 150:9
    160:10 166:6
every 6:19 81:17
    101:20 123:1 141:3
everybody 5:25
everyday 90:8
Everything 19:15
    83:4 140:5 144:1
everything's 148:16
evidence 102:15
exact 11:25 77:19
    159:12
exactly 96:18
examine 98:19
example 10:7 46:4
    56:3 69:24 82:14
    96:6
excavator 158:16,24
excavators 158:9,11,
    17
except 61:2 143:23
exception 79:12
excerpt 128:21
excerpts 31:20 112:6,
    21
exclusive 155:7
Excuse 27:10 138:10

146:15
exercises 17:3
exhaustive 126:1
Exhibit 32:17,19
    33:4,14,16,17,20,
    25 34:5,11,24 35:1,
    2 38:23 41:5 97:20,
    21,23 98:19 99:9,
    25 100:1,2,7,24
    103:6,7,8,9,13
    107:25 111:15,16,
    17,24 112:13,15,23
    113:6,15,16,18
    116:16,17,19
    126:18,19,20
    127:24,25 128:2,18,
    20 129:13,24 130:1,
    2,11 131:5,6,7,15,
    16 132:5 133:21,22
    134:2,13 153:18,19,
    21,23 165:16
exhibits 32:4
exist 51:2 76:12
    93:25 94:10 124:11
    125:25 143:10
existed 33:24
existence 91:11,18
    125:7
existing 104:10
    152:17
exists 25:22 134:14
expanding 84:2
expansion 84:5
expect 33:9 34:9,13,
    20 81:1 89:4,22
    117:24 121:2
expectation 34:12
    44:7 45:9 54:4,20
expectations 44:11
    149:24
expected 33:4,5,24
    34:4 85:23 89:17
expenditures 117:7
expensive 120:20
experience 12:15
    13:9 16:6,9,12
    22:24 24:22 28:20,
    24 29:3 30:9 135:1,
    9
experiences 125:10

**expert** 6:14 10:24 11:2,4,6,23 12:10 17:18 18:23 29:11, 25 30:9,20 34:14, 15 36:2,5 37:22 38:13,14 40:2 41:5 42:17 43:10 44:24 49:22 50:15,25 51:10 52:2 63:24 65:11 68:3,19 73:8 74:3,15 75:25 76:18 77:18 78:5, 11,15,19,25 79:10, 18 83:25 84:6,9 85:19 86:7,9 87:14 88:24 90:25 94:1 95:16 107:14 121:1 122:16 125:8,23 136:12 141:22 148:6 150:3,5 152:1,9 155:23 157:17 159:2 160:19 162:9 163:3 164:20,21 165:9,11 168:3
**experts** 6:3,4
**explain** 9:15 26:4 151:10 152:12 155:9
**explained** 6:11
**explanation** 100:15
**express** 42:5 54:5,22
**extended** 130:19
**extent** 47:6 51:8,20 76:23 80:5 83:9 86:4 139:1 152:23 163:4
**extremely** 120:24
**eye** 67:16 67:16
**eyes** 18:3

---

**F**

---

**fact** 20:22 95:24 96:10 104:25 137:19 157:6
**factor** 80:20 96:4
**factors** 48:24
**fair** 15:10 22:12 24:17 24:17,20

31:5 41:1 42:4,16 43:4,9 44:1,5 45:23 47:4 50:22 54:5 55:20 59:18 81:5 104:2 118:18, 19 137:23 145:1,6, 12 149:22,23 163:2
**fairly** 90:19 152:14
**faith** 67:4
**Falcon** 26:9 52:12,13, 14 62:21 86:24 104:8 122:10,21
**falling** 47:23
**Falls** 57:13,15
**familiar** 9:16 16:23 26:6 31:14 40:13 92:9,12 93:4 97:24 109:22 134:12 150:12 151:11
**far** 13:5,12,17 18:8 19:2,12 20:4 22:18 23:11 24:13,24 26:20 32:1 36:18, 21 39:15 42:10 46:10,12 47:19 54:2,18 63:5 65:16 66:17 68:7 77:12 80:23 81:13 84:25 94:9 96:19 99:1,4 102:4 107:10 108:15 110:11,13, 16 112:25 113:3 136:3 139:11 145:3 149:9 153:4 155:12 158:7 159:13 168:23
**farthest** 99:15
**fashion** 137:10
**faster** 120:2
**favorable** 157:15 162:17
**feasibility** 50:19 150:1 153:4
**feasible** 45:13 73:8 132:13,19,21,21,22 149:19 149:19
**Federal** 6:18 65:7 66:22 92:20 112:16 140:17,18 155:2,4, 8 157:2

**fee** 61:1 62:2 167:2, 3
**feed** 10:8
**feel** 32:5 109:23
**fee-owned** 61:10 155:2 166:19
**feet** 13:19 13:19 18:10 20:6,7 23:14, 19 24:10 46:6,23, 25 47:7,9,13,14,14, 14,14 48:18,21 49:17 55:22 56:6, 13 100:14 132:9
**few** 5:21 8:19 24:17, 22 82:14 100:14 117:17 146:16 163:24
**fifth** 104:10
**fifth-level** 87:25
**figure** 75:2 80:21 105:18 148:13 158:25
**filed** 11:21 100:4
**find** 25:6
**finding** 27:22
**fine** 32:10 48:15 74:8
**finish** 160:3
**first** 6:10 7:2 12:9 39:6 41:9 46:20 87:14 100:4 101:6 117:1,18 128:12 130:11 133:3 153:25 161:17
**firsthand** 63:6 67:8 124:8
**Fiscal** 126:24
**fish** 63:11 63:11 66:9
**Fisher** 37:15,16,19 82:12,13
**fishing** 15:7 63:1,4 103:22 168:22 169:2
**fit** 60:1
**five** 48:16
**fixed** 148:17
**Flash** 57:2
**float** 160:12
**floating** 18:12,18

20:2 21:3 22:13
23:13 38:8 39:18
100:11 160:12
**flood** 8:17 22:24
27:10,14 87:2
**flooding** 57:2
**Florida** 132:10
**flotation** 158:23
**flow** 19:2 22:8 25:12
26:14,23 44:9,18
54:19 55:15 57:9,
11 94:15 95:5
103:22 104:9
127:19 151:18
155:3
**flows** 36:10,13,17
41:10 53:20,22
54:6,24 55:8,11
127:20,21,21
143:20 144:6,7,9
**focused** 23:24,25
**folks** 42:22 62:9
66:10 67:6 155:13
**follow** 30:24 159:11,
12
**follows** 7:2
**foreign** 59:16,21
**foreseeable** 124:19
**foresue** 125:10
**forgotten** 153:12
**form** 8:12 20:25 21:6
22:7,15,23 24:23
25:10,19,24 28:7,
12,17 29:14 30:2,
12,22 31:6 34:1,7,
18 39:3 40:17 42:7
45:17 46:2 47:1,15
49:1,12 50:3,5,8,
17 51:4,12,23 52:4
53:15 54:9 55:1,14,
23 57:1,8 58:1
59:22 60:9,22 61:9,
22 62:3,17,23 63:3,
14 64:6,15 65:2,15
66:15 67:19 68:5,
12,20 69:2,11,19
70:1,7,16,22 71:2,
7,12,16 73:11
74:23 75:10,18
76:11 77:10,24

79:7 80:17 81:25
82:21,25 83:12
86:14 87:16 88:10,
23 89:7,18,25 90:9
93:3,23 94:14
95:19 96:2,11,24
97:9,15 98:9,23
99:17 100:18
101:24 102:3,7,18
104:14 105:3,11
106:5,15,18 107:1,
16 108:10,14,21
109:8,13,19 110:5,
12,15 111:3,9
114:14,24 115:5,17,
25 116:6,13 117:8,
9,13 118:10,25
119:5,11,16 120:5,
14,23 121:6,20
122:12 123:5,13,25
124:1,7,16,17,22
125:3,4,17 127:9,
16 128:16 129:7,21,
22 130:6,24 131:3
132:7,15,24 133:13,
18 136:7,20 137:8,
16,22 138:3,8,17
139:2,10,19 140:4,
21 141:5,12,18
142:5,10,19 143:11,
19 144:16 145:4,8,
15,20 146:5,22
147:4 148:2,24
149:8,21 150:18
152:2,25 153:9
156:8 157:21
158:21 159:24
160:17,24 161:16
162:11 163:8 168:9,
15 169:5
**formal** 13:6
**formed** 107:12
**Fort** 5:5 7:10,24 8:2,
7,13 9:3,6 10:19
12:14 16:13,14,15,
16,20 17:3 27:3
37:12 40:14 56:11
58:14,19,25 59:6,
15 60:5 63:17,22
71:18,21 73:9

81:22 82:6,18,23
83:7,17 84:17
99:14 111:2 112:24
113:12 115:1,9
117:11,19,25 124:5
125:11,13 154:19
156:4,6,14,19
166:14 167:15
**forth** 34:15 50:25
87:5 98:14 102:16
117:2 144:21
**forward** 64:10 115:21
138:22
**forwarded** 37:4
**found** 63:5 126:1
**four** 6:4 48:14,16
**Frabotta** 36:25 37:2
38:18 79:12,16,18
**frankly** 105:18
**free** 32:5 114:8
**frequently** 90:20
**from** 5:19,23 6:2
7:18 9:5 10:12
12:24 13:25 15:6
18:10,11,25 20:3
22:5 24:7 25:8
27:25 28:3 32:14
36:11 39:12 40:11
43:3,12,13,17 44:2,
15,17 45:5,7,15
46:24 49:13,24
50:14,24 51:2 52:9,
13,18 53:2 54:25
56:19 57:6 57:6,10
58:7,8,15,20,21,25
59:4,9,14 62:12
64:22 66:3,21
67:18 70:25 71:1,5,
19,23 73:20 75:11
79:11 80:13,14
81:17 84:18 85:13,
18,24 86:5,11,16
87:13 89:12 90:6,7,
23 91:12 92:10,19
93:1 93:1,10 97:4
98:14,18 99:10
101:16,21 103:16
113:25 114:19
115:8,15 118:2,15
120:21 121:3,18

123:11,18 124:20
125:15 126:7
128:21 130:19
132:14 133:11
134:21 135:9,22
136:18 140:2 143:9,
25 146:1 148:7
150:16,21 151:18
152:22 155:5 155:5,
6 157:23 159:6,9,
15 160:6 163:18
166:7
**front** 32:20 37:15
82:13 130:7
**full** 7:5 43:20
115:20 123:7
**fun** 81:9
**function** 30:5,6
**functions** 67:7
**fundamental** 67:15
**funded** 73:18 131:2
**funding** 45:1 53:6
72:14,17 73:6,13,
17,20 84:4 88:17
137:11
**funds** 71:19,24 73:1,
2 81:10
**further** 13:12 14:2
24:6 33:7 40:6
58:16 84:2 99:24
104:21,22,23
157:24 162:24
167:24 169:8
**Future** 110:7 124:19
149:6 150:6 161:15
168:6

---

**G**

**gained** 53:14
**Galveston** 37:8 59:11
72:3,8,12 101:7,13
**game** 96:12
**gate** 94:8
**gauging** 94:12,16,19,
22
**gave** 132:25
**General** 5:15 18:15
68:13 78:23 98:5
101:12 128:22

**generally** 24:1
166:18
**General's** 6:11
**generation** 8:19
90:25
**geologic** 37:25
**get** 18:25 21:4,21,22
22:1 40:6 43:3
48:14 56:5 67:14
80:20 84:18 99:23
122:10 123:9
135:17 141:2
149:16 152:15
159:22 161:7
162:22
**getting** 20:16 25:8
90:7 120:7,21
**give** 13:15 18:9 24:9,
12 28:3 41:22
51:18 55:15 68:9
76:23 77:2 141:7
144:18
**given** 11:6,9 44:6,25
51:13 64:7 69:7,12
87:20 88:12,16
90:15 105:14 107:9,
20 125:19 136:1,6
161:9
**gives** 21:13 45:25
**giving** 83:15
**glancing** 127:17
**goal** 44:22,23 147:14
161:5,8,9 162:23
**goes** 16:20 39:15
46:10 68:7 144:21
153:5
**going** 9:19 15:19
21:18 25:8 44:8
45:9,10 46:22
47:21,23 48:9 49:4,
13 52:20 54:19
58:8 67:8 79:21
80:4 91:3 99:4
100:19 105:13
108:16 109:17
118:4 119:17
119:17 119:17
121:5,10,21 134:19
149:10,12,12
154:17 157:24

158:8 168:15
**gone** 64:18 115:21
137:10 159:25
**good** 18:7 24:12 67:4
80:16 165:20
169:14
**goods** 49:11 58:15,19
59:8,14 97:14
123:21 143:4 145:1
160:10
**got** 19:14 36:11
39:13 67:5 99:13
103:10 143:23
151:20 165:18
**gotten** 62:11 84:18
**Government** 66:5,22
68:1 78:16,21 79:2
88:22 88:22 128:22
138:1 139:6 155:3,
4 157:2
**governmental** 62:1
64:25 66:6 91:17
139:3 159:7
**governments** 65:8
66:2 88:8 91:25
92:1 140:18
**grab** 165:18
**graduate** 7:18
**Grande** 10:11,12
14:12 16:4,7,10,21
17:5,12,22 18:21
19:6 20:22 23:12
24:8 25:2 26:12
27:23 33:8 37:23
38:10 41:9,16,19
43:12 44:16 45:7,
15 46:8,24 49:23
50:16 52:9,14,18
53:19 54:12 57:16,
22 58:8,11,15,16,
20,21,25 59:1,4,6,
9,10,14,15,19 60:8,
20 61:8,16 63:1,19,
25 64:14 65:12
68:4 69:18 70:21,
25 71:5,15,20,25
72:19 73:4 74:16,
22 75:9 77:16 80:3
81:22 82:6,19 83:8,
20 85:18 86:23

---

89:23 90:7 91:12
92:6,11,13,20,24
93:1,22 94:3,23
95:17,23,25,25
96:8,23 97:1,5
99:10 100:11
101:16,21 102:20
103:21 104:7
105:24 106:2,14
109:3 110:9,19
111:1,7 112:10
114:4,6,23 115:22
116:8 117:7,11
118:9,23 119:3,9,
25 120:4,13,18,19
121:5 122:11 123:3,
12,18,22,24 124:5,
14,20 125:24 127:8,
15 128:8 129:4,15,
20 132:13 133:5,11
138:14 140:2 142:9,
18 143:5,9 144:11,
15,18 145:3,7,14
146:12 148:21
150:10,17,21,25
151:18 152:7
154:13,21,21
155:11 156:2,6,20,
23 157:8 159:5,17,
23 160:11 160:11,
15,22 163:5,7
164:9,12,17,22
165:7,9,12,25
166:15 167:17,21
168:5 169:3
**grant** 29:4 91:17,23
92:2,5,25 142:1
**granted** 60:6,15
61:20 62:15 72:18
73:2,3 84:15 91:25
93:16 142:9 156:14,
18
**granting** 142:1
**grants** 92:8 166:14
**great** 158:11
**greater** 46:25 47:6,9
55:22 56:13
**greatly** 49:7,13,19
**Greg** 5:4
**group** 67:1 126:3

**grow** 89:17
**grown** 89:15
**growth** 89:13,14,19,
22 149:24
**guess** 9:17 77:25
113:1
**guides** 63:4 168:22
169:2
**Gulf** 59:16 71:1,6
98:5 144:14 145:2
**guy** 48:13

## H

**half** 135:17
**hand** 5:18 23:6 52:6
81:15 92:1 99:4
133:4
**handle** 96:8 157:4
**handled** 140:23
**handles** 96:9
**handling** 28:25
**happen** 72:6
**Harbors** 28:21 29:1,4,
12,12 30:1,4,11,21
31:13,17,22 42:6,
11,13 167:20
**hard** 24:12
**Harrison** 5:20
**has** 6:11 17:3 20:23
20:23 21:12 26:14
28:5,9 30:24 31:4
37:11 39:1,14
41:10 42:13 52:7,
12 53:20 54:6
57:13 58:10 60:5
61:20 64:8 64:8
67:1,6 71:18 72:17
73:21 82:6,19,23
83:8 84:17 92:9
104:10 129:15,18
135:3 140:9 140:9,
11 146:24 149:23
150:23 153:3 157:6
165:3,6 166:6
167:3,8
**hate** 140:7
**haven't** 11:4 83:6
107:12 123:16
126:14 139:25

161:9
**having** 7:2 9:23
11:18 85:9 113:18
**hazard** 77:25
**head** 39:22 68:22
151:5
**headed** 114:4
**heading** 108:4
**headquarters** 78:7
118:8
**hear** 87:18
**heard** 115:9 123:17
128:9,15 143:6
150:9
**heart** 113:4
**heavy** 123:3
**height** 55:12
**held** 8:10 14:25
**help** 31:10
**helpful** 137:21
**here** 5:11 7:10,24
8:1 12:10 43:21
45:24 49:5 54:11
60:25 77:5 83:14
98:20 127:18
134:18 145:24
154:14
**higher** 20:19 36:14
55:11 88:7 89:5
144:9 146:13
**highway** 45:16 59:20
119:15 142:16
163:6
**highways** 106:1,17
115:21
**hiking** 15:7
**historic** 164:16,19,
21 165:9,11
**historical** 67:12
145:18 165:4,7
**historically** 111:6
**history** 77:20 82:19,
24 83:18
**hit** 22:10 23:6
**hold** 49:17 87:3
138:8
**holder** 152:3
**holders** 86:17 87:10
88:6 89:5 138:14,
21 151:22

homes 155:6
hope 67:3
hour 135:16
However 19:23 31:7
    43:1 49:16 53:6
    54:17 56:4 66:18
    117:22 139:14
    149:12 157:10,25
    159:10
hull 48:23 49:20
hulls 144:3
hundred 13:19 18:10
    20:6 100:14
hunters 153:7,14
    154:6,13,21
hunting 15:8
hurry 57:2
hydroelectric 90:25
hydropower 8:18
    27:15 87:4 151:15
    155:17,18

I

I'd 32:24 55:24
    116:18 157:22
idea 66:25 90:12
    94:22 95:1,11
    100:19 101:11,14
    126:9 133:9,15
    141:14 149:16
identified 6:5
    161:23
identify 6:6,8 35:2
    103:8,12 116:19
    126:21 131:7 132:1
    134:1,9 136:17
    146:18 148:9 168:3
identifying 168:12
identity 6:20
I'll 80:12 113:1
    114:25 119:19
    135:17 163:11
illegal 153:6 154:6,
    13,20
Illinois 130:20
I'm 5:14 5:14 8:6
    12:2 12:2 17:2,17
    19:10,11,22 22:16
    25:4,11 26:17

30:23 31:14 32:21
40:13 40:13 42:9
43:2 43:2 49:5,6
50:9,12 51:5 51:5
53:5 53:5,7 57:14
58:17,23 59:2,7,12,
17 60:17,25 62:4,
11,18 63:8,15,20,
23 64:16 64:16
66:18,20 67:14
68:22 69:20 70:2
70:2,8,12,17,23
71:22 72:1,25 74:4,
6,24 75:2,23 77:19,
20 78:8 80:4,16
82:8,9 83:1 84:23
87:18 88:18 89:14
89:14 90:1 90:1
92:8,12,12,23 93:4
96:17 99:5 101:21
102:4,10,21,21,25
103:4,25 106:6
108:24 109:14,22,
24,24 110:2,13,16,
21 111:10 112:11
113:21 113:21
115:3 117:20
123:14 124:23
125:18 131:17
134:14 135:7,8
138:10 142:12,20,
20 145:5,10,10,17,
22 150:12,19,19,20
151:3,4,4 154:15
154:15 155:15
156:25 157:1,9,9,
10,11 158:12
159:13,25 160:16,
18 164:13,19,24
165:19,20,20
168:15
immediately 13:14
impact 166:25
impacts 153:5
impede 114:10
implement 44:7 51:15
    94:11
implementation 90:5
implemented 69:15
    141:17

implicit 140:1
    141:16,22
impossible 77:22
    96:21
impractical 53:13
    119:12,14
improve 41:20 42:14
    64:13 71:19 83:19
    110:9 148:1 149:15
    160:22
improved 104:6,17
improvement 44:9,16
    45:6 64:1 75:15,16
    86:10 104:6 122:23
improvements 9:1,2
    33:6 41:18 42:14
    43:11,18,20 44:4
    47:11 49:23 50:2,
    15,24 51:10,20,25
    52:2 65:10 68:4,18,
    25 69:10 71:24
    72:18 73:3,7 74:2,
    14,19,24 75:24
    76:17 77:17 78:5,
    10,15,18,25 79:10,
    19 81:15 83:24
    85:17,23,24 86:5,6,
    10 94:11 95:15
    105:13 106:2
    107:14 110:19
    118:9 121:1,16
    122:2,9 123:1
    127:7 136:18 137:7,
    14,20 138:7,15
    139:1,7,8 140:1
    141:17 142:3 146:9,
    21 147:9,11 149:4,
    7,11 151:25 152:10,
    11 154:14 160:21
    161:11,13,25 162:8
    163:4
improving 33:7 140:2
inadequate 143:4
inches 48:14,16,18
include 8:17 12:19
    27:14 43:5 96:15
    139:3,16 154:2
    155:14
included 86:6 101:8
    121:7

includes 41:6
including 6:20 86:23
    89:2 96:16
incorrect 100:17
increase 12:24 51:9,
    21
increased 148:22
increases 45:3
increasing 62:6
    127:13,21
increment 160:23,25
incremental 44:19
    45:2 51:14,15,25
    81:15 105:12 133:4
    147:9 161:2,4,21
    162:3
incrementally 41:20
    161:12
ind 40:19
independent 111:12
independently 31:3
    134:12
indicate 16:20
individual 10:3
individuals 40:19
inflows 150:16,20
inform 25:17 31:10
    36:12
information 18:3,25
    19:14 25:22 28:3
    30:3,16 31:10 36:9,
    11,13,16,22 39:11,
    13 40:1 45:8 54:11
    69:22 73:25 74:5
    80:13 97:3,6,8
    102:12,22 103:5
    106:9 109:15
    111:19 133:19
    160:10 163:10
    166:9 168:25
infrastructure
    134:20
ingredient 109:2
inhaled 120:9
initiate 130:22
inland 70:6 79:5
    116:21 129:1 135:2
inside 14:2 16:16
    18:13 31:19,21,23
    47:18 58:12 59:24

65:6 111:11 117:15
    121:22 142:11
    161:18
insofar 135:5
install 122:13
instance 36:8 46:14
    66:20 93:5 152:15
instances 13:22 22:8
    58:13,18 84:16
    146:6 156:22
instead 153:2
instruct 80:5
instruction 21:13
instructs 21:12
instrument 61:14
instruments 61:15
insufficient 89:24
intake 12:20 12:20,
    23 167:8
intend 6:14
intended 41:25 49:8,
    20
intent 42:12,20,21
    104:4
interaction 41:2
    79:15,17
interactive 131:8
Intercoastal 132:2
intermodal 145:7
internal 140:10
international 19:20
    26:7 75:9,17 84:10,
    19 91:19 93:6
    99:11 100:12
    113:24 115:13
    124:4,13,19 125:2,
    15 126:22 139:9,17
    145:14
internet 54:12 63:7
    108:18
interpretation
    152:14
Interrogatories
    39:7
interrupt 114:11
intersection 101:17
interstate 103:20
    145:14
into 10:8 48:14
    50:20 54:2 62:6

66:22 91:18 125:6
    141:19 149:9
    150:21 151:24
    152:4 159:10
    162:16 168:2
intracoastal 70:10
    132:9
introduce 5:8
invasive 67:10
investigation 68:24
investigations 69:8
involve 75:25 76:18,
    19
involved 40:20,24
    65:11 66:7,8,9,10
    89:2 91:22 97:13,
    16,17 117:7 134:22
    138:20 157:10
involvement 41:2
involves 127:7
irrelevant 73:13
    81:6,7,12
irrigation 87:5,11
    148:23 151:1
    155:16
irrigational 151:14
island 58:2
islands 57:24 58:7
Islitas 57:20
isn't 80:11 86:12
    122:25
issuance 167:16
issue 11:22 23:6
    30:6 46:17,19
    60:10 61:14 62:18
    81:9 105:9 115:12
issued 61:6,20,25
    167:10
issue's 6:9
issues 69:9
issuing 63:6 166:23
it'd 120:11 141:3
items 61:12 81:3
    108:6 161:1
it's 8:24 9:2,20
    10:21 14:1 18:8
    20:19 24:12 26:20,
    21 28:8 28:8 30:15
    35:14 37:18 38:5,7
    42:2 44:8 47:14

49:5,6,6,13 50:22
53:12 53:12 54:10,
18 55:24 60:2
66:22 67:9,10
72:24 83:2 83:2,5,
5 87:4,17,19 89:14
90:22 96:21 99:19
99:19 99:19 99:19
102:12 103:2 104:2,
15,16,16,25 105:18
106:16 108:11
109:12 115:1,6
118:19 118:19
119:12,17,17 130:8
131:8 132:20
134:10 136:23,24
141:25 147:6 147:6
149:23 149:23
151:2 151:2 151:2
151:2,13,20 153:1
155:8 156:25
162:15,19 167:3,11,
18,22 168:11
**its** 27:9,13 35:21
64:12 91:24 112:20
113:1 117:3 119:9
120:13 123:6
138:25 139:17
143:18 166:25
**itself** 8:3 9:9 10:20
14:2 22:19 27:25
32:1 36:21 38:5
90:10,17 96:25
97:16 140:7
**I've** 9:13 16:19
24:25 27:22 28:13
31:23 32:18 35:4
43:21 47:18 66:20
67:5,20 79:22 82:1
94:9 97:10 98:3
99:2,22 103:16
106:19 106:19
109:14 110:22
111:22 113:21,22
120:10 123:14
123:14 127:4
131:10 134:16
143:23 144:1,17,17
145:21,25 148:25
149:1 156:3 157:9

164:18 164:18

---

## J

**James** 5:6
**job** 7:15 30:15,16
53:12 103:2,3
105:18 133:24
**join** 5:21 5:21
**joint** 130:8
**judge** 105:4
**judgment** 53:17
107:12
**judgments** 31:2
**judiciously** 104:9
**July** 100:10
**jurisdiction** 17:3
166:25 167:16,19
**just** 9:23,24 11:13
11:13,15 13:2,11
14:20 16:25 16:25
18:14 19:1,11
20:15 21:13 22:10,
17 31:23 32:3
35:18 36:13 40:7
43:6,8 44:21 48:15
49:6,19 54:15
56:15 57:6,17
58:12 60:2,3,25
66:4,6 67:12 68:21
72:25 74:7 75:4
79:20 79:20,21
80:23 81:22 82:11
84:3,22 91:5 94:5
96:1,10,16 100:14,
24 103:4 104:13,16,
20 107:10 109:24
110:2 112:6 113:18,
20 116:2 120:9
121:11 132:17,21
134:5 135:5 136:8,
13 139:20 140:11
141:10 144:17,19,
25 146:6,13,16
148:11,12 151:3
156:11 157:10
158:25 161:20
162:3 163:24
**Justice** 5:10,20
**justification** 105:7

106:2

---

## K

**Katy** 5:11
**kayak** 48:13
**kayaks** 48:8
**keep** 75:1
**kept** 9:11 26:15
**Kimball** 5:19
**Kimere** 5:19
**kind** 9:4 15:22 18:14
19:4 23:5 27:16
45:13 46:16 48:8
55:18 56:20 66:22
69:3 73:21 77:1
97:17 105:14
126:15 136:7
138:18 144:24
147:22 152:17
166:21 168:22
**kinds** 67:12 96:15,17
121:22
**Kingsbury** 57:13
**knew** 40:5
**know** 6:7 15:2 18:9
19:2,4,9,10,13,14
21:8 23:23 25:21
31:12 39:14 40:18,
19,23 42:21 44:6,
10 45:8 46:11,15,
19,20 48:9,12,13,
14,18 49:18 49:18
57:9 66:7 67:11
71:22 72:6,11,12,
17 74:8,10 75:4,21
76:9 77:14 79:21
83:9,18 84:3,21
89:8,21 90:4,14,18
91:6,16,16 92:14
93:6 95:2 96:18
96:18,20 97:7 98:2
99:18 101:9,10
102:5 103:2 104:16
110:11 112:7 113:4
114:16,20,22 115:1
117:15,20 118:15
122:6 123:18 124:9
126:4 129:22 130:7,
25 131:4,11 132:12,

20 133:14 136:3
139:12,20 141:6
142:11,20,21,22
143:14 144:13,24,
25 145:11 146:1
147:2 150:11,13,15
152:5,8,15 155:6,9,
19 156:1,11,12,13,
17 158:10,14,14
159:21 160:18
162:20 169:1,4
**knowing** 44:9 63:6
83:14 113:4
**knowledge** 27:1 67:8
69:14 70:18 72:15,
16 73:21,24 76:13
78:9,13,22 79:3
82:22 83:21 91:14
106:12 111:5,13
114:12 116:11
124:8 129:8,17
130:14,21 131:1
142:8 145:9,10
146:25 147:1 148:9
154:20,22 160:13
169:14
**known** 57:13,20
110:18
**Knudsen** 5:9 163:23

---

## L

**lack** 29:23 38:6
**laid** 109:4
**Lake** 7:25 9:19 27:6,
18 28:2,5,11,16
37:18 52:7 125:11,
12 157:17 157:17
**lakes** 9:18
**land** 52:19 66:4 76:5
**landowners** 155:8
**lands** 61:2
**Lane** 5:7 154:5
**lap** 135:18
**Laredo** 118:22 118:22
119:15 120:3,22
121:4,9,18 122:18
123:4 126:3
**large** 15:5 57:23
**largely** 57:24

**larger** 54:7,17,25
55:3,9 95:17 161:3
**Las** 57:20
**last** 112:23 135:4,18
**later** 151:14
**launch** 18:6
**launching** 24:16
**law** 66:17,18,21
113:13 146:4
**laws** 66:14,17
**learn** 40:1
**lease** 15:20 61:3
**leases** 15:19 16:18
60:6 61:6,18,18,25
62:14,21 166:15,21,
21
**least** 46:6,23
**led** 38:21
**Lee** 7:6
**left** 140:13
**legal** 140:19
**length** 56:14 143:17
**less** 149:18 157:24
**lessee** 11:18
**lessons** 135:9
**let** 21:13 46:21 68:9
165:18
**Let's** 27:6 32:3
33:14 34:24 85:6
85:6 97:20 100:23
103:6 107:24
108:25 111:15
112:13 113:15
114:1 116:15
126:18 128:18
129:24 131:15,21
133:21 160:2,3
169:17
**letter** 116:9
**level** 44:16 45:6,18
53:6 87:23 89:14
122:4,23 123:8
161:14 162:5
**levels** 45:14 94:4
134:21 144:20
146:13,14 161:19
**levies** 9:3
**levy** 9:1
**Lewisville** 9:20
37:18 82:15 125:12

157:17
**license** 61:3
**licenses** 60:6,14
61:6,18,25 62:14,
21 166:14
**like** 9:17,20 12:21
18:11 19:3,12 21:8
32:24 36:21 37:18
46:14 56:15 62:9
65:18 80:1 82:15
93:4 102:22 107:10
108:16 112:14
116:18 118:1
125:11,15 128:11,
12 133:24 139:12
140:8 143:14
144:19 157:17
158:16
**likelihood** 104:11
105:1
**likely** 56:14 147:13
**limit** 53:3 147:16
**limited** 95:25 96:3
**line** 6:2 99:15
101:16,17,22,22
154:24
**list** 6:3,4 28:1,15
38:20,23 49:22
101:2,8,15 136:4,
11
**listed** 6:3,4,5 61:12
67:10 98:20 101:13
129:16 161:11
**litigation** 11:7
**little** 7:14 48:16
57:4 60:18 93:21
94:4 104:11 105:1
118:20 127:11
144:20 158:2
**live** 33:2 67:7
**loading** 154:5
**local** 62:9 66:5
**located** 167:12
**location** 5:4 20:14
74:18 147:23
**locations** 8:19 37:18
73:4 74:7,9,10,19
75:12 143:13
**lock** 52:24 53:7
122:14

locks 52:8,12 130:18
lodge 6:21
long 7:12 61:13
    141:2
longer 54:7
long-term 149:10
look 6:4 18:14 28:4,
    18 32:24 33:14,20
    34:24 49:9 97:20
    99:9,25 100:6,23
    103:6,18 107:4,24
    108:25 111:15
    112:13 113:15,18
    114:1 116:15,18
    122:6 126:18
    127:23 128:18
    129:13,24 131:5,15
    133:21 149:24
    153:16
looked 54:2 56:2
    62:5 97:10 111:22
    138:18
looking 20:16 36:9
    90:3 103:11 115:19
looks 62:8 128:11,12
    158:16
lot 48:24 49:17
    120:10 121:7
    152:16
lots 15:10
Louisiana 132:3
low 144:7
lower 20:19 54:20
    55:19
lowest 132:8
lumped 143:24
lunch 85:16

M

MacAllister 5:3,17
    7:6 32:17,18 33:16
    34:5,11 35:1 85:16
    97:21,22 100:1
    103:7 111:16
    112:15 113:16
    116:17 126:19
    127:25 128:20
    130:1 131:6,16
    133:22 135:25

160:9 163:23 168:2
    169:10
Macallister's 33:4
machine 79:16 158:6,
    7,9
machinery 79:20
made 12:13 31:5
    35:20 41:19 42:14
    43:23 51:20 52:3
    74:20 75:25 76:18
    77:18 89:9 104:5
    105:13 114:8
    115:16 117:22,24
    118:5 123:14
    146:18 147:11
    154:13 156:6
    168:19
magically 88:16
main 13:12 98:13
    108:24 114:8 129:2
maintain 9:1 61:11
    64:17 76:22 83:10,
    15,18 148:19
maintained 70:5
    90:17 118:4 129:3,
    5 131:12 132:5
maintaining 8:16
    26:22 127:21
maintains 26:8 69:24
    91:20
Maintenance 9:8
    10:17 63:17 76:20,
    21,24 77:3,12
    83:10 147:12,13
    148:15,18 152:6
    154:2 167:1
make 18:2 21:14
    23:18 30:6 31:2
    35:15 43:24 51:25
    53:16 54:16 67:5,
    23 75:4 76:7 81:15
    90:5,21 91:3 99:6
    116:1 121:23 123:1,
    2 132:16 133:4
    136:2 138:5 147:9
    149:4 163:5 165:18
    168:3
makes 101:11 130:7
    151:17 152:12
making 14:15,18

43:11 105:7
manage 86:16 92:3
    129:10
managed 10:9
management 7:19 8:17
    22:25 33:6 87:3
    118:13
managing 66:4
maneuver 48:14
maneuvering 21:23
manmade 23:3
manner 105:16 136:19
manual 26:15 77:12
manuals 9:12
many 17:11 24:10
    74:8 89:11 90:1
    94:22 95:11 125:25
    126:4 140:7 147:14
    156:5,13,18 169:1
map 131:10
maps 99:11
marina 15:22 166:21
mark 32:4 114:23
marked 32:17,19
    33:16 34:24 35:1
    53:18,19 97:20,21,
    23 100:1 103:7
    111:16 112:15
    113:16 116:17
    126:19 127:25
    128:20 130:1 131:6,
    16 133:22
marker 121:9
market 121:22
Master 92:10,12,13,
    14,18,21,23,25
    93:4,7 150:10,13,
    15,23
material 39:8 76:1
    158:23
materials 76:6
matter 5:3 6:12 11:8,
    14,16 20:19 109:17
    127:18
matters 34:10
maximize 91:4
maximum 48:6,21,22,
    25 49:10
maximums 48:10
may 5:21 13:20 15:20

16:25 17:15 18:1
19:15 20:11 23:1,4,
4 24:9 34:4 35:6,8,
16,17,18,21 40:12
40:12 46:16 48:12
56:18 58:9 61:12
62:9 67:7 85:9
112:4 114:9,10
116:23 118:8
135:15 140:6
141:24 142:14
153:13 167:7
168:24
**maybe** 18:9 18:9 20:6
20:6,7 48:17 99:23
**mean** 9:16 10:18,20
15:1,6 23:14 39:16
74:12,25 81:13
102:25 104:15,16
109:20 113:20
121:24 145:24
150:11,20 164:13,
18 167:6
**meaning** 12:20 31:16
41:23 42:6 81:9
138:19 162:4
**means** 15:5 21:9 35:9
37:17 52:8 121:19
147:14,15 150:20
**meant** 167:14
**mechanical** 37:17
79:22 157:13
**mechanism** 135:6
**mechanisms** 95:6
**media** 124:9
**meet** 109:4
**Melanie** 5:23
**mention** 117:10
140:12 147:17
**mentioned** 27:3 74:6
79:16 81:4,20
82:15 87:2 93:19
118:12 146:9,10
148:5 153:13
157:16
**mentions** 150:5 153:6
159:3
**merely** 6:24
**message** 113:25
**met** 18:6 98:3 141:16

**method** 81:2 81:2
**methodologies** 81:3
**Metroplex** 10:6
**Mexican** 68:1 74:20
75:8,17 84:10,18,
19 88:22 139:8
140:18 140:18
**Mexico** 59:16 68:1
71:1,6 78:16 86:19,
21 87:22 88:2,21
89:2,12 92:1 98:5
101:17,18,22 102:9
105:19 112:1
123:22 126:23
138:1,5 139:6,16
145:2
**microphone** 5:24
**middle** 24:7 79:24
117:18
**midway** 101:5
**might** 6:7 43:5 43:5,
6,8 82:16,24 84:4
103:2 119:20
127:10 140:18
149:19
**mile** 13:20 18:9
49:24 71:11 98:6
132:14 143:9
144:19 148:7
**Mileages** 98:4
**Miles** 16:22 18:8
24:10,18,21,22
38:11 41:10,16,19
53:19 61:8 98:14,
16,20,21 99:22
100:11,16 114:19
115:15 123:22
125:16 128:12
129:2,5 145:3
166:7
**mind** 44:23
**Mine** 131:23,24
**minimize** 153:5
**minimum** 70:9,19
131:11
**minimums** 48:10
**Minnesota** 130:19
**minor** 161:2
**Minute** 99:12
**minutes** 5:21 24:14

**misremembered** 82:4
**Mississippi** 69:24
96:9,23 130:13,23
**misunderstood** 82:3
135:14
**model** 54:16
**modern** 144:15
**modes** 105:7,25
142:15,21
**modified** 34:21
**modify** 52:17
**money** 51:15 72:23
73:19 136:15
151:18
**monitor** 94:3 95:3
**monitoring** 95:9
**monitors** 95:12
**months** 45:9
**more** 9:22,23 10:18
13:20 15:9 19:25
20:6,16,16,16
24:17,24 28:4
43:20 44:8 45:8
47:22 48:17 49:17
54:20 55:16 89:19
90:3 93:4 98:24,25
110:3 121:2 138:18
152:22 157:15
158:11 162:22
**morning** 87:2 118:2
163:25
**most** 45:12 48:17
54:4 55:19 56:3,14
90:2 90:2 120:20
120:20 121:14
140:5 147:5,13
**Mountain** 130:9
**move** 64:10 138:22
**much** 43:21 44:7,9
45:11 49:3 51:16
57:4 80:21 82:24
85:22 93:21 94:5
96:22 97:4 126:9
134:7 141:15 149:1,
5,18 151:18 158:5,
14 161:6,13 169:11
**multiple** 8:16 9:21,
25 91:4,21
**multipurpose** 27:4,7
153:1 157:25

**municipal** 87:5,11
  148:23 155:16
**municipalities** 65:8
**municipality** 15:21
**must** 6:19
**myself** 48:13

## N

**name** 5:6 7:5 32:25
  33:21 34:11
**names** 6:5
**narrow** 55:17
**National** 65:5 66:11
  130:8
**natural** 8:18 27:16
  87:8 103:20 119:10
  143:18 147:15
  166:25
**nature** 157:25
**navigability** 28:21
  29:12 30:10 31:13,
  16,25 83:19 98:18,
  22 101:12 102:6,16,
  16 103:16 127:13
**navigable** 14:15
  27:24 30:16,21
  55:22,25 101:6,13,
  23 102:8,12 112:17
  113:2,7,8,13 114:7
  129:2,5,10
**navigate** 144:2,4
**navigated** 41:17,22
  103:21
**navigation** 14:19
  16:4,7,10,12,16
  27:18,25 28:1,6,10,
  15 39:2 41:11,20,
  22,23 42:6,9,15,17
  43:2,4 44:4,16
  45:6 51:8,22 53:20
  54:7,24 59:23 62:7
  64:1 69:17,25 70:6,
  14,20 71:11,19,24
  72:13,18,21 73:3,
  23 75:15 85:18,24
  86:5,13 87:25 88:6
  89:5 91:13 93:20
  95:17 96:15 97:5
  104:7,10,10 105:2

109:3 110:9,19
  111:6,10 112:9
  114:7,11,18 115:14,
  22 116:7,10 123:11,
  15 124:15 125:14
  127:8 129:1,12,19
  140:2 142:2,8
  145:13 148:1
  149:15 152:23
  160:14,22 161:12
  165:7,11 166:6
  168:13
**navigational** 33:7
  129:1,11,14,19
  131:13
**near** 21:3,18 58:4
  101:22 118:21
  123:22 124:4,20
  125:2,16 154:21
**nec** 55:12 76:19
**necessarily** 42:19
  48:12 94:15 117:22
  136:22 147:6
**necessary** 44:15 45:5
  46:8 47:11 55:13
  69:7 74:11 76:24
  81:17 83:10 93:12
  136:24 138:6 139:1
  142:2 149:4 158:19
  159:6,21 163:4
  164:6
**necessity** 76:19
**need** 32:4,5 34:14
  43:17,21 44:2 45:8,
  12,12,22 46:5 47:8
  64:22,25 67:17,25
  68:11,24 74:1
  76:15 90:8,18 95:3
  113:17 120:8
  127:11 134:1
  139:22 146:20
  150:6 158:8,18
  159:15 164:2,11
**needed** 45:15 50:21
  53:6 73:22 75:3
  81:10 84:4,14
  87:10 88:14 94:6
  136:15 137:15,20
  139:8,13,17 147:24
  154:11,12 159:14,

20
**needs** 86:17 89:22
  92:15 142:17 148:9,
  22 150:6
**Negras** 58:15,20,22
  160:16
**neither** 114:9
**networks** 145:7
**never** 17:22 83:2,8
  98:3 106:19 106:19
  114:18 115:9,14
  129:18
**new** 99:5 152:16
**news** 116:20
**next** 5:21 15:6 34:11
  105:5 114:17
  115:19 116:5
**night** 19:7,8
**none** 78:4,10,14,18,
  24 97:13,18
**nonresponsive** 23:10
**normal** 19:3
**nothing** 16:15 80:25
  84:9 104:19 129:16
**Now** 10:23 16:3,19
  23:11 32:8 38:20
  41:5,21 43:17 48:3,
  10 56:19 60:7
  63:18 76:16 78:1
  81:20 83:22 86:16
  96:9,23 99:6,8
  100:16 101:5 110:7,
  22 118:12,21
  120:19,25 121:23
  122:8 127:3 133:9
  138:10 143:18
  148:20 149:19
  151:5 152:9,19
  154:8 160:10
  165:19,20 168:5
**Nuevo** 118:22 119:15
  120:3,21 121:4
  160:15
**nuisance** 156:25
**number** 18:8 20:17
  44:8,18 49:23
  57:23 99:12 103:19
  143:9 144:19
  144:19 147:3,6,23
  155:9,19 156:16

**numbered** 100:24
**numbering** 98:16
**numbers** 98:17 99:21
**numerous** 117:3

O

**object** 6:17 21:12
24:23 25:10,19,24
28:7,12,17 29:14
30:2,12,22 31:6
34:1,7,18 39:3
40:17 42:7 45:17
46:2 47:1,15 49:1,
12 50:3,5,8,17
51:4,12,23 52:4
53:15 54:9 55:1,14,
23 57:1,8 58:1
59:22 60:9,22 61:9,
22 62:3,17,23 63:3,
14 64:6,15 65:2,15
66:15 67:19 68:5,
12,20 69:2,11,19
70:1,7,16,22 71:2,
7,12,16 74:21
75:10,18 76:11
77:10,24 79:7 80:4,
12,17 81:25 82:21,
25 83:12 86:14
87:16 88:10,23
89:7,18,25 90:9
93:3,23 94:14
95:19 96:2,11,24
97:9,15 98:9
100:18 101:24
102:3,7,18 104:14
105:3,11 106:5,15,
18 107:1,16 108:10,
14,21 109:8,13,19
110:5,12,15 111:3,
9 114:14,24 115:5,
17,25 116:13 117:8,
13 118:10,25 119:5,
11,16 120:5,14
121:6 122:12
123:13,25 124:7,16,
22 125:3,17 127:9
128:16 129:7,21
130:6,24 131:3
132:7 133:13,18

136:20 137:8,16,22
138:3,8,16,17
139:2,6,10,19
140:4,21 141:5,12,
18 142:5,10,19
143:19 144:16
145:4,8,15,20
146:5,22 147:4
148:2,24 149:8,21
150:18 152:2,25
153:9 156:8 157:21
158:21 159:24
160:17,24 161:16
162:11 163:8
168:15,16 169:5
**objection** 6:21 20:25
21:6,14 22:7,15,23
23:10 73:11 74:23
98:23 99:17 120:23
121:20 123:5
127:16 132:15,24
143:11 168:9
**Objections** 39:6
106:23 107:3,8,13
**objectives** 149:10
**objects** 18:12,13
**obligated** 139:12
**obligating** 139:16
**observation** 157:11
**observations** 53:24
**observe** 21:20
**observing** 6:24
**obstacles** 69:9
**obstructions** 23:1
**obtain** 25:11 79:13
85:23
**obtained** 69:13 80:13
85:24 86:5 137:11
140:14
**obtaining** 36:22
**obvious** 53:2
**obviously** 155:17
**occasion** 17:25 21:19,
20 113:5
**occasions** 17:11
**occur** 25:13 42:24
57:2 61:13 81:24
157:1,4
**occurred** 157:6
**occurrence** 26:15

**occurring** 108:5
157:2
**off** 32:11,13 39:21
39:21 68:22 85:6,
12 113:20 114:21
135:21 154:17
156:23 160:5
163:17 169:19
**offer** 15:22 164:16,
20 165:3,6
**office** 5:11,15 6:11
8:3 12:14 78:23
128:22 134:20
**offices** 40:18,20
**official** 92:20
**offloaded** 144:13
**often** 14:3 15:5
19:11 54:18
**Okeechobee** 132:10
**old** 116:7
**once** 83:11 126:20
**one** 10:10 11:13,17
15:2,6 17:13,21
19:21,25 21:19,23
23:7 26:1 32:5
34:3 36:8,24 37:15
43:20 45:20 46:21
49:6,13 54:13
55:16 56:3 66:22
74:1,15 76:19
91:20 92:1 100:20
107:10 126:2
131:19,22 133:19
134:3 136:14
136:14 146:10,24
147:11 148:16
152:19 153:2
158:14,17 159:2
161:2 161:2 165:18
**ones** 14:8 56:17
91:22 158:12
159:12
**ongoing** 15:3 76:20
79:5 80:10 147:12,
13,16 148:15,18
**Online** 5:22 6:24
63:5 131:8
**only** 9:8 11:8 24:21,
25 25:16 31:3,24
44:25 44:25 53:25

56:7 59:23 62:4
65:12 74:15 95:5
97:10 103:22
111:10 112:25
119:6 127:17 139:6
140:14 142:25
**on-the-job** 13:2,6
**operate** 19:6 60:7
61:11 64:17 91:20
125:15 169:2
**operated** 90:17 118:4
**operates** 26:8
**operating** 8:15
118:21
**operation** 22:24 33:6
61:1
**operations** 8:6,13
9:10 10:9,17,20
13:1 14:8,12,15
19:8 26:20 37:8
62:1 63:1 77:11
91:24 144:10 167:1
**opinion** 36:12 41:9,
15,18 44:1,14 45:4,
14 46:7 50:1 51:7
53:18 54:6,22,23
55:7,13,21 104:20,
21,22,23 107:7
108:19 109:16
110:3 116:3,4,11,
14 117:9 124:1,17
125:4 129:23
**opinions** 11:6 18:23
29:11,25 30:10
34:15,22 35:22,25
36:3,6,19,23 38:13
41:6,21,24 42:5
42:5,12 43:10,16
44:24 45:24 52:1,
16 164:16,21 165:3,
7
**opportunities** 20:17
96:17
**opportunity** 119:18
**opposed** 8:23
**ops** 31:8,9
**option** 91:22
**options** 142:25 143:4
**order** 6:15 25:11
34:14 43:19 44:10

46:13 68:2 69:16
73:23 74:1 94:11
121:12 122:13
142:2 159:7,22
165:19
**organization** 127:3
**original** 28:2
**originally** 35:5
130:17
**other** 11:3 13:20
14:6 18:20,22
21:13 25:7 26:16
27:13,15 31:4,18
34:10 36:17,20
38:17 44:19 47:13,
16 51:3 52:8 55:10
56:10 58:6,21
59:20 62:1 63:6
64:25 65:7 66:25
69:16,17 70:6
76:12 78:23 79:1,4,
14,14 80:9 81:3,18
83:22 84:11 85:20
86:13 92:1 100:20
102:6,25 103:4,5,
22 105:6,25 108:17
114:10 119:3 121:3
122:5,10 125:11,13
127:14 133:20
135:2 139:15,25
140:15 141:21
142:13,15 144:7,14
145:24 146:3
149:14,16 156:24
157:15 157:15,20
159:6,13,14
**others** 36:18 47:22
75:4 97:18 155:5
164:13
**ours** 60:10
**out** 14:4 19:23 25:6
47:23 59:25 68:15
75:2,3 80:21 82:16
92:15 105:15,19
137:19 139:8,14,14
140:8,13 148:13
155:6 158:10,25
164:3 165:19
166:24 166:24
**outlet** 12:21 14:1

**outside** 16:13,15
72:21 84:20 144:21,
22 163:9 168:16
**outweigh** 137:6
**over** 7:14 11:25 17:2
49:18 57:3 89:17
97:2 135:3 143:9
148:20 149:2 153:2
167:16,20
**overall** 143:12 148:4
**overarching** 64:21
**overcome** 46:20 107:5,
8,19
**owe** 167:3
**own** 18:3 31:3 155:13,
16 167:2,3
**owned** 155:4
**owns** 159:18

---

**P**

**p.m** 85:13,14 135:20,
22,22,23 160:4,6,6,
7 163:16,18,18,19
169:18,20
**page** 32:24 33:20
38:6,23 39:5 41:6
99:9 100:6,25
103:18,19 107:24
109:1 111:24 114:1
115:19 117:18
130:7,11,16 153:16,
22,23 154:23
165:21,22,24
**pages** 100:24
**paper** 28:8
**Paragraph** 100:6,9
101:6 103:19 105:5
106:22 109:1,20
115:20 153:25
**parallel** 24:3
**paraphrasing** 60:25
**park** 15:19 18:11
130:8
**Parks** 26:1
**part** 9:10 10:1 14:12
15:2 40:2 50:18
54:10 56:7,10 58:6
61:10 61:10 65:19
69:4 72:19,20 94:9,

10,16 105:22
112:22 113:19
127:6 128:4 129:4,
15,20 130:3 132:17,
18 140:5,9 150:1
153:4 161:17,18
**partial** 153:25
**participants** 6:2,6,
22
**participate** 6:25
40:10
**participates** 40:15
**participation** 6:21
**particular** 44:16,23
45:6 47:13 48:1
55:12 56:3 112:9
113:7,12 122:23
**particularly** 85:19
86:22 90:24
**parties** 6:8,16
**partner** 15:20
**partners** 155:10,12
157:3 167:7
**parts** 31:4 70:11
78:20 111:17 116:9
156:22
**party** 81:18 93:12
**Paso** 58:25 71:1 71:1
98:6 101:23 114:19
115:15 128:12
166:7
**Pass** 17:8,12,21 18:4,
21,22 20:3 21:3
26:9 35:20 58:4,15,
20,22 71:6 100:12
118:21 120:21
121:4,18 151:3,6
160:15 163:11
169:7
**passable** 144:8
**passage** 57:24
**past** 18:11,12 21:3,4
59:19 122:10
168:25
**path** 139:22 144:7
**Patrol** 18:6,25 19:5
20:11,13 21:4,17,
21 22:13 56:3
**Paul** 130:19
**people** 9:18 15:7

49:15,18 80:9 90:2
100:10 146:6
155:15
**people's** 97:11
**per** 69:7 71:11
101:25 109:9
**percent** 54:15 67:16
101:5
**perform** 44:20 152:17
**performed** 148:13
162:5
**performing** 67:7
**period** 56:25 141:4
**periods** 45:10 45:10
55:10 103:21
145:19
**permissions** 69:7
159:22
**permit** 28:25 61:3
62:11 62:11 63:6
95:16 166:18
167:10 167:10
**permits** 29:4 30:6
60:6,11,14 61:5,19,
25 62:14,18,20
156:5,13,18 159:6,
13,14,15 166:14,23
167:16,20
**permitted** 12:22
**permitting** 140:10
**person** 15:6 24:24,25
77:13 92:9,18
144:1 150:14
151:20
**personal** 16:6 24:21
41:2 124:8 126:14
144:17 168:21
168:21 168:21
**personally** 13:22
14:9 25:23 49:14
50:11 77:8 98:2
126:11 157:9
**personnel** 36:20
49:11
**persons** 5:7 6:20,24
**person's** 11:19
**pertained** 18:22
**pertaining** 36:9
**pertains** 128:7
**photo** 38:6,8 54:13

**photographs** 37:22
**photos** 37:1,3,4,10
79:16,22,23,24
**phrase** 154:9
**physically** 104:7
134:15
**picked** 122:18
**picture** 151:4 158:15
**pictured** 38:4 158:3,
12,18
**pictures** 36:25
**piece** 18:8 102:11
**pieces** 102:11
**Piedras** 58:15,20,22
160:16
**pinpoint** 99:24
**place** 22:25 45:19
54:14 75:12 159:22
**placed** 23:4,6,25
39:14,15 100:10
159:16
**placement** 60:25
**places** 20:22 147:6
**placing** 154:4 159:3
**plaintiff** 163:24
**plaintiffs** 5:11
**Plaintiff's** 39:6
**plan** 116:25 117:20,
23 126:24 127:2,6,
15 151:24 161:21,
25
**planned** 130:17
**plans** 75:21 110:8,18
117:6 118:7
**plant** 83:23 84:11
85:20 151:15
156:24
**platform** 38:8
**play** 93:5
**Plaza** 5:4
**please** 5:8 12:7
33:20 103:18
113:17 120:10
126:21 127:5,11
128:2 133:25
165:22
**plenty** 22:5,14
**plus** 15:9
**point** 18:13 25:7
28:14 34:20 40:23

43:3 43:3 55:4,19 56:18 59:9,14,25 76:14 77:22 81:23 90:11 95:1,22 99:18 101:17 106:6, 9 109:17 110:2,18 118:3 119:12 120:6 121:21 141:2,7 142:25 143:20 150:2 161:9,24
points 9:18 58:21 59:1,4,5,10 94:13 95:4,11 98:14 144:8
Policy 65:5 66:11
Ponder 33:2
pontoon 49:16
pools 130:18
portfolios 129:11,19
portion 17:2 55:24 71:5 114:3 115:4 162:1
portions 10:3 16:2 31:23,24 35:19 55:24,25 56:15,16 71:15 75:7 113:2 161:20
ports 59:16 144:10, 14,14
position 6:12 92:9, 12 101:19 102:1
possibility 43:11 125:2 147:18 148:6 159:3
possible 46:11,12 51:25 52:2,17,23 60:2,3 64:1 96:1 104:7 122:25 123:2 125:23 140:1 158:9 159:19
possibly 26:2 130:8 159:18
potential 33:5 47:23 49:23 62:6 86:10 93:24 103:19 123:7 124:14 152:10 157:1 168:13,22
potentially 65:8
pounds 49:16 49:16, 18 158:10

power 17:3 90:25
practical 48:17 55:19 80:11 114:18 115:14 118:23 119:3 121:3 166:6
practice 68:13
practices 43:13 44:3 83:4
precedence 46:13
precipitation 157:19,22,25
precipitations 157:23
predate 134:18
predetermined 76:6
predicated 109:21
predominantly 36:9 147:21
preferable 121:17
preponderance 144:2
present 5:8 6:20 43:12 108:4,5
presently 41:17
present-use 109:4
President 96:6 113:25 134:19
pretend 42:23
Pretty 18:7 53:13 113:22 165:20
pri 88:7
primary 27:9
principles 83:3 159:13
Printing 128:22 128:22
printout 134:10
prior 11:7 140:23 141:16
priorities 86:18,22 87:1,20 88:5,7,9 92:16 105:2 116:21 117:2
prioritize 88:5
priority 88:1 89:5 104:10
private 18:7 81:18 155:6
probably 23:7 40:23 48:18 101:5 108:22 112:20 144:6

164:13
problem 84:11 154:18
problematic 40:5
problems 40:5 93:20
Procedure 6:9,18
proceeding 6:25 11:3
proceedings 169:20
process 11:22 64:19 65:3,4 76:4,5,5 77:21 107:2,4 140:9 167:9
processes 140:10
Proctor 7:25
produce 129:10
produced 123:22 129:18
producing 155:18
product 80:6
products 123:21 168:4
profit 15:16 60:7 61:2 62:2,15 63:11, 13
Program 8:25 10:9 39:24 40:6,10,16, 25 41:3 83:24 84:1, 3 128:11 138:15 140:1 141:17 149:3 156:10 160:21 167:4
programs 157:12
prohibited 61:2
project 9:9,13,16,24 10:2,4,13 13:18 15:2 53:17 60:19, 21,23 61:2,12,13 64:17,23 73:16,18, 19,20 90:10 118:4 119:6 121:13,25 122:4 128:8,15 130:13,14,17,23 131:2 134:23 135:2 137:10 138:23 140:20 155:1 162:15 164:9
projects 9:22 11:17 64:18 113:2 116:21 117:3,17,20,23 134:20 135:3,9 155:2 164:3,6,12

166:19,20,24
**promote** 129:12
**properties** 61:11
**property** 18:7 155:2,
8
**proposal** 89:6
**proposals** 110:18
118:7
**propose** 53:11,12
89:4 139:7 146:11
**proposed** 50:15 51:10
67:2 68:3,19 78:6,
11,16,18,19 94:11
127:14
**propulsion** 48:24
49:8,20
**prospect** 124:18,25
**protect** 155:5
**protection** 11:21
**provide** 25:2 29:11,
25 30:9 31:9 55:21
77:4,6 99:7 104:9
106:10 114:7,13
163:10
**provided** 30:4 35:4
39:11 50:18 53:6
68:6 69:13 79:24
79:24 80:19,23
81:8,9 88:17 88:17
95:20 102:22
107:11,17 133:2,6,
19 135:6
**provides** 132:9
**providing** 154:3
**public** 81:18
**publication** 130:5,8
**published** 90:20
**pull** 12:24 157:13
**pump** 96:16
**purpose** 8:16 9:21
11:7 22:25 27:9,18
28:2,6,10,15 37:24
68:14 91:5,13
152:24 155:7
**purposes** 14:15 15:25
27:13,14,15 46:15
62:6 71:24 72:18
91:4,21,21 127:8
131:13 140:2
149:11 151:14

152:20
**pursuant** 93:13
**pursue** 141:15
**put** 14:4 48:20 49:15
51:1 52:23 53:7
73:15,19,20 95:15
96:22 119:19
141:19 153:10,12
154:12 158:17
**putting** 52:19 52:19
153:14

**Q**

**qualified** 29:7,10,17,
24 30:9 31:2
161:17
**qualify** 108:6 113:1
143:23
**Quality** 66:8 93:17
140:16
**quantification**
50:13,23 84:5
85:22
**quantifications**
86:4
**quantified** 74:4,6
146:23
**quantify** 84:7 163:3
**quantity** 84:7
**quarrel** 31:1
**question** 12:7 21:15
23:11 26:22 30:8
43:19 52:21 54:21
61:17 67:15 70:25
71:5 80:8 81:15
103:12 124:24
135:14 156:9
**questions** 19:2
110:22 163:24
166:3,5 167:24
169:8
**quick** 33:14 63:7
108:18 127:12
**quickly** 127:17
129:13
**quite** 105:18 144:5
**quote** 33:4 41:15,18
53:20 101:6,16
104:6 105:6 106:22

108:5 109:1 110:8
114:6,18 115:14
116:5 130:16
152:10 154:2
**quoted** 31:24

**R**

**rail** 19:21,22 119:19,
21 120:3,12 121:4
142:15
**railroads** 106:1
115:21
**rails** 106:17
**rainfall** 57:10 96:25
**raise** 5:17
**ramps** 12:19 14:21
147:18,23 148:11
**rancher** 118:21
**ranching** 118:16
**range** 7:19 72:2
75:16 118:13
146:12 148:21
157:7
**rapids** 57:15 143:10
**rate** 22:8 44:9 55:15
**rates** 19:2 25:12
26:14,23 57:10
83:4 94:15
**rather** 13:6 15:16
24:2 91:4 157:13
**Rayburn** 125:12
157:17,23
**reach** 68:15
**read** 20:17 31:15,18,
20,20,22,23 33:24
104:13 112:5,11,20
126:7 145:25 149:1
149:1 156:3
**readily** 20:17 22:18
63:5 90:19 152:15
**Reading** 34:6 40:23
110:4 132:8,11
**ready** 135:18
**reaffirm** 102:12
**reaffirmed** 27:23
**real** 61:14 61:14
100:12,21 141:9
**reality** 76:10
**realize** 23:7

reallocate 149:11
really 20:7 23:24
   24:12 44:8 53:16
   81:2 99:6 100:19
   124:17,23 136:10
   146:9 158:12
realm 141:24
reason 46:15 55:2
   80:19 98:13 109:11
   124:10,12 162:18
Reasonable 41:18
   54:4,20 68:3,25
   69:9 73:7 74:2,14
   75:24 77:17 78:4
   95:15 107:14
   120:25 124:25
   141:17 146:8 149:4,
   7 151:25 152:11,12,
   14 160:21
reasonableness
   96:19
reasonably 85:23
   160:23 163:5
reasoning 35:24 36:6
reasons 9:25
recall 12:12 20:7
   82:1 113:18 128:5
   136:14 153:8,14
   154:8 166:2,13
receive 30:16 93:13
   137:25
receives 93:12
recent 97:23
recently 19:12 146:1
Recess 32:14 85:13
   135:22 160:6
   163:18
recollection 128:14
recommend 53:8
record 5:5,8 6:19
   21:14 32:13,16
   85:6,12,15 135:21,
   24 160:5,8 163:17,
   20 169:19
records 90:18
recreation 14:23
   15:4 15:4,5,19,20,
   25 16:17 27:16
   43:6 87:8 146:4
   152:20 166:20

recreational 8:18
   15:8,9,11 109:2
   152:24 167:6
Red 101:20
redirect 168:16
   169:6
refer 8:21 10:1,11
   13:14 14:23 15:7,
   18 17:1 18:18
   113:5 154:25
reference 39:5,23
   47:25 79:12 132:4
   154:23
referenced 11:13
   31:19 57:17 58:12
   66:20 99:2 103:17
   150:12
references 27:24,25
   59:23 63:5 102:8
   111:10 125:23
   130:12 134:18
   145:24 155:23
referred 16:21 26:3
   83:25 101:3 116:24
   150:9
referring 12:2 17:2
   21:25 38:3 39:17
   93:24 155:12
refers 42:18 93:9
   152:9
reflected 38:14
reflection 20:21
refresh 128:14
regard 6:16 86:1
   118:23 168:12
regarding 33:5 34:10
   90:5 112:17 117:11
regardless 88:18
   89:9 141:10
Regional 130:9
regularly 80:2
regulations 66:21
   112:17,23
regulatory 30:5,6
   40:21 69:8 102:21
   140:15,19 141:24
   154:4 156:10,15,15
   167:4,15,19
relate 29:11,25
related 22:22 79:18

   156:19
relating 30:10 156:2
release 12:21 88:5
released 43:17,18
   44:2 151:12
releases 9:11 36:16
   43:13 44:14 45:5
   46:7,10 57:6 86:11,
   16 87:4,13 88:4
   90:6,23,24 91:3
releasing 151:21
   152:22
relevant 168:11,14
relinquish 88:7
remainder 161:22
remember 11:25 151:4,
   16 164:1 166:5
remembering 166:4
removal 154:3
remove 13:25 37:17
removed 157:11
removing 148:6
render 34:14,21
rendering 115:22
rent 42:22
rental 62:8 125:23
rentals 15:22 146:7
repeat 12:7
report 9:14 17:18
   18:23 25:8 28:20
   34:15 35:3,6,8,16,
   16,19 36:2,5,12,15,
   21,23,23 37:2,22,
   25 38:4,14,16,19,
   20,21 39:9 40:2
   41:5 42:5,17 43:5,
   10 44:4 47:19,25
   49:22 50:15,25
   51:10 52:3 55:2
   57:17,18 58:12
   59:24 60:1 63:24
   65:11 68:3,19 73:8
   74:3 75:25 76:18
   77:18 78:5,11,15,
   19,25 79:10,18
   83:25 84:6,9 85:19,
   25 86:7,10 87:14
   90:25 93:9 94:2
   95:16 99:20 104:4
   105:16 107:15

111:11 113:23
121:1,16 122:3,9,
16,17,22 125:8,10,
23 126:22 136:4
137:7,13 140:3
141:22 146:10,21
147:17 148:6 150:3,
5 152:1,9 153:6,15,
16,17 154:9,12
155:23 157:17
158:3,13,15,18
159:2 160:20 161:1
162:10 163:3 168:3
**reports** 25:17 74:15
124:8 126:10 149:1
**representative** 38:6
**representing** 5:16
**request** 12:13 45:11
52:6 71:23 72:9,23
73:1
**requested** 12:23 31:9
71:19 162:6 168:24
**requests** 90:21
**require** 42:19 65:12,
16,25 66:13,16
84:25 87:14,21
88:6,20,21 89:1
112:8 147:12,13
148:15,18
**required** 70:10,13,20
77:23 80:3,10 85:4
90:21 94:11,24
95:12
**requirements** 140:19
**requires** 6:19
**research** 25:4 40:12,
22 51:5 68:21
69:20 70:8 145:21
165:14
**reservoir** 9:10,24
26:9 27:7 52:9,13
62:16,22 87:10
90:15,17 91:12
93:2 152:20,24
153:1 157:18,19
158:1
**reservoirs** 8:16,21,
23 9:21 10:7 12:17,
18,24 16:17 22:25
26:8,20,23 27:3,4

91:20 93:10 96:16
104:8 125:11,14
153:14 157:16
**resources** 8:18 27:16
87:8 98:25 166:25
**respect** 8:22 9:6
12:15,25 14:17
16:3 17:21 28:25
44:24 61:7,20
62:21 63:18 69:9
87:10 88:6 91:24
92:5,10,19,25
106:13 112:9 114:6
155:10 156:5 157:7
**responded** 135:6
**response** 11:19
**responsibilities**
8:13,22 9:5,6
14:17 31:8
**responsibility** 8:15,
25 10:16 26:11,14,
16,18,19,24
**responsible** 15:3
142:1 151:21
154:15 155:18
166:23
**restate** 29:21
**result** 44:13 106:1
**reuse** 149:12
**re-vegetated** 157:14
**revenue** 97:4
**review** 36:2,5 40:1
62:7 62:7 112:25
127:5,12 128:2
134:1
**reviewed** 18:2 25:23
27:22 35:19 40:7
98:12 100:3 109:10,
14 111:21 113:21,
22 114:15 126:20
127:4 132:16
**reviewing** 109:1,18
113:3 128:5
**revised** 126:25
**right** 5:18 16:1
21:12 32:8,18
33:14 35:7 39:21
39:21 43:14 46:25
48:10 56:8 65:20
72:5 76:16 78:1

81:20 92:8,17
93:22 94:5 97:14
99:6,8 102:15
103:4 107:22 110:1
113:20 114:21
115:4 121:23 123:4
128:1 143:2 150:7
151:5,22 152:3,20
154:14 155:15
161:24 162:2,7,12
165:16,18
**rights** 86:18 87:10
88:6,8,9 89:5
91:11,18,23,25
92:3 92:3,5,19,25
93:7,13,16 138:14,
21 142:1,2,8
155:13,16,21
**Rio** 10:11,12 14:12
16:4,7,10,21 17:5,
12,22 18:21 19:6
20:22 23:12 24:8
25:2 26:12 27:23
33:7 37:23 38:10
41:9,16,19 43:12
44:16 45:7,14 46:8,
24 49:23 50:16
52:9,14,18 53:19
54:12 57:15,22
58:8,11,15,16,20,
21,25 59:1,3,6,9,
10,14,15,19 60:8,
20 61:8,15 63:1,19,
25 64:14 65:12
68:4 69:18 70:21,
25 71:5,15,20,25
72:19 73:4 74:16,
22 75:9 77:16 80:3
81:22 82:5,19 83:8,
20 85:18 86:23
89:23 90:7 91:12
92:6,11,13,19,24
93:1,21 94:3,23
95:17,23,24,25
96:8,23 97:1,5
99:10 100:11
101:15,21 102:20
103:21 104:7
105:24 106:2,14
109:3 110:9,19

111:1,7 112:9
114:4,6,23 115:22
116:7 117:7,11
118:9,23 119:3,9,
25 120:4,13,18,19
121:5 122:11 123:3,
12,18,22,24 124:5,
14,20 125:24 127:7,
15 128:7 129:4,15,
20 132:13 133:5,11
138:14 140:2 142:9,
18 143:4,9 144:11,
15,18 145:3,7,13
146:12 148:21
150:10,14,16,21,25
151:18 152:7
154:13,21,21
155:11 156:2,6,19,
23 157:8 159:5,16,
23 160:11,15,22
163:5,7 164:9,12,
17,21 165:7,9,11,
25 166:15 167:17,
21 168:5 169:3
**riprap** 159:3,16,22
**risk** 8:17 22:25 87:2
**river** 10:1 10:1,11,
12 13:12 14:12,15,
18 16:4,7,10,21,21
17:2,5,12,22,25
18:4,13 19:7,17,25
20:22 21:2 22:5
23:12,24 24:2,5,5,
9,10,13 25:2,7,13
26:12 27:23 37:23
38:10 41:10,16
43:12 44:17 45:3,7,
15 46:1,8,24 49:24
51:8 52:9,14,18
53:19 54:3,6,18
56:8,21,21,24 57:6,
16,22,25 58:8,11,
15 60:16 61:8
63:11,19,25 64:1,
14 68:4 69:15,25,
25 70:21,25 71:5,
10,10,15,25 72:19
73:4 74:16,22 75:9
77:16 80:3 81:22
82:6 83:20 85:18

86:23 89:12 91:12
92:11 93:5,22 94:3,
8,12,23 95:4 96:4,
9,23,23 97:5,12,14,
16 98:4,6,14,15,16,
20,21 99:21 101:21
101:21 106:14
108:17 109:3 110:9,
19 111:1,7 112:10
114:8,19,23 115:15
117:7,11 118:9
119:9,23 121:18
122:11 123:3,12,18,
24 124:5,14,15,20
125:1,2 127:8,15
129:15,20 130:13,
23 132:13 133:11
135:2 140:2 142:18
143:5,9,17 144:11,
19 145:7 146:12,20
148:7 149:6,15,17,
18 150:7,17,25
151:13 152:7
154:21 154:21
155:11 156:2,6,20
159:5,17,18,23
160:11,15,22
161:22 163:5,7
166:7 168:5 169:3
**rivering** 96:4
**rivers** 8:23 9:2,6
12:16 13:10 16:13
28:21,25 29:4,11,
12,25 30:1,4,11,21
31:13,17,22 41:19
42:6,11,13 69:17
70:15 101:12 116:8
125:14 129:2,5,10
167:20
**Rochester** 109:5,10,
14,21,22
**rocks** 20:23
**Rocky** 130:9
**rode** 19:17
**role** 30:23
**roles** 31:8 93:5
**Roma** 114:19,20 115:9,
15 166:4,7
**room** 22:5,14
**Rooney** 5:11

**Roosevelt** 134:19
134:19
**roughly** 24:21
**Rule** 6:18
**Rules** 6:9,18
**run** 21:23 77:21 96:9
159:1 161:21
**running** 150:21
**runoff** 36:17
**runs** 151:2

---

**S**

---

**safe** 129:12
**safely** 49:11
**safer** 120:11
**said** 19:11 28:10
37:19 55:2 65:18
87:19 96:7 102:22
108:15 110:8 118:1
127:20 139:21
152:19 153:22
154:11 162:17
**Sam** 125:12 157:17
**same** 33:23 47:17
62:24 70:24 71:4
93:7 96:8 106:10,
22 144:7 148:11
158:1 159:11,13
**sandy** 38:2
**sat** 22:16
**satisfy** 86:17 87:10
142:16
**saw** 54:15 56:15 62:8
97:19
**say** 6:23,25 9:18
10:18 12:2 13:21,
22 15:10 21:25
22:12 23:1 24:17,
20 30:19 31:7
37:24 38:3 41:1,25
42:4,16,23 43:4
44:1,5,8 45:23
47:4 48:9,22 49:10
50:22 54:3,5 55:20,
24 56:17 59:18
67:4 72:24 75:19
81:5 88:12,25 89:1,
9 100:20 110:6
118:19 123:6

143:25 145:1,6,12
147:5 148:25
149:23 157:22
161:13 163:2 164:5
**saying** 30:23 55:18
82:1 103:4 104:19
109:23 113:1 143:3
**says** 33:4 35:9
103:20 104:6 105:6
108:4 109:1 114:17
116:20 126:25
**scarcity** 90:1
**scenario** 88:14 121:8
**scheduling** 6:15
**school** 7:25
**scope** 44:5 76:25
84:20 95:20 124:23
161:5,23 162:6,24
163:9 168:10,16
169:6
**screwed** 165:19
**search** 63:7 108:18
126:1
**searches** 54:12 97:11
**seasonal** 36:10,15,15
**second** 27:6 32:4,24
85:7 99:9 115:20
136:17 161:18
**Section** 60:24 113:23
126:24 127:7 166:3
167:11,17
**sediment** 14:1
**sedimentation** 25:13
37:17 38:2 47:23
56:20
**see** 6:4 18:20 18:20
25:15 32:25 33:21
40:7,25 41:7 46:21
47:25 54:16 67:16
75:11 98:7,25
112:2 114:3 117:10
124:25 126:3
127:12,14,18
129:14 129:14
131:21 132:18
133:3 165:24
**seeing** 24:22,24
25:25 128:5
**seek** 84:22
**seeking** 44:10

**seem** 98:15 149:19
**seems** 31:1
**seen** 9:13 16:19
24:24 32:22 33:17
56:8,9 98:11 100:2
106:19 106:19
111:17 112:19
113:18 128:3 130:2
131:9,10 134:15
144:1
**selection** 112:16
**self-i** 159:11
**self-identify**
159:11
**self-permit** 159:12
**sell** 63:11
**send** 120:3,12 121:17
**sending** 119:15
**sentence** 114:17
117:1
**September** 99:12
126:25
**serious** 106:23
107:13
**serve** 11:23 12:9
**served** 105:6,25
**Service** 130:8
**set** 18:15 34:15 39:6
50:25 51:14 51:14
102:16 116:24
**sets** 116:21 117:2
**setting** 98:14
**seven** 10:7
**several** 109:1
**severity** 147:7
**shallow** 20:23 46:19
47:21,22 103:22
**shallower** 38:2
**share** 93:1
**shared** 26:18
**Shelby** 18:11
**ship** 118:22,23 119:3,
9 121:3,10 123:3,
18,23 143:4
**shipment** 120:18
**shipments** 58:24 59:3,
8,13 142:22
**shipped** 58:14,20
123:23 145:2,3
160:11

**shipping** 59:20 122:7
**ships** 46:23
**shoaling** 25:13 47:21
74:25 75:8,11,12
**shop** 10:21
**shoreline** 24:3
**shorelines** 159:3
**short** 40:3 56:25
160:2
**shortly** 7:15
**should** 35:12 52:3
**show** 158:15
**shown** 37:21 38:9
158:8
**sic** 40:22 125:10
126:2
**side** 10:21 24:4,5,6
74:16,20 75:2,8,13,
17 82:13 84:10,14,
14,19 139:9,17
150:16,20 159:16,
23
**significant** 75:8
133:16
**significantly** 56:25
89:17 95:17 96:1
**signs** 23:1
**sills** 143:10
**silt** 37:17
**silty** 38:2
**similar** 59:24
**similarly** 156:13
162:7
**simple** 38:7 97:10
**simply** 18:20 42:17
91:24 168:10
**Sinaloa** 125:20
**since** 8:10 104:10
**single** 19:23
**single-purpose** 9:23
**singular** 91:5
**sir** 7:5,20 8:9,11
9:17 10:4,14 11:1,
10 13:3,18 14:10,
16 15:12,15 16:2,
24 17:6,10,17,20
18:19,24 19:1,4,8,
19,22 20:4,24
21:10 22:3 23:22,
23 24:3,7,19 25:15

27:1,8,17 31:14
32:1,21,21 33:1,3,
11,13,19,22 34:2,
17,19,23 35:3,7,10,
14,23 36:1,4 37:4,
6,13 38:12,16,19,
22,25 39:4,19,22,
25 40:19 41:8,13,
25,25 42:25 43:15,
25 44:18 46:3 46:3
48:2,5,23 49:6,25
50:12 51:1 52:11,
15,21 53:4 54:4
55:5 56:23 57:2,14,
21 58:3,5 60:4,23
63:15 64:3 66:1
67:3 69:5 70:3,8
72:10,14 74:8
75:13,23 78:13,22
79:8 79:8,13 81:19
84:13 85:3 86:3
87:12 89:15,20
90:3,13 91:10
93:15,18 97:19
98:1,8 101:25
102:4 103:10,14
104:5 105:4,18
107:23 108:1,3
110:13 111:14,23
112:3,12 113:9,14,
20,21 114:2,5,21
115:11 116:4 117:1
118:14,20 119:1,19,
25 120:6,15,24
123:15,20 124:24
125:9 126:8,10,13,
16 128:17 129:8
130:15,25 131:4,14
132:23 134:14,16,
24 135:11,12,19
136:5,16 137:4,17,
23 138:2 139:3
141:13,20 142:4,6,
25 143:1,6 144:12
145:10,17,22
146:23 147:1,21,25
148:3 150:4,8,11
151:5 152:3,21
153:17 154:10
155:20,22,25 156:3,

12,16 157:10,22
159:4 160:13,18
161:10 165:5,8,10,
13,15 166:22 168:7
169:12
sit 45:24 77:5 83:13
site 18:2,7 23:13
24:16 160:12
sites 76:3,6,12,14,
15 77:15,19 140:17
sits 94:8
situation 15:17 42:3
67:20 106:13
121:16
situations 49:6
six 46:6,23,25 47:6,
9,13 55:22 56:6,13
six-feet 47:5
size 143:8 158:6,7
slash 154:4,5
slope 147:15
slopes 146:15
slowest 120:20
slowly 157:13,14
small 62:8 120:12
151:15
smaller 104:1
smallest 158:9
snags 20:23 148:6
soil 146:15
soil's 38:12
sole 109:2
solely 26:19
Solutions 126:24
some 9:18 11:19
13:11,18 15:7
19:18 20:2,22
21:13 27:3 32:4
37:1 37:1,19 39:12
43:11 45:25 47:6
54:14 62:8 75:12
79:13,22 81:21,23
82:16 85:9 89:21
95:6 109:18 110:3
110:3 118:3 123:3
127:18 138:16
140:6 143:13 144:5,
6,8,20 149:4,16
152:23 155:3
somebody 9:15 117:15

151:11
someone 25:8 26:6
45:25 48:12
something 15:5 24:14
30:16 62:5 67:8
82:12 98:25 107:5
118:15 121:10
122:15 128:7
132:19 147:8 147:8
sometime 161:15
Sometimes 14:5
somewhat 152:23
somewhere 9:20
soon 6:14
sorry 12:2,6,12
17:17 25:20 32:21
34:8 39:4 50:5
87:18 98:10 101:21
103:11 106:15
133:24 160:16
164:24 165:18
sought 119:18
source 25:22 27:21
37:2 51:3 97:7
sources 49:23 89:23
96:13
south 100:12 130:19
southern 132:10
speak 36:20 38:14,17
39:1 72:2,20 96:18
Speaking 10:11 36:14
43:2 47:8,22 54:19
127:21
specialist 14:24
species 40:4 40:4
67:10 67:10 68:18,
22 83:23 84:12
85:21 140:16
156:24,25
specific 28:3 64:23
144:22 160:23
161:14 162:1
specifically 8:7
17:8 20:15 39:17
72:1 86:1 139:11
166:4
specifications
45:25
specificity 73:5
specifics 162:22

spending 117:3
    169:13
spirit 116:9
spoke 79:15 107:2
spoken 92:3
sponsor 65:3,13,16,
    17,21 164:6,8,12,
    14
sponsored 65:20
sponsoring 65:19
sponsors 9:1 66:5
sporadic 147:7
spot 24:25 56:18,19
spots 55:17 56:4
    144:5,6
spring 36:17 57:11
stabilization
    146:10,11,20
    147:11 148:12
    159:9
stage 96:12
stakeholders 89:2
standing 6:21
standpoint 53:3
    118:2 159:9
stands 120:19 143:18
start 8:1 42:13
started 141:3
starts 151:4
State 6:2,12 7:5,18
    8:16 15:21 39:13,
    23 40:6,10,12,15
    41:2 43:1 54:3,14
    55:7,13 56:12
    59:21 65:7 66:7
    67:10 78:21 79:1
    81:1 90:2 101:17,
    22 119:10,23,25
    120:13 121:25
    122:23 133:19
    138:24 140:17,18
    150:22 157:2
    159:15 164:8 165:2
stated 28:8 34:11
    80:22 99:5
statement 6:20 29:18,
    20 33:9 34:4 43:9
    103:24 104:25
    105:5 108:9,11,20
    109:6,9,12 115:13

116:5 121:23 136:3
statements 104:13
States 5:3 10:24
    28:19 30:17 46:5
    53:19 60:25 66:5,6
    68:2 69:17 70:11
    71:11 75:2 86:19,
    21 87:21 92:7,19
    96:7 99:10 100:5,9
    101:6,15,23 102:9
    104:23 105:19
    106:22 112:1,8
    113:25 114:6
    115:20 117:4
    126:23 126:23
    127:7 129:1 130:9,
    16 131:13 132:8
    133:7 138:5 154:2
    165:3,6
State's 66:19
stating 103:25
    104:17 105:23
stations 94:16,22
status 40:7,25
staying 72:2
step 164:14
still 33:2 101:9
    102:1,12 103:24
    106:10 107:12
    108:20 112:8
    114:13 115:24
    116:12 121:2 122:9
    123:2 128:13
Stone 6:11
stop 121:11
stopped 131:23
Storage 104:8
story 116:20,22
Strategic 126:24
    127:2,6,15
streambeds 37:20
stretch 17:1,23
    26:12 37:23 39:2
    45:16 46:9 47:3
    50:4 51:9,22 55:21
    56:11,21,21,24
    57:13,16,19,22,23
    58:7,11 59:1,5,10,
    15,19 60:15 61:21
    62:2 63:1,19,25

68:4 70:21,25
    71:20 73:23 74:1
    75:8,16 77:16 82:5,
    20 83:9,19 85:18
    93:21 94:3,5,23
    95:4,13 97:5 111:1
    123:11,24 124:5,11,
    15 125:8,24 133:10
    142:17 143:10,17
    145:13 146:3,19,19
    147:19 148:1
    149:15 150:25
    152:6 153:7 155:11
    156:6,20 159:23
    160:23 162:1 163:5
    168:14 169:3
stretches 54:18
strictly 74:18
strike 8:20 14:22
    19:16 63:9 120:17
stroke 139:21
struck 22:18
structure 22:2,10
    23:3,25 24:1 167:8
structures 12:20
    12:20,23 22:22
    77:13 154:3
studies 108:17 117:3
    159:21,25
study 28:4,5 31:19,
    21,23,25 51:17
    52:5 98:18,22
    102:6,8,17 103:16
    106:22 107:25
    108:6,11 109:4
    110:10,23,23
    132:18 150:1 153:4
stuff 19:4 49:4
subject 25:18 40:2
    45:24 111:13 116:3
    128:25 148:5
subjects 168:13
submitted 113:25
    118:8
substantial 11:18
    18:17 75:15 76:17
    78:14,24 79:10
    83:24 89:13 108:6
    119:6
substantially 62:7

114:22
**substantial-sized**
119:7
**such** 9:3 14:3,21
16:18 25:13,22
43:23,24 50:19
50:19 55:13 56:1
60:14 61:5,18,25
62:20 64:25 65:13
68:14,24 73:2
75:22 76:12 77:8
80:23 83:6 87:13
89:6,23 91:17
92:16 93:13 94:19
95:8 96:1 97:7
105:25 129:14
142:15 143:17
146:15 147:10
149:24 151:25
161:1 164:6 166:20
**sufficient** 41:10
53:20,22 54:6,24
55:8 103:22 104:9
**suggest** 51:21 85:24
90:24 107:14
121:16 122:22
**suggested** 50:15 52:2
65:10 78:19 79:19
87:14
**suggesting** 122:16
**suggestions** 85:17
86:6 90:5
**suggests** 63:24
**suitable** 71:11
123:23 163:6
**Suite** 5:5 129:11
**summarized** 41:15
**summary** 41:6,9,18
53:18
**supervised** 13:22
14:9,11,14
**supplemented** 35:8,17
**supplied** 43:22
**supply** 8:17 9:23
12:22 35:5 93:9,10
96:13 149:5 155:23
156:1,3
**support** 36:6 41:11
53:20 54:7,24 55:8
134:21 152:23

**supports** 145:14
**supra** 109:5
**Sure** 9:17 16:16
19:22 29:22 32:9
53:7 54:15 67:5
75:2,4 77:20 92:13
99:5 100:21 102:10
106:7 108:24
109:15 124:23
131:17 135:19
136:13 142:20
159:19 164:13
165:18
**surface** 22:10
**surveillance** 154:5,
24
**survey** 73:22
**susceptible** 14:18
**sustain** 122:5
**sustainability**
127:19
**swath** 15:5
**swept** 140:19
**sworn** 7:2
**synopsizes** 154:14
**system** 10:10 25:17
94:8,12,19 95:3,9
96:4,15 129:2
**systems** 9:1 95:23
96:16

---

**T**

**Table** 98:4
**take** 11:19 18:10
32:3,4,7,11 33:14
44:8 73:20 75:11
79:23 89:6,8 92:19
99:25 100:6 105:9
112:13 113:7,15,17
114:25 115:12
116:15,18 120:8
122:6 125:6 126:18
127:10,11,23
129:24 131:5
133:25 135:17
141:2,4 159:10
160:2 163:12
**taken** 32:14 47:24
50:20 57:3 85:13

98:17 99:10 135:22
140:11 149:9
151:24 152:4 160:6
162:16,20 163:18
**takes** 72:12 150:15
**taking** 45:19 115:8
**talk** 27:6 43:11
54:11 74:25 75:1
**talked** 48:3 62:9
74:25 127:20
135:25 139:25
143:7 158:2
**talking** 42:9 42:9
43:2 48:10 74:24
81:2 92:21 98:16
111:7 157:5 158:12
**talks** 42:13
**Tamaulipas** 68:2
**Tarleton** 7:18
**tasks** 152:17
**technical** 85:9
**technologies** 152:17
**technology** 152:16
**teleconference**
136:9
**tell** 46:5 72:9 98:19
99:7 106:20 113:18
116:19 128:3
**tells** 28:5
**temporary** 14:5
**tenets** 66:19
**Tennessee** 70:14
**Tennessee-Tombigbee**
134:11,13 135:2
**term** 9:13 14:7 60:18
66:24 110:23
154:10 155:1
**terminology** 9:16
**terms** 157:18
**territories** 117:4
**territory** 72:4
**test** 109:4
**testified** 7:2 11:11
**testify** 33:5,10,24
34:5,10
**testimony** 27:2 61:5
81:21 93:19 100:13
101:3 163:25 164:5,
21 166:13
**Texas** 5:5,7,15,15

6:2,11 7:10 11:17
24:4 26:1 33:2
40:10,15 41:2 66:8,
13,17,17 78:20,21
84:1 89:12 93:17
100:10,13 105:19
114:20 123:22
138:24 140:17
150:22 159:15,16,
23
**Texas-New** 101:17,22
**than** 9:22,23 13:6
15:16 18:20 19:25
20:16 24:2,6,17,24
25:7 31:18 34:10
36:18 38:17 46:25
47:6,9,22 48:18
49:17 54:7,17,25
55:3,10 63:6 78:23
86:13 91:5 95:18
98:24,25 100:20
102:6,25 103:5
108:17 145:24
146:3 157:13,18
158:11
**Thank** 8:1 10:22
21:16 131:25 134:7
163:15 166:12
169:10,16
**Thanks** 163:12
**That's** 13:12 15:2
17:24 22:3 23:3,5
32:10 32:10 34:3,
12 35:7 38:5,14
39:13,14 41:4
42:22 43:9 43:9,15
45:20 46:3,19
49:17 52:5,11,15
53:9,10 54:3 55:18
56:7 58:4 60:10
65:19 67:3,11
68:13,14 69:4 71:3,
8 72:4,20,20 77:20
78:17 79:3 81:19
82:22 84:20 86:15,
20,25 88:3 91:16
93:7,18 94:16 97:2
98:17 99:4,21
101:9 102:14
103:10,25 104:2

104:2 105:15,21
106:10 107:23
108:22 109:9 110:6,
23 111:4 113:9
115:6,18 116:12
119:4 122:15,18,24
124:9 127:4 132:5
133:24 137:9
141:13 142:7,20
143:2,20,21 145:5
148:25 149:1 150:4
153:17 155:2
156:15,21 161:14
162:3,17,17,24
163:1,10 167:14
**their** 12:23,24 26:15
62:10 72:13 88:8
89:16,22 90:8
100:10 111:20,22
130:18 138:5
**themselves** 5:8 12:18
77:13
**then** 14:3 18:11
18:11,12,13 21:14
22:19 24:15 25:12
30:17 45:20,21
46:16 51:17 53:9
57:3,10 64:8,9,20
67:8,24 77:2 82:14
83:3 89:19 103:6
106:22 107:4 113:2
118:5 120:12
121:14 122:5,6
126:2 134:1 135:6
136:10 145:2
149:20 153:4
159:20 160:2
162:17 167:9
**there** 6:1 6:1,2,12
9:25 15:10 18:10
19:22 21:23 22:5,
14 23:1,4,7,8 25:1,
6,8,25 27:24 32:25
35:18 37:1,25 39:8
46:18,23 48:15
51:19 54:12,17,23
56:4,6,10 57:23
58:2,7,9 65:3,6
67:12 69:8 72:21
74:19 75:7,14,14,

21 76:14,19 77:14,
20 79:4 80:25
81:21 82:14,16
83:2,6 84:5 86:22
91:11,15 93:20
95:3,22 96:3 96:3,
23 97:2 100:21,22
104:15 106:22
107:13,18 108:2,5
110:8,17 111:6,24
117:6 117:6,23
118:3 118:3 121:11
122:25 122:25
124:3 126:2,4
132:4,6 134:6,21
136:4,5,15 137:5
140:6 143:13,14
144:25 145:6,25
146:8 147:17
148:12 150:24
153:10,13 155:6,10,
15 156:18 157:25
158:9,10 159:9
161:1 166:6
**therefore** 88:21
101:8 116:5 161:11
**there's** 9:22 9:22,25
10:7 27:24 27:24
39:5,23 42:21 44:7
45:9,10 54:10 55:8
63:4 65:6 65:6
66:17 73:18 75:8,
12 76:2,14,15
80:25 89:19 96:10
98:25 103:19
104:11 105:1 107:4
108:23 114:18
115:14 119:17
121:7 129:16
134:18 136:3
142:21 144:20
145:24 147:2
149:18 150:13
151:1,5,15 152:16
152:16 154:23
155:17 157:11,12,
24 158:10 164:13
167:6,7
**these** 6:21 9:20 50:6
99:5 105:14 112:19

115:20 133:1,3
139:22 143:3
154:14 161:13
162:4
**they'll** 89:19
**They're** 48:9 67:8
107:5
**they've** 64:18 99:5
102:10
**thing** 9:4 15:23 23:5
45:13 46:16 66:23
77:1 97:10 127:17
161:20 168:22
**things** 13:21 15:8
18:15 25:12 29:8
44:13 55:18 56:20
65:6 67:13 75:6
79:13 80:11 81:14
85:3 96:15 103:3
105:14,15 135:11
140:7 141:9 143:14
152:18 161:1 167:3
**think** 5:24 22:16
27:2 42:20 80:7
81:20 83:1 88:11
93:19 100:13,16,16
107:10,21 112:4
139:11,24 140:5,6
141:21,24 143:23
147:5 150:5 151:3,
15 152:9,19 153:6,
10 155:23 161:12
164:18
**thinking** 82:9 139:12,
13
**thinks** 67:17
**third** 108:25 111:24
**tho** 55:17 66:9
**thorough** 145:21
**those** 6:6,7 9:5,8
10:4 13:21 13:21
14:8 15:4,8,18,24
16:2 18:14 22:8
27:16 29:8 30:17
31:2,20 34:10
36:17 37:3,4,10
38:1 41:21 42:12
43:18 44:13 47:24
48:7,20 49:6 50:2
52:17 54:14 55:8,

18 56:20 59:7
61:13 61:13,15
62:4 66:9 67:7,9
68:15,25 69:3,21
70:2,17,23 71:13
75:6 76:5 79:11,24
81:14 87:1,14 88:8,
12 89:4,22 90:20
91:20 93:16 96:18
97:13,17 98:17
99:21 101:10
102:11 102:11
103:1 104:12
105:15 107:3,18
108:24 108:24
112:5,7 116:9
117:6 119:1 120:21
125:15,25 126:11
129:10,12 133:6
135:9,11 136:4,6
139:8 141:9,15,23
142:25 143:13
144:2,7,14 146:6,
14 147:11,12
149:25 150:23
152:17 152:17
153:5 155:4,5,21
156:3 158:5,25,25
161:1,25 162:4,7,
14 165:14
**though** 142:8
**thought** 100:13
137:20 154:10,11
**thousand** 13:19 23:14,
18
**three** 48:14
**through** 11:21 18:7
21:23 36:16 41:16
56:6 64:18 76:3,4,
4 91:2 101:5
126:25 127:17
129:13 136:11
137:11 145:2
151:15,20 167:9
**throughout** 47:3 50:4
80:24 145:25 147:7
162:5
**throw** 140:8
**thus** 105:7 115:22
**Tim** 5:2 67:6

**time** 17:13 18:13,15
32:12,15 34:23
44:2 54:20 55:4,7,
10,19 56:25 76:15,
19 77:23 78:1 85:4,
11,14 89:17 90:15
91:7,8 98:24 106:6,
7,9 113:17 115:15
118:1 120:6,9
127:11 127:11,18
133:25 135:20,23
141:10 143:1 144:7
147:11 148:13,16,
20 149:6,17,19
157:6 160:4,7,20
162:9 163:2,16,19
169:18
**times** 14:6 20:22
36:17
**timing** 45:4 46:7
81:12,13 162:8
**Timothy** 7:6
**title** 8:4,10 14:25
61:10
**today** 6:25 11:9 12:5,
10 33:18 34:5
43:24 44:13 46:7
56:18 77:6 78:19
79:11 91:11 94:7,8
102:2 103:24 105:1
108:13,20,22
109:12 110:14
114:13 115:24
116:12 125:25
141:3 145:7,16,17
156:18 161:13
**today's** 166:13
**together** 48:20 51:1
95:15 143:24 157:3
**told** 53:6 81:5,7,7,
11,16 82:9 100:21
132:21,25
**Tombigbee** 70:14
**too** 57:3 93:20,21
94:4 94:4 120:10
**took** 18:14 107:20
134:19
**top** 39:21 68:22
**topic** 86:9
**topics** 165:14

**topographically**
  47:22
**topography** 75:1
**Total** 7:14 95:24
  147:6
**totally** 53:17
**touched** 60:18 83:22
  140:6 142:14
**touches** 140:7
**towards** 114:3
**trade** 42:19,21,24
  43:6,8 45:16,19
  46:1 59:20 97:14
  163:6
**traffic** 19:21 19:21,
  22
**training** 12:15,25
  13:2,6,7 16:3
  28:20,24 29:3 30:9
**transportation**
  105:7,25 106:13
  121:19 142:15,17,
  21 168:5
**transshipped** 144:14
**trash** 154:3
**travel** 20:10 21:2
  52:8,13,18 143:8
**traveled** 24:11 58:10
**traversing** 145:25
**treaties** 45:1 86:21
  87:21 88:1,20,24
  104:11 111:25
  112:5,7 114:7,13
  116:7,10 138:6
  139:13
**treaty** 86:19,22
  87:20 139:16
**trial** 5:9
**tributaries** 150:21
**Trinity** 10:7,8
**trip** 35:18,20,24
**troublesome** 144:5
**truck** 119:15,22
  120:3,12 121:4
**true** 57:5 61:24
  63:21 103:24
  115:24 136:23
  145:18 148:20
  162:20
**try** 98:25 113:10

135:17 149:12
153:5 157:3
**trying** 5:21 21:21,22
  22:16 49:5 67:14
  80:21 83:1,14
  123:8 151:3,4,4
  161:6
**turn** 55:17 165:16,22
**turned** 24:15
**turning** 21:18
**two** 6:10 19:20 48:20,
  21 56:4 100:11,16
  126:7 143:13
**two-part** 29:20
**type** 13:2 20:10
  39:15 44:11 48:23,
  24 49:2,7,7,20,20
  61:15 80:10 106:10
  108:15 122:5
  127:19 141:19
  146:15 155:10
  158:22 159:16
**types** 15:10 38:1
  49:19 63:24 65:25
  66:10,19 74:24
  80:23 81:14 144:3,
  4 149:25 157:15
  162:4 168:3,20
**typical** 48:6,9
**Typically** 13:24
  15:19 36:14 38:1
  47:8 54:19 67:22,
  24 167:8

## U

**ultimate** 94:25
**ultimately** 167:9
**umbrella** 140:8
**unaware** 145:1
**under** 6:17 9:10 10:8
  10:8 19:18,20
  22:10 28:21,25
  29:4,12 30:11,21
  31:13,17 40:7
  54:12,13 61:13
  64:12 88:1 89:13
  104:10 107:4 108:4
  110:7 113:13
  117:20,23 149:25

167:16,20
**undergoing** 89:13
**underlie** 136:12
**underlies** 136:12
  137:13
**understand** 17:1
  22:11 30:7,19
  39:10 40:11 42:11,
  23 46:21 65:9,24
  72:4 76:7 84:25
  88:15 89:16 102:23
  103:2 121:8 124:23
  127:10 160:19
  162:19 167:18
**understanding** 16:19
  19:10 27:20,21
  52:11,15 85:4
  86:20,25 87:12,17,
  19 88:3 92:2 93:18
  110:25 111:4 115:6
  167:22
**understandings**
  39:12
**Understood** 53:4
  72:10 105:22
  122:20 122:20
**undertaken** 69:1
  119:6
**underwater** 23:1
**undesirable** 85:20
  156:24
**undetermined** 162:9
**uneconomical** 119:14
**United** 5:3 10:24
  46:5 66:4 69:17
  70:11 71:11 75:1
  86:19,21 87:21
  92:6,19 96:7 100:5,
  9 101:23 102:9
  105:19 112:1,8
  113:25 126:23
  126:23 127:6 130:9
  131:12 133:7 138:5
  165:3,6
**University** 7:19
**unless** 21:12 74:20
**unloading** 154:5
**unnamed** 6:22
**unnecessary** 115:22
**unpassable** 144:6

unquote 53:21 101:8
  106:24 114:19
  115:23 116:25
  154:24
unsure 92:8
until 45:24 162:21
upcoming 117:5
upon 23:3 45:18 57:9
  61:2 158:7,8 161:4
upper 130:13,23
upriver 58:21
upstream 18:8,10
  21:18 101:16,22
  128:12
usable 42:1
use 14:7,18 16:25
  36:15 37:22,25
  38:10 41:21 42:2,9,
  18,19 43:4,5 45:15,
  21 49:8,21 53:23
  55:4 59:19 60:23
  62:10 66:24 79:21
  103:19 105:2,20
  108:4 110:7 121:14
  145:7 147:14,15
  149:12 152:16
  154:8 155:7,16,16
  158:9,23 160:25
  163:6 168:21
used 9:13,14 37:11,
  16,16 42:6,13,14,
  17 46:13 54:13
  82:14 99:22 104:9
  110:23 110:23
  112:22 118:17,19
  126:11 135:8
  154:10
user 9:19 15:24
uses 20:14 86:13,22
  87:11 88:6 146:2,3
  148:23 157:19
  164:16,19,21 165:4,
  9
using 10:6 15:25
  41:24 43:2 46:1
  107:11 121:9 125:1
  155:6
usually 14:1 159:11,
  12

utilization 87:3,24
  91:4
utilize 30:3 45:3
  46:14 87:7 88:14
  121:10 150:23
  151:12
utilized 27:15
  102:11 119:7
  157:13
utilizing 153:2

## V

Valley 90:7 95:25
  144:18
variable 96:1
variables 121:7,22
  122:5 158:25
variations 131:10
various 63:24 65:25
  66:4 75:12 86:13
  95:4 98:14 134:21
  136:1 157:23
vary 49:13 56:22,25
  74:18 132:11
vastly 15:6
vegetation 147:16
  157:15
vegetations 148:7
vehicle 19:21
vehicles 95:23
vehicular 20:1
verified 18:14 36:16
verify 18:3 52:21
version 40:3
versus 5:4
very 15:4 15:4 25:14
  40:4 55:4 58:9
  121:23 134:7
  139:21 157:18
  169:10
vessel 21:22,23 42:1,
  2,10,18,19 43:3,5,
  6 45:20 49:2,7,8,9,
  10,13,15,19 52:8,
  13,19 54:16 55:17
  58:10 61:1 119:3
  120:19 121:5
  125:23 144:4
  161:18

vessels 17:4 41:14,
  17 42:22 44:12
  46:1,6 47:5,12
  48:1,4,6,15 52:18
  53:23 54:1,7,17,25
  55:3,9,22 56:1,12
  57:24 58:8 95:17,
  18 96:8 119:1,7
  143:7,8,17 144:25
  146:3 147:19
  168:20
via 5:24 121:4
vicinity 35:21 98:6
view 89:6,8 105:23
viewable 22:18
views 75:11
visit 17:21 18:2,5
visited 23:12
visual 22:9 157:10

## W

wage 83:4
want 17:1 29:22
  29:22 32:7,10
  48:17 51:16 75:1
  88:25 89:9 96:7
  121:14 123:18
  143:4 147:8 149:14
  159:19 161:19,20
wanted 22:1,5,13
  75:3 118:22 134:20
wasn't 20:7,8 23:7,
  24 81:7 100:21
  100:21 136:22
water 8:17 9:11,23
  12:16,21,22,23,24
  13:25 14:5 20:18
  22:10 23:6 24:25
  26:7,15 27:14
  30:10,20 33:6
  36:16,18 41:10
  42:1,2,10,18,25
  43:3,13,17,21 44:2,
  7,14 46:13 48:14
  53:20 54:19,24
  55:8,10 56:22,25
  57:4 86:11,12,18
  87:3 87:3,4,7,10,
  24 88:5,14 89:5,10,

17,20,22,23 90:1,5,
8,15 91:4,11,12,17,
19,23,25 92:2,3,5,
8,10,10,12,13,14,
17,18,19,21,23,25,
25 93:4,7,9,11,12,
13,14,16,21 94:4
95:5,24 96:3,10,13,
22 101:23 105:2,20
111:25 113:24
115:13 126:23
138:14,21 140:16
142:1,2,8 144:6
149:5,16,18 150:6,
10,13,15,16,21,22,
23 151:18,21 152:3,
22 155:10,12,13,16,
21,23 156:1,3
158:19 167:7,17
**watercraft** 61:1
**waters** 46:14 60:21
61:2 86:23 87:9
92:6 93:1 101:6,13
112:17 113:7,12
129:12 148:21
149:11 150:23
151:21
**water's** 151:12,13
**watershed** 10:7,8
**waterway** 14:18 41:11
53:21 54:24 70:10
132:2,9,10 134:11,
13
**waterways** 70:6 79:5
116:21 154:15
**way** 18:23 21:11 25:6
32:4 35:21,24 38:7
39:10 40:9,15
42:10 43:4 53:2
76:9 79:18 84:13
88:11 101:5 104:2
105:16 106:7 117:9
119:19 121:10,14
122:10 125:6,22
133:19 138:16
140:19 147:5 150:3
160:25
**ways** 122:7 146:16
157:4
**Webb** 99:16

**website** 111:20,21,23
128:21
**weekend** 169:15
**weigh** 158:5,10,11
**weighs** 158:15
**weight** 49:10 158:5
**weight's** 49:4
**Well** 6:17 9:9,14
11:21 12:19 19:16
26:1 27:22 35:14
49:18 49:18 54:12
56:9,18 57:11 58:9
62:4 65:8 66:6
68:9 72:4 74:8
87:8 91:19 99:23
105:22 109:20
117:10,14 134:5
135:15 140:22
143:23 148:23
151:20 154:10
161:17 164:18
**we'll** 99:23
**well-established**
115:21
**went** 11:21 24:13,14,
16 56:2,5 58:2
162:18 168:2
**we're** 9:10 12:3,10
32:13,16 44:9,10
48:10 73:16 73:16,
18 76:16 81:2
83:14 85:12,15
121:24 134:19
135:21,24 136:13
160:5,8 163:17,20
169:19
**west** 157:24
**wetter** 45:10
**we've** 6:10 12:19,21
37:16 46:18 82:2
83:2 98:16 135:5,
16,25 140:5 152:10
**whatever** 67:11 81:10
84:4 109:21 113:17
119:20 127:11
133:25 136:15
137:14 138:5
139:13 141:4,25
142:1 162:16
167:11 167:11

**what's** 16:21 27:9
34:24 43:17 48:6
57:17 58:12 97:20
121:21 142:11
161:4,5 162:22,23
166:10
**whatsoever** 51:24
126:16
**whenever** 149:24
**whereas** 121:8
**wherever** 167:11
**whether** 9:2,19 12:16
19:6,9 25:22 29:4
30:15,20 37:18
46:11 47:14 50:10
50:10 51:8,20
52:16 54:22,23
55:8 67:9,10 72:15
73:13 87:4 89:21
90:4 98:20 100:15,
16 103:12 105:19
106:16 107:5,8,13,
21 108:20 111:6
112:7 113:12,18
114:12 116:12
121:12 127:6
132:12,19,20
133:15 135:8
139:20 140:15
141:3 144:13 147:2
150:15 151:17
152:5 159:21 166:6
**which** 6:18 13:22
17:2 28:4 31:15
40:21 56:17,22,24
57:23 58:7,14,19
66:18 75:14 82:9
84:16 95:11,22
100:24 103:8
107:25 108:6
110:23 116:6,10
131:19 142:21
147:3 156:22
161:19 161:19
165:21 167:9
**while** 19:23
**Whitney** 125:12
157:18,23 158:1
**who** 5:24 6:5,7,24
12:13,22 15:22

25:8 39:1 40:15,19,
24 58:14 62:11
80:9 88:5 92:5,8,9,
13,18,21,23 93:12
123:17 132:25
150:11,13 151:17,
21 159:18 165:1
**whoever** 138:20
**whole** 89:9 109:20
161:20
**whom** 67:1
**who's** 9:15 26:6
151:11
**Whose** 60:12 60:12
**why** 10:15 20:13
30:14 55:18 77:20
80:1,8 101:11
105:15 122:18
130:21 131:2,24
135:17 168:8
**wide** 23:24 158:23
**Wikipedia** 134:10
**Wildlife** 26:2 66:9
**will** 5:17 6:8,12,23,
24 9:24 10:10 14:6
24:15 28:4 55:16
56:14 58:3 88:13,
16,17 113:1 125:1
136:15
**willing** 54:22
**wish** 22:22 169:14
**within** 9:6 12:14
30:17 59:1 63:25
66:4,7 73:8,25
75:16 78:19 80:14
92:6 108:6 109:3
113:12 115:7
127:15 129:4
141:24 146:12,19
151:13 166:25
168:10
**without** 21:5 44:9
52:19 75:16 83:14
86:8 95:2 96:13
109:17 110:3 114:9
**witness** 10:24 11:2,4,
5 80:5 163:11
169:7,9
**witnesses** 6:14
**word** 36:15 41:21

114:25 115:9
160:25
**words** 76:12 139:15
149:14
**work** 7:23 12:21
34:13,21 37:7 38:8,
14,21 39:9 40:2
47:10 63:24 67:23
80:6 81:6,11,17
85:3 110:3 112:23
113:6 114:10
116:25 117:20,23
134:20,25 135:10
136:2,12 138:13
148:9,16 168:2,14
**worked** 105:15 139:14
139:14 157:3
**working** 8:1 40:6
128:13
**Works** 8:24 14:1
64:16,17,18 92:23
118:2
**world** 141:9 167:1
**worries** 138:12
**worry** 45:2
**Worth** 5:5 7:10,24
8:2,7,13 9:3,6
10:19 12:14 16:13,
14,15,16,20 17:3
27:3 37:12 40:14
56:11 58:14,19,25
59:6,15 60:5 63:17,
22 71:18,21 73:9
81:22 82:6,18,23
83:7,17 84:17
99:14 111:2 112:24
113:13 115:2,9
117:11,19,25 124:5
125:11,13 154:19
156:4,7,14,19
166:14 167:15
**wouldn't** 48:22 77:25
84:22 96:1 119:22
122:19 123:2
140:23 148:16
149:19 168:11
**would've** 19:15
139:14
**wrapped** 66:22
**written** 104:15

108:11 116:22
117:14 117:14
136:7
**wrong** 120:9
**wrote** 106:6

**Y**

**year** 7:21 12:11
17:16,17 36:18
56:19 117:5 141:4
144:8
**years** 7:14 11:25
58:13,18,25 59:9,
14 63:21 112:23
126:25 141:4 141:4
145:25 149:2 156:4,
14
**yesterday** 35:13
**You'll** 32:10
**you're** 9:19 23:17,20,
20 25:25 29:7,10
31:2 33:23 34:4
38:3 41:24 42:8
46:22 47:21,23
49:3 51:2 59:18
61:18,24 64:19
67:1 92:21 96:4
97:24 99:8 100:19
102:15 113:7 121:9
122:15 123:16
133:23 134:5
141:10 142:24
143:3 145:1,12,19
149:24 157:5 158:8
**yourself** 14:23 25:8
107:21 126:12
166:9
**you've** 10:23 17:22
25:22 26:3 28:9
56:8 63:21 88:15
96:19 111:21
126:20

**Z**

**Zapata** 99:16
**Zapata-Webb** 101:16,
21