## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No. 1:23-cv-00853-DAE |
| GREG ABBOTT, in his capacity as GOVERNOR OF THE STATE OF TEXAS, and THE STATE OF TEXAS, | |
| *Defendants*. | |

## PLAINTIFF UNITED STATES' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

JAIME ESPARZA
UNITED STATES ATTORNEY

LANDON A. WADE
  Assistant United States Attorney
  Texas Bar No. 24098560
United States Attorney's Office
Western District of Texas
903 San Jacinto Blvd., Suite 334
Austin, TX 78701
(512) 370-1255 (tel)
(512) 916-5854 (fax)
Landon.wade@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

BRIAN H. LYNK
  Senior Trial Counsel
  NY Bar No. 2868743
BRYAN HARRISON
  Trial Attorney
  FL Bar No. 106379
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov

Dated:  October 24, 2024

*Counsel for the United States of America*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT REGARDING NAVIGABILITY PREMISED ON
SUSCEPTIBILITY TO FUTURE USE IN COMMERCIAL NAVIGATION ...........................1

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ........................................3

    I.    General Conclusions of Law under the Rivers and Harbors Act............................3

        A.    Section 10 of the RHA .......................................................................3

        B.    Determining navigability ....................................................................4

        C.    "Other structure"................................................................................6

        D.    Obstruction to navigable capacity......................................................8

        E.    Injunctive relief under the RHA .........................................................9

    II.    Findings of Fact ..................................................................................................10

        A.    Texas installed a federally unauthorized "Floating Barrier"
            in the Rio Grande ............................................................................10

        B.    The Rio Grande between river miles 275.5 and 610 was
            historically susceptible to commerical navigation and was
            historically navigated ......................................................................12

            1.    The Rio Grande between river miles 275.5 and 610
                was historically susceptible to commercial
                navigation.....................................................................12

            2.    The Rio Grande between river miles 275.5 and 610,
                especially in the vicinity of Eagle Pass, was
                historically navigated ...................................................18

        C.    The physical characteristics of the 1,000 foot river stretch
            where the Floating Barrier is located are substantially
            similar to those of the larger stretch between river miles
            275.5 and 610................................................................................19

        D.    The Floating Barrier is a "structure".............................................21

E.      The Floating Barrier obstructs the river's navigable
        capacity and adversely impacts federal agencies'
        waterborne operations ...................................................................23

        1.      Impacts on U.S. Border Patrol waterborne
                operations and other navigation ....................................................23

        2.      Impacts on Coast Guard waterborne operations ...........................25

        3.      Impacts on USIBWC waterborne operations ................................27

        4.      The Floating Barrier creates a hazard to navigation
                in the Rio Grande and increases the risks of vessel
                operation in the barrier's vicinity...................................................28

F.      The Floating Barrier adversely impacts other important
        United States interests ....................................................................30

        1.      Adverse impacts on USIBWC's mission and
                operations ......................................................................................31

        2.      Adverse impacts on U.S. diplomacy with Mexico .......................32

III.    Additional Findings and Conclusions ..................................................  34

A.      The relevant segment of the Rio Grande is a navigable
        water of the United States and a navigable river and
        therefore subject to RHA section 10 .............................................34

B.      The evidence establishes that Texas violated RHA Section
        10 by installing an unpermitted "structure" in the Rio
        Grande .............................................................................................35

C.      The evidence establishes that Texas also violated Section
        10 by creating an "obstruction" to the navigable capacity of
        the Rio Grande ................................................................................35

D.      Texas fails to sustain its affirmative defense to liability............................36

E.      The permanent injunctive relief requested by the United
        States under the RHA is appropriate and should be granted ....................39

# INTRODUCTION

The United States submits the following proposed findings of fact and conclusions of law in advance of trial, pursuant to the Court's Order Resetting Bench Trial.  ECF 214; *see also* Text Order of Aug. 20, 2024 (modifying filing deadline to Oct. 24, 2024).  The United States previously submitted its brief explaining which points of law were resolved by the controlling portions of the Fifth Circuit's en banc decision reversing and remanding this Court's preliminary injunction order, and which issues either were not addressed by that decision or were not conclusively resolved by the en banc court's multiple opinions.  ECF 227 (discussing *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024)).

## STATEMENT REGARDING NAVIGABILITY PREMISED ON SUSCEPTIBILITY TO FUTURE USE IN COMMERCIAL NAVIGATION

Prior to the Fifth Circuit's en banc decision, the United States intended to offer evidence at trial in this case regarding potential methods of improving the capacity of the relevant stretch of the Rio Grande to be used in the future for commercial navigation.  The United States intended to argue that this evidence shows the relevant river stretch is a "navigable river" within the meaning of Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, because it is susceptible to future use for commercial navigation if reasonable improvements to it were made.  *See United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 405 (1940); *see also Newbold v. Kinder Morgan SNG Operator, L.L.C.*, 65 F.4th 175, 181 (5th Cir. 2023) ("'[T]he extent of existing commerce is not the test' for navigability.").  The Fifth Circuit's lead opinion concluded that proving such hypothetical improvements would be "reasonable" requires evidence of the "costs and benefits of those improvements today or in the future, whenever those improvements would be useful," such that the Court can ascertain whether the improvements "would be cost-effective for *this river*."  *Abbott*, 110 F.4th at 717, 718 (emphasis in original); *see also* ECF 227 at 14-15.  The lead

opinion thus held that the record from the preliminary injunction hearing failed to establish that the United States was likely to prove that the relevant stretch of the Rio Grande is susceptible to future commercial navigation with reasonable improvements.  *Abbott*, 110 F.4th at 718.  Chief Judge Richman concurred in this holding but did not specifically discuss or endorse the lead opinion's method for determining reasonableness.  *Id.* at 724; *see also* ECF 227 at 15.

The United States disagrees that the lead opinion sets forth the correct legal test, as no previous Supreme Court opinion required a cost-benefit analysis to demonstrate susceptibility to future navigation.  Instead, in *Appalachian Elec. Power* the Court was careful to note that no navigability formula will "fit[] every type of stream under all circumstances and at all times," and it declined to establish "any single definitive test."  311 U.S. at 404.  There, the Court found a river segment navigable notwithstanding evidence that the costs of improvements for navigation were considered "prohibitive" at that time.  *Id.* at 418.  And the Supreme Court had earlier explained that a cost-benefit analysis is *not* necessary because navigability does not depend on the need for commercial traffic in an area, which turns on population and economic factors that could change, but instead on the river's physical capacity to "meet the needs of commerce as these may arise."  *United States v. Utah*, 283 U.S. 64, 83 (1931).  That capacity "may be shown by physical characteristics and experimentation as well as by the uses to which the streams have been put."  *Id*.

If, as Texas contends, the lead opinion's test is controlling here, the United States presents the foregoing to preserve for appeal its argument that the Fifth Circuit's approach to future navigability is legally incorrect.  As such, the United States does not have, and without reopening discovery cannot obtain, evidence establishing the economic benefits of the potential improvement methods for future navigation that its experts identified in discovery.  This Court has stated that it will not reopen discovery before proceeding with a bench trial in this matter on

November 7, 2024.  Aug. 7, 2024 status conference, Tr. at 25.  Therefore, the United States will not offer trial evidence on this issue and thus proposes no findings of fact below with respect to navigability based on susceptibility to future commercial navigation as justified by a cost-benefit analysis.

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

To the extent that any findings of fact below contain or express conclusions of law, they shall also be deemed to be conclusions of law.  To the extent that any conclusions of law contain or express findings of fact, they shall also be deemed to be findings of fact.

**I.      General Conclusions of Law under the Rivers and Harbors Act**

**A.      Section 10 of the RHA**

1.      The Rivers and Harbors Act ("RHA"), 33 U.S.C. § 403, was enacted "to prevent obstructions in the Nation's waterways," and the Supreme Court has "consistently found its coverage to be broad." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967).

2.      Section 10 of the RHA independently prohibits "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States," and "build[ing] . . . any . . . boom . . . or other structures in any . . . navigable river, or other water of the United States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army."  33 U.S.C. § 403.

3.      A Section 10 permit issued by the United States Army Corps of Engineers ("Corps") is required for structures or work in or affecting waters of the United States.  33 C.F.R. § 322.3(a).

4.      Section 12 of the RHA provides that "the removal of any structures . . . erected in violation of [Section 10] may be enforced by the injunction of any district court exercising

jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the [U.S.] Attorney General." 33 U.S.C. § 406; *see also id.* § 413.

### B. Determining navigability

5. Determining the navigability of a waterway is a question of fact. *Appalachian Elec. Power*, 311 U.S. at 405; *Abbott*, 110 F.4th at 708.

6. Whether a water is "navigable" under Section 10 is not determined solely by considering any *current* use in interstate or foreign commerce. *See, e.g., Abbott*, 110 F.4th at 708-09; *Newbold,* 65 F.4th at 181.

7. Rather, "a river is navigable if non-commercial uses evince its suitability for commercial traffic, even if it is not presently being used for commerce, or if reasonable improvements, even hypothetical ones, could make it suitable for commercial use." *Abbott*, 110 F.4th at 708-09. "Nor is it necessary that the improvements should be actually completed or even authorized." *Appalachian Elec. Power*, 311 U.S. at 408.

8. Alternatively, a river is navigable if the evidence establishes that it "was historically used or susceptible of use in interstate or foreign commerce in its natural condition." *Abbott*, 110 F.4th at 710-11; *accord id.* at 724-25 (Richman, C.J., concurring in the judgment).

9. The use of ferry boats in commerce is a "customary mode[ ] of trade and travel on water," *Economy Light & Power v. United States*, 256 U.S. 113, 122 (1921). *See, e.g.*, *New York Cent. & H.R.R. Co. v. Bd. of Chosen Freeholders of Hudson Cnty.*, 227 U.S. 248, 264 (1913) ("[A]ll business of the ferries between the two states was interstate commerce within the power of Congress to control."); *Appalachian Elec. Power*, 311 U.S. at 413 n.46; *Puente de Reynosa, S.A. v. City of McAllen*, 357 F.2d 43, 51 (5th Cir. 1966).

10.     Evidence establishing that a river segment historically was used for commercial, cross-river ferry traffic is sufficient to establish that such river segment is a "navigable . . . water of the United States" and a "navigable river" within the meaning of RHA section 10.  *Abbott,* 110 F.4th at 724-25 (Richman, C.J., concurring in the judgment)*; see also Appalachian Elec. Power*, 311 U.S. at 413 n.46; *Puente de Reynosa,* 357 F.2d at 51.  Judge Willett's opinion in *Abbott* did not establish controlling law on this point.  ECF 227 at 18.

11.     "Once a river is found to be navigable, it remains so, even if natural or artificial changes later render it incapable of commercial use."  *Abbott*, 110 F.4th at 709 (citing *Economy Light & Power*, 256 U.S. at 124).  "Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense."  *Appalachian Elec. Power*, 311 U.S. at 409-10.

12.     In determining whether a river is navigable in an RHA enforcement action seeking injunctive relief, the Court must focus its inquiry on the segment of the river for which the United States seeks injunctive relief.  *See* ECF 227 at 15-18 (explaining the United States' understanding of *Abbott*, 110 F.4th at 710 (Willett, J.) & 724 (Richman, C.J., concurring in the judgment)).

13.     In this case, the United States seeks prohibitory injunctive relief with respect to the entire stretch of the Rio Grande described in the Corps' 1975 navigability finding, i.e., from river mile 275.5 to river mile 610.0, inclusive of the stretch of the river in the vicinity of Eagle Pass, Texas, and of the location where Texas placed the Floating Barrier.  ECF 227 at 17 & n.5 & Att. 1.  *See also* ECF 60 ¶ 46.a, b (United States' prayers for prohibitory injunctive relief under the RHA); ECF 221 (denying Texas's motion to exclude prohibitory injunctive relief from the pre-trial order).

14.     Thus, the relevant river segment in this case for purposes of determining navigability is not limited to the 1,000-foot stretch in which the Floating Barrier is placed, but rather includes the entire stretch of the Rio Grande described in the Corps' 1975 navigability finding as further detailed in Paragraph 13 *supra*.  ECF 227 at 15-18 at n.5.

### C.     "Other structure"

15.     To establish a violation of Section 10's "structure" clause, the United States must show that Texas (1) built or commenced the building (2) "of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure[ ]" (3) in navigable waters (4) outside established harbor lines or where no harbor lines have been established (5) without the Corps' permission.  33 U.S.C. § 403; *United States v. Abbott*, 690 F. Supp. 3d 708, 724 (W.D. Tex. 2023), *rev'd & remanded on other grounds by* 110 F. 4th 700 (5th Cir. 2024).

16.     The Corps has promulgated regulations pursuant to its Congressionally-deleted authority under the RHA, defining "structure" for purposes of Section 10 as follows:  "The term structure shall include, without limitation, any pier, boat dock, boat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction."  33 C.F.R. § 322.2(b).

17.     The Fifth Circuit's en banc decision did not address the legal or factual merits of the United States contention that Texas's Floating Barrier constitutes an "other structure" within the meaning of Section 10.  ECF 227 at 18-19.

18.     A "structure" is "that which is built or constructed" including "any production or piece of work artificially built up, or composed of parts joined together in some definite manner." Structure, The Century Dictionary and Cyclopedia (1900).

19.     "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (citing and quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997), and Webster's Third New International Dictionary 97 (1976)); *Babb v. Wilkie*, 589 U.S. 399, 405 n.2 (2020).

20.     Thus, the use of the word "any" in the second clause of Section 10, and the clause's enumeration of eight terms followed by the catchall term "other structures," indicates that Congress intended Section 10 to comprehensively establish a requirement for federal permission before construction of any structures in navigable waterways.

21.     "Permanence" is not a necessary element of proof that the Floating Barrier constitutes an "other structure" within the meaning of Section 10, as Section 10 does not use the term "permanent."  *See Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) (Courts "may not narrow a [statutory] provision's reach by inserting words Congress chose to omit."); *see also Abbott*, 690 F. Supp. 3d at 726.  In promulgating its regulatory definition of the term "structure," the Corps expressly rejected "permanence" as a limiting condition on which things would constitute "structures" pursuant to 33 C.F.R. § 322.2(b).  *See* 51 Fed. Reg. 41,206, 41208 (Nov. 13, 1986) (stating that final regulatory language would "clarify [the Corps'] intent that obstacles or obstructions, *whether permanent or not*, do require a permit") (emphasis added).

22.     A barrier anchored to the bed of a navigable river need not be irremovably affixed to the riverbed to constitute an "other structure" within the meaning of Section 10.  *Abbott*, 690 F. Supp. 3d at 726.

**D.**     **Obstruction to navigable capacity**

23.     Section 10's "obstruction" clause bars the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403; *Abbott*, 690 F. Supp. 3d at 722.

24.     The Fifth Circuit's en banc decision did not address the legal or factual merits of the United States contention that Texas's Floating Barrier obstructs the navigable capacity of the Rio Grande.  ECF 227 at 18-19.

25.     Whether there is an obstruction to a river's navigable capacity is a question of fact. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 709 (1899); *Abbott*, 690 F. Supp. 3d at 722.

26.     To establish a violation of Section 10's obstruction clause, the United States must prove that the Floating Barrier "fairly and directly tends to obstruct (that is, interfere with or diminish) the navigable capacity of" the Rio Grande.  *Rio Grande Dam*, 174 U.S. at 709; *Abbott*, 690 F. Supp. 3d at 722.

27.     Recognizing that "[t]he Supreme Court has encouraged a broad interpretation of a section 10 'obstruction,'"  the Fifth Circuit has likewise construed the term flexibly, without a size or positional limit.  *Abbott,* 690 F. Supp. 3d at 722 (quoting *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 462-63 (5th Cir. 1989), and citing other cases).

28.     An object is not required to extend perpendicularly from the bank across a river in order to be determined to obstruct the river's navigable capacity within the meaning of Section 10. *See, e.g.*, *United States v. Raven*, 500 F.2d 728, 731 (5th Cir. 1974).

29.     Section 10 refers to "obstruction" of navigable "capacity," not obstruction of "commercial navigation."  33 U.S.C. § 403.  Therefore, creating an "obstruction" in a historically

navigable river without affirmative Congressional authorization violates Section 10 regardless of whether such river is presently used for commercial navigation.  *Cf. Abbott*, 110 F.4th at 709 ("Once a river is found to be navigable, it remains so, even if natural or artificial changes later render it incapable of commercial use.") (citing *Economy Light & Power,* 256 U.S. at 124).

> **E.      Injunctive relief under the RHA**

30.      The Supreme Court has held that "the authority of the United States to remove obstructions" pursuant to the RHA "is superior to that of the States" and that, when considering the United States' request for injunctive relief, courts "are not at liberty to consider [alleged harms to a defendant liable under Section 10] as against the edict of a paramount power."  *Sanitary Dist. of Chi. v. United State*s, 266 U.S. 405, 432 (1924).

31.      The Fifth Circuit has likewise held that when the United States seeks permanent injunctive relief enforcing a public-interest statute following a trial that establishes a violation of the statute, the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute" justifies a court in granting a permanent injunction "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience."  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996); *see also United States v. FDIC,* 881 F.2d 207, 210 (5th Cir. 1989) (holding similarly in the context of granting preliminary injunctive relief).

32.      In *Abbott*, the en banc Fifth Circuit considered but did not decide the question of whether the Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), effectively overrules *Marine Shale* and *FDIC*.  *Abbott*, 110 F.4th at 719-20.  Unlike this case, *Winter* was not an enforcement action brought by the United States; instead, it was a complaint filed by private citizens alleging that certain federal actions were inconsistent with the

National Environmental Policy Act, the Clean Water Act, and other statutes.  *See Winter*, 555 U.S. at 15-17.

33.     Judge Willett's opinion did not address *Sanitary District* at all.  *Id.*  Rather, Judge Willett's opinion held only that *Marine Shale* and *FDIC* do not govern the test for granting preliminary injunctive relief where the evidence at the preliminary injunction stage fails to establish a likelihood of success on the merits.  110 F.4th at 719 ("We have already concluded that the United States has not shown a likelihood of success on its RHA claim, so even if *Marine Shale Processors* and *FDIC* have not been overtaken by *Winter,* they do not control here.").  Only nine of the 18 judges participating en banc joined this part of Judge Willett's opinion.  ECF 227 at 20.

34.     If the evidence at trial establishes that Texas violated Section 10, then *Sanitary District* and *Marine Shale* are controlling on this Court with respect to the basis for granting a permanent injunction requested by the United States to enforce the RHA.

## II.     Findings of Fact

### A.     Texas installed a federally unauthorized "Floating Barrier" in the Rio Grande.

Evidence at trial establishes the following facts:

35.     On July 10, 2023, the United States Army Corps of Engineers' (the "Corps") Fort Worth District was made aware of a potential violation of the Rivers and Harbors Act ("RHA") in the Rio Grande near the city of Eagle Pass, Texas.

36.     The potential violation involved a floating barrier comprised of orange, interconnected buoys tethered to anchors that the State of Texas had begun placing in the Rio Grande (hereinafter, "the Floating Barrier").

37.    Neil Lebsock, Chief of the Fort Worth District's Compliance and Enforcement Branch, and Joseph Shelnutt, a regulatory project manager in the Fort Worth District, were tasked with investigating Texas's actions.

38.    Texas never submitted a permit application to the Corps for the Floating Barrier.

39.    The Corps' Fort Worth District maintains a publicly available list of bodies of water it considers to be navigable waters of the United States under Section 10 of the RHA.  The list includes the Rio Grande "[f]rom the Zapata-Webb county line upstream to the point of intersection of the Texas-New Mexico state line and Mexico."  The stretch of the river within the Fort Worth District's jurisdiction—river miles 275.5 to 610—is within this larger stretch of the river that the Corps has deemed to be a navigable water of the United States.

40.    The stretch of the Rio Grande in the vicinity of Eagle Pass, including the location where Texas installed the Floating Barrier in the river, is between river miles 275.5 and 610.  The entirety of the Rio Grande from river mile 275.5 to river mile 610 was reaffirmed to be a navigable water of the United States in 1975.  This determination was made by Fort Worth's District Engineer, and it was supported by a detailed navigability study.  Among other things, the study considered past, present, and future use of the river, along with applicable legal precedent governing navigability. The Corps' 1975 navigability determination has not been modified or rescinded.

41.    No harbor lines have been established in the Eagle Pass area of the Rio Grande.

42.    The Corps determined that the Floating Barrier had been placed, without authorization, in a navigable water of the United States.

11

43.     As part of their investigation, Lebsock and Shelnutt conducted a site visit on July 13, 2023, to observe the Floating Barrier.  At the time of their visit, there was active, ongoing work on the Floating Barrier.  Approximately 450 feet of buoys had been placed in the river.

44.     Based on his observations and the information the Corps was able to gather about the Floating Barrier, Lebsock concluded that Texas's placement of the Floating Barrier in the Rio Grande without a permit violated Section 10 of the RHA.  He concluded that the barrier would obstruct cross-river navigation of any vessels in its vicinity.  He also concluded that the barrier constituted an "other structure" within the meaning of Section 10. After the site visit, Lebsock relayed his observations to Corps Headquarters in Washington, D.C.

45.     To date, Texas has not applied for a permit in an effort to come into compliance with the RHA through the after-the-fact permitting process.

46.     The Floating Barrier has been in the Rio Grande for fifteen months.  Texas has identified no intention or plan for its removal.

**B.     The Rio Grande between river miles 275.5 and 610 was historically susceptible to commercial navigation and was historically navigated.**

**1.     The Rio Grande between river miles 275.5 and 610 was historically susceptible to commercial navigation.**

47.     The United States presented the expert testimony of Dr. Benjamin H. Johnson, a well-qualified historical expert with a particular expertise in the history of borderlands generally and the U.S.-Mexico border and historical uses of the Rio Grande specifically.  Dr. Johnson is a Professor in the Department of History and School of Environmental Sustainability at Loyola University Chicago.  Dr. Johnson received his Ph.D. in History, with an emphasis in the history of the U.S.-Mexican borderlands, from Yale University.  He has published three books, one forthcoming book, and twenty-two articles on the U.S.-Mexican borderlands and/or U.S. environmental history.  He is the editor of four books as well as a book series on borders.  He has

received several National Endowment for the Humanities grants for his individual research and seminars on borders for other scholars, and his expertise on various subjects of history is routinely sought by publishers and universities evaluating historians of the United States and Mexico for promotion and retention.  Dr. Johnson opined on the historical uses of the relevant section of the Rio Grande, based on research he conducted using generally accepted methodologies of historians in his field.

48.     People have used watercraft to navigate the Rio Grande between river miles 275.5 and 610 as long as there have been records of people in the area.  The first records of Spanish explorers in the disputed area note Indigenous use of watercraft for transportation on the river. That use intensified with permanent settlements along the river.

49.     Settlers of present-day Eagle Pass and Piedras Negras began using the river for transportation immediately upon their arrival.

a.     In 1850, journalist Jane Cazneau recorded her arrival in Eagle Pass and noted that other residents owned and used watercraft.  Cazneau reported traveling by boat down to the confluence of the Rio Grande and the Rio Escondido, downriver of the current location of the Floating Barrier, with no impediments to navigation.

b.     In 1852-1853, William Emory passed through Eagle Pass as part of the U.S. government's survey of the southern border.  In Emory's report of the area, he included two watercolors depicting watercraft on the river.

c.     In 1855, James Callahan led a force of more than 100 Texas Rangers and militia on a raid into Mexico by commandeering ferry skiffs at the ferry landing in Eagle Pass and taking them 2 miles downriver past the present-day location of the Floating Barrier to the site where the militia was camped.  Upon his retreat out of Piedras Negras, Callahan absconded with

"large quantities of corn, beans, flour, and produce," as well as a cannon, that they looted across the river by boat into the United States.

50.     Historically, the only significant hindrance to navigation up and down the Rio Grande between river miles 275.5 and 610 was an area of rapids approximately 30 miles south of present-day Eagle Pass known as Kingsbury Falls or Las Isletas, and even that hindrance could be passed by boat.

    a.     In 1850, Captain H. Love headed a U.S. military expedition in a fifty-foot long, sixteen-foot-wide keel boat, the *Major Babbitt*, manned by twelve men and loaded with provisions and weapons that traveled 976 miles up the Rio Grande.  The *Major Babbitt* set sail at Fort Ringgold (in present-day Rio Grande City at approximately river mile 236) and traveled up to approximately river mile 1212, traversing the full length of the river at issue in this litigation (river mile 275.5 to 610).

    b.     Later in 1850, a second military expedition, the *Harry Love*—a keelboat over sixty feet long and fourteen feet wide—ascended the Rio Grande to Eagle Pass, Texas, at approximately river mile 496.

51.     Improving the Rio Grande for navigation by removing Kingsbury Falls/Las Isletas would have cost substantially less than similar river improvement projects undertaken by the U.S. Army Corps of Engineers nationwide in the 1800s.

    a.     In an 1850 official report that Assistant Quartermaster W.W. Chapman sent to Quartermaster Jessup, Assistant Quartermaster Chapman reported that the U.S. Army had surveyed Kingsbury Falls/Las Isletas in two expeditions.  Assistant Quartermaster Chapman reported that "Captain Kingsburry [sic] (a practical engineer) who made an examination of [Kingsbury Falls/Las Isletas] in 1819, under [Assistant Quartermaster Chapman's] instructions . .

14

. assured [Assistant Quartermaster Chapman] that a channel could be cut through to allow the passage of keel-boat *Harry Love* (which was 75 feet long, 20 wide and drew 18 inches of water) for less than $500" (in 1850 dollars).

        b.      The same 1850 Assistant Quartermaster Report reported that "Captain Love is of the opinion that a channel could be cut through [Kingsbury Falls/Las Isletas], or rather that the present channel could be widened to admit the passage of steamboats *Corvette* and *Major Brown* for about $3,000" (in 1850 dollars).

        c.      In 1852, William Emory headed a U.S. government expedition to map the then-new international border with Mexico and reported that Kingsbury Falls/Las Isletas were "sedimentary rocks . . . lying in horizontal strata; these would yield easily to the pick."

        d.      Other frontiersman determined that Kingsbury Falls/Las Isletas could be easily and cheaply cleared to improve navigation to allow for large steam ships.

           i.      In 1834, frontiersman William Egerton of the Rio Grande and Texas Land Company, who had established a colony on Las Moras Creek upriver from the future site of Eagle Pass, asserted that the company planned to clear obstacles upriver from Laredo for steamboat use.

           ii.      In 1850, U.S. Army Lieutenant W.T. Smith, whom the U.S. Army had sent to map the Rio Grande, determined that Kingsbury Falls/Las Isletas and snags below Laredo could be cleared for $25,760 (in 1850 dollars).

           iii.      In 1852, Jane Cazneau, a journalist living in the then-recently established Eagle Pass, asserted that the river could be cleared for steamship passage for $100,000 (in 1850s dollars).

iv.     In 1854, Frederick Law Olmsted, the landscape architect that designed Central Park in New York City, visited Eagle Pass and opined that the river could be improved for steamship navigation for $100,000 (in 1850s dollars).

e.     A $100,000 improvement project as estimated by Cazneau and Olmsted—and certainly the more circumscribed $500 or $3000 projects identified by Captains Kingsbury and Love—were well within the range of river projects routinely undertaken by the U.S. Army Corps of Engineers in the 1800s.

i.     By 1850, the federal government spent over $67,000 (in 1850 dollars) on clearing sand bars and making other improvements at the mouth of the Merrimac River in Massachusetts.

ii.     By 1880, Congress had allocated $198,300 (in 1880 dollars) to deepen 3 miles of the Penobscot River near Bangor, Maine.

52.     The federal government's failure to undertake improvement projects on the Rio Grande between river mile 275.5 and 610 results not from any characteristic of the river, but rather the incredible political and social upheaval in the area at the time.

a.     Prior to the settlement of Eagle Pass in the late 1840s, there were no significant permanent settlements between Presidio, immediately below Kingsbury Falls/Las Isletas, and El Paso, over 900 river miles away.  Del Rio was not settled until 1871, and by 1880 had only fifty residents.

b.     In 1882, the railroad connected Eagle Pass to railroad and commercial networks, which provided an alternative commercial outlet and reduced incentives for river navigation.

c.      In the short period of time between the 1840s and 1882 in which a market for expanded river traffic upstream of Laredo was developing, the area was plagued by constant war and upheaval.

i.      Texas fought Mexico for independence from 1835 through 1836, then, struggling as a fledgling independent nation, was not in a position to undertake infrastructure projects throughout the time of its independence, through 1845.  Additionally, Mexico invaded Texas multiple times throughout its existence as an independent nation.

ii.      From April 1846 to April 1848, the United States and Mexico were embroiled in the Mexican-American War.

iii.      Mexico created further instability in the area as it suffered constant revolutions including a civil war from 1857 to 1861 and an additional war resulting from French intervention from 1861 through 1867.

iv.      The U.S. Civil War ravaged the area from 1861 through 1865, and the newly reintegrated nation struggled with reconstruction through 1877.

v.      Additionally, throughout this entire time period, hostile relations with certain local indigenous groups further deterred development of the Mexican northwest and Texas/American southwest.

53.      Above Kingsbury Falls/Las Isletas, historical reports demonstrate no significant impediments to navigation.

a.      In the 1820s, French naturalist Jean Louis Berlandier reported that an American beaver trapper informed the naturalist that he had traveled most of the river and that it could be navigated with chalanes, or small boats, for over 900 miles from its mouth.

17

b.      In 1889, a beaver trapper navigated down the river with approximately 600 pounds of beaver pelts from the Rio Grande Canyon (80 miles south of El Paso) approximately 600 miles to Eagle Pass.  Upon arrival in Eagle Pass, he sold 400 beaver pelts for $6 each, or $2400 total in 1889 dollars (approximately $661,000 in 2024 dollars).

**2.      The Rio Grande between river miles 275.5 and 610, especially in the vicinity of Eagle Pass, was historically navigated.**

54.      Navigation of the Rio Grande in the vicinity of Eagle Pass has been a critical component of international commerce since its settlement.

55.      Shortly after its founding, Eagle Pass became one of the most important international ports for the Confederacy during the Civil War.

a.      In 1863 alone, Texas exported 57,467 bales of cotton by ferry across the Rio Grande at Eagle Pass.  This cotton sold for $17 million in 1863, or the equivalent of $442 million in 2024 dollars.

56.      Following the Civil War, ferry traffic at Eagle Pass remained an important component of the United States' foreign commerce.  In 1881, U.S. consular reports note exports totaling approximately $500,000 in 1881 dollars ($12 million in 2024 dollars) ferrying across the river at Eagle Pass.

57.      U.S. Censuses of Eagle Pass demonstrate that multiple residents made their living boating on the river.

a.      The 1860 Census, in which Eagle Pass counted only 522 residents, identified two residents with the profession of "boatman" and "waterman."

b.      By 1870, Eagle Pass had grown to approximately 1200 residents, five of whom identified their professions as "ferry boatmen."

c.    In 1880, Eagle Pass had approximately 1600 residents, six of whom identified professions on the river, as a "ferryman" or "boatman."

58.    Photographs from the late 1800s and early 1900s similarly demonstrate commercial use of ferries for transport across the river.

**C.    The physical characteristics of the 1,000 foot river stretch where the Floating Barrier is located are substantially similar to those of the larger stretch between river miles 275.5 and 610.**

59.    The United States presented the expert testimony of Michael Chapman, a hydraulic engineer with specific expertise in river-based civil works projects.  Mr. Chapman retired in August 2024 as Senior Technical Lead for the U.S. Army Corps of Engineers Kansas City District. During his 31-year career with the Corps, Mr. Chapman's work primarily focused on the Missouri River Bank Stabilization and Navigation Project, a Congressionally-authorized federal navigation improvement project on the Missouri River.  His relevant experience includes:  geospatial analysis; modeling of river systems; design of river training structures ("RTS") to improve navigation on rivers and streams; maintenance of existing RTS; design and monitoring of navigation channel dredging; conducting sediment studies; monitoring the geomorphic effects of RTS; and identification of navigation problem areas.  Mr. Chapman is a licensed Professional Engineer in the state of Missouri and received a Bachelor of Science degree in Civil Engineering from the University of Missouri-Kansas City in 1993.

60.    Mr. Chapman testified that he directly observed the Rio Grande in the vicinity of Eagle Pass during a site visit on June 4, 2024.  During his site visit, he travelled along the river on a vessel over a stretch extending from the site of the Floating Barrier to a point approximately 10 miles upstream of the city limits of Eagle Pass.  The stretch that Mr. Chapman travelled by boat

includes the location that Dr. Johnson testified is the likely site of historic ferry travel across the Rio Grande.

61.     Mr. Chapman testified that based on his observations, the Rio Grande in the Eagle Pass area flows through a bed and banks composed primarily of sands and gravels.  Throughout this reach, the river follows a pattern typical of rivers flowing through these materials, in which the thalweg (i.e., the deepest part of the river) shifts from one side of the river to the other and is deeper in bends than between bends.  The river bed contains some areas of natural rock that create shallower shoals within the river.

62.     Mr. Chapman opined that these rocky shoals are not part of the bedrock layer, but are likely less than 3 feet thick and rest on top of sands and gravels, meaning they can easily be removed with commonly available equipment.  Mr. Chapman explained that the rocky shoals within the riverbed were likely similar to rocky outcrops he observed within the river banks, which were likewise less than 3 feet thick and rested on sands and gravels.  Mr. Chapman also explained that based on his research, there are numerous sand and gravel pit mines in the floodplain next to the river from Del Rio to Eagle Pass, which indicates that the bedrock layer is likely at least 40 feet below the floodplain and at least 20 feet below the riverbed.

63.     Based on his observations, training, and professional experience, Mr. Chapman opined that the physical characteristics of the Rio Grande do not materially vary within the stretch that he observed during his site visit.

64.     Mr. Chapman further explained that based on his training and professional experience, rivers generally only change characteristics when large tributaries or a large number of smaller tributaries enter, when the slope changes, or where the composition and shape of the surrounding watershed changes.  He testified that in the stretch of the Rio Grande between Del Rio

and Laredo, no major tributaries or large groups of smaller tributaries enter the river.  He testified that this stretch of the Rio Grande is relatively uniform in slope because it is below the deeply incised upstream canyons and well above delta at the mouth of the river.  And he testified that the watershed throughout this stretch of the Rio Grande appears to be homogenous.

65.    Based on the foregoing, Mr. Chapman testified that in his professional opinion, the physical characteristics of the Rio Grande throughout the stretch from Del Rio to Laredo are substantially similar to the physical characteristics he observed for the reach in Eagle Pass.

66.    The Court finds the expert testimony of Mr. Chapman to be credible and useful in determining whether the Rio Grande between river mile 275.5 and 610 is a navigable water of the United States and navigable river.  Mr. Chapman's expertise in river systems, along with his direct observations of the reach of the Rio Grande in the vicinity of Eagle Pass, make him qualified to opine in this area.

67.    Based on the testimony from Mr. Chapman, and particularly on his opinion that the physical characteristics of the Rio Grande are substantially similar throughout the stretch from Del Rio to Laredo, including the reach in Eagle Pass, the Court finds that the evidence of historical cross-river navigation presented by Dr. Johnson supports a finding of navigability for the specific stretch of the Rio Grande in which the Floating Barrier is located.

**D.    The Floating Barrier is a "structure."**

Evidence at trial established the following facts:

68.    The Texas Department of Public Safety contracted with Cochrane USA ("Cochrane") to design and install the Floating Barrier.  Cochrane selected Spencer Construction to install the floating barrier system. Cochrane engaged Michael Baker International for engineering support.

69.     The buoys, equipment and support materials for the Floating Barrier were mobilized in Eagle Pass, Texas, on July 7, 2023.  Installation was completed by July 28, 2023.  Cochrane appeared to use excavators to move the buoy system into place.  The specific machinery used by Cochrane was left to the discretion of the contractor.  The cost of the project was $850,000.

70.     The Floating Barrier is constructed of 4-foot, rotating injected foam buoys fixed on a steel beam and anchored to the riverbed of the Rio Grande with concrete anchors.  It consists of a series of units of three attached buoys, which are linked together in the river to extend approximately 1,000 feet.

71.      A total of approximately 65 to 68 three-thousand-pound, cast-concrete anchors were used to secure the buoys.  The buoy configuration is designed in clusters of four anchors repeated every fifth beam.

72.     Additionally, the system includes approximately 24 smaller, 150-pound positioning anchors placed in between the main anchor clusters, intending to ensure the buoys' centerline is maintained as the water rises.

73.     The total weight of the Floating Barrier's main anchors and positioning anchors is about 100 tons.  It is firmly in place on the riverbed of the Rio Grande.

74.     The buoys are held by 39-foot metal chain segments which are designed to allow the buoys to rise to a 100-year flood level.

75.     The concrete anchors extend approximately four to six feet laterally on each side of the Floating Barrier.  The barrier's total width including both the buoys and the attached anchors is approximately 12 to 16 feet.

76.     The Floating Barrier is an integrated system.

77.     It would take approximately three weeks to disassemble and remove the Floating Barrier from the Rio Grande using heavy machinery.

**E.      The Floating Barrier obstructs the river's navigable capacity and adversely impacts federal agencies' waterborne operations.**

The United States presented evidence of how the Floating Barrier impacts the use of watercraft on the Rio Grande, including the testimony of U.S. Border Patrol Del Rio Division Chief Micky Donaldson; Capt. Michael Cintron, U.S. Coast Guard; Francisco ("Dan") Sainz, from the U.S. Section of the International Boundary and Water Commission ("USIBWC"); and Capt. John Timmel, an expert in navigation safety including with respect to commercial and other navigation on rivers.

**1.      Impacts on U.S. Border Patrol waterborne operations and other navigation**

78.     In the stretch of the Rio Grande from river mile 275.5 to 610, U.S. Border Patrol operates air boats, river shallow draft vessels, and zodiac boats.

79.     In addition to U.S. Border Patrol's boats, several other individuals and entities operate boats on the Rio Grande between river miles 275.5 and 610.

a.      The State of Texas operates boats on the river.

b.      The City of Eagle Pass occasionally operates boats on the river.

c.      The Mexican government operates boats on the river.

d.      Fishermen operate boats on the river.

e.      Occasionally migrants will use rafts on the river.

80.     Because the current location of the Floating Barrier creates a narrow passage between the barrier and the U.S. shore, U.S. Border Patrol primarily operates its boats on the Mexican side of the barrier to ensure safe passage of the boats.

81.     The Floating Barrier creates an impassable barrier that precludes boats from navigating laterally across the barrier from the Mexican side of the barrier to the U.S. shore of the Rio Grande.

82.     The Floating Barrier's preclusion of lateral movement across to the U.S. shore of the river creates a number of operational concerns for U.S. Border Patrol.

a.     The inability to move laterally across the river creates a safety hazard because it limits U.S. Border Patrol's ability to take evasive measures in that stretch of the river by narrowing the width of the river in which boats can maneuver and precluding passage to the U.S. shore at the location of the barrier.

b.     The inability to move laterally could further impair U.S. Border Patrol's ability to gather information about migration patterns because it may impede immediate access to the shore at the location of the barrier.

c.     The inability to move laterally also could create safety concerns because of any delay caused in reaching an individual needing emergency aid.  If an agent, migrant, or other individual has an emergency, either in the water on the U.S. side of the barrier or on the U.S. shore, a U.S. Border Patrol boat must circumnavigate around the entire barrier to reach the individual in distress, which could preclude U.S. Border Patrol from reaching the individual in time to render life-saving aid.

83.     The existence of the Floating Barrier in the water further impairs U.S. Border Patrol operations because it decreases the width of the river through which boats can navigate, requiring U.S. Border Patrol to slow the speed of its boats in the area of the Floating Barrier to avoid collisions or capsizing boats due to the wake of the boats.

84.     If the Floating Barrier were extended, or if additional barriers were placed in the Rio Grande, the impact on U.S. Border Patrol's operations would be magnified.

        a.      If the Floating Barrier were extended, or if additional barriers were placed in the water, the extended narrowing of the portion of the river boats can navigate could preclude U.S. Border Patrol from being able to operate boats on the river.

        b.      U.S. Border Patrol boating operations are a critical component of the agency's ability to effectively patrol the U.S.-Mexican border, as boats serve both to deter migrants from crossing in the presence of boats and also provide critical surveillance information for the detection and interception of migrants between ports of entry.

        c.      Extension of the Floating Barrier or deployment of additional barriers in locations and in a manner that continues to interfere with U.S. Border Patrol operations would impair U.S. Border Patrol's ability to safeguard the border and the country.

### 2.     Impacts on Coast Guard waterborne operations

85.     United States Coast Guard (the "USCG") Captain Michael Cintron has served as an officer in the USCG for twenty-five years.

86.     In July 2023, operating as the Deputy Sector Commander for USCG Sector Corpus Christi, Captain Cintron was initially made aware of the Floating Barrier in the Rio Grande near the city of Eagle Pass, Texas, by watching the news.

87.     The State of Texas did not contact Sector Corpus Christi or USCG District 8 offices which have jurisdiction on the Rio Grande, prior to installing the Floating Barrier.

88.     Captain Cintron has seen pictures of the Floating Barrier taken by USCG personnel who went to Eagle Pass in January 2024 to support a DHS Customs and Border Protection mission.

89.     The USCG has mission operations on inland waterways, including the Rio Grande. USCG Marine Safety Security Teams have deployed both to Falcon Lake and to McAllen, Texas, to support CBP operations.  Falcon Lake is within the stretch of the Rio Grande from river mile 275.5 to river mile 610 that the Corps reaffirmed as navigable in 1975 and that USCG determined navigable in 1984.

90.     The USCG inspects vessels operating on the Rio Grande near Mission and Los Ebanos, Texas. The USCG, if needed, may also deploy search and rescue teams, or pollution responders for oil response operations, on the Rio Grande.

91.     The USCG also can respond in emergency situations like hurricanes, train derailments, or boating accidents that have caused, or could cause, human or marine casualties in the marine environment.

92.     The Floating Barrier will prevent, in an emergency or distress situation, someone from reaching the shore side of the river by blocking a person's access to the shore.

93.     Adjacent to the Rio Grande there are regulated facilities that could be a source of pollution that would require a pollution response the USCG would lead or support.  For example, as recently as July 2024, there was an incident reported to the USCG involving a railcar derailment carrying gasoline and diesel fuel near Raynosa, Mexico, immediately adjacent to the Rio Grande on the Mexico side of the border.

94.     Depending on how close such a facility is to the Floating Barrier, or to any other barrier that might be deployed elsewhere in the river in the future, the USCG's response could be adversely impacted by such barrier's presence in the maritime environment.

95.     The Eagle Pass-Piedras Negras International Railway Bridge crosses the Rio Grande about 1.5 nautical miles upriver from the Floating Barrier.  In the event of a train

26

derailment incident impacting the Rio Grande, the USCG would respond either as a lead or supporting federal agency. Such a response could be impacted by the Floating Barrier's presence in the marine environment.

96.    The Floating Barrier poses a unique complication to the USCG because of its maritime operations, especially emergency pollution response and search and rescue missions. Deployment of additional barriers in the river could increase the potential for adverse impacts on the USCG operations described above.

### 3.    Impacts on USIBWC waterborne operations

97.    Typically, USIBWC and Comisión Internacional de Límites y Aguas ("CILA" or the Mexican Section of IBWC) can go into any location on the Rio Grande independently for survey and engineering work of the IBWC and its sections.

98.    The Floating Barrier is an impediment to crossing the Rio Grande where it is located; a single person could not independently conduct a lateral survey across the Rio Grande and a stream measurement with radar or sensor equipment could not be taken at that location.

99.    USIBWC is also concerned that the Floating Barrier may impact water flows in the Rio Grande and that the design and construction of the Floating Barriers is such that it could accumulate debris that might obstruct or deflect water flow.

100.    As recently as the summer of 2024, the extensive debris was visible on the Floating Barrier.

101.    If the Floating Barrier were extended, or if additional barriers were placed at other locations in the Rio Grande, it could exacerbate these impacts on USIBWC's mission.

4.    **The Floating Barrier creates a hazard to navigation in the Rio Grande and increases the risks of vessel operation in the barrier's vicinity.**

102.    The United States presented the expert testimony of Captain John C. Timmel. Captain Timmel is a recently retired member of the American Pilots Association.  Captain Timmel has a Bachelor of Science in Marine Transportation from the State University of New York ("SUNY") Maritime College at Fort Schuyler, and has spent a career as a professional mariner on numerous waterways, including 18 rivers in the United States.   During more than 3 decades as a Tampa Bay Pilot, Captain Timmel served as Director of Deputy Pilot Training, Co-Director of Safe Vessel Handling Guidelines, President of the Tampa Bay Pilots, and vice-president of the Florida Harbor Pilots Association, which represents all commercial ports in the State of Florida.  He also has served as an Adjunct Professor teaching shiphandling, piloting, navigation, watchstanding practices, and seamanship to the cadets aboard SUNY Maritime College's training ship, the T/S Empire State VI.  In 2018, he co-founded the Gulf Coast Maritime Academy, a U.S. Coast Guard-certified commercial and boating safety training and licensing school, and served as its President and CEO through December 2023.  He has given expert opinion testimony in court cases on issues relating to navigation safety and the standard of care, and has testified before Congress and the National Academy of Sciences on the use of GPS technology in marine navigation.

103.    Captain Timmel offered expert opinions in this case concerning the risks to safe navigation created by the presence of the Floating Barrier in the Rio Grande, based on his investigation and analysis using generally accepted methodologies of professional mariners. Captain Timmel is well qualified to testify on these matters.

104.    Captain Timmel employed a three-pronged methodology that included:  (1) initial research and analysis regarding the Floating Barrier and the stretch of the Rio Grande in its vicinity; (2) oral and written questions to mariners who have operated on the Rio Grande in the

28

vicinity of the barrier, including representatives of U.S. Border Patrol and USIBWC involved in water borne operations in that river stretch; and (3) in person inspection of the Floating Barrier site.

105.   Captain Timmel personally attended two site visits of the Floating Barrier in U.S. Border Patrol boats, on February 20 and June 4, 2024.

106.   During each of his site visits, while in a boat, Captain Timmel conducted a close-range visual inspection of the Floating Barrier, and also toured the surrounding stretch of the Rio Grande.  Captain Timmel also observed the Floating Barrier from a location on land on the U.S. side.

107.   During his first site visit, Captain Timmel was in an airboat.  He toured a stretch of the Rio Grande from several miles upriver of the Floating Barrier to just downriver of the barrier, passing close by the barrier on the side facing the Mexican bank.

108.   During his second site visit, Captain Timmel was initially in a larger, jet-powered vessel referred to as an RVSD, and then in an airboat.  On this site visit he toured the river from a point approximately ten miles upriver of the City of Eagle Pass to about two miles downriver of the Floating Barrier.

109.   During the second site visit, Captain Timmel switched from the RVSD to the airboat in order to be able to pass by the Floating Barrier on the side closest to the U.S. bank.  This avoided an increased risk of grounding the vessel if attempting the same maneuver in the RVSD.  His airboat passed by the barrier on each side during this site visit.

110.   Captain Timmel observed no navigational aids on or near the Floating Barrier on either site visit.

111.   The Floating Barrier constitutes a hazard to navigation because the locations of the concrete blocks that anchor it are not marked or visibly indicated or otherwise made known to boaters navigating that stretch of the river.

112.   The presence of the Floating Barrier, including the concrete anchors extending out laterally from either side of the barrier, reduces the width of the safely navigable portion of the river channel in that stretch of the Rio Grande.

113.   The presence of the Floating Barrier in the Rio Grande increases the risk of collision, allision, or grounding for vessels passing in its vicinity.

114.   The additional risk to safe navigation posed by the Floating Barrier, in combination with other physical characteristics of that stretch of the river, prevents a boat the size of the RVSD from safely passing the barrier on the side closest to the U.S. bank.

115.   Depending on weather and other variable conditions, the increased risk from the Floating Barrier's presence may require vessels to travel more slowly in order to maintain a safe speed, maintain a greater distance between vessels, or take other precautions, even when passing the barrier on the side facing the Mexican border (the widest portion of the river channel).

116.   If the Floating Barrier were extended, or if additional barriers were deployed at other locations in the river, it could further increase the degree of risk to safe navigation.

**F.      The Floating Barrier adversely impacts other important United States interests.**

The United States presented additional evidence, including testimony from Mr. Sainz of USIBWC and from Hilary Quam, formerly of the U.S. Department of State, on other adverse impacts to important United States interests from the Floating Barrier.

30

1.      **Adverse impacts on USIBWC's mission and operations.**

117.    The Floating Barrier has frustrated USIBWC's mission and operations pertaining to relations and interactions with CILA.

118.    Shortly after Texas's installation of the Floating Barrier, Mexico's Foreign Relations Secretary Alicia Barcena released public statements noting that the barrier was an issue of great concern for the Mexican government.

119.    Then, CILA identified that the Floating Barrier was primarily located in Mexico.

120.    This fact prompted several letters from CILA to USIBWC.  These letters expressed concern over not only the placement of the Floating Barrier on the Mexican side of the international boundary, but also Texas's installation of the barrier generally.

121.    In addition, CILA, through Commissioner Adriana Resendez, raised Texas's Floating Barrier, its location, and concerns from the Mexican ambassador and Mexican officials with USIBWC.

122.    The Floating Barrier has been an impediment to agreement on two minutes:  the Rio Grande minute and the emergency minute.

123.    "Minutes" are defined by the 1944 Water Treaty and constitute a formal agreement between the two IBWC sections—USIBWC and CILA—on certain issues or topics pertaining to the 1944 Treaty.  Minutes are agreed to by IBWC and then are formally approved by both the United States through the Department of State and Mexico through the Secretary of Foreign Ministries.

124.    Rio Grande minute discussions began at the start of 2023 in an attempt to reach a comprehensive agreement between USIBWC and CILA to increase the reliability and

31

predictability of water deliveries on the Rio Grande by providing a specific timeline and various tools to do that.

125.    Due to Texas's installation of the Floating Barrier, there have been added difficulties and harm related to USIBWC's negotiation of the Rio Grande minute.

126.    Throughout 2023, USIBWC and CILA were close to signing the Rio Grande minute, but a number of factors complicated the negotiations, including Texas's installation of the Floating Barrier.

127.    The emergency minute is an initiative by USIBWC that would have expedited Mexican reservoir water deliveries to Lower Rio Grande stakeholders for irrigation and other critical purposes and would have provided benefits to Texas and its residents.

128.    Due to Texas's installation of the Floating Barrier, there have been added difficulties and harm related to USIBWC's negotiation of an emergency minute with CILA.

129.    Specifically, CILA officials made clear to USIBWC that CILA was not inclined to sign the emergency minute at a time when the Floating Barrier was in the Rio Grande.

130.    These difficulties and complications due to Texas's installation of the Floating Barrier have delayed USIBWC and CILA reaching final agreement on the Rio Grande Minute and emergency minute.  The lack of such agreement has hindered USIBWC's mission and operations and harmed stakeholders, including Texas and its residents.

## 2.    Adverse impacts on U.S. diplomacy with Mexico

131.    The installation of the Floating Barrier had an immediate adverse impact on the United States' relationship with the government of Mexico.

132.    The Mexican government began protesting the installation of the Floating Barrier in late June 2023, and it raised its concerns at the highest diplomatic levels.  Mexico expressed its

concerns in three diplomatic notes to the United States, as well as in multiple conversations between high-level officials from both countries.

133.    Mexico has expressed concerns that the Floating Barrier will obstruct and deflect water and result in runoff in Mexican territory.  It also asserts that the Floating Barrier violates the 1970 Treaty between the United States and Mexico which, in part, requires that any installations in the Rio Grande be reviewed and approved by the IBWC.  Mexico expressed further humanitarian concerns in the event the Floating Barrier caused injury or death to individuals swimming in the river. Any such incident could quickly rise to a significant international incident.

134.    The presence of the Floating Barrier contributed to a breakdown in negotiating an emergency minute to facilitate water deliveries in accordance with the 1944 Treaty between the United States and Mexico.

135.    While the United States has heard less from Mexico about the Floating Barrier, both publicly and privately, since late-summer 2023, it is likely because Mexican officials are reassured and pleased that the United States is challenging Texas's Floating Barrier in court.

136.    The Mexican government's concerns regarding the Floating Barrier were assuaged to some degree by the United States' filing suit to demand its removal.  Should Texas ultimately be permitted to leave the Floating Barrier in place and install additional floating barriers with no federal oversight or authorization, it is nearly certain that Mexico's concerns will be renewed, heightened, and escalated.

137.    The United States/Mexico relationship is one of the most important, dynamic, and economically impactful partnerships in the world.  The continued presence of the Floating Barrier and any unilateral installation by Texas of additional barriers in the Rio Grande will likely have a negative impact on the countries' diplomatic relationship.  A strain in this relationship could affect

a number of different areas, such as prosecuting transnational crime, economic competitiveness, security, human rights, labor rights, and educational and cultural opportunities.  A strained diplomatic relationship could also affect the countries' efforts to support human migration management and border infrastructure.

138.    The Floating Barrier and the prospect of additional barriers poses a unique complication to the United States/Mexico relationship because it involves unilateral action taken by a State with the express disapproval and condemnation of the federal government.  Mexico does not have the same diplomatic relationship with Texas that it has with the United States or other sovereign nations.  If Texas is permitted to take unilateral state action in contravention of agreements between the United States and Mexico, such as the treaties between the two countries, it can be expected to cause a significant strain on diplomatic relations.

## III.    Additional Findings and Conclusions

### A.    The relevant segment of the Rio Grande is a navigable water of the United States and a navigable river and is therefore subject to RHA section 10.

139.    The relevant segment of the Rio Grande for purposes of determining in this case whether it is a "navigable water of the United States" and a "navigable river" subject to RHA Section 10 is the stretch from river miles 275.5 to 610, which includes the location of the Floating Barrier.  *Supra* ¶¶ 12-14, 39-40.

140.    The evidence establishes that during the nineteenth century, the Rio Grande within this stretch "was historically used or susceptible of use in interstate or foreign commerce in its natural condition."  *Abbott,* 110 F.4th at 710-11; *accord id.* at 724-25 (Richman, C.J., concurring in the judgment); *supra* ¶¶ 47-58.  Therefore, the Rio Grande from river miles 275.5 to 610 is a "navigable water of the United States" and a "navigable river" subject to RHA Section 10.

141.     Alternatively, even if the relevant segment is the specific portion of the river where the Floating Barrier is placed, the evidence establishes that this portion of the river is substantially similar, with respect to its physical characteristics supporting navigability, to the surrounding stretch from river miles 275.5 to 610, including the portion of that stretch historically navigated in the vicinity of Eagle Pass by commercial ferries.  *Supra* ¶¶ 54-67.  Thus, the Court would still conclude that the relevant river segment at least was "historically susceptible of use in interstate or foreign commerce in its natural condition" and therefore is a navigable water of the United States and a navigable river subject to RHA Section 10.

**B.     The evidence establishes that Texas violated RHA Section 10 by installing an unpermitted "structure" in the Rio Grande.**

142.     Texas admits that it constructed the Floating Barrier and installed it in the Rio Grande.  *Supra* ¶¶ 68-69.

143.     Texas did not seek a permit from the Corps for the Floating Barrier and had no affirmative Congressional authorization to install the Floating Barrier in the Rio Grande.  *Supra* ¶¶ 35-46.

144.      No harbor lines have been established in the Eagle Pass area of the Rio Grande.  *Supra* ¶ 41.

145.     The Floating Barrier is a "structure" within the meaning of Section 10.  *Supra* ¶¶ 15-22, 68-77.

**C.     The evidence establishes that Texas also violated Section 10 by creating an "obstruction" to the navigable capacity of the Rio Grande.**

146.     The Floating Barrier obstructs the navigable capacity of the Rio Grande.  *Supra* ¶¶ 23-29, 78-116.

**D.      Texas fails to sustain its affirmative defense to liability.**

147.    Texas has asserted an affirmative defense under Article I, Section 10, Clause 3 of the U.S. Constitution (the "State War Clause"), arguing that the United States' claim under the RHA "conflicts with and is barred by Texas's constitutional prerogative to defend itself."  ECF 120 at 6 ¶ 2.  Texas further argues that its "good-faith invocation of this self-defense authority in deploying the Floating Buoys, which have been placed for defensive purposes, raises a non-justiciable political question."  *Id.*

148.    The State War Clause provides that "[n]o State shall, without the Consent of Congress, … engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10 cl. 3.

149.    Whether a state's present circumstances indicate that it has been "actually invaded" under the State War Clause is a question that the Constitution commits to the policy making (*i.e.*, political) branches of the federal government, not to this Court.  *United States v. Texas*, No. 1:24-cv-0008, 2024 WL 861526 at *37 (W.D. Tex. Feb. 29, 2024); *see also California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997), cert. denied, 522 U.S. 806 (1997); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995); *cf. Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) (finding that Texas "suggests no manageable standards by which a court could decide the type and degree of immigration law enforcement that would suffice to comply with [the] strictures" of the Constitution).

150.    Texas itself asserts that its invocation of the State War Clause as an affirmative defense to the United States' RHA claim presents a "non-justiciable political question."  ECF 120 at 6 ¶ 2.  Texas argues that because it has raised an affirmative defense involving what Texas

argues is a non-justiciable political question, this Court must dismiss the United States' RHA claim for lack of jurisdiction. Setting aside the merits of that argument, the Court finds that it can (and hereby does) deny Texas's affirmative defense under the State War Clause without addressing the question of whether Texas has been "actually invaded" or any other questions that may be committed to the federal political branches or otherwise non-justiciable. Thus, the Court need not decide whether a defendant's invocation of an affirmative defense requiring resolution of a political question necessitates dismissal of the underlying claim.

151.    First, even if Texas had been "actually invaded," the State War Clause does not entitle a state to persist in war-premised activities indefinitely or to disregard the paramount role of the federal government in deciding whether (and how) to "engage in War" or pursue other measures in response to particular circumstances. *Texas*, 2024 WL 861526, at *34-35. The State War Clause provides a time-limited emergency authority to allow a state to respond to circumstances that "will not admit of delay" until the federal government has had an opportunity to respond. U.S. Const. art. I, § 10, cl. 3. Any alternative reading would allow a state to usurp the United States' constitutionally-committed power to engage in war based on a governor's unilateral declaration of an "invasion."

152.    Here, the United States is aware of the conditions that Texas claims constitute an "actual invasion," has had time to respond, and has directed Texas to cease its deployment of the Floating Barrier and refrain from deploying additional similar barriers in the Rio Grande. Moreover, Congress has already taken the conditions Texas is purporting to address in hand through law enforcement—not military—means, and has entrusted enforcement to the federal Executive. For example, Congress has enacted a statutory scheme that comprehensively addresses immigration, including particular mechanisms for the Secretary of Homeland Security to authorize

37

state and local law-enforcement officers to exercise powers conferred by the Immigration and Nationality Act in the event of a "mass influx of aliens." 8 U.S.C. § 1103(a)(10). Accordingly, the Court finds that any authority to "engage in War" that Texas may have properly invoked under the State War Clause has already expired.

153.     Second, even if Texas had been "actually invaded," federal statutes "are still supreme even when the State War Clause has been triggered." *United States v. Texas*, 97 F.4th 268, 295 (5th Cir. 2024). The "actually invaded" exception in the State War Clause applies by its terms only to the specific constitutional prohibition against "engag[ing] in War" "without the Consent of Congress." U.S. Const. art. I, § 10, cl. 3. It does not purport to excuse states from compliance with all other federal laws, especially on an ongoing basis. Even assuming Texas has properly invoked the State War Clause and its deployment of the Floating Barrier constitutes "engag[ing] in War," this Court still has authority to determine whether Texas is doing so in a manner that violates the Constitution, including the Supremacy Clause. *Cf. Sterling v. Constantin*, 287 U.S. 378, 397, 400-01 (1932) (holding that "[w]hat are the allowable limits of [state] military discretion, and whether or not they have been overstepped in a particular case, are judicial questions," because otherwise the "fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land"). Thus, the Court finds that Texas remains subject to the RHA notwithstanding its claim to have been "actually invaded."

154.     Third, the Court holds that neither irregular migration nor the various criminal activities that Texas cites can qualify as an "actual[] inva[sion]" within the meaning of the State War Clause, and therefore cannot justify a state's decision to "engage in War." U.S. Const. art. I, § 10, cl. 3. Interpreting the meaning of the Constitution's text is a "familiar judicial exercise" well within the Court's competence. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).

The original public meaning of the phrase "actually invaded" indicates that the exception was intended to apply to conflict of a military nature, which would not encompass unlawful entry of noncitizens or other criminal activity of the sort Texas has cited in invoking the State War Clause. *See Texas*, 2024 WL 861526, at *25-*33 (exhaustively discussing Founding Era sources on the meaning of "actually invaded" exception); *see also* ECF 114 at 25-28; *California*, 104 F.3d at 1090-91; *New Jersey*, 91 F.3d at 468; *Padavan*, 82 F.3d at 28.

155.     Accordingly, Texas's affirmative defense based on the State War Clause of the U.S. Constitution fails as a matter of law and is denied.

> **E.    The permanent injunctive relief requested by the United States under the RHA is appropriate and should be granted.**

156.     The United States seeks two forms of permanent injunctive relief—a mandatory injunction and a prohibitory injunction.

157.     The requested mandatory injunction would:  (1) "Compel Defendants to promptly remove the Floating Barrier and any related unauthorized structures from waters of the United States pursuant to the RHA, 33 U.S.C. § 401 et seq., and in accordance with all other requirements of law and consultation with the relevant authorities, including the Corps"; and (2) "Compel Defendants to promptly remove the unauthorized obstruction to the navigable capacity of navigable waters of the United States pursuant to the RHA 33 U.S.C. § 401 et seq., and in accordance with all other requirements of law and consultation with the relevant authorities, including the Corps."  ECF 60 ¶ 46.d, e.

158.     The requested prohibitory injunction would:  (1) "Enjoin Defendants from further constructing, installing, placing, or maintaining structures in waters of the United States, except in compliance with the RHA and all other applicable law"; and (2) "Enjoin Defendants from creating

or maintaining obstructions in or affecting the navigable waters of the United States, except in compliance with the RHA and all other applicable law."  ECF 60 ¶ 46.a, b.

159.    The Court concludes that both the mandatory and prohibitory forms of injunctive relief are within its authority pursuant to the RHA, for the reasons the Court previously explained when denying Texas's motion to exclude injunctive relief from the pretrial order.  *See* ECF 221 (Order dated Aug. 30, 2024).

160.    When considering whether to grant permanent injunctive relief in a case where the plaintiff has established defendant's liability, courts typically consider the following equitable factors:  (1) whether the plaintiff will suffer harm in the absence of an injunction; (2) whether the balance of harms favors the plaintiff;  and (3) whether the injunction is in the public interest.  In addition, when the United States is a party, "the government's and the public's interests merge" and the last two factors are considered together.  *See Abbott*, 110 F.4th at 719.

161.    However, the Supreme Court has held in the specific context of RHA injunctive relief that courts cannot withhold injunctive relief for an established violation based on an equitable balancing of harm to the federal government versus harm to the defendant from granting relief.  *See Sanitary Dist.*, 266 U.S. at 432; *supra* ¶ 30.  And the Fifth Circuit has likewise held that a district court may grant a permanent injunction to remedy an established violation in an enforcement action brought by the United States, "without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience."  *Marine Shale*, 81 F.3d at 1358-59; *supra* ¶ 31.

162.    In *Abbott*, the Fifth Circuit's en banc opinion did not address *Sanitary District* at all, and did not resolve whether *Marine Shale* remains controlling law in this circuit in a case where the United States has established a violation.  *Supra* ¶¶ 32-33.

163.     This Court concludes that it is bound by *Sanitary District* and *Marine Shale*, and finds it appropriate to grant the requested mandatory and prohibitory injunctive relief based on the evidence presented at trial, without conducting a full equitable balancing.  *Supra* ¶ 34.

164.     To the extent a full equitable balancing is determined necessary, the Court finds that the evidence presented at trial establishes:

> a.     That there will be substantial irreparable harm to the interests of the United States if the Floating Barrier is allowed to remain in the Rio Grande, including to water-borne operations of the U.S. Border Patrol, USIBWC and USCG, as well as to the United States' diplomatic relationship with Mexico and to the USIBWC's negotiation of important agreements that would benefit the United States including Texas residents in particular.  *Supra* ¶¶ 78-101, 117-38.

> b.     These harms are likely to be exacerbated if Texas extends the Floating Barrier or deploys additional barriers into the Rio Grande without federal authorization.  *Supra* ¶¶ 84, 96, 101, 136.

> c.     An injunction to remedy the harms caused by the existing Floating Barrier and to prevent Texas from deploying additional barriers into the Rio Grande without federal authorization is warranted and justified by the evidence the United States presented at trial.

> d.     The public interest will be served by the requested injunctive relief, and the United States' interest in this relief outweighs any countervailing harm to Texas from granting it.

165.     For the forgoing reasons, the Court will enter the injunction requested by the United States as described in ¶¶ 157 and 158 *supra*.  The prohibitory injunction described in ¶ 158 will apply to the Rio Grande from river miles 275.5 to 610.

Respectfully submitted,

Dated:  October 24, 2024

JAIME ESPARZA
UNITED STATES ATTORNEY

_/s/ Landon A. Wade_____
LANDON A. WADE
  Assistant United States Attorney
  Texas Bar No. 24098560
United States Attorney's Office
Western District of Texas
903 San Jacinto Blvd., Suite 334
Austin, TX 78701
(512) 370-1255 (tel)
(512) 916-5854 (fax)
Landon.wade@usdoj.gov

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division

_/s/ Brian H. Lynk_____
BRIAN H. LYNK
  Senior Trial Counsel
  NY Bar No. 2868743
BRYAN HARRISON
  Trial Attorney
  FL Bar No. 106379
KIMERE J. KIMBALL
  Trial Attorney
  CA Bar No. 260660
ANDREW D. KNUDSEN
  Trial Attorney
  DC Bar No. 1019697
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 514-6187 (Lynk)
(202) 514-8865 (fax)
Brian.lynk@usdoj.gov

_Counsel for the United States of America_

## CERTIFICATE OF SERVICE

I certify that on October 24, 2024, a copy of this filing was served on counsel of record through the Court's electronic filing system.

/s/  Brian H. Lynk
Brian Lynk
