## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**UNITED STATES OF AMERICA,**

*Plaintiff,*

**v.**

**GREG ABBOTT, in his capacity as Governor of the State of Texas, and the STATE OF TEXAS,**

*Defendants.*

**No. 1:23-cv-00853-DAE**

---

## DEFENDANTS' PRE-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. ii

Index of Authorities ......................................................................................................... iv

Introduction ...................................................................................................................... 1

Proposed Findings Of Fact ............................................................................................... 1

   I.   The Buoys And Their Location ................................................................................ 1

       A. The Parties ...................................................................................................... 3

       B. Defendants' Witnesses .................................................................................... 3

   II.  The Rio Grande River is not an actually navigable river ......................................... 7

       A. Commercial grade watercraft do not operate in the River ............................. 9

       B. The River is not susceptible to navigation in its natural conditions ............. 11

   III. The Rio Grande River is Not an Historically Navigable River ............................. 13

       A. Pre-colonial Use ........................................................................................... 13

       B. Spanish and Mexican Use ............................................................................. 13

       C. Military Expeditions and Other Uses of the Rio Grande Above Presidio del Rio Grande after 1836 ................................................................................... 14

       D. Local Uses of the Rio Grande, Including Cross-River Ferries, in the Eagle Pass Area ................................................................................................................ 16

       E. Use of the Rio Grande as a Highway of Commerce and Trade Along the River ......... 16

       F. The Recent Past ............................................................................................. 17

       G. The River's Geography is not suited to Navigation ...................................... 18

       H. Rendering the River capable of commercial navigation would be a fantastical undertaking ................................................................................................... 19

       I.  Attempts to enhance the River's navigable capacity would not be cost-effective ......... 23

       J.  Navigational Improvements would severely burden water resources and upend existing water rights ....................................................................................... 24

       K. Raising the water level of the Rio Grande to a level sufficient to permit commercial navigation would have extensive and serious environmental impacts. ......... 26

   IV. The Buoys are not an obstruction ......................................................................... 28

   V.  The Buoys are not a "wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure" ...................................................................................... 30

   VI. Texas is being invaded across the Rio Grande River ............................................ 31

VII.    Texas deployed the Buoys in defense of its people and territory in response to an active invasion ............................................................................................33

VIII.   The Buoys have not negatively impacted commercial navigation ..............................35

IX. The Buoys have not negatively impacted the Public Interest .............................................35

    A. The Buoys have not negatively impacted foreign relations ...........................................36

Proposed Conclusions of Law ...............................................................................................36

I.  Standard for Navigability ...................................................................................................37

    A. Actual Navigation.......................................................................................................38

    B. Historic Navigation ...................................................................................................39

    C. Susceptibility to Navigation following reasonable improvements................................ 40

II. The listed terms in Section 10 should be given their ordinary, contemporary meanings ............................................................................................................................41

III. The meaning of "other structure" refers to items that block movement along a waterway ...........................................................................................................................43

IV. Section 10 of the Rivers and Harbors Act does not apply to States like Texas.................43

V.  The sole remedy for a Section 10 violation is an injunction for removal ..........................44

VI. For any injunctive relief, Plaintiff would need to show the balance of equities favors granting it...............................................................................................................45

VII.    As a Sovereign State Texas has a right to self-defense from actual invasion ............ 46

Certificate of Service ..............................................................................................................50

## INDEX OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) ........................................................................ 49

*Appleby v. City of New York*,
    271 U.S. 364 (1926) ........................................................................ 48

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U. S. 320 (2015) ....................................................................... 50

*Barnacle Marine Mgmt., v. United States*,
    233 F.3d 865 (5th Cir. 2000) ......................................................... 50

*Bates v. Illinois Central R.R. Co.*,
    66 U.S. 204 (1861) ..........................................................................47

*eBay, Inc. v. MercExchange, L. L. C.*,
    547 U. S. 388 (2006) .......................................................................51

*Econ. Light*,
    256 U.S., 41 S.Ct. 409 ................................................................... 44

*Ex Parte Quirin*,
    317 U. S. 1 (1942) ...........................................................................53

*Freimanis v. Sea-Land Serv., Inc.*,
    654 F.2d 1155 (5th Cir. 1981) ....................................................... 50

*Gilman v. Philadelphia*,
    70 U.S. 713 (1865) ......................................................................... 44

*Greenleaf-Johnson Lumber Co. v. Garrison*,
    237 U.S. 251 (1915) ....................................................................... 48

*Heckman v. Sutter*,
    119 F. 83 (9th Cir. 1902) ............................................................... 48

*Holyoke Co. v. Lyman*,
    82 U.S. 500 (1872) ......................................................................... 48

*Idaho v. Coeur d'Alene Tribe of Idaho*,
    521 U.S. 261 (1997) ....................................................................... 30

*Ledge Lounger, Inc. v. Luxury Lounger, Inc.*,
    2024 U. S. Dist. LEXIS 25556 (S. D. Tex. 2024) ....................... 50

iv

*Leovy v. United States*,
    177 U.S. 621 (1900) ............................................................................ 44

*Lindsay & Phelps Co. v. Mullen*,
    176 U.S. 126 (1900) ............................................................................ 47

*Texas v. Biden*,
    142 S. Ct. 2528 (2022) ........................................................................ 37

*Meyer v. Brown & Root Constr. Co.*,
    661 F.2d 369 (5th Cir. 1981) ............................................................. 50

*NLRB v. Express Pub. Co.*,
    312 U. S. 426 (1941) ........................................................................... 50

*Oklahoma v. Texas*,
    258 U.S. 574 (1922) ............................................................................ 45

*Philadelphia v. Standard Oil Co. of Pennsylvania*,
    12 F. Supp. 647 (E.D. Pa. 1934) ...................................................... 48

*Pound v. Turck*,
    95 U.S. 459 (1877) .............................................................................. 47

*Rest. Law Ctr. v. United States Dep't of Labor*,
    115 F.4th 396 (5th Cir. 2024) ........................................................... 47

*Return Mail, Inc. v. U. S. Postal Service*,
    139 S. Ct. 1353 (2019) ........................................................................ 49

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ........................................................................ 51

*Susquehanna Boom Co. v. West Branch Boom Co.*,
    110 U.S. 57 (1884) .............................................................................. 47

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
    566 U.S. 560, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012) .................. 47

*Texas v. Biden (MPP I)*,
    554 F .Supp. 3d 818 (N. D. Tex. 2021) ............................................ 37

*The Daniel Ball*,
    77 U.S. 557 (1870) ....................................................................43, 44, 45

*The Montello*,
    87 U.S. 430 (1874) ..........................................................................44, 45

*United States v. Abbott*,
  110 F.4th 700 (5th Cir. 2024) ................................................................. passim

*United States v. Appalachian Elec. Power Co.*,
  311 U.S. 377 (1940) ...........................................................................44, 45, 46

*United States v. Bellingham Bay Boom Co.*,
  176 U.S. 211 (1900) ...................................................................................47

*United States v. Oregon*,
  295 U.S. 1, (1935) ................................................................................44, 45

*United States v. Rio Grande Dam & Irrigation Co.*,
  174 U.S. 690 (1899) ...................................................................................44

*United States*,
  189 F.2d 349 (5th Cir. 1951) ......................................................................50

*Will v. Michigan Dept. of State Police*,
  491 U. S. 58 (1989) ...................................................................................50

*Willson v. Black-Bird Creek Marsh Co.*,
  27 U.S. 245 (1829) ...................................................................................44

*Yates v. United States*,
  574 U.S. 528 (2015) ...................................................................................49

*Yeti Coolers, L. L. C.. v. Mercatalyst, Inc.*,
  2024 U. S. Dist. LEXIS 50151, 2024 WL 1216726 ....................................51

*Zeller v. American International Corp.*,
  292 F. 822 (3d Cir. 1923) ...........................................................................48

## Regulations

22 U.S.C. § 277d-15 ...........................................................................................31

33 U.S.C. § 403 ....................................................................................... 9, 44, 48

Tex. Water Code § 11.0235(d)...........................................................................33

Tex. Water Code §§ 11.021, 11.121 ...................................................................31

Tex. Water Code §§ 11.023, 11.024 ...................................................................33

**INTRODUCTION**

Pursuant to the Court's August 20, 2024 Order, Defendants Greg Abbott, in his official capacity as Governor of the State of Texas, and the State of Texas, hereby submit the following proposed Findings of Fact and Conclusions of Law for the Court's consideration in connection with the trial of this case on the merits, currently scheduled to begin on November 7, 2024.

**PROPOSED FINDINGS OF FACT**

## I.   THE BUOYS AND THEIR LOCATION

1.  In July 2023, Texas caused a 1000-foot row of interconnected, orange buoys (the "Buoys") to be placed in the Texas-side of the Rio Grande River at a site roughly two miles downstream from the Camino Real International Bridge in Maverick County, Texas.

2.  The Buoys are currently located entirely within the territory of the State of Texas and the United States of America at 28° 40' 21" N, 100° 30' 14" W.

3.  The Buoys' location lies in the middle section of the Texas portion of the Rio Grande River. The site of the Buoys roughly corresponds to river mile 475 as measured by the United States Army Corps of Engineers ("USACE"). The Fort Worth District of the USACE considers the segment of the Rio Grande River between river miles 610 and 275.5 under its jurisdiction.

4.  This middle stretch of the River is enclosed by two major dams, Amistad Dam lying upstream and Falcon Dam downstream. Amistad and Falcon Dams each collect significant reservoirs referred to as Lake Amistad and Falcon Lake. Amistad and Falcon Dams are roughly located at river mile 610 and river mile 275.5 respectively.

5.  The portion of the Rio Grande River that flows through Texas is an international waterway that forms part of the boundary between the United States and Mexico. The binational border is fixed at the median line that runs through middle of the main channel of the Rio Grande River.

6. Texas intended to place the Buoys entirely within the territory of Texas and the United States. In order to ensure that the Buoys remain entirely on the American side, Texas on or about August 21, 2023, moved the Buoys to a location that is indisputably within the territory of Texas and the United States.

7. Since at least August 21, 2023, the Buoys have remained entirely in the territory of Texas and the United States. A survey team affiliated with the IBWC confirmed on August 30, 2023, that the Buoys were entirely on the American side of the Rio Grande River.

8. The Buoys were designed by Cochrane Global. Cochrane Global was previously contracted to provide similar Buoys to the United States Customs and Border Protection.

9. United States Customs and Border Protection conducted a three-day test of Cochrane Buoys at the U. S. Border Patrol Academy in Artesia, New Mexico, in 2020. The U.S. Border Patrol concluded from the test that the Cochrane Buoys were effective and would create no additional danger to agents or migrants.

10. The structure of the Buoys consists of multiple, orange-colored buoyant spheres approximately four feet in diameter connected by metal cables that run through the center of each sphere. The Buoys are fixed in place by chains connected to concrete blocks that sit on the riverbed. A two-foot-anti-dive net made of stainless-steel wire mesh is connected to these chains and runs along the Buoys just below the waterline.

11. The Buoys are deployed along the River's length, parallel to the direction of flow of the Rio Grande.

12. On July 24, 2023, the United States filed the instant lawsuit claiming that Texas had deployed the Buoys in violation of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. The United States reads Section 10 to contain two independent prohibitions and claims Texas has violated both. In support of its Section 10 claim the United States alleges as follows: *First*, that "Defendants' structures [] constitute an

2

unauthorized obstruction to the navigable capacity of waters of the United States." Pl. Am. Compl., ECF 60 at 2, 8. *Second*, that "Texas (1) built or commenced the building (2) 'of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure[]' (3) in navigable waters (4) outside established harbor lines or where no harbor lines have been established (5) without the Corps' permission." Pl.'s Mot. Prelim. Inj.[ECF 5] at 13; *accord* ECF 60 at 7–8.

## A. The Parties

13. Plaintiff in this action is the United States of America.

14. Defendant State of Texas is a sovereign State.

15. Defendant Greg Abbott, sued in his official capacity, is Governor of the State of Texas.

## B. Defendants' Witnesses

16. Michael Banks is the Special Advisor to the Governor of Texas on Border Matters. He served with the United States Border Patrol for approximately 23 years, much of which was spent on the Southwest border.

17. Victor Escalon serves as Regional Director for the Texas Department of Public Safety with responsibility for DPS operations in twenty-seven counties in South Texas. He has served in DPS for nearly thirty years in various capacities, beginning as a patrolman in Zapata County. He has served as a Narcotics Investigator and as a Major in the Texas Rangers. He served beginning in September 2019 as the DPS Regional Director of the South Texas Region including dozens of Counties on the Southwest Border.

18. Rodney Scott is a Distinguished Senior Fellow for Border Security and Immigration at the Texas Public Policy Foundation. Formerly he was Chief of the United States Border Patrol from February 2020 until his retirement in August 2021.

19. Dr. Eleftherios Iakovou is the Harvey Hubbell Professor of Industrial Distribution at Texas A&M University and the Associate Director for Resilience and Sustainability of Integrated Energy and Manufacturing Supply Chains at the Texas A&M Energy

Institute. He is an expert on all issues related to supply chain management, including the commercial infrastructure required to sustain supply chains. He holds a Ph.D. from Cornell University's School of Operations Research and Industrial Engineering.

20. Captain Thomas Ciarametaro is an expert in maritime navigation, structures subject to the Section 10 Rivers and Harbors Act permitting process, and homeland security. He has accumulated over eighteen years of experience in the maritime industry and more than ten years of experience in incident, navigation, and accident investigations. Captain Ciarametaro also has seventeen years of experience in the Department of Homeland Security.

21. Carlos Rubinstein is a principal at RSAH20, LLC, a professional consulting firm specializing in Texas water rights issues. He has served in a leadership capacity in State agencies charged with water regulation. Formerly, he was Chairman of the Texas Water Development Board from 2013 to 2015, a Commissioner of the Texas Commission on Environmental Quality from 2009–2103, and the Rio Grande Watermaster from 2000 to 2006. Before his State service, he was City Manager of the City of Brownsville from 1997 to 2000.

22. Herman Settemeyer is a principal at RSAH20, LLC. Formerly, he served as the advising engineer to the Rio Grande Compact Commission, the interstate commission tasked with re-negotiating the water sharing agreement for the Rio Grande watershed, and as an engineer at the Texas Commission on Environmental Quality.

23. Kathy Alexander is the Senior Policy and Technical Analyst at the Water Availability Division, Texas Commission on Environmental Quality. She has not been retained or employed by Texas as an expert witness. Instead, she appears as a vicarious witness on behalf of the Texas Commission on Environmental Quality. She is a hydrologist and expert in the Texas Water Code, TCEQ regulations, water availability determinations, the water permitting process, and related matters.

24. Ancil Taylor is the managing partner of Ancil Taylor Dredging Consulting, LLC. He has more than 45 years of experience on dredging and related projects.

25. Dr. Douglas Shields is a consulting engineer. He holds a Ph.D. in hydraulic engineering from Colorado State University and helped design the Tennessee-Tombigbee Waterway, an inland navigable channel, for the Nashville District of the Corps of Engineers.

26. Dr. Tong Zhao is the Senior Director of Delta Consulting Group, Inc. He has extensive experience as a professional cost estimator for large-scale construction and infrastructure projects. He has a Ph.D. in civil engineering from the University of Maryland.

27. Heather Miller is the Principal Historian and Vice President of Historical Research Associates, Inc. Dr. Miller graduated in 1993 from California State Polytechnic State University, San Luis Obispo, with a BA in history. In 1996, she received an MA in history from the University of Oregon. Dr. Miller earned her PhD in history from The Ohio State University in 2002, focusing primarily on the nineteenth- and twentieth-century United States history.

28. Christine Magers has been providing regulatory permitting and National Environmental Policy Act (NEPA) services to clients for almost 20 years across the U.S. Ms. Magers graduated from Texas A&M College Station with a Bachelor of Science in Wildlife and Fisheries Science in 2005 and earned her Master of Science in Environmental Management from the University of Houston Clear Lake in 2011.

29. Cassandra Hart serves as the Division Director of Applied Science, Southwest Region and Senior Environmental Project Manager with Coastal Environments, Inc in Corpus Christi, Texas with over 20 years of experience in regulatory permitting and NEPA services. Ms. Hart graduated with a Bachelor of Science and Master of Science in Marine Biology from Texas A&M-Corpus Christi in 1997 and 2000, respectively.

30. Ramon Gonzalez is a Sheriff with the Maverick County Sheriff's Department. Prior to joining the Sheriff's Department, he lived on three to four kilometers of river-front land across from Maverick County, Texas from 1970 to the early 2000s. And in 2012, he moved to Maverick County, where he later became a Sheriff with the Maverick County Sheriff's Department, where he is presently employed.

31. Ben Valdez served with the United States Customs and Border Patrol ("CBP") for twenty-one years, retiring in 2021. With the CBP, he worked along the Rio Grande River, stationed for eleven years in Del Rio, Texas, for seven years in Eagle Pass, Maverick County, and three years in Eagle Pass South in Maverick County. In this capacity, Valdez maintained consistent monitoring of the Rio Grande River, either directly or via video-surveillance. Valdez possesses knowledge regarding the condition and uses of the Rio Grande River throughout his service with CBP.

32. Chris Nordloh serves as a Major within the Tactical Marine Unit of Texas Highway Patrol, a Division of the Texas Department of Public Safety ("DPS"). Major Nordloh has worked in the Maverick County region since 2009 and has worked for DPS for close to thirty years. He works to support Operation Lone Star and is responsible for a large area in Texas, including the segment of the Rio Grande in Maverick County where the Buoys at issue in this matter are located. He is professionally familiar with the Maverick County segment of the Rio Grande because part of his work responsibilities involves traveling this segment of the river by air boat. His responsibilities include performing marine and water rescues, maritime patrols, riverine operations, and coastal operations. Major Nordloh is also personally familiar with the Maverick County segment of the Rio Grande, because he grew up in the area and engaged in outdoor recreation and hunting there throughout his life.

33. Loren Flossman is a project manager at Cochrane USA. He had direct responsibility for the manufacture and initial deployment of the Buoys. He supervised the final design, manufacture, assembly, and initial deployment of the Buoys.

34. Ivan Morua is Assistant City Manager of Eagle Pass. He has served in the City government throughout the time the Buoys have been deployed. Texas deposed Mr. Morua on July 18, 2024, in both his personal capacity and in a representative capacity on behalf of the City of Eagle Pass.

35. Walker Smith is the Director of the Port of Harlingen Authority in Harlingen, Texas. The Port of Harlingen is a major maritime port on the Gulf of Mexico that is connected to the Gulf Intercoastal Waterway. Mr. Smith oversees planning and development of the Port Harlingen. He is also the current president of the Gulf Ports Association.

## II. THE RIO GRANDE RIVER[1] IS NOT AN ACTUALLY NAVIGABLE RIVER

36. There is no commercial navigation on any segment of the Rio Grande River, including on the stretch spanning from mile markers 610 to 275.5.

37. Plaintiff has not demonstrated the presence of any actual commercial navigation on the River.

38. The United States Customs and Border Protection is not aware of any commercial navigation on the stretch spanning from mile markers 610 to 275.5, from 2018 through the present.

39. The City of Eagle Pass is not aware of any use of the Rio Grande River near Eagle Pass for commercial navigation.

40. The United States Coast Guard conducted a site visit of Eagle Pass and its surroundings, in January 2024, and did not observe ongoing commercial navigation of the local river.

41. The Coast Guard's only operations within the 610 to 275.5 segment of the Rio Grande River were temporary operations in 2020 and 2023 on Falcon Lake in support of United States Customs and Border Protection operations and Texas Parks and Wildlife

---

[1] Here and throughout this document "Rio Grande River," "Rio Grande," and "River" refer to the segment of the Rio Grande River that runs between mile markers 275.5 and 610, which the United States has placed under contention, unless otherwise specified.

operations. The Coast Guard has not deployed to clean up any oil spills or assist with post-hurricane recovery in the 610 to 275.5 segment of the Rio Grande.

42.    The Coast Guard unit nearest to the site of the Buoys is the Marine Safety Unit located in Brownsville, Texas; it has not been deployed for any purpose in the 610 to 275.5 segment of the Rio Grande.

43.    There are no Coast Guard units permanently deployed or permanently stationed along the 610 to 275.5 segment of the Rio Grande.

44.    Typically, inland waterways are used in contemporary commerce to facilitate port-hinterland connections; that is, to move goods between maritime ports where ocean-going ships are offloaded and inland destinations.

45.    No part of the Rio Grande River is currently utilized as an inland waterway that connects maritime ports with inland destinations.

46.    There are no ports on any part of the Rio Grande River, and there are not sites that belong to any of the major associations that represent marine commerce facilities including the Gulf Ports Association, the Inland River Ports and Terminals, or the Texas Ports Association.

47.    The entire River is totally bereft of commercial infrastructure: there are no ports or other facilities on the Rio Grande River that have wharves, docks, dry bulk handling facilities, or rail facilities like those of the Port of Harlingen.

48.    There are no products or commodities that are shipped down the Rio Grande River to the Gulf of Mexico, and that has been true throughout the time Mr. Smith has been engaged in the commercial navigation industry.

49.    The only river infrastructure that exists near Eagle Pass is to facilitate small-scale recreational or law enforcement use. The City owns one boat ramp, which can launch small craft into the local River.

50.   The Amistad and Falcon Dams enclose nearly all of the River between river miles ("RM") 610 and 275.5. These dams are impassable and cut off the River from locations down or upstream.

51.   Plaintiff admits that Amistad and Falcon Dams block the flow of the Rio Grande and that vessels cannot navigate past, over, or around them.

52.   The Amistad and Falcon Dams are one of many obstacles to navigation. Even if the River were otherwise suited to commercial navigation, commercial craft would be unable to navigate past the dams.

**A.   Commercial grade watercraft do not operate in the River**

53.   Contemporary river commerce is borne by shallow-draft barges that are usually propelled by towboats. Towboats require 7-8 feet of water and conventional barges require at least 9 feet of water. Individual barges vary from 190-209 feet in length, 35-50 feet in width and 12-16 feet in depth (including their above-water height).

54.   Class A and Class 1 vessels are not used for commercial navigation transporting cargo.

55.   Vessels capable of carrying commercial cargo are not viable methods of transport along the Rio Grande due to regulatory specifications, existing water uses, and the physical characteristics of the river.

56.   Prior to the placement of the Buoys, United States Customs and Border Protection airboats would wait for boats moving in the opposite direction to pass, before proceeding on the narrowest parts of the Rio Grande.

57.   In January 2024, the Coast Guard conducted a pre-deployment survey in Eagle Pass, including at the site of the Buoys, to determine whether the Coast Guard could operate in Eagle Pass.

58.   During that survey, Coast Guard staff rode in CBP airboats up and down the segment of the Rio Grande in Eagle Pass to determine the feasibility of putting Coast Guard assets on the river at that time. The Coast Guard observed that the water in the Rio

Grande in the vicinity of Eagle Pass was very shallow, and in some places, only inches deep.

59. During the survey, the Coast Guard observed that the Rio Grande in the vicinity of Eagle Pass contained numerous obstructions, including large boulders, sticks, logs, poles sticking out of the water, and rocks.

60. During the survey, the Coast Guard did not observe any commercial traffic or vessels transporting goods on the segment of the Rio Grande in the vicinity of Eagle Pass, and the only vessels the Coast Guard did observe were law enforcement airboats.

61. Response boat smalls are Coast Guard vessels that are approximately twenty-nine feet long, eight feet wide, and a draft of one foot eight inches; they are the only vessels the Coast Guard has used on any segment of the Rio Grande. However, the Coast Guard determined that due to the shallow water and obstructions throughout the entire Maverick County segment of the river, it would not be possible to use Coast Guard response boat smalls on the Rio Grande in Eagle Pass.

62. The Coast Guard even determined that it was infeasible to use Coast Guard specialized inflatable boats on the Rio Grande in Eagle Pass.

63. After conducting the pre-deployment survey, the Coast Guard concluded that it would not deploy assets to Eagle Pass, Texas.

64. No commercial barges, fishing boats, cargo ships, cargo carriers, tankers, or other commercial vessels operate on the segment of the Rio Grande located in Maverick County.

65. Law enforcement agencies, including the Tactical Marine Unit of the Texas Highway Patrol, use airboats with very shallow draft in the Maverick County segment of the Rio Grande.

66. In addition to airboats, the United States Customs and Border Protection agents operate Riverine Shallow Draft Vessels (RSDV-21) in the Eagle Pass area, which have a draft of

only 4 inches. There are times however when the water level is too low for them to operate these Vessels.

67. The United States Customs and Border Protection has 25-foot boats but does not operate them in the Eagle Pass area of the Rio Grande.

68. Due to low water levels, it is unsafe for United States Customs and Border Protection agents to conduct water boardings in the Eagle Pass area.

69. The Rio Grande's water levels under the Port of Entry 2 Bridge in Eagle Pass were "ankle-deep" in November 2022. The United States Customs and Border Protection observed that water levels were low in the Eagle Pass area in 2022, 2023, and 2024.

70. The airboats used by law enforcement agencies in the Maverick County segment of the Rio Grande do not have the weight capacity to carry commercial cargo.

**B. The River is not susceptible to navigation in its natural conditions**

71. Commercial navigation cannot take place on the RM 610 to 275.5 segment of the Rio Grande in the river's current condition.

72. The current width and depth of the channel in the segment at issue is not conducive to commercial navigation.

73. A lack of access to shore facilities in the segment at issue, including commercial and security facilities, prevents the segment of the river from being conducive to commercial navigation.

74. The conditions of the Rio Grande River in and near Maverick County, Texas are unsuitable for commercial navigation, preventing even skilled navigators from utilizing the Rio Grande River.

75. The Rio Grande River does not maintain a consistent depth, which is necessary for safe navigation.

76. The River runs though an area marked by an arid to semi-arid climate. Rainfall is relatively sparse, evaporation rates are high, and droughts are recurrent. The resultant low water levels pose a hazard to boats.

11

77. For much of the year, water levels at the Buoys current location are too low to allow passage to boats with offboard motors. Local law enforcement is sometimes limited to operating airboats.

78. During the time in which the Buoys have been deployed, water levels have gotten so low that the Buoys themselves have visibly sat atop the riverbed, unable to float for lack of water.

79. As an additional challenge, obstacles within the River are dangerous to traveling boats, whether the travel might be up and down the Rio Grande.

80. While some obstacles to navigation are visible, concerningly, obstacles to commercial travel are often not, which threaten the ability of any operator to safely utilize the river. As a result of these issues, an operator would often need to be located adjacent to the obstacle to observe it, which would not result in safe boating, as the operator would be unable to stop in time to avoid the obstacle.

81. Various obstacles exist in the river that would prevent safe navigation, such as steel and lead pipes, rocks, and even fence posts. Furthermore, weir dams on the river have resulted in a consistently shallow Rio Grande. To complicate matters even more, rock crossings also result in any persons attempting to travel on the river needing to navigate the Rio Grande in a zig-zag fashion, a method of travel that only a familiar navigator would be able to command, safely.

82. Those attempting to navigate the river often sustain collisions that compromise the watercraft.

83. The United States Customs and Border Protection has had nine incidences from 2020 through the present where its patrol boats have been damaged by collisions with rocks, shoals, debris, weirs, dams, buoys, structures, booms, or other structures in the RM 610 to 275.5 segment of the Rio Grande. None of these incidents involved the Buoys.

84. Occasionally, there has been fishing on the banks of the Rio Grande for personal recreation; however, there has not been fishing via watercraft, or commercial fishing of

any kind, due to the poor water quality and runoff from maquiladoras in Mexico that taint the water.

### III.   THE RIO GRANDE RIVER IS NOT AN HISTORICALLY NAVIGABLE RIVER

85.   Plaintiff has not shown that the River was historically used to sustain commercial navigation.

#### A.   Pre-colonial Use

86.   Early Spanish accounts indicate that indigenous tribes such as the Lipans who lived in the region of the Rio Grande River used traditional watercraft on the River.

87.   There is no evidence as to any specific routes or voyages of such indigenous watercraft use; whether any usage of such watercraft specifically occurred at the site of the Buoys or at modern-day Eagle Pass; whether such watercraft were regularly rather than sporadically used; or whether such watercraft were used for purposes of commerce or trade along the Rio Grande River.

#### B.   Spanish and Mexican Use

88.   Beginning in the mid-1700s, Spanish settlers began to develop settlements on the lower Rio Grande near the Gulf of Mexico. Waterborne commerce using flatboats began in this region. Friar Vicente Santa Maria reported in 1787 that, in times of high water, there could be navigation all the way upriver to Laredo.

89.   Beginning with Mexican independence from Spain in 1821, observers such as Ortiz y Ayala speculated about the use of the Rio Grande for commerce upstream of Laredo once threatening tribes no longer limited economic development and population growth.

90.   In the 1820s and 1830s, steamship travel spread to the lower Rio Grande near the Gulf of Mexico. However, steamship navigation never reached upstream of what came to be known as Kingsbury Falls, a natural barrier on the River more than 30 miles downstream from present-day Eagle Pass that could not be passed by steamship.

91. An isolated report states that an Alpheus Rackliffe went into the "freighting business" on the Rio Grande using keelboats large enough to carry up to 125 men. The report says Rackliffe's keelboats "usually" ran from Presidio del Rio Grande downstream to Matamoros. This farthest point upstream – Presidio del Rio Grande – was still 30 miles downstream from present day Eagle Pass.

92. Jean Louis Berlandier, an observer in the 1820s and 1830s "went as far upriver as Laredo, like his predecessors not traveling to the site of Eagle Pass-Piedras Negras because there was no settlement there." Berlandier claimed to have spoken to an unidentified "American beaver trapper" who claimed that the River could be navigated up to 1000 miles upstream in chalanas or small, manually-operated boats.

93. There is no evidence that the Rio Grande upstream of Presidio del Rio Grande was ever used as commercial conduit prior to 1836.

94. During the 1830s and subsequently the regular steamship navigation did not reach further upstream than Roma, Texas (approximately 50 miles downriver of the RM 610 to 275.5).

**C. Military Expeditions and Other Uses of the Rio Grande Above Presidio del Rio Grande after 1836**

95. The 1846 *Brown* military steamboat expedition reached Laredo after delay from reefs and rapids downstream. Above Laredo, the travelers encountered a "labyrinth of islands, shoals, rocks, reefs, and snags."

96. The 1850 H. Love military expedition traveled over 950 miles upriver, far past the site of the Buoys, in a flatboat with a crew of 12. It reported on return that the main obstacles to navigation were at Kingsbury Falls and Las Islitas, about 30 miles downstream from Eagle Pass.

97. Captain Daniel Kingsbury made a military expedition upstream from Laredo in the spring of 1850, but his journey by water ended at the natural barrier eponymously

dubbed Kingsbury Falls. These falls are 30 plus miles downstream from the Buoys' location and remain there today.

98.  Kingsbury entertained the idea of demolishing Kingsbury Falls and recommended to Major W. W. Chapman that this be done by the Army. Major Chapman believed that upstream navigation might be possible after blasting a channel through Kingsbury Falls. He recommended this to his superiors in Washington, but his request was never approved or seriously reviewed. Consequently, Kingsbury Falls was never demolished.

99.  A military mapping expedition under Lieutenant W. T. Smith traveled upstream. Lt. Smith opined that the Rio Grande upstream of Kingsbury Falls could be opened to the largest steamers by demolishing the Falls at a cost of about $25,760. However, Smith concluded that there were too few people upstream and too little economic activity, and the plan was "too unsure to warrant the cost."

100.  Eagle Pass was first established in 1849 alongside Fort Duncan as its civilian counterpart. Eagle Pass was poor and had little population for many years. Fort Duncan was routinely supplied by land from San Antonio and was never supplied via the Rio Grande.

101.  Major W.H. Emory visited the Eagle Pass area in 1853 as part of a military survey expedition. He identified Kingsbury Falls and Las Islitas as the principal obstacles to navigation of the Rio Grande, but predicted they would be overcome. However, Emory also foresaw that the coming of railroads could reduce the improvement of the Rio Grande for navigation to "minor importance."

102.  Beginning after the end of the Mexican War in 1848, use of Rio Grande waters upstream for irrigation increasingly took its toll on river levels. By the end of the 1850s, water levels in the Rio Grande at Roma had decreased by 13 inches. By the end of the 1860s, water levels at Roma were reduced by more than two feet, snags began to appear where there had been none, and there were river crossings where deep water had been only five years earlier.

**D. Local Uses of the Rio Grande, Including Cross-River Ferries, in the Eagle Pass Area**

103. As Eagle Pass and Piedras Negras developed, local residents and merchants used watercraft locally for various purposes. These uses included recreation, bathing, supplying local ranches, visiting, and socializing. A small ferry developed before the Civil War between Eagle Pass and Piedras Negras, more than two miles upstream from the site of the Buoys, and local residents used it for recreation and local commercial purposes. Commercial traffic across the River between the two cities briefly increased during the latter part of the Civil War, as goods like cotton were moved across the border to evade the Union blockade of Confederate Gulf ports.

104. After the Civil War, the ferry between the two cities continued, but decreased in significance after the coming of the railroad to Eagle Pass in 1882. The ferry continued into the 20th century and had a brief revival in 1922 when a flood destroyed the bridges across the Rio Grande at Eagle Pass.

**E. Use of the Rio Grande as a Highway of Commerce and Trade Along the River**

105. The Rio Grande has never operated as a highway of commerce connecting Eagle Pass or Piedras Negras to locations downstream, including locations within the RM 610 to 275.5 segment that Plaintiff disputes such as Laredo. The Rio Grande has never functioned as a highway of commerce for the shipment of goods.

106. Commercial goods have never been shipped on the Rio Grande from Eagle Pass or Piedras Negras to Brownsville, the Gulf of Mexico, or any point downstream of Laredo.

107. Commercial goods have never been shipped on the Rio Grande from Del Rio to Eagle Pass or Piedras Negras.

108. There has never been any scheduled passenger service departing Laredo and transporting persons upstream on the Rio Grande.

109. The ferry that once crossed the Rio Grande at Eagle Pass and Piedras Negras was at least two miles upstream from the site of the Buoys. No ferry has ever crossed the Rio Grande at the Buoys' site.

110. There is no evidence that there ever has been any cross-bank commercial navigation of the Rio Grande at the Buoys' Site.

111. Although various plans and recommendations were made in the mid-1800's and before to link river commerce on the Rio Grande below Laredo to the Eagle Pass area, that never occurred.

112. The actual head of navigation on the Rio Grande at the time Texas became a State in 1845 was Laredo. The "head of navigation" is the farthest point above the mouth of a river that can be navigated by ships.

113. However, Laredo was never served by regular steamship transportation. Navigation as far upstream as Laredo was rare and sporadic.

114. The actual head of navigation on the Rio Grande from the 1860's until navigation ceased in the early 1900s was Roma, in Starr County, Texas.

115.  The actual head of navigation on the Rio Grande River never reached above Kingsbury Falls, and never reached the Buoys' Site or Eagle Pass.

## F.  The Recent Past

116. For the last few decades, the conditions of the Rio Grande River in and near Maverick County, Texas have remained unsuitable for commercial navigation.

## G.  The Rio Grande River is not susceptible to navigation following reasonable improvements

117. Transforming the Rio Grande River into a waterway capable of commercial navigation is neither technically feasible nor reasonable. The improvements that would be necessary are impractical and may not be possible. Furthermore, the costs of improvements would be extravagant and there are no discernible offsetting benefits.

118. Plaintiff has not presented any evidence that the benefits of improvements will outweigh the costs.

119. Plaintiff has not shown that the River is susceptible to navigation following improvements, reasonable or otherwise.

### H. The River's Geography is not suited to Navigation

120. The segment of the Rio Grande where the Buoys are located is comprised of sand bars, shallow water, water with inconsistent depths, small islands, large rocks, manmade debris, natural debris such as logs and stumps, and sandy shoals.

121. The depth of the segment of the Rio Grande where the buoys are located varies from day to day and within the same day but averages between 3 and 4 feet.

122. Water levels in the segment of the Rio Grande where the buoys are located fluctuate depending on releases of water from Amistad Dam.

123. The arid climate and heavy use of the River's waters keep water levels low. Additionally, droughts are recurrent and are becoming more frequent.

124. The shallow depth, sand bars, and hidden dangers within the Maverick County segment of the Rio Grande pose dangers to watercraft operating in this segment of the river.

125. Aside from natural barriers, the River's physical morphology inhibits navigational use. The middle Rio Grande is marked by steep declines in elevation and by a sinuous course full of sharp turns. These two characteristics pose severe challenges for potential navigation that realistic improvements would need to solve.

126. Near Lake Amistad, the River reaches 915 feet above sea level. Therefore, from the uppermost point of the segment Plaintiff disputes down to the mouth the River drops more than 900 feet in elevation. This steep decline flushes new water, either from rainfall or releases from Amistad Dam, out of the channel relatively quickly.

127. The Rio Grande from mile marker 610 to the Gulf is marked by numerous tight bends. The bends in the Rio Grande's channel on average have smaller radii than those in the Tennessee-Tombigbee navigable waterway.

128. Commercial watercraft navigating the River would face significant difficulties negotiating these tight river bends.

129. Any scheme to improve the River for navigation must reckon with its unforgiving physical characteristics, including the formidable natural obstacles that dot its course.

**I. Rendering the River capable of commercial navigation would be a fantastical undertaking**

130. Modern commercial shallow draft waterways require a minimum channel depth of 9 feet.

131. This minimum is in line with the USACE's standards, which require a minimum depth of 9–12 feet.

132. USACE also recommends that "the minimum clearance required for reasonably safe navigation in straight reaches should be at least 20 feet between tow and channel limits for two-way traffic, 40 feet for one-way traffic, and at least 50 feet between tows when passing." Engineer Manual 1110-2-1611 (US Army Corps of Engineers 1980).

133. To accommodate commercial traffic the Rio Grande River would need to be at least 250 feet wide as well as 9-12 feet deep.

134. Increasing the depth of the Rio Grande to 12 feet would cause the National Oceanic and Atmospheric Administration (NOAA) to classify the river gauges at Laredo and Eagle Pass as "minor flooding" and at Del Rio as "major flooding." NOAA lists the impacts of "major flooding" as "extensive inundation of structures and roads. Significant evacuations of people and/or transfer of property to higher elevations."

135. Furthermore, this minimum depth and width are required to practically accommodate even the lightest commercial craft.

136. Navigable waterways can be either open, meaning that their waters either flow freely downstream, or canalized, meaning that the flow of their waters is controlled by locks and dams.

137. Improving the River for navigation involves the challenge of maintaining water levels that are deep enough to sustain navigation.

138. If the River were transformed into an open navigable waterway, its waters would flow unimpeded from Amistad Dam to the Gulf of Mexico. Consequently, an open River would need 9 feet of depth along its entire course to be used by commercial craft.

139. In this scenario, Amistad Dam, Falcon Dam, Maverick Dam as well as other minor improvements will be removed to leave the River channel unobstructed.

140. Flow rate and discharge values measured by USIBWC river gages allow calculation of the time in which Amistad Reservoir would empty. If the River were turned into an open channel, Amistad Reservoir would empty in 143 days. Without water from Amistad, there would not be enough water to fill the channel to an adequate depth.

141. A system of locks and dams could attempt to maintain sufficient water for adequate depths by using pumps to recycle water back upstream. However, installing locks and dams will create pools between locks, and this will increase the River's surface area. An increased surface area results in larger water losses due to evaporation.

142. Canalization is frequently used to overcome the challenges of navigating along a steep river gradient.

143. An optimal system of locks and dams balances the number of sets of locks and dams with the drop-off elevation at each set. The Tennessee-Tombigbee waterway uses average lifts of 34 feet.

144. An optimum average lift for a canalized Rio Grande is 20 feet. Larger drop-offs would subject the surrounding land to extensive, permanent flooding.

145. With a 20-foot drop-off, canalizing the Rio Grande would entail constructing 45 sets of locks and dams, from mile marker 610 to the Gulf. This number includes four locks that

would need would be needed to facilitate navigation along the 100-foot decline in elevation where Falcon Dam currently stands.

146. The Texas portion of the Gulf Intracoastal Waterway uses lock chambers constructed to be 22.3'x75'x900'. With these dimensions and assuming 25 locking events per day, navigation on the River would consume more than 37 million cubic feet of water every day.

147. Additionally, the canalized River's surface area would expand to nearly 21,300 acres, leading to annual evaporation of 2.13 million acre-feet. Total annual evaporative losses will equal between 19% and 115% of the average annual outflow from Falcon Dam and between 44% and 210% of the River's dry-year flow rate at Laredo.

148. This means that during dry years—i.e. years that record total annual flow in the bottom 10th percentile—99% of the total river flow would be consumed by evaporation, leaving almost no water for navigation purposes.

149. Regardless of whether an open or canalized project is pursued, developing the River for navigation will require extensive dredging and removal of both man-made and natural obstacles.

150. Among the man-made obstacles that would need to be moved and/or rebuilt would be much of the infrastructure for border security and operations, including existing fencing, gates, patrol areas, and cameras.

151. The average depth of the Rio Grande is likely between 3 and 4 feet. The amount of sediment that would need to be excavated to deepen the River to 9 feet is between 95 million and 79 million cubic yards, corresponding to an average depth of 3 and 4 feet respectively.

152. The character of sediment that would need to be removed changes between different parts of the River. Fine silt predominates near the mouth whereas along the middle segment, including the 610-to-275.5 stretch, the main types of sediment are probably

vuggy limestone and caliche. Vuggy limestone typically is resistant to penetration by dredging equipment.

153. Sediment that is mostly silt can be removed by hydraulic suction and towed away from the River mouth by barge, while the harder, denser limestone and caliche will require using mechanical excavators. Excavators that are used in dredging are assembled onsite.

154. Dredging the River from mile 610 down to the Gulf will require assembling excavators and related equipment at 45 separate sites.

155. Ancil Taylor estimates that the dredging required to turn the River into a navigable channel would cost more than $3.3 billion, given an effective cost of $35 per cubic yard of excavated material.

156. Security is a significant concern for commerce facilitated by inland waterways. US-Mexico cross-border trade is especially susceptible to security threats.

157. Unlike the Rio Grande River, the Gulf Intercoastal Waterway (GIWW) is a bona fide highway of commerce. It connects important maritime ports, such as Houston and Brownsville, and provides a conduit for the distribution of petrochemicals and other important goods.

158. The GIWW maintains a channel depth of 12 feet along its course to allow navigation by commercial-scale craft. It includes 10 locks that stabilize flow and depth.

159. The GIWW illustrates what the Rio Grande River would need to become like if the River is to really support commercial navigation. That is, the River would need to become physically able to sustain navigation by commercial craft and economically viable as a cost-effective means to distribute specific goods.

160. Plaintiff has provided no concrete allegations about the goods that could be shipped on the Rio Grande were it somehow transformed into a commercial channel nor about its cost-competitiveness as compared to existing modes of commerce.

**J.   Attempts to enhance the River's navigable capacity would not be cost-effective**

161.   Going by the norms that structure federal water resource development projects, a serious project to develop the Rio Grande for commercial navigation would begin with a Congressionally authorized feasibility study. Only projects that are both technically feasible and economically and environmentally acceptable are then recommended to Congress for final authorization and funding.

162.   The Federal Government has not conducted or approved a feasibility study for navigation-related improvements to the Rio Grande.

163.   The USACE does not have an engineering mission on the relevant stretch of the Rio Grande.

164.   The USIBWC's guidelines for structures built on or near the River discourage modifications that would alter the River channel.

165.   The cost to transform the River into a canalized channel capable of supporting commercial navigation would be prohibitive.

166.   Dr. Zhao estimates that a system of locks and dams that canalizes the River from mile marker 610 down to the Gulf would exceed $95 billion, and he estimates canalizing the River between mile markers 610 and 275.5, the segment that Plaintiff disputes, would cost approximately $59 billion.

167.   Any benefits from either canalization project would be significantly lower than costs. Dr. Zhao estimates that the net benefits from full canalization would be negative $84 billion (i.e. costs would exceed benefits by approximately $84 billion), and the net benefits from canalization of only the RM 610 to 275.5 would be nearly negative $57 billion.

168.   Ancil Taylor concludes similar cost figures for outfitting the River with locks and dams. He estimates that canalization would require at least $58 billion, including costs related to channel modification such as dredging.

169. Potential benefits of a limited project to render only RM 610 to 275.5 navigable are especially dubious. The stretch under contention is isolated from major transit hubs. Amistad and Falcon Dams pose impassable barriers to up and downriver navigation respectively.

170. Even if navigational improvements were feasible, the RM 275.5 to 610 stretch that Plaintiff disputes is too sparsely populated to generate local demand for river-borne transit or a riverine supply chain.

171. Additionally, the area's transit and supply chain needs are already capably served by rail, air, and road infrastructure.

## K. Navigational Improvements would severely burden water resources and upend existing water rights

172. Any scheme to enhance the navigability of the Rio Grande River would require increasing downriver water flows above their current levels. Plaintiff's proposals for improvements all contemplate increasing water flows.

173. The waters of the Rio Grande River are governed by State and international authorities, which determine their ownership and use.

174. The 1944 Treaty on the Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande (the "1944 Treaty") between the United States and Mexico governs the allocation of the waters of the Rio Grande between the two countries. *See generally*, 59 Stat. 1219.

175. Usage of the American-share waters is in turn governed by Texas state law. *See* Tex. Water Code §§ 11.021, 11.121 (defining State water); 22 U.S.C. § 277d-15 (recognizing Texas's authority over water releases from the international dams on the Rio Grande River); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 286–87 (1997) (upholding State's authority over its waters in accordance with state statute).

176. Texas water rights are regulated by the Texas Commission on Environmental Quality ("TCEQ"), a State of Texas agency, which assigns and adjudicates water rights pursuant to the Texas Water Code.

177. The waters of the Rio Grande are a scarce resource. Currently all available water is fully appropriated, meaning that permit-holding users have rights to the full amount of water sitting in the Amistad and Falcon reservoirs.

178. In fact, the River is *over*-appropriated; active water use permits confer rights to more water than is currently available.

179. Because it is a fully appropriated river, there is no additional water in the Rio Grande for navigational use.

180. Meanwhile, the quantity of new water entering the River is decreasing year on year. This is due in part to changing climate conditions and in part to deficient water deliveries from Mexico.

181. Under the Texas Water Code, TCEQ cannot grant new water rights to Rio Grande water. This is because new water rights are only granted for unappropriated water. Existing rights can be modified but only if the modification sought does not require a larger quantity of water than the right is entitled to.

182. Releasing American-share waters from Amistad Dam or Falcon Dam always requires a Texas water right. Although the IBWC facilitates water releases, the authority to call for releases (for American waters) lies with TCEQ.

183. TCEQ schedules and coordinates water releases through its watermaster program. Georgina Bermea is TCEQ's current watermaster for the Rio Grande.

184. Diverting water for navigational use would require a Texas water right issued by TCEQ. Releasing water from Amistad Dam for navigation would likewise require water rights to whatever quantity of water is released.

185. Dredging and bank stabilization will require Texas water rights from TCEQ if these activities cause or involve "storing, taking, or diverting" water as defined by the Texas Water Code and TCEQ's guidelines.

186. Federal entities that wish to acquire or use Texas water must obtain a water right from TCEQ. Accordingly, TCEQ has issued several water use permits to federal entities, including the USIBWC.

187. Under the Texas Water Code, navigation is classified as an incidental use; as such, TCEQ cannot grant water rights solely for navigational purposes. Tex. Water Code § 11.0235(d).

188. Both the 1944 Treaty and the Texas Water Code designate "navigation" as a low priority use. *See* 59 Stat. 1219 at *3 (Article 3); Tex. Water Code §§ 11.023, 11.024.

189. Currently, the waters of the Rio Grande are dedicated to higher priority uses, such as agriculture and municipal use. If water were reprioritized for navigation, doing so would eliminate some or all of these higher priority uses.

190. There are no water rights on the Rio Grande that authorize navigational use, and TCEQ has never granted such a right for Rio Grande water.

**L. Raising the water level of the Rio Grande to a level sufficient to permit commercial navigation would have extensive and serious environmental impacts.**

191. Raising the water level of the Rio Grande via either water releases, dredging, or a locks & dam system would cause the loss of farmland adjacent to the Rio Grande and would therefore be subject to the Farmland Protection Policy Act (FPPA). The FPPA, established in 1981, aims to minimize the conversion of farmland to non-agricultural uses by federal programs.

192. The Harlingen Irrigation District (HIDCC1) serves 56,114 acres of farmland in the Rio Grande Valley, sourcing water from the Falcon Reservoir. The Rio Grande is the only source of water for the District.

193. Raising the water level of the River could result in areas with limestone outcroppings susceptible to sinkhole development being inundated with water, causing unintended loss of surface water.

194. The Rio Grande has many U.S. tributaries, including the Pecos and Devils Rivers, which provide highly variable inflows. Impacts to these tributaries through water releases, dredging, or a locks & dam system would be subject to the Clean Water Act, §§ 10, 401, and 404.

195. There are over seven thousand acres of wetlands on the U.S. side of the Rio Grande from RM 610 to 275.5. Wetlands provide important habitat for many types of flora and fauna in the affected area and the impact from the loss of wetlands would have a cumulative affect across many natural resources. Any alteration of the wetlands by the USACE would require a mitigation plan.

196. The segment of the Rio Grande at issue is approximately 60 miles downstream from the southernmost designated wild and scenic river segment of the River. Any impacts to the water levels of the wild and scenic rivers would be subject to Section 7 of the Wild & Scenic Rivers Act.

197. The area of the Rio Grande challenged by the Plaintiff contains approximately 52,738 acres of designated flood hazard areas. Executive Order 11988 requires federal agencies to avoid direct and indirect support of floodplain development wherever there is a practicable alternative.

198. The challenged area of the Rio Grande contains 22 threatened, endangered, or candidate species of animals. Two of the protected species are the bald and golden eagles, which are protected under the Bald and Golden Eagle Protection Act (BGEPA) and the Migratory Bird Treaty Act (MBTA). The MBTA implements conventions (bilateral treaties) between the United States and four neighboring countries, one of which is Mexico, for the protection of migratory birds. Altering the flow of the Rio Grande could have a significant impact on the habitat of these protected species.

199.   Within a half mile buffer of the challenged length of the Rio Grande lie 724 terrestrial archaeological sites, 11 National Register Historic Districts, 32 historical markers, 5 National Register Properties, and 21 cemeteries.

IV. **THE BUOYS ARE NOT AN OBSTRUCTION**

200. The Buoys are placed parallel to the River's current. They never drift out of their parallel alignment and have always remained oriented *along* rather than *across* the river channel.

201. Texas has no plans to move the Buoys so that they are perpendicular to the River.

202. Given their parallel orientation, Buoys do not hinder navigation up or down the river; shallow draft vessels such as law enforcement airboats and john boats can easily navigate around the buoys.

203. The United States Coast Guard was able to operate their airboats within 20 feet of the Buoys without difficulty.

204. Since the Buoys were deployed, law enforcement's ability to operate boats near Eagle Pass has not been impaired.

205. Local and federal law enforcement regularly operate watercraft in the immediate vicinity of the Buoys and regularly steer watercraft passed the Buoys without incident.

206. The Buoys do not affect the course of the Rio Grande in a way that impacts its navigable capacity.

207. U.S. Customs and Border Protection contracted for a floating barrier system like that at issue in this case in 2020. The contract was cancelled in January 2021 because of a Presidential Proclamation by the new Biden administration.

208. U. S. Customs and Border Protection tested a floating buoy system like that at issue in this case for three days at the U. S. Border Patrol Academy in Artesia, New Mexico in 2020. The three-day testing proved the efficacy of the floating buoy system and demonstrated it posed no additional danger to agents or migrants.

209. U.S. Customs and Border Protection viewed the floating buoy system that it tested as a tool that would save lives by reducing drownings.

210. The floating buoy system that is at issue in this case was designed to be a mechanism to save lives and direct migrants to U.S. Customs and Border Protection ports of entry, while deterring unlawful, dangerous crossings, drug smuggling, human trafficking, and terrorist infiltration.

211. The floating buoy system cannot be fairly characterized as, and is not sold as, a "boom."

212. The floating buoy system at issue in this case is temporary in nature and may be moved from location to location as needed.

213. The floating buoy system at issue in this case is anchored by concrete blocks that are not attached in any way to the riverbed. No excavation, filling, or building occurred in the Rio Grande River when they were placed in July 2023. The concrete blocks are not subject to drifting or moving.

214. The floating buoy system as deployed does not interfere with any existing lawful uses of the Rio Grande River.

215. The floating buoy system as deployed does not interfere with the travel of any watercraft up and down the Rio Grande River.

216. The floating buoy system as deployed does not interfere with the free flow of water through the segment of the Rio Grande River where the floating buoy system is located.

217. The floating buoy system as deployed does not substantially interfere with the navigable capacity of the Rio Grande River.

218. As of August 22, 2023, the floating buoy system at issue in this action was entirely within the territory of Texas and the United States of America.

219. The United States Coast Guard has not deployed watercraft in the Maverick County segment of the Rio Grande.

220. The Buoys are very well marked and colorful.

The law enforcement watercraft operating on the Maverick County segment of the Rio Grande can easily maneuver around the Buoys.

221. The Buoys do not impede any lawful use of the waters of the Maverick County segment of the Rio Grande.

222.  The Buoys are located entirely in the United States.

223. The United States side of the Rio Grande, in the Maverick County segment, is shallower than the corresponding Mexican side of the Rio Grande.

224. USACE is unaware of any specific instances in which the barriers obstructed any form of traffic on the Rio Grande River.

225. Law enforcement watercraft are the only type of watercraft regularly operating in the Maverick County segment of the Rio Grande.

226. Plaintiff has not shown that the Buoys have ever prevented, blocked or impeded the operation of a vessel up or downstream. Plaintiff has not shown that the Buoys obstruct navigation of the River.

## V.    THE BUOYS ARE NOT A "WHARF, PIER, DOLPHIN, BOOM, WEIR, BREAKWATER, BULKHEAD, JETTY, OR OTHER STRUCTURE"

227. The United States has only argued that the Buoys are either a boom or other structure and has admitted that the Buoys are not a wharf, pier, dolphin, weir, breakwater, bulkhead or jetty.

228. The Buoys are not a boom.

229. Booms are typically used as a means of containment (for example, to contain an oil spill).

230. The buoys are not other structures that would require a Section 10 permit under the Rivers and Harbors Act.

231. Buoys are anchored devices used primarily for marking positions on the water and serving purposes such as navigation, mooring, or delineating boundaries.

232.  Buoys are designed to remain stable, fixed in a specific location, and are frequently anchored to the seabed or riverbed.

233.  The Buoys are not permanently moored.

234.  Buoys are distinguishable from booms because they do not obstruct passage *along* the Rio Grande.

235.  Visible physical barriers such as buoys are recognized mechanisms used to define boundaries and restrict access or movement to a particular area.

236.  Visible physical barriers such as buoys are recognized mechanisms used to psychologically deter entry into a particular area.

237.  Plaintiffs have not shown that the Buoys are a boom or an other structure.

## VI.  TEXAS IS BEING INVADED ACROSS THE RIO GRANDE RIVER

238.  In fiscal year 2021, the Border Patrol reported more than 1.7 million encounters with aliens along the Mexican Border." *Texas v. Biden*, 142 S. Ct. 2528, 2549 (2022) (Alito, J., dissenting).

239.  The number of border encounters on the Mexican border reported by the Border Patrol jumped to nearly 2.9 million in 2022.

240.  The number of aliens crossing the Mexican border into the United States that were detected but not encountered or apprehended increased 300 % between 2020 and 2023.

241.  At a March 15, 2023, hearing before the House Committee on Homeland Security, then Border Patrol Chief Raul Ortiz testified that the Department of Homeland Security no longer had "operational control" of the Mexican border with the United States.

242.  The Mexican border with the United States is a portal for sex and forced-labor trafficking. *Texas v. Biden (MPP I)*, 554 F .Supp. 3d 818, 838 (N. D. Tex. 2021), *rev'd on other grounds*, 142 S. Ct. 2528.

243. In 2022, over 107,000 people in the United States died of drug overdoses and drug poisonings, of which 67% involved synthetic opioids like fentanyl, much of which is smuggled into the United States over the Mexican border by transnational cartels.

244. A United Nations Migration Study deemed the US-Mexico Border the deadliest land route in the world in 2021.

245. United States Customs and Border Protection agents do not perform boardings of other watercraft in the Rio Grande in Maverick County due in part to agents being fired upon from the Mexican side of the River.

246. In 2024, the Governors of 25 States other than Texas expressed their support for Gov. Abbott's determination that Texas is being invaded across its border with Mexico.

247. Fourteen States filed an Amicus Curiae Brief in the Fifth Circuit Court of Appeals on September 28, 2023, in the appeal of the preliminary injunction in this case (No. 23-50632) (ECF 73) stating in part, "[It] is hard to describe what is occurring on the border any other way [than as an invasion]").

248. Current and former FBI and Intelligence officials testified to Congress in 2024 that potential terrorists have invaded the United States through its border with Mexico.

249. At least 50 Texas counties have declared that Texas is under invasion as of early 2024.

250. In September 2023, the City of Eagle Pass, Texas declared an emergency because of the danger to the public caused by intensive unlawful incursions across the Rio Grande River from Mexico into Eagle Pass.

251. Texas has a substantial history of incursions into its territory by transnational criminals and bandits as well as Indians, and of response to such incursions by requesting federal protection and if such protection was not forthcoming or was not effective, using Texas military and law enforcement resources to defend Texas.

252. Growing numbers of Chinese migrants, mostly single men of military age, have crossed from Mexico into the United States illegally in 2023 and 2024.

253. FBI Director Wray in March 2024 publicly warned of "Dangerous Individuals" coming across the southern border into the United States.

## VII. TEXAS DEPLOYED THE BUOYS IN DEFENSE OF ITS PEOPLE AND TERRITORY IN RESPONSE TO AN ACTIVE INVASION

254. Texas acted, and is now acting, in good faith by deploying and maintaining the Buoys based on their belief that these actions are lawful under the United States Constitution, including but not limited to Article I, Section 10, Clause 3, and the Tenth Amendment.

255. Texas, through its Governor, has invoked its Article I, Section 10, Clause 3 power to defend its territory and people from invasion on the basis of the Governor's good faith belief that illegal immigration into Texas, trafficking and related crime constitute an ongoing invasion of the State.

256. Texas declared a border disaster in accordance with Texas law in numerous Texas counties, including Maverick County, Texas, on May 31, 2021, and has maintained that border disaster declaration in effect at all times since then.

257. Under Texas law, since declaring emergency on May 31, 2021, the State has had the right to control ingress and egress from disaster areas, and the Buoys control ingress across the Rio Grande River into a portion of the disaster area in Maverick County, Texas.

258. Over fifty Texas Counties, including Maverick County, Texas, have declared border disasters in their Counties since May 31, 2021.

259. In 2021, Texas initiated Operation Lone Star, a combined effort of the Texas Department of Public Safety, the Texas Military Department, and other Texas agencies to respond effectively to the border disaster.

260. The Texas Legislature has supported and funded Operation Lone Star since 2021 and continues to do so.

261. Governor Abbott was a candidate for re-election as Governor in 2022. His opponent criticized Governor Abbott's actions with respect to Operation Lone Star. The voters of Texas re-elected Governor Abbott in November 2022.

262. In 2021 and 2022 Governor Abbott issued public letters and publicly called on the President of the United States to cause the United States to fulfill its duty under Article IV, Section 4 to defend Texas from invasion.

263. Governor Abbott, in November 2022, publicly declared that Texas had been invaded and invoked Texas's right under Article I, Section 10, Clause 3 of the United States Constitution to engage in defensive war to defend Texas against invasion.

264. Over 50 Texas Counties have since November 2022 declared that Texas has actually been invaded across the Rio Grande River.

265. Twenty-five Governors of other States of the United States of America in addition to Texas have publicly expressed their support for Texas in the invocation of Texas's Constitutional right to defend itself because it has actually been invaded.

266. Numerous former FBI and United States counterintelligence officials publicly advised the United States Congress in January 2024, that the United States has actually been invaded across the Southwest Border.

267. On June 8, 2023, Governor Abbott publicly announced that Texas planned to cause the Buoys to be placed in the Rio Grande River at the Barrier Site.

268. In June, July, August, and September of 2023, Maverick County, Texas, and its county seat Eagle Pass, Texas, were national hotspots for unlawful incursions into Texas across the Rio Grande River.

269. In September 2023, Eagle Pass, Texas, declared an emergency as a result of public dangers caused by extensive unlawful incursions across the Rio Grande River into Eagle Pass.

270. Texas caused the Buoys to be placed in the Rio Grande River at the Barrier Site in 2023 when there were no reasonable plans, efforts, or prospects of actual navigation within

the meaning of the Rivers and Harbors Act at or near that Barrier Site, and none have existed at any time to the present.

271. Texas deployed the Buoys as a defensive measure to prevent and deter illegal entry. At the time the Buoys were placed in the Rio Grande River at the Barrier Site and at all times since then, Texas believed that the Buoys would prevent, deter, and decrease unlawful incursions into Texas across the Rio Grande River.

272. Since the Buoys were placed at the Barrier Site, no person has made an unlawful incursion into Texas by climbing over the Buoys. Nor has anyone swum under the Buoys.

273. Plaintiff admits that the Buoys have not injured any person or vessel.

274. Plaintiff admits that the Buoys have not been crossed by anyone attempting to illegally enter the United States during the time they have been deployed.

## VIII. THE BUOYS HAVE NOT NEGATIVELY IMPACTED COMMERCIAL NAVIGATION

275. No substantial interstate or foreign water-borne commerce now exists at the site of the Buoys or existed when they were deployed; none ever has existed; and there are no plans to make the River navigable at the barrier site.

276. The Buoys have not been shown to actually impede, obstruct, or deter any interstate or foreign water-borne commerce.

277. The Buoys are movable, and if there ever came a time in the future when interstate or foreign commerce were to exist at the Barrier Site by reason of future "reasonable improvements," the Buoys could be readily moved so that no harm to such commerce occurs.

## IX. THE BUOYS HAVE NOT NEGATIVELY IMPACTED THE PUBLIC INTEREST

278. The Buoys are, and are intended by Texas to be, passive and defensive in nature. Since the Buoys were placed at the Barrier Site, no person has been drowned or otherwise killed or seriously injured by the Buoys.

279. No United States Customs and Border Protection employee or contractor has been injured or killed by the Buoys.

280. The United States Customs and Border Protection has not performed any search and rescue operations in the immediate vicinity of the Buoys from July 2023 through the present.

### A. The Buoys have not negatively impacted foreign relations

281. At the time the Buoys were placed in the Rio Grande River, Mexico expressed concern that it was "inhumane" and risked harm to Mexicans and others crossing the river, and that it violated the "Navigation" provisions of Treaties between the U. S. and Mexico. None of these are concerns of RHA and therefore are not legal injuries cognizable under RHA.

282. Any Mexican Government fears of harm to Mexicans and others from the Buoys have proved unfounded; no one has been harmed by the Buoys

283. The Buoys have not been "inhumane"; no one has crossed them, and illegal migrants have avoided them by crossing at ports of entry or elsewhere, or simply not crossing the Rio Grande.

284. Commercial trade into the United States that does not enter through ports of entry is illegal.

285. Mexico has not publicly complained to the U.S. about the Buoys in over a year, despite the ongoing presence of the Buoys in the Rio Grande.

286. The United States presents no evidence of any tangible adverse effect on the United States from Mexican concerns about the Buoys or from the Buoys' actual presence in the Rio Grande since July 2023. "Concerns" are not a cognizable harm under the RHA.

### PROPOSED CONCLUSIONS OF LAW

1. This Court lacks jurisdiction of this action because Defendants have in good faith invoked as a defense to Plaintiff's RHA claim its right under the United States

Constitution to defend itself from invasion by placing the Buoys in the Rio Grande River at their current location. Plaintiff's RHA claim and Defendants' Constitutional defense thus present a nonjusticiable political question that this Court has no jurisdiction to adjudicate.

2.  Additionally, the Court lacks subject matter jurisdiction because Section 12 of the RHA only provides for remedies against persons and corporations, and not States. Both the State of Texas and Governor Greg Abbott, in his official capacity as Governor of Texas, are neither persons nor corporations for purposes of the RHA.

3.  Plaintiff's claim in its First Amended Complaint under the Treaty of Guadalupe Hidalgo of 1848 was properly dismissed by the Court because it was not a claim upon which relief could be granted as a matter of law.

4.  To succeed on its RHA claim, Plaintiff must carry its burden to prove that the Buoys are a "boom" or "other structure" that obstructs "the navigable capacity of [a] water[] of the United States." 33 U.S.C. § 403 (Section 10). Only an injunction for "the removal of any structures or parts of structures" may be properly awarded to remedy violations of Section 10. *Id.* at § 406 (Section 12).

5.  "Success under RHA § 10 requires the United States to show that the barrier [the Buoys] sits within navigable water." *United States v. Abbott*, 110 F.4th 700, 708 (5th Cir. 2024).

I.   **STANDARD FOR NAVIGABILITY**

6.  "[A] river is navigable if it is used, or is susceptible of being used, in its ordinary condition, as a highway for interstate or foreign commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *United States v. Abbott*, 110 F.4th 700, 708 (5th Cir. 2024) (citing The Daniel Ball, 77 U.S. 557, 563 (1870)) (quotation marks omitted).

7.   "Navigability is a question of fact," *Abbott*, 110 F.4th at 708 (citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 405 (1940)), that "should be determined by evidence." *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899).

8.   Navigability may be shown by sufficient evidence of either 1) a water's actual use for commercial navigation, 2) its historic use for commercial navigation or 3) by showing that the water is susceptible to commercial navigation following reasonable improvements. *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407–09 (1940).

9.   "That the river must be of 'practical service' [as a highway of commerce] means that the commercial use or susceptibility of use must be more than 'sporadic and ineffective' or 'exceptional'" *Abbott*, 110 F.4th at 709 (quoting *United States v. Oregon*, 295 U.S. 1, 23, (1935); *Rio Grande Dam*, 174 U.S. 690, 699 (1899)).

10.  Recreational or personal boating is not navigation; "[n]avigability [] does not extend to 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water.'" *Abbott*, 110 F.4th at 709 (quoting *Rio Grande Dam*, 174 U.S. at  698-99).

11.  The fact that a river can be traversed by "fishing boats and other shallow draft craft" by itself cannot establish navigability. *Id.* at 712 (quoting from Plaintiff's PI evidence).

### A. Actual Navigation

12.  Navigability focuses on a waterway's capacity to facilitate actual commerce "in the nature of a highway." *See, e.g., Willson v. Black-Bird Creek Marsh Co.*, 27 U.S. 245, 250–51 (1829); *Gilman v. Philadelphia*, 70 U.S. 713, 724–25 (1865); *The Montello*, 87 U.S. 430, 442 (1874); *Rio Grande*, 174 U.S. at 698; *Leovy v. United States*, 177 U.S. 621, 627–28 (1900).

13.  "[N]avigability requires evidence that the river was used or susceptible of use as a "*highway* for commerce" *Id.* at 713 (citing *Econ. Light*, 256 U.S. at 121, 41 S.Ct. 409 (emphasis added) (citing *The Daniel Ball*, 77 U.S. at 564; *The Montello*, 87 U.S. at 439).

14. Showing a river is a *highway of commerce* necessarily requires commerce to travel "up the river," travel "down" the river, and travel "along" it. *The Montello*, 87 U.S. at 439; *The Daniel Ball*, 77 U.S. at 565; *Appalachian Elec.*, 311 U.S. at 413.

15. Bank to bank commercial traffic does not show trade or travel that qualifies as commercial navigation. *Abbott, supra*; *Appalachian Elec.*, 311 U.S. at 413. A water constitutes a highway of commerce when "the stretch of the river can sustain trade or travel along its length." *Abbott*, 110 F.4th at 714.

16. The ability to demonstrate that a river may be forded on foot is not sufficient to establish navigability. *United States v. Oregon*, 295 U.S. 1, 20–21 (1935)

**B. Historic Navigation**

17. Statutes relating to "free navigation" along the Rio Grande are generally "only precautionary and not intended as an affirmation of navigable capacity in that locality." *Oklahoma v. Texas*, 258 U.S. 574, 586 (1922); *Compare*, *Abbott*, 110 F.4th at 711, *with e.g.,* Act of Mar. 4, 1923, 67 Cong. Ch. 254, 42 Stat. 1482, *and* Act of Sept. 30, 1890, 51 Cong. Ch. 1122, 26 Stat. 502*, and* Act of Sept. 27, 1890, 51 Cong. Ch. 1002, 26 Stat. 495, *and* Act of May 29, 1884, 48 Cong. Ch. 57, 23 Stat. 29. These statutes are not relevant to the determination of the navigability of the Rio Grande River at the site of the Buoys or elsewhere.

18. Nor do "the Treaty of Guadalupe Hidalgo and the Gadsden Treaty" establish navigability. *Abbott*, 110 F.4th at 711 (stating that "whether the river is navigable is . . . not answered by the treaties themselves.").

19. Those treaties do not affirm the navigable capacity of the Rio Grande, but serve as precautionary statements that navigability should not be obstructed where it exists. *United States v. Abbott*, 110 F.4th 700, 712 (5th Cir. 2024). Thus, these treaties are not evidence of navigability of the Rio Grande at the site of the Buoys or elsewhere.

20.  Because the treaties cannot establish navigability, and the United States Coast Guard's 1984 navigability determination relied on those treaties, the Coast Guard's navigability determination does not establish that the Rio Grande River is a navigable water of the United States and is not relevant to that determination. *United States v. Abbott*, 110 F.4th 700, 712 n.44 (5th Cir. 2024).

21.  "The Corps's 1975 Navigability Study fares no better" as "[a]ny evidence of past use in the Corps's study is too sporadic and exceptional to establish historical navigability." *Id.* at 712. Moreover, the 1975 Navigability Study erroneously relied on these statutes and treaties, as well as the Supreme Court's decision in *Rio Grande Dam* to establish navigability of the Rio Grande between River Miles 275.5 and 610.0. The 1975 Navigation Study and the Corps' determination of navigability thus was invalid and is not relevant evidence to prove that the Rio Grande River is navigable water of the United States at any point, including the site of the Buoys.

22.  Because bank-to-bank navigation does not count as evidence of navigability, historic ferry travel cannot demonstrate historic navigation. *Abbott*, 110 F.4th at 714.

**C. Susceptibility to Navigation following reasonable improvements**

23.  A river may be navigable if reasonable improvements could render it susceptible to commercial use. *Appalachian Elec.*, 311 U.S. at 407–08; *Abbott*, 110 F.4th at 708–09.

24.  The possibility of navigational improvements to a waterway does not suffice to show that it is navigable; the party contending a water is susceptible to navigation must show that the necessary improvements are also reasonable. *Id.* at 716–17.

25.  The reasonableness of improvements consists in showing their feasibility as a practical and legal matter and in showing that the proposed improvements can be accomplished with at least "a balance between cost and need at a time when the improvement would be useful." *Appalachian Elec.*, 311 U.S. at 408.

26.  Prospective improvements are reasonable only if the "costs…are justified by benefits." *Abbott*, 110 F.4th at 718. The showing required to prove navigability based on future

improvements includes (a) proof with reasonable certainty of the costs of the proposed improvements; (b) proof within reasonable certainty of the ensuing benefits to commercial navigation; and (c) proof that such benefits will equal of exceed the necessary costs at a time when the proposed improvements would remain useful. *Id.*

## II.   THE LISTED TERMS IN SECTION 10 SHOULD BE GIVEN THEIR ORDINARY, CONTEMPORARY MEANINGS

27.   Section 10 of the RHA prohibits the unauthorized construction of "any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in navigable rivers. 33 U.S.C. § 403.

28.   Unless given an express definition, statutory terms have the meanings that were in common usage at the time of enactment. *Rest. Law Ctr. v. United States Dep't of Labor*, 115 F.4th 396, 404–05 (5th Cir. 2024). Contemporary dictionary definitions can be relied on as sources of meaning. *Id.* (citing *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566–69, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012)).

29.   "Boom" means "a chain cable or line of spars extended across a river or the mouth of a harbor, to obstruct passage" Webster's New International Dictionary 254 (1930); *see also Lindsay & Phelps Co. v. Mullen*, 176 U.S. 126, 154 (1900) ("constructed" boom "extend[ed] across the main channel of the Mississippi river and into the territory of Wisconsin"); *United States v. Bellingham Bay Boom Co.*, 176 U.S. 211, 211 (1900) ("boom . . . constructed across the Nooksack river"); *Susquehanna Boom Co. v. West Branch Boom Co.*, 110 U.S. 57, 57–58 (1884) (similar).

30.   "Pier" means "a breakwater, groin, or mole extending into navigable water for use as a landing place…hence, a structure built out into the water with piles" Webster's New International Dictionary 1633 (1930); *see also Pound v. Turck*, 95 U.S. 459, 461 (1877) ("piers…across the stream"); *Bates v. Illinois Central R.R. Co.*, 66 U.S. 204, 207 (1861) ("constructed" pier "was run across" the river).

41

31.  "Wharf" means "A structure of timber, masonry, iron, earth, or other material, built on the shore of a harbor, river, canal, or the like, and usually extending from the shore to deep water" Webster's New International Dictionary 2322 (1930); *see also Greenleaf-Johnson Lumber Co. v. Garrison*, 237 U.S. 251, 256 (1915) ("continuous wharf of three sides" "made extension into the river from two points on the shore"); *Heckman v. Sutter*, 119 F. 83, 87 (9th Cir. 1902) (attempt "to construct a wharf . . . across the tide flats to the deep water")

32.  "Breakwater" means "a structure for breaking the force of waves, as a mole or sea wall" Webster's New International Dictionary 272 (1930); *see also Rio Grande*, 184 U.S. at 419 ("breakwater . . . across the Rio Grande or the waters thereof").

33.  "Weir" means "A dam in a river to stop and raise the water" Webster's New International Dictionary 2318–19 (1930); *see also Holyoke Co. v. Lyman*, 82 U.S. 500, 513 (1872) (statute prohibiting "any weir" "in or across rivers or streams").

34.  "Bulkhead" means "A structure of wood or stone to resist the pressure of earth or water; a partition wall or structure, as in a mine" Webster's New International Dictionary 289 (1930); *see also Appleby v. City of New York*, 271 U.S. 364, 386 (1926) ("city erected a bulkhead outshore from such westerly line and filled up the space between it and the old bulkhead and destroyed the use of the wharf").

35.  "Jetty" means "a structure, as a pier or mole of wood or stone, extended into a sea, lake or river, to influence the current or tide" Webster's New International Dictionary 1162 (1930); *see also Zeller v. American International Corp.*, 292 F. 822, 823 (3d Cir. 1923) (US "built a stone jetty . . . diagonally down the river . . . to deflect the current").

36.  "Dolphin" means "a mooring post or posts on a wharf or beach" Webster's New International Dictionary 659 (1930); *see also Philadelphia v. Standard Oil Co. of Pennsylvania*, 12 F. Supp. 647, 648 (E.D. Pa. 1934) ("a line of dolphins" together with a wharf "extend into the river").

37. The Buoys are not a wharf, pier, dolphin, boom, weir, breakwater, bulkhead, [ or]jetty" those terms are used in the RHA.

### III. THE MEANING OF "OTHER STRUCTURE" REFERS TO ITEMS THAT BLOCK MOVEMENT ALONG A WATERWAY

38. Section 10 of the RHA ends its list of prohibited marine and riparian works with the general term, "other structure."

39. When a statute ends a list of specific items with a general 'catchall' term, courts should apply the canon of *ejusdem generis* to construe the catchall to refer only to items similar in nature to the enumerated terms. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (canon turns on the "common attribute" shared); *see also Yates v. United States*, 574 U.S. 528, 545–46 (2015) (plurality op.).

40. The list that appears in Section 10 contains permanent structures that extend across a waterway. Section 10 structures—i.e. booms, piers, wharfs, breakwaters, weirs, bulkheads, jetties, dolphins—all are 1) immovable once installed and 2) block movement along a watercourse due to their orientation perpendicular to the current.

41. Therefore, the term "other structure" only refers to similar items that are permanent and perpendicular.

42. Therefore, for the buoys to constitute an "other structure" they must extend across the River, rather than along it, and must be permanently moored to the riverbed, instead of fixed in place by movable weights.

43. The Buoys are not an "other structure" as that term is used in the RHA.

### IV. SECTION 10 OF THE RIVERS AND HARBORS ACT DOES NOT APPLY TO STATES LIKE TEXAS

44. The RHA's Section 12 authorizes relief against "persons" and "corporations", but not against sovereign States. There is a longstanding legal presumption that when statutes impose liability on "persons" or "corporations", that does *not* include a sovereign like Texas. *E.g., Return Mail, Inc. v. U. S. Postal Service*, 139 S. Ct. 1353, 1861–62 (2019);

*Will v. Michigan Dept. of State Police*, 491 U. S. 58 (1989); *Freimanis v. Sea-Land Serv., Inc.*, 654 F.2d 1155, 1160 (5th Cir. 1981).

## V.     THE SOLE REMEDY FOR A SECTION 10 VIOLATION IS AN INJUNCTION FOR REMOVAL

45.   The First Amended Complaint seeks permanent future injunctive relief against "any work that may impede or interrupt, in whole or in part, navigation on the Rio Grande" River, but this relief as to the entire 1250+ miles of the Rio Grande that forms Texas's border grossly exceeds any area of the Rio Grande that Plaintiff can prove to be a navigable water of the United States. The relevant area for any relief in this case (and none is warranted here) is limited to the current location of the Buoys only.

46.   The United States seeks vague "Obey the Law" injunctive relief that violates the requirement of Rule 65, Fed. R. Civ. P. that injunctions must be "specific in terms and describe in reasonable detail . . . the acts to be restrained," and is legally impermissible. *NLRB v. Express Pub. Co.*, 312 U. S. 426 (1941); *Payne v. Travenol Laboratories, Inc.*, 896, 898 (5th Cir. 1978) ("Obey the Law" injunctions cannot be sustained); *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981); *Russell C. House Trans. & Stor. Co. v. United States*, 189 F.2d 349, 352 (5th Cir. 1951); *Ledge Lounger, Inc. v. Luxury Lounger, Inc.*, 2024 U. S. Dist. LEXIS 25556 (S. D. Tex. 2024) ("Obey the Law" injunctions are overbroad and vague).

47.   The sole injunctive relief authorized by the Section of the RHA on which the United States sues (Section 12) is a *mandatory* injunction to require a defendant to remove an unlawful obstruction. Where a statute provides specific remedies for a violation, no other remedies are permissible for violation of that statute, so no other injunctive relief sought by the United States may be granted. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U. S. 320, 327–28 (2015) (courts of equity can't ignore statutory remedy limits); *Barnacle Marine Mgmt., v. United States*, 233 F.3d 865, 870 (5th Cir. 2000) (courts should "be reluctant to imply a remedy broader than Congress has expressly provided).

**VI.**    **FOR ANY INJUNCTIVE RELIEF, PLAINTIFF WOULD NEED TO SHOW THE BALANCE OF EQUITIES FAVORS GRANTING IT**

48.    Equity courts have historically employed a Four-Factor Test for determining whether a claimant is entitled to permanent injunctive relief. "The test requires a plaintiff to demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, L. L. C.*, 547 U. S. 388, 391 (2006); *Yeti Coolers, L. L. C.. v. Mercatalyst, Inc.*, 2024 U. S. Dist. LEXIS 50151, 2024 WL 1216726 (W. D. Tex. 2024 (Ezra, J.) at *15.

49.    The District Court has previously held that it is acting as a court of equity in this case and has discretion with respect to equitable remedies in this case. Order dated August 30, 2024 (ECF 220). Assuming this is correct, Plaintiff must carry its burden to meet the Four Factor Test in this case, in addition to establishing that the Buoys violate the RHA.

50.    The traditional Four-Factor Test applies even when the Government seeks to enforce a public interest statute by injunctive relief, absent a clear command to the contrary from Congress. *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024); *United States v. Abbott*, 110 F.4th 700, 719 (5th Cir. 2024) (en banc).

51.    The RHA includes nothing that "overcomes the presumption that the four traditional criteria" apply. *United States v. Abbott*, 110 F.4th 700, 719–20 (2024) (preliminary injunction) (en banc). The language of the RHA contains no "specific instruction that suggests Congress altered the traditional equitable rules." *Id.*, quoting *Starbucks v. McKinney*, 144 S. Ct. 1570, 1577 (2024).

52. The sole Constitutional purpose of the RHA is to protect interstate and foreign water-borne commerce, and the Buoys have not harmed any such commerce, much less "irreparably" harmed such commerce.

53. The alleged harms to U. S. relations with Mexico from the Buoys are unrelated to the concerns or purposes of the RHA and would not be irreparable even if they existed.

54. Texas's actions in its own territory in defense of its borders pursuant to the Constitution cannot cause cognizable "irreparable harm" because a foreign nation disapproves of them.

55. The Impact of the Buoys on U. S.-Mexico relations was temporary and minor, not substantial and irreparable.

**VII.   AS A SOVEREIGN STATE TEXAS HAS A RIGHT TO SELF-DEFENSE FROM ACTUAL INVASION**

56. Under the United States Constitution, the United States was delegated certain powers, but the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, or to the people. 10th Amendment, United States Constitution.

57. Under Article I, Section 10 of the United States Constitution, a State when actually invaded, may engage in war to defend itself against invasion without the consent of Congress.

58. Future Chief Justice John Marshall referred to Article I, Section 10 of the United States Constitution in the Debates of the Virginia Convention (June 16, 1788) when he affirmed that the States "when invaded, may engage in war, as also when in imminent danger." This conclusion then was reinforced by future President James Madison, who was an author of the U. S. Constitution. 10 The Documentary History of the Ratification of the Constitution (John P. Kaminsky et al. 1976-23), at 1307.

59. An "invasion" at the time the United States Constitution was adopted was not understood to be synonymous with "war". The Massachusetts Constitution of 1780

spoke of a time of "war or invasion". Mass. Constitution, Part the second, chapter 2, § 1, art. VII.

60.  An "invasion" at the time the United States Constitution was adopted was not understood to be limited to actions by formal military forces, or to actions by persons acting at the direction or behest of any foreign government. Participants in the Constitutional debates referred to "invasions of barbarous tribes," "invasion of the savages," and "hostile invasions of lawless and ambitious men intending . . . to . . . introduce anarchy, confusion, and every disorder." Natelson & Hyman, The Constitution, Invasion, Immigration, and the War Powers of States, 13 Brit. J. of Am. Legal Studies 1, 23 (2024).

61.  In Federalist No. 41, James Madison referred to attacks along the Atlantic coast by "licencious [sic] adventurers . . . daring and sudden invaders."

62.  Under Article IV, Section 4 of the United States Constitution, the United States Government shall protect each State of the Union against invasion.

63.  In Federalist No. 43, James Madison justified a broad meaning of "Invasion in Article IV, Section 4 of the U. S. Constitution by stating, "The latitude of the expression here used, seems to secure each state not only against foreign hostility, but against ambitious or vindictive enterprizes [sic] of its more powerful neighbors."

64.  An "invasion" may be accomplished by relatively small groups of people and may be accomplished by stealth as well as by force. The United States Supreme Court in *Ex Parte Quirin*, 317 U. S. 1, 20 (1942), referred to eight German saboteurs who entered the United States by stealth in darkness as "invaders." This was so even though some of the invaders were Untied States citizens, and all had previously been United States residents.

65.  An "invasion" as that term is used in the United States Constitution, includes any unauthorized and uninvited course of action across a border that cause or threatens to cause significant detriment beyond the fact of the crossing of the border.

66.    Since 2022 or earlier, Mexican drug cartels and persons authorized by them have engaged in an unauthorized and uninvited course of action across the Southwest Border of Texas and the Rio Grande River that has caused and threatened to cause significant detriment beyond the fact of the crossing of that Southwest Border, and constitutes an invasion of Texas as that term is used in the United States Constitution.

67.    Within the meaning of the United States Constitution, including Article I, Section 10, and Article IV, Section 4, the State of Texas has been actually invaded since 2022 or earlier, and has been since that time and is now the subject of an invasion as that term is used in the United States Constitution, across the Southwest Border of Texas and the Rio Grande River, including but not limited to Maverick County, Texas.

68.    A State that has been actually invaded has the right to place and use defensive barriers at or near its borders to defend against and deter incursions and acts of invasion.

69.    Texas has had at all times since 2022, and has the right now, under the United States Constitution to place and maintain floating barriers (including the Buoys) in the Rio Grande River within the boundaries of the State of Texas, including Maverick County, Texas, to defend against and deter acts of invasion.

70.    The acts of the State of Texas and Governor Greg Abbott his official capacity in placing a floating barrier in the Rio Grande River in Maverick County, Texas at the Barrier Site are lawful exercises of the Constitutional rights of the State of Texas.

71.    The acts of the State of Texas and Governor Greg Abbott in his official capacity in placing a floating barrier in the Rio Grande River in Maverick County, Texas are privileged and superior in right as against any attempted regulatory enforcement claim under the Rivers and Harbors Act.

72.    The State of Texas and Governor Greg Abbott his official capacity have no liability to Plaintiff United States of America under the RHA and are entitled to judgment in their favor on all claims against them in this action.

73. The State of Texas and Governor Greg Abbott, in his official capacity, timely and properly asserted Texas's right to defend itself under the United States Constitution as an affirmative defense to Plaintiff's claim in this action under the Rivers and Harbors Act.

74. Texas's Constitutional right to defend itself is a legally valid affirmative defense against Plaintiff's claim under the Rivers and Harbors Act because a Constitutional right cannot be defeated or abridged by Congressional regulatory legislation or federal agency regulation or actions.

75. Whether Texas has been actually invaded within the meaning of the United States Constitution and therefore has a Constitutional right to defend itself against such invasion is a nonjusticiable political question committed by the Constitution to each State and the officers authorized to so determine under each State's Constitution.

76. The Governor of Texas is the highest executive officer of Texas under its Constitution and the person authorized to determine whether Texas has been actually invaded within the meaning of the United States Constitution.

77. The good faith determination of the Governor of Texas that Texas has been actually invaded within the meaning of the United States Constitution is not subject to negation or adjudication in this or any other federal court because it presents a nonjusticiable political question.

78. Because Texas's Affirmative Defense is legally valid and is not subject to negation or adjudication by Plaintiff in this Court, Plaintiff's claim against Texas under the Rivers and Harbors Act fails and Plaintiff may not recover any relief on that claim in this Court.

79. Alternatively, assuming arguendo that Texas's Affirmative Defense does not present a political question and is justiciable, then Texas's Affirmative Defends is valid, has been established. Plaintiff's claim against Texas under the Rivers and Harbors Act therefore fails and Plaintiff may not recover any relief on that claim in this Court.

Dated October 24, 2024

Respectfully submitted,

KEN PAXTON
Attorney General of the State of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN WALTERS
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

*/s/ David Bryant*
**DAVID BRYANT**
Senior Special Counsel
Tex. State Bar No. 03281500
david.bryant@oag.texas.gov

**JOHNATHAN STONE**
Special Counsel
Tex. State Bar No. 24071779
Johnathan.stone@oag.texas.gov

**MUNERA AL-FUHAID**
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

**KYLE S. TEBO**
Special Counsel
Tex. State Bar No. 24137691
kyle.tebo@oag.texas.gov

**ZACHARY BERG**
Special Counsel
Tex. State Bar. 24107706
Zachary.Berg@oag.texas.gov

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

On October 24, 2024, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ David Bryant*
**DAVID BRYANT**
Senior Special Counsel