# Exhibit D
## Deposition of Ancil Taylor (Excerpts)

Page 1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DIVISION OF TEXAS
2                  AUSTIN DIVISION
3
4
5    UNITED STATES OF AMERICA
                                            PLAINTIFF
6
7    VS.                    CASE NO. 1:23-CV-00853-DAE
8
     GREG ABBOTT, IN HIS
9    CAPACITY OF GOVERNOR OF
     THE STATE OF TEXAS , AND
10   THE STATE OF TEXAS
                                            DEFENDANTS
11
12
13
14
              DEPOSITION OF ANCIL TAYLOR
15
16
17
       Taken at the instance of the Plaintiff at the
18       U.S. Attorney's Office for the Southern
       District of Mississippi, 501 East Court Street,
19           Jackson, Mississippi, on Wednesday,
            July 3, 2024, beginning at 9:40 a.m.
20
21
22
23              * * * * * * * * * * * *
24
            REPORTED STENOGRAPHICALLY BY:
25            SHANNA CUMBERLAND, CCR #1774
                 Job No. CS6778924

```
 1    APPEARANCES:
 2
 3         ANDREW KNUDSEN, ESQ.
           U.S. Department of Justice
 4         Environment and Natural Resources Division
           Environmental Defense Section
 5         Post Office Box 7611
           Washington, DC 20044-7611
 6         Telephone:  (202)514-6187
           Facsimile:  (202)514-8865
 7         Email:  Andrew.Knudsen@usdoj.gov
 8
                 COUNSEL FOR PLAINTIFF
 9
10
           JOHNATHAN STONE, ESQ.
11         Office of the Attorney General
           Special Litigation Division
12         Post Office Box 12548
           Austin, Texas  78711-2548
13         Telephone:  (512)936-2613
           Facsimile:  (512)457-4410
14         Email:  johnathan.stone@aog.texas.gov
15
                 COUNSEL FOR DEFENDANT
16
17
18
19
20
21
22
23
24
25
```

1    location.
2              So it's probably not five feet deep and
3    it's probably not one foot deep, and I had to pick a
4    number.  Then I -- because it was an assumption, I
5    put a table in here that said, well, if it was one
6    foot deep, this is what the quantity would be.  If
7    it was five or six feet, whatever the table had in
8    it, I don't recall.  It's in the report as to what
9    the quantities would be.
10        Q.   Is that assumption an estimate of the
11   average depth across the width of the channel?
12        A.   Full 250.  The 250-foot channel, correct.
13        Q.   Okay.  Thank you.
14             Do you know the composition of the
15   materials underneath the Rio Grande?
16        A.   No, I don't know it.  I have certainly
17   experienced in the -- in the area, the region.  I
18   have asked people that have been on the site, people
19   that I've worked with over the years just in
20   conversation, I said, "What's the material here?"
21             I have worked and dredged the channels
22   in -- on the Brazos and Brownsville and Corpus.  I'm
23   familiar with coastline area where the Rio Grande
24   enters the Gulf of Mexico, and I'm also familiar
25   with the type of material that is in that region

1    whether it's caliche or limestone.  And one of the
2    experts, TJ Seramantero (phonetic), I believe
3    it's -- I'm sure I'm pronouncing his last name
4    incorrectly.  He visited the site and was able to
5    help me image it through FaceTime video.  He was on
6    site.
7              I asked him to, you know, take me to some
8    shoreline locations and let me see the material to
9    confirm that it was consistent with what I expected
10   it to be, which would be a limestone and sand,
11   gravel type of material in some locations.  And the
12   features that I saw in the river were -- appeared to
13   be limestone rock.  And the fragmentation of
14   limestone will occur in such an environment and
15   create limestone gravel.  Some of them can be large
16   rocks.
17             So that's -- that's what informed the type
18   of dredging equipment that I believe would be
19   necessary in order to -- to do the work on the Rio
20   Grande.
21       Q.   So let me try and understand.  You did not
22   visit the river, yourself, but another one of Texas'
23   experts, Mr. Seramantero (phonetic), video
24   conferenced you from a visit that he was making to
25   the river; is that right?

1      A.   That's correct.
2      Q.   Okay.  And about how long were you on this
3   video call with him?
4      A.   I didn't record it.  I don't recall.
5   Maybe 15 minutes, 20 minutes, something like that.
6   We had a couple of disconnects and had to reconnect
7   a few times.
8      Q.   Were you able to direct him to certain
9   features on the river that you were interested in
10  seeing?
11     A.   Well, he didn't have a lot of mobility
12  from, you know, where he was.  He didn't have
13  certain -- the ability to look at the satellite
14  images that I had, but I wanted him to get into the
15  shoreline so that I could see the interaction
16  between the water and the sediment that was on the
17  shore.  You can see the type of material a little
18  bit more clear on -- around the shoreline as it's
19  washed, as opposed to being up on land and crushed
20  by trucks and whatever.
21     Q.   Was Mr. Seramantero (phonetic) on a boat
22  when he was having this call with you?
23     A.   Not while he was talking with me.  I don't
24  believe he was.
25     Q.   Was he walking along the shoreline?

```
 1         A.   Yes.
 2         Q.   Do you know what part of the Rio Grande he
 3    was standing in as she shared this information with
 4    you?
 5         A.   I don't know for sure, but I think he was
 6    in the Eagle Pass range.
 7         Q.   Do you know if it was at the location of
 8    the floating barrier that's at issue in this case?
 9         A.   I don't recall it being in the FaceTiming
10    that we were -- we were doing.  I have seen the
11    barrier in videos and pictures, but I can't recall
12    if it was on that FaceTime event that I had with him
13    or not.
14         Q.   Did you learn any other information about
15    the river from this call with
16    Mr. Seramantero (phonetic)?
17         A.   I was primarily interested in the material
18    that was on the shoreline to confirm that my belief
19    was that we had to go in there with a marine
20    excavator, we had to remove this stuff mechanically
21    from the bottom.  That's what my major concern was.
22         Q.   Did you develop any knowledge about the
23    river's depth at this point based on your call with
24    Mr. Seramantero (phonetic)?
25         A.   Not based on the call, no.
```

1   two countries.  It's not uncommon when, say, within
2   a state or even two states or -- like on the
3   Mississippi River, but here we're talking about
4   changing the boundary where, if Mexico wants to hold
5   on to their piece of land that's just got cut off
6   from the river bend, or U.S. wanted to hang on to
7   their piece of land, it would make a pretty good
8   challenge.  So I did consider it, but I didn't
9   pursue it because of that.
10       Q.   Are -- are tight river bends evenly
11  distributed across the length of the Rio Grande?
12       A.   No.  They're natural.  When you say evenly
13  distributed, is it like a pattern that's --
14       Q.   No.  Let me ask that differently.
15            Are there some stretches of the Rio Grande
16  that have more of these tight bends than other
17  stretches of the Rio Grande?
18       A.   Yes.
19       Q.   Okay.  What segment of the Rio Grande is
20  more likely to have narrow bends -- excuse me.
21            What segment of the Rio Grande is more
22  likely to have tight bends?
23       A.   I don't recall.  I mean, it's certainly
24  more visible on Google Earth to be able to zero in.
25            Are you talking about specifically, like,

1   what reach or what might cause the bends?
2         Q.   I'm wondering in general:  Are you more
3   likely to find tight bends on the portions of the
4   river close to its mouth or it's farther upstream
5   reaches?
6         A.   It really has more to do with the
7   riverbed, the type of material that it is and the
8   currents that are in a particular location.  River
9   bends are created by the currents eroding the
10  outside corner or the outside edge of a river.  And
11  the accretion of dirt or the accumulation of
12  material on the inside of that bend.  So the current
13  eats that outer bank, it goes around -- the curve
14  goes across to the other side, eats that other bank.
15              And those currents may be increased
16  because the geotechnical description of the riverbed
17  is not allowing the river to widen out.  It's
18  cutting a path of least resistance through this
19  material, which was resulting in a higher current
20  around the edge.
21              So it's the hydrodynamics of the river,
22  the current, the geotechnical conditions that caused
23  these bends to be created or not.
24        Q.   In developing the opinions in your expert
25  report, did you assume that this navigation channel

1    Waterway?
2         A.   I don't recall.
3         Q.   Okay.  Earlier we discussed your
4    assumptions regarding the type of material
5    underlying the Rio Grande in the upper regions of
6    the river, right?
7         A.   Yes.
8         Q.   What were you assumptions about that type
9    of material?
10        A.   A limestone, a caliche, a course sand and
11   gravel, and I think -- if you want to call it
12   limestone, a bedrock type of thing.  I would not be
13   surprised to see formations of bedrock present in
14   the area, as well.
15        Q.   And I think you testified earlier that
16   that assumption was based on evidence that you saw
17   through a video call with another expert that made a
18   visit to the site; is that right?
19        A.   That along with the features that you
20   could see on the river from Google Earth and the
21   type of material that was in the channel blocking
22   water flow down the river.  That is evident of
23   limestone degrading and breaking apart and migrating
24   its way down the river and accumulating in one
25   location.

1            So you could tell from -- and me knowing
2    what the characteristics, the geology is of the
3    area, combined with the fact that those boulders
4    were present, indicates that it's not -- I think I
5    have a good assumption in that regard.
6        Q.   Did you assume different materials
7    underlying different parts of the river?
8        A.   My assumption understands -- recognizes
9    that I can have relatively soft granular gravel on
10   one side of the river, but have a limestone
11   formation on the other side of the river.
12           Yeah, that's the reason for the type of
13   equipment that I assumed would be necessary for
14   the -- for the work to be done.  You've got to bring
15   to bear the equipment that will be able to handle
16   the broad spectrum of the character and material to
17   be in encountered.
18       Q.   Did you assume a different type of
19   underlying material in the reaches of the Rio Grande
20   that are closer to the Gulf of Mexico?
21       A.   Yes, yeah.
22       Q.   What type of materials did you assume
23   would be -- would need to be removed in the lower
24   reaches?
25       A.   Finer sand, silts that -- more of a river

```
 1   sediment once the river transport suspended
 2   sediments in the water as it goes down -- goes
 3   downstream.
 4             Once that river hits the Gulf of Mexico
 5   and encounters salt water, then those fine sediments
 6   that are in the waterway attract themselves to each
 7   other and they flocculate and they fall to the
 8   bottom.
 9             Clay particles are not round, they're
10   flat-shaped, if you've ever looked at clay
11   platelets.  And in their -- in fresh water, clay
12   platelets are negatively charged and positively
13   charged on the flat side versus the edge of
14   platelets.
15             I'm sure you won't be able to go to sleep
16   tonight thinking about all of this exciting stuff.
17             So when salt water comes in contact with
18   it, the salt water acts as a catalyst to cause the
19   two positive sides or the negative sides to come
20   together like this.  And when they attach this way
21   instead of this way, microscopically, they
22   flocculate together and become heavier in the water,
23   and they fall out to the -- to the seabed.  That
24   occurs when it hits salt water, which is what you
25   have in the tidal reach of the lower end of the
```

1    Rio Grande.
2        Q.   In developing the opinions in your report,
3    did you assume a dividing line in the river where
4    the materials change from one type to another type?
5        A.   Both dredge types could be utilized in
6    that transition zone.  Either the mechanical dredge,
7    with the heavy breakout forces for hard material,
8    could be used all the way to the Gulf of Mexico, or
9    the cutter dredge could be used through the
10   transition zone further up the channel than what I
11   assumed.
12            And this report, I broke it at the first
13   dam.  I said the cutter dredge is going to go after
14   the first dam, and then the mechanical equipment is
15   going to take over from there.
16       Q.   Does your assumption about where that
17   dividing line falls affect your estimates of the
18   cost in this project?
19       A.   You can see on the -- I know that this
20   spreadsheet has a cost per cubic yard for the two
21   types of the dredges.  I just need to find it.
22       Q.   Is it on a spreadsheet that begins with
23   the heading "Land cut up to pool one sea level."
24       A.   Yeah.  What number?
25       Q.   Can you try turning to the 15th page of